E-FILED
Friday, 14 January, 2005  11:51:50 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, AND COMPAQ TRADEMARK B.V. | § § § § § | |
| Plaintiffs | § § | Civil Action No. 04-3055 |
| vs. | § § | |
| MIDWEST INFORMATION TECHNOLOGY GROUP, INC. AND MICHAEL LAUBER, | § § § § | |
| Defendants. | § § | |

**PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW, Plaintiffs Hewlett-Packard Development Company, L.P., Hewlett-Packard Company and Compaq Trademark B.V., file this Response to Midwest Information Technology Group, Inc.'s Motion to Compel and for good cause would show this Court as follows:

**MITG'S CLAIM FOR LOST PROFITS DUE TO BREACH OF CONTRACT WITH A SUBSIDIARY DOES NOT ENTITLE IT TO THE INFORMATION AND DOCUMENTS SOUGHT**

Defendant Midwest Technology Group, Inc. ("MITG") was a vendor for Compaq Direct, Inc. ("CDI") pursuant to an agreement with CDI, a subsidiary of Compaq, Inc. ("Compaq"). MITG provided non-Compaq spare parts to Compaq customers and had the ability to also acquire and supply to customers in-stock Compaq parts through a Compaq channel, CSN. The agreement was entered into prior to the May 2002 merger of Compaq and Hewlett-Packard,

Company ("HP"). MITG has asserted breach of contract claims[1] against Plaintiffs related solely to its two contracts with CDI. Only one of the two contracts, the Standard Support Agreement (the "Agreement"), is relevant to the matters at issue in this Motion. In summary, MITG claims HP improperly diverted calls and/or sales away from MITG, in violation of the Agreement, thereby resulting in lost profits. In its Memorandum, MITG claims the requested information is relevant to the exclusivity provision of the Agreement and the diversion of monthly revenue. The fallacy of that argument is exposed by a brief explanation of the Agreement.

The Agreement between CDI, a subsidiary of Compaq, and MITG was executed in February 2002, prior to the merger of Compaq and HP. The Agreement remained in place after the merger, though there was a name change from CDI to HP Direct (CDI and HP Direct may be referred to herein as "Direct"). Pursuant to and during the term of the Agreement, MITG was to provide call center support and sell spare parts to CDI customers (as the term is defined in the Agreement) in exchange for monetary payments, as detailed therein. [A true and correct copy of the Agreement is attached as Exhibit "A-1" to the Crowley Declaration (the Crowley Dec. is Exhibit "A")]. Pursuant to the Agreement, MITG was compensated a minimum of $41,000 per month for the call center operations. As part of its customer support, MITG, using the CDI name, also sold spare parts to CDI customers. These parts were "multi-vendor" or "third party" parts, which were non-Compaq or HP parts, obsolete or legacy parts, which were Compaq or HP parts not in-stock in Compaq/HP facilities. Collectively these parts obtained from companies other than Compaq/HP were referred to as "sourced" parts. [Crowley Dec. 11]. Or MITG obtained in-stock Compaq/HP parts from Compaq/HP.

---

[1] On January 4, 2005 MITG filed a Motion to Amend its Counterclaim to allege a claim for tortious interference against Plaintiffs. Even if MITG is permitted to amend, that amendment should not affect the discovery at issue, as that claim deals with letters sent to identifiable entities on or around February 1, 2004 and not with HP's overall spare parts business.

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –                                     PAGE 2
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

If a CDI customer ordered sourced parts, MITG found a vendor, obtained the part from that vendor for shipment to the customer and invoiced Compaq/HP. Compaq/HP generated an invoice to the customer and reimbursed MITG for the cost of the part and paid MITG 75% of the gross profit on the part sale. If the customer ordered a Compaq/HP part that was in-stock, MITG ordered the part through Compaq/HP and Compaq/HP handled the rest of the transaction, i.e. supplied the part, shipped, and prepared the invoice. In this instance, no monies were paid to MITG for the sale of the parts. [Bloomquist Dec. 3–4, attached as <u>Exhibit "B"</u>]. Thus, the "revenue" paid to MITG was largely reimbursement for the cost of sourced parts and, to a lesser extent, profit on those parts[2].

The payment structure is important to understanding why the records Defendant seeks are irrelevant. MITG was paid (and earned profit) for the sale of sourced parts only. Compaq/HP sold only their own current parts for their own parts – they did not sell multi-vendor or their own obsolete parts. Direct/MITG's ability to provide these third party and obsolete parts was an added value MITG provided in servicing Compaq/HPDirect's customers. In fact, other arms of HP, including the Service Delivery Group (a part of the HP Customer Service Division), bought multi-vendor parts from MITG, as needed for maintenance, though this arrangement was outside the scope of the Agreement. [Crowley Dec. 13] Over 55% of MITG's sales were from sourced parts [Schmaderer Dec. 3, attached as <u>Exhibit "C"</u>], an area in which HP did not compete. All profit paid to MITG for sales under the Agreement were for sales of sourced parts, as the 75%-25% split did not apply to in-stock parts. [Bloomquist Dec. 5]. Therefore, HP's financial records are wholly irrelevant to MITG's damages claim, which is a claim for lost profits based on diverted business. Even if HP diverted the portion of the business on which MITG was paid

---

[2] Obviously, the only recoverable amount in the unlikely event MITG prevails would be the lost profits, as the portion of the revenue that was the reimbursement of expenses paid to others is not a loss to MITG.

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –                                    PAGE 3
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

on the profit split (which HP denies), it could not have diverted the business to an internal supply source because it did not have an internal source. [Crowley Dec.12]. Thus, HP's revenue and profit on spare parts sales is irrelevant to MITG's claim for damages, which is based on its alleged loss of profits and Plaintiffs' objections to Interrogatory No. 12, Request for Production Nos. 5, 14, and 20 are good objections.

### THE SMALL REVENUE DROP IN SALES OF PARTS ON WHICH MITG WAS PAID PROFIT SHOWS THAT THESE REQUESTS ARE FISHING EXPEDITION

MITG does not articulate a reason why it should have full access to revenue information for HP's entire spare parts organization, other than to say the information is relevant. However MITG has suggested that its alleged loss of revenue entitles it to look in HP's records. HP would show that any reduction in payments to MITG was on the profit generating business was a drop of less than 1/16th of the annual payments for spare parts sales paid to MITG [Schmaderer Dec 4]. The following key facts support this argument:

1. The general ledger documents produced by Plaintiffs show that MITG was paid $4,417,559 in 2002 and $4,191,730 in 2003, a difference of $225,829, on the portion of business on which MITG got a 75% profit split. [Schmaderer Dec 4]. These are <u>revenue</u> numbers, not profits; and

2. Over 55% of MITG's business pursuant to the Agreement and the majority of the monies paid to MITG were driven from its sale of third party spare parts or part options for Compaq/HP products, a market not serviced by any other group within HP [Schmaderer Dec. 3; Crowley Dec. 12]. The only money paid to MITG for sales of HP stocked parts to Direct customers was the $41,000 per month under the Agreement. [Bloomquist Dec. 4].

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

PAGE 4

The Direct organization serviced a specific customer set in the Compaq and HP worlds, and MITG was the only organization working with HP that provided third party spare parts or parts options for Compaq or HP parts to customers. No other arm within HP sold these parts. Thus, HP had no place to divert this business internally. HP's financial records would not shed light on monies that might have been paid to MITG for parts sales if the alleged diversion did take place, and therefore the records are irrelevant. Moreover, the small drop from year to year does not justify the burden to HP to produce such highly confidential, and clearly irrelevant, information. Clearly the burden outweighs any benefit that might be derived from MITG's fishing expedition.

### MITG'S CONTRACT WITH A SUBSIDIARY DOES NOT ENTITLE IT TO PROBE THE RECORDS OF THE PARENT COMPANY AND THE LATER ACQUIRING COMPANY

Despite the undeniable fact that the Agreement provides that MITG will service "CDI Customers," MITG propounded discovery upon Plaintiffs that encompasses the entire Hewlett-Packard organization[3]. There is no basis to read the Agreement to give MITG the exclusive right to sell spare parts to <u>all</u> customers of Compaq, let alone HP. Such discovery directed to revenue and call volume information from non-parties to the Agreement is improper for the following reasons:

1. Compaq and HP merged in May 2002, so pre-merger HP business is irrelevant to the matters at issue;

2. Compaq sold Compaq spare parts through other entities within Compaq in addition to the Direct organization prior to and during the time of the Agreement. Thus,

---

[3] To the extent the discovery lists a time period, it lists February 2002 to the present. MITG's letter and Motion revise the end date to February 2004. This revised time period is addressed herein.

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –    PAGE 5
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

information about other parts of Compaq serving other Compaq customers is irrelevant;

3. HP continued to sell spare parts post-merger through its existing organization unrelated to the Direct business and the Direct business continued to be serviced by MITG, making the HP spare parts business unrelated to MITG and irrelevant to this lawsuit.

The following facts support HP's position

1. The Agreement between CDI and MITG was executed in February 2002, prior to the merger of Compaq and HP;

2. Pursuant to and during the term of the Agreement, MITG was to provide call center support and sell spare parts to CDI customers (as the term is defined in the Agreement) in exchange for monetary payments, as detailed therein;

3. Direct/MITG sold "multi-vendor" or "third party" parts, which were non-Compaq or HP parts, and obsolete or legacy parts, which referred to Compaq or HP parts not in stock in Compaq/HP facilities. Collectively these parts obtained from companies other than Compaq/HP were referred to as "sourced" parts. [Crowley Dec 11];

4. HP and Compaq merged in May 2002 [Crowley Dec 5];

5. The Agreement remained in place until it expired and HP, in compliance with the terms of the Agreement, terminated it effective February 7, 2004 (there is no claim that the termination was wrongful) [Crowley Dec 14];

6. Prior to the merger of Compaq and HP, Compaq operated call centers for customer service purposes, with authorized resellers who sold Compaq spare parts

to Compaq end user customers through other channels unrelated to the CDI/MITG channel. Both the authorized resellers and Compaq Direct ordered Compaq parts through an application called CSN [Love Declaration 3, attached as Exhibit D];

7. Prior to the merger of HP and Compaq, HP operated calls centers for technical support and sales, provided web-based customer sales and service and sold spare parts for HP product through the Channels and Parts Division of HP Services [Crowley Dec 3];

8. After the merger, CDI, which was re-named HP Direct, continued to service the same customers and was accessed in the same way as before the merger [4] [Crowley Dec. 10];

9. After the May 2002 merger of Compaq and HP, HP integrated the operations of the two corporations and continued to provide call center support, provide web-based customer service and sales and to sell spare parts for HP and Compaq equipment [Crowley Dec. 5-6];

10. During 2003, HP consolidated various call centers into a single call center in Roseville, CA. The only call center not subject to the consolidation was the call center staffed by MITG [Crowley Dec 7];

11. Compaq/HP Direct customers were likely to be customers of Compaq (and then HP) and have multiple customer numbers depending on the subsidiary servicing and/or supplying part to them because the Compaq/HP parts or systems for which the customer needed support or spare parts were acquired through other

---

[4] There were two 800 numbers for CDI customers [800-848-4589 and 800-848-9771], and MITG operated websites using Plaintiffs' trademarks. The other call centers were accessed through different 800 numbers [Crowley Dec. 10].

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –     PAGE 7
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC