**E-FILED**
Friday, 14 January, 2005  11:54:10 AM
Clerk, U.S. District Court, ILCD

subsidiaries/groups within Compaq/HP.   Thus, throughout the term of the Agreement these customers had multiple means of access to and support providers from Compaq/HP [Crowley Dec.15];

12.    HP's annual revenue, from all points of access for spare parts sales, post merger, exceeded $170,000,000 [Crowley Dec 17].  Total payments to MITG for payment of parts ordered by Direct Customers, plus MITG's portion of the profit split on sourced parts[5], or by internal HP groups in need of third party parts, in 2002-2003 were approximately $10 million and, over the entire relationship (including prior to the Agreement being formalized in writing) were approximately $13.8 million. [Schmaderer Dec. 5].

As outlined above, CDI/MITG serviced a separate segment of Compaq customers in need of spare parts than did Compaq Services.  Compaq Services used authorized re-sellers to sell spare parts to its customers. Those re-sellers acquired parts through CSN, just as Direct/MITG did.  The two arms of Compaq operated independently of each other.  After the merger of HP and Compaq, CDI was re-named HP Direct and continued to service the same customer segment through its call center and website, to sell sourced part and obtain in-stock Compaq and HP spare parts from CSN.  Post-merger Compaq Services was combined with HP's Customer Support ("HPCS") and that organization continued to provide customer service through call centers and websites and to sell spare parts to its customers [Crowley Dec. 5-7].  Allowing MITG free access to records that clearly have no relationship to MITG is inappropriate.  This information is confidential and proprietary information of HP and involves a separate arm of the company that has no direct relationship to the Direct organization or this Agreement.

---

[5]   The 75%/25% profit split applied only to the sale of sourced parts.  There was no profit split on in-stock Compaq/HP parts [Bloomquist Dec. 5].

**PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION**
**TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –**                                    **PAGE 8**
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

Moreover, the majority of MITG's contact was with Compaq/HP customer service representatives ("CSRs") within the Direct organization that contacted MITG to acquire spare parts for their customers. [Crowley Dec. 16]  These same CSRs continued to contact MITG to meet their customers' spare parts needs post-merger (in fact, many of them continue to contact MITG now to acquire sourced parts for their customers).  MITG cannot present evidence of a single customer who was diverted by HP away from the Direct organization serviced by MITG to the HP Channel and Parts Division or another arm of HP, nor can it point to any communication or directive instructing call centers to send business elsewhere prior to the termination date of the Agreement. Further, MITG cannot show that HP interfered with MITG's 800 number service to rout calls from the MITG 800 numbers to a number serviced by another HP call center.   Rather, MITG, without support, speculates that HP was engaged in such activity.  Such speculation and conjecture do not make HP's financial records discoverable and simply results in a fishing expedition such as the one MITG is engaged in here.

Moreover, a look at call volumes of unrelated call centers does not provide any information on the alleged diversion of business.  These call centers pre-existed the Agreement and serviced other customers.  While it is true that a customer that should have contacted Direct/MITG may have called another HP 800 number, the call volumes will not reveal such a misdialed or misdirected call.  Nor does HP have records that show such information or from which such information can be gleaned[6].

The lack of justification for allowing MITG full access to HP's records is further demonstrated by a review of the finances involved.  MITG's relationship with Compaq/HP was with a small subsidiary, particularly in terms of spare parts revenue.  HP's annual revenue from

---

[6] HP did search for emails or other forms of communication relating to such misdirected or misdialed calls but did not locate any such documents [Crowley Dec 18; Chizek Dec. 4, attached as Exhibit E].

**PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –**                                                      **PAGE 9**
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

spare parts sales was over $170,000,000.  Direct/MITG generated approximately $10 million in revenue from the sale of in-stock Compaq/HP parts by acting as Compaq/HP Direct over that same time period.

HP has fully complied with its discovery obligations as to information and documents concerning the Direct business and Compaq/HP's dealings with MITG during the referenced time period.  HP's objections focus on MITG's attempt to explore HP's entire $100 million plus spare parts business, despite the utter lack of connection between MITG and other groups within Compaq/HP.  The enormity of HP's business, especially when compared to MITG's small size, shows both the lack of relevance of the requested information to this lawsuit, and the over breadth of MITG's requests.

## THE SPECIFIC DISCOVERY AT ISSUE

**INTERROGATORY NO. 11**: this interrogatory addresses other sources of spare parts to which Compaq/HP may have referred customers outside of HP.  Plaintiffs asserted objections and responded that it had no knowledge of Direct/MITG customers being referred to third parties for spare parts.  Answering beyond Direct customers serviced by MITG is inappropriate for the reasons discussed above.  There were multiple call centers and websites operated by Compaq/HP unrelated to MITG and serviced a different customer segment.  The Agreement gave MITG the exclusive right to sell to Direct customers only.  Sales to non-Direct customers are, therefore, irrelevant.  Moreover, HP call center representatives did not obtain or maintain information about a call that did not result in a sale by HP.  Thus, if a caller wanted a non-stocked part, the caller generally was given names of one or more third party distributors that might be able to supply the part.  Whether the caller purchased from that third party is beyond the records of HP. [Chizek Dec. 3].  HP's other call centers did refer their customers to third parties to acquire parts,

but have no records that would enable it to provide the information sought in Interrogatory No. 11.

**INTERROGATORY NO. 12:** this interrogatory is vague in that it appears to be seeking two different things. It requests information on "monthly revenues from the handling and processing of sales calls for spare parts, parts options for HP and pre-merger Compaq parts <u>pursuant to the Standard Support Agreement,</u> including but not limited to all service call centers...."[emphasis added]. Plaintiffs have produced documents showing monthly revenues relating to the processing of spare parts sales under the Agreement, which means that handling and processing by MITG of sales calls. No other call centers operated under the Agreement or handled or processed sales calls governed by the Agreement, thus there are not records or information to provide. The remainder of the objections address any attempt by MITG to interpret the Interrogatory to address monthly revenues for spare parts sales by all call centers. For the reasons discussed above, such information is irrelevant.

**REQUEST FOR PRODUCTION NO. 4:** Plaintiffs produced the four InFormer documents located that dealt with the Direct/MITG spare parts business during the term of the Agreement and, in an abundance of caution, they are attached (albeit in a different format) to the Ellis Declaration. [Ellis Dec. 3, attached as <u>Exhibit F</u>] The primary document sent via an InFormer was the internal letter to CDI employees about the transition of the spar parts business to Roseville. Three other short InFormers were also distributed. InFormer documents were the name given by Compaq Direct to internal communications to all CDI employees. Any InFormer documents outside the time of the Agreement that deal with spare parts sales unrelated to MITG would be irrelevant. Plaintiffs have no more documents to produce.

**REQUEST FOR PRODUCTION NO. 5**: this Request is another vague Request that can be read to request encompass the entire spare parts business of Compaq and HP, unrestricted by time, hence the objections as to vagueness, overbreadth, undue burden, and relevance. Furthermore, ordering of parts outside the Agreement is not relevant to the claim at issue, which deal only with an alleged breach of the Agreement. In an attempt to be responsive, Plaintiffs agreed to and did [Crowley Dec. 18] produce documents concerning the ordering of spare parts by or from MITG outside of the term of the Agreement, as Direct and MITG did some business prior to the execution of the Agreement.

**REQUEST FOR PRODUCTION NO. 7**: Plaintiffs are not withholding any documents based on their very valid objections. However, the objections were necessary and called for, as the Request has no time limit and subject matter. HP personnel with knowledge of the matters at issue in this lawsuit have searched for documents concerning training by or to MITG and located one or two documents. We are not aware not aware of any further documentation.

**REQUEST FOR PRODUCTION NO. 14**: documents regarding the handling and processing of all spare parts sales calls under the Agreement have been produced, as have all PBCOs that were located [Carroll Dec. 3, attached as Exhibit G]. The objections address any interpretation of this Request to encompass of documents relating to the handling of spare parts sales by all of Compaq/HP for the reasons discussed at length above.

**REQUEST FOR PRODUCTION NO. 15**: MITG is not entitled to all records of all Compaq/HP call center operations, as explained above. This Request, as written, certainly can be read that broadly, particularly if one simply uses the plain meaning of "processing," which could be interpreted to involve taking the order, filling the order, shipping the part, billing and collecting on the invoice. Additionally, during the year 2003, HP consolidated several call

centers so that the facility in Roseville, Caifornia handled all service calls, except those for Direct/MITG [Crowley Dec 7]. The consolidation process was an involved and complicated project dealing with the processing and routing of calls that is completely irrelevant to this litigation. In response to other requests HP has produced documents that refer to the phone numbers to reach Direct/MITG during the Agreement and the handling of calls to Direct after the termination of the Agreement [Carroll Dec. 2]. As stated in the response, HP does not have documents referring, relating, referencing, mentioning or discussing diverting, routing or processing sales calls intended for Direct/MITG.

**REQUEST FOR PRODUCTION NO. 20**: this Request is clear though, as discussed above, is over broad. Activity at unrelated call centers is not relevant to MITG's claims in this lawsuit. Further, Compaq/HP did not have a relationship with any other third parties similar to the Agreement, whereby the third party was known to the public, for instance, as Compaq/HP[7]. Plaintiffs did not keep records of nor have access to information on calls those third parties may have received, so could not provide the information requested as to "other venders." [Chizek Dec 3, 4].

## CONCLUSION

Plaintiffs have fully complied with their obligations under the Federal Rules. In fact, they produced many documents related to the Agreement and their dealings with MITG that were conceivably asked for in the Requests. Plaintiffs have produced over 6500 pages of e-mails, reports, memorandums, spreadsheets of financial information and other documents. MITG has not produced any documents, nor can it point to any basis for its claim that calls were diverted. Instead, it is trying to review the operation of HP's spare parts business to see if it has

---

[7] To be clear, MITG was Compaq/HP Direct for the purpose of the Agreement. The telephone was answered Compaq/HP Direct, and the website used trademarks owned by Compaq and HP (which MITG refuses to relinquish). All other third parties, such as authorized resellers, did business under their own names.

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL – PAGE 13
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

any basis for its claim. As set out above, the reduction in revenue paid to MITG under the Agreement is so small compared to the volume of business. It is inconceivable that it will locate the alleged diversion of $250,000 in business over a one-year period to another entity within HP, particularly when HP could not provide the third party or obsolete parts that generated most of MITG's revenue.

WHEREFORE, Plaintiffs respectfully request that this Court deny Defendant MITG's Motion in it entirety, sustain Plaintiffs' objections and grant to Plaintiffs such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

__/s Elizann Carroll_____
ELIZANN CARROLL
State Bar No. 00787209
JUNEAU, BOLL & WARD, P.L.L.C.
15301 Spectrum Dr., Suite 300
Addison, Texas 75001
(972) 866-8333
(972) 866-8378 *fax*

MOLLY BUCK RICHARD
State Bar No. 16842800
THOMPSON & KNIGHT, LLP
1700 Pacific Ave., Suite 3300
Dallas, Texas 75201
(214) 969-1700
(214) 969-1750 *fax*

SCOTT D. SPOONER
Heyl, Royster, Voelker & Allen
Suite 575 National City Center
1 North Old State Capital Plaza
P. O. Box 1687
Springfield, IL 62705
(217) 522-8822
(217) 523-3902 *fax*

ATTORNEYS FOR PLAINTIFFS

PLAINTIFFS' RESPONSE TO MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.'S MOTION TO COMPEL –                                   PAGE 14
F:\CASES\HP\DISCOVERY\RESPONSE TO MOTION TO MITG COMPEL.DOC

## CERTIFICATE OF SERVICE

I hereby certify that on this the 14th day of January, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of the filing to James Hansen, counsel for Defendants, and Molly Buck Richard and Scott Spooner, counsel for Plaintiffs.

/s Elizann Carroll
ELIZANN CARROLL
State Bar No. 00787209
JUNEAU, BOLL & WARD
15301 Spectrum Dr., Suite 300
Addison, Texas 75001
(972) 866-8333
(972) 866-8378 *fax*
ecarroll@juneauboll.com
