Condenselt™    Ronald Haught
E-FILED
Thursday, 12 May, 2005 03:54:09 PM
Clerk, U.S. District Court, ILCD

Page 245

Page 247

1  correspond with Mr. Bloomquist after his job
2  transfer, and there wasn't -- and you communicated on
3  a daily and everyday basis with Sherry Ellis, is that
4  right?
5     A. That's correct. I have also had
6  conversation with Charlie Boyle and Tony Barnett, and
7  there was somebody else. I don't remember.
8     Q. And what were -- were all of those
9  communications relating to the Standard Support
10 Agreement or --
11    A. Yes.
12    Q. Okay. What did you understand Mr.
13 Boyle's -- how did he get in the loop, do you know?
14    A. No, I don't remember how he got in there.
15    Q. You were also dealing with Mr. Boyle or he
16 was in the loop when there were issues regarding slow
17 payments on the service parts?
18    A. I do recall that, that's correct.
19    Q. And let me switch topics on you here.
20    A. Can we swing a break real quick?
21    Q. Sure.
22               (Whereupon a short recess
23                was taken.)
24    Q. Let me just turn abruptly so I make sure I
25 get questions about the tortious interference claim.

Page 246

Page 248

1     A. Sure.
2     Q. Tell me what the factual basis is for your

```
 1      A. Sure.
 2      Q. Tell me what the factual basis is for your
 3   claim that HP tortiously interfered with business
 4   relationships of MITG and MITG clients or customers
 5   in your counterclaim, and if you need to look at your
 6   counterclaim --
 7      A. No, that's all right.  For example, the
 8   supplier.
 9      Q. Well, let me try to break that out because
10   we have discussions about customers and then a
11   separate paragraph about suppliers.
12      A. Well, then let me see it.  Let me see that,
13   then.
14      Q. There you go.  And if they are one and the
15   same, that's fine, you can just tell me that, but I
16   want to make sure that we're distinguishing.
17      A. Okay.  I'm sorry.  Go ahead.
18      Q. So in the paragraphs, in 33, for example,
19   MITG developed valid business relationships with
20   customers, and there is discussion about that through
21   Paragraph 40, and then Paragraph 41 says, HP also
22   specifically intentionally instructed various
23   suppliers and distributors of MITG not to do further
24   business with MITG.  And so I want to break those --
25   if that's appropriate, I want to break those into who
```

HP and Compaq v. MITG
3:04-cv-03085-JES-CHE 04/19/13 Page 3 of 5
Condens

Page 249

1 are the customers and let's talk about that
2 interference and then who were the suppliers and
3 distributors and talk about that interference
4 separately.
5  A. That's fine.
6  Q. So starting with the customers, who -- what
7 customers did HP tortiously interfere with of
8 MITG's? Are there particular ones that you can
9 name? Are there a particular subset of customers?
10  A. I can name a few. Avnet would be one, for
11 example.
12  Q. Okay.
13  A. Baxter Healthcare. The rest of them are
14 it's just kind of a big jumble quite frankly.
15  Q. Okay. Tell me about Avnet, what kind of
16 customer -- well, when did they first become a
17 customer of MITG's, whether as Compaq Direct or HP
18 Direct or whatever?
19  A. I can't answer that. I mean, they have
20 been a customer for a long time.
21  Q. Do you know if they were a customer before
22 the Standard Support Agreement went in place?
23  A. I believe so.
24  Q. Okay. Were they a customer based on the
25 relationship when MITG was servicing customers of CEI

Page 250

1 or Compaq Direct prior to the Standard Support

24      Q. Okay. Were they a customer based on the
25   relationship when MITG was servicing customers of CEI

Page 250

1   or Compaq Direct prior to the Standard Support
2   Agreement?
3      A. I can't answer that. I don't know.
4      Q. Okay. And tell me -- do you know how much
5   business on an annual basis Avnet was doing with MITG
6   and in whatever aspect?
7      A. What capacity? No.
8      Q. All right. Do you know if there is any way
9   that there is a report that could be run that would
10  show what Avnet did in terms of business, for
11  example, in 2002, 2003?
12     A. That is possible, I believe.
13     Q. All right. Tell me what you know about the
14  alleged tortious interference by HP of the
15  relationship between MITG and Avnet?
16     A. My understanding is they were visited as
17  well as several other customers were visited by an HP
18  representative and were informed that MITG was to,
19  they were to no longer do business with MITG and that
20  any subsequent business after this visit would
21  constitute a breach of any agreement that they had
22  with HP. Now, I'm not privy to what that agreement
23  is so to speak, but --
24     Q. So do you -- well, did somebody at Avnet
25  tell you that directly?

**Gina L. Nottingham, C.S.R.**

1  A. We actually had some higher level sales
2  managers contact us, and then we contacted their
3  legal counsel.
4  Q. Okay. Who were the -- can you give me the
5  names of the Avnet sales personnel that contacted
6  you?
7  A. No, I can't.
8  Q. All right. Who did they contact at MITG,
9  you or somebody else?
10  A. I believe they actually contacted Mr. Rice,
11  if I'm not mistaken.
12  Q. Okay. And you don't know who those people
13  were? You don't know their names as you sit here?
14  A. No. Again, as I testified earlier this
15  morning, we just really started this tortious
16  interference thing. It was only a month and a half
17  old, so we are still developing all that information.
18  Q. Well, when did you learn about this Avnet
19  issue? When did Mr. Rice report to you that Avnet
20  reported this contact from HP?
21  A. End of February, first of March, possibly
22  April.
23  Q. Of last year?
24  A. Of last year.
25  Q. All right. And did you -- you said that

1  after hearing this from the sales rep you contacted