Page 257

1          MS. CARROLL: Q. All right.  And did
2 Stephanie Boden tell you who she spoke with at Baxter
3 Healthcare?

4    A. I don't recall specifics about that, no.

5    Q. Okay.  Do you -- did you ever have any
6 contact with Baxter Healthcare after Miss Boden
7 reported this information to you?

8    A. No.

9    Q. Are you aware of any documentation that
10 would show how much business Baxter Healthcare was
11 doing with MITG under the Standard Support Agreement
12 up to the termination date of the Standard Support
13 Agreement, how much annual business was being done?

14    A. No.  I believe that actually could be
15 pulled from your records.  I don't know that I would
16 have that necessarily.

17    Q. Do you have records that would show how
18 much business either Avnet or Baxter Healthcare did
19 with MITG from the termination of the Standard
20 Support Agreement until the alleged statements were
21 made by an HP representative?

22    A. That's possible, but I reserve the right to
23 check into that because I can't answer that for
24 certain.

25    Q. You don't know for sure?

Page 258

1    A. I don't know for certain, no.

24 certain.
25    Q. You don't know for sure?

1    A. I don't know for certain, no.

2    Q. Okay. Are there any other companies that

3 you recall the names of while you sit here today that

4 you have been told by someone got a visit from an HP

5 person or communication from an HP person telling

6 them not to do business with MITG?

7    A. Insight was one, and I don't recall

8 anymore. I mean, those are the three that stick in

9 my head.

10       MR. HANSEN: Are you talking about

11 suppliers or distributors?

12       MS. CARROLL: I'm still sticking to

13 customers.

14       THE WITNESS: Okay.

15       MS. CARROLL: Q. So is Insight -- we are

16 going to wait for Insight on suppliers and

17 distributors, or are they customers?

18    A. No, they are a customer. And I'm thinking

19 Multiple Zones, which would have been Microsoft.

20 It's a subsidiary of Microsoft.

21    Q. Multiple Zones?

22    A. Multiple Zones. Those are the only ones

23 that pop out.

24    Q. Well, who at Insight reported this contact

25 from HP?



**Gina L. Nottingham, C.S.R.**

xter

was

ment

one?

1     A. I don't know.

2     Q. Who reported the contact to you?

3     A. I'm not exactly certain to be honest with

4 you.

5     Q. Was it somebody from your organization told

6 you, hey, Ronnie, listen to what I heard from

7 Insight?

8     A. Yeah.  You know, typically the conversation

9 would go, hey, this is what I just got told, and, oh,

10 by the way we've been shut off or shut down and they

11 have asked for no further communication.

12     Q. How long had Insight been doing business

13 with MITG prior to this communication that you allege

14 occurred?

15     A. Years.

16     Q. Do you have documentation that would show

17 when you first began, when MITG first began to do

18 business with Insight?

19     A. Possibly.  I don't know for certain.

20     Q. And you don't know who any contact person

21 would be for Insight?  Well, for example, do you

22 have -- would have you in your record contact names

23 of people who were ordering parts on behalf of Avnet,

24 Baxter, Insight, or Multiple Zones from MITG?

25     A. Yes.

1     Q. So at least you would have the names of

2 people who at the time of the order had the

24  Baxter, Insight, or Multiple Zones from MITG?
25      A. Yes.

Page 258

Page 260

hat

lay that

m an HP

telling

k in

1      Q. So at least you would have the names of
2  people who at the time of the order worked for these
3  companies who were communicating with MITG?
4      A. Yes.
5      Q. Have you at any time made any attempt to
6  contact those people whose names you do have for
7  these companies to ask them, you know, what's going
8  on or what they, you know, this is what you heard
9  and --
10      A. Attempts have been made, but in every case,
11  at least to the best of my recollection, the calls
12  either aren't returned or correspondence is just
13  replied back as, you know, we have been told we can
14  no longer do business with you, thank you.
15      Q. Do you have correspondence that you believe
16  someone responded to you via e-mail or letter?
17      A. I believe these are all phone calls.
18      Q. And did you personally make phone calls to

ing

osoft.

19  any of these four companies or any other companies to
20  people, the individuals who had ordered parts
21  previously and you personally asked them, hey, I

s

22  heard that HP contacted you, I'd like to talk to you
23  about it?

t

24      A. No.
25      Q. And who for MITG made those contacts, to

Page 261

1  your knowledge?

2      A. Could have been Rich Rice, could have been

3  any of the sales reps directly trying to find out

4  exactly what's going on through their contacts.  I

5  can't answer that.

6      Q. Other than the four you've identified --

7  and I take it Multiple Zones was similar information

8  which was one of your sales reps told you that they

9  were told by someone at Multiple Zones that HP said

10 don't do business with MITG?

11     A. Yes.

12     Q. All right.  Are there any other companies

13 that you can think of while you sit here that you've

14 heard that information?

15     A. Not that I can specifically recall names of

16 companies, no.

17     Q. Well, do you believe that at some point you

18 heard names of other companies and you simply don't

19 recall what those are as you sit here having your

20 deposition taken?

21     A. That is possible, yes.

22     Q. Okay.  All right.

23     A. Oh, that's correct.  There is another one.

24     Q. All right.

25         MR. HANSEN: While you're here.

Page 262

1          MS. CARROLL: No.  That's fine.  I don't

24    Q. All right.
25        MR. HANSEN: while you're here.

Page 26

1        MS. CARROLL: No. That's fine. I don't
2 want to come back. Tell me?
3    A. The other one would be CDW.
4    Q. And who is the contact person at -- CDW was
5 a customer of MITG's?
6    A. That's correct.
7    Q. Were they doing business with MITG under
8 the Standard Support Agreement?
9    A. I believe prior to.
10    Q. Okay. Were -- did they do it during the
11 time that MITG was being Compaq Direct or HP Direct?
12    A. I can't answer that. You get too far
13 back. It's --
14    Q. Well, so it's clear, before the Standard
15 Support Agreement CDW was doing business with MITG
16    A. Correct.
17    Q. After the Standard Support Agreement for
18 some period of time did CDW go back to, did they
19 continue to do business with MITG after February 7th
20 of 2004?
21    A. I believe so, yes.
22    Q. Okay. And when did they cut off doing
23 business with MITG?
24    A. I can't answer that.
25    Q. Did you personally have any contacts with

**Gina L. Nottingham, C.S.R.**

1  anybody from CDW?

2      A. No.

3      Q. All right.  And do you know if anyone --

4  well, who reported to you about CDW, do you recall

5  which one of your folks?

6      A. I don't recall who specifically, no.

7      Q. Now, in the amended -- in your amended

8  counterclaim there is reference that HP sent a letter

9  to the top MITG accounts as part of the agreement

10  terminating and --

11                    (Whereupon a document was

12                        marked Deposition Exhibit

13                        Number 28.)

14      Q. Exhibit 28, this is a January 30, 2004,

15  dear parts customer letter that went from HP.  Do you

16  know if Exhibit 28 is the letter that is being

17  referred to in Paragraph 37 of your amended, 37 and

18  38 of your amended counterclaim?

19      A. Is that the specific letter?

20      Q. Yeah.  Do you know when it's referring to a

21  letter in January that a letter was sent out to these

22  customers without their acknowledgment or consent of

23  MITG indicating process changes as to the ordering of

24  parts, account numbers, and other information

25  regarding the placement of parts orders, and what I'm

1  wondering is the reference, the description of the

1  wondering is the reference, the description of the

2  letter and the amended counterclaim if the

3  correspondence that has been marked as Exhibit 28,

was   4  the January 30, 2004, letter, is the same letter

5  that's being referenced?

6        MR. HANSEN: Let me just object to the

ler   7  form, that it is completely prepared by counsel.

8  It's not a verified complaint. And if he knows, go

9  ahead.

10       MS. CARROLL: Q. Yeah.

P Direct?  11   A. I don't.

12    Q. Have you ever seen the letter that is in

13  front of you, the January 30 letter that's Exhibit

14  28?

ith MITG?  15   A. Yes.

16    Q. Okay. Looking through that letter, do you

or   17  take issue with the accuracy of any of the statements

hey   18  made?

ıry 7th   19   A. Okay. I'm sorry. Your question was?

20    Q. Is there anything in that letter that to

21  your knowledge or understanding is incorrect?

22    A. Incorrect, no. I believe your question

23  earlier was that I take issue with.

24    Q. Okay. Well, and I didn't mean to ask you a

th   25  different question. It's a good thing you asked me