Thursday, 12 May, 2005 03:59:11 PM
Clerk, U.S. District Court, ILCD

Page 265

1 to repeat it. Is anything incorrect? The answer is
2 no. Take issue with?
3      A. I take issue with the word genuine.
4      Q. All right. Why?
5      A. A genuine -- by my reading this letter HP
6 and Compaq are saying that this letter would
7 represent that HP and Compaq parts are only genuine
8 if purchased from HP or Compaq, and I don't believe
9 that's the case.
10      Q. All right. Do you understand that that is
11 how parts by HP and Compaq are defined? If they come
12 directly from them, they are genuine parts, or they
13 go directly from one of their authorized resellers
14 it's referred to as a genuine part, and if it's
15 anybody else, it may not be counterfeit, but it may
16 not be genuine. Have you heard that before this came
17 up? Have you heard that distinction buying directly
18 from them or from their authorized parts seller
19 allows you to sell a genuine part?
20      A. No. And I would question -- I would
21 question the definition of the word genuine.
22      Q. Okay. Well, are you aware that Microsoft,
23 you can only purchase genuine Microsoft product from
24 Microsoft and Microsoft's resellers?
25      MR. HANSEN: Object to relevance, but go

Page 266

1 ahead.

```
24  Microsoft and Microsoft's resellers?
25          MR. HANSEN: Object to relevance, but go
 1  ahead.
 2          MS. CARROLL: Q. Do you know in the
 3  software industry whether that use of genuine parts
 4  for, in software by Microsoft what that means to
 5  them?
 6      A. No.
 7      Q. Okay. You just -- and it's your
 8  understanding of what you understand genuine parts to
 9  be that the upcoming changes that you disagree or you
10  take issue with the use of genuine parts in here in
11  this letter, the first sentence of the letter, is
12  that correct?
13      A. That's correct.
14      Q. Is there anything in here that MITG doesn't
15  sell genuine parts?
16      A. In this letter?
17      Q. Correct.
18      A. No.
19      Q. All right. Is there anything else that you
20  take issue with, other than the use of genuine, to
21  modify parts in the first sentence of the letter or
22  anywhere else that appears?
23      A. No.
24      Q. All right. Other than the letter that is
25  referenced in the counterclaim and the specific
```





Gina L. Nottingham, C.S.R.

Page 267

1 examples that you've given me here of five different
2 customers, as you sit here today, are you aware of
3 any other facts which support the contention of MITG
4 that HP tortiously interfered with customers of
5 MITG's?
6          MR. HANSEN: In addition to the phone calls
7 we have pled?
8          MS. CARROLL: Q. I'm sorry. The phone,
9 follow-up phone calls to this letter as pled. So
10 what is included are the facts that are pled in your
11 amended counterclaim, the five companies you have
12 named for me here in this deposition, are you aware
13 of any other facts which support your claim that HP
14 tortiously interfered with MITG's customers?
15    A. Today, no.
16    Q. All right. Suppliers, let's try to get
17 through this, and I think we'll be about done. What
18 suppliers, if any, or distributors as pled in
19 Paragraph 41 of your amended counterclaim do you
20 contend that HP tortiously interfered with?
21    A. The one that specifically comes to mind
22 that I had personal knowledge with was Parts Now.
23    Q. And Parts Now was a supplier to MITG?
24    A. Correct.
25    Q. Okay. What kind of parts was Parts Now

Page 268

1 supplying?
2    A. They could supply a myriad of

```
            24      A. Correct.
            25      Q. Okay. What kind of parts was Parts Now
```

Page 266                                                                Page 268

```
parts      1 supplying?
to         2      A. They could supply a myriad of parts,
           3 multivendor stuff.
           4      Q. How long had MITG been doing business with
           5 Parts Now?
           6      A. Quite sometime.
           7      Q. Okay. And you said you had personal
parts to   8 knowledge of this. Is that because somebody at Parts
or you     9 Now said they wouldn't do business with MITG?
in        10      A. Their vice-president actually called me.
          11      Q. And what is his name?
          12      A. I don't have that in front of me.
          13      Q. When did this occur?
't        14      A. Again, I don't have that right in front of
          15 me. It's happened between April and May.
          16      Q. Of '04?
          17      A. Yeah. I can say it was after the suit was
          18 started, I believe.
          19      Q. The allegation in -- well, can you tell me
to        20 anything more specifically about what the VP of Parts
or        21 Now told you about?
          22      A. Sure.
          23      Q. The contact with HP?
          24      A. He received a call and/or visit, I don't
          25 recall specifically that portion of it, from folks
```

Page 265 - Page 268

1  that he deemed in Roseville, would not elaborate as
2  to who that person or persons was, inquiring as to a
3  historical report as to all product that we had
4  purchased in the previous "X" amount of time, whether
5  it was six months, 12 months, whathave you, and as
6  well wanted to know where the product was shipped,
7  who it was shipped to, and any other orders that we
8  had done with them over the last "X" period. I
9  believe it was probably 12 months. I don't remember
10 exactly what he said.
11     Q. And he told you -- anything else that he
12 reported that was communicated to him by the HP
13 person?
14     A. He was also informed that if he did not
15 cease doing business with us that he would lose his
16 HP reseller certification and he would no longer be
17 able to procure HP product from HP.
18     Q. All right. Did he tell you whether he
19 provided this report that is allegedly requested?
20     A. He was in the air as to whether he was
21 going to do that prior to our phone call. Or prior
22 to his calling me. I'm sorry.
23     Q. And do you know whatever happened to that?
24 Did he send it?
25     A. I don't know.

1     Q. All right. Have you had any further

```
24  Did he send it?
25      A. I don't know.
 1      Q. All right.  Have you had any further
 2  communications with him after this phone call you've
 3  just told me about?
 4      A. Not after I informed him at the end of that
 5  phone call that I would have counsel contact him.
 6      Q. Okay.  Any other suppliers or distributors
 7  that you allege stopped doing business with MITG
 8  because of actions of HP?
 9      A. It's on the tip of my tongue.  Just give me
10  a second.
11      Q. Okay.
12      A. I can't recall who it is.
13      Q. In the tortious interference claim I know
14  from my question a long time ago first thing this
15  morning that you have not calculated your damages on
16  that, so I'm not looking for a number, but I'm
17  wondering if you believe that MITG has experienced
18  monetary damages as a result of Parts Now not selling
19  parts to MITG?
20      A. Yes.
21      Q. And how is that?  Have you not been able to
22  get a supplier in place of Parts Now?
23      A. In some cases, that's correct.
24      Q. Okay.  What parts have you been unable to
25  acquire from third parties that you used to get from
```



Gina L. Nottingham, C.S.R.