Page 271

```
 1  Parts Now before this alleged tortious interference
 2  occurred?
 3      A. I mean, I can't speak specifically to a
 4  part. It's -- I mean, I don't know.
 5      Q. Okay. Well, can you think of an instance
 6  since this happened in April/May, timeframe of 2004
 7  where a customer called in and requested a part and
 8  you were unable to find a supplier for it but you
 9  knew that if Parts Now were selling, still selling to
10  you you could have acquired it from Parts Now?
11      A. I'm sorry. One more time.
12      Q. Are you aware -- can you think of a time
13  when you heard, you learned from one of your
14  employees or you got through personal knowledge that
15  a customer called in for a part and your only source
16  of that part would be Parts Now and they weren't
17  selling you parts anymore?
18      A. Do I know of an incident?
19      Q. Yes.
20      A. Yes.
21      Q. Okay. Tell me about that.
22      A. I mean, I just know that it has occurred.
23  They were a very beneficial supplier of some
24  strategic parts, usually along the lines of printer
25  or even the Presario type line of equipment.
```

Page 272

```
 1      Q. Can you tell me how much business MITG did
```

```
24  strategic parts, usually along the lines of printer
25  or even the Presario type line of equipment.
```

Page 270

```
ll you've

hat
him.
ors
MITG

ne

this
mages on

enced
ot selling

le to

e to
from
```

Page 272

```
 1      Q. Can you tell me how much business MITG did
 2  with Parts Now in 2003?
 3      A. Sitting here today, no.
 4      Q. All right.  So you believe that this, it
 5  cost you a sale to a customer because Parts Now is
 6  your only source of a part that someone called in
 7  for?
 8      A. I believe so, yes.
 9      Q. And, as you sit here now, you can't give me
10  a specific instance when that happened, you just
11  believe that happened?
12      A. No, that's correct.
13      Q. Let's just take a minute.  I might be
14  done.  I just want to make sure I at least asked one
15  question on every category.
16              (Whereupon a short recess
17                was taken.)
18      Q. I understand from documents that have been
19  produced at various times over the last, since really
20  the start of the production of documents, that
21  customer service representatives of Hewlett-Packard
22  continue to make inquiries into potential parts
23  orders or sending their customers to MITG for parts
24  and continue to do so today?
25      A. And place orders.  We are actually still
```

HP and Compaq v. MITG
3:04-cv-03955-JSW CHE #49-17 Page 3 of 5
Condense
Page 273

1 filling orders for HP.
2    Q. So the HP Direct, the HP salesperson would
3 -- you would bill HP?
4    A. Colorado Springs.
5    Q. Okay. And is that for similar types of
6 multivendor parts that you were providing under the
7 Standard Support Agreement, or is that similar to the
8 parts, the service parts aspect of the business?
9 What is it?
10    A. That would be under the Standard Support
11 Agreement.
12    Q. Okay. So in this case what kind of parts?
13 Are they all multivendor parts, or were they all
14 sourced parts, some of each kind?
15    A. I can't answer that. The two I have seen
16 where I have actually looked at a purchase order they
17 were both Compaq parts that were not available, I
18 assume, through Compaq's channel. So they were
19 basically sent to us out of total frustration and
20 fear of termination, but they have the unwilling
21 desire to keep this customer happy, and that's what
22 they have done.
23    Q. I'm going to object to that as
24 non-responsive. To your -- your understanding, then,
25 of when HP people have continued to contact MITG or

Page 274

1 had their customers contact MITG to acquire parts

```
24  non-responsive.  To your -- your understanding, then,
25  of when HP people have continued to contact MITG or
```

Page 274

```
 1  had their customers contact MITG to acquire parts
 2  they are requiring what we referred to earlier as
 3  sourced parts, which is multivendor parts or legacy
 4  Compaq or HP parts?
 5      A.  Right.  Or could possibly even be out of
 6  stock parts.
 7      Q.  Out of stock parts?
 8      A.  Right, correct.
 9      Q.  Okay.  And you bill either HP's, whoever
10  orders it, HP or HP's customer, you bill them
11  directly?
12      A.  That's correct.
13      Q.  All right.  And you no longer have a profit
14  split?  You get 100 percent of the profit that's
15  involved?
16      A.  That's correct.
17      Q.  How much business in terms of dollar volume
18  would you say that you have sold and billed HP
19  directly on for these types of orders since the
20  termination of the Standard Support Agreement?
21      A.  A couple thousand bucks maybe.
22      Q.  And what about to HP's customers where HP,
23  it's clear that HP was in the loop on sending the
24  customer to you?
25      A.  I have no way of knowing that.
```



**Gina L. Nottingham, C.S.R.**



1       MS. CARROLL: All right. With that and
2  with the reservation I'm going to reserve the right
3  to continue the deposition in the event that he adds
4  anyone on these tortious interference claims since
5  it's not a fully developed claim. If he comes back
6  and maybe if he adds one person, we'll do a phone
7  deposition, but I'm going to reserve my right to ask
8  questions of a corporate representative if he goes
9  into anymore information than he has provided now
10 about these five customers. And I'm going to reserve
11 my right to the extent that factual basis for damages
12 -- though I assume based on his testimony that that
13 is going to come from a retained expert. If it's not
14 and there is a factual basis on the damage claims, I
15 reserve the right to continue the deposition since he
16 was unable to completely articulate that because he
17 hasn't gotten all of the information that he believes
18 is necessary.
19      MR. HANSEN: So noted. And I think -- I
20 guess my one caveat would be you have received my
21 discovery, so arguably there may be a more detailed
22 answer in the discovery than you got in the
23 deposition today.
24      MS. CARROLL: And if there is, that's
25 fine. I'm not going to -- I don't want to continue

Page 276

1  this for the sake of continuing it, but I just want
2  to reserve the right to let you know I might bring it