E-FILED
Monday, 23 May, 2005 01:31:15 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V., <br><br> Plaintiffs, <br><br> vs. <br><br> MIDWEST INFORMATION TECHNOLOGY GROUP, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) Civil Action No. 04-3055 ) ) ) ) ) ) |

### DEFENDANT MIDWEST INFORMATION TECHNOLOGY GROUP, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL

Comes now Defendant, **MIDWEST INFORMATION TECHNOLOGY GROUP, INC.** (MITG), by and through its attorneys, **SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL** and states that Plaintiffs' Motion to Compel should be denied and in support of its Response states as follows:

### PLAINTIFFS' REQUESTS ARE OVERLYBROAD AND IRRELEVANT TO THE CLAIM FOR DAMAGES ARISING OUT OF PLAINTIFFS' TORTUOUS INTERFERENCE

Plaintiffs correctly state to this Court that MITG has alleged that Plaintiffs interfered with MITG's business relationships. Plaintiffs misstate to this Court that MITG refuses to provide requested information on its sales, revenues and profits generated from the relationships that Plaintiffs tortuously interfered. Plaintiffs have correctly stated the status of the issues surrounding the discovery disputes and the attempts to resolve these disputes in good faith by the parties that have been unresolved. Defendant will address the specific discovery requests at issue as framed in Plaintiffs' Motion to Compel.

## RESPONSE TO SPECIFIC DISCOVERY REQUESTS AT ISSUE

**Interrogatory No. 1:** As stated in MITG's Answer to Interrogatory No. 1, the total amount of lost profits to MITG is unknown based on the conduct of Plaintiff Hewlett-Packard ("HP"). HP selectively targeted the top accounts of MITG and later all MITG accounts. Further, HP instructed its agents to stop referring any parts inquiries to the HP Direct phone number (which was MITG) as of January 16, 2004. (See Chizek Deposition Exhibit NN (HP 6132-6134) attached hereto and incorporated herein as Exhibit 1). Continuing with this unwarranted conduct and behavior, HP instructed its agents to remove the MITG referral number from all phone lists and to address all parts inquiries and orders to Roseville in violation of the Standard Support Agreement between the parties. (See Exhibit 1).

However, that is not the complete answer contained within Interrogatory No. 1. (See Tabs 6 and 7 of Plaintiffs' Motion to Compel). MITG provided HP with the additional response that it has attempted to calculate lost profits, based on its own numbers, by comparing the revenues from entities that had ordered from MITG in the month of January 2004, the month the alleged conduct of HP took place, to orders and revenues to MITG for all customers from February through December 2004. These documents (MITG 1023 and 1024) were produced to Plaintiffs. Plaintiffs erroneously state that this somehow indicates that MITG speculated that it lost business. As evidenced by the actions of HP and the severe drop in numbers reflected on documents MITG 1023 - 1026 this assertion is patently false.

All the law requires is that lost profits be approximated by competent proof. The fact that the exact amount of lost profits is impossible to calculate does not justify refusing compensation. Independence Tube Corporation v. Cooperweld Corp., 691 F.2d 310, 328 (7th Cir. 1982). "Not only are reasonable projections and estimates generally acceptable, but a defendant whose actions contribute to the difficulties of accurate measurement is in a poor position to demand precision." Id. at 329. MITG has provided base documentation to Plaintiffs. MITG is still in the process of trying to calculate its total

lost profits to a reasonable certainty. The expert disclosure deadline in this case is July 1, 2005. MITG will supplement its answers as needed to provide its calculations of lost profits. However, for Plaintiffs' to argue MITG has not answered the Interrogatory or failed to provide documentation is incorrect.

Further, the amount of lost profits is certainly within the realm of expert testimony. The expert deadline in this case for Counterclaim Plaintiff is July 1, 2005. Therefore, the lost profits may be subject to any expert report and disclosure which is not due to opposing counsel by July 1, 2005.

**Interrogatory Nos. 4, 8, 9 and Request for Production Nos. 3, 4, 5, 10, 11:**

Plaintiffs have requested MITG answer interrogatories and provide documents under a Request for Production addressing the company's sales revenue (gross and net) and profit (gross and net) from clients, customers, suppliers and/or distributors from February 7, 2000 (two (2) years before the Standard Support Agreement entered into between the parties) to the date any entity terminated its relationship with MITG. (emphasis added). MITG has objected to each of these discovery requests as they are overlybroad, unduly burdensome and irrelevant to the claims presented by MITG in its Amended Counterclaim.

As stated in MITG's Amended Counterclaim, HP communicated with entities with whom MITG had a business relationship prior to and after the termination of the Standard Support Agreement which resulted in these entities ceasing to do business with MITG and thus lost profits to MITG. It appears from the Motion to Compel that Plaintiffs are arguing they are entitled to documentation as far back as 2000 alleging MITG would have expected a drop in its revenues and profits to pre-Standard Support Agreement levels. As Plaintiffs stated in their Motion, MITG continued throughout the two (2) years of the Standard Support Agreement to operate its business selling spare parts as MITG separate and apart from any agreement it had with Compaq/ HP.

Plaintiffs fail to state the applicable Illinois law that would require MITG to provide to them

3

any sales, profit or revenue documentation dating as far back as the year 2000. In fact, Plaintiffs have cited no law to support any of their positions in the Motion to Compel. The law in the State of Illinois, which will be applied by this Court, is that to show lost profits due to a business interruption or tortuous interference, the "the business must have been established before the interruption so that the evidence of lost profits is not speculative." SK Hand Tool Corporation v. Dresser Industries, Inc., 219 Ill.Dec. 833, 840, 672 N.E.2d 341, 348, (Ill.App. 1st Dist. 1996); Milex Products, Inc. v. Alra Laboratories, Inc., 177 Ill.Dec. 852, 862, 603 N.E.2d 1226, 1236, (Ill.App. 2nd Dist. 1992). Contrary to Plaintiffs assertions, MITG does not have to provide documentation to show that it was profitable prior to the Agreement entered into between MITG and HP. The only thing that MITG must show is that it was an established business prior to the interruption or tortuous interference.

In this case, the alleged interference occurred in January 2004. MITG has produced all of its sales revenue, operating expenses and net profits for the entire term of the Standard Support Agreement for the years 2002 - 2004. HP cannot argue MITG was not an established entity prior to the tortuous interference. In fact, Teresa Koch, MIITG's Chief Financial Officer, has testified the sales and revenue figures of MITG for years 2002 - 2004 were made up of additional revenue besides that generated from HP and Compaq. For the year 2003 she testified $10,000 to $30,000 a month was revenue from additional sales revenue outside the agreement with Plaintiffs. (See page 21 of the deposition testimony of Teresa Koch attached hereto and incorporated herein as Exhibit 2). This example is one year prior to the alleged tortuous conduct. Obviously, MITG was an established entity.

Plaintiffs request for documents dating back to the years 2000 and 2001 are not only overly broad but unduly burdensome. MITG is not required to produce documents other than that which establishes it was an ongoing business entity prior to the tortuous interference. It has done so in this case.

4

**Interrogatory Nos. 2, 3, 5, 7, 10, 11:**

MITG has supplemented Interrogatory No. 2 and provided Plaintiffs with the names, addresses and phone numbers for the entities identified in this interrogatory answer. Further, as contained within the Answer to Interrogatory No. 2, MITG specifically stated that it did not have any knowledge or information as to who the individual was at HP that made the statements and instructions to these entities. Certainly, if this information becomes available Defendant will gladly supplement the interrogatory to provide the requested information. To date, that information is not within Defendant's possession.

As to the remaining identity of the customers, clients, suppliers and distributors that HP made statements to or engaged in actions which MITG contends constitutes tortuous interference, they will be supplemented accordingly as information becomes available. To date, Defendant has answered as to the knowledge that is currently within its possession.

### RESPONSE TO PLAINTIFFS' REQUEST TO CONTINUE WITH DISCOVERY OUTSIDE OF COURT IMPOSED DEADLINE

If the Court deems that Plaintiffs have the right to continue any depositions of MITG representatives or employees, the right should be specifically limited to information and documents associated with the tortuous interference claim. Plaintiffs deposed MITG employees Rich Rice, Teresa Koch and Ron Haught at length already and should not be given a second bite at the apple with these individuals as to questions and information Plaintiffs had in their possession prior to the tortuous interference issues.

Defendant has no objection if the Court extends discovery to allow Plaintiffs to depose entities identified by Defendant that Plaintiffs interfered with under the condition that the existing discovery Order be modified to allow an extension of any expert deadline due to any newly obtained information.

At a minimum, the depositions should be given a deadline in which to be completed. Counterclaim Plaintiff's expert deadline is July 1, 2005 and there may be newly discovered information from these depositions that impact the disclosure. To that extent, Defendant would request either an extension on the deadline or a built in allowance for any supplemental reports that may be needed.

WHEREFORE, Defendant, **MIDWEST INFORMATION TECHNOLOGY GROUP, INC.**, respectfully requests that this Court deny Plaintiffs Motion to Compel and for such other and further relief as the Court deems just and proper.

s/          James A. Hansen
James A. Hansen IL Bar #6244534
Attorney for Defendant/Counterclaim Plaintiff,
Midwest Information Technology Group, Inc.
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey Street, P. O. Box 1069
Quincy, IL 62306-1069
Telephone: (217) 223-3030
Facsimile: (217) 223-1005
E-mail: jhansen@srnm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of May, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Elizann Carroll
>Juneau, Boll & Ward
>15301 Spectrum Drive, Suite 300
>Addison, TX 75001

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

>s/        James A. Hansen
>James A. Hansen IL Bar #6244534
>Attorney for Defendant/Counterclaim Plaintiff,
>Midwest Information Technology Group, Inc.
>Schmiedeskamp, Robertson, Neu & Mitchell
>525 Jersey Street, P. O. Box 1069
>Quincy, IL 62306-1069
>Telephone: (217) 223-3030
>Facsimile: (217) 223-1005
>E-mail: jhansen@srnm.com

From: Vagadori, Lauri J. [Lauri.Vagadori@sykes.com]
Sent: Friday, January 16, 2004 11:48 AM
To: CHIZEK,RICHARD (HP-Roseville,ex1); Vagadori, Lauri J.; SORIANO,ROLAND (HP-Roseville,ex1)
Cc: Mathews, Glenn; ODOM,CHRISTOPHER (HP-Roseville,ex1); VAGADORI,LAURI (HP-Roseville,ex1); KARAS,JOHN (HP-Roseville,ex1); MEYERFELD,LOUISE (HP-Roseville,ex1)
Subject: RE: HP Direct Migration Plans

Thanks Richard,

Chris....

Please start getting the DEC agents up to speed and make sure that they know NOT to refer any of these calls out at this time. I would like them to start tracking what is coming in that they are handling. This should be a very smooth transition, and if we prepare for it now it will be that much easier. Let me know if you have any questions.

Lauri

-----Original Message-----
From: CHIZEK,RICHARD (HP-Roseville,ex1) [mailto:richard.chizek@hp.com]
Sent: Friday, January 16, 2004 10:17 AM
To: 'Vagadori, Lauri J.'; CHIZEK,RICHARD (HP-Roseville,ex1); SORIANO,ROLAND (HP-Roseville,ex1)
Cc: Mathews, Glenn; ODOM,CHRISTOPHER (HP-Roseville,ex1); VAGADORI,LAURI (HP-Roseville,ex1); KARAS,JOHN (HP-Roseville,ex1); MEYERFELD,LOUISE (HP-Roseville,ex1)
Subject: RE: HP Direct Migration Plans
Importance: High

Lauri,

Thanks for summarizing. Attached is the first message I sent about the HP Direct migration with historic volume reports and map of current phone structure.

- Yes, the target date 2/9. We may want to move some calls before then.

- It's not likely that PBCO will be offered as many calls as HP Direct was getting. As the referral sources and web sites are decommissioned Feb. 6, volumes should decline. HP Direct volumes have already dropped in the last week. Much of the 'misdirected' traffic will be filtered out in the phone system.
- Orders are for eSpares on both credit card and Net 30 accounts. We intended to route calls to eSpares/HPPS agents. Routing Net 30 issues to DEC agents with PEPS tools is a practical solution. Good call. I'll include that in the Telecon plans.
- Yes, we'll provide process outlines and agent scripts to address the changes to services.

Alert all PBCO agents that HP Direct parts activity is migrating to Roseville PBCO, and that call center location will be closed 2/6/2004.
- PBCO agents should be directed to STOP referring any parts inquiries to the HP direct number immediately. Remove that referral number from phone


EXHIBIT
1


EXHIBIT N
Deponent Chizek
Date 1/13/05  Rptr. RO
DEPOBOOK

lists.  (Note that PBCO is also driving traffic to HP Direct.)
- Address all parts inquiries and submit orders for any available pmCompaq or HP parts here.
- Use www.hp.com referral tools and internal support sites to research support options for products and parts N/A via PBCO.
- Also, refer inquiries for unavailable parts or non-HP parts issues to HP Authorized Parts Resellers.


Regards,
Richard Chizek,
HP Parts Sales Centers Manager
HPS Americas - Channel and Parts Business
916 785-8651 (desk)
916 628-5225 (cell)

To Order Parts: <www.hp.com/buy/parts>


                        1-800-227-8164


-----Original Message-----
From: Vagadori, Lauri J. [mailto:Lauri.Vagadori@sykes.com]
Sent: Friday, January 16, 2004 7:23 AM
To: richard.chizek@hp.com; roland.soriano@hp.com
Cc: Mathews, Glenn; CHRISTOPHER ODOM (HP-Roseville,ex1) (E-mail); Vagadori, Lauri
Subject: HP Direct
Importance: High


Hello,

I wanted to follow up on our meeting yesterday about HP Direct.

*    Target date is 2/09/04
*    Call volume is expected at 200 calls per day, with 100 redirecting to Tech Support
*    Less than 20 orders per day
*    Calls will be routed to eSpares
*    HP will provide scripts to Sykes on services that no longer will be available through HP Direct
*    Orders will be for net 30 accounts and placed on PEPS
*    HP is waiting on Sykes to come up with the best way to route these calls because not all eSpares agents have PEP's ordering systems

After speaking with Chris yesterday I think that sending these calls through Digital may be our solution to how to route these calls. With the volume at 200 calls per day it would require 3.5-4 agents. Digital has 6 agents now with a low call volume (average 46 calls a day). These agents also all have PEP's ordering tools. This would almost require no training because these agents have handled calls like this. Scripting will be the key for the Team on services no longer available through HP Direct.

This is just some thoughts I have had on this so we can certainly follow up.

HP006133

Please let me know if I left anything out.

Lauri Vagadori
Client Services Manager
Sykes, Enterprises
Roseville, California
916-296-2489   Mobile
916-748-4394

HP006134

```
                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF ILLINOIS
                     SPRINGFIELD DIVISION



HEWLETT-PACKARD DEVELOPMENT            )
COMPANY, L.P., HEWLETT-PACKARD         )
COMPANY, and COMPAQ TRADEMARK B.V.,    )
                                       )
         PLAINTIFFS,                   )
                                       ) Civil Action
              vs.                      ) No. 04-3055
                                       )
MIDWEST INFORMATION TECHNOLOGY         )
GROUP, INC. and MICHAEL LAUBER,        )
                                       )
         DEFENDANTS.                   )
```

COPY

EXHIBIT 2

DISCOVERY DEPOSITION of TERESA KOCH, taken in the above-entitled case before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter of Adams County, Illinois, at 3:30 p.m., on February 17, 2005, at 525 Jersey, Adams County, Quincy, Illinois, pursuant to stipulation hereto annexed.

Tracy L. Grott, CSR
2901 Sonata Drive
Quincy, IL  62301
217-223-3624

```
 1  APPEARANCES

 2  MS. ELIZANN CARROLL
    Attorney at Law
 3  Juneau, Boll & Ward
    15301 Spectrum Drive, Suite 300
 4  Addison, Texas  75001
            appeared for the Plaintiffs.
 5

 6


 7  MR. JAMES HANSEN
    Attorney at Law
 8  Schmiedeskamp, Robertson, Neu & Mitchell
    525 Jersey
 9  Quincy, IL  62306
            appeared for the Defendants.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   BY MS. CARROLL:
 2       Q    Just looking in 2003 as your example, it's
 3   the only full year that the contract was in place.
 4            THE WITNESS:  Okay.
 5   BY MS. CARROLL:
 6       Q    Looking at this, the sales and revenue,
 7   you've told me that this is the four parts that we
 8   just discussed; the CSN price, the source price, 75%
 9   profit and $41,000 a month.  What else might go into
10   the 8,784,09.78?
11       A    There could be a small amount of sales to
12   customers other than HP or Compaq.
13       Q    Do you have any idea as you sit here today
14   how much revenue MITG generated in 2003 from nonHP
15   Direct related business?
16       A    A ball park guess, in the 10 to 30,000 a
17   month range.
18       Q    Okay.  Were all of these -- well, strike
19   that.  All of the business that was governed by the
20   Standard Support Agreement had this same, and it was
21   sourced product, had a 75/25 split.  Was there any
22   business that MITG did for HP or for HP customers
23   that was not sourced product, that was not subject
24   to the 75/25% split?
25       A    Yes.  I believe that there were some
```