UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, AND COMPAQ TRADEMARK B.V. | § § § § § § | |
| Plaintiffs | § § | Civil Action No. 04-3055 |
| VS. | § § | |
| MIDWEST INFORMATION TECHNOLOGY GROUP, INC. AND MICHAEL LAUBER, | § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXPERT, OR IN THE ALTERNATIVE FOR ATTORNEYS' FEES AND COSTS AND ADDITIONAL TIME TO DESIGNATE A RESPONSIVE EXPERT

COME NOW, Plaintiffs Hewlett-Packard Development Company, L.P., Hewlett-Packard Company and Compaq Trademark B.V. ("Plaintiffs" or "HP"), file this Motion to Strike Defendant's Expert, or in the Alternative, for Attorneys' Fees and Costs and Additional Time to Designate a Responsive Expert, seeking to have this Court strike the designated expert of Defendant Midwest Information Technology Group, Inc. ("MITG"), or alternatively to require MITG to pay HP's fees and costs both for this Motion and to re-depose MITG's expert on a second report that attempts to correct the errors revealed during the expert's deposition on his original report. MITG's expert's reliance upon unsupported "facts" and his methodology render his opinions inadmissible, as discussed in detail below.

### MITG's First Attempt at an Expert Report Failed Because the "Facts" and Assumptions Relied upon By the Expert were Erroneous, and the Methodology is Contrary to Accounting Standards, Thereby Making the Expert's Opinions Unreliable and Inadmissible

The Court's Scheduling Order required the designation of expert witnesses on the parties' affirmative claims[1] on or before Friday, July 1, 2005, almost a year and half after the start of litigation. Counter-Plaintiff MITG designated Scott A. Stringer, a certified public accountant, as an expert on the calculation of MITG's damages. By this Motion, HP challenges the admissibility of Mr. Stringer's opinions because his opinions are not grounded in or based on fact (and at times contrary to undisputed facts), but rather are supported only by inadmissible assertions and assumptions. Further, Mr. Stringer should be excluded from testifying in the case, and his reports stricken because he made such fundamental errors in how he processed information provided to him that his methodology is unreliable.

Mr. Stringer provided a report briefly setting out his opinions as to the amount of damages and the basis therefore, spreadsheets showing his calculations and a list of documents he reviewed [a true and correct copy of his report is attached hereto as **Exhibit A**]. In a nutshell, he calculated damages for the breach of the Standard Support Agreement ("SSA") between MITG and Compaq Direct, Inc., a subsidiary of Compaq Computer Corporation[2], by assuming that certain telephone calls relating to the sale of spare parts that were handled by HP Roseville should have been routed to MITG. This assumption and several other unsupportable assumptions led Stringer to opine that MITG incurred "diverted sales" damages in excess of $6 million. The tortious interference damages were calculated by piling assumptions on top of a assumptions to predict that MITG's future lost profits would be approximately $5 million.

---

[1] MITG is Counterclaim Plaintiff, with allegations of breach of contract and tortious interference against HP.
[2] HP and Compaq Computer Co. merged in May 2002, and Compaq Direct was re-named HP Direct. For simplicity's sake, his entity will be referred to herein as "Compaq/HP Direct" or "Direct."

PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXPERT, OR IN THE ALTERNATIVE, FOR
ATTORNEYS' FEES AND COSTS AND ADDITIONAL TIME TO DESIGNATE A RESPONSIVE EXPERT    PAGE 2

Mr. Stringer's deposition was taken on July 27, 2005. The report and Mr. Stringer's deposition testimony violate one of the basic requirements of Federal Rule of Evidence 702 – that opinion testimony be "based on sufficient facts or data." Further, the report is replete with errors, unfounded and/or unsupportable assumptions and faulty reasoning. It is so flawed that it should be stricken and Mr. Stringer excluded from testifying. To allow the presentation of such evidence would result in the admission of false and irrelevant information, would be highly prejudicial, potentially confusing to a jury and a waste of both the Court's and the jury's time.

**Stringer's Calculation of Damages Arising from the Breach of the Standard Support Agreement is Wrong Because He Misunderstands the Compensation Paid under the Agreement and Assumes, Without Basis, that Andover and MITG had the Same Sales Mix**

Mr. Stringer makes several glaring mistakes in his report that render his calculation of breach of contract damages, and thus the subject matter of his expert opinion, incorrect and inadmissible. Mr. Stringer calculated "diverted sales" and "diverted call center revenue" MITG should have made based on the assumption that, upon the closing of the Andover call center, HP was required to send Andover call center calls to MITG, rather than HP Roseville. He further assumes that the Andover call center handled the same mix of sales/calls as MITG. However, Andover only sold in-stock parts, and MITG did not receive any of the part sales revenue or profit for selling such parts, thus, Stringer's calculation of profit on so-called "diverted sales" on exhibit III of his report is incorrect and, therefore, irrelevant.

Without any basis for his assumption, Stringer simply <u>assumes</u> that the mix of calls to and parts sales by the Andover call center would match MITG's calls and sales mix [**Exhibit** B, Stringer Depo 64:16-18]. There is no admissible evidence to justify this assumption. In fact, that assumption is contrary to the only admissible evidence on the subject, which is that the Andover

call center did not sell "multi-vendor" or "sourced parts."[3] This error is important, because Mr. Stringer assumes that sending Andover center calls to MITG would have increased MITG's spare parts sales and call center revenue. However, it is clear that Mr. Stringer did not understand how MITG earned revenue and profit under the SSA.

Mr. Stringer obviously did not understand the ways MITG was compensated by Compaq/HP Direct for sales of different categories of spare parts [Stringer Depo 33:2-35:16 (although he testified he understood, he could not provide any details of how it worked), 52:22-53:24, 65:16-22, 90:13-25, 92:13-96:15]. It is critical to understand how a party makes a profit in order to calculate allegedly lost profit. This lack of understanding means Mr. Stringer's opinions are not based on sufficient facts so as to be admissible.

Briefly, MITG, acting as Compaq/HP Direct, sold three categories of computer spare parts: (1) multi-vendor parts; (2) legacy Compaq parts (meaning Compaq parts not stocked by HP) (multi-vendor and legacy parts are collectively referred to as "sourced parts"); and (3) in-stock Compaq parts (also referred to as "CSN parts"). If a customer contacted MITG for a CSN part, MITG would take the order, enter the order into Compaq/HP Direct's order entry system and Direct would take care of the rest of the transaction. These sales were not subject to the 75/25% profit split. In fact, MITG did not receive any revenue or profit directly tied to a sale of a CSN part. If, however, a customer wanted a sourced part (multi-vendor or Compaq legacy), MITG ordered and shipped the part to the customer, Direct invoiced the customer, and MITG invoiced Compaq/HP Direct for the cost of the part plus 75% of the profit made; Direct kept the remaining 25% of the profit [**Exhibit D,** Koch Depo 12:19-15:17; **Exhibit E,** Haught Depo. 203:10-204:10]. For example, if the multi-vendor part cost MITG $100, and it sold the part to a customer for $200, Direct would

---

[3] Diane Pound, the former call center manager, testified, repeatedly, that Andover only handled Compaq and DEC parts, not multi-vendor parts [**Exhibit C,** Pound Depo 10:20-11:1, 14:10-20].

bill the customer $200; MITG would invoice Compaq/HP Direct and Direct would pay MITG $175 ($100 to pay for the part and 75% of the profit on $100).

Understanding this fact is important because the revenue that MITG could have derived if the Andover calls were routed to MITG would have been governed by the terms of the SSA (as MITG claims a right to the Andover calls based on an exclusivity provision on the SSA). However, Mr. Stringer did not know that sales of CSN parts were governed by the SSA, or that MITG did not get 75% of the profit on the sale of CSN parts. He also did not know, despite claiming to have read other witnesses' depositions in this case, of MITG's owner's testimony that 75-85% of MITG's sales were subject to the SSA [Haught Depo 112:21-113:19; Plaintiffs Ex. 21] and the CFO's testimony that a majority of MITG's business was subject to the terms of the SSA [Koch Depo 34:4-12 (all but $10,000-$30,000 per month of revenue governed by SSA)]. Instead, Stringer wrongly believed that only 45% of MITG's sales were subject to the SSA, and the remaining 55% of the MITG sales resulted in MITG realizing 100% of the profit on those sales.[4] Drawing from these misunderstood facts, Mr. Stringer calculated that MITG paid HP the 25% profit split called for in the SSA on 45% of the "diverted" sales, and that MITG retained 100% of the revenue and profit on the remaining 55% of these sales.

There is no basis to believe that if Andover center calls were routed to MITG instead of HP Roseville, that only 45%, rather than 100%, of the Andover center orders would have been subject to the SSA. All calls were subject to and governed by the SSA. Again, under the SSA, MITG got profit on sourced parts only, not on CSN parts. Even assuming, *arguendo*, that 45% of the orders were for sourced parts, the damage calculation that provided for 100% of the profit and revenue for all the other parts, which are CSN parts, is wrong because MITG would not earn a profit on those

---

[4] In effect, under Stringer's calculation if MITG sold a CSN part for which a customer was invoiced $100, and sold a sourced part that cost $100 and for which the customer was invoiced $200, that MITG got $275 -- $100 for the CSN part and $175 for the sourced part (cost of good + 75% of the $100 profit).

PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXPERT, OR IN THE ALTERNATIVE, FOR
ATTORNEYS' FEES AND COSTS AND ADDITIONAL TIME TO DESIGNATE A RESPONSIVE EXPERT     PAGE 5

CSN part sales [Koch Depo 13:22-14:1,15:5-17 (the 75/25% profit split was on sourced product only].

In addition to not being familiar with MITG's sales under the SSA, or the testimony of MITG witnesses, when asked to explain how he came up with the 45% figure, Mr. Stringer could not do so.[5] Thus, in addition to being wrong about MITG's sources of profit under the SSA, he cannot even explain the percentage he chose to use.

**Stringer's Calculation of Damages Arising from the Breach of the Standard Support Agreement is Wrong Because Andover Calls Were Not Sent to Roseville Until Early 2003.**

Mr. Stringer calculated the damages based on the call volume beginning in May 2002, because he mistakenly believed that the calls were transferred from Andover to Roseville at that time [Stringer 72:17-73:1]. Mr. Stringer again either did not understand or ignored Ms. Pound's clear deposition testimony that the Andover transition of calls began in early 2003 and was completed by April 2003. [Pound Depo 9:1-10]. Thus, even if the unsupported assumption that the calls should have been routed to MITG, Stringer's calculation of damages beginning in May 2002 is incorrect and, therefore, irrelevant.

**Stringer's Calculation of Damages Arising from the Breach of the Standard Support Agreement is Wrong Because Stringer Did Not Bother to Do Simple Addition, But Instead Took MITG's Number, Which was Not Supported by the Documents.**

A second element of Stringer's analysis was to determine the number of calls MITG would have gotten if the calls had been routed to MITG instead of HP Roseville. He assumed MITG was getting 5000 calls per month and then added what he understood were calls to Andover. However, Stringer simply accepted Mr. Haught's word on MITG's average monthly call volume, rather than add up the monthly numbers for the months amounts listed in week ending summaries provided to

---

[5] Mr. Stringer cited a document, but after a short time of questioning, retracted his prior testimony and said "I am not sure it's right as I look at it now" and "I think this is an error because I am comparing apples and oranges" and "what it does is reduce my 45 percent share number." [Stringer Depo 97:16-99:8].

him. When questioned on this approach, Stringer responded – "it's easier to ask for a number and then look at a document and test it, rather than compile every bit and piece of a document …. Whether it was right or wrong, we made a judgment … based upon looking at this document and looking at a few months." [Stringer Depo 104:22-105:3].[6]  Mr. Stringer's lack of effort certainly cannot be considered the usual and accepted methodology of a CPA.  A review of the documents will also show is that the 5000 call number provided by Haught and relied on by Stringer is wrong.  There are very few months in which MITG received 5000 calls (in fact, it averaged less than 4000 calls per month in the second half of 2003).  Thus, the calculation of "diverted" call center revenue is wrong and renders his opinion misleading and irrelevant.

Additionally, Stringer relied on an HP document that combines call and website information, to calculate calls MITG should have received if the Andover center business was sent to MITG. Stringer testified he reviewed both HP 11007-09 (marked as Ex. 51) and HP 11048-50 (Ex. 52). Stringer testified that he used "gross orders" (the first column of Exhibit 52) as the number of calls the Andover center received [Stringer Depo 101:23-102:2].  A review of Exhibit 51, which splits the data into "agent" (meaning call center operator) and "web"(website hits), shows that the gross number on Exhibit 52 relied on by Mr. Stringer is both calls and website data.[7]  The SSA does not provide for payment for web contacts, only for telephone calls. Thus, Mr. Stringer's calculation of diverted call center revenue is wrong because he improperly includes website hits in his calculation of the number of calls for which MITG was to be paid $5.25 per call.

**Stringer's Calculation of Tortious Interference Damages is Wrong Because it Relies, in Part, on Diverted Sales Numbers Which, as Discussed Above, are Wrong.**

---

[6] To give the Court an appreciation of the limited effort that an actual calculation would have been, by Mr. Stringer or one of his two CPA colleagues who assisted him on the project, attached are Exhibits 51 and 52, two documents reviewed by Mr. Stringer to determine the Andover call volume [**Exhibit F**].

[7] For example, compare the week ending December 21, which shows a "gross" figure of 1530 on Ex. 52, with the agent, web and total for the same week ending on Ex. 51 (431 calls, 1099 web for a total of 1530.

To arrive at his tortious interference figures, Stringer calculated MITG's average monthly net profit based on "actual" and the assumed "diverted" sales revenue plus actual and the assumed "diverted" call center volume[8]. This calculation is not supported by admissible evidence, and in fact, is disproved by testimony and exhibits that Stringer testified he reviewed. Because the tortious interference damages are based in large part on an erroneous calculation of average gross profit per month, the damages are not supported and should be stricken.

Additionally, Stringer improperly includes call center revenue in the calculation of average gross profits that he applies to the period after the end of the SSA. Call center revenue was paid pursuant to the SSA and once that agreement ended, would not be paid any more. Including those figures in the average gross profit Stringer claimed MITG could have expected to earn after the end of the SSA is not logical or reasonable. It is further evidence of the suspect and unreliable methodology and unsupported conclusions reached by Stringer that render his opinions irrelevant and inadmissible.

**Stringer's Tortious Interference Damages Calculation Based on a Summary Prepared by MITG, Not Previously Produced and that is Contrary to Prior Evidence of Revenue is Wrong**

Mr. Stringer relied on a chart prepared by MITG's CFO, Teresa Koch, as the basis for MITG's sales and cost of goods sold. This document was not listed in his list of information reviewed in his report (because he "forgot" to list it), nor was it produced in advance of the deposition. Rather, HP first learned of the existence of the summary while questioning Mr. Stringer [Stringer Depo 53:25-57:23]. The summary is hearsay, in that there is no evidence that it was compiled in the ordinary course of business. The summary is also improper because MITG did not provide the data from which the summary was created. This lack of back up is particularly important because the financial information that MITG did provide is not consistent with the figures in the summary.

---

[8] The "diverted" sales and call numbers are erroneous for the reasons discussed at length above, and thus Stringer's average gross profit per month average is erroneous.

During discovery MITG provided a "Detailed Invoice Register" that showed the amount MITG invoiced Compaq/HP Direct for the sale of sourced parts and the 25% profit share to HP. MITG also provided a document with revenue and profit information for 2002-2004 for the entire company. In her February deposition, Ms. Koch testified she could not break out how much of MITG's total revenue and/or profit were sales of sourced and CSN parts sold under the SSA versus other revenue streams. Neither did she have documentation showing MITG's sales of CSN parts. MITG never provided any cost of goods sold information. By late June, she apparently was able to create a summary for the expert, but the information on the summary [Depo. Ex. 60] does not match the limited information MITG provided in discovery. The summary breaks sales into two categories – business to business sales and business to consumer sales – and addresses only sourced part sales. Such a breakdown was never presented to HP in any format before Mr. Stringer pulled out the document in his deposition. In fact, there is no information produced by MITG that matches the figures on Ms. Koch's chart or explain why the figures are different.

Furthermore, the chart itself is nonsensical and Mr. Stringer, though relying on it, could not explain it. For instance, he assumed the caption "Sales Ext." was total revenue and "Pur. Ext. $" meant cost of goods sold. However, he conceded that cost of goods sold + re-stock fee (he identified this as another source of revenue) + profit did not, in fact, add up to the total revenue (though "you would think so"). [Stringer Depo 60:4-62:3]. Despite this obvious problem, Mr. Stringer did not question the veracity of the information. Instead, he cherry picked numbers he thought would be helpful and ignored the rest. [Stringer Depo 61:9-62:11, 63:20-64:2]. Mr. Stringer made no attempt to gather more reliable information, or question his client on her document. This is not an accurate or trustworthy methodology, and certainly not one endorsed by generally accepted accounting principals. Instead of seeking the sufficient facts to support his

opinion, Mr. Stringer made unsupported assumptions, which had the effect of maximizing his client's damage claim.

**Stringer's Calculation of Tortious Interference Damages is Wrong Because it Assumes Interference with 100% of MITG's Alleged Customers.**

After calculating an incorrect average net profit per month that MITG should have earned, Stringer assumes MITG would have continued to make the same gross profit[9] after the end of the SSA, but for HP's alleged interference. He assumes, again incorrectly, that none of the customers MITG serviced under the SSA bought from MITG during the remainder of 2004. That is directly contrary to documents Stringer reviewed and the sworn interrogatory answer provided by Ron Haught. In response to discovery, MITG provided a list of customers who ordered from MITG under the SSA and then after the SSA terminated [Depo Ex. 50, attached as **Exhibit G**]. Those sales total almost $490,000. Stringer admitted getting this document but testified the document "was not explained well enough," that he "did not understand it" and "did not rely on it because we didn't understand it." [Stringer Depo 115:7-116:2]. Instead of having it explained, Stringer just assumed anyone who bought under the SSA never bought anything after the end of the SSA [Stringer 116:3-9]. This is further evidence of a lack of effort (that one might characterize as shoddy or lazy) made by Mr. Stringer to provide an accurate, reliable report. Rather than ask a few questions, Stringer just assumes no sales were made, and thus artificially and incorrectly inflates the damages by failing to provide the proper credit for the actual sales. This is not a reliable method.

### MITG SHOULD NOT BE PERMITTED A SECOND BITE OF THE APPLE BECAUSE ALL INFORMATION RELIED UPON IN THE SECOND REPORT WAS AVAILABLE, AND IN FACT, MOST WAS ALLEGEDLY REVIEWED, PRIOR TO THE FIRST REPORT

---

[9] Stringer does reduce the gross profit by 1% per month to account for normal, expected customer shrinkage.

After Stringer's deposition revealed fundamental flaws in his methodology, reasoning, opinions and conclusions, MITG announced it would be "supplementing" his opinion. It did so in an August 17, 2005 "Supplement to Expert Report of Scott A. Stringer" [a true and correct copy of which is attached as **Exhibit H**]. This so-called Supplement should be stricken because:

1. it is not a supplement; it is an entirely new, untimely report that uses different methods, to try to support MITG's damage claim, after the first attempt failed;

2. it contains information available and reviewable before the first report (though MITG failed to provide certain of that information) which does not meet the standard of "thereafter acquired" information under Federal Rule 26(e); and

3. the new report continues to rely on incorrect information fundamental to the damage calculation, and thus is irrelevant.

Stringer acknowledges he is changing his report because of incorrect information in his original report, though he claims it is a supplementation. It is not.

Stringer lists only one document not listed in the "Information Reviewed" section of his first report or that should have been listed but was not due to his purported forgetfulness (namely the Koch summary and e-mails revealed for the first time at his deposition). The document is listed as "An Excel spreadsheet titled 'Copy of HP info by customer 2002 to 2004'." In a telephone conversation, MITG's counsel stated that the information on the spreadsheet is based on documents produced by HP, namely HP 6157-10009, which was produced to MITG as part of Production 6A, on or around January 7, 2005, and then re-sorted by MITG. MITG had the information from HP for almost six months before the expert deadline. The fact that MITG chose not to give Stringer this information for his first attempt at an expert report, should not be a basis for allowing a second, untimely, bite of the apple.

After his methodologies, assumptions and opinions were proven unreliable and/or false, Stringer decided to change course and come up with a whole new way to opine that HP caused MITG millions of dollars of damages. Sadly, he continues to lack an understanding of his client's relationship with Compaq/HP Direct under the SSA. He now seems to understand there are sourced parts and CSN parts -- that sourced part sales were the subject of the 75/25% profit split and that CSN parts were not subject to the profit split – but not the Andover call center business. To calculate the alleged damages for breach of the SSA, he takes MITG's re-sort of HP's information from Production 6A and accepts from that, that 56% of MITG's sales were sourced product and 44% of MITG sales were CSN parts. He then assumes, again incorrectly and contrary to Diane Pound's deposition testimony (the only evidence on the subject), that the Andover center had the same mix of calls/sales as MITG's call center. Using this unsupported assumption, he then multiplies 56% of the Andover "calls" (again incorrectly using the calls and website hits, discussed above at page 7), by $482.13, which MITG claims is the "average sales price on outsourced order," and assumes an average gross profit percentage to get lost revenue/profits from so-called diverted sales. He multiplies 44% of the "calls" by $5.25 to get the additional revenue MITG should have earned for call center services/CSN part sales. The calculation is fundamentally flawed because the assumption that that Andover sold sourced parts is incorrect.

The second report also has a number of what are, at this point, unexplored assumptions and calculations[10], and further reliance on documents provided by Ms. Koch for which no back up has been provided. Based on Stringer's inability in his first deposition to support his opinions with facts, one may fairly assume a second deposition will reveal many more flaws in his methods, opinions and conclusions.

---

[10] For example, the assumption that sales to customers in 2003 would be representative of what those customers would buy in 2004, without stating a basis for that assumption.

**PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXPERT, OR IN THE ALTERNATIVE, FOR ATTORNEYS' FEES AND COSTS AND ADDITIONAL TIME TO DESIGNATE A RESPONSIVE EXPERT   PAGE 12**

### ALTERNATIVELY, HP REQUESTS THAT THE COURT ORDER MITG TO PAY THE FEES AND EXPENSES ASSOCIATED WITH THIS MOTION AND THE RE-TAKING OF STRINGER'S DEPOSITION, AND EXTEND HP'S TIME TO DESIGNATE A RESPONSIVE EXPERT

HP believes that the facts presented above justify striking Mr. Stringer as an expert. However, in the event this Court is not inclined to strike Mr. Stringer, HP requests that the Court order MITG to pay all fees and expenses associated with taking Mr. Stringer's deposition on his new report, and for preparing this Motion. As discussed above, his "Supplement" is more accurately described as a "do-over." HP spent thousands of dollars preparing for, traveling to take and taking Mr. Stringer's deposition in St. Louis. After successfully undermining the bases for MITG's damage calculation and Mr. Stringer's methodology and calculations, MITG had Stringer try again and write a second report. In the interest of fairness, if MITG is permitted a second bite of the apple, it should have to pay for HP to take Stringer's deposition on this second report. Moreover, the so-called "Supplement" was provided six weeks after the deadline provided in the Scheduling Order. Thus, pursuant to Rule 16(f), this Court has the authority to impose sanctions, including an award of attorney's fees and costs for non-compliance with the Scheduling Order. Such an award is appropriate in this case where a defendant failed to provide its expert with information, or provided incorrect information, and the expert failed to exercise due diligence to ensure he understood the information provided, resulting in an unsupportable first report.

Further, HP took Mr. Stringer's deposition within three weeks of receiving his report to allow for time for a possible expert in response. Under the Scheduling Order, the deadline for HP to designate a responsive expert, is September 30, 2005. MITG's actions in providing a new report six weeks after the deadline, depending on this Court's ruling, will result in the need for a second deposition of the expert. HP requests additional time to designate a responsive expert. HP requests

a deadline at least six weeks after the re-deposition of Mr. Stringer. This case is not set for trial until summer of 2006, and thus, such an extension will not delay the trial of this matter.

## CONCLUSION

While it is true that many months remain before this case will go to trial, Mr. Stringer's utter disregard of generally accepted accounting principals, complete lack of curiosity or initiative to evaluate the information he was given and apparent pre-disposition to inflate damages for his client, MITG, justifies that he be stricken as an expert. He knowingly relied on incorrect, inconsistent, and/or unsupported information, made assumptions contrary to the deposition testimony he claims to have read, consciously decided not to ask questions and then dismissed information he did not understand as not important or material to his work (even though, or perhaps because, that information would reduce that damage calculation). This is the very conduct Federal Rules of Evidence 702 and 703, plus the long line of cases such as *Daubert,* seek to exclude from litigation. Accordingly, HP respectfully requests that this Court strike Mr. Stringer as an expert and exclude his opinions and any evidence based on his testimony and either of his reports.

WHEREFORE, Plaintiffs respectfully request that, upon consideration of the evidence presented and arguments of counsel, this Court strike MITG's expert Scott Stringer, including both of his reports, or in the alternative, award to Plaintiffs attorneys' fees and expenses incurred or to be incurred in filing this Motion, and in preparing for, traveling to take and taking Mr. Stringer's deposition, allow additional time for Plaintiffs to designate a responsive expert, and grant to Plaintiffs such other and further relief to which it may show itself entitled.

Respectfully submitted,

/s Elizann Carroll
ELIZANN CARROLL
Texas State Bar No. 00787209
JUNEAU, BOLL & WARD, P.L.L.C.
15301 Spectrum Dr., Suite 300
Addison Texas 75001
(972) 866-8333
(972) 866-8378 *fax*

MOLLY BUCK RICHARD
Texas State Bar No. 16842800
Richard Law Group
8411 Preston Road, Suite 890
Dallas, TX 75225
(214) 206 4300
(214) 206 4330 (fax)
molly@richardlawgroup.com

SCOTT D. SPOONER
Heyl, Royster, Voelker & Allen
Suite 575 National City Center
1 North Old State Capital Plaza
P. O. Box 1687
Springfield, IL 62705
(217) 522-8822
(217) 523-3902 *fax*

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of August, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to Delmer Mitchell and James Hansen, counsel for Defendants, and Molly Buck Richard and Scott Spooner, counsel for Plaintiffs.

/s Elizann Carroll
ELIZANN CARROLL
State Bar No. 00787209
JUNEAU, BOLL & WARD
15301 Spectrum Dr., Suite 300
Addison Texas 75001
(972) 866-8333
(972) 866-8378 *fax*
ecarroll@juneauboll.com