```
                                                    Page 1
 1
 2
 3            UNITED STATES DISTRICT COURT
 4            CENTRAL DISTRICT OF ILLINOIS
 5                 SPRINGFIELD DIVISION
 6
 7   HEWLETT-PACKARD DEVELOPMENT     )
     COMPANY, L.P., HEWLETT-PACKARD  )
 8   COMPANY, and COMPAQ TRADEMARK B.V.,)
                                     )
 9             Plaintiffs,           )
                                     )
10        - vs -                     ) No. 04-3055
                                     )
11   MIDWEST INFORMATION TECHNOLOGY  )
     GROUP, INC., and MICHAEL LAUBER,)
12                                   )
               Defendants.           )
13
14        DEPOSITION of RONALD HAUGHT, taken in the
15   above-entitled case before Gina Nottingham, a Notary
16   Public and Certified Shorthand Reporter of Adams
17   County, Illinois, at 9:00 o'clock A.M., on February
18   18, 2005, at 525 Jersey Street, Quincy, Adams County,
19   Illinois.
20
21
22
23
24
25
```

```
                                                    Page 2
 1   APPEARANCES:
 2        MS. ELIZANN CARROLL
          Attorney at Law
 3        15301 Spectrum Drive, Suite 300
          Addison, Texas  75001
 4
               appeared for the Plaintiffs.
 5
          MR. JAMES HANSEN
 6        Attorney at Law
          525 Jersey Street
 7        Quincy, Illinois  62301

 8             appeared for the Defendants.

 9   ALSO PRESENT:
10        Ms. Gaynelle Jones
          Litigation Counsel for Hewlett-Packard
11
...
20   MRS. GINA L. NOTTINGHAM, CSR
21   License No. 084-002584
     924 Rim Road
22   Quincy, Illinois  62301
     (217) 224-7009
23
24
25
```

PLAINTIFF'S EXHIBIT E

```
                                                    Page 3
 1                    I N D E X
 2   DEPONENT                              PAGE NUMBER
 3   RONALD HAUGHT
 4        Examination by Ms. Carroll           4
 5
 6
 7
 8
 9
10
11
12              E X H I B I T S
13   NUMBER                      MARKED    IDENTIFIED
     Deposition Exhibit Number 20    *          7
14   Deposition Exhibit Number 5     *         17
     Deposition Exhibit Number 4     *         37
15   Deposition Exhibit Number 2     *         42
     Deposition Exhibit Number 1     *         43
16   Deposition Exhibit Number 6     *         64
     Deposition Exhibit Number 22   72         72
17   Deposition Exhibit Number 19    *         76
     Deposition Exhibit GG           *         96
18   Deposition Exhibit Number 23  147        147
     Deposition Exhibit M            *        154
19   Deposition Exhibit KK           *        169
     Deposition Exhibit Number 24  169        172
20   Deposition Exhibit Number 25  169        171
     Deposition Exhibit B            *        184
21   Deposition Exhibit C            *        194
     Deposition Exhibit Number 21    *        206
22   Deposition Exhibit Number 26  209        209
     Deposition Exhibit Number 27  222        222
23   Deposition Exhibit Number 28  263        263
24
25
```

```
                                                    Page 4
 1
 2            (Whereupon the Deponent was
 3             sworn by the Notary Public.)
 4            R O N A L D   H A U G H T
 5   having been first duly sworn by the Notary Public,
 6   deposeth and saith as follows:
 7                 EXAMINATION BY
 8                 MS. CARROLL:
 9        Q.  Can you state your name for the record,
10   please, sir?
11        A.  Ronald Dean Haught, Jr.
12        Q.  And what is your address, Mr. Haught?
13        A.  4304 Deer Ridge Road, Quincy, Illinois,
14   62305.
15        Q.  Thank you.  Have you had your deposition
16   taken before?
17        A.  Yes.
18        Q.  How many times?
19        A.  Several over the years.  I was former law
20   enforcement, so I have been through this process a
21   few times over the years.
22        Q.  Okay.  Any of the depositions relating to
23   MITG?
24        A.  One.
25        Q.  Okay.  And what kind of case was that?
```

Page 201

1 Compaq Direct Online or you can go to Ambry and all
2 these others, and so then what is happening here your
3 Terry Welch at MITG is forwarding e-mails about
4 referring business to PC Nation and to Ambry that was
5 a solicitation or an attempt for somebody to buy
6 parts from your other company?
7     A. I disagree with that characterization.
8     Q. And I'm not trying to characterize it.
9 What I'm trying to do is figure out this guy was
10 trying to buy parts from Globalonlineparts.com, and
11 then he gets referred -- at some point HP refers him
12 to your company, HPdireconline or Compaqdirect-
13 online.com?
14         MR. HANSEN: As evidenced in this e-mail?
15         MS. CARROLL: Correct.
16         MR. HANSEN: I'm following you.
17         MS. CARROLL: Q. With some other issues.
18 Ms. Welch then takes the e-mail correspondence that
19 was between Toby and Globalonlineparts.com and then
20 gets that into MITG stream, is that correct, because
21 there is no e-mail that ever forwards -- what I'm
22 confused about we go from Toby to info@-
23 globalonlineparts, but there doesn't appear ever to
24 be a forwarding of these e-mails. All of a sudden
25 Miss Welch says she is forwarding it, but how did she

Page 202

1 pick that up?
2     A. I can't answer that. I don't know.
3     Q. And then in the front page e-mail you say,
4 very interesting. I think we might include a portion
5 of this into our letter. What letter are you
6 referring to, do you remember?
7     A. That's a good question. No, I don't.
8     Q. Do you remember using any of this portion
9 of the other part of the e-mail in a letter to any of
10 the HP executives to whom you sent correspondence?
11    A. I don't recall.
12    Q. Okay. Just to try to wrap this subject up,
13 we have at least two examples, and there may be --
14 there are two e-mail strings that give examples of
15 what you think is inappropriate or improper referral
16 of business to sources outside HP, being Ambry or
17 Super Warehouse or whoever else?
18        We talked earlier that you believe that
19 some of the calls that were going to the Andover call
20 center that were the subject of the exhibits that we
21 went through before this most recent discussion, that
22 some of those calls were also supposed to go to MITG
23 under the Standard Support Agreement. Are you aware
24 of any other sources of calls that you have specific
25 knowledge of, I don't want to pay attention to call

Page 203

1 volume's down, but specific examples such of these
2 documents that you have been able to produce that
3 show calls that in your mind should have come to you
4 instead of going to another call center or to a third
5 party outside the company?
6    A. No. That's why we requested your records.
7    Q. Okay. Let's take a break.
8         (Whereupon a short recess
9           was taken.)
10   Q. I have a follow-up with a couple of
11 questions on the subject that I was belaboring
12 before. In terms of the types of parts that people,
13 that the calls going in to Andover that you thought
14 should be coming to MITG, if those were parts that
15 were, that you could acquire through CSN, is it true
16 that those parts would not have been subject to the
17 75/25 profit split if you acquired those through CSN?
18   A. That is a correct statement.
19   Q. Okay. And for these parts that we talked
20 about in Exhibits B and C where they were referring,
21 they being internal HP people, to Super Warehouse or
22 to Ambry or something else, if those parts were
23 available, if they contacted you and they were
24 available via CSN, that would not have been subject
25 to the 75/25 percent split, correct?

Page 204

1    A. That is correct.
2    Q. The parts that were subject to the 75/25
3 split were a sourced product, whether they be
4 multivendor or whether they be out of stock or legacy
5 parts, is that correct?
6    A. That's correct.
7    Q. And the compensation that MITG is, Compaq
8 Direct and HP Direct got in part for selling those
9 CSN parts was the $41,000 a month, is that correct?
10   A. That is correct.
11   Q. All right. Did you ever do an analysis to
12 determine whether or not that $41,000 a month payment
13 for the sale of the CSN parts was a good deal, a bad
14 deal, a break even deal?
15   A. Not specifically, no.
16   Q. Did you have a sense during the time of the
17 Standard Support Agreement whether 41,000 was working
18 out to be a number that was break even or better for
19 MITG?
20   A. It all depended. Certain months had
21 different answers to that. On the average I would
22 say it was probably a break even or a little bit less
23 deal depending on what services we had to do.
24   Q. The parts that you were selling to people
25 or offering to sell to people under that were

Page 109

1 interactive with the XML interface that MITG created
2 that you contend is loaded on Vista?
3    A. They could have very easily have just sent
4 a flat file XML format to our tool within HP and had
5 the same response.
6    Q. Do you have any knowledge of how Microsoft
7 or any other customers, specifically knowledge of how
8 any customer of Compaq or HP orders from the order
9 entry system, the Vista order entry system?
10    A. Today?
11    Q. Correct.
12    A. No.
13    Q. At any time?
14    A. I had --
15    Q. Other than your contention that Microsoft
16 was using your -- I'm trying to set that aside. Do
17 you have any knowledge of how Microsoft interacts
18 with Compaq or HP for ordering parts?
19    A. I have a rudimentary understanding of that
20 quite frankly hobbled together method of how those
21 things work, but I don't have specifics, no. I would
22 have to refer to your documentations of flows to go
23 see that.
24           (Whereupon a short recess
25            was taken.)

Page 110

1    Q. Mr. Haught, two or three follow-up
2 questions. You indicated that you were in Omaha when
3 orders came across that you thought were incorrect
4 and/or shouldn't have been going through the
5 Middleware and that you stuck your head up over the
6 cubicle and commented about it. Who did you comment
7 to?
8    A. Sherry Ellis.
9    Q. And what was Miss Ellis's response?
10    A. It's kind of her usual response. I'll get
11 to it. I'll look at it. Whatever. She was never
12 real proactive.
13    Q. Do you know if that order that you
14 allegedly saw was ever processed?
15    A. Through another channel. I mean, did I
16 process it? I was unable to process it.
17    Q. Why?
18    A. I didn't offer those finished goods.
19    Q. Okay. Well, I don't mean process.
20 Processed through so that it became a final order
21 that came in across that screen, it got billed, all
22 of these things got shipped, it got sent to the right
23 place?
24    A. I would assume so, yes. It was redirected,
25 if that's your correct question.

Page 111

1    Q. You assume so, but you don't really know
2 what happened to it?
3    A. No. I don't really have the specifics to
4 it, no.
5    Q. And you have indicated that you have been
6 to Omaha on more than one occasion for this data
7 entry process. Do you have travel records that would
8 show when you made those trips to Omaha?
9    A. Oh, I'm sure I could probably find credit
10 card receipts or hotel receipts, but otherwise I
11 wouldn't have any specific information, no. I mean,
12 I'm sure I can find that from the hotels.
13    Q. Okay. And, Jim, I would ask that you
14 consider the request that we get information that
15 shows when he made those trips to Omaha that he has
16 testified about.
17       MR. HANSEN: Are you making a formal
18 request for that, because your formal request before
19 was for travel expenses of MITG's employees that was
20 reimbursed by HP.
21       MS. CARROLL: Yes, I'm making a formal
22 request for these, yeah. I'm making a formal request
23 for this. If you'll consider that, I would
24 appreciate it.
25       MR. HANSEN: Okay.

Page 112

1       MS. CARROLL: Q. You -- during the time of
2 the Standard Support Agreement, and just making sure
3 that we are clear, February 7th of 2004, the Standard
4 Support Agreement is now in place?
5    A. 2002?
6    Q. 2002. I'm sorry.
7    A. That's okay. Long day.
8    Q. I know. It's early still, too. They have
9 -- from that time going forward I want to talk
10 initially, and I want to break this down a little bit
11 into your initial business when it was still Compaq
12 Direct premerger, and for the purpose of these
13 questions I would ask that you assume that my
14 statement that the merger happened in May of '02 is
15 correct. Before you -- before the merger, how much
16 business, so from February to May, how much of MITG's
17 business was addressing the needs of Compaq Direct's
18 customers pursuant to the Standard Support Agreement?
19    A. How do you want that answered? From a
20 dollar perspective I have no way of knowing it.
21    Q. How about a percentage of business,
22 resources dedicated to the work? Try to start with
23 that. How much of MITG's personnel were going to be
24 dedicated to servicing Compaq Direct customers under
25 the Standard Support Agreement?

Page 113

1  A. 75 to 80 percent maybe.
2  Q. And can you give me a rough estimate of the
3  percentage of revenue during this Compaq Direct only
4  time period, how much of MITG's revenue was generated
5  from sales or parts or service under the Standard
6  Support Agreement?
7  A. I have no way of doing that. I have no
8  recollection of that offhand.
9  Q. Okay. Is it fair to say it would be more
10 than 50 percent of your revenue was being derived
11 from business under the Standard Support Agreement?
12 A. At the time this is in effect?
13 Q. Yeah, from February to May, so the spring
14 of '02.
15 A. I would say that it's fair that it's more
16 than 50 percent, yes. Quite a bit more actually.
17 Q. Would it be along the lines of 75 to 85
18 percent, you think?
19 A. Probably. Yeah. And actually I would say
20 75 to 85 percent.
21 Q. Was there other business that you were
22 doing in the spring of '02 for Compaq Direct that was
23 not governed by the Standard Support Agreement?
24 A. Yes.
25 Q. Okay. Tell me what kind of business that

Page 114

1  was?
2  A. That was a specific piece of -- well, there
3  are multiple pieces actually, but I'm assuming the
4  specific piece you are referring to is in regards to
5  the third party parts which were procured
6  specifically for the service organization of Compaq
7  slash HP slash CEI slash whatever.
8  Q. And trying to focus just again in the
9  spring of '02, were you -- was MITG providing service
10 parts, so which means Compaq Direct service personnel
11 in need of multivendor parts would call and request
12 parts be shipped.
13 A. Well, now we are talking about two
14 different things now.
15 Q. Okay. I apologize.
16 A. That's all right.
17 Q. The service parts that you are talking
18 about, what are we talking about here?
19 A. They are specifically related to customers
20 such as Wiltel, Intel.
21 Q. Savvis maybe?
22 A. Yeah, Savvis, thank you. Savvis. I
23 believe we were even involved in some Sprint stuff.
24 I mean, there were various customers. I don't recall
25 all of them.

Page 115

1  Q. Okay. Half a dozen, give or take,
2  customers that MITG was providing service parts to?
3  A. Well, it could be more than a half a
4  dozen. It was an expansive number. It depended on
5  which ones we previously primarily serviced and which
6  ones were secondary or third on the tier, but, yes,
7  that's true.
8  Q. Just using Intel as an example, how did
9  that -- if Intel needed service parts and MITG was
10 going to provide them, how did that relationship or
11 how that did that scenario go?
12 A. Well, we were providing third party parts
13 anyway along with Compaq HP parts for the out of
14 stock, etc., scenario. There was a tool developed by
15 IP Revolution, which was a service dispatch tool.
16 That service dispatch tool -- and I'm speaking
17 strictly from hearsay, because I have not seen nor do
18 I have specific knowledge of their contract. I know
19 that IP Revolution was put in place to do specific
20 Sun related and Intel related technical support. I
21 don't want to say service calls, even though they did
22 dispatch service teams. I believe they had on-site
23 -- the term escapes me now, but basically engineers
24 like site engineers that were on site to do technical
25 assistance and things of that nature. IPR developed

Page 116

1  that piece of business, and through that then there
2  was a need to have properly diagnosed and properly
3  acquired parts to send out to these service
4  suppliers.
5  Q. So that service supplier needs -- and we
6  are talking about third party parts as well as non-
7  stocked or legacy Compaq and HP parts?
8  A. Most of the parts through that channel were
9  Sun, Intel. You might deal with Motorola in regard
10 to the processors. I mean, there were specific --
11 EMC Storage Works. I mean, there was a whole myriad
12 of, I would say, non-traditional enterprise plus type
13 equipment that those people specifically targeted.
14 Q. Now, when these folks were contacting MITG
15 for the service parts, were they contacting a number
16 that was answered, hi, this is MITG, or, hi, this is
17 Compaq Direct?
18 A. Who are these folks?
19 Q. The Intel. When you are talking about
20 shipping these service parts, who was contacting --
21 well, let me ask first. Who was contacting your
22 organization, regardless of which part of your
23 organization was being contacted? Who was contacting
24 you? Was it Wiltel and Savvis?
25 A. Well, it could have been customers direct.