E-FILED
Thursday, 01 September, 2005 11:31:29 AM
Clerk, U.S. District Court, ILCD

5

```
 1   SCOTT STRINGER

 2   of lawful age, having been first duly sworn to

 3   testify the truth, the whole truth, and nothing but

 4   the truth in the case aforesaid, deposes and says in

 5   reply to oral interrogatories, propounded as follows,

 6   to-wit:

 7                  EXAMINATION

 8           QUESTIONS BY MS. CARROLL:

 9       Q:  Can you please state your name for the

10   record, sir?

11       A:  Scott A. Stringer, S-t-r-i-n-g-e-r.

12       Q:  For whom do you work, Mr. Stringer?

13       A:  Uhy Advisors.

14       Q:  I take it from your CV you've had your

15   deposition taken before?

16       A:  Yes, ma'am.

17       Q:  I just want to remind you of a couple of

18   rules.  One, if you don't understand my question, if

19   you can please ask me to restate it or rephrase it.

20   If you answer the question, I'm going to assume you

21   understood it.  Is that all right?

22       A:  Yes, ma'am.

23       Q:  And the other thing is if you can try to

24   remember to let me finish my question some of which

25   take me a while before you begin your answer, that
```

PLAINTIFF'S
EXHIBIT
B
PART 1

1    **A:**  Nothing that's not stated in my report.

2    **Q:**  Okay.  Do you have any understanding as to

3    what kind of computer spare parts MITG was offering

4    for sale during the term of the standard support

5    agreement?

6    **A:**  No, ma'am, not specifically.

7    **Q:**  Do you have any understanding as to how MITG

8    made money or was compensated under the terms of the

9    standard support agreement?

10   **A:**  Yes, I do.

11   **Q:**  Tell me what your understanding is.

12   **A:**  Well, my understanding is that for certain

13   third party parts, that they were to pay HP a 25

14   percent of gross profit for that -- for those sales,

15   and that other sales, they did not have to pay that.

16   **Q:**  And what falls into sales?

17   **A:**  Sales to non third party.  And again, they

18   made their money by buying at a lower price than they

19   sold it at.

20   **Q:**  Fair enough.  That's pretty much the only

21   way you make money.  What's been referred to

22   throughout most of the depositions has been the

23   profit split, 75 percent, 25 percent split of the

24   profits.  Do you have any understanding as to --

25   well, let me back up.  You said certain third party

1    parts were subject to that split and other parts

2    weren't.  I want to get more specific on how you

3    define -- what your understanding is of certain third

4    party parts versus other parts.  Do you understand

5    that MITG during the time of the standard support

6    agreement had the ability to take orders for in stock

7    Compaq parts from customers that called in?

8        A:  Am I aware that they did?

9        Q:  Yes.

10       A:  I believe so, yes, ma'am.

11       Q:  And in some of the depositions you've read,

12   I think there has been a discussion about a

13   difference between in stock Compaq parts or Legacy

14   parts?

15       A:  That sounds familiar, yes, ma'am.

16       Q:  And do you have any recollection of reading

17   the explanation of what Legacy Compaq parts are?

18       A:  I don't recall, no, ma'am.

19       Q:  If you will for the purposes of my question

20   just assume that Legacy for the purpose that I'm

21   going to use it in this deposition means out of stock

22   or older Compaq parts that are no longer stocked by

23   Compaq or HP, okay?

24       A:  Yes, ma'am.

25       Q:  Do you have any understanding if a customer

1   called in and was buying a Legacy Compaq part, do you

2   know one way or the other whether that part was

3   subject to the 75, 25 profit split?

4       **A:** I can't remember as I sit here today.

5       **Q:** And then there is another group of parts

6   that are referred to in the depositions as third

7   party parts or multi vendor parts?

8       **A:** Yes, ma'am.

9       **Q:** Do you know what those are as opposed to the

10  Legacy parts and the in stock Compaq parts?

11      **A:** As I sit here today, I just can't recall

12  those distinctions.  When we put our report together,

13  we relied on information that we got out of the

14  documents, and the nomenclature and definitions

15  behind those documents, although I read them, they

16  obviously didn't stick completely for today.

17      **Q:** Do you have an understanding whether if a

18  customer called Compaq Direct, gets MITG, and the

19  part they want is in stock in Compaq's system or in

20  HP's system, whether that part was subject to the 75,

21  25 split?

22      **A:** I can't remember exactly the 75, 25, the

23  distinctions.

24      **Q:** Other than the 75, 25 split, was there any

25  other way that MITG was compensated for work it was

1  that would appear to be a different number.  Did you

2  talk to anybody to try to see where these numbers

3  came from since they don't seem to be consistent

4  between these two charts?

5      A:  As I said, we didn't attempt to reconcile.

6  It was our understanding that this was a more

7  complete document and that it was representative of

8  the numbers we needed for the calculation.

9      Q:  And it was your understanding that it was

10  more complete, was that based on your own analysis or

11  was that based on deposition testimony or something

12  you heard from MITG or Mr. Hansen?

13      A:  I don't remember exactly how I gained that

14  understanding.  It was probably a combination of

15  several things that you just mentioned.

16      Q:  Do you recall putting a call into Mr. Hansen

17  or anyone else to ask him if there was any

18  explanation as to what these various columns meant?

19      A:  I don't remember if I did or not.

20      Q:  Now, we saw when we looked at the deposition

21  testimony of Ms. Pound that she indicated that

22  Andover handled DEC calls and Compaq calls.  Do you

23  have any idea how if MITG was to handle those calls

24  how they would be compensated for that business under

25  the standard support agreement?

53

1        A:  I believe it would have been in a similar

2    manner that they were handling the calls that they

3    were getting.

4        Q:  The 75, 25 split?

5        A:  On certain parts of the business and not on

6    other parts of the business.

7        Q:  Well, what parts -- again, what parts of the

8    Andover -- just assume for me that Andover was

9    selling only in stock Compaq or DEC parts.  If those

10   calls were going to Andover, those calls for in stock

11   Compaq and DEC parts went to MITG, how would MITG

12   have been compensated for selling those parts by

13   Compaq Direct?

14       A:  We took a little different approach in

15   calculating that.  When we received this information

16   on the sales at Roseville that theoretically should

17   have gone to MITG, we asked the question because we

18   didn't have detailed information about what qualified

19   for the split and what didn't qualify for the split,

20   and the representation that we received from Ms. Koch

21   through a spreadsheet was that -- which we

22   recalculated, that the average amount would be 45

23   percent of sales would be subject to the 25 percent

24   split with HP.

25       Q:  Do you have that documentation that Ms. Koch

54

1    sent you?

2        **A:**  Yes, ma'am, I do.  This is what Ms. Koch

3    sent us.  And this is the spreadsheet we prepared to

4    determine the 45 percent.

5        **Q:**  All right.  Let's start with this.  And I'm

6    going to note that this document was never produced

7    to us by me specifically asking Ms. Koch if she

8    provided anything that had not been provided in

9    discovery, and she said no, other than the E-mails.

10   So let me get this marked as a deposition exhibit and

11   I'll have you explain your understanding of it.

12   (Deposition Exhibit 60 marked for

13   identification.)

14       **Q:**  Page two of Exhibit 60 is the spreadsheet

15   that you indicate -- you said that Ms. Koch gave to

16   you, sent to you?

17       **A:**  She sent to us, yes, ma'am.

18       **Q:**  Now, explain what is being depicted on here.

19       **A:**   Okay.  What this represents is the actual

20   sales and 25 percent split that MITG had for 2003 and

21   the split that they had with HP.  So this is actually

22   sales information and split information.

23       **Q:**  And what Ms. Koch told you is that 45

24   percent of their total sales were subject to the 75,

25   25 split?

1      A:  Actually, what Ms. Koch did was supply this

2   document.  And then we took the totals of these

3   documents and prepared our own sheet which basically

4   came to 45 percent so that we could use just one

5   number to extrapolate the amount of the split to 45

6   percent.

7      Q:  Well, let me go back because I'm still not

8   following.  Ms. Koch, the information that she

9   provided here, is she telling you that this

10  represents the invoice totals, etc. for all sales of

11  parts that were subject to the 75, 25 split?

12     A:  No, ma'am.  What this represents is the

13  actual sales of MITG for 2003 as well as the amount

14  subject to the 25 percent split.

15     Q:  Okay.  So what is the number -- on what

16  she's given you, what she's given you is the total

17  revenue for sales to -- subject to the 75, 25 split;

18  is that one of those columns there?

19     A:  What we have here is the 25 percent amount

20  that -- let's see here.  I've got it laid out a

21  certain way.  I want to make sure I answer this

22  correctly.  Right, this column represents the 25

23  percent fees paid.

24     Q:  The one that says 25 percent?

25     A:  Yes, ma'am.  So I can't break out the actual

1 sales that that was to on this column, but what I can

2 do is I basically determined that these are the

3 amount -- this is the amount of the 25 percent

4 payment. And when I -- let's see. When I look at

5 that amount relative to the total sales before the 25

6 percent, basically, I take 453,869 divided by 4 or

7 divided by .25, excuse me, that's the implied gross

8 on 25 percent fees. So if you will, I back into from

9 the top side kind of mentality, what the total sales

10 subject to 25 percent is, compare that number to the

11 total sales per here which is the addition of these

12 two columns to come up with 43.12 percent.

13    Q:  Okay.  Do you know how Ms. Koch came up with

14 all the numbers in these columns, do you know what

15 documents she relied on?

16    A:  We asked her to provide the information from

17 her records.

18    Q:  Did she?

19    A:  That was the representation to us.

20    Q:  But you don't know what the backup for this

21 -- you've never seen the backup for the spreadsheet?

22    A:  No, ma'am.

23       MS. CARROLL:  I'm just going to say right

24 now I'm objecting on the record to this document

25 being given to me at this time based on the

1   deposition testimony of your witness who says she

2   didn't provide anything and based on the deposition

3   testimony of your witness that she couldn't divide

4   out the information, unless you're going to tell me I

5   have the backup documentation to figure this out.

6          MR. HANSEN:  First of all, I'll state for

7   the record this is the first time I've seen this

8   document.  Had I gotten this before, I would have

9   sent it to you.

10          MS. CARROLL:  I'm sure you would have.  I'm

11   not implicating you.  I'm indicating I think your

12   client was either forgetful or not entirely truthful

13   in her deposition.

14          MR. HANSEN:  Well, I'll have to check.

15   You're calling my client a liar, I object to that.

16   This information, 2003 monthly totals, has been

17   provided I believe in document MITG -- what you have

18   in front of you, 613.  In looking at this, I haven't

19   sat here and added them up.  I don't know if you

20   add--

21          MS. CARROLL:  It doesn't add up.  That's my

22   point is the numbers here -- well, let me just ask

23   some questions.

24      Q:  Let's look at this.  If you don't know where

25   the source of this information is, that's fine.

1  the top line for the CD monthly totals which are the

2  business to consumer; is that right?

3      A:  I believe so, yes, ma'am.

4      Q:  For January, their total invoices for

5  business to consumer was $120,576.00.  There's sales

6  extension.  What are these different columns?  I'm

7  not sure I'm following.

8      A:  Our understanding after looking at the

9  documents that when it says sales extension, that's

10  the sales number.  However, you have to add the

11  restock fee to get their actual sales.  That's the

12  way they account for their sales.

13      Q:  What is a restock fee?

14      A:  A fee for restocking.  I can't go into much

15  more detail than that.

16      Q:  But if you're selling something, you're not

17  restocking.  I thought a restock fee was charged to

18  somebody if they return a product.

19      A:  What we were just trying to capture is how

20  do they account for their revenue, and their revenue

21  is a component of both of those pieces.  And it was

22  insignificant.  Purchase extension, our understanding

23  is that's cost of goods sold.

24      Q:  Did you confirm that with Ms. Koch or are

25  you just figuring that based on the numbers there,

61

1  that makes sense?

2      **A:** We had seen that nomenclature throughout our

3  process. And so our general understanding was that

4  when we saw that, it was cost of goods sold.

5      **Q:** Do you recall in other MITG documents cost

6  of goods sold being referred to as purchase

7  extension?

8      **A:** I believe so.

9      **Q:** And so ultimately, she gets a profit, Ms.

10  Koch is telling you looking still at the month of

11  January that the profit that she made on a total of

12  134,000 sales, MITG made $62,900.00?

13      **A:** Well, you think that. But for whatever

14  reason, it doesn't crossfoot properly. So what we

15  did was understanding that that is sales plus the

16  restock fee and understanding that that is cost of

17  goods sold, we did our own calculations as to what

18  that is. So even though naturally you would think

19  that that would be the number, for purposes of our

20  analysis, we picked up these numbers, these numbers

21  and these numbers, as well as for the 25 percent

22  split.

23      **Q:** So is it sales extension plus restock fee

24  minus purchase extension equals profit?

25      **A:** On this schedule, no. Again, we only picked

1  certain parts out.  We weren't able to determine and

2  we noticed that we weren't able to calculate profit

3  accurately on this.

4      Q:  Okay.

5      A:  Again, instead of critiquing, we didn't take

6  the approach to try to critique her document, we just

7  wanted to be able to say what can we pull out of her

8  document which is the sales, and we're counting, so

9  we know sales minus cost of goods sold equals gross

10  profit.  I just wanted to punch some numbers in to

11  try to see where the disconnect was.

12      Q:  Do you recall seeing in the deposition

13  testimony of Ms. Koch that in the 0612 through 14

14  that cost of goods sold, the 25 percent incentive as

15  it was referred to at times, the 25 percent portion

16  of the profit to HP was included in the cost of goods

17  sold?

18      A:  Since I didn't rely on this document, it's

19  not ringing a bell.

20      Q:  Okay.  I didn't know if that affected the

21  way that -- if your cost of goods sold, if you knew

22  whether she was counting the 25 percent incentive as

23  a part of the cost of goods sold.

24      A:  We calculated that separately in our sheet,

25  and we assumed that the purchase extension was

1  strictly the cost of product.

2  **Q:** Okay. Let's go back to this now. Going to

3  the first page of Exhibit 60 that you created, total

4  sales, we see that that's out of her category or

5  sales extension out of Ms. Koch's documents?

6  **A:** Yes, ma'am.

7  **Q:** What does weight mean, you're just dividing

8  how much was between the two of them; is that right?

9  **A:** Correct, yes, ma'am.

10  **Q:** So about two-thirds of their business was

11  business to business?

12  **A:** Yes, ma'am.

13  **Q:** Okay. Total of 25 percent fees paid, what

14  is this?

15  **A:** That is just a summation of this column from

16  page two.

17  **Q:** And then implied gross on 25 percent fees?

18  **A:** Yeah. That's basically multiplying the 25

19  percent fees paid column times four.

20  **Q:** So on this, ultimately what you decided by

21  attempting to back into her number is assuming that

22  the sales numbers that she's given you are correct

23  and the 25 percent fee is correct, then this other

24  column implied gross on 25 percent would end up being

25  the sales minus cost of goods sold would give you

1   this number in this column; is that correct?

2        A:  Yes, ma'am.

3        Q:  Now, by taking -- I don't even remember how

4   we got to that document.  We were talking about how

5   you figured -- going back to where we are or where, I

6   think we were anyway, you said that you determined

7   based on what we've now marked as Exhibit 60 and

8   talked about that 45 percent of MITG's total business

9   was sales that were subject to the 75, 25 split of

10  the standard support agreement?

11       A:  Yes, ma'am, that's correct.

12       Q:  Why is that calculation relevant to your

13  calculation of revenue that would have been generated

14  on part sales if the Andover business had been sent

15  to MITG?

16       A:  The assumption is that the Andover business

17  would have the same mix of 25 percent profit going to

18  HP as MITG's 2003 financials.

19       Q:  I want to go back, and I'm sorry to seem

20  like I'm belaboring this point, but do you know what

21  are the other -- I guess what's the other 55 percent

22  of MITG's business that is not the subject of the 75,

23  25 split?

24       A:  No, ma'am.

25       Q:  You don't know that?

1       **A:** No, ma'am.

2       **Q:** Do you have any understanding whether any of

3  those sales are done that are subject to the standard

4  support agreement, but not subject to the 75, 25

5  split?

6       **A:** You're talking about the sales from Andover?

7       **Q:** Sales that MITG was doing -- the other 55

8  percent of their business, was there any of that

9  business that was covered by the standard support

10  agreement, but not subject to the 75, 25 split?

11      **A:** Based upon this analysis, we had to

12  determine that 55 percent was not subject to the 25

13  percent split and the other 45 was.  But we didn't

14  have any other detail, ma'am, other than this

15  document to determine that.

16      **Q:** And you don't know whether the parts that

17  were sold that are the subject of this 45 -- 45

18  percent of this business, whether these parts were in

19  stock Compaq parts, Legacy Compaq parts or multi

20  vendor parts?

21      **A:** We were not able to go to that level of

22  detail, that's correct.

23      **Q:** Did you ask anyone from MITG or Mr. Hansen

24  about that point, what type of parts, which category

25  of parts or categories of parts made up this 45

72

1      **A:** Well, you make -- often times, you don't

2  have complete data when you're asked to testify about

3  damages, and so you have to make certain assumptions.

4  And it's a judgment call based upon the fact pattern

5  and the type of company you're dealing with, etc.  We

6  felt it was a reasonable approach to utilize those

7  ten months.

8      **Q:** So we've got that amount for the diverted

9  sales, and that is assuming that all the money made

10  by the Andover Call Center that is on Exhibit 52

11  would have been revenues earned by MITG if they had

12  been sent those calls?

13      **A:** That is correct, ma'am.

14      **Q:** And now, you have on Exhibit Roman 3-3 the

15  numbers for the year 2002?

16      **A:** That is correct, ma'am.

17      **Q:** Why did you start your analysis in May of

18  2002?

19      **A:** Well, it's primarily because of Exhibit 52

20  because our understanding is that this document

21  quantifies what was done in Andover now being done at

22  Roseville.

23      **Q:** Is it your understanding that the call

24  center activity at Andover was transitioned to

25  Roseville in May of 2002?

1      **A:**  That is my understanding.

2      **Q:**  Let me have you look at the highlighted

3   testimony on the top of page nine from Diane Pound.

4      **A:**  Yes, ma'am.

5      **Q:**  Okay.  Do you understand Ms. Pound's

6   testimony there to be that the Andover Call Center

7   was -- started the transition in early 2003, and it

8   was finished in April of 2003?

9      **A:**  I do as I read it now, yes, ma'am.

10     **Q:**  Okay.  Assuming that this testimony that Ms.

11  Pound gave under oath is accurate, does it -- would

12  it be appropriate to include the diverted sales in

13  2002 when the work was still being done at Roseville?

14          MR. HANSEN:  Object to the form of the

15  question.  I think it misstated your question.  Do

16  you mean when the work was still being done at

17  Andover?

18          MS. CARROLL:  Thank you.

19     **Q:**  Assuming that Ms. Pound's testimony is true

20  that the transition occurred in early 2003 and

21  finished in April of 2003, would it be appropriate to

22  include in your calculations diverted sales for 2002

23  when that work was still being done in Andover?

24     **A:**  Unless my understanding is wrong, my

25  understanding was that this document contained what

1          MS. CARROLL:  Correct.

2          MR. HANSEN:  Times--

3          MS. CARROLL:  45 percent times 25 percent,

4   and that got you the $45,697.00 that he's calculated

5   for 25 percent to HP on diverted sales.

6          MR. HANSEN:  Okay.

7      Q:  Now, let me go back though because what

8   you're saying is that only on -- they got all the

9   sales, they get 100 percent of the sales, but only on

10  45 percent of those sales did they have to give up 25

11  percent of the profit?

12     A:  Yes, ma'am.

13     Q:  Why are you making the assumption that they

14  would get all of the revenue -- they get all of the

15  revenue for the other 55 percent of the business that

16  they were doing?

17     A:  Because it was not subject to the 25

18  percent.

19     Q:  But there was business that they did that

20  when they told parts, they were in stock, for in

21  stock parts, those parts when we looked at the

22  testimony before, the way they got compensated out of

23  that was the 41,000 only.  They did not get the

24  revenue on those parts.

25     A:  That's not my understanding.

1    all, I did not rely on this statement.  I utilized

2    what I thought were more specific information about

3    the sales.  I can juggle and re-categorize things

4    with the numbers, but I'm not sure that that would

5    change my bottom line.

6        **Q:**  Okay.  Assume something for me.  Assume that

7    the amount of business that MITG was doing with HP

8    under the standard support agreement was the majority

9    of their work, so all the parts under the standard

10   support agreement plus they sold what was referred to

11   as service parts.  Do you remember that?

12       **A:**  Yes.

13       **Q:**  And they had some business that Ms. Koch

14   estimated when I asked her on page 21 of her

15   deposition do you have any idea as you sit here today

16   how much revenue MITG generated in 2003 from non HP

17   Direct related business, and she said a ball park

18   guess in the 10 to $30,000.00 a month range.  So you

19   have this little piece that's non HP Direct, and then

20   there is some service part business that is not

21   subject to the standard support agreement.  There are

22   the parts that they're selling, the 45 percent of

23   their business as you've calculated on Exhibit 60

24   that they get a 75, 25 split.  Do you understand that

25   their business was the sale of parts, that all they

1   did was put an order entry in to CSN and never looked

2   at -- never got that part, never invoiced that part,

3   never got cash in, never took in revenue for that

4   part?

5         MR. HANSEN:  Object to the form.  Go ahead.

6     **A:**  That doesn't make sense.  I'm not sure why

7   they would sell product and not make a profit on it.

8     **Q:**  Well, they have -- let me show you again or

9   for the first time if I didn't show it to you before

10  information on -- looking again, because I'm talking

11  to her about this number in 2003 on MITG 0613, and I

12  said to her so what this number includes, the 8.7

13  million that we're looking at, almost 8.8 million in

14  2003, is all of that sourced product, MITG's profit

15  on the sourced product, the $41,000.00 a month plus

16  the cost of the stocked parts on CSN's web site,

17  correct.  And so what profit is that they're making

18  is that they were selling parts on CSN, and the

19  $41,000.00 minimum that they were getting under the

20  standard support agreement was substituted as the

21  automatic profit that they got or the efforts they

22  were making for selling in stock Compaq parts.  Has

23  that been explained to you at all?

24     **A:**  Well, the way I read your question is that

25  she's explaining the 8.7 million -- obviously, sales,

1   if you work backwards, sales is a function of your

2   profit plus your costs, it's working backwards from

3   the gross margin calculation, plus the 41,000.  So

4   she's representing that that number includes all of

5   those things.  And I guess what you're asking me to

6   say is for -- she's saying here a month plus the cost

7   of the stock parts and CSN's web site.  Are you

8   telling me that she only received $41,000.00 a month

9   on certain products and no gross profit on the

10  difference between sales?

11      Q:  Correct.

12      A:  It's very convoluted.  It's not clear to me.

13  I apologize.  That just wasn't clear to me.

14      Q:  No problem.  Just so I'm clear, what you

15  have done here is -- well, strike that.  It is not

16  your understanding or you have not come to an

17  understanding that when a customer called in and

18  wanted to buy parts, if MITG could acquire those

19  parts or those parts were in stock, that MITG did the

20  data entry and was done with that part other than

21  potentially tracking it for customer service reasons,

22  but they didn't -- it didn't come out of their

23  warehouse, they didn't box it up, they didn't ship

24  it, they didn't pay for it, they didn't invoice the

25  customer, that that was all done by Compaq, and

1   regardless of how many CSN parts or how few CSN

2   parts, that they were guaranteed to get at least

3   $41,000.00 a month?

4       MR. HANSEN:  Object to the form.  I think

5   it's compound.  Subject to that, go ahead.

6       A:  My understanding is that the $41,000.00 a

7   month is based upon call volume and not necessarily

8   dollar volume, but that in addition to that 41,000,

9   they received a profit from selling their products.

10  And I relied on information -- the information that I

11  discussed that I received to determine what their

12  gross profit percentage was on those sales.

13      Q:  Page 15 of Ms. Koch's deposition, lines 5

14  through 17, starting with my question, do you know

15  how, if at all, MITG was compensated for the sale of

16  CSN parts?

17      A:  Okay.

18      Q:  Do you recall reading that or do you recall

19  getting any explanation about this $41,000.00 being

20  compensation for the sale of CSN parts?

21      A:  My understanding was that the $41,000.00 was

22  for handling the call volume.

23      Q:  And so no one ever told you that that also

24  served as compensation for making any sales of parts

25  that were in stock at Compaq?

96

1    **A:** If I misunderstood it, again, my

2    understanding was that that was for call volume, and

3    I asked for gross profit information and utilized

4    that information in my report.

5    **Q:** All right. So just to be clear, no one ever

6    gave you an understanding that that was -- that also

7    included in that $41,000.00 was whatever compensation

8    they may get for selling CSN parts?

9    **A:** Again, my understanding was that the 41,000

10    was for call volume--

11    **Q:** And didn't have anything to do with parts?

12    **A:** And that they earned a profit from selling

13    the parts as well.

14    **Q:** And all parts, no matter where it came from?

15    **A:** That was my understanding.

16    **Q:** So what you did was based on the information

17    that Teresa Kock gave you that's part of Exhibit 60,

18    you assumed then that all of the business that --

19    that 45 percent of the business that MITG did they

20    had to give to -- the 25 percent cut of the profit to

21    HP, and on the remaining 55 percent of the business,

22    all of the revenue that was generated for their sales

23    came into the account of MITG for their revenue

24    purposes?

25    **A:** Yes, ma'am.

97

1    Q:  I know you did not rely on the spreadsheets

2    that were Exhibit 46, but is it your belief that

3    these numbers -- or do you have an understanding

4    whether these numbers are supposed to represent the

5    total amount of money, revenue, that came in to

6    MITG's pocket when you're looking at sales and

7    revenue?

8    A:  I haven't analyzed this statement other than

9    to look at what it is.  My understanding or my belief

10   is that it includes items that I should not -- that

11   was not to include or to analyze with respect to this

12   assignment, and that there were other non HP business

13   that this company handles, and as a result, you can't

14   use this if it doesn't have the HP -- it isn't just

15   solely for what I'm looking at.

16   Q:  Now, the 45 percent number that you

17   determined was the sales subject to the 75, 25 split,

18   was that a number she gave you or did you calculate

19   that?

20   A:  I calculated that.

21   Q:  Based on what?

22   A:  Well, my earlier testimony indicated I took

23   the numbers on the second page that was calculated

24   for MITG on a monthly basis, and we determined --

25   backed into the amount that would be subject to the

98

1    25 percent because we had the 25 percent number.

2        Q:  But how did you determine that that amount

3    of business was 45 percent of the total MITG

4    business?

5        A:  Through our calculation.

6        Q:  Okay.  Remind me again.

7        A:  Okay.  Total of 25 percent fees paid

8    453,869, if that's the 25 percent fee, then multiply

9    that times 4, and then that would be the base that

10   those fees were paid, and then we compared that

11   number, 1.8 million, to this 4.2 million and

12   determined that 43 percent of it.

13       Q:  So you determined -- you understood this to

14   be $453,000.00 was paid to HP?

15       A:  Yes, ma'am.  That's the way we've done it.

16   I'm not sure it's right as I look at it now though.

17       Q:  Because the 25 percent that you have here,

18   if you multiply that number out by 4, that is to get

19   this implied gross, that would actually give you the

20   total profit on these sales?

21       A:  Yes.

22       Q:  And that may be 45 percent, but that doesn't

23   determine whether this 4.2 million, what percentage

24   of the overall revenue of MITG that is, right?

25       A:  Actually, I think this is an error because

1  I'm comparing apples and oranges because this should

2  be gross profit versus sales.  And I think this is

3  income, not actual payments.  So subject to that,

4  what that will do, ma'am, I believe, and obviously,

5  I've got a couple of things, and I've got more

6  information that I'm going to have to utilize anyway,

7  but I think what that does is it reduces my 45

8  percent share number.  I have overstated it.

9      Q:  Well, if you assume that this 4.2 million is

10  correct on those sales and you look at this document,

11  MITG 0613, that has the total 8.7 million, shouldn't

12  the calculation if you're trying to determine what

13  percentage of MITG's business is subject to the

14  split, shouldn't it be what the percentage -- this

15  4.2 versus this 8.7?

16      A:  No.  Because my understanding was is that

17  MITG was a call center for other non HP customers.

18      Q:  Right.  But if this is the total revenue

19  that was generated by standard support agreement

20  business, and all the other business that they had

21  was everything else, whether it be non HP business,

22  other companies or anything else, then they generated

23  another 4.5 million from other sources, right?

24      A:  Correct.

25      Q:  So I mean you're looking really at something

1    minimum which was 7,810 calls?

2        A:  Yes, ma'am.

3        Q:  And if they got more than 7,810 calls, they

4    got paid $5.25?

5        A:  Yes, ma'am.

6        Q:  So then for the purpose of doing your

7    calculations here, what you did was -- well, let's go

8    back to 3 because we don't need to be on Roman 4 for

9    that.  Let's go back to the breach of contract part,

10   so Exhibit 3-1, 2 and 3.

11       A:  Okay.

12       Q:  What you did there is have -- it says call

13   center revenue on diverted calls, and you have dollar

14   figures all the way across here, and are you saying

15   then that, for example, in January of 2003, that if

16   all of these calls had come from Andover and gone to

17   MITG, there would have been additional calls at $5.25

18   and would have generated $21,184.00?

19       A:  Yes, ma'am.

20       Q:  So that would be an additional 4,035 calls

21   under my calculation.

22       A:  Exactly.

23       Q:  All right.  Let's start with where did you

24   get the number of calls for each of those months,

25   what documents did you look at?

1      **A:** I utilized Exhibit 52. And specifically,

2  the gross orders column. I added those numbers, and

3  then based upon discussion with Ron Haught that

4  average call volume was about 5,000 calls per month.

5  I added these numbers to 5,000, and if I was short of

6  7,810, there was no revenue, and if I was over 7,810,

7  I had additional revenue.

8      **Q:** Did you do anything to verify the accuracy

9  of Ron Haught's claim that they averaged 5,000 calls

10  per month?

11      **A:** I did look at a call -- kind of on a spot

12  basis, looked at a call sheet.

13      **Q:** Let me show you these that are marked as

14  Exhibit 53 which are all of the call volume sheets

15  that were produced by MITG. And I think that may

16  start with '02 instead of '03.

17      **A:** Yes.

18      **Q:** Let me tell you the Bates number that gets

19  to '03 is MITG 0673. I've got that marked as the

20  first '03 sheet.

21      **A:** These numbers all add up to more than 5,000

22  it looks like.

23      **Q:** Let me show you some other -- the call stats

24  document is Exhibit 54, and this is the 2003 call

25  stats, and this was a document that was given to HP

1  were severely understated for the beginning of the

2  contract and overstated toward the end?

3      A:  Well, the first month we calculated, for

4  example, we were 450 under.  And then in January was

5  much lower than February and March, so.

6      Q:  As you sit here today, you can't say whether

7  it's a wash or not, it's your belief that just

8  glancing at that, it might be a wash?

9      A:  My guess is, ma'am, -- I'm sorry, my opinion

10  is that it's probably not significantly different.  I

11  have not done a detailed analysis of this.  For

12  purposes of, you know, getting this report done, that

13  seemed like a reasonable number based upon what I was

14  able to see.  And it may be different month by month,

15  but all in all, 5,000 seemed like a reasonable

16  number.

17      Q:  And neither you nor the two people working

18  with you went through all those pages of documents

19  that you were provided on call volume to determine

20  whether or not Mr. Haught's statement was accurate

21  throughout the life of the contract?

22      A:  You know, sometimes, it's easier to ask for

23  a number and then look at a document and test it

24  rather than to compile every bit and piece of a

25  document.  We made the judgment, whether it was right

1   or wrong, we made the judgment that the 5,000 call

2   amount number seemed reasonable based upon looking at

3   this document and looking at a few months.

4       Q:  So when calculating damages, you're going to

5   get in front of a jury and ask a jury to award,

6   you're going to say I had 24 months worth of data on

7   these sheets and there were three of us working on

8   this file, and rather than doing the addition, three

9   CPA's doing the addition, we just listened to what

10  our client told us was the number?

11          MR. HANSEN:  Object to the form,

12  argumentative.  If you want to rephrase your

13  question--

14          MS. CARROLL:  I'm not going to rephrase my

15  question.

16          MR. HANSEN:  Object to the form,

17  argumentative.

18      A:  We felt that the call center revenue number

19  was not the most significant part of this analysis

20  and that there are -- there was additional discovery

21  ongoing and that hopefully, we would get more

22  specific detail and would have the opportunity to

23  amend our report as such.  And considering the call

24  volume revenue relative to the lost profits which is

25  a generally accepted accounting principal, it's

1  buying parts that were subject to the 75, 25 split,

2  and so that you were not supposed to give any

3  credits, so you decided based on that not to give any

4  credits for those sales?

5       MR. HANSEN:  Object to the form.  I don't

6  think anyone told him that.

7    A:  I'll try to answer your questions.  My

8  understanding throughout this case was that it's

9  difficult to determine -- I've got a profit and loss

10  statement showing 8 million dollars in revenues.

11  I've got another statement showing 4 million dollars.

12  I've customers subject to the 25 percent.  I've got

13  customers not subject to the 25 percent.  My

14  understanding is I've got customers that aren't even

15  part of this deal.  Because of the confusion of that

16  data, I had to pick and choose what I relied on, and

17  this particular document wasn't explained well enough

18  to me.  We made a decision trying to get our report

19  done on June 30th that we didn't understand it, we

20  were told that -- you know, we didn't know how this

21  impacted our analysis, so we relied strictly on --

22  sort of the macro analysis that says Mr. Haught, what

23  reduction is that going to be, and we relied on that

24  analysis rather than a detailed analysis because we

25  didn't feel, and thank you for bearing with my long

1   answer, because we didn't feel like we could rely on

2   this document because we didn't understand it.

3       Q:  So does your analysis assume that every

4   customer who bought something that was subject to the

5   75, 25 profit split never bought anything after the

6   end of the standard support agreement?

7       A:  No, ma'am.  It assumes that -- let me think

8   here a minute.  Yes, it does.  Your exactly right,

9   yes, ma'am.

10          MS. CARROLL:  Let's take a break.

11  (At this time, a break was taken.)

12  (Deposition Exhibits 61 and 62 marked for

13  identification.)

14      Q:  I'm going to hand you Exhibit 61 and 62

15  which are two E-mails that Ms. Koch forwarded to Mr.

16  Hansen that below the forwarding information, it

17  looks like either E-mails she had either with you or

18  people in your office, and I just want to know --

19  take a look at those and tell me what, if anything,

20  you learned from those two E-mails.

21      A:  Yes, ma'am.

22      Q:  What, if anything, did you learn from

23  Exhibit 61 and 62 that you used in your report?

24      A:  Okay.  Attached to Exhibit 61 was an Excel

25  spreadsheet, and from that Excel spreadsheet, we were