E-FILED
Wednesday, 14 September, 2005  03:24:13 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| Hewlett Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V. | ) ) ) ) | |
| PLAINTIFFS | ) ) | |
| v. | ) ) ) | CIVIL ACTION No. 04-3055 |
| Midwest Information Technology Group, Inc. and Michael Lauber | ) ) ) | |
| DEFENDANTS | ) ) | |

**EXPERT REPORT OF SCOTT A. STRINGER**
**June 30, 2005**

Respectfully submitted,

UHY Advisors

Scott A. Stringer

**EXHIBIT**

A

## I.    ASSIGNMENT

I have been retained by Mr. James A. Hansen attorney for Defendant Midwest Information Technology Group (MITG) to evaluate the economic damages in the above-styled litigation. As of this report date, my analysis and opinions are limited to damages pertaining to Counts I and V of the Counterclaim by MITG. To date, I have not yet billed for services rendered in this matter, however I have received an initial retainer of $5,000 pursuant to my letter of engagement. I will bill based upon the hourly rates of the individuals assigned to the engagement. My current hourly rate is $300 per hour. Other staff that have and may assist in this matter will be billed at our hourly rates ranging from $135 to $175 per hour.

This report summarizes my opinions and conclusions to date. It is my understanding that discovery in this matter is ongoing. Therefore, I reserve the right to supplement this report and update my opinions should additional information become available.

## II.    EXPERT QUALIFICATIONS

I am a managing director of UHY Advisors (UHY) and a licensed Certified Public Accountant. In addition, I am certified in business valuation by the National Association of Certified Valuation Analysts. My qualifications, including a list of all publications written in the last ten years and all deposition and trial testimony during the last four years, are included as Exhibit I.

## III.    INFORMATION REVIEWED

In developing my opinions in this case, I have reviewed certain documents and information. The information I reviewed and considered most relevant in this matter is listed in Exhibit II.

## IV.    BACKGROUND

On February 8, 2002, MITG entered into a two year Standard Support Agreement (the Agreement) with Compaq to provide call center services for the orders of computer parts by both business and consumer users of Compaq computers. Prior to the Agreement, MITG had operated as a call center for Compaq under a different contract since 2000. In May of 2002, Hewlett Packard (HP) acquired Compaq and became a party to the Agreement.

Later in 2002, HP began redirecting call center activity from the Andover facility (acquired in its merger with Compaq) to the HP Roseville call center or to other third parties. MITG is asserting in its Counterclaim Count I that servicing these calls was the exclusive right of MITG as stated in the Agreement.

Count V of the Counterclaim asserts that HP interfered with the business relationships of MITG by contacting both customers and vendors without the acknowledgement or

consent of MITG. This interference began prior to the termination of the agreement on February 7, 2004. It is the contention of MITG that the termination of the Agreement with HP did not end its business relationships with customers and vendors.

## V. ANALYSES

*Count I – Breach of Contract*

I obtained information from HP which reflected the actual call level and sales dollar volume for the Andover business transferred to Roseville. As shown on Exhibit III, I calculated the incremental profits that would have accrued to MITG had this business been transferred to MITG pursuant to the Agreement through February 7, 2004.

My analysis incorporated the average gross profit experienced by MITG, the effect on payments between HP and MITG pursuant to the Agreement, and the incremental costs in personnel and infrastructure that would have been incurred by MITG in supporting this additional volume of business.

Based upon the analysis performed, the amount of damages to MITG pursuant to Count I was $6,422,000, rounded.

*Count V – Tortuous Interference*

In conjunction with the information obtained in our analysis of Count I, we calculated lost profits to MITG, as shown on Exhibit IV, relating to Count V. We calculated the profit per month based upon the average profit achieved in 2003, including the effect of the profit diverted to Roseville as calculated on Exhibit III.

We then assumed that an incremental loss of profit occurred beginning with the end of the contract in February through December 2004 of between one and eleven percent. This loss of profit considers the expiration of the Agreement, offset by the assumption that the business relationships MITG formed were not hindered by HP, as Count V asserts.

Based upon the analysis performed, the cumulative amount of damages to MITG pursuant to Count V was $5,190,000, rounded, through December, 2004.

## VI. CONCLUSION

Based upon the work that I have performed in this matter, it is my opinion that the amount of damages sustained by MITG pertaining to Count I of the Counterclaim was $6,422,000. Further, it is my opinion that the amount of damages sustained by MITG pertaining to Count V of the Counterclaim was $5,190,000 through December, 2004.

**EXHIBIT I**

# CURRICULUM VITAE
# SCOTT A. STRINGER
### 06/30/2005

## EMPLOYMENT

**Current:**

(2001 – Present)
UHY Advisors
3117 South Big Bend Boulevard
St. Louis, Missouri 63143
Managing Director
Business Consulting Department Head

**History:**

(1997 – 2001)
Sabino Stringer & Associates LLC
St. Louis, Missouri
Member

(1991 – 1997)
Pritchard, Osborne, LLC
Clayton, Missouri
Member

(1992 - 1993)
Maryville University
Chesterfield, Missouri
Instructor of Accounting
(Concurrent with Pritchard Osborne)

(1988 - 1991)
Grant Thornton
St. Louis, Missouri
Senior Consultant

(1988 – 1989)
Southern Illinois University
Edwardsville, Illinois
Adjunct Instructor of Accounting
(Concurrent with Grant Thornton)

(1987 - 1988)
Coin Acceptors, Inc.
Clayton, Missouri
Manager of Financial Reporting
(1984 - 1987)
KPMG Peat Marwick LLP
St. Louis, Missouri
Senior Accountant

(1982 - 1984)
Pet, Incorporated
St. Louis, Missouri
Cost Accountant

**CERTIFICATIONS**

Certified Public Accountant
Certified Valuation Analyst

**EDUCATION**

**Graduate:**

St. Louis University, St. Louis, Missouri
Master in Business Administration - Finance

**Undergraduate:**

Southern Illinois University,
Edwardsville, Illinois
Bachelor of Science in Accountancy

**Other:**

Specialized Training in:

Business Valuation
Litigation Support
Fraud and Forensic Examinations

***TESTIMONY OVER***
***LAST FOUR YEARS***

2005 – *Computers Plus Inc. v Evers & Company,* Accounting standards required for a certified audit, Cole County, Missouri (deposition)

2005 –*Solavie v TricorBraun,* Lost Profits rebuttal, St. Louis Missouri (AAA arbitration)

2005 – *Jeffrey M. Lowel v. American Standard Inc.* Economic damages, US District Court, Eastern District of Missouri, Eastern Division (trial)
2004 – *DelVecchio v DelVecchio* – Projection of net income, St. Louis County, Missouri (trial)

2004 – *United States v Keith E. Anderson et al*, Propriety of business structure, US District Court, Western District of Washington at Seattle (trial)

2004 – *Cosman v Cosman*, Business Valuation, Marital Dissolution, St. Louis County, Missouri (deposition)

2004 – *Game Face Sports International inc., v Reuben O. Charles et al.,* Rebuttal of Damages, City of St. Louis, State of Missouri (deposition)

2004 – *Traffic Control v Able Industries,* Calculation of amounts owed under purchase agreement, rebuttal of damage calculation, St. Louis Missouri (AAA deposition)

2004 – *Mehard v. Mehard*, Business Valuation, Marital Dissolution, St. Louis County, Missouri (deposition and trial)

2004 – *Chipongian v. Edward Jones* Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2004 – *Jeffrey M. Lowe v. American Standard Inc.* Economic damages, US District Court, Eastern District of Missouri, Eastern Division (deposition)

2003 – *Brooks v. Morgan Stanley Dean Witter* Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2003 – *Clement v. Burns, Gustus & Co.*, Schedules of Trading Activity, St. Louis County, MO (deposition and trial)

2003 – *Scharff v. A.G. Edwards & Sons, Inc.*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2003 – *Moore v. Moore*, Business Valuation, Marital Dissolution, St. Louis County, Missouri (deposition)

2003 – *Bender v. Morgan Stanley Dean Witter Inc.*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2003 – *McLaughlin v. A.G. Edwards & Sons, Inc.*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2003 - *Muenz v. Muenz*, Calculation of expected income on investments, Marital Dissolution, St. Louis County, Missouri (trial)

2003 – *Wash Solutions, Inc et al. v. PDQ Manufacturing, Inc., et al*, Lost Profits calculation, US District Court, Eastern District of Missouri, Eastern Division (trial)

2003 – *Ehrler v. Morgan Keegan*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2003 – *Millner v. Millner*, Business Valuation, Marital Dissolution, St. Louis County, Missouri (trial)

2003 – *Jody DeBold and Tri-River Trading v. Jersey County Grain et al*, Compilation of trading activity records, rebuttal of damage calculation, Circuit Court for the City of St. Louis, Twenty-Second Judicial Court, State of Missouri (deposition)

2003 – *Wang Tong v. First Securities*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2002 – *Wash Solutions, Inc et al. v. PDQ Manufacturing, Inc., et al*, Lost Profits calculation, US District Court, Eastern District of Missouri, Eastern Division (deposition)

2002 – *McIntyre v. Blanford*, Business Valuation, Marital Dissolution, St. Louis County, Missouri (deposition)

2002 – *Link v. First Securities*, Schedules of Trading Activity, St. Louis, MO (NASD arbitration hearing)

2001 – *Hartzell v. Hartzell*, Business Valuation, Marital Dissolution, Jo Daviess County, Illinois (trial)

2001 *Smith v. Smith*, Business Valuation, Marital Dissolution, Franklin County, Missouri (trial)

2001 *Johnson v. Johnson*, Business Valuation, Marital Dissolution, St. Charles County, Missouri (deposition)

## PUBLICATIONS AND PRESENTATIONS OVER LAST TEN YEARS

"Managing Your Business For Success", presented at the Paint and Decorating Retailers Association conference, Phoenix AZ, March 18, 2005

"Income – What is it and Where is it?" presented at the Domestic Relations Seminar 2004, St. Louis County Bar Association, October 15, 2004

"Business Valuations – Factors Impacting Value," *St. Louis Courier Post*, June 14, 1996.

## PROFESSIONAL ORGANIZATIONS

American Institute of CPAs, 1987-Present

Missouri Society of CPAs, 1985 - Present

* Litigation Services Committee, 1995 – 1997

National Association of Certified Valuation Analysts, 1996 – Present

Association of Certified Fraud Examiners, 2002- Present

Estate Planning Council of St. Louis
2003 - Present

Missouri Venture Forum 1991-
Present

**SIGNIFICANT CIVIC POSITIONS**

National Children's Cancer Society,
Chairman, Vice Chairman, Member of
the Board, Audit Committee Chairman
1993 - present

**EXHIBIT II**

## INFORMATION REVIEWED

Various pleadings and court filings in this matter.

MITG prepared revenues and expenses for 2002 through 2004, Bates No.MITG 0612-0614.

HP prepared revenues and expenses from the Schmaderer deposition, Exhibits DDD and EEE.

MITG prepared documents for sales for 2004, Bates No. MITG 1023-1026.

HP documents regarding E-spares handled at Roseville, Bates No. HP 11007-11009, and HP 11048-11050.

MITG prepared documents on call volume, Bates No. MITG 0615-0724.

HP prepared documents for 2003 and 2004 labeled 2003 stats and 2004 stats.

HP prepared documents titled 41K Pmts.

Various e-mail documentation, Bates No. HP1139-1189

Deposition transcripts and exhibits for Teresa Koch, Charles Schmaderer, Roland Soriano, Chip Love, Louise Meyerfeld, Ronald Haught, Randy Wagner, Richard Chizek and Diane Pound.

Exhibit III-1

| | 2004 Year | | 2004 Total | Grand Total |
|---|---|---|---|---|
| | January | February | | |
| **Diverted Sales** | 1,070,692 | 267,673 | 1,338,365 | 19,061,355 |
| Average Gross Profit % | 40% | 40% | 40% | 40% |
| Gross Profit on Diverted Sales | 428,277 | 107,069 | 535,346 | 7,624,542 |
| **Add** | | | | |
| Call Center Revenue On Diverted Sales | 21,242 | 5,311 | 26,553 | 348,996 |
| **Total Lost Revenue** | 449,519 | 112,380 | 561,899 | 7,973,538 |
| **Less** | | | | |
| 25% to HP on Diverted Sales | (48,181) | (12,045) | (60,226) | (857,761) |
| **Incremental Operating Expense** | | | | |
| **Additional Staffing:** | | | | |
| 4 Admin $30k salary&benefit | (10,000) | (2,500) | (12,500) | (212,500) |
| 5 Agents $40k salary&benefit | (16,666) | (4,167) | (20,833) | (354,153) |
| 1 Supervisor $50k salary&benefit | (4,166) | (1,042) | (5,208) | (88,528) |
| **Extra Cost per Additional Staff:** | | | | |
| Phone and Headset | (416) | (104) | (520) | (8,840) |
| Computer | (166) | (42) | (208) | (3,528) |
| Licensing | (833) | (208) | (1,041) | (17,701) |
| Consumables | (416) | (104) | (520) | (8,840) |
| **Net Profit Per Month** | 368,675 | 92,169 | 460,843 | 6,421,688 |

Note 1: The gross margin used was the average calculated for 200?

Note 2: February includes just one week of activity due to contract ending on Feb 7th, 200?

Exhibit III-2

|  | | 2003 Year | | | | | | | | | | | |
|  | January | February | March | April | May | June | July | August | September | October | November | December | 2003 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Diverted Sales | 1,015,461 | 1,007,170 | 1,469,409 | 869,041 | 914,948 | 1,150,621 | 917,546 | 951,535 | 1,310,051 | 1,011,319 | 1,070,892 | 1,070,892 | 12,849,530 |
| Average Gross Profit % | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% |
| Gross Profit on Diverted Sales | 406,192 | 402,868 | 587,764 | 383,616 | 365,979 | 460,248 | 367,020 | 380,614 | 524,020 | 404,528 | 428,277 | 428,277 | 5,139,325 |
| **Add** | | | | | | | | | | | | | |
| Call Center Revenue On Diverted Sales | 21,184 | 23,231 | 30,434 | 19,084 | 23,035 | 16,286 | 16,643 | 27,678 | 17,796 | 16,254 | 21,242 | 21,242 | 254,906 |
| Total Lost Revenue | 427,376 | 426,099 | 618,198 | 402,700 | 388,914 | 476,534 | 383,663 | 408,107 | 541,816 | 420,782 | 449,519 | 449,519 | 5,394,229 |
| **Less** | | | | | | | | | | | | | |
| 25% to HP on Diverted Sales | (46,697) | (46,323) | (66,123) | (43,157) | (41,173) | (51,778) | (41,290) | (42,810) | (58,952) | (45,509) | (48,161) | (48,161) | (578,174) |
| **Incremental Operating Expense** | | | | | | | | | | | | | |
| **Additional Staffing:** | | | | | | | | | | | | | |
| 4 Admin $30k salary&benefit | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (120,000) |
| 5 Agents $40k salary&benefit | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (199,992) |
| 1 Supervisor $50k salary&benefit | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (49,992) |
| **Extra Cost per Additional Staff** | | | | | | | | | | | | | |
| Phone and Headset | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) |
| Computer | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (1,992) |
| Licensing | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (9,996) |
| Consumables | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) |
| **Net Profit Per Month** | 348,017 | 346,113 | 519,411 | 326,861 | 316,078 | 392,063 | 309,716 | 332,684 | 450,203 | 342,609 | 368,675 | 368,675 | 4,424,069 |

Note 1:   The gross margin used was the average calculated for 200C

Exhibit III-3

| | May | June | July | August | September | October | November | December | 2002 Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2002 Year | | | | |
| **Diverted Sales** | 56,547 | 350,945 | 337,288 | 542,046 | 827,827 | 785,602 | 852,123 | 1,122,324 | 4,874,682 |
| Average Gross Profit % | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% |
| Gross Profit on Diverted Sales | 22,619 | 140,378 | 134,907 | 216,818 | 331,131 | 314,241 | 340,849 | 448,930 | 1,949,873 |
| **Add** | | | | | | | | | |
| Call Center Revenue On Diverted Sales | - | - | 1,869 | 10,537 | 7,618 | 8,484 | 22,827 | 16,202 | 67,537 |
| **Total Lost Revenue** | 22,619 | 140,378 | 136,776 | 227,355 | 338,749 | 322,725 | 363,676 | 465,132 | 2,017,410 |
| **Less** | | | | | | | | | |
| 25% to HP on Diverted Sales | (2,545) | (15,793) | (15,177) | (24,392) | (37,252) | (35,352) | (38,346) | (50,505) | (219,361) |
| **Incremental Operating Expense** | | | | | | | | | |
| Additional Staffing: | | | | | | | | | |
| 4 Admin $30k salary&benefit | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (80,000) |
| 5 Agents $40k salary&benefit | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (133,328) |
| 1 Supervisor $50k salary&benefit | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (33,328) |
| **Extra Cost per Additional Staff:** | | | | | | | | | |
| Phone and Headset | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (3,328) |
| Computer | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (1,328) |
| Licensing | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (6,664) |
| Consumables | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (3,328) |
| **Net Profit Per Month** | (12,589) | 91,922 | 88,936 | 170,300 | 268,834 | 264,710 | 292,668 | 381,864 | 1,536,745 |

Note 1:   The gross margin used was the average calculated for 2003.

Exhibit IV –1

| | | | | | | 2004 Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October | November | December | Total |
| Average Net Profit Per Month | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | 513,100 | |
| Less Loss of Customers | 1% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | |
| Adjusted Profit per Month | 513,100 | 507,969 | 502,838 | 497,707 | 492,576 | 487,445 | 482,314 | 477,183 | 472,052 | 466,921 | 461,790 | 456,659 | 6,157,200 |
| Less Actual Profit | | | | | | | | | | | | | |
| | 513,100 | 507,969 | 502,838 | 497,707 | 492,576 | 487,445 | 482,314 | 477,183 | 472,052 | 466,921 | 461,790 | 456,659 | 5,616,554 |
| **Sales:** | | | | | | | | | | | | | |
| Business to Consumer | 45,062 | 21,720 | | | | | | | | | | | |
| Business to Business | 180,899 | 54,108 | | | | | | | | | | | |
| Total Sales | 225,961 | 75,828 | | | | | | | | | | | |
| **Cost of Sales:** | | | | | | | | | | | | | |
| Business to Consumer | 23,821 | 13,281 | | | | | | | | | | | |
| Business to Business | 123,299 | 34,323 | | | | | | | | | | | |
| Total Cost of Sales | 147,120 | 47,604 | | | | | | | | | | | |
| Total Gross Profit Realized | 80,841 | 28,024 | | | | | | | | | | | |
| Net Gross Profit Lost | 424,269 | 479,945 | 502,838 | 497,707 | 492,576 | 487,445 | 482,314 | 477,183 | 472,052 | 466,921 | 461,790 | 456,659 | 5,701,698 |
| Less Call Center Revenue Realized | (41,000) | (10,250) | | | | | | | | | | | (51,250) |
| Eliminate Profits Claimed In Count 1 | (368,675) | (92,169) | | | | | | | | | | | (460,844) |
| Net Lost Profits | 14,594 | 377,526 | 502,838 | 497,707 | 492,576 | 487,445 | 482,314 | 477,183 | 472,052 | 466,921 | 461,790 | 456,659 | 5,189,595 |
| Cumulative Lost Profits | 14,594 | 392,110 | 894,948 | 1,392,655 | 1,885,231 | 2,372,676 | 2,854,990 | 3,332,173 | 3,804,225 | 4,271,146 | 4,732,936 | 5,189,595 | |

Exhibit IV-2

| | January | February | March | April | May | June | July | August | September | October | November | December | Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | |
| Business to Consumer | 134,623 | 106,407 | 188,087 | 165,367 | 132,740 | 151,190 | 84,077 | 82,368 | 76,384 | 64,838 | 46,405 | 54,174 | 1,204,303 | |
| Business to Business | 223,520 | 143,753 | 220,659 | 285,186 | 277,459 | 262,315 | 281,248 | 253,097 | 269,059 | 341,557 | 172,636 | 172,936 | 2,600,898 | |
| Total Sales | 358,443 | 250,160 | 398,146 | 440,543 | 410,199 | 413,510 | 369,325 | 335,452 | 345,443 | 406,456 | 221,047 | 227,110 | 4,724,863 | |
| **Costs of Sales** | | | | | | | | | | | | | | |
| Business to Consumer | 86,592 | 95,823 | 104,003 | 104,937 | 78,819 | 76,737 | 47,921 | 42,906 | 37,891 | 33,170 | 27,579 | 28,241 | 790,718 | |
| Business to Business | 141,290 | 91,350 | 145,867 | 184,896 | 152,460 | 129,237 | 179,127 | 153,421 | 152,271 | 229,538 | 109,696 | 109,704 | 1,772,177 | |
| | 228,082 | 186,973 | 249,960 | 289,833 | 228,979 | 202,974 | 227,048 | 195,728 | 190,162 | 259,408 | 137,276 | 137,948 | 2,562,896 | |
| Gross Profit on Sales | 131,961 | 113,287 | 139,406 | 150,710 | 181,220 | 210,536 | 142,277 | 139,724 | 155,281 | 147,078 | 83,672 | 89,164 | 1,891,968 | |
| Gross Profit % on Sales | 36.7% | 37.7% | 35.3% | 36.4% | 44.2% | 50.9% | 38.5% | 41.7% | 45.0% | 36.2% | 37.9% | 39.3% | 40.0% | |
| Diverted Sales | 1,015,481 | 1,007,170 | 1,489,496 | 959,041 | 914,948 | 1,160,621 | 917,549 | 951,335 | 1,310,051 | 1,015,316 | 1,070,892 | 1,070,892 | 12,848,306 | |
| Average Gross Profit % | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | 40% | |
| Gross Profit on Diverted Sales | 406,192 | 402,868 | 567,798 | 383,616 | 365,979 | 460,248 | 367,020 | 380,534 | 524,020 | 404,528 | 428,277 | 428,277 | 5,139,322 | |
| **Total Gross Profit** | 537,753 | 516,155 | 727,220 | 542,326 | 547,199 | 670,784 | 509,297 | 520,280 | 679,301 | 551,606 | 511,949 | 517,441 | 6,831,291 | |
| **Add:** | | | | | | | | | | | | | | |
| Call Center Revenue | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 41,000 | 492,000 | |
| Call Center Revenue On Diverted Sales | 21,194 | 23,231 | 30,434 | 19,004 | 23,935 | 19,286 | 18,643 | 27,573 | 17,798 | 16,264 | 21,242 | 24,242 | 257,906 | |
| **Less:** | | | | | | | | | | | | | | |
| 25 % to IrP - Consumer | (14,043) | (17,312) | (17,221) | (19,453) | (17,221) | (19,994) | (11,308) | (10,982) | (10,419) | (8,442) | (5,865) | (7,019) | (106,786) | |
| 25 % to IrP - Business | (22,990) | (14,932) | (19,353) | (23,614) | (33,317) | (34,229) | (26,968) | (26,190) | (29,833) | (30,399) | (15,531) | (16,182) | (284,115) | |
| 25% to IrP on Diverted Sales | (40,697) | (45,333) | (88,123) | (43,107) | (41,173) | (51,778) | (41,290) | (62,610) | (36,302) | (45,509) | (48,191) | (48,191) | (578,174) | |
| **Incremental Operating Expense** | | | | | | | | | | | | | | |
| **Additional Staffing:** | | | | | | | | | | | | | | |
| 4 Add'n $30k salary&benefit | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (120,000) | |
| 6 Add'n $50k salary&benefit | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (199,992) | |
| 1 Supervisor $90k salary&ben | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (49,992) | |
| **Extra Cost per Additional Staff:** | | | | | | | | | | | | | | |
| Phone and headset | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) | |
| Computer | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (1,992) | |
| Licensing | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (9,996) | |
| Consumables | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) | |
| **Net Profit Per Month** | 484,570 | 469,988 | 662,083 | 481,604 | 487,781 | 569,436 | 454,651 | 477,299 | 606,436 | 491,446 | 471,940 | 478,895 | 6,157,456 | 513,100 |

Note 1:   For Nov. and Dec., 2003, no information was supplied for diverted sales - used 10 month averages for diverted sales and related call center revenue

AUG 25 2005

*IN THE MATTER OF:*

# Hewlett Packard Development , et al.
## vs.
# Midwest Information Technology, et al.

*Cause No. 04-3055*

*Deposition of Scott Stringer*
*7/27/2005*

*Gore Perry Gateway & Lipa Reporting*
*515 Olive Street*
*Suite 700*
*St. Louis, MO 63101*

*Full GLOSSARY included with this DepoScript*

**EXHIBIT**

B

DepoScript

Deposition of Scott Stringer
3:07-cv-05055-JES-CHE    # 64-2    Page 17 of 32

Hewlett Packard Development , et al.  vs.
Midwest Information Technology, et al.

## Page 69

[1] **MR. HANSEN:** Object to the form. That's an
[2] improper hypothetical because all the testimony in
[3] this case is not that Andover only sold in stock CSN
[4] parts. Subject to that, you can answer the question.
[5]    A: If it becomes a fact that none of the parts
[6] from Andover were subject to the 25 percent split,
[7] then that would change my calculation.
[8]    Q: Okay. How would it change your calculation?
[9]    A: Well, I believe it would change my
[10] calculation with respect to call center revenue that
[11] was earned. I'm sorry, it would change my 25 percent
[12] split number, and it might also change my gross
[13] profit number.
[14]    Q: Well, let's look at your report so we can
[15] talk specifically about those numbers that you have.
[16] And you have your copy of your report in front of
[17] you; is that correct?
[18]    A: Yes, ma'am, I do.
[19]    Q: And what exhibit is -- we're looking at the
[20] breach of the standard support agreement spreadsheet,
[21] correct?
[22]    A: Yes, ma'am.
[23]    Q: And they're exhibits Roman 3-1 through 3?
[24]    A: Yes, ma'am.
[25]    Q: Let's look at -- it seems to be easiest to

## Page 70

[1] look at 2003 since it's the only complete year we
[2] have.
[3]    A: Okay.
[4]    Q: This diverted sales number at the top, it's
[5] labeled diverted sales because these are sales that
[6] you're assuming should have gone to MITG?
[7]    A: That's correct.
[8]    Q: And this diverted sales, where is that
[9] number coming from, for example, for each of these
[10] months, where is that dollar figure coming from?
[11]    A: It comes from Exhibit 52.
[12]    Q: Okay. So if we add up -- turning to HP
[13] 11049, you get to January, the first week -- you get
[14] to January of 2003 on this page starting here, and
[15] then we want to -- if we added up all the numbers in
[16] the column called revenue (NOR), those four numbers
[17] for the month of January would give us 1,015,481,
[18] right?
[19]    A: That is correct.
[20]    Q: And that's consistent all the way through
[21] this calculation until the end of October?
[22]    A: Until the end of October, yes, ma'am.
[23]    Q: All right. And then I understand from
[24] looking at Exhibit Roman numeral 4-2 which also has
[25] these diverted sales numbers that you used ten month

## Page 71

[1] averages for November and December because you didn't
[2] have that information?
[3]    A: That is correct.
[4]    Q: And is that something that in your
[5] experience as an expert doing lost profit analysis,
[6] that that's an appropriate thing to do is take the
[7] prior ten months and use those to that average?
[8]    A: In the absence of other data and other
[9] specific information, that's the only thing we could
[10] do at that point.
[11]    Q: How come you didn't go back and use all of
[12] the information you had to do an average from the
[13] numbers that you had beginning in May of '02?
[14]    A: Well, a lot of times when you compute an
[15] average, you're going to look at the most recent
[16] monthly activity. So we felt -- we made the judgment
[17] that 2003, ten months in 2003, would be more relevant
[18] than ten months in 2002. So we utilized later months
[19] for an average.
[20]    Q: And is it your belief that that would be
[21] standard practice in your industry?
[22]    A: I have seen it done on lost profits cases,
[23] yes, ma'am.
[24]    Q: Has it happened on any of the ones that we
[25] talked about earlier, you or the other side doing it?

## Page 72

[1]    A: Well, you make -- often times, you don't
[2] have complete data when you're asked to testify about
[3] damages, and so you have to make certain assumptions.
[4] And it's a judgment call based upon the fact pattern
[5] and the type of company you're dealing with, etc. We
[6] felt it was a reasonable approach to utilize those
[7] ten months.
[8]    Q: So we've got that amount for the diverted
[9] sales, and that is assuming that all the money made
[10] by the Andover Call Center that is on Exhibit 52
[11] would have been revenues earned by MITG if they had
[12] been sent those calls?
[13]    A: That is correct, ma'am.
[14]    Q: And now, you have on Exhibit Roman 3-3 the
[15] numbers for the year 2002?
[16]    A: That is correct, ma'am.
[17]    Q: Why did you start your analysis in May of
[18] 2002?
[19]    A: Well, it's primarily because of Exhibit 52
[20] because our understanding is that this document
[21] quantifies what was done in Andover now being done at
[22] Roseville.
[23]    Q: Is it your understanding that the call
[24] center activity at Andover was transitioned to
[25] Roseville in May of 2002?

3:04-cv-... Hewlett Packard Development., et al., vs. Midwest Information Technology, et al. Page 18 of 32

Deposition of Scott Stringer
7/27/2005

Page 73

[1] A: That is my understanding.

[2] Q: Let me have you look at the highlighted

[3] testimony on the top of page nine from Diane Pound.

[4] A: Yes, ma'am.

[5] Q: Okay. Do you understand Ms. Pound's

[6] testimony there to be that the Andover Call Center

[7] was -- started the transition in early 2003, and it

[8] was finished in April of 2003?

[9] A: I do as I read it now, yes, ma'am.

[10] Q: Okay. Assuming that this testimony that Ms.

[11] Pound gave under oath is accurate, does it -- would

[12] it be appropriate to include the diverted sales in

[13] 2002 when the work was still being done at Roseville?

[14] MR. HANSEN: Object to the form of the

[15] question. I think it misstated your question. Do

[16] you mean when the work was still being done at

[17] Andover?

[18] MS. CARROLL: Thank you.

[19] Q: Assuming that Ms. Pound's testimony is true

[20] that the transition occurred in early 2003 and

[21] finished in April of 2003, would it be appropriate to

[22] include in your calculations diverted sales for 2002

[23] when that work was still being done in Andover?

[24] A: Unless my understanding is wrong, my

[25] understanding was that this document contained what

Page 74

[1] was diverted to Roseville, and if there are sales on

[2] here that were not diverted to Roseville, then

[3] correct, that would change my calculation.

[4] Q: So again, just based on Ms. Pound's

[5] testimony that it was early 2003 before the

[6] transition actually took place, if that is in fact

[7] the case, those wouldn't be diverted sales yet, they

[8] would still be Andover sales until they went over to

[9] Roseville?

[10] A: Yes, ma'am.

[11] MS. CARROLL: Let's take a quick break.

[12] (At this time, a break was taken.)

[13] Q: Starting where we left off, diverted sales,

[14] we've established where those numbers come from

[15] document wise and assumption wise, and the next

[16] category we have is average gross profit percentage.

[17] A: Yes, ma'am.

[18] Q: And that 40 percent is based on what?

[19] A: That 40 percent is actually calculated on

[20] Exhibit 4-2.

[21] Q: Okay.

[22] A: If you go to the total column about five or

[23] six lines down, you see the 40.0 percent?

[24] Q: Correct.

[25] A: That is an average of the gross profit

Page 75

[1] percentage for 2003.

[2] Q: And what you did was take the sales numbers

[3] that Ms. Koch gave you on the second page of Exhibit

[4] 60?

[5] A: Yes, ma'am.

[6] Q: All right. And then the cost of goods sold?

[7] A: Yes, ma'am.

[8] Q: Where did you get those numbers?

[9] A: Those numbers came from page two of Exhibit

[10] 60 for each month.

[11] Q: All right. Under what we said is the

[12] purchase extension column, you're assuming that

[13] that's cost of goods sold?

[14] A: Yes, ma'am.

[15] Q: And other than this document, that's the

[16] only way you -- this is the only document then that

[17] you relied upon is the spreadsheet from Ms. Koch,

[18] right?

[19] A: Yes, ma'am.

[20] Q: Did you notice in reading her deposition

[21] testimony when she talked about the way MITG kept

[22] their records for their internal purposes and for

[23] their accountant who did their taxes that they

[24] included the 25 percent in the cost of goods sold?

[25] A: I don't remember reading that.

Page 76

[1] Q: Page 26, line 2 through line 9, is where I'm

[2] talking to Ms. Koch about the sales and revenue lines

[3] and the cost of goods sold lines on MITG 0612 through

[4] 0614.

[5] A: Okay.

[6] Q: And then you see where I asked her if the

[7] incentive is included in the cost of goods sold?

[8] A: Yes, ma'am.

[9] Q: Okay. So assuming that that is -- what I'm

[10] talking to her is you took the incentive on the

[11] detail register out from the cost of goods sold, and

[12] she says that's correct. Why didn't you when you

[13] were doing your calculation do it the same way and

[14] have the cost of goods sold include the incentive --

[15] the 25 percent split for HP?

[16] A: I just broke it out separately. I've got it

[17] on the schedule separately.

[18] Q: Why? Why do it that way instead of the way

[19] MITG did it in the ordinary course of their business?

[20] A: Because the documents I had, I was able to

[21] split it out, and it helped me to see on the document

[22] how that information got there. Cost of goods sold

[23] as it's lumped in a financial statement will often

[24] contain many variable accounts, and I was concerned

[25] about the incremental effect which is the cost of the

3:04-cv- Hewlett Packard Development, , et al., vs. Page 19 of 32
Midwest Information Technology, et al.

Deposition of Scott Stringer
7/27/2005

## Page 113

[1] you've been getting serviced by a company called MITG
[2] on behalf of HP, if you want to still order from us,
[3] this is how to get to us?
[4] **A:** That sounds familiar.
[5] **Q:** Other that Mr. Haught possibly telling you
[6] or suggesting to you that during the time of the
[7] contract that people knew that HP On Line Parts was
[8] really MITG, did you see any deposition testimony or
[9] any documents that told you that people from -- that
[10] the customers going in knew that that really was MITG
[11] and not an HP entity?
[12] **A:** I don't recall if I did or not, ma'am.
[13] **Q:** What other revenue that was earned in 2003
[14] that's on Exhibit 4-2 was earned -- that was earned
[15] in 2003 on 4-2, would go away after the end of the
[16] standard support agreement?
[17] **A:** Both the call center revenue and the 25
[18] percent split I believe to HP would go away. And we
[19] didn't adjust that. We just used the 513,1.
[20] **Q:** Why didn't you make that adjustment?
[21] **A:** You know, they're pretty -- actually, let's
[22] see here a minute. Because it actually works out in
[23] favor of -- I mean it's a $282,000 swing to the
[24] positive for net profit, and we just disregarded it
[25] to account for, you know, other assumptions that may

## Page 114

[1] be out of line the other way, so we just let them
[2] wash.
[3] **Q:** All right. Are you aware of sales that were
[4] made by MITG to the same folks in March through
[5] December of '04 that they were selling to before the
[6] end of the standard support agreement?
[7] **A:** Yes.
[8] **Q:** Why is there not a credit for those
[9] customers who didn't go away and continued to buy
[10] from MITG?
[11] **A:** My understanding when I produced the report
[12] was it was -- we could not -- we did not know which
[13] customers were HP related and which were not HP
[14] related, and so in that confusion, ma'am, of not
[15] knowing that, I relied strictly on this information.
[16] **Q:** You've got a document that was on your list
[17] here that shows sales in -- it's Exhibit 49 and 50.
[18] **A:** Yes, ma'am.
[19] **Q:** And Exhibit 49 are sales in January to
[20] customers that were under the standard support
[21] agreement, and are you telling me that it was your
[22] understanding that -- and I guess maybe 50 for the
[23] purpose of the analysis is more relevant, but you
[24] were told that the customers that are on Exhibit 50,
[25] that MITG did not know whether these customers were

## Page 115

[1] buying parts that were subject to the 75, 25 split,
[2] and so that you weren't supposed to give any
[3] credits, so you decided based on that not to give any
[4] credits for those sales?
[5] **MR. HANSEN:** Object to the form. I don't
[6] think anyone told him that.
[7] **A:** I'll try to answer your questions. My
[8] understanding throughout this case was that it's
[9] difficult to determine -- I've got a profit and loss
[10] statement showing 8 million dollars in revenues.
[11] I've got another statement showing 4 million dollars.
[12] I've customers subject to the 25 percent. I've got
[13] customers not subject to the 25 percent. My
[14] understanding is I've got customers that aren't even
[15] part of this deal. Because of the confusion of that
[16] data, I had to pick and choose what I relied on, and
[17] this particular document wasn't explained well enough
[18] to me. We made a decision trying to get our report
[19] done on June 30th that we didn't understand it, we
[20] were told that -- you know, we didn't know how this
[21] impacted our analysis, so we relied strictly on --
[22] sort of the macro analysis that says Mr. Haught, what
[23] reduction is that going to be, and we relied on that
[24] analysis rather than a detailed analysis because we
[25] didn't feel, and thank you for bearing with my long

## Page 116

[1] answer, because we didn't feel like we could rely on
[2] this document because we didn't understand it.
[3] **Q:** So does your analysis assume that every
[4] customer who bought something that was subject to the
[5] 75, 25 profit split never bought anything after the
[6] end of the standard support agreement?
[7] **A:** No, ma'am. It assumes that -- let me think
[8] here a minute. Yes, it does. Your exactly right,
[9] yes, ma'am.
[10] **MS. CARROLL:** Let's take a break.
[11] (At this time, a break was taken.)
[12] (Deposition Exhibits 61 and 62 marked for
[13] identification.)
[14] **Q:** I'm going to hand you Exhibit 61 and 62
[15] which are two E-mails that Ms. Koch forwarded to Mr.
[16] Hansen that below the forwarding information, it
[17] looks like either E-mails she had either with you or
[18] people in your office, and I just want to know --
[19] take a look at those and tell me what, if anything,
[20] you learned from those two E-mails.
[21] **A:** Yes, ma'am.
[22] **Q:** What, if anything, did you learn from
[23] Exhibit 61 and 62 that you used in your report?
[24] **A:** Okay. Attached to Exhibit 61 was an Excel
[25] spreadsheet, and from that Excel spreadsheet, we were

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| Hewlett Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V. | ) ) ) ) | |
| PLAINTIFFS | ) ) ) | |
| v. | ) ) | CIVIL ACTION No. 04-3055 |
| Midwest Information Technology Group, Inc. and Michael Lauber | ) ) ) ) | |
| DEFENDANTS | ) | |

**SUPPLEMENT TO EXPERT REPORT OF SCOTT A. STRINGER**
**Originally dated June 30, 2005**

**August 17, 2005**

Respectfully submitted,

UHY Advisors

Scott A. Stringer

EXHIBIT

C

## I.     JUSTIFICATION FOR SUPPLEMENT TO ORIGINAL REPORT

In accordance with Federal Rules of Civil Procedure 26 (e)(1), I am supplementing my original report because of incorrect information contained therein.

After my deposition on July 27, 2005 important information became available which required me to modify my methodology and data used in the calculations. As such, I have revised Exhibits II, III, and IV and attached them to this supplement.

## II. INFORMATION REVIEWED

Exhibit II from the original report is amended to reflect additional documents which I reviewed and relied upon in forming my opinions in this matter.

## III.  COUNT I – BREACH OF CONTRACT

In my original report, I included all of the gross orders of HP E-spares listed on documents HP11007-11009, and HP11048-11050 under the assumption that this list was exclusively Andover calls diverted to Roseville beginning in May 2002. However, I subsequently noted that per the deposition testimonies and exhibits of Richard Chizek, Diane Pound, and Richard Soriano, Roseville did not begin accepting calls from Andover until November 9, 2002. Therefore, my updated report only includes call activity beginning November 9, 2002.

Secondly, my original calculation of diverted sales from HP 11007-11009 included both CSN and outsourced calls. I subsequently discovered that CSN calls resulted in a direct order from HP and that MITG earned either the $5.25 per call on these types of orders, or the 75/25 split if the price break was obtained as referred to in the MITG "Bible" (Haught deposition Exhibit 4).

Subsequent to my deposition, we received an electronic spreadsheet produced originally by HP and sorted by MITG titled "Copy of HP info by customer 2002 to 2004" (Spreadsheet) which calculated MITG's sales volume by CSN and outsourced orders. Based upon a sort of the data by MITG, which I reviewed, I was able to determine that MITG's 2003 call volume was 56% outsourced orders and 44% CSN. Given the nature and timing of the diverted sales to Roseville, as well as the absence of specific order information on actual Roseville calls, I considered this methodology as the best estimate of this call split.

Once the call split was determined, the next step was to determine the lost profits for CSN calls. Because CSN calls (not subject to the 75/25 split) earn revenue at the $5.25 per call level, I added the monthly diverted calls as calculated in the previous paragraph to the actual monthly calls handled by MITG as noted on MITG 615 – 724. Once the diverted calls were added to the actual calls, I then compared the resulting number to the contract amount of 7,810 calls. To the extent that monthly calls exceeded this number,

$5.25 was computed as additional call revenue to MITG. Where the number was below 7,810, no additional revenue was computed.

The next step was to determine the lost profits on CSN orders subject to the split which would have been classified as outsourced orders. Using the Spreadsheet provided by MITG, I computed the 2003 average sales price on outsourced orders of $482.13, which was then multiplied by the diverted monthly percentage of outsourced calls. The total revenue by month for CSN and outsourced orders was then summarized, with additional operating expenses deducted in exactly the same way as in my original report.

Based upon the analysis performed, the net damages to MITG pursuant to Count I was $6,242,000 (rounded).

## III. COUNT V – TORTIOUS INTERFERENCE

Because of the revenue recognition issues encountered in the breach of contract calculations, I had to also adjust the damages computed for tortuous interference. In addition, with the receipt of the Spreadsheet, I was able to utilize actual historical customer data to determine which customers discontinued doing business with MITG and what their historical buying patterns were.

The first step in the process was to compare the customers contacted by HP as noted in Exhibit PP of Richard Chizek's 01/03 deposition to MITG 1025, which listed sales by customer for 2004. If the customer continued buying from MITG, as evidenced by their inclusion on MITG 1025, then they were excluded. For the remaining customers contacted per Exhibit PP, I then reviewed the Spreadsheet and eliminated those customers listed that had bought from MITG in only one of the two years of the contract. The basis for this exclusion was that these customers were not regularly buying from MITG and thus may not have bought from MITG in 2004.

After these steps, I concluded that the remaining customers noted on Exhibit PP that had been contacted by HP had ceased buying from MITG and had demonstrated a regular pattern of purchasing. From the Spreadsheet, I obtained the actual sales of these customers for 2003 under the assumption that this was representative of expected sales in the future. Because the contract ended February 8, 2004, I prorated the total sales for these customers in 2003 to account for 10 ¾ months remaining in 2004. Additionally, since the call center contract was no longer in place during this period, I treated CSN revenue and outsourced revenue in the same manner.

The sales amount was then multiplied by the expected margin percentage of 34%. I calculated this amount utilizing revenues and cost of goods sold from MITG 0612 for the ten months ended December 31, 2004. Next, I reduced the amount of expected gross profit by an expected increase in operating expense that would have been needed for this additional volume. In order to determine an appropriate amount of expense, I calculated the ratio of the amount of the gross profit in the tortious interference claim to the amount computed in the breach of contract claim. This ratio of 13 percent was then applied to the

estimated annual expense computed in the breach, and prorated for 10 ¾ months.  This amount of expected incremental expense was then deducted from the gross profit amount to arrive at lost profits for the 10 ¾ month period ended 12/31/2004.

Based upon the analysis performed, the net damages to MITG pursuant to Count V for the period between February 8, 2004 and December 31, 2004 was $673,000 (rounded).

## VI . CONCLUSION

Based upon the work that I have performed in this matter, it is my opinion that the net damages sustained by MITG pertaining to Count I of the Counterclaim were $6,242,000. Further, it is my opinion that between February 8, 2004 and December 31, 2004, the net damages sustained by MITG pertaining to Count V of the Counterclaim were $673,000.

**EXHIBIT II**

### INFORMATION REVIEWED

Various pleadings and court filings in this matter.

MITG prepared revenues and expenses for 2002 through 2004, Bates No.MITG 0612-0614.

HP prepared revenues and expenses from the Schmaderer deposition, Exhibits DDD and EEE.

MITG prepared documents for sales for 2004, Bates No. MITG 1023-1026.

HP documents regarding E-spares handled at Roseville, Bates No. HP 11007-11009, and HP 11048-11050.

MITG prepared documents on call volume, Bates No. MITG 0615-0724.

HP prepared documents for 2003 and 2004 labeled 2003 stats and 2004 stats.

HP prepared documents titled 41K Pmts.

Various e-mail documentation, Bates No. HP1139-1189

Deposition transcripts and exhibits for Teresa Koch, Charles Schmaderer, Roland Soriano, Chip Love, Louise Meyerfeld, Ronald Haught, Randy Wagner, Richard Chizek and Diane Pound.

An E-mail dated June 27, 2005 from Teresa Koch containing an electronic spreadsheet titled HP copy of 2003 billing credit totals.

An E-mail dated June 30, 2005 from Teresa Koch describing elements of incremental overhead.

An Excel spreadsheet titled "Copy of HP info by customer 2002 to 2004".

Exhibit III-1

## Damages Calculation - Breach of Contract Claim
### Analysis of Lost Profits – 2004 & Summary of Annual Totals

| | 2004 | | | Totals | | | Cumulative |
| | January | February (1 week) | 2004 Total | 2002 | 2003 | 2004 | Totals |
|---|---|---|---|---|---|---|---|
| Lost Gross Profit on CSN Calls | $ 3,555 | $ 394 | $ 3,959 | $ 22,559 | $ 73,647 | $ 3,959 | $ 100,165 |
| Lost Gross Profit on Outsourced Orders | 444,215 | 111,083 | 555,298 | 753,627 | 5,331,162 | 555,298 | 6,640,087 |
| Lost Gross Profits | $ 447,780 | $ 111,477 | $ 559,257 | $ 776,186 | $ 5,404,809 | $ 559,257 | $ 6,740,252 |
| **Incremental Operating Expense** | | | | | | | |
| **Additional Staffing:** | | | | | | | |
| 4 Admin. $30k Salary & Benefits | (10,000) | (2,500) | (12,500) | (20,000) | (120,000) | (12,500) | (152,500) |
| 5 Agents $40k Salary & Benefits | (16,686) | (4,167) | (20,833) | (33,332) | (199,992) | (20,833) | (254,157) |
| 1 Supervisor $50k Salary & Ben | (4,166) | (1,042) | (5,208) | (8,332) | (49,992) | (5,208) | (63,532) |
| **Extra Cost per Additional Staff:** | | | | | | | |
| Phone and headset | (416) | (104) | (520) | (832) | (4,992) | (520) | (6,344) |
| Computer | (166) | (42) | (208) | (332) | (1,992) | (208) | (2,532) |
| Licensing | (83) | (208) | (1,041) | (1,666) | (9,996) | (1,041) | (12,703) |
| Consumables | (416) | (104) | (520) | (832) | (4,992) | (520) | (6,344) |
| Total Incremental Operating Expense | (32,683) | (8,167) | (40,830) | (65,328) | (391,956) | (40,830) | (498,112) |
| Lost Net Profits | $ 415,117 | $ 103,310 | $ 518,427 | $ 710,860 | $ 5,012,853 | $ 518,427 | $ 6,242,140 |

Exhibit III-2

## Damages Calculation – Breach of Contract Claim
### Analysis of Lost Profits - 2003

| | January | February | March | April | May | June | July | August | September | October | November | December | 2003 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lost Gross Profit on CSN Code | $ 16,813 | $ 18,711 | $ 19,882 | $ 11,739 | $ 8,705 | $ 798 | | | | | | | $ 73,847 |
| Lost Gross Profit on Outsourced Orders | 443,521 | 466,862 | 457,728 | 477,852 | 477,840 | 383,120 | 387,517 | 622,405 | 401,749 | 392,657 | 444,215 | 444,215 | 5,531,162 |
| **Lost Gross Profits** | $ 459,334 | $ 466,573 | $ 477,610 | $ 429,541 | $ 485,345 | $ 383,918 | $ 387,517 | $ 622,405 | $ 401,749 | $ 392,657 | $ 444,215 | $ 444,215 | $ 5,604,809 |
| Incremental Operating Expense | | | | | | | | | | | | | |
| Additional Staffing: | | | | | | | | | | | | | |
| 4 Admin, $35k Salary & Benefits | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (120,000) |
| 1 Supervisor $50k Salary & Benefits | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (16,666) | (199,992) |
| 1 Supervisor $50k Salary & Ben | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (4,166) | (49,992) |
| Extra Cost per Additional Staff: | | | | | | | | | | | | | |
| Phone and Internet | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) |
| Computer | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (1,992) |
| Licensing | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (833) | (9,996) |
| Communications | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (416) | (4,992) |
| **Total Incremental Operating Expense** | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (32,663) | (391,956) |
| **Lost Net Profits** | $ 426,671 | $ 433,910 | $ 444,947 | $ 396,878 | $ 452,682 | $ 351,255 | $ 354,854 | $ 489,772 | $ 369,086 | $ 349,994 | $ 411,552 | $ 411,552 | $ 5,012,853 |

Exhibit III-3

## Damages Calculation – Breach of Contract Claim
### Analysis of Lost Profits - 2002

| | 2002 | | 2002 |
| --- | --- | --- | --- |
| | November | December | Total |
| Lost Gross Profit on CSN Calls | $ 9,198 | $ 13,381 | $ 22,559 |
| Lost Gross Profit on Outsourced Orders | 371,549 | 382,078 | 753,627 |
| Lost Gross Profits | $ 380,747 | $ 395,439 | $ 776,186 |
| Incremental Operating Expense | | | |
| Additional Staffing: | | | |
| 4 Admin. $30k Salary & Benefits | (10,000) | (10,000) | (20,000) |
| 5 Agents $40k Salary & Benefits | (16,666) | (16,666) | (33,332) |
| 1 Supervisor $50k Salary & Ben | (4,166) | (4,166) | (8,332) |
| Extra Cost per Additional Staff: | | | |
| Phone and headset | (416) | (416) | (832) |
| Computer | (166) | (166) | (332) |
| Licensing | (833) | (833) | (1,666) |
| Consumables | (416) | (416) | (832) |
| Total Incremental Operating Expense | (32,663) | (32,663) | (65,326) |
| Lost Net Profits | $ 348,084 | $ 362,776 | $ 710,860 |

Exhibit II-4

**Damages Calculation - Breach of Contract Claim**
**Analysis of Lost Gross Profits - 2004 & Summary of Annual Totals**

| | 2004 | | | Totals | | | Cumulative |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | January | February (1 week) | 2004 Total | 2002 | 2003 | 2004 | Totals |
| Total Calls (Andover to Roseville) | 6,856 | 1,714 | 8,570 | 11,630 | 82,273 | 8,570 | 102,473 |
| 44% Considered CSN Calls | 3,017 | 754 | 3,771 | 5,117 | 36,200 | 3,771 | 45,088 |
| 56% Considered Outsourced Calls | 3,839 | 960 | 4,799 | 6,513 | 46,073 | 4,799 | 57,385 |
| Lost Gross Profit on CSN Calls | 3,839 | 960 | 4,799 | 6,513 | 46,073 | 4,799 | 57,385 |
| | | | | | | | |
| Minimum Number of Calls Associated with $41,000 Monthly Payment | 7,810 | 1,953 | 9,763 | 15,620 | 93,720 | 9,763 | 119,103 |
| Less Number of Calls Historically Handled by MTG | 5,472 | 1,274 | 6,746 | 14,800 | 68,132 | 6,746 | 89,678 |
| Remaining Minimum Call Requirement | 2,338 | 679 | 3,017 | 820 | 27,867 | 3,017 | 31,704 |
| CSN Calls Diverted to Roseville | 3,017 | 754 | 3,771 | 5,117 | 36,200 | 3,771 | 45,088 |
| Calls in Excess of Monthly Minimum | 679 | 75 | 754 | 4,297 | 14,028 | 754 | 19,079 |
| Compensation per Call | $ 5.25 | $ 5.25 | $ 5.25 | $ 5.25 | $ 5.25 | $ 5.25 | $ 5.25 |
| Lost Gross Profit on CSN Calls | $ 3,565 | $ 394 | $ 3,959 | $ 22,559 | $ 73,647 | $ 3,959 | $ 100,165 |
| | | | | | | | |
| **Lost Gross Profit on Outsourced Orders** | | | | | | | |
| Outsourced Calls Diverted | 3,839 | 960 | 4,799 | 6,513 | 46,073 | 4,799 | 57,385 |
| Average Revenues per Call | $ 482.13 | $ 482.13 | $ 482.13 | $ 482.13 | $ 482.13 | $ 482.13 | $ 482.13 |
| Lost Sales | $ 1,850,897 | $ 462,845 | $ 2,313,742 | $ 3,140,113 | $ 22,213,175 | $ 2,313,742 | $ 27,667,030 |
| Lost Gross Profit on Lost Sales at 24% (Includes payment of 25% of gross profits to H.P.) | $ 444,215 | $ 111,083 | $ 555,298 | $ 753,627 | $ 5,331,162 | $ 555,298 | $ 6,640,087 |

NOTE:    Data on calls was not provided for January and February, 2004. The 10-month average for January-October, 2003 was used.

Exhibit #-5

## Damages Calculation - Breach of Contract Claim
### Analysis of Lost Gross Profits - 2003

| | January | February | March | April | May | June | July | August | September | October | November | December | 2003 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Calls (Andover to Roseville) | 6,840 | 7,235 | 8,807 | 6,445 | 7,389 | 5,912 | 5,680 | 6,062 | 6,300 | 5,000 | 6,055 | 6,008 | 63,273 |
| 4% Considered CSR Calls | 3,012 | 3,183 | 3,767 | 2,535 | 3,242 | 2,001 | 2,631 | 3,457 | 2,728 | 2,539 | 3,017 | 3,017 | 39,300 |
| 96% Considered Outbound Calls | 3,653 | 4,052 | 4,850 | 3,609 | 4,727 | 3,311 | 3,340 | 4,515 | 3,472 | 3,307 | 3,639 | 3,639 | 45,072 |
| **Lost Gross Profit on CSR Calls** | | | | | | | | | | | | | |
| Minimum Number of Calls Associated with $41,000 Monthly Payment | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 7,810 | 93,720 |
| Lesser Number of Calls Historically Handled by MTG | 9,277 | 8,198 | 8,295 | 7,210 | 6,226 | 5,361 | 4,648 | 4,225 | 3,827 | 4,053 | 3,414 | 3,081 | 69,132 |
| Remaining Minimum Call Requirement | 0 | 0 | 0 | 600 | 1,584 | 2,449 | 3,294 | 3,085 | 3,883 | 3,747 | 4,396 | 4,249 | 27,867 |
| CSR Calls Diverted to Roseville | 3,012 | 3,183 | 3,767 | 2,535 | 3,242 | 2,001 | 2,631 | 3,457 | 2,728 | 2,539 | 3,017 | 3,077 | 36,500 |
| Calls in Excess of Monthly Minimum | 3,012 | 3,183 | 3,767 | 2,235 | 1,658 | 152 | 0 | 0 | 0 | 0 | 0 | 0 | 14,028 |
| Compensation per Call | 6.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 6.25 |
| Lost Gross Profit on CSR Calls | $ 18,833 | $ 16,711 | $ 19,852 | $ 11,729 | $ 8,705 | $ 798 | $ — | $ — | $ — | $ — | $ — | $ — | $ 73,647 |
| **Lost Gross Profit on Outsourced Orders** | | | | | | | | | | | | | |
| Outsourced Calls Diverted | 3,853 | 4,052 | 4,820 | 3,600 | 4,127 | 3,311 | 3,340 | 4,616 | 3,472 | 3,307 | 3,839 | 3,499 | 48,073 |
| Average Revenue per Call | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 | 482.13 |
| Lost Sales | $ 1,846,004 | $ 1,953,591 | $ 2,323,867 | $ 1,749,007 | $ 1,989,751 | $ 1,596,332 | $ 1,614,683 | $ 2,176,817 | $ 1,673,955 | $ 1,594,404 | $ 1,850,667 | $ 1,703,887 | $ 22,213,175 |
| Lost Gross Profit on Lost Sales at 24% (Includes payment of 20% of gross profits to HP.) | $ 443,521 | $ 468,862 | $ 557,728 | $ 417,602 | $ 477,540 | $ 383,120 | $ 387,877 | $ 522,436 | $ 401,749 | $ 382,657 | $ 444,215 | $ 444,215 | $ 5,331,162 |

NOTE: Data on calls was not predicted for November and December, 2003. The 10-month average for January-October, 2003 was used.

Exhibit III-6

## Damages Calculation - Breach of Contract Claim
## Analysis of Lost Gross Profits - 2002

| | 2002 | | 2002 |
| --- | --- | --- | --- |
| | November | December | Total |
| Total Calls (Andover to Roseville) | 5,734 | 5,896 | 11,630 |
| 44% Considered CSN Calls | 2,523 | 2,594 | 5,117 |
| 56% Considered Outsourced Calls | 3,211 | 3,302 | 6,513 |
| **Lost Gross Profit on CSN Calls** | | | |
| Minimum Number of Calls Associated with $41,000 Monthly Payment | 7,810 | 7,810 | 15,620 |
| Less Number of Calls Historically Handled by MITG | 7,039 | 7,761 | 14,800 |
| Remaining Minimum Call Requirement | 771 | 49 | 820 |
| CSN Calls Diverted to Roseville | 2,523 | 2,594 | 5,117 |
| Calls in Excess of Monthly Minimum | 1,752 | 2,545 | 4,297 |
| Compensation per Call | 5.25 | 5.25 | 5.25 |
| Lost Gross Profit on CSN Calls | $ 9,198 | $ 13,361 | $ 22,559 |
| **Lost Gross Profit on Outsourced Orders** | | | |
| Outsourced Calls Diverted | 3,211 | 3,302 | 6,513 |
| Average Revenues per Call | 482.13 | 482.13 | 482.13 |
| Lost Sales | $ 1,548,119 | $ 1,591,993 | $ 3,140,113 |
| Lost Gross Profit on Lost Sales at 24% (Includes payment of 25% of gross profits to HP.) | $ 371,549 | $ 382,078 | $ 753,627 |

Exhibit IV-1

## Damages Calculation - Tortious Interference Claim
### Analysis of Damages Based on 2003 Sales Experience

| Original Number | CBN | Customer Name | 10050 Sales CSN | 11000 Sales Outsourced | Total 2003 Sales |
|---|---|---|---|---|---|
| 11 | OS1004 | Kimberly-Clark Corporation | $ 40,503 | $ 34,712 | $ 75,215 |
| 160 | OS1012 | Ernst & Young LLP | 2,695 | 46,738 | 49,433 |
| 36 | OS1037 | Xerox | 77,236 | 147,238 | 224,474 |
| 185 | OS1055 | Siemens Medical Solutions Heal | 0 | 8,137 | 8,137 |
| 133 | OS1057 | Wells Fargo | 6,915 | 21,676 | 28,591 |
| 199 | OS1062 | United Parcel Service | 4,089 | 6,461 | 10,550 |
| 4 | OS1085 | Kaiser Foundation Health | 23,569 | 73,930 | 97,499 |
| 61 | OS1089 | George Hertzberg & Associates | 7,696 | 5,152 | 12,848 |
| 280 | OS1096 | Wells Fargo Bank | 3,202 | 10,968 | 14,170 |
| 171 | OS1103 | NDPS Inc | 927 | 5,480 | 6,407 |
| 33 | OS1104 | Microsoft Corp/MSN | 14,819 | 16,182 | 31,001 |
| 55 | OS1131 | GreenPages Inc | 3,169 | 5,100 | 8,269 |
| 97 | OS1138 | Nike Inc | 244 | 0 | 244 |
| 29 | OS1141 | Vicom computer Services | 524 | 4,694 | 5,218 |
| 49 | OS1155 | Georgia-Pacific Corp | 27,476 | 57,177 | 84,653 |
| 109 | OS1156 | Pricewater House Cooper | 1,305 | 14,617 | 15,922 |
| 242 | OS1168 | Micro Strategies Inc | 293 | 0 | 293 |
| 74 | OS1182 | Anthem Inc | 1,801 | 2,167 | 3,969 |
| 91 | OS1183 | Liebert Corporation | 1,977 | 281 | 2,257 |
| 98 | OS1206 | Oracle | 2,784 | 2,771 | 5,556 |
| 158 | OS1242 | Household International | 6,453 | 31,864 | 38,317 |
| 45 | OS1254 | Bank One Corp Accounts Payable | 4,632 | 62,624 | 67,256 |
| 128 | OS1311 | Anadarko Petroleum Corp | 2,977 | 7,535 | 10,512 |
| 20 | OS1340 | CSC Technology Management Grp | 40 | 8,802 | 8,841 |
| 63 | OS1363 | USS Corporation | 8,658 | 2,424 | 11,082 |
| 43 | OS1394 | Kaiser Permanente | 8,758 | 18,825 | 27,583 |
| 67 | OS1396 | Anheuser Busch Companies, Inc | 8,977 | 17,773 | 26,749 |
| 207 | OS1408 | The World Bank Group | 70 | 1,046 | 1,116 |
| 80 | OS1418 | IPG-GIS | 16,687 | 22,283 | 38,970 |
| 126 | OS1430 | Motorola, Inc | 6,699 | 368 | 7,067 |
| 32 | OS1443 | Merrill Technologies | 11,743 | 1,521 | 13,264 |
| 73 | OS1479 | Cardinal Health, Inc | 4,495 | 11,786 | 16,281 |
| 141 | OS1483 | HH Gregg Appliances, Inc | 15,210 | 15,147 | 30,357 |
| 47 | OS1590 | GMAC-RFC | 1,500 | 3,959 | 5,458 |
| 136 | OS1592 | Wells Fargo Bank Denver | 776 | 7,763 | 8,539 |
| 236 | OS1593 | Liberty Mutual | 108 | 6,125 | 6,233 |
| 1 | OS1611 | Insight Direct USA, Inc | 263,627 | 492,840 | 756,467 |
| 3 | OS1656 | Bloomberg LP | 46,708 | 4,988 | 51,696 |
| 261 | OS1686 | Commerce Bank | 15,035 | 45,302 | 60,337 |
| 192 | OS1691 | SSN Inc DBA Entre Computer CTR | 1,553 | 3,796 | 5,349 |
| 6 | OS1730 | Capital One Services, Inc | 66,293 | 78,546 | 144,839 |
| 124 | OS1746 | Quality Solutions Inc | 166 | 372 | 538 |
| 16 | OS1763 | Trinity Information Services | 5,544 | 12,376 | 17,920 |
| 142 | OS1798 | Wells Fargo Insurance | 0 | 2,459 | 2,459 |
| 212 | OS1817 | Kellogg Company | 1,975 | 76 | 2,051 |
| 169 | OS1845 | Maytag Appliance | 4,944 | 2,070 | 7,014 |
| 84 | OS1893 | Carlson Shared Services | 7,932 | 2,725 | 10,657 |
| 244 | OS1898 | Global Computer Supplies | 17 | 284 | 301 |
| 53 | OS1902 | Unilever HPC/USA | 8,407 | 20,540 | 28,946 |
| 172 | OS1943 | Kaiser Foundation Health Plan | 0 | 183 | 183 |
| 57 | OS1946 | Whirlpool Corporation | 10,567 | 6,004 | 16,672 |
| 135 | OS2026 | MBNA Procurement Services | 3,177 | (401) | 2,776 |
| 262 | OS2075 | Reliant Resources Inc | 1,282 | 3,513 | 4,795 |
| 100 | OS2082 | Costco Wholesale | 83 | 0 | 83 |
| 107 | OS2110 | Charles Levy Circulating Co | 698 | 5,244 | 5,942 |
| 90 | OS2138 | Baxter Financial Services | 4,821 | 3,561 | 8,382 |
| 264 | OS2168 | H&R Block | 479 | 0 | 479 |

Exhibit IV-2

### Damages Calculation - Tortious Interference Claim
### Analysis of Damages Based on 2003 Sales Experience

| Original Number | CBN | Customer Name | 10050 Sales CSN | 11000 Sales Outsourced | Total 2003 Sales |
|---|---|---|---|---|---|
| 108 | OS2275 | Robert W Baird & Co | $ 1,603 | $ 318 | $ 1,921 |
| 37 | OS2276 | Wachovia | 528 | 79,311 | 79,838 |
| 110 | OS2313 | Arbitech Inc | 24,017 | 76 | 24,093 |
| 114 | OS2326 | Corning Inc | 2,073 | 8,677 | 10,749 |
| 157 | OS2355 | International Paper | 1,374 | 2,657 | 4,031 |
| 62 | OS2393 | USG Corporation | 4,505 | 6,063 | 10,568 |
| 205 | OS2400 | ExxonMobil Upstream Techinical | 241 | 19,749 | 19,991 |
| 95 | OS2452 | Mckesson Corporation | 2,457 | 3,250 | 5,707 |
| 204 | OS2509 | Bright Horizons Family Solution | 352 | 104 | 456 |
| 78 | OS2510 | Admin Office of the Courts | 845 | 0 | 845 |
| 200 | OS2547 | MCPC | 1,097 | 146 | 1,243 |
| 111 | OS2557 | Fleet Capital | 0 | 462 | 462 |
| 256 | OS2569 | Dictaphone Corporation | 5,777 | 3,950 | 9,727 |
| 96 | OS2575 | Level 3 Communications | 15,743 | 2,623 | 18,366 |
| 122 | OS2583 | Lockheed Martin Techonology | 0 | 6,337 | 6,337 |
| 227 | OS2771 | Diageo | 745 | 586 | 1,331 |
| 50 | OS2839 | Microsoft Corp | 0 | 1,722 | 1,722 |
| 16 | OS2866 | Adecco Staffing | 1,836 | 5,669 | 7,505 |
| 263 | OS2939 | GMAC/Motor Insurance corp | 0 | 1,984 | 1,984 |
| 123 | OS3007 | Fleet Credit Card | 1,505 | 0 | 1,505 |
| 170 | OS3036 | University of CA Berkeley | 388 | 0 | 388 |
| 68 | OS3039 | The World Bank | 0 | 2,412 | 2,412 |
| 5 | OS3041 | Federal Express | 6,621 | 10,137 | 16,758 |
| 41 | OS3051 | DHL Airways Inc | 67 | 3,984 | 4,050 |
| 167 | OS3077 | Bank of the West | 42 | 924 | 966 |
| 218 | OS3079 | Xerox Services | 0 | 43 | 43 |
| 102 | OS3189 | Sungard-Plaid Brother Software | 38 | 578 | 615 |
| 25 | OS3236 | Pricewater House Cooper | 0 | 456 | 456 |
| 56 | OS3273 | Deloitte Consulting | 0 | 1,470 | 1,470 |
| 44 | OS3284 | Blue Cross Blue Shield of Mich | 1,670 | 286 | 1,956 |
| 153 | OS3291 | Sears Roebuck and Co | 37 | 227 | 264 |
| 22 | OS3301 | Lockheed Martin Shared Service | 321 | 4,081 | 4,402 |
| 99 | OS3321 | Charles Levy Circulating Co | 0 | 614 | 614 |
| 77 | OS3333 | GlaxoSmithKline | 0 | 874 | 874 |
| 208 | OS3335 | Cardinal Health | 13 | 0 | 13 |
| 105 | OS3351 | International Paper | 0 | 530 | 530 |
| | | Total Sales in 2003 for Selected Customers | $ 836,185 | $ 1,536,123 | $ 2,374,308 |
| | | Sales Associated with a 10-3/4 Month Period | | | $ 2,126,984 |
| | | Lost Gross Profits at 34% | | | 723,175 |
| | | Less Associated Operating Expenses | | | 50,000 |
| | | Net Profit Lost Due to Tortious Interference | | | $ 673,175 |