**E-FILED**
Wednesday, 11 January, 2006 11:27:05 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEWLETT-PACKARD | § | |
| DEVELOPMENT COMPANY, L.P., | § | |
| HEWLETT-PACKARD COMPANY, | § | |
| AND COMPAQ TRADEMARK B.V. | § | |
| | § | Civil Action No. 04-3055 |
| Plaintiffs/Counter-Defendants | § | |
| | § | |
| VS. | § | |
| | § | |
| MIDWEST INFORMATION | § | |
| TECHNOLOGY GROUP, INC. | § | |
| | § | |
| | § | |
| Defendants/ Counter-Plaintiff | § | |
| | § | |

### COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY MIDWEST INFORMATION TECHNOLOGY GROUP, INC.

Plaintiffs/Counter-Defendants Hewlett-Packard Development Company, L.P., Hewlett-Packard Company and Compaq Trademark, B.V. (collectively "Counter-Defendants" or "HP") file this Motion for Summary Judgment as to the Counterclaims Asserted by Counter-Plaintiff Midwest Information Technology Group, Inc. ("MITG") pursuant to Federal Rule of Civil Procedure 56(b) requesting that this Court render judgment in favor of Counter-Defendants as to the claims in the Amended Counterclaim.

### INTRODUCTION

MITG's Amended Counterclaim alleges that HP breached the parties' Standard Support Agreement ("SSA"), breached the parties' Middleware Agreement and tortiously interfered with MITG's purported business relationships. Counter-Defendants are entitled to judgment on each of the claims. More particularly, MITG alleges that HP breached the SSA upon closing of the Andover call center by diverting those calls, that MITG claims should have gone to MITG, to

another HP call center. This allegation fails because (1) the calls at issue were not from "Customers," as that term is defined in the SSA, so HP was not obligated to direct the calls to MITG; (2) MITG's owner and corporate representative Ron Haught testified in his deposition that he was not complaining about calls for in-stock spare parts and the evidence shows all "diverted" calls cited by MITG were for in-stock spare parts; and (3) MITG cannot show damages arising from the alleged diversion of calls because (a) the calls about which MITG complains were for in-stock parts and MITG did not receive a profit split on the sale of such parts [1] and (b) there is no admissible evidence of call volume.

On the Middleware Agreement, MITG claims HP improperly used software, developed by MITG, to interface with Compaq/HP Direct's order entry system, VISTA, for other customers. However, MITG has no admissible evidence to establish that allegation. The evidence shows HP made no use of the Middleware software developed by MITG for other customers before or after the termination of the SSA. Furthermore, MITG has provided no evidence of damages from this alleged breach, although discovery has been closed for months and its damages expert failed to address this claim.

Finally, MITG cannot establish that HP interfered with any business relationships of MITG because it has no admissible evidence of such interference. HP had a legitimate economic interest and employed no improper means in contacting its customers. Further, HP was justified in undertaking the communications about which MITG complains because HP was communicating with it own customers. Finally, any damage calculation provided by MITG related to this claim is based on inadmissible hearsay and speculation.

---

[1] There are a few exceptions on the sale of stocked parts. The only one cited by MITG is the one that provides if MITG could locate a part from another vendor at a price that was $175 or more lower than the stocked Compaq/HP Direct price, MITG could sell the customer that lower priced part. As discussed below, MITG has no evidence to show what, if any, sales might be subject to this exception.

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                    PAGE 2

## UNDISPUTED MATERIAL FACTS

A. Counter-Defendants present the following undisputed material facts as to the claim for breach of the Standard Support Agreement:

1. MITG and Compaq Direct, Inc., a subsidiary of Compaq Computer Corp. ("CDI"), entered into the Standard Support Agreement ("SSA") on February 7, 2002. By this agreement, MITG was to "provide CDI with computer related support services which shall include, but not limited to, computer hardware maintenance and repair. These services will be offered to CDI's end users, customers, companies or commercial entities (collectively "Customers") directed or referred by CDI to MITG." [¶1 of the SSA (attached to MITG's Amended Counterclaim as Ex. 1 and attached hereto at Tab 1].

2. The "Customers" that MITG had an exclusive right to provide service to under the exclusivity provision of paragraph 22 of the SSA were CDI's customers as defined by the SSA, not all customers of Compaq. [SSA ¶¶1, 22; Crowley[2] Depo. 81:23-82:20, Tab 2].

3. Customers contacting CDI to buy spare parts would be connected to MITG. The 800 number and website (which incorporated Compaq (and later HP) trademarks in the domain names) were responded to by MITG as CDI/HP Direct. The 800 number was not part of the Compaq/HP main directory so a Customer using that telephone number could not be routed to one of the other HP calls centers to buy a spare part [Crowley Depo 85:5-23; Meyerfeld Depo 26:1-27:5, Tab 3; Rice Depo 23:10-23, 28:10-16, Tab 4].

4. Under the SSA, MITG sold "sourced parts" (also referred to in depositions as multi-vendor or third party parts) to Customers. These sourced parts were parts not found in

---

[2] In the event the Court finds it helpful, information on the roles and/or involvement of persons cited is included in the deposition testimony presented for each such witness.

Compaq's inventory for various reasons, including that the parts were manufactured by a third party, which Compaq did not stock, or that the parts were "legacy" or older Compaq parts no longer carried in inventory. [Bloomquist Decl. ¶ 3, Tab 5; Crowley Depo 35:4-16; Haught Depo #1 204:2-6, Tab 6]

5.  MITG acquired the sourced parts from its suppliers, had the parts shipped to the Customer, and sent daily invoices to CDI for reimbursement of the actual cost of the part, plus 75% of the profit made on the part (CDI retained the other 25%). [Bloomquist Declaration ¶¶3, 5; Koch Depo 9:25-12:18, Tab 7; Haught Depo #1 204:2-6]. CDI paid MITG and invoiced the Customers.[Ellis Depo 92:11-95:3, 110:7-22, 114:6-115:1, Tab 8].

6.  Under the SSA, MITG also took orders for spare parts stocked in Compaq's inventory (sometimes referred to as the "CSN" parts). MITG transmitted those orders to CDI for fulfillment and invoicing and had no other involvement in that sale, unless a Customer called in with a question, such as a delivery date. Unless the part fell within one of the limited exceptions, MITG did not receive a profit split on the sale of these parts, nor were they paid based on the number of parts sold or amount invoiced. Rather, CDI paid MITG a set dollar amount per call for calls received into MITG's call center, with a minimum monthly payment of $41,000, to pay for the call center operations, including the sale of CSN parts. [Bloomquist Decl ¶4; Koch Depo 12:19-14:10, 15:5-17; Haught Depo #1 203:10-204:10].

7.  In May 2002, HP and Compaq merged. Compaq Direct became known as HP Direct. The SSA remained in place, with MITG servicing the Customers of HP Direct. The Customers continued to contact MITG through the same 800 numbers and website, with

additional links to the website created using HP trademarks [Crowley Depo 37:18-39:24, 77:14-25; Crowley Decl ¶10, Tab 9].

8. At the time of the merger, Compaq had several call centers, including a call center located in Andover, MA. (the "Andover Call Center"). The Andover Call Center was originally a Digital Equipment Corp. ("DEC") call center and became a Compaq call center after the Compaq/DEC merger in the summer of 2001. The Andover Call Center was never part of the Compaq/HP Direct organization. [Pound Depo 7:3-8:9, 8:15-25, Tab 10; Pound Decl. ¶2, Tab 11].

9. At the time of the May 2002 Compaq/HP merger, the Andover Call Center handled the sale of in stock DEC and Compaq spare parts, support of the "Spares Store" or "eSpares" website, laptop warranty issues, and invoicing issues. The Andover Call Center did not handle sourced, multi-vendor, third party or legacy spare parts. It sold only stocked Compaq and DEC spare parts. [Pound Depo 13:8-19, 14:10-20, 29:25-30:11; Pound Decl ¶3].

10. Following the merger in 2002, HP decided to centralize its spare parts call center operations, then spread across the country, into a single location in Roseville, CA. HP personnel in Roseville worked to transition these operations. They closed the Andover Call Center and several other former Compaq and HP call centers. The transition also resulted in the termination of the SSA, pursuant to the provisions in paragraph 7 therein, upon expiration of the initial two year term of the SSA. [Meyerfeld Depo 13:11-23. 14:19-23, 16:10-19; Crowley Decl ¶¶6, 7, 14].

11. In November 2002, HP began working on the transition of the work of the Andover Call Center to Roseville. Roseville slowly began to receive calls beginning in January 2003.

That transition was completed and Andover shut down in April 2003. [Pound Depo 9:1-10, 29:10-24; Pound Decl ¶2].

12. In his deposition, MITG's owner and corporate representative, Ron Haught, admitted MITG was never the sole access point for the sale of Compaq or HP spare parts, and was not intended to be. In fact, Haught admitted that he was aware Compaq and HP had various call centers, web access points (including the Spares Store), and business partners, from whom customers could acquire in stock Compaq and/or HP spare parts. Haught did not object to the various sales channels. He understood that, under the SSA, MITG was to get calls seeking out of stock parts (third party and legacy spare parts) [Haught Depo #1 131:6-16; 139:6- 140:8; 146:15-147:16; 148:8-14; 183:14-21; 184:13-186:17, and MITG's Depo Ex. B].

13. Because the Andover Call Center sold only in stock spare parts, even if the calls had been transferred to MITG instead of Roseville, and MITG made the sales, MITG would not have gotten a 75% profit share of each sale, unless it could establish that each stocked part sold fell under an exception in the SSA. The SSA required MITG to sell stocked parts out of the Compaq inventory unless one of the four limited exceptions applied[3]. The only exception cited by MITG[4] was the one that provided that if MITG could locate a part stocked by Compaq for an amount that was $175 less if purchased from a third party, MITG could acquire the part from the vendor, sell it and share in the profit split. MITG's expert, Scott Stringer relied on this exception, but admitted that he did not know how many, if any, sales by MITG were made relying on this exception. He assumed the

---

[3]  See Plaintiff's Depo Ex. 4 (proven up in the deposition of Ronald Haught #1 37:23-38:16].
[4]  MITG never mentioned or cited this exception until its expert's second report dated August 17, 2005, although fact discovery closed May 13, 2005. In his deposition, Stringer did not accurately remember the dollar amount.

percentage of sales that would have been made if MITG had been forwarded the calls
from the Andover Call Center was equal to the percentage of sales MITG actually made
that were subject to the profit split because he did not know the number. MITG could not
give him a percentage and based on his conversation with MITG's <u>lawyer</u>, he decided
that the percentage was "probably not zero, it's probably not 100, somewhere in between,
but I have no idea what that number is." MITG has no such evidence and its expert's
assumption that these sales qualified for this exception is unsupportable and inadmissible.
[Haught Depo #1 203:10-18; Stringer Depo #2 11:11-12:16, 30:10-31:19, 70:5-71:15,
Tab 12; Stringer Report #2, §III, Tab 13].

14. MITG has no evidence as to the number of phone calls the Andover Call Center received.
Accordingly, MITG cannot establish any amounts over the 7810 calls per month covered
by the $41,000 minimum monthly paid that was indisputably paid to MITG by HP Direct.
[Bloomquist Decl ¶ 4]. MITG's expert, Scott Stringer, used information on website and
telephone <u>orders</u> handled by Andover. The SSA does not provide for, and MITG was not
paid for, website contacts or orders. [*see* the SSA; Stringer Depo #2 27:6-20, 32: 5-14,
38:11-40:13]

15. Stringer's method of calculating the number and volume of calls received by MITG is
inaccurate and unreliable because he does not use the same analysis throughout his
report. Stringer used three different reports from three different time periods, including
for one year, a report of <u>all</u> incoming calls, whether answered or not, even though MITG
was only paid for "answered sales calls". [Stringer Depo #2 33:12-38:10] Stringer's
calculations, at a minimum, significantly increase the true number and/or volume of calls.

**B.** Counter-Defendants present the following undisputed material facts as to the claim for breach of the Middleware Agreement:

1. CDI and MITG entered into the Middleware Agreement on February 8, 2002. Pursuant to this Agreement MITG was to develop software that would allow MITG to place orders under the SSA directly into CDI's VISTA order entry system. This process would eliminate the need for CDI personnel to manually enter orders received from MITG. [Middleware Agreement (Depo Ex. Y), Tab 14; Bloomquist Depo 68:14-69:9, Tab 15; Ellis Depo 90:16-91:16, 92:2-93:21].

2. MITG representatives, including John Brewer of eData Enterprises, who was hired by MITG to do the necessary programming, worked with CDI to develop the software. The software (referred to as "the Middleware" or the "XML"), which allowed MITG's computer to communicate directly with the VISTA system, resided on MITG's system. No software developed by or on behalf of MITG resided on the VISTA system. [Brewer Depo 8:15-11:4, 12:22-16:20, 18:4-19:12, Tab 16]

3. At the end of the term of the SSA, post-merger HP Direct shut off MITG's ability to access the VISTA system, as there was no further use of the Middleware by HP Direct, or any other HP entity. [Urwin Depo 82:20-83:8, 88:19-91:20, 93:8-94:9, Tab 17; Broady Depo 7:22-25, 9:2-12, 12:3-6, 31:6-12, 55:6-25, Tab 18].

4. During the term of the Middleware Agreement, the only entity ordering through the VISTA system using the Middleware or any similar direct access was MITG. No other customers or vendors of Compaq/HP Direct ordered in this way. [Urwin Depo 82:20-83:8].

5.  Up to the close of discovery, MITG could never identify anyone with whom HP used the
    Middleware, as alleged in the Amended Counterclaim paragraphs 25-27. [Haught Depo
    #1 78:1-5].

6.  After the close of discovery, MITG has not disclosed any damage amount, despite
    requests for same in deposition and the requirements of Rule 26. [Haught Depo #1 8:20-
    9:5, Haught Depo #2 9:1-10:25, Koch Depo 67:17-68:11; *see also* MITG's Rule 26(a)
    Disclosures, Tab 19].

C.  Counter-Defendants present the following undisputed material facts as to the claim for
tortious interference:

1.  Under the SSA, MITG was servicing Compaq/HP Direct's customers and communicating
    with Direct inside sales representatives ("CSRs"), using the Compaq/HP names and
    trademarks (i.e. Compaq Direct, Compaq Online Parts, etc).   Typically, a CSR would be
    engaging MITG to get parts for their customers. [Bloomquist Depo 26:13-27:1]  Thus,
    CSRs and Customers received e-mails from people with e-mail addresses using
    Compaq/Hewlett Packard trademarks (such as info@hpdirectonlineparts.com) and were
    greeted on the phone with a message identifying the company as Compaq/HP Direct
    (such as "Thank you for calling Compaq Direct, part of the new HP.") [Crowley Depo
    39:4-24, 41:15-42:1, 42:14-23; Haught Depo #1 147:21-151:9 and Depo Ex. 23]
    Customers were not informed that Compaq/HP Direct had a third party servicing this
    spare parts business. [Crowley Dec ¶1; Rice Depo 28:10-16; Haught Depo #1 Ex. 23].

2.  By letter dated January 30, 2004, HP informed its Customers that after February 7, 2004,
    when the SSA terminated, the phone numbers and websites to acquire in-stock spare parts
    would change and that HP Direct would no longer supply third party parts.  HP also

informed its internal sales personnel of the change, so they would have the right contact information to use for or provide to their customers when ordering on their own. [Meyerfeld Depo. #1 87:14-88:14, 89:16-90:2, 93:14-18, 96:12-21, Meyerfeld Depo. #2 126:19-127:12 and Depo Ex. DDDD].

3. HP personnel followed up on the letters by telephone with what HP identified as the top 89 Customers to ensure that these Customers were aware of, and understood, the new access points and account numbers [Meyerfeld Depo #1 87:14-89:3].

4. Mr. Haught, the owner of and corporate representative for MITG, testified that nothing in the January 30, 2004 letter to the Customers was incorrect. [Haught Depo #1 264:12-22, Plaintiff's Depo Ex. No. 28].

5. MITG has no admissible evidence that companies ceased doing business with MITG because of wrongful actions of HP, but instead relies on speculation and hearsay. [Haught Depo #1 250:13-252:15, 256:8-257:8, 258:2-259:4, 260:18-24, 261:17-263:6]. For example, on one allegedly interfered with Customer, Avnet, Haught deferred to an MITG employee, Richard Rice [Haught Depo #1 249:6-252:8]. However, Mr. Rice testified he did not remember the name of any customer who allegedly told him not to do business with MITG and it was only his "opinion" that MITG lost business because of HP. [Rice Depo 112:18-114:6] This testimony is hearsay, so even if it was true, which HP disputes, it is not admissible evidence to support MITG's claim.

6. MITG's expert report of damages allegedly arising from interference with customers is based on speculation piled upon inadmissible hearsay. For example, Stringer assumed that but for HP's alleged interference, MITG's 2004 business would have been identical to its 2003 business, even though the SSA was no longer in place, and that MITG would

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                    PAGE 10

have access to stocked Compaq and HP spare parts at the same price it acquired them during the term of the SSA. He also assumed that all customers who bought in 2002 and 2003 who did not buy from MITG from February 7, 2004 through December 31, 2004 did not buy because of tortious interference by HP. [Stringer Depo #2 131:20-133:24, 135:7-12, 136:4-12]. Stringer's assumptions were made because he did not have contrary evidence, but that does not make such assumptions admissible just because they are offered by an expert.

7. Mr. Haught also claimed Parts Now, a supplier of parts to MITG, ceased selling to MITG after being contacted and told by HP that it would lose its reseller status with HP if it continued to do business with MITG. [Haught Depo #1 267:16-270:5] This was the only supplier Haught could identify. [Haught Depo #1 270:6-12]. Haught's testimony is hearsay so, even if it were true, which HP disputes, it would not be admissible evidence in support of a claim. Further, Haught does not explain how MITG was damaged, and MITG has presented no damages arising from this supplier allegedly ceasing to sell to MITG. [Haught Depo #1 270:13-272:12; Stringer Report #2]

## ARGUMENT

### HP DID NOT BREACH THE STANDARD SUPPORT AGREEMENT

The Standard Support Agreement explicitly provides that it "shall be governed by, and construed under the laws of the State of Missouri,"[5] and therefore, Missouri law applies to MITG's claim for breach of the SSA. In order to establish a claim for breach of contract under Missouri law, MITG must establish the existence of the contract, the rights and obligations of the

---

[5] *See* the SSA at ¶19.