parties to the contract, a violation of the terms, and damages resulting from the breach.[6] Based on the undisputed material facts presented above, MITG cannot, as a matter of law, establish a breach of the SSA by HP.

The SSA gave MITG the exclusive right to service "Customers." The SSA clearly defines "Customers" as "<u>CDI's</u> end users, customers, companies or commercial entities." (emphasis added) [Undisputed Fact A:1]. Thus, to prevail, MITG must show that Plaintiffs violated the exclusivity provision of the SSA by selling to "Customers" of CDI. A showing of sales to customers outside of Compaq Direct/HP Direct cannot be a violation of the SSA because the SSA does not give MITG any rights (let alone exclusive rights) to sell to customers outside of the Compaq Direct/HP Direct organization. [Undisputed Facts A:1-2].

In support of its breach claim, MITG's original tact was to cite a decline in its call volume at a time when it alleges that HP's call volume increased, then demand a percentage of overall spare parts sales revenue as its damages [See Defendant's Initial Disclosure (b), *see* Tab 18]. It abandoned that approach, as evidenced by its expert's damages calculation, which is based on the alleged diversion of calls from the Andover Call Center to Roseville, CA., when the Andover Call Center operations were transferred to HP Roseville [Undisputed Facts A: 10, 11, 13, 14]. Thus, in order to establish HP's liability, MITG must show that the calls that had been answered by the Andover Call Center, that were routed to Roseville beginning in the first quarter of 2003, were from "Customers" covered by the SSA and should have been directed to MITG. [Undisputed Facts A:1, 2] This MITG cannot do. As shown by the testimony of the former Andover Call Center manager, Diane Pound, Andover was never a part of Compaq Direct, or subsequently HP Direct. It was a pre-merger Compaq call center that was in existence prior to the execution of the SSA [Undisputed Fact A:8].

---

[6] *Gilomen v. Southwest Mo. Truck Center*, 737 S.W.2d 499, 500-501 (Mo. App. 1987).

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                                         PAGE 12

Further, under the SSA, MITG sold both in-stock spare parts and "sourced" spare parts. [Undisputed Fact A:4] MITG's owner, president and corporate representative, Ron Haught, testified that he believed that under the SSA MITG was to be the source for out of stock (third party and legacy) spare parts. [Undisputed Fact A:12]. Haught admitted he (1) knew MITG was never the sole access point for stocked Compaq and HP parts and (2) was aware of multiple access points, including the Spares Store (supported by the Andover call center) and business partners, where customers could acquire in-stock spare parts. Haught testified he did not object to the existence of these other sales channels for stocked parts. [Undisputed Facts A:9,12]. It is undisputed that Andover sold only in-stock parts, and did not sell legacy or third party parts. [Undisputed Facts A:8, 9, 13]. Thus, by the clear admission of MITG's representative, Ron Haught, calls received and sales made by other HP access points, including the Andover Call Center, for stocked parts did not constitute a breach of the SSA. Thus, summary judgment should be granted in favor of HP on MITG's claim of breach of the SSA.

**MITG CANNOT ESTABLISH DAMAGES FLOWING FROM THE ALLEGED BREACH OF THE SSA**

Under the SSA, MITG was only paid the profit split for the sale of sourced parts. [Undisputed Fact A:5]. Its sales of in-stock or CSN spare parts were not subject to the profit split, but rather were compensated by payments for calls received. [Undisputed Fact A:6]. Stringer acknowledged the error in his first report that calculated all sales as being subject to the profit split and changed his methodology so as to compensate MITG on the profit split for the sale of sourced parts. However, the indisputable evidence is that Andover did NOT sell third party or legacy parts. Andover only sold stocked Compaq and DEC parts. [Undisputed Facts A:8-9]

MITG's expert, Scott Stringer, then cites an exception in a different document, separate from, but referenced in, the SSA, known as the MITG "Bible." In the MITG Bible, if MITG could acquire an in-stock spare part from a third party for a price that was $175 less than the cost of the part if purchased directly from HP, MITG could sell the cheaper part and receive 75% of the profit on the sale. [Undisputed Fact A:13] Stringer goes on to <u>assume</u>, without any basis in fact, that if the Andover Call Center calls had been directed to MITG, instead of Roseville, MITG would have sold in-stock parts from a third party at a $175 or more price break. The flaw with Stringer's methodology is that there is absolutely no evidence MITG ever made use of the $175 price break exception, and even if it had, there is no evidence from which to calculate a percentage of sales or share of profit from parts sales falling under the exception. [Undisputed Fact A:13] In fact, the evidence indicates that such an exception NEVER happened, as neither Haught, nor MITG's chief operating officer, Teresa Koch, mentioned this exception when asked in the two depositions they each gave in the case how MITG was compensated.

Further, and more fundamentally, in order to calculate damages, Stringer assumes, without any foundation, that the Andover call center sales mix matched MITG's sales mix. [Stringer Depo #2 60:18-61:24] Thus, under his assumption, IF the Andover call center calls were transferred to MITG instead of Roseville, those additional calls would have resulted in sales matching MITG's sales to Direct customers. There is no evidence to support this assumption, and, in fact, the evidence presented is contrary to it. Stringer even admits that he "can't explain" how this assumption is correct in the face of Diane Pound's testimony to the contrary[7] [Stringer #2 63:21-64:24] and admits he has not seen information that shows that

---

[7] Stringer testified that before his first and second depositions that he reviewed and relied upon various depositions, including the deposition of Diane Pound. [Stringer #1 22:2-9, Exhibit 2 to Stringer Reports #1 and #2; Stringer #2 18:25-20:10]. During his second deposition, it became clear that Stringer reviewed only part of Ms. Pound's deposition because, as MITG's counsel stated "it appears we are missing from Ms. Pound's deposition the backside

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                    PAGE 14

Andover could handle the same sales as MITG [Stringer Depo #2 67:13-23]. The evidence is that Andover did not sell any third party or legacy parts. [Undisputed Facts A:9, 13]. Further, Stringer admits that he does not know what percentage of MITG's sales, if any, were of in stock parts acquired by MITG elsewhere. [Stringer Depo #2 30:10-31:19] Thus, Stringer's damages calculation, based on the assumption that callers, if serviced by MITG instead of HP Roseville, would have ordered in-stock product that MITG could acquire elsewhere at the necessary price break and that the percentage of those sales would have matched exactly his calculation of MITG's sales mix, has no foundation, because it is based on mere speculation and is, thus, inadmissible. [Stringer Depo #2 69:17-72:7]

In addition to assuming, without basis, that Andover's sales mix was identical to MITG's, Stringer incorrectly calculated call volumes for Andover and MITG. Stringer has no evidence of the Andover call center's telephone call volume. He just uses total <u>order</u> information for Andover, which includes web orders for which MITG would not have been compensated under the SSA. [Undisputed Fact A:14]. Trying to determine the number of telephone calls MITG would have received by using information on web and telephone orders combined is blatantly wrong and provides no evidence of the number of allegedly diverted phone calls. Stringer compounds his error by using incorrect and inconsistent information to calculate the actual number of calls from MITG [Undisputed Fact A:15]. Because Stringer uses inadmissible evidence as the basis for his damage calculation, the calculation is likewise inadmissible.

As set forth above, MITG cannot establish its claim of breach of the SSA because the undisputed material facts show that the calls and sales about which MITG complains were not to "Customers" as that term is defined in the SSA. Further, MITG's corporate representative

---

of the pages...." [Stringer Depo #2 62:21-23]. Stringer admits not having reviewed certain pages because they were missing [Stringer #2 64:19-24]

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                                                          PAGE 15

admitted that he did not take issue with the existence of the Andover Call Center or believe the sale of stocked parts by other sales channels of HP breached the SSA. Finally, MITG's damage calculation is based on unfounded assumptions piled on unfounded assumptions and/or assumptions contrary to the admissible evidence by its expert and such assumptions are inadmissible, and thus, cannot form the basis for its damage claim.

**HP DID NOT IMPROPERLY USE THE MIDDLEWARE AND IS NOT IN BREACH OF THE CONTRACT**

The Undisputed Facts set forth above clearly establish that HP did not breach the Middleware Agreement between MITG and Compaq Direct. Not only does MITG have no admissible evidence of a breach, but HP affirmatively established no breach. The Middleware Agreement is governed by Illinois law.[8] To establish a claim for breach of contract under Illinois law, MITG must show: (1) the existence of a valid and enforceable contract; (2) performance by MITG; (3) breach by HP; and (4) injury arising therefrom.[9] The Undisputed Facts establish that MITG cannot establish elements 3 and 4 of its claim.

Briefly, at the beginning of the relationship between MITG and CDI, CDI manually entered orders received from MITG under the SSA into CDI's order entry system, VISTA. CDI worked with MITG to assist MITG in developing a means of communication between the two companies' systems. Out of that effort came software known as the "Middleware," which was a means for data entered by MITG on its computer system to be translated so it was accepted and understood by VISTA. [Undisputed Facts B:1-2]. During the term of the SSA and Middleware Agreement, MITG was the only entity using the Middleware it created to communicate with CDI/HP Direct's VISTA system. [Undisputed Fact B:4] At the end of the SSA, HP Direct shut off the portal that allowed MITG access to VISTA and that access has remained off since

---

[8] Middleware Agreement, attached to MITG's Amended Counterclaim, Ex. C. and at Tab 14.
[9] *Catanian v. Local 4250/5050 of Communications Workers of America*, 834 N.E.2d 966, 971 (Il. App. 2005).

COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY
MIDWEST INFORMATION TECHNOLOGY GROUP, INC.                                          PAGE 16

February 7, 2004. [Undisputed Fact B:3] MITG asserts that the Middleware was used by HP for other customers, but could never identify who allegedly was given use of the Middleware. [Undisputed Fact B:5]. MITG's assertion of a breach by HP is nothing more than speculation and thus inadmissible.

Further, MITG failed to establish any damages that arise out of this alleged breach. [Undisputed Fact B:6] Because damage is an element necessary to establish to prove a breach of contract, without such evidence, the claim must fail. Accordingly, summary judgment for HP on this claim is warranted.

### MITG HAS NO ADMISSIBLE EVIDENCE THAT COMPANIES CEASED DOING BUSINESS WITH MITG BECAUSE OF IMPROPER ACTIONS BY HP

MITG alleges that HP interfered with its business by (1) contacting Customers by letter and, for some by telephone, to tell them of process changes as to the ordering of parts [Amended Counterclaim ¶¶ 37-40]; and (2) by instructing suppliers and distributors and distributors not to do further business with MITG [Amended Counterclaim ¶ 41]. In order to prove a claim for intentional interference, MITG must prove: (1) a contract or valid business expectancy; (2) HP's knowledge of such contract or relationship; (3) intentional interference inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from HP's conduct.[10] HP is entitled to judgment as a matter of law because MITG cannot provide any material facts to show elements 3, 4 or 5.

### MITG CANNOT PRESENT EVEN A SCINTILLA OF EVIDENCE OF INTERFERENCE INDUCING OR CAUSING A BREACH

MITG has no admissible evidence that the actions of HP in sending letters and making telephone calls to certain customers informing them of a change in the ordering process for HP spare parts induced a breach. MITG pled that HP instructed suppliers and distributors of MITG

---

[10] *Cmty. Title v. Roosevelt Fed. S&L*, 798 S.W.2d 369, 372 (Mo. banc 1990).