UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

vs.    Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.
_____/

Deposition of
BILL CROWLEY
Tuesday, September 28, 2004

Job No. 1608RD
Reported by: Ruth E. Diederich, RPR, CSR
    CSR No. 4952

EXHIBIT 2

---

APPEARANCES

FOR THE PLAINTIFFS:

  THOMPSON & KNIGHT, LLP
  BY: ELIZANN CARROLL, Esq.
  1700 Pacific Avenue, Suite 3300
  Dallas, Texas 75201
  (214) 969-1700

FOR THE DEFENDANTS:

  SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
  BY: JAMES A. HANSEN, Esq.
  525 Jersey
  Quincy, Illinois 62306
  (217) 223-3030

IN-HOUSE COUNSEL FOR HEWLETT-PACKARD:

  SUZANNE RAY MILLER
  Senior Attorney
  3000 Hanover Street, ms 20bq
  Palo Alto, California 94304-1112
  (650) 857-4939

---o0o---

---

BILL CROWLEY    Tuesday, September 28, 2004

INDEX

| | | Page |
|---|---|---|
| Examination by Mr. Hansen | | 5 |

---o0o---

EXHIBITS

| Exhibits | Description | Page |
|---|---|---|
| A | A document entitled "Midwest Information Technology Group Incorporated Standard Support Agreement." | 74 |
| B | E-mails Bates-stamped MITG 0101 and MITG 0102. | 91 |
| C | E-mails Bates-stamped MITG 0430, MITG 0431, MITG 0432, MITG 0433, MITG 0434 and MITG 0435. | 91 |
| D | E-mails Bates-stamped HP 000065, HP 000066, HP 000067, HP 000068, and HP 000069. | 103 |
| E | E-mails Bates-stamped HP 000232, HP 000233, HP 000235, HP 000237, HP 000238, HP 000239, HP 000240, HP 000241 and HP 000242. | 132 |
| F | A document entitled "US Parts Sales in K$." | 166 |
| G | A document entitled "US Parts Call Volumes." | 181 |
| H | Business center operations daily metrics. | 187 |
| I | E-mails Bates-stamped HP 001226 and HP 001227. | 202 |
| J | An e-mail Bates-stamped HP 001228 with attached slides. | 206 |
| K | An invitation to a teleconference. | 216 |
| L | A document entitled "HPS Spares Business Summary." | 225 |

---o0o---

**Page 5**

1  sections of the Code of Civil Procedure of the State of
2  California, on Tuesday, September 28, 2004, commencing
3  at the hour of 9:07 a.m. thereof, at Hewlett-Packard,
4  8000 Foothills Boulevard, Building R10, Conference
5  Room B, Roseville, California, before me,
6  Ruth E. Diederich, a Certified Shorthand Reporter
7  in the State of California, there personally appeared
8
9
10             BILL CROWLEY,
11  called as a witness by the defendants in the
12  above-entitled action, who, having been duly sworn by me
13  to tell the truth, the whole truth, and nothing but the
14  truth, was examined and testified as follows:
15              ---oOo---
16        EXAMINATION BY MR. HANSEN
17  Q.  Please state your name for the record.
18  A.  William J. Crowley.
19  Q.  Mr. Crowley, have you ever had your deposition
20  taken before?
21  A.  Yes.
22  Q.  Okay.  And I'm sure you got this information
23  from the attorneys that you met with prior to your
24  deposition today, but to go over it again, I am going to
25  be asking you questions here today in relation to a suit

**Page 6**

1  that's pending in the Central District Federal Court in
2  Springfield, Illinois.
3       If at any time I ask you a question today that
4  you do not understand, please say so, and I will
5  rephrase it and hopefully put it in a form that you can
6  answer.
7       Will you do that for me?
8  A.  Yes.
9  Q.  Also, again, we need verbal responses since your
10  answers are being typed up in a booklet form, as are my
11  questions, to read later.  Somebody's uh-huh means an
12  huh-uh to somebody else, so we need verbal answers.  And
13  I may, from time to time, remind you of that; okay?
14  A.  Okay.
15  Q.  Lastly, I would ask that you allow me to
16  complete my questioning before you jump in with an
17  answer.  It's very common that you may know exactly
18  where my question is going, but it's very difficult for
19  our court reporter to transcribe two people talking at
20  the same time; okay?
21  A.  Okay.
22  Q.  And there is a fan over here, so I may have to
23  ask you to speak up a little bit so we can hear your
24  answers, if that's all right.
25  A.  Okay.

**Page 7**

1  Q.  I won't take it that you're yelling at me.
2  A.  Okay.
3  Q.  How old are you, sir?
4  A.  I am 43.
5  Q.  Your date of birth?
6  A.  6/29/61.
7  Q.  Okay.  What is your educational background?
8  A.  I have a bachelor of science degree from
9  US Military Academy at West Point in engineering.  I
10  have a master's of business administration from the
11  University of Notre Dame.
12  Q.  Who do you root for when Notre Dame plays Army?
13  A.  It's got to be Army.  The longest losing streak
14  in the country.
15  Q.  And when did you graduate from West Point?
16  A.  1983.
17  MR. HANSEN:  Let's go off the record for a
18  second.
19       (Interruption in the deposition.)
20  MR. HANSEN:  Back on.
21  Q.  After graduating from West Point, did you do
22  military service, some duty?
23  A.  Yes.
24  Q.  Okay.  How many years?
25  A.  About five and a half.

**Page 8**

1  Q.  Okay.  Honorably discharged?
2  A.  Yes.
3  Q.  And then did you go on to obtain your MBA from
4  Notre Dame?
5  A.  No.
6  Q.  Okay.  Did you work for a period of time first?
7  A.  Yes.
8  Q.  Okay.  Where at?
9  A.  At a company called Gerawan Farming.
10 Q.  Could you spell that first name?
11 A.  G-e-r-a-w-a-n.
12 Q.  And what?  Farming?
13 A.  Yes.  It's a farming company.
14 Q.  Where at?
15 A.  Ridley, California, outside of Fresno.
16 Q.  Okay.  What did you do for them?
17 A.  They're a family-owned business.  They're the
18 largest growers of peaches, plums, nectarines and table
19 grapes, and I was in a variety of post production and
20 logistics positions where after the fruit was harvested,
21 we brought it in, cold storage, packaged, shipped it
22 around the world.
23 Q.  Okay.  How long were you with them?
24 A.  About five and a half years.
25 Q.  Okay.  Did you then go to work for some other

## Page 9

1  company or go back to get your MBA?
2  A.  Then I got my MBA.
3  Q.  Okay. What year did you obtain your MBA?
4  A.  1995.
5  Q.  Okay. Any subspecialty within that MBA?
6  A.  Dual concentration in operations and finance.
7  Q.  Ever go on to try and obtain a doctorate?
8  A.  No.
9  Q.  Do you hold any certifications?
10  A.  No.
11  Q.  Any professional accreditations?
12  A.  No.
13  Q.  Are you a member of any professional societies
14  or organizations?
15  A.  No.
16  Q.  On any professional committees?
17  A.  No.
18  Q.  Have you ever lectured or taught at any
19  universities?
20  A.  No.
21  Q.  Published any research or articles?
22  A.  No.
23  Q.  Okay. Your present employer, is it
24  Hewlett-Packard?
25  A.  Yes.

## Page 10

1  Q.  Okay. And we are taking your deposition today
2  here in Roseville, California.
3  A.  Correct.
4  Q.  Okay. At the -- is the address 8000 Foothills
5  Boulevard?
6  A.  Correct.
7  Q.  And what is your current position or title with
8  Hewlett-Packard?
9  A.  I am the parts business development manager.
10  Q.  How long have you been working for HP at this
11  location?
12  A.  Since June of 1996.
13  Q.  Okay. Going back a little bit, you graduated
14  with your MBA in 1995. I take it that would have been
15  May, June of '95?
16  A.  Correct.
17  Q.  Okay. So you had a year, roughly, in between
18  there before -- you just indicated to me you started
19  here in June of '96?
20  A.  That's right.
21  Q.  What did you do for that one year?
22  A.  I worked for Procter & Gamble Company.
23  Q.  In Cincinnati?
24  A.  No. In Sacramento. I was hired out of
25  Cincinnati, their headquarters in Cincinnati.

## Page 11

1  Q.  Right. What did you do for P & G?
2  A.  I was a -- I was in their financial analysis
3  group.
4  Q.  Any particular reason you left P & G to come to
5  work for HP?
6  A.  Better opportunity.
7  Q.  I mean, were you fired or anything like that?
8  A.  No. No. Not at all.
9  Q.  Okay. Better job opportunity, and you took it
10  with HP?
11  A.  Correct.
12  Q.  Okay. I want to break down a little bit of you
13  employment here with HP.
14  You say you started in June of '96. Have you
15  always been the parts business development manager?
16  A.  No.
17  Q.  Okay. That is your current role, you indicated
18  How long have you held that position?
19  A.  I have held some form of it for probably
20  approximately three years.
21  Q.  Okay. Let's focus on your current job, then
22  we'll work backwards.
23  Describe for me your duties or responsibilities
24  for HP as a parts business development manager.
25  A.  I -- there's a product line that involves

## Page 12

1  selling spare parts and replacement parts to outside
2  companies, and I am the person who is in charge of that
3  business for the Americas, that includes Latin America
4  and Canada. I'm responsible for the financial
5  performance of the product line, the profitability of
6  the product line, the customer satisfaction, setting th
7  strategic directions, and that's it.
8  Q.  Going back, you said you're responsible for the
9  product line, the selling of spare parts or replacement
10  parts to outside companies. Describe for me what types
11  of outside companies.
12  A.  Well, inside of HP, we move a lot of replacement
13  parts and spare parts around, some of those under
14  contract and under warranty, and those are not sold.
15  Parts that are sold fall under my product line, and so
16  the companies -- the customer sets that we have
17  include -- it's really every type of -- it's parts for
18  every type of HP product. So our customers include
19  consumers, end users of those products, repair provider
20  who are repairing HP products, partners or resellers wh
21  have sold the product and then are providing support to
22  those products, and also parts resellers with companies
23  who specialize in -- in selling parts, support parts fo
24  computing and printing equipment.
25  We also have customers who -- who take our parts

**Page 33**

1  A.  He manages the Sykes call center parts.
2  Q.  S-i-k-e-s?
3  A.  S-y-k-e-s.  S-y-k-e-s.  Sykes is a company, an
4  outside provider of call center services, much like
5  MITG.
6  Q.  Did Sykes perform the same type of third-party
7  spare parts procurement and services that MITG did?
8  A.  No.
9      MS. CARROLL:  Object as vague.
10 Q.  BY MR. HANSEN:  Okay.  Well, you said they're
11 similar to the -- well, are they simply a router of
12 calls?  Or what is their -- strike that.
13     You said they're similar to MITG.  What did you
14 mean by that?
15 A.  No.  I said they provide call center services.
16 Q.  You said similar to MITG.  What did you mean by
17 that?
18 A.  I think my understanding of MITG is that they
19 also provide call center services.
20 Q.  Okay.  Do you have specific knowledge whether or
21 not Sykes was also an entity that was under contract
22 with HP to provide third-party spare parts services for
23 outside customers?
24 A.  Sykes has a contract with HP, and has had a
25 contract with HP, to provide call center services for

**Page 34**

1  customers calling in to purchase spare parts.
2  Q.  Okay.  Do they fill those orders?
3  A.  They provide call center services.
4  Q.  Okay.  But my question is, Do they fill the
5  orders?
6  A.  I don't understand.
7  Q.  If I call in to the Sykes call center as
8  Joe Smith and want to buy some memory upgrade, can Sykes
9  fill my order?
10 A.  They take the call, and they -- they help place
11 that order.
12 Q.  Okay.  Do they place that order by creating a
13 purchase order, invoice, to HP, then HP sends the part
14 to them to forward on to the client?
15 A.  No.
16 Q.  Okay.  What is your understanding of how Sykes
17 fills that order?
18 A.  They place -- they -- they take the credit card
19 or the payment, and they enter an order into the HP
20 system, and then they are finished with that customer.
21 Q.  Okay.  Does Sykes ship the part to the customer?
22 A.  No.
23 Q.  So other than taking the call, taking the credit
24 card information, if applicable, routing the purchase
25 order through HP, is it your understanding, then, that

**Page 35**

1  fulfills the end of Sykes' role with that -- with that
2  call?
3  A.  Yes.
4  Q.  Okay.  What is your understanding of how that
5  differs to what services MITG performed on behalf of HP?
6  A.  MITG provided services to Compaq Direct, which
7  is a different entity of HP.  That's a major difference.
8  So MITG serviced customers who came in -- and I'm really
9  not clear on -- on all the details in which they may
10 have obtained their customers, but customers were
11 referred to MITG from the Compaq Direct organization,
12 and they provided call center services and web hosting
13 and fulfillment services for Compaq Direct.
14     Sykes is a call center provider for HP Services,
15 and they take phone calls for people -- from people who
16 want to buy parts.
17 Q.  Okay.  I guess, Why would you be contacting
18 Mr. Chizek at Sykes for documents in this case?
19     MS. CARROLL:  Objection; ambiguous, assumes
20 facts not in evidence.
21 Q.  BY MR. HANSEN:  Go ahead.  You can answer.
22 A.  Mr. Chizek, his call center runs the 800 number
23 and the phone response where after the MITG contract
24 terminated, the calls were routed to the call center
25 that Mr. -- that Mr. Chizek manages.

**Page 36**

1  Q.  Okay.  So that's after February --
2      Well, when you say "after the contract was
3  terminated," after the notice --
4  A.  After the contract expired.
5  Q.  In February of '04?
6  A.  Yes.  On the -- I believe it was the day after
7  the contract expired, we switched the 800 number or the
8  calls that were going in from the HP 800 number into the
9  MITG call center over to the -- the HP parts call
10 center.
11 Q.  Okay.  Now, previously, you said it was your
12 understanding that MITG serviced customers that came in
13 from Compaq Direct.  Upon the merger, when HP merged
14 with Compaq, is it your understanding that that became
15 HP Direct as well?
16 A.  No.
17 Q.  Okay.  So it's your understanding that MITG did
18 no services for HP Direct customers?
19 A.  On the merger, Compaq Direct remained as Compaq
20 Direct.  After the merger, several months later, they
21 changed names to HP Direct.
22 Q.  Okay.  But that change occurred during the time
23 in which the contract with MITG was still in effect; is
24 that fair?
25 A.  Yes.

```
 1   Q.  Okay.
 2   A.  They became HP Direct.
 3   Q.  Okay.  And that was during the time in which
 4  MITG was still providing services pursuant to the
 5  Standard Support Agreement between the parties?
 6   A.  Correct.
 7   Q.  Okay.  So would MITG have then been providing
 8  services for not only Compaq Direct, but then after the
 9  merger, HP Direct?
10   A.  After the merger, HP Direct included Compaq, HP,
11  everything.  So HP -- it was a name change to HP Direct.
12   Q.  Okay.  But is it your testimony that MITG did
13  not provide any services for any other entity under the
14  HP Direct umbrella besides the Compaq Direct parts?
15   A.  No --
16   Q.  Okay.
17   A.  -- that's not my testimony.
18   Q.  Okay.  Then my previous question was, Is it your
19  understanding and knowledge that MITG provided parts,
20  services, pursuant to the Standard Support Agreement for
21  HP Direct after the merger took place?
22   A.  Yes.  They provided parts to HP Direct.
23   Q.  Okay.
24   A.  And that's not the same as all of HP, or it's
25  not the -- the same as -- as our organization.
                                                      37
```

```
 1   Q.  And that's not my question.  My question simply
 2  was, You would agree with me that they provided parts
 3  and services on behalf of HP Direct after the merger
 4  took place?
 5   A.  Yes.
 6   Q.  Okay.  Now, Compaq Direct didn't necessarily go
 7  away after the merger; correct?
 8   A.  Correct.
 9   Q.  Okay.  So MITG was providing services on behalf
10  of not only the HP Direct, but the Compaq Direct under
11  the Standard Support Agreement?
12   A.  Compaq Direct became HP Direct.
13   Q.  But if I'm a customer on the outside that didn't
14  know that, and I called my old Compaq Direct number or
15  go to that website, I can still procure and buy Compaq
16  parts; correct?
17   A.  Yes.  The -- the -- you could -- yeah.  The
18  numbers didn't change.  The interaction didn't change.
19   Q.  Right.
20   A.  That's right.
21   Q.  Okay.  Now, while we're here -- and we will get
22  into this in more detail later, but what is your
23  understanding of -- during the terms of the Standard
24  Support Agreement?
25       You've testified that after the termination --
                                                      38
```

```
 1  well, let me word this -- after the contract ended in
 2  February of '04, that the calls that came into this
 3  800 number were then sent to Sykes and Mr. Chizek's
 4  group.  What is your understanding, during the
 5  time of the Standard Support Agreement with MITG, what
 6  800 numbers, if you know, were being used in which MITG
 7  could receive routed calls?
 8   A.  There was an 800 number that went to Compaq
 9  Direct --
10   Q.  And I don't mean to interrupt, but if I use the
11  term "the welcome center," do you understand that Compaq
12  800 number to be termed "the welcome center"?
13   A.  I don't understand that.
14   Q.  Okay.
15   A.  So Compaq Direct is a -- it's one sales -- and
16  then later, HP Direct -- that's one customer entry point
17  of HP.
18   Q.  And that's that the 800 number?
19   A.  And that 800 number had an option off of it in
20  which it would -- if you're interested in parts, that
21  option would route over to MITG -- the call center
22  operated by MITG, and those agents would answer the
23  phone as HP Direct parts or Compaq Direct parts.  They
24  would answer on behalf of HP or Compaq.
25   Q.  Okay.  Do you know offhand that -- the exact
                                                      39
```

```
 1  800 number they're referring to there?
 2   A.  No.
 3   Q.  Okay.  Do you know -- was it more than one
 4  800 number?
 5   A.  No.  I don't know.
 6   Q.  Okay.  You don't know one way or the other?
 7   A.  I don't know.
 8   Q.  Okay.  Whether it's one or multiple 800 numbers,
 9  let's just focus on -- I come into that number as a
10  potential customer, and you said there're various
11  options.  I take it it's kind of like when you call,
12  "Press 1 if you want to speak to warranty; Press 2 if
13  you want spare parts; Press 3 if it's something we need
14  to order from Mars," or whatever, something like that.
15  You are given various options, and from those options, a
16  call could be routed to MITG?
17   A.  That's my understanding.
18   Q.  Okay.  Do you know on those options how many
19  options there were?
20   A.  No.
21   Q.  Do you know how many of those options sent the
22  caller to MITG?
23   A.  No.
24   Q.  Okay.  Do you know what the other routing call
25  centers, if any, were on those options?
                                                      40
```

**Page 41**

```
 1    A.  No.
 2    Q.  Okay.  You said that was one entry point for the
 3  potential customer to get to MITG.  What -- is there
 4  another, more?
 5    A.  My understanding is that sales -- inside --
 6  Compaq Direct and HP Direct sales folks and inside sales
 7  folks would also refer or transfer customers to the MITG
 8  call center --
 9    Q.  If I --
10    A.  -- as a representative of HP.
11    Q.  I'm sorry.  I didn't mean to cut you off.
12        If I use the term CSRs, is that customer service
13  representatives?
14    A.  Yes.
15    Q.  Okay.  So internal folks at HP Direct or Compaq
16  Direct could, by phone, e-mail, what have you, contact
17  MITG and say, "Hey, I'm looking for a quote on this
18  part.  Can you give it to me?"  Is that what you're
19  referring to?
20    A.  Yeah.  They would contact the Compaq Direct
21  spares organization, which -- of which MITG provided the
22  call center and support, and so in -- inside of HP
23  Direct and Compaq Direct, when they had a customer who
24  wanted spare parts, they would refer them over to the
25  Compaq Direct spares or HP Direct spares, which was
```

**Page 42**

```
 1  operated by MITG.
 2    Q.  Have you seen the communications that have been
 3  produced in this case where that is still ongoing?
 4    A.  No.
 5    Q.  Okay.  Would it surprise you to know that
 6  internal folks at HP are still using MITG to get quotes
 7  and have orders filled?
 8    A.  No, it wouldn't.
 9    Q.  Okay.  That was -- the second contact was the
10  internal folks.  Is there a third contact, being the
11  websites?
12    A.  MITG did have a website that they hosted on
13  behalf of Compaq Direct.
14    Q.  Okay.  And just so I'm clear and you're clear on
15  this line of questioning, I'm still limiting myself in
16  the time frame of the Standard Support Agreement before
17  it expired; okay?
18    A.  In that term, MITG presented a website that --
19  that said HP Direct parts or Compaq Direct parts,
20  on-line parts, something like that, and they would take
21  orders.  They wouldn't transact, but they did have a
22  website in which customers could enter a request for a
23  quote.
24    Q.  Is there any other entry point that you're aware
25  of during the terms of the Standard Support Agreement
```

**Page 43**

```
 1  besides the three we just discussed, the 800 numbers,
 2  the internal folks, and then the websites?
 3    A.  I am not certain, because I -- I am not certain,
 4  but I think there may have been direct lines into the
 5  MITG call center in addition to the ones that routed
 6  through the main number.  So a direct line into the
 7  HP parts -- or HP -- I'm sorry -- HP Direct parts.
 8    Q.  So a direct 800 number to MITG's call center, as
 9  opposed to one where you're routed off?
10    A.  Yes.  I believe that is correct.  And I'm -- but
11  I've got to say that I'm not certain.
12    Q.  Okay.  Going back to where we got off on this
13  line of questioning, we talked about how you asked
14  Victor Manzo, after speaking to Mr. Chizek, for the
15  documents.  Who else at HP did you ask for specific
16  documents relative to this case?
17    A.  I asked Roland Soriano and Vickie Ngo, N-g-o,
18  for back history of the PBCO report.  I asked
19  Darlene Lowe for back copies of the PBCO report.  And
20  I -- there may have been others that I asked for
21  specific items of information.  I don't recall now.
22    Q.  Well, I was produced some documents yesterday by
23  HP where this individual, Barbara Sain, S-a-i-n, appears
24  to have produced some documents.  Did you ask her for
25  anything in particular?
```

**Page 44**

```
 1    A.  No.
 2    Q.  Okay.  Did you, yourself, go back -- you said
 3  you went back and reviewed your e-mails?
 4    A.  Correct.
 5    Q.  Okay.  How long is -- how long are e-mails kept
 6  on an individual's e-mail system here at HP?
 7    A.  Individuals manage their own e-mail.  I don't
 8  know how long the company is able to retrieve e-mail.
 9    Q.  Okay.  Do you know how long, for instance, on
10  your e-mail -- let's say you get an e-mail, you read it,
11  you hit delete.  It goes into your delete box.  Is there
12  some sort of time frame where it automatically is
13  deleted from that box?
14    A.  I delete every day.  I empty my delete, because
15  I don't have enough storage to manage otherwise.
16    Q.  Okay.  And when you delete those e-mails, do you
17  know how you can retrieve them back?
18    A.  For a little while, you can retrieve them
19  through Microsoft Outlook.  There's a tool that says,
20  you know, "Look in deleted items."  But after a while, I
21  don't know any other way.
22    Q.  Did you go back and look through your -- look in
23  to see if you had any e-mails?
24    A.  No.
25    Q.  Okay.  You didn't do that relative to any
```

**Page 77**

Q. Okay. Were you familiar with the Standard Support Agreement prior to October 2003?

A. No.

Q. Okay. What is your understanding as to what services were provided by MITG under the Standard Support Agreement?

A. My understanding is that MITG provided call center services and logistics and fulfillment -- parts fulfillment to Compaq Direct.

Q. Would those services have also been provided to HP Direct after the merger?

A. Right.

Q. Okay. And it said under paragraph 1 there in Exhibit A, that -- the second sentence, that "These services will be offered to CDI's," which at the time was an abbreviation for Compaq Direct, Inc., as contained in the first paragraph above that, "end users, customers, companies or commercial entities directed or referred by CDI to MITG."

Do you see where I'm at there?

A. Yes.

Q. Okay. Would that also, after the merger, have been the same for HP Direct?

A. Yes.

**Page 78**

Q. Okay.

A. As far as I know. I don't know --

Q. Right. I understand. I'm asking for your --

A. -- the legal form of CDI or the legal form of the company, or -- I don't know. But I would assume that it --

Q. HP Direct fell under the same thing as Compaq Direct as far as this agreement?

A. Yes.

Q. Okay. Now, in turn, CDI and HP Direct agreed to pay MITG for those services performed in parts supplied; correct?

A. Correct.

Q. Okay. Now, is it your understanding -- and specifically, it's in paragraph 9 of this agreement on page 4 -- that -- excuse me. It's paragraph 10 at the top of page 5. I'm sorry -- part of that payment included a sharing of profit on parts; is that correct?

A. Correct.

Q. Okay. And that MITG was entitled to 75 percent of the gross profit on the sale of parts to customers, and that CDI and HP Direct then were entitled to 25 percent of the gross profit on the sale, all parts to customers.

Is that how you understand that?

**Page 79**

A. Yes.

Q. Okay. Now, we have -- so we have a profit sharing arrangement between the two parties. Next we also have in paragraph 11, CDI, and then HP Direct, guaranteed a service level schedule to MITG; is that correct?

A. That's what it looks like, yes.

Q. Okay. And in paragraph B, it says there that, "In consideration for MITG maintaining its call service centers with technicians available to customers during regular business hours as outlined in subsection A, CDI shall guarantee a minimum fee payment to MITG each month for basic telephone service calls based upon either 400 calls per day or $41,000 per month, whichever is greater," that's termed the minimum fee.

Do you see what I just read there, the first sentence of paragraph B in clause 11?

A. Yes.

Q. Okay. Are you aware if there were ever any payments made to MITG that were based on call volume as opposed to the flat $41,000 per month?

A. I don't -- I'm not aware.

Q. Okay. Were you involved at all in the financial side as far as the billing and payment of MITG under either the profit sharing contained in No. 10 or the

**Page 80**

service level schedule and guarantee in No. 11?

A. No.

Q. Okay. Now, the other -- I'll call it the third payment form under the agreement, if you flip to page 4, No. 9, did CDI and then HP Direct also agree to pay MITG for invoices submitted for parts delivered to customers?

A. I'm sorry. I missed the question.

Q. Did CDI and HP Direct also agree to pay MITG for invoices MITG submitted for parts delivered to the customers?

A. That's what it looks like --

Q. Okay.

A. -- yes.

Q. Now, do you know how the agreement worked regarding whether or not those parts were CSN parts or outsourced?

A. I don't understand.

Q. Do you have personal knowledge of the agreement as to when MITG had to buy or use a CSN part or they could outsource it?

A. No.

Q. Okay. Do you know what I'm talking about when I say a CSN part?

A. No. I -- let me clarify. I know what CSN is. It's an ordering system. It's not a type of part.

**Page 81**

1 Q. -- while I'm re-- re-- my question.
2 Do you know under the agreement what
3 specifically governed whether or not MITG had to sell or
4 use a Compaq CSN part or -- a Compaq part through CSN or
5 they could outsource it?
6 A. No.
7 Q. Okay. Is that better phrased?
8 A. I -- yes.
9 Q. Okay. Now, under the Standard Support
10 Agreement, if you turn to page 7, paragraph 22, it says
11 "Exclusive agreement. This agreement is exclusive,"
12 period. "Everything" --
13 A. I'm sorry. Which paragraph?
14 Q. I'm sorry. Paragraph 22 on page 7 at the
15 bottom. Do you see where I'm at?
16 A. Yes.
17 Q. Okay. It says, "Exclusive agreement. This
18 agreement is exclusive. Everything herein contained
19 shall be deemed to provide MITG with an exclusive right
20 to provide parts and services to the customers."
21 Did I read that correctly?
22 A. Yes.
23 Q. Okay. My question is, Based on your
24 understanding of this document, who were the customers
25 that MITG was given the exclusive right to?

**Page 82**

1 A. Customers -- Compaq Direct or later HP Direct
2 customers who -- who wanted to buy parts who came in
3 through that touch point, channel.
4 Q. Okay. So would you agree with me that that
5 referred to Compaq Direct or HP Direct customers,
6 whether they came in through the 1-800 number, the
7 website, internal customer service representatives or
8 the direct 800 number that you thought was in existence
9 to MITG?
10 A. Could you say that again?
11 Q. Sure. You said it's your understanding that the
12 exclusivity of paragraph 22 was to customers of Compaq
13 Direct or HP Direct; correct?
14 A. Correct.
15 Q. Okay. Would you agree with me that those are
16 customers that come in, from regardless of what channel,
17 entry point, if it's a Compaq Direct customer that calls
18 the 1-800 number, they should be forwarded or referred
19 to MITG?
20 A. Correct.
21 Q. Okay.
22 A. That particular -- the 1-800 number for Compaq
23 Direct, those customers would go to -- MITG was the only
24 provider of parts in the Compaq Direct organization.
25 Q. Okay. And that would be customers, whether they

**Page 83**

1 come in through the 800 number, and my question was, The
2 website, internally referred by HP customer service
3 reps, or what you thought was a direct line to MITG?
4 A. Correct.
5 Q. Okay. Would you agree that if some other party
6 is referred the parts and services from Compaq Direct or
7 HP Direct customers, some other party other than MITG,
8 that would be in violation of that clause?
9 A. I don't know.
10 MS. CARROLL: Objection; calls for a legal
11 conclusion.
12 Q. BY MR. HANSEN: You can answer.
13 A. I don't know.
14 Q. Okay. So if, let's say, PC Nation was referred
15 customers from Compaq Direct, you don't know whether
16 that would be a violation of the exclusivity clause as
17 identified in paragraph 22 of Exhibit A?
18 MS. CARROLL: Objection; calls for legal
19 conclusion. Also assumes facts not in evidence and is
20 vague and ambiguous.
21 Q. BY MR. HANSEN: Go ahead.
22 A. I don't know.
23 Q. Okay. Well, let me mark for you --
24 No. First before I do that, go to paragraph 24
25 on page 8, if you would. Are you there?

**Page 84**

1 A. Yes.
2 Q. Okay. Paragraph 24 says, "Amount of work.
3 ALL" --
4 And that's in all caps, is it not?
5 A. Yes.
6 Q. Okay.
7 -- "applicable parts and service orders of the
8 customers will be referred by CDI to MITG pursuant to
9 the terms outlined in paragraph 1 of this agreement."
10 Did I read that correctly?
11 A. Yes.
12 Q. Okay. Would you -- would it be a violation of
13 this agreement if Compaq or HP themselves filled these
14 orders, as opposed to referring them to MITG?
15 MS. CARROLL: Same objections.
16 THE WITNESS: When you say Compaq or HP, you're
17 incorrect --
18 Q. BY MR. HANSEN: Okay. How --
19 A. -- so I don't know.
20 Q. How am I incorrect?
21 A. Could you rephrase that question?
22 Q. Sure. Let me back up. Compaq and then HP has
23 their own call centers; correct? Doesn't Roseville have
24 a call center?
25 A. Yes.

**Page 85**

1 Q. There are various routing options that a
2 potential customer can go to as opposed to simply MITG
3 on behalf of Compaq or HP Direct; correct?
4 A. No. Could you rephrase that? I --
5 Q. If I am a customer and I call in and I -- I am
6 given various options, other than simply going to Compaq
7 Direct, which was the MITG option; correct?
8 A. No, you're not correct.
9 Q. Okay. Well, if I call in to the 800 number and
10 I'm given six options to choose from, and I mistakenly
11 punch in Option 4, and I go to the Roseville call center
12 as opposed to --
13 A. No, you are not correct.
14 Q. Okay.
15 A. That's not how it works.
16 Q. Okay. Explain to me how it works.
17 A. A customer contacts Compaq Direct, and their
18 only option to buy a part is to go to MITG. Now, there
19 are other places, other 800 numbers, other parts of HP
20 that customers can contact. But when a customer comes
21 into Compaq Direct, they are not able to be routed --
22 they were not -- during the term of this, they were not
23 able to be routed to the Roseville call center.
24 Q. Okay. And we simply just have a
25 misunderstanding here as to the way my question was

**Page 86**

1 worded.
2 Let's say I call one of these other 800 numbers.
3 That's what I am talking to. If I call one of these
4 other 800 numbers, is that, for instance, the Roseville
5 call center?
6 A. If you --
7 MS. CARROLL: I am going to object as vague and
8 ambiguous.
9 Q. BY MR. HANSEN: If you don't understand the
10 question, sir, you can tell me you don't understand it.
11 A. If you call the Roseville 800 number, you will
12 be connected to the Roseville call center.
13 Q. Correct. Let's say I call that number, and I
14 mistakenly got that number when I wanted to call Compaq
15 Direct; okay? Are you following me?
16 A. I suppose.
17 Q. Well, I mean, I'm Joe Smith out in the public.
18 Someone gives me the wrong 800 number, and I accidently
19 get called into your Roseville center when I am looking
20 for Compaq Direct; okay? That's the assumption I want
21 you to make.
22 A. Misrouted call.
23 Q. Correct.
24 Let's say I am looking for a part from Compaq
25 Direct, and instead I'm connected to Roseville. Are you

**Page 87**

1 following me so far?
2 A. You are not connected to Roseville.
3 Q. If I call the Roseville number, I am in the
4 Roseville --
5 A. If you call the number, that's right, and you
6 ask for a part.
7 Q. Right. And let's say Roseville doesn't have the
8 capability to fill that order. Well, no. Let me back
9 up.
10 Does Roseville have the capability to fill the
11 orders during the terms of that agreement that Compaq
12 Direct and MITG did?
13 A. There was overlap. Yeah, the parts could be
14 sold through a variety of channels around HP. Compaq
15 Direct was one sales channel.
16 Q. Right. And for this line of questioning, again,
17 assume I'm the individual that calls the Roseville
18 number. I think you said it was a mis --
19 A. So that individual, as an individual, is not a
20 Compaq Direct customer; right? They're just a Joe Schmo
21 calling an 800 number.
22 Q. Well, if I am looking for a Compaq Direct part,
23 wouldn't I be considered a Compaq Direct customer?
24 A. I don't know what you mean by a Compaq Direct
25 part. There's no such thing as a Compaq Direct part.

**Page 88**

1 Q. Okay. What types of parts did MITG sell?
2 A. They sold parts for Compaq products and HP
3 products --
4 Q. Okay.
5 A. -- as well as Sun products, IBM products and
6 many other brands.
7 Q. Okay. Let's assume for the purposes of this
8 question, I am a business that is looking for Sun parts;
9 okay? And I contact the 800 number that puts me into
10 Roseville.
11 Are you following me so far?
12 A. Yes.
13 Q. Okay. And I'm looking for Sun parts, which are
14 parts which you just described for me that MITG would
15 sell and orders they would fill; is that correct?
16 A. I assume so.
17 Q. Okay. Well, you just told me that, so I take it
18 you know. So --
19 A. Yeah. They sell -- I am not sure that they
20 would have the same part that the guy is looking for.
21 Q. Right. Fair enough. But I'm saying, Sun was a
22 part that MITG sold and provided to people. Now,
23 following my example here, I am in Roseville; okay? And
24 I get a customer service representative from Roseville.
25 If I talk to that Roseville customer service