## Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION
---oOo---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

vs.    Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.
_____/

Deposition of
LOUISE MEYERFELD
Wednesday, September 29, 2004

Job No. 1610RD
Reported by:  Ruth E. Diederich, RPR, CSR
            CSR No. 4952

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:

THOMPSON & KNIGHT, LLP
BY:  ELIZANN CARROLL, Esq.
1700 Pacific Avenue, Suite 3300
Dallas, Texas  75201
(214) 969-1700

FOR THE DEFENDANTS:

SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
BY:  JAMES A. HANSEN, Esq.
525 Jersey
Quincy, Illinois  62306
(217) 223-3030

---oOo---

EXHIBIT 3 (Blumberg No. 5208)

## Page 3

LOUISE MEYERFELD    Wednesday, September 29, 2004

                                              Page

Examination by Mr. Hansen            4

---oOo---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| M | E-mails Bates-stamped MITG 36 to MITG 66, regarding metrics. | 21 |
| N | E-mails with no Bates-stamps dated May 6, 2003; May 12, 2003; and May 16, 2003. | 42 |
| O | E-mails with no Bates-stamps dated September 25, 2003; September 26, 2003; and September 29, 2003. | 59 |
| P | E-mails Bates-stamped HP 9, HP 10, HP 11 and HP 12. | 84 |
| Q | E-mails Bates-stamped HP 13 and HP 14. | 91 |
| R | E-mails Bates-stamped MITG 0179, MITG 0180, MITG 0181, MITG 0182 and MITG 0183. | 100 |

---oOo---

## Page 4

      BE IT REMEMBERED that under the applicable sections of the Code of Civil Procedure of the State of California, on Wednesday, September 29, 2004, commencing at the hour of 9:00 a.m. thereof, at Hewlett-Packard, 8000 Foothills Boulevard, Building R10, Conference Room B, Roseville, California, before me, Ruth E. Diederich, a Certified Shorthand Reporter in the State of California, there personally appeared

                  LOUISE MEYERFELD,

called as a witness by the defendants in the above-entitled action, who, having been duly sworn by me to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

                  ---oOo---

             EXAMINATION BY MR. HANSEN

Q.    Could you please state your name for the record.
A.    Louise Meyerfeld.
Q.    And how old are you?
A.    Fifty-three.
Q.    Date of birth?
A.    3/10/51.
Q.    Okay.  What is your educational background?
A.    I have got an A.A., and I did four years of college.

```
"Call centers"2
 2    A.   Correct.  I do.
 3    Q.   Okay.  Do you see where -- what's the first call
 4  center listed there?
 5    A.   Houston.
 6    Q.   Okay.  Is that Houston, Texas, which,
 7  pre merger, was Compaq?
 8    A.   Correct.
 9    Q.   Okay.  And what -- let me go over this
10  generally.
11         After the merger took place, you said it was
12  your duties and responsibilities to integrate all North
13  America trade parts call centers to Roseville.
14    A.   Uh-huh.  Yes.
15    Q.   Identify for me what call centers you're
16  referring to that were going to be integrated to
17  Roseville.
18    A.   We had the Cypress call center, we had the
19  Andover call center, we had the Canadian call center,
20  the Roseville call center, and there was a second call
21  center in Houston, and it was -- dealt with the warranty
22  piece of the business, but they handled the trade parts
23  through that as well.  I can't recall the name of --
24    Q.   Okay.  Is that different --
25    A.   And then --
                                                        13
```

```
 1    Q.   Oh.
 2    A.   Also the -- the pre merger Compaq business that
 3  MITG was using.
 4    Q.   Okay.  And you said in early 2002, there was a
 5  decision made to integrate all those call centers to
 6  Roseville.  Is that -- when you say "to integrate,"
 7  meaning all calls would be handled by Roseville?
 8    A.   Correct.
 9    Q.   Was it HP's desire to have one call center that
10  handled all warranties, sales parts, third-party parts,
11  all calls?
12    A.   It was HP services decision.
13    Q.   Okay.  But was that the goal that was
14  communicated to you?
15    A.   Not multi vendor parts, no.
16    Q.   Okay.  Describe for me what you mean by multi
17  vendor parts.
18    A.   Anything that was not an HP or Compaq part.
19    Q.   Okay.  So any call, customer, business,
20  otherwise, that was for an HP or a Compaq part, the goal
21  was to have those all integrated and handled at some
22  point in time at the Roseville call center?
23    A.   Correct.
24    Q.   The third -- I'm sorry.  The multi vendor parts,
25  how were those going to be handled?
                                                        14
```

```
 1    A.   Those were to stay with MITG.
 2    Q.   Okay.  Were there other contractors that did the
 3  same type of work that you know of?
 4    A.   As MITG?
 5    Q.   Correct.
 6    A.   No.
 7    Q.   Okay.  Well, MITG, do you understand that
 8  contract was eventually terminated, and their services
 9  were no longer requested?
10    A.   I don't think it was terminated.  It was -- it
11  was not renewed.
12    Q.   Okay.  Did you see a copy of the termination
13  letter that was sent by Kristin Triolo from HP?
14    A.   I saw a copy of the letter that was sent, yes.
15    Q.   Terminated, not renewed, however you want to
16  refer to it throughout the depo is fine with me.  But
17  regardless, MITG services were no longer requested or
18  used by HP?
19    A.   Correct.
20    Q.   Who was going to take over, then, the multi
21  vendor call center duties and responsibilities that MITG
22  had on behalf of HP?
23    A.   MITG was keeping that business.  HP was not
24  taking that business on.
25    Q.   Okay.  Does HP, as of February '04, have a call
                                                        15
```

```
 1  center or a sub --
 2         Well, first, does it have a call center that
 3  handles multi vendor parts?
 4    A.   Not that I'm aware of.
 5    Q.   Does it have other subcontractors that handle
 6  multi vendor parts on their behalf?
 7    A.   Again, not that I'm aware of.  I don't really
 8  know that much about that business.
 9    Q.   Okay.  What was the -- strike that.
10         Was the decision also to integrate the call
11  centers for Compaq Direct and HP Direct to Roseville?
12    A.   For the trade parts business, yes.
13    Q.   And is it your understanding that that was work
14  that was also handled by MITG?
15    A.   Correct.  For the Compaq Direct, yes.
16    Q.   Which later became HP Direct?
17    A.   Correct.
18    Q.   So MITG was handling HP Direct business?
19    A.   Yes.
20    Q.   Okay.  And there was a decision made for that
21  part -- the trade parts business in early '02, the
22  decision was made to integrate that, as well, to the
23  Roseville call center?
24    A.   Correct.  That was one of the groups identified.
25    Q.   So was there any discussion, then, in early --
                                                        16
```

**Page 25**

Q. At least client in tone, were integrated to Roseville, and that's why they no longer appear in that form as we see on Exhibit H?

A. Correct.

Q. Okay. Do you recall when that took place?

A. No. This -- that part of it was outside of my -- my realm.

Q. Okay. The integration of Andover and Cypress was outside of your duties?

A. Of what happened once it got here, yes.

Q. Okay. No. I am talking about integrating Cypress and Andover to Roseville.

A. Uh-huh.

Q. As manager of the call center integrations, did you oversee that integration?

A. Yes.

Q. Okay. But you just don't recall when that took place?

A. Well, okay. Here we've got Roseville. This is part of the integration. And the trade parts call center managers apparently decided to take these and roll them into one number here.

Q. Okay. Let's go back to the phone tree we were talking about.

A. Okay.

**Page 26**

Q. As of March 13 -- March 12, 2003 as, contained in Exhibit M, I want you to explain to me how calls were routed on this phone tree off of an 800 number when somebody looking for a part would call in.

A. Okay. I will explain what -- what I know.

Q. That's all I'm here to find out.

A. Okay. There is a tree, and there -- off of that 800 number, you have got different branches that come off, different -- and there're options within those branches. And based on the option you pick will determine on what type of business group you're going to fall into for parts.

Q. So to break that down even a little more simpler, if I call in and I am looking for, let's say, Roseville eSpares on March 12 of 2003, I call an 800 number. Would I then get what I like to refer to as a voice activated prompt that says, "If you are looking for eSpares, please press 2" --

A. Yes.

Q. -- "If you are looking for Roseville PDO, please press 3"?

A. Correct.

Q. Was HP Direct, the MITG, also an option off of that 800 number?

A. No.

**Page 27**

Q. Okay. What is your understanding as to how someone got in contact with HP Direct or Compaq Direct for parts ordering?

A. They have -- they have their own separate business. They had their own website, own 800 number.

Q. Do you know how many 800 numbers there were for Compaq Direct, HP Direct?

A. No.

Q. Okay. Were there any numbers that you had to integrate?

A. I believe there were two.

Q. Okay. And when you integrate those numbers, are you taking the 800 numbers that HP would pay for for -- I'll call it a division, such as HP Direct, and then revising the tree options off of that 800 number after the integration?

A. What happened was -- so you have those two live 800 numbers for MITG at the time. Once the integration was completed as of February 9th, those two phone numbers had messages that the people needed to call the 800 number here, and I believe there may have even been a temporary routing off those numbers so all they had to do was select a button, and it would route them here.

Q. Okay. So is it your understanding, then, for the time that the Standard Support Agreement was in

**Page 28**

place between HP and MITG, that MITG, Compaq Direct/HP Direct -- I am using them synonymously --

A. Okay.

Q. -- had two of their own 800 numbers that people would call, and it would route them directly to MITG?

A. Correct.

Q. Which is, to your understanding, different than the numbers that were here for Roseville or for Houston?

A. Definitely, yes.

Q. Okay. What would happen if, during the time of the Standard Support Agreement, for instance, on March 12th of 2003, I am looking for MITG, but I accidently dial the 800 number that sends me to Roseville.

Was there an option to route me back to Compaq Direct off of the Roseville number?

A. No.

Q. Was there a standard operating procedure within HP how to handle misplaced, I'll call them, 800 calls from people looking for MITG?

MS. CARROLL: Objection; calls for speculation. Go ahead, if you know.

Q. BY MR. HANSEN: You can answer.

A. The call center, if they ever got any types of calls that they weren't understanding how to handle,

**Page 85**

1  A.  Correct.
2  Q.  Okay.  And it discusses minutes of an account
3  setup meeting?
4  A.  Yes.
5  Q.  Okay.  Do you recall when that meeting took
6  place?
7  A.  No.
8  Q.  Okay.  Yvonne Cowan, C-o-w-a-n?
9  A.  Yes.
10  Q.  What is her title, if you know?
11  A.  She's over -- she's over in credit and
12  collections that handled the accounts.
13  Q.  Accounts receivable issues?
14  A.  Yeah.  Yes.
15  Q.  Okay.  On the bottom there, it says under her
16  name, to release the announcement ASAP.  Recommends HP
17  Direct migration letter includes that "account numbers
18  will follow."  Approximately 110 pre MITG accounts
19  identified as recurrent parts customers.  Many of the
20  MITG clients have existing HP accounts.
21     And then if you flip to page HP 12, the last
22  paragraph says, "A draft of the announcement letter to
23  MITG clients is attached outlining process changes and
24  parts options.  Do not forward outside of project team."
25     My question is, Did you draft the announcement

**Page 86**

1  letter that was sent to MITG clients?
2  A.  No.
3  Q.  Who did?
4  A.  There was a collaboration of Bill, myself,
5  Shari Ellis and then our -- our communications person
6  Jodi Parmeley.
7  Q.  Okay.  What did the letter state?
8  A.  I don't recall.
9  Q.  Was it sent to MITG clients before February 7 of
10  '04?
11  A.  Yes.
12  Q.  Was it sent to -- well, do you understand -- do
13  you have an understanding of what it means when it says,
14  "Approximately 110 pre MITG accounts identified as
15  recurrent parts customers" on the bottom of HP 11?
16  A.  I know that we found a lot of the MITG customers
17  had account setups with HP and Compaq, as well as MITG.
18  Q.  So would you have to then still create a
19  migration account for them into PL 91?
20  A.  No.
21  Q.  Okay.  So there were some that had been ordering
22  from both that you didn't need to do that for?
23  A.  Correct.
24  Q.  But I take it, then, there were also clients
25  that had just simply ordered from MITG that you had to

**Page 87**

1  change over into the HP account system?
2  A.  Yes.
3  Q.  Okay.  Flipping forward on the 9 and 10 of that
4  exhibit, page 9 at the top -- disregard the forwarding
5  to Mr. Crowley, but the original message is from you by
6  e-mail dated Thursday, January 22nd of '04, to a host of
7  recipients.
8     Do you see that?
9  A.  Yes.
10  Q.  Okay.  And are you sending out an e-mail there
11  regarding various issues for the integration of the MITG
12  business?
13  A.  Basically updates.
14  Q.  Okay.  Now, it says, in the second paragraph
15  there under account setups, "The letters will be mailed
16  out to the top 89 accounts by January 29th, with the
17  follow-up calls starting February 1 that will provide
18  account numbers and information about the parts store
19  and other information required about placing parts
20  orders."  Do you see that?
21  A.  Yes.
22  Q.  Okay.  What is -- is the letter the same letter
23  that was referred to as the draft announcement letter on
24  HP 12, or was it different?
25  A.  I believe it was the same.

**Page 88**

1  Q.  Okay.  That's not the letter you drafted -- you
2  drafted; right?  It was a collaboration?
3  A.  Right.  Yes.
4  Q.  Okay.  Was there someone's signature on the
5  bottom of it?
6  A.  I believe -- I'm not sure.
7  Q.  Okay.  Who determined what the top 89 accounts
8  were?
9  A.  It was based on their amount of business done.
10  Q.  With MITG?
11  A.  Yes.
12  Q.  And HP was going to send those top 89 accounts
13  these letters by January 29th?
14  A.  Yes.
15  Q.  And then they were going to -- "they" being
16  HP -- were going to call these customers beginning
17  February 1?
18  A.  Correct.
19  Q.  Okay.  Who was going to make the follow-up
20  calls?
21  A.  We had some folks in Sykes identified to make
22  them.
23  Q.  What were they calling these customers and
24  telling them?
25  A.  To provide them -- to, one, make sure that they

**Page 89**

1  received their letter, and if not, explain so and
2  did some scripting for them, and then to let them know
3  what the new account number would be.
4  Q. What if they wanted to stay with MITG, were they
5  given that option?
6  MS. CARROLL: Objection; calls for speculation,
7  assumes facts not in evidence.
8  THE WITNESS: I don't -- we never told them that
9  they couldn't.
10 Q. BY MR. HANSEN: Did you ever tell them that they
11 could?
12 A. No.
13 Q. Okay. Were you involved in any of the follow-up
14 calls, or were they all by these Sykes people?
15 A. No, I was not involved.
16 Q. Okay. It then says, continuing that paragraph,
17 "The remainder of the letters, 2000-plus, will go out
18 the first week in February." Do you see that?
19 A. Yes.
20 Q. Okay. Is that the same letter that has been
21 referred to here?
22 A. Yes.
23 Q. Okay. Why were these letters being sent out to
24 these MITG customers?
25 A. Because they were customers at MITG, and we

**Page 90**

1  wanted to make them aware of the change so it would have
2  been a seamless transition.
3  Q. Okay. And that was -- those letters were sent
4  out prior to the agreement ending; correct? The
5  contract.
6  A. Prior.
7  Q. Prior to the contract ending?
8  A. Yes.
9  Q. Okay. It then says, "The letters will contain
10 the parts store URL as well as any needed phone
11 numbers."
12 A. Correct.
13 Q. What is the parts store URL?
14 A. That's where they can go on-line and place the
15 trade orders on-line rather than calling in.
16 Q. So that's a website?
17 A. Yes.
18 Q. Do you know what that website was?
19 A. I believe it was www.partstore.com.
20 Q. Okay. Was there -- it then says, "The letters
21 will also contain any needed phone numbers."
22 Was there a change in phone numbers?
23 A. Well, there was a change in the number they
24 would call to place the order, and there were also
25 numbers as far as escalation if they needed information.

**Page 91**

1  Q. Okay. Were they informed that the prior 800
2  numbers that they were using to call to get direct to
3  MITG would no longer be in service?
4  A. I don't know about that. They were informed as
5  of the 8th, that they should be start -- they should
6  start calling here.
7  Q. Were they informed in this letter as of the 8th,
8  if they wanted to, they could also call MITG?
9  A. No.
10 Q. Okay. Let me show you --
11 Were there any calls made to these customers
12 informing them not to use MITG anymore?
13 A. No.
14 Q. Were they discouraged from using MITG after
15 February 8th of '04, to your knowledge?
16 A. Not to my knowledge.
17 Q. Okay. Let me show you what I will mark as
18 exhibit -- I think we're on Q, a two-page document,
19 HP 13 and HP 14.
20 (Defendants' Exhibit Q was marked
21 for identification.)
22 Q. Actually, before we get to that, let me ask you
23 a question real quick back on the previous exhibit.
24 The top 89 accounts that were identified, you
25 said were based on -- were identified by HP based on the

**Page 92**

1  amount of call volume and dollars of orders placed with
2  MITG.
3  A. Correct.
4  Q. Okay. Was there a decision that you were
5  involved in that HP wanted to make sure that these top
6  89 accounts continued on and did business with HP after
7  February 8 of '04?
8  A. Can you repeat that?
9  Q. Sure. Were there any discussions, meetings,
10 conferences that you were involved in that once these
11 top 89 accounts were established based on call volume
12 and call dollars -- or excuse me -- call volume and
13 parts dollars to MITG, that HP wanted to make absolutely
14 sure that these top 89 accounts kept doing business with
15 HP and did not go with MITG?
16 A. No. We didn't proactively go after them, no.
17 Q. Well, you sent them letters and called them,
18 didn't you?
19 A. We sent them letters. We did that with
20 everyone.
21 Q. Right. But the top 89 accounts were sent
22 letters before January 29th?
23 A. Correct.
24 Q. And then there were follow-up calls made prior
25 or right around February 1?

**Page 93**

1  A.  Correct. To ensure they got the letter.
2  Q.  Okay. And then -- and also to explain to them
3  various ways in which they could continue to transition
4  their business over to HP now that HP had integrated the
5  MITG business to Roseville?
6  A.  Basically, what was given to them are -- was the
7  URL and the phone numbers to call to make sure they
8  understood what the letter -- the intent of the letter.
9  Q.  And also account numbers and information --
10 A.  Yes.
11 Q.  -- about the part stores and other information
12 required about placing parts orders?
13 A.  Correct.
14 Q.  Okay. And then the other 2000 or so letters, I
15 guess that represents the remaining accounts that
16 weren't the top 89, were then also sent out the first
17 week in February?
18 A.  Correct.
19 Q.  Okay. Was there ever any follow-up that you
20 were involved in after February 8th of 2004, to
21 determine if, in fact, these 2089 accounts, in fact, had
22 all set up an account with HP?
23 A.  We proactively set the accounts up.
24 Q.  Okay. Prior to February 8 of '04?
25 A.  Yes.

**Page 94**

1  Q.  Okay. Back -- I'm sorry. Back to Exhibit --
2  what is it? -- Q?
3      MS. CARROLL: Yes.
4      THE WITNESS: Yes.
5  Q.  BY MR. HANSEN: Okay. The original message is
6  February 3 of '04 from Ms. Cowan, of which you are a
7  recipient. Do you see that?
8  A.  Yes.
9  Q.  Okay. And this is a synopsis of the HP Direct
10 integration status?
11 A.  Correct.
12 Q.  Okay. It gives you some updates?
13 A.  Yes.
14 Q.  Okay. And that first paragraph is in regards to
15 the redirection of telephone calls and the two known
16 entry points, which are the 800 numbers, will be
17 directed from Omaha to Roseville. Do you see that?
18 A.  Correct. Yes.
19 Q.  Okay. Now, my question to you is, Under
20 "Action," it says, "To include RMA option for HP Direct
21 parts." What is RMA option?
22 A.  Return material authorization.
23 Q.  What is that?
24 A.  If the customer has -- receives a defective
25 part, then they can return that to HP and receive a

**Page 95**

1  replacement.
2  Q.  Okay.
3  A.  So it's just like a return label type of thing.
4  Q.  Okay. So there was going to be on option, then,
5  placed on the phone -- 800 line for that return?
6  A.  Correct.
7  Q.  Okay. It says, "Victor and Victoria will handle
8  the move details, along with Jeff and Maureen."
9      Now, I see Victoria appears to be the person in
10 Omaha. Victor appears to be here in Roseville.
11 A.  Correct.
12 Q.  Who are Jeff and Maureen?
13 A.  They're in the customer solutions center.
14 Maureen is the manager and Jeff is her BPA.
15 Q.  What is BPA?
16 A.  Business process analyst.
17 Q.  Is that here in Roseville?
18 A.  Yes.
19 Q.  Okay. It says -- skip the next paragraph.
20 "Letters to top 100 mailed 1/30." It says, "Shari -
21 letters went to a key target and disbursed to other
22 internal HP players. Most letters went to HP sales
23 reps. Questions that arrived were met with confidence
24 that customers will not notice flow in actions," and
25 then Shari had a concern about two key customers.

**Page 96**

1  Is that simply referencing the letters we've
2  already talked about in the earlier e-mail there
3  dated -- or in Exhibit P, or is there an additional
4  letter?
5  A.  There was an internal letter that went out as
6  well.
7  Q.  Okay. To -- well, it says, "Letters to top 100
8  mailed 1/30."
9  A.  That's what we were talking about.
10 Q.  Okay. The top 100 accounts?
11 A.  Yes.
12 Q.  And then letters also went to internal HP
13 players and HP sales reps?
14 A.  Correct.
15 Q.  I guess -- was that describing for them -- what?
16 What to tell their accounts or --
17 A.  Actually, more detail of what we were doing, so
18 they understood if they had accounts calling them.
19 Q.  Okay. So questions -- how they could better
20 understand questions that may come from customers?
21 A.  Correct.
22 Q.  Customers that previously had been ordering from
23 MITG that now were going to be directed to Roseville?
24 A.  Correct.
25 Q.  Do you know why Shari Ellis was concerned, or