E-FILED
Wednesday, 11 January, 2006  11:37:24 AM
Clerk, U.S. District Court, ILCD

--- Page 1 ---

```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
                   SPRINGFIELD DIVISION


HEWLETT-PACKARD DEVELOPMENT      )
COMPANY, L.P., HEWLETT-PACKARD   )
COMPANY, and COMPAQ TRADEMARK B.V.,)
                                 )
          PLAINTIFFS,            )
                                 )  Civil Action
     vs.                         )  No. 04-3055
                                 )
MIDWEST INFORMATION TECHNOLOGY   )
GROUP, INC. and MICHAEL LAUBER,  )
                                 )
          DEFENDANTS.            )
```

DISCOVERY DEPOSITION of RICHARD RICE, taken in the above-entitled case before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter of Adams County, Illinois, at 12:30 p.m., on February 17, 2005, at 525 Jersey, Adams County, Quincy, Illinois, pursuant to stipulation hereto annexed.

```
              Tracy L. Grott, CSR
              2901 Sonata Drive
              Quincy, IL  62301
              217-223-3624
```

--- Page 2 ---

APPEARANCES

MS. ELIZANN CARROLL
Attorney at Law
Juneau, Boll & Ward
15301 Spectrum Drive, Suite 300
Addison, Texas  75001
    appeared for the Plaintiffs.

MR. JAMES HANSEN
Attorney at Law
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey
Quincy, IL  62306
    appeared for the Defendants.

--- Page 3 ---

                    INDEX
DEPONENT                            PAGE NUMBER

RICHARD RICE

Examination by Ms. Carroll              5




                   EXHIBITS

NUMBER        MARKED FOR IDENTIFICATION

Exhibit A          13
RR No. 11          46
RR No. 12          52
RR No. 13          58
RR No. 14          63
RR No. 15          74
RR No. 16          78
RR No. 17          82
RR No. 18          82
RR No. 19          89

EXHIBIT

--- Page 4 ---

                 S T I P U L A T I O N

    It is stipulated and agreed by and between the parties hereto, through their attorneys that the deposition of RICHARD RICE may be taken for discovery purposes before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter, upon oral interrogatories, on the 17th day of February A.D., 2005, at the instance of the Plaintiffs, at the hour of 12:30 p.m. at 525 Jersey, in the City of Quincy, County of Adams, State of Illinois;

    That all requirements of the Code of Civil Procedure and the Rules of the Supreme Court and the reading over and signing of the deposition by the Deponent are expressly waived;

    That any objections as to competency, materiality or relevancy are herby reserved, but any objection as to the form of question and answer is waived unless specifically noted;

    That the deposition, or any parts thereof, may be used for any purpose for which discovery depositions are competent, by any of the parties hereto, without foundation proof;

    That any party hereto may be furnished copies of the transcript at his or her own expense.

            (Whereupon the Deponent
            was sworn by the Notary Public.)

Page 5

```
 1                    RICHARD RICE
 2   having been first duly sworn, testified as follows:
 3                    EXAMINATION BY:
 4                    MS. CARROLL
 5        Q    Can you please state your name for the
 6   record, sir.
 7        A    Richard Rice.
 8        Q    And what's your address, Mr. Rice?
 9        A    For my home address?
10        Q    Yes, please.
11        A    1127 North 11th Street, Quincy, Illinois,
12   62301.
13        Q    Thanks. Have you had your deposition
14   taken before?
15        A    No.
16        Q    I'm sure Mr. Hansen has gone over the
17   rules and what's going to happen today. I just want
18   to remind you of a couple of rules. And you can
19   continue to do what you have been doing, answering
20   out loud, so the court reporter can hear you. That
21   will make her job much easier.
22        A    Okay.
23        Q    If you can, also try to let me finish my
24   question before you begin your answer so we're not
25   speaking over each other. It will, again, make her
```

Page 6

```
 1   job easier and make our record clear.
 2        A    Okay.
 3        Q    And I'll warn you in advance as I always
 4   do, sometimes my questions take a while, so try to
 5   have some patience.
 6        A    No problem.
 7        Q    If you don't understand one of my
 8   questions, please ask me to rephrase it or restate
 9   it. If you answer the question, I'm going to assume
10   you understood it, is that fair?
11        A    That's all right.
12        Q    If you need a break during the course of
13   this afternoon, we'll be going for a couple of
14   hours, just let me know and we'll take a break,
15   okay?
16        A    Okay.
17        Q    Have you ever testified in any court or
18   arbitration proceeding before?
19        A    No.
20        Q    Have you ever been a party to a lawsuit?
21        A    No.
22        Q    Who is your current employer?
23        A    Midwest Information Technology Group
24   Incorporated.
25        Q    All right. For the rest of the deposition
```

Page 7

```
 1   is it all right if I refer to them as MITG?
 2        A    Yes.
 3        Q    How long have you worked for MITG?
 4        A    Two and a half years, approximately.
 5        Q    Early -- well, when do you think you
 6   started?
 7        A    October of 2002, if I'm not mistaken.
 8        Q    All right. What is your current job
 9   title?
10        A    Director of Business Development.
11        Q    What does being Director of Business
12   Development entail?
13        A    My primary responsibilities are driving
14   revenue related to our call center business.
15        Q    What kind of call center business does
16   MITG do?
17        A    It's an inbound contact center, customer
18   service, sales, electronic communication.
19        Q    And is that all for MITG or is that for --
20   are you providing that service for other companies?
21        A    Just MITG.
22        Q    Okay.
23        A    Well, if we acquire additional clients.
24        Q    Well, for example, during the time of the
25   Standard Support Agreement, MITG was providing call
```

Page 8

```
 1   center support and you had people answering the
 2   phone Compaq Direct and HP Direct, correct?
 3        A    Correct.
 4        Q    Do you have any kind of relationship like
 5   that with any other company at this point?
 6        A    No.
 7        Q    And in terms of driving revenue, what do
 8   you do to drive revenue related to the call center
 9   business?
10        A    In respect to the work we perform for HP
11   through improving processes, developing better ways
12   to communicate. I think truly through improved
13   processes.
14        Q    Okay. On the improved processes, in what
15   way? Give me some examples if you could.
16        A    One way early on, for example, with HP was
17   to accept a PO that had been sent to HP. That PO
18   could be accepted by us as well; however, at the
19   time I started it wasn't, so we developed a process
20   so that we could send those POs through HP, through
21   our operation. That way the customer would feel it
22   was more of a one-stop solution.
23        Q    A customer would send a PO to HP and HP
24   was going to use MITG to procure the parts on the
25   PO?
```

21

1 were making within HP to educate them as to what
2 MITG might be able to do for them, how were you
3 getting those folks, what kind of folks were you
4 trying to get to?
5     A    Contacts began through conversation
6 related to the service that we provided for HP.
7     Q    Okay.
8     A    Questions and answers, and as things
9 escalated.
10    Q    Who was your primary contact in terms of
11 when you were talking to someone at HP Direct, who
12 was the primary person that you talked to?
13    A    It depended on the issue.
14    Q    Okay. Was there a person that oversaw, in
15 general, the relationship from HP Direct's side?
16    A    I believe it would be Troy.
17    Q    Okay. And did Troy -- well, strike that.
18 You had dealings with Troy Bloomquist. Who else
19 from HP Direct did you have contacts with?
20    A    There were a number of them. I don't
21 recall all of them.
22    Q    Okay. And well, what I'm trying to do is
23 from before you get out and start talking to sales
24 reps, trying to see who your initial contacts were,
25 was Troy Bloomquist, for example, trying to make

22

1 introductions to you to other parts of the HP world
2 for you to make sales calls on them or have training
3 sessions with these folks?
4     A    No.
5     Q    Okay. How were you getting -- were you
6 co-calling within HP to try to set opportunities up
7 for you to talk with them about what you could
8 provide?
9     A    Trying to simplify it, if I can, Troy
10 would be a resource when we were working to improve
11 some of the processes that we were governed by,
12 okay.
13    Q    Okay.
14    A    If I had an escalated issue with regard to
15 an order, it just depended where that issue came
16 from and who it involved. And then I would, if I
17 had to, go to Troy to get an answer. Who should I
18 talk to or go back to? The person that the issue
19 began with. Over time as issues developed and I was
20 able to create sort of a list of problems that we
21 had, I felt like if I resolved those then it would
22 be a better solution for HP at that time. That's
23 when I would go out and see who it would be to talk
24 to to communicate that.
25    Q    Okay. And now who were the people who

23

1 were contacting MITG as HP Direct, were those -- did
2 those people primarily tend to be the HP CSRs who
3 were calling inquiring about parts for their
4 customers or -- and users or was it users and
5 customers contacting you folks?
6     A    I would have to say both.
7     Q    Okay. Was it 50/50? Is it one more than
8 the other?
9     A    I'm not sure.
10    Q    Okay. What kind of -- in what ways could
11 someone, an HP Direct customer or CSR, contact MITG
12 to inquire about getting spare parts?
13    A    Phone, email and fax.
14    Q    Okay. Do you recall what the phone
15 numbers were that were used to contact HP Direct?
16    A    No.
17    Q    Okay.
18    A    It's been a while.
19    Q    Fair enough. But you're aware there were
20 800 numbers where if somebody called into an 800
21 number they ended up at the call center staffed by
22 MITG folks?
23    A    Yes.
24    Q    All right. And how many people worked in
25 the call center that was handling the HP Direct

24

1 business during the time you were there when the
2 Standard Support Agreement was in place?
3       MR. HANSEN: Just the people taking the
4    calls you mean?
5       MS. CARROLL: Yes.
6     A    There was HP Direct then there was HP
7 Online.
8     Q    Okay. Well, let's -- what's the
9 difference?
10    A    HP Direct is the business-to-business and
11 HP Online is consumer.
12    Q    Were there two different 800 numbers for
13 that?
14    A    I believe so.
15    Q    Okay.
16    A    I believe so.
17    Q    I don't want to mark this, but I want to
18 show you a document, it's a series of emails talking
19 about two 800 numbers for HP Direct.
20    A    Okay.
21    Q    And here's one which is the (800)848-4589
22 and then the second one is (800)848-9771. Look at
23 that. Do you know if one went to one and one went
24 to the other or do they even look familiar to you?
25    A    No, they don't.

## Page 25

```
 1    Q    Okay. All right. Now how, when you're
 2  looking at this business-to-business, tell me what
 3  you mean by that?
 4    A    The Hpdirectonline group would interact
 5  with a variety of businesses. In some cases, I
 6  don't want to say that they were small businesses,
 7  these were businesses buying for the need of the
 8  business versus someone who would be buying for
 9  their residence.
10    Q    Okay. So you had people who were buying
11  for some kind of commercial entity, whether it be
12  huge or whether it be a small, you know, say a
13  five-person law firm or a 500-person law firm, both
14  of those would be business-to-business customers
15  versus somebody sitting at home on their Presario
16  that would call HP Online. If I'm sitting at home
17  just using my own computer, I would call a different
18  number than the business'?
19    A    That's right.
20    Q    Okay. And was that true the entire time
21  from the time you started?
22    A    Yes.
23    Q    Okay. Now how many people were calling --
24  how many people were covering the
25  business-to-business phone calls?
```

## Page 26

```
 1    A    Four.
 2    Q    Okay. Was that true from the time you
 3  started until the termination of the agreement?
 4    A    At one time I had five.
 5    Q    Okay. And were these people overlapping?
 6  You had four people working 9:00 to 5:00 or whatever
 7  the hours were of the call center?
 8    A    Initially, yes.
 9    Q    Okay. So when you started in October you
10  had four full-time?
11    A    When I started in October there were two.
12    Q    Okay. So you had two full-time people
13  covering business-to-business calls?
14    A    Correct.
15    Q    And that increased at some point to five?
16    A    Correct.
17    Q    Do you recall when it got up to five
18  people?
19    A    No.
20    Q    All right. And did it stay five for any
21  length of time?
22    A    Briefly. Maybe three to four months.
23    Q    Okay. Then it went down to four and
24  remained at four?
25    A    Yes.
```

## Page 27

```
 1    Q    Okay. And those were four full-time
 2  people?
 3    A    Yes.
 4    Q    All right. How many people were staffing
 5  the call center for the consumer calls?
 6    A    I'm not certain. I want to say 12.
 7    Q    And was that the same throughout the time
 8  that you were there from the time you got there to
 9  the end of the Standard Support Agreement?
10    A    No.
11    Q    Okay. How did it change?
12    A    I don't recall what the number was, but it
13  did grow over time.
14    Q    Okay. When the Standard Support Agreement
15  terminated in February of '02, did any of these call
16  center people stay on?
17    A    Yes.
18    Q    Okay. And went to answering the phone
19  MITG? Is that who they were covering? It was the
20  MITG portion of the business as opposed to answering
21  the phone HP Direct?
22    A    I don't recall exactly how we were
23  answering the phone.
24    Q    Okay. But it was covering MITG's own
25  business as opposed to covering for someone else's?
```

## Page 28

```
 1    A    Correct.
 2    Q    All right. And how many of the people
 3  stayed on?
 4    A    I don't recall exactly.
 5    Q    Okay. Do you have an estimate? Can you
 6  give me a ball park?
 7    A    It would be speculation.
 8    Q    Well, half?
 9    A    I'm not sure, really. Maybe half.
10    Q    Okay. And you said people could also
11  contact HP Direct, MITG, through email?
12    A    Yes.
13    Q    Okay. And was that info at
14  Hponlineparts.com or what was the email address that
15  they would go to?
16    A    I believe it was info@hpdirectonline.com.
17    Q    Okay. And how many people -- were there
18  people who were assigned to specifically handle that
19  access point? Emails came in and there was an
20  assigned person?
21    A    Yes.
22    Q    The same way, some people answered the
23  phone and some people answered the computer or
24  whatever?
25    A    Yes.
```

| | |
|---|---|
| 1 | Q They were in Hannibal? |
| 2 | A Yes. |
| 3 | Q When did they move to Quincy? |
| 4 | A March of 2003. |
| 5 | Q Okay. |
| 6 | A In that -- close to that. |
| 7 | Q Do you know when they started construction |
| 8 | on the building? |
| 9 | A Around October of 2002. |
| 10 | Q Okay. So around the time you had started, |
| 11 | they were in the early stages of building or just |
| 12 | starting to build? |
| 13 | A Correct. |
| 14 | Q Okay. Did you ever participate in any |
| 15 | discussions with anyone from HP regarding any |
| 16 | promises of business from HP or the volume of |
| 17 | business that HP Direct was going to be sending |
| 18 | MITG? |
| 19 | A No. |
| 20 | Q Okay. You were aware that there was a -- |
| 21 | hold on a second. Do you know what the Compaq Spare |
| 22 | Parts Store was? |
| 23 | A See, that's what I was saying before, the |
| 24 | names of the different departments and whatnot got |
| 25 | confusing. As far as I knew, that was equal to what |

| | |
|---|---|
| 1 | HP Direct was. |
| 2 | Q Do you have any idea what kind of customer |
| 3 | base the Compaq Spare Parts Store was? |
| 4 | A No. |
| 5 | Q Was it a brick and mortar store? A |
| 6 | website? Any knowledge of what that was? A call |
| 7 | center? Anything? |
| 8 | A I would have to speculate. I really am |
| 9 | not sure. |
| 10 | Q Did you ever have any specific |
| 11 | conversations with Mr. Haught about how MITG would |
| 12 | increase its capabilities at its call center staff, |
| 13 | etcetera to handle all of the HP's spare parts |
| 14 | business from around the world in terms of how you |
| 15 | go out, get call center people, how you would train |
| 16 | that many people and find that many people in that |
| 17 | area? Did you ever have a plan that had been put in |
| 18 | place of how that was going to get done? |
| 19 | A He and I never had that conversation. It |
| 20 | was ultimately -- that's the reason why I was hired, |
| 21 | so if I can't do it then I can't do my job, so he |
| 22 | didn't go into those details. It was assumed I knew |
| 23 | how to do it. |
| 24 | Q Okay. And when you say that was why you |
| 25 | were hired, you were hired with the anticipation |

| | |
|---|---|
| 1 | that you were going to be the person responsible for |
| 2 | getting the call center of dozens or hundreds of |
| 3 | call center people up to speed and prepared to |
| 4 | answer phones in the event that MITG had enough HP |
| 5 | spare parts business to keep a call center that size |
| 6 | busy? |
| 7 | A Yes. |
| 8 | Q And do you recall if, at any time, having |
| 9 | conversations with Mr. Haught about -- either during |
| 10 | the time of the Standard Support Agreement or |
| 11 | afterwards, why you all never got more than say a |
| 12 | dozen or more call center personnel? |
| 13 | A No. |
| 14 | Q How many people work for MITG today, |
| 15 | about? |
| 16 | A 12. |
| 17 | Q Okay. I've asked you questions in terms |
| 18 | of staffing capabilities and size and everything |
| 19 | that you may have had with Mr. Haught, did you ever |
| 20 | have any conversations about the HP Direct business |
| 21 | and MITG's role in the HP Direct business with |
| 22 | Teresa Koch? |
| 23 | A Could you be more specific? |
| 24 | Q Sure. You told me you got an |
| 25 | understanding of the relationship between MITG and |

| | |
|---|---|
| 1 | HP Direct from Ron Haught telling you this is what |
| 2 | we do for HP. Do you recall having any |
| 3 | conversations with Ms. Koch where she explained to |
| 4 | you or informed you of any aspects of the |
| 5 | relationship between the companies? |
| 6 | A No. |
| 7 | Q Okay. I think you've already answered |
| 8 | this, I apologize if I'm asking it again, the |
| 9 | Middleware, you're not familiar with what the |
| 10 | Middleware -- something known as the Middleware |
| 11 | Agreement? |
| 12 | A No. |
| 13 | Q Okay. Are you aware of -- well, strike |
| 14 | that. Has any customer that you have dealt with |
| 15 | ever told you that HP told the customer not to do |
| 16 | business with MITG any longer? |
| 17 | A Say that again, please. |
| 18 | Q Has a customer ever told you that someone |
| 19 | from HP told the customer not to do business with |
| 20 | MITG any longer? |
| 21 | A Yes. |
| 22 | Q Okay. What customer told you that? |
| 23 | A I don't recall. |
| 24 | Q When did they tell you that? |
| 25 | A It was several months after the contract |

113

1  had expired.
2      Q    What did that customer tell you exactly?
3      A    Exactly what you just said, that they were
4  told by HP not to do business with us.
5      Q    Did that person tell you that -- how did
6  they communicate that?
7      A    Over the phone.
8      Q    Did they -- did you have any further
9  conversation trying to get them to articulate or
10 describe more how this conversation allegedly came
11 about?
12     A    I naturally asked them if they would mind
13 communicating that via email and they did not want
14 to that do that for reasons of getting involved in a
15 potential argument.
16     Q    And how did you have contact with that
17 customer, did they initiate the call to you?
18     A    I don't recall.
19     Q    Did you call them?
20     A    I don't recall.
21     Q    Has that customer ever done -- since that
22 conversation have you spoken to that customer again?
23     A    I wouldn't -- I don't know.
24     Q    Okay.
25     A    I don't remember which customer it was.

114

1      Q    Well, do you know if you lost that
2  customer? Can you say for sure that MITG lost the
3  business of that customer because of something that
4  HP said to them?
5      A    I can't state it as a fact, but my opinion
6  is yes.
7      Q    All right.
8           MS. CARROLL:  I'm going to object as
9      nonresponsive to everything other than, "I
10     can't state that as a fact."
11 BY MS. CARROLL:
12     Q    And they didn't tell you why HP said not
13 to do business with MITG?
14     A    No.
15     Q    Okay. Are you aware of any other customer
16 that has told you that HP said not to do business
17 with MITG?
18     A    Not told me specifically, but I've been
19 told it has happened with others in the company.
20     Q    Okay. Who has told you that they had a
21 customer say that HP told them not to do business
22 with MITG?
23     A    I don't recall who it's been.
24     Q    Well, who at MITG has customer contact
25 that it might have been? How many people are we

115

1  talking about that it might have been?
2      A    It could be any number of the ones that we
3  still have there now. Through the course of the
4  past year or so everyone has had a variety of roles,
5  so it could be any one of the employees.
6      Q    And did that -- did this happen once or
7  did it happen more than once that an employee told
8  you that they were told that HP said not to do
9  business with MITG?
10     A    I believe I've heard of it happening maybe
11 one to maybe three times.
12     Q    All right. Do you know the identity of
13 any of those customers that allegedly reported this?
14     A    I'm not sure.
15     Q    Do you know how much business of MITG's is
16 represented by the customers that you have heard
17 said that HP did not -- let me try that again.
18 You've heard from other people, one to three
19 instances that they heard from a customer that HP
20 said not to do business with MITG, correct?
21     A    That's correct.
22     Q    Okay. So combined with your own
23 experience, at a maximum, you've got four people who
24 have reported, that you're aware of, that reported
25 that HP told a customer not to do business with

116

1  MITG, is that right?
2      A    A maximum of four.
3      Q    That you're aware of?
4      A    All right, that's fair.
5      Q    Can you say how much business in terms of
6  revenue those customers would represent of MITG's
7  business?
8      A    No.
9      Q    And so is it fair to say that you also
10 can't say how much profit would have been lost if
11 these customers stopped doing business because of
12 the statements by MITG -- because of the statements
13 allegedly made by HP?
14     A    That's a true statement at this time.
15     Q    And did any of -- are you aware of any
16 derogatory comments that HP has made about MITG,
17 separating HP says to a customer, don't do business
18 with MITG or says bad things about MITG instead of
19 saying HP doesn't do business with MITG?
20     A    I'm not aware of any in particular.
21     Q    Okay. Are you aware of any suppliers or
22 distributors of MITG that refuse to do business or
23 have declined to do business with MITG because of
24 statements allegedly made by HP?
25     A    Yes.

## DECLARATION OF TROY BLOOMQUIST

1. My name is Troy Bloomquist. I am over the age of 18 years, am fully competent to make this Declaration and hereby make this Declaration under penalty of perjury. The matters stated herein are within my personal knowledge and are true and correct.

2. I have been employed by Hewlett-Packard ("HP") since August 1992. I was originally hired by Compaq to work for the Compaq Direct ("CDI") on October 1999. I was the primary contact between Compaq Direct and MITG and signed the Standard Support Agreement for Compaq Direct.

3. During the term of the Standard Support Agreement, when a CDI customer ordered a sourced part, MITG found a vendor, ordered the part from the vendor for shipment to the customer and invoiced Compaq/HP. Compaq/HP generated the invoice to the customer and reimbursed MITG for the cost of the product and paid MITG 75% of the gross profit on the part sale. If the customer ordered a Compaq/HP part that was in-stock, MITG ordered the part through Compaq/HP and Compaq/HP handled the rest of the transaction, such as shipping, invoicing, etc. No monies were paid to MITG for the sale of these parts.

4. The only money CDI/HP Direct paid to MITG for sales of Compaq/HP stocked parts to Direct customers was the $41,000 for month under the Agreement.

5. All profit paid to MITG for sales under the Agreement were for sales of sourced parts, as the 75%/25% split did not apply to in-stock parts.

So sworn under penalty of perjury this 12 day of January, 2005 in Omaha, NE.

Troy Bloomquist

EXHIBIT 5