HP and Compaq v. MITG   CondenscIt™   Ronald Haught
3:04-cv-03055-JES-CHE   # 68-10   Page 1 of 4
E-FILED
Wednesday, 11 January, 2006  11:38:19 AM
Clerk, U.S. District Court, ILCD

Page 1

```
 1                                    INDEX
 2                     DEPONENT                        PAGE NUMBER
 3                     RONALD HAUGHT
 4                         Examination by Ms. Carroll      4
 5
 6
 7
 8
 9
10
11
12                                  E X H I B I T S
13   NUMBER                                  MARKED      IDENTIFIED
     Deposition Exhibit Number 20              *             7
14   Deposition Exhibit Number 5               *            17
     Deposition Exhibit Number 4               *            37
15   Deposition Exhibit Number 2               *            42
     Deposition Exhibit Number 1               *            43
16   Deposition Exhibit Number 6               *            64
     Deposition Exhibit Number 22             72            72
17   Deposition Exhibit Number 19              *            76
     Deposition Exhibit GG                     *            96
18   Deposition Exhibit Number 23            147           147
     Deposition Exhibit M                      *           154
19   Deposition Exhibit KK                     *           169
     Deposition Exhibit Number 24            169           172
20   Deposition Exhibit Number 25            169           171
     Deposition Exhibit B                      *           184
21   Deposition Exhibit C                      *           194
     Deposition Exhibit Number 21              *           206
22   Deposition Exhibit Number 26            209           209
     Deposition Exhibit Number 27            222           222
23   Deposition Exhibit Number 28            263           263
24
25
```

Page 1

```
 1                                                      Page 1
 2
 3              UNITED STATES DISTRICT COURT
 4                CENTRAL DISTRICT OF ILLINOIS
 5                    SPRINGFIELD DIVISION
 6
 7   HEWLETT-PACKARD DEVELOPMENT        )
     COMPANY, L.P., HEWLETT-PACKARD     )
 8   COMPANY, and COMPAQ TRADEMARK B.V.,)
                                        )
 9              Plaintiffs,             )
                                        )
10       - vs -                         ) No. 04-3055
                                        )
11   MIDWEST INFORMATION TECHNOLOGY     )
     GROUP, INC., and MICHAEL LAUBER,   )
12                                      )
                Defendants.             )
13
14
15       DEPOSITION of RONALD HAUGHT, taken in the
16   above-entitled case before Gina Nottingham, a Notary
17   Public and Certified Shorthand Reporter of Adams
18   County, Illinois, at 9:00 o'clock A.M., on February
19   18, 2005, at 525 Jersey Street, Quincy, Adams County,
20   Illinois.
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2       MS. ELIZANN CARROLL
         Attorney at Law
 3       15301 Spectrum Drive, Suite 300
         Addison, Texas  75001
 4
               appeared for the Plaintiffs.
 5
         MR. JAMES HANSEN
 6       Attorney at Law
         525 Jersey Street
 7       Quincy, Illinois  62301

 8             appeared for the Defendants.

 9   ALSO PRESENT:
10       Ms. Gaynelle Jones
         Litigation Counsel for Hewlett-Packard
11
12
13
14
15
16
17
18
19
20   MRS. GINA L. NOTTINGHAM, CSR
21   License No. 084-002584
     924 Rim Road
22   Quincy, Illinois  62301
     (217) 224-7009
23
               EXHIBIT
24              6
25
```

Page 4

```
 1          (Whereupon the Deponent was
 2           sworn by the Notary Public.)
 3              R O N A L D   H A U G H T
 4
 5   having been first duly sworn by the Notary Public,
 6   deposeth and saith as follows:
 7              EXAMINATION BY
 8              MS. CARROLL:
 9       Q.  Can you state your name for the record,
10   please, sir?
11       A.  Ronald Dean Haught, Jr.
12       Q.  And what is your address, Mr. Haught?
13       A.  4304 Deer Ridge Road, Quincy, Illinois,
14   62305.
15       Q.  Thank you.  Have you had your deposition
16   taken before?
17       A.  Yes.
18       Q.  How many times?
19       A.  Several over the years.  I was former law
20   enforcement, so I have been through this process a
21   few times over the years.
22       Q.  Okay.  Any of the depositions relating to
23   MITG?
24       A.  One.
25       Q.  Okay.  And what kind of case was that?
```

Page 5

1   A. Over a construction case.
2   Q. All right. And was MITG a party to the
3 lawsuit, I take it?
4   A. Yes.
5   Q. Plaintiff or defendant?
6   A. Plaintiff.
7   Q. And what was the issue?
8   A. Improper assembly of some beams. I had a
9 bent beam in a construction process.
10   Q. Was it for the construction of the new
11 facility here in Quincy?
12   A. That's correct.
13   Q. All right. And is that case completed now?
14   A. No, it is not.
15   Q. All right. And is that pending here in
16 Quincy?
17   A. I don't know the answer to that actually.
18 I don't know where it was filed.
19   Q. Okay. But MITG is the plaintiff against
20 the construction company in a current lawsuit, is
21 that correct?
22   MR. HANSEN: No. No. MITG is not the
23 plaintiff. It relates to MITG's building. MITG is
24 not the plaintiff.
25   THE WITNESS: That's correct.

Page 6

1   MS. CARROLL: MITG is a party to the
2 lawsuit?
3   MR. HANSEN: No. He can answer. If you
4 know. Go ahead. If you want, I can tell you. MITG
5 is not a party to the lawsuit.
6   MS. CARROLL: Q. There is a dispute
7 involving the construction of MITG's facility here in
8 Quincy, and you had your deposition taken in that
9 context?
10   A. That's correct.
11   Q. All right. Have you had to testify in
12 court for any matters relating to MITG?
13   A. No.
14   Q. All right. You understand that you are
15 here today for your deposition both individually and
16 as the corporate representative of MITG?
17   A. I understand I'm here as a corporate
18 representative, that's correct.
19   Q. Well, you are also here just to the extent
20 that there are matters that aren't included in this
21 deposition notice that you know from your capacity as
22 an employee and the owner of MITG, those questions
23 will be asked today also?
24   A. That's correct.
25   Q. Okay. Let me show you the deposition

Page 7

1 notice. Have you seen that document before? It's
2 Exhibit 20.
3   MR. HANSEN: I can tell you he may not have
4 seen the notice. He has seen the exhibit.
5   MS. CARROLL: Q. That's fine. And I
6 understand from your lawyer, if you can confirm with
7 me, that it's also your understanding that you are
8 the representative on all of the, all 22 topics
9 except 8 and 9 on which your CFO, Miss Koch, was
10 designated. Is that your understanding?
11   MR. HANSEN: And, just so the record is
12 clear, 12.
13   MS. CARROLL: Q. 12 you all were jointly
14 designated on that topic?
15   A. That's correct.
16   Q. What did you do, if anything, to prepare
17 for your deposition today?
18   A. Read over a few -- well, I read over the
19 original contract. That's really about it.
20   Q. The Standard Support Agreement?
21   A. That's correct, yes, and the Middleware
22 document, yes.
23   Q. And have you or has MITG calculated the
24 actual damages that you claim it suffered due to the
25 plaintiff's alleged breach of contract of the

Page 8

1 Standard Support Agreement?
2   A. No. I have been unable to totally
3 calculate those damages.
4   Q. Why is that?
5   A. Well, for one you, I believe, just recently
6 turned over the documents necessary for us to be able
7 to fully evaluate that on one case. Secondly, the
8 damages will more than likely be calculated by an
9 expert, because I don't feel that's my level of
10 expertise.
11   Q. And what documents are you referring to in
12 terms of the documents necessary to fully evaluate
13 the claim?
14   A. Well, if I'm not incorrect, part of our
15 claim for damages is based on misdirected or
16 redirected calls away from my facility, and those
17 records I would not have any, you know, any per se
18 knowledge of. So we have asked that those records be
19 produced by your client.
20   Q. And I'll get into the diversion issue in a
21 little while. Have you calculated the damages that
22 you claim that MITG has suffered due to
23 Hewlett-Packard's alleged misuse of the Middleware,
24 or breach of the Middleware Agreement?
25   MR. HANSEN: Has he or the company?

Page 9

1  MS. CARROLL: Q. Has he or the company,
2  uh-huh.
3  A. We have not calculated as well based on a
4  previous answer, which is, I think that would be
5  determined by an expert.
6  Q. Do you believe that you have all of the
7  documents that would be necessary for an expert to
8  make that calculation?
9  MR. HANSEN: Object to form. Go ahead.
10  THE WITNESS: Can you rephrase that for
11  me?
12  MS. CARROLL: Q. Yeah. You indicated
13  before that there were some documents that you just
14  got that would assist you in calculating the damages
15  relating to the Standard Support Agreement. Do you
16  believe that there are any outstanding documents that
17  you need from HP that would help you calculate? Are
18  you waiting for something from HP to calculate those
19  damages?
20  A. I have yet to see those documents.
21  Actually I know that they were received. I don't
22  know what the content of those documents are. So I
23  don't feel I can answer that question today.
24  Q. Well, tell me who -- do I understand your
25  breach of the Middleware Agreement claim to be that

Page 10

1  HP has used the Middleware for the benefit of a third
2  party?
3  MR. HANSEN: Object to form. I think the
4  pleading speaks for itself. But subject to that, he
5  can answer it.
6  THE WITNESS: Yes.
7  MS. CARROLL: Q. All right. And do you
8  know what third party or parties have been given the
9  use of the Middleware?
10  A. Can you put that in more specific terms?
11  Q. Yeah. Tell me who is using the Middleware
12  improperly?
13  A. I don't have specific knowledge of the
14  customers using that tool as I do not have access to
15  those records from within HP.
16  Q. Okay. Have you calculated the damages that
17  you claim MITG has suffered due to the alleged
18  tortious interference by HP?
19  A. The tortious interference claim, if I'm not
20  incorrect, was just recently filed, and we are still
21  trying to develop all of the information and get the
22  information so that those determinations can be
23  made. So today, no.
24  Q. Okay. And just so the record is clear, I'm
25  reserving my right to retake his deposition on those

Page 11

1  issues since they are the subject of this notice, and
2  if a later date you are going to have an MITG
3  corporate representative discuss the amount of the
4  damages that's not an expert, a retained expert, then
5  I'm reserving my right.
6  All right. When was your first contact
7  with Custom Edge?
8  A. In regards to timeframe, incident?
9  Q. Do you have a general timeframe as to when
10  you first heard from Custom Edge about doing work for
11  their customers or a customer of theirs?
12  A. I'm going to say in the year 2000, but I
13  could be off on the timeframe. I mean, I recall the
14  specific incidence.
15  Q. Okay. Tell me about that, please.
16  A. The specific incident is we were contacted
17  by then CEI or Custom Edge, Incorporated. I don't
18  know which of the parties, either Mr. Bloomquist,
19  Mrs. Ellis. There were some other folks in that
20  department at the time, but we were contacted and
21  asked to provide service and/or parts for a customer
22  in Hannibal, Missouri, by the name of Swiss Colony.
23  Q. And what kind of business was Swiss Colony?
24  A. They are a call center that sells cheese
25  and sausage and all that around the holidays.

Page 12

1  Q. And were they -- do I understand you
2  correctly that CEI was looking for you to do on-site
3  repairs and service calls for them?
4  A. I believe so, yes.
5  Q. And did you have any kind of written
6  agreement that you entered into with CEI to handle
7  that Swiss Colony business?
8  A. No.
9  Q. Okay. How long did that relationship last
10  where you were providing, you being MITG was
11  providing, the service to Swiss Colony?
12  A. The actual service calls went on for
13  several years off and on. It wasn't a repetitive
14  day-to-day scenario. It was hit and miss type of
15  deal.
16  Q. I mean, as-needed bases?
17  A. Correct.
18  Q. So instead of calling a CEI or Compaq
19  Direct service person, they called MITG?
20  A. That's correct.
21  Q. All right. And did then MITG bill CEI?
22  A. I would assume so. I wouldn't have
23  specific knowledge of that.
24  Q. Okay. You don't recall how your company
25  handled that billing?

Okay.

You were trying to take advantage of the opportunity that might be presented by them wanting to find out resources and you wanted to be able to take advantage of that opportunity to grow your business. Is that fair?

What is that question in reference to, the actual facility itself?

The -- well, I asked what kind of projections you were making, and you talked about increasing call volumes and then Compaq letting people go and sending work to you.

Correct.

And what I'm asking is was part of the reason for having more space the ability to take on that additional work?

Yes, that's correct. Thank you.

Okay. Sometimes it takes me awhile.

We all have that problem.

Since you have been deposed so many times, I didn't give you the warning at the beginning that my questions sometimes take a half-hour.

Let me ask you to take a look at Exhibit 4, which is a document bates MITG 0527 through 31. It's dated December 5 of 2001. Do you recognize this

Page 38

1 document?
2  A. First let me ask is there a cover page
3 missing possibly?
4  Q. Well, this is the way the document came to
5 me. So if there is a cover page missing, I don't
6 know where it went because I didn't get it.. It
7 indicates it is Page 1, and unless there was a
8 transmittal letter from you to him --
9  A. No. What I was getting at is I was
10 assuming, and this looks to me to be the quote/
11 unquote bible of the process, but I was looking for
12 something quite --
13  Q. Okay. And this document has been
14 identified in response to request for production that
15 this is the bible.
16  A. Right.
17  Q. Tell me how this document came about?
18  A. It came about, quite frankly, from issues
19 that were consistently arising through various
20 processes, etc. Sherry Ellis is a lovely lady and
21 did a fine job for your client being a pain to us,
22 and that was part of the reason this document was put
23 in place is it seemed that the rules would
24 consistently change depending on her mood, whether it
25 was customer complaint, who was to handle the

Page 39

1 customer complaint, what the escalation process was.
2 I believe there is, you know, issues in here in
3 regards to the wrong order of and things of that
4 nature, our main procedures and things of that
5 nature. So those things were put in place to try to
6 alleviate some of those issues on a consistent basis,
7 and as well the communication was a big issue.
8  Q. All right. And RMA stands for?
9  A. Return Material Authorization.
10  Q. All right. Prior to creation of the bible
11 here, did MITG handle RMA?
12  A. Yes.
13  Q. And so this is simply putting, this is what
14 we are going to do, this is what our responsibilities
15 are, we agree that we are going to handle it this
16 way, and you CEI are going to do X, Y, and Z?
17  A. I wouldn't phrase it that way, no.
18  Q. Okay.
19  A. It was more of a general meeting of the
20 minds in regards to, these are our problems, these
21 are the processes, and this was the generally agreed
22 to solution, so that there wasn't it's her word, his
23 word, etc., etc.
24  Q. So this is just the process -- we all agree
25 this is the process. We are going to put it in

Page

1 writing so everybody knows?
2  A. Basically, yeah. So it's easily referred
3 back to, correct.
4  Q. Prior to the Standard Support Agreement,
5 did MITG have a website that MITG customers could
6 use? For example, is there an MITG.com?
7  A. Yes.
8  Q. Was that an interactive website for
9 customers to order parts?
10  A. Define interactive.
11  Q. Well, for example, if you go to any kind of
12 regular shopping, retail, you put it in a shopping
13 cart and you put your credit card number in and you
14 can buy that part. Could you do that prior to the
15 Standard Support Agreement on an MITG website? I
16 want to order a spare part. I order it, I give you
17 my credit card number, and I wait for it to show up
18 UPS?
19  A. Yes, but it's not that simple. It's -- it
20 was more based off of e-mail and quote type of
21 scenario. The technology you are talking about
22 really didn't evolve and become mainstream until
23 little bit later.
24  Q. It is true after the Standard Support
25 Agreement that when people went on the website,