3:04-cv-03055-JEQ-CHARLIE # 68-11    Page 1 of 6
HP and Compaq v. MITG    CondenseIt™    Ronald Haught
Wednesday, 11 January, 2006  11:39:56 AM
E-FILED
Clerk, U.S. District Court, ILCD

### Page 77

1  How long were people from the outside able to contact
2  MITG by using e-mail addresses that had the HP name
3  in them?
4      A. I don't know.
5      Q. Okay. Do you have -- well, the message
6  that is Exhibit 22, how long was that message
7  displayed before the domain names would just go to a
8  not found or an error message, do you know?
9      A. 20 some days. Is that right? 15 days.
10     Q. I think it's been identified as early
11 March?
12         MR. HANSEN: I think March 1.
13         THE WITNESS: I know there was a date. I
14 don't recall the date.
15         MS. CARROLL: Q. It was taken down after
16 that. Without revealing communications with counsel,
17 and you may not be able to answer this question, why
18 was the message taken off of the domain name so it
19 just says not --
20     A. I can't answer that.
21     Q. Okay.
22     A. Privileged.
23     Q. Okay. I want to go back to the Middle-
24 ware.
25     A. Okay.

### Page 78

1      Q. And if you will tell me what evidence you
2  have that HP used the Middleware after February 7th
3  of 2004?
4      A. Documented physical evidence, I have none
5  in my possession today.
6      Q. What is the basis for your belief that HP
7  used the Middleware after February 7th of 2001?
8      A. My contention is that during the
9  development process and the subsequent signing of the
10 Middleware Agreement associated around the
11 development of the software that the software resided
12 on two separate locations, one within my organization
13 and as well within the Vista tool, which is a Compaq
14 Direct, Compaq/HP, whatever, owned system. My
15 contention is that from my experience and my
16 knowledge of, A, the process taken to develop that
17 and, B, my understanding of computer programming, not
18 contending to be an expert by any means, but my
19 understanding of the programming and the work that
20 went into that process that it would be extremely
21 difficult, if not impossible, to remove what I would
22 contend would be a portion of the Middleware software
23 out of the Vista system.
24     Q. Let's start back with some basics on what
25 Middleware is.

### Page 79

1      A. Uh-huh.
2      Q. Tell me what your understanding is
3  generically of what Middleware is?
4      A. Middleware in a generic overview is a piece
5  of software or various pieces of software utilized
6  by, in this specific instance, both of our companies,
7  respective companies, to communicate via XML for the
8  transmittal of orders, order processing, I believe in
9  some cases inventory level, etc. It was a new
10 developed tool to replace the portal driven, which
11 was the old term, or the -- I can't believe I just
12 lost that word. It will come to me in a minute. The
13 original form of order processing, etc., took place
14 from basically hard line, hard coded relationships.
15 So Vista would have to have a specific tool for you
16 that went just to you and only you, and you as the
17 customer had to as well customize that response
18 back. So it was an extremely time consuming and a
19 relatively expensive process to develop EDI, the EDI
20 link between the two companies.
21         What XML allows you to do is adopt a
22 standard and communicate in very basic overviews,
23 because I don't have a tremendously in-depth
24 knowledge based on the technical aspect of this. In
25 essence, you're communicating with secure e-mail, in

### Page 80

1  essence, or documents, XML documents that would have
2  specific line one contains 25 characters, which would
3  be this field. The next 30 characters might be this
4  field, etc., etc.
5      Q. The Middleware is acting as a translator
6  from MITG's system to?
7      A. Vista.
8      Q. Vista?
9      A. Correct. It's -- actually it's operating
10 on both sides as a translator.
11     Q. What is your basis to believe that there is
12 MITG developed software loaded on HP or in this case
13 Compaq Direct's Vista system?
14     A. What's my basis?
15     Q. To believe that software developed by MITG
16 is loaded directly onto the Vista system?
17     A. I was present at the time of development.
18     Q. Was that at the time that there were test
19 runs done to see whether the system would work?
20     A. That was part of it. It was an ongoing
21 process, but, sure.
22     Q. Do you realize that that software after the
23 test process was done was taken off, was deleted off
24 of the system?
25     A. I also know that it was put into production

Page 129

1  process is once you were able to get a customer and
2  maintain a relationship they typically would find
3  whatever method was the easiest to get their problem
4  resolved. And so in a lot of cases calls would have
5  bypassed that tree altogether, and they would have
6  said, I have always worked with Jim. I want to
7  continue to work with Jim. So therefore they called
8  Jim.
9     Q. So what you have are consumers and B to B
10 ended up through either calling a number that's
11 specifically assigned to HP Direct slash MITG or they
12 could end up someplace else in the Compaq and HP
13 world and eventually get routed to MITG as the direct
14 organization?
15    A. Correct. Or they could have dialed the
16 extensions of that person directly.
17    Q. All right. And then -- but the consumer as
18 far as --
19    A. We are going back to them. If they called
20 and ended up at the Welcome Center, they could end up
21 in multiple places and may, in fact, be able to
22 acquire what they want to acquire from one of these
23 other Compaq sources or from MITG. So say they
24 needed a new keyboard for their Presario, a Compaq
25 keyboard. They could have ended up at MITG. They

Page 130

1  could have ended up at the Compaq spare parts store.
2  They could have gone to an authorized retailer of
3  Compaq parts.
4     Q. Well, is it out of warranty parts?
5     A. Non-warranty parts.
6     Q. So it's an out of warranty part and as well
7  it's --
8     A. I would like for you to discern what
9  timeframe you are talking about, because we were
10 prior to the parts store ever existing.
11    Q. Okay. In the spring of '02 consumer wants
12 to buy a stocked, an in stock Compaq spare part?
13    A. Uh-huh.
14    Q. Where could they get that? They could get
15 it obviously from MITG acting as Compaq Direct?
16    A. Uh-huh.
17    Q. Where else could the consumer go?
18    A. Depending on which method they were
19 shuffled through. On the Compaq side they could get
20 it from -- you know, I don't know where the Welcome
21 Center directed their calls quite frankly, but, you
22 know, they could go to the spare store. They might
23 very well be sent to Ambry or PC Mall or, I mean,
24 there were a myriad of places that we find in
25 retrospect that they were sending those customers to

Page 131

1  versus funneling those customers to us.
2     Q. You were aware at the time of the Standard
3  Support Agreement that Compaq had authorized
4  resellers of spare parts?
5     A. That's correct.
6     Q. Okay. Is there -- do you contend that upon
7  the signing of the Standard Support Agreement that
8  MITG was acting as Compaq Direct was to replace all
9  of those sources as product, as suppliers of spare
10 parts?
11    A. My understanding of the contract as such is
12 that if a call came into the Compaq organization
13 requiring a spare part which was out of stock within
14 Compaq's own warehouse that, yes, that call would be
15 directed to us for us to be able to supply that
16 product.
17    Q. Compaq Direct organization or all of
18 Compaq?
19    A. My understanding is that that would be
20 organizational wide.
21    Q. Compaq worldwide? Compaq U.S.?
22    A. I can't answer that.
23    Q. Well, what was -- at the time what was your
24 belief as to what your customer set was? Is it all
25 people who called in to Compaq in the United States

Page 132

1  who needed non-stocked spare parts?
2     A. Well, it's not that easily defined. You
3  could say -- if you want to be bold about the
4  statement, you could say it's a worldwide effort
5  based on the fact that we did a lot of international
6  shipments to various customers. That wasn't
7  necessarily my belief and/or my intention, but
8  because of the level of service that is what grew out
9  of it.
10    Q. Were you shipping parts under the Standard
11 Support Agreement worldwide?
12    A. We could, yes.
13    Q. Did you?
14    A. Yes, Canada and various other places.
15    Q. Okay. There are some references in e-mails
16 that I discussed with Mr. Rice yesterday about
17 stocking parts in various locations around Europe,
18 and I understood that is to be service parts?
19    A. That could be correct, yeah.
20    Q. All right. Is it fair to say that the
21 majority of your international business would have
22 been the stocking of service parts as opposed to the
23 shipment of product under the Standard Support
24 Agreement, or do you know?
25    A. I don't know. I mean, that's a hard number

Page 137
1  customer that was going to be serviced by MITG acting
2  as Compaq Direct and then later HP Direct?
3      A. But not always was it under that auspice
4  and as well I think it's unfair to characterize it
5  strictly Compaq Direct because we did a lot of
6  business with Houston, which is not Compaq Direct, if
7  I'm not mistaken.
8      Q. And my question here, and that's what I'm
9  trying to determine who you are saying your customers
10 are. So you say you were doing business with
11 Houston. Who are you referring to? Were they in the
12 bucket of existing customers, or were they in the
13 bucket of customers to come?
14     A. They were both.
15     Q. Okay. What customers were to come from
16 Houston that were going to fill the bucket?
17     A. I mean, I don't have specific knowledge of
18 which customers, so to speak, if that's your
19 question.
20     Q. Well, what was -- what customers that were
21 in the bucket of existing customers how did Houston
22 -- how did you end up getting those or servicing
23 those customers for Houston?
24     A. Well, a myriad of ways. One, the customer
25 through various levels of frustration, whether it was

Page 138
1  a solutions architect, whether it was the customer
2  themselves seeking out information and contacting us,
3  etc., etc. I mean, we could be contacted from a
4  myriad of directions over that.
5      Q. Okay. After the merger -- well, at the
6  time of the merger, did someone -- do you recall
7  having a discussion with anyone from what became HP
8  Direct or the HP organization about what MITG's role
9  was going to be post-merger, if it was going to
10 change, if it was going to stay the same?
11     A. We were basically told it was to stay the
12 same.
13     Q. Okay. And so once you have the merger, you
14 continued to have your call center people and you
15 have your customers that you're servicing and you
16 have your customers that you're still working to
17 recruit, etc., is that correct?
18     A. That's a fair statement, yes.
19     Q. Okay. And, now, were you aware or did you
20 become aware shortly after the time of the merger
21 that HP had access points for their customers that
22 existed prior to the merger for customers to buy
23 spare parts?
24     A. Was that ever communicated to us.
25     Q. Were you aware of it, however you became

Page 139
1  aware of it?
2      A. Not specifically, but it was obvious with
3  the decrease in volumes, etc., we went from a peak to
4  a slope.
5      Q. How -- you were aware of -- well, let me
6  ask you this. You were aware that HP had call
7  centers, for example, in various locations?
8      A. That's correct.
9      Q. Okay. And you were aware that HP had web
10 access points for people to buy spare parts?
11     A. That is correct, but I need to expand. May
12 I?
13         MR. HANSEN: Answer the question. Were you
14 aware, yes or no?
15         THE WITNESS: Yes.
16         MS. CARROLL: Q. Were those -- did you
17 know at the time that those, that they were also
18 business partners or authorized resellers of HP spare
19 parts that existed prior to the merger?
20     A. Yes.
21     Q. And did you believe -- well, strike that.
22 Did anyone tell you that MITG was going to become the
23 sole source of spare parts for the entire HP
24 organization and replace those other contact points
25 or access points that customers had to buy spare

Page 140
1  parts?
2      A. Specifically, no.
3      Q. Okay. Did you come to that understanding
4  in some way or based on some communication from HP or
5  Compaq that MITG was going to be acting as, HP Direct
6  was going to become the sole access point for spare
7  parts?
8      A. Sole access point, no.
9      Q. Okay. Was there a limitation -- was there
10 something that MITG acting as HP Direct was going to
11 assume the role or take over the role of pre-existing
12 HP organizations that were providing spare parts to
13 customers?
14     A. Yes, I believe so.
15     Q. Okay. What was MITG as HP Direct going to
16 take over?
17     A. It specifically relates to the ability to
18 have a customer, whomever, to continue the ability
19 which under Compaq existed and under HP post-merger
20 did not exist and as today I believe still doesn't
21 exist. Our understanding is that we would be able to
22 migrate and as well expand upon the customer base, so
23 to speak, based on a one PO scenario. So a customer
24 could order a product, whether it was finished good,
25 whether it was spare parts, whether it was warranty

Page 145

1 you say an authorized reseller, I think of finished
2 goods and sales and support thereof. When you look
3 at someone like Ambry and etc., they are not, to the
4 best of my knowledge, an authorized reseller because
5 that is not their business model. Their business
6 model is spare parts.
7    Q. And do you have any knowledge as to how
8 Ambry or PC Nation or any of this third group where
9 they acquire parts?
10    A. Where they acquire?
11    Q. Where they are acquiring spare parts.
12    A. I would assume some of the same places that
13 we were.
14    Q. Okay. Well, and if they are in stock
15 Compaq or HP parts, would they go through CSN just
16 like MITG did, or do you know?
17    A. I don't know, but I would not suspect so,
18 no.
19    Q. Is it your belief that sales
20 representatives -- well, strike that. Is it your
21 belief that call center representatives, for example,
22 in Roseville, if they were referring somebody out to
23 Ambry that they were referring people out who were
24 not authorized business partners of HP or Compaq?
25    A. That would be my understanding, correct.

Page 146

1    Q. Okay.
2       (Whereupon a recess was
3       taken for lunch at 12:30.)
4    Q. Mr. Haught, I want to go back to some
5 discussions we were having in the spring of 2002 in
6 terms of the spare part business that you were
7 handling. You were aware at that point that there
8 were some other access points within Compaq where
9 people could get spare parts other than Compaq Direct
10 slash MITG? Was that accurate?
11    A. In the spring of '02?
12    Q. Correct. Before the merger of the
13 companies, but after the Standard Support Agreement.
14    A. Were there other --
15    Q. Let me ask it differently. Were there
16 other access points within Compaq that you're aware
17 of where people, whether they be consumers or
18 businesses, could buy spare parts?
19    A. Compaq spare parts?
20    Q. Correct.
21    A. Yes. Multivendor, no.
22    Q. And was there -- there were also not
23 directly within Compaq but authorized representatives
24 that consumers or business people could acquire
25 Compaq spare parts from?

Page 147

1    A. Yes.
2    Q. And post-merger of the companies you are
3 aware that within or what became HP that there were
4 multiple access points within HP for people to buy
5 in-stock Compaq or HP parts, spare parts?
6    A. In stock spare parts, yes.
7    Q. Right. And were there other access points,
8 other than HP Direct slash MITG, within HP where
9 people could buy what are sometimes referred to as
10 legacy Compaq spare parts or out of stock Compaq
11 spare parts?
12    A. With the exception of Houston at that time,
13 I would say I was unaware of anyone else.
14    Q. And what is Houston when you refer to that?
15    A. I guess the Compaq spare store, if that's
16 the correct terminology for it.
17    Q. Let me --
18       (Whereupon a document was
19       marked Deposition Exhibit
20       Number 23.)
21    Q. Let me hand you what's been marked as
22 Deposition Exhibit 23, which is a document, just for
23 the record, Bates MITG 0479 through 81. And the
24 first e-mail, just so it's clear, is kind of at the
25 bottom of the first page from you to April -- how do

Page 148

1 you pronounce that?
2    A. Muehring.
3    Q. Muehring. For a proposed script for the
4 phone greeting, and if you will take a look at that
5 e-mail stream, I have a question for you.
6    A. Okay. I'm sorry. What's your question?
7    MR. HANSEN: I don't think there was one.
8    MS. CARROLL: Q. No. I let you get
9 through the exhibit first. On the third page there
10 is a reference at the end to Compaq parts. You can
11 visit www.Compaq.com\sparestore. Is that what you
12 were referring to when you referenced Houston a
13 minute ago?
14    A. Yes.
15    Q. And now let me just ask you about the
16 proposed script for a phone greeting. Under your
17 name it's bracket, Bloomquist, comma, Troy, closed
18 bracket?
19    A. Uh-huh.
20    Q. Does that mean -- why is his name there?
21 Is he proposing this, or why is his name there?
22    A. I'm sorry. Where are you?
23    Q. On Page 2 at the bottom right down here
24 there is your name, and then it has Troy Bloomquist's
25 name in brackets. I was wondering what the meaning

Page 149

1 of that was?
2    A. If I'm correct, they were using Lotus notes
3 for their e-mail at that time, and I believe he
4 replied that would bracket his comments, if I'm not
5 incorrect. I'm not all that familiar with Lotus
6 notes so --
7    Q. And is that -- so does that mean that Troy
8 Bloomquist is proposing this phone greeting?
9    A. I can't answer that.
10    Q. Can you tell that?
11    A. No, I can't tell.
12    Q. And this is the phone greeting for people
13 calling in to MITG slash Compaq Direct?
14    A. I would say this is the proposed greeting
15 or discussed, yes.
16    Q. Do you know if this was ever implemented?
17    A. No, I don't have a clue.
18    Q. And this is obviously post-merger? We are
19 looking at an August of 2002, because it says, thank
20 you for calling Compaq Online Parts, now part of the
21 new HP.
22    A. Yes.
23    Q. This gives a couple of different options
24 that you're pressing I take it -- when you call in, I
25 take it that you don't know what the phone number is

Page 150

1 that this phone tree is off of where it says,
2 technical support, please press 2?
3    A. No, I don't know where that's from.
4    Q. Okay. And why the reference at the end,
5 for additional Compaq parts you can visit us at the
6 spare store? Why was this a part of the automated
7 greeting?
8    A. I can speculate. I mean, I have no --
9    Q. Do you know if when the phone message, your
10 automated phone message to MITG slash HP Direct or
11 Compaq Direct, did it ever include that reference to
12 go into the spare store or any other HP, subsequently
13 an HP website?
14    A. I believe that it possibly did, yes.
15    Q. And on your e-mail that's on the first
16 page, it says, new phone scripts for the CPQ, meaning
17 Compaq, side of the house. What did you mean by the
18 Compaq side of that house?
19    A. CPQ would have referred to the B to B.
20 Well, maybe not. Hold on.
21    Q. Okay.
22    A. I would have said that that references the
23 consumer piece.
24    Q. All right.
25    A. We had acronyms for all that stuff. I

Page 151

1 don't remember what they all are now.
2    Q. All right. And your message here
3 indicates, please get with April on this and make it
4 happen on Monday. So it was presumably by the
5 contents of this e-mail string a phone greeting
6 identical to or very similar to what you've got at
7 the bottom of the e-mail was put on the phone system
8 at MITG?
9    A. I would presume, yes.
10    Q. Okay. Now, after the merger -- we talked
11 about the Compaq spare store. After the merger, was
12 there -- I think there is within HP. Was there
13 anyplace for people to buy, customers to buy
14 multivendor parts other than contacting HP Direct?
15    A. To my knowledge, for multivendor parts, no.
16    Q. All right. If people were calling in to
17 buy multivendor parts, they would either get sent to
18 HP Direct slash MITG or possibly get sent to an
19 outside business partner regardless of I'm not
20 getting into what that relationship is?
21    A. Right.
22    Q. Okay. Did you ever during the course of
23 the Standard Support Agreement complain to anyone in
24 writing at HP saying you should not be sending any
25 business from anywhere in the HP organization for

Page 152

1 multivendor parts to anyone other than HP Direct?
2    A. Was I that specific in my correspondence?
3    Q. Correct.
4    A. No. There were multiple e-mails expressing
5 concern, yes.
6    Q. And what were the general content of these
7 e-mails expressing that you say were expressing
8 concern?
9    A. Where are our calls?
10    Q. So it's a call volume as opposed to that
11 your call volume was down?
12    A. The call volume was down. Sales were
13 down. Yes, both.
14    Q. And could you or did you at the time do any
15 analysis to see if you were maintaining one set of
16 customers or servicing one set of customers or types
17 of customers versus another kind? For example, you
18 were losing B to B business and staying the same on
19 consumer or the other way around. Any kind of
20 analysis that would indicate to you who seemed to be
21 not coming to your call center anymore?
22    A. Well, I think the consumer side was pretty
23 apparent that it was decreasing or definitely not
24 increasing at all, and the B to B side would be a
25 little bit more difficult to be able to monitor.

Page 181

1 contention -- is it your contention that the Andover
2 calls that are the subject of Exhibits 24, 25, and KK
3 were calls from capital C Customers, as that term is
4 defined in the Standard Support Agreement?
5     A. Not all.
6        MR. HANSEN: I want to object, calls for a
7 legal conclusion. Go ahead and answer.
8        THE WITNESS: Not all calls, no.
9        MS. CARROLL: Q. Okay. How can you
10 distinguish, or can you, from any of the information
11 you have between what you consider Customers, capital
12 C Customers, that should have come to MITG under the
13 Standard Support Agreement versus others that were
14 not covered by the Standard Support Agreement?
15    A. I would need your documents to produce
16 that, and I believe we requested those.
17    Q. Well, let me ask you this. What are you
18 looking for in terms of -- what are you looking for
19 the documents to show you about the Andover call
20 center calls that are the subject of these exhibits?
21    A. I'm looking to see from a historical
22 perspective an increase in one and a decrease in the
23 other.
24    Q. Do you have an increase in one and a
25 decrease in the other one of what?

Page 182

1    A. An increase from Andover and a decrease in
2 myself.
3    Q. Okay. Do you know -- do you have any
4 understanding as to how it came to be that this
5 Andover call center got inundated with calls in the
6 fall of '02?
7    A. No.
8    Q. All right. Do you have any knowledge as to
9 what -- do you have any knowledge of what the content
10 or things that people were calling in about on
11 those? This is Presario and non-Presario calls?
12    A. I mean, only from -- I don't have specific
13 knowledge that I recall where the source was, but I
14 do know that the calls were presuming not only
15 Presario but were two other, I believe, models or
16 type of consumer PC's.
17    Q. Well --
18    A. Whether it was the Armada or whathave you,
19 I don't recall.
20    Q. Well, do you have any understanding,
21 though, as to whether those were people trying to buy
22 spare parts versus looking for technical assistance
23 versus return parts versus getting warranty
24 replacements? Any understanding as to what the
25 nature of those calls were?

Page 183

1    A. Sure. My understanding is those were non-
2 warranty parts calls.
3    Q. Sales?
4    A. Sales, whatever.
5    Q. And from whom did you gain that under-
6 standing?
7    A. I don't recall.
8    Q. Do you recall ever getting, seeing any
9 documentation that set out what types of calls in
10 terms of spare parts, returns, technical assistance,
11 any of those, do you recall seeing any documents that
12 laid that out?
13    A. No.
14    Q. And to the extent that the Andover calls
15 before the influx of these calls that are the subject
16 of the e-mails, if those were all DEC, Digital
17 Equipment Corp., calls, you don't contend that those
18 are calls that should have been coming to MITG, is
19 that correct?
20    A. That's correct, even though we did have
21 calls and do business with those folks.
22    Q. All right.
23    A. You want to keep all of this in order?
24    Q. Yeah. You can just toss it over there.
25 Thank you. You were -- is it true that MITG was

Page 184

1 providing -- well, strike that. I don't want to go
2 down that path. I want to try to finish where I
3 was.
4       I understand from your prior testimony, and
5 correct me if I'm wrong, that you took issue with
6 business that was referred to kind of this third
7 group of people, Ambry, etc., that you don't know
8 what their relationship might have been with HP or
9 Compaq, is that correct?
10    A. Do I take issue with that?
11    Q. Yes.
12    A. Yes.
13    Q. Okay. Let's start with Exhibit B.
14    A. Okay.
15    Q. If you will take a look at that e-mail
16 string, it goes as they all do, and the last page
17 going forward. And just so the record is clear, it's
18 MITG's 101 through 102.
19    A. Okay.
20    Q. All right. That document familiar to you?
21    A. Not necessarily, no.
22    Q. Okay. Well, let's just go through starting
23 with April's e-mail at the bottom.
24    A. Okay.
25    Q. And it appears that she is the one that