E-FILED
Wednesday, 11 January, 2006 11:40:49 AM
Clerk, U.S. District Court, ILCD

Page 185

1 starts the string, and her subject, interesting
2 information we wanted to pass on, and she is sending
3 it to Troy with copy to you and Miss Koch and Miss
4 Briscoe.
5    A. Okay.
6    Q. And somebody told her this information that
7 she then passed on about Lyle from warranty group
8 refers a customer to an authorized service provider
9 in her area or the Spare Store or HP Online Parts.
10 She said (that's us) or she could go to Ambry. What
11 is -- do you take issue with Lyle from warranty group
12 giving a customer that information, or those possible
13 access points for getting the part that the person is
14 looking for?
15    A. Yes.
16    Q. Okay. All of it -- well, other than
17 sending it to HP Online Parts, I take it you don't
18 have a problem with that? The other places that are
19 mentioned, an authorized service provider, the Spare
20 Store, or Ambry, do you take issue with all of those
21 other possible sources that are referred to by Lyle
22 in warranty?
23    A. Well, not necessarily. Only because, A, I
24 don't know what that part is.
25    Q. Okay. All right.

Page 186

1    A. B, I'm unfamiliar if it is truly a warranty
2 issue or not, and, C, I would as well take -- I would
3 also be concerned as to her last or second to last
4 sentence, why would technical support refer someone
5 to Ambry when this a part that is available from CSN.
6    Q. So you have somebody apparently from this
7 -- I would read this as that the part, the person
8 ended up in warranty group or technical support and
9 didn't have an item that was under warranty?
10    A. Correct.
11    Q. Hence, the recommendations to go elsewhere?
12    A. That's what I would assume, yes.
13    Q. Okay. And so it's all right if -- in your
14 mind in terms of where customers can go, you don't
15 take issue with going to the Spare Store or coming to
16 HP Online Parts or the authorized service provider?
17    A. That is correct.
18    Q. Okay. The issue is with the referral to
19 Ambry who's outside, is this third group that we
20 talked about earlier?
21    A. In that specific instance, yes.
22    Q. Okay. And do you have -- and all the
23 information you have on this customer, I mean, that's
24 everything you know, that you know about this matter
25 is what we see here?

Page 187

1    A. That's correct.
2    Q. All right. Then the second one that's
3 below that from April, Tuesday, May 20th of '03, a
4 customer called the Welcome Center?
5    A. That's correct.
6      MR. HANSEN: where is that at?
7      MS. CARROLL: Q. The second page, the
8 second description of the issue.
9    A. Yes.
10    Q. Now, do you have an issue on how this was
11 handled, just assuming everything in here is, this is
12 all we know about this situation. Tell me what you
13 take issue with, if anything, on the May 20, '03,
14 call?
15    A. I'm sorry. What is my issue with this?
16    Q. Yeah. I mean, is there anything that this
17 person did wrong or that you take issue with that you
18 think is the improper handling of or referral of
19 business that's described in the second one?
20    A. Yes. I mean, my issue is why are internal
21 people taking revenue from both your company and mine
22 by referring these to outside vendors?
23    Q. Okay. Other than -- and that's from a
24 business standpoint? In your mind that doesn't make
25 any sense, is that fair?

Page 188

1    A. That's fair, yeah.
2    Q. Okay. Well -- and you don't know one way
3 or the other what relationship HP may have or may
4 have had at the time with Super Warehouse?
5    A. No, I don't.
6    Q. And so you don't know whether Super
7 Warehouse bought the parts that they have available
8 directly from HP at whatever price HP was willing to
9 sell it to?
10    A. That is correct. But my contract stated,
11 and it was explicitly in the nature of or the spirit
12 of the agreement, these types of situations would be
13 stopped.
14    Q. Well, when this -- the Welcome Center, you
15 don't know where this person when they called the
16 Welcome Center, this unknown phone number that we
17 talked about earlier, you don't know how that person
18 got there to the Welcome Center?
19    A. No.
20    Q. Who gave them that number?
21    A. (Shook his head from side to side.)
22    Q. And you don't know who that customer was, I
23 mean, in terms of were they around, for example, and
24 had done business with Compaq Direct before the
25 Standard Support Agreement? You don't know enough

Page 201

1  Compaq Direct Online or you can go to Ambry and all
2  these others, and so then what is happening here your
3  Terry Welch at MITG is forwarding e-mails about
4  referring business to PC Nation and to Ambry that was
5  a solicitation or an attempt for somebody to buy
6  parts from your other company?
7      A. I disagree with that characterization.
8      Q. And I'm not trying to characterize it.
9  What I'm trying to do is figure out this guy was
10 trying to buy parts from Globalonlineparts.com, and
11 then he gets referred -- at some point HP refers him
12 to your company, HPdireconline or Compaqdirect-
13 online.com?
14     MR. HANSEN: As evidenced in this e-mail?
15     MS. CARROLL: Correct.
16     MR. HANSEN: I'm following you.
17     MS. CARROLL: Q. With some other issues.
18 Ms. Welch then takes the e-mail correspondence that
19 was between Toby and Globalonlineparts.com and then
20 gets that into MITG stream, is that correct, because
21 there is no e-mail that ever forwards -- what I'm
22 confused about we go from Toby to info@-
23 globalonlineparts, but there doesn't appear ever to
24 be a forwarding of these e-mails. All of a sudden
25 Miss Welch says she is forwarding it, but how did she

Page 202

1  pick that up?
2      A. I can't answer that. I don't know.
3      Q. And then in the front page e-mail you say,
4  very interesting. I think we might include a portion
5  of this into our letter. What letter are you
6  referring to, do you remember?
7      A. That's a good question. No, I don't.
8      Q. Do you remember using any of this portion
9  of the other part of the e-mail in a letter to any of
10 the HP executives to whom you sent correspondence?
11     A. I don't recall.
12     Q. Okay. Just to try to wrap this subject up,
13 we have at least two examples, and there may be --
14 there are two e-mail strings that give examples of
15 what you think is inappropriate or improper referral
16 of business to sources outside HP, being Ambry or
17 Super Warehouse or whoever else?
18         We talked earlier that you believe that
19 some of the calls that were going to the Andover call
20 center that were the subject of the exhibits that we
21 went through before this most recent discussion, that
22 some of those calls were also supposed to go to MITG
23 under the Standard Support Agreement. Are you aware
24 of any other sources of calls that you have specific
25 knowledge of, I don't want to pay attention to call

Page 203

1  volume's down, but specific examples such of these
2  documents that you have been able to produce that
3  show calls that in your mind should have come to you
4  instead of going to another call center or to a third
5  party outside the company?
6      A. No. That's why we requested your records.
7      Q. Okay. Let's take a break.
8              (Whereupon a short recess
9              was taken.)
10     Q. I have a follow-up with a couple of
11 questions on the subject that I was belaboring
12 before. In terms of the types of parts that people,
13 that the calls going in to Andover that you thought
14 should be coming to MITG, if those were parts that
15 were, that you could acquire through CSN, is it true
16 that those parts would not have been subject to the
17 75/25 profit split if you acquired those through CSN?
18     A. That is a correct statement.
19     Q. Okay. And for these parts that we talked
20 about in Exhibits B and C where they were referring,
21 they being internal HP people, to Super Warehouse or
22 to Ambry or something else, if those parts were
23 available, if they contacted you and they were
24 available via CSN, that would not have been subject
25 to the 75/25 percent split, correct?

Page 204

1      A. That is correct.
2      Q. The parts that were subject to the 75/25
3  split were a sourced product, whether they be
4  multivendor or whether they be out of stock or legacy
5  parts, is that correct?
6      A. That's correct.
7      Q. And the compensation that MITG is, Compaq
8  Direct and HP Direct got in part for selling those
9  CSN parts was the $41,000 a month, is that correct?
10     A. That is correct.
11     Q. All right. Did you ever do an analysis to
12 determine whether or not that $41,000 a month payment
13 for the sale of the CSN parts was a good deal, a bad
14 deal, a break even deal?
15     A. Not specifically, no.
16     Q. Did you have a sense during the time of the
17 Standard Support Agreement whether 41,000 was working
18 out to be a number that was break even or better for
19 MITG?
20     A. It all depended. Certain months had
21 different answers to that. On the average I would
22 say it was probably a break even or a little bit less
23 deal depending on what services we had to do.
24     Q. The parts that you were selling to people
25 or offering to sell to people under that were

Page 249

1  are the customers and let's talk about that
2  interference and then who were the suppliers and
3  distributors and talk about that interference
4  separately.
5     A. That's fine.
6     Q. So starting with the customers, who -- what
7  customers did HP tortiously interfere with of
8  MITG's? Are there particular ones that you can
9  name? Are there a particular subset of customers?
10    A. I can name a few. Avnet would be one, for
11 example.
12    Q. Okay.
13    A. Baxter Healthcare. The rest of them are
14 it's just kind of a big jumble quite frankly.
15    Q. Okay. Tell me about Avnet, what kind of
16 customer -- well, when did they first become a
17 customer of MITG's, whether as Compaq Direct or HP
18 Direct or whatever?
19    A. I can't answer that. I mean, they have
20 been a customer for a long time.
21    Q. Do you know if they were a customer before
22 the Standard Support Agreement went in place?
23    A. I believe so.
24    Q. Okay. Were they a customer based on the
25 relationship when MITG was servicing customers of CEI

Page 250

1  or Compaq Direct prior to the Standard Support
2  Agreement?
3     A. I can't answer that. I don't know.
4     Q. Okay. And tell me -- do you know how much
5  business on an annual basis Avnet was doing with MITG
6  and in whatever aspect?
7     A. What capacity? No.
8     Q. All right. Do you know if there is any way
9  that there is a report that could be run that would
10 show what Avnet did in terms of business, for
11 example, in 2002, 2003?
12    A. That is possible, I believe.
13    Q. All right. Tell me what you know about the
14 alleged tortious interference by HP of the
15 relationship between MITG and Avnet?
16    A. My understanding is they were visited as
17 well as several other customers were visited by an HP
18 representative and were informed that MITG was to,
19 they were to no longer do business with MITG and that
20 any subsequent business after this visit would
21 constitute a breach of any agreement that they had
22 with HP. Now, I'm not privy to what that agreement
23 is so to speak, but --
24    Q. So do you -- well, did somebody at Avnet
25 tell you that directly?

Page 251

1     A. We actually had some higher level sales
2  managers contact us, and then we contacted their
3  legal counsel.
4     Q. Okay. Who were the -- can you give me the
5  names of the Avnet sales personnel that contacted
6  you?
7     A. No, I can't.
8     Q. All right. Who did they contact at MITG,
9  you or somebody else?
10    A. I believe they actually contacted Mr. Rice,
11 if I'm not mistaken.
12    Q. Okay. And you don't know who those people
13 were? You don't know their names as you sit here?
14    A. No. Again, as I testified earlier this
15 morning, we just really started this tortious
16 interference thing. It was only a month and a half
17 old, so we are still developing all that information.
18    Q. Well, when did you learn about this Avnet
19 issue? When did Mr. Rice report to you that Avnet
20 reported this contact from HP?
21    A. End of February, first of March, possibly
22 April.
23    Q. Of last year?
24    A. Of last year.
25    Q. All right. And did you -- you said that

Page 252

1  after hearing this from the sales rep you contacted
2  or somebody for MITG contacted their legal counsel?
3     A. I believe that's who we were referred to.
4  I can't honestly say.
5     Q. Okay. Did you personally, Ron Haught, talk
6  to this legal counsel or other representatives that
7  the sales people referred you to?
8     A. No.
9     Q. Okay. Did anyone from MITG do that?
10    A. I believe Mr. Rice did.
11    Q. And do you know is there any documentation
12 that you might have that would indicate who Mr. Rice
13 heard from on the sales part or who he talked to from
14 the legal department, do you know?
15    A. No, not that I know of.
16       MR. HANSEN: If we have it. I think he has
17 served, you have served me a request for production,
18 didn't you?
19    Q. Yeah. And you don't know who the HP, no
20 report as to the HP person was?
21    A. No.
22    Q. And there was, I believe, some testimony
23 yesterday, and correct me if I'm wrong in terms of
24 whether you have heard this, that one of the things
25 that was communicated to Avnet was that MITG was no

Page 253

1 longer an authorized part reseller of Compaq or HP
2 parts. Did you hear something along those lines that
3 had been reported to Avnet?
4   A. Yes.
5   Q. Okay. And that statement is true after the
6 end of the Standard Support Agreement, correct?
7   A. That is correct, but that's not the form
8 for which the statement I heard.
9   Q. Well, what was the -- when you say that,
10 what do you mean?
11   A. It was an expanded statement. I mean,
12 that's the short of it.
13   Q. Go ahead and tell me.
14   A. My understanding of the statement is that
15 we were no longer an authorized reseller because we
16 did not sell approved HP Compaq product.
17   Q. Okay. Well, that is a true statement if
18 you were not getting, since you were no longer
19 getting Compaq or HP parts directly from HP?
20   A. I wasn't getting most of those parts from
21 HP directly anyway.
22   Q. Well, what kind of parts was Avnet
23 purchasing from MITG during the time of the Standard
24 Support Agreement, or at least prior to this contact
25 from HP?

Page 254

1   A. Typically they were parts that were not
2 available on CSN or through their channels. They
3 were more to your unavailable product.
4   Q. Do you have any -- do you believe you have
5 any records that would show what percentage, if any,
6 of Avnet's purchases from MITG were CSN parts versus
7 service parts?
8   A. I don't know. I don't think so.
9   Q. Okay. Well, when they were purchasing
10 things, I understand that during this time of the
11 Standard Support Agreement a spread sheet would have
12 been created to get sent in for the sourced parts.
13 Did you get any records so we could go through the,
14 all the spread sheets and look for Avnet and see what
15 they bought, any records of what people were ordering
16 from CSN?
17   A. Well, let me rephrase my earlier statement
18 so it clears it up for you. The product that they
19 would have ordered that would have come through CSN
20 or whathave you, whatever channels, we would have
21 never received those orders. We only received orders
22 that were not available through their typical HP
23 channel. So, for instance, if they wanted a part and
24 it was available through HP, they would have procured
25 it through HP. If it was not available through HP,

Page 255

1 then they would have come to us. This visit happened
2 after that.
3   Q. All right. So you are saying that you
4 heard from Mr. Rice who heard from sales people and/
5 or legal counsel for Avnet that HP told them not to
6 do business with MITG and that business that was
7 being referred to was the acquisition of multivendor
8 parts?
9   A. Multivendor or -- correct. It could have
10 been HP Compaq product if it was not available.
11   Q. Legacy?
12   A. Legacy Compaq, correct.
13   Q. All right. Did you -- have you ever --
14 have you personally ever followed up with anyone from
15 Avnet to try to get back in the door, as it were, for
16 that business?
17   A. Have I personally?
18   Q. Yes.
19   A. No.
20   Q. Do you know if Mr. Rice has, for example,
21 gone to them and said, hey, HP still orders third
22 party parts from us on occasion. Why don't you ask
23 HP, because I'm sure that will be all right. Do you
24 know if he has ever tried to make that --
25   A. Huh-uh.

Page 256

1   Q. -- contact with them?
2   A. No. I mean, after we were told that, then
3 all communication with Avnet's been shut off.
4   Q. And is it true that MITG at times purchased
5 product from Avnet?
6   A. I don't have a clue.
7   Q. Okay.
8   A. Baxter Healthcare, what do you know about
9 the alleged tortious interference with Baxter
10 Healthcare?
11   A. Very similar situation. They received a
12 visit, and subsequent to that visit all communication
13 was cut off.
14   Q. All right. Do you know who at Baxter
15 Healthcare -- well, I take it that somebody at MITG
16 told you about the conversation with Baxter
17 Healthcare?
18   A. That's correct.
19   Q. Who?
20   A. I believe that conversation would have come
21 from -- I can see her face even. Stephanie.
22   Q. Hays?
23       MR. HANSEN: Boden.
24       THE WITNESS: Boden, thank you. Stephanie
25 Boden, I believe.