**Page 257**

1   MS. CARROLL: Q. All right. And did
2   Stephanie Boden tell you who she spoke with at Baxter
3   Healthcare?
4       A. I don't recall specifics about that, no.
5       Q. Okay. Do you -- did you ever have any
6   contact with Baxter Healthcare after Miss Boden
7   reported this information to you?
8       A. No.
9       Q. Are you aware of any documentation that
10  would show how much business Baxter Healthcare was
11  doing with MITG under the Standard Support Agreement
12  up to the termination date of the Standard Support
13  Agreement, how much annual business was being done?
14      A. No. I believe that actually could be
15  pulled from your records. I don't know that I would
16  have that necessarily.
17      Q. Do you have records that would show how
18  much business either Avnet or Baxter Healthcare did
19  with MITG from the termination of the Standard
20  Support Agreement until the alleged statements were
21  made by an HP representative?
22      A. That's possible, but I reserve the right to
23  check into that because I can't answer that for
24  certain.
25      Q. You don't know for sure?

**Page 258**

1       A. I don't know for certain, no.
2       Q. Okay. Are there any other companies that
3   you recall the names of while you sit here today that
4   you have been told by someone got a visit from an HP
5   person or communication from an HP person telling
6   them not to do business with MITG?
7       A. Insight was one, and I don't recall
8   anymore. I mean, those are the three that stick in
9   my head.
10      MR. HANSEN: Are you talking about
11  suppliers or distributors?
12      MS. CARROLL: I'm still sticking to
13  customers.
14      THE WITNESS: Okay.
15      MS. CARROLL: Q. So is Insight -- we are
16  going to wait for Insight on suppliers and
17  distributors, or are they customers?
18      A. No, they are a customer. And I'm thinking
19  Multiple Zones, which would have been Microsoft.
20  It's a subsidiary of Microsoft.
21      Q. Multiple Zones?
22      A. Multiple Zones. Those are the only ones
23  that pop out.
24      Q. Well, who at Insight reported this contact
25  from HP?

**Page 259**

1       A. I don't know.
2       Q. Who reported the contact to you?
3       A. I'm not exactly certain to be honest with
4   you.
5       Q. Was it somebody from your organization told
6   you, hey, Ronnie, listen to what I heard from
7   Insight?
8       A. Yeah. You know, typically the conversation
9   would go, hey, this is what I just got told, and, oh,
10  by the way we've been shut off or shut down and they
11  have asked for no further communication.
12      Q. How long had Insight been doing business
13  with MITG prior to this communication that you allege
14  occurred?
15      A. Years.
16      Q. Do you have documentation that would show
17  when you first began, when MITG first began to do
18  business with Insight?
19      A. Possibly. I don't know for certain.
20      Q. And you don't know who any contact person
21  would be for Insight? Well, for example, do you
22  have -- would have you in your record contact names
23  of people who were ordering parts on behalf of Avnet,
24  Baxter, Insight, or Multiple Zones from MITG?
25      A. Yes.

**Page 260**

1       Q. So at least you would have the names of
2   people who at the time of the order worked for these
3   companies who were communicating with MITG?
4       A. Yes.
5       Q. Have you at any time made any attempt to
6   contact those people whose names you do have for
7   these companies to ask them, you know, what's going
8   on or what they, you know, this is what you heard
9   and --
10      A. Attempts have been made, but in every case,
11  at least to the best of my recollection, the calls
12  either aren't returned or correspondence is just
13  replied back as, you know, we have been told we can
14  no longer do business with you, thank you.
15      Q. Do you have correspondence that you believe
16  someone responded to you via e-mail or letter?
17      A. I believe these are all phone calls.
18      Q. And did you personally make phone calls to
19  any of these four companies or any other companies to
20  people, the individuals who had ordered parts
21  previously and you personally asked them, hey, I
22  heard that HP contacted you, I'd like to talk to you
23  about it?
24      A. No.
25      Q. And who for MITG made those contacts, to

Page 261

1  your knowledge?
2    A. Could have been Rich Rice, could have been
3  any of the sales reps directly trying to find out
4  exactly what's going on through their contacts. I
5  can't answer that.
6    Q. Other than the four you've identified --
7  and I take it Multiple Zones was similar information
8  which was one of your sales reps told you that they
9  were told by someone at Multiple Zones that HP said
10 don't do business with MITG?
11   A. Yes.
12   Q. All right. Are there any other companies
13 that you can think of while you sit here that you've
14 heard that information?
15   A. Not that I can specifically recall names of
16 companies, no.
17   Q. Well, do you believe that at some point you
18 heard names of other companies and you simply don't
19 recall what those are as you sit here having your
20 deposition taken?
21   A. That is possible, yes.
22   Q. Okay. All right.
23   A. Oh, that's correct. There is another one.
24   Q. All right.
25       MR. HANSEN: While you're here.

Page 262

1        MS. CARROLL: No. That's fine. I don't
2  want to come back. Tell me?
3    A. The other one would be CDW.
4    Q. And who is the contact person at -- CDW was
5  a customer of MITG's?
6    A. That's correct.
7    Q. Were they doing business with MITG under
8  the Standard Support Agreement?
9    A. I believe prior to.
10   Q. Okay. Were -- did they do it during the
11 time that MITG was being Compaq Direct or HP Direct?
12   A. I can't answer that. You get too far
13 back. It's --
14   Q. Well, so it's clear, before the Standard
15 Support Agreement CDW was doing business with MITG?
16   A. Correct.
17   Q. After the Standard Support Agreement for
18 some period of time did CDW go back to, did they
19 continue to do business with MITG after February 7th
20 of 2004?
21   A. I believe so, yes.
22   Q. Okay. And when did they cut off doing
23 business with MITG?
24   A. I can't answer that.
25   Q. Did you personally have any contacts with

Page 263

1  anybody from CDW?
2    A. No.
3    Q. All right. And do you know if anyone --
4  well, who reported to you about CDW, do you recall
5  which one of your folks?
6    A. I don't recall who specifically, no.
7    Q. Now, in the amended -- in your amended
8  counterclaim there is reference that HP sent a letter
9  to the top MITG accounts as part of the agreement
10 terminating and --
11       (Whereupon a document was
12        marked Deposition Exhibit
13        Number 28.)
14   Q. Exhibit 28, this is a January 30, 2004,
15 dear parts customer letter that went from HP. Do you
16 know if Exhibit 28 is the letter that is being
17 referred to in Paragraph 37 of your amended, 37 and
18 38 of your amended counterclaim?
19   A. Is that the specific letter?
20   Q. Yeah. Do you know when it's referring to a
21 letter in January that a letter was sent out to these
22 customers without their acknowledgment or consent of
23 MITG indicating process changes as to the ordering of
24 parts, account numbers, and other information
25 regarding the placement of parts orders, and what I'm

Page 264

1  wondering is the reference, the description of the
2  letter and the amended counterclaim if the
3  correspondence that has been marked as Exhibit 28,
4  the January 30, 2004, letter, is the same letter
5  that's being referenced?
6        MR. HANSEN: Let me just object to the
7  form, that it is completely prepared by counsel.
8  It's not a verified complaint. And if he knows, go
9  ahead.
10       MS. CARROLL: Q. Yeah.
11   A. I don't.
12   Q. Have you ever seen the letter that is in
13 front of you, the January 30 letter that's Exhibit
14 28?
15   A. Yes.
16   Q. Okay. Looking through that letter, do you
17 take issue with the accuracy of any of the statements
18 made?
19   A. Okay. I'm sorry. Your question was?
20   Q. Is there anything in that letter that to
21 your knowledge or understanding is incorrect?
22   A. Incorrect, no. I believe your question
23 earlier was that I take issue with.
24   Q. Okay. Well, and I didn't mean to ask you a
25 different question. It's a good thing you asked me

Page 265

1 to repeat it. Is anything incorrect? The answer is
2 no. Take issue with?
3    A. I take issue with the word genuine.
4    Q. All right. Why?
5    A. A genuine -- by my reading this letter HP
6 and Compaq are saying that this letter would
7 represent that HP and Compaq parts are only genuine
8 if purchased from HP or Compaq, and I don't believe
9 that's the case.
10    Q. All right. Do you understand that that is
11 how parts by HP and Compaq are defined? If they come
12 directly from them, they are genuine parts, or they
13 go directly from one of their authorized resellers
14 it's referred to as a genuine part, and if it's
15 anybody else, it may not be counterfeit, but it may
16 not be genuine. Have you heard that before this came
17 up? Have you heard that distinction buying directly
18 from them or from their authorized parts seller
19 allows you to sell a genuine part?
20    A. No. And I would question -- I would
21 question the definition of the word genuine.
22    Q. Okay. Well, are you aware that Microsoft,
23 you can only purchase genuine Microsoft product from
24 Microsoft and Microsoft's resellers?
25    MR. HANSEN: Object to relevance, but go

Page 266

1 ahead.
2    MS. CARROLL: Q. Do you know in the
3 software industry whether that use of genuine parts
4 for, in software by Microsoft what that means to
5 them?
6    A. No.
7    Q. Okay. You just -- and it's your
8 understanding of what you understand genuine parts to
9 be that the upcoming changes that you disagree or you
10 take issue with the use of genuine parts in here in
11 this letter, the first sentence of the letter, is
12 that correct?
13    A. That's correct.
14    Q. Is there anything in here that MITG doesn't
15 sell genuine parts?
16    A. In this letter?
17    Q. Correct.
18    A. No.
19    Q. All right. Is there anything else that you
20 take issue with, other than the use of genuine, to
21 modify parts in the first sentence of the letter or
22 anywhere else that appears?
23    A. No.
24    Q. All right. Other than the letter that is
25 referenced in the counterclaim and the specific

Page 267

1 examples that you've given me here of five different
2 customers, as you sit here today, are you aware of
3 any other facts which support the contention of MITG
4 that HP tortiously interfered with customers of
5 MITG's?
6    MR. HANSEN: In addition to the phone calls
7 we have pled?
8    MS. CARROLL: Q. I'm sorry. The phone,
9 follow-up phone calls to this letter as pled. So
10 what is included are the facts that are pled in your
11 amended counterclaim, the five companies you have
12 named for me here in this deposition, are you aware
13 of any other facts which support your claim that HP
14 tortiously interfered with MITG's customers?
15    A. Today, no.
16    Q. All right. Suppliers, let's try to get
17 through this, and I think we'll be about done. What
18 suppliers, if any, or distributors as pled in
19 Paragraph 41 of your amended counterclaim do you
20 contend that HP tortiously interfered with?
21    A. The one that specifically comes to mind
22 that I had personal knowledge with was Parts Now.
23    Q. And Parts Now was a supplier to MITG?
24    A. Correct.
25    Q. Okay. What kind of parts was Parts Now

Page 268

1 supplying?
2    A. They could supply a myriad of parts,
3 multivendor stuff.
4    Q. How long had MITG been doing business with
5 Parts Now?
6    A. Quite sometime.
7    Q. Okay. And you said you had personal
8 knowledge of this. Is that because somebody at Parts
9 Now said they wouldn't do business with MITG?
10    A. Their vice-president actually called me.
11    Q. And what is his name?
12    A. I don't have that in front of me.
13    Q. When did this occur?
14    A. Again, I don't have that right in front of
15 me. It's happened between April and May.
16    Q. Of '04?
17    A. Yeah. I can say it was after the suit was
18 started, I believe.
19    Q. The allegation in -- well, can you tell me
20 anything more specifically about what the VP of Parts
21 Now told you about?
22    A. Sure.
23    Q. The contact with HP?
24    A. He received a call and/or visit, I don't
25 recall specifically that portion of it, from folks

Page 269

1  that he deemed in Roseville, would not elaborate as
2  to who that person or persons was, inquiring as to a
3  historical report as to all product that we had
4  purchased in the previous "X" amount of time, whether
5  it was six months, 12 months, whatever you, and as
6  well wanted to know where the product was shipped,
7  who it was shipped to, and any other orders that we
8  had done with them over the last "X" period. I
9  believe it was probably 12 months. I don't remember
10 exactly what he said.
11     Q. And he told you -- anything else that he
12 reported that was communicated to him by the HP
13 person?
14     A. He was also informed that if he did not
15 cease doing business with us that he would lose his
16 HP reseller certification and he would no longer be
17 able to procure HP product from HP.
18     Q. All right. Did he tell you whether he
19 provided this report that is allegedly requested?
20     A. He was in the air as to whether he was
21 going to do that prior to our phone call. Or prior
22 to his calling me. I'm sorry.
23     Q. And do you know whatever happened to that?
24 Did he send it?
25     A. I don't know.

Page 270

1     Q. All right. Have you had any further
2  communications with him after this phone call you've
3  just told me about?
4     A. Not after I informed him at the end of that
5  phone call that I would have counsel contact him.
6     Q. Okay. Any other suppliers or distributors
7  that you allege stopped doing business with MITG
8  because of actions of HP?
9     A. It's on the tip of my tongue. Just give me
10 a second.
11    Q. Okay.
12    A. I can't recall who it is.
13    Q. In the tortious interference claim I know
14 from my question a long time ago first thing this
15 morning that you have not calculated your damages on
16 that, so I'm not looking for a number, but I'm
17 wondering if you believe that MITG has experienced
18 monetary damages as a result of Parts Now not selling
19 parts to MITG?
20    A. Yes.
21    Q. And how is that? Have you not been able to
22 get a supplier in place of Parts Now?
23    A. In some cases, that's correct.
24    Q. Okay. What parts have you been unable to
25 acquire from third parties that you used to get from

Page 271

1  Parts Now before this alleged tortious interference
2  occurred?
3     A. I mean, I can't speak specifically to a
4  part. It's -- I mean, I don't know.
5     Q. Okay. Well, can you think of an instance
6  since this happened in April/May, timeframe of 2004
7  where a customer called in and requested a part and
8  you were unable to find a supplier for it but you
9  knew that if Parts Now were selling, still selling to
10 you you could have acquired it from Parts Now?
11    A. I'm sorry. One more time.
12    Q. Are you aware -- can you think of a time
13 when you heard, you learned from one of your
14 employees or you got through personal knowledge that
15 a customer called in for a part and your only source
16 of that part would be Parts Now and they weren't
17 selling you parts anymore?
18    A. Do I know of an incident?
19    Q. Yes.
20    A. Yes.
21    Q. Okay. Tell me about that.
22    A. I mean, I just know that it has occurred.
23 They were a very beneficial supplier of some
24 strategic parts, usually along the lines of printer
25 or even the Presario type line of equipment.

Page 272

1     Q. Can you tell me how much business MITG did
2  with Parts Now in 2003?
3     A. Sitting here today, no.
4     Q. All right. So you believe that this, it
5  cost you a sale to a customer because Parts Now is
6  your only source of a part that someone called in
7  for?
8     A. I believe so, yes.
9     Q. And, as you sit here now, you can't give me
10 a specific instance when that happened, you just
11 believe that happened?
12    A. No, that's correct.
13    Q. Let's just take a minute. I might be
14 done. I just want to make sure I at least asked one
15 question on every category.
16             (Whereupon a short recess
17             was taken.)
18    Q. I understand from documents that have been
19 produced at various times over the last, since really
20 the start of the production of documents, that
21 customer service representatives of Hewlett-Packard
22 continue to make inquiries into potential parts
23 orders or sending their customers to MITG for parts
24 and continue to do so today?
25    A. And place orders. We are actually still