E-FILED
Wednesday, 11 January, 2006  11:45:50 AM
Clerk, U.S. District Court, ILCD

## Page 1

```
         UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF ILLINOIS
               SPRINGFIELD DIVISION


HEWLETT-PACKARD DEVELOPMENT     )
COMPANY, L.P., HEWLETT-PACKARD  )
COMPANY, and COMPAQ TRADEMARK B.V., )
                                )
          PLAINTIFFS,           )
                                ) Civil Action
     vs.                        ) No. 04-3055
                                )
MIDWEST INFORMATION TECHNOLOGY  )
GROUP, INC. and MICHAEL LAUBER, )
                                )
          DEFENDANTS.           )
```

DISCOVERY DEPOSITION of TERESA KOCH, taken in the above-entitled case before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter of Adams County, Illinois, at 3:30 p.m., on February 17, 2005, at 525 Jersey, Adams County, Quincy, Illinois, pursuant to stipulation hereto annexed.

```
              Tracy L. Grott, CSR
              2901 Sonata Drive
              Quincy, IL  62301
              217-223-3624
```

## Page 2

APPEARANCES

MS. ELIZANN CARROLL
Attorney at Law
Juneau, Boll & Ward
15301 Spectrum Drive, Suite 300
Addison, Texas  75001
          appeared for the Plaintiffs.

MR. JAMES HANSEN
Attorney at Law
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey
Quincy, IL  62306
          appeared for the Defendants.

## Page 3

```
                    INDEX
DEPONENT                         PAGE NUMBER
TERESA KOCH

Examination by Ms. Carroll            5




                  E X H I B I T S
NUMBER            MARKED FOR IDENTIFICATION
TK No. 20                  6
Exhibit A                 14
Exhibit 4 & 5             38
TK No. 21                 50
```

EXHIBIT

## Page 4

S T I P U L A T I O N

It is stipulated and agreed by and between the parties hereto, through their attorneys that the deposition of TERESA KOCH may be taken for discovery purposes before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter, upon oral interrogatories, on the 17th day of February A.D., 2005, at the instance of the Plaintiffs, at the hour of 3:30 p.m. at 525 Jersey, in the City of Quincy, County of Adams, State of Illinois;

That all requirements of the Code of Civil Procedure and the Rules of the Supreme Court and the reading over and signing of the deposition by the Deponent are expressly waived;

That any objections as to competency, materiality or relevancy are herby reserved, but any objection as to the form of question and answer is waived unless specifically noted;

That the deposition, or any parts thereof, may be used for any purpose for which discovery depositions are competent, by any of the parties hereto, without foundation proof;

That any party hereto may be furnished copies of the transcript at his or her own expense.

(Whereupon the Deponent was sworn by the Notary Public.)

5

TERESA KOCH,
having been first duly sworn, testified as follows:
EXAMINATION BY:
MS. CARROLL

Q Can you state your name for the record, please.
A Teresa Koch.
Q And Ms. Koch, what is your address?
A 3420 South 46th Street, Quincy, Illinois.
Q All right. You currently work for MITG, is that correct?
A Correct.
Q And what do you do for MITG?
A I'm the chief financial officer.
Q How long have you been the CFO for MITG?
A Since July of 2000.
Q And what did you do before you went to MITG?
A I worked for a local ISP data stream network.
Q And how did you end up at MITG?
A The owners of those two corporations had business acquaintances and I met them through that.
Q All right. And you understand that your deposition today is in both your individual capacity

6

and as a corporate representative of MITG on certain subject matters?
A I guess.
MR. HANSEN: Yes.
(Exhibit No. 20 was marked for identification.)
Q Let me hand you what's been marked as Deposition Exhibit 20, which is a document, Amended Notice of Deposition of the Corporate Midwest Information Technology Group, Inc, and I understand from Mr. Hansen that you have been designated to provide responses on behalf of MITG on 8 and 9?
A That's my understanding too.
Q Okay. All right. And what, if anything, did you do to prepare for your deposition today?
A I met with Mr. Hansen.
Q Okay.
A Here and reviewed documents as presented.
Q What documents did you review?
A Financial statement documents that were prepared for you.
MR. HANSEN: Just let me know which ones you're pulling. I have them here and we can just do it that way. That will probably be easier.

7

BY MS. CARROLL:
Q Okay. If you -- well, let me just show you -- was it revenue and expense reports?
A Correct.
Q For '02, '03 and '04?
A Yes, that's correct.
Q And what did you do to prepare, what documents or information did you use to prepare the revenue and expense reports that you have prepared for me?
A Sales and revenue records of the company.
Q All right. And do these numbers -- well, let me strike that. Sales and revenue, is that one in the same or something different from sales?
A Well, revenue you could look at as maybe more could possibly be defined as services versus sale of product, so it's just a standard accounting term.
Q All right. That's what I'm wondering, is there something other than sales that was generating revenue that's reflected in these charts?
A There may be some service or fees included in there.
Q All right. Fair enough. And is this the revenue and expenses of MITG as a total company as

8

opposed to any particular portion of MITG?
A I guess I don't fully understand that question.
Q All right. You are aware that MITG for a period of time was doing business under a contract with HP Direct?
A Oh, yes. I understand, I guess the answer to that is that all of those revenues are included in these numbers.
Q All right. And for any other business that MITG was doing, that's also included in these numbers?
A That's right.
Q Do you have any documents that break out the revenue and expenses of just the Compaq Direct/HP Direct portion of the business?
A Not in a concise form.
Q Okay. Do you have any capabilities to create such a report or is the information not stored in that?
A I presented an invoice register that would have had all the billings to HP and Compaq, and those numbers would be included in the numbers presented.
Q Okay.

## 9

MS. CARROLL: And Jim, if I could just take a quick look.

A    Those would be the same numbers that were given to HP and Compaq in invoicing, which they already have.

Q    All right.

MR. HANSEN: So the record's clear, what this is is orders that were placed?

THE WITNESS: Those are just recent.

MR. HANSEN: On 2/7/05 and 2/8/05 from Hewlett-Packard regarding a shipment to Emerson Shaeffer Valve, and they wanted HP cable, which is reflected in two invoices.

THE WITNESS: Those are two HP POs.

MS. CARROLL: Okay.

MR. HANSEN: HP POs, but those numbers aren't reflected on any other documents.

THE WITNESS: Correct.

MS. CARROLL: All right. Let me just go through and make sure that I understand what these documents are showing without getting into too much nitty-gritty.

THE WITNESS: Okay.

BY MS. CARROLL:

Q    On this, just tell me, this is the current

## 10

history file and this bookends the first part of '04 to the end of the relationship, correct?

A    Yeah, it was the first two months of '04.

Q    Okay. And now this first column, what is the cumulative bill, what does that mean?

A    That's just an item description from the accounting software that -- how it was billed, how it was decided to be billed with Omaha at the beginning of the contract, so these numbers wouldn't be reflected in any invoices presented to HP and Compaq for payment.

Q    And what does incentives mean?

A    A 25% split which is reduced off the billing amount, then they paid the net amount.

Q    This would be the total sales that were shown on the invoices that were ultimately generated by HP and sent to the customers?

A    I did not have any part of what HP did once they got that information. You would have to ask them.

Q    All right. Let me -- I'm trying to just get your knowledge. This would be, this example, this $4,186 would be what MITG would show as what the invoice should be?

A    To the customer for non-CSN product.

## 11

Q    Okay. Then this is the 25% profit sharing?

A    That's correct.

Q    So this amount, the 3,804.84 is how much HP should have remitted to MITG?

A    That's correct.

Q    Okay. And this entire thing, that's --

A    It's by date, right. And so this is -- I had rubber bands around it, but you can look at the current history file.

Q    That's really just an accounting system.

A    Correct.

Q    Then everything in those dates would be reflected.

A    This would be all of '03. Then I have '02 --

Q    In rubber bands over there?

A    Right. To my knowledge, to the customer for that business.

Q    And invoice number is referring to what?

A    The invoice number as it was presented, that would be reflected in HP's records.

Q    Okay. This is an MITG invoice?

A    Right.

Q    MITG's invoice number to them, and this is

## 12

how much you're being -- MITG said, you owe this much minus your 25%, so you need to remit this amount?

A    Correct.

Q    Okay. And included on this MITG invoice could be -- could that be multiple? This is for one single client.

A    No, that's just for one -- excuse me.

Q    Okay. Go ahead.

A    That invoice would be for one single day.

Q    So this is all the business that MITG did for the day. It all went on a single invoice to MITG -- to HP Direct?

A    Correct.

Q    And were you the person responsible for getting these invoices sent to or did you oversee the process of getting the invoices sent to HP?

A    It was under my oversight, yes.

Q    Okay. And you made a distinction earlier about non-CSN parts. Explain.

A    We didn't bill HP directly for CSN product.

Q    So when someone called in to the call center and they ordered three parts, they wanted three parts and one of the parts you could get from

### Page 13

```
 1   CSN which was Compaq/HP's internal system, that was
 2   the stocked part, correct?
 3       A    That's my understanding. If it was
 4   available.
 5       Q    All right. So if one of the three parts
 6   that they wanted was available, that went off to
 7   Compaq and subsequently HP and that was the end of
 8   the handling of that by MITG, do you know?
 9       A    The only additional handling would be to
10   probably track that order to its end user.
11       Q    To make sure that the customer you were
12   servicing received their part?
13       A    That's correct.
14       Q    Now do you know what -- I take it you
15   don't know what the invoice looked like from
16   Compaq -- I mean from, yeah, Compaq or from HP
17   Direct when it went to their customer or was the CSN
18   part included on there as well as the sourced parts
19   that MITG was providing? Do you know if it was a
20   single invoice?
21       A    I do not know that.
22       Q    Okay. And so the 25% that was being
23   listed here as the incentive, how did the 75/25
24   split work? What amounts was it on?
25       A    It was on the sourced product that did not
```

### Page 14

```
 1   go through CSN.
 2       Q    Say MITG finds the product for the
 3   customer and charges the customer $100?
 4       A    Uh-huh.
 5       Q    But it only costs them $90 to buy it, so
 6   that's a 10% profit, then MITG and HP split that 10
 7   bucks?
 8       A    Correct.
 9       Q    75/25?
10       A    Correct.
11       Q    Okay. Who paid for the shipping and all
12   those things?
13       A    MITG paid for the shipping, I believe.
14       Q    Okay. Were they reimbursed for those
15   amounts by HP or do you know?
16       A    No, I do not believe so.
17       Q    Okay. Were you involved -- just in case
18   you need to look at it, Exhibit A is the Standard
19   Support Agreement, were you involved in the
20   negotiation and terms of that agreement?
21       A    No. Mr. Haught handled that.
22       Q    Did you have any discussions with
23   Mr. Haught in advance of the agreement being signed?
24       A    I'm sure we did regarding the financial
25   arrangement on the split.
```

### Page 15

```
 1       Q    All right. And how did you -- well, did
 2   you have input into how that split was calculated,
 3   how it ended up being 75/25?
 4       A    No, I didn't.
 5       Q    Okay. Do you know how, if at all, MITG
 6   was compensated for the CSN parts?
 7       A    We billed that at $41,000 a month to
 8   support that. It was my understanding of what -- I
 9   just billed it, I don't know how he arrived at that
10   necessarily.
11       Q    All right. So $41,000 a month was paid by
12   Compaq Direct and HP Direct, and that covered the
13   CSN parts, the call center, making sure the call
14   center is staffed, etcetera. And then the only
15   compensation you recall MITG getting for sourced
16   parts was the 75% profit split?
17       A    That's my understanding.
18       Q    Okay. And do you have -- strike that.
19   What accounting program did you use to create the
20   documents that are the current and history files for
21   invoices and credit memos?
22       A    It's called SBT.
23       Q    And do you know who makes SBT?
24       A    It's just basically canned accounting
25   software we bought.
```

### Page 16

```
 1       Q    Okay. All right. And what software was
 2   used to create the revenue and expense spreadsheets
 3   that you created for us?
 4       A    Excel.
 5       Q    Okay. And did you use information from
 6   this SBT accounting software to come up with the
 7   numbers that are on this Excel spreadsheet?
 8       A    Yes.
 9       Q    Okay. And is there any way to take, to
10   your knowledge, in the SBT, to take all of these
11   numbers and be able to do a thing where you add up
12   all of the cumulative bill amounts for each year and
13   the total incentives, essentially HP's 25%? Can
14   that be run on the SBT, do you know?
15       A    Can I look at these?
16       Q    Sure. Absolutely.
17           MR. HANSEN:  Are you talking about running
18       it to separate them out and get a total at the
19       end of each year?
20           MS. CARROLL:  Correct.
21           THE WITNESS:  This has the invoice totals.
22       I'm honestly not sure about that.
23           MR. HANSEN:  I think at the end of each
24       year there is a total.
25           THE WITNESS:  A total for the end of this
```

**Page 65**

1  again for me?
2  Q  Sure. Do you recall any comments or
3  statements made by Mr. Haught that -- now I forgot
4  what my question was. Let me think about this in a
5  simpler fashion. Do you recall Mr. Haught ever
6  saying that he had the right to use the domain names
7  that had incorporated Compaq in the domain names at
8  the end of the Standard Support Agreement after
9  being requested by Compaq to transfer those domain
10 names?
11 A  I don't believe he ever said that he had
12 the right to use them. I don't recall those terms.
13 Q  Okay. And when he said -- is it your
14 understanding that his reason for not transferring
15 the domain names was because he didn't think it was
16 necessary?
17 A  That his company owned them. That's all
18 I --
19 Q  You didn't have any discussion -- did you
20 have any discussion with him about the allegations
21 in the lawsuit by the Plaintiffs, that the use of
22 those domain names infringed the trademark right?
23 A  I knew that was alleged from HP.
24 Q  Not including any conversations that you
25 may have had with lawyers, that you heard Mr. Haught

**Page 66**

1  having with lawyers, have you had any discussions
2  with him about the possible trademark infringement
3  that would derive out of the use of the domain names
4  that incorporate Compaq and HP?
5  A  Only that -- that was what his company was
6  being sued for.
7  Q  Did you ever hear Mr. Haught talk about or
8  say that HP was making use of the Middleware for a
9  third party?
10 A  I've heard him say that, yes.
11 Q  Do you know what -- anymore than just him
12 saying that, do you know any factual basis for that?
13 A  No, just what he told me would be the only
14 thing I would know.
15 Q  Have you ever seen any documents that
16 would show this alleged misuse of the Middleware by
17 HP?
18 A  I don't recall seeing anything specific.
19 Q  Okay. Did he ever identify for you who
20 those customers were that HP was using the
21 Middleware with?
22 A  No.
23 Q  And you don't have any technical knowledge
24 of whether the Middleware could be used or could not
25 be used by HP?

**Page 67**

1  A  My technical abilities are limited in that
2  area, no.
3  Q  So you really don't have an understanding
4  of how it works or?
5  A  No, I do not.
6  Q  Okay. And do you know where the
7  Middleware resides? Is it on MITG's system? Is it
8  on HP's system? Do you have any knowledge of that
9  one way or another?
10 A  You mean where the actual software
11 resides?
12 Q  Correct.
13 A  Mr. Haught would have to answer that for
14 you.
15 Q  You don't have any knowledge of that then?
16 A  No.
17 Q  Have you done any analysis to say to try
18 to determine how much money, if any, that this
19 alleged misuse has negatively affected MITG's
20 revenue stream?
21 A  I have no numbers to do any analysis from
22 that.
23 Q  Okay. Have you had any discussions with
24 him as to how you might calculate, with "him" being
25 Mr. Haught, how you might calculate damages that

**Page 68**

1  might arise from HP using the Middleware for
2  somebody else?
3  A  How I would arrive at that?
4  Q  Yeah.
5  A  No, I have none.
6  Q  So you haven't had any discussions on how
7  that would work in terms of a damage model, for
8  example?
9  A  A damage model, no. I mean I just have
10 no -- there's no way I could calculate any of that.
11 I don't have any numbers to do that.
12 Q  Did you have any discussions with
13 Mr. Haught about HP's alleged diversion of business
14 that was intended during this Standard Support
15 Agreement to go to MITG that went to someplace else?
16 A  I've heard that customers were referred to
17 other businesses other than MITG.
18 Q  Do you have any knowledge as to where
19 those customers, under the Standard Support
20 Agreement, were designated or were supposed to go to
21 be serviced by MITG?
22 A  No, I don't.
23 Q  All right. And the reason I ask you do
24 you have any knowledge as to how they were -- the
25 Standard Support Agreement refers to Compaq Direct