Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
       SPRINGFIELD, DIVISION

HEWLETT-PACKARD              )  CIVIL ACTION NO. 04-3055
DEVELOPMENT COMPANY, L.P.,   )
HEWLETT-PACKARD COMPANY      )
AND COMPAQ TRADEMARK B.V.,   )
                             )
        PLAINTIFFS,          )
                             )
VS.                          )
                             )
MIDWEST INFORMATION          )
TECHNOLOGY GROUP, INC.,      )
AND MICHAEL LAUBER,          )
                             )
        DEFENDANTS.          )
------------------------------

              DEPOSITION OF
              SHARI K. ELLIS

            TAKEN ON BEHALF OF
                DEFENDANTS


    DEPOSITION OF SHARI K. ELLIS, taken before
Cynthia Craig, General Notary Public within and for
the State of Nebraska, beginning at 8:30 a.m., on
October 15, 2004, at the Hewlett-Packard Office,
10810 Farnam Drive, Omaha, Nebraska.
```

EXHIBIT 8

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 2

```
           A P P E A R A N C E S
 1
 2   FOR THE PLAINTIFFS:
        MS. ELIZANN CARROLL
 3      THOMPSON & KNIGHT, LLP
        1700 Pacific Avenue, Suite 3300
 4      Dallas, Texas 75201
        (214) 969-1700  FAX 969-1751
 5
     FOR THE DEFENDANTS:
 6      MR. JAMES A. HANSEN
        SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
 7      525 Jersey
        P.O. Box 1069
 8      Quincy, Illinois 62306
        (217) 223-3030  FAX 223-1005
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
                 I N D E X
 1
 2   CASE CAPTION ..................... Page    1
     APPEARANCES ...................... Page    2
 3   INDEX ............................ Page    3
     TESTIMONY ........................ Page    4
 4   REPORTER CERTIFICATE ............. Page  124
     COST CERTIFICATE ................. Page  125
 5   READ & SIGN LETTER ............... Page  126
     ERRATA SHEET ..................... Page  127
 6
     DIRECT EXAMINATION:
 7      By Mr. Hansen................... Page    4
 8
 9   EXHIBITS:                         MARKED
10   HH.  E-mail Bates
          Stamp HP 001270
11        ( 1 page ) ...................    26
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       (Whereupon, the following proceedings were had,
 2   to-wit:)
 3       COURT REPORTER: Are there any
 4   stipulations?
 5       MR. HANSEN: No.
 6            SHARI K. ELLIS,
 7   having been first duly sworn,
 8   was examined and testified as follows:
 9            DIRECT EXAMINATION
10   BY MR. HANSEN:
11     Q.  Good morning.  Please, state your name for
12   the record.
13     A.  Shari Ellis.
14     Q.  Okay.  Is your first name spelled
15   S-H-A-R-I?
16     A.  Yes.
17     Q.  Okay.  How old are you?
18     A.  Forty-two.
19     Q.  Date of birth?
20     A.  3/11/62.
21     Q.  Okay.  You live here in Omaha?
22     A.  Fremont.
23     Q.  Are you married?
24     A.  Yes.
25     Q.  Children?
```

Page 5

```
 1     A.  Yes.
 2     Q.  How many?
 3     A.  Two.
 4     Q.  Okay.  Grown or still living at home?
 5     A.  I have a 21-year-old and a 16-year-old.
 6     Q.  Okay.  What is your educational
 7   background?
 8     A.  High school.
 9     Q.  Okay.  Are you from around the area here?
10     A.  Yeah, I was born and raised in Fremont.
11     Q.  How far is Fremont from here?
12     A.  Thirty, forty miles.
13     Q.  Which direction?
14     A.  West.
15     Q.  What is your current position at HP?
16     A.  I am an international customer service
17   rep.
18     Q.  International, you focus on accounts that
19   are overseas?
20     A.  Exports.
21     Q.  Have you ever had your deposition taken?
22     A.  No.
23     Q.  You may have been instructed on some
24   ground rules by your attorney here today.  If I ask
25   a question you don't understand, ask me to rephrase
```

2 (Pages 2 to 5)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 10

1  play.
2     Q. Okay. How long were -- let's go back.
3     You were -- you said you were in the --
4  enlisting these service centers to be part of the
5  group from maintenance for resellers beginning in
6  2000, how long were you in that role?
7     A. About six months.
8     Q. Okay. Then did you go over to the spare
9  parts division?
10    A. Yeah, it was created -- being created
11 during that six-month period.
12    Q. Okay. So it was in 2000 that you went
13 over there to the new division, or was it 2001?
14    A. No, it was 2000.
15    Q. Okay. What title did you have if you can
16 recall?
17    A. Claims administrator.
18    Q. What were your duties and
19 responsibilities?
20    A. To process claims for spare parts and bill
21 the customer.
22    Q. When you say claims for spare parts, do
23 you refer to that as orders, or are we talking about
24 something different?
25    A. Invoices from a vendor for spare parts and

Page 11

1  billing the customer using the VISTA tool.
2     Q. Okay. Back in this time frame were you
3  the person who manually keyed in the orders to the
4  VISTA system?
5     A. Yes.
6     Q. Okay. I take it there was more than one
7  person that did that?
8     A. Yes.
9     Q. Okay. And was the setup one where the
10 invoices would come from the vendor for the spare
11 parts, you would enter it into VISTA and then a bill
12 would be shipped to the customer?
13    A. Yes.
14    Q. Okay. Was it at this point in time --
15 well, when was it that you first had any contact
16 with MITG?
17    A. The latter part of 2000.
18    Q. Okay. Who was your -- did you have a
19 certain contact at MITG or did you just basically
20 deal with their customer reps for any invoices that
21 were sent over here?
22    A. I dealt mostly with Mike Lauber and
23 Terri Welch.
24    Q. And was Terri Welch a customer service rep
25 or account rep?

Page 12

1     A. I think she was a manager of the group.
2     Q. Okay. And how about Mike Lauber, what was
3  your involvement with Mike?
4     A. Working on setting up the program.
5     Q. What program?
6     A. The spare parts program with MITG as a
7  vendor.
8     Q. Okay. Now, you did not sign the contract
9  entered into between MITG and Compaq -- sorry,
10 Troy Bloomquist. Did you help negotiate that at
11 all?
12    A. No.
13    Q. Okay. And how long were you in your role
14 there as the claims administrator for spare parts
15 dealing with groups such at MITG?
16    A. February of '04.
17    Q. Okay. At some point in time in October of
18 2003 did you become responsible for the day-to-day
19 operations of the MITG account?
20    A. Yes.
21    Q. That was after Troy had been transitioned
22 to a different job?
23    A. Yes.
24    Q. Okay. Were you involved -- strike that.
25       Were you the point contact for Compaq in

Page 13

1  regards to MITG? I mean, were you specifically
2  assigned to handle all their invoices that came in?
3     A. Yes.
4     Q. Okay. So as the claim administrator, any
5  invoice that they had for spare parts prior to the
6  Middleware--that's what I'm talking about okay--they
7  would send that to you, you or somebody that you
8  would give it to I guess would enter it into VISTA?
9     A. In general, yes.
10    Q. Okay. Was there anyone else here that was
11 responsible for the MITG invoicing accounts?
12    A. Yes.
13    Q. Okay. Who was it?
14    A. Troy.
15    Q. Okay. Yeah?
16    A. Lisa Stork.
17    Q. Okay. What was her --
18    A. She would assist me and back me up when I
19 was out of the office.
20    Q. Okay. The three of you?
21    A. Dave Suhr.
22    Q. What's the last name?
23    A. S-U-H-R.
24    Q. Okay. Was he another person that would
25 assist you?

4 (Pages 10 to 13)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 90

1  Q. Okay. So the order could be placed and
2  invoiced correctly?
3  A. Yes.
4  Q. Okay. Had that type of -- had you been
5  involved in that type of interface creation prior to
6  the one with MITG?
7  A. Not that I remember.
8  Q. Okay. Are you aware if any of -- if any
9  interface like the one that was developed with MITG
10 existed between VISTA and any other outside vendor
11 or customer?
12 A. I don't know.
13 Q. Had you ever been involved in that prior
14 to the one with MITG?
15 A. No.
16 Q. Okay. And you said that you were involved
17 in making sure that the information that fed over
18 from the web tool to VISTA was correct for invoicing
19 and you said that information consisted of the
20 customer number, purchase order, part info, part
21 description. Were all those things actually on the
22 purchase order?
23 A. Yes.
24 Q. Okay. So if I look at the purchase order
25 as one -- you know, a one-sheet document, you were

Page 91

1  making sure that the information that was on that
2  document fed properly over from MITG's web tool into
3  the proper user defined fields --
4  A. Yes.
5  Q. -- for placing the order and then
6  invoicing back?
7  A. Yes.
8  Q. Okay. Was the invoice then sent to MITG
9  or to the customer?
10 A. Customer.
11 Q. By MITG or by Compaq?
12 A. Compaq.
13 Q. Okay. And prior to the Middleware, all of
14 that purchase order information, did that have to be
15 manually entered into VISTA?
16 A. Yes.
17 Q. Do you know if there had ever been any
18 development of the type of user defined fields that
19 were created pursuant to this Middleware agreement?
20 A. I don't know.
21 Q. I take it since you were the person that
22 was doing some of the entries you didn't have any
23 interface capability -- well, strike that.
24    Did you have any interface capability with
25 any other web sites?

Page 92

1  A. No.
2  Q. So was everything that was being done for
3  the VISTA system as far as order entry was being
4  done manually?
5  A. For the spare parts, yes.
6  Q. Okay. How about for nonspare parts?
7  A. I don't know.
8  Q. Because you were only involved in the
9  spare parts side?
10 A. Yes.
11 Q. Okay. Now, after the information was fed
12 over from the MITG side to the Compaq side and it
13 went into VISTA and it had all the correct, proper
14 information, was there also a review and release
15 screen that was created that you had the capacity to
16 view prior to the order going out?
17 A. Yes.
18 Q. Okay. Were you one of two people that had
19 the capability to look at that review and release
20 screen and delete an order or cancel an order?
21 A. I was -- I was a person, I don't know of
22 anybody else.
23 Q. Okay. How was that set up as far as the
24 review and release screen; was it after it had been
25 entered VISTA that you could review the order and

Page 93

1  then release it back to MITG?
2  A. Yeah, the order would be -- come in and be
3  in review and release and I could review the order
4  for pertinent information, verify it against the
5  purchase order and/or delete it if it wasn't
6  correct.
7  Q. If you deleted it, it would send it back
8  to MITG to have it corrected?
9  A. Yes.
10 Q. If you released it what would happen? It
11 would go to be filled and then the invoice sent out?
12 A. These orders were already filled.
13 Q. Okay.
14 A. It was -- once I released it it was
15 invoiced to the customer. The customer already
16 received the product when we got the orders from the
17 review and release on a purchase order situation.
18 Q. Back up. The customer had already
19 received the product prior to you reviewing and
20 releasing the invoice?
21 A. Yes.
22 Q. Okay.
23 A. On a purchase order.
24 Q. Okay. What about on a nonpurchase order
25 type arrangement?

24 (Pages 90 to 93)

Page 94

1  A. A credit card had to be preapproved before
2  product was shipped out, so that was reviewed and
3  released and approved before the product went out
4  the door.
5  Q. And part of the reason this XML interface
6  was created is because it also allowed that credit
7  card review to be securely done along this e-mail
8  string, is that your understanding?
9  A. No, the XML was created to save time for
10 manually keying in. The credit card process for
11 keying in was no longer -- it was the same amount of
12 time.
13 Q. Okay. So we had two different scenarios
14 though, if it was a PO type situation, the customer
15 already had the product prior to you releasing the
16 invoice?
17 A. Yes.
18 Q. If it's credit card the product hadn't
19 been shipped if the credit card hadn't been approved
20 already?
21 A. Yes.
22 Q. Okay. Did you have to review and release
23 every order?
24 A. Yes.
25 Q. Okay. So if there was 300 orders that

Page 95

1  came in on a daily basis you had to review and
2  release them all?
3  A. Yes.
4  Q. Was there somebody else that also did
5  that?
6  A. Yes.
7  Q. Okay. Were those those two people you
8  mentioned earlier, Lisa Stork and -- I can't
9  remember the other guy, David Suhr?
10 A. Yes.
11 Q. Okay. Let me show you what's previously
12 been marked as Exhibit V, do you recognize that
13 document?
14 A. Somewhat.
15 Q. Your name on Page I is kind of listed
16 there under author, correct?
17 A. Yes.
18 Q. Under key contributor?
19 A. Yes.
20 Q. Okay. Before we get into that I have a
21 couple more questions for you.
22     Were you part of the testing phase of the
23 Middleware?
24 A. Yes.
25 Q. Okay. What was your involvement in that?

Page 96

1  A. Once it was I guess created and they
2  were -- they sent over test orders from MITG's web
3  tool into VISTA, my role was to basically have a
4  purchase order in front of me and verify that
5  information was feeding over correctly.
6  Q. Kind of review and release?
7  A. Yeah, before the program was live.
8  Q. Yeah, right, exactly. And do you recall
9  if your written approval was required prior to the
10 Middleware going live?
11 A. I don't remember if I had to have a
12 written approval, but I remember I had to approve
13 it.
14 Q. Okay. And Page 24 of Exhibit V under
15 approval of testing, do you see you are listed there
16 as an individual that had to give written approval?
17 A. Yes.
18 Q. So does that refresh your memory?
19 A. Yeah, I knew I had to approve it, I just
20 didn't remember if I had to do it in writing.
21 Q. Okay. Do you recall how long the testing
22 phase was?
23 A. A couple, three months.
24 Q. Okay. Do you recall when it was launched
25 or went live?

Page 97

1  A. 2002.
2  Q. Beginning of the year?
3  A. Yes.
4  Q. Did you -- you already told me you weren't
5  on the programming side. Did you have anything to
6  do with the switching over from the test server to
7  go-live?
8  A. No.
9  Q. All right. And to your knowledge, there
10 was not any interface with the VISTA for customers
11 prior to the one created by MITG?
12 A. That's correct.
13 Q. Okay. VISTA is still currently being used
14 today, correct?
15 A. Yes.
16 Q. Is there any XML interface that have been
17 implemented for other customers with VISTA?
18 A. I don't know.
19 Q. Well, do you -- prior to you leaving your
20 position in February of '04, did you have an
21 occasion to review and release any other orders from
22 customers that had a direct interface with VISTA?
23 A. No.
24 Q. Were you involved in the creation of any
25 other interfaces such as the one with MITG that your

25 (Pages 94 to 97)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 110

1  Q. Okay. Then additional information would
2  be needed, okay.
3      Once it's been approved, though, VISTA
4  automatically submitted the order for credit card
5  approval under this summary?
6  A. Yeah, on a credit card.
7  Q. Right, yeah, okay. What if -- what if
8  it -- on the review and release it wasn't rejected,
9  for instance, you know, all of the information was
10 complete and accurate, what happened then, did you
11 release it?
12 A. Yes.
13 Q. Okay. And, what, release it for
14 invoicing?
15 A. Yes.
16 Q. And then invoicing, was that created here?
17 A. Yes.
18 Q. Okay. And that invoice would be sent from
19 here to the customer?
20 A. Yes.
21 Q. Okay. So MITG didn't do the invoicing?
22 A. No.
23 Q. Okay. Was that type of invoicing
24 system -- strike that.
25     Was there anything in place such as this

Page 111

1  allowing that invoicing type review and release
2  prior to this being developed?
3  A. I don't know.
4  Q. Okay. You weren't involved in any?
5  A. No.
6  Q. Okay. Were you involved in any of this
7  auditing report, running a Visa, V-I-S-A, sales out
8  report and comparing the information with MITG's XML
9  feed to ensure all orders are being captured and
10 invoiced correctly?
11 A. No.
12 Q. Do you know what a Visa sales out was?
13 A. No.
14 Q. Okay. On Page 18, under security
15 requirements, right here, Compaq Direct service
16 parts coordinators, that's the coordinator who
17 manages the service parts order, was that you?
18 A. Yes.
19 Q. Okay. Because you needed access to the
20 order entry and review and release, correct?
21 A. Yes.
22 Q. You were listed along with Ms. Stork as
23 the only individuals that were allowed to delete
24 orders from review and release, correct?
25 A. Dave Suhr could.

Page 112

1  Q. Okay. When would an order be deleted?
2  A. If it's a declined credit card, if the
3  customer decides they don't want the product
4  anymore.
5  Q. So that's different than it being rejected
6  for incorrect information?
7  A. Yes.
8  Q. Was that a separate screen you had to go
9  to or did that come up under review and release as
10 well?
11 A. If the credit card was declined in the
12 review and release we had to go to a different
13 screen to delete it.
14 Q. Did the Middleware help with the
15 efficiencies?
16 A. Yes.
17 Q. Did it reduce some double entry and
18 backlog that was created by that process?
19 A. On the Compaq side, yes.
20 Q. Okay. Do you have any knowledge of that
21 type of interface being used with any other outside
22 provider or vendor such as MITG to reduce
23 inefficiencies like that?
24 A. I don't know.
25 Q. So the answer is no?

Page 113

1  A. No.
2  Q. Okay. Next I'm going to show you
3  Exhibit X, do you see that as a Compaq record of
4  meeting?
5  A. Yes.
6  Q. Okay. Do you see your name on there and
7  checked as an attendee?
8  A. Yes.
9  Q. I've already heard from other people that
10 this is a meeting that took place over at the tech
11 center?
12 A. Yes.
13 Q. Okay. And do you recall attending these
14 type of meetings?
15 A. Yes.
16 Q. Okay. Were they like status meetings to
17 go over the Middleware?
18 A. Yes.
19 Q. Okay. Were there records like this handed
20 out, minutes, for each meeting after they took
21 place?
22 A. No.
23 Q. Did you ever take those minutes?
24 A. No.
25 Q. Okay. Did you ever prepare this type of

29 (Pages 110 to 113)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 114

1 document?
2   A. No.
3   Q. After you received it -- or do you recall
4 receiving it?
5   A. I don't remember.
6   Q. Okay. Under the order acknowledgement
7 only occurs after the order has been reviewed and
8 released, so once you have reviewed and released an
9 order and confirmed that everything lined up okay,
10 that would send an invoice to the customer, would
11 there then be an order acknowledgement sent along
12 this line back to MITG?
13   A. Yes.
14   Q. Okay. What was that order acknowledgement
15 saying, it's gone, it's been approved?
16   A. Yes.
17   Q. Okay. Meaning the invoice is gone because
18 as we talked about earlier, the customer already had
19 the product on a noncredit card situation?
20   A. Yes.
21   Q. Okay. So what was the ordering
22 acknowledgement?
23   A. The order was never -- I never approved a
24 PO number until I had the POs in front of me, so
25 when I was reviewing the order and reviewing the

Page 115

1 PO I was paying MITG.
2   Q. I understand, but what was the
3 acknowledgement that was sent to them?
4   A. The VISTA order number.
5   Q. Okay. I mean, would it -- did it say
6 anything on it?
7   A. I don't know.
8   Q. Okay. It says under there under the
9 middle of the page under the last bullet point under
10 the Compaq Direct, it says, the VISTA order number,
11 the PO number and nontaxable order total will be
12 sent as the order acknowledgement, so I take it --
13 was that what it was?
14   A. Never saw an acknowledgement.
15   Q. Oh, you didn't?
16   A. No.
17   Q. Okay. If you go to the bottom there on
18 that there's talk about, you know, requesting a list
19 of rejection codes that Sandy Urwin was requesting,
20 and under action items on the second page you're
21 identified as the person who is sending Chris Vondra
22 a list of -- it should be of rejection codes to be
23 utilized in Scenario No. 2; what did that refer to?
24   A. It was a list of rejections, why an order
25 would have been rejected back to MITG.

Page 116

1   Q. Okay. Were those codes in place on the
2 Compaq side that could be then implemented, for
3 instance, under Scenario 2, which is listed there on
4 the second page, you can flip back, giving you the
5 capability to reject an order during review and
6 release?
7   A. Yes.
8   Q. Okay. So that was something that the
9 business team requested I guess that they didn't
10 have the capability -- the business team requested
11 that to have that capability in the Middleware?
12   A. Yes, so that when I rejected an order MITG
13 knew why.
14   Q. Okay.
15   A. We had a list of reason codes.
16   Q. And you requested that capability during
17 the review and release --
18   A. Yes.
19   Q. -- screen?
20       Okay. To try and catch I guess
21 inefficiencies before they went out?
22   A. That was my job.
23   Q. Okay. During this -- if you flip to the
24 third page, Troy was listed as the service program
25 manager. Were you reporting to Troy at this time?

Page 117

1   A. Yes.
2       MR. HANSEN: Let's take a break and come
3 back and see where we're at. I may be done.
4       MS. CARROLL: All right.
5       (11:50 - 12:06 a.m. - Recess.)
6 BY MR. HANSEN:
7   Q. What documents did you review prior to
8 your deposition today?
9   A. What documents?
10   Q. Uh-huh.
11   A. I don't remember reviewing any other than
12 my own stuff.
13   Q. Okay. What is your own stuff?
14   A. I had a spreadsheet that I kept.
15   Q. Of what?
16   A. Just the orders that came in over review
17 and release so I knew those needed to be paid.
18   Q. Okay. Does that spreadsheet have a title?
19   A. I don't remember what the title was.
20   Q. When did you review that, yesterday?
21   A. No, I haven't had that for a long time.
22   Q. Okay. Well, I want to know what -- did
23 you sit down yesterday and go over some documents
24 to, you know, remind you of anything that happened,
25 did you review e-mails, spreadsheets you know, did

30 (Pages 114 to 117)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.