IN THE MATTER OF:

# Hewlett Packard Development, et al.
# vs.
# Midwest Information Technology, et al.

Cause No. 04-3055

## Deposition of Scott Stringer
## 7/27/2005

*Gore Perry Gateway & Lipa Reporting*
515 Olive Street
Suite 700
St. Louis, MO 63101

*Full GLOSSARY included with this DepoScript*

EXHIBIT 12

Hewlett Packard Development, et al. vs.
Midwest Information Technology, et al.

3:04-cv-03055-JES-CHE    #68-20    Page 2 of 4

Deposition of Scott Stringer
7/27/200

Page 1

[1] Hewlett Packard Development Company, Et Al.,
[2]
[3]
[4] Plaintiffs,
[5]
[6]
[7] vs.
[8]
[9]
[10] Midwest Information Technology Group, Et Al.,
[11]
[12]
[13] Defendants.
[14]
[15] DEPOSITION OF
[16] STEVE STRINGER
[17]
[18] JULY 27, 2005
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1] UNITED STATES DISTRICT COURT
[2] CENTRAL DISTRICT OF ILLINOIS
[3] SPRINGFIELD DIVISION
[4]
[5] HEWLETT PACKARD DEVELOPMENT COMPANY, et al.,
[6]
[7] Plaintiffs,
[8]
[9] vs.            No. 04-3055
[10]
[11] MIDWEST INFORMATION TECHNOLOGY GROUP, et al.,
[12]
[13] Defendants.
[14]
[15] Deposition of STEVE STRINGER, taken on behalf of
[16] the Plaintiffs, at the offices of Uhy Advisors, 3117
[17] S. Big Bend Boulevard, Suite 100, in the County of
[18] St. Louis, State of Missouri, on the 27th day of
[19] July, 2005, before Tina R. Wright, Certified Court
[20] Reporter and Notary Public.
[21]
[22]
[23]
[24]
[25]

Page 3

[1] APPEARANCES OF COUNSEL:
[2]
[3] FOR THE PLAINTIFFS:
[4] Ms. Elizann Carroll
[5] Juneau, Boll & Ward
[6] 15301 Spectrum Drive, Suite 300
[7] Addison, Texas  75001
[8]
[9] FOR THE DEFENDANTS:
[10] Mr. James Hansen
[11] Schmiedskamp, Robertson, Neu & Mitchell
[12] 525 Jersey
[13] Quincy, Illinois  62306
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1] INDEX
[2]
[3] Examination by Ms. Carroll           5
[4]
[5]
[6] EXHIBITS
[7] Deposition Exhibit 45               6
[8] Deposition Exhibit 46               19
[9] Deposition Exhibit 47               19
[10] Deposition Exhibit 48              19
[11] Deposition Exhibit 49              19
[12] Deposition Exhibit 50              20
[13] Deposition Exhibits 51 and 52      20
[14] Deposition Exhibit 53              20
[15] Deposition Exhibits 54 and 55      21
[16] Deposition Exhibit 56              21
[17] Deposition Exhibit 57              21
[18] Deposition Exhibit 58              26
[19] Deposition Exhibit 59              37
[20] Deposition Exhibit 60              54
[21] Deposition Exhibits 61 and 62      116
[22] Deposition Exhibit 63              117
[23] Deposition Exhibit 64              120
[24]

3:04-cv-03055-JES-CHE #68-20 Page 3 of 4

Deposition of Scott Stringer
7/27/2005

Hewlett Packard Development, et al. vs.
Midwest Information Technology, et al.

Page 5

[1] SCOTT STRINGER
[2] of lawful age, having been first duly sworn to
[3] testify the truth, the whole truth, and nothing but
[4] the truth in the case aforesaid, deposes and says in
[5] reply to oral interrogatories, propounded as follows,
[6] to-wit:
[7] EXAMINATION
[8] QUESTIONS BY MS. CARROLL:
[9]  Q: Can you please state your name for the
[10] record, sir?
[11]  A: Scott A. Stringer, S-t-r-i-n-g-e-r.
[12]  Q: For whom do you work, Mr. Stringer?
[13]  A: Uhy Advisors.
[14]  Q: I take it from your CV you've had your
[15] deposition taken before?
[16]  A: Yes, ma'am.
[17]  Q: I just want to remind you of a couple of
[18] rules. One, if you don't understand my question, if
[19] you can please ask me to restate it or rephrase it.
[20] If you answer the question, I'm going to assume you
[21] understood it. Is that all right?
[22]  A: Yes, ma'am.
[23]  Q: And the other thing is if you can try to
[24] remember to let me finish my question some of which
[25] take me a while before you begin your answer, that

Page 6

[1] will make it easier for our court reporter to get the
[2] testimony down. Okay?
[3]  A: Yes, ma'am.
[4]  Q: Looking at your CV on your report, in 2005,
[5] you had two cases that I wanted to ask you about.
[6] MS. CARROLL: Why don't we go ahead and mark
[7] this as 45.
[8] (Deposition Exhibit 45 marked for
[9] identification.)
[10]  Q: Deposition Exhibit 45 is your report and
[11] your CV is in there. On your testimony over the last
[12] four years, the case Solavie versus TricorBraun?
[13]  A: Yes, ma'am
[14]  Q: What were you doing on this lost profits
[15] rebuttal?
[16]  A: What I was doing was looking at the business
[17] plan and all of the events that lead up to the lost
[18] profits assertion by Solavie against TricorBraun.
[19]  Q: And were you representing TricorBraun?
[20]  A: TricorBraun, yes, ma'am.
[21]  Q: And what kind of documentation you were
[22] looking at, what were you -- at least in terms of
[23] financial documentation, what were you looking at to
[24] try to rebut the lost profits claim?
[25]  A: I looked at a variety of documents. I

Page 7

[1] looked at business plans. I looked at actual
[2] financial statements. I looked at E-mail
[3] correspondence between Solavie and TricorBraun and
[4] various other, you know, pleadings, etc.
[5]  Q: What kind of relationship did Solavie and
[6] TricorBraun have?
[7]  A: Solavie was a company that was developing a
[8] new skin care line. They asked TricorBraun to
[9] develop a new type of bottle for that, and
[10] TricorBraun could not produce that bottle to
[11] Solavie's specifications, and Solavie claimed lost
[12] profits because the bottle wasn't ready to go to
[13] market.
[14]  Q: And what was the basis for their claim of
[15] lost profits, were they claiming -- how were they
[16] trying to establish lost profits that you were
[17] rebutting?
[18]  A: They were trying to establish lost profits
[19] primarily because of spoiled product because the
[20] bottles weren't ready. Then they also -- there was
[21] no expert in that case. I was the only expert in the
[22] case. So I was rebutting what the plaintiff was
[23] asserting herself. They were also -- there was a
[24] number thrown out in the pleadings as to what they
[25] thought the future lost profits were within the next

Page 8

[1] year or two without any supporting documentation, and
[2] I looked at that, and also as well as the business
[3] plan and all of the events that lead up to the
[4] supposed acts of TricorBraun that created lost
[5] profits for Solavie.
[6]  Q: Was Solavie an existing company?
[7]  A: It was an existing company. However, it was
[8] -- had not manufactured skin products. It has a spa
[9] in Idaho, and it decided that it wanted to go into a
[10] new line of products that was primarily based on
[11] ecosystems. So they were launching a new product
[12] line, and this person also wanted to have a yin and
[13] yang bottle that snapped in together for the travel
[14] industry. And so a lot of their profits were very
[15] speculative. There was never really any sales to
[16] those customers.
[17]  Q: The Jeffrey Lowel versus American Standard
[18] case, I saw that you testified at trial in '05, and
[19] it looks like you had your deposition taken in the
[20] case in '04. Did that involve any lost profits
[21] analysis?
[22]  A: No, ma'am. That was an employment
[23] situation.
[24]  Q: And the DelVecchio?
[25]  A: Yes, ma'am.

Page 21

[1] 54 and the 2004 as 55.
[2] (Deposition Exhibits 54 and 55 marked for
[3] identification.)
[4]  Q: Next, you've got HP prepared document
[5] entitled 41K payments.
[6] MR. HANSEN: The one's a little different,
[7] but--
[8] MS. CARROLL: This is only a partial of
[9] what--
[10] MR. HANSEN: See, that's HP 1097. This was
[11] part of the HP 6145. That's 6156. It's right in
[12] here.
[13] MS. CARROLL: It didn't identify which one
[14] of these HP prepared documents it was, so I went with
[15] Exhibit FF, but let me see if these--
[16] MR. HANSEN: Do you want to mark the one--
[17] (Deposition Exhibit 56 marked for
[18] identification.)
[19]  Q: So the 41K payments is Exhibit 56. The last
[20] specific document you noted is various E-mail
[21] documentation, Bates number HP 1139 through 1189.
[22] See if that looks right.
[23]  A: Yes, ma'am.
[24] MS. CARROLL: Let's mark that as 57.
[25] (Deposition Exhibit 57 marked for

Page 22

[1] identification.)
[2]  Q: You also indicated that you looked at the
[3] deposition transcripts and exhibits for Teresa Koch,
[4] Charles Schmaderer, Roland Soriano, Chip Love, Louise
[5] Meyerfield, Ronald Haught, Randy Wagner, Richard
[6] Chizek and Diane Pound. Are there specific exhibits
[7] out of those depositions that you separated out that
[8] you relied upon for the purpose of your report?
[9]  A: I do not believe so, ma'am.
[10]  Q: Who else in your office worked with you on
[11] preparing your report?
[12]  A: I prepared the report myself. I had
[13] additional assistants with Excel spreadsheets and
[14] data modeling. And the two people that worked with
[15] me were Lynda, L-y-n-d-a, Lieberman,
[16] L-i-e-b-e-r-m-a-n, and Duane, D-u-a-n-e, Lenk,
[17] L-e-n-k.
[18]  Q: And what are -- is Ms. Lieberman or Mr. Lenk
[19] a CPA?
[20]  A: Both are CPA's.
[21]  Q: And how long have they been with Uhy
[22] respectively?
[23]  A: Lynda has been with Uhy for ten years, and
[24] Duane has been with Uhy for nine years.
[25]  Q: And what is Ms. Lieberman's title?

Page 23

[1]  A: She is manager.
[2]  Q: And what about Mr. Lenk?
[3]  A: Mr. Lenk is manager as well.
[4]  Q: And your title is managing director?
[5]  A: Yes, ma'am.
[6]  Q: What does it mean to be a manager at Uhy?
[7]  A: To be a manager?
[8]  Q: Yes.
[9]  A: It's one of the ranks that you attain in our
[10] firm either -- in the business consulting department
[11] where I'm at, the managers typically assist the
[12] partners, managing directors and principals in doing
[13] forensic analysis. We do fraud investigations, a
[14] whole litany of consulting. If they're the auditor
[15] tax side manager, that means something different.
[16] They're typically supervising staff out in the field
[17] or doing tax returns, etc.
[18]  Q: Are Ms. Lieberman and Mr. Lenk both in your
[19] group, the consulting group?
[20]  A: Yes, ma'am.
[21]  Q: And what did Ms. Lieberman do in particular?
[22]  A: Ms. Lieberman helped me to sort through
[23] documents as they came in. She helped me in putting
[24] together the schedules in sort of drafting how we
[25] would approach with the data that we had to do the

Page 24

[1] lost profits analysis. I asked her to communicate
[2] with Ms. Koch regarding some questions we had as we
[3] were finalizing our report, and I think I asked her
[4] to review my report to make sure I didn't have
[5] type-o's and such.
[6]  Q: And what about Mr. Lenk?
[7]  A: Mr. Lenk was less involved than Ms.
[8] Lieberman, and his role was primarily in the data
[9] modeling.
[10]  Q: What does that mean, data modeling?
[11]  A: Putting all the information into
[12] spreadsheets and then creating a spreadsheet to look
[13] a certain way.
[14]  Q: The documents that we have gone over in this
[15] stack that we've marked as exhibits and the pleadings
[16] that we saw in your box, were those all documents
[17] that you were given without a need to request them or
[18] did you make a list of documents you wanted to be
[19] able to do the analysis?
[20]  A: I don't believe I ever made a list of
[21] documents. Those were just given to me.
[22]  Q: Were there any documents that you did not
[23] receive without asking for them, for example, call
[24] somebody up and ask for, say hey, wait a minute, how
[25] come we don't have this or we need this?