E-FILED
Wednesday, 11 January, 2006 11:51:18 AM
Clerk, U.S. District Court, ILCD

IN THE MATTER OF:

# Hewlett Packard Development Co., et al
## vs.
# Midwest Information Technology, et al.

*Cause No. 04-3055*

**Deposition of Scott Stringer**
**11/2/2005**

*Gore Perry Gateway & Lipa Reporting*
*515 Olive Street*
*Suite 700*
*St. Louis, MO 63101*

*Full GLOSSARY included with this DepoScript*

3:04-cv-03056-JES-CHE  #66-21  Page 2 of 8
Hewlett Packard Development Co., et al.
Midwest Information Technology, et al.
Deposition of Scott Stringer
11/2/2005

Page 1

[1] In Re: the matter between:
[2] HEWLETT PACKARD DEVELOPMENT CO., et al.
[3] and
[4] MIDWEST INFORMATION TECHNOLOGY GROUP, et al.

[14] Deposition of Scott A. STRINGER
[15] November 2, 2005

Page 2

[1] UNITED STATES DISTRICT COURT
[2] CENTRAL DISTRICT OF ILLINOIS
[3] SPRINGFIELD DIVISION

[5] HEWLETT PACKARD DEVELOPMENT CO., et al.,
[7] Plaintiffs,
[9] vs.    Cause No. 04-3055
[11] MIDWEST INFORMATION TECHNOLOGY GROUP, et al.,
[13] Defendants.

[16] Deposition of SCOTT A. STRINGER, taken on
[17] behalf of the Plaintiffs, at the offices of UHY
[18] Advisors, 3117 S. Big Bend Blvd., Suite 100, St.
[19] Louis, Missouri, on the 2nd of November, 2005,
[20] before Nicki J. Madison, a Certified Court Reporter
[21] #959(G), a Registered Professional Reporter and
[22] Certified Shorthand Reporter and Notary Public.

Page 3

[1] APPEARANCES OF COUNSEL:
[3] FOR THE PLAINTIFFS:
[4]     Ms. Elizann Carroll
[5]     Juneau, Boll & Ward
[6]     15301 Spectrum Drive, Suite 300
[7]     Addison, Texas 75001
[8]     (972) 866-8333

[10] FOR THE DEFENDANTS:
[11]     Mr. James A. Hansen
[12]     Schmiedeskamp, Robertson, Neu & Mitchell
[13]     525 Jersey
[14]     Quincy, Illinois 62306
[15]     (217) 223-3030

[17] ALSO PRESENT:

Page 4

INDEX OF EXAMINATIONS

| QUESTIONS BY: | PAGE |
|---|---|
| By Ms. Elizann Carroll | 5 |

INDEX OF EXHIBITS

| EXHIBIT NO. | PAGE MARKED |
|---|---|
| Exhibit No. 65 was marked and identified | 5 |
| Exhibit No. 66 was marked and identified | 13 |
| Exhibit No. 67 was marked and identified | 166 |
| Exhibit No. 68 was marked and identified | 175 |

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al
Deposition of Scott Stringer
11/2/2005
Page 3 of 8

Page 5

    SCOTT A. STRINGER,
of lawful age, having been first duly sworn to
testify the truth, the whole truth, and nothing but
the truth in the case aforesaid, deposes and says
in reply to oral interrogatories propounded as
follows, to-wit:
    DIRECT EXAMINATION
QUESTIONS BY MS. CARROLL:
    Q: Can you, please, state your name for the
record?
    A: Scott A. Stringer.
    Q: And Mr. Stringer, we are here for a second
time now for the deposition of you and your second
report, a supplement to your expert report dated
August 17, 2005; is that correct?
    A: Yes, ma'am.
    (Exhibit No. 65 was marked, dated, NJM.)
    Q: (By Ms. Carroll) And let me just hand you
what has been marked as Exhibit 65, and ask you if
that is a full copy of your supplement to your
expert report?
    A: Yes, ma'am, it is.
    Q: And you indicated -- you can keep that, or
do you have a copy that you want to work off of?
    A: I have a copy in front of me.

Page 6

    Q: You indicated in the first paragraph of
your report, the second paragraph of your report
that -- well, first paragraph of your report that
you're supplementing your original report because
of incorrect information contained therein. Tell
me what incorrect information you determined was in
your first report?
    A: Yes, ma'am. Two pieces of information
primarily. The first one was that the Andover
Roseville calls weren't shifted until November of
2002, and my original report I had utilized the
date of, I believe, May 4 or so. The second error
in my report was the misunderstanding on the way
CSN parts were compensated to MITG, and this
particular report then changes to the correct
methodology.
    Q: Anything else?
    A: Those are -- oh, and then finally -- well,
I guess you didn't ask me this question, but I
received additional information as well.
    Q: And that was going to be my next question
in terms of what additional information did you --
you said important information became available
which required me to modify my methodology and data
amount. What is the important information that

Page 7

became available after your July 27 deposition?
    A: I received a disk which contained actual
sales data that MITG had from 2002 through 2004
relating to this contract.
    MR. HANSEN: I want to go back up and so
the record's clear, there is additional information
that was corrected which is reflected in the report
under the tortious interference part on the
assumption he made in his first deposition that
people who bought -- everyone stopped buying from
MITG, so I just want to make sure that that gets in
there.
    Q: (By Ms. Carroll) And let me follow up. I
know that in the report, and you and I had a
discussion in your first deposition about the
assumption that was made in that report that
essentially there were no more sales to anybody
from --
    A: Correct.
    Q: -- from MITG who they used to sell to; is
that correct?
    A: Correct.
    Q: And now you have used information that you
had that shows that there were at least some sales
continued to people that had been selling to

Page 8

previously?
    A: That's correct, yes, ma'am.
    Q: Okay.
    THE WITNESS: Thanks, Jim.
    Q: (By Ms. Carroll) And now why was the
actual sales data for MITG from when we say from
'02 to '04, is that just being shorthand for the
term of the contract February 7 of '02, to February
7 of '04?
    A: Actually from November -- yes, I believe it
is from February of '02.
    Q: It's the two years for the term of the
contract?
    A: Yes.
    Q: Which don't quite overlap the two year
calendar year?
    A: Yes, ma'am, that's correct.
    Q: Now, why did that information require you
to change your methodology?
    A: Because that was the information that I
would have liked to have had in my first report
because it's specific, and now that it was
available, that was the best information I could
utilize.
    Q: And it was specific in what way?

3:04-cv-03055-JES-CHE    # 68-21     Page 4 of 8

Hewlett Packard Development Co., et al  vs.
Midwest Information Technology, et al.

Deposition of Scott Str...
11/2/2...

Page 9

[1] A: Because it showed the breakdown of CSN
[2] versus non-CSN. It also gave me information about
[3] the profit margin on products as well. It helped
[4] me in the tortious interference calculation that
[5] refer to which customers had regularly bought
[6] versus which ones they had not regularly bought, so
[7] he contained a lot of information through the
[8] process.
[9] Q: Did you ask for that information before you
[10] did your first report?
[11] A: Yes.
[12] Q: Who did you ask?
[13] A: I asked Mr. Hansen for specific sales
[14] information.
[15] Q: And what were you told when you asked for
[16] it?
[17] A: It was being compiled and/or they were
[18] trying to -- there was going to be subsequent
[19] information supplied, but at this point, that that
[20] information was not available.
[21] Q: Have you ever seen the spreadsheets whether
[22] it be on a disk or printed out that has the same
[23] information that is on the CD provided to you by
[24] MITG that was provided by HP in a different format?
[25] A: I don't believe I ever saw any specific

Page 10

[1] customer information, sales by customer information
[2] at all, no, ma'am.
[3] Q: So until -- so before you got the CD that
[4] was provided to you, that was the first time that
[5] you saw specific information from MITG about their
[6] customer sales during the time of the standard
[7] support agreement; is that correct?
[8] A: I believe it is, yes, ma'am.
[9] Q: Just before we go, because we are going to
[10] be taking much of your deposition about CSN parts
[11] versus non-CSN parts, and I just want to talk about
[12] some technology and make sure you and I are on the
[13] same page. When we say CSN parts, do you
[14] understand those as being in-stock Compaq parts?
[15] A: Yes, ma'am.
[16] Q: And non-CSN parts, what are we -- I think
[17] in your report you refer to them as outsourced
[18] parts?
[19] A: Correct.
[20] Q: What is your understanding as to what those
[21] parts are?
[22] A: Those would be parts that are not in stock
[23] or parts that could be outsourced at a lower price
[24] than what's in stock.
[25] Q: And is it your understanding, are these

Page 11

[1] Compaq spare parts, or are they spare parts of
[2] other vendors?
[3] A: They can be -- are you talking about the,
[4] just the outsourced or both outsourced what they
[5] could --
[6] Q: I mean in terms of the parts that are the
[7] non-CSN parts as you refer to them, and we will
[8] refer to them in the deposition as outsourced parts
[9] or sourced parts.
[10] A: Okay.
[11] Q: Those sourced parts, is it your
[12] understanding they could be Compaq parts that are
[13] no longer carried by Compaq or HP?
[14] A: Yes, I believe so.
[15] Q: Do they also include Compaq parts that are
[16] in stock but meet a certain criteria in terms of a
[17] price savings so could be obtained from another
[18] vendor?
[19] A: Yes, ma'am.
[20] Q: And what is the criteria by which it cuts
[21] it off that they could get the parts from a vendor
[22] through Compaq or HP?
[23] A: It's spelled out in the standard agreement,
[24] and I don't have it memorized, but I believe I'm
[25] going to do it from my best recollection, it seems

Page 12

[1] like $200, if it was a $200 difference. I don't --
[2] I just don't remember the exact terminology and
[3] what that number was.
[4] Q: And when you say it was in the standard
[5] support agreement, there is an indication in your
[6] report, and I don't want to -- your supplemental
[7] report here, that references the MITG quote
[8] "Bible."
[9] A: Yes, ma'am.
[10] Q: Closed quote. And that is also referenced
[11] in the standard support agreement?
[12] A: Yes, ma'am.
[13] Q: So when it's in the standard support
[14] agreement, that's a reference over to this MITG
[15] Bible that sets out --
[16] A: Yes, ma'am, correct.
[17] Q: So do you also understand that sourced
[18] product can be multi-vendor parts?
[19] A: Yes.
[20] Q: And by multi-vendor parts, that somebody
[21] other than Compaq or HP?
[22] A: Correct.
[23] Q: How did the spreadsheet that was provided
[24] by MITG give you information on profit margin on
[25] products?

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

3:04-cv-03055-JES-CHE    #68-21    Page 5 of 8

Page 17

[1] for that disk really before we started anymore
[2] work. Since the disk was received, by telephone,
[3] Mr. Hansen and I talked about, he explained to me
[4] how the disk was put together and what the
[5] information contained, etc., and then we talked
[6] about, you know, approaches to taking this data and
[7] modifying the report.
[8]    Q: Did you have any discussions with Ron
[9] Haught about any of the information, whether it be
[10] on this spreadsheet or the information that you
[11] relied upon for your first report?
[12]    A: The only time I spoke with Mr. Haught,
[13] which was discussed in the previous deposition, was
[14] about the information regarding additional costs
[15] per additional volume. Other than that, I've had
[16] no conversations with Mr. Haught, and specifically
[17] none since the last deposition.
[18]    Q: Have you had any conversations with
[19] Ms. Koch since your last deposition?
[20]    A: No, ma'am.
[21]    Q: Have you had conversations with any
[22] representative of MITG other than Mr. Hansen since
[23] your last report?
[24]    A: No, ma'am.
[25]    Q: There were -- well, in your new report, you

Page 18

[1] have, "Information Reviewed," that's Exhibit 2.
[2] Let's turn to that. The bottom three, the last
[3] three items on the information reviewed list are
[4] new from your first report, but the only new
[5] information that you are relying on for your new
[6] report is the very last item, correct?
[7]    A: Yes, ma'am, that is correct.
[8]    Q: Those other two items were items that you
[9] hadn't relied upon in your first report, you just
[10] accidentally didn't include them on the list; is
[11] that right?
[12]    A: Yes, ma'am, that's correct.
[13]    Q: For the purpose of the new report, have you
[14] changed the methodology by which you calculated the
[15] damages for both claims; is that correct?
[16]    A: Yes, ma'am.
[17]    Q: Has that changed -- what I want to do is go
[18] through this list of information reviewed because I
[19] know from your prior deposition that some of the
[20] information you reviewed but you didn't rely upon
[21] for various reasons, either it wasn't relevant or
[22] it didn't match up, or you didn't have a good
[23] understanding of the documents.
[24]    A: Yes, ma'am.
[25]    Q: So what I'd like to do is go through each

Page 19

[1] of these things and find out not so much what you
[2] reviewed, but what you relied upon to do your
[3] second report.
[4]    A: Yes, ma'am. And I think this will be
[5] helpful because I've taken all the documents, the
[6] vast majority of those documents that I did into my
[7] report here, so this will be helpful. The first
[8] item, MITG prepared revenues and expenses for 2002
[9] through 2004, Bates No. 612 through 614, I relied
[10] upon.
[11]    MS. CARROLL: And that was, for the record,
[12] that was marked as Exhibit 46 in the first
[13] deposition.
[14]    A: Okay. Let me just skip down to MITG
[15] prepared documents for sales for 2004, Bates No.
[16] MITG 1023 to 1026.
[17]    Q: (By Ms. Carroll) Which are deposition
[18] Exhibits 49, 50?
[19]    A: HP documents regarding E-spares handled at
[20] Roseville, Bates No. HP 11007 through 11009, and
[21] Ms. Carroll, I believe 11048 through 11050 is a
[22] repeat of this, but I really for purposes of this
[23] report, just relied on that particular document.
[24]    Q: Yeah, I believe 11048 to 11050 is simply a
[25] repeat of 11007 and 11009.

Page 20

[1]    MR. HANSEN: What are you looking for, the
[2] deposition exhibit?
[3]    MS. CARROLL: It's Exhibit 51 is 11007 to
[4] 11009, okay.
[5]    A: MITG prepared documents on call volume,
[6] Bates No. MITG 615 to 724.
[7]    Q: (By Ms. Carroll) Which is Exhibit 53?
[8]    A: The deposition transcripts and exhibits
[9] were reviewed again.
[10]    Q: All of them?
[11]    A: Yes, ma'am.
[12]    Q: And I know you specifically referenced
[13] Exhibit PP?
[14]    A: Yes.
[15]    Q: Three Ps or two Ps?
[16]    A: Two Ps.
[17]    Q: And obviously the last one which is the
[18] spreadsheet that we've already discussed part of
[19] which we've marked as Exhibit 56?
[20]    A: Yes, ma'am.
[21]    Q: Is there anything else, any additional
[22] information you've gotten since you prepared your
[23] new report that you have reviewed?
[24]    A: No, ma'am.
[25]    Q: So that's everything you relied upon for

Hewlett Packard Development Co., et al vs.
Midwest Information Tech, et al.  Page 6 of 8

Deposition of Scott Stringer
11/2/2005

Page 21

[1] the -- that's contained in the supplemental report?
[2] A: I believe so, yes, ma'am.
[3] Q: Let's start with the breach of contract
[4] claim. Just summarize for me the way you did the
[5] breach of contract claim in your first report,
[6] because I want to discuss what the different
[7] approaches were.
[8] A: Certainly. At the risk of getting myself
[9] confused with two methodologies, I will attempt to
[10] relook at this old way.
[11] Q: And what I'm looking for is an overview,
[12] I'm not look for the details, we have plenty of
[13] details the last time.
[14] A: All right, okay. Let me refresh my memory
[15] here, I guess. We received information from May
[16] through, I believe, the end or through November of
[17] '04, showing actual call level and sales dollar
[18] volumes for the Andover business. This information
[19] again was inaccurate because the Roseville business
[20] didn't come over until November of that year. When
[21] I look -- these are shown in my previous Exhibit 3.
[22] From the information, I calculated diverted sales
[23] from the information I had previously received,
[24] which included both CSN and outsourced parts, and I
[25] made some, I believe I made some, took some

Page 22

[1] averages, etc., for months that I did not have.
[2] And I took those into '04, as well as into November
[3] and December of '03. I then through inquiry and
[4] review of documents determined that the average
[5] gross profit was 40 percent on that information,
[6] and determined what the lost revenue was for that,
[7] for each month. Then I inadvertently took a 75/25
[8] split. I took a 25 percent of that, basically
[9] said is payable to HP, again, because I didn't
[10] understand the CSN was a different program
[11] completely. I then took away the costs associated
[12] with additional volume which was per discussion
[13] with Mr. Haught, and arrived at a monthly net
[14] profit that was lost.
[15] Q: So what you did was take the sales, what
[16] you understood to be sales from that were generated
[17] from calls to the Andover call center after those
[18] calls were being answered by Roseville, subjected
[19] them to 75/25 split. That's for sourced product?
[20] A: Correct.
[21] Q: And then did the calculations based on
[22] that, and the errors are the start date being in
[23] May instead of November and subjecting all of the
[24] sales as though they were 75/25 profit split on 100
[25] percent of the sales?

Page 23

[1] A: That's correct.
[2] Q: So after the deposition, you came to the
[3] conclusion that there are two errors that you
[4] needed to correct. Could you -- did you have the
[5] act to use the same methodology that you used
[6] before and fixed those numbers based on correcting
[7] your -- with the correct assumptions?
[8] A: I had -- when I received the disk with the
[9] specific sales information, that gave me a better
[10] -- that is what I had asked for and would have
[11] preferred to have had, and that is much more
[12] accurate information. So the methodology that I
[13] utilized before in addition to containing errors
[14] because of my misunderstanding of the contract and
[15] the revenues, etc., now that I have the specific
[16] sales data, I was able to calculate a much more
[17] accurate calculation. So it required, in my
[18] opinion, it required a change in the methodology.
[19] Q: Explain to me again from an overview or
[20] broad view the way you did it for your supplemental
[21] report.
[22] A: Yes, ma'am. For the supplemental report, I
[23] started with Exhibit PP from Chizek's deposition,
[24] and I pulled total calls Andover to Roseville, and
[25] then I determined based upon the MITG historial

Page 24

[1] split out on the HP disk that was given to me
[2] subsequent to the prior deposition that 44 percent
[3] of those were CSN calls and 56 percent were
[4] outsourced calls. And then I took the actual calls
[5] from that Exhibit PP for the month and split them
[6] out between the two, 44 CSN and 56 outsourced. My
[7] first -- after I did that then, I took the CSN
[8] calls, and I compared that to the actual call
[9] volume that MITG had experienced for those months.
[10] When I added those to the actual call volume, I
[11] then compared the total call volume to the minimum
[12] number of calls per the standard agreement of 7810
[13] to the extent that those calls were greater than
[14] 7810. I then took that number times $5.25 per call
[15] to come up with additional call revenue on CSN for
[16] each month. That was the first piece. The second
[17] piece then was to take the outsourced calls that I
[18] had previously calculated, multiplied those calls
[19] times the average revenue per call as calculated on
[20] Exhibit GG as we discussed earlier.
[21] MR. HANSEN: 66.
[22] A: Oh, I'm sorry, 66, and then took that
[23] number and calculated total sales of CSN. I then
[24] took total sales, and utilizing MITG's historical
[25] gross profit after payment of the 75/25 split,

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

Deposition of Scott Stringer
11/2/2005

Page 7 of 8

Page 25

[1] which calculated to be 24 percent to determine the
[2] total loss profit for that month. After the loss
[3] profit of each month was calculated, I then
[4] subtracted from each of those months the
[5] incremental operating expense that have in the same
[6] manner that I had done in the first report. Each
[7] month was then summarized and brought up to Exhibit
[8] 3-1, where it says cumulative totals, and the very
[9] bottom box, loss net profits, is the summation of
[10] all of that methodology for each month.
[11]     Q: Let me just make sure I'm clear. When you
[12] referred to Chizek Exhibit PP, that is also HP
[13] 11007 to 009?
[14]     A: Yes, ma'am, it is.
[15]     Q: Let me ask you this, you said that getting
[16] the disk provided you with actual sales information
[17] that made the second methodology more accurate than
[18] the first methodology?
[19]     A: Yes, ma'am.
[20]     Q: Well, the disk that was provided is
[21] providing information on MITG's actual sales during
[22] that time period, correct?
[23]     A: That's correct, yeah.
[24]     Q: It does not provide any information as to
[25] the actual sales by Andover, does it?

Page 26

[1]     A: That's correct.
[2]     Q: You have information that tells you the
[3] actual sales numbers generated from the Andover
[4] calls; isn't that correct?
[5]     A: The information I have on the Andover calls
[6] were incomplete and insufficient for me to be able
[7] to take that information. In other words, I
[8] couldn't understand it, and as a result -- and nor
[9] could it be explained to me, and as a result, I
[10] felt that the historical MITG split, because of the
[11] number of calls, you saw how many orders they had,
[12] was my best, the best information I had about the
[13] split between CSN and outsourced products.
[14]     Q: For the purpose of -- well, let me ask you
[15] two things. What was it that you said you didn't
[16] understand or the information was incomplete that
[17] you had on Andover? Tell me what information you
[18] thought was missing that you would have needed to
[19] use actual sales information generated from the
[20] Andover calls rather than using the MITG?
[21]     MR. HANSEN: I'm going to pose an objection
[22] only as to form. Are we talking pre-November 9,
[23] 2002, Andover, or post November 9, 2002?
[24]     Q: (By Ms. Carroll) Well, let me try to
[25] clarify the question. You have -- you agree that

Page 27

[1] you have information on Andover calls that are
[2] noted in, for example, HP 11007 through 11009, and
[3] some other Chizek PP and other documents; is that
[4] correct?
[5]     A: Yes, ma'am.
[6]     Q: And you said you had information on Andover
[7] that you didn't understand or that was incomplete.
[8] Were you referring to not understanding all of the
[9] information that's on what was previously marked in
[10] your first deposition as Exhibit 51, which is HP
[11] 11007 through 11009?
[12]     A: HP 11007 gives me good information about
[13] the actual call volume, but it does not give me
[14] information at all about the CSN versus outsourced
[15] split.
[16]     Q: So that when you are talking about
[17] incomplete information, that was the incomplete --
[18] that was the part that was incomplete what split
[19] that was?
[20]     A: Yes, ma'am.
[21]     Q: Is there anything else about the reports
[22] that was incomplete, something else that you needed
[23] to have used, information on actual Andover calls?
[24]     A: Could you restate that question? I'm
[25] sorry.

Page 28

[1]     Q: Sure. You've identified one big area that
[2] said this is incomplete. It doesn't tell me what
[3] the sales mix was of Andover. Was there something
[4] else that you also would have needed to know about
[5] Andover calls to use actual Andover calls versus
[6] assuming that Andover calls matched MITG calls?
[7]     A: Well, I think a couple of things. You
[8] know, having the actual CSN versus outsourced calls
[9] in a format like I received on this disk would have
[10] been helpful, but even then, even then, that would
[11] have been not necessarily as good of data I
[12] received because that information I don't believe
[13] was part -- the Andover Roseville, the way
[14] Roseville operated wasn't necessarily the way MITG
[15] would operate under the standard support agreement,
[16] i.e., the 75/25 split for in-stock parts that they
[17] could outsource and receive the 75/25 split on sell
[18] without better information about how Roseville's,
[19] what their standard procedures and operating
[20] procedures were in those situations. Even getting
[21] that data would have required more information for
[22] me to understand the split between CSN and
[23] outsourced orders.
[24]     Q: All right. Now, I'm not sure I'm following
[25] you. In terms of Roseville's standard operating

Page 29

[1] procedure on handling CSN parts and sourced parts,
[2] let me ask you this, if you got the spreadsheet we
[3] looked at was marked at 66.
[4]   A: Yes, ma'am.
[5]   Q: If you got this information in this same
[6] set up where you also had, you had information
[7] broken down between CSN and outsourced revenue.
[8]   A: Yes, ma'am.
[9]   Q: And instead of this being MITG's sales mix,
[10] this was the actual order information from Andover.
[11]   A: Yes, ma'am.
[12]   Q: Would you have been more accurate to use
[13] that information than to assume that Andover
[14] matched --
[15]   A: It would have been.
[16]   Q: MITG --
[17]   A: With one exception, and that would be
[18] understanding how the Roseville personnel handled
[19] in-stock parts because I don't know whether they
[20] have had the incentive like MITG to find the
[21] outsourced part, the $200, whatever we referred to
[22] earlier, so that's just a question mark. I mean,
[23] it would be if they operated in the same manner,
[24] then that would be better information for me to
[25] utilize, but without that information, utilizing

Page 30

[1] historical information I received was the best
[2] estimation.
[3]   Q: Okay. So you would need to know both the
[4] information in a format similar to what's presented
[5] on the spreadsheet for MITG plus know whether they
[6] had criteria such as that stated in the MITG Bible
[7] about when they could go to an outside source for
[8] an in-stock product?
[9]   A: Correct.
[10]   Q: Do you know out of the outsourced sales by
[11] MITG how many, what percentage of those were
[12] products that were in stock that were, that MITG
[13] was able to acquire from someone else at the
[14] required price cut?
[15]   A: I don't, do not know that.
[16]   Q: Did you ask anybody?
[17]   A: I believe -- I don't know if I specifically
[18] asked Mr. Hansen, but I think it was implied that,
[19] you know, they were either CSN or outsourced, and
[20] that this particular document didn't show a trail
[21] on what would have otherwise been a CSN part but
[22] which is now being outsourced. So I, again, the
[23] understanding, I don't remember if he told me that
[24] or whether I asked him that.
[25]   Q: So is it your understanding then that the

Page 31

[1] majority of outsourced parts are actually in stock,
[2] parts that could have been acquired through CSN
[3] that were acquired someplace else?
[4]   A: I have no idea about the outsourced parts,
[5] whether they are, you know, only outsourced parts
[6] or whether they are in stock that could be
[7] outsourced because of the agreement. I don't know
[8] the split on that at all, ma'am.
[9]   Q: So it could be that 100 percent of the
[10] outsourced sales are actually parts that were
[11] available through CSN that were cheaper, or it
[12] could be that zero percent were that way?
[13]   A: Based on my conversations with Mr. Hansen,
[14] I know that some of it, it's probably not zero,
[15] it's probably not 100, somewhere in between, but I
[16] have no idea where that number is, ma'am.
[17]   Q: And to your knowledge, MITG can't provide
[18] you with that information?
[19]   A: That's my understanding, yes, ma'am.
[20]   MR. HANSEN: Can I have a break.
[21]   (At this time, there was a break in the
[22] deposition.)
[23]   Q: (By Ms. Carroll) Let's just try to get
[24] into the details of your report and your
[25] calculations, and I want to break it into a couple

Page 32

[1] of different segments. And let's start with how
[2] you calculated the call volume.
[3]   A: Okay. I took --
[4]   MR. HANSEN: I'm sorry?
[5]   Q: (By Ms. Carroll) How you calculated the
[6] call volume for Andover, start with that.
[7]   A: All right. I utilized HP 11007 through
[8] 11009.
[9]   Q: Okay.
[10]   A: And I pulled for each month starting
[11] November 9, I pulled the data for each month and
[12] summarized them from the TTL orders column. I did
[13] that throughout the document, and that gave me the
[14] total Andover costs.
[15]   Q: And when you -- in the first report you
[16] assumed, well, that's for the -- is that the same
[17] way you calculated the calls to Andover in your
[18] first report?
[19]   A: I want to be sure I'm correct here.
[20]   MR. HANSEN: What exhibit was that, his
[21] first depo?
[22]   MS. CARROLL: 51.
[23]   MR. HANSEN: I got his depo here. I think
[24] that's what he testified here, that was the same
[25] way he did it. I'm trying to find it.