Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

Deposition of Scott Stringer

3:04-cv-03055-JES-CHE    #68-23    Page 1 of 5

E-FILED
Wednesday, 11 January, 2006  11:52:59 AM
Clerk, U.S. District Court, ILCD

Page 65

[1] were unaware that -- that Andover didn't outsource
[2] any percentage of its sales?
[3]     MR. HANSEN: I'm going to object to the
[4] form. I don't think he ever testified that Andover
[5] did outsource its sales, but subject to that, I
[6] object to the form. Go ahead.
[7]     Q: (By Ms. Carroll) Is it your belief, I'm
[8] going to try to clear this up, in your report, you
[9] have tried to determine a percentage outsourced
[10] sales by Andover based on the sales volume of MITG,
[11] correct?
[12]     A: Yes, ma'am.
[13]     Q: And by doing that and coming up with a
[14] percentage of outsourced sales by MITG and applying
[15] that percentage to Andover, you are then making the
[16] assumption that Andover outsourced a percentage of
[17] its sales, right?
[18]     MR. HANSEN: No, I'm going to object. That
[19] mischaracterizes his testimony which was
[20] specifically MITG could outsource based on the
[21] Bible not Andover outsourcing, so object to the
[22] form. Go ahead.
[23]     A: Just as I stated earlier about when we were
[24] speaking, the standard support agreement that was
[25] in place for MITG was obviously different than the

Page 66

[1] Andover call center, and so there would be
[2] opportunities for MITG to outsource a product
[3] because of the part in the standard support
[4] agreement where gross profit would be subject to a
[5] split. So again, this being in more detail fashion
[6] being an example of how MITG handled its orders, to
[7] me, was the best evidence because although
[8] Ms. Pound does testify to that, and I recall
[9] discussing that with Mr. Hansen or reading that
[10] someplace else, the fact remains is that how
[11] Andover was run, it being outsourced, would be
[12] different than MITG because of the standard support
[13] agreement.
[14]     Q: (By Ms. Carroll) Well, but you have to
[15] take into account who the people are who are
[16] calling into the call center, right? You have
[17] people who have a phone number for HP direct, and
[18] they end up getting serviced by MITG, right?
[19]     A: Okay. Yes, ma'am.
[20]     Q: And those people, when they call in can
[21] get, order any kind of spare part because MITG has
[22] both in-stock parts and they can source parts from
[23] someplace else, right?
[24]     A: Correct.
[25]     Q: And those people, to your knowledge, did

Page 67

[1] they know whether some of those parts were at the
[2] time they were ordering were going to come directly
[3] from in stock at HP, or whether they were going to
[4] be acquired from somebody else?
[5]     A: Are you talking about the customer?
[6]     Q: Correct.
[7]     A: No.
[8]     Q: So the customer is calling in saying I want
[9] these three Compaq parts and these three Sun parts,
[10] and I want you to ship them to me, and that's what
[11] MITG did, right?
[12]     A: I believe so.
[13]     Q: Do you know when a customer called in to
[14] Andover they said, we want three Compaq parts and
[15] three Sun parts, what Andover had the capability of
[16] handling for those people? Could they do the whole
[17] order just like MITG?
[18]     A: I don't know the answer.
[19]     Q: Have you seen anything that said when both
[20] MITG was operational and Andover was being handled
[21] in Andover, whether Andover could do exactly what
[22] MITG did?
[23]     A: I don't know.
[24]     MR. HANSEN: Is this an okay time to use
[25] the restroom?

Page 68

[1]     (At this time, there was a break in the
[2] deposition.)
[3]     Q: (By Ms. Carroll) When you said you didn't
[4] -- well, let me back up. Based on Ms. Pound's
[5] testimony and a caller called in to Andover, they
[6] got -- they were calling for Compaq and deck spare
[7] parts, right?
[8]     A: That's my understanding.
[9]     Q: That's what they were able to get from
[10] talking to that salesperson?
[11]     A: That's my understanding.
[12]     Q: And when -- we disagree of the date of the
[13] transition of the calls, but regardless, we agree
[14] that at some point, all of the Andover calls were
[15] then handled by Roseville?
[16]     A: Yes, ma'am.
[17]     Q: Whether it be November or April. When
[18] those calls were no longer answered by people
[19] physically located in Andover and people located in
[20] Roseville, what kind of parts would those callers
[21] be able to get, do you know?
[22]     A: What type of calls or parts were they able
[23] to get in Roseville?
[24]     Q: Right. Did it change from something other
[25] than for a year, I have a Compaq computer, and I

## Page 69

[1] have a deck, and I want spare parts, and I'm using
[2] Andover as my place for spare parts. When they
[3] were still at Andover, I could call that 800
[4] number, and I could get deck parts and I got Compaq
[5] parts, I didn't know where I was calling, I get
[6] Andover?
[7]     A: Right.
[8]     Q: When I was still calling this 800 number
[9] and those people are now located in California, am
[10] I still getting my deck parts and my Compaq parts?
[11]     A: Yes, ma'am.
[12]     Q: Do you have any understanding as to whether
[13] or not those callers were presented with an
[14] expanded group of parts, namely multi-vendor or
[15] third party parts?
[16]     A: No.
[17]     Q: So do you assume that when those calls, if
[18] those calls instead of going to California had gone
[19] to MITG, that MITG would have been selling them
[20] both in-stock parts that they had been buying and
[21] sourced product?
[22]     A: I believe they would have done that, yes.
[23]     Q: And what is the basis for that belief?
[24]     MR. HANSEN: When we say sourced product,
[25] are you talking about outsourced multi-vendor or

## Page 70

[1] out-sourced CSN?
[2]     MS. CARROLL: We've agreed on a meaning of
[3] sourced.
[4]     MR. HANSEN: I will let him answer.
[5]     Q: (By Ms. Carroll) When -- if those calls
[6] had gone to MITG instead of going to Roseville,
[7] would they, those people have been -- is it your
[8] belief that those folks could buy in-stock Compaq
[9] parts and the Digital parts that they had been
[10] buying plus they would buy an expanded group of
[11] parts?
[12]     A: I believe that the MITG personnel because
[13] of the standard support agreement would have
[14] outsourced some of that because part of the
[15] standard support agreement and the Bible basically
[16] say that they can, even though there is an in-stock
[17] part, if they can find a price break outside of the
[18] company, they get the 75/25 split. So I believe
[19] that that's a different way of operating than what
[20] Roseville would have done and Andover would have
[21] done, because I don't understand that they had that
[22] same agreement.
[23]     Q: And now, then is it your belief then that a
[24] percentage of the people who were calling in to
[25] quote Andover, if they had been directed to MITG

## Page 71

[1] instead of Roseville, would have been ordering out
[2] -- product, in-stock products that MITG would find
[3] that were the $150 or $200 less than the listed
[4] price presented by HP?
[5]     A: That's my understanding, yes.
[6]     Q: And the basis for that assumption is what?
[7]     A: The basis for that assumption is because
[8] MITG operated that way.
[9]     Q: But you don't know as you sit here today
[10] what percentage of the outsourced product that were
[11] sold by MITG in 2003, were in-stock products that
[12] they were able to acquire cheaper someplace else
[13] versus legacy products or multi-vendor products?
[14]     A: That's correct, I don't know that split
[15] out.
[16]     Q: Did you assume then for the purpose of your
[17] analysis here, that when people called in for the
[18] Andover calls that they had gotten to MITG instead
[19] of going to Roseville would have then, 44 percent
[20] of their calls would have been resulted in sales of
[21] in-stock parts through CSN, and that 56 percent of
[22] their calls would have resulted in sales of stocked
[23] Compaq parts that were available from another
[24] vendor to entitle them to the price break?
[25]     A: Yes.

## Page 72

[1]     Q: And you did that based on the overall
[2] outsourced percentage that you determined from MITG
[3] despite the fact that you don't know which
[4] percentage of outsourced were cheaper in-stock
[5] parts versus multi-vendor parts, right?
[6]     A: That was the best information I had, and I
[7] made that assumption, yes, ma'am.
[8]     Q: Are there -- other than assuming that the,
[9] if the Andover calls had been directed to MITG,
[10] those calls would have equalled this 44 percent, 56
[11] percent mix that you determined from the
[12] spreadsheet, are there any other assumptions that
[13] were made in trying to determine the percentage of
[14] source, CSN versus outsourced calls?
[15]     A: No, ma'am.
[16]     Q: And you told me that you did the
[17] calculation that's shown on Exhibit 66 by taking
[18] the box on the right-hand side, on the upper
[19] right-hand corner as you are looking at it, and
[20] this has CSN and the identification number is 150,
[21] and that had about 3.3, 3.4 million in sales
[22] volume?
[23]     A: Yes, ma'am.
[24]     Q: And the outsourced at almost 4.4 million in
[25] sales volume, right?

3:04-cv-03055-JES-CHE    #58-23    Page 3 of 5

Hewlett Packard Development Co., et al. vs.
Midwest Information Technology, et al.

Deposition of Scott String
11/2/20

Page 125

A: Right. It clarified by customer who was still there and who was not still there.

Q: And now, let's walk-through how you did it and how you came up starting with how you got to the customer list. And you say in the first step in your process, according to your report, is customers contacted by HP as noted on Exhibit PP of Richard Chizek's 01/03, and it's a typo, it should say '05 deposition?

A: Right. May I go to the restroom?

(At this time, there was a break in the deposition.)

Q: We were just starting to go through this methodology, and the first thing you said you did was look at Chizek Exhibit PP, which is Bates labeled -- well, the first page of it is HP 005071.

A: Yes, ma'am.

Q: And the rest of the pages, but I have a copy of it also. Tell me what you did looking at the spreadsheet behind the first two pages, what did you do with this spreadsheet?

A: Okay. Well, I took the spreadsheet, and I looked at the customers that were on the spreadsheet, and I went to MITG 10 -- it's handwritten Bates stamped MITG 1025.

Page 126

Q: Right. I think it was marked as Exhibit 50 in your last deposition.

MR. HANSEN: Yeah, I think that's the same one.

Q: (By Ms. Carroll) Starting with a -- about computer, and it has February through December and then totals on sales and margin?

A: Correct.

Q: That was marked as Exhibit 50, just so the record's clear in the first deposition. So what did you do with these two documents?

A: The first thing I did was I looked at these customers.

Q: These customers being the one on Exhibit PP?

A: On Exhibit PP, and I checked those against Exhibit MITG 1025.

Q: All right. So if the customer was on this list --

MR. HANSEN: PP.

A: On PP, sorry, and also on MITG 1025, then I assumed that they continued buying, and I put a little checkmark on my work paper here. So that meant that they were no longer -- because they were continuing to buy subsequent to January of '04,

Page 127

that they were not, there was no lost customer per se.

Q: (By Ms. Carroll) Okay. So you now have a list of your customers not lost. And what next?

A: Now I have a list of customers who were doing business apparently per PP, and the ones that didn't have a checkmark on them, I needed to investigate further. So I said, okay, let's go back. Now that I have the specific sales data on the spreadsheet, I went back, and I checked against the sales data for both '02 and '03.

Q: Okay. And which part, I've got spreadsheet up on my computer, just doing, let's start with '03, there are two different '03 spreadsheets. The first one is under tab INV-1046 2003, and the one that's 2003 by customer.

A: It would be the tabs by customer.

Q: All right and that was actually the one that we marked as Exhibit 66 before, correct?

A: Correct.

Q: So you looked at -- you came up and just give me an example of one that doesn't have a checkmark by it, so we'll use it.

A: So, for example, Inside Direct USA, I went to 2003 by customer on the spreadsheet to see if

Page 128

they had bought in 2003.

Q: Okay. Can we just do a find here?

A: Um-hum.

Q: So we just do the find function, find next, and there they are.

A: Correct. And so that's the first prong on my test. And the second prong is did they buy also in '02.

Q: And so we went to 2002 by customer?

A: And did the same thing, yes, ma'am.

Q: And again, just doing the find function, find next, and that wraps us back around and we see they show up at line 430 as having to purchase?

A: Correct. So that told me -- what that means is that they bought in '02, they bought in '03, they stopped buying after January of '04.

Q: And then on your, in your supplemental report here, then they made the list that is Exhibit 4-1 through 4-2, correct?

A: Yes, ma'am.

Q: And about two-thirds of the way down they show up?

A: Correct.

Q: Now, once they made it on this list, you've done something else also. You are looking just at

3:04-cv-03055-JES-CHE    # 68-23    Page 4 of 5

Hewlett Packard Development Co., et al. vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

Page 129

[1] -- you are looking now when you put them on this
[2] list, they may, at least customer name shows up on
[3] your exhibit because they bought in 2002, they
[4] bought in 2003, and they didn't buy after February
[5] 7 of 2004, which is what's shown on MITG 1025
[6] through 1026?
[7]     A: Yes, ma'am, that's correct.
[8]     Q: So once all of those -- and do all of these
[9] people, these customers that are on the Exhibit 4-1
[10] through 4-2 of your report fit that criteria that
[11] I've just identified?
[12]    A: Yes, ma'am.
[13]    Q: Now, once they make the list, what was the
[14] next step?
[15]    A: Once they made the list, then it was to
[16] determine what was an expected sales volume for
[17] 2004, and the first step was to basically
[18] determine, you know, what would be the best base
[19] for that. And we determined that 2003, because it
[20] was closer to 2004, would probably serve as a
[21] batter proxy of an estimation of 2004. So we took
[22] the 2004 sales -- I'm sorry, beg your pardon. We
[23] took the 2003 sales, both CSN and outsourced and
[24] added those for 2003 to come up with a total. We
[25] then prorated that because the period of '04, we

Page 130

[1] are looking at is not a full year, it's only ten
[2] months and three weeks, so we prorated that number
[3] of '03 to ten and three-quarters.
[4]    Q: Which one of the tabs on the spreadsheet
[5] that is up on the screen did you use to determine
[6] the CSN sales versus outsource sales?
[7]    MR. HANSEN: So we are talking about the
[8] same thing?
[9]    Q: (By Ms. Carroll) You want 2003 by
[10] customer?
[11]   A: Yes.
[12]   Q: And again, just so the record's clear,
[13] that's Exhibit 66?
[14]   A: Right.
[15]   Q: So how did you determine that information
[16] from this report?
[17]   A: It was determined -- well, it's basically
[18] laid out by customer here in the Column C, D, E and
[19] F.
[20]   Q: All right. So what we have, this
[21] spreadsheet has two different parts of it, the
[22] Columns A and B are dealing with per order basis,
[23] and C through F are then combining all of the
[24] information for any particular customer, so just
[25] looking at the first one. Let's look at

Page 131

[1] Kimberly-Clark, and you have Kimberly-Clark
[2] outsource sales CSN sales and a total sales by MITG
[3] to Kimberly-Clark for the year 2000.
[4]    A: 3.
[5]    Q: 2003 for Kinberly Clark?
[6]    A: Yes, ma'am.
[7]    Q: So everybody who made your list, you went
[8] down the right side of the spreadsheet as Exhibit
[9] 66 and up on the computer screen and took the
[10] information that's contained here for those sales
[11] and added it to your list?
[12]   A: Correct.
[13]   Q: And you added all of those up to get total
[14] sales for 2003?
[15]   A: Correct.
[16]   Q: Prorated it, and then how did you use that
[17] for 2004?
[18]   A: Well, I prorated it to reflect the ten and
[19] three-fourths months of 2004.
[20]   Q: So you assumed then that the business they
[21] did for the calendar year 2003 was going to be the
[22] same volume of business on a prorated basis for
[23] 2004?
[24]   A: Exactly.
[25]   Q: Do you have any information that you have

Page 132

[1] been given as to any reasons why the companies that
[2] are listed on your Exhibit 4-1 through 2 stopped
[3] doing business with MITG?
[4]    A: Specific reasons?
[5]    Q: Correct.
[6]    A: Why each -- well, I know that the list that
[7] was prepared which was Exhibit PP represents
[8] customers who are contacted by HP. And without
[9] calling each customer individually and saying why
[10] did you stop buying from MITG, I did not do that
[11] analysis, no.
[12]   Q: And have you seen anything, did MITG
[13] representatives provide you with anything about any
[14] of these people saying, testimony or an affidavit
[15] saying we quit doing business with MITG because HP
[16] called us?
[17]   A: I have not seen anything like that.
[18]   Q: So what you did was for the purpose of your
[19] analysis assumed that if they were contacted by HP,
[20] that they ceased doing business because of that
[21] contact?
[22]   A: Based upon my methodology for looking at,
[23] you know, the fact that they bought for two years
[24] and then stopped buying, yes, ma'am, that was my
[25] only way of determining who would have stopped

3:04-cv-03055-JES-CHE #68-26 Page 5 of 5

Hewlett Packard Development Co., et al vs. Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

Page 133

[1] buying.
[2] Q: And just so it's clear, you don't have any
[3] information about actual comments made by HP or
[4] anything else to account for the fact that back up
[5] the tortious interference claim?
[6] A: Unless they are in deposition and I've
[7] forgotten them since and I don't recall.
[8] Q: Now, I just want to make sure before we go
[9] any further, I think in your report, you referred
[10] to these in the third paragraph of your tortious
[11] interference, it says you included these people
[12] because they demonstrated a regular pattern of
[13] purchasing.
[14] A: Yes, ma'am.
[15] Q: Do you see that phrase?
[16] A: Yes, ma'am.
[17] Q: Is that regular pattern of purchasing
[18] simply on the fact that they purchased some revenue
[19] from them as opposed to the number of orders that
[20] they may have placed?
[21] A: Yes. My only attribute was my attribute
[22] test was did they purchase in '03, and did they
[23] purchase in '02, irregardless of what the volume
[24] was.
[25] Q: You are aware, are you not, that once the

Page 134

[1] standard support agreement terminated on February 7
[2] of '04, that MITG would not have access to in-stock
[3] Compaq parts?
[4] A: You are asking defining in-stock Compaq
[5] parts as they won't be able to order through HP
[6] anymore.
[7] Q: Let me back up and make sure we are on the
[8] same page. You understand CSN parts to be those
[9] parts that were ordered because they were in stock
[10] from HP?
[11] A: Correct.
[12] Q: All right. Were you aware that after the
[13] end, the standard support agreement, MITG won't be
[14] able to order CSN parts from HP?
[15] A: Well, I guess my understanding is just so I
[16] understand, that if I had a customer, if MITG had a
[17] customer and they need Hewlett Packard parts, that
[18] MITG was going to be able to get those parts either
[19] through a third party or some supplier. So the
[20] fact that they were not under the standard support
[21] agreement in my assumption was that that would not
[22] prohibit them from finding supply for these
[23] customers.
[24] Q: But you did understand they weren't going
[25] to be able to buy those directly from Hewlett

Page 135

[1] Packard?
[2] A: I definitely understood the standard
[3] support agreement changed, and that you know, that
[4] they would have other suppliers to buy that from,
[5] whether Hewlett Packard would sell to them, I made
[6] no assumption.
[7] Q: You simply assumed that regardless of where
[8] they could get them, that MITG was going to have
[9] access to the same identical CSN parts that they
[10] had access to in 2003?
[11] A: Yeah, pretty much that's my assumption,
[12] yes, ma'am.
[13] Q: And the basis for that assumption is what?
[14] A: Is that they can buy parts from other
[15] vendors, that typically as a buyer, I mean, they
[16] have access to supply, and that I just assumed that
[17] there would be no problem with supply to these
[18] customers.
[19] Q: Do you have any knowledge as to how the HP
[20] authorized parts resell program parts?
[21] A: Unless it's in documents, I can't quote it.
[22] Q: As you sit here, you have no knowledge as
[23] to whether or not -- well, do you know one way or
[24] the other whether HP has a program that restricts
[25] the sale of authorized parts at least by HP to

Page 136

[1] certain people, certain customers they have under
[2] contract?
[3] A: I'm not aware of that.
[4] Q: Did you make the assumption also that even
[5] if they couldn't get the parts from HP, the CSN
[6] parts through HP, and they got them through another
[7] vendor, that the cost of the part would be the
[8] same?
[9] A: I simply assumed that the cost of the part
[10] would be the same.
[11] Q: What's the basis for that assumption?
[12] A: Not having data to contradict it.
[13] Q: Well, is it -- if they are obtaining CSN
[14] parts from a source other than HP, wouldn't the
[15] fair assumption to be is that that source had some
[16] kind of markup so they made profit off of the sale
[17] of that part?
[18] MR. HANSEN: Object to form. It assumes
[19] facts not in evidence. Go ahead.
[20] A: What I know about the CSN parts though is
[21] that there are opportunities to go out the CSN or
[22] had been opportunities and achieve a price that was
[23] lower and achieve the non-stock price. So there
[24] would be situations I think where they would pay
[25] more for a part and situation where they would pay