Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
 2              SPRINGFIELD, DIVISION

 3   HEWLETT-PACKARD            ) CIVIL ACTION NO. 04-3055
     DEVELOPMENT COMPANY, L.P., )
 4   HEWLETT-PACKARD COMPANY    )
     AND COMPAQ TRADEMARK B.V., )
 5                              )
           PLAINTIFFS,          )
 6                              )
     VS.                        )
 7                              )
     MIDWEST INFORMATION        )
 8   TECHNOLOGY GROUP, INC.,    )
     AND MICHAEL LAUBER,        )
 9                              )
           DEFENDANTS.          )
10   ---------------------------

11
                   DEPOSITION OF
12                 TROY BLOOMQUIST

13              TAKEN ON BEHALF OF
                    DEFENDANTS
14

15       DEPOSITION OF TROY BLOOMQUIST, taken

16   before Cynthia Craig, General Notary Public within

17   and for the State of Nebraska, beginning at

18   9:00 a.m., on October 12, 2004, at the

19   Hewlett-Packard Office, 10810 Farnam Drive, Omaha,

20   Nebraska.

21

22

23

24

25
```

EXHIBIT 15

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

## Page 2

```
 1           A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
     MS. ELIZANN CARROLL
 3   THOMPSON & KNIGHT, LLP
     1700 Pacific Avenue, Suite 3300
 4   Dallas, Texas  75201
     (214) 969-1700  FAX 969-1751
 5
     MS. GAYNELLE GRIFFIN JONES
 6   HEWLETT-PACKARD COMPANY
     20555 SH 249, ms 110701
 7   Houston, Texas  77070
     (281) 518-0298  FAX 518-1388
 8
     FOR THE DEFENDANTS:
 9   MR. JAMES A. HANSEN
     SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
10   525 Jersey
     P.O. Box 1069
11   Quincy, Illinois  62306
     (217) 223-3030  FAX 223-1005
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2   CASE CAPTION .................. Page   1
     APPEARANCES ................... Page   2
 3   INDEX ......................... Page   3
     TESTIMONY ..................... Page   6
 4   REPORTER CERTIFICATE .......... Page 174
     COST CERTIFICATE .............. Page 175
 5   READ & SIGN LETTER ............ Page 176
     ERRATA SHEET .................. Page 177
 6
     DIRECT EXAMINATION:
 7     By Mr. Hansen............. Page   6
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   EXHIBITS:                                    MARKED
 2   V.  Business Requirements of
         OD 2001-522 manual
 3       Bates Stamp MITG 0536 - 0563
         ( 29 pages ) ....................         49
 4
     W.  E-mails
 5       Bates Stamp MITG 0532 - 0535
         ( 4 pages ) .....................         36
 6
     X.  Record of Meeting
 7       Bates Stamp MITG 0565 - 0570
         ( 6 pages ) .....................         62
 8
     Y.  Middleware Agreement
 9       ( 5 pages ) .....................         68
10   Z.  E-mails
         Bates Stamp MITG 068 - 076
11       and 0482, 0486, 0487
         ( 9 pages ) .....................         99
12
     AA. E-mails
13       Bates Stamp HP 001277 - 001278
         ( 2 pages ) .....................        127
14
     BB. E-mails
15       Bates Stamp HP 001301 - 001303
         ( 3 pages ) .....................        132
16
     CC. E-mails
17       Bates Stamp HP000042 - 000043
         ( 2 pages ) .....................        143
18
     DD. E-mails
19       Bates Stamp HP 001236 - 001238
         ( 3 pages ) .....................        152
20
     EE. E-mails
21       Bates Stamp MITG 0106 - 0107
         ( 2 pages ) .....................        157
22
23
24
25
```

## Page 5

```
 1        (Whereupon, the following proceedings were had,
 2   to-wit:)
 3        COURT REPORTER:  Are there any
 4   stipulations?
 5        MR. HANSEN:  No, just I will just make a
 6   statement on the record.
 7        We're here today pursuant to deposition
 8   notice cause pending in the Central District of
 9   Illinois.
10        Let the record reflect that counsel of
11   record is here, HP also has one of their internal
12   lawyers, Ms. Jones, present for the deposition.
13        The only thing I will state is, counsel,
14   we have agreed that we're going to consecutively
15   number the deposition exhibits.  I have the exhibits
16   here today from our depositions in California.
17        In going through them, I think we left off
18   with U, and what I plan on doing is I'll just go AA,
19   BB, et cetera.
20        MS. CARROLL:  That's fine.
21
22
23
24
25
```

2 (Pages 2 to 5)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 6

1  TROY BLOOMQUIST,
2  having been first duly sworn,
3  was examined and testified as follows:
4  DIRECT EXAMINATION
5  BY MR. HANSEN:
6  Q. Please, state your name for the record.
7  A. Troy Bloomquist.
8  Q. Troy, how old are you?
9  A. Thirty-five.
10 Q. Date of birth?
11 A. 2/5/69.
12 Q. You reside here in Omaha?
13 A. Yes.
14 Q. Okay. Married?
15 A. Yes.
16 Q. Kids?
17 A. Three.
18 Q. Okay. All still living in the home?
19 A. Yes.
20 Q. Can you tell me your educational
21 background?
22 A. I've got a bachelor's degree in computer
23 science from University of Nebraska, Omaha, with a
24 minor in communications.
25 Q. When did you receive your bachelor's?

Page 7

1  A. 1991.
2  Q. Have any postgraduate schooling work
3  towards a master's or anything?
4  A. No.
5  Q. Any specialized postgraduate training?
6  A. I've been through a lot of sales
7  management training and executive briefing training,
8  and spent a lot of time in front of customers.
9  Q. You hold any professional certifications
10 or accreditations?
11 A. No.
12 Q. Are you a member of any professional
13 business associates?
14 A. (Witness nods head.)
15 Q. You have to answer out loud.
16 A. No.
17 Q. That's a good point. I'll stop right
18 here, I forgot to do it.
19    I'm sure you met with the attorneys here
20 sometime prior to your deposition and went over the
21 ground rules. If at any time I ask you a question
22 today that you don't understand, ask me to rephrase
23 it and hopefully I'll put it in a form you can
24 answer.
25 A. Okay.

Page 8

1  Q. As you were just reminded, we need
2  verbal --
3  A. Verbal yeah, sorry.
4     MS. CARROLL: Don't interrupt, that'll be
5  the next one.
6  BY MR. HANSEN:
7  Q. Say yes or no because Cindy here is taking
8  down everything we say and it'll be typed up in a
9  booklet form for us to read later, but one person's
10 uh-huh is another person's huh-uh, so it's very
11 difficult. We'll remind you, don't worry.
12    And also it's very hard for Cindy to take
13 down two of us talking at the same time, so I would
14 ask you to allow me to complete my question before
15 you answer, and I in turn will allow you to answer
16 before I ask my next question, okay?
17 A. Yes.
18 Q. If at any time you need to take a break
19 today let us know, and we'll do so. I'm sure we'll
20 take breaks throughout the course of the deposition
21 but if for any reason you need to use the rest room,
22 make a call or something, just let us know, okay?
23 A. Yes.
24 Q. Tell me your present employer.
25 A. Hewlett-Packard.

Page 9

1  Q. What is your position or title?
2  A. Business development manager for the
3  Great Lakes for integrated support.
4  Q. That was a mouthful. Business developer
5  manager for Great Lakes?
6  A. Uh-huh.
7  Q. What was the last?
8  A. Integrated support.
9  Q. How long have you been in that position?
10 A. Well, kind of hard -- well, in this
11 specific Great Lakes position about a year.
12 Q. Okay.
13 A. I held a regional position before that and
14 then we collapsed the region into areas so I moved
15 to an area.
16 Q. How long were you in the regional
17 position?
18 A. About a year, year and a half.
19 Q. Okay. Tell me what your current duties
20 and responsibilities are in your current position.
21 A. My job is to -- is to help drive and
22 develop business, new business in HP clients around
23 what we call integrated support, which is
24 multivendor support, so supporting other products
25 like Sun and Dell, IBM and others.

3 (Pages 6 to 9)

Page 26

1  way from a division perspective, you know. You
2  still have a group that manages resellers, then you
3  have a group that manages Direct customers.
4      So we were -- we started in the reseller
5  portion of the company and we thought it made sense
6  to go ahead and expand the third-party parts piece
7  to the end user environment because at the time the
8  Custom-Edge entity still had the ability to procure
9  multivendor products like IBM, for instance, so we
10 really started supporting customers who needed
11 things like AC adaptors and batteries for ThinkPads
12 and things of that nature.
13     Q.  So MITG, were they then used to support
14 those end users as a direct contact?
15     A.  Not necessarily a direct contact.
16 Typically what would happen in those scenarios is we
17 would have what we call a CSR, or an inside sales
18 rep.
19     They would typically, 80 percent of the
20 time, would be engaging MITG, and then MITG would be
21 following back to that inside sales rep, you know,
22 for, you know, yes, the order is going to ship,
23 those types of activities.
24     When you talk about direct end users, most
25 of the time we had an HP person that was involved in

Page 27

1  those conversations.
2      Q.  Okay.  Was there a division I guess -- did
3  CEI fall under Compaq Services organization, or was
4  it -- I guess what division of Compaq did CEI fall
5  under?
6      A.  Well, it was -- CEI for the first year or
7  so was ran as a completely separate business,
8  completely separate business entity.
9      Q.  Right.
10     A.  It was part of the big umbrella but it was
11 in a sense being run as a separate business.
12     Q.  At some point in time did it fall under
13 the Compaq umbrella?
14     A.  Once it became Compaq Direct.
15     Q.  Okay.
16     A.  It was now under the Compaq umbrella, but
17 I wouldn't -- still would not say that it was --
18 still wasn't at that time part of Compaq Services.
19     Q.  Okay.  Well, what time frame are we
20 talking about here as far as when MITG got involved
21 in the, you know, support services, was it 2000,
22 2001?
23     A.  You mean -- when you say support
24 services --
25     Q.  Well, I'm talking about when they were

Page 28

1  contacted to help provide support to Swiss Colony in
2  Hannibal, and then they were engaged on a larger
3  case-by-case national --
4      A.  I think the first contact was probably in
5  late '99.
6      Q.  Okay.  All right.
7      A.  Late '99, it was probably the first
8  contact.  Could be early 2000, but I'm -- well, I'll
9  say for the record it was late '99.
10     Q.  Ogallala.  At the time in which MITG was
11 engaged on a case-by-case national basis what was
12 the ordering time system -- and maybe this will cut
13 to the chase, did Compaq have a web tool in place to
14 interface orders between MITG and Compaq at the time
15 they were initially engaged?
16     A.  No.
17     Q.  Okay.  How was that interface or order
18 system conducted?
19     A.  Well, that happened some time after the
20 first engagement.
21     Q.  Right.  If I refer to what's called an
22 electronic data interface, an EDI, it's my
23 understanding that around 2000 when MITG was engaged
24 to begin this national case-by-case -- when we say
25 case-by-case, does that mean just order by order?

Page 29

1      A.  Yeah, best way to explain case-by-case,
2  maybe a better definition would be an
3  incident-to-incident basis, so every time a call was
4  put in we could potentially use them for the
5  third-party parts procurement.
6      Q.  Okay.  Were they specifically used solely
7  for third-party parts at this time?
8      A.  Yes.
9      Q.  Okay.  It's my understanding that the way
10 when this began, MITG or, for that matter, maybe any
11 other customer or supplier, an order would be placed
12 through Compaq on electronic interface, or what's
13 called an EDI, and then it would be put into
14 Compaq's VISTA order entry system?  Maybe I'm not
15 explaining that correctly.
16     A.  Well --
17     Q.  Why don't you tell me how it was used.
18     A.  Well, can I clarify what you're asking?
19     Q.  Sure.
20     A.  Are you asking how MITG system was used or
21 how other entities were used?
22     Q.  Let's focus on MITG.
23     A.  When we first -- when we started this, you
24 know, one of the -- one of the -- one of the things
25 I already had in place was I had a web-based

8 (Pages 26 to 29)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 66

1  Q. Now, these two documents here are all --
2  they were produced by MITG. Were there records of
3  meetings such as Exhibit X created for each meeting
4  that occurred on this project?
5  A. Typically from my knowledge of these
6  deals, Chris Fortun would typically -- yes, she
7  typically -- when we would have a meeting, they
8  would put a document like this together to my
9  recollection.
10      I'm not sure she did it for every meeting
11  though, but that was what -- Chris typically did
12  this when we had meetings so everybody was very
13  clear on what we were doing for the project.
14  Q. Is she still around if you know?
15  A. I don't know. I think she is, but I'm not
16  sure.
17  Q. Okay.
18      MS. CARROLL: When we get to a breaking
19  point can we take a break?
20      MR. HANSEN: Almost there.
21  BY MR. HANSEN:
22  Q. Did Compaq Services ever review the
23  MITG's web-based tool?
24  A. I did send the tool off for -- there's two
25  folks in the organization that, quote, looked at it,

Page 67

1  but when I talk -- when you're talking about the
2  Compaq entity, there's a person that was -- I can't
3  remember her name, and we talked about -- we were --
4  we mentioned it yesterday I thought, but there was a
5  lady that was -- her job was to look at web sites to
6  make sure that they were compliant and things of
7  that nature, you know, and so she looked at it. I
8  do apologize, I don't recall her name.
9      And then I also sent the web site
10  snapshot, you know, via e-mail to my recollection to
11  a gentleman by the name of Chip Love, who was from a
12  Compaq Services organization. He was the gentleman
13  who came to us and wanted to -- I guess I was going
14  to say bolt on, but who wanted to -- who brought us
15  the consumer business from that perspective and he
16  wanted to take advantage of the programming we had
17  in place with the end user customers.
18      So I gave him -- I just showed him the
19  snapshot of what it looked like, and his only
20  comment back to me was it looks good, and that was
21  it. I don't know how far and deep he looked into it
22  but he certainly seen what the page was looking like
23  and how it looked.
24      MS. CARROLL: I'm going to object to that
25  answer as nonresponsive.

Page 68

1  BY MR. HANSEN:
2  Q. He's a guy out of Houston?
3  A. I believe so. I believe he's out of
4  Houston, I believe.
5  Q. Now, when you say you sent him the web
6  site snapshot, is that after the XML was created?
7  A. I don't recall if it was after or before.
8      MR. HANSEN: Okay. We can take a break
9  right there.
10      (10:19-10:33 a.m. - Recess.)
11      (Exhibit Y marked for
12      identification.)
13  BY MR. HANSEN:
14  Q. I'm going to hand you what's been marked
15  as Deposition Exhibit Y, and, again, this is a
16  document. It's not Bates labeled but each side has
17  a copy and has produced it. It's the Middleware
18  agreement, and if you look on the very last page I
19  believe your signature is on the document?
20  A. Yes.
21  Q. Okay. Dated February 8 of 2002; is that
22  correct?
23  A. Yes.
24  Q. Okay. And to your recollection, if you
25  know, was this Middleware agreement entered into at

Page 69

1  or around the time that Middleware was launched?
2  A. After.
3  Q. After. Okay. And under No. 1 there,
4  development of Middleware, it discusses that
5  MITG shall develop software that will link together
6  the parties' web tools and more specifically create
7  the interface we're talking about, so at this time
8  of this agreement that had been accomplished?
9  A. Yes.
10  Q. Okay. And the last sentence there in
11  Paragraph 1 indicates that the business requirement
12  shall be set forth in the final form of a document
13  referred to as Compaq's business requirements for
14  OD 2001-522 now in the process of being developed by
15  the parties.
16      My question is: Is that what was to be
17  the final version of Exhibit V?
18  A. Yes.
19  Q. Okay. Now, you already told me I think
20  when I asked about the final copy, that Chris Fortun
21  would be a person that could possibly have that or
22  maybe knows where it is?
23      MS. CARROLL: Objection: Calls for
24  speculation.
25      THE WITNESS: I don't know.

18 (Pages 66 to 69)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.