Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      SPRINGFIELD, DIVISION

 3   HEWLETT-PACKARD              ) CIVIL ACTION NO. 04-3055
     DEVELOPMENT COMPANY, L.P.,   )
 4   HEWLETT-PACKARD COMPANY      )
     AND COMPAQ TRADEMARK B.V.,   )
 5                                )
            PLAINTIFFS,           )
 6                                )
     VS.                          )
 7                                )
     MIDWEST INFORMATION          )
 8   TECHNOLOGY GROUP, INC.,      )
     AND MICHAEL LAUBER,          )
 9                                )
            DEFENDANTS.           )
10   -----------------------------

11
                        DEPOSITION OF
12                     DEBRA P. BROADY

13                  TAKEN ON BEHALF OF
                         DEFENDANTS
14

15        DEPOSITION OF DEBRA P. BROADY, taken

16   before Cynthia Craig, General Notary Public within

17   and for the State of Nebraska, beginning at

18   1:00 p.m., on October 14, 2004, at the

19   Hewlett-Packard Office, 10810 Farnam Drive, Omaha,

20   Nebraska.

21

22

23

24

25
```

EXHIBIT 18

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFFS:
       MS. ELIZANN CARROLL
 3     THOMPSON & KNIGHT, LLP
       1700 Pacific Avenue, Suite 3300
 4     Dallas, Texas 75201
       (214) 969-1700  FAX 969-1751
 5
    FOR THE DEFENDANTS:
 6     MR. JAMES A. HANSEN
       SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
 7     525 Jersey
       P.O. Box 1069
 8     Quincy, Illinois 62306
       (217) 223-3030  FAX 223-1005
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  CASE CAPTION .................. Page  1
    APPEARANCES ................... Page  2
 3  INDEX ......................... Page  3
    TESTIMONY ..................... Page  6
 4  REPORTER CERTIFICATE .......... Page 60
    COST CERTIFICATE .............. Page 61
 5  READ & SIGN LETTER ............ Page 62
    ERRATA SHEET .................. Page 63
 6
    DIRECT EXAMINATION:
 7     By Mr. Hansen.............. Page  4
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         (Whereupon, the following proceedings were had,
 2  to-wit:)
 3         COURT REPORTER:  Are there any
 4  stipulations?
 5         MR. HANSEN:  No stipulations.
 6             DEBRA P. BROADY,
 7     having been first duly sworn,
 8  was examined and testified as follows:
 9         DIRECT EXAMINATION
10  BY MR. HANSEN:
11     Q.  Go ahead and state your name for the
12  record.
13     A.  Debra Broady.
14     Q.  You're employed with HP?
15     A.  Yes, I am.
16     Q.  How long have you been here?
17     A.  Four years.
18     Q.  Well, what is your title now?
19     A.  Business analyst.
20     Q.  Have you been in that position for
21  four years?
22     A.  No.
23     Q.  What did you start out as?
24     A.  EDI programmer analyst.
25     Q.  Okay.  EDI program --
```

Page 5

```
 1     A.  Programmer analyst.
 2     Q.  And how long were you in that role?
 3     A.  For probably about a year and a half.
 4     Q.  How long have you been a business analyst?
 5     A.  Since February.
 6     Q.  '04?
 7     A.  Yes.
 8     Q.  And you've been here for four years.  What
 9  did you do before you were an EDI programmer
10  analyst?
11     A.  I was a Middleware programmer analyst.
12     Q.  Was that your involvement in the project
13  with MITG?
14     A.  Yes, it was.
15     Q.  Okay.  How long were you the Middleware
16  programmer analyst?
17     A.  Two and a half years, whatever the
18  difference.
19     Q.  Was that the first job you had here, was
20  the Middleware?
21     A.  No, my first job was EDI programmer
22  analyst.
23     Q.  Then you went to Middleware?
24     A.  Yes.
25     Q.  Then you went to EDI business analyst?
```

2 (Pages 2 to 5)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

D. BROADY - Direct (By MR. HANSEN)

Page 6

```
1    A.  Yes.
2    Q.  What's your educational background?
3    A.  I'm currently working on a bachelor's in
4  business management.  I do have an associate's in
5  AS/400 programming.
6    Q.  Okay.  Where is that from?
7    A.  My associate's is from Metro Community
8  College.
9    Q.  Is that here in Omaha?
10   A.  Yes.
11   Q.  Where are you working on your bachelor's
12 at?
13   A.  Bellevue University.
14   Q.  Bellevue, Nebraska.
15   A.  Yes.
16   Q.  Did you graduate high school?
17   A.  Yes.
18   Q.  Okay.  Are you from around the area here?
19   A.  No.
20   Q.  Okay.  What did you do before you came to
21 HP?
22   A.  I was an EDI programmer analyst.
23   Q.  Where at?
24   A.  Werner Enterprises.
25   Q.  Is that W-E-R-N-E-R, the trucking company?
```

Page 7

```
1    A.  Yes.
2    Q.  How long were you with Werner?
3    A.  Approximately three years.
4    Q.  Okay.  You live in Omaha?
5    A.  I live in Papillion.
6    Q.  Okay.  Let's get to the job duties and
7  responsibilities you had as a Middleware programmer
8  while at HP.
9    A.  I was responsible for developing
10 Middleware applications.  That's pretty much it.
11   Q.  Okay.  I got some testimony this morning
12 from Ms. Urwin.  She said she was a VISTA programmer
13 on the VISTA order entry side, that there's web
14 programmers over here and that Deb Broady was with
15 the Middleware which is kind of in the middle, would
16 you agree?
17   A.  Makes sense.
18   Q.  In a nutshell?
19   A.  Yeah.
20   Q.  Okay.  In laymen's terms so I can
21 understand it.
22       Were you the individual that in the
23 Middleware -- Middleware programmer analyst position
24 helped create the interface between MITG and VISTA?
25   A.  Yes.
```

Page 8

```
1    Q.  Okay.  Who did you report to, is it
2  Exendine?
3    A.  Yep.
4    Q.  Okay.  Were you involved in the creation
5  of the -- well, let me back up.
6        How do you want me to refer to it:
7  Middleware, XML, interface?  Are they all synonymous
8  if I use them interchangeably, or what would you
9  prefer?
10   A.  Middleware.
11   Q.  Middleware?
12   A.  Yeah, it's a little more than just XML,
13 but, yeah, our group is referred to as Middleware.
14   Q.  XML, would you agree, is kind of an e-mail
15 string of data that's securely encrypted for this
16 instance, it was that way because there was credit
17 card transactions going back and forth in a very
18 generic sense?
19   A.  Sure.
20   Q.  Well, tell me, what does XML mean to you?
21   A.  XML is just a format, a format of data
22 that comes across.
23   Q.  Fields of data, is that --
24   A.  Yes.
25   Q.  Okay.
```

Page 9

```
1    A.  It's a very specific format.
2    Q.  And the Middleware, were you in your
3  position as a programmer analyst for the entire time
4  of that project for the MITG deal?
5    A.  Yes, I was.
6    Q.  Okay.  Is there anyone else besides
7  yourself in the Middleware group that was involved
8  in that with MITG?
9    A.  Primarily I dealt with --
10   Q.  Okay.  Is there anyone more knowledgeable
11 or involved than you were on the Middleware side?
12   A.  Probably not, no.
13   Q.  Okay.  It's my understanding and there's
14 been testimony that the reason the Middleware idea
15 came about and MITG was approached was to enhance
16 efficiencies and eliminate the double order entry
17 that was ongoing when an order was received at the
18 MITG tool and it had to be manually keyed in again
19 in VISTA, is that your understanding?
20   A.  That was my understanding.
21   Q.  Okay.  And prior to -- well, let me ask it
22 this way:  Did you have any other involvement with
23 MITG other than Middleware?
24   A.  No.
25   Q.  Okay.  Prior to -- strike that.
```

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 10

1  So there was not a tool or system in place
2  that -- prior to this project -- when I refer to the
3  project I'm talking about the Middleware with MITG,
4  that was allowing MITG and VISTA to interface?
5  A. Not that I'm aware of.
6  Q. Okay. And is it your understanding that
7  the Middleware was to create that tool that would
8  allow orders to come into MITG's web site and be
9  directly placed into the VISTA system?
10  A. Yes.
11  Q. Okay. And was there any XML interfaces
12  linking to VISTA from any other outside web sites
13  prior to the one created with MITG?
14  A. What do you mean by outside web sites?
15  Outside of our --
16  Q. Customers, General Motors, General
17  Electric, MITG vendors?
18  A. That had their own web site that was
19  linked up through our firewall?
20  Q. Sure.
21  A. Not that I'm aware of.
22  Q. Okay.
23  A. I can't think of any, no.
24  Q. Was there any -- for instance, did
25  Microsoft have the capability to have an XML

Page 11

1  interface through any Compaq web site directly into
2  VISTA prior to this project with MITG?
3  A. Prior to, yes.
4  Q. Okay. What was that interface?
5  A. I believe it was our Version 2.
6  Q. Version 2 of what?
7  A. Version 2 of the XML format that came in.
8  Q. Okay. Was that a direct interface link
9  between Microsoft and VISTA?
10  A. No.
11  Q. Okay. That's my question. Was there any
12  direct interface link between Microsoft or any other
13  entity directly into VISTA?
14  A. No.
15  Q. Okay. Microsoft had an XML -- excuse me,
16  Microsoft had a Middleware I'll call it link with
17  what now, Version 2.0, which was what?
18  A. So that's just a format, an XML format,
19  and that's how we define that flow of orders that
20  came in.
21  Q. Okay. Let me ask it this way: Did
22  Microsoft or any other entity have the ability to go
23  to a web site and place an order and have that order
24  directly linked into VISTA prior to the Middleware
25  that was developed with MITG?

Page 12

1  A. Not directly. There's some hops it takes
2  before it gets to us.
3  Q. Are you aware of Microsoft or any other
4  entity now having the Middleware interface link
5  directly into VISTA now?
6  A. No, I'm not aware of that.
7  Q. Okay. You said it had to take some hops,
8  what's that mean?
9  A. When the order comes in and is placed
10  through that web site or web tool it -- all of these
11  web sites interface with another Middleware solution
12  that is not within our group at HP Direct called web
13  methods, and that web methods in turn takes that --
14  those orders and sends them to the ASP that is
15  within the HP Direct domain I guess is --
16  Q. Is that -- the ASP page is that --
17  A. Yes.
18  Q. -- is that VISTA?
19  A. No.
20  Q. Okay. Does then ASP page send the
21  information then to VISTA?
22  A. No, it sends it to me.
23  Q. To you?
24  A. Yes.
25  Q. What do you do with it?

Page 13

1  A. Then I take that XML format and I convert
2  into it flat file format.
3  Q. To then send on to VISTA?
4  A. And then send it to VISTA.
5  Q. Okay. We're talking about the current
6  arrangement with HP for various web sites that
7  there's a tool that will interface with Middleware
8  technology called web methods; is that correct?
9  A. Yes, to the best of my ability, that still
10  happens today.
11  Q. Okay. Were you asked or did you help
12  develop the web methods that you --
13  A. No.
14  Q. Okay. Have you ever had your deposition
15  taken before?
16  A. No.
17  Q. Okay I'm sure you met with Ms. Carroll and
18  she told you the backgrounds and guidelines for
19  today. I'll just go over them real quick.
20  We need you to answer out loud so if you
21  give a nod of the head or an uh-huh or huh-uh, I'm
22  probably going to step in and ask what your answer
23  is again because it's being typed up.
24  Second of all, if I ask a question you
25  don't understand ask me to rephrase it and I will so

4 (Pages 10 to 13)

D. BROADY - Direct (By MR. HANSEN)

Page 30

1 going through my group.
2  Q. Okay.
3  A. So however it was before I don't know,
4 prior to my group coming in to the picture.
5  Q. Okay. Are you aware of any customers, for
6 instance, Microsoft, that has the interface ability
7 through Middleware directly into VISTA currently?
8  A. I am not aware.
9  Q. Okay. Are you aware, if I remove
10 Microsoft from it, any customers that have that
11 ability?
12  A. I am not aware.
13  Q. Are you aware if Microsoft or any other
14 customer has a direct interface link to any of the
15 Compaq Houston groups?
16  A. I don't know.
17  Q. Okay. Were you in -- I think you said you
18 left the Middleware programming -- you were there
19 for two and a half years and left that position in
20 February of '04?
21  A. Yes.
22  Q. Okay. Were you involved in designing,
23 creating any interfaces with outside entities after
24 MITG?
25  A. No.

Page 31

1  Q. Okay. Were you involved in creating
2 interfaces for Compaq that involved the same
3 methodology or technology that was developed with
4 MITG?
5  A. Can you clarify?
6  Q. Was this model that was used for
7 developing MITG interface used then for Compaq to
8 create any other interfaces with outside entities?
9  A. No.
10  Q. Okay. No, you weren't involved in that
11 or, no, you don't believe it was ever done?
12  A. I don't believe it was ever done.
13  Q. Okay. If there was testimony that there
14 was various test orders that were run on an
15 interface with Microsoft, were you -- into VISTA
16 system, were you privy to any of that?
17    MS. CARROLL: I'm going to object to the
18 extent that it misstates prior testimony of the
19 witness. You can go ahead and answer.
20    THE WITNESS: Can you ask the question
21 again.
22 BY MR. HANSEN:
23  Q. Sure. Were you involved in any running of
24 testing, for instance, test orders, for any XML
25 interface with Microsoft and Compaq?

Page 32

1  A. So I could have been involved with testing
2 of orders?
3  Q. Throughout a direct interface between
4 Microsoft and Compaq?
5  A. No, I'm sorry.
6  Q. Okay. If Microsoft, for instance, placed
7 an order through what's called the small/medium
8 business group in that web site of which you said
9 the interface with VISTA was in place, was there any
10 way for that order to be routed from VISTA to MITG's
11 web site?
12  A. No.
13  Q. If that happened do you know how that
14 could have happened?
15  A. I guess I'd have to have a specific
16 example.
17  Q. Okay. Say, for instance, Microsoft goes
18 to the small/medium business web site -- strike
19 that.
20    Say Microsoft goes to one of these Compaq
21 web sites you were talking about that had the
22 interface on it and they submit an order, you said
23 that automatically had an interface direct to VISTA
24 prior to MITG, that was a Compaq web site, are you
25 following me?

Page 33

1  A. Okay, yeah.
2  Q. Okay.
3  A. So they --
4  Q. Let me start over.
5    Microsoft goes to, let's say, compaq.com,
6 okay, and submits an order and there's an interface
7 directly with VISTA, correct, you said there was an
8 XML interface that you had created prior to anything
9 with MITG that had that interface between compaq.com
10 or internal web sites?
11  A. That I created?
12  Q. That your group created, there was --
13  A. Yes.
14  Q. -- Middleware interface?
15  A. Yes, I'm sorry.
16  Q. Okay. I probably phrased that improperly
17 by saying you.
18    I mean, there was a Middleware interface
19 in existence, okay, after the Middleware with MITG
20 was created, okay, let's say Microsoft goes to a web
21 site that is MITG owned and places an order that has
22 a direct interface to VISTA, is there any way that
23 that order could somehow come into VISTA and get
24 kicked out to MITG for fulfilling of the order?
25  A. No.

9 (Pages 30 to 33)

D. BROADY - Direct (By MR. HANSEN)

Page 54

1  discussion with that due to invoicing problems?
2    A.  I don't remember.
3    Q.  Okay.  Do you recall if that type of
4  UDF fields were used on the other interfaces that
5  were with the Compaq web sites prior to MITG,
6  specific UDF fields for each customer?
7    A.  To me, a UDF is a UDF.  Anybody can bring
8  in a UDF.  To me, it's a field that defines length.
9    Q.  Do you recall any discussions in this
10 Middleware project with MITG about creating a
11 specific one for customers which then could be used
12 at a later date because that option was not
13 available on the previous existing interfaces?
14   A.  I'm sorry, could you repeat that?
15   Q.  Do you recall any discussions during the
16 Middleware development with MITG about this user
17 defined fields specifically to customers being
18 developed so it could be used at a later date on
19 other interfaces to help with other invoicing?
20   A.  I don't remember.
21   Q.  Okay.  Do you recall that being an issue?
22   A.  No.
23   Q.  Last thing I want to ask you about is
24 these type of meetings, like in Exhibit X there, I
25 don't see your name on the document, but did you

Page 55

1  attend meetings where the status of the Middleware
2  project was discussed?
3    A.  I can't remember specific meetings, but
4  that is part of what I would do in a project like
5  this.
6    Q.  For instance, if you look in this there
7  are various invitees, and I didn't see your name on
8  there and I was just wondering -- I mean, I don't
9  have -- I've got to sneeze.
10       I don't have any other documents regarding
11 records of meetings, so I don't know if these were
12 on a weekly-type basis or what, but, you know, were
13 there various type meetings where you did attend
14 relative to this project and I just happen to have
15 one where you weren't invited or --
16   A.  I don't remember any meetings.  I remember
17 my main contact was the person I dealt with in
18 setting up MITG.
19   Q.  Who was that?
20   A.  John Brewer (phonetic).
21   Q.  Was he an MITG employee or was he a
22 programmer that was brought in to help facilitate
23 the project?
24   A.  He was a programmer that was contracted by
25 MITG to develop this.

Page 56

1    Q.  Okay.  Now, I noticed your boss was
2  Mr. Exendine, correct?
3    A.  Yes.
4    Q.  He is on here and checked as an attendee?
5    A.  Yes.
6    Q.  Was it standard practice I guess at this
7  time in this project that he would attend and pass
8  on to you any relevant information?
9    A.  Yes.
10   Q.  Do you recall receiving documents like
11 this at any time?
12   A.  No.
13   Q.  Okay.  And it says minutes copies to and
14 then there is invitees; George Powers, was he in
15 your group?
16   A.  No.
17   Q.  Bill Pogge?
18   A.  No.
19   Q.  Chris Yarges?
20   A.  No.
21   Q.  Let me just ask you about some of these
22 other people, Terrie Bonnett?
23   A.  She was in my group.
24   Q.  Okay.
25   A.  Well, she wasn't in the Middleware group

Page 57

1  but she was the business analyst.  She was what I
2  now do, so --
3    Q.  What are your duties and responsibilities
4  now?
5    A.  Currently I analyze requirements for
6  projects, determine what needs to be done in order
7  to get the project constructed, help with the
8  design, decide on what we're going to do for
9  construction, attend meetings, give updates, assist
10 with testing, coordinate activities of the EDI and
11 Middleware group.
12   Q.  Okay.  So it's still relative to
13 Middleware projects?
14   A.  Yes.
15   Q.  Is it still involving creating interfaces
16 from web sites in to VISTA?
17   A.  It hasn't been.
18   Q.  But if that came up it would fall under
19 your -- potentially could fall under your duties and
20 responsibilities?
21   A.  Potentially.
22   Q.  Okay.
23   A.  I'm sorry, not creating, not doing the
24 programming, but the analyst portion would.
25   Q.  Parameters reporting, meeting attending,

15 (Pages 54 to 57)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V., </br></br>Plaintiffs, </br></br>vs. </br></br>MIDWEST INFORMATION TECHNOLOGY GROUP, INC. and MICHAEL LAUBER, </br></br>Defendants. | Civil Action No. 04-3055 |

### DEFENDANTS/COUNTERCLAIM PLAINTIFF'S RULE 26 DISCLOSURES

Comes Now the Defendants/Counterclaim Plaintiff, **Midwest Information Technology Group, Inc. ("MITG") and Michael Lauber**, by their attorneys, **Schmiedeskamp, Robertson, Neu & Mitchell**, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure states as follows:

1. Individuals likely to have discoverable information:

    a. Individuals from Hewlett-Packard ("HP"):

    Carleton Fiorina, 3000 Hanover Street, Palo Alto, CA 94304
    Ann Livermore, 3000 Hanover Street, Palo Alto, CA 94304
    M.L. Krakauer, 2 Results Way, Marlboro, MA 01752
    Bill Crowley, 8000 Foothills Boulevard, Roseville, CA 95747
    Randy Wagner, 8000 Foothills Boulevard, Roseville, CA 95747
    Kristin Triolo, 7887 Sitio Abeto, Carlsbad, CA 92009
    Troy Bloomquist, 10810 Farnam Dr., Omaha, NE
    Chuck Schmader, 10810 Farnam Dr., Omaha, NE

1

EXHIBIT 19

        Linda Gretzinger, Roseville, CA 95747
        John Kading, Roseville, CA 95747
        Dan Wieland, address unknown
        Patrick Vogt, address unknown
        Jeff Hatfield, address unknown
        Sheryl Williams, address unknown
        Lynn Farlin, address unknown
        Louise Meyerfeld, address unknown
        Charlie Boyle, address unknown
        Roland Soriano, address unknown
        Jim Dupree, address unknown
        Al Karisa, address unknown
        Pete Graziano, 10810 Farnam Dr., Omaha, NE
        Sheri Ellis, address unknown
        Tony Barnett, address unknown
        Deb Brody, 10810 Farnam Dr., Omaha, NE
        Chip Love, address unknown
        Robert Calvert, 10810 Farnam Dr., Omaha, NE

    b.    Individuals from MITG:

        Ronald Haught, Jr., 4220 Kochs Lane, Quincy, IL 62305
        Teresa Koch, 4220 Kochs Lane, Quincy, IL 62305
        Michael Lauber, 4220 Kochs Lane, Quincy, IL 62305
        Richard Rice, 4220 Kochs Lane, Quincy, IL 62305
        Tony Bacott, 4220 Kochs Lane, Quincy, IL 62305
        Dulsey Hays, former employee, address unknown
        Stephanie Boden, 4220 Kochs Lane, Quincy, IL 62305
        Andrea Clarkson, 4220 Kochs Lane, Quincy, IL 62305

2.    Documents currently in the possession of Defendants/Counterclaim Plaintiff:

    a.    Defendants/Counterclaim Plaintiff hereby produce copies of documents bate stamped MITG 01- MITG 0324 which relate to the defense of the claims presented by Plaintiff as well as the claims being brought by Counterclaim Plaintiff.

3.    Damages Calculations:

    a.    Defendants/Counterclaim Plaintiff hereby produce copies of documents bate stamped MITG 01 - MITG 0324 which relate to the claims being brought by Counterclaim Plaintiff.

2

b.  Counterclaim Plaintiff's damages are based on the Standard Support Agreement executed by the parties, the BCO Matrices of the Parts Business Center Operations (PBCO), the Middleware Agreement executed by the parties, and all documents being produced herein by Counterclaim Plaintiff. Further, Counterclaim Plaintiff affirmatively states that the entire scope of the documents evidencing its damages are in the possession of the Counterclaim Defendants.

At this time, the computation of MITG's damages for HP's breach of the Standard Support Agreement is based on the average sales calls diverted by HP away from MITG for the year 2003. In reviewing the limited PBCO Matrices in possession of Counterclaim Plaintiff to establish the average number of calls diverted, Counterclaim Plaintiff states that this number appears to be 4,000 calls per day. Of the 4,000 average calls per day diverted away from MITG to HP, approximately one-half led to service orders. Based on HP's own records, the daily service orders produced an average daily sales revenue of $500,000. For 2003, these sales total $120,000,000. Based upon the profit sharing arrangements contained within the Standard Support Agreement, MITG's damages are equal to 75% of the gross profits on $120,000,000. Counterclaim Plaintiff reserves the right to amend its alleged damages and computation as discovery progresses and the entire documentation is produced in this case evidencing the diverted calls for the years 2002 and 2004.

MITG is also alleging damages for Counterclaim Defendants' breach of the Middleware Agreement entered into between the parties. MITG is alleging damages for the continued and intentional breach of the Middleware Agreement by Counterclaim Defendants. HP is/was using the Middleware software in contrast to the terms of the agreement to interface orders with its customers. This use is in direct violation of the Middleware Agreement which is the sole and exclusive property of MITG and MITG had and has not consented to such use. Counterclaim Plaintiff will supplement its computation of damages as the case progresses and HP produces documents within its possession relative to the allegations regarding its unauthorized use of the Middleware software.

Lastly, MITG is alleging damages in the sum of $2,000,000 for the expenditures incurred by MITG in building a new facility based upon the representations of Counterclaim Defendants as to the amount of volume that would be experienced by MITG in furtherance of the Standard Support Agreement entered into between the two parties.

4.  Insurance Agreement:

Defendants/Counterclaim Plaintiff state that there is no insurance agreement from any insurance business which may be liable to satisfy part or all of the judgment which may be entered in this action.

                                              MIDWEST INFORMATION TECHNOLOGY
                                              GROUP, INC., and MICHAEL LAUBER
                                                  Defendants/Counterclaim Plaintiff

                                                  By: _____
                                                          One of their Attorneys

Delmer R. Mitchell
James A. Hansen
Schmiedeskamp, Robertson, Neu & Mitchell
Attorneys for Defendant/Counterclaim Plaintiff
525 Jersey
P.O. Box 1069
Quincy, Illinois   62306
Telephone:  217-223-3030
Facsimile:  217-223-1005

4