**E-FILED**
Wednesday, 01 February, 2006  03:34:38 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

|  |  |  |
|---|---|---|
| HEWLETT-PACKARD | ) | |
| DEVELOPMENT COMPANY, L.P., | ) | |
| HEWLETT-PACKARD COMPANY, | ) | |
| and COMPAQ TRADEMARK B.V., | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 04-3055 |
| | ) | |
| MIDWEST INFORMATION | ) | |
| TECHNOLOGY GROUP, INC. | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

### RESPONSE IN OPPOSITION TO COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendant/Counter-Plaintiff, **Midwest Information Technology Group, Inc.** ("MITG"), by and through its attorneys, **Schmiedeskamp, Robertson, Neu & Mitchell**, submits this response in opposition to the motion for summary judgment filed by Plaintiffs/Counter-Defendants Hewlett-Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V. (collectively "HP").

### INTRODUCTION

HP has filed a motion seeking summary judgment in its favor on MITG's counterclaims. HP is not entitled to summary judgment. MITG has developed evidence which defeats HP's motion for summary judgment. If anything, HP's motion demonstrates that numerous issues of material fact exist in this case.

## RESPONSE TO HP's STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.    Undisputed Material Facts**

The following facts from HP's motion for summary judgment are undisputed and material:

**A.    Undisputed Facts Pertaining to the Breach of the Standard Support Agreement:**

1.    Undisputed. (Although, the word "be" is missing from the phrase "but not *be* limited to").

2.    Undisputed.

4.    Undisputed.

5.    Undisputed.

6.    Undisputed.

7.    MITG does not dispute that in May 2002, HP and Compaq merged. It further does not dispute that Compaq Direct became known as HP Direct. It also does not dispute that the Standard Support Agreement remained in place. MITG disputes the remaining allegations and statements contained within this paragraph.

8.    MITG does not dispute the first three (3) sentences of paragraph 8. MITG disputes the last sentence contained within this paragraph which reads "The Andover call center was never part of the Compaq/HP Direct organization."

10.    Undisputed.

**B.    Undisputed Facts Pertaining to the Breach of the Middleware Agreement:**

1.    Undisputed.

2.    Undisputed.

6.    Undisputed.

2

C.    **Undisputed Facts Pertaining to Tortious Interference Claim:**

3.    Undisputed.

4.    Undisputed.

7.    MITG does not dispute the first two (2) sentences of this paragraph. The remaining two (2) sentences are disputed.

II.    **Disputed Material Facts**

The following facts from HP's motion for summary judgment are disputed:

A.    **Disputed Facts Pertaining to the Breach of the Standard Support Agreement:**

3.    There is no main directory for Compaq/HP as claimed in this statement. The deposition testimony cited, specifically that of Bill Crowley, indicates there are other 800 numbers to call but references nothing about a main directory. The 800 number called to reach HP's call center in Roseville in 2003 had a phone tree which allowed callers to select various options. However, the number to reach HP Direct/Compaq Direct (MITG) was not provided as an option. (Deposition of Louise Meyerfeld, Exhibit 1, p. 26). In addition, the Andover call center had the ability to forward customers to Compaq Direct/HP Direct (MITG) if it did not have a part, but Compaq Direct/HP Direct was not an option a customer could select from Andover's phone tree. (Deposition of Diane Pound, Exhibit 2, p. 38). However, there is a welcome center, which is a group of people that take all Compaq-type calls at the 1-800-OK-Compaq number. Compaq Direct (MITG) was an option off of the welcome center. (Deposition of Troy Bloomquist, Exhibit 3, p. 93).

7.    MITG serviced its own customers. MITG had its own accounts and customers who transacted business with MITG. These were the same customers that HP later referenced when targeting MITG's business. (Deposition of Shari Ellis, Exhibit 4, p. 65-66; Deposition of Louise

3

Meyerfeld, Exhibit 1, p. 85-86, 87-88, 92-93; See Meyerfeld Deposition Exhibit P, attached with Group Exhibit 5, at page HP 000011-12; Chizek Deposition Exhibits OO, PP, and TT, attached with Group Exhibit 6). MITG disputes the reference herein to the 800 numbers and incorporates herein its position from paragraph 3 above. MITG further disputes HP's reference to a website and HP trademarks as HP fails to identify any website or trademarks to which it is referring.

8.      MITG disputes the last statement in this paragraph which reads "The Andover Call Center was never part of the Compaq/HP Direct organization." Andover was an HP Direct call center. (Deposition of Shari Ellis, Exhibit 4 , p. 53). Andover was in place as an HP Direct call center for spare parts orders if their customers had the need. (Deposition of Shari Ellis, Exhibit 4, p. 54). Andover handled Compaq parts. (Deposition of Chip Love, Exhibit 7, p. 22). The Andover call center was in operation in 2001 prior to the merger of HP/Compaq and was previously a Compaq call center. (Deposition of Diane Pound, Exhibit 2, p. 8).

9.      Andover was a HP Direct call center. (Deposition of Shari Ellis, Exhibit 4, p. 53). Andover was in place as an HP Direct call center for spare parts orders if their customers had the need. (Deposition of Shari Ellis, Exhibit 4, p. 54). Andover did handle legacy parts. According to Richard Chizek, the Andover phone number was the "pre-merger Compaq spares phone number," and Andover handled the same parts as MITG, except for multi-vendor or third-party parts. (Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 14-15). Troy Bloomquist had Chip Love as his main contact from a legacy prospective. Legacy prospective meant prior to the merger and simply Compaq. Andover was selling Compaq spare parts. (Deposition of Troy Bloomquist, Exhibit 3, p. 101; Deposition of Diane Pound Exhibit 2, p. 14).

4

11.    The decision was made in early 2002 for all call center activity to be handled by Roseville. (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p.13). The transition of call center activity from Andover to Roseville began in November 2002. HP ramped up capacity and redirected all of the call volume from Andover to Roseville and began accepting calls for part orders at Roseville in November 2002. (Deposition of Richard Chizek, Vol. I, <u>Exhibit 8</u>, p. 16, 33, 34, 49; Chizek Deposition Exhibit KK, at p. MITG 084, attached with <u>Group Exhibit 6</u>; Deposition of Roland Soriano, <u>Exhibit 10</u>, p. 19, 29, 65-66). The migration of the Andover call center finished in January 2003. (Deposition of Richard Chizek, Vol. I, <u>Exhibit 8</u>, p. 40).

12.    Ron Haught testified that the agreement gave MITG an exclusive right to service customers that were governed by the agreement. This also included any call for an out of stock spare part throughout the worldwide Compaq organization or an in stock spare part. (Deposition of Ron Haught, February 18, 2005, <u>Exhibit 11</u>, p. 129-134). MITG's understanding was that its customer base would expand so the customer could "order a product, whether it was finished good, whether it was spare parts, whether it was warranty parts, etc." (Deposition of Ron Haught, February 18, 2005, <u>Exhibit 11</u>, p. 140-41). Further, Ron Haught testified that he knew that post-merger there were other access points where customers could buy "in stock spare parts." (Deposition of Ron Haught, February 18, 2005, <u>Exhibit 11</u>, p. 147).

13.    Pursuant to the terms of the Standard Support Agreement, MITG was also to receive a payment per call based on a call volume schedule. (<u>See</u> para. 11 of Exhibit 1 attached to HP's motion).[1]  Therefore, had the calls been referred to MITG as they were supposed to pursuant

---

[1]Where able, MITG will cite to exhibits already forwarded by HP with its motion for summary judgment. These materials will be cited as "HP's Exhibit #."

to the agreement, MITG was to receive an additional payment per call based on set volumes. (See HP's Exhibit 1, para. 11, 12; Stringer's Expert Report, Exhibit 22). This payment would be in addition to any price break MITG could find under the exceptions outlined in "the Bible." (See HP's Exhibit 1, para. 11, 12; Stringer's Expert Report, Exhibit 22). All of the calls at Andover would have qualified for payment to MITG in two forms: either payment based on an outsourced split as governed by the "Bible" or by payment of a set dollar rate per call. (See para.11 and 12 of Exhibit 1 attached to HP's motion; Stringer's Expert Report, Exhibit 22). Once these calls were transferred to Roseville from Andover, Roseville reported them in the manner contained on Chizek Deposition Exhibit GGGG (HP 11007-10009) and as HP did not operate under the same premise as MITG relative to searching for a price break on CSN parts, it was not reported in a manner by HP that would allow MITG to break out the calls as HP argues in this paragraph. (Deposition of Richard Chizek, Vol. 2, Exhibit 9, p. 143- 153, Chizek Deposition Exhibits FFFF, GGGG and JJJJ, attached with Group Exhibit 6; Deposition of Scott Stringer, Exhibit 23, p. 27-29; Stringer's Expert Report, Exhibit 22). In footnote 3 to this paragraph, HP claims to have proven up certain evidence in the deposition of Ron Haught. Although Ron Haught discusses Plaintiff's Depo. Exhibit 4 (the MITG "Bible"/procedure manual), Ron Haught does not specify any "limited exceptions" as outlined in HP's paragraph 13. In addition, this paragraph includes argument and attacks on the credibility of MITG's expert witness, and not merely the required factual statements. Such matters are improper in the facts section of a motion for summary judgment.

14.    Andover itself has no number of phone calls that it received. Diane Pound testified to call volumes in her deposition for the selections off of the 800 number for Digital parts and Compaq parts. She testified the documents represented the total call volume for each month of

6

Digital classic parts and Compaq parts. She had no idea why the Digital call volumes were only reported for Quarters 1 and 2 for the year 2002. She further did not know if it was because her call center had transitioned and it was being reported by Roseville. Further documentation she reviewed listed total calls for 52 weeks but she had never seen the document and did not know if it was a combination of the Roseville and Andover call centers. She did not receive any documents that showed the sales and revenue for the Andover parts orders. Further the call volume documents for year 2003 do not report Quarters 3 and 4. Diane Pound's deposition exhibits show calls the Andover call center received. (Deposition of Diane Pound Exhibit 2, p. 40-41, 46, 50-54, 60-62; Pound Deposition Exhibits III, LLL, NNN and TTT, attached with Group Exhibit 12). The calls from Andover were turned over to HP beginning November 9, 2002 and were reported from that point by Roseville in HP 11007-11009 as Richard Chizek testified that Roseville began reporting the total orders and volume from Andover in its reports beginning the week of November 9, 2002. (Deposition of Richard Chizek, Vol. 2, Exhibit 9, p. 143- 153, Chizek Deposition Exhibits FFFF, GGGG and JJJJ, attached with Group Exhibit 6). MITG has claimed the calls sent to Roseville from Andover were governed by the SSA and the exclusive right of MITG and therefore the reporting of the calls/orders at Roseville as testified to by Richard Chizek is the relevant issue, not Andover. (Deposition of Richard Chizek, Vol. 2, Exhibit 9, p. 143- 153, Chizek Deposition Exhibits FFFF, GGGG and JJJJ, attached with Group Exhibit 6). The reporting of Roseville beginning the week of November 9, 2002 added to the historical call volume of MITG leads to the amount above and beyond the 7810 level that MITG is to be compensated for under the SSA. (Stringer's Expert Report, Exhibit 22). Obviously, telephone orders come from telephone calls.

15.    HP argues that the call volumes used by Stringer to determine the historical call volume received by MITG is inaccurate and focuses on one line item "Less Number of Calls Historically Handled by MITG" used by Stringer in Exhibits III-6, III-5, and III-4 of his report. (Stringer's Expert Report, Exhibit 22).  There is nothing within the Standard Support Agreement that states MITG was only paid for "answered sales calls" as stated by HP.  (See HP's Exhbit 1, para. 11). If anything, Stringer states he may have undervalued the total call amount.  (Deposition of Scott Stringer, Exhibit 23, p. 36).  Even assuming HP is correct that the number of calls answered column should have been used, it would have reduced the total number of calls for 2003 used by Stringer (68,132) by only 680 calls. (Deposition of Scott Stringer, Exhibit 23, p. 120, Stringer's Expert Report, Exhibit 22).  This certainly does not make his report unreliable.

**B.    Disputed Facts Pertaining to the Breach of the Middleware Agreement:**

3.    Shutting off one aspect of VISTA was insufficient to shut off access to the entire system.  At least one order was received through the VISTA system after HP allegedly "shut off" access. (Deposition of Troy Bloomquist, Exhibit 3, p. 71).  HP has not removed the Middleware created by MITG from its system, and HP can easily reopen the software for use.  (Deposition of Sandra Urwin, Exhibit 13, p. 93, 100-101). In fact, Shari Ellis testified that she transferred user defined fields (UDF's) from the MITG Middleware to HP.  She transferred them from Compaq to HP to avoid the same manual entry order problems Compaq experienced. (Deposition of Shari Ellis, Exhibit 4 , p. 45).  Some HP customers, including Xerox and Microsoft, had the ability to send orders directly into HP's VISTA system.  (Deposition of Shari Ellis, Exhibit 4, p. 99-101).

4.    Troy Bloomquist was aware of one instance when an order from Microsoft was placed through the Middleware.  (Deposition of Troy Bloomquist, Exhibit 3, p. 71).  Troy

8

Bloomquist testified that for Microsoft to have placed that order, Microsoft would have needed to have the same interface on its system that MITG had created for its transactions with Compaq. (Deposition of Troy Bloomquist, Exhibit 3, p. 76-77). Shari Ellis was aware that other customers had the ability to feed their orders directly into VISTA. (Deposition of Shari Ellis, Exhibit 4, p. 99). She was informed in 2003, during the term of the Middleware Agreement, that Xerox and Microsoft could feed their orders directly into VISTA. (Deposition of Shari Ellis, Exhibit 4, p. 100, 101).

     5.     See previous response to paragraph 4.

**C.    Disputed Facts Pertaining to Tortious Interference Claim:**

     1.     MITG serviced its own customers. MITG had its own accounts and customers who transacted business with MITG. These were the same customers that HP later referenced when targeting MITG's business. (Deposition of Shari Ellis, Exhibit 4, p. 65-66; Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 87-88, 92-93; See Meyerfeld deposition Exhibit P at page HP 000011-12, attached with Group Exhibit 5; Chizek deposition Exhibits OO, PP, and TT, attached with Group Exhibit 6).

     2.     On January 29, 2004, prior to the termination of the Standard Support Agreement, HP sent a letter to MITG's customers notifying those customers to contact HP instead of MITG. (Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 87-88, 92-93; Meyerfeld Deposition Exhibit P, attached with Group Exhibit 5; Deposition of Shari Ellis, Exhibit 4, p. 65-66; Ron Haught Deposition Exhibit 28, attached with Group Exhibit 14). MITG serviced its own customers. MITG had its own accounts and customers who transacted business with MITG. These were the same customers that HP later referenced when targeting MITG's business. (Deposition of Shari Ellis, Exhibit 4, p. 65-66; Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 87-88, 92-93; See

Meyerfeld Deposition Exhibit P at page HP 000011-12, attached with <u>Group Exhibit 5</u>; Chizek Deposition Exhibits OO, PP, and TT, attached with <u>Group Exhibit 6</u>). MITG disputes the reference herein to the 800 numbers and incorporates herein its position from paragraph II (A)(3) above. MITG further disputes HP's reference to a website and HP trademarks, as HP fails to identify any website or trademarks to which it is referring.

        5.      This paragraph includes pure argument, and at that, argument that is not proper in a motion for summary judgment. Ron Haught testified in his second deposition to a specific conversation he had with Tom Walter of Parts Now regarding the termination of their business relationship. (Deposition of Ronald Haught, <u>Exhibit 24</u>, p. 12). Further discovery answers showed specific conversations had by MITG employees with representatives from Avnet and Software House International regarding their termination of the business relationship with MITG. (Deposition of Ronald Haught, <u>Exhibit 24</u>, p. 12, 13). Also, HP's own employees sent an email instructing HP's agents (a) that all HP parts business center operation agents should be directed to immediately stop referring any parts inquiries to the HP Direct/MITG telephone number, (b) that the HP Direct/MITG telephone number be removed from HP's phone lists, and (c) that all parts inquiries and orders for any pre-merger Compaq parts and HP parts be directed to Roseville. (Deposition of Richard Chizek, <u>Exhibit 8</u>, Vol. I, p. 52-55; Deposition of Roland Soriano, <u>Exhibit 10</u>, p. 35-37, 38; Chizek Deposition Exhibit NN, attached with <u>Group Exhibit 6</u>). HP determined who MITG's top 89 accounts/customers were by the amount of business those customers transacted with MITG (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 88); drafted and sent a letter to MITG's customers notifying those customers to contact HP for parts instead of MITG (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 85-86, 87-88; Meyerfeld Deposition Exhibit P, attached with <u>Group Exhibit 5</u>;

Deposition of Shari Ellis, Exhibit 4, p. 65-66); sent the same letter to MITG's remaining 2,000 plus accounts/customers in the first week of February (Deposition of Shari Ellis, Exhibit 4, p. 66; Deposition of Louise Meyerfeld, Exhibit 1, p. 89); began telephoning MITG customers regarding conducting business from now on with HP, not MITG (Deposition of Louise Meyerfeld, Exhibit 1, p. 87-88, 92-93); conducted a presentation for Agilent, one of MITG's customers which had a highly customized account with MITG, to explain how it should conduct business with HP (Deposition of Louise Meyerfeld, Exhibit 1, p. 97; Meyerfeld Deposition Exhibit Q, attached with Group Exhibit 5); had accounts set up for MITG customers to place orders with HP Roseville as of January 13, 2004 which was the spare account business HP integrated that was being handled by MITG (Deposition of Louise Meyerfeld, Exhibit 1, p. 105, 108); and as of January 16, 2004 had consolidated part of the MITG business to Roseville for order processing. (Deposition of Shari Ellis, Exhibit 4, p. 74). MITG's representatives were told to send all calls to Roseville, and Roseville was additionally taking MITG back orders as of February 2, 2004. (Deposition of Shari Ellis, Exhibit 4, p. 68-69, 74). Stringer then compared the list of those customers of MITG that were targeted by HP with those that continued doing business with MITG in 2004 after the SSA ended and those that did not. (Deposition of Scott Stringer, Exhibit 23, p. 126-127). He then analyzed the historical buying patterns for those customers that had stopped doing business with MITG after the SSA ended with their buying patterns during the SSA to determine expected sales volume for 2004 but for the tortious interference. (Deposition of Scott Stringer, Exhibit 23, p. 128-129).

6.    This paragraph is pure argument regarding witness credibility and not the required factual statements. It is not appropriate as a statement of undisputed material fact on a motion for summary judgment. The fact that HP disagrees with Stringer's methodology or believes

11

Stringer's assumptions are incorrect are left to cross-examination. The question of whether Stringer

is credible or whether his theories are correct given the facts of the case is a factual determination

left to the jury after cross-examination. Smith v. Ford Motor Company, 215 F.3d 713, 719 (7th Cir.

2000).

       7.    The last two sentences of this paragraph are argument, not statements of

material fact. Ron Haught testified in his second deposition to a specific conversation he had with

Tom Walter of Parts Now regarding the termination fo their business relationship. (Deposition of

Ronald Haught, Exhibit 24, p. 12). Further discovery answers showed specific conversations had by

MITG employees with representatives from Avnet and Software House International regarding their

termination of the business relationship with MITG. (Deposition of Ronald Haught, Exhibit 24, p.

12, 13).

## III. Immaterial Facts

The following facts from HP's motion for summary judgment are immaterial:

### A. Immaterial Facts Pertaining to the Breach of the Standard Support Agreement:

None

### B. Immaterial Facts Pertaining to the Breach of the Middleware Agreement:

None

### C. Immaterial Facts Pertaining to Tortious Interference Claim:

       5.    This paragraph includes pure argument and not the required factual

statements.

       6.    This paragraph is pure argument and not the required factual statements. It

is not appropriate as a statement of undisputed material fact on a motion for summary judgment.

## IV.    Additional Material Facts

### A.    Breach of the Standard Support Agreement:

1.    On February 7, 2002, MITG and Compaq Direct, a corporate subsidiary of Compaq, entered into a Standard Support Agreement.  (See HP's Exhibit 1).

2.    On or about May 3, 2002, Compaq merged with HP, and thus, HP assumed Compaq's obligations under the Standard Support Agreement.  (See MITG's amended counterclaim, para. 10 and HP's answer to MITG's amended counterclaim, para. 10).

3.    The Standard Support Agreement provided MITG the exclusive right to provide parts and services to certain customers on behalf of Compaq.  (Deposition of Troy Bloomquist, Exhibit 3, p. 89; HP's Exhibit 1, p. 7, para. 22).[2]

4.    The Standard Support Agreement further provided that Compaq Direct would refer all applicable parts and service orders to MITG.  (Deposition of Troy Bloomquist, Exhibit 3, p. 89; HP's Exhibit 1, p. 8, para. 24).

5.    Under the Standard Support Agreement, MITG was to receive 75% of the profits and Compaq (HP) received 25% of the profits for all sourced parts sold to customers. (Deposition of Troy Bloomquist, Exhibit 3, p. 88; HP's Exhibit 1, p. 5, para. 10; Deposition of Ron Haught, February 18, 2005, Exhibit 11, p. 204).

6.    In addition, MITG was guaranteed to receive at least $41,000 per month from Compaq (HP) for providing technical advice, assistance, and support.  (Deposition of Troy Bloomquist, Exhibit 3, p. 88; HP's Exhibit 1, p. 5, para. 11).

-----

[2]At times, in the record MITG is referred to as "Compaq Direct" or "HP Direct."

7. Under the Standard Support Agreement, MITG was to receive from Compaq/HP additional payment based on call volumes and service levels attained by MITG through its call center on behalf of Compaq. (Deposition of Troy Bloomquist, Exhibit 3, p. 88-89; HP's Exhibit 1, p. 5, para. 11; ).

8. The Standard Support Agreement also incorporated the MITG "Bible," which was MITG's written policies and procedures. (Deposition of Troy Bloomquist, Exhibit 3, p. 80; HP's Exhibit 1, p. 5-6, para. 12).

9. According to the MITG "Bible," if the part requested by a customer was in stock[3], but MITG could locate the part elsewhere (outsourcing) for a price at least $175.00 lower than the price of the in stock part ($100.00 lower for memory and hard drives), MITG could obtain the part for the customer from an outside vendor. (Deposition of Troy Bloomquist, Exhibit 3, p. 80; Deposition of Ron Haught, February 18, 2005, Exhibit 11, p. 37-38; Haught Deposition Exhibit 4, p. 4, attached with Group Exhibit 14).

10. If a call came into Compaq's welcome center (Compaq's main contact number of 1-800-OK-Compaq) for Compaq Direct and the customer needed to order a part, that call should have been referred to MITG pursuant to the Standard Support Agreement. (Deposition of Troy Bloomquist, Exhibit 3, p. 93).

11. However, there is evidence that HP provided customers with other options for their parts needs besides contacting MITG. Specifically, HP provided customers, in addition to providing MITG's contact information, with contact information for other HP/Compaq parts

---

[3]In the record "in stock" parts are sometimes referred to as CSN parts.

providers. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 96; Deposition of Bill Crowley, <u>Exhibit</u> <u>15</u>, p. 91-92, 98; Crowley Deposition Exhibits B & C, attached as <u>Group Exhibit 16</u>).

12.    If a requested part was not in stock, MITG would locate a compatible part from a third party. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 80).

13.    On various occasions throughout 2002, Ron Haught informed Troy Bloomquist, who was in charge of the third-party parts business for Compaq and HP, that calls to MITG seemed to be slowing down. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 99-100, 103; Bloomquist Deposition Exhibit Z, attached as <u>Exhibit 17</u>).

14.    Troy Bloomquist's response to Ron Haught's concerns about MITG receiving fewer calls was to contact Chip Love, the head of the team that managed parts sales for Compaq/HP, to find out why HP was sending calls to the Andover call center that could have been going to MITG. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 104).

15.    Troy Bloomquist knew, during 2002, that Andover was taking spare parts calls. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 104-105).

16.    Andover and MITG were offering the same services and parts. Andover was a HP Direct Call Center. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 105; Deposition of Chip Love, <u>Exhibit 7</u>, p. 78, 79; Deposition of Shari Ellis, <u>Exhibit 4</u>, p. 53).

17.    According to Roland Soriano, HP's channel and parts business center operations manager, MITG and Andover had the same business model. (Deposition of Roland Soriano, <u>Exhibit 10</u>, p. 10).

18.    According to Richard Chizek, HP's vendor manager and operations manager for the parts business call center in Roseville, California, Andover and MITG did the same thing,

15

except that Andover did not source multi-vendor parts. (Deposition of Richard Chizek, <u>Exhibit 8</u>, Vol. I, p. 6-7, 14-15).

19.    The Andover call center had the ability to forward customers to Compaq Direct/HP Direct (MITG) if it did not have a part, but Compaq Direct/HP Direct was not an option a customer could select from Andover's phone tree. (Deposition of Diane Pound, <u>Exhibit 2</u>, p. 38).

20.    When Chip Love responded to Troy Bloomquist's requests investigating why MITG's call volume was decreasing, Love informed Bloomquist that HP was looking into a different way to do things from a services perspective ---- meaning HP was moving in a different direction from sending calls to MITG (HP Direct/Compaq Direct). (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 109-110).

21.    Troy Bloomquist informed Chip Love that HP had a Standard Support Agreement in effect with MITG which required that calls go to MITG. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 110-111).

22.    Chip Love informed Troy Bloomquist that calls which could have gone to MITG were, in fact, going to the Andover call center. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 111).

23.    After its merger with Compaq in early 2002, HP almost immediately began considering whether it wanted to continue the third-party parts business that MITG was providing or eliminate it altogether. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 122).

24.    HP decided the third-party parts business wasn't something it wished to continue. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 122).

25.     According to the manager of the integration for all call centers in North America, the decision had been made by HP in early 2002 for all calls to be handled by Roseville. All North American trade parts call centers were going to be consolidated to the call center at Roseville, California for HP. (Deposition of Louise Meyerfeld, Exhibit 1, p. 9, 10, 13). This included the integration of the HP Direct/Compaq Direct (MITG) and Andover call centers to Roseville. (Deposition of Louise Meyerfeld, Exhibit 1, p. 13, 16).

26.     In addition, in October 2002, HP planned to integrate the Andover call center into its own in-house call center in Roseville, California. (Deposition of Roland Soriano, Exhibit 10, p. 17).

27.     Calls were fully integrated from Andover to Roseville on November 18, 2002. (Chizek Deposition Exhibit KK, at MITG 085, attached with Group Exhibit 6; Deposition of Roland Soriano, Exhibit 10, p. 18, 24, 29).

28.     As of May 6, 2003, HP had decided to integrate MITG's business to Roseville. (Deposition of Louise Meyerfeld, Exhibit 1, p. 43).

29.     Louise Meyerfeld, the manager of the integration of HP call centers to Roseville, was in charge of integrating MITG's business to Roseville. (Deposition of Louise Meyerfeld, Exhibit 1, p. 59).

30.     Around July of 2002, Compaq launched its eSpares store ---- a web site customers could use to order Compaq spare parts. (Deposition of Chip Love, Exhibit 7, p. 17; Deposition of Roland Soriano, Exhibit 10, p. 15).

31.     The number for the Andover call center was placed on the eSpares web site ---- Compaq Direct's (MITG's) number was not. (Deposition of Chip Love, Exhibit 7, p. 31).

17

32.    Prior to the launching of the eSpares web site, MITG was the party filling orders for parts which, as of July 2002, could be purchased from eSpares. (Deposition of Chip Love, Exhibit 7, p. 76-77).

33.    The Andover call center supported the orders obtained through the eSpares web site. (Deposition of Chip Love, Exhibit 7, p. 78).

34.    In October 2002, Andover began experiencing an increase in call volume which exceeded its capacity. (Deposition of Roland Soriano, Exhibit 10, p. 13; Chizek Deposition Exhibits KK, LL, and HHH, attached with Group Exhibit 6).

35.    According to Chip Love, this increase in call volume was due to Andover offering the same parts as Compaq Direct/MITG. (Deposition of Chip Love, Exhibit 7, p. 79).

36.    Others at HP believed the increase in calls to Andover was due to the eSpares web site. (Deposition of Roland Soriano, Exhibit 10, p. 15).

37.    Regardless of the reason for the increased call volume at Andover, MITG was able to support these calls and offered assistance in supporting the excess calls. (Chizek Deposition Exhibits KK and HHH, attached with Group Exhibit 6; Deposition of Roland Soriano, Exhibit 10, p. 27).

38.    One option HP considered to resolve the problem was having the excessive calls sent to MITG. (Deposition of Roland Soriano, Exhibit 10, p. 17, 20).

39.    Roland Soriano believed MITG (the HP Direct call center) had the capacity and could have taken care of Andover's excess calls. (Deposition of Roland Soriano, Exhibit 10, p. 27; Chizek Deposition Exhibit KK, attached with Group Exhibit 6).

40.    On October 30, 2002, Roland Soriano directed that the excess Andover calls be sent to MITG.  (Deposition of Roland Soriano, Exhibit 10, p. 27-28).

41.    Roland Soriano assumed the calls were redirected to MITG.  (Deposition of Roland Soriano, Exhibit 10, p. 29).

42.    Roland Soriano was never informed that MITG could not handle Andover's excess calls.  (Deposition of Roland Soriano, Exhibit 10, p. 30).

43.    According to Soriano, however, the excess Andover calls were actually sent to Roseville instead of  MITG because Roseville was HP's first option.  (Deposition of Roland Soriano, Exhibit 10, p. 31).

44.    According to Soriano, HP chose Roseville over MITG merely because HP wanted all call centers integrated into one primary location.  (Deposition of Roland Soriano, Exhibit 10, p. 34).

45.    In October 2002, HP had the capacity to and was filling pre-merger Compaq parts orders.  (Deposition of Roland Soriano, Exhibit 10, p. 34).

46.    From November 2, 2002 through October 25, 2003, HP's net revenue from pre-merger Compaq parts handled now at Roseville was $15,581,606.00.  (Deposition of Richard Chizek, Vol. II, Exhibit 9, p. 157).

47.    Shari Ellis told Terri Welch at MITG to send any calls for new accounts to Roseville prior to the termination of the Standard Support Agreement.  (Deposition of Shari Ellis, Exhibit 4, p. 69).

19

48. The post-merger Compaq parts that were part of the ordering fulfilled by MITG had been consolidated to the Roseville call center as of January 16, 2004. (Deposition of Shari Ellis, Exhibit 4, p. 74).

49. Roseville was taking MITG back orders as of February 2, 2004 and was accepting spare parts orders all prior to the termination of the Standard Support Agreement. (Deposition of Shari Ellis, Exhibit 4, p. 68).

50. HP terminated the Standard Support Agreement effective February 7, 2004. (See Letter from HP to Ron Haught, dated October 30, 2003, attached as Exhibit 18).

**B.    Breach of the Middleware Agreement:**

51. Compaq and MITG entered into the Middleware Agreement on February 8, 2002. (Deposition of Troy Bloomquist, Exhibit 3, p. 68; Deposition Exhibit Y at HP's Exhibit 14).

52. When HP and Compaq merged, HP assumed Compaq's obligations under the Middleware Agreement. (See MITG's amended counterclaim, para. 10 and HP's answer to MITG's amended counterclaim, para. 10).

53. The Middleware Agreement authorized Compaq to use the Middleware created by MITG to link its VISTA order entry system to MITG's web tools for the purpose of receiving orders from MITG. (Deposition of Troy Bloomquist, Exhibit 3, p. 72; HP's Exhibit 14, p. 2, para. 5).

54. VISTA is the computerized ordering and billing system used by Compaq/HP to process orders. (Deposition of John Brewer, Exhibit 19, p. 8).

55. MITG hired John Brewer through eData Enterprises to create the Middleware. (Deposition of John Brewer, Exhibit 19, p. 8).

20

56.    The Middleware involved software being placed on MITG's system which would convert orders into an XML format, and also involved software being placed on Compaq's system which would covert the XML document transmitted by MITG into a format which Compaq's VISTA system could then read. (Deposition of John Brewer, Exhibit 19, p. 13-14).

57.    The Middleware created was developed to allow MITG to place a customer order in XML format so it could be transmitted directly to Compaq's VISTA system. (Deposition of John Brewer, Exhibit 19, p. 13-14; Deposition of Ron Haught, February 18, 2005, Exhibit 11, p. 79).

58.    Prior to the Middleware Agreement that was developed with MITG, there were no XML interfaces with any non-internal Compaq entity. There was no XML interface to the outside Compaq world prior to MITG. (Deposition of Debra Broady, Exhibit 20, p. 21-24).

59.    Compaq did not have a web tool in place to interface orders between the MITG web site and the VISTA system. The Middleware was developed to send orders directly from MITG into VISTA. (Deposition of Troy Bloomquist, Exhibit 3, p. 44-45).

60.    In the Middleware Agreement, MITG granted Compaq a personal nontransferable and nonexclusive right and license to use the Middleware solely for the purpose of doing business with MITG. (Deposition of Troy Bloomquist, Exhibit 3, p. 70; HP's Exhibit 14, p. 2, para. 3).

61.    The Middleware Agreement further provided that Compaq was not to modify, revise or sublicense the Middleware to others, nor use the Middleware for the benefit of parties other than MITG without MITG's prior written consent, except that it could be sublicensed by Compaq

21

for use by Compaq's affiliates and subsidiaries. (Deposition of Troy Bloomquist, Exhibit 3, p. 70-71; HP's Exhibit 14, p. 2, para. 3).

62.    Troy Bloomquist was aware of one instance when an order from Microsoft was placed through the Middleware. (Deposition of Troy Bloomquist, Exhibit 3, p. 71).

63.    Troy Bloomquist testified that for Microsoft to have placed the Microsoft order, Microsoft would have needed to have the same interface on its system that MITG had created for its transactions with Compaq. (Deposition of Troy Bloomquist, Exhibit 3, p. 76-77).

64.    Some HP customers, including Xerox and Microsoft, had the ability to send orders directly into HP's VISTA system. (Deposition of Shari Ellis, Exhibit 4, p. 99-101).

65.    In the Middleware Agreement, Compaq explicitly acknowledged that the Middleware was the exclusive property of MITG and that Compaq had no right to the ownership of the Middleware. (Deposition of Troy Bloomquist, Exhibit 3, p. 72; HP's Exhibit 14, p. 2, para. 5).

66.    HP still uses the VISTA system. (Deposition of Sandra Urwin, Exhibit 13, p. 43).

67.    The VISTA system is being used in Roseville. (Deposition of Roland Soriano, Exhibit 10, p. 40).

68.    Some customers place orders with Roseville through VISTA. (Deposition of Roland Soriano, Exhibit 10, p. 41).

69.    Shari Ellis of Compaq was ordered to transfer the user defined fields that were created as part of the Middleware for customer specific invoicing to HP. (Deposition of Shari Ellis, Exhibit 4, p. 44).

70.    The user defined fields (UDF's) were created under the Middleware to allow direct access to VISTA with no more manual entries.  Shari Ellis transferred to HP the UDF's to allow HP to avoid the same problematic entry system on HP's side. (Deposition of Shari Ellis, Exhibit 4, p. 45).

71.    Immediately after the integration of MITG's call center to Roseville, Roseville began placing and filling spare parts orders using VISTA.  (Deposition of Roland Soriano, Exhibit 10, p. 46).

72.    HP has not removed the Middleware created by MITG from its system, and HP can easily reopen the software for use. (Deposition of Sandra Urwin, Exhibit 13, p. 93, 100-101).

73.    According to Debra Broady, an HP programmer, there was no XML interface used by Compaq prior to that created by MITG. (Deposition of Debra Broady, Exhibit 20, p. 24).

74.    According to John Brewer, the Middleware could easily be used by HP to accept orders from companies other than MITG. (Deposition of John Brewer, Exhibit 19, p. 21).

75.    To allow other companies to use the Middleware created by MITG for placing orders, HP would merely have to inform those other companies of HP's accepted format on how to get an order into HP's system. (Deposition of John Brewer, Exhibit 19, p. 24).

76.    It is not necessary that the customer have the exact software that MITG had installed on its system to send orders using the Middleware on HP's system. (Deposition of Ron Haught, February 18, 2005, Exhibit 11, p. 108).

77.     Once HP had the information Brewer helped create for MITG, it could easily be communicated to other customers simply by giving them the accepted format to get their orders into HP's VISTA system. (Deposition of John Brewer, Exhibit 19, p. 26).

**C.    Tortious Interference:**

78.     The Standard Support Agreement ended effective February 7, 2004. (See Letter from HP to Ron Haught, dated October 30, 2003, attached as Exhibit 18).

79.     As of January 5, 2004, Shari Ellis instructed MITG that any new accounts that had called MITG for parts ordering were to be diverted to HP Roseville. (Deposition of Shari Ellis, Exhibit 4, p. 26-27).

80.     Any new orders as of January 5, 2004 for spare parts were to be handled at Roseville and MITG was removed from handling any of those orders even though the Standard Support Agreement had not ended. (Deposition of Shari Ellis, Exhibit 4, p. 28).

81.     Shari Ellis told Terri Welch at MITG to send all calls to Roseville, and part of the ordering that had been fulfilled by MITG had already been consolidated to the Roseville call center as of January 16, 2004, even though the Standard Support Agreement was in full force and effect. (Deposition of Shari Ellis, Exhibit 4, p. 69-74).

82.     Despite knowing that the Standard Support Agreement had not yet ended, Richard Chizek sent an email on January 16, 2004, instructing HP's agents (a) that all HP parts business center operation agents should be directed to immediately stop referring any parts inquiries to the HP Direct/MITG telephone number, (b) that the HP Direct/MITG telephone number be removed from HP's phone lists, and (c) that all parts inquiries and orders for any pre-merger Compaq parts and HP parts be directed to Roseville. (Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 52-

24

55; Deposition of Roland Soriano, <u>Exhibit 10</u>, p. 35-37, 38; Chizek Deposition Exhibit NN, attached with <u>Group Exhibit 6</u>);

83.    As early as January 22, 2004, HP made plans to contact MITG's top 89 accounts/customers and notify them of new contact information (HP's contact information) for the parts and service they had been receiving from MITG ---- in other words, not to contact MITG any more. (Deposition of Shari Ellis, <u>Exhibit 4</u>, p. 65-66; Deposition of Richard Chizek, Vol. I, <u>Exhibit 8</u>, p. 62).

84.    Prior to the termination of the Standard Support Agreement, HP determined who MITG's top 89 accounts/customers were by the amount of business those customers transacted with MITG. (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 88).

85.    On January 29, 2004, prior to the termination of the Standard Support Agreement, HP sent a letter to MITG's customers notifying those customers to contact HP instead of MITG. (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 85-86, 87-88, 92-93; Meyerfeld Deposition Exhibit P, attached with <u>Group Exhibit 5</u>; Deposition of Shari Ellis, <u>Exhibit 4</u>, p. 65-66; Ron Haught Deposition Exhibit 28, attached with <u>Group Exhibit 14</u>).

86.    HP sent the same letter to MITG's remaining 2,000 plus accounts/customers in the first week of February 2004. (Deposition of Shari Ellis, <u>Exhibit 4</u>, p. 66; Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 89).

87.    On February 1, 2004, HP began telephoning MITG customers about conducting business from now on with HP, not MITG. (Deposition of Louise Meyerfeld, <u>Exhibit 1</u>, p. 87-88, 92-93).

88.    On February 4, 2004, prior to the end of the Standard Support Agreement, HP employee Yolanda Topinski even conducted a presentation at Agilent, one of MITG's customers which had a highly customized account with MITG, to explain how Agilent should conduct business with HP.  (Deposition of Louise Meyerfeld, Exhibit 1, p. 97; Meyerfeld Deposition Exhibit Q, attached with Group Exhibit 5).

89.    HP was aware that when it sent its letter on January 29, 2004 informing customers to contact HP instead of MITG, the Standard Support Agreement had not yet ended. (Deposition of Bill Crowley, Exhibit 15, p. 157; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 55; Deposition of Roland Soriano, Exhibit 10, p. 35-37, 38; Chizek Deposition Exhibit NN, attached with Group Exhibit 6).

90.    The customers HP contacted via letter, telephone call, and/or personal visit in January and February of 2004 were MITG's customers.  (Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 86-87, 89; see Meyerfeld Deposition Exhibit P, at p. HP000011-12, attached with Group Exhibit 5; Chizek Deposition Exhibits OO, PP, and TT, attached with Group Exhibit 6 ; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 62, 71).

91.    HP repeatedly referred to these 2,089 customers as "MITG clients." (Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 89; see Meyerfeld Deposition Exhibit P, at p. HP000011-12, attached with  Group Exhibit 5; Chizek Deposition Exhibits OO, PP, and TT, attached with Group Exhibit 6).

92.    Louise Meyerfeld acknowledged the 2,089 customers were "MITG customers." (Deposition of Louise Meyerfeld, Exhibit 1, p. 86).

26

93.     Richard Chizek acknowledged the customers as "accounts of MITG" and knew that these customers had been ordering with MITG for years. (Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 62, 71).

94.     Many of the customers HP contacted had been ordering through MITG for years and did not even have an HP account. (Deposition of Louise Meyerfeld, Exhibit 1, p. 86-87; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 71).

95.     However, HP proactively set up accounts at HP for MITG's 2,089 customers prior to the termination of the Standard Support Agreement on February 8, 2004. All accounts that were established could place parts orders with HP. (Deposition of Louise Meyerfeld, Exhibit 1, p. 93).

96.     HP did not bother to inform the 2,089 customers it contacted that they could continue to do business with MITG if they chose to do so. (Deposition of Louise Meyerfeld, Exhibit 1, p. 89).

D.     **Damages:**

97.     According to Teresa Koch, the total HP was billed by MITG for services/parts MITG provided in 2002 was $4,850,217.39. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18).

98.     According to Teresa Koch, the total HP was billed by MITG for services and parts MITG provided in 2003 was $4,402,574.04. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18).