99.     According to Teresa Koch, the total HP was billed by MITG for services/parts MITG provided in January and February of 2004 was $329,783.53.  (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18).

100.    From November 2, 2002 through October 25, 2003, HP's net revenue from pre-merger Compaq parts handled at Roseville was $15,581,606.00. (Deposition of Richard Chizek, Vol. II, Exhibit 9, p. 157).

101.    According to Teresa Koch, in 2003, MITG earned between $10,000 and $30,000 per month from non HP Direct/Compaq Direct business.  (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 21).

102.    HP Direct/Compaq Direct business was the majority of MITG's business. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 33).

103.     In the latter half of 2003, Teresa Koch pointed out to Ron Haught that revenues were declining.  (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 43).

104.    According to MITG's expert, Scott Stringer, MITG suffered net damages of $6,242,000 due to HP's breach of the Standard Support Agreement.  (Stringer's Expert Report, Exhibit 22).

105.    According to MITG's expert, Scott Stringer, MITG suffered net damages of $673,000 due to HP's tortious interference with MITG's customers.  (Stringer's Expert Report, Exhibit 22).

## ARGUMENT

Summary judgment is proper only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

28

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden to identify the parts of the pleadings, depositions, interrogatory answers, admissions, and affidavits which it believes demonstrate the lack of any genuine issue of material fact. Vitug v. Multistate Tax Commission, 860 F. Supp. 546, 549 (N.D. Ill. 1994), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). Only then, does the non-moving party have any burden to demonstrate the existence of a genuine issue of material fact. Vitug, 860 F. Supp. at 549; Fed. R. Civ. P. 56(c). In determining if a genuine issue of material fact exists, the court must read all facts and draw all inferences from the facts and evidence presented in the light most favorable to the non-moving party. Cedillo v. Int'l Ass'n of Bridge & Structural Iron Workers, Local Union No. 1, 603 F.2d 7, 11 (7th Cir. 1979). Any doubt whether summary judgment is proper must be resolved against the moving party and the motion must be denied. Consolidated Laboratories, Inc. v. Shandon Scientific Co., 413 F.2d 208, 213 (7th Cir. 1969). Summary judgment should never be entered on a motion brought by a defendant unless the defendant is entitled to summary judgment "beyond all doubt." Mitchell v. Pilgrim Holiness Church Corp., 210 F.2d 879, 881 (7th Cir. 1954).

On a motion for summary judgment, the court does not weigh the evidence or the credibility of witnesses. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255; Dykema v. Skoumal, 261 F.3d 701, 704 (7th Cir. 2001). Even if there is no dispute about basic facts, summary judgment is inappropriate when the parties disagree about the inferences which may be drawn from those facts. Central National Life Insurance v. F & D Co. of Maryland, 626 F.2d 537, 539 (7th Cir.1980). The court's only function is to determine if a genuine issue of material fact exists which requires a trial. McGraw-Edison Co. v. Walt Disney Productions, 787 F.2d 1163, 1167 (7th Cir. 1986).

## I.    THERE IS EVIDENCE THAT HP BREACHED THE STANDARD SUPPORT AGREEMENT.

HP does not deny the existence of the Standard Support Agreement ("SSA"), that the SSA applied to HP, or that MITG complied with the terms of the SSA. HP claims only that MITG cannot produce evidence that HP breached the SSA. HP correctly states that the SSA is governed by Missouri law. (See Standard Support Agreement, HP's Exhibit 1, para. 19). The evidence in this case demonstrates HP's breach of the SSA. As such, HP's motion should be denied.

To prove breach of contract under Missouri law, MITG must prove the existence of a valid contract, the rights and obligations of each party, a breach, and damages. Evans v. Werle, 31 S.W.2d 489, 493 (Mo. Ct. App. 2000). The SSA clearly and unambiguously grants MITG the exclusive right to provide parts and services to "end users, customers, companies or commercial entities . . . " on behalf of Compaq Direct (HP) and obligates Compaq Direct (HP) to refer all applicable parts and service orders from such "end users, customers, companies or commercial entities . . . " to MITG. (Deposition of Troy Bloomquist, Exhibit 3, p. 89; HP's Exhibit 1, p. 7, para. 22, p. 8, para. 24). Thus, MITG had the exclusive right to provide parts and services to HP's "end users, customers, companies or commercial entities . . . " in the same manner as it had with Compaq's customers, and HP was obligated to forward all calls to MITG which MITG had the capacity to serve. (Deposition of Troy Bloomquist, Exhibit 3, p. 89; HP's Exhibit 1, p. 7, para. 22, p. 8, para. 24).

MITG has uncovered abundant evidence that HP breached the SSA. Instead of referring to MITG all calls from customers that MITG had the capacity to serve, HP diverted those calls to and from the Andover call center and ultimately to the Roseville call center. (Deposition of Troy Bloomquist, Exhibit 3, p. 111; Deposition of Louise Meyerfeld, Exhibit 1, p. 43; Statement of Additional Material Facts, para. 15, 20, 22, 25, 28, 31-35, 43, 44, 47, 48, 49). In addition, HP gave customers options other than MITG for service which MITG was able to and contractually entitled to provide. (Deposition of Troy Bloomquist, Exhibit 3, p. 96; Deposition of Bill Crowley, Exhibit

30

15, p. 91-92, 98; Crowley Deposition Exhibits B & C, at Exhibit 16; Deposition of Chip Love, Exhibit 7, p. 31, 76-77; Statement of Additional Material Facts, para. 10, 11, 31-33).

When the Andover call center was overburdened with calls, which MITG had the capacity to service, HP redirected those calls to Roseville, rather than MITG. (Deposition of Roland Soriano, Exhibit 10, p. 27, 31; Chizek Deposition Exhibit KK, at Group Exhibit 6; Statement of Additional Material Facts, para. 34-44). Prior to the termination of the SSA, HP was servicing MITG's customers, had set up accounts for MITG customers at HP and was fulfilling parts orders that should have gone to MITG. (Deposition of Roland Soriano, Exhibit 10, p. 34; Deposition of Richard Chizek, Vol. II, Exhibit 9, p. 157; Deposition of Louise Meyerfeld, Exhibit 1, p. 93; Deposition of Shari Ellis, Exhibit 4, p. 68, 69, 74).

HP claims there is no breach because (a) the Andover call center existed before the SSA came into being, (b) the Andover call center did not carry the same parts as MITG, and (c) MITG cannot prove the allegedly diverted customers were customers that fell under the provisions of the SSA.

First, HP's argument that there can be no breach because Andover existed before the SSA is without merit. There is nothing in the SSA to indicate that it was alright for HP to send calls to another call center instead of MITG merely because that call center existed before the SSA came into being. (See HP's Exhibit 1). Rather, the SSA gave MITG the *exclusive* right to provide parts and services to all HP/Compaq customers which it had the capacity to serve. (Deposition of Troy Bloomquist, Exhibit 3, p. 89; HP's Exhibit 1, p. 7, para. 22, p. 8, para. 24). HP attempts to make the argument that Ron Haught knew the existence of other channels for sales of parts and did not object. HP states this somehow means it did not breach the SSA. The testimony of Ron Haught simply states that MITG realized it was not the only call center in the world for HP. This does not relieve HP from the contractual obligations of the SSA that it was to refer ALL applicable parts and service orders of the customers to MITG. (HP's Exhibit 1, p. 8, para. 24). Under the provisions of the SSA,

31

MITG's exclusive right to serve any customer it had the ability to serve includes customers who contacted or were otherwise referred to the Andover call center.

Next, HP relies on the deposition testimony of Diane Pound, the former manager of the Andover call center, to support its argument that it could not have breached the SSA by diverting calls from Andover to Roseville because Andover did not carry the same parts as MITG. Compaq's own people have testified otherwise. (Deposition of Shari Ellis, Exhibit 4, p. 53-54). Andover was an HP Direct call center. (Deposition of Shari Ellis, Exhibit 4, p. 53). Andover was in place as an HP Direct call center for spare parts orders if their customers had the need. (Deposition of Shari Ellis, Exhibit 4, p. 54). Andover did handle legacy parts. According to Richard Chizek, the Andover phone number was the "pre-merger Compaq spares phone number," and Andover handled the same parts as MITG, except for multi-vendor or third-party parts. (Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 14-15). Troy Bloomquist had Chip Love as his main contact from a legacy prospective. Legacy prospective meant prior to the merger and simply Compaq. Andover was selling Compaq spare parts. (Deposition of Troy Bloomquist, Exhibit 3, p. 101; Deposition of Diane Pound Exhibit 2, p. 14). Thus, contrary to HP's assertion, the evidence shows that MITG and the Andover call center were both HP Direct call centers and provided the same parts and services to customers.

Finally, HP claims that MITG cannot prove customers diverted to other call centers were covered by the SSA. As outlined above, HP's own representatives stated in depositions that HP was diverting exactly those customers that MITG was servicing under the SSA. (Deposition of Troy Bloomquist, Exhibit 3, p. 93, 96, 111; Deposition of Bill Crowley, Exhibit 15, p. 91-92, 98; see Crowley Deposition Exhibits B & C, at Exhibit 16; Deposition of Chip Love, Exhibit 7, p. 31, 76-77, 78; Deposition of Roland Soriano, Exhibit 10, p. 17, 20, 27, 31, 34; Deposition of Richard Chizek, Vol. II, Exhibit 9, p. 157; see Statement of Additional Material Facts, para. 10, 11, 15, 20, 22, 25, 28, 31-37, 43, 44, 47, 48, 49). There is ample evidence that MITG had the capacity to serve the customers that HP redirected to Andover (and ultimately to Roseville). (Deposition of Troy

32

Bloomquist, Exhibit 3, p. 93; Deposition of Chip Love, Exhibit 7, p. 76-77; Chizek Deposition

Exhibits KK and HHH, attached with Group Exhibit 6; Deposition of Roland Soriano, Exhibit 10,

p. 17, 20, 27-28, 34; see Statement of Additional Material Facts, para. 10, 12, 14, 16-18, 22, 32, 37-

42, 44, 45). By diverting calls from these customers to any call center other than MITG, HP

breached the provisions of the SSA which gave MITG the exclusive right to service those customers.

## II.    MITG HAS PRODUCED EVIDENCE OF DAMAGES RESULTING FROM HP'S BREACH OF THE SSA.

HP does not question the qualifications of MITG's expert. Rather, they challenge the

methodology and calculations of Scott Stringer. In his supplemental report which was allowed by

this Court, Stringer states that he examined and reviewed numerous depositions and voluminous

documents in preparing his report. (Stringer's Expert Report, Exhibit II, attached as Exhibit 22). He

analyzed the income history of MITG for the years 2002-2004 from documents produced by not only

MITG but by HP for the years during which the agreement at issue was in effect. (Stringer's Expert

Report, Exhibit II, attached as Exhibit 22). He reviewed numerous depositions of HP and MITG

personnel. He reviewed call statistics and a detailed Excel spreadsheet which contained all customer

invoices and order amounts for every order placed with MITG for outsourced as well as CSN parts.

(Stringer's Expert Report, Exhibit II, attached as Exhibit 22; Deposition of Scott Stringer, Exhibit

23, p. 7-9). Other documents were also reviewed. (Stringer's Expert Report, Exhibit II, attached as

Exhibit 22).

HP claims that MITG has no evidence of damages flowing from its breach of the SSA.

MITG's expert, Scott Stringer, clearly opined that due to HP's breach of the SSA, MITG incurred

damages totaling $6,242,000. (Stringer's Expert Report, attached as Exhibit 22). Again, HP chooses

to ignore this evidence. HP's argument merely focuses on its disagreement with Stringer's

methodology and conclusions.

HP incorrectly states that the product sold by Andover was in stock or CSN spare parts and

MITG would not receive a profit split on such orders. As stated in the SSA and the "Bible"

governing the CSN transactions for MITG, MITG could receive the 75/25 percent profit split on certain CSN transactions. (HP's Exhibit 1, p. 5-6, para. 12). HP then argues that Stringer's analysis is flawed because there is no evidence that MITG ever made use of the price breaks referenced in the "Bible." HP incorrectly states that such an exception never happened because it was not referenced by Ron Haught or Teresa Koch in their depositions. HP ignores the testimony of MITG's expert and the Excel spreadsheet he reviewed that showed the CSN versus outsourced order split that was determined based on every invoice of MITG during the terms of the agreement. (Deposition of Scott Stringer, Exhibit 23 , p. 9, 59-61). The spreadsheet was on a disk provided to Stringer and contained every sale MITG had from 2002 through 2004 relating to this contract. (Deposition of Scott Stringer, Exhibit 23, p. 7). It also provided Stringer with profit margin on the products. (Deposition of Scott Stringer, Exhibit 23, p. 9). CSN revenues made up 44% of MITG's business. (Deposition of Scott Stringer, Exhibit 23, p. 23). As stated, Andover did not have the incentive to outsource CSN parts as did MITG under the SSA. (Deposition of Scott Stringer, Exhibit 23, p. 65-66). HP tries to mislead this court with citations to Stringer's deposition testimony that he did not have the entire copy of Diane Pound's deposition and therefore he did not review all of it and can't explain various issues. As stated in the testimony, the pages referenced by opposing counsel on the day of the deposition were not located at that moment. Stringer further stated he may not have seen it but certainly there is no admission it was not reviewed and to suggest otherwise is improper. (Deposition of Scott Stringer, Exhibit 23, p. 50, 62, 63 64).

Stringer specifically had the breakdown of CSN versus outsourced parts for MITG for the entire term of the SSA. This provided him the accurate specific sales information which he used to base the percentage split of the Andover calls that were improperly referred to Roseville that should have been sent to MITG. (Deposition of Scott Stringer, Exhibit 23 p. 23, 24; Stringer's Expert Report, Exhibit 22). HP argues that there is no foundation that the Andover and MITG call centers had the same sales mix. This position is refuted by HP's own people. Although Diane Pound testified that Andover did not carry third-party or multi-vendor parts, she acknowledged that

34

Andover did carry Compaq spare parts. (Deposition of Diane Pound, Exhibit 2, p. 10-11, 14). Both Andover and MITG carried pre-merger Compaq (legacy) and in-stock Compaq (CSN) parts. (See Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 6-7, 14-15); see deposition of Chip Love, Exhibit 7, p. 77, 79). Chip Love, who Diane Pound reported to, testified that HP Direct (MITG) was offering the same parts that Andover was offering. (Deposition of Chip Love, Exhibit 7, p. 77, 79). HP's own representatives testified that Andover and MITG provided comparable services and the same parts to customers. (Deposition of Troy Bloomquist, Exhibit 3, p. 105; Deposition of Roland Soriano, Exhibit 10, p. 10; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 6-7, 14-15; see Statement of Additional Material Facts, para. 16-18). Again, Andover was an HP Direct call center. (Deposition of Shari Ellis, Exhibit 4 , p. 53-54).

HP states that Stringer's report and testimony is incorrect because he did not have the call volumes for Andover. Andover did not have the call volumes for its own facility. Its own call center manager, Diane Pound, did not have accurate call volumes for her own facility. She testified the documents represented the total call volume for each month of Digital classic parts and Compaq parts. She had no idea why the Digital call volumes were only reported for Quarters 1 and 2 for the year 2002. She further did not know if it was because her call center had transitioned and it was being reported by Roseville. Further documentation she reviewed listed total calls for 52 weeks, but she had never seen the document and did not know if it was a combination of the Roseville and Andover call centers. She did not receive any documents that showed the sales and revenue for the Andover parts orders. Further the call volume documents for year 2003 do not report Quarters 3 and 4. (Deposition of Diane Pound Exhibit 2, p. 40-41, 46, 50-54, 60-62; Pound Deposition Exhibits III, LLL, NNN and TTT, attached with Group Exhibit 12). Ultimately, the information on Andover was incomplete and insufficient for Stringer to use. (Deposition of Scott Stringer, Exhibit 23, p. 26). The historical MITG call split and HP's own reporting at Roseville (document HP 11007-11009) were the best and most accurate information to use. (Deposition of Scott Stringer, Exhibit 23, p. 26, 27).

35

HP takes the position that Stringer's testimony is without basis and inadmissible. MITG has provided the necessary showing that the testimony of its expert, Scott Stringer, is based on valid scientific knowledge and will assist the trier of fact in understanding or determining the economic issue of damages in this case. Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions are factual matters to be determined by the trier of fact. Smith v. Ford Motor Company, 215 F.3d 713 (7th Cir. 2000); *citing* Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The essence of HP's argument is that the basis of Stringer's opinions are speculative. The question of whether Stringer is credible or whether his theories are correct given the facts of the case is a factual determination left to the jury after cross-examination. Smith v. Ford Motor Company, 215 F.3d 713, 719 (7th Cir. 2000).

There is additional evidence that MITG suffered damages due to the breach of the SSA alleged in Count I of MITG's counterclaim. In 2002, the amount MITG earned from HP for services/parts MITG provided was $4,850,217.39. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18). MITG's revenue declined to $4,402,574.04 in 2003. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18). MITG earned only $329,783.53 from HP in 2004 before the SSA ended. (Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18). However, from November 2, 2002 through October 25, 2003, HP's net revenue from the sale of pre-merger Compaq parts handled at Roseville, that had been transitioned from Andover, was $15,581,606.00. (Deposition of Richard Chizek, Vol. II, Exhibit 9, p. 157). That MITG was damaged when HP redirected calls from Andover to Roseville instead of to MITG pursuant to the SSA is evident. According to MITG's expert, Scott Stringer, MITG suffered net damages of $6,242,000 due to HP's breach of the Standard Support Agreement. (Stringer's Expert Report, Exhibit 22).

### III.    THERE IS EVIDENCE WHICH INDICATES HP BREACHED THE MIDDLEWARE AGREEMENT.

Unlike the SSA, the Middleware Agreement is governed by Illinois law. (Middleware Agreement, HP's Exhibit 14, para. 12). Under Illinois law, to prove breach of contract, MITG must demonstrate the existence of a contract, the plaintiff's performance of all contractual conditions, the defendant's breach of the contract, and the damages that resulted from the breach. Finch v. Illinois Community College Bd., 315 Ill. App. 3d 831, 836, 734 N.E.2d 106 (5th Dist. 2000). Again, HP does not dispute the existence of the agreement, its application to HP, or MITG's full compliance with the agreement. HP argues MITG has no evidence of breach by HP or resulting damages.

In the Middleware Agreement, MITG granted Compaq a personal nontransferable and nonexclusive right and license to use the Middleware solely for the purpose of doing business with MITG. (Deposition of Troy Bloomquist, Exhibit 3, p. 70; HP's Exhibit 14, p. 2, para. 3). The Middleware Agreement further provided that Compaq was not to modify, revise or sublicense the Middleware to others, nor use the Middleware for the benefit of parties other than MITG without MITG's prior written consent. (Deposition of Troy Bloomquist, Exhibit 3, p. 70-71; HP's Exhibit 14, p. 2, para. 3).

When MITG was first approached by Compaq in late 1999, Compaq did not have a web tool in place to interface orders between it and MITG. (Deposition of Troy Bloomquist, Exhibit 3, p. 28). One of the problems existing at that time was that an order would be placed by MITG and it would have to be manually entered into the Compaq VISTA order entry system. (Deposition of Troy Bloomquist, Exhibit 3, p. 31). Basically, MITG would provide a quote via its website that Compaq would check and then enter into a VISTA system manually to invoice the customer. (Deposition of Troy Bloomquist, Exhibit 3, p. 35). Even though MITG was keeping up with their side of the sales

37

agreement, Compaq was getting behind as their customer service representatives could not enter the quotes into the VISTA system fast enough. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 42). So, MITG was approached to create an interface that would allow the part orders coming from MITG's website to be loaded directly into the VISTA system. This was created through an XML interface which is a glorified e-mail string of data that comes through in a tabled format. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 45, 46).

MITG hired eData Enterprises for the programming project of the Middleware. They were hired to format the XML communications into the VISTA system. (Deposition of John Brewer, <u>Exhibit 19</u>, p. 7, 10, 11). eData Enterprises created a process where information was taken from MITG and transmitted through the XML and ended up as an order in the Compaq system. (Deposition of John Brewer, <u>Exhibit 19</u>, p. 22, 23). The Middleware was something that could easily be reused. (Deposition of John Brewer, <u>Exhibit 19</u>, p. 21, 22). The functionality could be reused by Compaq to allow other customers to place their orders into the VISTA system. (Deposition of John Brewer, <u>Exhibit 19</u>, p. 22). The only thing the external client would need to know is the format of how to accept the XML. (Deposition of John Brewer, <u>Exhibit 19</u>, p. 24).

Troy Bloomquist has testified that prior to the development of the Middleware by MITG, Compaq had no web tool in place to interface orders with any client. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 28). Further, there was no XML interfacing to the external non-Compaq world prior to MITG. (Deposition of Debra Broady, <u>Exhibit 20</u>, p. 24). There were no other XML interfaces to any other customer sites. (Deposition of Debra Broady, <u>Exhibit 20</u>, p. 10).

Troy Bloomquist knew of one instance where an order from Microsoft was placed through the Middleware. (Deposition of Troy Bloomquist, <u>Exhibit 3</u>, p. 71). Bloomquist also testified that

38

for Microsoft to have placed this order, Microsoft would have needed the same interface on its system that MITG had created for its transactions with Compaq. (Deposition of Troy Bloomquist, Exhibit 3, p. 76-77). Because HP has the information created by MITG, it can easily be communicated to other customers simply by giving them the accepted format to get their orders into HP's VISTA system. (Deposition of John Brewer, Exhibit 19, p. 26). The information had to have been communicated to Microsoft for Microsoft to have placed an order directly into VISTA. This evidence indicates a breach of the Middleware Agreement by HP.

HP has not removed the Middleware created by MITG from its system, and HP can easily reopen the software for use. (Deposition of Sandra Urwin, Exhibit 13, p. 93, 100-101). In fact, Shari Ellis testified that she transferred user defined fields (UDF's) from the MITG Middleware to HP. She transferred them from Compaq to HP to avoid the same manual entry order problems Compaq experienced. (Deposition of Shari Ellis, Exhibit 4, p. 45). Roseville (HP) was to use the UDF's created by MITG. (Deposition of Shari Ellis, Exhibit 4, p. 45). Ellis is aware that Xerox and Microsoft feed their orders right into VISTA. (Deposition of Shari Ellis, Exhibit 4, p. 100-101). Again, there was no direct XML interface between VISTA and the outside world prior to its development by MITG under the Middleware Agreement. (Deposition of Debra Broady, Exhibit 20, p. 24). This violates the terms of the Middleware Agreement which provided that Compaq was not to modify, revise or sublicense the Middleware to others, nor use the Middleware for the benefit of parties other than MITG without MITG's prior written consent. This is further evidence of a breach of the Middleware agreement. Therefore there exists genuine issues of material fact precluding a motion for summary judgment.

39

HP argues that MITG has failed to establish any damages that arise out of the breach of the Middleware Agreement and this defeats MITG's claim. However, the law recognizes nominal damages for every invasion of a legal right. If a party proves that it had the right to damages but fails to provide a proper basis for computing those damages, nominal damages may be awarded. Midwest Software, Ltd. v. Willie Washer Mfg. Co., 258 Ill. App. 3d 1029, 1105, 630 N.E.2d 1088 (1st Dist. 1994); Keno and Sons Const. Co. v. LaSalle Nat. Bank, 214 Ill. App. 3d 310, 312, 574 N.E.2d 151 (2d Dist. 1991); Brewer v. Custom Builders Corp., 42 Ill. App. 3d 668, 677, 356 N.E.2d 565 (5th Dist. 1976). Without proof of actual damages definite in amount that the jury can arrive at a sum as actual damages, nominal damages can be given. Van Velsor v. Seeberger, 35 Ill. App. 598 (1895).

> "The law never permits a party to wilfully break his solemn engagement, and to trifle with and disappoint with impunity those with whom he deals; and where there has been a violation of a contract by one party the other may sue and recover nominal damages, even when substantial damages have not been sustained. If, then, a party, without any sufficient excuse, violated an agreement, they would be liable for at least nominal damages."

Deere v. Lewis, 51 Ill. 254 (1869).

There is evidence that MITG's ownership of the Middleware has been compromised and, at a minimum, nominal damages may be awarded.

## IV.   THERE IS EVIDENCE SUPPORTING MITG'S CLAIM THAT HP TORTIOUSLY INTERFERED WITH MITG'S RELATIONSHIP WITH CUSTOMERS.

### A.   Illinois Law Applies to This Claim.

HP claims Missouri law applies here because the Standard Support Agreement is governed by Missouri law. However, the Standard Support Agreement does not provide that Missouri law applies to all tort claims between the parties. Rather, this court must apply Illinois law to MITG's tortious interference claim.

40

Federal district courts sitting in Illinois apply Illinois' choice of law rules. <u>Hardly Able Coal Co. v. International Harvester Co.</u>, 494 F. Supp. 249, 250 (N.D. Ill. 1980); <u>Nicholson v. Marine Corps West Federal Credit Union</u>, 953 F. Supp. 1012, 1015 (N.D. Ill. 1997). Generally, Illinois applies the local law of the state where the injury occurred, unless some other state has a more significant relationship to the occurrence and the parties. <u>Hardly Able Coal Co.</u>, 494 F. Supp. at 250; <u>Nicholson</u>, 953 F. Supp. at 1016; <u>Wreglesworth v. Arctco Inc.</u>, 316 Ill. App. 3d 1023, 1031, 738 N.E.2d 964 (1st Dist. 2000). All of the alleged interference by HP occurred in 2004, when MITG was located in Quincy, Illinois. (Deposition of Ron Haught, February 18, 2005, <u>Exhibit 11</u>, p. 32). Thus, unless the law of Missouri, as asserted by HP, has a more significant relationship to this case than Illinois, Illinois law applies.

To determine which state has the more significant relationship to the case, the following factors are relevant: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." <u>Nicholson</u>, 953 F. Supp. at 1016. Here, the injury (MITG's loss of business) occurred in Illinois because MITG was conducting business in Illinois in 2004 when HP committed the tortious interference. Missouri has no contact whatsoever to MITG's tortious interference claim. There is no factor which leads to the application of Missouri law to this claim. Illinois law must be applied.

**B.**    **HP's Argument that There is No Evidence it Interfered With MITG's Customer Relationships and that MITG Has No Evidence to the Contrary Must Fail.**

There are various types of tortious interference claims in Illinois, among them: tortious interference with prospective economic advantage; tortious interference with contracts; and tortious

41

interference with business relationships. (Compare and See cases cited by HP in footnote 11 of its motion, with cases cited below). MITG's claim is for tortious interference with business relationships.

According to the Illinois Fourth District Appellate Court (the state appellate district in which Quincy, Illinois sits), the elements of a claim for tortious interference with business relationships are:

> "the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."

O'Brien v. State Street Bank & Trust Co., 82 Ill. App. 3d 83, 85, 401 N.E.2d 1356 (4th Dist. 1980); see also, Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc, 214 Ill. App. 3d 1073, 1080, 573 N.E.2d 1370 (5th Dist. 1991).[4]

MITG had existing business relationships with numerous customers (Deposition of Louise Meyerfeld, Exhibit 1, p. 88, 89; Chizek Deposition Exhibit PP, attached with Group Exhibit 6); HP knew that MITG had those existing business relationships (Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 86-87, 88, 89; see Meyerfeld Deposition Exhibit P, at p. HP000011-12, at Group Exhibit

---

[4]The Illinois cases cited by HP in footnote 11 of its motion, which discuss the interferer's lack of justification, are inapposite. These cases do not involve cases for *tortious interference with business relationships*, but involve cases for tortious interference with contract and prospective business relations. Stofer v. First National Bank of Effingham, 212 Ill. App. 3d 530, 542, 571 N.E.2d 157 (5th Dist. 1991) (existing contract and prospective business expectancy); Fieldcrest Builders v. Antonucci, 311 Ill. App. 3d 597, 611, 724 N.E.2d 49 (1st Dist. 1999) (existing contract); Roy v. Coyne, 259 Ill. App. 3d 269, 279, 630 N.E.2d 1024 (1st Dist. 1994) (existing contract and prospective business relations). No Illinois case could be located requiring a party to prove the interferer's actions were unjustified in a claim for *tortious interference with business relationships* as we have here. Because Illinois law applies, HP's argument that its actions were justified, that it had a legitimate economic interest in interfering with MITG's customers, and that it employed no improper means in doing so, is irrelevant and must be disregarded.

42

5; Chizek Deposition Exhibits OO and TT, at Group Exhibit 6; Deposition of Richard Chizek, Vol.

I, Exhibit 8, p. 62, 71); HP actively pursued those business relationships for itself (Deposition of

Richard Chizek, Vol. I, Exhibit 8, p. 52-55, 62; Chizek Deposition Exhibits NN and PP, at Group

Exhibit 6; Deposition of Roland Soriano, Exhibit 10, p. 35-37, 38; Deposition of Shari Ellis, Exhibit

4, p. 65-66, 74-75; Deposition of Louise Meyerfeld, Exhibit 1, p. 86-89, 92-93, 97; Haught

Deposition Exhibit 28 at Group Exhibit 14; Deposition of Bill Crowley, Exhibit 15, p. 157); and

MITG suffered decreased business revenues as a result of HP's actions. (Stringer's Expert Report,

Exhibit 22; Deposition of Teresa Koch, February 17, 2005, Exhibit 21, p. 18).

HP claims there is no evidence it tortiously (or improperly) interfered with MITG's

relationships with its customers or could have caused those customers to cease doing business with

MITG. This assertion ignores the evidence. Before the termination of the Standard Support

Agreement, HP's representatives:

- sent an email instructing HP's agents (a) that all HP parts business center operation
  agents should be directed to immediately stop referring any parts inquiries to the HP
  Direct/MITG telephone number, (b) that the HP Direct/MITG telephone number be
  removed from HP's phone lists, and (c) that all parts inquiries and orders for any pre-
  merger Compaq parts and HP parts be directed to Roseville (Deposition of Richard
  Chizek, Vol. I, Exhibit 8, p. 52-55; Deposition of Roland Soriano, Exhibit 10, p. 35-
  37, 38; Chizek Deposition Exhibit NN, at Group Exhibit 6);

- planned to contact MITG's top 89 accounts/customers and notify them of new contact
  information (HP's contact information) for the parts and service they had been

43

receiving from MITG (Deposition of Shari Ellis, Exhibit 4, p. 65-66; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 62);

- determined who MITG's top 89 accounts/customers were by the amount of business those customers transacted with MITG (Deposition of Louise Meyerfeld, Exhibit 1, p. 88);

- drafted and sent a letter to MITG's top 89 customers notifying those customers to contact HP instead of MITG (Deposition of Louise Meyerfeld, Exhibit 1, p. 85-86, 87-88; Meyerfeld Deposition Exhibit P, at Group Exhibit 5; Deposition of Shari Ellis, Exhibit 4, p. 65-66);

- sent the same letter to MITG's remaining 2,000 plus accounts/customers in the first week of February (Deposition of Shari Ellis, Exhibit 4, p. 66; Deposition of Louise Meyerfeld, Exhibit 1, p. 89);

- began telephoning MITG customers regarding conducting business from now on with HP, not MITG (Deposition of Louise Meyerfeld, Exhibit 1, p. 87-88, 92-93);

- conducted a presentation for Agilent, one of MITG's customers which had a highly customized account with MITG, to explain how it should conduct business with HP. (Deposition of Louise Meyerfeld, Exhibit 1, p. 97; Meyerfeld Deposition Exhibit Q, at Group Exhibit 5);

- had accounts set up for MITG customers to place orders with HP Roseville as of January 13, 2004 (Deposition of Louise Meyerfeld, Exhibit 1, p. 105, 108); and

- as of January 16, 2004 had consolidated part of the MITG business to Roseville for order placement and instructed MITG's representatives to send all calls to Roseville.

Roseville was additionally taking MITG back orders as of February 2, 2004. (Deposition of Shari Ellis, Exhibit 4, p. 68-69, 74).

HP was aware these actions were taken prior to the termination of the Standard Support Agreement. (Deposition of Bill Crowley, Exhibit 15, p. 157; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 52-55; Deposition of Roland Soriano, Exhibit 10, p. 35-37, 38). Many of the customers HP contacted had been ordering through MITG for years and did not even have an HP account. (Deposition of Louise Meyerfeld, Exhibit 1, p. 86-87; Deposition of Richard Chizek, Vol. I, Exhibit 8, p. 71). However, HP took a proactive approach and set up accounts at HP for MITG's 2,089 customers prior to the termination of the Standard Support Agreement on February 8, 2004. (Deposition of Louise Meyerfeld, Exhibit 1, p. 93). The testimony of HP representatives shows that HP actively targeted MITG's customers prior to the termination of the Standard Support Agreement. These customers were not only told to no longer do business with MITG, but Roseville had actually started fulfilling MITG orders prior to the end of the SSA.

HP asserts in its motion that there can be no tortious interference because these 2,089 customers were HP's customers, not MITG's. This statement is contrary to the admissions of HP's own representatives that these customers were MITG's. (See Statement of Additional Material Facts, para. 85-87, 90-93). The deposition testimony indicates that HP knew these customers were MITG's customers. (See Statement of Additional Material Facts, para. 85-87, 90-93). HP now attempts to claim these customers as its own.

HP's argument that MITG has no evidence it tortiously interfered with MITG's business relationships is contrary to the weight of evidence, and the evidence produced by MITG creates a genuine issue of material fact which defeats HP's motion.

45

**C.    MITG Has Produced Evidence of Damages Resulting from HP's Tortious Interference With MITG's Business Relationships.**

Again, HP does not contest Stringer's qualifications.  HP takes the position that Stringer's testimony is without basis and inadmissible.  MITG has provided the necessary showing that the testimony of its expert Stringer is based on valid scientific knowledge and will assist the trier of fact in understanding or determining the economic issue of damages in this case.  Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions are factual matters to be determined by the trier of fact. Smith v. Ford Motor Company, 215 F.3d 713 (7th Cir. 2000); *citing* Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The essence of HP's argument is that the basis of Stringer's opinions are speculative.  The question of whether Stringer is credible or whether his theories are correct given the facts of the case is a factual determination left to the jury after cross-examination.  Smith v. Ford Motor Company, 215 F.3d 713, 719 (7th Cir. 2000).  To establish a basis for damages for tortious interference does not require absolute certainty but evidence with a fair degree of probability.  E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993).  Stringer has provided evidence with the degree of probability required.

Scott Stringer, MITG's expert, determined that MITG was damaged in the amount of $673,000 due to HP's tortious interference with MITG's business relationships. (Stringer's Expert Report, attached as Exhibit 22).  It is clear that HP disagrees with his determination and disagrees with Stringer's methodology. Stringer compared the customers of MITG that were contacted by HP to a list regarding those that had continued to buy from MITG after the SSA ended. (Deposition of

46

Scott Stringer, Exhibit 23, p. 124-127). If they kept buying they obviously had not been interfered with. Stringer then took historical MITG sales data of those customers that stopped buying with MITG from their purchases that occurred during the SSA. (Deposition of Scott Stringer, Exhibit 23, p. 128-129). He then made his analysis as to CSN versus outsourced parts and made a determination as to damages suffered by MITG. (Stringer's Expert Report, Exhibit 22; Deposition of Scott Stringer, Exhibit 23, p. 125-131). He also adjusted for incremental operating expenses and calculated the profit margin to come to an ultimate damages number on this claim. (Deposition of Scott Stringer, Exhibit 23, p. 163-165; Stringer's Expert Report, Exhibit 22). MITG has evidence supporting the claimed damages and HP disagrees with the amount claimed and how that amount was determined.

## CONCLUSION

MITG demonstrates that factual issues exist which necessitate a denial of HP's motion. HP's assertions that MITG has no evidence to support its claims against HP are unreliable. MITG has brought forth evidence which exists to support MITG's claims and illustrates that numerous genuine issues of fact exist. This case is not a proper for summary judgment, and HP's motion should be denied.

WHEREFORE, Defendant/Counterclaim Plaintiff Midwest Information Technology Group, Inc., prays that this Court deny HP's Motion for Summary Judgment on all counts and in its entirety and award such other and further relief as this Court deems just and proper.

s/_____ James A. Hansen_____
James A. Hansen IL Bar #6244534
Attorney for Defendant/Counterclaim Plaintiff,
Midwest Information Technology Group, Inc.
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey Street, P. O. Box 1069
Quincy, IL 62306-1069
Telephone: (217) 223-3030
Facsimile: (217) 223-1005
E-mail: jhansen@srnm.com

47

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of February, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Molly Buck Richard
> Thompson & Knight, LLP
> 1700 Pacific Avenue, Suite 3300
> Dallas, TX 75201-4693
>
> Elizann Carroll
> Juneau, Boll & Ward
> 15301 Spectrum Drive, Suite 300
> Addison, TX 75001
>
> Scott Spooner
> Heyl, Royster, Voelker & Allen
> Suite 575, National City Center
> 1 North Old State Capitol Plaza
> P.O. Box 1687
> Springfield, IL 62705-1687

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

> s/ _____ James A. Hansen _____
> James A. Hansen IL Bar #6244534
> Attorney for Defendant/Counterclaim Plaintiff,
> Midwest Information Technology Group, Inc.
> Schmiedeskamp, Robertson, Neu & Mitchell
> 525 Jersey Street, P. O. Box 1069
> Quincy, IL 62306-1069
> Telephone: (217) 223-3030
> Facsimile: (217) 223-1005
> E-mail: jhansen@srnm.com

48