E-FILED
Wednesday, 01 February, 2006  03:43:11 PM
Clerk, U.S. District Court, ILCD

**Page 1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

    vs.         Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.

_____/

Deposition of

LOUISE MEYERFELD

Wednesday, September 29, 2004

Job No. 1610RD
Reported by:  Ruth E. Diederich, RPR, CSR
    CSR No. 4952

---

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    THOMPSON & KNIGHT, LLP
    BY:  ELIZANN CARROLL, Esq.
    1700 Pacific Avenue, Suite 3300
    Dallas, Texas  75201
    (214) 969-1700

FOR THE DEFENDANTS:

    SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
    BY:  JAMES A. HANSEN, Esq.
    525 Jersey
    Quincy, Illinois  62306
    (217) 223-3030

---o0o---

---

**Page 3**

LOUISE MEYERFELD    Wednesday, September 29, 2004

                         Page

Examination by Mr. Hansen           4

---o0o---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| M | E-mails Bates-stamped MITG 36 to MITG 66, regarding metrics. | 21 |
| N | E-mails with no Bates-stamps dated May 6, 2003; May 12, 2003; and May 16, 2003. | 42 |
| O | E-mails with no Bates-stamps dated September 25, 2003; September 26, 2003; and September 29, 2003. | 59 |
| P | E-mails Bates-stamped HP 9, HP 10, HP 11 and HP 12. | 84 |
| Q | E-mails Bates-stamped HP 13 and HP 14. | 91 |
| R | E-mails Bates-stamped MITG 0179, MITG 0180, MITG 0181, MITG 0182 and MITG 0183. | 100 |

---o0o---

---

**Page 4**

1      BE IT REMEMBERED that under the applicable
2  sections of the Code of Civil Procedure of the State of
3  California, on Wednesday, September 29, 2004, commencing
4  at the hour of 9:00 a.m. thereof, at Hewlett-Packard,
5  8000 Foothills Boulevard, Building R10, Conference
6  Room B, Roseville, California, before me,
7  Ruth E. Diederich, a Certified Shorthand Reporter
8  in the State of California, there personally appeared

10           LOUISE MEYERFELD,
11  called as a witness by the defendants in the
12  above-entitled action, who, having been duly sworn
13  by me to tell the truth, the whole truth, and nothing
14  but the truth, was examined and testified as follows:
15           ---o0o---
16      EXAMINATION BY MR. HANSEN
17    Q.    Could you please state your name for the record.
18    A.    Louise Meyerfeld.
19    Q.    And how old are you?
20    A.    Fifty-three.
21    Q.    Date of birth?
22    A.    3/10/51.
23    Q.    Okay.  What is your educational background?
24    A.    I have got an A.A., and I did four years of
25  college.

**Page 5**

1    Q.    Okay.  A.A., an associates degree?

2    A.    Yeah.

3    Q.    From where?

4    A.    College of San Mateo, Junior College of

5    San Mateo.

6    Q.    What area of study was your A.A.?

7    A.    Teaching.

8    Q.    Okay.  When did you receive that?

9    A.    Well, I got that in '72.

10   Q.    Okay.  You said you had four years of college?

11   A.    Yes.

12   Q.    Okay.  Is that at one school or more?

13   A.    San Francisco State.

14   Q.    Did you receive a degree?

15   A.    No.

16   Q.    Have you ever gone back to finish up?

17   A.    No.

18   Q.    Have you ever had your deposition taken before?

19   A.    No.

20   Q.    Okay.  Some ground rules.  I will be asking you

21   questions today in relation to a suit that's pending

22   over in the Central District Federal Court in

23   Springfield, Illinois.

24       If at any time today I ask you a question that

25   you do not understand, ask me to rephrase it, and I'll

**Page 6**

1    hopefully put it in a form that you can answer.

2    A.    (No audible response.)

3    Q.    I also need you to answer out loud.

4    A.    Okay.

5    Q.    Our court reporter is taking down everything

6    that is said today, and it's going to be typed up in a

7    booklet form, and you may have to read it at some later

8    date.  And it's very difficult to take down two people

9    talking at the same time, as well as nonverbal

10   responses, such as huh-uh, uh-huh.  So from time to

11   time, throughout the deposition, I may remind you to

12   answer out loud.  And, again, I ask you to allow me to

13   complete my question before you answer, and I, in turn,

14   will allow you to answer before I ask my next question.

15       Do you have any other specific specialized

16   training or educational background besides your A.A. and

17   your four years of college?

18   A.    I'm working towards a program management

19   certification through work, through HP.

20   Q.    Is that an internal program or is it through --

21   connected through a college?

22   A.    It's actually through a -- I think it's called

23   PMI, Project Management Institute.

24   Q.    Okay.  Is it course work?

25   A.    Yes.

**Page 7**

1    Q.    Is there a certain number of hours you have to

2    have to obtain that certification or a certain number of

3    classes?

4    A.    I want to say it's a -- like a six-day course --

5    six-day course where there are approximately eight

6    courses within that day.  It's almost like a boot camp

7    type of thing.

8    Q.    Okay.  Have you started that or --

9    A.    No.

10   Q.    Okay.

11   A.    I am waiting for the approval.

12   Q.    Any other trade school training or anything like

13   that?

14   A.    No.

15   Q.    Okay.  Do you hold any current certifications or

16   professional accreditations?

17   A.    No.

18   Q.    Have you ever been a member of any professional

19   societies or organizations?

20   A.    Back when I was in junior college.

21   Q.    Okay.  We don't need to go back that far.

22   Within the last ten years, let's say.

23   A.    Okay.  No.

24   Q.    Okay.  Have you ever been a lecturer or taught

25   at a university?

**Page 8**

1    A.    No.

2    Q.    After you got your teaching degree, did you

3    teach for a while?

4    A.    I actually coached softball and volleyball at

5    Menlo Atherton High School in Palo Alto.

6    Q.    You are currently employed with HP?

7    A.    Correct.

8    Q.    Here at the location on Foothills Road in

9    Roseville, California?

10   A.    Yes.

11   Q.    How long have you been at this location?

12   A.    Twenty-five years.

13   Q.    Okay.  What is your current position or title?

14   A.    I'm currently warranty program manager.

15   Q.    How long have you held that position?

16   A.    I would say about nine months.

17   Q.    What are your duties and responsibilities

18   as the warranty program manager?

19   A.    Working with the PGU's, the product -- product

20   groups, to decrease warranty costs, look for different

21   processes to help improve warranty -- basically to

22   save -- save money.

23   Q.    Improve warranty claims?

24   A.    Costs.

25   Q.    Costs?

1    A.   Uh-huh.  Yes.

2    Q.   Would that include calls from people who
3  purchase HP products and are trying to make a claim on
4  their warranty?

5    A.   No, not in this case.  This is actually working
6  with the divisions.

7    Q.   The product division?

8    A.   This is internal.  Yeah.  Yes.

9    Q.   Is it kind of a quality-control-type position?

10   A.   No.

11   Q.   Okay.

12   A.   No.

13   Q.   What -- you have been employed with HP for
14  25 years?

15   A.   Yes.

16   Q.   Okay.  I don't need to go back through 25 years.
17  We're going to be here for a couple of days.  What I
18  want to go over is -- let's take it from the time frame
19  of 2000, let's say --

20   A.   Okay.

21   Q.   -- before the merger with Compaq, and then up
22  until you became warranty program manager, let's go over
23  your positions of employment.  Let's backtrack --

24   A.   Okay.

25   Q.   -- okay?

9

1         Prior to being the warranty program manager,
2  what position did you have?

3    A.   I managed the integration of call centers in
4  North America.

5    Q.   Okay.  How long were you in that role?

6    A.   I would say probably two years.

7    Q.   So that would take us back to roughly the
8  beginning of 2002 up until the beginning of 2004?

9    A.   Correct.

10   Q.   Okay.  What were your duties in that role?

11   A.   Go out -- well, my end result was to integrate
12  all the North American trade parts call centers into one
13  call center here in Roseville.

14   Q.   Okay.  And integrating all the North American
15  trade parts call centers to Roseville, did that include
16  integration of Compaq call centers?

17   A.   Correct.

18   Q.   Post merger?

19   A.   Correct.

20   Q.   Was there a time that you specifically recall
21  after the merger where the decision was made to
22  integrate all North America trade parts call centers to
23  Roseville?

24   A.   Uh-huh.

25   Q.   Is that a yes?

10

1    A.   Do I remember what?

2    Q.   The time in which -- there was a decision --
3  specific decision made that you recall that you were
4  told HP was going to integrate all North America trade
5  parts call centers to Roseville?

6    A.   Yes.

7    Q.   Okay.  When was that?

8    A.   I would say early 2002.

9    Q.   Shortly after the merger with Compaq or before?

10   A.   No.  After.

11   Q.   So do you recall when the merger was?

12   A.   Not off the top of my head.

13   Q.   I think it was May of '02.

14        MR. HANSEN:  Is that what's been represented?
15  February of '02?

16        MS. CARROLL:  Yeah.  First half of '02.

17   Q.   BY MR. HANSEN:  Okay.  Beginning of '02, let's
18  say first, second quarter of '02.

19        Okay.  Let me show you -- okay.  Well, let me
20  just backtrack and clear this up.

21   A.   Okay.

22   Q.   Prior to '02, when you were the manager of the
23  call center integrations in North America, what was the
24  role you had at HP?

25   A.   Business process analyst.

11

1    Q.   Okay.  And how long were you involved in that?

2    A.   About three years.

3    Q.   Okay.  So that takes us through the time
4  frame I asked for.  About '99 up to '02, you were the
5  business -- a business process analyst?

6    A.   Correct.

7    Q.   Was that involving the call centers?

8    A.   No.  It involved the warranty business, working
9  on improving processes, policies, working with the
10  warranty group.

11   Q.   Okay.  I am going to show you a deposition
12  exhibit that was marked yesterday at Mr. Crowley's
13  deposition, Exhibit H, and ask you to just take a look
14  at that for a second.  And while you're looking, I will
15  just tell you, those are documents that HP produced in
16  this case.  I believe it's 1139 to 1159.

17        Do you recognize those as parts business center
18  operations metrics?

19   A.   Yes.

20   Q.   Okay.

21   A.   Yes.

22   Q.   First date on the top is February 5, 2004, on
23  the metrics itself.

24   A.   Oh, yes.

25   Q.   Okay.  Now, do you see on there where it says

12

**Page 13**

1  call centers?

2  A.  Correct.  I do.

3  Q.  Okay.  Do you see where -- what's the first call

4  center listed there?

5  A.  Houston.

6  Q.  Okay.  Is that Houston, Texas, which,

7  pre merger, was Compaq?

8  A.  Correct.

9  Q.  Okay.  And what -- let me go over this

10  generally.

11      After the merger took place, you said it was

12  your duties and responsibilities to integrate all North

13  America trade parts call centers to Roseville.

14  A.  Uh-huh.  Yes.

15  Q.  Identify for me what call centers you're

16  referring to that were going to be integrated to

17  Roseville.

18  A.  We had the Cypress call center, we had the

19  Andover call center, we had the Canadian call center,

20  the Roseville call center, and there was a second call

21  center in Houston, and it was -- dealt with the warranty

22  piece of the business, but they handled the trade parts

23  through that as well.  I can't recall the name of --

24  Q.  Okay.  Is that different --

25  A.  And then --

**Page 14**

1  Q.  Oh.

2  A.  Also the -- the pre merger Compaq business that

3  MITG was using.

4  Q.  Okay.  And you said in early 2002, there was a

5  decision made to integrate all those call centers to

6  Roseville.  Is that -- when you say "to integrate,"

7  meaning all calls would be handled by Roseville?

8  A.  Correct.

9  Q.  Was it HP's desire to have one call center that

10  handled all warranties, sales parts, third-party parts,

11  all calls?

12  A.  It was HP services decision.

13  Q.  Okay.  But was that the goal that was

14  communicated to you?

15  A.  Not multi vendor parts, no.

16  Q.  Okay.  Describe for me what you mean by multi

17  vendor parts.

18  A.  Anything that was not an HP or Compaq part.

19  Q.  Okay.  So any call, customer, business,

20  otherwise, that was for an HP or a Compaq part, the goal

21  was to have those all integrated and handled at some

22  point in time at the Roseville call center?

23  A.  Correct.

24  Q.  The third -- I'm sorry.  The multi vendor parts,

25  how were those going to be handled?

**Page 15**

1  A.  Those were to stay with MITG.

2  Q.  Okay.  Were there other contractors that did the

3  same type of work that you know of?

4  A.  As MITG?

5  Q.  Correct.

6  A.  No.

7  Q.  Okay.  Well, MITG, do you understand that

8  contract was eventually terminated, and their services

9  were no longer requested?

10  A.  I don't think it was terminated.  It was -- it

11  was not renewed.

12  Q.  Okay.  Did you see a copy of the termination

13  letter that was sent by Kristin Triolo from HP?

14  A.  I saw a copy of the letter that was sent, yes.

15  Q.  Terminated, not renewed, however you want to

16  refer to it throughout the depo is fine with me.  But

17  regardless, MITG services were no longer requested or

18  used by HP?

19  A.  Correct.

20  Q.  Who was going to take over, then, the multi

21  vendor call center duties and responsibilities that MITG

22  had on behalf of HP?

23  A.  MITG was keeping that business.  HP was not

24  taking that business on.

25  Q.  Okay.  Does HP, as of February '04, have a call

**Page 16**

1  center or a sub --

2      Well, first, does it have a call center that

3  handles multi vendor parts?

4  A.  Not that I'm aware of.

5  Q.  Does it have other subcontractors that handle

6  multi vendor parts on their behalf?

7  A.  Again, not that I'm aware of.  I don't really

8  know that much about that business.

9  Q.  Okay.  What was the -- strike that.

10      Was the decision also to integrate the call

11  centers for Compaq Direct and HP Direct to Roseville?

12  A.  For the trade parts business, yes.

13  Q.  And is it your understanding that that was work

14  that was also handled by MITG?

15  A.  Correct.  For the Compaq Direct, yes.

16  Q.  Which later became HP Direct?

17  A.  Correct.

18  Q.  So MITG was handling HP Direct business?

19  A.  Yes.

20  Q.  Okay.  And there was a decision made for that

21  part -- the trade parts business in early '02, the

22  decision was made to integrate that, as well, to the

23  Roseville call center?

24  A.  Correct.  That was one of the groups identified.

25  Q.  So was there any discussion, then, in early --

1    in the year of 2002 when the decision was communicated
2    to you to integrate all North America trade parts call
3    centers to Roseville, which included the trade parts
4    business for Compaq Direct and Hewlett-Packard Direct,
5    what was going to happen to MITG for that part of the
6    business?
7        A.    Now, I didn't start having communication with --
8    as far as any of MITG integration until, I want to say,
9    the latter part of that year.
10       Q.    Latter part of '02?
11       A.    Yeah.  Probably the September, October time
12   frame.
13       Q.    And who were those communications with?
14       A.    Troy Bloomquist.
15       Q.    Troy?
16       A.    Uh-huh.
17       Q.    I thought you said Tray.
18       A.    Troy.  Sheryl Williams, who was his manager.
19       Q.    Okay.  Are these people that are based in Omaha;
20   do you know?
21       A.    I believe so.
22       Q.    Okay.  And what -- I guess, what was the nature
23   of those discussions that you had with Mr. Bloomquist,
24   Ms. Williams in the latter part of '02?
25       A.    Explaining to them what the objective was,

17

1    asking for any call center stats, information they had,
2    processes that they may have had in place so we could
3    review those and see what we needed to do, and if it
4    was something that was -- would fit into our business
5    here.
6        Q.    You said you explained to them the objective.
7    What was the objective?
8        A.    To -- to integrate all HP and Compaq trade parts
9    business into one call center.
10       Q.    In '02, the latter part of '02, when you were
11   communicating this to Mr. Bloomquist and Ms. Williams,
12   did HP have the capability or call center already set up
13   to handle that trade parts business --
14       A.    Yes.
15       Q.    You have got to let me finish.
16             -- of Compaq Direct and HP Direct?
17       A.    Yes.
18       Q.    Was Roseville, in the latter part of 2002,
19   handling calls for the trade parts business of Compaq
20   Direct and HP Direct?
21       A.    No.
22       Q.    Okay.  I will get into that later.
23             To your knowledge, when did they begin to handle
24   call center volume for the trade parts business of
25   Compaq Direct and HP Direct here at Roseville?

18

1        A.    February 9th of 2004.
2        Q.    It's your testimony there was none handled prior
3    to that time?
4        A.    Correct.
5        Q.    I want to go back just real quick here to some
6    of these other call centers.  Just tell me briefly what
7    kinds of calls they handled.  You said Cypress.  Is that
8    California?
9        A.    Houston.
10       Q.    Okay.  What was that?
11       A.    That was Compaq trade business.
12       Q.    Okay.  Is that considered Compaq Direct or
13   separate from Compaq?
14       A.    Separate.
15       Q.    Okay.  How is it differentiated?  Because you
16   said trade parts business was also Compaq Direct and
17   Hewlett-Packard Direct.  What was Cypress handling that
18   differentiated it?
19       A.    Well, what Cypress was handling was, like,
20   HP services business where the Compaq Direct is a
21   totally different business than ours.
22       Q.    What about Andover?
23       A.    Andover was Compaq parts.
24       Q.    Is that Andover, Massachusetts?
25       A.    Yes.

19

1        Q.    Were they separate from Compaq Direct?
2        A.    Correct.
3        Q.    Okay.  Then Canada, you said?
4        A.    Yes.
5        Q.    What were they handling?
6        A.    They handled HP parts, and I believe they -- I
7    believe they did Compaq parts.
8        Q.    Roseville, what were they handling?
9        A.    All the trade business in the US.
10       Q.    Okay.  I have seen some breakdown on metrics.
11   We have Roseville PDO, Roseville eSpares and
12   Roseville SOM.
13       A.    Uh-huh.  Correct.
14       Q.    Are those different divisions within the
15   Roseville call center?
16       A.    No.  Those denote -- because each call center
17   had their own systems, what they had to utilize to do
18   their work, well, we took those same systems and brought
19   them here.  So all those do is denote which of those
20   call centers we're talking about.
21       Q.    Let me show you Exhibit M, which is a new
22   exhibit I marked for your deposition here.  The document
23   is MITG 36 to, I think -- what's the last page?  Is it
24   66?
25       A.    66.

20

2        (Defendants' Exhibit M was marked

         for identification.)

3    Q.    Okay.  Do you see that PBCO metrics --

4    A.    Yes.

5    Q.    -- dated March 12, 2003?

6    A.    Yes.

7    Q.    Do you see how it differs from the one dated

8    February 5 in Crowley Exhibit H under call centers?

9    A.    Yes.

10   Q.    Do you see where I am looking at there?

11   A.    Yes.

12   Q.    Okay.  Let's start with Exhibit M.  We have

13   Roseville PDO.  What does PDO stand for?

14   A.    Parts direct ordering.

15   Q.    Does that include HP Direct?

16   A.    No.

17   Q.    Okay.  Parts direct.  What kinds of parts are we

18   talking about?

19   A.    Trade business.

20   Q.    Would that include, for instance, if I'm

21   Joe Smith consumer, and I buy an HP laptop or some

22   product, and I called in wanting a part or a warranty

23   claim, is that PDO?

24   A.    Yes.

25   Q.    Okay.  Is it also for business calls?

                                                    21

1    A.    No.

2    Q.    Okay.  So if I'm mom-and-pop grocery store that

3    has an HP computer system, and I want to make a claim,

4    is that directed to someplace other than Roseville PDO

5    as of March 12, '03?

6        MS. CARROLL:  I am going to object to that.  It

7    calls for speculation.

8        THE WITNESS:  Yeah.

9    Q.    BY MR. HANSEN:  How about this.  You tell me how

10   the calls came in, consumer, business, otherwise.

11   A.    Okay.  Consumer commercial business went through

12   our warranty call center.

13   Q.    Okay.  Hold on a second.

14       Consumer commercial and business went through,

15   you said, warranty?

16   A.    Warranty.

17   Q.    Call center, which was what?

18   A.    It's called -- it's business -- let's see --

19   business center operations.

20   Q.    Okay.  But which call center is it on there?

21   A.    They are not on here, because this is strictly

22   trade business.

23   Q.    Where -- what call center, physical location,

24   would that have been sent to on the ones you listed for

25   me?  Is it Roseville?

                                                    22

1    A.    For the PCO?

2    Q.    Yeah.

3    A.    Yes.  Roseville, and it moved to Houston about a

4    year ago.

5    Q.    Okay.  So they aren't on the metrics that have

6    been produced in this case, either form, Exhibit H or

7    Exhibit M?

8    A.    Correct.

9    Q.    Okay.  Go ahead.  Continue with the explanation

10   of calls and where they're routed.

11   A.    Okay.  All of these calls come into a phone

12   tree; okay?

13   Q.    I understand.  And you know, let's do this as

14   simple as possible.

15   A.    Okay.

16   Q.    A phone tree off of an 800 number?

17   A.    Yes.

18   Q.    Okay.  Let's focus strictly for the time on

19   Exhibit M.

20   A.    Okay.

21   Q.    As of March 12 of 2003, do you see all the call

22   centers listed there?

23   A.    Yes.

24   Q.    Okay.  Are those -- well, let me ask you, Is

25   Roseville -- is this all in one location, Roseville SOM,

                                                    23

1    eSpares and PDO?

2    A.    Today, yes.

3    Q.    How about at this time in March of 2003?

4    A.    PDO was here, I believe SOM was here.

5    Q.    Okay.  What does SOM stand for?

6    A.    Service order management.

7    Q.    Okay.

8    A.    And I -- I want to say eSpares was here as well.

9    Q.    Okay.  Then we have Missouri HP direct, do you

10   understand that to be MITG?

11   A.    Yes.

12   Q.    Then we have the two, Canada red and Canada

13   blue.  Does that mean Canada red is Compaq, Canada blue

14   is HP?

15   A.    Correct.

16   Q.    And Latin America?

17   A.    Correct.

18   Q.    Disregard Canada and Latin America for purposes

19   of this line of questioning.

20       I do not see on there, for instance, Cypress,

21   Andover, those two that you mentioned earlier.  Were

22   they not included on this?

23   A.    Yes.  They're part of the eSpares.

24   Q.    Okay.  Both Cypress and Andover?

25   A.    Yes.

                                                    24

1    Q.   Okay.  At some point in time, were they
2  integrated to Roseville, and that's why they no longer
3  appear in that form as we see on Exhibit H?
4    A.   Correct.
5    Q.   Okay.  Do you recall when that took place?
6    A.   No.  This -- that part of it was outside of
7  my -- my realm.
8    Q.   Okay.  The integration of Andover and Cypress
9  was outside of your duties?
10    A.   Of what happened once it got here, yes.
11    Q.   Okay.  No.  I am talking about integrating
12  Cypress and Andover to Roseville.
13    A.   Uh-huh.
14    Q.   As manager of the call center integrations, did
15  you oversee that integration?
16    A.   Yes.
17    Q.   Okay.  But you just don't recall when that took
18  place?
19    A.   Well, okay.  Here we've got Roseville.  This is
20  part of the integration.  And the trade parts call
21  center managers apparently decided to take these and
22  roll them into one number here.
23    Q.   Okay.  Let's go back to the phone tree we were
24  talking about.
25    A.   Okay.

25

1    Q.   As of March 13 -- March 12, 2003 as, contained
2  in Exhibit M, I want to explain to me how calls were
3  routed on this phone tree off of an 800 number when
4  somebody looking for a part would call in.
5    A.   Okay.  I will explain what -- what I know.
6    Q.   That's all I'm here to find out.
7    A.   Okay.  There is a tree, and there -- off of that
8  800 number, you have got different branches that come
9  off, different -- and there're options within those
10  branches.  And based on the option you pick will
11  determine on what type of business group you're going to
12  fall into for parts.
13    Q.   So to break that down even a little more
14  simpler, if I call in and I am looking for, let's say,
15  Roseville eSpares on March 12 of 2003, I call an 800
16  number.  Would I then get what I like to refer to as a
17  voice activated prompt that says, "If you are looking
18  for eSpares, please press 2" --
19    A.   Yes.
20    Q.   -- "If you are looking for Roseville PDO, please
21  press 3"?
22    A.   Correct.
23    Q.   Was HP Direct, the MITG, also an option off of
24  that 800 number?
25    A.   No.

26

1    Q.   Okay.  What is your understanding as to how
2  someone got in contact with HP Direct or Compaq Direct
3  for parts ordering?
4    A.   They have -- they have their own separate
5  business.  They had their own website, own 800 number.
6    Q.   Do you know how many 800 numbers there were for
7  Compaq Direct, HP Direct?
8    A.   No.
9    Q.   Okay.  Were there any numbers that you had to
10  integrate?
11    A.   I believe there were two.
12    Q.   Okay.  And when you integrate those numbers, are
13  you taking the 800 numbers that HP would pay for for --
14  I'll call it a division, such as HP Direct, and then
15  revising the tree options off of that 800 number after
16  the integration?
17    A.   What happened was -- so you have those two live
18  800 numbers for MITG at the time.  Once the integration
19  was completed as of February 9th, those two phone
20  numbers had messages that the people needed to call the
21  800 number here, and I believe there may have even been
22  a temporary routing off those numbers so all they had to
23  do was select a button, and it would route them here.
24    Q.   Okay.  So is it your understanding, then, for
25  the time that the Standard Support Agreement was in

27

1  place between HP and MITG, that MITG, Compaq Direct/HP
2  Direct -- I am using them synonymously --
3    A.   Okay.
4    Q.   -- had two of their own 800 numbers that people
5  would call, and it would route them directly to MITG?
6    A.   Correct.
7    Q.   Which is, to your understanding, different than
8  the numbers that were here for Roseville or for Houston?
9    A.   Definitely, yes.
10    Q.   Okay.  What would happen if, during the time
11  of the Standard Support Agreement, for instance, on
12  March 12th of 2003, I am looking for MITG, but I
13  accidently dial the 800 number that sends me to
14  Roseville.
15        Was there an option to route me back to Compaq
16  Direct off of the Roseville number?
17    A.   No.
18    Q.   Was there a standard operating procedure within
19  HP how to handle misplaced, I'll call them, 800 calls
20  from people looking for MITG?
21    MS. CARROLL:  Objection; calls for speculation.
22        Go ahead, if you know.
23    Q.   BY MR. HANSEN:  You can answer.
24    A.   The call center, if they ever got any types of
25  calls that they weren't understanding how to handle,

28

1 they would go to their team managers. They in turn,
2 would work with the call center vendor manager.
3     Q.   Are the two numbers that were being used by
4 Compaq Direct/HP Direct to send people to MITG, are they
5 still in existence and just have now been referred over
6 to Roseville?
7     A.   No. I believe those two 800 numbers have been
8 shut down.
9     Q.   Okay. Was there anything sent out to known
10 Compaq Direct or HP Direct customers as to informing
11 them, "Hey, don't call this number anymore. You're not
12 going to get anybody"?
13     A.   There was a letter that went out informing
14 customers internally and externally that there was going
15 to be a change.
16     Q.   That MITG would no longer be servicing HP Direct
17 and Compaq Direct?
18     A.   That for HP and Compaq trade parts, that they
19 should start calling the 800 number here.
20     Q.   How many 800 numbers are there for Roseville?
21     A.   For the call center?
22     Q.   Correct.
23     A.   One.
24     Q.   Okay. What is that number?
25     A.   800-227-8164.

        29

1     Q.   So just so I'm clear, that is the one number
2 that's in existence for anyone that wants to place a
3 call for any part or order that is serviced by
4 Roseville, and then you tree option off of that number?
5     A.   Correct.
6     Q.   Okay. Now, Cypress and Andover, are these
7 places that are still being used, or have they been shut
8 down and everything is now here?
9     A.   They have been shut down.
10     Q.   Okay. So was there any -- take out Canada and
11 Latin America. Is Houston still in operation?
12     A.   Not for trade business, no.
13     Q.   Okay. What is Houston still handling?
14     A.   Warranty.
15     Q.   Okay. Who handles out-of-warranty claims or
16 parts orders?
17     A.   That would be trade business. But if you are a
18 partner, which is a part of the warranty program, they
19 would go to the warranty call center.
20     Q.   Is that here?
21     A.   No. That's in Houston.
22     Q.   Okay. What is your understanding of what types
23 of services or calls were handled by MITG? Was it
24 warranty? Multi vendor? Trade parts?
25     A.   My understanding is that anything that had to do

        30

1 with the Compaq Direct business, as well as multi vendor
2 parts, and I understood that they did sourcing of
3 material.
4     Q.   Are you aware that they're still being used by
5 HP in various capacity?
6     A.   I don't have any knowledge of that.
7     Q.   Okay. Were you -- wait a second. Let me finish
8 up some stuff here.
9         Did you review any materials in preparation for
10 your deposition today?
11     A.   Well, past e-mails that I had.
12     Q.   Were you given those by the attorneys, or, I
13 mean, did you go and do a separate search on your own?
14     A.   No. I -- I have them in my e-mail.
15     Q.   Okay. Have you produced those e-mails to
16 counsel for this case?
17     A.   Yes. I believe they have all the --
18     Q.   Okay. And I guess, What is the policy here on
19 how long e-mails are kept at someone's --
20     A.   No idea.
21     Q.   Okay.
22     A.   No idea.
23     Q.   But you just happened to be a person, I guess,
24 that had some e-mails relative to the MITG issues still
25 on your computer?

        31

1     A.   Well, I have e-mails from all the integration --
2 I have e-mails from all the integration I did.
3     Q.   Do you keep that in a file, or do you just save
4 them on the computer?
5     A.   It's in a file on the computer.
6     Q.   Other than e-mails --
7         And you said they were regarding the
8 integration?
9     A.   Correct.
10     Q.   Anything else that you reviewed?
11     A.   No.
12     Q.   Did you review any of the pleadings, which are
13 the documents filed with the Court?
14     A.   No.
15     Q.   Have you taken any notes or created any
16 documents?
17     A.   No.
18     Q.   When did you review those e-mails? Last night?
19 A couple days ago?
20     A.   Probably last night.
21     Q.   Okay. Did it refresh your memory about
22 anything?
23     A.   It's pretty much still there.
24     Q.   Okay. Have you spoken to anyone besides
25 counsel -- and I am not going to get into those

        32

**Page 33**

2    A.  Regarding?

3    Q.  The case, the facts of what's at issue here,

4 anything at all.

5    A.  No.  I have just mentioned to a few people that

6 I was being deposed.

7    Q.  Okay.  Did you go and speak to anyone, like

8 Bill Crowley, Randy Wagner, and say, "Hey, I'm being

9 deposed.  Let's sit down and talk about" --

10    A.  No.

11    Q.  Who do you report to?

12    A.  Tom Kervin.

13    Q.  Okay.

14    A.  It's K-e-r-v-i-n.

15    Q.  As a warranty program manager, are you now

16 totally removed from the call centers?

17    A.  Yes.

18    Q.  When you were the manager at call center

19 integrations, who did you report to?

20    A.  Lynne Farlin.

21    Q.  Is it a male or female?

22    A.  Female.

23    Q.  Is she here in Roseville?

24    A.  Yes.

25    Q.  What -- I will use the term department.  You can

**Page 34**

1 use whatever you want -- did that fall under?  I mean, I

2 got some testimony yesterday from Mr. Crowley that

3 there's HP -- I don't want to misquote him, so let me

4 tell you directly.  He talked about HP customer support

5 Americas, there's the personal systems group, some other

6 ones.  What did call center integrations fall under?  Is

7 there a specific department?

8    A.  Americas call centers.  HP -- it's actually HP

9 services.

10    Q.  HP services?

11    A.  Yes.

12    Q.  Who was in charge of that division?

13    A.  Randy Wagner.

14    Q.  Okay.  Were you asked at all to go back and

15 do any searches on your computer, hard dive, disks,

16 et cetera, for documents relative to the MITG, HP case?

17    A.  Just the information I gave counsel today.

18    Q.  The e-mails?

19    A.  Yes.

20    Q.  Okay.  Do you know if there's a centralized

21 location here at HP for storage of company documents

22 that may be relative to this case that you just don't

23 have?

24    A.  Not that I'm aware of.

25    Q.  Okay.  Is there any sort of policy as far as,

**Page 35**

1 for instance, those PBCO metrics, where they're stored

2 or how long they're stored for?

3    A.  There's a binder actually kept by the call

4 center manager.

5    Q.  Who is the call center manager for Roseville?

6    A.  Roland Soriano, S-o-r-i-a-n-o.

7    Q.  And that binder that's kept by the call center

8 manager, would that contain the PBCO metrics that are

9 created and generated on a daily basis?

10    MS. CARROLL:  Objection; calls for speculation.

11    THE WITNESS:  I'm not sure.

12    Q.  BY MR. HANSEN:  Do you know the policy on how

13 long those are kept for?

14    A.  No.

15    Q.  You were a person who was sent those on a daily

16 basis on those --

17    A.  Correct.

18    Q.  -- e-mail chains; correct?

19    A.  Yes.

20    Q.  How long did you keep them for?

21    A.  I just looked at them and got rid of them.

22    Q.  Okay.  You just hit delete and --

23    A.  Yes.

24    Q.  Okay.  Was there any search done or did you go

25 back and try to retrieve them off the hard drive or

**Page 36**

1 anything?

2    A.  No.

3    Q.  Are those still sent out on a daily basis?

4    A.  I don't know.

5    Q.  Since you have been removed from the call center

6 integration, are you no longer receiving those?

7    A.  Correct.

8    Q.  Were you involved at all in the preparation of

9 those metrics?

10    A.  No.

11    Q.  It says on the second page of some of those

12 documents that they were prepared by a Darlene Lowe,

13 Vickie Ngo, N-g-o, and somebody else I don't know.

14    But are those people at Roseville or where are

15 they at?

16    A.  Vicki is in Roseville.  I believe Darlene is in

17 Houston.

18    Q.  And just so I'm clear, you're not aware of any

19 HP retention policy on e-mails?

20    A.  No.

21    Q.  Okay.  And other than those e-mails, again, just

22 to tidy this up, were you shown the Request For

23 Production of Documents that was served upon HP and

24 asked to gather information or documents from that?

25    A.  Yes, I believe I got that.

1    Q.  Okay.  And in looking over the Request For
2  Production of Documents, other than e-mails that you
3  produced here today, was there anything else you were
4  able to locate that you have produced?
5    A.  No.
6    Q.  Have you produced all of the e-mails that you
7  were able to find?
8    A.  I -- most e-mails I was copied on, so --
9    Q.  Okay.  Well, did you print all those out and
10  give them to counsel?
11    A.  No.
12    Q.  Okay.  I guess, why not?  Did you think somebody
13  else had them?
14    A.  (No audible response.)
15    Q.  You need to --
16    A.  Yes, because I -- Bill asked me to provide some
17  to him as well.
18    Q.  Okay.  So you provided some to Bill.  Did you
19  provide them to Bill Crowley?
20    A.  Yes.
21    Q.  Okay.  Alls I am trying to determine, Are there
22  any that you haven't provided to Bill Crowley or counsel
23  that you just thought weren't applicable, or, "Hey,
24  someone got them.  I don't need to produce them"?
25    A.  I think I believed that somebody else already

37

had them, because there was information I provided to
2  our HP lawyer as well, so there was documentation there.
3    Q.  Are you aware or have you been informed at all
4  of any of the allegations regarding the lawsuit filed by
5  HP against MITG?
6    A.  I know there's a lawsuit.
7    Q.  Okay.  Do you know why HP is suing MITG?
8    MS. CARROLL:  I am going to -- when you answer
9  the questions not to reveal any conversations that you
10  had with me or any in-house counsel at HP.
11    THE WITNESS:  Okay.
12    Q.  BY MR. HANSEN:  What is your understanding of
13  the lawsuit filed by HP against MITG?
14    A.  I don't know.
15    Q.  Do you have any understanding of the suit filed
16  by MITG against HP?
17    A.  No.
18    Q.  Do you have any personal knowledge regarding
19  domain name issues with MITG?
20    A.  I know that they had the HP/Compaq name within
21  their domain, and that was part of the integration was
22  to work on getting that domain removed, yes.
23    Q.  Okay.  Transferring those domains back to HP?
24    A.  I'm not sure what they did with them.
25    Q.  Okay.  So as you sit here today, do you have any

38

1  knowledge regarding allegations that MITG is trading
2  upon HP's goodwill?
3    A.  No.
4    Q.  Do you have any knowledge that MITG is
5  intentionally distributing MITG products based on HP's
6  trademark or business reputation?
7    A.  Not that I'm aware of.
8    Q.  Do you have any knowledge that MITG or
9  Mike Lauber have acted unfairly or misappropriated HP's
10  work product?
11    A.  Not that I'm aware of.
12    Q.  Do you have any personal knowledge that MITG is
13  trying to capitalize on HP's success by using domain
14  names similar to HP's?
15    A.  No.
16    Q.  Do you have any knowledge of any domain names
17  that MITG is using?
18    A.  I know they changed theirs.  I am not sure what
19  it went to.
20    Q.  Okay.  So if you're not sure, you don't know.
21  Is that a no?
22    A.  Yes.
23    Q.  Okay.  Have you been asked to do any web
24  searches prior to your deposition here today?
25    A.  No.

39

1    Q.  Did you do any host master searches?
2    A.  No.
3    Q.  Did you do any all domains searches?
4    A.  No.
5    Q.  Do you know if MITG is selling any product at
6  any website it has?
7    A.  No.
8    Q.  Do you have any personal knowledge or
9  information that the public or anyone in the public
10  believes that MITG's goods or services are somehow
11  provided, sponsored, approved, licensed or affiliated
12  with HP?
13    A.  No.
14    Q.  Do you have any knowledge of any of the
15  irreparable harm allegedly suffered by HP from MITG's
16  use of domain names or selling of MITG products?
17    A.  No.
18    Q.  Okay.  One more question in this -- well, two
19  more questions in this area.
20    Do you have any knowledge that MITG is using any
21  domain names to inform users or customers that they
22  could go to the MITG website to order HP or Compaq parts
23  after February 7 of '04?
24    A.  No.
25    Q.  Do you have any knowledge that MITG has diverted

40

1  any business by using domain names after February 7 of
2  '04, that HP alleges it should have received?
3      A.   No.
4      Q.   Moving right along.
5           MS. CARROLL:   This is one time you can clearly
6  say ignorance is bliss.
7      Q.   BY MR. HANSEN:   Let me show you what has been
8  marked as Exhibit A, which is the Standard Support
9  Agreement or contract between HP and MITG.   It was
10 entered into, actually, on February 7 of '02 with Compaq
11 Direct.   Was it your understanding that HP merged with
12 Compaq?
13     A.   Correct.
14     Q.   Okay.   Now, I didn't have any knowledge that you
15 had seen that before, but there's an e-mail in there --
16          MR. HANSEN:   You know what?   Why don't we do
17 this.   Let's go off right now, take a break, make copies
18 of this, because I would rather just get it all
19 addressed right now.
20          MS. CARROLL:   Okay.
21          (Recess taken.)
22          MR. HANSEN:   Back on the record.
23     Q.   I have handed you what's been marked as
24 Exhibit A from Mr. Crowley's deposition yesterday, which
25 is a Standard Support Agreement.   Have you seen that

41

1  document before?
2      A.   Yes.
3      Q.   Okay.   Did you review it prior to your
4  deposition?
5      A.   No.
6      Q.   Okay.   I guess, When did you see it for the
7  first time, if you recall?
8      A.   When?   I talked with Troy and asked him to send
9  it to me, so that was quite a while ago.
10          MR. HANSEN:   Let's mark this as Exhibit N.
11          (Defendants' Exhibit N was marked
12          for identification.)
13     Q.   Exhibit N is a document that -- I will state my
14 understanding -- you produced this morning to counsel.
15 It hasn't been Bates-stamped yet by HP.   But this is a
16 two-sided document which -- take a look on the --
17 starting on the bottom there.   Do you see your e-mail?
18 It says from you, and then you have got to flip over to
19 the back, Tuesday, May 6th of '03, to Troy Bloomquist.
20 Do you see where I'm at?
21     A.   Yes.
22     Q.   Okay.   Now, that e-mail of May 6th, 2003, is
23 that where you asked Mr. Bloomquist to send you a copy
24 of the contract?
25     A.   Correct.

42

1      Q.   Okay.   And you were asking for him to send it on
2  as soon as possible because you needed to review it and
3  make recommendations?
4      A.   Correct.
5      Q.   Then it says, "A two-phase approach or some
6  other alternative."   What do you mean by that?
7      A.   Well, based on the contract, we would have --
8  you know, I -- I can't recall.   I can't recall.   It was
9  so long ago.
10     Q.   Well, what does a two-phase approach mean?
11     A.   Do it in two steps.
12     Q.   Okay.   Do what in two steps?
13     A.   I'm trying to remember.
14     Q.   Sure.
15     A.   I believe it was a discussion regarding the
16 parts business, the Compaq/HP parts business versus what
17 to do with their multi vendor sourcing business.
18     Q.   And when you say "their," you mean MITG?
19     A.   MITG, yes.
20     Q.   Okay.   But as of May 6 of '03, in your role as
21 the manager of the call center integrations, it had
22 already been decided to integrate MITG's business to
23 Roseville?
24     A.   Yes.
25     Q.   Were you discussing as to -- were you discussing

43

1  at that point in time with Mr. Bloomquist, Ms. Williams
2  and Ms. Farlin what you may or may not do with the multi
3  vendor business?
4      A.   No.
5      Q.   Okay.   What -- the multi vendor business portion
6  of MITG work was never going to be integrated; is that
7  correct?
8      A.   Correct.
9      Q.   Okay.   The parts business was always going to be
10 integrated?
11     A.   Yes.
12     Q.   Okay.   So as of May 6th of '03, knowing that you
13 were going to integrate MITG's parts business, was it
14 your understanding that Exhibit A was going to be
15 terminated or not renewed?
16     A.   No.   First, we -- we received this, looked at
17 it, had Bill look it over.
18     Q.   Bill who?
19     A.   Crowley.
20     Q.   Okay.
21     A.   And there was -- there was never a discussion of
22 terminating it.   The discussion was around the non --
23 nonrenewal of it, and that was based on the content of
24 dates.
25     Q.   Based on what?

44

**Page 45**

1    A.    The content of dates within the contract.

2    Q.    Okay.  Meaning -- okay.  Let's -- I will take

3    the term "terminate" out of it.

4         After you received the contract, you said that

5    you sent it on to Bill Crowley?

6    A.    Correct.

7    Q.    Okay.  Do you recall receiving the contract

8    shortly after you sent this e-mail to Mr. Bloomquist in

9    May of '03?

10   A.    I'm sorry.  Say that again.

11   Q.    Do you recall Mr. Bloomquist sent you that

12   contract shortly after this e-mail of May 6th, 2003?

13   A.    Yes.

14   Q.    And then you said there was a discussion.  Was

15   it after you had, then, forwarded it on to Mr. Crowley?

16   A.    The discussion about the contract?

17   Q.    Correct.

18   A.    Well, yeah.  He took the contract, reviewed it,

19   talked to some other folks about it and then came back.

20   We weren't moving forward at all on any integration

21   until we had reviewed this, because Troy -- I was

22   working with Troy, and then all of a sudden, he brought

23   up the fact that there was a contract.  We wanted to

24   look at that before we moved forward on anything.

25   Q.    Okay.  I am wanting to get this narrowed down as

**Page 46**

1    far as the time frame.

2    A.    Okay.

3    Q.    Are we talking about May of '03 that the

4    discussion takes place, "Hey, we're not going to move

5    forward with any integration of MITG because Troy has

6    told us there's a contract.  We need to get a copy of

7    the contract and have it looked over"?

8    A.    We actually put a hold on it before May 6th,

9    '03.

10   Q.    Okay.  Put a hold on what?

11   A.    On any integration plans, on what we wanted to

12   do until we saw this.

13   Q.    Right.  Okay.  So was that a directive that you

14   gave or somebody else gave?

15   A.    I did.

16   Q.    Okay.  Because you were the manager of the call

17   center integrations; is that fair?

18   A.    Correct.

19   Q.    Okay.  So you give that directive, and then

20   sent, I guess, this e-mail out to Troy saying, "Hey, we

21   need to see the contract"?

22   A.    Correct.

23   Q.    And I think you testified he sends it to you,

24   and you get a copy, and you distribute it to whom?

25   A.    Bill Crowley, Lynne Farlin.

**Page 47**

1    Q.    Is that who you reported to at the time?

2    A.    Yes.

3    Q.    Okay.  And then do you recall after, how many

4    days, weeks passed, that the three of you got together

5    and discussed the contract?

6    A.    Yes.  It was probably maybe two weeks later.

7    Q.    Okay.  At that discussion, what was -- was there

8    a decision made?

9    A.    No.

10   Q.    Okay.  Was there a discussion about nonrenewal

11   of the contract?

12   A.    Yes.

13   Q.    Okay.  Was a recommendation made?

14   A.    As far as?

15   Q.    Whether to renew or not renew the contract.

16   A.    Not during this discussion.

17   Q.    Okay.  Was that made at some later discussion?

18   A.    Yes.

19   Q.    Okay.  Now, the last part of that e-mail to

20   Troy, you indicate you actually had the luxury of

21   waiting because there were some other priority projects

22   regarding integration that you moved to the top of your

23   list?

24   A.    Correct.

25   Q.    Okay.  Mr. Bloomquist then responds to you the

**Page 48**

1    same day, it looks like, saying he's going to overnight

2    it to you?

3    A.    Correct.

4    Q.    Okay.  And then apparently he forgot.

5    A.    Correct.

6    Q.    Okay.  You then follow up on the top, May 16 of

7    '03, that apparently you still hadn't gotten it, and you

8    asked him to overnight it.

9    A.    Correct.

10   Q.    Okay.  Did you finally get it?

11   A.    I finally got it.

12   Q.    Okay.  Now, after -- did you review the

13   contract?

14   A.    I kind of eyeballed it, yes.

15   Q.    Okay.  Was there any discussion amongst

16   yourself, Bill Crowley and Lynne Farlin as to any

17   exclusivity rights as far as customers that were granted

18   to MITG by way of the contract?

19   A.    No.

20   Q.    Okay.  I think you testified earlier it was your

21   understanding that MITG provided parts business and

22   multi vendor services?

23   A.    Correct.

24   Q.    Okay.  Were those services all provided to

25   Compaq Direct and Hewlett or HP Direct customers?

Q.  Okay.  Who was the multi vendor services
provided to?

A.  There are several different.  IBM -- I don't
really -- yeah.  I can't really recall who they were.

Q.  Okay.  Were the multi vendor services provided
by MITG done so in a fashion where someone from HP may
contact them to provide parts that were then integrated
to the multi vendor business that HP had?

A.  I don't know.

Q.  Okay.  Do you know if MITG had any other
contract or written documentation regarding their multi
vendor business with HP?

A.  No.

Q.  Okay.  If you would, flip to paragraph 24 there,
which is, I believe, on the last page.  Do you see it?

A.  Yes.

Q.  And it says that "All applicable parts and
service orders of the customers will be referred by CDI
to MITG."

A.  Okay.  Yes.

Q.  Does -- okay.  What is your understanding of how
those -- how all of those applicable parts and services
orders were referred?

A.  I don't know.

49

Q.  Okay.  If I use the term "entry points of
contact" --

A.  Yes.

Q.  -- as far as -- do you understand what I'm
talking about?

A.  The first point of contact.

Q.  Well, I am talking about 800 numbers, websites,
those types of things.

A.  Okay.

Q.  You told me earlier, you believe there were two
800 numbers for Compaq Direct/HP Direct that went right
to MITG.

A.  Yes.

Q.  Okay.  It was your testimony also that there
were no 800 numbers to Roseville or any other call
facility owned and operated by Hewlett Packard where
there was an option or a routing to MITG.

A.  Correct.

Q.  Okay.  What other possible -- I call them entry
points or points of contact -- were there for Compaq
Direct or HP Direct customers to be referred to MITG?

A.  Website business.

Q.  Okay.

A.  HP Direct -- or Compaq Direct business, a lot of
the salespeople there worked with them directly.

50

Q.  Okay.  So there -- was there a -- I'll call it
internal HP Direct customer service representatives?

A.  Yes.

Q.  Okay.  Was there also internal Compaq Direct
customer service representatives, or after the merger,
were they all called HP Direct?

A.  They were all called HP Direct.

Q.  Is that based out of a certain geographical
location in the country, or are they all over?

A.  I think there are three or four locations.

Q.  Okay.  So if there was a call placed, for
instance, on an account to an HP Direct CSR -- there are
a lot of abbreviations here -- that could be referred
over to MITG by the --

A.  If -- can you say that again?

Q.  Sure.  If I am a customer, and I contact my
HP Direct sales representative and have a --

A.  Okay.

Q.  -- part or part order that I want, would that
also be a contact point where that service
representative would refer me on to MITG?

A.  Yes.

Q.  Okay.  Under the terms of that agreement, do you
understand paragraph 24 to mean that all customer
service calls that came into HP Direct through their

51

sales representatives should have been referred to MITG?

A.  Based on what it says, yes.

Q.  Okay.  Would you agree that if they were
referred to -- referred to PC Nation, Netstream, Super
Micro Warehouse, that that would be in violation of the
terms of the Standard Support Agreement?

MS. CARROLL:  I am going to object that it
assumes facts not in evidence and calls for a legal
conclusion.

You can answer.

Q.  BY MR. HANSEN:  You can answer.

A.  I don't know.

Q.  Okay.  Well, paragraph 24 says the word "All,"
does it not?

A.  Yes.

Q.  Okay.  It says -- it says, "All applicable parts
and service orders of the customers," which is defined
as all customers of Compaq Direct and Hewlett-Packard
Direct, "should be referred to MITG"; correct?

A.  Yes.

Q.  Okay.  And if a call came in to a customer
service representative at HP Direct, and they're
referring it to some other entity other than MITG, is it
your understanding that that violates the Standard
Support Agreement?

52

**53**

1    MS. CARROLL:  Objection; calls for a legal
2  conclusion and assumes facts not in evidence.
3    Q.  BY MR. HANSEN:  You can answer.
4    A.  I would -- I would say based on what it says
5  here, it says "all applicable," so I don't -- I don't
6  know if that's all inclusive parts or -- or if there are
7  certain parts that aren't applicable to it.
8    Q.  Okay.  If it is an applicable order, you would
9  agree that's a violation?
10    A.  Yes.
11    Q.  Okay.  Are you aware of any other -- I will use
12  the term "vendor," such as MITG, that had contracts with
13  servicing HP Direct or Compaq Direct --
14    A.  No.
15    Q.  -- orders?
16    A.  No.
17    Q.  Do you recall what the 800 numbers were that
18  were used by MITG?
19    A.  No.
20    Q.  On the 800 numbers that were set up that you
21  said directed people automatically to MITG, was that --
22  were those two numbers that had any other options as far
23  as tree options to go anywhere else?
24    A.  The 800 numbers at MITG?
25    Q.  Correct.

**55**

1  E-i-c-h-e.
2    Q.  I have seen Chip Love's name on some of this
3  documentation.  Do you know -- have you ever dealt with
4  him?
5    A.  Yeah.  I know who he is and I know he had some
6  part in the business, but I'm not sure what that part
7  was.
8    Q.  Okay.  I think -- was it Roland Soriano who is
9  in charge of the Roseville call center?
10    A.  Yes.
11    Q.  There was some testimony yesterday of
12  Mr. Richard Chizek.  Who is he?
13    A.  He's the vendor manager.
14    Q.  Of what?
15    A.  Sykes call center.
16    Q.  Okay.  Does that mean he was the manager of
17  vendors such as people like MITG, or -- what does vendor
18  manager mean?
19    A.  Sykes is an in-sourced vendor that we have a
20  contract with to do our call center business.
21    Q.  Here in Roseville?
22    A.  Correct.
23    Q.  So he manages Sykes, which is the contract --
24    A.  He manages the relationship.
25    Q.  Okay.  Now, are the Sykes people housed here

**54**

1    A.  I believe one of them did.  The other one was
2  exclusive --
3    Q.  Exclusive, meaning --
4    A.  -- to the call center, yes.
5    Q.  What were the options on the other one that you
6  recall?
7    A.  I don't know.
8    Q.  Okay.  Was it options, for instance, to go to
9  the call center in Ambry -- excuse me -- the call center
10  in Andover?
11    A.  No.
12    Q.  Was it an option to go to the call center at
13  Cypress?
14    A.  No.
15    Q.  Okay.  Do you have any recollection as to what
16  the options were?
17    A.  No.
18    Q.  Okay.  Do you know if there was a welcome center
19  call number in place in Houston that would direct
20  potential orders or customers to Compaq Direct which was
21  MITG?
22    A.  I don't know.
23    Q.  Who was in charge of the call center in Houston?
24  Is that Chip Love?
25    A.  It was Terry Zimmermann and Phil Eiche,

**56**

1  within Roseville?
2    A.  Correct.
3    Q.  But they are actually contracted -- Sykes is its
4  own -- is Sykes an entity outside of HP?
5    A.  Yes.  It's its own company.
6    Q.  Are there any other contractors such as Sykes
7  that fall within the Roseville facility?
8    A.  No.
9    Q.  Okay.  So Mr. Chizek manages Sykes here in
10  Roseville?
11    A.  Yes.
12    Q.  Is he also the person who manages how calls are
13  handled, how they're routed, the trees that are on the
14  800 number here?
15    MS. CARROLL:  Objection to the extent it calls
16  for speculation.
17    Go ahead.
18    THE WITNESS:  Yes.
19    Q.  BY MR. HANSEN:  Who was the manager over the
20  800 call numbers that routed to MITG?
21    A.  I -- I don't know.  Shari Ellis is one that I
22  worked with, and I believe that she worked with the
23  telephony person there.
24    Q.  Okay.  We have talked about these other entry
25  options, as far as you just mentioned the websites.  Do

**Page 57**

1  or redirect or know what those websites were that
2  directed potential web orders to MITG?  Do you know the
3  domain names?
4      A.   No.
5      Q.   Okay.  Do you know how many there were?
6      A.   No.
7      Q.   Were you involved in trying to integrate those?
8      A.   The domain names?
9      Q.   Correct.
10     A.   The only portion I was, was contacting
11  Linda Gretzinger.
12     Q.   And asked her to take care of it?
13     A.   Yes.
14     Q.   Okay.  Ms. Gretzinger is going to be deposed
15  tomorrow.  But what is her title, if you know?
16     A.   I can't recall, because we just reorg'd, so I
17  can't recall.
18     Q.   You reorganized?
19     A.   Yeah.
20     Q.   I think I have seen the communication.  What did
21  you ask her to do?  Just capture the websites or capture
22  the domain names?
23     A.   I asked her to check into it and the legalities
24  of it, and if she would follow through with -- with what
25  needed to be done.

**Page 58**

1      Q.   Did she tell you she was not able to do that?
2      A.   Yeah.  She said she was having problems with it.
3      Q.   Okay.  Were you involved at all with anything
4  further, follow-upwise, after you had turned it over to
5  Ms. Gretzinger?
6      A.   No.
7      Q.   Is that Exhibit N?  Okay.
8      A.   N?
9      Q.   No?
10     A.   This one?
11     Q.   Yeah.  Never mind.
12          Who was -- did you report to Sheryl Williams?
13     A.   No.
14     Q.   Okay.  Is she here in Roseville?
15     A.   No.  I believe she's out --
16     Q.   Is she in Omaha?
17     A.   She might be.  Troy reported to her.
18     Q.   Okay.  We might as well discuss this and get it
19  over with.
20          I am handing you what's been marked as
21  Exhibit O.  This appears to be a chain of e-mails that
22  started on the second page of Exhibit O, Thursday,
23  September 25 of '03, with an e-mail from Kristin Triolo
24  to Sheryl Williams regarding the MITG contract review.
25          Do you see that?

**Page 59**

1      A.   Yes.
2          (Defendants' Exhibit O was marked
3           for identification.)
4      Q.   Okay.  Now, your name only appears on page 1 up
5  at the top on an e-mail that was forwarded to you dated
6  Monday, September 29, 2003, from Bill Crowley.  It just
7  says, "FYI."  Do you see that?
8      A.   Yes.
9      Q.   Okay.  Was that forwarded to you because you
10  were in charge of the integration of the MITG business
11  into the Roseville call center?
12     A.   Yes.
13     Q.   Okay.  And if you look on the second page,
14  apparently Kristin Triolo is sending Ms. Williams an
15  e-mail forwarding on comments from the legal department
16  at HP regarding the MITG contract.
17          Do you see that?
18     A.   Yes.
19     Q.   Okay.  Then the last sentence she has there, it
20  says, "I think no matter what we decide, we need to
21  terminate this contract.  And if there is a need,
22  establish a new contract on our paper."
23          Were you involved in any of those conversations
24  about terminating the contract?
25     A.   No.

**Page 60**

1      Q.   Okay.  Then if you look at the e-mail on the
2  bottom of page 1, which was sent to Mr. Crowley -- it
3  would have been nice to have this yesterday -- it
4  says -- there're apparently some land mines.  Do you see
5  that on the bottom there, September 26, page 1 of
6  Exhibit O?
7      A.   No.
8      Q.   Okay.  E-mail from Sheryl Williams --
9      A.   Oh.  Oh, okay.  I'm sorry.  Yes.
10     Q.   Do you see where I'm at?
11     A.   Yes.
12     Q.   It says, "There are some land mines - apparently
13  MITG has established quite an infrastructure to manage
14  the business they were getting from Custom Edge, Compaq,
15  HP.  It's a small company.  Moving this business away
16  will have an impact, and they will likely not let it go
17  quietly."  It says, "We've already talked with them that
18  we are moving the HP/Compaq trade parts business away
19  from them into HP's standard trade parts business" -- or
20  "processes."
21          After receiving this e-mail, did you contact
22  Ms. Williams, Mr. Crowley to discuss the impact it would
23  have moving this business away from MITG?
24     A.   No.
25     Q.   That sentence there says, "We have already

**Page 61**

1. talked with them.
2. Q. Did you have any conversations as of
3. September 26th, 2003, with MITG directly?
4. A. No.
5. Q. Okay. Have you ever spoken directly with anyone
6. at MITG?
7. A. No.
8. Q. Okay. Were you involved ever in a conference
9. call when they were on it?
10. A. No.
11. Q. Have you ever even met anyone from MITG?
12. A. No.
13. Q. Okay. Then skipping on up on the first page
14. here of Exhibit O, it says -- it's an e-mail from
15. Bill Crowley dated September 29 of '03. Do you see
16. that?
17. A. Yes.
18. Q. Okay. It's right underneath the one that was
19. forwarded to you.
20. It says, "Hi Sheryl and Kristin. Go ahead with
21. your plans. If we do something with MITG and MV parts,
22. it will be with a new agreement."
23. Does that mean multi vendor?
24. A. Correct.
25. Q. Okay. Were you involved in the decision that

**Page 62**

1. was made to ultimately not involve MITG with any multi
2. vendor parts business on behalf of HP?
3. A. When I was doing the integration piece of it,
4. the multi vendor business question came up from Troy,
5. and I said at the time that we are not interested in
6. moving the multi vendor business. Only the trade parts
7. business.
8. Q. Okay. Why was it your opinion or comment that
9. HP was not interested in the multi vendor business?
10. A. Because all the call centers deal with is the
11. trade business, not -- no multi vendor.
12. Q. Okay. Did you do any sort of analysis as to the
13. type of revenue it generated?
14. A. I believe Bill worked with -- talked with Ron or
15. somebody about --
16. Q. Okay. So you weren't involved in any of that?
17. A. No.
18. Q. Were you involved in reviewing any proposals
19. submitted to HP from MITG?
20. A. No.
21. Q. Actually, why don't you hand me that exhibit.
22. I am going to hand you what was marked yesterday
23. as Exhibit E from Mr. Crowley's deposition.
24. Have you had a chance to look that over? Are
25. you still looking it over?

**Page 63**

1. A. Yeah, I'm still looking. Okay.
2. Q. All right. Flip to HP 241 within that set of
3. documents. Are you there?
4. A. Yes.
5. Q. Okay. Do you see in the middle of the page the
6. e-mail that was sent from Bill Crowley to you as one
7. recipient dated Monday, October 13, 2003?
8. A. I was one of the recipients, yes.
9. Q. Okay. And apparently, you were an attendee at a
10. meeting discussing the MITG contract on October 8 of
11. '03. Do you see that there under "attendees"?
12. A. Oh, yes. I see.
13. Q. Okay. Do you recall attending that meeting
14. discussing the MITG contract?
15. A. I remember a lot of the meetings with
16. Charlie Boyle and those folks. Specifically, I don't
17. remember contract information.
18. Q. Okay. Well, it appears that under the issues
19. section, under capital letter A there, one of the issues
20. was whether or not to renew the contract with MITG.
21. A. Yes.
22. Q. And it says, "Decision no." Do you see that?
23. A. Yes. Yes. I remember this now.
24. Q. Okay. Do you recall discussing not renewing the
25. MITG contract at this meeting?

**Page 64**

1. A. Yes.
2. Q. Okay. Do you recall what the reasons were for
3. not renewing?
4. A. Well, one, the business that they were handling
5. for HP and Compaq Direct trade parts business, they were
6. HP customers, and we wanted all -- all parts work coming
7. through the one call center.
8. Q. Here in Roseville?
9. A. Yes.
10. Q. Okay. Anything else you recall?
11. A. No.
12. Q. Under C there for implementation, it
13. notes that you will be the lead for the website and call
14. center transitions. Do you see that?
15. A. Correct. Yes.
16. Q. Okay. I think you've already told me, even
17. though you were the lead for the website, you asked
18. Ms. Gretzinger to handle that?
19. A. Yes.
20. Q. And you did remain as the lead for the call
21. center transitions?
22. A. Correct.
23. Q. Okay. And what were you asked to do or
24. accomplish by the call center transitions?
25. A. Well, one was to find out -- do investigation to

1  ...find out what systems they used, what the processes were
2  that MITG used.
3      Q.   As far as the routing off the 800 numbers?
4      A.   No.  As far as placing orders.
5      Q.   Okay.  Are you -- as far as -- are you talking
6  about, like, the Vista system here at HP?
7      A.   Yeah.
8      Q.   Okay.
9      A.   And also getting any, I guess, data collection
10 numbers and stuff on their -- on their call center
11 business.
12     Q.   Okay.  Well, how did you go about getting that
13 information if you've told me you never talked to anyone
14 at MITG?
15     A.   Through e-mail through Shari Ellis.  She was the
16 contact.
17     Q.   So Ms. Ellis was the contract -- contact for the
18 MITG contract?
19     A.   Yes.
20     Q.   Okay.  So any information you needed as far as
21 how MITG placed orders, their data collection, you
22 requested that from Ms. Ellis?
23     A.   Correct.
24     Q.   Okay.  Were you provided that information?
25     A.   Yes.

65

1      Q.   Okay.  What is your understanding of how orders
2  were placed by MITG?
3      A.   I can't recall that.
4      Q.   Okay.
5      A.   I can't recall.
6      Q.   And after you did -- you said data collection on
7  the numbers.  What?  As far as the number of orders
8  placed?
9      A.   Calls, how much time was spent on each call,
10 service levels.
11     Q.   Okay.  As reflected, service levels kind of in
12 the metrics that we saw?
13     A.   Yeah.  Yes.
14     Q.   Okay.  Did Ms. -- Ms. Ellis provided those to
15 you?
16     A.   Yes.
17     Q.   Okay.  And what else were you asked to do?  Were
18 you asked to transfer the phone numbers, integrate the
19 800 numbers to --
20     A.   Yes.
21     Q.   Okay.  And I think we talked about that.
22          You set up, I guess you said, a messaging system
23 on the number for a while that said to call the 800
24 number here?
25     A.   Correct.

66

1      Q.   Okay.  And then were those numbers -- I guess
2  you said they were terminated?
3      A.   I believe so.
4      Q.   Is that other number still up and operating and
5  messages people to call here?
6      A.   I believe the other number was used by multiple
7  areas within HP Direct, so --
8      Q.   Before or after the merger?
9      A.   Before.
10     Q.   Okay.  Meaning someone could call that
11 800 number, and MITG was one option off that 800 number?
12     A.   I don't know.  I don't know what the tree was
13 for that one.
14     Q.   Okay.  Was there some person that was
15 responsible for the trees or the 800 numbers that MITG
16 used?
17     A.   Yes.  But I can't recall her name.  Shari Ellis
18 worked with her to get -- get the information taken care
19 of.
20     Q.   Okay.  Next under -- flip forward, please, on
21 240.  This is an e-mail dated Wednesday, November 5th,
22 2003, from Bill Crowley to you as a recipient; is that
23 correct?
24     A.   Correct.
25     Q.   Okay.  And he was providing you, I guess, with

67

1  some updates on his call with Ron Haught that occurred
2  that day.
3      A.   Yes.
4      Q.   Okay.  Were you involved at all under the
5  number -- it's not listed as No. 2, but the second
6  indentation there where it says, "We talked about four
7  specific items included in the termination.  Vista
8  connection will be shut down."
9           Were you involved in that?
10     A.   In that discussion with him?
11     Q.   No.  In shutting down the Vista connection.
12     A.   Shari was.
13     Q.   Okay.  Do you know what the Vista system is?
14     A.   It -- I believe it was a system that captured
15 the orders MITG placed, and there was some work on that
16 end that Shari had to do.
17     Q.   Okay.  So you wouldn't know really how it was
18 cut off or anything like that?
19     A.   No.
20     Q.   It says, "HP spares website will be shut down."
21 Were you involved in that?
22     A.   No.  That was Chip.
23     Q.   Chip Love?
24     A.   Correct.
25     Q.   Why Chip Love?

68

1    A.   Because the website was in Houston?

2    Q.   Okay.  If you would, flip to page 235.  This is

3  an e-mail from -- the second e-mail is from Shari Ellis

4  to you dated September 22nd of '03.  Do you see that?

5    A.   Yes.

6    Q.   The subject is MITG percent --

7    A.   Yes.

8    Q.   -- of out-sourced orders.

9         Had you requested the breakdown percentage of

10 MITG's business that HP represented from Ms. Ellis?

11   A.   We asked for a breakdown.  I believe it was Bill

12 who wanted to know the breakdown.

13   Q.   Okay.  Do you know why?

14   A.   I think he wanted to look at the -- the

15 out-sourced business and see what he could work out with

16 Ron.

17   Q.   When you say "out-sourced business," is that

18 business that --

19   A.   The multi vendor.  I'm sorry.

20   Q.   And that's -- is that what you understand to be

21 placement of orders that are not HP parts?

22   A.   Correct.

23   Q.   Okay.  Do you know if it, at all, was requested

24 to evaluate MITG's percentage of business that was going

25 to be impacted by being -- by not renewed?

69

1    A.   I don't know.

2    Q.   Okay.  Are you aware of any policy that HP had

3  in place about not harming the small business partners?

4    A.   No.

5    Q.   Okay.  Were you involved in any evaluation as to

6  the nonrenewal of MITG's contract as to how that was

7  going to impact MITG?

8    A.   No.

9    Q.   Okay.  If you would flip to the very first page,

10 232.  This is an e-mail from Charlie Boyle to you as one

11 recipient dated Wednesday, January 14 of '04.  Do you

12 see that?

13   A.   Yes.

14   Q.   Okay.  Under Shari/Louise, do you see where I'm

15 at?

16   A.   Yes.

17   Q.   "Continue migration of S account customers to

18 PL 91."  What does that mean?

19   A.   The S account, it's the type of account that

20 they were set up with with MITG

21   Q.   Was it specific to MITG?

22   A.   Yes.

23   Q.   Okay.  What -- what does it refer -- I mean, how

24 is it specific to them?  Is it ordering-based or --

25   A.   Yeah.  It's like an account number type thing.

70

1    Q.   Which is different than the account numbers at

2  HP?

3    A.   Yes.

4    Q.   And you were asked to migrate those to PL 91?

5    A.   Correct.

6    Q.   Okay.  What is PL 91?

7    A.   That's the trade parts business here in

8  Roseville.  It's a product line for the parts.

9    Q.   And when you say "migrate them to PL 91," is it

10 to set up some sort of specific account number, then,

11 here within that product group?

12   A.   It was to set up an equivalent part number in

13 the database so the customers could start ordering their

14 parts through PL 91.

15   Q.   Okay.  So set up an equivalent part number in

16 the HP database?

17   A.   Account number.

18   Q.   That was what I thought I said.  Equivalent part

19 number in the HP database.

20   A.   Not the part number.

21   Q.   Oh, part.  I am sorry.  Account number.

22        MS. CARROLL:  She said part number, and I think

23 she meant account number.

24        THE WITNESS:  Account number.  Sorry.

25   Q.   BY MR. HANSEN:  To set up an equivalent account

71

1  number for the customer in the HP database that would

2  correlate with S accounts on the MITG?

3    A.   Correct.

4    Q.   It then says, "No. 2, assignment of call center

5  individuals to top accounts."

6    A.   Yes.

7    Q.   Were you going to assign certain individuals to

8  the account switch from the MITG to PL 91?

9    A.   The understanding from Shari was there were some

10 high touch accounts, and so we wanted to make sure that

11 there was no disruption in their order placement when we

12 made the switchover.

13   Q.   When you say "high touch accounts," do you mean

14 high volume or high customization?

15   A.   Kind of high maintenance.

16   Q.   High maintenance.  Okay.

17        On the bottom of 232, which is describing

18 results from prior action items, it says, "Continue

19 migration of S account customers to PL 91" under your

20 name.  Do you see that?

21   A.   Yes.

22   Q.   It says, "As stated earlier, MITG is making this

23 difficult."

24        Do you have any knowledge as to what that is

25 referencing?

72

1    A.   We had some problems getting information from
2   MITG.

3    Q.   Okay.  What?  Like specific account information
4   that you requested from them?

5    A.   Yes.  Like their -- like the -- that's where I
6   mentioned -- where it's mentioned top accounts, trying
7   to understand exactly what it was that was special that
8   was done for them.

9    Q.   Okay.  Are you aware if anywhere it was stated
10   MITG was required to turn over that information?

11    A.   They were requested to.  I don't know if they
12   were required to, no.

13    Q.   Okay.  I guess, did that take you by surprise
14   that MITG had been informed they were going to be
15   terminated, and didn't want to turn over their account
16   information?

17    A.   Yes.

18    Q.   Okay.  So you thought this company that had just
19   been terminated was going to hand over that information
20   to HP to help them take over the business?

21    A.   Working through Shari Ellis as -- as that
22   contact, I was given the understanding that they were
23   going to be up front and give us everything we needed.

24    Q.   Okay.  And just so I'm clear on all this
25   information that we've seen, for instance, back on

                                                        73

1   page 239, 240, regarding a telephone call Bill Crowley
2   had with Ron Haught, you never spoke to Mr. Haught;
3   correct?

4    A.   Correct.

5    Q.   And you never spoke to anyone at MITG over the
6   phone during this time frame?

7    A.   Correct.

8    Q.   Okay.  It was either Mr. Crowley, Mr. Ellis,
9   somebody other than you?

10    A.   Yes.

11    Q.   Were you involved in any evaluation of how the
12   termination -- nonrenewal with MITG was going to affect
13   the customers that HP wanted to take over?

14    A.   How it was going to affect them?

15    Q.   Yeah.  Their ordering, the disruption of
16   business, if at all.

17    A.   We understood the possibility.

18    Q.   And did you understand that because if you look
19   on page 233, up at the very top, it says, "Customers
20   have to tell us what services they received from MITG"?
21   Do you see that sentence there?

22    A.   Yes.

23    Q.   Okay.  Did you have an understanding or an
24   awareness of what types of services customers received
25   from MITG?

                                                        74

1    A.   We attempted to get the information, but, no, we
2   didn't get it.

3    Q.   And is that the info you were trying to get from
4   Mr. Haught's group?

5    A.   Yes.

6    Q.   Okay.  I want to go over these metrics.  Let's
7   start with Exhibit M, which was marked here today.

8    Now, we've discussed the call centers.  I just
9   want you to tell me your knowledge of calls offered,
10   that column there.  Do you see where I'm at?

11    A.   Yes.

12    Q.   Okay.  This is the metrics dated March 12 of
13   2003.

14    A.   Yes.

15    Q.   Okay.  Do you see the Roseville PDO, the first
16   line?

17    A.   Yes.

18    Q.   They apparently were offered 3,407 calls that
19   day.

20    A.   Yes.

21    Q.   Okay.  The next line -- or excuse me -- the next
22   column says, "Handle rate."  What is your understanding
23   of what handle rate describes?

24    A.   I believe it's how many of the calls are
25   answered within, I think, 180 seconds.

                                                        75

1    Q.   Okay.  Now, I understand if you flip to the
2   second page of that exhibit, there's a definition there
3   under service level, which means the call volume is
4   answered in 180 seconds --

5    A.   Okay.

6    Q.   -- and that is the next column.

7    Is handle rate, if you know, the percentage of
8   the calls that are offered that are actually taken?  So
9   for instance, if there's 3,407 calls that were offered
10   to Roseville, they handled 97 percent of those?

11    A.   Yes.

12    Q.   Is that what you understand that to mean?

13    A.   Yes.

14    Q.   Okay.  Then the service level, is that the
15   percentage of those calls that were actually handled
16   that were answered within three minutes as defined by
17   page 2, call center --

18    A.   No.  That would be the overall -- wait.  Yes.
19   You're correct.

20    Q.   Okay.  And then MTDSL, does that mean month to
21   date service level?

22    A.   Yes.

23    Q.   Okay.  That would be the total percentage of
24   calls offered month to date that were handled within
25   three minutes?

                                                        76

**Page 77**

1    A.    Yes.  That's the average.

2    Q.    Okay.  Now, do you have any understanding or
3 involvement in what the goals were that were established
4 for the call centers?

5    A.    No.

6    Q.    Do you have any understanding or knowledge as to
7 how -- how the calls were tracked that came into the
8 various call centers?

9    A.    No.  I know -- all I know is they used the phone
10 tree to pull things, pull numbers.

11    Q.    That would be pulled by the individuals on the
12 second page of this metrics, Darelene Lowe, Vickie Ngo,
13 Michelle Sarty and Troy Bloomquist who provided the
14 metrics?

15    A.    I don't know if they used that information or if
16 they get something else to do that.

17    Q.    Okay.  Would those people have more knowledge
18 than you as far as interpreting and describing how those
19 calls are tracked, handled, et cetera?

20    A.    Yes.

21    Q.    Okay.  Because it says they prepared them,
22 and I suppose that they were forwarded on to you, for
23 instance in this case, the one March 12 of '03, by
24 Ms. Darelene Lowe?

25    A.    Correct.

**Page 78**

1    Q.    Were those people in Omaha, Darlene Lowe,
2 Vickie Ngo, Michelle Sarty and Troy Bloomquist?

3    A.    Michelle Sarty is in Canada, Vicki is here in
4 Roseville, Darlene is in Houston, and Troy is in Omaha.

5    Q.    Omaha.  And I take it that's done, obviously,
6 for reasons, because we have Roseville on here, Canada
7 on here, Missouri HP direct on here?

8    A.    Correct.

9    Q.    Okay.  If you look at the bottom of Exhibit M,
10 it also describes the orders of that day.

11    A.    Yes.

12    Q.    And then we have Roseville PL 91.  Do you see
13 that?

14    A.    Yes.

15    Q.    Okay.  And is that the trade parts business?

16    A.    Yes.

17    Q.    Okay.  And it said CC and ePDO.  Do you know
18 what that means?

19    A.    EPDO is the parts direct ordering where trade
20 orders can be placed by the end users.  CC, I'm not sure
21 what that stands for.

22    Q.    Okay.  Then parts direct orders, would that be
23 different than Missouri, which is HP Direct and Compaq
24 Direct?

25    A.    Yes.  They provided us numbers to put on there.

**Page 79**

1    Q.    Okay.  No.  My question is, Does the ePDO --

2    A.    Okay.

3    Q.    -- orders encompass HP Direct and Compaq Direct,
4 if you know?

5    A.    No.  This one does not incorporate it.

6    Q.    Okay.  Well, I guess, do you know what the --
7 how it was differentiated, then, HP and Compaq Direct
8 versus eParts Direct?

9    A.    Okay.  H -- Compaq Direct is the Missouri
10 numbers right here.

11    Q.    Okay.

12    A.    They are broken out.  They don't come through on
13 our systems.  So Troy would provide these numbers to
14 Richard.

15    Q.    Okay.  How about HP Direct?

16    A.    There was no HP Direct.

17    Q.    Well, I have been told that HP Direct is what --
18 the name that came after the merger.

19    A.    True.

20    Q.    Okay.  But you're telling me there was no HP
21 Direct for ordering?

22    I don't understand what you're telling me when
23 you said there's no HP Direct.

24    A.    After the merger, it became HP Direct.

25    Q.    Correct.  And that --

**Page 80**

1    A.    So that is a Missouri number.

2    Q.    Okay.  What is -- then Roseville, Andover, the
3 next line, CC and eSpares, what does the CC stand for?

4    A.    I don't know.

5    Q.    Okay.

6    A.    The eSpares is an ordering system for adding
7 spare parts, and that was used by the Andover group that
8 we transitioned in.

9    Q.    Was that a separate domain name that was
10 specific to Andover?

11    A.    No.  They had the HP domain name or Compaq
12 domain name.

13    Q.    Okay.  Was it the same website that was used by,
14 for instance, the Missouri Compaq Direct --
15 compaqspareparts.com?

16    A.    No.

17    Q.    Okay.  They were different?

18    A.    Yes.

19    Q.    And then we have Missouri CC, which I take it
20 you don't know what CC means?

21    A.    No.

22    Q.    Okay.  And then Canada red.  Do you see that?

23    A.    Yes.

24    Q.    Okay.  And that has total orders per day by
25 thousands of dollars, and then month-to-date dollars?

**81**

2    Q.   Okay.  So the Missouri info was compiled by the
3  folks in Omaha?
4    A.   Correct.
5    Q.   All right.  Okay.  And I think you said you
6  weren't involved in -- or don't know the goals or the
7  levels that were requested by the service call centers?
8    A.   No.
9    Q.   Okay.  Let me hand you what's been marked as
10  Crowley Exhibit H, just to compare the two.  It appears
11  they have now been consolidated, and we have US Houston,
12  US Roseville, US Hannibal, Missouri.  Do you see that?
13    A.   Yes.
14    Q.   Okay.  Were you involved at all in how that
15  change was made in terms of how they are reporting now
16  on the metrics?
17    A.   No.
18    Q.   And apparently, the order section just says
19  US and Canada.  Do you see that at the bottom?
20    A.   Yes.
21    Q.   Okay.  It's not broken out per call center?
22    A.   No, it doesn't look like it.
23    Q.   Okay.  I guess, why were you receiving those on
24  a daily basis?
25    A.   Because as the integration manager, for a while,

**82**

1  I wanted to see, as we brought work in, if there was any
2  negative impact on the call center here.
3    Q.   As far as --
4    A.   As far as --
5    Q.   -- service levels?
6    A.   Yes.
7    Q.   Okay.  Well, let's take a look.  On the service
8  level from Exhibit M, Roseville PDO as of March 12,
9  2003, it is apparently 96 percent.  Do you see that?
10    A.   Yes.
11    Q.   Month-to-date, 93 percent?
12    A.   Yes.
13    Q.   Okay.  And if you look at US Roseville on the
14  February 5, 2004 Exhibit H, that is now at a service
15  level of 77 percent --
16    A.   Correct.
17    Q.   -- month-to-date, and Houston is all the way
18  down to 45 percent --
19    A.   Correct.
20    Q.   -- as compared to the previous March 12 of 2003.
21  Is that fair?
22    A.   Yes.
23    Q.   Is that what it says?
24    A.   Yes.
25    Q.   Okay.  Were you involved in determining the

**83**

1  impact, then, on why that service level dropped?
2    A.   No.
3    Q.   Okay.  Who was?  Is that Mr. Wagner?
4    A.   No.
5         MS. CARROLL:  Objection; calls for speculation.
6    Q.   BY MR. HANSEN:  Okay.  Do you know?
7    A.   Richard Chizek.
8    Q.   Okay.  So if there was a continued drop -- I
9  mean, let's -- in Exhibit H here, look at February 3rd,
10  month-to-date service level for Houston there.  It's
11  61 percent?
12    A.   Correct.
13    Q.   Roseville is 73 percent; correct?
14    A.   Yes.
15    Q.   Okay.  Would that be something that Mr. Chizek
16  would address?
17    A.   Yes.
18    Q.   Do you know the impact on the service levels of
19  Roseville or Houston since MITG --
20         Well, do you have any knowledge of any service
21  level decrease or increase due to the business that was
22  integrated into HP that was formerly handled by MITG?
23    A.   No.
24    Q.   Okay.  Is that Mr. Chizek?
25    A.   Yes.

**84**

1    Q.   Okay.  However, you did testify that the
2  integration has taken place, has it not, where the trade
3  parts business that was previously handled by MITG is
4  now handled here at Roseville?
5    A.   Correct.
6    Q.   Okay.  Is Houston handling any of that?
7    A.   No.
8    Q.   And the multi vendor business was just, for lack
9  of a better term, left by the wayside?  I mean, HP
10  didn't assume it; right?
11    A.   Correct.
12    Q.   I am going to hand you what I'm marking
13  as Exhibit P, which are documents HP 9, 10, 11 and 12.
14  And I will state on the record, I highlighted your name
15  on there so I knew to use it at your deposition.
16         (Defendants' Exhibit P was marked
17         for identification.)
18    Q.   Okay.  Have you had a chance to look those over?
19    A.   Yes.
20    Q.   Let's flip to the back, because these go from
21  earliest date -- or later date to early date.  HP 11,
22  12.  Okay.  HP 11, it appears to be an e-mail.  The
23  original message is from Mr. Chizek to you as a
24  recipient dated Friday, January 6th of 2004; is that
25  correct?

2    Q. Okay. And it discusses minutes of an account
3  setup meeting?
4    A. Yes.
5    Q. Okay. Do you recall when that meeting took
6  place?
7    A. No.
8    Q. Okay. Yvonne Cowan, C-o-w-a-n?
9    A. Yes.
10    Q. What is her title, if you know?
11    A. She's over -- she's over in credit and
12  collections that handled the accounts.
13    Q. Accounts receivable issues?
14    A. Yeah. Yes.
15    Q. Okay. On the bottom there, it says under her
16  name, to release the announcement ASAP. Recommends HP
17  Direct migration letter includes that "account numbers
18  will follow." Approximately 110 pre MITG accounts
19  identified as recurrent parts customers. Many of the
20  MITG clients have existing HP accounts.
21      And then if you flip to page HP 12, the last
22  paragraph says, "A draft of the announcement letter to
23  MITG clients is attached outlining process changes and
24  parts options. Do not forward outside of project team."
25      My question is, Did you draft the announcement

85

1  letter that was sent to MITG clients?
2    A. No.
3    Q. Who did?
4    A. There was a collaboration of Bill, myself,
5  Shari Ellis and then our -- our communications person
6  Jodi Parmeley.
7    Q. Okay. What did the letter state?
8    A. I don't recall.
9    Q. Was it sent to MITG clients before February 7 of
10  '04?
11    A. Yes.
12    Q. Was it sent to -- well, do you understand -- do
13  you have an understanding of what it means when it says,
14  "Approximately 110 pre MITG accounts identified as
15  recurrent parts customers" on the bottom of HP 11?
16    A. I know that we found a lot of the MITG customers
17  had account setups with HP and Compaq, as well as MITG.
18    Q. So would you have to then still create a
19  migration account for them into PL 91?
20    A. No.
21    Q. Okay. So there were some that had been ordering
22  from both that you didn't need to do that for?
23    A. Correct.
24    Q. But I take it, then, there were also clients
25  that had just simply ordered from MITG that you had to

86

1  change over into the HP account system?
2    A. Yes.
3    Q. Okay. Flipping forward on the 9 and 10 of that
4  exhibit, page 9 at the top -- disregard the forwarding
5  to Mr. Crowley, but the original message is from you by
6  e-mail dated Thursday, January 22nd of '04, to a host of
7  recipients.
8      Do you see that?
9    A. Yes.
10    Q. Okay. And are you sending out an e-mail there
11  regarding various issues for the integration of the MITG
12  business?
13    A. Basically updates.
14    Q. Okay. Now, it says, in the second paragraph
15  there under account setups, "The letters will be mailed
16  out to the top 89 accounts by January 29th, with the
17  follow-up calls starting February 1 that will provide
18  account numbers and information about the parts store
19  and other information required about placing parts
20  orders." Do you see that?
21    A. Yes.
22    Q. Okay. What is -- is the letter the same letter
23  that was referred to as the draft announcement letter on
24  HP 12, or was it different?
25    A. I believe it was the same.

87

1    Q. Okay. That's not the letter you drafted -- you
2  drafted; right? It was a collaboration?
3    A. Right. Yes.
4    Q. Okay. Was there someone's signature on the
5  bottom of it?
6    A. I believe -- I'm not sure.
7    Q. Okay. Who determined what the top 89 accounts
8  were?
9    A. It was based on their amount of business done.
10    Q. With MITG?
11    A. Yes.
12    Q. And HP was going to send those top 89 accounts
13  these letters by January 29th?
14    A. Yes.
15    Q. And then they were going to -- "they" being
16  HP -- were going to call these customers beginning
17  February 1?
18    A. Correct.
19    Q. Okay. Who was going to make the follow-up
20  calls?
21    A. We had some folks in Sykes identified to make
22  them.
23    Q. What were they calling these customers and
24  telling them?
25    A. To provide them -- to, one, make sure that they

88

1  reserved their letter; and if not, explain -- Richard
2  did some scripting for them, and then to let them know
3  what the new account number would be.
4     Q.  What if they wanted to stay with MITG, were they
5  given that option?
6        MS. CARROLL:  Objection; calls for speculation,
7  assumes facts not in evidence.
8        THE WITNESS:  I don't -- we never told them that
9  they couldn't.
10    Q.  BY MR. HANSEN:  Did you ever tell them that they
11  could?
12    A.  No.
13    Q.  Okay.  Were you involved in any of the follow-up
14  calls, or were they all by these Sykes people?
15    A.  No, I was not involved.
16    Q.  Okay.  It then says, continuing that paragraph,
17  "The remainder of the letters, 2000-plus, will go out
18  the first week in February."  Do you see that?
19    A.  Yes.
20    Q.  Okay.  Is that the same letter that has been
21  referred to here?
22    A.  Yes.
23    Q.  Okay.  Why were these letters being sent out to
24  these MITG customers?
25    A.  Because they were customers at MITG, and we

89

1  wanted to make them aware of the change so it would have
2  been a seamless transition.
3     Q.  Okay.  And that was -- those letters were sent
4  out prior to the agreement ending; correct?  The
5  contract.
6     A.  Prior.
7     Q.  Prior to the contract ending?
8     A.  Yes.
9     Q.  Okay.  It then says, "The letters will contain
10  the parts store URL as well as any needed phone
11  numbers."
12    A.  Correct.
13    Q.  What is the parts store URL?
14    A.  That's where they can go on-line and place the
15  trade orders on-line rather than calling in.
16    Q.  So that's a website?
17    A.  Yes.
18    Q.  Do you know what that website was?
19    A.  I believe it was www.partstore.com.
20    Q.  Okay.  Was there -- it then says, "The letters
21  will also contain any needed phone numbers."
22        Was there a change in phone numbers?
23    A.  Well, there was a change in the number they
24  would call to place the order, and there were also
25  numbers as far as escalation if they needed information.

90

1     Q.  Okay.  Were they informed that the prior 800
2  numbers that they were using to call to get direct to
3  MITG would no longer be in service?
4     A.  I don't know about that.  They were informed as
5  of the 8th, that they should be start -- they should
6  start calling here.
7     Q.  Were they informed in this letter as of the 8th,
8  if they wanted to, they could also call MITG?
9     A.  No.
10    Q.  Okay.  Let me show you --
11        Were there any calls made to these customers
12  informing them not to use MITG anymore?
13    A.  No.
14    Q.  Were they discouraged from using MITG after
15  February 8th of '04, to your knowledge?
16    A.  Not to my knowledge.
17    Q.  Okay.  Let me show you what I will mark as
18  exhibit -- I think we're on Q, a two-page document,
19  HP 13 and HP 14.
20        (Defendants' Exhibit Q was marked
21        for identification.)
22    Q.  Actually, before we get to that, let me ask you
23  a question real quick back on the previous exhibit.
24        The top 89 accounts that were identified, you
25  said were based on -- were identified by HP based on the

91

1  amount of call volume and dollars of orders placed with
2  MITG.
3     A.  Correct.
4     Q.  Okay.  Was there a decision that you were
5  involved in that HP wanted to make sure that these top
6  89 accounts continued on and did business with HP after
7  February 8 of '04?
8     A.  Can you repeat that?
9     Q.  Sure.  Were there any discussions, meetings,
10  conferences that you were involved in that once these
11  top 89 accounts were established based on call volume
12  and call dollars -- or excuse me -- call volume and
13  parts dollars to MITG, that HP wanted to make absolutely
14  sure that these top 89 accounts kept doing business with
15  HP and did not go with MITG?
16    A.  No.  We didn't proactively go after them, no.
17    Q.  Well, you sent them letters and called them,
18  didn't you?
19    A.  We sent them letters.  We did that with
20  everyone.
21    Q.  Right.  But the top 89 accounts were sent
22  letters before January 29th?
23    A.  Correct.
24    Q.  And then there were follow-up calls made prior
25  or right around February 1?

92

1  A. Correct. To ensure they got the letters.

2  Q. Okay. And then -- and also to explain to them

3  various ways in which they could continue to transition

4  their business over to HP now that HP had integrated the

5  MITG business to Roseville?

6  A. Basically, what was given to them are -- was the

7  URL and the phone numbers to call to make sure they

8  understood what the letter -- the intent of the letter.

9  Q. And also account numbers and information --

10  A. Yes.

11  Q. -- about the part stores and other information

12  required about placing parts orders?

13  A. Correct.

14  Q. Okay. And then the other 2000 or so letters, I

15  guess that represents the remaining accounts that

16  weren't the top 89, were then also sent out the first

17  week in February?

18  A. Correct.

19  Q. Okay. Was there ever any follow-up that you

20  were involved in after February 8th of 2004, to

21  determine if, in fact, these 2089 accounts, in fact, had

22  all set up an account with HP?

23  A. We proactively set the accounts up.

24  Q. Prior to February 8 of '04?

25  A. Yes.

93

1  Q. Okay. Back -- I'm sorry. Back to Exhibit --

2  what is it? -- Q?

3  MS. CARROLL: Yes.

4  THE WITNESS: Yes.

5  Q. BY MR. HANSEN: Okay. The original message is

6  February 3 of '04 from Ms. Cowan, of which you are a

7  recipient. Do you see that?

8  A. Yes.

9  Q. Okay. And this is a synopsis of the HP Direct

10  integration status?

11  A. Correct.

12  Q. Okay. It gives you some updates?

13  A. Yes.

14  Q. Okay. And that first paragraph is in regards to

15  the redirection of telephone calls and the two known

16  entry points, which are the 800 numbers, will be

17  directed from Omaha to Roseville. Do you see that?

18  A. Correct. Yes.

19  Q. Okay. Now, my question to you is, Under

20  "Action," it says, "To include RMA option for HP Direct

21  parts." What is RMA option?

22  A. Return material authorization.

23  Q. What is that?

24  A. If the customer has -- receives a defective

25  part, then they can return that to HP and receive a

94

1  replacement.

2  Q. Okay.

3  A. So it's just like a return label type of thing.

4  Q. Okay. So there was going to be on option, then,

5  placed on the phone -- 800 line for that return?

6  A. Correct.

7  Q. Okay. It says, "Victor and Victoria will handle

8  the move details, along with Jeff and Maureen."

9  Now, I see Victoria appears to be the person in

10  Omaha. Victor appears to be here in Roseville.

11  A. Correct.

12  Q. Who are Jeff and Maureen?

13  A. They're in the customer solutions center.

14  Maureen is the manager and Jeff is her BPA.

15  Q. What is BPA?

16  A. Business process analyst.

17  Q. Is that here in Roseville?

18  A. Yes.

19  Q. Okay. It says -- skip the next paragraph.

20  "Letters to top 100 mailed 1/30." It says, "Shari -

21  letters went to a key target and disbursed to other

22  internal HP players. Most letters went to HP sales

23  reps. Questions that arrived were met with confidence

24  that customers will not notice flow in actions," and

25  then Shari had a concern about two key customers.

95

1  Is that simply referencing the letters we've

2  already talked about in the earlier e-mail there

3  dated -- or in Exhibit P, or is there an additional

4  letter?

5  A. There was an internal letter that went out as

6  well.

7  Q. Okay. To -- well, it says, "Letters to top 100

8  mailed 1/30."

9  A. That's what we were talking about.

10  Q. Okay. The top 100 accounts?

11  A. Yes.

12  Q. And then letters also went to internal HP

13  players and HP sales reps?

14  A. Correct.

15  Q. I guess -- was that describing for them -- what?

16  What to tell their accounts or --

17  A. Actually, more detail of what we were doing, so

18  they understood if they had accounts calling them.

19  Q. Okay. So questions -- how they could better

20  understand questions that may come from customers?

21  A. Correct.

22  Q. Customers that previously had been ordering from

23  MITG that now were going to be directed to Roseville?

24  A. Correct.

25  Q. Do you know why Shari Ellis was concerned, or

96

1  and she ever tell you why she was concerned about two

2  key customers Agilent and DHL?

3      A.   DHL, I don't know.  I know Agilent had special

4  arrangements.

5      Q.   With MITG?

6      A.   Yes.

7      Q.   And apparently, Yolanda Topolonski,

8  T-o-p-o-l-o-n-s-k-i, was going to give a presentation to

9  Agilent management to explain the flow on February 4 of

10  '04.

11          Do you see that?

12     A.   Yes.

13     Q.   Okay.  So Ms. Topolonski was going to Agilent,

14  who had a high customized account with MITG, as of

15  February 4, '04, to explain to them what was going to

16  take place?

17     A.   Yes.

18     Q.   Do you know if she made the presentation?

19     A.   Yes, she did.

20     Q.   Were you there?

21     A.   No.

22     Q.   It then says, "Remainder of letters to be mailed

23  February 4," the next paragraph.  Do you see that?

24     A.   Yes.

25     Q.   Okay.  Were those what we talked about earlier,

97

1  the 2000 or so letters?

2      A.   Yes.

3      Q.   Okay.  Then it says, "Internal letter to HP

4  Direct mailed 1/27."  Was that a letter to MITG, or is

5  that to HP Direct?

6      A.   No.  That was HP Direct.

7      Q.   The customer service reps?

8      A.   Yes.

9      Q.   Do you know what that letter -- did you see that

10  letter?

11     A.   I can't recall what it was about.

12     Q.   Okay.  Then it says, "MITG's access to CSN to be

13  cut off Friday, February 6th, at 5 p.m. Pacific standard

14  time."  What do you understand MITG's access to CSN to

15  be?

16     A.   That's -- they were able to access CSN to place

17  Compaq parts.

18     Q.   So they were no longer going to have those

19  ordering access measures?

20     A.   Correct.

21     Q.   Were you involved in cutting that off?

22     A.   No.

23     Q.   Okay.  Flip to page HP 14.  That very long

24  paragraph there, do you see that?

25     A.   Yes.

98

1      Q.   Okay.  Talking about the account setups, the TAT

2  with five silos touching the account setups in various

3  systems.

4          Were you involved in any of that?

5      A.   I was.

6      Q.   Your name doesn't appear there.

7      A.   I was in discussions with it.

8      Q.   Okay.

9      A.   But not --

10     Q.   Did you provide input into that, or was that

11  outside of your realm of duties and responsibilities?

12     A.   That was outside of my realm.

13     Q.   The last sentence there in that big

14  paragraph says, "Richard C will discuss that call center

15  agents should not refer customers direct to Sonia for

16  new account setups, but refer to" -- then there's this

17  hyperlink.  Do you see that?

18     A.   Yes.

19     Q.   Okay.  Were the MITG customers that had to set

20  up accounts with HP being referred, then, to this

21  hyperlink to do that?  Is that how new accounts were

22  supposed to be set up?

23     A.   Yes.  We had a process in place for setting up

24  new accounts.

25     Q.   Okay.  As opposed to referring everyone to this

99

1  Sonia?

2      A.   Correct.  Yes.

3      Q.   Okay.  The next paragraph regarding the MITG

4  website, "Domain in limbo."  Then it says, "Louise will

5  share information with Bill C and Chip Love."

6          What information were you to share with them?

7      A.   Just what I learned from Linda --

8      Q.   What --

9      A.   -- as far -- as.

10     Q.   Oh, Gretzinger?

11     A.   Gretzinger, yes.

12     Q.   Okay.

13         MS. CARROLL:  Can we take a short break.

14         MR. HANSEN:  Yes.  I only have, I believe, one

15  more document to go over, and we'll finish up right

16  around lunchtime.

17         (Recess taken.)

18         MR. HANSEN:  Last one here.

19         (Defendants' Exhibit R was marked

20         for identification.)

21     Q.   This is Exhibit R.  This is a document, it's

22  MITG 179, 80 -- 180, 181, 182 and 183.

23         Have you had a chance to look that over?

24     A.   Yes.

25     Q.   Okay.  Let's start on the back page.  Page 182

100

1  A. With respect and the top of 183, the original message
2  was from a Bridget Rowntree, who apparently is
3  associated with HP, to Sonia Perez, regarding Xerox
4  spares account setup.  Do you see that?
5      A.   Yes.
6      Q.   Okay.  And apparently, she was forwarding on
7  some appropriate paperwork that she thought to set up an
8  account for Xerox with the HP spares.
9          Is that what you understand that to be?
10     A.   Correct.
11     Q.   Okay.  Now, is that spares for the type of
12  spares business that MITG was handling?
13     A.   Yes.  It was their account.
14     Q.   Okay.  And she was, on January 8 of '04,
15  forwarding to Sonia account information to set up a
16  Xerox account with HP, because, I guess -- and I want
17  you to answer for me -- they didn't have one with HP.
18  They had one with MITG?
19     A.   Correct.
20     Q.   Okay.  Now, Sonia there -- is this the same
21  Sonia who is referenced in -- bear with me a second --
22  Document Exhibit Q, where we talked about Richard C says
23  not to forward new account setups to Sonia, but to go to
24  this link?  Is that the same Sonia?
25     A.   Same Sonia.

                                                     101

1      Q.   Okay.  So apparently -- and this e-mail from
2  Ms. Cowan is dated February 3rd of '04, whereas the one
3  in Exhibit R to Ms. Perez was January 8, '04.  So that
4  had not been communicated yet -- is that fair? -- that
5  people should not go to Sonia for new account setups, or
6  do you know one way or the other?
7      A.   I'm not sure when we communicated that to the --
8  to the folks.
9      Q.   Okay.  But anyway, then on page 182, Ms. Perez
10 sends one back to parts credit, and I guess a Josey.  It
11 says, "A CBN has been set up for this customer."
12         What is that CBN?
13     A.   Customer base number.
14     Q.   Okay.  And that's the new number they have now
15 in the HP system?
16     A.   Correct.
17     Q.   It says, "This should be in VCP tomorrow."  What
18 is that?
19     A.   I don't know.
20     Q.   Okay.  Then the next one up, Sonia Perez
21 forwards Ms. Rowntree the new account number for the
22 Xerox spares.  Do you see that?
23     A.   Yes.
24     Q.   Okay.  Then apparently, we flip to 181,
25 Ms. Perez finally cc's you on this e-mail dated

                                                     102

1  January 13 of '04 in the middle.  Do you see that?
2      A.   Yes.
3      Q.   Okay.  Indicating that Sonia -- she doesn't have
4  the capability or access to place orders, and "nowhere
5  did it state this needed to be a Compaq account.  If
6  this is not mentioned, a blue account will be set up."
7          So my question to you from that is, It appears
8  that the Xerox account needed to be set up as a Compaq
9  account for parts, and instead, it was set up as a blue
10 account; is that --
11     A.   Actually, they needed to be linked so they could
12 do it.
13     Q.   Okay.  And that didn't take place?
14     A.   Correct.
15     Q.   Okay.  Then you were asked a question by
16 Ms. Perez if customers could place orders for Compaq
17 parts with an HP account number.  Is that --
18     A.   Correct.
19     Q.   Okay.  And you responded to her with the
20 e-mail that begins on the bottom of 180 dated Tuesday,
21 January 13 of '04.  Do you see that?  It says, "Hello
22 everyone," and continues back?
23     A.   Yes.
24     Q.   Now, it says, "All accounts should be set up as
25 purple accounts.  Do you see that?

                                                     103

1      A.   Yes.
2      Q.   Meaning what?  They could access both Compaq and
3  Hewlett Packard parts?
4      A.   Correct.
5      Q.   "There should not be any separate accounts set
6  up," and here you're informing them, Sonia is not the
7  person to place orders, and that the call center for
8  order placement on the website is what's listed there in
9  your e-mail; is that correct?
10     A.   Correct.
11     Q.   Okay.  So this was -- was this an integration of
12 the Xerox spares business that MITG had been doing now
13 over to HP?
14     A.   Yes.
15     Q.   And this took place on January 13 of 2004?
16     A.   Yes.
17     Q.   Okay.  And the agreement with MITG didn't
18 nonrenew until February 7th of '04?
19     A.   Correct.
20     Q.   How many other accounts had been set up and
21 orders -- to take orders for MITG customers within
22 HP prior to the agreement not renewing besides this one
23 with Xerox?
24     A.   How many accounts were set up prior to the 8th?
25     Q.   Right.

                                                     104

2    Q.   Okay.  So do you know how many orders were
3  actually placed with HP from those account setups and
4  integration prior to the agreement non-renewing with
5  MITG on February 7th or 8th?
6    A.   I don't believe any.
7    Q.   Okay.  Well, let's continue on with this here.
8  You said you don't believe any.  Who -- any -- you don't
9  believe any.  Do you know someone or have someone in
10  mind who would know that information?
11    A.   No.
12    Q.   But at least in this e-mail you gave Sonia -- or
13  I'm sorry -- you stated Sonia is not the person to place
14  orders, and you provided them a call center number for
15  order placement.  Do you see that call center number
16  there?
17    A.   Yes.
18    Q.   Where does that number connect to?
19    A.   The call center here in Roseville.
20    Q.   Okay.  So did Roseville, as of January 13 of
21  '04, have the capacity to take the Xerox Compaq orders
22  once their account was set up?
23    A.   If the account was set up and they knew to call
24  here, yes.
25    Q.   Okay.  And that was business that previously

105

1  MITG could do that now was integrated over to HP?
2    A.   Yes, I believe so.
3    Q.   Okay.  And that was as of January 13 of 2004?
4    A.   Yes.
5    Q.   Okay.  And then you also had given them the
6  website in which Xerox could go, or anyone who had a
7  purple account set up, which was hp.com, to buy spare
8  parts?
9    A.   Correct.
10    Q.   So if that information was forwarded on to
11  Xerox, who is the example here, on or about January 13
12  of '04, they could then call to Roseville, that number,
13  or go to that website to place their spare parts orders?
14       MS. CARROLL:  Object that it assumes facts not
15  in evidence.
16       Go ahead.  You can answer.
17       THE WITNESS:  I'm trying to think back to this.
18       Okay.  I'm sorry.  Could you ask one more time?
19    Q.  BY MR. HANSEN:  Sure.  As of January 13, '04,
20  when you sent out this e-mail, you sent out a call
21  center number and website.  So I take it as of
22  January 13, '04, that call center, which is the 800
23  number here to Roseville and that website, were options
24  that Xerox could use to place spare parts orders?
25       MS. CARROLL:  Objection; calls for speculation.

106

1       THE WITNESS:  Yeah.  Yeah.  I don't know.
2    Q.  BY MR. HANSEN:  Why would you forward out a
3  number if it didn't work to place orders?
4    A.   The number was given to the folks at HP Direct.
5    Q.   No.  You sent this e-mail out, on page 180, to
6  Sonia Perez and Bridget Rowntree; correct?
7    A.   Correct.
8    Q.   Okay.  And you are responding to their concerns
9  about -- well, you are responding at least to
10  Ms. Perez's e-mail sent to you that she doesn't have the
11  capability or access to place orders.
12    A.   Right.
13    Q.   Okay?
14    A.   Right.
15    Q.   And you say, "That's right.  Sonia is not the
16  person to place orders," and you provide the call center
17  number for order placement and the URL to place orders,
18  which is the 800 number to Roseville.  You told me that;
19  correct?
20    A.   Correct.
21    Q.   And then the website www.hp.com?
22    A.   Correct.
23    Q.   Okay.  So for this Xerox account that had been
24  set up as a purple account within HP, those were options
25  that you had sent on to these folks to forward to Xerox

107

1  for their spare parts ordering?
2    A.   Yes.  But I'm not sure that this whole
3  communication just had to do with Xerox.
4    Q.   Okay.  Well, would it also have to do with the
5  other -- all 89 or 2000 accounts that you said were set
6  up?
7    A.   No.  That's not what I mean.
8    Q.   Okay.  Well, the e-mail reference trail here is
9  regarding the Xerox spares accounts setup.
10    A.   I agree.
11    Q.   Okay.  So at least we can agree that it does
12  pertain to the Xerox account.
13    A.   That's how it appears, yes.
14    Q.   Okay.  And my question is, Based on this call
15  center number and the website www.hp.com that you list
16  there in your e-mail, those were options that Sonia or
17  Bridget Rowntree, who was at HP Fairport, could forward
18  on to Xerox for their spare account ordering?
19    A.   Yes.
20    Q.   Okay.  And, again, that is the spare account
21  business that HP integrated that previously was handled
22  by MITG?
23    A.   Correct.
24    Q.   My next question is, Do you know as of
25  January 13 of '04, when you sent out this e-mail, how

108

1    many other accounts had been set up as a purple account
2    to transition over to HP that previously were handled by
3    MITG?
4        A.    We had all accounts --
5        Q.    Okay.
6        A.    -- changed over.
7        Q.    So all of those accounts that were identified,
8    the top 89 or -- from your previous e-mail, had been set
9    up as a purple account prior to February 7 of 2004?
10       A.    Correct.
11       Q.    Okay.  Had all of those accounts been given this
12   call center option number to Roseville and the HP
13   website prior to February 7 of 2004?
14       A.    In the notification letter.
15       Q.    Okay.  Well, it appears at least Xerox may have
16   been given that info prior to the notification letter.
17            MS. CARROLL:  Objection; calls for speculation.
18       Q.    BY MR. HANSEN:  You can answer.
19       A.    I don't know.
20       Q.    Okay.  Let's go on to the e-mail above your
21   e-mail on page MITG 180.  And this is apparently from
22   Bridget Rowntree, now, back to Sonia and Andrea
23   Clarkson, who was at the hpdirectonline.com, which -- do
24   you understand that to be MITG?
25       A.    The Compaq --

                                                        109

1        Q.    Hpdirectonline.com.
2        A.    Yes.
3        Q.    Okay.  Bridget, who is -- indicates, "I just
4    called this phone number" -- okay -- "the 800 number
5    that you provided, and they said they're not going to
6    take orders for Compaq spare part numbers," and that rep
7    referred her to that other 800 number there.
8            Do you see that?
9        A.    Yes.
10       Q.    Which is the number for Compaq parts numbers?
11       A.    Okay.  I don't know that, but --
12       Q.    Okay.  That was my question.  Do you know that?
13       A.    No.
14       Q.    Okay.  And apparently, that rep said he could
15   only take orders with a credit card, but that she could
16   order on-line at the website you provided.
17            Do you see that sentence there?
18       A.    Yes.
19       Q.    And apparently, Bridget now has some questions
20   or concerns as to how she can get this order facilitated
21   for the customer.  Is that fair?
22       A.    Yes.
23       Q.    Okay.  And she wants to know at this point in
24   time why she can't order this part like she has all
25   other spare parts in the past three years through

                                                        110

1    HP Direct on-line.  Do you see that there?
2        A.    Yes.
3        Q.    Okay.  And then you were asked to respond to
4    that, if you look on page 179, by Andrea Clarkson.  Do
5    you see that?
6        A.    Yes.
7        Q.    Okay.  I do not see on here that you -- in this
8    chain -- and this is what MITG has in its possession --
9    responded to that e-mail, because the next e-mail is
10   from Tracy Miller.
11            Do you know who Tracy Miller is?
12       A.    She is a manager for the group that actually
13   sets up accounts.
14       Q.    Okay.  And apparently, she had -- oh, yes.  It
15   says here, "Service program manager."  Do you see that
16   under the e-mail to you?
17       A.    Yes.
18       Q.    Okay.  And that's with the HPS Americas customer
19   operations?
20       A.    Yes.
21       Q.    She's asking you to clear up the confusion, to
22   pull together and figure this out, and not make it so
23   apparent to the customer that the left hand doesn't talk
24   to the right hand.  Do you see that?
25       A.    Yes, I do.

                                                        111

1        Q.    And, "Let me know if we need to get on the phone
2    to get this straightened out," and she would be happy to
3    facilitate.
4            My question is, Do you recall how this was
5    resolved or what happened with this?
6        A.    No, I don't.
7        Q.    Do you know or do you recall if you responded by
8    e-mail?
9        A.    Tracy and I spoke on the phone.
10       Q.    Okay.  Are you aware of other accounts that had
11   this problem with ordering spare parts when they were
12   given various 800 numbers or the hp.com website to go to
13   as of January 13 of 2004?
14            MS. CARROLL:  Objection; ambiguous and assumes
15   facts not in evidence.
16            Go ahead.
17       Q.    BY MR. HANSEN:  You can answer.
18       A.    I have no idea.
19       Q.    Okay.  Were you involved in the decision that
20   was made not to renew MITG, the ultimate decision?
21       A.    No.
22       Q.    Were you ever communicated the reasons why
23   MITG's contract was not renewed?
24       A.    No.
25       Q.    Okay.  On the exhibit in front of you, that

                                                        112

2    A.   Yes.

3    Q.   -- you told me that's the Roseville call center

4  number.  What do you recall -- what is Option 2?

5    A.   Off the top of my head, I can't remember what

6  the exact naming of it is.

7    Q.   Okay.  But at the time of this e-mail, that was

8  what you at least thought was the option for the spares

9  account or spares orders that previously were handled by

10  MITG?

11    A.   Correct.

12    Q.   Okay.

13         MR. HANSEN:  Let me go over my notes here.  I

14  think I may be done.

15         (A discussion was held off the record.)

16    Q.   I don't have anything further, ma'am.

17    A.   All right.  Can I make one correction, though?

18    Q.   I don't have a question pending, so --

19         MS. CARROLL:  No.

20         THE WITNESS:  Okay.

21                (Whereupon, the deposition

22                adjourned at 11:42 a.m.)

23

24                ---oOo---

25

                                                    113

---

REPORTER'S CERTIFICATE

1    REPORTER'S CERTIFICATE

2

3         I hereby certify that the witness in the

4  foregoing deposition was duly sworn by me to testify to

5  the truth in the within-entitled cause; that said

6  deposition was taken at the time and place herein named,

7  and that the testimony of said witness was reported by

8  me, a duly certified shorthand reporter and

9  disinterested person, and was thereafter transcribed

10  under my direction by computer-aided transcription.

11         I further certify that I am not of counsel or

12  attorney for either or any of the parties to said

13  deposition, nor in any way interested in the outcome of

14  the cause named in said caption.

15         In witness whereof, I have hereunto set my hand

16  this 13th day of October, 2004.

17

18

19

20         _____

              RUTH E. DIEDERICH, CSR, RPR

                  CSR No. 4952

21

22

23

24

25

                                                    115

---

DEPONENT'S SIGNATURE AND CORRECTIONS PAGE

2  Deponent:  LOUISE MEYERFELD

   Case Title:  Hewlett-Packard Development Company,
3               L.P., et al., vs. Midwest Information
                Technology Group, Inc., et al.

4  Date of Deposition:  Wednesday, September 29, 2004

5       I, LOUISE MEYERFELD, have read my deposition and
   state that there are:

6

7    (Check One) _____  no corrections
                 _____  corrections as noted below

8  Signed under penalty of perjury:

9

10  _____    _____
    (Date)                  (Signature)

11  Page   Line         Change/Add/Delete

12  ____   ____      _____

13  ____   ____      _____

14  ____   ____      _____

15  ____   ____      _____

16  ____   ____      _____

17  ____   ____      _____

18  ____   ____      _____

19  ____   ____      _____

20  ____   ____      _____

21  ____   ____      _____

22  ____   ____      _____

23  ____   ____      _____

24

25  (If you need more space, please use reverse side.)

                                                    114

---

1         RUTH E. DIEDERICH, RPR, CSR
             Certified Shorthand Reporter
2         1000 Sunrise Boulevard, Suite 9B
                    PMB 146
3         Roseville, California  95661
                Phone: (916) 722-7814

4

5  October 13, 2004

6

7  LOUISE MEYERFELD
   C/O Thompson & Knight, LLP
   Attn:  Elizann Carroll, Esq.
8  1700 Pacific Avenue, Suite 3300
   Dallas, Texas  75201

9

10  Title of Case:  Hewlett-Packard Development Company,
                    L.P., et al., vs. Midwest Information
11                  Technology Group, Inc.

   Date of Deposition:  Wednesday, September 29, 2004
12

   Dear Ms. Meyerfeld:
13

        Your deposition transcript is now ready for you to
14  read, correct and sign, and will remain available at
    Thompson & Knight until November 20, 2004.  If you would
15  like to review your deposition, please make arrangements
    through counsel.

16

        After that time, the original copy of your
17  transcript will be forwarded to the noticing party,
    Mr. Hansen.

18

19

20  Very truly yours,

21

   RUTH E. DIEDERICH
22  Certified Shorthand Reporter, No. 4952

23  cc:  Original transcript
         All counsel present

24

25

                                                    116

2.

3      I certify that the witness was given the
statutory allowable time with which to read and sign the
4  deposition, and that:

5  _____  The witness has failed to appear for such
signing and reading.
6

7  _____  The witness has waived review/signature
on the record.

8  _____  The witness has reviewed and signed the
transcript.
9

10 _____  A correction letter has been submitted
and is attached to the transcript.

11 _____  Statements on the record do not require a
30-day witness review process.
12

13 _____  The parties have agreed to waive
signature and review by the witness and
14          to have the original transcript sent
immediately to the Court.

15

16
       Date: _____
17

18     By: _____
          RUTH E. DIEDERICH, CSR No. 4952
19

20              --0o0--

21

22
23
24
25
                                        117