1              IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  SPRINGFIELD, DIVISION

3   HEWLETT-PACKARD            ) CIVIL ACTION NO. 04-3055
    DEVELOPMENT COMPANY, L.P.,)
4   HEWLETT-PACKARD COMPANY    )
    AND COMPAQ TRADEMARK B.V.,)
5                             )
             PLAINTIFFS,       )
6                             )
    VS.                        )
7                             )
    MIDWEST INFORMATION        )
8   TECHNOLOGY GROUP, INC.,    )
    AND MICHAEL LAUBER,        )
9                             )
             DEFENDANTS.       )
10  -------------------------

11

                    DEPOSITION OF
12              TROY BLOOMQUIST

13           TAKEN ON BEHALF OF
                  DEFENDANTS

14

15           DEPOSITION OF TROY BLOOMQUIST, taken

16   before Cynthia Craig, General Notary Public within

17   and for the State of Nebraska, beginning at

18   9:00 a.m., on October 12, 2004, at the

19   Hewlett-Packard Office, 10810 Farnam Drive, Omaha,

20   Nebraska.

21

22

23

24

25

Page 2

```
 1        A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
     MS. ELIZANN CARROLL
 3   THOMPSON & KNIGHT, LLP
     1700 Pacific Avenue, Suite 3300
 4   Dallas, Texas  75201
     (214) 969-1700  FAX 969-1751
 5
     MS. GAYNELLE GRIFFIN JONES
 6   HEWLETT-PACKARD COMPANY
     20555 SH 249, ms 110701
 7   Houston, Texas  77070
     (281) 518-0298  FAX 518-1388
 8
     FOR THE DEFENDANTS:
 9   MR. JAMES A. HANSEN
     SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
10   525 Jersey
     P.O. Box 1069
11   Quincy, Illinois  62306
     (217) 223-3030  FAX 223-1005
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   EXHIBITS:                       MARKED
 2   V.  Business Requirements of
         OD 2001-522 manual
 3       Bates Stamp MITG 0536 - 0563
         ( 29 pages ) ...................   49
 4
     W.  E-mails
 5       Bates Stamp MITG 0532 - 0535
         ( 4 pages ) ...................    36
 6
     X.  Record of Meeting
 7       Bates Stamp MITG 0565 - 0570
         ( 6 pages ) ...................    62
 8
     Y.  Middleware Agreement
 9       ( 5 pages ) ...................    68
10   Z.  E-mails
         Bates Stamp MITG 068 - 076
11       and 0482, 0486, 0487
         ( 9 pages ) ...................    99
12
     AA.  E-mails
13       Bates Stamp HP 001277 - 001278
         ( 2 pages ) ...................   127
14
     BB.  E-mails
15       Bates Stamp HP 001301 - 001303
         ( 3 pages ) ...................   132
16
     CC.  E-mails
17       Bates Stamp HP000042 - 000043
         ( 2 pages ) ...................   143
18
     DD.  E-mails
19       Bates Stamp HP 001236 - 001238
         ( 3 pages ) ...................   152
20
     EE.  E-mails
21       Bates Stamp MITG 0106 - 0107
         ( 2 pages ) ...................   157
22
23
24
25
```

Page 3

```
 1          I N D E X
 2   CASE CAPTION ......................... Page   1
     APPEARANCES ......................... Page   2
 3   INDEX ................................. Page   3
     TESTIMONY ........................... Page   6
 4   REPORTER CERTIFICATE ................ Page 174
     COST CERTIFICATE ................... Page 175
 5   READ & SIGN LETTER .................. Page 176
     ERRATA SHEET ........................ Page 177
 6
     DIRECT EXAMINATION:
 7     By Mr. Hansen..................... Page   6
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1      (Whereupon, the following proceedings were had,
 2   to-wit:)
 3          COURT REPORTER:  Are there any
 4   stipulations?
 5          MR. HANSEN:  No, just I will just make a
 6   statement on the record.
 7          We're here today pursuant to deposition
 8   notice cause pending in the Central District of
 9   Illinois.
10          Let the record reflect that counsel of
11   record is here, HP also has one of their internal
12   lawyers, Ms. Jones, present for the deposition.
13          The only thing I will state is, counsel,
14   we have agreed that we're going to consecutively
15   number the deposition exhibits.  I have the exhibits
16   here today from our depositions in California.
17          In going through them, I think we left off
18   with U, and what I plan on doing is I'll just go AA,
19   BB, et cetera.
20          MS. CARROLL:  That's fine.
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

1        TROY BLOOMQUIST,
2    having been first duly sworn,
3    was examined and testified as follows:
4        DIRECT EXAMINATION
5 BY MR. HANSEN:
6    Q.  Please, state your name for the record.
7    A.  Troy Bloomquist.
8    Q.  Troy, how old are you?
9    A.  Thirty-five.
10   Q.  Date of birth?
11   A.  2/5/69.
12   Q.  You reside here in Omaha?
13   A.  Yes.
14   Q.  Okay.  Married?
15   A.  Yes.
16   Q.  Kids?
17   A.  Three.
18   Q.  Okay.  All still living in the home?
19   A.  Yes.
20   Q.  Can you tell me your educational
21 background?
22   A.  I've got a bachelor's degree in computer
23 science from University of Nebraska, Omaha, with a
24 minor in communications.
25   Q.  When did you receive your bachelor's?

Page 7

1    A.  1991.
2    Q.  Have any postgraduate schooling work
3 towards a master's or anything?
4    A.  No.
5    Q.  Any specialized postgraduate training?
6    A.  I've been through a lot of sales
7 management training and executive briefing training,
8 and spent a lot of time in front of customers.
9    Q.  You hold any professional certifications
10 or accreditations?
11   A.  No.
12   Q.  Are you a member of any professional
13 business associates?
14   A.  (Witness nods head.)
15   Q.  You have to answer out loud.
16   A.  No.
17   Q.  That's a good point.  I'll stop right
18 here, I forgot to do it.
19      I'm sure you met with the attorneys here
20 sometime prior to your deposition and went over the
21 ground rules.  If at any time I ask you a question
22 today that you don't understand, ask me to rephrase
23 it and hopefully I'll put it in a form you can
24 answer.
25   A.  Okay.

Page 8

1    Q.  As you were just reminded, we need
2 verbal --
3    A.  Verbal yeah, sorry.
4        MS. CARROLL:  Don't interrupt, that'll be
5 the next one.
6 BY MR. HANSEN:
7    Q.  Say yes or no because Cindy here is taking
8 down everything we say and it'll be typed up in a
9 booklet form for us to read later, but one person's
10 uh-huh is another person's huh-uh, so it's very
11 difficult.  We'll remind you, don't worry.
12      And also it's very hard for Cindy to take
13 down two of us talking at the same time, so I would
14 ask you to allow me to complete my question before
15 you answer, and I in turn will allow you to answer
16 before I ask my next question, okay?
17   A.  Yes.
18   Q.  If at any time you need to take a break
19 today let us know, and we'll do so.  I'm sure we'll
20 take breaks throughout the course of the deposition
21 but if for any reason you need to use the rest room,
22 make a call or something, just let us know, okay?
23   A.  Yes.
24   Q.  Tell me your present employer.
25   A.  Hewlett-Packard.

Page 9

1    Q.  What is your position or title?
2    A.  Business development manager for the
3 Great Lakes for integrated support.
4    Q.  That was a mouthful.  Business developer
5 manager for Great Lakes?
6    A.  Uh-huh.
7    Q.  What was the last?
8    A.  Integrated support.
9    Q.  How long have you been in that position?
10   A.  Well, kind of hard -- well, in this
11 specific Great Lakes position about a year.
12   Q.  Okay.
13   A.  I held a regional position before that and
14 then we collapsed the region into areas so I moved
15 to an area.
16   Q.  How long were you in the regional
17 position?
18   A.  About a year, year and a half.
19   Q.  Okay.  Tell me what your current duties
20 and responsibilities are in your current position.
21   A.  My job is to -- is to help drive and
22 develop business, new business in HP clients around
23 what we call integrated support, which is
24 multivendor support, so supporting other products
25 like Sun and Dell, IBM and others.

3 (Pages 6 to 9)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 10

1    So my job is to help drive new business
2  and work with our sales folks to help qualify and
3  look at opportunities.
4    Q.  When you say multivendor support is that
5  servicing and providing parts that are Dell, IBM,
6  Sun related?
7    A.  Not necessarily.  It's more of providing
8  on-site services, which could include parts, but
9  mostly on-site services.  Obviously in any on-site
10  service scenario, I guess parts would also be
11  involved in some way, some form, I mean, that's just
12  the nature of the beast.
13    Q.  When you say providing on-site services,
14  is this to, for instances, businesses that maybe
15  have a Dell or IBM computer system at their
16  location?
17    A.  That's correct.
18    Q.  Okay.  And I think you said that you have
19  been in that position for a year.  Have you always
20  been here in Omaha?
21    A.  I've always been in Omaha.
22    Q.  Okay.  The regional position that you held
23  for a year, year and a half prior to your current
24  position, were the duties and responsibilities
25  basically the same?

Page 11

1    A.  The same.
2    Q.  Simply, what did you say, collapse of a
3  region and put it in an area?
4    A.  Basically what happened is HP had a
5  regional structure where I was the business
6  development manager for the central region.  As
7  they -- as HP looked at streamlining things they
8  obviously, when I say collapsed, eliminated the
9  regional structure and just focused on having
10  specific areas like the Great Lakes the central,
11  southeast, east and the west.
12    Q.  Okay.  So based on what you just told me,
13  it takes us back to roughly regional positions up
14  through now 2002?
15    A.  And one thing I can note is I held a dual
16  role for some time where I was actually doing the
17  central business development job as well as acting
18  as a program manager for the service delivery
19  organization in the America, so I was doing a
20  50/50 job for some time at the end of 2002.
21    And as I sit here I'd like to correct
22  myself, I did -- I wasn't actually in the -- I mean
23  the position from a true business development was
24  probably just a year.
25    Q.  Okay.

Page 12

1    A.  But I was doing a dual role where I was
2  mostly doing the -- doing program management.
3    Q.  Okay.  Let's see, how long have you been
4  with HP --
5    A.  I've been with --
6    Q.  -- or Compaq, which merged --
7    A.  Through mergers I've been here since 1992.
8    Q.  Okay.  When you say mergers, if I bring up
9  the name of a company called Inacom were you
10  employed with them?
11    A.  Yes.
12    Q.  And was that the company you were employed
13  with in 1992?
14    A.  Yes.
15    Q.  So Inacom, did that become CEI?
16    A.  Inacom became Custom-Edge.
17    Q.  If I refer to them as CEI is that the same
18  or is that different?
19    A.  That is the -- that can be the same.
20    Q.  Okay.  And then CEI, were they bought by
21  Compaq?
22    A.  No, Compaq bought a portion of Inacom --
23    Q.  Okay.
24    A.  -- that they named CEI.
25    Q.  Okay.  But -- so when I'm talking about

Page 13

1  your job history, in 1992 it was with Inacom,
2  which -- you've been with some companies that rolled
3  over into your current position; is that correct?
4    A.  Yes, sir.
5    Q.  Okay.  Let's start right there.  Tell me
6  what business was Inacom in.
7    A.  Inacom was a computer reseller, or as they
8  refer to sometimes in the industry, a VAR.
9    Q.  Who?
10    A.  A VAR.
11    Q.  Is it B-A-R?
12    A.  VAR, value added reseller.
13    Q.  Okay.  When you say they were a computer
14  reseller, did they -- does that mean resell computer
15  parts?
16    A.  No, that -- it means they sold new
17  equipment, IBM, HP, Compaq, probably others as well,
18  Toshiba, you know.
19    They really were selling most -- most
20  professional products, you know, minus Dell, of
21  course, because Dell always had a direct strategy.
22    Q.  Okay.  Tell me what you did for Inacom.
23    A.  For Inacom I held a number of different
24  positions.
25    Q.  How about starting out?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 14

1    A.   Starting out, I started out as an
2   engineer.
3    Q.   Would that be in 1992?
4    A.   Yes.
5    Q.   Okay.  How long were you in that position?
6    A.   A year.
7    Q.   Okay.  Then what did you do?
8    A.   Then I became a service manager.
9    Q.   Okay.  How long were you in that role?
10   A.   Oh, approximately about a year and a half.
11   Q.   Okay.  At what point in time -- was Inacom
12  bought by Custom-Edge?
13   A.   Inacom was bought by Compaq.
14   Q.   Okay.  How long were you with Inacom?
15   A.   I was with Inacom up until the purchase.
16  I believe the purchase was in 19 -- I believe it was
17  1999.
18   Q.   Okay.  Was it when you were employed at
19  Inacom that you met Ron Haught at MITG, or was that
20  afterward?
21   A.   That was afterwards.
22   Q.   Okay.  Was Inacom at all in the procuring
23  of parts business, the third-party parts type
24  business?
25   A.   Yes, Inacom had their own -- I mean as a

Page 15

1   computer reseller for customers and being
2   multivendor, they also had a service arm which
3   serviced customers' products as well.
4        So in this -- with that business practice,
5   once again, if you're going to do on-site break/fix
6   services.
7    Q.   On-site what?
8    A.   On-site break/fix services.  As I stated
9   before, parts are -- parts come with a package in a
10  sense.  They also did sell parts to resellers and
11  other customers as well as just a direct sale, so,
12  yes, they were in the parts business.
13   Q.   Okay.  After Compaq -- well, let me strike
14  that.
15        Was Shari Ellis with Inacom?
16   A.   Yes.
17   Q.   She's been along --
18   A.   Yes.
19   Q.   -- the way the whole time?
20   A.   She's Inacom as well.
21   Q.   Okay.  And I guess when Compaq bought
22  Inacom in 1999 what position were you holding at
23  that time?
24   A.   At that time I was holding what -- my job
25  was pretty much a business sales consultant, so my

Page 16

1   job was to do about the same thing I'm doing today,
2   which is to help sell to our Inacom customers, then
3   talk about capabilities and then help our sales reps
4   understand our programs and things of that nature.
5    Q.   Okay.  At what point in time did
6   Custom-Edge become an entity?
7    A.   I think Custom-Edge became an entity when
8   Compaq purchased them; however, you know, the name
9   Custom-Edge didn't come right away.
10        It was something they worked on, studied,
11  and then I would say maybe a couple -- maybe
12  30, 35, 40, 45 days after the close of the
13  Compaq/Inacom purchase they named it Custom-Edge.
14   Q.   So they renamed Inacom Custom-Edge?
15   A.   They renamed the entity that they bought
16  from Inacom Custom-Edge.  Understand that Inacom is
17  still running as its own company during that time.
18   Q.   Okay.
19   A.   They -- basically what they did is they
20  bought the procurement arm of Inacom.
21   Q.   The procurement arm is what they named
22  Custom-Edge?
23   A.   Yes.
24   Q.   When you say procurement arm, you're
25  talking about the parts procurement?

Page 17

1    A.   No, I'm talking about the actual
2   procurement of new products.
3    Q.   Okay.
4    A.   The actual parts procurement piece, as
5   you're stating it, Inacom still obviously had that
6   because they were -- they stayed in the services
7   business, so they still had their own parts
8   procurement organization after the merger.
9    Q.   Okay.  So Compaq buys Inacom in 1999, and
10  then we have Inacom still operating as an entity and
11  then Custom-Edge comes into focus as an entity some
12  30 to 45 days after the Inacom buy?
13   A.   When I say entity, just the name --
14   Q.   The name.
15   A.   -- the name -- it was an entity but it was
16  still operating as -- I don't know how you would
17  explain it.
18   Q.   How about a division?
19   A.   Yeah, a division, yeah, that's good.
20   Q.   So we have Inacom and Custom-Edge, are
21  they both doing the same thing or different
22  services?
23   A.   Well, at the time we weren't doing -- at
24  the time of the merger I continued to -- when the
25  merger first came a part -- or the purchase group

5 (Pages 14 to 17)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 18

1  first came about, I continued to work for Inacom for
2  some time --
3     Q.  Okay.
4     A.  -- right after that for probably two to --
5  probably four weeks after the signing or the deal
6  was done, and this is, of course, prior to them
7  calling it Custom-Edge to my knowledge.  I continued
8  to work for Inacom and kind of do the same role I
9  was doing in the past.
10     Q.  Okay.  When did you then --
11     A.  I was offered a job to come work for the
12  new organization, you know, under management
13  obviously that I knew from the past, and they wanted
14  me to come in and be a program manager and help them
15  drive some new programs within the new entity.
16     Q.  Custom-Edge?
17     A.  Yes.
18     Q.  When you say drive --
19     A.  Drive and develop is probably the right
20  word.
21     Q.  Okay.  What type of products?
22     A.  The first product set that we really
23  focused on looking at was building a coordination or
24  a delivery arm for resellers understanding that
25  resellers used to be customers of Inacom.

Page 19

1     When the purchase happened between Compaq
2  and Inacom in buying that procurement arm they also
3  bought the reseller division, so the resellers came
4  over with the purchase of Inacom.  Inacom just
5  stayed as a service organization with no resellers'
6  ties.
7     Q.  Okay.  Was CEI also involved in -- if I
8  call it Integration Services, do you know -- if I --
9  configuration and integration services?
10     A.  Yes, that was part of what came over in
11  the purchase.
12     Q.  Okay.  So at some point in time did you
13  help develop and drive for Custom-Edge a program
14  providing service support and third-party parts for
15  Compaq?
16     A.  We -- I -- the first program we developed
17  was a service coordination piece that did have
18  parts, once again, used on an as-needed basis as we
19  needed them, and so that was the first program we
20  developed, and parts were involved, not on -- not on
21  a I would say a transaction-by-transaction basis,
22  but more as an as-needed basis, on a per-call basis.
23     Q.  Okay.  Did Compaq at some time drop the
24  Custom-Edge name?  What happened to Custom-Edge?
25     A.  I think -- I don't know all the reasons

Page 20

1  for it, but they -- I think they decided to not draw
2  confusion and even -- you know, Custom-Edge was an
3  entity -- part of Compaq and I think the thought
4  process was instead of drawing confusion on which
5  company was which, you know, bring in the Compaq
6  name and name it Compaq Direct was the next step.
7     Q.  Okay.  So CEI became Compaq Direct?
8     A.  That's correct.
9     Q.  Okay.  Do you know when that occurred?
10     A.  I don't know exactly, no.  The -- from my
11  recollection, it was about a year after the naming
12  of the -- naming of Custom-Edge.
13     Q.  Okay.  Was at some point in time the
14  integrations services that CEI provided eliminated?
15  Did they go to a complete service support and
16  third-party types business?
17     A.  The integration piece was never
18  eliminated.
19     Q.  Okay.
20     A.  It was always in place and it's still in
21  place today.
22     Q.  Okay.  Well, tell me, how did the
23  relationship then with MITG begin?
24     A.  It actually came as a -- as an opportunity
25  came with the services business that I just spoke

Page 21

1  about previously, we had a customer in Hannibal,
2  Missouri, called Swiss Colony, we were -- we were
3  looking for partners who could help us in the
4  Hanaball area and MITG was a -- at the time was a
5  partner under the Compaq network at the time, so
6  we -- you know, we engaged them, talked to them
7  about what we needed.
8     They obviously were able to help us in
9  that need, which was providing on-site services at
10  Swiss Colony in Hannibal, so that's how -- that's
11  how we first became acquainted and started working
12  with MITG.
13     Q.  What is Swiss Colony?
14     A.  They are a --
15     Q.  I mean are they even still around?
16     A.  They are, I think they are.  I mean, I
17  don't know.  We no longer support that customer.
18  Swiss Colony is a -- I'm not sure exactly what they
19  are to be honest with you as far as businesswise.
20     Q.  Okay.
21     A.  But they were -- the need was to provide
22  on-site services where they would go out a couple
23  days a week and help the Swiss Colony people do odds
24  and end jobs around the technology.
25     Q.  Computer related?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 22

1    A.  Yes.
2    Q.  Okay.  How did the relationship then
3  develop to where MITG became involved in third-party
4  parts?
5    A.  They -- obviously we had a couple
6  instances where we needed parts at Swiss Colony, we
7  asked at the time if MITG could provide that,
8  obviously they were able to.
9        We also asked them at the time was there
10  any way that we could potentially engage you for
11  other projects that we have to see if you could
12  potentially help us with spare parts in other areas
13  of the country, and obviously they said yes, and we
14  began to work with them on a case-by-case basis or
15  incident-by-incident basis.
16    Q.  If I refer to a document called the
17  standard support agreement I take it you've seen
18  that prior to today?
19    A.  Yes.
20    Q.  So you worked with them on a case-by-case
21  basis I take it prior to that agreement -- prior to
22  that agreement being entered into?
23    A.  Uh-huh.
24    Q.  Is that a yes?
25    A.  Yes.

Page 23

1    Q.  Okay.  Was CEI at one point in time
2  providing that third-party parts service for Compaq?
3    A.  CEI was providing the spare parts, the
4  third-party spare parts for Direct customers.  I
5  wouldn't want to stretch it as far as saying that
6  they were providing it for all of Compaq because
7  that wouldn't -- would not be the correct statement.
8    Q.  Okay.  My follow-up to that then would be
9  I guess was there a situation where other entities
10  were providing these parts on a nationwide basis and
11  you wanted to bring MITG into that fold, or how was
12  it determined that, hey, let's maybe engage MITG to
13  try and procure these parts nationwide?
14    A.  Well, the way that we handled the MITG
15  parts procurement piece on a nationwide basis was
16  really to support at the time our resellers that
17  were under the -- that were still under this
18  umbrella from a CEI perspective.
19        So the main purpose of doing nationwide
20  spare parts was for those different partners -- let
21  me give you an example.
22        Different partners like a reseller in
23  Madison, Wisconsin, that was the one that actually
24  needed help in Hannibal, Missouri.  They didn't have
25  an office themselves in Hannibal, so we built an

Page 24

1  accordational alliance that allowed them to engage
2  my group, we would make sure we had a service
3  provider in the area to do the work, and then
4  obviously if parts were needed we would also deal
5  with the parts' piece.
6        That's when we started to use MITG more is
7  when we found that could help us in the Hannibal
8  area of the Swiss Colony parts, we started to engage
9  them on different sites for different resellers that
10  had a parts need and wherever that may be.  That may
11  be Kentucky, could be Louisiana, and that's how we
12  started using use them for the third-party parts.
13    Q.  To support the authorized resellers
14  located throughout the country?
15    A.  And their service needs, yes.  And it
16  would be more not necessarily authorized resellers
17  but the authorized resellers' customers.
18    Q.  At this point in time MITG wasn't --
19  strike that.
20        Did you manage this MITG program?
21    A.  Yes.
22    Q.  Okay.  Explain to me I guess what you
23  managed and what it was?
24    A.  Well, I mean a couple things, obviously
25  understanding the first program we just talked

Page 25

1  about, I was responsible for bringing that up to
2  speed and building that program obviously.
3    Q.  Hold on.  I'm going to interrupt you.  I
4  want -- let me clarify my question.
5        I'm just talking about the time frame
6  before the standard support agreement.  I know you
7  have managed it along the way and we'll get to that,
8  but I just want to know when MITG is brought into
9  the fold here to support the resellers' customers,
10  tell me -- you were managing at that time; is that
11  correct?
12    A.  Yes.
13    Q.  Okay.  That's kind of what I'm interested
14  in right now, so explain that to me.
15    A.  Well, at that time we were obviously, you
16  know, working with MITG on a case-by-case basis, on
17  a need-by-need basis.
18        What we also did during that time frame is
19  sense, you know, it was working well and the quality
20  was good, one of the things that we started to do is
21  kind of expand the third-party spare parts piece to
22  the actual direct customer base, you know, which
23  is -- you know, which are the end user customers.
24        Understanding that Custom-Edge,
25  Compaq Direct really was kind of looking the same

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 26

1  way from a division perspective, you know. You
2  still have a group that manages resellers, then you
3  have a group that manages Direct customers.
4      So we were -- we started in the reseller
5  portion of the company and we thought it made sense
6  to go ahead and expand the third-party parts piece
7  to the end user environment because at the time the
8  Custom-Edge entity still had the ability to procure
9  multivendor products like IBM, for instance, so we
10 really started supporting customers who needed
11 things like AC adaptors and batteries for ThinkPads
12 and things of that nature.
13     Q.  So MITG, were they then used to support
14 those end users as a direct contact?
15     A.  Not necessarily a direct contact.
16 Typically what would happen in those scenarios is we
17 would have what we call a CSR, or an inside sales
18 rep.
19     They would typically, 80 percent of the
20 time, would be engaging MITG, and then MITG would be
21 following back to that inside sales rep, you know,
22 for, you know, yes, the order is going to ship,
23 those types of activities.
24     When you talk about direct end users, most
25 of the time we had an HP person that was involved in

Page 27

1  those conversations.
2      Q.  Okay.  Was there a division I guess -- did
3  CEI fall under Compaq Services organization, or was
4  it -- I guess what division of Compaq did CEI fall
5  under?
6      A.  Well, it was -- CEI for the first year or
7  so was ran as a completely separate business,
8  completely separate business entity.
9      Q.  Right.
10     A.  It was part of the big umbrella but it was
11 in a sense being run as a separate business.
12     Q.  At some point in time did it fall under
13 the Compaq umbrella?
14     A.  Once it became Compaq Direct.
15     Q.  Okay.
16     A.  It was now under the Compaq umbrella, but
17 I wouldn't -- still would not say that it was --
18 still wasn't at that time part of Compaq Services.
19     Q.  Okay.  Well, what time frame are we
20 talking about here as far as when MITG got involved
21 in the, you know, support services, was it 2000,
22 2001?
23     A.  You mean -- when you say support
24 services --
25     Q.  Well, I'm talking about when they were

Page 28

1  contacted to help provide support to Swiss Colony in
2  Hannibal, and then they were engaged on a larger
3  case-by-case national --
4      A.  I think the first contact was probably in
5  late '99.
6      Q.  Okay.  All right.
7      A.  Late '99, it was probably the first
8  contact.  Could be early 2000, but I'm -- well, I'll
9  say for the record it was late '99.
10     Q.  Ogallala.  At the time in which MITG was
11 engaged on a case-by-case national basis what was
12 the ordering time system -- and maybe this will cut
13 to the chase, did Compaq have a web tool in place to
14 interface orders between MITG and Compaq at the time
15 they were initially engaged?
16     A.  No.
17     Q.  Okay.  How was that interface or order
18 system conducted?
19     A.  Well, that happened some time after the
20 first engagement.
21     Q.  Right.  If I refer to what's called an
22 electronic data interface, an EDI, it's my
23 understanding that around 2000 when MITG was engaged
24 to begin this national case-by-case -- when we say
25 case-by-case, does that mean just order by order?

Page 29

1      A.  Yeah, best way to explain case-by-case,
2  maybe a better definition would be an
3  incident-to-incident basis, so every time a call was
4  put in we could potentially use them for the
5  third-party parts procurement.
6      Q.  Okay.  Were they specifically used solely
7  for third-party parts at this time?
8      A.  Yes.
9      Q.  Okay.  It's my understanding that the way
10 when this began, MITG or, for that matter, maybe any
11 other customer or supplier, an order would be placed
12 through Compaq on electronic interface, or what's
13 called an EDI, and then it would be put into
14 Compaq's VISTA order entry system?  Maybe I'm not
15 explaining that correctly.
16     A.  Well --
17     Q.  Why don't you tell me how it was used.
18     A.  Well, can I clarify what you're asking?
19     Q.  Sure.
20     A.  Are you asking how MITG system was used or
21 how other entities were used?
22     Q.  Let's focus on MITG.
23     A.  When we first -- when we started this, you
24 know, one of the -- one of the -- one of the things
25 I already had in place was I had a web-based

8 (Pages 26 to 29)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 30

1 dispatch system, okay.
2    Q.   Okay. What's that?
3    A.   Which means when I talked about the
4 incident-by-incident base things, my resellers could
5 actually go in and log their own service tickets on
6 this web-based tool, and this tool was owned by at
7 the time Custom-Edge.
8    Q.   Okay.
9    A.   Obviously since we'd already went to a
10 web-based nature at that time, you know, one of the
11 conversations that we had with MITG is MITG said,
12 hey, I can develop a tool for the spare parts and
13 help you link those tools -- two tools together, you
14 know, that would allow you to kind of have one place
15 where you can deal with not only your service needs
16 but your spare parts needs, so they develop their
17 own page, per se, and -- that we could work with,
18 kind of tie the two tools together so when a service
19 dispatch happened and MITG ordered a part we would
20 have visibility to that.
21    Q.   Okay.
22    A.   But it -- at the time it didn't have
23 anything to do with the VISTA system.
24    Q.   Okay. Well, my understanding was in
25 reviewing what we'll go over here, this Compaq

Page 31

1 business requirements, that one of the problems was
2 from the MITG web sites they would have to manually
3 key in the order entry and then it duplicate -- have
4 to be keyed in on the Compaq VISTA order entry?
5    A.   That is correct, but we're talk -- that --
6 that was -- that was related to -- to another phase
7 of the business that we haven't talked about yet.
8    Q.   Okay. What phase is that?
9    A.   Which is when we really started to
10 focus -- as I stated before, we -- we began to
11 expand the third-party parts piece to our end user
12 customer base, and -- to be able to order parts like
13 AC adaptors, hard drives and things for like IBM and
14 third-party products.
15    Q.   So --
16    A.   So --
17    Q.   Go ahead.
18    A.   When we expanded that, obviously -- and
19 when I say we expanded that, we didn't -- all that
20 we didn't move over the service dispatch piece
21 because obviously Compaq did its own thing around
22 services.
23    So at the time, you know, that little
24 entity that I built for resellers, we just kind of
25 took the parts thing, moved it over to a new program

Page 32

1 and started that as its own program in itself.
2    Q.   Okay. So we have two separate --
3    A.   But using the same tool. I mean, the same
4 MITG tool was used for.
5    Q.   Resellers and end users?
6    A.   Yes.
7    Q.   That's what you're talking about here when
8 you say they're two distinct different areas?
9    A.   Right.
10    Q.   Okay. Resellers -- just again clarify for
11 me the difference between the reseller portion and
12 the third-party parts. I understand the resellers
13 would be somebody in Madison, Wisconsin, let's say,
14 that needed parts to sell to their end users and
15 then MITG could facilitate that order; is that
16 correct?
17    A.   Correct.
18    Q.   And then the end user would be maybe
19 somebody that an internal customer service rep from
20 Compaq contacts MITG and facilitates that order?
21    A.   Correct.
22    Q.   Okay. So we have those two separate
23 issues I'll call them ongoing, and at the time you
24 said you had a web-based dispatch system in place
25 for the reseller?

Page 33

1    A.   Yes.
2    Q.   But there was not one in place for the end
3 user; is that correct?
4    A.   From a service dispatch perspective? If I
5 can clarify some things --
6    Q.   Yeah.
7    A.   Understand the service dispatch system was
8 owned by Custom-Edge.
9    Q.   Right.
10    A.   It was mainly meant as a coordination
11 place or coordination point for resellers to check
12 the status of their calls, things of that nature.
13    So that tool -- that tool never expanded
14 to the end user base. That specific tool did not --
15 did not expand to the end user base ever.
16    Q.   Okay.
17    A.   It did -- at one point later down the line
18 we did use it for some Compaq Services customers,
19 but it had no link to the MITG relationship.
20    Q.   Okay. So then should we -- would you
21 agree that the MITG relationship just focused on the
22 web-based tool and link to the third-party parts end
23 users?
24    A.   Yes.
25    Q.   Was that though also used after it was

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 34

1  developed at all with your previously developed
2  reseller web-based tool?
3      A.  Not in that sense.
4      Q.  Okay.
5      A.  Their web-based tool was used mostly for
6  end user type activities around procuring parts,
7  third-party parts.
8      Q.  Okay.  So let's just focus on that then if
9  that's the --
10      A.  Okay.
11      Q.  -- only issue with MITG as far as that
12  web-based tool that you're talking about.
13          Okay.  Let's focus on prior to the
14  development of what I'll call the Middleware and I'm
15  sure we'll talk about it later.
16          How were end users' orders placed which
17  led obviously to some of the issues talked about in
18  the --
19      A.  Yeah, at the time the way orders were
20  placed were, one, a call either from an HP CSR or
21  potential customer, not very often but could -- I'm
22  not saying it never happened, because obviously in
23  an 80/20 you have some instances, but for the most
24  part an HP person would call MITG, tell them what
25  they were looking for, MITG would deliver a quote

Page 35

1  and it would be delivered via usually their web
2  site, so the HP person would go on that web site,
3  look up their quote, once they had their quote they
4  would deliver it back to the HP customer, say do
5  you -- are you -- do you want to go ahead with this,
6  and then from there obviously once the customer said
7  yes, we at HP or the folks that were managing the
8  end user relationship, the CSRs that I mentioned
9  before, they would then get my group engaged, say,
10  hey, we -- you know, this order has been approved,
11  we now need to get this order into VISTA.  It was a
12  manual process.
13          So basically MITG would provide a quote
14  via their web site that we would -- we obviously had
15  a queue set up in their web site so we could check
16  it to make sure everything was okay.  My team would
17  then enter it into VISTA manually to invoice the
18  customer.
19      Q.  What was being -- strike that.
20          What were the MITG web sites that you're
21  talking about?
22              (An individual enters the room
23              to adjust the temperature.)
24  BY MR. HANSEN:
25      Q.  Did you help set up the names to be used

Page 36

1  by MITG at these web sites to provide quotes,
2  et cetera?
3      A.  When you names to be used for, which web
4  site?
5      Q.  That's what I want to know.  MITG, what
6  names were they using, was it compaqspareparts.com?
7      A.  There was the Compaq Direct online parts,
8  there was a -- I think -- I believe -- and I'm not
9  certain of this because I don't remember to be
10  honest with you, there may have been a CEI web site
11  before that, but the web site that was used most of
12  the time, the majority of the business, was the
13  Compaq Direct online parts.
14          (Exhibit W marked for
15          identification.)
16  BY MR. HANSEN:
17      Q.  All right.  I'm going to hand you what's
18  been marked at Exhibit W, which are four pages:
19  MITG 532, 533, 534 and 535.
20      A.  (Witness reviewing document.)
21      Q.  Have you had a chance to look at those?
22      A.  Uh-huh.
23      Q.  Is that a yes?
24          MS. CARROLL:  I just want to note for the
25  record that I'm objecting to the exhibit to the

Page 37

1  extent there's a suggestion that these are all one
2  e-mail string.  They're consecutively Bates numbered
3  but they are two separate e-mails.
4          MR. HANSEN:  We'll go over that.
5  BY MR. HANSEN:
6      Q.  Is the first page MITG 532 an e-mail sent
7  from you to rdhj@MITG.com, dated Wednesday,
8  November 28, 2001?
9      A.  Yes.
10      Q.  Okay.  And is that the e-mail address for
11  Ron Haught?
12      A.  Yes.
13      Q.  Okay.  And in there -- in that e-mail
14  there on MITG 532, are you discussing domain names
15  with him to be used by MITG for these web-based
16  sites?
17      A.  Yeah, they were asking me questions on
18  obviously what -- in -- since we've already been
19  web-based do we want to continue to be wed-based in
20  our program, and that was one of our initiatives is
21  to become a web-based program.  We were obviously
22  looking for -- to continue that path and also on the
23  parts side, so yes.
24      Q.  And apparently down here in the e-mail
25  that was cc'd to you, the folks at MITG were looking

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 38

1 for a site that apparently had already been taken by
2 someone else?
3     A. Okay.
4     Q. Is that --
5     A. Yes.
6     Q. -- how you read that?
7       Are these the names that you suggested to
8 the MITG folks to try and capture as a domain name
9 the compaqparts.com or compaq-spareparts.com?
10     A. It appears from this e-mail that the
11 answer to that is yes.
12     Q. Now let's turn to the page MITG 534, this
13 is an e-mail from Mr. Haught back to you dated
14 November 28, 2001, which if you look at the time,
15 3:43 p.m., it's after your e-mail to him that we
16 just discussed at the top of Page 532, correct?
17     A. Yes.
18     Q. He informs you that they have gone and
19 registered the following and asked if you had any
20 other suggestions for names; is that correct?
21     A. Appearing -- yes.
22     Q. Okay. And it appears that they had
23 registered four domain names, and then you provided
24 one more suggestion so they could register that
25 which was captain CPQSspareparts.com; is that

Page 39

1 correct?
2     A. Yes.
3     Q. Okay. Do you know if that was ever
4 captured or not?
5     A. To my knowledge -- to my knowledge, no,
6 but I can't confirm that.
7     Q. Okay. And were these then various sites
8 when we talk about a potential customer going to --
9 or MITG, excuse me, delivering a quote via their web
10 site to the customer after -- prior to the
11 Middleware when the MITG was involved, is that the
12 web sites that a customer could go to to look at
13 their quotes or was this after --
14     A. Well, this -- it's not after the
15 Middleware.
16     Q. Okay.
17     A. I mean, I -- I mean, the only site I have
18 recollection of that was actually used by our
19 customers was the Compaq Direct online site.
20     Q. Okay.
21     A. I mean that was used by our customers.
22 I'm not saying that they didn't have these sites
23 reserved, but the ones that we -- the one we were
24 using for our -- for the program was the
25 Compaq Direct online parts site.

Page 40

1     Q. Okay. Well, let me ask you which one that
2 is because there's not one here that reads that. We
3 have compaqdirectonline.com, compaqonlineparts.com,
4 compaqdirectspareparts.com and
5 compaqdirectservices.com, so you said it was one of
6 these first two?
7     A. It was one of the first two.
8     Q. Okay. Now, going back to the -- going to
9 those sites, did you or someone else within the
10 Compaq organization give MITG the authorization to
11 go ahead and capture those domain names to use in
12 the order process?
13       MS. CARROLL: Objection to the extent that
14 it calls for a legal conclusion.
15 BY MR. HANSEN:
16     Q. You can answer.
17     A. I don't want to say that I told them what
18 sites to get, but I will say I told them these sites
19 are okay to use.
20 BY MR. HANSEN:
21     Q. Okay.
22     A. But I once again want to state that I
23 didn't say go procure it, but I did say, yes, I said
24 yes, this is fine.
25     Q. Okay. Well, and those were the sites that

Page 41

1 were used throughout the term of the agreement,
2 correct?
3     A. Right.
4     Q. Okay. All right. So let's go back to
5 this order system prior to the Middleware being
6 developed, which was MITG delivering the quotes, the
7 customer could look up the quote, but then your
8 division would contact you, get your group engaged,
9 you would get the order into VISTA and then the
10 customer would be invoiced.
11       Was that -- the VISTA order entry system,
12 was that in place at Compaq years before?
13     A. The VISTA order system came with the
14 Inacom.
15     Q. Okay.
16     A. The Inacom purchase.
17     Q. Okay. Was there in this system an
18 internal purchase order created as well as an
19 external purchase order, was there one to MITG and
20 one for HP, or Compaq at the time?
21     A. So you're saying the VISTA system?
22     Q. Yeah, correct.
23     A. Well, the VISTA system would produce, you
24 know, an order number for the customer, and we would
25 have -- for MITG -- MITG -- as far as how MITG was

11 (Pages 38 to 41)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 42

1  paid, wasn't ran through VISTA, the actual payment
2  of MITG, but we would give MITG the order number
3  that they could reference as their PO when they
4  invoiced us, so if they had an order, say 12345 was
5  our order number, when they shipped that part we had
6  them use 12345 as their PO.
7      Q.  Okay.  Let me just ask it this way:  Tell
8  me the problems associated with this double entry
9  system.
10     A.  Well, obviously the biggest problem we had
11 was at the time I didn't have the ability to hire a
12 lot of people.  You know, as a new entity, you know,
13 we didn't have a lot of -- a lot of bandwidth to go
14 out and procure new people.
15     So the problem it was causing is my team
16 was getting two and three days behind.  Even though
17 MITG was keeping up on their side of putting out the
18 quotes, spitting out the quotes, quoting -- you
19 know, giving the quotes back to our CSRs and end
20 users, the problem was is on my side I was doing
21 double entry and -- because I had to go to MITG's
22 page, back to VISTA, enter into it VISTA and then
23 back to MITG to update them on the order number, so
24 it was a very manual process and it was causing us
25 to get behind two and three days on orders, and

Page 43

1  obviously when customers are -- understanding the
2  spare parts world, is typically I need it tomorrow
3  scenario, we were getting a lot of complaints.
4      Q.  Spare parts could also include I take it
5  when someone's computer has broken down and they
6  need it up and running --
7      A.  Absolutely.
8      Q.  -- as soon as possible?
9      Okay.  The fact that you were behind in
10 the manual entry upset the customer, they want to
11 know where their part is, et cetera?
12     A.  Yes.
13     Q.  And also I think you said it was a double
14 entry system.  Was it creating inefficiencies
15 timewise?
16     A.  Absolutely.
17     Q.  Okay.  So at this point in time then there
18 was no tool or system that could interface between
19 the customers and directly with MITG or VISTA, or
20 was it -- let me re-ask that.
21     So at the time there's no tool that could
22 directly interface between MITG and VISTA?
23     A.  No, not at the time.
24     Q.  Okay.  As a result of these issues that we
25 just talked about, the double entry, the

Page 44

1  inefficiencies, et cetera, was MITG approached by
2  Compaq to create an interface between the web tool
3  of MITG and the VISTA order entry system?
4      A.  Yes.
5      Q.  Let me back up.
6      Was MITG the only entity in which these
7  problems existed with the double entry and orders
8  being placed, or was this systemwide for your
9  division.
10     MS. CARROLL:  Objection:  Calls for
11 speculation, assumes facts not in evidence.  Go
12 ahead and answer.
13     THE WITNESS:  I can't answer that
14 question.  I can only answer it from my program.
15 For our program's sake, you know, that inefficiency
16 was really driven by volume and by people.
17     We didn't have enough people to handle the
18 volume, so we needed to make a -- we needed to do
19 something, so that's why we made -- we made the
20 choice of doing the integration because we knew
21 that, one, you know, long term, it was going to be
22 more cost effective to do anyway because hiring
23 people, keeping people, all those things, real
24 estate, you know, we tried to add everything up, and
25 this seemed to be about the best viable option for

Page 45

1  everybody because it drove efficiency.
2      Q.  Was MITG the only person -- the only
3  entity in your division that you were responsible
4  for that had this problem?
5      A.  That I was responsible for?
6      Q.  Yes.
7      A.  Yes.
8      Q.  Okay.  Now, the approach to MITG to create
9  this interface, was that to create a tool that would
10 send the parts orders directly from MITG's web site
11 and load those orders directly into the VISTA
12 system?
13     A.  Yes.
14     Q.  Okay.  And we're going to go over that,
15 but just in general, that tool would accept an order
16 for review, review the credit approval, and the
17 interface would then submit an order acknowledgement
18 back to the MITG web site?
19     A.  That's correct.
20     Q.  Okay.  Was this interface called an XML?
21     A.  It was an XML interface, that's -- how the
22 interface was streamed through was via XML.
23     Q.  Okay.  Not being a gentleman that holds a
24 computer degree, is XML basically a fancy type
25 e-mail system?

12 (Pages 42 to 45)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 46

1    A.  XML is a glorified e-mail string of data
2    that comes through in a tabled format; i.e., we set
3    parameters on how it needed to come, in what format
4    it needed to come; i.e., with the tables that needed
5    to be populated or the fields, per se, that needed
6    to be populated, and then they would -- if VISTA
7    would accept all those populations it would accept
8    it.
9        Q.  Okay.  So it was an interface or piece
10   that created standard types of fields for entries?
11       A.  Yes.
12       Q.  Okay.  And this was also a way to transfer
13   data securely and encrypted over the e-mail; is that
14   correct?
15       A.  Yes, because we had credit card
16   information and other confidential information that
17   came across.
18       Q.  Right.  Were you involved in any type of
19   these problems with duplicate entries for other
20   Compaq suppliers such as Amby parts now?
21       A.  I wasn't aware of any support -- let me
22   stop right there.
23       Can you restate your question because what
24   you asked me and what I --
25       Q.  Was Ambry parts now being used in the same

Page 47

1    capacity that MITG was prior to this interface being
2    created?
3        A.  They were -- Ambry, I know, was being used
4    by some folks in the organization just because they
5    knew of them, but it wasn't the same type of
6    relationship in -- like we had with MITG.
7        With MITG at least we were billing the
8    customer, we were getting a little bit of profit off
9    the deal.  In the other scenarios we as
10   Compaq Direct or as the folks at Compaq Direct would
11   send them directly to those suppliers for -- for
12   procurement, so it pretty much left our division,
13   left our company.  We would just in a sense refer
14   them to those companies.
15       Q.  Okay.  And my question was going to be
16   could that XML interface -- was that something that
17   was looked at to be used for people also such as
18   Ambry, or was there no order type entry system even
19   in place?
20       A.  There was -- it wasn't -- they weren't
21   even tied to HP -- Compaq, excuse me.  They weren't
22   tied to Compaq electronically at all, and once the
23   phone call left here and went to Ambry we never knew
24   if there was a sale.  We lost visibility once it
25   left us.

Page 48

1        Q.  Okay.  Maybe we've already talked about
2    this, but I guess tell me what was the business
3    justification for the XML interface between Compaq
4    and MITG?
5        A.  Well, first of all, a customer sat --
6    customer sat was a driving factor.
7        Q.  I don't mean to interrupt but we're going
8    to need -- I know you mean satisfaction, but for
9    later when we read this record I might --
10       A.  We did it for customer satisfaction
11   reasons, we also did it for growth reasons.  You
12   know, we planned on growing this program obviously
13   and tried to -- to grow that program more.
14       With the situation we had and the lack of
15   being able to hire people, it was really -- to be
16   honest, it was really our avenue to be able to
17   survive long term as a program and remain efficient.
18       Q.  Is that because if you can't hire the
19   people, you can't keep up with the orders, you may
20   lose customers?
21       A.  Yes.
22       Q.  Okay.  Obviously you said customer
23   satisfaction reasons was one, you wanted to keep
24   timely with the customers I take it?
25       A.  Yes.

Page 49

1        Q.  Okay.  Growth reasons, you said you wanted
2    to grow the program, is that the program with MITG?
3        A.  Well, yeah, the program with MITG and the
4    overall spare parts program.
5        Q.  Spare parts, and then third was I guess
6    tied in with lack of being able to hire people, this
7    was your option to solve that problem, to become
8    more efficient and keep up with customer
9    satisfaction?
10       A.  Yes.
11       MR. HANSEN:  Okay.  All right.  Let me
12   hand you -- and we'll mark this as Exhibit V --
13   we'll go back and -- I don't think I have a V.
14       MS. CARROLL:  I don't think you do.
15       MR. HANSEN:  We'll mark this as V.
16           (Exhibit V marked for
17            identification.)
18   BY MR. HANSEN:
19       Q.  I'm going to hand you Exhibit V, which is
20   marked Bate stamped MITG 536 to 564.  I think it's
21   also been produced by HP in this case so everybody's
22   got a copy.  Have you seen that document before?
23       A.  Yes, I helped prepare it.
24       Q.  Okay.  And it states on the front,
25   Business Requirements for OD 2001-522.  Does the

13 (Pages 46 to 49)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 50

1  OD stand for opportunity development?
2      A.  Yes.
3      Q.  Okay.  There's a date down there on the
4  document, first page, says effective date 6/13
5  of '01, it's Version 2.2.  Do you know if this was
6  the final version of this document?
7      A.  I don't recall if this is the final
8  version of this document.
9      Q.  And we'll go over some revision history
10  there on Page I -- or Roman Numeral I, excuse me, of
11  this document, and if you look you'll see Page
12  Roman Numeral ii, see there at the top it says 2.2,
13  6/14/01, minor edits and additions to the assumption
14  section, so -- which would correlate with this
15  document, so I haven't seen a final version, I don't
16  know if one exists, but I'm asking you, have you
17  looked or determined to see if you could find a
18  final version of that document?
19      A.  I myself did, yes.  I've been through
20  several laptops since, you know, I initially started
21  this, as well as to be honest, you know, I was the
22  original author of this document, but the actual
23  holder of this document is Chris Fortun.
24        So if there's any changes made after that,
25  after let's say maybe we started working, I wouldn't

Page 51

1  be aware of -- they wouldn't be in my possession,
2  because Chris was the driver from a project
3  management perspective, and she was making updates
4  after the initial document was put in place.
5      Q.  Okay.  If you turn -- flip that page over.
6      A.  (Witness complies.)
7      Q.  On Page MITG 537, you are listed as an
8  author there of this document, correct?
9      A.  Yes.
10      Q.  And apparently it says initiation date, is
11  that the date the Middleware project was initiated?
12      A.  Yes.
13      Q.  And there's some key contributors listed
14  there of which you're one, correct?
15      A.  Yes.
16      Q.  So is Mr. Haught from MITG?
17      A.  Yes.
18      Q.  Okay.  And you and Ron Haught are also
19  listed as approvers in the next section?
20      A.  Yes.
21      Q.  Okay.  And we'll flip further in the
22  document, isn't it true that you and Mr. Haught had
23  to give written approval of the Middleware before it
24  was entered into I'll call it production?
25      A.  We had -- we had to -- yes, we had to

Page 52

1  approve -- we -- Ron and myself were part of the
2  testing phase and that testing phase was, yes, a
3  final -- a final sign-off that everything was
4  working as it needed to be and as it was designed to
5  be.
6      Q.  And just generally in the
7  scope/applicability, it kind of talks about --
8  mentions what we've already talked about, that the
9  scope of this opportunity definition is to create an
10  interface that will send orders from MITG's web
11  sites.
12        To your understanding, those were some of
13  the web sites we looked at in Exhibit W, is that
14  correct, the compaqonlineparts.com?
15      A.  Yes.
16      Q.  Okay.  And load these orders directly into
17  the VISTA order entry system after an order has been
18  reviewed, backslash, released, and credit approval
19  has been obtained the interface submits an order
20  acknowledgement to the web sites, and does that mean
21  back to the MITG web site?
22      A.  Yes.
23      Q.  Okay.  And I take it then that was your
24  understanding as to what was to be developed and the
25  reasons why we've already talked about; is that

Page 53

1  correct?
2      A.  Yes, sir.
3      Q.  Okay.  Now, if you turn to Page 1 of the
4  document, actual Page 1, past the table of contents.
5      A.  (Witness complies.)
6      Q.  Section 1.1 there is the introduction,
7  which basically restates what we've already talked
8  about, correct?
9      A.  Yes.
10      Q.  That Compaq Direct and MITG have combined
11  efforts and created an environment that allows user
12  to purchase spare parts, and then goes on to state
13  that, currently all service parts orders submitting
14  into MITG's web tools are manually keyed into
15  Compaq Direct's VISTA order system for invoicing
16  purposes, and the last sentence indicates the
17  inefficiencies and time consuming efforts that you
18  had talked about your division was experiencing
19  prior to this development; is that correct?
20      A.  Yes.
21      Q.  Okay.  And then Section 1.3, we then have
22  the goals and objectives, the objective I take it
23  was to streamline this order entry process?
24      A.  Yes.
25      Q.  One of the goals.  Now I'm not going to go

14 (Pages 50 to 53)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 54

1 over this, but Section 1.4, it says existing
2 processes, does that describe--in my read of it it
3 does and I want to ask you--the processes that were
4 being used prior to this Middleware being developed
5 as to how an order was placed, the double entry,
6 goes on all the way over to Page 4?
7     A. Yeah, I would say that's right on, other
8 than I would say on No. 1 of existing processes, it
9 would be customer, slash, HP CSR because it wasn't
10 always the customer entering things into the web
11 site.
12     Q. Okay. Turn over to Page 8 if you would.
13     A. (Witness complies.)
14     Q. This talks about the solution detail. To
15 your understanding, was that the proposed solution
16 that was going to be created?
17     A. Yes.
18     Q. Okay. Now, this chart that's created
19 there, it says Compaq Direct process, do you see
20 where I'm at right above the chart there?
21     A. Uh-huh.
22     Q. Is that a yes?
23     A. Yes, sorry.
24     Q. Okay. Tell me what the difference is
25 between Compaq Direct process and then on Page 10,

Page 55

1 it says legacy Custom-Edge process, product procured
2 by MITG?
3     A. The legacy Custom-Edge process was
4 describing the original program and how it was
5 processed.
6         Why it was called legacy Custom-Edge was
7 because the way we engaged them was different than
8 the way we wanted to do the Compaq Direct piece.
9     Q. Okay. Flip back to Page 8.
10     A. (Witness complies.)
11     Q. See under execution mode up there on the
12 top of the chart over to the right?
13     A. On 7.
14     Q. (Counsel indicating.)
15     A. Yes.
16     Q. I understand M to be manual, A to
17 automated. There is no B in any of these columns,
18 what does B stand for?
19     A. I don't know.
20     Q. Okay. Next column says business,
21 backslash, IM delivery owner.
22     A. Uh-huh.
23     Q. What does that -- what does that mean?
24     A. It means the business IM owner -- it
25 stands for business initiative -- initiative -- I

Page 56

1 don't remember what it means to be honest with you,
2 but what it means -- the business owner -- delivery
3 owner means that that person would be the owner of
4 that activity.
5     Q. Responsibility for its development?
6     A. Right.
7     Q. And then in a column obviously Mr. Haught
8 is listed for a number of items, you're listed
9 there, same with the Page 10, legacy Custom-Edge
10 process?
11     A. Uh-huh.
12     Q. On Page 10, the tasks that were assigned
13 there, the person responsible for that is listed, the quote,
14 unquote, owner for that is listed on the column
15 there, Mr. Haught, then you're next, then
16 Mr. Haught, do you see where I'm at?
17     A. Yeah.
18     Q. Okay. Was this a project where you guys
19 were in touch daily for this thing?
20     A. Absolutely, this was a pretty drawn-out
21 process. It took a lot of testing, yeah, really
22 probably on a day-to-day basis through this process
23 we were probably having some communication.
24     Q. Okay. You and Mr. Haught were both
25 involved in the programming process and the testing

Page 57

1 process?
2     A. Well, I don't know if I would technically
3 the say the programming because I did no keying, nor
4 Mr. Haught, but we were definitely part of when they
5 did the programming and needed people to help with
6 testing --
7     Q. All right.
8     A. -- we were involved in those tests. We
9 didn't do any of the programming, per se, the
10 programmers did that piece.
11     Q. Okay. On Page 11, the functional
12 requirements that starts in Section 1.9 there, it
13 appears on all the web order entry and web tool
14 changes Mr. Haught was the owner and responsible for
15 making all of those in developing this interface.
16 If you look on Page 11 and 12; is that correct?
17     A. Yes.
18     Q. The Middleware process as far as the
19 solution and transferring of the data, Mr. Haught
20 was involved in as well as -- I want to know, who is
21 Dean Anderson?
22     A. Dean Anderson was the head of IT for the
23 organization.
24     Q. And who is Jim Exendine?
25     A. He was the XML kind of specialist person,

15 (Pages 54 to 57)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 58

1  per se.
2      Q.   Are they still with HP?
3      A.   I don't know. I've been kind of
4  disconnected from that group.
5         Dean Anderson I think is no longer, I
6  think he retired. I think Jim is still with the
7  company though, but I can't be for sure.
8      Q.   Okay. Page 16 appears to then under
9  Section 1.11 describe the inputs and outputs that,
10  for lack of a better term, basically describes what
11  the program was going to do; is that correct?
12      A.   Yes.
13      Q.   Okay. And that would -- go over to
14  Page 18 under user community, where -- under user
15  organization, see where it says parts procurement
16  services, description, business unit that manages
17  the services part business for Compaq Direct and
18  Compaq?
19      A.   Yes.
20      Q.   Is that you or was that your --
21      A.   Our program at this time was responsible
22  for Compaq Direct end user customers, and we were
23  also servicing the consumer business for
24  Compaq Services from a spare parts perspective.
25      Q.   Okay. And then under 1.15, the security

Page 59

1  requirements, it says, service program manager, then
2  your name is over on the far right side. Were you
3  the service manager?
4      A.   Yes.
5      Q.   Okay. And then on Page 24 you see under
6  user acceptance testing requirements?
7      A.   Uh-huh.
8      Q.   Is that a yes?
9      A.   Yes.
10      Q.   Okay. The testing period, it says, once
11  programming is ready to go, contact Troy Bloomquist
12  Shari, S-H-A-R-I, Ellis, E-L-L-I-S, Rich Foster and
13  Ronnie Haught of MITG, requesting two weeks of
14  testing.
15         Were you the four individuals that were
16  responsible and involved in the testing process?
17      A.   Yes.
18      Q.   Okay. And then approval of testing after
19  the testing was I take it completed, written
20  approval--says right in the box--is required from
21  yourself, Shari Ellis and Ronnie Haught before
22  programming is placed into production?
23      A.   Yes.
24      Q.   Okay. And to your recollection, did that
25  take place?

Page 60

1      A.   Yes.
2      Q.   Okay. Now, I think I already asked you
3  and you didn't recall exactly when the Middleware
4  launch went into effect?
5      A.   I don't.
6      Q.   That's fine.
7      A.   I don't.
8      Q.   Now, you said you and Mr. Haught were not
9  the programmers for this. Did MITG pay for the
10  programming of the XML interface?
11      A.   For their tool, yes.
12      Q.   Did they hire programmers with experience
13  on Compaq Direct's VISTA system?
14         MS. CARROLL: Objection: Calls for
15  speculation.
16         THE WITNESS: The programmers that they
17  hired did have some knowledge of the VISTA system.
18  That I recall.
19  BY MR. HANSEN:
20      Q.   Okay.
21      A.   They were people that -- they identified
22  some consultant programmers that were actually
23  ex-Inacom employees but they were running their own
24  business.
25      Q.   The same Inacom that Compaq had purchased?

Page 61

1      A.   Yes.
2      Q.   Did MITG pay for any on-site resources to
3  ensure the program's success?
4      A.   Yes.
5      Q.   What were they?
6      A.   Well, they put people on site here to help
7  specifically when -- the time they really chipped in
8  is when we were having problems with efficiencies.
9  We were able to give them a couple cubes to have
10  people in there from an on-site perspective to help
11  us deal with issues on their side, so if there was
12  issues with the MITG side we could have somebody
13  right there on site to help us deal with those
14  issues.
15      Q.   As opposed to calling them up all the
16  time --
17      A.   Tracking people down, exactly, so we kind
18  of had both eyes to look at the issues.
19      Q.   Did MITG ever request reimbursement for
20  that from Compaq?
21      A.   Not to my knowledge.
22      Q.   Do you know how that was addressed at all?
23      A.   I think the MITG just thought, to be
24  honest with you, I think they thought for the
25  program to be successful, since my hands were tied,

16 (Pages 58 to 61)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 62

1  they felt that it was needed to continue the success
2  of the program.
3          (Exhibit X marked for
4          identification.)
5  BY MR. HANSEN:
6      Q. Okay. Now, handing you what's marked as
7  Exhibit X in the line of exhibits, this is a
8  document entitled Compaq record of meeting, and it
9  appears to have the date of June 20, 2001, do you
10 see that at the top?
11     A. Uh-huh.
12     Q. Is that a yes?
13     A. Yes, sorry.
14     Q. The project name coordinates to the
15 OD 2001-522 we've been talking about here, correct?
16     A. Yes.
17     Q. Okay. And this is a meeting -- is this a
18 meeting regarding the Middleware --
19     A. Yes.
20     Q. -- development?
21     A. Yes.
22     Q. Okay. And it lists individuals that were
23 invited, and if they were present they have an X by
24 their name; is that correct?
25     A. Yes.

Page 63

1      Q. Does that mean they were present here on
2  site?
3      A. That means they were present -- yes, they
4  were present here on site or at our other facility,
5  the tech center, which to be honest with you, most
6  of the testing and most of the meetings happened at
7  our -- what we call our tech center facility, which
8  is about 20 minutes from here.
9      Q. Okay. And is Mr. Haught one of the
10 individuals that was there?
11     A. Yes.
12     Q. Okay. And you were there?
13     A. Yes.
14     Q. Okay. And Mike Lauber was there?
15     A. Yes.
16     Q. Do you understand him to be also an
17 individual that was with MITG?
18     A. Yes.
19     Q. Because -- you kind of just answered this,
20 it says meeting location Taipei. I was going to ask
21 where --
22     A. We named -- they named all the --
23     Q. Was that the tech center?
24     A. Yes.
25     Q. Okay. And other than reviewing the

Page 64

1  projects status and the section down here, it says
2  reviewed functional requirements, do you as you sit
3  here today, do you recall any other reasons for this
4  meeting or was it a weekly status update?
5      A. Well, it was really a status update and
6  obviously anything -- anything as critical as this
7  we had to continue to have status meetings to ensure
8  we were on track.
9      Q. It appears -- were you reviewing further
10 testing scenarios for the Middleware under the
11 discussions section right here (indicating)?
12         It says Chad McCord, M-C, capital C,
13 O-R-D, has identified that there will be two order
14 rejection scenarios for each order submitted to
15 VISTA.
16         Was this another testing scenario that you
17 were going to try to do before --
18     A. Yes.
19     Q. Okay. Now, under the project plan
20 portion, the very last sentence says, the estimated
21 time of completion is by close of business on
22 Wednesday, June 27, 2001.
23         Was that project in its entirety or just
24 for this testing phase, if you remember?
25     A. I recall it was for the project in its

Page 65

1  entirety.
2      Q. Okay.
3      A. And I can say this, we didn't make the
4  projected date originally. There was some delays.
5      Q. Okay. And then the next section under
6  action items, it appears there's going to be a
7  scheduled conference call for Monday, July 2nd, in
8  which MITG was going to be included?
9      A. Yes.
10     Q. Do you recall that taking place?
11     A. To be honest, no.
12     Q. Okay.
13     A. But it -- I mean, I certainly can say it
14 did happen. I don't remember all the conversations
15 that happened during that meeting.
16     Q. Do you recall if the Middleware was
17 completed by that time?
18     A. I don't recall if it was completed by that
19 time, and as I just previously stated, it was
20 delayed. We didn't make our target date originally.
21     Q. Okay. Was that due to additional testing?
22     A. Yes. There were some issues. Like any
23 time you do a program, there was issues that we were
24 working through, you know, to make sure that the
25 orders were flowing correctly.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 66

1    Q.  Now, these two documents here are all --
2  they were produced by MITG.  Were there records of
3  meetings such as Exhibit X created for each meeting
4  that occurred on this project?
5    A.  Typically from my knowledge of these
6  deals, Chris Fortun would typically -- yes, she
7  typically -- when we would have a meeting, they
8  would put a document like this together to my
9  recollection.
10    I'm not sure she did it for every meeting
11  though, but that was what -- Chris typically did
12  this when we had meetings so everybody was very
13  clear on what we were doing for the project.
14    Q.  Is she still around if you know?
15    A.  I don't know.  I think she is, but I'm not
16  sure.
17    Q.  Okay.
18    MS. CARROLL:  When we get to a breaking
19  point can we take a break?
20    MR. HANSEN:  Almost there.
21  BY MR. HANSEN:
22    Q.  Did Compaq Services ever review the
23  MITG's web-based tool?
24    A.  I did send the tool off for -- there's two
25  folks in the organization that, quote, looked at it,

Page 67

1  but when I talk -- when you're talking about the
2  Compaq entity, there's a person that was -- I can't
3  remember her name, and we talked about -- we were --
4  we mentioned it yesterday I thought, but there was a
5  lady that was -- her job was to look at web sites to
6  make sure that they were compliant and things of
7  that nature, you know, and so she looked at it.  I
8  do apologize, I don't recall her name.
9    And then I also sent the web site
10  snapshot, you know, via e-mail to my recollection to
11  a gentleman by the name of Chip Love, who was from a
12  Compaq Services organization.  He was the gentleman
13  who came to us and wanted to -- I guess I was going
14  to say bolt on, but who wanted to -- who brought us
15  the consumer business from that perspective and he
16  wanted to take advantage of the programming we had
17  in place with the end user customers.
18    So I gave him -- I just showed him the
19  snapshot of what it looked like, and his only
20  comment back to me was it looks good, and that was
21  it.  I don't know how far and deep he looked into it
22  but he certainly seen what the page was looking like
23  and how it looked.
24    MS. CARROLL:  I'm going to object to that
25  answer as nonresponsive.

Page 68

1  BY MR. HANSEN:
2    Q.  He's a guy out of Houston?
3    A.  I believe so.  I believe he's out of
4  Houston, I believe.
5    Q.  Now, when you say you sent him the web
6  site snapshot, is that after the XML was created?
7    A.  I don't recall if it was after or before.
8    MR. HANSEN:  Okay.  We can take a break
9  right there.
10    (10:19-10:33 a.m. - Recess.)
11    (Exhibit Y marked for
12    identification.)
13  BY MR. HANSEN:
14    Q.  I'm going to hand you what's been marked
15  as Deposition Exhibit Y, and, again, this is a
16  document.  It's not Bates labeled but each side has
17  a copy and has produced it.  It's the Middleware
18  agreement, and if you look on the very last page I
19  believe your signature is on the document?
20    A.  Yes.
21    Q.  Okay.  Dated February 8 of 2002; is that
22  correct?
23    A.  Yes.
24    Q.  Okay.  And to your recollection, if you
25  know, was this Middleware agreement entered into at

Page 69

1  or around the time that Middleware was launched?
2    A.  After.
3    Q.  After.  Okay.  And under No. 1 there,
4  development of Middleware, it discusses that
5  MITG shall develop software that will link together
6  the parties' web tools and more specifically create
7  the interface we're talking about, so at this time
8  of this agreement that had been accomplished?
9    A.  Yes.
10    Q.  Okay.  And the last sentence there in
11  Paragraph 1 indicates that the business requirement
12  shall be set forth in the final form of a document
13  referred to as Compaq's business requirements for
14  OD 2001-522 now in the process of being developed by
15  the parties.
16    My question is:  Is that what was to be
17  the final version of Exhibit V?
18    A.  Yes.
19    Q.  Okay.  Now, you already told me I think
20  when I asked about the final copy, that Chris Fortun
21  would be a person that could possibly have that or
22  maybe knows where it is?
23    MS. CARROLL:  Objection:  Calls for
24  speculation.
25    THE WITNESS:  I don't know.

18 (Pages 66 to 69)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 70

BY MR. HANSEN:
1
2    Q.  You don't have a final -- you don't have a
3    copy of the final agreement, the final business
4    requirements?
5    A.  I don't at this time.
6    Q.  Okay.  Anyway, under that agreement if you
7    turn to Paragraph 3 on Page 2, do you see the
8    paragraph, grant of license, Paragraph 3?
9    A.  Yes.
10   Q.  Up at the top, pursuant to the agreement
11   which you signed on behalf of Compaq, MITG granted
12   Compaq a personal nontransferable and nonexclusive
13   right and license to use the Middleware and all
14   portions thereof solely for the purpose of doing
15   business with MITG and for no other use; is that
16   correct?
17   A.  Yes, that is the way it's --
18   Q.  Is that what it says in the document?
19   A.  Yes.
20   Q.  In the last sentence under that
21   Paragraph 3 pursuant to the Middleware agreement,
22   states that Compaq shall not modify, revise or
23   sublicense the Middleware to others, nor use the
24   Middleware for the benefit of parties other than
25   MITG without MITG's prior written consent except

Page 71

1    that the Middleware may be sublicensed by Compaq for
2    use by its affiliates and subsidiaries.
3    Is that what that says in the last
4    sentence of Paragraph 3 on Page 2 of Exhibit Y?
5    A.  Yes.
6    Q.  To your knowledge, has Compaq or
7    Hewlett-Packard used this technology for use with
8    other customers?
9    A.  Not to my knowledge.
10   Q.  Okay.  Have you been told that they've
11   used this Middleware for use with other customers?
12   A.  I only know of one instance, which was
13   with an accidental order that flowed through to MITG
14   for Microsoft, but it was a -- I think it was a test
15   order only.
16   Q.  To your knowledge, is Compaq or HP using
17   this technology for use with currently Microsoft?
18   A.  I have no knowledge of that.
19   Q.  Do you know who would?
20   A.  I don't know.
21   MS. CARROLL:  Objection:  Calls for
22   speculation.
23   BY MR. HANSEN:
24   Q.  Are they using technology for use with
25   UPS, Xerox or Arthur Andersen?

Page 72

1    A.  I have no knowledge of that.
2    Q.  Have you heard that?
3    A.  No.
4    Q.  To your knowledge, is Compaq and
5    Hewlett-Packard still using the Middleware for any
6    other use since MITG has been terminated?
7    A.  Not to my knowledge.
8    Q.  Under Paragraph 5, ownership rights in the
9    Middleware, Compaq acknowledges that the Middleware
10   is the sole and exclusive property of MITG, and that
11   it has no right to the ownership therein, the
12   Middleware license authorizes Compaq to use the
13   Middleware to link its VISTA order entry system to
14   MITG web tools and for other purposes set forth
15   herein; however, except as stated herein, the
16   Middleware license gives Compaq no other rights or
17   entitlements to the Middleware, nor shall Compaq
18   have any rights to use the Middleware in any other
19   way.  Compaq acknowledges that MITG owns the
20   Middleware.
21   To your knowledge, is Compaq or
22   Hewlett-Packard using the Middleware to link it's
23   VISTA order entry system to any other third-party
24   parts suppliers' web tools?
25   A.  Not to my knowledge.

Page 73

1    Q.  Have you heard that?
2    A.  No, I have not.
3    Q.  Okay.  Do you have knowledge that HP or
4    Compaq is using the Middleware in any fashion, way,
5    shape or form other than to do business with MITG?
6    A.  Not to my knowledge.
7    Q.  Okay.  What do you have knowledge of as
8    far as what the Middleware is currently being used
9    for?
10   A.  My knowledge was is once HP did not renew
11   the contract that both agreements were once -- once
12   we cancelled -- not -- excuse me.
13   Once we didn't renew the contract, that
14   they were tied together.
15   Q.  Okay.  But would you agree with me that
16   the Middleware is not something you can simply flip
17   a switch and turn it off?
18   MS. CARROLL:  Objection:  Calls for
19   speculation, assumes facts not in evidence.
20   BY MR. HANSEN:
21   Q.  Tell me what you know.
22   A.  I have no knowledge of a switch.
23   Q.  Okay.  This is a program that is
24   implemented and placed onto Compaq's systems,
25   correct?

19 (Pages 70 to 73)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 74

1    MS. CARROLL: Objection: Assumes facts
2  not in evidence.
3  BY MR. HANSEN:
4    Q.  You can answer.
5    A.  Well, yes, it is used by -- I mean, it's
6  part of -- it was part of the VISTA system.
7    Q.  Okay.
8    A.  But without the other -- you know, without
9  the -- without the MITG side, nothing -- it probably
10  didn't -- they could probably shut that off.
11    Q.  Well, could they or not, do you know?
12    A.  I'm not a technical -- I'm not a technical
13  person, so I couldn't tell you if they could
14  actually flip it to turn it on and shut it off.
15    Q.  Have they removed -- they being
16  Compaq/Hewlett-Packard, removed the Middleware from
17  the VISTA system?
18    MS. CARROLL: Objection: Calls for
19  speculation.
20    THE WITNESS: I don't know the answer to
21  that exact question.
22  BY MR. HANSEN:
23    Q.  Okay. Tell me about the one order you are
24  aware of from Microsoft that you were talking about.
25    MS. CARROLL: Objection: Assumes facts

Page 75

1  not in evidence.
2  BY MR. HANSEN:
3    Q.  You brought it up, go ahead and tell me
4  about it.
5    MS. CARROLL: Same objection: It's vague,
6  ambiguous, misstates the witness's prior testimony.
7  Go ahead.
8  BY MR. HANSEN:
9    Q.  That's fine, you can answer.
10    A.  The only -- the only thing I was aware of
11  was an e-mail that came across from our IT team that
12  stated, you know, please, excuse this -- you know,
13  these orders, they were tested orders for Microsoft.
14    Q.  Okay. Test orders implementing the
15  Middleware system from Microsoft?
16    A.  Don't know the exact answer to that. Just
17  know it was an e-mail communicating that an error
18  had occurred.
19    Q.  That Microsoft was -- well, that some sort
20  of test orders had been placed with Microsoft using
21  the Middleware agreement?
22    MS. CARROLL: Objection: Assumes facts
23  not in evidence.
24    THE WITNESS: I think it stated that
25  something had flowed through VISTA and then for

Page 76

1  whatever reason went to MITG versus Microsoft.
2  BY MR. HANSEN:
3    Q.  Okay. Well, for that to occur, Microsoft
4  would have had to have the interface on their system
5  to accept the VISTA XML, correct?
6    MS. CARROLL: Objection: Calls for
7  speculation, assumes facts not in evidence.
8    THE WITNESS: Not sure. Not sure what
9  Microsoft would have on their side.
10  BY MR. HANSEN:
11    Q.  Well, for them to accept or place a test
12  order that you just described inadvertently went to
13  MITG, Microsoft would have had to have the capacity
14  to accept that same interface on their end; is that
15  correct?
16    MS. CARROLL: Same objections.
17    THE WITNESS: Not exactly sure on that --
18  that -- that answer, but --
19  BY MR. HANSEN:
20    Q.  What's your -- I want -- not sure what,
21  yes or no?
22    MS. CARROLL: Same objection.
23  BY MR. HANSEN:
24    Q.  You can answer.
25    A.  I guess my answer would be since test

Page 77

1  orders went through something -- you know, there
2  must have been something in the works or in place
3  for them to do that. That's all I know.
4    Q.  But weren't involved in it, but it's your
5  testimony that you're -- based on your experience
6  with the creation of the Middleware, for that to
7  occur they would have had to have something on their
8  end to either accept or reject that test order?
9    MS. CARROLL: Objection: Vague and
10  ambiguous, misstates the witness's prior testimony
11  and assumes facts not in evidence.
12  BY MR. HANSEN:
13    Q.  You can answer.
14    A.  As I stated before, I guess, yes, the --
15  they would -- something would have to be in place
16  for them to do that, so, you know, what -- when that
17  communication came through I think we were just
18  trying to make sure that MITG knew that it was an
19  error, you know, on our part, on the VISTA system's
20  part.
21    Q.  Did anyone at any point in time from
22  Compaq or MITG -- or from Compaq or HP have
23  Ron Haught or MITG's written permission to use that
24  Middleware with anyone other than MITG?
25    A.  I have knowledge of that --

20 (Pages 74 to 77)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 78

1    Q.  Okay.
2    A.  -- that taking place.
3    Q.  Okay.  If that Middleware is in place with
4  Microsoft, would you agree that had they not
5  received the prior written permission of MITG or
6  Mr. Haught, it constitutes an unauthorized use of
7  the Middleware and is in direct violation of
8  Paragraphs 3 and 5 of the Middleware agreement?
9        MS. CARROLL:  Objection:  Calls for
10  speculation, assumes facts not in evidence and calls
11  for a legal conclusion.
12        THE WITNESS:  I can't answer that question
13  today because I don't know how it -- I don't know
14  how all that works, you know.
15  BY MR. HANSEN:
16    Q.  But you would agree with me that any
17  modification, revision or sublicense of the
18  Middleware to others or using the Middleware for the
19  benefits of parties other than MITG without MITG's
20  prior written consent pursuant to Paragraph 3 would
21  be a violation of this agreement?
22        MS. CARROLL:  Objection:  Calls for a
23  legal conclusion and for speculation.
24        THE WITNESS:  You know, no, I mean, I
25  can't speculate either way since I don't know how --

Page 79

1  have any knowledge to how that process would work.
2  BY MR. HANSEN:
3    Q.  Okay.  After the Middleware was launched
4  how did the interface assist in your program's
5  success?
6    A.  After it was launched?
7    Q.  Uh-huh.
8    A.  Well, obviously, once again, it allowed us
9  to drive efficiencies, it allowed us to begin to
10  obviously get the orders responded to within a day
11  or actually within the same day of the order, and
12  obviously allowed us to turn around and provide
13  shipment to our customers for next day.
14    Q.  Did the interface help increase revenue
15  for the Compaq Services organization?
16    A.  Well, it helped both Compaq Direct and
17  Compaq Services because we were -- they were also
18  assisting with procuring parts directly from
19  Compaq Services via CSN.
20    Q.  When you say they you mean MITG?
21    A.  MITG, yes.
22    Q.  That is based on the terms where if a part
23  fell within a certain dollar amount it had to first
24  be purchased from CSN before it was out sourced, is
25  that what you're talking about?

Page 80

1    A.  No, what I'm talking about is MITG was
2  helped -- if there was a -- if the part was in stock
3  with us, with Compaq, okay, if it was in stock
4  they -- obviously that part would come via Compaq,
5  and MITG just would help facilitate that order
6  through their tool into VISTA.
7    Q.  Okay.  If the part wasn't in stock they
8  could then out source it to a third-party?
9    A.  Well, they would out source to whoever
10  their partners were.  We didn't necessarily care who
11  their third parties were, but we just said -- then
12  MITG could procure it, yes.
13    Q.  What if there was a part available from
14  both?
15    A.  It depended on rules that were set up with
16  the relationship.
17    Q.  Okay.  Is that what we called the MITG
18  bible?
19    A.  Yes.
20    Q.  Okay.  I take it then this interface
21  assisted Compaq and Compaq Direct in invoicing their
22  customers?
23    A.  Yes.
24    Q.  Okay.  Prior to the development of the
25  Middleware did the Houston site have any spare parts

Page 81

1  program?
2    A.  The Houston site didn't have a spare parts
3  program for -- that was directly interfaced with end
4  users and consumers.  They did arrangements with
5  resellers.
6    Q.  Did they have--they being Houston--a web
7  tool to develop an order system with the end users?
8    A.  Not at the time that our program -- not at
9  the time that our program was in place or the XML
10  was in place.
11    Q.  After the Middleware was developed, did
12  Houston then develop the parts direct center?
13    A.  Yes.
14    Q.  Okay.  That's what Chip Love headed up?
15    A.  Yes.
16    Q.  Then did Chip Love take the web tool that
17  was created from the Middleware and implement it
18  into the order system for Compaq?
19        MS. CARROLL:  Objection:  Calls for
20  speculation and assumes facts not in evidence.
21        THE WITNESS:  No knowledge of that.
22  BY MR. HANSEN:
23    Q.  Okay.  Do you know if after the Middleware
24  was created if Chip Love or the Houston site had the
25  capacity and capability to have that interface with

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 82

1  the end user from their web tool?
2      A.  Can you restate the question?
3      Q.  Sure.  After the Middleware was developed,
4  you told me previously Houston did not have the
5  interface with its end users and consumers.
6          After the Middleware was developed did
7  they then have the web tool and --
8      A.  They launched their estore.
9      Q.  Right.  Did that estore use the Middleware
10  agreement to interface with the customers?
11      A.  No.
12      Q.  Okay.  What was the estore?
13      A.  It's just a web site managed by the group
14  in Houston that allowed people to procure parts.
15      Q.  Directly through Compaq?
16      A.  Yes.
17      Q.  You don't know if they used the Middleware
18  for that interface?
19      A.  They couldn't have because it didn't -- it
20  doesn't interface with VISTA.
21      Q.  What doesn't?
22      A.  The estore.
23      Q.  Okay.  Is Houston parts direct and espares
24  the same thing?
25      A.  No, espares was the legacy Compaq tool;

Page 83

1  parts direct was the legacy HP tool.
2      Q.  Did the HP tool that parts direct
3  interfaced with customers using the web tool?
4      A.  They had their own interface with
5  customers similar to the estore.
6      Q.  Did they, to your knowledge, use the
7  Middleware at all?
8      A.  No, because same thing, they -- those web
9  sites were not tied to VISTA.
10      Q.  Do you recall conversations after the
11  Middleware was launched with any Hewlett-Packard or
12  Compaq representatives whereby they stated we did
13  not have an XML in place because we could never
14  figure out how to set it up with VISTA?
15      A.  We attempted to interface VISTA with CSN,
16  which was the back end in a sense of the estore
17  prior to doing an integration with MITG, and at that
18  time they didn't feel that the cost -- there's a
19  cost justification to do the -- to do an interface
20  from VISTA to CSN because at the time CSN was kind
21  of scheduled or was scheduled to be replaced.
22      Q.  At some point in time did the cost justify
23  the interface?
24      A.  No.
25      Q.  Okay.

Page 84

1      A.  And the interface never happened.
2      Q.  With CSN?
3      A.  No.
4      Q.  Is that what you're talking about?
5      A.  Yes.
6      Q.  Okay.  Do you recall any conversations
7  where Hewlett-Packard or Compaq representatives
8  stated they really liked the Middleware because now
9  Compaq could use it with all its customers and
10  suppliers?
11      A.  No knowledge of any comments from other
12  HP folks.
13      Q.  Were you part of any conversations or hear
14  any of those comments yourself?
15      A.  No, I mean not -- did not.
16      Q.  The XML interface, that tool was something
17  that had to be implemented onto the Compaq VISTA
18  system; is that correct?
19          MS. CARROLL:  Objection:  Assumes facts
20  not in evidence.
21          THE WITNESS:  Can you restate that one
22  more time?
23  BY MR. HANSEN:
24      Q.  The interface on the Compaq side, it was
25  programmed into the VISTA system?

Page 85

1          MS. CARROLL:  Same objection.
2          THE WITNESS:  No, no, Compaq part system
3  has been integrated to VISTA to date.
4  BY MR. HANSEN:
5      Q.  I'm talking about the Middleware.
6      A.  You're are talking about --
7      Q.  When you launched the Middleware --
8      A.  Okay.
9      Q.  -- after it was developed --
10      A.  Uh-huh.
11      Q.  -- it had to be placed into the Compaq
12  internal computer system web tool or whatever to
13  implement the project?
14      A.  Are you talking about the XML interface
15  between MITG and VISTA?
16      Q.  Yes, correct.
17      A.  Yes, it was implemented in VISTA, yes.
18      Q.  Then it in turn had to be implemented on
19  the MITG side, correct, to create that interface?
20      A.  Well, yeah, there had to be an interface
21  on both sides for them to talk.
22      Q.  Right.  Now, to stop using that interface
23  do you know if it's something that has to be removed
24  from both systems?
25      A.  I have no knowledge of that.

22 (Pages 82 to 85)