E-FILED
Monday, 27 February, 2006  03:49:33 PM
Clerk, U.S. District Court, ILCD

T. BLOOMQUIST - Direct (By Mr. Hansen)

Page 86

1    Q.  Okay.  Is the VISTA system still being
2  used?
3    A.  Yes.
4    Q.  Okay.  Are you aware of any other
5  XML interface that's been created to replace the
6  Middleware that was developed with MITG?
7    A.  Not to my knowledge.
8    Q.  If there is an XML interface currently
9  being used with VISTA, to your knowledge, is it
10  still the Middleware that was created with MITG?
11    A.  I don't know.
12    Q.  If the VISTA system is still being used
13  and the Middleware is not, are you back to the
14  double-entry system?
15       MS. CARROLL:  Objection:  Calls for
16  speculation, assumes facts not in evidence.
17       THE WITNESS:  It's hard to answer because,
18  you know, I'm not sure what other groups are using
19  VISTA today.
20  BY MR. HANSEN:
21    Q.  You said you're not aware of any other
22  interface that's been created to replace the
23  Middleware we've been talking?
24    A.  No, I'm not.  I'm not.  I'm not saying
25  there's not.

Page 87

1    Q.  Okay.  Other than using the Middleware
2  infrastructure that was built with MITG, how else
3  did CEI or Compaq Direct -- strike that, let me
4  rephrase it.
5       Other than creating the interphase,
6  explain how CEI used the infrastructure that was
7  built with MITG.
8       MS. CARROLL:  Objection:  Vague.
9       THE WITNESS:  I would agree, I really
10  don't understand what you're asking there.
11  BY MR. HANSEN:
12    Q.  That's all right, I'll move on.
13       Let me show you what's been marked as
14  Crowley Exhibit A.  Is that the standard support
15  agreement entered into with the MITG and at the time
16  I believe it was Compaq Direct?
17    A.  Yes.
18    Q.  Okay.  Is your signature on the last page
19  of that document?
20    A.  Yes.
21    Q.  Tell me what you understand MITG was hired
22  to provide pursuant to this standard support
23  agreement?
24    A.  Well, they were hired to provide spare
25  parts services for the end user group that they're

Page 88

1  already providing support for, as well as the
2  consumer business of Compaq around procurement of
3  Compaq spare parts and third-party parts.
4    Q.  And in return, that agreement outlines the
5  way in which they were going to be paid; is that
6  correct?
7    A.  Yes.
8    Q.  Okay.  And they were to receive sharing of
9  profits on parts pursuant to Paragraph 10?
10    A.  Yes.
11    Q.  Okay.  And they also were -- well, that
12  breakdown of profits was 75 percent to MITG,
13  25 percent to CDI for all parts sold to the
14  customers; is that correct?
15    A.  Yes.
16    Q.  Okay.  And were they also given a specific
17  service level and schedule guarantee pursuant to
18  Paragraph 11?
19    A.  Yes.
20    Q.  Okay.  And in Paragraph B it says that
21  guarantee was approximately -- well, that guarantee
22  was 400 calls a day or $41,000 a month, do you see
23  that?
24    A.  Yes.
25    Q.  Okay.  Do you know if MITG was ever paid

Page 89

1  any amount over $41,000 a month based on call level
2  volume?
3       MS. CARROLL:  Objection:  Vague.
4  BY MR. HANSEN:
5    Q.  You can answer.
6    A.  No, they weren't -- they weren't paid -- I
7  mean we paid them the flat 41,000.
8    Q.  Okay.  Now, also pursuant to that
9  agreement under Paragraph 22 -- flip to
10  Paragraph 22.
11    A.  (Witness complies.)
12    Q.  Okay.  That indicates that MITG was given
13  the exclusive right to provide parts and services to
14  the customers, correct?
15    A.  Yes.
16    Q.  Okay.  And lastly Paragraph 24 of that
17  agreement provided that all applicable parts and
18  service orders of the customers will be referred to
19  MITG from CDI, correct?
20    A.  Yes.
21    Q.  Okay.  Now, I'm going to show you what's
22  been marked as Crowley Exhibit B.
23    A.  (Witness reviewing document.)
24    Q.  Actually probably ought to start at the
25  bottom down there, which is Wednesday, May 21, and

23 (Pages 86 to 89)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 90

1  continues over on the second page. Go ahead and
2  take whatever time you need to read that.
3      A.  (Witness reviewing document.)
4      Q.  Okay. Is that an e-mail to you from April
5  at MITG dated May 21, 2003?
6      A.  Yes.
7      Q.  Okay. Apparently she's talking about
8  someone named -- in the first portion there,
9  actually Monday, May 19, '03, it says Lyle from
10 Warranty Group refer customer to any of the
11 following for purchase part number, and she -- the
12 customer was told to contact the spare store, HP
13 online parts, where she could go to Ambry, and that
14 she indicated to you that she had a concern why
15 technical support was referring someone to Ambry
16 when this part was available from CSN, do you see
17 that in the e-mail?
18     A.  Yes.
19     Q.  Okay. And then the top -- well, the
20 other -- the bottom portion is an e-mail string she
21 also copied you on if you flip it over, dated
22 May 20, 2003, do you see that?
23         A customer called the welcome center
24 looking to order part number, was routed to auto
25 attendant and then was eventually referred to

Page 91

1  Super Warehouse.
2      A.  Yes.
3      Q.  Okay. And she had a question to you that
4  said on both of these, why is the internal rep
5  referring customers to places that are not
6  Compaq/HP-related for parts that they could procure,
7  do you see that?
8      A.  Yes.
9      Q.  Okay. And if you then go to the top of
10 the second page, you said in a response --
11     A.  Second page or first page?
12     Q.  First page. Thank you.
13         Dated May 27, 2003, you responded back to
14 Jeff Hatfield. Who is he?
15     A.  He was part of -- he headed up -- he was
16 part of the -- third-party in the small business
17 group for -- for Compaq Direct.
18     Q.  Okay. And you indicated, do you have any
19 idea who heads up the small and medium business
20 department, why would we send customers outside the
21 company, this is lost revenue, is that what your
22 e-mail says?
23     A.  Yes.
24     Q.  Would you agree that if those customers
25 were referred by Compaq/HP representatives to Ambry

Page 92

1  or Super Warehouse that was in violation of the
2  standard support with MITG?
3         MS. CARROLL: Objection: Calls for a
4  legal conclusion.
5  BY MR. HANSEN:
6      Q.  You can answer.
7      A.  I would say that to my recollection of the
8  agreement, you know, the way it's written, it was
9  for Compaq Direct, so the -- you know, the issue is,
10 you know, the small/medium business group wasn't
11 underneath the Compaq Direct organization.
12     Q.  Okay. Well, you certainly had concerns
13 over it, did you not?
14     A.  Well, certainly.
15     Q.  Okay. And that is the -- you said the
16 small and medium business centers were not
17 Compaq Direct; however, it said, we had a customer
18 that was speaking with the spares store.
19         The spares store, would that be part of
20 the third-party parts and spares that MITG was
21 servicing for Compaq?
22     A.  Spares store was the group out of Houston,
23 that Compaq Services group out of Houston led by
24 Chip Love.
25     Q.  What about the -- another customer started

Page 93

1  at the welcome center, what was the welcome center?
2      A.  The welcome center is a -- is a group of
3  people that are there to kind of take all
4  Compaq-type calls, so if you want to -- the welcome
5  center is the number that was the -- that answered
6  the 1-800 okay Compaq, that's what the welcome
7  center was.
8      Q.  Okay. And off the 1-800 okay Compaq, if
9  they were all taking all Compaq calls, would
10 Compaq Direct have been on one of those options?
11     A.  It was an option, yes.
12     Q.  So if a call came into the welcome center
13 for Compaq Direct and had a customer that needed to
14 order the part, it should have been referred to
15 MITG pursuant to the standard support agreement?
16         MS. CARROLL: Objection: Calls for
17 speculation.
18         THE WITNESS: Yes.
19 BY MR. HANSEN:
20     Q.  Okay. And on the e-mail from the warranty
21 group, this Lyle, Monday, 5/19/03, apparently the
22 part was available on CSN, for $25 our cost and
23 $29 to the customer cost, but the individual was
24 referred to Ambry where the part was $55, did that
25 also lead to your concern that that was money that

24 (Pages 90 to 93)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 94

1  was being sent outside of HP Compaq?
2      A.  Yes.
3      Q.  Okay.  What is -- do you know what PC and
4  Netstream are?
5      A.  No.
6      Q.  Okay.  And then -- did I hand you Crowley
7  Exhibit C on the back of that?  Let me find it.
8  (Counsel hands document to witness.)
9      A.  (Witness reviewing document.)
10     Q.  Actually I'm going to ask you, to speed
11  things along, flip to the page marked MITG 432.
12     A.  Okay.
13     Q.  Do you see in the middle there it should
14  say original message from a Toby Morris?
15     A.  Uh-huh, yes.
16     Q.  Okay.  And this individual was sending an
17  e-mail to info@globalonlineparts.com, is that HP --
18  is that an HP e-mail site, do you know?
19     A.  I have no idea.
20     Q.  Anyway, this person indicates that --
21  something about a notebook, he was looking for
22  RW drive, but my questions relate to this, it says,
23  dear HP customer, do you see where I'm at there?
24     A.  Okay.
25     Q.  Thank you for contacting HPE Services,

Page 95

1  okay, what was HPE Services?
2      A.  HPE Services was the services
3  organizations' web-based tool.
4      Q.  Was it connected at all to third-party
5  parts or the HP Direct?
6      A.  No.
7      Q.  Okay.  Now, if you flip over to the --
8  well, continuing on, apparently this guy was looking
9  for some Armada E500 notebook, do you see that?
10     A.  Uh-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  Okay.  He wanted to purchase the CD-RW
14  drive, and they gave him a spare part number, do you
15  see that?
16     A.  Yes.
17     Q.  Okay.  It says for spare parts and prices
18  you can visit the following link, and flip over,
19  okay, and it says the web site for
20  sparestore.compaq.com, do you see that, flip over?
21     A.  (Witness complies.)
22     Q.  Compaq online parts, do you see that?
23     A.  Uh-huh, yes.
24     Q.  Okay.  And the Compaq online parts web
25  site, is that the MITG web-based tool?

Page 96

1      A.  Yes.
2      Q.  Okay.  So that was one of the options
3  given for this individual who wanted to get some
4  CD-RW drive?
5      A.  Yes.
6      Q.  So eservices was referring this person as
7  a potential part order to the MITG site, correct?
8      A.  Yes.
9      Q.  Okay.  They list the 800 number there next
10  to that?
11     A.  Yes.
12     Q.  Now, they also give this individual other
13  options as far as searching the internet, and they
14  give them Netstream, PC Nation and Ambry, do you see
15  that there, one, two and three?
16     A.  Yes.
17     Q.  Okay.  Do you know -- Ambry you said you
18  had knowledge of?
19     A.  Yes.
20     Q.  Okay.  And are these other places that the
21  consumer could go to to buy that part, do you know?
22     A.  It appears, yes.
23     Q.  Okay.  My question is if that was a part
24  that could have been filled in the order provided by
25  MITG through Compaq online parts pursuant to this

Page 97

1  the standard support agreement, should it have been
2  referred to them?
3          MS. CARROLL:  Objection: Assumes facts
4  not in evidence and is an improper hypothetical.
5          THE WITNESS:  No knowledge on how they
6  were told to route calls from this e-mail.
7  BY MR. HANSEN:
8      Q.  Okay.  But you do agree that the
9  Middleware agreement says that all --
10  Paragraph 24 --
11         MS. CARROLL:  Standard support agreement.
12         MR. HANSEN:  I'm sorry, in the standard
13  support agreement, thank you.
14         MS. CARROLL:  Behind you, on the table
15  behind you.
16         MR. HANSEN:  Thank you.
17  BY MR. HANSEN:
18     Q.  Paragraph 24 states that all, in caps,
19  applicable parts and service orders of the customers
20  will be referred by CDI to MITG.
21         Pursuant to that, should that call have
22  been referred to MITG only?
23         MS. CARROLL:  Objection: Assumes facts
24  not in evidence, improper hypothetical and calls for
25  a legal conclusion.

25 (Pages 94 to 97)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 98

1  BY MR. HANSEN:
2     Q.  You can go ahead.
3     A.  The HPE Services group was their own
4  entity and they weren't necessarily tied to
5  Compaq Direct.
6     Q.  Okay.  Do you know then how HPE Services
7  came about getting the MITG web-based tool as a
8  possible place to refer customers to?
9        MS. CARROLL:  Objection:  Calls for
10 speculation.
11       THE WITNESS:  We were -- HP Services was
12 using us for some time as a parts entity.
13 BY MR. HANSEN:
14    Q.  Okay.  Do you know -- I think you just
15 said you don't know how the calls or e-mails were
16 routed?
17    A.  All of these types of activities were
18 handled by the welcome center and by people
19 connected to the welcome center.  We weren't -- the
20 welcome center isn't part of the Compaq Direct
21 umbrella, per se.
22    Q.  Who ran the welcome center?
23    A.  I have no idea who ran the welcome center.
24    Q.  Do you know what the number was?
25    A.  It's 1-800 okay compaq -- when -- when we

Page 99

1  were Compaq it was 1-800 okay Compaq.
2     Q.  Okay.  After the merger do you know what
3  it was?
4     A.  I don't.
5     Q.  Do you know what call center if I dial
6  1-800 okay Compaq that was sent to?
7     A.  I have no idea where that call center is
8  located.
9           (Exhibit Z marked for
10            identification.)
11 BY MR. HANSEN:
12    Q.  Okay.  I'm going to hand you Exhibit Z,
13 which are nine total pages of documents.  They do
14 not run numerically consecutively, so take a look at
15 those.
16    A.  (Witness reviewing document.)
17    Q.  Okay.  The first e-mail on the top page
18 there MITG 68, which is an e-mail from Ron Haught to
19 you dated Friday, March 22nd, 2002; is that correct?
20    A.  Yes.
21    Q.  Okay.  And he's expressing to you that the
22 calls at Compaq Direct seem to be slow, very slow
23 this week, is there any idea why the calls are not
24 being sent here, and is the tech support call still
25 on, please advise, thanks, Ron.

Page 100

1        Is that what it says?
2     A.  Yes.
3     Q.  When you would -- and these other e-mails
4  in this exhibit kind of indicate the same thing, do
5  you recall MITG throughout the terms of the
6  agreement expressing concerns to you over the lack
7  of call volumes?
8     A.  Yes.
9     Q.  Okay.  And what was the I guess standard
10 operating procedure or way in which you handled such
11 e-mails when you received them?
12    A.  I would go to -- obviously communicate to
13 my contacts and just say -- and ask, you know,
14 what -- you know, is there a reason calls are down,
15 and try to find out, you know, why calls are down,
16 was there something happening that I wasn't aware
17 of.
18       Basically just go up the -- go to the
19 appropriate contacts and find out if they knew of
20 anything that was taking place that would cause
21 that.
22    Q.  At this time in March of '02 who did you
23 report to?
24    A.  In '02, March '02, I was probably still
25 reporting to Bill Pogge, P-O-G-G-E.

Page 101

1     Q.  Okay.  Did you ever report directly to
2  Bill Crowley?
3     A.  Never.
4     Q.  So would Bill Pogge have been an
5  individual that you went and talked to?
6     A.  To be honest, no, because I had my
7  contacts from a program perspective that we worked
8  with, like Chip Love and folks like Bill Crowley.
9  In that time frame I don't think we were even in the
10 HP merger.
11    Q.  Okay.
12    A.  But my main contact was Chip Love from a
13 legacy perspective, from a Compaq perspective.
14    Q.  When you say legacy perspective what do
15 you mean?
16    A.  I just meant prior to the merger.
17    Q.  Okay.  So is legacy Compaq?
18    A.  Just Compaq, yeah, I'll just say Compaq.
19    Q.  Chip Love, was he ever here in Omaha or --
20    A.  Always out of Houston.
21    Q.  Okay.  And I guess why would you have
22 contacts with him if you didn't report directly to
23 him?
24    A.  Well, because he was the gentleman who
25 engaged us -- engaged my program to take over the

26 (Pages 98 to 101)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 102

1  consumer -- the consumer calls.
2      Q.  When you say engaged your program, is that
3  the relationship with MITG you're referring to?
4      A.  No, what I mean is the Compaq Services
5  organization from a spare parts perspective in
6  engaged our program, the Compaq Direct program, to
7  be able to -- they had a need to be able to have an
8  800 number for consumers to take their spare parts
9  orders rather than send them off to authorized
10  resellers.
11      Q.  Okay.  So to create 800 numbers so Compaq
12  didn't sell money elsewhere, the orders were placed
13  here with the authorized resellers?
14      A.  Yes.
15      Q.  Okay.  And were those the 800 numbers that
16  were tied directly into MITG?
17      A.  Restate the question.
18      Q.  Were those the 800 numbers that were tied
19  directly into MITG, meaning I call 1-800 whatever
20  the number is and I'm -- somebody says Compaq Direct
21  and it's somebody at MITG's facility?
22      A.  For that initiative, yes.
23      Q.  Okay.  You said it was Compaq Services who
24  engaged your group?
25      A.  Correct.

Page 103

1      Q.  Okay.  And your group was Compaq parts?
2      A.  Compaq --
3      Q.  Direct?
4      A.  My group was -- I was the program manager
5  for Compaq Direct for support services.
6      Q.  Okay.  And Chip Love, was he the Compaq
7  Services?
8      A.  Person.
9      Q.  Person, okay.
10      A.  Uh-huh.
11      Q.  Okay.  And then flipping to MITG 76, which
12  is in that exhibit, there is apparently an e-mail to
13  you from Ron Haught, dated Monday, October, 21,
14  2002, subject says call volume, do you see that?
15      A.  Yes.
16      Q.  He was asking you to check into the calls
17  today to find out why they were getting lesser and
18  lesser, do you see that?
19      A.  Yes.
20      Q.  Okay.  At the top we actually have your
21  response on this e-mail, you responded back to him
22  shortly thereafter; is that correct?
23      A.  Yes.
24      Q.  Okay.  You said I've made the request,
25  what request were you talking about?

Page 104

1      A.  I made the request to Chip Love regarding
2  call volumes and why -- you know, if he knew where
3  the calls were going and if they're going to
4  Andover, which was a HP call center, you know, my
5  question was why or, you know, is there -- what's
6  the change.
7      Q.  Okay.  My next question was going to be
8  what was Andover?  It says their Andover only
9  540 calls on Friday versus 436 for us, what is
10  Andover?
11      A.  It was a Compaq call center.
12      Q.  Were they a call center providing the same
13  service that MITG was?
14          MS. CARROLL:  Objection:  Calls for
15  speculation.
16  BY MR. HANSEN:
17      Q.  You can answer.
18      A.  I'm not sure exactly what all of their --
19  their actual charter was from that perspective.
20      Q.  Okay.  Well, you said you'd call Chip Love
21  to find out why calls were going to Andover that
22  could have been going to MITG, why would you do
23  that?
24      A.  Because I -- because that was an area that
25  I knew that we were taking -- as Compaq, they were

Page 105

1  taking some spare part calls, but Andover typically
2  was focused on digital parts, which wasn't part of
3  our program.
4      Q.  But they were taking some spare parts
5  calls that also could have been serviced by MITG?
6          MS. CARROLL:  Objection:  Calls for
7  speculation.
8  BY MR. HANSEN:
9      Q.  You can answer.
10      A.  I have no direct knowledge of that taking
11  place.
12      Q.  But you said you contacted Chip Love to
13  find out why calls were going to Andover?
14      A.  Yes.
15      Q.  Did you do that because those were calls
16  that you felt could have been directed to --
17      A.  Potentially, yes, I was trying to look
18  into it.
19      Q.  Because Andover and MITG was offering
20  similar type services for spare parts?
21      A.  Yes.
22      Q.  Okay.  Now, Andover was taking these
23  calls, you indicate 540 calls on Friday, which would
24  have been sometime in October 2002, correct?
25      A.  Yes.

27 (Pages 102 to 105)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 106

1    Q.  Okay.  Which would have been after the
2  standard support agreement was entered into in
3  February 2002?
4    A.  Yes.
5    Q.  Okay.  Do you know how the system was in
6  place as to how someone got directed to Andover
7  versus MITG, what I mean is being routed off of an
8  1-800 number?
9    A.  The only way I was -- that I knew -- the
10  only way that I knew people got to us was via either
11  the welcome center knowing of us or through -- you
12  know, through information that was provided by
13  Chip's team to folks that needed spare parts.
14    Q.  Okay.  When you say the information that
15  was provided by Chip's team, do you mean someone
16  would call down to Houston, and Chip's team, whoever
17  that might be, could direct a call to MITG?
18    A.  No, they more -- more what they did was
19  they communicated to places like the welcome center
20  or organizations that were involved in customer
21  facing, that if you need spare parts here's an
22  800 number that we have in place to support that.
23    Q.  And would Chip's team, do you know, also
24  be the entity that would maybe give the MITG
25  800 number or give the number to the call center in

Page 107

1  Andover?
2    A.  Yes.
3    Q.  If Chip's team was referring calls for
4  spare parts to Andover that could have gone to MITG,
5  would you agree that that referral is a violation of
6  the standard support agreement that says all
7  customer orders should be referred by Compaq Direct
8  to MITG?
9        MS. CARROLL:  Objection: Calls for
10  speculation, assumes facts not in evidence, calls
11  for a legal conclusion.
12  BY MR. HANSEN:
13    Q.  You can answer the question.
14    A.  I can speak for Compaq Direct, only.
15    Q.  Okay.
16    A.  We had -- we had -- you know, we had -- we
17  had an agreement in place with the services
18  organization but our contract for HP Direct, you
19  know, with MITG was in place.  I have no way to know
20  how they -- how they were managing their business on
21  the back side of this deal.
22    Q.  When you say they who do you mean?
23    A.  I mean the service organization that was
24  responsible for Andover.
25    Q.  Chip Love's group?

Page 108

1    A.  He was on -- yeah, he was one of the
2  leaders of the group.
3    Q.  Who else was?
4    A.  I don't recall the names to be honest.
5    Q.  After that standard support agreement was
6  signed between the Direct and MITG, was a copy ever
7  sent down to Chip Love and his group?
8    A.  We did share the agreement with them at
9  one time.  I don't know the exact date of that time,
10  but we did share that we had a two-year agreement in
11  place with MITG.
12    Q.  Okay.  And then some other documents in
13  there, MITG 482, is another e-mail to you from
14  Mr. Haught, dated July 24, 2002, about calls
15  dropping off; is that correct?
16    A.  Yes.
17    Q.  Okay.  And is this, again, an e-mail that
18  you would have contacted Chip Love to find out why
19  calls at MITG are dropping off?
20    A.  Yes.
21    Q.  Okay.  What was -- if you recall, what was
22  Mr. Love's response to any of these inquiries?
23    A.  I didn't get a lot of responses.
24    Q.  Okay.  Do you know why?
25    A.  No.

Page 109

1    Q.  Okay.  I mean, when you say you didn't get
2  a lot, give me an example.
3    A.  He wasn't returning my messages.
4    Q.  Okay.  So you would call down to him to
5  find out where calls --
6    A.  Typically it would be a call or e-mail
7  depending on if I didn't get an e-mail back I'd try
8  to call.
9    Q.  Okay.  Inquiring of him, hey, why is
10  MITG's call volume what it is?
11    A.  Just asking what -- you know, what's
12  happened to the calls that we were servicing for you
13  guys before.
14    Q.  Okay.  And I want to be clear, he wouldn't
15  respond or --
16    A.  I didn't say he wouldn't respond.  He
17  didn't always respond right away.
18    Q.  When you got a response what was the
19  nature of the response?
20    A.  Either that they were -- that he would
21  look into it or that, you know, or that they -- the
22  other answer that came back is that they were
23  looking at doing some different things around that
24  space for -- from a services perspective, they were
25  looking at a different way to do things.

28 (Pages 106 to 109)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 110

1    Q.   Meaning cancelling the contract with MITG?
2    A.   No.
3    Q.   Okay.
4    A.   Meaning that, you know, they had an
5    agreement with HP Direct where they would send the
6    calls, they were moving a different direction.
7    Q.   Okay.  They would send the calls to
8    Andover?
9    A.   Not sure exactly where they were sending
10   them, but they were going somewhere else.
11   Q.   Other than to MITG?
12   A.   Right.
13   Q.   Would you then in turn communicate that
14   back I guess to Mr. Haught at MITG?
15   A.   I communicated back to him every time I
16   got communication back of what I was hearing, and I
17   would tell him I'd continue to try to work it and
18   see, you know, what we could -- what we could do.
19   Q.   Did you ever have any communications or
20   conversations with Mr. Love specifically discussing
21   the standard support agreement that was in place
22   regarding calls that should be referred to MITG and
23   that that wasn't taking place based on the call
24   volume?
25   A.   My messaging was, yes, that we had an

Page 111

1    agreement in place that -- where a vendor was
2    suspecting calls and that we weren't hitting the
3    same numbers we were hitting in the past.
4    Q.   You inquired as to where those calls were,
5    what happened to them, where they were going, and
6    that's when you said Mr. Love told you whatever he
7    responded, that he had an agreement with HP, that
8    the calls going to someplace else?
9        MS. CARROLL:  Objection:  Misstates the
10   witness's prior testimony.
11   BY MR. HANSEN:
12   Q.   Go ahead and tell me.
13   A.   He said that the -- he said he referred to
14   the calls -- that they were being routed to Andover.
15   Q.   Okay.  I'm going to show you a previous
16   deposition exhibit, which is actually Meyerfeld M,
17   and it was -- let me get this out of your way.
18       Do you recognize those as parts business
19   center operations matrix?
20   A.   Yes.
21   Q.   Okay.  And the one sitting in front of you
22   is dated March 12 of 2003?
23   A.   Yes.
24   Q.   Okay.  And if you flip to the second page
25   do you see there it says matrix provided by --

Page 112

1    A.   Uh-huh, yes.
2    Q.   -- Darlene Low -- hold on a second, let me
3    finish, Vicki Ngo, N-G-O; Michelle Sarty, S-A-R-T-Y,
4    and then your name?
5    A.   Yes.
6    Q.   Were you the individual that prepared
7    these and sent them on to whoever?
8    A.   I only prepared -- I only prepared the
9    Missouri HP Direct numbers.  I received a daily -- a
10   daily call stat sheet from MITG that I in turn put
11   in a format and forwarded on for daily -- daily
12   updates.
13   Q.   Okay.  You said you put it in a
14   spreadsheet format and then e-mailed it on to
15   somebody?
16   A.   Yes.
17   Q.   Who would you send your reports to?
18   A.   Either Vicki Ngo -- I think she -- that
19   was the only one to my recollection.
20   Q.   Okay.  Was she at Roseville or do you
21   know?
22   A.   I don't know.
23   Q.   And then to the best of your
24   knowledge and recollection, would she then compile
25   the full matrix that we have there or would somebody

Page 113

1    else do that, do you know?
2    A.   I'm not sure who compiled it.
3    Q.   But the information you provided
4    specifically related to the line we see there,
5    Missouri HP Direct?
6    A.   Yes.
7    Q.   Okay.  Now, after you sent those on
8    apparently would then be put in this form and resent
9    back to you in a final form?
10   A.   Uh-huh, yes.
11   Q.   Because you're one of the individuals
12   listed there amongst others that received the
13   complete matrix?
14   A.   Yes.
15   Q.   Okay.  Would you receive these on a daily
16   basis?
17   A.   Yes.
18   Q.   Okay.  Now, you said you compiled this
19   information based on numbers that were sent to you
20   from -- or tied to you from Missouri HP Direct?
21   A.   Yes.
22   Q.   Okay.  Would the folks from MITG send
23   those to you on a daily basis?
24   A.   Yes.
25   Q.   Okay.  For instance, I just want to go

29 (Pages 110 to 113)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 114

1  over this, on March 12 of '03, apparently
2  Missouri HP Direct was offered 387 calls?
3      A.  Yes.
4      Q.  Okay.  Of that it says handle rate
5  99 percent, does that mean of the 387 calls that
6  were forwarded to them they were able to handle
7  99 percent of them?
8      A.  Yes.
9      Q.  Then it says service level was the next
10  column, which apparently means how many of the calls
11  are you answering within 180 seconds?
12      A.  Yes.
13      Q.  Okay.  So of the 99 percent calls that
14  they took of the 387, they were able to answer
15  99 percent of them within 180 seconds?
16      A.  Yes.
17      Q.  Okay.  And then MTVSL, does that column
18  reflect the month-to-date service levels?
19      A.  Yes.
20      Q.  Okay.  So apparently as of March 12, 2003,
21  Missouri HP Direct was operating at a 99 percent
22  service level for the month; is that correct?
23      A.  Yes.
24      Q.  Okay.  Now, those other call centers,
25  Roseville PDO, do you know what that is?

Page 115

1      A.  Yes.
2      Q.  What is it?
3      A.  It's a Roseville Parts Direct Operations.
4      Q.  Okay.  Were they taking any HP Direct
5  calls, do you know?
6      A.  There's a difference.
7      Q.  Okay.  Tell me.
8      A.  Roseville -- the Roseville PDO was -- I'm
9  going to use this word again, was legacy, which was
10  legacy HP, so prior to the merger, they had their
11  own spare parts operations for HP parts only.
12      Q.  Okay.  So that's what Roseville PDO means?
13      A.  Yes.
14      Q.  So that was the Roseville spare parts for
15  HP that existed prior to the merger?
16      A.  Yes.
17      Q.  Okay.  What's Roseville espares?
18      A.  Espares is the espares -- espares would be
19  the Compaq parts web site group.  That's what --
20  espares is the Compaq side.
21      Q.  Was that Chip Love's group?
22      A.  Part of, yes.
23      Q.  Okay.  Well, the orders that Chip Love's
24  group took, would that be about part of the calls
25  offered under Roseville espares?

Page 116

1      A.  According to this, yes.
2      Q.  Okay.  Because then it says Roseville SOM,
3  what does that mean?
4      A.  Don't recall.
5      Q.  Okay.  Then the next line is MITG?
6      A.  Yes.
7      Q.  Okay.  Now, down at the bottom there do
8  you see where it says orders?
9      A.  Yes.
10      Q.  Okay.  Roseville PL91, which is CC and
11  EPDO, do you know what that means or refers to?
12      A.  I don't know what PO91 means.
13      Q.  Okay.  And then there is Roseville,
14  backslash, Andover, do you see that?
15      A.  Yes.
16      Q.  Okay.  So that's the Andover call site
17  we've referred to and spoke about earlier?
18      A.  I'm assuming, yes.
19      Q.  Well, do you know of any other Andovers?
20      A.  No.
21      Q.  Okay.  And apparently as of March 12,
22  2003, that call center had taken total daily orders
23  of 322, is that what that says?
24      A.  Yes.
25      Q.  Okay, then it says K dollars, does that

Page 117

1  mean thousands of dollars?
2      A.  I don't know what the answer to that is.
3      Q.  Then it says MTD dollars, does that stand
4  for month-to-date dollars?
5      A.  I really don't know exactly, because if
6  you look at those dollar amounts they don't look
7  like month-to-date numbers.
8      Q.  Okay.
9      A.  So I don't know what -- what -- you know,
10  looking at this right now today, I don't recall
11  exactly what that was saying.
12      Q.  Well, if you look at the next line it says
13  Missouri, do you agree that that's MITG?
14      A.  Yeah, following everything above, yes.
15      Q.  And then it says total 111, under the
16  total, under K dollars it says 23 and has a dollar
17  sign, and then month-to-date says 180, do you see
18  that?
19      A.  Yes.
20      Q.  Were you responsible for putting that --
21  those numbers together to send on for the matrix?
22      A.  Those specific numbers, no, I mean, I gave
23  them -- I gave them -- what I provided was a -- was
24  the number of orders and then the total revenue for
25  each day.

30 (Pages 114 to 117)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 118

1    Q.   Okay.  Do you know who provided those
2   numbers that are there?
3    A.   Those numbers were done by somebody -- you
4   know, somebody, you know, behind in the scene --
5   behind the scenes to the folks I sent it to.
6    Q.   Which was the Vicki Ngo?
7    A.   Yep.
8    Q.   Now, this document also has an MITG 58 as
9   the matrix dated July 28th, 2003, do you see that?
10    A.   Yes.
11    Q.   Okay.  You are still the individual listed
12   on the second page that is providing matrix for the
13   PBCOs?
14    A.   Yes, I see that.
15    Q.   Okay.  And the reason I ask that is
16   because if you flip to MITG 60, as of December 1,
17   '03, your name is no longer on the second page as
18   someone who is providing that matrix?
19    A.   Right, because I left or I was
20   transitioned to another job function, so even on the
21   previous one you showed me, my name was on there but
22   Shari Ellis was actually providing the report.
23    Q.   When were you transitioned?
24    A.   I was transitioned out in the --
25   probably -- well, you know, transitioned -- well,

Page 119

1   I'll just say October time frame is when I finally
2   probably started getting everything handed off to
3   Shari from a day-to-day perspective.
4    Q.   October of '03?
5    A.   Yes.
6    Q.   So after October '03 were you involved
7   anymore in the MITG side of --
8    A.   I was involved only in the sense of I
9   received communications, you know, from MITG.  I was
10   told to step away from the program, so I -- you
11   know, I did as I was instructed.
12    Q.   Who gave you that?
13    A.   My boss at the time, Sheryl Williams.
14    Q.   Okay.  Now, if you put side by side
15   MITG 60 with MITG 62, I know you said you were
16   transitioned out, but do you have any knowledge as
17   to how those matrices were reconfigured to read as
18   they do on July 14 of '04, where now we just have
19   U.S. Houston, U.S. Roseville, U.S. Hannibal and then
20   Canada Toronto?
21    A.   No.
22    Q.   Okay.  Was Ms. Ellis, who is listed as the
23   matrix provider, involved in that -- the Missouri
24   side of things?
25    A.   Yes.

Page 120

1    Q.   When you were involved in the
2   MITG program, how did the merger affect the
3   Compaq Direct spare parts program?
4    MS. CARROLL:  Objection:  Overbroad.
5   BY MR. HANSEN:
6    Q.   You can still answer the question.
7    A.   It is kind of hard for me to answer that
8   question.  Like she says, it's pretty broad how it
9   affected it.
10    Q.   Did the newly merged company have a single
11   sourcing strategy for HP Compaq parts?
12    A.   No.
13    Q.   What were you -- were you informed that
14   after the merger the MITG side of things was going
15   to be eliminated?
16    A.   No.
17    Q.   Okay.  When was the merger, May of '02?
18    A.   I don't recall to be honest.  I should
19   know that, but I don't recall exactly when the exact
20   merger date was.
21    Q.   Okay.  What was the strategy then for
22   sourcing of spare parts after the merger?
23    A.   Strategy for my program?
24    Q.   Yeah.
25    A.   My program was to continue to operate to

Page 121

1   procure third-party and Compaq parts for direct
2   customers.  The company was still kind of operating
3   in two ways, so our focus was still what our
4   original charter was, which was the third-party and
5   the Compaq parts.
6    Q.   So you said you were operating in two
7   ways, what was the other way?
8    A.   Well, I meant the company was still
9   operating as what we referred to as red and blue,
10   Compaq and HP.
11    Q.   Were you made aware of HP's plans to
12   eliminate the Compaq Direct program and MITG's
13   contract?
14    MS. CARROLL:  Objection:  Vague.
15    THE WITNESS:  I was aware when they
16   sent -- when they decided to send the letter.
17   BY MR. HANSEN:
18    Q.   Well, what is your understanding as to the
19   way in which after the merger HP was going to handle
20   the third-party parts business that had been handled
21   by your program at MITG; was it going to be
22   integrated to HP, were they going to eliminate it
23   altogether?
24    A.   Can you ask me one more time so I can hear
25   the first part of the question.

31 (Pages 118 to 121)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 122

1    Q.   After the merger --
2    A.   Okay.
3    Q.   -- were you made aware of the strategy by
4  HP to integrate the third-party parts business or
5  were they going to eliminate it altogether?
6    A.   Well, obviously there were several
7  discussions that were had.  One was to look at do
8  they keep it, and one was to look at, you know, if
9  they did, how they would do that.
10       That was the discussions obviously, the
11  final -- the final answer to that was they decided
12  it wasn't something that they wanted to do any
13  longer.
14   Q.   Okay.  Were you involved in discussions
15  regarding keeping the Compaq Direct program as an
16  option?
17   A.   I was involved in some discussions, yes.
18   Q.   Were you there end user issues that you felt
19  the Compaq Direct program offered that the HP
20  solution did not?
21   A.   Yes.
22   Q.   Okay.  What were they?
23   A.   Well, single invoicing, allowing the
24  customer to have a single invoice for not only their
25  spare parts but also for their new computer

Page 123

1  products; the ability to be able to work off of POs
2  versus credit card, and then the ability to set up
3  new accounts for new direct customers if they
4  weren't already a net terms customer with HP.
5    Q.   Okay.  Were you involved in addressing
6  these with considering the Compaq Direct an option
7  going forward?
8    A.   I wasn't part of those -- the final
9  conversations other than, you know, I was invited to
10  a couple of calls, but it wasn't my decision.
11   Q.   All right.  I never said it was.
12   A.   Okay.
13   Q.   I just want to know.
14   A.   Okay.
15   Q.   Were you involved in addressing some of
16  the end users' issues that Compaq Direct program
17  offered that HP did not?
18   A.   Yes.
19   Q.   Okay.  And what was that process, how were
20  they addressed?
21   A.   We addressed those through meetings with
22  Louise Meyerfeld laying out, you know, what the
23  program offered today and, you know, what some of
24  the benefits were.
25   Q.   Do you recall if that was before or after

Page 124

1  you were transitioned in October?
2    A.   It was before.
3    Q.   Do you recall who else was involved in the
4  process?
5    A.   Louise was the main point of contact.
6    Q.   Was Bill Crowley involved?
7    A.   Bill Crowley was -- I believe was over --
8  you know, over Louise, so Bill was the -- I think
9  Bill was the final decision maker for the most part.
10   Q.   Who from the Omaha end was involved?
11   A.   I'm not sure if anybody from the Omaha end
12  involved in the decision.
13   Q.   I meant in this communication of the
14  process and contacts with Louise.
15   A.   Shari Ellis obviously was involved.
16   Q.   Okay.  Was there discussions regarding the
17  end user issues that the Compaq Direct program
18  offered that HP did not as far as the potential
19  effect on the customers?
20   A.   Yes, there was several meetings and
21  conference calls to talk about it.
22   Q.   What do you recall was the discussion as
23  far as the effect it could have on customers and
24  their satisfaction levels?
25   A.   Obviously there was concern, you know,

Page 125

1  there was concern around making sure that we did --
2  that we had the least amount of customer effect as
3  possible, trying to make sure that the customer
4  experience remained the same.
5    Q.   Okay.  Before I get too far, let me ask
6  you a couple more questions.
7        Was there any discussion or any comments
8  that MITG had poor performance or poor customer
9  satisfaction?
10   A.   No.
11   Q.   You said your role with the direct program
12  changed in October of '03 roughly?
13   A.   Yes.
14   Q.   Okay.  And you were -- why were you
15  removed from the program?
16   A.   I was -- I took -- I had taken on a new
17  responsibility in the services organization.
18   Q.   Shari Ellis had been -- you and her were
19  with Inacom and then with CEI; were you always in
20  the same division, you two?
21   A.   Shari Ellis and I had past experiences
22  with each other, yes, we weren't -- at one point we
23  worked together at Inacom, then I moved on and did
24  some other things, so we worked with each other at
25  times in the -- in my Inacom career.

32 (Pages 122 to 125)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 126

1    Q.  Well, when you guys were at Compaq were
2    you guys on the same level, did you report to her,
3    did she report to you?
4    A.  She reported to me.
5    Q.  She did, okay.  After you left and were
6    transitioned who became the owner of
7    the MITG relationship?
8    A.  Well, I would say two people.  Shari Ellis
9    was the day-to-day operations person and she always
10   was.  The person who kind of took my duties on was a
11   gentleman by the name of Charlie Boyle.
12   Q.  So is he based out of New Jersey?
13   A.  Uh-huh.
14   Q.  Is that a yes?
15   A.  Yes.
16   Q.  Do you know, is he Compaq or was he HP and
17   then came along with the merger?
18   A.  He was HP.
19   Q.  Okay.  So Shari Ellis had day-to-day
20   operations, and was Charlie Boyle someone Shari
21   reported to?
22   A.  No, actually Charlie -- when we -- when
23   they transitioned my team originally to the
24   Compaq Services organization, we transitioned and
25   once I left Shari became -- actually ended up

Page 127

1    reporting to my old boss, Sheryl, so they were
2    peers, her and Charlie were peers.
3    Q.  Okay.  I guess if one of them responsible
4    for the MITG relationship, is that Charlie?
5    A.  That would be Charlie.
6    Q.  Did you have conversations with these
7    people, Shari and Charlie, regarding MITG and
8    whether or not to keep the program or get rid of it?
9    A.  Well, the only conversations I had with
10   Charlie was I just gave him my input of how I
11   thought MITG had performed in the past.
12   Q.  And what was that, how did MITG perform in
13   the past?
14   A.  Very well, I thought they'd always done a
15   good job and customer satisfaction was always good,
16   good partner.
17   Q.  Okay.  I'm going to show you a document
18   and mark it, I guess we're on AA.
19          (Exhibit AA marked for
20          identification.)
21   BY MR. HANSEN:
22   Q.  This is a two-page document marked
23   HP 1277 and 1278, at the bottom is where I'll begin.
24   It's an e-mail from Charlie Boyle to some
25   individuals and you're cc'd on the e-mail dated

Page 128

1    December 15, 2003; is that correct?
2    A.  Yes.
3    Q.  Okay.  Read that e-mail from Mr. Boyle if
4    you would?
5    A.  Okay.
6    Q.  On the second page apparently Mr. Boyle
7    actually -- strike that.
8          Let's go to 1277 at the bottom, Mr. Boyle
9    is indicating that he had been asked to help with
10   the HP Direct MITG transition to the new business
11   model, do you see that?
12   A.  Uh-huh.
13   Q.  And he indicates -- was that a yes?
14   A.  Yes.
15   Q.  Okay.  And he states, our HP contract with
16   MITG is not being renewed and the expiration date.
17          Flip over to the second page then.
18   A.  (Witness complies.)
19   Q.  Middle paragraph says, what can go wrong
20   typically does, and I have this vision of an
21   HP freight train -- actually it says HP freight
22   training, I think it should be train, barreling down
23   on a stalled commuter bus filled with HP customers
24   who benefitted from this program.  As such I'd like
25   to get together prior to the holidays, take stock of

Page 129

1    exactly where we are, where we are going and decide
2    upon any actions needed to help our customers, if
3    any.  Did I read that correctly?
4    A.  Yes.
5    Q.  Okay.  Did you have communications with
6    Mr. Boyle regarding the impact that the termination
7    of MITG would have on HP customers?
8    A.  Obviously in previous conversations, as I
9    answered before, I told Charlie, you know, what
10   the -- what I thought that the program brought to
11   the table, and obviously with Shari's help, we laid
12   out what -- what the benefits that we -- that were
13   there today from a program perspective.
14   Q.  Okay.  Now, I guess what was
15   Mr. Boyle--through any communications you had with
16   him around this time--asking to take stock of where
17   exactly we are, where we are going and decide upon
18   any action if, in fact, at this time MITG, the
19   contract had already been terminated?
20   A.  Well, there was -- there was obviously
21   discussions around what they -- what they were going
22   to do with the third-party piece.  That was an open
23   item.
24   Q.  Okay.  The third-party piece that MITG had
25   been providing, now that that agreement had been

33 (Pages 126 to 129)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 130

1   terminated, what was going to happen to it?
2       A.   Yes.
3       Q.   Okay.  Obviously Mr. Boyle had some
4   concerns about that, would you agree?
5       A.   Yes.
6       Q.   Okay.  Did you share those same concerns
7   with him?
8       A.   Not at the time because, you know, prior
9   to that as I transitioned this responsibility over
10  to him, I obviously gave him a good dump of what I
11  thought and what the program brought to the table,
12  and he's obviously looking at things through his
13  eyes.
14      Q.   Okay.  And if you then flip back to the
15  first page of that exhibit, you then have some
16  communication with Ms. Ellis, do you see that in the
17  middle?
18      A.   Yes.
19      Q.   She sends you an e-mail dated Tuesday,
20  December 16 of '03?
21      A.   Yes.
22      Q.   Okay.  Apparently Mr. Boyle had left her
23  off that string, but you then replied, I thought he
24  laid it out, do you see that?
25      A.   Uh-huh, yes.

Page 131

1       Q.   Okay.  Now, are you referring to the
2   comment regarding the freight train barreling down
3   on the commuter bus?
4       A.   Yes.
5       Q.   And Ms. Ellis then responds, and in the
6   very last sentence says, the e-mail from Charlie
7   must have lit a fire, did you have any further
8   conversations with her as to what she was referring
9   to about that?
10      A.   What she was talking about there --
11  because I obviously would periodically touch base
12  with folks just to see how things were going because
13  the program was something I built, so in some sense
14  that was important, but regardless I think what they
15  were speaking of there is what to do with all those
16  accounts that the old program was doing business
17  with.
18      Q.   Okay.  You're referring to the
19  transitioning of accounts setup process beginning
20  January 5th she refers to in that mail?
21      A.   Yes.
22      MR. HANSEN:  Okay.  I guess this is as
23  good a time to break here for lunch if you want.
24           (12:00 - 1:05 p.m. - Recess.)
25      MR. HANSEN:  Back on the record here.

Page 132

1   BY MR. HANSEN:
2       Q.   We just finished up with Exhibit AA, and
3   if I recall we were talking about some various
4   communications that you were involved in regarding
5   the MITG decision even after you were transitioned
6   off of your job?
7       A.   My old role.
8       Q.   Yeah, in October of '03, so let me hand
9   you what I'm going to mark as -- we're up to BB.
10          (Exhibit BB marked for
11          identification.)
12  BY MR. HANSEN:
13      Q.   It's three pages produced by
14  Hewlett-Packard in this case, HP 1301, 1302 and
15  1303.
16          To kind of speed this along on
17  Page 1303 you can just disregard, there's nothing on
18  there but an e-mail signature block, so on 1302 it
19  appears this is an e-mail from Teresa Koch at the
20  bottom dated February, October 31, 2003, indicating
21  they had just received the -- they being MITG, the
22  termination letter from Kristin Triolo, T-R-I-O-L-O,
23  and wanted your opinion.
24          You respond with what does it say, I know
25  they wanted to move to an HP agreement versus an

Page 133

1   MITG agreement, and then on the top of Page 1302,
2   Ms. Cook basically just tells you what the
3   termination letter said.
4           What I want to get to is what is on the
5   bottom of Page 1301.
6           It's an e-mail from a lady named Dianne
7   Knipe, K-N-I-P-E?
8       A.   Knipe.
9       Q.   Knipe, sorry, dated Friday October 31,
10  2003, to a Cecelia --
11      A.   Vellier.
12      Q.   Okay.  V-E-L-L-I-E-R and Ms. Triolo on
13  which you were cc'd, correct?
14      A.   Yes, according to this, yes.
15      Q.   Okay.  Well, do you have any reason to
16  disagree that you were?
17      A.   Yes, I just don't remember this specific
18  one when it came through, but that's fine.
19      Q.   Who is Ms. Knipe?
20      A.   Dianne Knipe is the integrated support
21  manager for the Americas.
22      Q.   Okay.  And who is Ms. Vellier?
23      A.   She's a procurement person, resell
24  procurement or services of procurement person, she
25  works for Kristin.

34 (Pages 130 to 133)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 134

1    Q.   Ms. Triolo?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   Yes.
5    Q.   Okay.  The other people on here I just
6  want to find out who they are:  Mike Holubar,
7  H-O-L-U-B-A-R?
8    A.   He's a worldwide person for integrated
9  support.
10   Q.   Okay.  And Kathy McCurdy, M-C-C-U-R-D-Y?
11   A.   She heads up procurement for the Americas.
12   Q.   Okay.  It says -- and Ms. Knipe says this
13  Cecelia and Kristin, what is this all about,
14  question mark.  This does not line up with the
15  actions regarding MITG from our call yesterday.
16  Were you a participant in that call?
17   A.   In that specific call I was not.
18   Q.   Okay.  It says this memo is making the
19  rounds rapidly.  I've received multiple copies from
20  different sources in the past few hours.  We need an
21  explanation/clarification ASAP, do you know what was
22  making the rounds?
23   A.   I have no idea.
24   Q.   Okay.
25   A.   I haven't seen anything to what they

Page 135

1  were --
2    Q.   I don't either, that's why I asked.  I
3  don't see anything attached or what they were
4  referring to.
5         Did you have any discussions with either
6  Ms. Knipe, Vallier or Triolo in or around the time
7  in which you were cc'd on this e-mail at the bottom
8  of HP 1301 to find out what she was talking about
9  regarding the actions and the call?
10   A.   Well, Kristin was the one to my knowledge
11  that delivered the termination letter.
12   Q.   Okay.
13   A.   The only discussions that we -- that I
14  would have had with Kristin and Dianne would have
15  been with regards to supporting current customers
16  that were now integrated support customers that may
17  have been using some of MITG's third-party parts
18  services.
19   Q.   Okay.  Ms. Knipe as the integrated -- as
20  an integrated support manager for the Americas, was
21  she then the person who the accounts, when they were
22  transitioned over to HP after MITG was terminated,
23  they fall under her realm, if you know?
24   A.   No, I believe what all of this is meaning
25  that one of the things that, you know, MITG did do,

Page 136

1  you know, the third-party parts piece.  There were
2  certain HP services accounts from my previous
3  discussion where I talked about the service dispatch
4  coordination business --
5    Q.   Right.
6    A.   -- they had engaged -- that part of the
7  program was also engaged by the services
8  organization, and they used it for certain customers
9  like Intel Corp., and others.  In those cases MITG
10  was providing in a sense incident-by-incident spare
11  parts.  That's what it was.
12   Q.   Okay.
13   A.   That's the only thing it could have been
14  to have these people involved.
15   Q.   Okay.  And if you again go to the e-mail
16  above that one dated Monday, November 3, '03, do you
17  see that?
18   A.   Yes.
19   Q.   Okay.  Apparently Ms. Vallier responds to
20  Ms. Knipe, again you're cc'd on the e-mail.  The
21  second sentence says, my action with regard to
22  Nortel were under the assumption we were putting a
23  contract in place with MITG.  Did you have any
24  follow-up with any of these individuals to determine
25  what she was referring to?

Page 137

1    A.   Well, I know exactly what she was
2  referring to, to Nortel, which was MITG was helping
3  provide third-party parts for their -- for the Sun
4  equipment for Nortel for a service contract.
5    Q.   That was a service contract between Nortel
6  and HP?
7    A.   Yes.
8    Q.   And you said it was for Sun parts?
9    A.   They were for Sun parts, yep.
10   Q.   Nortel had the contract with HP, and this
11  is one of the incidents where HP may engage MITG on
12  a case-by-case basis to provide some parts to
13  Nortel --
14   A.   Right.
15   Q.   -- which was a contract they had?
16   A.   Yes.
17   Q.   Okay.  Did you ever ask her what actions
18  those were she was referring to with regard to
19  Nortel that she said were under the assumption?
20   A.   Was that MITG would continue to provide
21  the parts that they were providing for that
22  contract.
23   Q.   Okay.  Then the -- well, strike that.
24        Are you aware what has happened with the
25  supplying of parts to various companies that are

35 (Pages 134 to 137)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 138

1  under contract with HP that MITG had been servicing
2  previously?
3      A.  They -- you're asking me what they -- who
4  else we used or did --
5      Q.  No, I'm asking what's going on now for
6  instance.
7      A.  Today you mean?
8      Q.  Yeah.
9      A.  They found -- they're probably using
10  providers that they found on their own.
11      Q.  Okay.  They being Nortel?
12      A.  Procurement, services procurement.
13      Q.  From HP?
14      A.  Uh-huh.
15      Q.  Is that a yes?
16      A.  Yes.
17      Q.  Okay.  Are you aware that HP CSRs, the
18  customer services reps, still refer various entities
19  to MITG to fill orders and quotes?
20      A.  I'm not directly aware, but I've heard it
21  through other people.  I haven't seen anything
22  direct to me.
23      Q.  So you haven't reviewed any documents
24  showing that in any of the e-mails that have been
25  produced in this case?

Page 139

1      A.  I haven't for this case, no.
2      Q.  So you wouldn't know whether or not those
3  are the same type of arrangements we're talking
4  about filling orders for Nortel for Sun parts
5  under --
6      A.  I would have no idea.  I've only heard
7  hearsay.
8      Q.  Okay.  Now, the top e-mail on Exhibit BB,
9  dated November 3, 2003, you were copied on that as
10  well, correct?
11      A.  Yes.
12      Q.  Okay.  Is that an e-mail from Ms. Triolo
13  back to these other two ladies that she was
14  corresponding with?
15      A.  Yes.
16      Q.  Okay.  And the e-mail indicates that
17  Ms. Triolo was on a team with Bill Crowley, Sheryl
18  Williams, Shari Ellis and Louise Meyerfeld in which
19  we decided along with legal that HP needed to cancel
20  the current agreement with MITG.
21          Do you see what I just read?
22      A.  Yes.
23      Q.  Were you part of that team and discussion?
24      A.  I wasn't part of that specific discussion,
25  no.

Page 140

1      Q.  Okay.  It says that agreement puts HP in
2  an unfavorable position and we need to get out of
3  that contract, do you see that?
4      A.  Yes.
5      Q.  Okay.  And apparently Bill, meaning Bill
6  Crowley, will be having follow-up conversations with
7  MITG regarding our future, do you see that?
8      A.  Yes.
9      Q.  Did you have any discussions after getting
10  this e-mail with anyone regarding the statement
11  about the agreement putting HP in an unfavorable
12  position?
13      A.  I'm not sure what that means and no one
14  ever -- it was never defined to me what that meant.
15      Q.  Okay.  And then Mr. Crowley was going to
16  be having follow-up conversations with MITG
17  regarding the future, do you see that?
18      A.  Yes.
19      Q.  Did Mr. Crowley ever consult you for any
20  of your thoughts on whether or not MITG was an
21  option going forward?
22      A.  The answer to that is yes.  It was prior
23  to any letter being sent out, but, yes, they asked
24  me -- they asked me to give them an overview and my
25  opinion and things of that nature around, you know,

Page 141

1  MITG's performance, which, you know, I said had been
2  positive.
3      Q.  We talked about that earlier?
4      A.  Uh-huh.
5      Q.  You indicated that was before the
6  termination letter went out.  My question though now
7  is specifically after that letter went out, which is
8  this e-mail of Monday, November 3, 2003 is after
9  that occurred, did Mr. Crowley or anyone consult you
10  further regarding your position or thoughts on MITG
11  as a future option?
12      A.  No.
13      Q.  Okay.
14      A.  Not directly.
15      Q.  Okay.  Well, how about indirect contact?
16      A.  Well, when I said -- the reason I said
17  that was I was asked to sit in on one conference
18  call after this went -- all happened around the
19  third-party pieces, but I was never asked to do any
20  of the action items or anything of that nature.  I
21  was just basically listening in on the call.  I
22  listened in but I didn't have any input on that
23  specific call.
24      Q.  Do you recall when that took place
25  time framewise November, December '03?

36 (Pages 138 to 141)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 142

1    A.  I think it was December.
2    Q.  Okay.  Who was on the call?
3    A.  Well, obviously Bill Crowley, I believe
4  Shari, Charlie Boyle, a guy by the name of Bill
5  Ebanks.  I think he was a third-party guy.  I
6  believe Chuck Schmaderer was on that call,
7  Pete Graziano, and after that I'd be guessing.  I
8  remember those guys being on the call because I had
9  worked with them so many times in the past.
10    Q.  Was Mr. Crowley on the call?
11    A.  Yeah, he was leading the call.
12    Q.  What was discussed?
13    A.  Just what the options were to handle
14  third-party going forward.
15    Q.  Did Mr. Crowley ever indicate to you that
16  he wanted to go forward with MITG as a third-party
17  option, or did he indicate he did not?
18    A.  He was -- he had not made a decision at
19  that point.
20    Q.  Did he indicate in the call whether he was
21  leaning one way or the other?
22    A.  He said he thought that it was something
23  that they should look at, but they weren't -- they
24  weren't sure if it was something that they really
25  wanted to continue to do.

Page 143

1    Q.  Okay.  And did anyone else speak on this
2  call?
3    A.  You know, I don't recall exactly everybody
4  that spoke on that call.  I mean, obviously there's
5  people from Direct like Bill Ebanks that made some
6  statements around their specific needs, but I can't
7  remember every person that spoke up other than Bill
8  was leading the call.
9    Q.  Bill Crowley?
10    A.  Yes.
11    Q.  Was there any decision made when this call
12  ended?
13    A.  No, I remember the call just being kind of
14  an open discussion and then Bill was going to -- if
15  I remember correctly, Bill was going to have some
16  conversation with MITG and then make his decision on
17  how he was going to move on the third-party.
18          (Exhibit CC marked for
19          identification.)
20  BY MR. HANSEN:
21    Q.  Handing you what's been marked as
22  Exhibit CC, Documents HP 42 and 43.
23    A.  Do you want me to read the second page
24  too?
25    Q.  You probably need to read the e-mail

Page 144

1  that's on the bottom of 42 up to 43 because you're
2  an individual that that was sent to.
3    A.  Okay.
4    Q.  Okay.  Do you recall getting the e-mail at
5  the bottom of HP 42 from Ms. Krakauer?
6    A.  Yes.
7    Q.  Okay.  That was sent to you the day after
8  she received a formal letter from Ron Haught,
9  correct?
10    A.  Yes.
11    Q.  Okay.  And she asked you and Randy to take
12  the lead working with the rest of the addressees on
13  the e-mail, to look into the situation and come back
14  with an action plan for the company response to the
15  contact, correct?
16    A.  Yes.
17    Q.  Is Randy Randy Wagner?
18    A.  Yes.
19    Q.  Okay.  You then responded a couple hours
20  later to Ms. Krakauer with the e-mail that is
21  contained on the top of Page HP 42; is that correct?
22    A.  Yes.
23    Q.  Okay.  And you -- in the first paragraph
24  do you tell her kind of how the program was
25  originally developed?

Page 145

1    A.  Yes.
2    Q.  Okay.  You indicated it was developed
3  under the Custom-Edge Compaq Direct organization
4  under your direction in 1999 to support -- you list
5  PSG Direct, what is that?
6    A.  PSG is what we referred to as
7  Compaq Direct or HP Direct, whichever name you want
8  to call it.  It's part of the PSG organization,
9  which is a personal systems group; i.e., desktop,
10  laptop group, so Direct is at this time in this
11  e-mail and today is part of what they call the
12  PSG group.
13    Q.  Okay.  And it was developed to support
14  multivendor spare part requests of customers?
15    A.  Yes.
16    Q.  Then you state, MITG continued to support
17  both pipelines after the merger took place, what do
18  you mean by both pipelines, HP and Compaq?
19    A.  A third-party and Compaq.
20    Q.  Okay.  And just so we're clear,
21  third-party is that situation such as the Nortel
22  example we discussed where it may be called to buy
23  third-party parts for an entity that has a contract
24  with HP?
25    A.  Yes.

37 (Pages 142 to 145)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 146

1    Q.  And then Compaq itself was the
2  Compaq Direct side, the -- when you said service
3  Compaq and third-party?
4    A.  Well --
5    Q.  Direct orders through Compaq?
6    A.  Right.
7    Q.  Okay.  Now, the second paragraph you
8  indicate that in January of 2003 HP Direct and
9  HP CS -- is that customer services?
10    A.  Yes.
11    Q.  Okay. -- began discussions on the
12  transition of the spares program, which is the web
13  tool that we've been talking?
14    A.  Both programs, right.
15    Q.  And the third-party multivendor support to
16  HP CS.  Now, this next line says a decision was made
17  to transition the existing programs to HP CS led by
18  Jim Dupree, who he is?
19    A.  Jim Dupree was my boss's boss, Sheryl
20  Williams' boss.
21    Q.  Okay.  And then you list and Sheryl
22  Williams.
23        You then indicate that, in fact, the
24  resources were moved to customer services but the
25  program business remained in HP Direct.  You then

Page 147

1  indicate you transferred to customer services in the
2  February/March time frame, began focussing my time
3  on -- what is IS business development?
4    A.  What I do today.
5    Q.  Okay.  All right.  You then indicate in
6  the third paragraph over the last year that you had
7  provided education to the Channels organization, on
8  the history of the unique program and benefits
9  offered to direct customers?
10    A.  Uh-huh.
11    Q.  Why were you educating the Channels
12  organization?
13    A.  Because in the Compaq world the Channels
14  organization owns spare parts.
15    Q.  Okay.  How about in the HP world, who
16  owns --
17    A.  I'm not sure to be honest in the HP world
18  how it was -- how it was done that way.
19    Q.  Okay.  Skipping down a little bit you say
20  one of the biggest issues around this relationship
21  with MITG is the lack of communication on direction
22  over the last six months.
23        Is that internal communication, external
24  to MITG or both?
25    A.  To be honest, I would say both.

Page 148

1    Q.  Okay.  What did you feel were the issues
2  regarding the lack of communication?
3    A.  Well, I don't -- I was not -- I think --
4  well, the lack of communication now that, you know,
5  was really communicating to me what the plans were
6  of the program, and then actually having the reverse
7  happen to the program.
8        That's really what I meant when I wrote
9  this was, you know, I was told when I agreed with my
10  team to move over to the organization that I
11  would -- part of my -- part of my reasoning was I
12  don't have a problem moving over to the organization
13  in the programs as long as you don't break my
14  programs down and break them apart, and the
15  agreement was, no, we're going to grow these
16  programs.
17        So that's what I was really meaning by
18  that communication.  I didn't feel the
19  communications were solid from beginning to end
20  around, you know, the whole program in regards to
21  MITG and other programs that I managed.
22    Q.  So you made the switch to the new job
23  within your organization, is that what you're
24  talking about when you say when you moved over?
25    A.  Technically what that means is when I

Page 149

1  moved over and that would include myself and Shari
2  and Lisa and Richard, was physically moving our head
3  count from HP Direct to Compaq Services.  That's
4  what that means.
5    Q.  Okay.  And you said that you did that
6  under the impression that they were not going to
7  break apart the programs that you had grown and
8  previously managed?
9    A.  Yes.
10    Q.  Okay.  So do you feel that those
11  communications to yourself with MITG were then
12  inconsistent with what had been represented to you
13  as far as that the programs were going to grow?
14    A.  Yes.
15    Q.  Okay.  Because in actuality they were
16  terminated?
17    A.  Yes.
18    Q.  Okay.  Did you feel there was a
19  communication -- lack of communication to MITG as
20  well as to what was going to happen with the
21  program?
22    A.  I thought it could have been handled
23  better, yes.
24    Q.  Okay.  And as of October '03, I think you
25  said you were removed from that process entirely; is

38 (Pages 146 to 149)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 150

1  that correct?
2      A.  From the decision process, yes.
3      Q.  Well, communication at all?
4      A.  From communication, I was supposed to back
5  off my communication.
6      Q.  With MITG?
7      A.  Yes.
8      Q.  Did someone specifically instruct you to
9  back off your communications with MITG?
10     A.  Yes.
11     Q.  Who?
12     A.  Sheryl Williams.
13     Q.  Okay.  I guess did she have some sort of
14  problem --
15     A.  She said --
16     Q.  -- with your communication?
17     A.  She said that I was -- in a sense her
18  feeling is MITG would come back to me versus coming
19  back to the people they should be talking to, so she
20  wanted to take me out of the middle of the -- of the
21  process.
22     Q.  So --
23     A.  Because technically I wasn't --
24  technically wasn't supposed to be responsible for
25  the program anymore anyways, so me communicating

Page 151

1  with MITG didn't help what they were trying to get
2  done.
3      Q.  Meaning Sheryl Williams and other people?
4      A.  And the people that were on that team.
5      Q.  Okay.  Your next statement is HP is MITG's
6  biggest customer, 65 percent of their current
7  business, and they're concerned about the program's
8  future thus their future.
9          After sending this letter on to
10  Ms. Krakauer did you receive any further follow-up
11  to your e-mail from her?
12     A.  No, because I -- I sat in on a conference
13  call with M.L. and Randy and other team members to
14  discuss this whole issue.
15     Q.  I've deposed Mr. Wagner and Mr. Crowley,
16  and apparently since you had been transitioned off,
17  the decision was made by Mr. Wagner that Mr. Crowley
18  was going to be the point person for this?
19     A.  Yes.
20     Q.  And at this point in time when that
21  decision was made that Mr. Wagner and Mr. Crowley
22  have testified to, you were removed from the
23  equation as far as any response to the letter to
24  MITG follow up with MITG or anything in that regard?
25     A.  Yes.

Page 152

1          (Exhibit DD marked for
2          identification.)
3  BY MR. HANSEN:
4      Q.  I'm going to hand you what's been marked
5  as Exhibit DD, which is HP Documents 1236, 1237, and
6  1238.
7          And for the record, you do not need to
8  look at 1238.  I included it just so the item there
9  on the top would not be cut off, but there's really
10  only two pages of the text.
11         Okay.  On HP 1237 there is an e-mail at
12  the top from Carly Fiorina, who do you understand to
13  be the CEO of Hewlett-Packard?
14     A.  Yes.
15     Q.  Okay.  Dated Thursday, January 15 of 2004,
16  to Ms. M.L. Krakauer, Bill Crowley, and carbon
17  copied to Charlie Boyle and yourself; is that
18  correct?
19     A.  Yes.
20     Q.  Okay.  Now, I said it was an e-mail from
21  Ms. Fiorina, but actually it says from her.  It's
22  apparently from the -- her executive assistant, Jane
23  Ector, E-C-T-O-R, do you see that?
24     A.  Yes.
25     Q.  Okay.  Now, this asks I guess Bill and

Page 153

1  M.L., Charlie or yourself to respond on
2  Ms. Fiorina's behalf, or if you feel that it's
3  necessary to get her involved, draft a response for
4  her to send directly to Mr. Haught, do you see that?
5      A.  Yes.
6      Q.  Okay.  Did you review -- strike that.
7          Did you prepare any response on behalf of
8  Ms. Fiorina?
9      A.  I did not in this instance.
10     Q.  Okay.  Did you after getting this e-mail
11  from her executive assistant have any telephone
12  communications with either Mr. Crowley, Mr. Boyle or
13  Ms. Krakauer as to who was going to respond?
14     A.  No, because I was -- from the previous
15  conversation with M.L., that Bill would take the
16  lead, so I knew in this instance that it really
17  needed to be handled by Bill because I was told on
18  that conference call with M.L. that I needed to let
19  Bill and Randy run with this.
20     Q.  Okay.  But did any of them ever contact
21  you to get your input or any response that was
22  prepared?
23     A.  Not this one, no.
24     Q.  Did you ever see any response that went
25  out to Mr. Haught from --

39 (Pages 150 to 153)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 154

1   A.  Not that I was cc'd on.
2   Q.  Okay.  Then if you turn onto Page HP 1236,
3   which is the first page of the exhibit, you did FYI
4   forward this to Shari Ellis and Mr. Schmaderer; is
5   that correct?
6   A.  Correct, yes.
7   Q.  Okay.  And Ms. Ellis responded to you, I
8   am on a call and I heard about this e-mail on a
9   call, what is going on, what a mess.
10      You responded shortly thereafter I have no
11  idea, Ms. Ellis, if you just follow the e-mail with
12  me up to the top it says, I can tell you this
13  transition is a nightmare, and then you responded,
14  it's really sad from a customer perspective.  I know
15  Roseville believes it will -- I think it should say
16  all work out but there will be backlash, and
17  Ms. Ellis finally at the top responded to you that
18  says, absolutely, already is.
19      Other than the string here of e-mails did
20  you have telephone conversations with Ms. Ellis to
21  discuss her reference that the transition is a
22  nightmare and that there already has been backlash
23  from a customer perspective?
24  A.  Well, obviously since I office out of this
25  building and so did she, I obviously -- and since

Page 155

1   she was an employee of mine at one time and
2   considered her a good -- a friend at least, I always
3   checked in just to see how she was doing, so we
4   would have -- we would have conversations just on
5   how are things going, and, you know -- so of course
6   I had some interest because she used to work for me
7   and, you know -- and she just -- you know, luckily
8   she was able to find a job.  She was pretty much at
9   the point after this was done she was going to lose
10  her job, so I did stop in and talk to her once in a
11  while just to see how things were going.
12  Q.  Okay.  Did you have specific discussions
13  with her about what the tran -- what transition she
14  was referring to?
15  A.  Well, obviously the transition she's
16  referring to is transition in the program as it sat
17  and its 2,000-plus customers to Roseville, you know,
18  to Roseville from this program, from the model that
19  was in place with Compaq Direct; i.e. using the
20  VISTA system.
21  Q.  Okay.  Was she involved in that
22  transition?
23  A.  Oh, completely.
24  Q.  Because she was day-to-day contact for
25  MITG?

Page 156

1   A.  Uh-huh.
2   Q.  Is that a yes?
3   A.  Yes, I am sorry, yes.
4   Q.  All right.  I take it any details or
5   specifics about that transition you would feel she
6   could better answer?
7   A.  Especially anything after I was asked to
8   step away she certainly is the right person to ask
9   those questions.
10  Q.  Okay.  Did you discuss with her her
11  statement that there already had been customer
12  backlash, what that meant?
13  A.  Well, I understood because I knew what was
14  going to be happening.
15  Q.  Which was?
16  A.  They couldn't meet the requirements that
17  we had in place with our customers around single
18  invoicing and understanding that these customers now
19  today at Compaq Direct no longer could buy spare
20  parts through this entity.
21      So now if they wanted to buy some -- a
22  couple extra AC adaptors on the product they could
23  no longer do that.  We all knew that going in, that
24  there was no way that that was ever going to be able
25  to happen.  That was one of the most common issues

Page 157

1   that we had addressed that was going to be a gap.
2   Q.  Which was what, the single invoicing?
3   A.  The single invoicing, the ability to POs
4   versus credit cards, and things of that nature, so
5   the flexibility, providing the customer a single
6   invoice and kind of a single source for not only
7   their product needs but their part needs.
8   Q.  Is that because Roseville didn't have the
9   capability to do that?
10  A.  From a system's perspective they didn't
11  have the capability.
12  Q.  Okay.  Let me show you what I'm going to
13  mark as Exhibit EE.
14      (Exhibit EE marked for
15      identification.)
16  BY MR. HANSEN:
17  Q.  Before I do that, let me go back.
18      The issues we talked about--couldn't
19  single invoice, you know, the ability to create a
20  purchase order before a credit card--was the VISTA
21  system totally abandoned by HP?  Is this VISTA
22  system used at all?
23  A.  Yes, it is.  It's used by the Direct
24  organization for invoicing the customers.
25  Q.  But to your knowledge, is there any

40 (Pages 154 to 157)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 158

1  Middleware interface that's currently being used
2  with the VISTA system?
3      A.  Like I said before, I have no knowledge
4  to -- once the MITG link was shut off I would have
5  no knowledge after that if they ever used it again.
6      Q.  Okay.  Is that the instrument that allowed
7  for all these benefits of single invoicing, ability
8  to create a purchase order versus a credit card that
9  isn't currently in place at the HP?
10         MS. CARROLL:  Objection:  Vague and
11  ambiguous.  Go ahead.
12         THE WITNESS:  The -- I don't know how to
13  answer that.
14  BY MR. HANSEN:
15      Q.  Let me rephrase that.  You told me
16  Roseville didn't have the capacity to do --
17      A.  They don't use VISTA.
18      Q.  Okay.
19      A.  They don't use VISTA, and so -- I mean to
20  answer your direct question, the VISTA system was
21  the system that allowed us to do the single
22  invoicing because their new products were flowing
23  through the VISTA, so obviously the advantage there
24  was not only can you buy your products but you can
25  buy all our parts with one system, with one invoice,

Page 159

1  you know, that type of scenario.
2      Q.  Okay.  And that doesn't exist for
3  customers through Roseville?
4      A.  They don't use VISTA.
5      Q.  Okay.  So is that a yes?
6      A.  Yes.
7      Q.  All right.  Now Exhibit EE, unfortunately
8  I didn't bring an extra copy.  It's MITG 106 and
9  107.  Let me ask first of all, on the e-mail there
10  on the first page in the middle it's from a
11  Michael --
12      A.  Giannou.
13      Q.  Giannou, G-I-A-N-N-O-U, who is he and who
14  is he with?
15      A.  Mike Giannou is part of this organization,
16  he manages Partner Direct, which is the reseller
17  division.
18         Both Mike and Pete have been my boss at
19  different times in my career throughout the Direct
20  organization.
21      Q.  So they're Compaq?
22      A.  Legacy Compaq guys.
23      Q.  Okay.  To Scott Anderson, who --
24      A.  Scott I believe is -- I'm not exactly sure
25  who Scott is.

Page 160

1      Q.  Okay.
2      A.  But from my recollection, Scott was Mike's
3  boss.
4      Q.  It says, Scott, we had a legacy parts
5  program that was carried over from Inacom through
6  Compaq to HP.  Is that what we've been talking about
7  here today?
8      A.  Yes.
9      Q.  Okay.  Unfortunately the decision had been
10  made to shut down the parts program that exists
11  locally under Troy Bloomquist, and move it to
12  Roseville.  That's shutting down what we've talked
13  about --
14      A.  Uh-huh.
15      Q.  -- just recently here in accordance with
16  these issues?
17      A.  Uh-huh.
18      Q.  Is that correct?
19      A.  Yes.
20      Q.  So they were shutting that down here and
21  moving all that to Roseville.
22         I have started to hear rumblings from
23  partners including CDW.  Who is CDW?
24      A.  CDW is a large reseller for HP, slash,
25  Compaq.

Page 161

1      Q.  Okay.  Who has made the decision to stop
2  purchasing nonwarranty spare parts through HP
3  because of the new program, and move that business
4  to go to a third-party vendor.
5         What are nonwarranty spare parts, for
6  instance, if I want a part to a computer that I
7  bought in 2000 without a warranty, CDW would be an
8  authorized reseller of that part for HP?
9      A.  No, CDW is an authorized reseller of new
10  products.
11      Q.  Okay.
12      A.  So they -- they -- they're considered a
13  bar or reseller as I stated before.  They're
14  authorized to sell HP products to customers as a
15  reseller.
16      Q.  Although I understand why we would want to
17  consolidate programs from HP's side, I don't think
18  people understand the impact on the customer.
19         After getting this e-mail did you speak to
20  Mr. Giannou to find out if he was still talk -- to
21  find out if he was talking about the shutting down
22  of the HP side?
23      A.  He was -- he was talking about the -- the
24  shutting down of actually having resellers have the
25  ability to actually use our program versus using the

41 (Pages 158 to 161)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 162

1  standard HP program.
2      So that was referring to at that time
3  obviously, you know, resellers were getting the
4  message that under the new HP, this is the group
5  that you need to buy your parts from, and so that's
6  what this all was referenced to was a discussion,
7  and I think it was more from internal communications
8  going out that, you know, CDW now -- I mean,
9  basically what the message said as I recall, you
10  need to be going to this web site for all of your
11  spare parts needs, this 800 number.
12      I don't know if the messages said you
13  can't call the old number, but it pretty much
14  directed them that you really need to move towards
15  Roseville as your parts suppliers versus using the
16  Direct organization for that.
17      Q.  Is that hp.com, is that the site, do you
18  know?
19      A.  I don't know what site was necessarily
20  referred to, but that was why, is the resellers --
21  before they made the final decision to terminate the
22  MITG agreement in those time frames there was a lot
23  of conflicting messages about where you go for here,
24  and that happens in mergers.
25      But around the resellers specifically,

Page 163

1  they were really pushing on the resellers to point
2  them towards Roseville and the espare store and the
3  HP PDO direct site.
4      Q.  Did that have any impact or anything to do
5  with the MITG agreement?
6      A.  At this specific time, no, other than it
7  didn't affect the agreement.  It just affected CDW
8  no longer did business with the Direct organization.
9      Q.  Okay.  Which MITG was used to provide --
10      A.  Right.
11      Q.  -- parts to those resellers?
12      A.  To that specific one, yes.
13      Q.  All right.  Okay.  The very last line it
14  says, anyway I would like you to place a call to
15  Randy Wagner who works M.L. Krakauer because this
16  has -- is starting to affect customer satisfaction.
17  Maybe M.L. will help us out this time around after
18  yesterday.  Were you a part of any of these
19  follow-up communications?
20      A.  Not follow-up, no.
21      Q.  Do you know what he was talking about,
22  were you part of anything?
23      A.  Before he sent this -- this e-mail, I
24  met -- he asked me to come up and meet with him and
25  Pete on what was going on, you know, what's -- you

Page 164

1  know, what -- here's the communication, what's this
2  really mean, and I said, well, here's what I
3  understand it means.
4      It means that the resellers really need to
5  start going towards Roseville for their needs, and
6  what he's referring to, maybe M.L. will help us, is
7  what he told me during that meeting, was M.L. was
8  just out of CDW, you know, an executive level
9  talking about how HP or Compaq was committed to them
10  and things of that nature.
11      So I think that's what his reference was
12  to the M.L. time, because I remember them saying
13  that she was out in front of the customer, or --
14  either -- I don't remember exactly, but M.L. was
15  involved in some kind of executive conversation with
16  the customer, and Mike was part of that
17  conversation.
18      Q.  With CDW?
19      A.  Yes.
20      Q.  Okay.  Under No. 3 there, it says under
21  the new program the partner must submit a separate
22  invoice for HP blue parts, HP red parts and
23  third-party parts.
24      Troy's legacy program had the ability to
25  take a PO -- does that mean purchase order -- for

Page 165

1  all parts, and Roseville has no source third-party
2  parts.
3      Is that the program they're referencing of
4  yours, the Middleware interface or --
5      A.  Just the program, the program for us to be
6  able to provide a single point of contact around --
7  you know, for instance, in our case -- and, you
8  know, this is not necessarily an absolutely true
9  statement, which is we can provide -- as the program
10  sat, we could provide red, quote, Compaq parts which
11  are referenced as red parts and third-party parts as
12  a single point of contact under one system, under
13  one PO system, under one invoice.
14      What happen -- the way that the program --
15  the direction the program was going or ended up
16  going, you actually -- if you wanted to buy an HP
17  part you had to have one PO, if you wanted to buy a
18  Compaq part you had another PO, and, oh, by the way
19  if you wanted to buy a third-party part you could
20  still work with Direct organization to do that -- to
21  do that transaction, so that's what that statement
22  is trying to I think say there.
23      Q.  So you had the ability to take one PO for
24  all those orders?
25      A.  Yes.

42 (Pages 162 to 165)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 166

1    Q.   Okay.  Was that under the VISTA system?
2    A.   Yes.
3    Q.   Okay.
4    A.   The only way we could do it was under the
5  VISTA system.
6    Q.   Was it through the VISTA system using the
7  Middleware XML that that had been created or did
8  that have nothing to do with it?
9    A.   That really has nothing to do with the
10  invoicing piece.
11    Q.   Okay.  Have you ever been contacted about
12  this lawsuit by any newspaper publication or media
13  outlet?
14    A.   No.
15    Q.   Have any television stations from
16  California or Illinois contacted you to discuss the
17  case?
18    A.   No.
19    MR. HANSEN:  Okay.  Go off for a second.
20         (Off the record.)
21  BY MR. HANSEN:
22    Q.   I don't want to know about discussions you
23  had with your lawyer because I'm sure you met with
24  them at length for some time to prepare for today.
25         Did you review any materials in

Page 167

1  preparation for your deposition?  Don't tell me
2  about any conversations.  I want to know materials
3  or documents that you reviewed.
4    A.   No, not relevant to this conversation.
5    Q.   To this deposition you mean?
6    A.   Yes, that's what I mean.
7    Q.   You didn't review any of the pleadings in
8  this case or any of the exhibits we've brought out
9  today?
10    A.   No.
11    Q.   Okay.  Have you spoken to anyone from
12  California that had their deposition taken?
13    A.   No.
14    Q.   Bill Crowley?
15    A.   No, I wasn't -- no.
16    Q.   Were you asked in this case to review your
17  computer, laptop, whatever for documents?
18    A.   Yes.
19    Q.   Okay.  That may be responsive to a request
20  that had been served upon HP?
21    A.   Yes.
22    Q.   Did you go back and do that?
23    A.   Yes, I did, I did do that, and I also --
24  they also came and took a snapshot of my laptop, so
25  anything I couldn't find they were able to abstract

Page 168

1  that.
2    Q.   Some IT person for HP?
3    A.   Yeah.
4    MR. HANSEN:  Okay.  Wasn't you guys,
5  wasn't a lawyer, right?
6    MS. CARROLL:  Correct.
7    THE WITNESS:  It was an IT person.
8    MS. CARROLL:  But it was at my
9  instruction.
10    MR. HANSEN:  Yeah, right, I understand.
11  BY MR. HANSEN:
12    Q.   After the merger was there any sort of
13  document retention policy as to how long you were to
14  keep, you know, e-mails sent to and from people?
15    A.   I mean, there is an HP retention program
16  that I'm aware of.
17    Q.   There is or isn't?
18    A.   There is.
19    Q.   What is it?
20    A.   That you need to keep your applicable
21  documents as long as you can, but, you know -- and I
22  for the most part tried to keep most of my documents
23  as I could.
24         I'm aware of that and I'm more aware of
25  that because of these proceedings, because, you

Page 169

1  know, in the -- my previous companies it wasn't a
2  fast truck -- a policy in writing, but I do
3  understand that policy, and I have for the most part
4  tried to keep all of my files to the best of my
5  ability.
6    Q.   And anything you had I take it you turned
7  over to --
8    A.   Well, since everything I had that I --
9  that I could find was either hopefully on my laptop
10  I did provide -- I was asked by my boss, Sheryl
11  Williams, at the time when I was asked to step away,
12  she asked me to box up all my contracts from MITG,
13  so -- as well as Shari Ellis, which we did and we
14  sent those off to Roseville, so all the documents
15  that we had we were supposed to box them up and send
16  them off, and we did that.
17    Q.   Who did you send them to at Roseville?
18    A.   I think Louise was the --
19    Q.   Meyerfeld?
20    A.   -- Meyerfeld was the person they went to.
21  I also sent my agreements, the MITG agreements, to
22  Kristin Triolo per Sheryl's request as well.
23    Q.   Sheryl Williams' request?
24    A.   Yes.
25    Q.   Okay.  I want to follow up on an answer

43 (Pages 166 to 169)

T. BLOOMQUIST - Direct (By MR. HANSEN)

Page 170

1  you gave me to a question I asked regarding the
2  interfacing of the Middleware agreement.
3       We've already gone over that it was with
4  VISTA, you then said various representatives of
5  HP or Compaq stated to you that they didn't feel
6  there was cost justification to interface it with
7  CSN, did I get that wrong?
8       A.  That's correct.
9       Q.  That is correct.  Okay.  So there -- what
10  do you mean by interface with CSN, is that totally
11  separate --
12      A.  CSN is the ordering tool, so if -- for
13  example, if the part is in stock and we met all
14  the -- all of the requirements per our agreement
15  with MITG that the part was in stock, you know, and
16  it was there to ship for next-day shipment, CSN is
17  the system that we actually entered the order
18  into -- into CSN.
19      So once that VISTA order was done and
20  approved, CSN was the ordering mechanism for us to
21  order the Compaq part from.
22      Q.  So CSN stands for Compaq Services Network?
23      A.  Network, yep.
24      Q.  Okay.  Now, was there some discussions to
25  create an interface VISTA and CSN?

Page 171

1       A.  Yes.
2       Q.  Okay.  Another Middleware agreement other
3  than the one with the MITG?
4       A.  We actually tried to do the CSN before we
5  did -- we went down the path with MITG.
6       Q.  Okay.  When you say we, was MITG involved
7  in that?
8       A.  No, that was an HP internal or Compaq
9  internal only discussion.
10      Q.  Okay.  And just to follow that up, was
11  there any discussion after the interface was
12  developed with MITG to go back and develop it for
13  CSN?
14      A.  Well, obviously it was always a goal of
15  mine because it would even further -- further drive
16  efficiencies because, once again, we went from doing
17  the swivel seat where we entered it into the MITG
18  system into the VISTA system, but there was still
19  one swivel seat left, which was entering them into
20  CSN.
21      That never went away, that was always one
22  lack -- or one deficiency in our process that we had
23  was because we could never get that link created, we
24  couldn't even get past the first discussions
25  usually.

Page 172

1       Q.  Which somebody internal --
2       A.  Said it doesn't make sense, and the reason
3  it didn't make sense at the time is they thought at
4  the time -- it ended up not being the issue, but
5  they thought at the time that the CSN would
6  eventually go away so why vest more money in it.
7       Q.  Did it go away?
8       A.  To my knowledge today it's still in place.
9       Q.  To your knowledge was there ever an
10  interface developed for CSN?
11      A.  Not from VISTA.
12      Q.  Okay.
13      A.  Not from VISTA.
14      Q.  When you were transitioned away was there
15  some individual or did it fall under Mr. Boyle and
16  Ms. Ellis that was not only responsible for the
17  standard support agreement with MITG but the
18  Middleware agreement?
19      A.  That really would have been handed
20  probably to a combination of Charlie and Shari.
21      Q.  Okay.
22      A.  So I mean it would be between -- those two
23  were really managing that.
24      MR. HANSEN:  Okay.  That's all I have.
25      MS. CARROLL:  That's it.  Read and sign,

Page 173

1  send it to me.
2            (2:00 p.m. - Adjournment.)
3            ** ** ** **

44 (Pages 170 to 173)