```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD, DIVISION

 3   HEWLETT-PACKARD           ) CIVIL ACTION NO. 04-3055
     DEVELOPMENT COMPANY, L.P.,)
 4   HEWLETT-PACKARD COMPANY   )
     AND COMPAQ TRADEMARK B.V.,)
 5                             )
              PLAINTIFFS,      )
 6                             )
     VS.                       )
 7                             )
     MIDWEST INFORMATION       )
 8   TECHNOLOGY GROUP, INC.,   )
     AND MICHAEL LAUBER,       )
 9                             )
              DEFENDANTS.      )
10   --------------------------

11
                        DEPOSITION OF
12                      SHARI K. ELLIS

13                   TAKEN ON BEHALF OF
                          DEFENDANTS
14

15       DEPOSITION OF SHARI K. ELLIS, taken before

16   Cynthia Craig, General Notary Public within and for

17   the State of Nebraska, beginning at 8:30 a.m., on

18   October 15, 2004, at the Hewlett-Packard Office,

19   10810 Farnam Drive, Omaha, Nebraska.

20

21

22

23

24

25
```

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 2

```
 1           A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
     MS. ELIZANN CARROLL
 3   THOMPSON & KNIGHT, LLP
     1700 Pacific Avenue, Suite 3300
 4   Dallas, Texas 75201
     (214) 969-1700  FAX 969-1751
 5
     FOR THE DEFENDANTS:
 6   MR. JAMES A. HANSEN
     SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
 7   525 Jersey
     P.O. Box 1069
 8   Quincy, Illinois 62306
     (217) 223-3030  FAX 223-1005
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                I N D E X
 2   CASE CAPTION ..................... Page   1
     APPEARANCES ...................... Page   2
 3   INDEX ............................ Page   3
     TESTIMONY ........................ Page   4
 4   REPORTER CERTIFICATE ............. Page 124
     COST CERTIFICATE ................. Page 125
 5   READ & SIGN LETTER ............... Page 126
     ERRATA SHEET ..................... Page 127
 6
     DIRECT EXAMINATION:
 7     By Mr. Hansen.................. Page   4
 8
 9   EXHIBITS:                         MARKED
10   HH. E-mail Bates
         Stamp HP 001270
11       ( 1 page ) ....................  26
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       (Whereupon, the following proceedings were had,
 2   to-wit:)
 3       COURT REPORTER:  Are there any
 4   stipulations?
 5       MR. HANSEN:  No.
 6       SHARI K. ELLIS,
 7     having been first duly sworn,
 8   was examined and testified as follows:
 9         DIRECT EXAMINATION
10   BY MR. HANSEN:
11     Q.  Good morning.  Please, state your name for
12   the record.
13     A.  Shari Ellis.
14     Q.  Okay.  Is your first name spelled
15   S-H-A-R-I?
16     A.  Yes.
17     Q.  Okay.  How old are you?
18     A.  Forty-two.
19     Q.  Date of birth?
20     A.  3/11/62.
21     Q.  Okay.  You live here in Omaha?
22     A.  Fremont.
23     Q.  Are you married?
24     A.  Yes.
25     Q.  Children?
```

Page 5

```
 1     A.  Yes.
 2     Q.  How many?
 3     A.  Two.
 4     Q.  Okay.  Grown or still living at home?
 5     A.  I have a 21-year-old and a 16-year-old.
 6     Q.  Okay.  What is your educational
 7   background?
 8     A.  High school.
 9     Q.  Okay.  Are you from around the area here?
10     A.  Yeah, I was born and raised in Fremont.
11     Q.  How far is Fremont from here?
12     A.  Thirty, forty miles.
13     Q.  Which direction?
14     A.  West.
15     Q.  What is your current position at HP?
16     A.  I am an international customer service
17   rep.
18     Q.  International, you focus on accounts that
19   are overseas?
20     A.  Exports.
21     Q.  Have you ever had your deposition taken?
22     A.  No.
23     Q.  You may have been instructed on some
24   ground rules by your attorney here today.  If I ask
25   a question you don't understand, ask me to rephrase
```

2 (Pages 2 to 5)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 6

1  it and I will.
2      We need verbal answers. Shakes, nods of
3  the head don't come out on the typewritten form.
4  We'll remind you, believe me. If you may say
5  huh-uh, uh-huh, we'll have to ask you if that's a
6  yes or no.
7      Lastly it's very common that you may know
8  exactly what my question is going to be, you know,
9  once I get started, but it's difficult to take two
10 people talking at the same time, so if you'd just
11 allow me to complete my question before you give
12 your answer, I in turn will do the same for you, and
13 it'll be much better.
14     If you need to take a break just let us
15 know and we'll take a break.
16     How long have you been international CSR?
17     A.  Seven months.
18     Q.  Okay. When were you first hired by
19 HP/Compaq/Inacom/CEI, were you with all of them?
20     A.  Yes.
21     Q.  Okay. What did you start out at with
22 Inacom, what was your role or title?
23     A.  Accounts payable clerk.
24     Q.  Okay. And then after Compaq bought Inacom
25 and created the division of CEI what was your role

Page 7

1  there?
2     A.  I was a claims adjustor.
3     Q.  Okay. When I think of a claims adjustor I
4  think of insurance and someone who is adjusting like
5  an auto accident or something. I'm sure that's not
6  what it was for CEI but what was a claims adjustor?
7     A.  I audited claims based on support
8  contracts that were sold.
9     Q.  What type of claims, give me an example?
10    A.  Service centers who would go out and
11 service work for Custom-Edge. We sold maintenance
12 contracts to resellers. And my job was to make sure
13 that the work was done in accordance with the
14 contract.
15    Q.  Okay. All right. So it had to do with
16 maintenance and servicing work for resellers?
17    A.  Yes.
18    Q.  Okay. When you were at CEI were you also
19 a claims adjustor or did your role ever change?
20    A.  I became a supervisor of the claims
21 adjustor group but stayed within the service.
22    Q.  Okay. And then it's my understanding from
23 some testimony we've received here this entire week,
24 CEI kind of went away, the name was dissolved and it
25 was then just Compaq/Compaq Direct; is that correct?

Page 8

1     A.  Yes.
2     Q.  Okay. What was your next role within the
3  company?
4     A.  I came over here and worked with Troy as
5  the -- under the spare parts.
6     Q.  Okay. What group was that, spare parts
7  group?
8     A.  Yeah, they called it the service alliance
9  group.
10    Q.  Okay. When did you -- did you report to
11 Troy?
12    A.  Yes.
13    Q.  Okay. When was that, what year?
14    A.  I believe 2000.
15    Q.  Okay. You said you came over and worked
16 with the spare parts group. What was your title?
17    A.  It's changed so many times.
18    Q.  Can't remember your title, how about just
19 tell me your duties and responsibilities.
20    A.  Well, when I first came over we had the
21 service alliance group, and it was my job to enlist
22 resellers to be a part of that group. We were
23 basically in a service mode where we would do
24 service dispatch, service labor.
25    Q.  When we talk about resellers, we're

Page 9

1  talking about authorized groups that would resell
2  HP/Compaq product?
3     A.  Yes.
4     Q.  Okay. And do you understand that to be
5  different than, for instance, let's say a group like
6  MITG?
7     A.  Yes.
8     Q.  Okay. So your first duties and
9  responsibilities were to enlist resellers to be part
10 of the service alliance group?
11    A.  Enlist service centers to be part of the
12 service alliance group to do service work for the
13 resellers.
14    Q.  Okay. Is that similar to what you were
15 doing at CEI as a claims adjustor kind of, you know,
16 dealing with service centers to do maintenance for
17 resellers?
18    A.  Yes, other than that was on a T&M basis
19 under Troy and the other was under a contract basis.
20    Q.  T&M means time and maintenance?
21    A.  Time and material.
22    Q.  Sorry. Okay. I take it at some point in
23 time you then had a different role or function
24 within Troy's group?
25    A.  Yeah, spare parts division came in to

3 (Pages 6 to 9)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 10

1  play.
2  Q. Okay. How long were -- let's go back.
3  You were -- you said you were in the --
4  enlisting these service centers to be part of the
5  group from maintenance for resellers beginning in
6  2000, how long were you in that role?
7  A. About six months.
8  Q. Okay. Then did you go over to the spare
9  parts division?
10 A. Yeah, it was created -- being created
11 during that six-month period.
12 Q. Okay. So it was in 2000 that you went
13 over there to the new division, or was it 2001?
14 A. No, it was 2000.
15 Q. Okay. What title did you have if you can
16 recall?
17 A. Claims administrator.
18 Q. What were your duties and
19 responsibilities?
20 A. To process claims for spare parts and bill
21 the customer.
22 Q. When you say claims for spare parts, do
23 you refer to that as orders, or are we talking about
24 something different?
25 A. Invoices from a vendor for spare parts and

Page 11

1  billing the customer using the VISTA tool.
2  Q. Okay. Back in this time frame were you
3  the person who manually keyed in the orders to the
4  VISTA system?
5  A. Yes.
6  Q. Okay. I take it there was more than one
7  person that did that?
8  A. Yes.
9  Q. Okay. And was the setup one where the
10 invoices would come from the vendor for the spare
11 parts, you would enter it into VISTA and then a bill
12 would be shipped to the customer?
13 A. Yes.
14 Q. Okay. Was it at this point in time --
15 well, when was it that you first had any contact
16 with MITG?
17 A. The latter part of 2000.
18 Q. Okay. Who was your -- did you have a
19 certain contact at MITG or did you just basically
20 deal with their customer reps for any invoices that
21 were sent over here?
22 A. I dealt mostly with Mike Lauber and
23 Terri Welch.
24 Q. And was Terri Welch a customer service rep
25 or account rep?

Page 12

1  A. I think she was a manager of the group.
2  Q. Okay. And how about Mike Lauber, what was
3  your involvement with Mike?
4  A. Working on setting up the program.
5  Q. What program?
6  A. The spare parts program with MITG as a
7  vendor.
8  Q. Okay. Now, you did not sign the contract
9  entered into between MITG and Compaq -- sorry,
10 Troy Bloomquist. Did you help negotiate that at
11 all?
12 A. No.
13 Q. Okay. And how long were you in your role
14 there as the claims administrator for spare parts
15 dealing with groups such at MITG?
16 A. February of '04.
17 Q. Okay. At some point in time in October of
18 2003 did you become responsible for the day-to-day
19 operations of the MITG account?
20 A. Yes.
21 Q. That was after Troy had been transitioned
22 to a different job?
23 A. Yes.
24 Q. Okay. Were you involved -- strike that.
25 Were you the point contact for Compaq in

Page 13

1  regards to MITG? I mean, were you specifically
2  assigned to handle all their invoices that came in?
3  A. Yes.
4  Q. Okay. So as the claim administrator, any
5  invoice that they had for spare parts prior to the
6  Middleware--that's what I'm talking about okay--they
7  would send that to you, you or somebody that you
8  would give it to I guess would enter it into VISTA?
9  A. In general, yes.
10 Q. Okay. Was there anyone else here that was
11 responsible for the MITG invoicing accounts?
12 A. Yes.
13 Q. Okay. Who was it?
14 A. Troy.
15 Q. Okay. Yeah?
16 A. Lisa Stork.
17 Q. Okay. What was her --
18 A. She would assist me and back me up when I
19 was out of the office.
20 Q. Okay. The three of you?
21 A. Dave Suhr.
22 Q. What's the last name?
23 A. S-U-H-R.
24 Q. Okay. Was he another person that would
25 assist you?

4 (Pages 10 to 13)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 14

1 A. Yes.
2 Q. Okay. Besides Troy were you the person
3 that had the most day-to-day contact with MITG?
4 A. Yes.
5 Q. Okay. And you were involved in the
6 development process of the Middleware?
7 A. Yes.
8 Q. Okay. Is it your understanding that that
9 Middleware MITG was approached to help create the
10 interface between their web tool and VISTA's so to
11 eliminate some of this double entry that was going
12 on?
13 A. I don't know.
14 Q. Okay. After the Hewlett-Packard/Compaq
15 merger how did that affect the Compaq Direct spare
16 parts program?
17 A. It didn't.
18 Q. After the merger what was the strategy
19 towards the MITG part of the business, was it going
20 to be transitioned over to HP?
21 A. Business as usual after the merger.
22 Q. Was MITG -- was it told to you that HP had
23 plans to eliminate the Compaq Direct and MITG
24 program?
25 A. No.

Page 15

1 Q. That was not communicated to you?
2 A. No.
3 Q. When were you made aware of that?
4 A. September.
5 Q. Of when?
6 A. '03.
7 Q. What were the end user issues that
8 Compaq Direct had offered that you saw HP did not?
9 A. I don't understand the question.
10 Q. What were some of the customer issues with
11 the Compaq Direct program benefitwise that they
12 offered that HP could not?
13     MS. CARROLL: Object: That calls for
14 speculation.
15 BY MR. HANSEN:
16 Q. Go ahead, you can answer.
17 A. Third-party parts.
18 Q. Okay. Anything else?
19 A. Obsolete parts.
20 Q. How about single invoicing?
21 A. I don't know.
22 Q. You don't know that MITG through the
23 Middleware offered single invoicing and HP didn't?
24 A. I did not know that HP did not.
25 Q. Do you know that now?

Page 16

1 A. No, I don't.
2 Q. Okay. Were you involved in the transition
3 of the MITG program over to HP?
4 A. Yes.
5 Q. Okay. How would you characterize the
6 transition?
7 A. Smooth.
8 Q. Okay. When you say smooth, no problems,
9 everything went according to plan, or what?
10 A. There was not a lot of problems.
11 Q. Okay. Did you have any concerns regarding
12 the transition and the effect it had on customers?
13 A. Yes.
14 Q. Okay. Did you make the HP people aware of
15 the effect that the transition of the Compaq Direct
16 customers over to HP was going to have?
17 A. Yes.
18 Q. And tell me your role in the transition.
19 A. My role was to transition the customer
20 PO accounts over to Roseville, California.
21 Q. When you say PO, what do you mean,
22 purchase order?
23 A. Uh-huh.
24 Q. Is that a yes?
25 A. Yes.

Page 17

1 Q. Okay. When did that begin to take place?
2 A. November.
3 Q. Of '03?
4 A. Yes.
5 Q. Okay. What was involved in transitioning
6 those PO accounts to Roseville?
7 A. Well, a list of the customer accounts that
8 needed to transition, the top 25 accounts, customer
9 specific invoicing.
10 Q. Okay. Anything else?
11 A. Informing the CSR that -- of the new area
12 of the parts procurement.
13 Q. That it was going to be in Roseville?
14 A. Yes.
15 Q. And who were you communicating with? Did
16 you have a specific contact at HP that, for
17 instance, you sent the list of customer accounts to?
18 A. Yes.
19 Q. Who was that?
20 A. Bill Crowley.
21 Q. How about Louise Meyerfeld?
22 A. Yes.
23 Q. Were those two your main contacts at HP?
24 A. Richard Krisek (phonetic).
25 Q. Okay. And I will probably say his name,

5 (Pages 14 to 17)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 18

1  Krisek, what is his -- what did you understand his
2  position to be?
3      A.  Call center manager.
4      Q.  Okay.  For Roseville?
5      A.  Yes.
6      Q.  Okay.  So in November of '03, were there
7  accounts then that were transferred from Omaha here
8  to Roseville to get set up in an HP system?
9      A.  Yes.
10     Q.  Okay.  And was that because the spare
11 parts program was now going to be handled by
12 Roseville for any call center ordering?
13     A.  I don't understand the question.
14     Q.  Was Roseville going to take over what
15 Omaha had been doing?
16     A.  Yes.
17     Q.  So if a customer had a spare part order it
18 was no longer going to go into VISTA?
19     A.  Yes.
20     Q.  Yes, I'm correct or yes, it was going to
21 go into VISTA?
22     A.  It was not going to go into VISTA.
23     Q.  It was going to be set up to go into the
24 HP system?
25     A.  Yes.

Page 19

1      Q.  And you said you began informing the CSR
2  of the new parts procurement, were those CSRs Compaq
3  CSRs or HP?
4      A.  HP Direct.
5      Q.  I'm sorry, that was a badly worded
6  question.
7          And were the HP Direct CSRs informed that
8  they should start sending the spare parts calls to
9  Roseville in November of '03?
10     A.  No.
11     Q.  Okay.  They were informed of the new
12 system that was going to be installed?
13     A.  Yes.
14     Q.  Okay.  Transition that was going to take
15 place?
16     A.  Yes.
17     Q.  Okay.  Now at this point in time in
18 November of '03, you were still involved in the
19 day-to-day operations on this side with MITG,
20 correct?
21     A.  Yes.
22     Q.  Okay.  Going back to -- what were the
23 concerns that you voiced to HP personnel regarding
24 the transition and the effect it could have on
25 customers?

Page 20

1      A.  The ability to get third-party obsolete
2  parts.
3      Q.  Okay.  Anything else?
4      A.  The ability to have customer specific
5  invoicing.
6      Q.  That was a big thing that was developed
7  here, is it not, the customer specific invoicing?
8      A.  Yes.
9      Q.  Okay.  That was developed through the
10 Middleware that was created?
11     A.  I don't know.
12     Q.  Did you have the ability to do customer
13 specific invoicing prior to the interface that was
14 created between MITG's web tool and VISTA?
15     A.  Yes.
16     Q.  Okay.  When you say customer specific
17 invoicing, was that a -- tell me how that system
18 worked.
19     A.  Customer specific invoicing means a
20 customer had specific requirements that needed to be
21 on their invoice in order for us to be paid.
22     Q.  Okay.  You voiced concerns whether or not
23 HP was going to be able to meet those requirements
24 on the -- on the invoices?
25     A.  Yes.

Page 21

1      Q.  Okay.  What else, what other concerns did
2  you have?
3      A.  That's all.
4      Q.  Now, Troy had been removed from the MITG
5  relationship formally I think in October of '03 when
6  you took over the day-to-day, correct?
7      A.  I'm not sure when he --
8      Q.  Okay.  But when you were responsible for
9  the day-to-day operations with MITG he wasn't part
10 of the group anymore; is that correct?
11     A.  He had a different manager.
12     Q.  Okay.  Well, he was removed from running
13 the day-to-day operations with MITG; is that
14 correct?
15     A.  I don't know.
16     Q.  Okay.  Who else was working with MITG
17 besides yourself?  I mean, he testified earlier that
18 he was removed in October of '03, you stepped in and
19 were responsible for the day-to-day operations with
20 MITG, you were called that owner, and then
21 Charlie Boyle had the other -- the other side of
22 things is that incorrect?
23     A.  I did the day-to-day operations, did not
24 make business decision regarding MITG.
25     Q.  Was that Mr. Boyle?

6 (Pages 18 to 21)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 22

1    A.  It was Sheryl Williams.
2    Q.  Okay.  Is that who you reported to?
3    A.  Yes.
4    Q.  Is that who you reported to for the entire
5  time up to five, six, seven months ago when you left
6  your position?
7    A.  No.
8    Q.  Was she -- did you report to her after
9  you -- well, strike that.
10       Did you report to Troy initially?
11    A.  Yes.
12    Q.  Okay.  And then at some point in time did
13  you no longer report to him and report to
14  Sheryl Williams?
15    A.  Yes.
16    Q.  And then was Ms. Williams then removed
17  from the picture?
18    A.  No.
19    Q.  Okay.  Who did you report to then if it
20  wasn't her?
21    A.  It was Sheryl.
22    Q.  Okay.  Would that have been through the
23  entire time, through February of '04?
24    A.  Yes.
25    Q.  Did you feel communication with his MITG

Page 23

1  regarding the transition were consistent with what
2  was going on internally here at Compaq and HP?
3       MS. CARROLL:  Object:  Calls for
4  speculation.
5       THE WITNESS:  I don't know.
6  BY MR. HANSEN:
7    Q.  You don't have an opinion one way or the
8  other on that?
9    A.  I don't.
10    Q.  Okay.  I'm going to hand you what has
11  previously been marked as Deposition Exhibit AA,
12  from the deposition of Mr. Bloomquist, and ask you
13  to take a look at that.
14    A.  (Witness reviewing document.)
15    Q.  Have you had a chance to read it?
16    A.  Yes.
17    Q.  Okay.  Now, this is an e-mail string
18  starting on the bottom, Monday, December 15, 2003,
19  from Charlie Boyle to a number of people of which
20  apparently you were left off on; is that correct?
21    A.  Yes.
22    Q.  Then Troy Bloomquist then forwarded it to
23  you that same day to which you responded on Tuesday,
24  December 16th, in the middle there by stating
25  thanks for sending this to me, Charlie did send this

Page 24

1  to me as well.  He apologized that he forgot.
2       Do you see what I just read?
3    A.  Yes.
4    Q.  Then Troy states to you, I thought he laid
5  it out and then you say me too, do you see that at
6  the top?
7    A.  Yes.
8    Q.  Okay.  And were you referring to
9  Mr. Boyle's thoughts on the transition and his
10  vision of the HP freight train barreling down on the
11  stalled commuter business filled with the HP
12  customers who benefitted from this program in the
13  middle there?
14    A.  I don't believe I was commenting on that
15  comment.
16    Q.  Okay.  Well, when Troy said I thought he
17  laid it out and you responded me too, what did
18  you -- what do you, as you sit here today, believe
19  you were commenting on?
20    A.  That he laid out that the number of
21  customers that there were and, you know, that this
22  was going to be a large process to transition this
23  over.
24    Q.  You didn't have any of the concerns that
25  Mr. Boyle shared with regards to the potential

Page 25

1  effect on the customers who benefitted from the
2  program?
3       MS. CARROLL:  Object to the extent that
4  mischaracterizes Mr. Boyle's comment in this e-mail,
5  but you can go ahead and answer.
6       THE WITNESS:  I had concerns on how it was
7  going to impact the customer, but it was my role to
8  make sure that it impacted the customer as least as
9  possible.
10  BY MR. HANSEN:
11    Q.  Okay.  And then your last sentence there
12  says, this e-mail from Charlie must have lit a fire,
13  what were you referring to?
14    A.  I don't see that.
15    Q.  This e-mail from Charlie, must have lit a
16  fire?
17    A.  Oh, because they were moving faster on the
18  transition.  I was not able to get people to move as
19  quick as I needed with 2,000 accounts to transition.
20       Charlie Boyle was asked to step in by
21  Sheryl Williams to assist me with the transition, so
22  he was able to get the players in place to help move
23  this business so it did not impact the customer.
24    Q.  Okay.  And apparently there in your top
25  e-mail you note that the new account process setup

7 (Pages 22 to 25)

S. ELLIS - Direct (By MR. HANSEN)

Page 26

1 was going to be beginning on January 5th, do you see
2 that at the top?
3    A.  Yes.
4    Q.  Okay.  Is that the new account setup
5 process for the transitioning of accounts away from
6 the MITG and VISTA system into the HP system?
7    A.  These were brand-new accounts that had no
8 former business with MITG or Compaq at the time from
9 a spare perspective.
10    Q.  But if a new account called MITG were to
11 set up an order and set up an account in VISTA as of
12 January 5, they were going to be directed to
13 HP Roseville?
14    A.  Yes.
15        MR. HANSEN:  Okay.  And then let me mark
16 this exhibit.
17            (Exhibit No. HH
18             marked for identification.)
19 BY MR. HANSEN:
20    Q.  And then Exhibit HH--I'll let your
21 attorney take a moment to get her copy out--is a
22 document labeled HP 1270 at the bottom, do you see
23 that?
24    A.  Yes.
25    Q.  And this is an e-mail you sent to

Page 27

1 Terri Welch on Wednesday, December 17th of 2003,
2 correct?
3    A.  Yes.
4    Q.  Okay.  Which is the day after this e-mail
5 string with Troy that we referenced in Exhibit AA?
6    A.  Yes.
7    Q.  Okay.  And in that e-mail to Terri -- is
8 Terri a female or male?
9    A.  Female.
10    Q.  That is what I thought.
11        In that e-mail to Terri you're instructing
12 her regarding new account setup, correct?
13    A.  Yes.
14    Q.  In your e-mail, you're instructing her
15 that beginning January 5, 2004, any new account
16 request was to be sent to Sonia Perez, do you see
17 that?
18    A.  Yes.
19    Q.  Who is Sonia Perez?
20    A.  A credit analyst within HP.
21    Q.  Okay.  Is she over in Roseville?
22    A.  Yes.
23    Q.  And that phone number there, is that her
24 number?
25    A.  Yes.

Page 28

1    Q.  Okay.  And you then further tell Ms. Welch
2 in the e-mail that accounts for spare orders would
3 no longer be set up in VISTA; is that correct?
4    A.  Yes.
5    Q.  Okay.  And VISTA was the Compaq ordering
6 system?
7    A.  Yes.
8    Q.  Okay.  And were the new account spares
9 orders then going to be sent to Roseville for
10 handling?
11    A.  Yes.
12    Q.  Okay.  That was as of January 5th of 2004?
13    A.  Yes.
14    Q.  So as of January 5th, 2004, if there was a
15 new account set up it was going to be sent to
16 Ms. Perez in Roseville to be placed into the
17 HP system?
18    A.  Yes.
19    Q.  Okay.  In fact, if a new account then had
20 a spare parts order after January 5th of 2004, it
21 was going to be sent to Roseville to be filled?
22    A.  Yes.
23    Q.  Okay.  So MITG, as of January 5th, '04,
24 was removed from filling any spare parts orders for
25 any new accounts?

Page 29

1    A.  New business.
2    Q.  Simply meaning someone who didn't have an
3 account in VISTA?
4    A.  Yes.
5    Q.  Okay.  Do you see the name there, Helen?
6    A.  Yes.
7    Q.  Okay.  Was she here on the Compaq side?
8    A.  Yes.
9    Q.  Okay.  All right.  So she was no longer
10 going to be setting up the new accounts here on
11 Compaq VISTA, they were going to go to Ms. Perez for
12 HP?
13    A.  Yes.
14    Q.  All right.  Let me show you what was
15 previously marked as Deposition Exhibit DD, let me
16 find it, there it is right at the bottom, ask you to
17 take a look at that.
18    A.  (Witness complies.)
19    Q.  As a matter of fact, you probably only
20 need to look at the first page starting down at the
21 bottom of 1236 as you were a recipient on an e-mail
22 that was forwarded by Troy Bloomquist on Thursday,
23 January 15 of '04, do you see that?
24    A.  Yes.
25    Q.  Okay.  And Mr. Bloomquist had forwarded to

8 (Pages 26 to 29)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 30

1  you an e-mail that had been sent to him from the
2  office of Ms. Fiorina regarding Rob Haught's letter;
3  is that correct?
4      A.  Yes.
5      Q.  Okay. And then you state in your response
6  e-mail there on January 15 of '04, right there, do
7  you see where I'm at?
8      A.  Yes.
9      Q.  That you were on a call and heard about
10 this e-mail on the call, what is going on, what a
11 mess.
12          Do you recall who told you about -- about
13 the e-mail on the call that you're referring to?
14     A.  Yes.
15     Q.  Who was it?
16     A.  Charlie Boyle.
17     Q.  Okay. And what was said by Mr. Boyle to
18 you?
19     A.  I don't remember.
20     Q.  Okay. What in general was discussed with
21 Mr. Boyle about the e-mail that he told you about?
22     A.  I think he just said that there was
23 something sent to Carly. I was on a staff -- it was
24 on a staff meeting call.
25     Q.  Okay. Who was all on that call?

Page 31

1      A.  Sheryl Williams and I don't remember the
2  other guy's name.
3      Q.  Okay. Troy Bloomquist then responded to
4  your e-mail, correct, where he says I have no idea,
5  do you see that?
6      A.  Yes.
7      Q.  Okay. And above that you indicated to him
8  on Thursday, January 15th, 2004, I can tell you
9  that this transition is a nightmare, do you see
10 that?
11     A.  Yes.
12     Q.  And the nightmare is in all caps, correct?
13     A.  Yes.
14     Q.  Earlier I asked how the transition went
15 and you said it was smooth, here you say it's a
16 nightmare. How was it a nightmare back on
17 January 15th, 2004?
18     A.  Getting the players in Roseville to assist
19 me in the transition.
20     Q.  Okay. Anything else?
21     A.  Making sure that the customer specific
22 invoicing was in place.
23     Q.  Okay. Having seen this e-mail now, is it
24 still your testimony that you thought this was a
25 smooth transition?

Page 32

1      A.  I think overall it was a smooth transition
2  for the number of accounts that were transitioned.
3      Q.  Okay. Going back to what you said was a
4  nightmare, getting players in place in Roseville,
5  the customer specific invoicing?
6      A.  Yes.
7      Q.  Okay. What else?
8      A.  That's all I can remember.
9      Q.  Okay. Let's look up at the two e-mails
10 above it. Troy sends an e-mail back to you, does he
11 not, saying it's sad from a customer perspective, I
12 know Roseville believes it will work out but there
13 will be backlash, is that what he said to you?
14     A.  Yes.
15     Q.  You responded back to him at the top,
16 absolutely already is.
17     A.  Yes.
18     Q.  Okay. You were already receiving customer
19 backlash at that point in time?
20     A.  We were receiving customer backlash
21 because they -- it wasn't a one-stop shop. They
22 could not get absolute third-party parts through
23 Roseville.
24     Q.  Okay. And were they also having invoicing
25 problems?

Page 33

1      A.  I wasn't aware of any.
2      Q.  Okay. Were you having conversations with
3  customers regarding their backlash?
4      A.  No.
5      Q.  Okay. You were obviously made aware of
6  those problems though?
7      A.  Yes.
8      Q.  Did you communicate those to the
9  HP people?
10     A.  Yes.
11     Q.  Okay. What was -- were you -- were -- did
12 you communicate it to Mr. Crowley?
13     A.  Yes.
14     Q.  What did he say in response?
15     A.  I don't remember.
16     Q.  Okay. Well, did he say thanks, we'll
17 address it, or did he say, too bad, you don't recall
18 anything?
19     A.  No, it was never that too bad.
20     Q.  Okay.
21     A.  I mean, his focus was always on making
22 sure this was a smooth transition. Streamline for
23 the customer was our main goal on the transition
24 from Compaq Direct to Roseville.
25     Q.  Streamlining what?

9 (Pages 30 to 33)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 34

1  A.  It was a streamline effect, where the
2  customer is not aware of any type of --
3  Q.  Well, the customer was made aware because
4  a letter was sent out to them, correct?
5  A.  But they could still get what their needs
6  met through Roseville.
7  Q.  Okay.  Did that, in fact, take place, were
8  their needs being met by Roseville?
9  A.  I don't know.
10  Q.  Well, you said they were having backlash
11  because they couldn't get the third-party parts or
12  third-party obsolete parts?
13  A.  Right, but every part wasn't an obsolete
14  or third-party part for their needs.  People were
15  coming to HP/Compaq typically for HP/Compaq parts.
16  We only offered the third-party as a value-add to
17  our HP Direct program.
18  Q.  All right.  And was that ever replaced?
19  Do you know currently what the situation is with the
20  third-party parts?
21  A.  I don't know.
22  Q.  Okay.  After it was transitioned from you
23  to Roseville have you been removed from that?
24  A.  Yes.
25  Q.  Were you involved in any business

Page 35

1  decisions in that?
2  A.  No.
3  Q.  Okay.  Was the customer specific invoicing
4  problem ever worked out in the transition?
5  A.  I don't know.
6  Q.  Were you involved in working it out?
7  A.  I was involved in telling them what was
8  needed.
9  Q.  Who's them?
10  A.  Roseville, Bill Crowley.
11  Q.  Ms. --
12  A.  Louise Meyerfeld.
13  Q.  Okay.  And then, what, they told you
14  they'd take it from there?
15  A.  Yes.
16  Q.  So I take it you had to get them as much
17  as you could on what customers required what
18  specific invoicing?
19  A.  Yes.
20  Q.  Okay.  And in doing so did they ask you
21  then for any additional help in regards to customer
22  specific invoicing after you sent them that
23  information?
24  A.  Not after February.
25  Q.  Okay.

Page 36

1  A.  Of '04.
2  Q.  Were you able to provide them all of the
3  customer specific invoicing that was required for
4  each customer?
5  A.  Most of it.
6  Q.  Okay.  There were some you were not?
7  A.  Some I may not have been aware of.
8  Q.  Okay.  So going back to your statement
9  regarding the transition is a nightmare, we talked
10  about getting players in Roseville.  Were you not
11  getting cooperation or --
12  A.  The right players in the right place.  I
13  was not familiar with who took care of what within
14  that organization.
15  Q.  Is that when Mr. Boyle stepped in and --
16  A.  Yes.
17  MS. CARROLL:  Try to let him finish.
18  BY MR. HANSEN:
19  Q.  -- got the group put together?
20  A.  Yes.
21  Q.  Okay.  The customer specific invoicing,
22  what else?  I think you said third-party parts and
23  absolute parts; is that correct?
24  A.  Yes.
25  Q.  Okay.  Anything else you can think of?

Page 37

1  A.  What was the question again?
2  Q.  The other factors that led you to the
3  statement that the transition was a nightmare.
4  A.  It was the customer specific invoicing and
5  the ability for the customer to procure third-party
6  and obsolete parts.
7  Q.  Okay.  And then also getting people in
8  place.
9  A.  Yes.
10  Q.  My question was any other factors that you
11  can think of?
12  A.  Just the transition of the 2,000 accounts.
13  Q.  And then again up at the top you indicated
14  to Troy there already is customer backlash.  In what
15  manner or form did you see the customer backlash?
16  A.  Within the Roseville, California, at that
17  time they had -- the customer had to have a Compaq
18  spare account number and an HP spare account number.
19  Q.  Okay.
20  A.  That was different than how it was within
21  Compaq Direct where they had one account number --
22  Q.  For --
23  A.  -- for either side.
24  Q.  -- either side?
25  A.  Right.  That was very hard on the customer

10 (Pages 34 to 37)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 38

1 to understand why they had to have two account
2 numbers and --
3    Q.  Because if existing customers called
4 HP for an HP part and didn't have an HP number that
5 order couldn't be placed?
6    A.  Right, they had to be set up with an
7 account number for HP parts.
8    Q.  So basically all of the 2,000 or so
9 customers you referred to, if they had two separate
10 part numbers, they had -- if they had one part
11 number here, they had to go through a registration
12 period to obtain two numbers on the Roseville side?
13    A.  Yes.
14    Q.  Okay.  Were you giving -- were you getting
15 feedback that that was creating a problem having --
16    A.  Yes.
17    Q.  Was it creating a problem because orders
18 were trying to be placed at Roseville and people
19 didn't have these two numbers?
20    A.  Yes.
21    Q.  That was around the time of your e-mail to
22 Troy on January 15 of '04?
23    A.  Yes.
24    Q.  And those were for the accounts that have
25 been serviced by MITG and Compaq Direct that were

Page 39

1 now being transitioned to Roseville?
2    A.  Yes.
3    Q.  So that would -- that would have been a
4 situation where not only for new accounts but that
5 was for the existing 2,000 accounts, correct?
6    A.  Yes, some of them did have accounts
7 already established in Roseville, you know, they had
8 an account there and they had an account with us, so
9 some of those accounts were able to transition
10 without any issues at all because they had an
11 established account.
12    Q.  At Roseville?
13    A.  At Roseville.
14    Q.  Was that for the ordering of spare parts?
15    A.  Yes.
16    Q.  Okay.  Much like the ordering that took
17 place through MITG on the Compaq side?
18    A.  Yes.
19    Q.  Okay.  So some people had -- some people
20 had accounts in place at both spots, others did not?
21    A.  Yes.
22    Q.  Okay.  So the problem was created then,
23 for instance, if an existing customer did not
24 have -- strike that.  I got what you're saying.
25       Did you have actual conversations

Page 40

1 yourself, for instance, on the phone dealing with
2 customers around this time, January of 2004, where a
3 customer expressed to you that concern that, hey,
4 I've gone to Roseville to order a spare part and I
5 can't get my part, what's going on, and then you had
6 to explain to them the account system?
7    A.  Not the customer.
8    Q.  Okay.  Who did you have conversations like
9 that with, customer service reps?
10    A.  Yes.
11    Q.  Okay.  HP Direct customer service
12 representatives?
13    A.  Yes.
14    Q.  Okay.  Who at this time -- had they been
15 informed of the transition?
16    A.  Yes.
17    Q.  Okay.  And the transition was going to be
18 for them to direct the existing and new accounts to
19 Roseville for the transition?
20    A.  The existing accounts did not transition
21 until after -- until February.
22    Q.  Well, if they're setting up new accounts
23 they're obviously transitioning at this point in
24 time?
25    A.  They were setting up the accounts but not

Page 41

1 sending the orders.
2    Q.  Well, you just testified that you were
3 receiving backlash from customers that were placing
4 the orders that had to have the two accounts,
5 correct?
6    A.  That were trying to set up the accounts.
7    Q.  Okay.  However, the customer service reps
8 were directed to send any new accounts to Roseville
9 right away, don't even send them to us?
10    A.  As of January.
11    Q.  Right, 5th.
12    A.  Yes.
13    Q.  Now, let me show you Crowley Exhibit E.
14    A.  (Witness reviewing document.)
15    Q.  Okay.  Take a look at HP 241, which is
16 part of this exhibit, specifically focusing on this
17 section down.
18    A.  Okay.
19    Q.  That is an e-mail from Bill Crowley dated
20 October 13 of 2003, to a group of people of which
21 you're a recipient, correct?
22    A.  Yes.
23    Q.  At this point in time you were involved in
24 the transition team with HP for MITG, correct?
25    A.  Yes.

11 (Pages 38 to 41)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 42

1  Q. Okay. And it says you were an attendee at
2  a meeting that apparently took place on 10/8 of '03,
3  regarding the MITG contract, right here, attendees?
4  A. Yeah, on the phone.
5  Q. Okay. Was a phone call, and it was to
6  discuss the MITG contract, correct?
7  A. Yes.
8  Q. Okay. The decision was made as of 10/8 of
9  '03, under Issue A, renew the contract with MITG,
10 decision no, correct?
11 A. Yes.
12 Q. So you were part of the group then that
13 discussed that and ultimately came to the decision
14 not to renew the contract?
15 A. I did not vote.
16 Q. Why not?
17 A. I felt it was Troy's place to.
18 Q. But he had been removed; is that correct?
19 A. Right, but I worked for Sheryl Williams.
20 Q. Okay. So how -- I'm not following if you
21 thought it was Troy's place to vote --
22 A. It was Troy's program and I reported to
23 Sheryl.
24 Q. Okay. So were you asked to vote?
25 A. No.

Page 43

1  Q. Okay. If you thought it was Troy's place
2  to vote because it was his program did you
3  communicate that to the people during this meeting?
4  A. I believe Sheryl Williams spoke on behalf
5  of that.
6  Q. Okay. What was her decision?
7  A. I don't remember.
8  Q. Okay. Well, regardless, the decision was
9  no, and then under implementation changes, do you
10 see where I'm at?
11 A. Yes.
12 Q. Okay. Under C there, you were deemed the
13 lead for the customer transition?
14 A. Yes.
15 Q. Okay. And the transitions that are
16 mentioned there I think we've already gone over, is
17 the customer specific invoicing, transferring the
18 accounts over to HP, the new account setups, is
19 there anything else that I've left out?
20 A. Well, as indicated, the UDF links.
21 Q. Web sites?
22 A. User defined fields within invoicing.
23 Q. I was thinking URL, sorry. UDF, what
24 did --
25 A. UDF links.

Page 44

1  Q. Okay. What were you to do with that?
2  A. User defined fields for customer specific
3  invoicing.
4  Q. Okay. So you had to transfer those UDFs
5  to HP?
6  A. Yes.
7  Q. Were those UDFs part of the Middleware
8  that was created?
9  A. Yes.
10 Q. Okay. So the UDF because -- would you
11 agree that was one of the benefits of the
12 Middleware, that those UDFs regarding the customer
13 specific invoicing was created as part of the
14 Middleware?
15      MS. CARROLL: Objection: Assumes facts
16 not in evidence.
17 BY MR. HANSEN:
18 Q. You can answer.
19 A. Yes, but the UDFs were in place before the
20 Middleware was created.
21 Q. I understand the term UDF was around
22 before then, but the UDFs for these specific
23 customers that were serviced by the interface with
24 VISTA was not around prior to the development of
25 Middleware?

Page 45

1  A. Yes, they were.
2  Q. Okay. Then what was the specific creation
3  that the Middleware developed for the user defined
4  fields for the customer invoicing?
5  A. It allowed me not to have to enter them
6  manually into the VISTA system.
7  Q. Okay. So would those UDFs then as they
8  were transferred to HP allow them to avoid the same
9  entry system on their program?
10 A. Roseville?
11 Q. Yes.
12 A. Yes.
13 Q. That was for the benefit of allowing
14 Roseville the customer specific invoicing that had
15 been created on this side?
16 A. The UDFs were on only specific customers,
17 and Roseville was told who those customers were and
18 they were to create the ability for the UDFs to be
19 on the invoice.
20 Q. Right, and you transferred those UDFs to
21 them to allow them to do that?
22 A. I gave them the information on what the
23 customers needed, yes.
24 Q. After you gave them the information were
25 you involved in developing those UDFs?

12 (Pages 42 to 45)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 46

1  A. No.
2  Q. Okay. Do the UDFs then allow the invoice
3  to go with all this specific information that's
4  required on it?
5  A. Yes, but not every customer has a user
6  defined field.
7  Q. Right, I understand.
8  A. There's just a handful of them that had
9  that. It wasn't the bulk of the customer base that
10 we had.
11 Q. Okay. It then says that there --
12 something about -- actually it's on the next e-mail
13 here.
14     Then on HP 240, actually -- did I grab the
15 wrong one? Actually I'll go back to 239.
16     At the bottom there is an e-mail from
17 Bill Crowley to a number of recipients on which
18 you're on there, dated December 19 of '03?
19 A. Yes.
20 Q. And apparently this is an e-mail that was
21 sent to you and the others regarding some notes he
22 had with a phone call with Ron Haught on the same
23 day; is that correct?
24 A. Yes.
25 Q. Okay. Were you, as the day-to-day

Page 47

1  operations owner of the MITG side of things, talking
2  with Ron Haught? Did you have a -- did you have
3  conversations with him at this time regarding the
4  transition?
5  A. After October?
6  Q. Well, yeah, in December of '03, October,
7  November, December, after this group is assembled,
8  you're dealing with Bill Crowley and Louise
9  Meyerfeld, were you having phone calls with Ron
10 Haught or anyone at MITG regarding the transition?
11 A. I may have talked to Ron once.
12 Q. Okay. Were you instructed not to talk to
13 him, that Bill Crowley would take that over?
14 A. Yes.
15 Q. Okay. And did Mr. Crowley or
16 Ms. Williams, your boss or someone tell you that
17 during one of these conversation calls?
18 A. Yes.
19 Q. Okay. And what was said to you about
20 that?
21 A. That I was to continue the day-to-day
22 operations with MITG, and communications regarding
23 the termination of the contract would be handled by
24 Bill, Charlie, those folks.
25 Q. Okay. After Troy was removed from the

Page 48

1  group and you were brought in in the role of the
2  day-to-day operations, was there ever a time when
3  you were communicating with Ron on a daily, weekly,
4  monthly basis?
5  A. I don't remember.
6  Q. Okay. You said you were brought in
7  October of '03, where that first e-mail we saw was a
8  meeting that took place on October 8th, regarding
9  terminating the contact. I mean, was it pretty much
10 right when you got brought on or close thereafter
11 that the decision was made, you know, to not renew
12 with MITG, and you were instructed that Bill Crowley
13 was going to be point man with communications with
14 MITG?
15 A. I don't know when the decision was made,
16 but that's when I became aware of it.
17 Q. Okay. Is that when you were instructed
18 to, you know, continue with the day-to-day, but the
19 communications were going to be handled with MITG by
20 Mr. Crowley?
21     MS. CARROLL: Objection: Vague. Go
22 ahead.
23     THE WITNESS: Yes, but I wanted it that
24 way.
25

Page 49

1  BY MR. HANSEN:
2  Q. Okay. Why?
3  A. Because I had to continue a relationship
4  with MITG and I wanted that relationship to be up
5  front and honest, so I wanted the communication
6  regarding the contract and what was going to happen
7  with that to be between management and here and
8  management with MITG, not from a day-to-day
9  operational perspective.
10 Q. Okay. Because you --
11 A. Business was going on as usual at that
12 point.
13 Q. Okay. Meaning what, orders were still
14 being taken by MITG, invoiced here?
15 A. Yes.
16 Q. Okay. Did you have any conversations with
17 Mr. Haught or anyone at MITG regarding the statement
18 contained in Mr. Crowley's e-mail that Ron expressed
19 frustration that HP is not referring more customers
20 to him and it said that he feels we are missing out
21 on revenue opportunities, did you have any further
22 follow-up with him on that, him being Ron?
23 A. Yes.
24 Q. Okay. And what was discussed?
25 A. He called venting to me.

13 (Pages 46 to 49)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 50

1  Q. Okay. And what -- regarding the referral
2  of the calls from the call centers?
3  A. I think it was just his frustration on the
4  communication that he was receiving.
5  Q. From?
6  A. From --
7  Q. From Bill Crowley and management?
8  A. Yes.
9  Q. Frustration regarding lack of
10 communication or frustration regarding
11 inconsistencies?
12 A. Both.
13 Q. Okay. Was it communications regarding
14 which direction, if at all, MITG was going to be
15 used in the future?
16 A. Ron had already been notified of the
17 termination of the contract when I had the call with
18 him.
19 Q. I understand that, but were you aware that
20 Mr. Crowley had requested him to submit a proposal
21 regarding possibly using MITG in a go-forward
22 different type of relationship after the agreement
23 ended?
24 A. No.
25 Q. Okay. And when Ron called venting, what

Page 51

1  did you say in response?
2  A. I told him he needed to talk to Troy or
3  Sheryl. He was very irate.
4  Q. Okay. And was that the last call you had
5  with him?
6  A. I don't remember.
7  Q. Okay. I think you said you didn't vote on
8  the decision whether or not to renew the contract?
9  A. No.
10 Q. Okay. Were you asked if you agreed with
11 the decision?
12 A. Yes.
13 Q. What did you say?
14 A. I told them I had concerns.
15 Q. And you said them, you mean the group?
16 A. The group.
17 Q. Okay. And do you recall, is it concerns
18 regarding the ability to have on the customer
19 specific invoicing, one-stop shopping, those type of
20 things?
21 A. I had concerns about the smooth transition
22 from Point A to Point B, from MITG to Roseville, and
23 the impact that it might have the customer and
24 customer service.
25 Q. Okay. Any concerns regarding the

Page 52

1  ability -- I think you already testified to it, you
2  did have concerns regarding HP's ability whether or
3  not they could have the single invoicing and the
4  one-stop shop that MITG and Compaq was providing?
5  A. I never said I had a concern on the single
6  invoicing because I was not aware that Roseville
7  could or could not do single invoicing.
8  Q. Had concerns regarding third-party parts,
9  obsolete parts, one-stop shop, that type of deal?
10 A. Yes.
11 Q. You said you expressed that to the group,
12 what did you get in response? I mean, what did
13 Ms. Williams say in response to that?
14 A. I don't remember.
15 Q. How about Mr. Crowley?
16 A. I don't remember exactly what they said.
17 Q. Okay.
18 A. I believe that the perception was that
19 Roseville would be -- they had been doing spare
20 parts for a long time and that we would work out any
21 and all issues that I had concerning the program.
22 Q. Okay. Did you have to work at all with
23 any of the HP call centers on the transition? Were
24 you also dealing with Ms. Meyerfeld?
25 A. Richard Krisek.

Page 53

1  Q. I'm sorry. I mean, did you have to deal
2  with, you know, anyone at Andover? Do you know what
3  Andover is?
4  A. It's called HP Direct call center.
5  Q. Okay. And was that in place during the
6  time of the MITG agreement prior to its termination?
7  A. Yes.
8  Q. Okay. Did you have to work with Andover
9  on transitioning anything with them?
10 A. Maybe a CSR or helping them with an
11 account.
12 Q. Okay. Where -- is that Andover,
13 Massachusetts?
14 A. Yes.
15 Q. Okay. You said they were an HP Direct
16 call center?
17 A. Yes.
18 Q. Is that for spare part orders?
19 A. No, product.
20 Q. I'm sorry?
21 A. Product.
22 Q. What's that?
23 A. Computer systems.
24 Q. Okay. Anything else?
25 A. Just product monitor sales, they took

14 (Pages 50 to 53)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 54

1  spare parts orders if their customer had a need.
2      Q. Okay. So they did a number of products,
3  monitors, computer systems, did they do printers?
4      A. Yes.
5      Q. Sales part orders if their customers had
6  the need?
7      A. Yes.
8      Q. Okay. Then this e-mail here at the top,
9  dated Thursday, January 8 of '04, again from Bill
10 Crowley to the group of which you're on there,
11 correct?
12     A. Yes.
13     Q. Again, he has some notes he's forwarding
14 to you regarding the call he had with Ron Haught
15 with MITG, correct?
16     A. Yes.
17     Q. Okay. And what are "S" accounts?
18     A. That's how we identified a service or
19 spare account number in VISTA.
20     Q. Okay. If I say S01 and S02, were those
21 the two types of spare accounts in VISTA?
22     A. Yes.
23     Q. Okay. What does the S01 stand for?
24     A. Sourced product.
25     Q. And S02?

Page 55

1      A. Compaq product.
2      Q. CSN product?
3      A. Yes.
4      Q. Okay. S02 meaning if MITG had an order
5  that the product was here through Compaq based on
6  some guidelines, if that was the type of product
7  used, it was S02; if it was sourced from MITG
8  getting elsewhere it was S01?
9      A. Yes.
10     Q. Okay. Now, in this e-mail Mr. Crowley
11 said that he and Ron briefly discussed the proposal
12 that was sent over the holidays. Were you asked to
13 review that proposal at all?
14     A. No.
15     Q. Did you ever see it?
16     A. No.
17     Q. Obviously you have no idea what it
18 involved?
19     A. No.
20     Q. Okay. Then it says that Shari Ellis is
21 the main HP contact for this transition, do you see
22 that?
23     A. Yes.
24     Q. Okay. Was there anyone else on this side
25 that you were working with for that transition,

Page 56

1  anyone helping you out?
2      A. No.
3      Q. Okay. Then continuing in this exhibit,
4  let me show you Page 235, okay, on HP 235 there,
5  that is an e-mail from you to Louise Meyerfeld and
6  Richard Krisek dated September 22nd of '03, so I
7  mean this is before, you know, this group is put
8  together in October.
9          And did you send them an e-mail regarding
10 what percentage HP was of MITG's business?
11     A. Yes.
12     Q. Okay. Who requested that, was it
13 Ms. Meyerfeld, Mr. Krisek, both?
14     A. Louise.
15     Q. Why did she request that information?
16        MS. CARROLL: Objection.
17        THE WITNESS: I don't know.
18 BY MR. HANSEN:
19     Q. Did she ever tell you why she wanted it?
20     A. No.
21     Q. Did she request it to you via e-mail, via
22 phone?
23     A. I believe it was phone.
24     Q. Okay. Where did you get the numbers that
25 you put in the e-mail back to her?

Page 57

1      A. Troy and Chuck Schmaderer.
2      Q. Okay. Chuck being the finance guy?
3      A. Yes.
4      Q. Did you ever ask or were you ever told why
5  this information was being requested in
6  September 22nd -- in September of '03?
7      A. I don't remember.
8      Q. Well, if we look at the e-mail at the top
9  here from Ms. Meyerfeld to Mr. Crowley, which is
10 dated October 8th of '03, which is the date your
11 group held its first meeting back here on HP 241,
12 were those percentages discussed at this meeting
13 when it was decided not to renew the HP/MITG
14 contract?
15     A. I don't remember.
16     Q. Do you recall having conversations during
17 these meetings regarding the percentage of MITG's
18 business that was HP related?
19     A. I don't remember conversations.
20     Q. Okay. Do you recall being part of
21 conversations or being on a phone where you're just
22 listening to conversations regarding the fact of the
23 impact it would have on MITG's business not renewing
24 the contract if 65 percent of it was HP related?
25     A. I was never on a call that that was

15 (Pages 54 to 57)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 58

1 discussed.
2  Q. Did you ever discuss that with anyone?
3  A. No.
4  Q. HP 232 and 233, at the top is an e-mail
5 from Charlie Boyle to a group of people of which
6 you're on there, dated Wednesday, January 14th,
7 2004, correct?
8  A. Yes.
9  Q. Okay. It's regarding the MITG transition
10 meeting notes, action items from the day before,
11 January 13th, correct?
12  A. Yes.
13  Q. And you attend -- you were listed as --
14 excuse me, as an attendee at the meeting, correct?
15  A. Yeah, on the phone.
16  Q. Was it a phone call?
17  A. Yes.
18  Q. Okay. Now, it says -- skip down a little
19 bit right here, Shari, backslash, Louise, continue
20 migration of "S" account customers to PL91.
21 "S" account we already went over is spare accounts.
22 Do you know what PL91 is?
23  A. No.
24  Q. Okay. Status of phone move, assignment of
25 call center individuals to top accounts and

Page 59

1 collection systems status; were those the items that
2 you were working on I guess regarding the transition
3 of January of '03?
4  A. Yes.
5  Q. Okay. You said you didn't know what
6 PL91 stood for. What was the -- it says migration,
7 is that just transferring the accounts over to
8 Roseville?
9  A. That was my understanding.
10  Q. Okay. And since the new accounts had
11 already started going there in January, as of
12 January 5th, is this just for the existing accounts?
13  A. Yes.
14  Q. Okay. On the prior action items, it says
15 results from prior action items events, do you see
16 that?
17  A. Yes.
18  Q. Down at the very bottom, again you and
19 Louise, continue migration of "S" account customers
20 to PL91. It says result, as stated earlier, MITG is
21 making this difficult. What information did MITG
22 have that was making that difficult if the account
23 customers were set up in VISTA?
24  A. They dealt with those customers on a daily
25 basis and had their -- you know, knew exactly what

Page 60

1 they needed. We had requested from them what
2 customers had -- needed customer specific
3 information on their invoices.
4  Q. Okay. But I thought that was already in
5 the UDFs that was on the Middleware?
6  A. UDFs is different than customer specific
7 invoicing.
8  Q. Okay. How?
9  A. UDFs is user defined fields, they're
10 basically numbers that the customer has to have in
11 order to process for payment; customer specific
12 invoicing is that they have to have their customer
13 PO in the body of the invoice. They have to a --
14 you know, a dot behind their PO number, you know,
15 that type of stuff. That's customer specific
16 invoicing that MITG dealt with every day.
17  Q. Okay. It says as a result, the plan
18 moving forward is to deal with this on an
19 account-by-account basis as the account calls in,
20 customers have to tell us what service they received
21 from MITG; is that relating to, what, service on the
22 invoice?
23  A. Well, invoice or, you know, any other TLC
24 that MITG would have done for that customer.
25  Q. TLC meaning tender loving care?

Page 61

1  A. Yes.
2  Q. Okay. It then says -- I'm reading upside
3 down, hold on.
4   Yeah, okay, this line here says customer
5 calling to three potential 800 numbers, one is owned
6 by MITG. What were the three 800 numbers, do you
7 know?
8  A. I don't remember them.
9  Q. Okay. Were they -- it says one is owned
10 by MITG. Was it your understanding one of the
11 800 numbers sent the call directly to MITG?
12  A. It was dialed straight into MITG.
13  Q. Where were the other two numbers dialed
14 into?
15  A. I know one was dialed into here.
16  Q. Okay. Was the other one Roseville?
17  A. I don't know.
18  Q. Okay. Those were for spare orders, spare
19 part orders?
20  A. Yes.
21  Q. Okay. Do you know who might be the
22 individual that would know the numbers and where
23 they were dialed into?
24  A. Yes.
25  Q. Who?

16 (Pages 58 to 61)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.