Page 62

1   A.  I can't think of her name.
2   Q.  Would Mr. Krisek?
3       MS. CARROLL:  Objection:  Calls for
4   speculation.
5   BY MR. HANSEN:
6   Q.  If you know.
7   A.  I don't know.  I only know from
8   HP Direct's perspective who manhandled the phone
9   here, the 800 number coming in here.
10  Q.  That's the person you can't --
11  A.  I can't --
12  Q.  That's fine.
13  A.  If I had a phone list I could see it.
14  Q.  Okay.  Then it says --
15  A.  Victoria.
16  Q.  Manzo?
17      MS. CARROLL:  No, that's Victor.
18      THE WITNESS:  Victoria used to be Griffin,
19  Lorenzo, I don't know.
20  BY MR. HANSEN:
21  Q.  I've seen her, Victoria Griffith --
22  A.  Yeah.
23  Q.  -- and now it's Victoria Lorenz
24  (phonetic)?
25  A.  Yes.

Page 63

1   Q.  Okay.  On the numbers one was Omaha here,
2   was one direct to MITG, and the third you can't --
3   you don't know; is that correct?
4   A.  Right.
5   Q.  Okay.  It says here on HP 232 you see this
6   name Ebanks, Bill Ebanks, do you know who that was?
7   A.  I recognize the name.
8   Q.  Okay.  He's up here on the group on the
9   e-mail that Charlie Boyle sent.  Is he Omaha?
10  A.  No.
11  Q.  Okay.  All right.  Anyway, it says end of
12  business Friday, meet with Shari and others to
13  better understand the MITG business, do you see
14  that?
15  A.  Yes.
16  Q.  Do you recall that meeting taking place?
17  A.  No, I don't remember who Bill Ebanks is.
18  Q.  Okay.
19  A.  And the meeting would have been on a phone
20  if I would have talked to him.
21  Q.  Right, I understand.  And you don't recall
22  one way the other if you did?
23  A.  I don't remember.
24  Q.  Okay.  It says result, there is not enough
25  business for HP Direct to be interested in, do you

Page 64

1   recall discussing that with anyone?
2   A.  I know that there was discussions about
3   HP Direct maintaining this business here.
4   Q.  Okay.  And when you say this business, are
5   we referring to third-party?
6   A.  The MITG/HP Direct business.
7   Q.  Okay.  Do you recall who made -- did
8   Bill Ebanks make the statement there was not enough
9   business for HP Direct to be interested in?
10  A.  I don't remember.
11  Q.  Okay.  On these type of meetings like here
12  for the e-mail at the top, apparently Mr. Ebanks was
13  an attendee on this call with you, Ms. Triolo,
14  Louise and Bill Crowley.  I mean, just the nature of
15  the calls, were they initiated and led by
16  Mr. Crowley?
17  A.  Yes.
18  Q.  Okay.  Did you just discuss past action
19  items, the status and then what needed to be done
20  currently?
21  A.  Yes.
22  Q.  Okay.  Updates, the like?
23  A.  Yes.
24  Q.  Okay.  Apparently it says in here, Crowley
25  indicates no further conversations are planned with

Page 65

1   MITG, do you recall speaking with Ron Haught or
2   anybody at MITG after January 14, 2004?
3   A.  Yeah.
4   Q.  Okay.  Would that have been in the context
5   of day-to-day, maybe dealing with Ms. Welch or
6   somebody over there on orders?
7   A.  Yes.
8   Q.  How about Mr. Haught or anyone outside of
9   the daily day-to-day people you dealt with on
10  invoicing and orders?
11  A.  No.
12      MR. HANSEN:  Okay.  Let's take a break.
13      (10:25 - 10:37 a.m. - Recess.)
14  BY MR. HANSEN:
15  Q.  Handing you what was previously marked as
16  Meyerfeld Exhibit P.  This is four pages, HP 9, 10,
17  11 and 12, and the first page there is an e-mail
18  dated Thursday, January 22nd, 2004, from
19  Ms. Meyerfeld to a group again of which you're on
20  here, correct?
21  A.  Yes.
22  Q.  Okay.  Second paragraph says, the letters
23  will be mailed out to top 89 accounts by
24  January 29th, do you see that?
25  A.  Yes.

17 (Pages 62 to 65)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 66

1  Q. Okay. What were the letters?
2  A. The letters were informing them of the new
3  web site, new phone numbers for spare parts.
4  Q. What was the new web site?
5  A. I don't remember --
6  Q. Okay.
7  A. -- exactly.
8  Q. Did it say what was happening to
9  HP Direct/MITG?
10 A. I think it stated the fact of immediately
11 the spare parts program will be moving to Roseville,
12 or something to that regard.
13 Q. Okay. Then later in that paragraph it
14 says the remainder of letters, 2,000 plus, was that
15 for all of the accounts?
16 A. Outside the top 89.
17 Q. How were the top 89 determined, volume?
18 A. Yes.
19 Q. Volume being number of orders or revenue?
20 A. Revenue.
21 Q. Okay. Did you draft the letter?
22 A. No.
23 Q. Okay. Were you responsible for sending
24 it?
25 A. No.

Page 67

1  Q. Okay. Who drafted it, do you know?
2  A. There was a group of people that
3  contributed to drafting the letter.
4  Q. Were you one of them?
5  A. I was asked for input, yes.
6  Q. Did you provide input?
7  A. I reviewed the letter and added no input.
8  Q. Okay. Who was in the group,
9  Ms. Meyerfeld?
10 A. Yes.
11 Q. Mr. Crowley?
12 A. Yes.
13 Q. Your boss, Sheryl Williams?
14 A. No.
15 Q. Okay. Anyone from Omaha?
16 A. I believe Troy saw the letter.
17 Q. Was he asked for input?
18 A. I don't know.
19 Q. Mr. Boyle?
20 A. He saw the letter.
21 Q. Okay. Flip to the second page, HP 10, do
22 you see the line that says calls MITG that results
23 in back order, do you see where I'm at?
24 A. Yes.
25 Q. Okay. It says as of 2/2, February 2, will

Page 68

1  be forwarded to Roseville 800-227-8164, looks like a
2  double print, Option 2 for order placement, do you
3  see that?
4  A. Yes.
5  Q. Okay. And as of February 2nd, then was
6  spare parts orders that got backlogged at MITG or
7  back order -- what was -- strike that.
8  What was being forwarded to Roseville as
9  of 2/2?
10 A. Any order that came in that was on back
11 order, meaning MITG did not have it in stock.
12 Q. Okay. How was it being forwarded to the
13 800 number at Roseville?
14 A. Those customers were instructed that --
15 MITG was instructed to tell the customers that those
16 orders need to go -- call this number for spare
17 parts.
18 Q. So Roseville has the capability through
19 this 800 number to accept spare parts orders as of
20 February 2nd?
21 A. Yes.
22 Q. Okay. Were you the person that told
23 MITG -- well, strike that. Let me back up.
24 When you say the calls that were sent to
25 MITG, if they didn't have the product in stock they

Page 69

1  were directed to send the customer to Roseville to
2  this number, were you the person that informed MITG
3  of that?
4  A. Yes.
5  Q. Okay. Who did you tell there, their
6  customer service reps?
7  A. No.
8  Q. Who?
9  A. Terri Welch.
10 Q. And were these orders regardless if they
11 came in the direct 800 number to MITG or over the
12 web site that should be referred over to this
13 Roseville number?
14 A. If they were on back order.
15 Q. Do you know what Option 2 was under that
16 Roseville 800 number?
17 A. No.
18 Q. Do you know how many orders were forwarded
19 to Roseville to fill that were on back order?
20 A. No.
21 Q. Would Roseville have that?
22 A. I don't know.
23 Q. It says this will allow VISTA access to be
24 shut down, and I don't know if that is supposed to
25 elevate or alleviate manual steps for Shari after

18 (Pages 66 to 69)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 70

1  the February 8th date.
2      Do you know what's being referred to?
3  VISTA access has to be shut down, is that VISTA
4  access for MITG?
5      A.  The feed from MITG to VISTA.
6      Q.  The Middleware?
7      A.  Yes.
8      Q.  Okay. What is that last part regarding?
9      A.  Once the Middleware is disconnected any
10 orders that MITG still had that they had not been
11 paid for then converted to a manual process, keying
12 in the order.
13     Q.  Back to where you were prior to the
14 Middleware?
15     A.  Yes.
16     Q.  Okay. And were you the person
17 that--apparently on the next line you were--remained
18 in place to work out those outstanding order issues?
19     A.  Yes.
20     Q.  Do you recall when all of those order
21 issues were wrapped up by?
22     A.  End of March.
23     Q.  Do you know if MITG is still being, you
24 know, referred third-party parts and spare order
25 business from HP Direct customer service reps?

Page 71

1      A.  Yes.
2      Q.  Okay. Now, their access to VISTA--their
3  being MITG--is shut off?
4      A.  Yes.
5      Q.  So are they having any more interaction
6  here with the orders where they have to be manually
7  keyed in?
8      A.  No.
9      Q.  Are all of their fulfillment of orders --
10 are all MITG's fulfillment of orders then being
11 outsourced?
12        MS. CARROLL: Objection: Calls for
13 speculation.
14        THE WITNESS: I don't know.
15 BY MR. HANSEN:
16     Q.  Are they invoicing Compaq at all?
17     A.  I don't know.
18     Q.  Okay. You're no longer with that group?
19     A.  Right.
20     Q.  Okay. You're in a new position?
21     A.  Yes.
22     Q.  Okay. Then the last paragraph there
23 says -- mentions a Mareen Heath (phonetic), who is
24 that?
25     A.  She did the -- she does the RMAs for

Page 72

1  Roseville.
2      Q.  RMAs being?
3      A.  Return of goods, return materials
4  authorization.
5      Q.  And that is the back end processes that
6  are being referred to there, I guess the return of
7  goods, how they were going to be handled?
8      A.  Yes.
9      Q.  Okay. How they were going to be handled
10 on the Roseville side now?
11     A.  How they were going to be handled. Parts
12 were guaranteed for 30 to 90 days.
13     Q.  Okay. So after the termination if there
14 was an order, what was going to be happen for that
15 guarantee until the transition had completely gone
16 over there to Roseville?
17     A.  How they were going to be handled if it
18 was an MITG part.
19     Q.  Okay. How was -- was there a decision
20 made as to how it was going to be handled?
21     A.  Yes.
22     Q.  What was that decision?
23     A.  We were going to request the part be
24 returned and issue a credit to the customer and not
25 request credit back from MITG.

Page 73

1      Q.  What does that mean?
2      A.  Meaning that we paid them for that part.
3      Q.  You were going to credit the customer?
4      A.  Customer sat.
5      Q.  Satisfaction?
6      A.  Uh-huh.
7      Q.  Is that a yes?
8      A.  Yes.
9      Q.  Go to HP 11, please next page.
10     A.  (Witness complies.)
11     Q.  It's an e-mail to you on January 16 of
12 '04, from Richard Krisek, correct?
13     A.  Krisek.
14     Q.  Krisek. All right. To you amongst
15 others?
16     A.  Yes.
17     Q.  Okay. It's minutes of an account setup
18 meeting; were you a part of that meeting which I
19 take it took place over the phone?
20     A.  Yes.
21     Q.  Okay. Under background it says, ordering
22 for PM Compaq parts has been consolidated at
23 Roseville parts center. Were those PM Compaq parts,
24 those orders, previously being serviced here in
25 Omaha?

19 (Pages 70 to 73)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 74

1  A. Yes.
2  Q. Okay. Were they part of the order
3  placement with MITG?
4  A. Yes.
5  Q. Okay. And were those PM Compaq parts --
6  what type of parts were those, if you know?
7  A. Hard drives.
8  Q. Okay. So they were part of the ordering
9  that was being fulfilled by MITG through VISTA here
10 in Omaha; is that correct?
11 A. Yes.
12 Q. Okay. That had been consolidated as of
13 January 16, 2004, over to the Roseville parts sales
14 center?
15 A. Yes.
16 Q. Okay. Then on the very bottom paragraph
17 there, Yvonne (phonetic) -- apparently his last name
18 is Cowan, C-O-W-A-N, from Roseville, is to release
19 the announcement ASAP, do you know what the
20 announcement was?
21 A. I don't remember.
22 Q. Okay. Recommends HP Direct migration
23 letter includes that account numbers will follow,
24 approximately 110 preMITG accounts identified as
25 recurrent parts customers, many of the MITG clients

Page 75

1  have existing HP accounts.
2      Do you know, are all of those preMITG and
3  MITG clients identified here sent this HP Direct
4  migration letter?
5  A. All of the accounts were sent a letter.
6  Q. Is that the letter we've been talking
7  about earlier?
8  A. Yes.
9  Q. Okay. That indicated that the
10 HP Roseville was now going to be handling the
11 HP Direct parts ordering system?
12 A. Yes.
13 Q. Okay. Gave a new web site out, new phone
14 number?
15 A. Yes.
16 Q. Okay. Well, let me ask, do you know if
17 the phone numbers were different? Obviously one
18 connected here into Omaha, one you said connected
19 directly to MITG, the third one you didn't know of.
20 Do you know if that was one that was already being
21 used by Roseville?
22 A. I don't know.
23 Q. Okay. All right. The second page HP --
24 I'm sorry, the next page, HP 12, the second
25 paragraph there, Richard will also calibrate

Page 76

1  Shari Ellis and MITG that new accounts setup request
2  and/or parts inquiries should be directed to PBCO,
3  and there's an 800 number listed there?
4  A. Yes.
5  Q. Does PBCO stand for parts business center
6  operations, do you know?
7  A. I have no idea.
8  Q. Do you know where that 800 number is, is
9  that Roseville?
10 A. I don't know.
11 Q. Okay. Well, I think we've already
12 reviewed the e-mails about the new account set up.
13 That had already started as of January 5th, to
14 Roseville, correct?
15 A. Yes.
16 Q. Okay. And any parts inquiries for those
17 new accounts -- spare parts inquiries for those new
18 accounts were directed to Roseville and whatever
19 800 number that was provided?
20 A. Yes.
21 Q. And if you look down under Mr. Krisek's
22 signature block there, do you see where it says to
23 order parts there's a www.hp.com and then an
24 800 number underneath there?
25 A. Yes.

Page 77

1  Q. That 800 number is the same as the one up
2  in that paragraph, correct?
3  A. Yes.
4  Q. Do you know if that was the HP 800 number
5  then for spare parts ordering?
6  A. I don't know because I never called that
7  number.
8  Q. Okay. All right. I'm done with that,
9  we'll get that out of your way.
10     I'm going to hand you what's been marked
11 as Crowley Exhibit H, do you recognize these
12 PBCO matrices?
13 A. No.
14 Q. Okay. Well, not specifically this one,
15 but your name appears on here as the individual that
16 was providing information to prepare these matrices,
17 do you recall doing that?
18     MS. CARROLL: Object to the extent that it
19 misstates what's on all of those documents.
20     MR. HANSEN: Fine.
21 BY MR. HANSEN:
22 Q. To resolve the objection go right to
23 1139 and 1140, matrix dated February 5, 2004, if you
24 turn to the second page on the very bottom, it says
25 matrix provided by and your name appears there, do

20 (Pages 74 to 77)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 78

1  you see that?
2    A.  Yes.
3    Q.  Were you the individual that was supplying
4  information to someone to compile these matrices?
5    A.  I don't remember doing this. The only
6  information I ever gave was to Chuck Schmaderer, so
7  maybe he was giving it to them.
8    Q.  Well, do you recall getting on a daily
9  basis information from Mr. Schmaderer or someone
10 else here regarding the number of calls that were
11 being handled by the call center labeled U.S.
12 Hannibal, MO, in this instance, February 5 of '04?
13   A.  The only call center rates I ever called
14 on that I ever got was from MITG.
15   Q.  Okay. Well, I'll represent to you that
16 MITG is U.S. Hanaball, Missouri, okay, so you --
17 would you get the calls offered handle rate and
18 service level from them on a daily basis?
19   A.  No.
20   Q.  Okay. Do you know why then your name
21 appears on this document, on HP 1140?
22   A.  No.
23   Q.  Do you recall providing matrix information
24 to anyone in Roseville on a daily basis so they
25 could calculate and come up with these matrices as

Page 79

1  identified in HP 1139?
2    A.  I don't remember. I might have given
3  something to Richard Krisek towards the end after
4  Troy left.
5    Q.  Okay. Well, let's go to
6  Exhibit Meyerfeld M, specifically within that
7  exhibit MITG 60, which indicates a matrix dated
8  December 1 of 2003, I'll lay these side by side for
9  you, again where it says matrix provided by and your
10 name appears there on MITG 61?
11   A.  Yes.
12   Q.  Okay. Were you -- were you providing --
13 in this matrix it's labeled differently, it's
14 Missouri HP Direct, do you see that?
15   A.  Yes.
16   Q.  Okay. Do you see calls offered?
17   A.  Yes.
18   Q.  Do you know what that volume -- or do you
19 know what that column represents?
20   A.  I think it means the calls that they took.
21   Q.  Per day?
22   A.  Yeah.
23   Q.  Handle rate, are you familiar with that?
24   A.  Yes.
25   Q.  Okay. What is the handle rate?

Page 80

1    A.  The number of calls that they were able
2  to --
3    Q.  Handle from offered?
4    A.  Yes.
5    Q.  Service level, I'm not trying to trick
6  you, service level on the second page indicated that
7  how many -- what percentage of the calls were
8  answered in 180 seconds, do you see that?
9    A.  Yes.
10   Q.  Okay. Do you understand then that they --
11 for instance, Missouri HP Direct were offered
12 204 calls, they were able to handle a hundred
13 percent of them, a hundred percent of them were
14 answered within 180 seconds, is that how you
15 understand this --
16   A.  Yes.
17   Q.  -- chart?
18      Okay. Then month-to-date service level,
19 is that what this column is?
20   A.  Yes.
21   Q.  Okay. And did you understand that to mean
22 that was the service level they were operating --
23 well, unfortunately in this case it's as of
24 December 1, which was the first day of the month,
25 does that represent a running total for the month to

Page 81

1  date?
2    A.  Yes.
3    Q.  Okay. Now, under orders on Page 61, do
4  you see we have Roseville PL91?
5    A.  Yes.
6    Q.  Roseville, Andover?
7    A.  Yes.
8    Q.  Okay. Then Missouri?
9    A.  Yes.
10   Q.  Okay. Do you understand MITG to be
11 Missouri?
12   A.  Yes.
13   Q.  Okay. Do you know what Roseville PL91 is?
14   A.  I don't know what PL91 is.
15   Q.  Roseville, backslash, Andover; do you know
16 what that call center is? Is it the Andover call
17 center for one?
18   A.  I don't know. I didn't know they had a
19 call center there.
20   Q.  Okay. Well, earlier I thought you told me
21 that was HP Direct?
22   A.  Well, I thought it was HP Direct but
23 obviously I was wrong.
24   Q.  Why do you say that?
25   A.  Well, because it's -- no, Andover,

21 (Pages 78 to 81)

Page 82

1  Massachusetts is HP Direct. Roseville, that's --
2  it's confusing there.
3      Q.  Because it's on the same line?
4      A.  Yeah.
5      Q.  Okay. Do you know what CC and espares
6  stand for?
7      A.  I don't know.
8      Q.  Okay. Do you know what the CC after
9  Missouri stands for?
10     A.  No.
11     Q.  Okay. Were you responsible -- well, let
12 me back up and ask this.
13         It say matrix provided by -- was Darlene
14 Lowe here in Omaha?
15     A.  No.
16     Q.  Vicki Ngo, N-G-O?
17     A.  No.
18     Q.  Surinder, S-U-R-I-N-D-E-R; last name
19 G-A-L-A-F, that person wasn't here?
20     A.  No.
21     Q.  How about Jennifer Sequeira,
22 S-E-Q-E-R-I-A?
23     A.  No.
24     Q.  And then you're the last one, correct?
25     A.  Yes.

Page 83

1      Q.  Okay. So you were the only person listed
2  in this group from Omaha?
3      A.  Yes.
4      Q.  Okay. Were you providing the order
5  information for Missouri to whoever was putting
6  these PBCOs together?
7      A.  I was providing a report I got from MITG.
8  I did not know what they were doing with it. I sent
9  it to Darlene and Vicki after Troy left.
10     Q.  Right. He's testified to that.
11     A.  Yes.
12     Q.  Okay. So prior to October of '03, Troy
13 did that?
14     A.  Yes.
15     Q.  And I'll show you the matrix directly
16 before the one we're looking at, which is July 28 of
17 '03, MITG 58 and 50 because your name isn't on
18 there, right, Troy's is?
19     A.  Right.
20     Q.  Okay. So you sent a, what did you say, a
21 daily report that MITG --
22     A.  Yes.
23     Q.  -- provided?
24         Okay. To Vicki and Darlene?
25     A.  Yes.

Page 84

1      Q.  Were they in Roseville?
2      A.  I don't know.
3      Q.  Okay. Were they HP people?
4      A.  Yes.
5      Q.  Okay. And then they, to the best of your
6  understanding, were the people that created this
7  document?
8      A.  I don't know.
9      Q.  Okay. Do you have any understanding at
10 all how this order number -- or excuse me, how the
11 numbers under the order section here were compiled?
12     A.  No, I just sent the report.
13     Q.  Okay. Did you -- I haven't seen your name
14 on the group of individuals, for instance, sticking
15 to 60 and 61, Ms. Ngo then sends it out to a group
16 the next day, do you see that?
17     A.  Yes.
18     Q.  Okay. And I don't see your name on here.
19 Were you ever an individual that was receiving the
20 PBCO matrix after they had been put into this form?
21     A.  No, I didn't even know this existed.
22     Q.  I'm sorry, you didn't what?
23     A.  I did not know this report existed.
24     Q.  Until I just showed it to you?
25     A.  Yes.

Page 85

1      Q.  Okay. If there was any issues -- if there
2  were any issues with regards to the MITG, for
3  instance, service level or handle rate, were you
4  ever contacted regarding that?
5      A.  No.
6      Q.  Are you aware of any issues regarding poor
7  customer satisfaction or customer service levels
8  from MITG?
9      A.  Well, there was always occasions of poor
10 customer service.
11     Q.  Well --
12     A.  But those were on a case-by-case basis.
13     Q.  Were you ever aware of anyone, for
14 instance, at HP indicating to you that they thought
15 MITG had a poor handle rate or service level with
16 regard to the call volume they handled?
17     A.  No.
18     Q.  I'm sorry, what was your answer?
19     A.  No.
20     Q.  Hold on a second, let me get these
21 matrices back in order.
22         Did you continue to send this report up to
23 and including I guess the day in which the contract
24 with MITG ended?
25         MS. CARROLL:  Object to that as vague.

22 (Pages 82 to 85)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 86

BY MR. HANSEN:
Q. You said you sent these MITG reports on a daily basis to Vicki Ngo or Darlene Lowe, correct?
A. I don't remember when I got the last one from MITG.
Q. Okay. Well, the last document we've been provided is a call center of February 5, 2004, on HP 1339 and your name does appear on the second page, correct?
A. Yes.
Q. Okay. But you don't recall when after that date you stopped forwarding any reports to Ms. Ngo or Lowe?
A. I don't remember.
Q. Okay. Can you tell me descriptionwise what was the report that you got on a daily basis from MITG so if I went looking for this document I'd know what I was looking for?
A. To be honest with you I just forwarded it.
Q. So it came -- who sent it from -- was it sent from MITG to you?
A. Yes.
Q. Okay. As opposed to something that was automatically created on the Compaq side?
A. Yes.

Page 87

Q. Okay. And do you remember who sent it from MITG to you, was it always the same person?
A. It was either Terri Welch or Mike Lauber.
Q. Okay. Did the document have a title or --
A. I don't remember.
Q. Okay. And then would it pop up on your e-mail, you would simply just hit forward and send it on?
A. Yes.
Q. Okay. Were you ever asked to review the numbers?
A. No. I only forwarded them on because Troy wasn't.
Q. Because Troy had been removed from doing that?
A. Yes.
Q. Okay. They at least apparently recognized the change on the second page of the documents, but they never substituted your name for Troy I guess up here on the list of recipients?
A. No.
Q. I take it you never went and asked them to do that?
A. I did not know that existed.
Q. Okay. We were talking about that lady

Page 88

named Victoria Griffith?
A. Yes.
Q. Was she someone here in Omaha?
A. Yes.
Q. Okay. I want to shift focus now to the Middleware, the XML piece.
You're aware that MITG was approached to create this interface along with Compaq between its web tool and the VISTA system, correct?
A. Yes.
Q. What was your involvement with regards to that Middleware development?
A. My involvement was making sure that the information that fed over was the appropriate information for invoicing.
Q. Let me get this down right. Information that fed over from where?
A. From MITG's web tool.
Q. Into VISTA?
A. Yes.
Q. I take it you're not a computer programmer?
A. No.
Q. Okay. You weren't involved in any of the programming or development of the software for the

Page 89

Middleware?
A. No.
Q. You're on the business side of the things?
A. Yes.
Q. Not the IT side?
A. Yes.
Q. Okay. You said the information that fed over was correct for invoicing. What type of information had to be fed over?
A. The customer number, the customer PO, the part information, part description.
Q. Okay. Were these user defined fields we talked about used for those types of items?
A. Yes.
Q. Okay. Let me hand you -- well, before I do, you said, was correct for invoicing, so the information would be placed into the MITG web tool by MITG or by a customer or both?
A. I believe both.
Q. Okay. And you wanted to make sure that that info that was placed in there was properly transferred along this interface over to the VISTA side?
A. That the information on their purchase order was transferred over correctly.

23 (Pages 86 to 89)

Page 90

1  Q. Okay. So the order could be placed and
2  invoiced correctly?
3  A. Yes.
4  Q. Okay. Had that type of -- had you been
5  involved in that type of interface creation prior to
6  the one with MITG?
7  A. Not that I remember.
8  Q. Okay. Are you aware if any of -- if any
9  interface like the one that was developed with MITG
10 existed between VISTA and any other outside vendor
11 or customer?
12 A. I don't know.
13 Q. Had you ever been involved in that prior
14 to the one with MITG?
15 A. No.
16 Q. Okay. And you said that you were involved
17 in making sure that the information that fed over
18 from the web tool to VISTA was correct for invoicing
19 and you said that information consisted of the
20 customer number, purchase order, part info, part
21 description. Were all those things actually on the
22 purchase order?
23 A. Yes.
24 Q. Okay. So if I look at the purchase order
25 as one -- you know, a one-sheet document, you were

Page 91

1  making sure that the information that was on that
2  document fed properly over from MITG's web tool into
3  the proper user defined fields --
4  A. Yes.
5  Q. -- for placing the order and then
6  invoicing back?
7  A. Yes.
8  Q. Okay. Was the invoice then sent to MITG
9  or to the customer?
10 A. Customer.
11 Q. By MITG or by Compaq?
12 A. Compaq.
13 Q. Okay. And prior to the Middleware, all of
14 that purchase order information, did that have to be
15 manually entered into VISTA?
16 A. Yes.
17 Q. Do you know if there had ever been any
18 development of the type of user defined fields that
19 were created pursuant to this Middleware agreement?
20 A. I don't know.
21 Q. I take it since you were the person that
22 was doing some of the entries you didn't have any
23 interface capability -- well, strike that.
24    Did you have any interface capability with
25 any other web sites?

Page 92

1  A. No.
2  Q. So was everything that was being done for
3  the VISTA system as far as order entry was being
4  done manually?
5  A. For the spare parts, yes.
6  Q. Okay. How about for nonspare parts?
7  A. I don't know.
8  Q. Because you were only involved in the
9  spare parts side?
10 A. Yes.
11 Q. Okay. Now, after the information was fed
12 over from the MITG side to the Compaq side and it
13 went into VISTA and it had all the correct, proper
14 information, was there also a review and release
15 screen that was created that you had the capacity to
16 view prior to the order going out?
17 A. Yes.
18 Q. Okay. Were you one of two people that had
19 the capability to look at that review and release
20 screen and delete an order or cancel an order?
21 A. I was -- I was a person, I don't know of
22 anybody else.
23 Q. Okay. How was that set up as far as the
24 review and release screen; was it after it had been
25 entered VISTA that you could review the order and

Page 93

1  then release it back to MITG?
2  A. Yeah, the order would be -- come in and be
3  in review and release and I could review the order
4  for pertinent information, verify it against the
5  purchase order and/or delete it if it wasn't
6  correct.
7  Q. If you deleted it, it would send it back
8  to MITG to have it corrected?
9  A. Yes.
10 Q. If you released it what would happen? It
11 would go to be filled and then the invoice sent out?
12 A. These orders were already filled.
13 Q. Okay.
14 A. It was -- once I released it it was
15 invoiced to the customer. The customer already
16 received the product when we got the orders from the
17 review and release on a purchase order situation.
18 Q. Back up. The customer had already
19 received the product prior to you reviewing and
20 releasing the invoice?
21 A. Yes.
22 Q. Okay.
23 A. On a purchase order.
24 Q. Okay. What about on a nonpurchase order
25 type arrangement?

24 (Pages 90 to 93)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 94

1  A. A credit card had to be preapproved before
2 product was shipped out, so that was reviewed and
3 released and approved before the product went out
4 the door.
5  Q. And part of the reason this XML interface
6 was created is because it also allowed that credit
7 card review to be securely done along this e-mail
8 string, is that your understanding?
9  A. No, the XML was created to save time for
10 manually keying in. The credit card process for
11 keying in was no longer -- it was the same amount of
12 time.
13  Q. Okay. So we had two different scenarios
14 though, if it was a PO type situation, the customer
15 already had the product prior to you releasing the
16 invoice?
17  A. Yes.
18  Q. If it's credit card the product hadn't
19 been shipped if the credit card hadn't been approved
20 already?
21  A. Yes.
22  Q. Okay. Did you have to review and release
23 every order?
24  A. Yes.
25  Q. Okay. So if there was 300 orders that

Page 95

1 came in on a daily basis you had to review and
2 release them all?
3  A. Yes.
4  Q. Was there somebody else that also did
5 that?
6  A. Yes.
7  Q. Okay. Were those those two people you
8 mentioned earlier, Lisa Stork and -- I can't
9 remember the other guy, David Suhr?
10  A. Yes.
11  Q. Okay. Let me show you what's previously
12 been marked as Exhibit V, do you recognize that
13 document?
14  A. Somewhat.
15  Q. Your name on Page I is kind of listed
16 there under author, correct?
17  A. Yes.
18  Q. Under key contributor?
19  A. Yes.
20  Q. Okay. Before we get into that I have a
21 couple more questions for you.
22    Were you part of the testing phase of the
23 Middleware?
24  A. Yes.
25  Q. Okay. What was your involvement in that?

Page 96

1  A. Once it was I guess created and they
2 were -- they sent over test orders from MITG's web
3 tool into VISTA, my role was to basically have a
4 purchase order in front of me and verify that
5 information was feeding over correctly.
6  Q. Kind of review and release?
7  A. Yeah, before the program was live.
8  Q. Yeah, right, exactly. And do you recall
9 if your written approval was required prior to the
10 Middleware going live?
11  A. I don't remember if I had to have a
12 written approval, but I remember I had to approve
13 it.
14  Q. Okay. And Page 24 of Exhibit V under
15 approval of testing, do you see you are listed there
16 as an individual that had to give written approval?
17  A. Yes.
18  Q. So does that refresh your memory?
19  A. Yeah, I knew I had to approve it, I just
20 didn't remember if I had to do it in writing.
21  Q. Okay. Do you recall how long the testing
22 phase was?
23  A. A couple, three months.
24  Q. Okay. Do you recall when it was launched
25 or went live?

Page 97

1  A. 2002.
2  Q. Beginning of the year?
3  A. Yes.
4  Q. Did you -- you already told me you weren't
5 on the programming side. Did you have anything to
6 do with the switching over from the test server to
7 go-live?
8  A. No.
9  Q. All right. And to your knowledge, there
10 was not any interface with the VISTA for customers
11 prior to the one created by MITG?
12  A. That's correct.
13  Q. Okay. VISTA is still currently being used
14 today, correct?
15  A. Yes.
16  Q. Is there any XML interface that have been
17 implemented for other customers with VISTA?
18  A. I don't know.
19  Q. Well, do you -- prior to you leaving your
20 position in February of '04, did you have an
21 occasion to review and release any other orders from
22 customers that had a direct interface with VISTA?
23  A. No.
24  Q. Were you involved in the creation of any
25 other interfaces such as the one with MITG that your

25 (Pages 94 to 97)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 98

1  name appears on this document?
2  A.  No.
3  Q.  Are you aware of test order situations
4  being run for Microsoft using an interface with
5  VISTA?
6  A.  No.
7  Q.  Okay. You do you recall or are you aware
8  of any Microsoft orders being reviewed and released
9  to MITG that were not originally placed through
10 their web tool, through the interface?
11 A.  I'm not aware of any.
12 Q.  Okay. Do you recall any Microsoft or any
13 other company orders that appeared on your review
14 and release screen to be submitted back to MITG that
15 did not originate from MITG's web tool?
16 A.  I don't -- no.
17 Q.  Don't recall that?
18 A.  I don't recall.
19 Q.  Do you recall any conversations with
20 Ms. Welch or Mr. Lauber regarding a situation where
21 orders were reviewed and released back to MITG along
22 the interface that did not originate at their web
23 tool?
24 A.  I don't remember conversations with them.
25 Q.  Taking Microsoft out of it, are you aware

Page 99

1  of other orders from any other companies appearing
2  on your review and release screen along the
3  XML interface with MITG that did not originate from
4  the MITG web tool?
5  A.  No, the only orders that I reviewed were
6  for MITG.
7  Q.  You don't recall any from Capital One
8  Arthur Andersen, Xerox?
9  A.  Fed straight into my XML?
10 Q.  Correct.
11 A.  No.
12 Q.  Do you know if any of these entities I
13 just listed had a direct interface from another web
14 tool to VISTA?
15 A.  I don't know.
16 Q.  Okay. Have you heard of that occurring?
17 A.  Yes.
18 Q.  Okay. Who told you that?
19 A.  A CSR.
20 Q.  Okay. And a CSR, what did they tell you,
21 what was the web site?
22 A.  I don't know.
23 Q.  Okay. Well, what did the CSRs tell you?
24 A.  That the customer had the ability to feed
25 their orders into VISTA.

Page 100

1  Q.  Through an interface?
2  A.  They never -- they just -- I mean, the
3  terminology was just that they had the ability to
4  send the orders. How it came I don't know.
5  Q.  Do you recall the names of the customers?
6  A.  No.
7  Q.  Okay. Wells Fargo, Capital One, Arthur
8  Andersen, Xerox, Microsoft, any of the --
9  A.  Xerox.
10 Q.  Okay. Do you recall what -- was it a
11 customer service rep out of Indianapolis, do you
12 recall where the CSR was from?
13 A.  Indianapolis.
14 Q.  Okay. Which was HP Direct?
15 A.  Yes.
16 Q.  Okay. And that customer service rep told
17 you, for instance, Xerox had the ability to
18 interface directly into VISTA?
19 A.  Yeah, they could feed their orders right
20 into VISTA. I don't know that it fed right into
21 VISTA but into a screen that populated into VISTA I
22 believe.
23 Q.  And I think you said you don't recall what
24 web site that was?
25 A.  No, I don't.

Page 101

1  Q.  Or web tool?
2  A.  No, I wasn't involved in that.
3  Q.  Was it -- you weren't involved in what?
4  A.  I wasn't involved, it was just casual
5  conversation with the CSR.
6  Q.  Okay. Any other customers you recall
7  besides Xerox?
8  A.  Well, I think Microsoft.
9  Q.  Okay. And that conversation -- that they
10 could place their order either directly into VISTA
11 through the interface?
12 A.  That their orders would come into like a
13 queue.
14 Q.  Do you recall anything you said during
15 this conversation?
16 A.  No.
17 Q.  Okay. You don't recall when it was?
18 A.  No.
19 Q.  Was it this year, 2004?
20 A.  No.
21 Q.  2003?
22 A.  Probably.
23 Q.  Okay. Do you know if any of the
24 Middleware technology that was used in developing
25 the interface with MITG was used for the interface

26 (Pages 98 to 101)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 102

1 with Xerox as you just mentioned?
2     MS. CARROLL: Objection: Assumes facts
3 not in evidence?
4     THE WITNESS: I don't believe so.
5 BY MR. HANSEN:
6     Q.  Well, you weren't involved in creating
7 that, were you?
8     A.  No.
9     Q.  Do you know one way or the other?
10    A.  No.
11    Q.  Okay.  After this conversation with the
12 CSR did you look into it any further?
13    A.  No.
14    Q.  Okay.  Throughout -- after the Middleware
15 was implemented at the beginning of 2002 with MITG,
16 did you continue to review and release the orders up
17 until the time the agreement ended and you left in
18 February of '04?
19    A.  Yes.
20    Q.  Okay.  During that time, are you aware of
21 any of these orders, for instance, from Microsoft --
22 for Microsoft or Xerox coming in from another
23 interface that came up on your review and release
24 screen as it related to MITG?
25    A.  I had no other orders other than MITG fed

Page 103

1 into my review and release screen?
2     Q.  Were you responsible for review and
3 release of any of other orders from any other web
4 tool?
5     A.  No.
6     Q.  Okay.  So your responsibility was strictly
7 related to the MITG review and release?
8     A.  Yes.
9     Q.  Okay.  Do you know if, for instance, in
10 2002, was Houston using the VISTA system for order
11 placement?
12    A.  I don't know.
13    Q.  Okay.  Were you ever involved in anything
14 in regards to web sites, VISTA order entering,
15 interfaces for the Houston side of things?
16    A.  No.
17    Q.  Okay.  Who was VISTA currently being used
18 by -- well, when you left in February of '04, was
19 VISTA still taking orders from where?
20    A.  VISTA is used for HP Direct.
21    Q.  Out of Roseville?
22    A.  Omaha.
23    Q.  Omaha.  Okay.
24    A.  Any facility tied to HP Direct uses VISTA.
25    Q.  Okay.  And is HP Direct -- is this a call

Page 104

1 center here?
2     A.  No.
3     Q.  Okay.  Well, if HP Direct is taking orders
4 for parts are they using the VISTA system?
5     A.  They're not taking orders for spare parts.
6     Q.  What does HP Direct take orders for?
7     A.  Product.
8     Q.  Well, what if somebody who buys their
9 product needs a spare part?
10    A.  They're sent to Roseville.
11    Q.  Okay.  So is it only new product or
12 product from authorized resellers or what is the
13 HP Direct in Omaha used for?
14    A.  I don't know, I'm not on the product side.
15    Q.  Okay.  Well, you're an international
16 account rep?
17    A.  I do export.
18    Q.  Okay.  For HP Direct?
19    A.  For HP Direct.
20    Q.  So let's say one of your clients for
21 export wants a product, do you pursue it from here?
22    A.  My accounts are Canada and Latin America,
23 so I am -- I'm a subsidiary.  Subsidiaries feed
24 orders to me and I procure the product from RDCs in
25 Indiana and Ontario, so I'm only working with the

Page 105

1 subsidiary.  I don't work with the customers
2 directly.
3     Q.  What subsidiary are we talking about?
4     A.  Canada, Mexico.
5     Q.  Okay.  So Canada and Mexico are an
6 HP subsidy, HP Direct?
7     A.  They're not part of HP Direct, they're HP.
8     Q.  Entities?
9     A.  Yes.
10    Q.  Okay.  That, what, need product?
11    A.  Need product that needs to be exported
12 because it's housed within HP Direct.
13    Q.  Okay.  And when they come to you for that
14 product is that purchased here, is it shipped from
15 here?
16    A.  It's shipped out of here as an export,
17 yes.
18    Q.  To Canada or Mexico?
19    A.  Yeah, to a forwarder or however it's set
20 up.
21    Q.  Is there still a Compaq Direct?
22    A.  I don't know.
23    Q.  Okay.  Do you know if parts are being
24 placed or ordered out of Houston?
25    A.  I don't know.

27 (Pages 102 to 105)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 106

1  Q. Okay. Do you know if Houston is using
2  VISTA?
3  A. I don't know.
4  Q. Okay. Have you been connected to the
5  VISTA system at all since you took your new position
6  in February of '04?
7  A. Yes.
8  Q. How so?
9  A. I have a review and release screen that I
10 do today for my subsidiaries.
11 Q. Okay. Do you know if that review and
12 release screen that you now have on your system
13 today is part of an interface that was created after
14 the one developed with MITG?
15 A. The international groups have been around
16 a lot longer than MITG.
17 Q. My question was do you know if it was
18 created before or after MITG, the interface that you
19 use?
20 A. I don't know.
21 Q. Okay. Is there anyone that is using VISTA
22 that has to do the double entry system anymore?
23     MS. CARROLL: Objection: Calls for
24 speculation.
25

Page 107

1  BY MR. HANSEN:
2  Q. You can answer.
3  A. I don't understand the question.
4  Q. Well, before you told me you talked about
5  the reason this interface was created was because
6  there was a double entry problem, you know, entries
7  having to be manually entered on the MITG side,
8  manually entered on the Compaq side, correct?
9  A. On the Compaq side I can speak of, yes.
10 Q. So on the Compaq side is anyone -- when
11 you were, you know, still involved in VISTA in '04,
12 or still currently you have a review and release
13 screen, is there anyone that's having to do the same
14 manual entry into the VISTA for orders?
15     MS. CARROLL: Objection: Calls for
16 speculation.
17     THE WITNESS: I don't know.
18 BY MR. HANSEN:
19 Q. Okay. For your subsidiaries do you have
20 to do that, that you deal with?
21 A. No.
22 Q. Okay. And the interface -- do your
23 subsidiaries use a web site?
24 A. No, they have their own system that feeds
25 into another system that feeds into VISTA.

Page 108

1  Q. Okay. Back to Exhibit V -- well, let --
2  before I get to it, are you aware of an XML
3  interface between VISTA and a company called IP
4  Revolution?
5  A. A VISTA connection?
6  Q. An interface between VISTA and a company
7  called IP Revolution?
8  A. No.
9  Q. Okay. Are you aware after the MITG if
10 there was any interfaces created directly linking
11 VISTA to any other outside web tool inventor?
12 A. I don't know.
13 Q. Okay. Do you know if parts direct is
14 Houston?
15 A. I don't know.
16 Q. Did you ever have any dealings with
17 Chip Love?
18 A. I've had a couple conversations with him.
19 Q. Okay. Did any of those conversations
20 involve the Middleware that was created?
21 A. No.
22 Q. Okay. Do you recall any statements from
23 Chip Love and his group stating that they really
24 like the Middleware because they could use it with
25 their customers and suppliers?

Page 109

1  A. No.
2  Q. Were you ever made aware of any interface
3  or Middleware being developed for Houston and any
4  customers or suppliers Houston has after that which
5  was developed by MITG?
6  A. No.
7  Q. Okay. Going to Exhibit V there, okay,
8  Page 8 describes the solution detail and business
9  processes for the Middleware, and if you go to
10 Page 9, under Activity 8, do you see where it says
11 review and release?
12 A. Yes.
13 Q. It says, after an order is placed in
14 review and release, the Compaq Direct service parts
15 coordinator is responsible for reviewing each order
16 for completeness and accuracy, do you see that?
17 A. Yes.
18 Q. Was that you?
19 A. Yes.
20 Q. Okay. If the information entered is
21 incorrect or information is missing, an
22 acknowledgement is sent back to MITG via the
23 Middleware identifying that the order was being
24 rejected, correct?
25 A. Yes.

28 (Pages 106 to 109)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 110
1  Q. Okay. Then additional information would
2  be needed, okay.
3      Once it's been approved, though, VISTA
4  automatically submitted the order for credit card
5  approval under this summary?
6  A. Yeah, on a credit card.
7  Q. Right, yeah, okay. What if -- what if
8  it -- on the review and release it wasn't rejected,
9  for instance, you know, all of the information was
10 complete and accurate, what happened then, did you
11 release it?
12 A. Yes.
13 Q. Okay. And, what, release it for
14 invoicing?
15 A. Yes.
16 Q. And then invoicing, was that created here?
17 A. Yes.
18 Q. Okay. And that invoice would be sent from
19 here to the customer?
20 A. Yes.
21 Q. Okay. So MITG didn't do the invoicing?
22 A. No.
23 Q. Okay. Was that type of invoicing
24 system -- strike that.
25     Was there anything in place such as this

Page 111
1  allowing that invoicing type review and release
2  prior to this being developed?
3  A. I don't know.
4  Q. Okay. You weren't involved in any?
5  A. No.
6  Q. Okay. Were you involved in any of this
7  auditing report, running a Visa, V-I-S-A, sales out
8  report and comparing the information with MITG's XML
9  feed to ensure all orders are being captured and
10 invoiced correctly?
11 A. No.
12 Q. Do you know what a Visa sales out was?
13 A. No.
14 Q. Okay. On Page 18, under security
15 requirements, right here, Compaq Direct service
16 parts coordinators, that's the coordinator who
17 manages the service parts order, was that you?
18 A. Yes.
19 Q. Okay. Because you needed access to the
20 order entry and review and release, correct?
21 A. Yes.
22 Q. You were listed along with Ms. Stork as
23 the only individuals that were allowed to delete
24 orders from review and release, correct?
25 A. Dave Suhr could.

Page 112
1  Q. Okay. When would an order be deleted?
2  A. If it's a declined credit card, if the
3  customer decides they don't want the product
4  anymore.
5  Q. So that's different than it being rejected
6  for incorrect information?
7  A. Yes.
8  Q. Was that a separate screen you had to go
9  to or did that come up under review and release as
10 well?
11 A. If the credit card was declined in the
12 review and release we had to go to a different
13 screen to delete it.
14 Q. Did the Middleware help with the
15 efficiencies?
16 A. Yes.
17 Q. Did it reduce some double entry and
18 backlog that was created by that process?
19 A. On the Compaq side, yes.
20 Q. Okay. Do you have any knowledge of that
21 type of interface being used with any other outside
22 provider or vendor such as MITG to reduce
23 inefficiencies like that?
24 A. I don't know.
25 Q. So the answer is no?

Page 113
1  A. No.
2  Q. Okay. Next I'm going to show you
3  Exhibit X, do you see that as a Compaq record of
4  meeting?
5  A. Yes.
6  Q. Okay. Do you see your name on there and
7  checked as an attendee?
8  A. Yes.
9  Q. I've already heard from other people that
10 this is a meeting that took place over at the tech
11 center?
12 A. Yes.
13 Q. Okay. And do you recall attending these
14 type of meetings?
15 A. Yes.
16 Q. Okay. Were they like status meetings to
17 go over the Middleware?
18 A. Yes.
19 Q. Okay. Were there records like this handed
20 out, minutes, for each meeting after they took
21 place?
22 A. No.
23 Q. Did you ever take those minutes?
24 A. No.
25 Q. Okay. Did you ever prepare this type of

29 (Pages 110 to 113)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 114

1 document?
2   A.  No.
3   Q.  After you received it -- or do you recall
4 receiving it?
5   A.  I don't remember.
6   Q.  Okay. Under the order acknowledgement
7 only occurs after the order has been reviewed and
8 released, so once you have reviewed and released an
9 order and confirmed that everything lined up okay,
10 that would send an invoice to the customer, would
11 there then be an order acknowledgement sent along
12 this line back to MITG?
13   A.  Yes.
14   Q.  Okay. What was that order acknowledgement
15 saying, it's gone, it's been approved?
16   A.  Yes.
17   Q.  Okay. Meaning the invoice is gone because
18 as we talked about earlier, the customer already had
19 the product on a noncredit card situation?
20   A.  Yes.
21   Q.  Okay. So what was the ordering
22 acknowledgement?
23   A.  The order was never -- I never approved a
24 PO number until I had the POs in front of me, so
25 when I was reviewing the order and reviewing the

Page 115

1 PO I was paying MITG.
2   Q.  I understand, but what was the
3 acknowledgement that was sent to them?
4   A.  The VISTA order number.
5   Q.  Okay. I mean, would it -- did it say
6 anything on it?
7   A.  I don't know.
8   Q.  Okay. It says under there under the
9 middle of the page under the last bullet point under
10 the Compaq Direct, it says, the VISTA order number,
11 the PO number and nontaxable order total will be
12 sent as the order acknowledgement, so I take it --
13 was that what it was?
14   A.  Never saw an acknowledgement.
15   Q.  Oh, you didn't?
16   A.  No.
17   Q.  Okay. If you go to the bottom there on
18 that there's talk about, you know, requesting a list
19 of rejection codes that Sandy Urwin was requesting,
20 and under action items on the second page you're
21 identified as the person who is sending Chris Vondra
22 a list of -- it should be of rejection codes to be
23 utilized in Scenario No. 2; what did that refer to?
24   A.  It was a list of rejections, why an order
25 would have been rejected back to MITG.

Page 116

1   Q.  Okay. Were those codes in place on the
2 Compaq side that could be then implemented, for
3 instance, under Scenario 2, which is listed there on
4 the second page, you can flip back, giving you the
5 capability to reject an order during review and
6 release?
7   A.  Yes.
8   Q.  Okay. So that was something that the
9 business team requested I guess that they didn't
10 have the capability -- the business team requested
11 that to have that capability in the Middleware?
12   A.  Yes, so that when I rejected an order MITG
13 knew why.
14   Q.  Okay.
15   A.  We had a list of reason codes.
16   Q.  And you requested that capability during
17 the review and release --
18   A.  Yes.
19   Q.  -- screen?
20       Okay. To try and catch I guess
21 inefficiencies before they went out?
22   A.  That was my job.
23   Q.  Okay. During this -- if you flip to the
24 third page, Troy was listed as the service program
25 manager. Were you reporting to Troy at this time?

Page 117

1   A.  Yes.
2       MR. HANSEN: Let's take a break and come
3 back and see where we're at. I may be done.
4       MS. CARROLL: All right.
5       (11:50 - 12:06 a.m. - Recess.)
6 BY MR. HANSEN:
7   Q.  What documents did you review prior to
8 your deposition today?
9   A.  What documents?
10   Q.  Uh-huh.
11   A.  I don't remember reviewing any other than
12 my own stuff.
13   Q.  Okay. What is your own stuff?
14   A.  I had a spreadsheet that I kept.
15   Q.  Of what?
16   A.  Just the orders that came in over review
17 and release so I knew those needed to be paid.
18   Q.  Okay. Does that spreadsheet have a title?
19   A.  I don't remember what the title was.
20   Q.  When did you review that, yesterday?
21   A.  No, I haven't had that for a long time.
22   Q.  Okay. Well, I want to know what -- did
23 you sit down yesterday and go over some documents
24 to, you know, remind you of anything that happened,
25 did you review e-mails, spreadsheets you know, did

30 (Pages 114 to 117)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

S. ELLIS - Direct (By MR. HANSEN)

Page 118

1  you review any of the stuff that we've gone over
2  here today?
3      MS. CARROLL: I just want to caution you
4  that not -- in your answer to this question not to
5  reveal any part of conversations that you and I had.
6  You can go ahead. I just want to make sure you
7  don't launch into what you and I talked about.
8      THE WITNESS: The only thing I looked at
9  prior to this deposition was a copy of an invoice.
10 BY MR. HANSEN:
11     Q.  Okay.
12     A.  From MITG.
13     Q.  For a specific order?
14     A.  No, just a copy of an invoice. Somebody
15 had asked me to look at a copy of an invoice.
16     Q.  Okay. Was it the attorney or somebody
17 else asked you to do that?
18     A.  Somebody else asked me if I had a copy of
19 one.
20     Q.  Who was that somebody else?
21     A.  Chuck Schmaderer.
22     Q.  Did he tell you why he wanted a copy of an
23 invoice?
24     A.  He just wanted to make sure he understood
25 how -- what they looked like.

Page 119

1      Q.  Okay. And did he ask you to get that for
2  him this week sometime?
3      A.  No, I had one in my drawer.
4      Q.  Okay. You just handed it to him?
5      A.  I just showed it to him.
6      Q.  When was that, was it before his
7  deposition?
8      A.  I don't know because I don't know when his
9  was.
10     Q.  Two days ago, Wednesday.
11     A.  It was either Tuesday or Wednesday.
12     Q.  Okay. And did you -- have you reviewed
13 any of the exhibits that have been marked in this
14 case?
15     A.  No.
16     Q.  Go back and review any e-mails or
17 anything?
18     A.  No.
19     Q.  Okay. Do you have an MITG file at your
20 desk anywhere?
21     A.  No.
22     Q.  Okay. Anywhere on your computer?
23     A.  Nope.
24     Q.  Okay. Were you asked in this case to
25 search for some documents to see if you had anything

Page 120

1  relative to MITG's still around such as e-mails or
2  anything like that?
3      A.  No.
4      Q.  Okay. Have you turned over or have you
5  printed out or pulled anything up off our hard
6  drive, server, laptop, and turned it over to the
7  attorneys?
8      A.  Yes.
9      Q.  Were those -- what were they, e-mails back
10 and forth?
11     A.  No.
12     Q.  What were they?
13     A.  Those spreadsheets.
14     Q.  Okay. And, again, what were they, invoice
15 spreadsheets --
16     A.  Yes.
17     Q.  -- or order spreadsheets?
18     A.  Yes.
19     Q.  Where -- it's -- let me -- were they
20 spreadsheets like this that showed kind of the day,
21 sales call, orders placed, or was it different than
22 that?
23     A.  No, it was different than that.
24     Q.  Okay. What type of information was on it?
25     A.  The MITG reference number, the VISTA order

Page 121

1  number, the date, the dollar amount of the sale.
2      Q.  Okay.
3      A.  If it was a credit card order, just stuff
4  pertaining to my job.
5      Q.  Okay. Did you review anything in relation
6  to the Middleware --
7      A.  No.
8      Q.  -- prior --
9          Okay. Who do you currently report to?
10     A.  RoseMary Camp.
11     Q.  C-A-M-P?
12     A.  Yes.
13     Q.  Are you here in this building or in the
14 tech center?
15     A.  Here.
16     Q.  And when were you -- when were you first
17 employed with Inacom? What was your start date with
18 them?
19     A.  July 8th, '91.
20     Q.  Pretty good you remember that. Actually I
21 meant just the year, but thanks.
22         So you've been with -- have you had any
23 period where you've not been with Inacom, CEI,
24 Compaq, HP?
25     A.  No.

31 (Pages 118 to 121)

S. ELLIS - Direct (By MR. HANSEN)

Page 122

1  Q. Okay. So that would take us for the past
2  13 years?
3  A. Yes.
4  Q. Have you created any like handwritten
5  notes or documents for this --
6  A. No.
7  Q. -- case?
8     And did you meet with the attorney prior
9  to your deposition?
10  A. Yes.
11  Q. Okay. How many times?
12  A. Once.
13  Q. After February of '04, have you spoken to
14  anyone at MITG?
15  A. (Inaudible response.)
16  Q. Okay.
17  A. Yes.
18  Q. I'm sorry?
19  A. Yes, I have.
20  Q. Who?
21  A. Because I stayed on the back end stuff and
22  worked on that until the end of March.
23  Q. Got you, okay. That was clearing up the
24  orders that were already placed in the VISTA that
25  had the 30-day warranty on them?

Page 123

1  A. Yes.
2  Q. The 30- or 60-day?
3  A. Yes.
4  Q. Okay. And to the best of your
5  recollection, those were wrapped up the end of
6  March?
7  A. I started my new job on March 15th, so
8  they were done by then.
9  Q. You weren't involved in any negotiations
10  of the Middleware agreement, were you?
11  A. No.
12     MR. HANSEN: That's all I have. Thanks.
13     MS. CARROLL: You're done.
14          (12:30 p.m. - Adjournment.)
15              ** ** ** **

Page 124

    C E R T I F I C A T E
STATE OF NEBRASKA    )
                     ) ss.
COUNTY OF DOUGLAS    )
    I, Cynthia Craig, General Notary Public
within and for the State of Nebraska, do hereby
certify that the foregoing testimony of SHARI K.
ELLIS was taken by me in shorthand and thereafter
reduced to typewriting by use of Computer-Aided
Transcription, and the foregoing one hundred
twenty-three (123) pages contain a full, true and
correct transcription of all the testimony of said
witness, to the best of my ability;
    That I am not a kin or in any way
associated with any of the parties to said cause of
action, or their counsel, and that I am not
interested in the event thereof.
    IN WITNESS WHEREOF, I hereunto affix my
signature and seal the 15th day of November, 2004.


             CYNTHIA A. CRAIG
             GENERAL NOTARY PUBLIC

My Commission Expires:

---

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD, DIVISION

HEWLETT-PACKARD         ) CIVIL ACTION NO. 04-3055
DEVELOPMENT COMPANY, L.P.,)
HEWLETT-PACKARD COMPANY  )
AND COMPAQ TRADEMARK B.V.,)
                         )
    PLAINTIFFS,          )
                         )
VS.                      )
                         )
MIDWEST INFORMATION      )
TECHNOLOGY GROUP, INC.,  )
AND MICHAEL LAUBER,      )
                         )
    DEFENDANTS.          ) COST CERTIFICATE
-------------------------

       DEPOSITION OF
       SHARI K. ELLIS
       TAKEN ON BEHALF OF
       DEFENDANTS

    I, Cynthia Craig, General Notary Public
within and for the State of Nebraska, do hereby
certify that the following costs should be assessed
in the above-entitled matter to:

DEPOSITION OF: SHARI K. ELLIS
DATE TAKEN: October 15, 2004
AMOUNT: $
DELIVERED TO: Mr. James Hansen
ATTORNEY FOR: Defendants
DATE DELIVERED: November 15, 2004


             CYNTHIA A. CRAIG
             GENERAL NOTARY PUBLIC

My Commission Expires:

32 (Pages 122 to 125)