E-FILED
Wednesday, 01 February, 2006  04:08:25 PM
Clerk, U.S. District Court, ILCD

# In the Matter of:

*Hewlett-Packard Development Company   v.*
*Midwest Information Technology Group, Inc.*

---

*Chip Love*
*March 30, 2005*

---

*Houston Reporting Service*
*1010 Lamar, Suite 1400*
*Houston, TX  USA  77002*
*(713) 739-1400*

*Original File LOVE.PRN, 98 Pages*
*Min-U-Script® File ID: 0398438406*

# Word Index included with this Min-U-Script®

Hewlett-Packard Development Company 3:04-cv-03055-JES-CHE  # 74  Page 3 of 27
Midwest Information Technology Group, Inc.

Chip Love
March 30, 2005

[1]         IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
[2]         SPRINGFIELD DIVISION
[3] HEWLETT-PACKARD
    DEVELOPMENT COMPANY,L.P., *
[4] HEWLETT-PACKARD COMPANY, *
    AND COMPAQ TRADEMARK B.V.,*
[5]
            Plaintiffs, *
[6] VS.        * CIVIL ACTION NO. 04-3055
[7] MIDWEST INFORMATION        *
    TECHNOLOGY GROUP, INC., *
[8]
            Defendant. *
[9]
[10]
[11]        ORAL AND VIDEO DEPOSITION OF
[12]        CHIP LOVE
[13]        March 30, 2005
[14]
[15]    ORAL AND VIDEO DEPOSITION OF CHIP LOVE,
[16] produced as a witness at the instance of the Defendant,
[17] and duly sworn, was taken in the above-styled and
[18] numbered cause on the 30th day of March, 2005, from
[19] 8:54 a.m. to 11:10 a.m., before Carolyn Ruiz Coronado,
[20] Certified Shorthand Reporter in and for the State of
[21] Texas, reported by stenographic means, at
[22] Hewlett-Packard, Houston Executive Briefing Center,
[23] 20555 SH249, Building CC11, Houston, Texas, pursuant to
[24] the Texas Rules of Civil Procedure and the provisions
[25] stated on the record or attached hereto.

Page 2

[1]         APPEARANCES
[2]
[3] FOR THE PLAINTIFFS:
[4]   Ms. Elizann Carroll
      LAW OFFICES OF JUNEAU, BOLL & WARD
[5]   15301 Spectrum Drive, Suite 300
      Addison, Texas 75001
[6]   PHONE: (972) 866-8330
      FAX: (972) 866-8378
[7]
[8] FOR THE DEFENDANTS:
[9]   Mr. James A. Hansen
      SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
[10]  525 Jersey, P.O. BOX 1069
      Quincy, Illinois 62306
[11]  PHONE: (217) 223-3030
      FAX: (217) 223-1005
[12]
[13] ALSO PRESENT:
[14]   Videographer
       Houston Reporting Service
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]            INDEX
[2]                              PAGE
[3] APPEARANCES .............. 02
    EXHIBITS ................ 03
[4] EXAMINATION
      By Mr. Hansen ........... 05,89
[5]   By Ms. Carroll .......... 82
      CHANGES ................ 94
[6] SIGNATURE ................ 95
    REPORTER'S CERTIFICATE ........ 96
[7]        DEFENDANT'S EXHIBITS
[8] NUMBER & DESCRIPTION
[9]   Exhibit BBBB ............ 65
      Parts Ordered For Ship To Transaction Report
[10]  Exhibit CCCC ............ 87
       E-mail String
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]            PROCEEDINGS
[2] 03/30/2005 (Deposition commenced at 8:54 a.m.)
[3]     THE VIDEOGRAPHER: We're now beginning
[4] this deposition. The date is March 30th, 2005. Time
[5] is approximately 8:54 a.m. We are now on the video
[6] record.
[7]     (Oath administered)
[8]     CHIP LOVE,
[9] having been first duly sworn, testified as follows:
[10]        DIRECT EXAMINATION
[11]        BY MR. HANSEN:
[12]   Q: Please state your name for the record.
[13]   A: Gary Love.
[14]   Q: Do you go by the name Chip?
[15]   A: Yes.
[16]   Q: Okay. You're currently employed with
[17] Hewlett-Packard?
[18]   A: Yes.
[19]   Q: And what is your position?
[20]   A: I manage a parts services and development team
[21] for the PL91 trade parts business within customer
[22] service.
[23]   Q: Okay. What does PL91 stand for?
[24]   A: Profit loss statement. It's just a trade
[25] parts business — or I think it's officially called the

Page 5

[1] replacement parts business.

[2] **Q:** Does that include multivendor spare parts?

[3] **A:** No.

[4] **Q:** Does that include Compaq replacement parts?

[5] **A:** Yes.

[6] **Q:** Is that — if I use the term "CSN," what does

[7] that mean?

[8] **A:** It's one of our avenues of sale.

[9] **Q:** Is that an avenue to obtain Compaq replacement

[10] parts?

[11] **A:** Yes.

[12] **Q:** Have you ever had your deposition taken

[13] before?

[14] **A:** No.

[15] **Q:** Okay. I'm sure you've met with Counsel

[16] previously. I will just tell you, if there's a

[17] question that I ask you today that you don't

[18] understand, ask me to rephrase it and I'll do so.

[19] Okay?

[20] **A:** Sure.

[21] **Q:** We are having this typed up for a transcript,

[22] and we need verbal answers. So occasionally you may

[23] nod your head or shrug your shoulders, we may remind

[24] you to answer out loud. Okay?

[25] **A:** Okay.

Page 6

[1] **Q:** And also, if you could, just let me complete

[2] my question before you answer, and I'll try to do the

[3] same to you 'cause it's very hard to take two people

[4] type — talking at the same time. All right?

[5] **A:** (Moving head up and down)

[6] **Q:** How long have you been employed with either

[7] Compaq and Hewlett-Packard or just Hewlett-Packard?

[8] **A:** A little over 13 years.

[9] **Q:** Have you always been at the Houston location?

[10] **A:** Yes.

[11] **Q:** And I take it then you were originally with

[12] Compaq?

[13] **A:** Yes.

[14] **Q:** Have you — what did you start out doing when

[15] you came on to Compaq?

[16] **A:** I was a supervisor in tech support arena as a

[17] call center.

[18] **Q:** Okay. What call center?

[19] **A:** What do you mean "what call center"? Sorry.

[20] **Q:** You said supervisor in tech support for a call

[21] center?

[22] **A:** Yeah. For — it was Compaq's customer service

[23] call center. Sorry.

[24] **Q:** Okay. And where was that at?

[25] **A:** Located here.

Page 7

[1] **Q:** Was it a call center that simply answered

[2] customer service calls or did it —

[3] **A:** Correct.

[4] **Q:** Okay. There was no replacement parts?

[5] **A:** No, not at the time. It was strictly tech

[6] support.

[7] **Q:** At some point in time, did that call center

[8] have the ability to take and fulfill Compaq — well,

[9] Compaq replacement part orders?

[10] **A:** No. That was Compaq's tech support center

[11] still, basically doing the same thing today. They have

[12] nothing to do with the trade parts business.

[13] **Q:** Okay. Is that a call center here in Houston?

[14] **A:** I'm not sure where they are now.

[15] **Q:** Well, how about when you were working for it?

[16] **A:** It was here in Houston. Just a lot of changes

[17] and outsourcing and stuff.

[18] **Q:** Sure. In your current position, are you

[19] responsible for any call center activity?

[20] **A:** No.

[21] **Q:** How are the replacement parts — the

[22] replacement part business that you're responsible for,

[23] is that — where is the avenue that those parts orders

[24] are fulfilled?

[25] **A:** Today?

Page 8

[1] **Q:** Yes.

[2] **A:** Depending on the customer segment, it can be

[3] on the Web or they can be in a call center.

[4] **Q:** Okay. Let's go back a little bit. How long

[5] have you been in your current position?

[6] **A:** Since the merger of HP and Compaq.

[7] **Q:** I forget again when that was. Was that '02?

[8] **A:** July — June, July of '02, I believe.

[9] **Q:** Prior to that — let's just focus on the year

[10] 2000 to 2002, when the merger take place — took place.

[11] **A:** Okay.

[12] **Q:** What were you doing?

[13] **A:** I managed Compaq, Assisted Services.

[14] **Q:** Okay. And what is that? What were your

[15] duties there?

[16] **A:** It was a small team that basically managed the

[17] trade parts business or the parts sales business of

[18] Compaq. Spare parts sales business, I should say.

[19] **Q:** Did you have any involvement in that time

[20] frame with the folks at Omaha, Troy Bloomquist?

[21] **A:** Yes.

[22] **Q:** Okay. Did you — let me back up. Did

[23] Troy Bloomquist report to you?

[24] **A:** No.

[25] **Q:** Okay. Tell me, you said that the position you

Hewlett-Packard Development Company
Midwest Information Technology Group, Inc.

Chip Love
March 30, 2005

---

Page 9

[1] were in for Compaq, Assisted Services, was managing
[2] spare parts in the sales business; is that correct?
[3]    A: Yes.
[4]    Q: Okay. And was that Web-based business?
[5]    A: No. We —
[6]    Q: Go ahead. I was going to say, Was it a call
[7] center business?
[8]    A: It was neither.
[9]    Q: Okay.
[10]    A: At the time.
[11]    Q: How, at the time, was it fulfilled?
[12]    A: It was — the only way that Compaq sold spares
[13] was to our channel partners. We didn't sell
[14] externally. It wasn't a business. So the only
[15] external sales was DEC Classic. So that's all we
[16] managed externally or to end users.
[17]    Q: DEC Classic meaning Digital Equipment
[18] Corporation?
[19]    A: Yes. Sorry. 252 parts, otherwise they're
[20] commonly known as.
[21]    Q: Okay. You lost me there. What kind of parts?
[22]    A: I'm sorry. The part number schematic is 252.
[23]    Q: When you say the spares business was through
[24] channel partners, is that authorized resellers?
[25]    A: Authorized service providers.

Page 10

[1]    Q: Were you involved at all with the Custom Edge
[2] Group that Troy Bloomquist was involved in?
[3]    A: Yes.
[4]    Q: Okay. Were you involved with the program in
[5] 1999 when that was developed under Compaq Direct?
[6]    MS. CARROLL: I'm going to object to that
[7] as vague.
[8]    A: I'm not sure what you're asking as far as
[9] involved.
[10]    Q: (BY MR. HANSEN) Well, did Compaq buy Custom
[11] Edge?
[12]    A: Yes.
[13]    Q: Okay. And the services that Troy Bloomquist
[14] and the group at Custom Edge were performing, did that
[15] get, then, brought into Compaq to perform the same type
[16] of services?
[17]    A: Not immediately. I'm not sure exact — I'm
[18] not sure of the time frame. But down the road we
[19] leveraged a portion of that — of that, I guess, their
[20] ability, CEI's ability, Custom Edge's ability.
[21]    Q: And what was that part that Compaq leveraged
[22] from CEI?
[23]    A: Take front-end calls.
[24]    Q: Is that front-end calls from both — well,
[25] front-end calls from whom?

Page 11

[1]    A: End users.
[2]    Q: Would that be consumers as well as business?
[3]    A: Primarily consumers.
[4]    Q: And that — was that taking calls from
[5] consumers to fill Compaq part orders?
[6]    A: Yes, and out-of-warranty-type environments.
[7]    Q: Did that also involve fulfilling multivendor
[8] part orders?
[9]    A: I wasn't involved in that aspect, so I'm not
[10] sure what they did there.
[11]    Q: And is it your understanding that that group
[12] became Compaq Direct?
[13]    A: Yes.
[14]    Q: What does PSG stand for?
[15]    A: Personal Systems Group.
[16]    Q: Okay. Was Compaq Direct, the part that was
[17] leveraged from CEI, developed to support the Personal
[18] Systems Group's multivendors spare parts requests?
[19]    MS. CARROLL: Object to the extent that
[20] calls for speculation.
[21]    MR. HANSEN: If you know, sir, you can
[22] answer it.
[23]    A: I don't know.
[24]    Q: (BY MR. HANSEN) Okay. Well, what involvement
[25] did you have in the Compaq Direct program that

Page 12

[1] Troy Bloomquist was involved with?
[2]    A: When we were in the process of developing a
[3] Web application, we needed a — an avenue to service
[4] our customers. And, so, that's where Compaq Direct
[5] came in.
[6]    Q: Okay. You said the process of developing a
[7] Web application?
[8]    A: Yes.
[9]    Q: Okay. And what was that Web application?
[10]    A: eSpares.
[11]    Q: Is that the eSpares Web site?
[12]    A: Yes.
[13]    Q: When was that — and you indicated you were
[14] involved with the Compaq Direct group for that Web
[15] application because you needed an avenue for end users
[16] to make purchases on the Internet. Is that fair to
[17] say?
[18]    A: No.
[19]    Q: Okay. Well, tell me what involvement, then,
[20] was — what involvement you had with the Compaq Direct
[21] folks in developing this Web application.
[22]    A: Compaq Direct wasn't involved at all in
[23] developing the Web.
[24]    Q: Okay.
[25]    A: That was totally outside of them. They were

---

**Chip Love** 304CV-03055-JES-CHE    # 71    Page 6 of 27
March 30, 2005

Hewlett-Packard Development Company   v.
Midwest Information Technology Group, Inc.

Page 13

[1] leveraged as a, I guess, a front-end call center. And
[2] it was a six-month year process of developing. So we
[3] needed to service our customers.
[4]     We had lost our ability to service our
[5] customers and we needed to service the customers until
[6] we could get a Web application, which was our
[7] direction.
[8]     Q: Okay. How did you lose the ability to service
[9] your customers?
[10]     A: It was another company that was doing us —
[11] doing the service for us that —
[12]     Q: Okay. Okay. So there was another company
[13] before Compaq Direct, Troy's group that was handling
[14] this. You needed somebody to step in and fulfill that
[15] role and they did that?
[16]     A: Yes, as far as —
[17]     Q: For the —
[18]     A: — like, the end user calls.
[19]     Q: Okay. And was it your understanding that that
[20] group was MITG?
[21]     A: No.
[22]     Q: Okay.
[23]     A: No.
[24]     Q: Who was that group?
[25]     A: Compaq Direct.

Page 14

[1]     Q: Out of Omaha?
[2]     A: Out of Omaha.
[3]     Q: Okay. Was there a call center at Omaha?
[4]     A: There was a call center — and I'm not — I
[5] don't think the call center was located in Omaha.
[6]     Q: Okay. Do you have an understanding that at
[7] some point in time MITG became the entity that handled
[8] multivendor spare part front-end user calls as well as
[9] Web site ordering?
[10]     A: I found out much later that there was a
[11] third-party company involved.
[12]     Q: Okay. So just so we're clear, the Compaq
[13] Direct, Troy Bloomquist group in Omaha was brought in
[14] and leveraged for Compaq to support their consumer base
[15] and front-end users?
[16]     A: For spare parts.
[17]     Q: Correct.
[18]     A: Yes.
[19]     Q: When did you find out that MITG was a
[20] third-party that was servicing the customer base?
[21]     MS. CARROLL: I'm going to object to that
[22] as vague.
[23]     Go ahead.
[24]     A: I don't remember.
[25]     Q: (BY MR. HANSEN) You became aware, I guess,

Page 15

[1] that MITG did provide multivendor spare parts solutions
[2] on behalf of Compaq?
[3]     A: I was never aware of that.
[4]     Q: Are you aware of that now?
[5]     A: Did they provide a third-party parts?
[6]     Q: Correct.
[7]     A: On our behalf?
[8]     Q: Correct.
[9]     A: No.
[10]     Q: Have you ever reviewed the Standard Support
[11] Agreement between Compaq/Hewlett-Packard and MITG?
[12]     A: No.
[13]     MS. CARROLL: I'm going to object to that
[14] as misleading and assumes facts not in evidence and
[15] vague.
[16]     Go ahead and answer it, if you can.
[17]     A: No.
[18]     Q: (BY MR. HANSEN) You're aware that MITG
[19] provided front-end consumers with Compaq parts through
[20] CSN?
[21]     MS. CARROLL: Object to that as
[22] misleading and assumes facts not in evidence.
[23]     Go ahead.
[24]     Q: (BY MR. HANSEN) You can answer the question,
[25] sir.

Page 16

[1]     A: Can you ask that again?
[2]     Q: Sure. Are you aware that MITG provided Compaq
[3] parts to front-end consumer users through CSN?
[4]     MS. CARROLL: Same objection.
[5]     A: I am now.
[6]     Q: (BY MR. HANSEN) Okay. When did you become
[7] aware of that?
[8]     A: That, I don't remember.
[9]     Q: Were you involved at all in the development of
[10] any XML interface for the eSpares Web site?
[11]     A: XML?
[12]     Q: Uh-huh.
[13]     A: I'm not sure what XML —
[14]     Q: Were you involved in any of the programming
[15] for the eSpares Web site?
[16]     A: I was involved in the design, not from a
[17] programming standpoint.
[18]     Q: Okay. When you say "design," do you mean what
[19] appears on the Web page?
[20]     A: Yes. Yes.
[21]     Q: Were you involved at all in the way in which
[22] orders are placed off that Web page?
[23]     A: As far as functionality, what we wanted from a
[24] business standpoint, yes.
[25]     Q: Were you involved at all in the middle ware

Page 17

[1] application that was created by MITG with Compaq?

[2]    A: No.

[3]    Q: When did Compaq launch the eSpares store?

[4]    A: July time frame of '02.

[5]    Q: And what's that Web site?

[6]    A: The URL?

[7]    Q: Yeah.

[8]    A: Compaq.com/sparestore, I think.

[9]    Q: Was there ever a call center here in Houston

[10] that took front-end consumer orders?

[11]    A: No.

[12]    Q: Prior to launching the eSpares store, what was

[13] the vehicle for ordering of Compaq parts?

[14]    A: For an end user?

[15]    Q: Yes.

[16]    A: There wasn't one.

[17]    Q: Okay. Well, say, for instance, I was a

[18] consumer or customer prior to the launch of the eSpares

[19] store and I needed a part for a Compaq laptop that I

[20] had and I called the 1-800 okay Compaq number, who was

[21] I told to contact to get that part?

[22]    A: It depends on the time frame we're talking

[23] about.

[24]    Q: Prior to the launch of the e store in July —

[25]    A: How much prior?

Page 18

[1]    Q: A year.

[2]    A: You were either sent to, like, an authorized

[3] service provider, who may service you or you were — we

[4] didn't have an avenue to sell externally.

[5]    Q: Authorized service provider, is that the same

[6] as an authorized local reseller?

[7]    A: The names can be interchanged, yes.

[8]    Q: Okay. And prior to the relationship between

[9] Compaq and MITG, were all part sales referred back to

[10] local channel partners?

[11]    MS. CARROLL: I'm going to object to that

[12] as vague.

[13]    A: No.

[14]    Q: (BY MR. HANSEN) Well, where else could they

[15] be referred to? You told me the authorized service

[16] provider. Where else?

[17]    MS. CARROLL: Objection. Calls for

[18] speculation.

[19]    A: Can you go back to the first question?

[20]    Q: (BY MR. HANSEN) Okay. Prior to the

[21] relationship between Compaq and MITG —

[22]    A: Uh-huh.

[23]    Q: — were all part sales referred back to local

[24] channel partners?

[25]    MS. CARROLL: I'm going to object to that

Page 19

[1] question as misleading and assumes facts not in

[2] evidence.

[3]    Go ahead.

[4]    Q: (BY MR. HANSEN) You can answer the question.

[5]    A: Yes.

[6]    Q: Prior to February of 2002, who had access to

[7] fulfilling part orders through the CSN?

[8]    MS. CARROLL: Objection to the extent it

[9] calls for speculation.

[10]    A: Prior to 2002?

[11]    Q: (BY MR. HANSEN) Uh-huh.

[12]    A: Primarily, service providers.

[13]    Q: Would those also be people classified as

[14] reseller partners?

[15]    A: No. Service providers. They have to be

[16] service authorized. CSN was a service authorization

[17] application, not a reseller application.

[18]    Q: Okay. Could you tell me that again? CSN was

[19] what?

[20]    A: Channel Services Network. And it's for our

[21] service authorized providers, which may be a reseller.

[22]    Q: Okay. Going to hand you what has previously

[23] been marked as Deposition Chizek LL.

[24]    (Witness reviewing document)

[25]    A: Okay.

Page 20

[1]    Q: (BY MR. HANSEN) And on the bottom of that

[2] exhibit is an e-mail from Troy Bloomquist to

[3] Richard Chizek dated October 22nd, 2002. Do you see

[4] that?

[5]    A: Yes.

[6]    Q: Okay. And then Troy is sending him a note

[7] from his call center. Is that what that says?

[8]    A: Yes.

[9]    Q: Okay. Did you have an understanding in

[10] October 2002, that the call center was Compaq Direct in

[11] Hannibal, Missouri?

[12]    A: I don't — I may have, I don't know. I don't

[13] remember exactly.

[14]    Q: Well, let me ask you this: Prior to October

[15] 2002, had you ever met Ron Haught from MITG?

[16]    A: No.

[17]    Q: Okay. Have you ever met Ron Haught?

[18]    A: No.

[19]    Q: Have you ever spoken to Ron Haught?

[20]    A: No.

[21]    Q: Did you have an understanding then that there

[22] was a call center in Omaha in October of 2002?

[23]    A: No. I know at some time in the workings with

[24] Troy we determined that the call center was not located

[25] in Omaha, but I'm not — I really do not remember when

Page 21

[1] that was.

[2] **Q:** Okay. Anyway, in Troy's e-mail —

[3] **A:** Uh-huh.

[4] — he references a statement that 4:30 p.m.

[5] Michelle from the spares store and there's a phone

[6] number there. Do you see that?

[7] **A:** Yes.

[8] **Q:** Okay. At this point in time, I take it the

[9] spares store Web site had been launched, based on the

[10] fact that you told me it was July of '02. That e-mail

[11] is October of '02; is that correct?

[12] **A:** Correct.

[13] **Q:** Okay. What — it says the spare store. Was

[14] there also a Web site — excuse me, a call center being

[15] referred to as the spare store?

[16] **A:** No. There was an Andover Call Center.

[17] **Q:** Okay. And is that phone number next to spare

[18] store there the Andover Call Center?

[19] **A:** Yes, I believe so.

[20] **Q:** And apparently, Michelle from the Andover

[21] spare store had called wanting pricing for a part that

[22] they did not have stock on. Do you see that?

[23] **A:** Yes.

[24] **Q:** Okay. How — how did it come about that

[25] Andover is referred to as the spares store?

Page 22

[1] **A:** I'm not sure why this was referring to Andover

[2] as a spare store. So I don't know.

[3] **Q:** What type of calls did Andover handle?

[4] **MS. CARROLL:** Objection. Calls for

[5] speculation.

[6] **A:** A variety.

[7] **Q:** (BY MR. HANSEN) Well, did they handle Compaq

[8] part orders?

[9] **A:** Yes.

[10] **MS. CARROLL:** Same objection.

[11] **Q:** (BY MR. HANSEN) You can answer, sir.

[12] **A:** Yes, the Andover Call Center was in place for

[13] years and years back in the Digital Equipment

[14] Corporation days.

[15] **Q:** Did Andover handle any multivendor spare parts

[16] orders?

[17] **A:** Not —

[18] **MS. CARROLL:** Object to speculation.

[19] **A:** — that I'm aware of.

[20] **Q:** (BY MR. HANSEN) And it continues on there in

[21] the e-mail. Do you see While our CSR was looking for

[22] the part? See where I'm reading?

[23] **A:** Yes. Yes.

[24] **Q:** Okay. And if you flip over, there's like

[25] seven phone numbers listed.

Page 23

[1] **A:** (Moving head up and down)

[2] **Q:** Do you see those numbers?

[3] **A:** Yes.

[4] **Q:** Okay. And it says the 1-800-888-0220 number

[5] was shut down. Do you see that?

[6] **A:** Yes.

[7] **Q:** Do you know what that number is?

[8] **A:** I'm not familiar with that number.

[9] **Q:** Okay. So I take it, having seen that here, it

[10] doesn't refresh your memory that that's a call center

[11] somewhere?

[12] **A:** No. I mean, I'm not familiar with that phone

[13] number.

[14] **Q:** Okay. How about the other numbers on there?

[15] **A:** I recognize, I think, the second one, right?

[16] I recognize the second one, and I recognize the fourth

[17] one.

[18] **Q:** Okay. What is the second number?

[19] **A:** And the fifth one 'cause it's the same as the

[20] second.

[21] What is the second number?

[22] **Q:** Right, that you —

[23] **A:** That's the Andover Call Center, if I'm not

[24] mistaken.

[25] **Q:** Okay. And what's four?

Page 24

[1] **A:** That was CEI.

[2] **Q:** The Troy Bloomquist. Is that the one that has

[3] in parenthesis, This is us?

[4] **A:** Yes.

[5] **Q:** And you don't recognize the other numbers on

[6] that —

[7] **A:** Well, they're duplicate.

[8] **Q:** Okay. It indicates there in that e-mail that

[9] Michelle's group, which is Andover, had taken an

[10] additional 600 calls in a day's time.

[11] **A:** Uh-huh.

[12] **Q:** And it references another note from

[13] 1-800-OK-COMPAQ. Do you see that?

[14] **A:** On the front page?

[15] **Q:** Yes.

[16] **A:** Yes.

[17] **Q:** Okay. Do you know what options were off of

[18] the 1-800-OK-COMPAQ line at this time of the e-mail for

[19] routing of part order calls?

[20] **A:** No, I don't.

[21] **Q:** Okay. Does the 1-800-OK-COMPAQ number come to

[22] Houston, do you know?

[23] **A:** I'm not sure. I know it used to years ago,

[24] but I — the routing is all over the country now, I

[25] think.

Page 25

[1]   Q: Okay. If someone in October of 2002 went to
[2]   the eSpares store's Web site, did they have the
[3]   capability of placing an order directly on the Web
[4]   site?

[5]   MS. CARROLL: I'm going to object to the
[6]   extent that calls for speculation of this witness.

[7]   A: Can you ask again?

[8]   Q: (BY MR. HANSEN) Sir, you developed the
[9]   eSpares Web site —

[10]   A: Yes.

[11]   Q: — correct?

[12]   A: Yes.

[13]   Q: You told me that you designed the page —

[14]   A: Yes.

[15]   Q: — that had the functionality of the business.
[16]   If I went to the eSpares store Web site and a page pops
[17]   up, is there a shopping cart where I could have ordered
[18]   a product in October of 2002?

[19]   MS. CARROLL: I'm going to — same
[20]   objection. It calls for speculation.

[21]   Q: (BY MR. HANSEN) You can answer.

[22]   A: Yes.

[23]   Q: Okay. Who fulfilled those orders from the Web
[24]   — Web-based eSpares store in 2002?

[25]   MS. CARROLL: I'm going to object that

Page 26

[1]   that's overly broad and calls for speculation. And the
[2]   reason is, he's already testified that he changed
[3]   positions in July of '02.

[4]   And, so, my objections are based on the
[5]   fact that if it changed from when he was involved —
[6]   unless he knows exactly what's happening in October,
[7]   since he said he changed jobs, that all of this is
[8]   calling for speculation —

[9]   Q: (BY MR. HANSEN) Sir —

[10]   MS. CARROLL: — predicate that he knows
[11]   the background of it.

[12]   Q: (BY MR. HANSEN) Sir, let me tell you
[13]   something. If you don't understand or you don't know a
[14]   question I ask —

[15]   A: Right. Right.

[16]   Q: — you can tell me that.

[17]   A: All right.

[18]   Q: Okay. So let's back up.

[19]   A: Okay.

[20]   Q: Take before you left in 2002. If, in fact,
[21]   you said you switched over when the merger took place,
[22]   did you still have responsibility for the eSpares store
[23]   after you switched positions?

[24]   A: There was a transitional period.

[25]   Q: Okay.

Page 27

[1]   A: When the two companies were merging.

[2]   Q: Okay. Well, you told me that the eSpares
[3]   store, which you helped design and launch —

[4]   A: Yes.

[5]   Q: — was launched in July of '02, which would
[6]   have been right around the time you testified earlier
[7]   you transitioned?

[8]   A: When we transitioned to HP, yes.

[9]   Q: Well, was that — did you take a new
[10]   position when Compaq transitioned to HP?

[11]   A: Sure, but there was overlap. You just don't
[12]   hand things off when folks are not totally aware.

[13]   Q: Very well. At some — well, did you
[14]   see the launch of the eSpares site then —

[15]   A: Yes.

[16]   Q: — until it —

[17]   A: Yes.

[18]   Q: Hold on.

[19]   A: Sorry.

[20]   Q: Okay. Until it was up operational and
[21]   functioning?

[22]   A: Yes.

[23]   Q: Okay. And did you have a time period there
[24]   where you were still involved in the eSpares store
[25]   where orders were being placed through the Web site.

Page 28

[1]   A: Yes.

[2]   Q: Okay. Tell me how orders were placed through
[3]   that eSpares store Web site?

[4]   A: Just in general?

[5]   Q: Yes.

[6]   A: Just like any Web store application. You come
[7]   in, you select your product. In this case our product
[8]   happened to be Compaq spares. You added it to a
[9]   shopping cart and you checked out.

[10]   Q: Okay. And what entity fulfilled that order?

[11]   A: Compaq customer service.

[12]   Q: Okay. Was that Andover?

[13]   A: No. It was customer service.

[14]   Q: Based out of where?

[15]   A: We were all over.

[16]   Q: Okay. Well, did it depend on the part that
[17]   was ordered as to where it was shipped from?

[18]   A: Sure.

[19]   Q: Okay. Was there a call center that was
[20]   responsible for the Web-based fulfillment orders?

[21]   A: There was a call center that was responsible
[22]   for supporting the Web application.

[23]   Q: Okay. And what call center was that?

[24]   A: Andover.

[25]   Q: Okay. And, in fact, had — okay. Had calls

Chip Love
3:04-cv-03055-JES-CHE     # 71     Page 10 of 27
March 30, 2005

Hewlett-Packard Development Company  v.
Midwest Information Technology Group, Inc.

Page 29

[1] in October of 2002, off the 1-800-OK-COMPAQ number for
[2] Compaq parts as referenced in that e-mail, started to
[3] be routed to Andover?
[4]     A: Sorry. Say that again.
[5]     Q: Had part calls —
[6]     A: Uh-huh.
[7]     Q: — I'm a consumer and I called the
[8] 1-800-OK-COMPAQ number —
[9]     A: Right.
[10]     Q: — and I wanted a Compaq spare part such as
[11] the eSpares stores, would that have been routed to
[12] Andover to handle?
[13]     A: Not that I'm aware of, no.
[14]     Q: Okay. Well, do you have knowledge then as to
[15] why Andover was experiencing the additional 600 calls
[16] per day?
[17]     A: I know of another group that shut down and I
[18] think they routed calls, but I wasn't directly related
[19] to or involved in any of the recovery efforts or
[20] anything like that.
[21]     Q: Okay. Did you ever communicate to anyone at
[22] — well, let me back up. Let's finish Chizek LL.
[23]     A: Sure.
[24]     Q: Go up to the top of that e-mail — or excuse
[25] me, the top of that page. It's an e-mail from

Page 30

[1] Mr. Chizek to Troy Bloomquist?
[2]     A: Uh-huh.
[3]     Q: Is that a yes?
[4]     A: Yes. Sorry.
[5]     Q: Okay. And you're on that e-mail, are you not?
[6]     A: Yes, I am.
[7]     Q: And Mr. Chizek indicates, in fact, that the
[8] Andover call volumes were higher than anticipated. Do
[9] you see that?
[10]     A: Yes.
[11]     Q: Okay. And says the increase is related to the
[12] launch of the spares store Web site,
[13] www.compaq.com/spare store and that parts order volumes
[14] online have increased.
[15]     A: Yes.
[16]     Q: Do you see that?
[17]     Okay. There's no reference there, is
[18] there, to the closing of any tech support center?
[19]     A: Not that I see, no.
[20]     Q: Okay. And who is Mr. Chizek?
[21]     A: He's a call center manager in Roseville.
[22]     Q: Okay. And how was the increased calls at
[23] Andover tied into the launch of your — the spares
[24] store Web site?
[25]     A: The Andover number was on the spares site

Page 31

[1] because Andover did post order, like, admin support.
[2]     Q: So when I — if I'm a consumer and I go to, in
[3] 2002, the eSpares store Web site and there's a number
[4] or was a number posted there at that time which was for
[5] the Andover Call Center?
[6]     A: Correct.
[7]     Q: Okay. Did — well, were you involved in any
[8] discussions as to how it was determined that the
[9] Andover Call Center number would be placed on that Web
[10] site?
[11]     A: Yes.
[12]     Q: Okay. How was it chosen that Andover would be
[13] that call center number?
[14]     A: They were involved in the whole design
[15] development process and testing of the site.
[16]     Q: Was Compaq Direct ever considered as a number
[17] to be placed on that Web site?
[18]     A: No.
[19]     Q: Okay. Was Compaq Direct, in 2002, handling
[20] Compaq spare parts orders?
[21]     MS. CARROLL: Objection, overly broad.
[22]     A: I don't know.
[23]     Q: (BY MR. HANSEN) You don't know that —
[24] whether or not Compaq Direct was handling the same type
[25] of parts orders that Andover was?

Page 32

[1]     MS. CARROLL: Objection, overly broad and
[2] misleading and vague.
[3]     Q: (BY MR. HANSEN) Go ahead.
[4]     A: I don't know.
[5]     Q: Did anyone — or did you ever communicate to
[6] Compaq Direct that the calls from the eSpare Web site
[7] were going to be routed to the Andover Call Center?
[8]     A: We weren't routing calls.
[9]     Q: The calls were — the number that was placed
[10] on the Web site —
[11]     A: Right.
[12]     Q: — did anyone ever communicate to Compaq
[13] Direct that that was the number that was going to be
[14] placed on the Web site?
[15]     A: Yes.
[16]     Q: Okay. Who did you communicate that to?
[17]     A: Troy Bloomquist.
[18]     Q: And what did Troy say in response?
[19]     A: I don't recall.
[20]     Q: Okay. Did he indicate to you that Compaq
[21] Direct could handle the same type of parts orders and
[22] that that number should be placed on the Web site?
[23]     A: No.
[24]     Q: Okay. Can you tell me anything specific
[25] regarding the discussions you had with Troy Bloomquist

Page 33

[1] about the number that was going to be placed on the
[2] eSpare Web site, the call center number?

[3]    A: I don't remember any specific conversations.

[4]    Q: Okay. Did somebody have to notify the
[5] 1-800-OK-COMPAQ number for routing of calls to Andover
[6] off of the eSpares store?

[7]    MS. CARROLL: Object to the extent that
[8] calls for speculation.

[9]    A: Did we communicate to the OK-COMPAQ folks?

[10]    Q: (BY MR. HANSEN) Let's say I'm a consumer that
[11] calls in wanting a part off the eSpares store and I
[12] call the 1-800 number —

[13]    A: Right.

[14]    Q: — the 1-800-OK-COMPAQ number —

[15]    A: Right.

[16]    Q: — was there a voice prompt that told me what
[17] option to select?

[18]    A: I'm not overly familiar with the OK-COMPAQ,
[19] like with the BDM or the phone menu, so I'm not sure
[20] what they were doing.

[21]    Q: Okay. Did the spares store Web site have the
[22] ability to handle net term customers?

[23]    A: No.

[24]    Q: Okay. In fact, were they only handling credit
[25] card customers?

Page 34

[1]    A: Credit card, correct.

[2]    Q: At some point in time, did the Web store have
[3] the ability to handle net term customers?

[4]    A: Not eSpares.

[5]    Q: Okay. Is eSpares still only handling credit
[6] card customers?

[7]    A: eSpares is no longer in existence.

[8]    Q: Okay. When did it shut down?

[9]    A: I don't remember specifically. I think it was
[10] in November of — like a year — a little over a year
[11] ago. So November of '03, I think.

[12]    Q: Okay. In the time in which you were involved
[13] with the eSpares stores —

[14]    A: Uh-huh.

[15]    Q: — eSpares store, sorry —

[16]    A: Okay.

[17]    Q: — did it ever obtain the capacity to handle
[18] net term customers?

[19]    A: No.

[20]    Q: Okay. Did the eSpares store service both
[21] Compaq and Hewlett-Packard parts?

[22]    A: No.

[23]    Q: Only Compaq parts?

[24]    A: Yes, eSpares was only Compaq.

[25]    Q: Okay. And was it or was it not multivendor

Page 35

[1] parts as well?

[2]    A: No.

[3]    Q: Were the orders off of the eSpares store CSN
[4] orders?

[5]    A: No.

[6]    Q: Because that's a channel services network?

[7]    A: Right. Completely different application.

[8]    Q: Since the eSpares store was — well, let me
[9] back up. Were you ever involved in any development or
[10] programming for the spare store to have an XML
[11] interface between the end customer and the Web site?

[12]    A: No.

[13]    Q: I'm sorry?

[14]    A: No.

[15]    Q: The eSpares store, you said you believe was
[16] shut down in November of 2003. Was there a new site
[17] created or was it discontinued altogether?

[18]    A: New site.

[19]    Q: Okay. What is the new site?

[20]    A: HP parts store.

[21]    Q: Is it off the hp.com Web site?

[22]    A: Yes.

[23]    Q: Do they sell Compaq parts at that site?

[24]    A: Yes.

[25]    Q: Do they sell Hewlett-Packard parts at that

Page 36

[1] site as well?

[2]    A: Yes.

[3]    Q: Okay. Were you involved in any way whatsoever
[4] with the development of the HP parts store Web site?

[5]    A: No.

[6]    Q: Okay. What — tell me a little bit more about
[7] your current position. You said you are the manager
[8] for the parts service and development team?

[9]    A: Yeah. Program — program development and —
[10] or services development and program development.

[11]    Q: Is that developing business?

[12]    A: It's very much a business development
[13] organization, yes.

[14]    Q: Okay. Is that business development with who,
[15] authorized resellers?

[16]    A: It varies between — it's all customer
[17] segments, really.

[18]    Q: Are you involved in any decisions with
[19] third-party entity that provide multivendor spare parts
[20] solutions on behalf of Compaq and Hewlett-Packard?

[21]    A: I don't believe we have anyone providing
[22] third-party parts support.

[23]    Q: Okay. Are you aware that previously there
[24] were entities such as MITG that provided multivendor
[25] spare parts solutions?

Chip Love
3:04-CV-03055-JES-CHE    # 71    Page 12 of 27
March 30, 2005

Hewlett-Packard Development Company   v.
Midwest Information Technology Group, Inc.

Page 37

[1] **A:** I —

[2] **MS. CARROLL:** Objection, vague.

[3] **A:** No, I'm not.

[4] **Q:** (BY MR. HANSEN) Okay. Well, if someone

[5] called the 1-800-OK-COMPAQ and was looking for a part

[6] for an IBM or a Dell —

[7] **A:** Right.

[8] **Q:** — are you aware that there were entities,

[9] such as MITG, that could fulfill that order for the

[10] customer?

[11] **MS. CARROLL:** Objection. Vague, overly

[12] broad.

[13] **Q:** (BY MR. HANSEN) You can answer.

[14] **A:** No.

[15] **Q:** The orders that were placed at the eSpares

[16] store, were those fulfilled through the VISTA System?

[17] **A:** The orders placed through eSpares, no.

[18] **Q:** Okay. How were they fulfilled?

[19] **A:** Through our service logistics systems.

[20] **Q:** Okay. Did that involve Omaha at all?

[21] **A:** No.

[22] **Q:** Was that all based here out of Houston?

[23] **A:** You have to be more specific. Sorry.

[24] **Q:** Well, you said it was fulfilled through your

[25] service logistics group.

Page 38

[1] **A:** Sure. Logistics is spread out all over,

[2] there's different sites or parts store.

[3] **Q:** Can I see that, the e-mail?

[4] **A:** Sure.

[5] **Q:** Was it your understanding in October of 2002,

[6] that the Andover Call Center was going to be

[7] transitioned to Roseville? Did you have any knowledge

[8] of that?

[9] **A:** I wasn't involved in that.

[10] **Q:** Let me hand you what was marked yesterday as

[11] Defendant's Exhibit HHH. Go ahead and take a look at

[12] those e-mails.

[13] **MS. CARROLL:** While he's reading that,

[14] I'm going to see if I can go turn the TV off.

[15] **THE VIDEOGRAPHER:** We're now going off

[16] the record. Time is approximately 9:37 a.m.

[17] (Off the record)

[18] **THE VIDEOGRAPHER:** We're now back on the

[19] record. Time is approximately 9:49 a.m.

[20] **Q:** (BY MR. HANSEN) Mr. Love, have you had a

[21] chance to read Deposition Exhibit HHH?

[22] **A:** Yes.

[23] **Q:** Okay. And if we flip to the very back page of

[24] that exhibit, there's an e-mail from Diane Pound to two

[25] individuals and you're CCed; is that correct?

Page 39

[1] **A:** Correct.

[2] **Q:** Okay. Were you the business contact for

[3] Andover here at Houston?

[4] **A:** During what time frame?

[5] **Q:** This October 30, 2002.

[6] **A:** Not officially. Not in my new role; but they

[7] still, because of the past relationships, they still

[8] called me at times.

[9] **Q:** Okay. And that past relationship being what,

[10] the launch of the eSpares store?

[11] **A:** Correct. Correct.

[12] **Q:** And this e-mail references the fact that

[13] Diane Pound — you understood she's at Andover; is that

[14] correct?

[15] **A:** Yes.

[16] **Q:** Okay. Her call center was losing almost 500

[17] calls per day and that customers were not happy about

[18] the long wait time. And then it mentions Roseville,

[19] which is California, handling some additional calls

[20] starting on November 18th.

[21] Were you involved in any follow-up

[22] telephone conversations after receiving this e-mail?

[23] **A:** I only remember one, and that was from

[24] Roland Soriano.

[25] **Q:** Okay. And we'll get to that in a second.

Page 40

[1] **A:** Okay.

[2] **Q:** Well, when was that call?

[3] **A:** I don't remember.

[4] **Q:** Okay. Would it have been at or around the

[5] time he sent his response e-mail, which is on the

[6] second page of Exhibit HHH?

[7] **A:** Yes.

[8] **Q:** Okay. Which is actually the same day,

[9] Wednesday, October 30, 2002, correct?

[10] **A:** Yes.

[11] **Q:** Okay. Now, did you have any discussions, just

[12] to clear that up, with Diane Pound as to what was going

[13] on at Andover regarding these additional calls?

[14] **A:** I may have. I don't remember specifically but

[15] we talked often.

[16] **Q:** Okay. And based on Exhibit Chizek LL,

[17] Mr. Chizek indicated to Troy Bloomquist and yourself,

[18] which was CCed on the e-mail, that those increased call

[19] volumes were related to the launch of the spares store.

[20] Do you remember that?

[21] **A:** I remember that e-mail, yes.

[22] **Q:** Okay. And at this point in time, is that what

[23] you understood this increase in calls at Andover was

[24] related to?

[25] **A:** Which increase?

Page 41

[1] **Q:** The 500 calls per day that Ms. Pound's group
[2] was receiving.
[3] **A:** I actually thought this increase was due to
[4] another — an options group shutting down and routing
[5] calls.
[6] **Q:** Okay. When you say "an options group," what
[7] are you referring to?
[8] **A:** hpshopping.com, I believe. Or maybe it was
[9] Compaq. No, it would have been hpshopping.com. And
[10] they were selling, I think, memory options or maybe
[11] options and they shut down and — and I — I thought
[12] that was where the high call volume started increasing.
[13] **Q:** When you say "selling memory options," is that
[14] for what, laptops, servers, what?
[15] **A:** Probably more consumer-oriented products.
[16] **Q:** Okay. Were they selling Compaq memory options
[17] on hpshopping.com at this time?
[18] **A:** I believe so, yes.
[19] **Q:** Because Ms. Pound's group only serviced
[20] Compaq parts or Digital parts, correct?
[21] **A:** Correct.
[22] **Q:** Okay. They didn't service any Hewlett-Packard
[23] parts?
[24] **A:** No.
[25] **Q:** Okay. Now, the next e-mail indicates a

Page 42

[1] response from Ms. Meyerfeld of the same date. Do you
[2] see that? And you're CCed on that e-mail?
[3] **A:** Yes.
[4] **Q:** And just so we're at the same place, it starts
[5] out, Diane?
[6] **A:** Yes.
[7] **Q:** Okay. Now, there's a specific paragraph down
[8] there directed to you. Do you see that?
[9] **A:** Yes.
[10] **Q:** Okay. What was your relationship with
[11] Ms. Meyerfeld — because she's out at Roseville —
[12] **A:** Right.
[13] **Q:** — how were — why is she sending this to you
[14] at this time?
[15] **A:** I think it was, again, my past involvement
[16] with this group and eSpares.
[17] **Q:** Okay. Well, at this point in time, October of
[18] 2002, had you shifted all duties and responsibilities
[19] in your new job, meaning you didn't have any
[20] involvement anymore with eSpares?
[21] **A:** It wasn't — like I said, it wasn't like a cut
[22] and dry when — and I don't exactly know what was
[23] shifted. What — we made an agreement between the H —
[24] premerger HP and Compaq managers that weren't going to
[25] drop the ball on anything. So it was just over time.

Page 43

[1] **Q:** Okay. Ms. Meyerfeld indicates, From talking
[2] with Roland the other day, he was going to call you to
[3] discuss looking at the portfolio of parts we are
[4] looking at for the Presario?
[5] **A:** Yes.
[6] **Q:** Okay. The portfolio of parts. That is for
[7] Compaq parts?
[8] **A:** Right. I think that's what she was primarily
[9] responding to.
[10] **Q:** And she indicates such things as part number,
[11] convergents, pricing, stocking. Do you have any idea
[12] as to when you can have this analysis done? Until we
[13] understand the offerings, we are on hold as to whether
[14] we will be transitioning the Presario parts into the
[15] Roseville Call Center.
[16] What was the analysis — strike that.
[17] Did you perform the analysis?
[18] **A:** Not directly, no.
[19] **Q:** Okay. Who did?
[20] **A:** I believe it was a member of my team, but I
[21] don't remember specifically.
[22] **Q:** Okay. What type of analysis was that?
[23] **A:** What our part availability was.
[24] **Q:** Meaning Compaq parts?
[25] **A:** Yes.

Page 44

[1] **Q:** And when you say "availability," is that from
[2] various call centers?
[3] **A:** No. From our — our support was through
[4] logistics or service parts or spare parts. In Compaq
[5] terminology there's a big difference between spare
[6] parts and option parts.
[7] **Q:** Okay. What's the difference?
[8] **A:** An option part is a — is a brand new part
[9] that can be sold by product divisions. We don't sell
[10] option parts. It can be sold by a product division.
[11] It carries a different warranty. A spare part is
[12] something else.
[13] **Q:** Did spare parts include out-of-warranty parts?
[14] **A:** It can, yes.
[15] **Q:** Well — okay. Was Andover handling
[16] out-of-warranty Compaq parts?
[17] **A:** Our entire parts business is all out of
[18] warranty.
[19] **Q:** Okay. The — well, if I need a spare part and
[20] it's within the time of my warranty, how is it then
[21] that all parts are out of warranty?
[22] **A:** All our business is out of warranty. The
[23] parts business is not in warranty.
[24] **Q:** Okay. And there's a separate business for
[25] warranty parts?

Chip Love
3:04-CV-03055-JES-CHE    # 71    Page 14 of 27
March 30, 2005

Hewlett-Packard Development Company   v.
Midwest Information Technology Group, Inc.

Page 45

[1]   A: Sure. It's not a business because it's
[2] warranty.
[3]   Q: Okay. That's how it was classified?
[4]   A: Yes.
[5]   Q: And that was — was that the situation
[6] premerger?
[7]   A: Yes.
[8]   Q: The analysis that was done was to also inform
[9] the HP people in Roseville what offerings Andover was
[10] handling. Is that true?
[11]   A: What offerings?
[12]   Q: It says, Until we understand the offerings, we
[13] are on hold as to whether we will be transitioning the
[14] Presario parts into the Roseville Call Center.
[15]   A: Yes.
[16]   Q: Okay. And what was your discussion with
[17] Roland Soriano regarding the increase call volume at
[18] the Andover Call Center?
[19]   A: It was more — where the calls were coming
[20] from and what type of parts eSpares could support.
[21]   Q: Sorry. Where calls were coming from and what
[22] type of parts eSpares could support?
[23]   A: Yes.
[24]   Q: Meaning, what type of parts orders?
[25]   A: Right.

Page 46

[1]   Q: Okay. And that was specifically referencing
[2] what Andover could handle and provide on behalf of the
[3] eSpares parts ordering?
[4]   A: Yeah. I believe the problem — and I wasn't
[5] directly involved — but I believe the problem was they
[6] were getting calls from this options group for some
[7] parts that we didn't even support, we didn't have a
[8] spare equivalent to that option.
[9]   Q: Do you know if MITG was an entity that had
[10] those parts and could fulfill those orders?
[11]   A: I don't know.
[12]   Q: Were you involved, then, in the discussion, if
[13] we go towards the e-mail from Mr. Soriano on October
[14] 30, 2002, at 3:30 p.m., which is the second page of
[15] that exhibit. Do you see that?
[16]   A: Uh-huh.
[17]   Q: Where he indicates, he being Mr. Soriano, he
[18] has been talking with Troy Bloomquist of the HP Direct
[19] Call Center in Hannibal, Missouri, about helping out
[20] with the Andover problem.
[21]     Were you involved in any discussions with
[22] Mr. Soriano or anyone else regarding HP Direct helping
[23] out in this situation?
[24]   A: Not that I remember, no.
[25]   Q: Okay. It says, The call center has the

Page 47

[1] capacity and can take care of these customers. Did you
[2] have an understanding that at this point in time HP
[3] Direct could handle and take care of the excess call
[4] volumes at Andover?
[5]   MS. CARROLL: Objection. Calls for
[6] speculation.
[7]   A: I wasn't involved.
[8]   Q: (BY MR. HANSEN) Okay. I think you both were
[9] talking at the same time.
[10]   MS. CARROLL: Sorry.
[11]   Q: (BY MR. HANSEN) What was your answer?
[12]   A: I wasn't — I wasn't involved.
[13]   Q: Okay. Did you have any understanding at this
[14] point in time, what type of options or services HP
[15] Direct in Hannibal, Missouri, was providing on behalf
[16] of Compaq or Hewlett-Packard?
[17]   A: They were — they were selling spare parts on
[18] our behalf, that's what I was aware of.
[19]   Q: Okay. Were they also providing and selling
[20] parts under the Channel Services Network?
[21]   A: That was their access to Compaq parts.
[22]   Q: Okay. Did your group have to give them access
[23] to that?
[24]   A: Yes.
[25]   Q: Okay. Do you know when that took place?

Page 48

[1]   A: The access?
[2]   Q: Yes.
[3]   A: Early on in the — the business relationship.
[4]   Q: Okay. And how does one — is there a process
[5] one goes through to get access to the —
[6]   A: Sure.
[7]   Q: — CSN?
[8]   A: Yes.
[9]   Q: Is it a review process by Compaq to make sure
[10] that these people are authorized —
[11]   A: Yes.
[12]   Q: — resellers?
[13]   A: Yes.
[14]   Q: Okay. The e-mail from Mr. Soriano indicates,
[15] I strongly suggest we take this option. That option
[16] being the HP Direct Call Center route, and make it
[17] happen. Please let me know immediately when Andover
[18] will see the decrease in calls. I will take action to
[19] redirect the calls to the HP Direct.
[20]     Were you involved at all in seeing that
[21] the calls were redirected to HP Direct?
[22]   A: No.
[23]   Q: Were you involved in the discussions or
[24] decisions as to where those calls ultimately ended up
[25] going?

Hewlett-Packard Development Company 3:04-cv-03059-SLE-CHE Page 15 of 27
Midwest Information Technology Group, Inc.

Chip Love
March 30, 2005

Page 49

[1] **A:** No. Not that I know of, no.

[2] **Q:** Okay. Did you recommend that those calls not

[3] go to the HP Call Center in Hannibal, Missouri?

[4] **A:** For — I don't remember being involved in this

[5] situation at all. Other — I can see that I'm copied

[6] on these e-mails; but this was not, as a manager, this

[7] was not my business decision.

[8] **Q:** Do you know who made the decision as to where

[9] those calls ultimately ended up going?

[10] **A:** No.

[11] **Q:** Let me ask my question again, so we can hear

[12] it.

[13] **A:** Sure.

[14] **Q:** Do you know ultimately who made that decision

[15] where those calls ended up going?

[16] **A:** No.

[17] **Q:** Okay. Do you know if — if in fact they ended

[18] up going to Roseville?

[19] **A:** I think so. I don't know for sure.

[20] **Q:** Okay. Was Andover eventually totally

[21] transitioned to Roseville and closed?

[22] **A:** Yes.

[23] **Q:** And Roseville then took on providing the parts

[24] options that the Andover Call Center previously had

[25] provided?

Page 50

[1] **A:** Spare parts, yes.

[2] **Q:** Yeah. Okay. Now, going to that first page of

[3] Exhibit HHH, you are CCed on that e-mail as well. Do

[4] you see that?

[5] **A:** Yes.

[6] **Q:** Okay. Nikhil Behl up at the top, do you know

[7] who that person is?

[8] **A:** No.

[9] **Q:** Okay. It then indicates in the body of the

[10] e-mail a short-term solution and a long-term solution.

[11] Did you see that?

[12] **A:** Yes.

[13] **Q:** Okay. It says links to the memory

[14] configurator and phone numbers published on hp.com or

[15] pre-mergercompaq.com have been removed. Do you see

[16] that?

[17] **A:** Yes.

[18] **Q:** Okay. Were you involved in the removal of any

[19] of those numbers?

[20] **A:** No.

[21] **Q:** Okay. It then says HPshopping has stopped

[22] referring calls to the spare parts store. Do you see

[23] that?

[24] **A:** Yes.

[25] **Q:** And is that the HPshopping referring the calls

Page 51

[1] you mentioned earlier regarding memory options to

[2] Andover?

[3] **A:** I believe so, yes.

[4] **Q:** Okay. Last — second to last bullet point

[5] there under short-term solution, it says, We have put

[6] in place mechanisms to refer customers to Kingston &

[7] Crucial. Do you see that?

[8] **A:** Yes, I do.

[9] **Q:** Who is Kingston & Crucial?

[10] **A:** I'm not sure but I believe they're a third

[11] party.

[12] **Q:** Third-party spare parts provider?

[13] **A:** I don't know.

[14] **Q:** Okay. Do you know who would know that?

[15] **MS. CARROLL:** Objection. Calls for

[16] speculation.

[17] **A:** No.

[18] **Q:** (BY MR. HANSEN) Okay. Let's go off for a

[19] second.

[20] **THE VIDEOGRAPHER:** We're now going off

[21] the record. Time is approximately 10:04 a.m.

[22] (Off the record)

[23] **THE VIDEOGRAPHER:** We're now back on the

[24] record. Time is approximately 10:06 a.m.

[25] **Q:** (BY MR. HANSEN) I believe the last question I

Page 52

[1] asked was in regards to the entity Kingston & Crucial.

[2] And I think — just so we're clear — your answer was

[3] you thought they were a third-party provider of parts?

[4] **A:** Yeah. I'm not sure.

[5] **Q:** Okay. Okay. I'm going to hand you Deposition

[6] Exhibit Meyerfeld M and have you take a look at that.

[7] **A:** Anything specific?

[8] **Q:** Just look at the first page. Sorry.

[9] **A:** Okay.

[10] Yeah.

[11] **Q:** Okay. Are these what are referred to as PBCO

[12] metrics?

[13] **A:** Yes.

[14] **Q:** Okay. And are you an individual there that

[15] received that on the e-mail screen?

[16] **A:** Yes.

[17] **Q:** And was that something in your capacity —

[18] well, prior to the merger and it appears even after the

[19] merger, you received those — sent to you —

[20] **A:** Sure. Sure.

[21] **Q:** And those were metrics that documented the

[22] call volume and order levels on a daily basis?

[23] **A:** Yes.

[24] **Q:** And the eSpares store is listed on there?

[25] **A:** Yes.

CHIP0759-03055-JES-CHE    # 71    Page 16 of 27
March 30, 2005

Hewlett-Packard Development Company v.
Midwest Information Technology Group, Inc.

Page 53

[1] Q: Okay. And the eSpares — do you know if that
[2] order total included both the Web site and the call
[3] volumes handled by Andover?
[4] A: I don't know.
[5] Q: Okay. I take it, you didn't prepare those
[6] figures?
[7] A: Oh, no.
[8] Q: Okay. And other than receiving them on a
[9] daily basis, did you have any involvement in them?
[10] A: No. This is operations.
[11] Q: Okay. Would you use them to help in your
[12] business development?
[13] A: No.
[14] Q: Is Andover specifically listed on
[15] there? I can't see from here.
[16] A: There's one reference, third from the bottom.
[17] Q: Okay. And that's under the order totals?
[18] A: Yes.
[19] Q: Okay. And in the call center is there an
[20] eSpares reference?
[21] A: Not directly. There's Roseville.
[22] Q: Roseville eSpares?
[23] A: Roseville eSpares.
[24] Q: Is that what the eSpares store and Andover was
[25] being classified as, as of March 2003, when that

Page 54

[1] metrics came out?
[2] A: I'm not real sure, to be honest with you.
[3] Q: Well, let me back up then. In 2002, when you
[4] were in your position prior to the merger —
[5] A: Sure.
[6] Q: — were you receiving those on a daily basis?
[7] A: This was a postmerger report.
[8] Q: Okay. So, again, even though you had
[9] transitioned out of your previous position, you still
[10] received those?
[11] A: Oh, sure. The whole business received this.
[12] Q: Okay. And I take it you weren't involved in
[13] the commenting or review on any of the performance
[14] levels in here?
[15] A: No.
[16] Q: Okay. After you left your position, pre — or
[17] postmerger, excuse me, who took over the responsibility
[18] for the eSpares group?
[19] A: Lynn Farland was the manager, but I believe
[20] there was others underneath her that were more directly
[21] responsible.
[22] Q: Do you know — do you have any names?
[23] A: Yes.
[24] Q: Okay. Who were they?
[25] A: From a business development or a new site

Page 55

[1] development, for the HP parts store there was
[2] Claudia Misner.
[3] Q: Okay. Who became, if you know, the contact
[4] for Andover?
[5] A: I know Richard Chizek was involved;
[6] Louise Meyerfeld, as far as transitional duties.
[7] Roland was the operations — Roland Soriano was an
[8] operations manager.
[9] Q: Okay. Were you involved in any
[10] decision-making process as to whether or not to
[11] transition the Andover Call Center to anywhere else
[12] other than Roseville?
[13] A: No, not directly.
[14] Q: Okay. Are you aware that there was
[15] discussions about that?
[16] A: Not immediately but it became known down the
[17] road, yes.
[18] Q: Okay. Was transitioning that business to
[19] MITG, HP Direct one of the options?
[20] A: I — which —
[21] Q: Andover?
[22] A: There was many things going on in Andover,
[23] so . . .
[24] Q: Well, was one of those many things the
[25] possibility of transitioning the call center activity

Page 56

[1] for the fulfillment of the Compaq spare parts orders to
[2] MITG?
[3] MS. CARROLL: Object to that as vague and
[4] overly broad.
[5] A: I'm not sure.
[6] Q: (BY MR. HANSEN) Okay. Well, let me ask it
[7] this way: Are you aware that one of the options
[8] discussed was transitioning the Andover Call Center,
[9] Compaq spare part business to Compaq Direct,
[10] Troy Bloomquist's group in Omaha?
[11] A: I may have been. I may have seen e-mails.
[12] I'm not sure.
[13] Q: Okay. Were you involved in any
[14] recommendations on whether or not to do that?
[15] A: The entire call center?
[16] Q: The spare parts ordering, yes, from Andover.
[17] A: We had a — we shared some e-mails; but it
[18] was, in my opinion, it was slightly different.
[19] Q: What was different?
[20] A: What we were discussing.
[21] Q: Okay. What was it you were discussing?
[22] A: It was — it was — that's when it was getting
[23] more closely related to what my new business was, which
[24] was parts resellers.
[25] Q: Okay. Well, how did MITG or Compaq Direct

Page 57

[1] come into your discussion regarding your new
[2] responsibilities for parts resellers?
[3]    **A:** I believe there was either a conversation or
[4] an e-mail that was asked, just recommendations on what
[5] our future direction would be, as far as resellers.
[6]    **Q:** With MITG specifically?
[7]    **A:** Yes, I believe so.
[8]    **Q:** Okay. And do you recall specifically
[9] recommending not to go with MITG?
[10]    **A:** Yes.
[11]    **Q:** Okay. And that was your recommendation. Why?
[12]    **A:** Because we had a well-defined parts reseller
[13] program with — we call an authorized parts reseller
[14] program. And we had, at the time, 11 or so APRs that
[15] we were using.
[16]    **Q:** Well, to have access to CSN, did MITG have to
[17] become an authorized parts reseller?
[18]    **A:** No.
[19]    **Q:** Okay. They did have to have authorization
[20] from your group, though, to have access to CSN,
[21] correct?
[22]    **A:** The access was provided to Compaq Direct and
[23] it was an internal ID.
[24]    **Q:** Which was then transferred to MITG?
[25]    **A:** Not that I knew —

Page 58

[1]    **MS. CARROLL:** Objection. Calls for
[2] speculation.
[3]    **A:** Not that I knew of.
[4]    **Q:** (BY MR. HANSEN) Okay. Just so we're clear,
[5] your involvement then, you're telling me, is with the
[6] discussion near the end of the contract with MITG,
[7] whether to keep them on as an authorized parts reseller
[8] under your group?
[9]    **A:** They were never — MITG was never an
[10] authorized parts reseller.
[11]    **Q:** Well, the discussion I said was regarding
[12] whether or not to keep them on in that type of
[13] capacity. And you said you had a group of 11 people
[14] already; so, therefore, you recommended not going with
[15] them?
[16]    **MS. CARROLL:** I'm going to object to that
[17] as vague and misleading. The use of the word "keep."
[18]    **MR. HANSEN:** What?
[19]    **MS. CARROLL:** It's the "keep," I think is
[20] the problem. "Keep them on," implies that they were
[21] already there as an authorized reseller. I think that
[22] was the issue with the question. You said that you
[23] wanted to —
[24]    **MR. HANSEN:** I'm confused. So I'll
[25] re-ask my question.

Page 59

[1]    **MS. CARROLL:** Okay. Good.
[2]    **THE WITNESS:** Okay.
[3]    **Q:** (BY MR. HANSEN) You said the discussion
[4] involving MITG that you recall was A, whether or not to
[5] continue any relationship with MITG; is that correct?
[6]    **A:** Correct.
[7]    **Q:** Okay. And whether or not to use them in a
[8] capacity as an APR group?
[9]    **A:** Correct.
[10]    **Q:** Okay. And it was your recommendation not to
[11] do that, correct?
[12]    **A:** Correct.
[13]    **Q:** Okay. Were you involved in any of the
[14] discussions or recommendations regarding using MITG in
[15] any other capacity?
[16]    **A:** Not that I'm aware of, no.
[17]    **Q:** Okay. Were you involved in the
[18] decision-making as to whether or not to keep them as a
[19] multivendor spare parts provider?
[20]    **A:** We never had a concerted effort to do
[21] multivendor spare parts.
[22]    **Q:** Okay. But my question was: Were you involved
[23] in any discussions regarding MITG and using them in
[24] that capacity?
[25]    **A:** Yeah, I can recall conversations with our

Page 60

[1] business manager; and just strategically I didn't agree
[2] with going after a multivendor business.
[3]    **Q:** Okay. Why not?
[4]    **A:** It's just too costly.
[5]    **Q:** Okay. Were you involved in the management of
[6] the multivendor spare part procurement business from
[7] 2002 through 2004?
[8]    **A:** No.
[9]    **Q:** Okay. I guess then, what is your basis for
[10] the statement that the multivendor spare parts business
[11] was too costly?
[12]    **A:** The — the Compaq parts business nor the HP
[13] parts business now has a multivendor aspect to it.
[14]    **Q:** Okay. And I understand that and I
[15] understand —
[16]    **A:** Okay.
[17]    **Q:** — that there was a decision made at some
[18] point in time to no longer go down that route with
[19] multivendor spare parts solution, correct?
[20]    **A:** No. Because you just said we're no longer
[21] going to go, and I just said we were never going.
[22]    **Q:** Okay. Well, do you understand that MITG from
[23] February 7th of 2002 to February 7th, 2004, did provide
[24] multivendor spare parts solutions?
[25]    **A:** If they did, it wasn't for us.

Page 61

[1]  **Q:** Okay. When you say "it wasn't for us," who's
[2] the us?
[3]  **A:** Either the Compaq parts business or the now HP
[4] parts business.
[5]  **Q:** Okay. Who was it for?
[6]  **MS. CARROLL:** Objection. Calls for
[7] speculation.
[8]  **A:** I don't know.
[9]  **Q:** (BY MR. HANSEN) I just want to be clear on
[10] this.
[11]  **A:** Sure.
[12]  **Q:** So it's your testimony that MITG did not
[13] provide multivendor spare parts solutions for either
[14] Compaq or Hewlett-Packard?
[15]  **MS. CARROLL:** Objection. Misstates the
[16] witness's prior testimony.
[17]  **A:** For the parts business.
[18]  **Q:** (BY MR. HANSEN) Okay. Then do you know who
[19] they were providing it for?
[20]  **A:** No, I don't.
[21]  **Q:** I'm going to hand you — before I do, let me
[22] clear up a few — a few questions.
[23]    You indicated that you were involved with
[24] the development of
[25] Troy Bloomquist's group after CEI was acquired by

Page 62

[1] Compaq and that — and that involvement was as to
[2] leveraging Troy's group as an avenue for end user
[3] customer part orders. Do you recall that?
[4]  **A:** Yes.
[5]  **Q:** Okay. And you said part of that was for the
[6] fact that the group previously providing that option
[7] stopped, ended, was terminated, whatever; and that's
[8] where Troy's group came in?
[9]  **A:** Correct.
[10]  **Q:** Okay. Were you involved then in the decision
[11] as to whether or not to continue leveraging and using
[12] the Compaq Direct group as the call center avenue for
[13] the eSpare Web site?
[14]  **A:** What time frame? I'm not sure of your
[15] question.
[16]  **Q:** When the eSpare Web site was launched —
[17]  **A:** Yes. Yes.
[18]  **Q:** Okay. In '02 —
[19]  **A:** Yes.
[20]  **Q:** — there was a decision made to place the
[21] Andover Call Center number on that Web site?
[22]  **A:** Yes.
[23]  **Q:** Okay. Can you tell me what discussion, if
[24] any, took place or analysis as to why to use Andover's
[25] call center instead of Troy's that had been leveraged

Page 63

[1] previously?
[2]  **A:** Sure.
[3]  **MS. CARROLL:** Objection. Assumes facts
[4] not in evidence.
[5]  **Q:** (BY MR. HANSEN) Go ahead.
[6]  **A:** Troy's folks had no access to the Andover —
[7] or not to the Andover — to eSpares' Web site or the
[8] supporting infrastructure behind eSpares. So they
[9] could not — they couldn't perform the admin support
[10] that Andover could. There was no choice in the matter.
[11] The primary purpose of Andover was postorder support.
[12]  **Q:** Okay. Well, they had no access, you said, to
[13] the eSpares Web site. Could they have been given
[14] access to it?
[15]  **MS. CARROLL:** Objection. Calls for
[16] speculation.
[17]  **A:** It's a Web site, anybody can have access.
[18]  **Q:** (BY MR. HANSEN) Okay.
[19]  **A:** Right. It's the supporting infrastructure
[20] behind.
[21]  **Q:** Explain to me how Troy's group could not
[22] obtain that supporting structure if they're given
[23] access to it.
[24]  **A:** Because it's not all connected. That's just
[25] — eSpares is just a front-end order entry tool or

Page 64

[1] order entry application.
[2]  **Q:** Okay. What is the supporting structure you're
[3] referring to that Andover had access to that
[4] Troy Bloomquist's group did not?
[5]  **A:** There's logistics systems involved. There's
[6] billing systems, internal billing systems. There's
[7] probably a few others that come to mind.
[8]  **Q:** Okay. Handing you what is documents HP10896
[9] through 10935, which will be Defendant's Exhibit D —
[10] well, four Ds — sorry, four Bs. Okay. This has been
[11] represented to be a document in an index I received
[12] called the CSN list. Okay?
[13]    Go ahead and take a look at it for a
[14] second.
[15]  **A:** Okay.
[16]  **Q:** Okay. What is that document?
[17]  **A:** It's a list of orders for a particular ID.
[18] Specific CSN ID.
[19]  **Q:** Okay. Do you know what that CSN ID is in
[20] reference to?
[21]  **A:** Yes. That's our internal parts business CSN
[22] ID.
[23]  **Q:** Is that specific to a vendor, a call center?
[24]  **A:** No. This is what we use internally.
[25]  **Q:** Okay. Well, does that reference orders placed

Hewlett-Packard Development Company    Page 19 of 27
Midwest Information Technology Group, Inc.

3:04-cv-05053-JES-CHE    Document #    Filed: 19 of 27

Page 65

[1] through CSN?

[2]    A: Yes. Yes. Sorry.

[3]    Q: Okay. And how do I identify on that document

[4] what group is placing the order?

[5]    A: The ID, #9969-1.

[6]    Q: Okay. What group is that for? You said —

[7]    A: That's — this is a carryover from the

[8] premerger Compaq days.

[9]    Q: Okay. Well, can you tell me specifically, is

[10] there anything on there that references, for instance,

[11] MITG?

[12]    A: No.

[13]    Q: Okay. What is the dates of the document?

[14]    A: Feb 7, '02 through Feb 7, '04 (sic).

[15]    Q: Okay. Well, how do I identify in that

[16] document who is placing the orders that are contained

[17] within the pages there?

[18]    A: As far as the person?

[19]    Q: Well, either the person or call center —

[20]    A: Or the group?

[21]    Q: — or entity or group?

[22]    A: No. Yeah. These orders were primarily placed

[23] by — actually placed by one person, a lot of them.

[24] There's others that had access to it, but it was mostly

[25] to support one business.

Page 66

[1]    Q: Okay. Well, tell me who the person or the

[2] business is.

[3]    A: Rich Stratton was the person.

[4]    Q: Rich Stratton?

[5]    A: Rich Stratton.

[6]    Q: Was he here in Houston?

[7]    A: No. He's actually located in Andover.

[8]    Q: Okay. Assume that, based on your testimony

[9] earlier, MITG had access to CSN. You told me you gave

[10] their group access.

[11]    A: Sure.

[12]    Q: Is there any printout that would show orders

[13] placed through either an individual or an entity that

[14] MITG used?

[15]    MS. CARROLL: Objection. Calls for

[16] speculation. Improper hypothetical.

[17]    A: Is there a report on the activity on the

[18] MITG —

[19]    Q: (BY MR. HANSEN) CSN orders.

[20]    A: — ID?

[21]    Yes.

[22]    Q: Okay. Well —

[23]    MS. CARROLL: Can I go —

[24]    MR. HANSEN: I think — let's go off.

[25]    THE VIDEOGRAPHER: We're now going off

Page 67

[1] the record. Time is approximately 10:26 a.m. We're

[2] ending tape 1.

[3]    (Off the record)

[4]    THE VIDEOGRAPHER: We're now back on the

[5] record. Time is approximately 10:32 a.m. We're

[6] beginning tape 2.

[7]    Q: (BY MR. HANSEN) Okay. Going back to Exhibit

[8] four Bs. This is a CSN list for service ID provider

[9] 9969-1, which we believe is An — is Andover, is that

[10] correct, to the best of that report?

[11]    A: Yeah. This isn't specific to the Andover Call

[12] Center. This is a business internal ID.

[13]    Q: Okay. But Rich Stratton is in Andover, you

[14] said?

[15]    A: Yes, but he's not part of the call center.

[16] He's part of my business team.

[17]    Q: Okay. What does he do at Andover? Is he

[18] located in Andover?

[19]    A: Yes, he is.

[20]    Q: Okay. And you said he's not part of the call

[21] center?

[22]    A: No.

[23]    Q: He was part of your team that was sent there?

[24]    A: He's — he's resided in Andover from premerger

[25] DEC.

Page 68

[1]    Q: Okay. And we have a list of orders there for

[2] that CSN —

[3]    A: Yes.

[4]    Q: — printout? Are those Web-based orders or

[5] can they be both Web and call orders?

[6]    A: No. These are — these are Web — this is a

[7] report out from CSN. So these are orders placed into

[8] CSN.

[9]    Q: Okay. I guess what I'm asking, is that from

[10] the Web-based eSpares store or —

[11]    A: No. No. This is from — CSN is a Web-based

[12] stores — or not store. It's a Web-based application

[13] as well. And these are from CSN.

[14]    Q: Okay. Well, I guess my question may have been

[15] poorly worded. Can you tie them to a certain Web site?

[16] Meaning, can you say those orders came from the eSpares

[17] store Web site?

[18]    A: No. They're from CSN.

[19]    Q: Okay. And it says Section 1 MSC?

[20]    A: Uh-huh.

[21]    Q: What is MSC mean?

[22]    A: Material support, I think.

[23]    Q: Okay. And then we have various columns on

[24] that report —

[25]    A: Strike that. I think it's material stock.

Chip Love
3:03-CV-03055-JES-CHE    # 71    Page 20 of 27
March 30, 2005

Hewlett-Packard Development Company    v.
Midwest Information Technology Group, Inc.

Page 69

[1]   **Q:** Okay. And any idea what the C is or .

[2]   **A:** Yes, that's CSN.

[3]   **Q:** And then we have columns there. Order date.

[4] Order number. Part ordered. Quantity. A description

[5] of the part. Purchase order number. Customer name.

[6] Do you see all those?

[7]   **A:** Yes.

[8]   **Q:** Okay. And then we have the column that says

[9] Center?

[10]   **A:** Uh-huh.

[11]   **Q:** What does that refer to?

[12]   **A:** I don't know.

[13]   **Q:** Looking at the document, is it a, if you know,

[14] call center?

[15]   **A:** No, it wouldn't refer to a call center.

[16]   **Q:** Okay. But you're not sure what that refers

[17] to, as you sit here today?

[18]   **A:** No, sir.

[19]   **Q:** And then we have order type?

[20]   **A:** Right.

[21]   **Q:** Unit and then a total?

[22]   **A:** (Moving head up and down)

[23]   **Q:** Okay. Go to 10932.

[24]   **A:** Okay.

[25]   **Q:** We then have section 2 there; is that correct?

Page 70

[1]   **A:** Section starting at the bottom, right.

[2]   **Q:** And that says GSC-Gratis orders through

[3] Houston. Is that a customer satisfaction issue?

[4]   **A:** That's what it said. It says, Gratis orders

[5] through Houston-customer sat, yes.

[6]   **Q:** Okay. Gratis orders, does that mean free

[7] orders?

[8]   **A:** Yes, GS orders are gratis orders by

[9] definition.

[10]   **Q:** Okay. And just, basically, do you know what

[11] those are in reference to?

[12]   **A:** No, I really don't. I don't know why it says

[13] Houston. I'm not sure anybody in Houston would have

[14] been using this ID.

[15]   **Q:** Okay. Well, that was my next question. Why

[16] does Houston appear on there?

[17]   **A:** Yeah. I don't know.

[18]   **Q:** Okay. Section 3.

[19]   **A:** Uh-huh.

[20]   **Q:** Well, let me back up. In that section 2

[21] there's no price or total for the order, right?

[22]   **A:** Right.

[23]   **Q:** Okay. Is that because, as we referenced,

[24] gratis may mean a free placement of an order?

[25]   **A:** Right. It's a customer sat. Like the

Page 71

[1] original was DOA or something like that.

[2]   **Q:** Okay. For all of us noncomputer people, what

[3] does DOA mean?

[4]   **A:** Dead on arrival.

[5]   **Q:** All right. So they use that in computer

[6] language too.

[7]   **A:** That and medical.

[8]   **Q:** Okay. Go to section 3, page 10933, right the

[9] next page. Do you see that?

[10]   **A:** Yes.

[11]   **Q:** Okay. And that says, XSC exchange orders,

[12] correct?

[13]   **A:** Correct.

[14]   **Q:** And it looks like there's a list there that

[15] these are warranty parts?

[16]   **A:** Right.

[17]   **Q:** So would this have been a situation where

[18] maybe somebody called, wanted a replacement part and

[19] was within warranty, so was it just exchanged?

[20]   **A:** Correct.

[21]   **Q:** Okay. And that is the three sections in the

[22] report, correct?

[23]   **A:** Correct.

[24]   **Q:** Going to page 10932, again.

[25]   **A:** Okay.

Page 72

[1]   **Q:** Is there any total listed there for all the

[2] orders in section 1?

[3]   **A:** No, there's not.

[4]   **Q:** Okay. The last — I'm done with that exhibit,

[5] so . . .

[6]     The last thing I just want to follow-up

[7] with you is, earlier you testified that you did have

[8] some telephone conversations with Troy Bloomquist where

[9] you communicated to him that the eSpares store was

[10] going to route telephone calls — excuse me, place the

[11] telephone number of Andover on the Web site. Do you

[12] recall that?

[13]   **A:** Yes.

[14]   **Q:** Okay. And I just want to follow-up. Why were

[15] you communicating that to Troy?

[16]   **A:** Because he needed to — he needed to be aware

[17] of what we were doing as far as the business in the

[18] eSpares development.

[19]   **Q:** Okay. Was there discussion with Troy in using

[20] the Compaq Direct group that he was in charge of at

[21] that time for the eSpares business?

[22]   **A:** Was there discussion about him supporting

[23] eSpares?

[24]   **Q:** Yes.

[25]   **A:** No. Like I said, it wasn't an option.

Page 73

[1] Q: Okay. Then, I guess, was the nature of your
[2] communication to him simply an FYI-type deal?
[3] A: Yes. This is what — this is what corporate
[4] is doing, basically.
[5] Q: Okay. Did you communicate, you know, with
[6] Troy on a frequent basis?
[7] A: Early on in our business relationship, yes.
[8] Especially when we were starting.
[9] Q: And that's when you were using his group to
[10] handle those front-end consumer issues?
[11] A: Correct.
[12] Q: Okay. Was the Andover Call Center business
[13] part of your responsibilities within your group?
[14] A: What time frame?
[15] Q: Before you left in 2002.
[16] A: They weren't — they weren't a direct report.
[17] They didn't even roll up through our organization. But
[18] we leveraged the — I think they were part of logistics
[19] at the time. So we just leveraged their — what they
[20] were doing from the old Digital Equipment Corp days.
[21] Q: Okay. Well, in your position prior to the
[22] merger, were you responsible at all for the managing of
[23] any contracts with outside vendors?
[24] A: No.
[25] Q: Okay. How about postmerger?

Page 74

[1] A: Today?
[2] Q: No. 2002, when you switched — you know, end
[3] of 2002 into 2003, were you responsible for the
[4] management of any contracts with outside vendors at
[5] that time?
[6] A: No.
[7] Q: Okay. Currently are you?
[8] A: I review contracts with our APRs as part of
[9] the programs.
[10] Q: Have you ever been involved in any contracts
[11] with any outside vendors that were providing
[12] multivendor spare parts solutions?
[13] A: No.
[14] MR. HANSEN: Let's go off the record for
[15] a second.
[16] THE VIDEOGRAPHER: We're now going off
[17] the record. Time is approximately 10:41 a.m.
[18] (Off the record)
[19] THE VIDEOGRAPHER: We're now back on the
[20] record. Time is approximately 10:48 p.m.
[21] Q: (BY MR. HANSEN) Prior to the relationship
[22] with Compaq Direct and MITG, was there any way that
[23] Compaq had to directly service the consumer base?
[24] A: No.
[25] Q: Okay. Prior to — what?

Page 75

[1] A: Not directly. I'm sorry. That's still no, we
[2] weren't directly.
[3] Q: And the relationship that developed with the
[4] Compaq Direct and Troy's group allowed Compaq to do
[5] that; is that correct?
[6] A: Correct.
[7] Q: Okay. Prior to the launch of the eSpares
[8] store Web site —
[9] MS. CARROLL: Put your microphone on.
[10] Q: (BY MR. HANSEN) Prior to the launch of the
[11] eSpares store Web site, who was filling those orders
[12] that eventually — for the parts that got placed on the
[13] eSpares store?
[14] A: Prior to the launch —
[15] Q: Prior to the launch.
[16] A: — of eSpares —
[17] Q: How were orders for those type of parts being
[18] handled?
[19] A: Directly prior, after we established the
[20] Compaq Direct relationship?
[21] Q: Yeah. Was Compaq Direct handling all that,
[22] prior to the launch of the eSpares store?
[23] A: Not all of it; but, yes, they were handling
[24] some of it, yes.
[25] Q: Okay. But let's set this up.

Page 76

[1] A: Okay.
[2] Q: Prior to the relationship with Compaq Direct,
[3] you've already told me that Compaq did not have an
[4] avenue or a way to directly service the consumer base,
[5] correct?
[6] A: End users, correct.
[7] Q: End users, right. People who wanted to place
[8] part orders?
[9] A: Correct.
[10] Q: Okay. And prior to July of 2002, when the
[11] eSpare Web site was launched —
[12] A: Yes.
[13] Q: — you just told me that Compaq Direct was the
[14] entity that was filling orders for those parts request
[15] from the end users?
[16] A: Yes.
[17] Q: Okay. The launch of the eSpares store, then,
[18] created an avenue for the end user that was previously
[19] being handled by Compaq Direct to place orders now on
[20] the Web site; is that correct?
[21] A: It created a Web avenue, so now we had a
[22] choice for our customers.
[23] Q: Which was the call center activity for Compaq
[24] Direct or the Web-based application that your group
[25] launched from Houston?

Chip Love
3:04-cv-03055-JES-CHE     # 71     Page 22 of 27
March 30, 2005

Hewlett-Packard Development Company   v.
Midwest Information Technology Group, Inc.

Page 77

[1]   **A:** Correct.

[2]   **Q:** Okay. And the parts orders that had

[3] previously been handled by the — well, strike that.

[4] The ordering of the parts, once the Web-based

[5] application, the eSpares store was launched, the end

[6] user could still use the call center, Compaq Direct to

[7] place those orders, correct?

[8]   **A:** Yes.

[9]   **Q:** Okay. They just now had a choice. They could

[10] either use the phone or they could use the Web site?

[11]   **A:** Correct.

[12]   **Q:** Okay. So the parts that were offered on the

[13] Web site application were also offered through Compaq

[14] Direct?

[15]   **A:** Correct.

[16]   **Q:** Okay. And the parts options that were offered

[17] on the Web site, you said, were handled and supported

[18] by Andover because Compaq Direct, you said, didn't have

[19] the supporting structure to do that?

[20]   **MS. CARROLL:** I'm going to object to that

[21] as vague.

[22]   **Q:** (BY MR. HANSEN) Is that correct?

[23]   **A:** I don't understand the question.

[24]   **Q:** Okay.

[25]   **A:** If you could ask it again, please.

Page 78

[1]   **Q:** What was the entity that was supporting and

[2] handling the eSpares store orders?

[3]   **A:** That would be Andover.

[4]   **Q:** Okay. So Andover is offering the same type of

[5] parts then that Compaq Direct is offering. One's a

[6] Web-based, one's a phone-based mechanism?

[7]   **A:** Yes. Yes.

[8]   **Q:** Okay. And did that offering stay the same

[9] then throughout the time frame in which the eSpares

[10] store was operational through November of '03?

[11]   **A:** Yes.

[12]   **Q:** Okay. So the customer for that period of time

[13] had the option of calling the Compaq Direct call center

[14] to place an order or going to your eSpare Web site to

[15] place an order?

[16]   **A:** Yes.

[17]   **MS. CARROLL:** Objection. Calls for

[18] speculation.

[19]   **Q:** (BY MR. HANSEN) So Compaq Direct was

[20] providing the same Compaq parts that your Web-based

[21] application was, that was being supported by Andover?

[22]   **A:** Yes.

[23]   **MS. CARROLL:** Objection. Overly broad.

[24] Calls for speculation.

[25]   **A:** As far as I know, yes.

Page 79

[1]   **Q:** (BY MR. HANSEN) So is that a yes?

[2]   **A:** Yes.

[3]   **Q:** Okay. Now, we've gone over these e-mails,

[4] which are marked as Defendant's Exhibit HHH, where

[5] Mr. Soriano indicated that the excess volume that was

[6] being experienced at Andover, one of the options was to

[7] route that to the HP Direct call center of Troy's group

[8] in Hannibal, Missouri. Do you recall that?

[9]   **A:** I remember seeing that e-mail earlier today,

[10] yes.

[11]   **Q:** Okay. And would you agree that that option

[12] was because — or is one of the options because HP

[13] Direct was offering the same parts as Andover was

[14] offering?

[15]   **A:** Yes.

[16]   **Q:** Okay. And did you send any follow-up

[17] correspondence or communication to the e-mails marked

[18] in HHH — and you can go ahead and take a look at those

[19] — indicating that HP Direct didn't have this

[20] supporting infrastructure to handle the excess volume

[21] that was being experienced by Andover?

[22]   **A:** Did I — not that I remember.

[23]   **Q:** Okay. So you never communicated to anyone

[24] that you didn't believe HP Direct was an option to

[25] handle the excess Andover call volume?

Page 80

[1]   **A:** Not — not that I remember.

[2]   **Q:** Okay. And as HP Direct is providing

[3] Troy Bloomquist's group the type of parts offerings

[4] that are being provided at Andover for Compaq, do you

[5] know — or did you have any involvement as to why the

[6] decision was made not to allow HP Direct to handle that

[7] excess call volume from Andover?

[8]   **A:** No.

[9]   **Q:** Okay. Is it your understanding that all that

[10] excess call volume for parts orders that were being

[11] experienced at Andover was not sent to HP Direct in

[12] Hannibal, Missouri, and instead was sent to Roseville?

[13]   **MS. CARROLL:** I'm going to object that

[14] that is misleading, misstates prior testimony in this

[15] case and is vague. Objection.

[16]   **MR. HANSEN:** Well, I'll just state that

[17] the prior testimony will speak for itself.

[18]     But go ahead and answer.

[19]   **MS. CARROLL:** That's correct.

[20]   **THE WITNESS:** What was the question,

[21] again?

[22]   **Q:** (BY MR. HANSEN) Sure. The question is: Were

[23] you involved in the decision to not send the excess

[24] call volume from Andover to HP Direct and instead send

[25] it to Roseville, California?

Page 81

[1]   A: No.

[2]   Q: Okay. Are you aware that that, in fact,

[3] occurred?

[4]   A: Eventually, yes, I was aware.

[5]   Q: Okay. Well, around the time frame of those

[6] e-mails in October of 2002, November of 2002, were you

[7] made aware that the decision was made in response to

[8] these concerns from Andover to send the calls to

[9] Roseville instead of to HP Direct in Hannibal,

[10] Missouri?

[11]   A: Was I aware?

[12]   Q: Well, you said you were made aware but —

[13]   A: Yeah, I don't remember specifically when I

[14] became aware of where the calls were going —

[15]   Q: Was —

[16]   A: — Andover.

[17]   Q: Was it in and around the time frame of those

[18] e-mails in Exhibit HHH?

[19]   A: It may have been.

[20]   Q: Okay.

[21]   MR. HANSEN: That's all I have. Thanks.

[22]   MS. CARROLL: Okay. I have a few

[23] questions.

[24]   (Time is 10:53 a.m.)

[25]

Page 82

[1]           CROSS-EXAMINATION

[2]           BY MS. CARROLL:

[3]   Q: Do you — Mr. Love, do you know the content of

[4] the calls — we talked about in these e-mails — this

[5] increase in call volume to Andover. Do you know what

[6] kind of callers or what the content of those calls were

[7] that Andover was receiving?

[8]   A: As far as — as it relates to this drastic

[9] increase?

[10]   Q: Correct.

[11]   A: My knowledge is this was more of a result of

[12] another, I guess, an 800 number within the postmerger,

[13] within HPshopping, shut down and redirected calls

[14] without — I don't even think anybody knew.

[15]   Q: Do you know whether those — that drastic

[16] increase in calls that was the subject of the e-mails

[17] you discussed with Mr. Hansen earlier —

[18]   A: Uh-huh.

[19]   Q: — were calls to order Compaq parts?

[20]   MR. HANSEN: Objection. Calls for

[21] speculation.

[22]   A: No, I don't know.

[23]   Q: (BY MS. CARROLL) All right. In terms of the

[24] administrative support functions that Andover had, in

[25] addition to supporting eSpares, what were those other

Page 83

[1] functions that Andover Call Center had, to your

[2] knowledge?

[3]   A: Outside of the eSpares support?

[4]   Q: Correct.

[5]   A: They supported our 252 business.

[6]   Q: Which is the DEC business?

[7]   A: Which is the DEC — sorry, which is the DEC,

[8] the Digital Equipment spare parts business and that was

[9] call-in only. And they supported a contract, a parts

[10] contract business.

[11]   Q: And when you were discussing with Mr. Hansen

[12] earlier why Compaq Direct was not an option to support

[13] eSpares, what were the administrative functions or the

[14] support functions that Andover had that, to your

[15] knowledge, Compaq Direct did not have?

[16]   A: Access to our billing systems (sic), primarily

[17] for misshipments, DOA to correct —

[18]   THE REPORTER: I'm sorry. Repeat that.

[19]   A: Access to building systems to correct

[20] misshipments, the DOAs, the failures, if we had a

[21] cancellation of an order and the bills, you know, we

[22] shipped and they canceled in shipping. Anything that

[23] happened postorder, that had to do with either

[24] logistics systems or financial systems that Compaq

[25] Direct didn't have access to.

Page 84

[1]   Q: (BY MS. CARROLL) Were those functions already

[2] in place at Andover prior to the start of the eSpares

[3] store?

[4]   A: Yes.

[5]   Q: Okay. Changing subject. Do you recall when

[6] you began testing eSpares store — you say it came

[7] online in July, do you remember when the process

[8] started of putting it — developing it, testing it?

[9]   A: Probably at the beginning of that year.

[10]   Q: Okay.

[11]   A: Oh, even before —

[12]   (Interruption)

[13]   Q: (BY MS. CARROLL) Let me ask the question

[14] again —

[15]   A: Okay.

[16]   Q: — so we're — so we're clear — so the record

[17] is clear.

[18]   Do you recall when you began testing the

[19] e store prior to it going live in July of 2002?

[20]   A: I would say fall of that year. Maybe the

[21] summer before. We tested for quite a long time.

[22]   Q: Okay. So the summer or fall of 2001?

[23]   A: Yes. Yes.

[24]   Q: Okay. Because having said it launched in '02?

[25]   A: Yes.

Page 85

[1]  Q: All right. And do you recall any tests that
[2] were undertaken that were — prior to going live, in
[3] terms of trying to see how it worked with customers —
[4]  A: Yes.
[5]  Q: — were you involved in that type of testing?
[6]  A: Yes.
[7]  Q: Okay. And tell me what testing was involved
[8] in getting the eSpares going, in terms of customer
[9] support or customer orders.
[10]  A: All right. We needed — we could test
[11] internally on our own but we needed to see how it
[12] actually worked from an external, coming in from
[13] outside. So we would get real live customers to place
[14] real orders and monitor them closely through the
[15] process just to make sure we had an end-to-end
[16] solution.
[17]  Q: And where did you get those customers?
[18]  A: I believe we coordinated that through
[19] Troy Bloomquist.
[20]  Q: And were these customers that went online onto
[21] — they were given access to go onto eSpares Web site?
[22]  A: I believe so. And I don't remember exactly
[23] how we went about doing it because it wasn't an
[24] external — I don't know if we lost the external.
[25] Maybe we just hit the URL but somehow we got them

Page 86

[1] access, yes.
[2]  Q: And who with — what was the Andover's role in
[3] that, if any?
[4]  A: To monitor that — those orders to make sure
[5] they went through properly.
[6]  Q: And do you recall when that testing was with
[7] using customers that you got from Troy's group?
[8]  A: I don't specifically. If we launched in July,
[9] it had to be with — you know, within six months prior
[10] to that.
[11]  Q: Let me show you —
[12]  MS. CARROLL: And I wrote on the edge of
[13] this exhibit and I've scribbled it out. Do you mind if
[14] I just use this one? Let me —
[15]  MR. HANSEN: It's the same one?
[16]  MS. CARROLL: Yeah. Yes, it is. Okay.
[17]  Q: (BY MS. CARROLL) Let me just show you —
[18]  MS. CARROLL: Do we need to mark this as
[19] — now we need to mark it as a number or can I mark it
[20] as another letter?
[21]  MR. HANSEN: Let's go with another
[22] letter. What are we on, triple —
[23]  MS. CARROLL: C.
[24]  MR. HANSEN: Quadruple C?
[25]  MS. CARROLL: Yeah.

Page 87

[1]  (Exhibit marked for identification)
[2]  Q: (BY MS. CARROLL) Let me hand you an exhibit
[3] that has been marked as Exhibit CCCC. It's an e-mail
[4] string. If you could take a look at this e-mail string
[5] for just a second. I have a couple of questions for
[6] you.
[7]  A: Okay.
[8]   Okay.
[9]  Q: The bottom third of the first page and pages
[10] 2, 3 of the e-mail string are exchanges between
[11] Diane Pound and Troy Bloomquist in which you were
[12] CCed —
[13]  A: Yes.
[14]  Q: — correct?
[15]  A: Yes.
[16]  Q: All right. And those are February 4th and
[17] February 5th of 2002; is that correct?
[18]  A: Yes.
[19]  Q: Okay. And then the top two-thirds of the
[20] first page is then Troy Bloomquist communicating with
[21] Mike Lauber and Ron Haught. You see the mitg.com?
[22]  A: Yes.
[23]  Q: Okay. All right. Looking at this e-mail
[24] string and more particularly the bottom third of the
[25] first page and pages 2 and 3, does this refresh your

Page 88

[1] recollection as to the time of doing testing in the e
[2] store using — or attempting to use live customer
[3] information?
[4]  A: Yes, it does.
[5]  Q: Okay. And with — do you have — well, strike
[6] that. Do you know if there was testing done prior to
[7] this February 4th, February 5th time frame or —
[8]  A: Oh —
[9]  Q: — is that the first time?
[10]  A: — sure, there was.
[11]  Q: Okay. And can you tell me, did that involve
[12] live customer information or is this the first instance
[13] of live customer information. Do you recall?
[14]  A: I'm not sure.
[15]  Q: Do you recall any follow-up testing or any
[16] follow-up e-mails after this string on which you're
[17] CCed involving customer information and whether or not
[18] Diane Pound was able to get information where they
[19] could place orders that would work correctly because
[20] there appeared to be some problems with these
[21] customers?
[22]  A: I don't remember specifically, but I know we
[23] had successful tests with external customers.
[24]  MS. CARROLL: Okay. I have no further
[25] questions.

Page 89

[1]    MR. HANSEN: I have some follow-up.

[2] Keep that in front of you.

[3] Can I use your copy?

[4]    MS. CARROLL: Sure.

[5]    (Time is 11:03 a.m.)

[6]          REDIRECT EXAMINATION

[7]             BY MR. HANSEN:

[8]    Q: Why would you be using Mike Lauber through

[9] Troy Bloomquist's group to have, as it says there, Have

[10] one of your folks pick four calls and have them call

[11] the number below, to test this system.

[12]    MS. CARROLL: I'm going to object to the

[13] extent that that misstates the content of the e-mail

[14] string.

[15]    But you can go ahead and answer.

[16]    A: All right. I did not. It was Troy that did

[17] that.

[18]    Q: (BY MR. HANSEN) Okay. Well, why would

[19] Diane Pound be using Compaq Direct, which is Troy's

[20] group, to test the eSpares store if they didn't have

[21] the administrative access that you testified to

[22] earlier?

[23]    A: We just needed access to an external customer.

[24]    Q: Okay. So you had Troy's group randomly call

[25] this to try and test your system?

Page 90

[1]    A: I think what they're asking is for Troy's

[2] group to provide us test customers, actual customers to

[3] place tests in the new system.

[4]    Q: Well, was it your understanding that Troy's

[5] group had, by way of this e-mail at least, engaged MITG

[6] under the Compaq Direct business in February 2002?

[7]    A: I don't —

[8]    MS. CARROLL: I'm going object to the

[9] extent that that misstates the e-mail string and the

[10] communications there.

[11]    Go ahead.

[12]    A: I wasn't on that e-mail, after the Diane.

[13]    Q: (BY MR. HANSEN) Okay. Well, my question was:

[14] Did you have an understanding that Troy's group had a

[15] relationship with MITG, which was Compaq Direct as of

[16] February 2002?

[17]    A: You know, I became aware of MITG at some time.

[18] I don't remember specifically when. I don't know if I

[19] was aware that they were actually the outsource company

[20] at this time.

[21]    Q: Okay. You mentioned that some of the other

[22] administrative support issues that Andover had was the

[23] DEC spare parts business?

[24]    A: Yes.

[25]    Q: Okay. Which is the Digital Equipment?

Page 91

[1]    A: Yes.

[2]    Q: Okay. And wasn't Troy Bloomquist's group at

[3] Compaq Direct also providing spare parts business —

[4] spare parts order fulfillment for Compaq?

[5]    A: For Compaq or for —

[6]    Q: For Digital, I'm sorry?

[7]    A: Not that I was aware of.

[8]    Q: Okay. Okay. So you're not aware. They may

[9] have been doing it, you just don't have the knowledge

[10] as you sit here today?

[11]    A: Sure.

[12]    Q: Okay. You then testified that — well, let me

[13] back up. So if the Compaq Direct, which is Troy's

[14] group, was providing the Digital Equipment spare part

[15] support similar to Andover, that's something that you

[16] believe he would be more knowledgable about than

[17] yourself?

[18]    A: Who Troy?

[19]    Q: Yes.

[20]    MS. CARROLL: Objection. Calls for

[21] speculation. Assumes facts not in evidence.

[22]    A: I don't know.

[23]    Q: (BY MR. HANSEN) Okay. Well, you said you

[24] didn't know if Compaq Direct, Troy's group, was

[25] supporting the Digital Equipment spare parts business.

Page 92

[1] My question simply is: Wouldn't he be the person to

[2] testify to that?

[3]    MS. CARROLL: Objection. Assumes facts

[4] not in evidence.

[5]    A: I would assume so.

[6]    Q: (BY MR. HANSEN) Okay. Now, you said that,

[7] upon your lawyer's questioning, that the results you

[8] believe — part of the result, at least, in the

[9] increase calls to Andover was this 800 Shopping number

[10] shutting down and that nobody really knew why the

[11] increase in calls occurred. Do you recall saying that?

[12]    A: Yes.

[13]    MS. CARROLL: I'm going to object to the

[14] extent that misstates his answers to my questions.

[15]    Go ahead.

[16]    Q: (BY MR. HANSEN) You recall saying that?

[17]    A: Yes.

[18]    Q: Okay. And apparently, Mr. Chizek had an

[19] opinion, did he not, in Chizek LL and the e-mail you're

[20] on, that the increase was due to the launch of your

[21] eSpares store?

[22]    A: Yes.

[23]    Q: Okay. And he didn't reference in that e-mail

[24] anything regarding another 800 number shutting down,

[25] did he?

Page 93

[1]   **A:** I don't know.

[2]   **Q:** His e-mail is at the top.

[3]   **A:** Oh, he did not.

[4]   **Q:** Okay.

[5]   **MR. HANSEN:** That's all I have.

[6]   **MS. CARROLL:** Okay. That's it.

[7]   **THE VIDEOGRAPHER:** We're now going off

[8]   the record. Time is approximately 11:10 a.m. We're

[9]   ending this deposition.

[10]      (Deposition concluded at 11:10 a.m.)

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 94

[1]              CHANGES AND SIGNATURE

[2]   PAGE   LINE   CHANGE              REASON

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 95

[1]              CHANGES AND SIGNATURE

[2]   PAGE   LINE   CHANGE              REASON

[3]

[4]

[5]

[6]   I, CHIP LOVE, have read the foregoing deposition

[7]   and hereby affix my signature that same is true and

[8]   correct, except as noted above.

[9]

              CHIP LOVE

[10]  THE STATE OF TEXAS

[11]  COUNTY OF HARRIS

[12]       Before me, _____, on

[13]  this day personally appeared PAT TAYLOR, known to me

[14]  (or proved to me under oath or through

[15]  _____                      ) (description of identity card or

[16]  other document)) to be the person whose name is

[17]  subscribed to the foregoing instrument and acknowledged

[18]  to me that they executed the same for the purposes and

[19]  consideration therein expressed.

[20]       Given under my hand and seal of office

[21]  this _____ day of _____, _____.

[22]

[23]            NOTARY PUBLIC IN AND FOR

              THE STATE OF TEXAS

[24]       My Commission Expires:_____

[25]

Page 96

[1]       IN THE UNITED STATES DISTRICT COURT

      FOR THE CENTRAL DISTRICT OF ILLINOIS

[2]            SPRINGFIELD DIVISION

[3]  HEWLETT-PACKARD        *

     DEVELOPMENT COMPANY,L.P., *

[4]  HEWLETT-PACKARD COMPANY, *

     AND COMPAQ TRADEMARK B.V. *

[5]

          Plaintiffs, *

[6]  VS.            * CIVIL ACTION NO. 04-3055

[7]  MIDWEST INFORMATION     *

     TECHNOLOGY GROUP, INC., *

[8]

          Defendants. *

[9]

[10]       REPORTER'S CERTIFICATE

[11]    ORAL AND VIDEO DEPOSITION OF CHIP LOVE

[12]            March 30, 2005

[13]       I, Carolyn Ruiz Coronado, Certified

[14]  Shorthand Reporter in and for the State of Texas,

[15]  hereby certify to the following:

[16]       That the witness, CHIP LOVE, was duly

[17]  sworn by the officer and that the transcript of the

[18]  oral deposition is a true record of the testimony given

[19]  by the witness;

[20]       That the deposition transcript was

[21]  submitted on _____, to the witness or

[22]  to the attorney for the witness for examination,

[23]  signature and return to me by

[24]

[25]       That the amount of time used by each party

Page 97

[1] at the deposition is as follows:

[2]     Mr. James A. Hansen - 1 HR, 59 MINS

    Ms. Elizann Carroll - 10 MINS

[3]   That pursuant to information given to the

[4] deposition officer at the time said testimony was

[5] taken, the following includes counsel for all parties

[6] of record:

[7]     Ms. Elizann Carroll, Attorney for

Plaintiffs

[8]     Mr. James A. Hansen, Attorney for

Defendants

[9]     I further certify that I am neither

[10] counsel for, related to, nor employed by any of the

[11] parties or attorneys in the action in which this

[12] proceeding was taken, and further that I am not

[13] financially or otherwise interested in the outcome of

[14] the action.

[15]     Further certification requirements

[16] pursuant to Rule 203 of TRCP will be certified to after

[17] they have occurred.

[18]   Certified to by me this ___ day of _____,

[19]

[20]

[21]     Carolyn Ruiz Coronado, Texas CSR#7113

    Expiration Date: 12/31/2006

[22] 1010 Lamar, Suite 1400, Houston, Tx 77002

    (713) 739-1400

[23]

[24]

[25]

Page 98

[1]     FURTHER CERTIFICATION UNDER RULE 203 TRCP

[2]     The original deposition was/was not

[3] returned to the deposition officer on

[4] _____;

[5]     If returned, the attached Changes and

[6] Signature page(s) contain(s) any changes and the

[7] reasons therefor;

[8]   If returned, the original deposition was

[9] delivered to _____, Custodial

[10] Attorney;

[11]     That $_____ is the deposition

[12] officer's charges to the party for preparing the

[13] original deposition transcript and any copies of

[14] exhibits;

[15]     That the deposition was delivered in

[16] accordance with Rule 203.3, and that a copy of this

[17] certificate was served on all parties shown herein on

[18] and filed with the Clerk.

[19]   Certified to by me this ____ day of _____,

[20]

[21]

[22]     Carolyn Ruiz Coronado, Texas CSR#7113

    Expiration Date: 12/31/2006

    1010 Lamar, Suite 1400, Houston, Tx 77002

[23]     (713) 739-1400

[24]

[25]