UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

---oOo---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

vs.    Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.
_____/

Deposition of
RICHARD CHIZEK
Thursday, January 13, 2005

Job No. 1761RD
Reported by: Ruth E. Diederich, RPR, CSR
    CSR No. 4952

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814    Fax: (916) 726-0784

---

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    JUNEAU, BOLL & WARD
    BY: ELIZANN CARROLL, Esq.
    15301 Spectrum Drive, Suite 300
    Addison, Texas 75001
    (972) 866-8333

FOR THE DEFENDANTS:

    SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
    BY: JAMES A. HANSEN, Esq.
    525 Jersey
    Quincy, Illinois 62306
    (217) 223-3030

---oOo---

---

RICHARD CHIZEK    Thursday, January 13, 2005

I N D E X

| | Page |
|---|---|
| Examination by Mr. Hansen | 6 |

---oOo---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| KK | E-mails Bates-stamped MITG 082, MITG 083, MITG 084 and MITG 085. | 13 |
| LL | Two e-mails, one from Richard Chizek to Troy Bloomquist, dated October 23, 2002, and another from Troy Bloomquist to Richard Chizek dated October 22, 2002. | 41 |
| MM | Three e-mails dated November 5, 2002, one from Troy Bloomquist to Richard Chizek; one from Richard Chizek to Troy Bloomquist; and the last from Louise Meyerfeld to Richard Chizek. | 46 |
| NN | E-mails Bates-stamped HP006132, HP006133 and HP006134. | 52 |
| OO | E-mails Bates-stamped HP005084, HP005085, HP005086 and HP005087. | 58 |
| PP | An e-mail Bates-stamped HP005071, with attached spreadsheets numbered HP005072 through HP005083. | 61 |
| QQ | An e-mail dated January 10, 2005 from Elizann Carroll to James Hansen, attaching an e-mail dated January 16, 2004, from Tracy Miller to Shari Ellis. | 63 |
| RR | An e-mail Bates-stamped HP005066. | 66 |
| SS | E-mails Bates-stamped HP005179, HP005180, HP005181 and HP005182. | 69 |
| TT | Several e-mails, the first from Richard Chizek to John Karas and Roland Soriano, dated February 19, 2004; one from Tracy Miller to Richard Chizek, John Karas and Roland Soriano, dated February 20, 2004; one from Richard Chizek to Tracy Miller, John Karas and Roland Soriano, dated February 20, 2004; one from Tracy Miller to Richard Chizek, John Karas and Roland Soriano, dated February 20, 2004; one from Melissa Allen to Tracy Miller, Richard Chizek, John Karas and Roland Soriano, dated February 20, 2004; and the last from Richard Chizek to Melissa Allen, Tracy Miller, John Karas and Roland Soriano, dated February 21, 2004. | 78 |
| UU | Documents HP004665 through HP005063, consisting of HPD Parts Accounts List Combined. | 80 |
| VV | Documents HP004665 through HP005063, consisting of HPD Parts Accounts List Combined, a more inclusive list. | 92 |
| WW | An e-mail dated February 9, 2004, from Richard Chizek to John Karas, Louise Meyerfeld, Roland Soriano and Bill Crowley. | 98 |
| XX | A document entitled, "Document Name: (HP005691-6126-Confidential) HP S01S02-0403-0903v2 Top 10.xls." | 105 |

Page 5:

| | | |
|---|---|---|
| YY | A document entitled, "Document Name: (HP005681-5682-Confidential) HP Billing Requirements HPD.xls." | 107 |
| ZZ | A document entitled, "Document Name: (HP005683-Confidential) HP Compaq Phone Numbers.xls." | 107 |

---oOo---

Page 6:

BE IT REMEMBERED that under the applicable sections of the Code of Civil Procedure of the State of California, on Thursday, January 13, 2005, commencing at the hour of 9:09 a.m. thereof, at Hewlett-Packard, 8000 Foothills Boulevard, Building R10, Roseville, California, before me, Ruth E. Diederich, a Certified Shorthand Reporter in the State of California, there personally appeared

RICHARD CHIZEK,

called as a witness by the defendants in the above-entitled action, who, having been duly sworn by me to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

---oOo---

EXAMINATION BY MR. HANSEN

Q. Please state your name for the record.
A. Eugene Richard Chizek.
Q. And what is your position of employment -- well, let me strike that.
   Who are you employed with?
A. Hewlett-Packard.
Q. Okay. And what is your position there?
A. I'm the vendor manager and operations manager for the parts business call center.

Page 7:

Q. Is that the call center here in Roseville?
A. Yes.
Q. And how long have you been employed in that position?
A. Since June of 2000, so just --
Q. Going on four years, five years?
A. Going on five years, yeah.
Q. Have you held that title for the entire time you have been employed here?
A. Titles are kind of subjective. It's been -- my responsibilities have been pretty much those of vendor management and making sure the call center is functioning.
Q. That was my next question. Since June of 2000, have your responsibilities or duties here at Hewlett-Packard changed?
A. Yeah. My responsibilities have changed. The scope of my responsibility has changed.
Q. How so?
A. Through the parts business consolidation and the merger, it grew from the local parts business to the -- all the pre-merger Compaq and HP business for North America.
Q. What did you do prior to June of 2000?
A. I was a business process analyst for the parts

Page 8:

business and trainer.
Q. Were you on the Compaq side or the Hewlett-Packard side prior to the merger?
A. Hewlett-Packard side.
Q. How long have you been with Hewlett-Packard?
A. Almost 15 years. Since May of 1990.
Q. What is your educational background?
A. High school graduate, and I have got a couple of years of college courses and -- and some other training.
Q. Do you hold any post high school degrees?
A. No.
Q. You said a couple years of college courses. Was that at a four-year institution? Two-year institution?
A. No. Mostly local community colleges.
Q. Is that in the Sacramento area?
A. Yes.
Q. Okay. Technical school?
A. No.
Q. Were you working towards a degree?
A. That was my intent.
Q. What field of study?
A. Just general education at liberal arts.
Q. Okay. You said you had some additional training?
A. Just as far as the business goes as a process

1 analyst and a trainer, I took training delivery, course
2 design, training management courses, technical writing.
3  Q. Is that through HP or an outside entity?
4  A. Most of the training was actually delivered
5 through third-party, you know, providers.
6  Q. Okay. Was that on-site here, or was it a class
7 you attended, or what was the scope of the training?
8  A. Most of the training was off-site. We would go
9 to a -- to a vendor site or a designated site, and, you
10 know, a couple, three days of focused training.
11  Q. Okay. Any training since you have been in the
12 position as the vendor manager of the parts business
13 call center since June of 2000?
14  A. No. No -- no specific dedicated training.
15  Q. Okay. Prior to the merger between
16 Hewlett-Packard and Compaq, what responsibilities did
17 you have for what call center?
18  A. It was -- the vendor relationship is managing
19 the relationship with our partner who provides the
20 support services for what we refer to as the channel and
21 the parts business. And the channel is -- is our
22 authorized delivery partners, and the parts business is
23 all the rest of the trade activity, and that was for the
24 United States. So that -- that -- my responsibilities
25 covered the -- that area, the channel and parts business

9

1 for the US and the vendor relationship.
2  Q. Prior to the merger?
3  A. Prior to the merger.
4  Q. Okay. Post merger, the same thing?
5  A. After the merger, it expanded into Canada as
6 well.
7  Q. Okay. Let's focus pre-merger. Did your
8 management include that of the Roseville call center?
9  A. Yes.
10  Q. Andover?
11  A. Yeah, for -- I didn't manage any of the activity
12 at Andover, but once the merger took place, I was
13 responsible for helping with the operations and
14 delivery. And when there were questions about what's
15 happening, and, you know, what kinds of volumes and
16 service levels are happening in Andover, I would answer
17 those questions as well.
18  Q. And Andover is where?
19  A. Andover, Massachusetts.
20  Q. Okay. And when did the merger take place?
21  A. Let's see. I think it's somewhere, like, mid
22 2002.
23  Q. Okay. Did your responsibility also include the
24 HP Direct, or as I will call them, MITG call center?
25  A. No. I never had any responsibility.

10

1  Q. Was that out of Omaha?
2  A. Well, I -- yeah, I understand it was out of
3 Omaha.
4  Q. Okay. How was it that you did not have any
5 responsibility for the MITG center, but in your duties,
6 you did for Andover?
7  A. I don't know.
8  Q. Well, would you agree with me that MITG was a
9 parts business partner with Compaq pre-merger?
10  A. Yeah, I understand that was their relationship.
11  Q. Okay. And then you said post merger -- I'm
12 sorry -- you had that responsibility for call centers,
13 as well as into Canada?
14  A. Yes.
15  Q. Okay. Tell me the call centers that you did not
16 have direct responsibility for.
17  A. Well, there's a very large support environment
18 out, and there's many, many, you know, different call
19 centers. And so if -- if our -- if we're talking about
20 the things that are related to the parts business --
21   The areas that I did not have responsibility
22 for?
23  Q. Correct.
24  A. Well, the parts business was -- there was a
25 piece of it in Andover. There was a piece of it in

11

1 Houston. I wasn't responsible for the Houston
2 operations.
3  Q. Was that Chip Love?
4  A. Yeah, part of his organization was there in
5 Houston.
6  Q. Okay.
7  A. I wasn't responsible for the channel
8 deliverables in that area where there wasn't a vendor
9 relationship.
10  Q. Is that Lynn Farlin?
11  A. Yeah. That would be the group that was under
12 her -- her management.
13  Q. But you did have direct input as to the
14 operations and recommendations for handling call
15 volumes, et cetera, for Andover?
16  A. Well, only so far as when the merger took place,
17 and we were aware that we were going to be migrating,
18 consolidating some activity, the -- when we first got
19 involved with Andover, we were already managing that
20 project.
21  Q. Okay. And you said the migrating -- was it the
22 migrating of Andover to Roseville?
23  A. Yes.
24  Q. Okay. And is it your understanding, immigration
25 such as that at Andover also took place for MITG?

12

1  A.  Well, we were taking those projects one at a
2  time, but I was aware that there were other parts
3  business segments that were going to be ultimately
4  migrated to Roseville.
5  Q.  And you were involved -- correct? -- in the
6  migration of the MITG to Roseville?
7  A.  Yeah.
8  Q.  Okay.  I am going to hand you a document I'm
9  going to mark as Exhibit KK.  This didn't come off very
10 well, but it still has the date, reporter and the
11 deponent on there, so that's all we need.  I will have
12 you take a look at this MITG 82 to 85, and I will tell
13 you, for ease of reference, it flows from back to front.
14 So 85 would be the first e-mail in the chain.
15 A.  Okay.
16     (Exhibit KK was marked for
17     identification.)
18 Q.  Okay.  You have had a chance to look that over?
19 A.  Yeah.
20 Q.  Okay.  Starting with MITG 85, which is the last
21 page in that exhibit --
22 A.  Yes.
23 Q.  -- it is an e-mail dated Wednesday, October 30,
24 2002, from Diane Pound to Louise Meyerfeld and
25 Janine Lindstrom of which you are copied on the e-mail;

13

1  is that correct?
2  A.  Yes.
3  Q.  Okay.  And it says, "Re: 1-800-225-5385
4  changes"; is that correct?
5  A.  Yes.
6  Q.  What is that phone number?
7  A.  That was the pre-merger Compaq spares phone
8  number.  They referred to the parts business as spares.
9  Q.  Okay.  Is that a number that was for Andover?
10 A.  Yes.
11 Q.  Okay.  Was that -- let me back up.
12     What is your understanding as to what the
13 business was that MITG was providing?  Were they in the
14 spares parts business as well?
15 A.  I understood that they were the point of contact
16 for customers who wanted to order spare parts, options,
17 and what we refer to as multi vendor parts, parts that
18 we don't typically carry in stock.
19 Q.  Is that the same type of line of offerings that
20 were being offered by Andover?
21 A.  Andover did the same thing, except they didn't
22 source multi vendor parts.
23 Q.  Okay.  They had spare parts similar --
24 A.  They had spare parts.  They -- as I understood
25 it, they were using the same back -- back end order

14

1  management tools to place these parts orders.
2  Q.  That MITG was?
3  A.  Yeah.
4  Q.  Okay.  And then the difference was MITG would
5  have multi vendor offerings, whereas Andover did not?
6  A.  That's correct.
7  Q.  Okay.  This e-mail --
8      Well, before I get into it, who is Diane Pound?
9  A.  Diane Pound was the -- the call center manager
10 in the Andover spares call center, so she managed that
11 team of call center agents and support staff.
12 Q.  Okay.  Did Andover offer Compaq and
13 Hewlett-Packard parts?
14 A.  No.  They only offered Compaq parts.
15 Q.  Okay.  And I think you said Diane was at the
16 Andover call center; correct?
17 A.  Yeah.  She was -- she was the manager there.
18 Q.  Okay.  It indicates in this e-mail that Diane
19 sent to Louise Meyerfeld --
20     And, again, I apologize.  Before I get into it,
21 Louise Meyerfeld, I have already deposed her in this
22 case.  She is here in Roseville; correct?
23 A.  Yes.
24 Q.  And she was one of the people who was also
25 involved in the migration and transition of Andover as

15

1  well as MITG to Roseville?
2  A.  Yes.
3  Q.  Okay.  This e-mail from Ms. Pound to
4  Ms. Meyerfeld indicates in the second sentence, "We are
5  losing almost 500 calls per day, and customers are not
6  happy about the long wait time."
7      Did you ever have any conversations with
8  Ms. Pound or Ms. Meyerfeld to determine what types of
9  calls those were?
10 A.  Well, I don't think that we ever talked about
11 what types of calls that they were.  It was that -- that
12 they were getting these calls that -- that were flooding
13 their call center.  I -- today, I still don't know what
14 anybody determined what the -- what the issues were,
15 what types of calls, or what -- what types of customer
16 inquiries were associated with these calls.
17 Q.  Okay.  Well, it then says in the second
18 paragraph, "Can Roseville handle a thousand calls per
19 day starting 11/18?  I thought we talked about
20 approximately 400 calls initially, and then taking four
21 to six weeks to get additional resources."
22     Were you involved in those discussions about
23 Roseville handling the flow of these calls beginning on
24 November 18th?
25 A.  Yeah.  I -- I had some discussions about that,

16

**Page 17**

1  yes.
2  Q. Okay. And what was the substance of those
3  discussions?
4  A. Well, so the Andover business was -- was ramping
5  up. Their call volumes and their order volumes were
6  increasing. Because of the merger, most businesses were
7  under directive not to expand, not to add head count.
8  So while call volume --
9  Q. By "head count," you mean personnel?
10 A. Add personnel, yeah.
11    So while Andover's order volume and call volume
12 was increasing, their staffing was not. So they were
13 getting beyond their capacity, and this was prior to
14 this event that resulted in another influx of calls into
15 their -- into their call center. So they were already
16 beginning to get calls that were beyond their capacity,
17 and then another event happened that steered more calls
18 towards them.
19 Q. Okay. I'll get to whatever that other event is
20 in a second. But if they're having this influx of call
21 volume and not increasing the head count, would you
22 agree that that call volume was for Compaq parts,
23 because that's all that they offered?
24 A. The initial influx of call volume, yeah, my
25 assumption was -- is that that was Compaq spare parts.

**Page 18**

1  Q. Okay. Now, the next e-mail -- well, excuse me.
2  The next paragraph there, it says, "I left Richard a
3  voice message yesterday to see if we can come up with a
4  Plan B to deal with this critical issue now."
5     I'm assuming Richard is yourself?
6  A. Yeah, I believe that's right.
7  Q. Okay. Indicating coming up with a Plan B to
8  deal with the critical issue. Was the critical issue
9  the calls that were being lost on a daily basis?
10 A. Yes. It was the -- the amount of volume that
11 they were getting and their inability to handle it.
12 Q. Okay. I guess since she's referring to a
13 Plan B, what was plan A?
14 A. Plan A was the original migration and
15 consolidation plan. Now, that's -- Plan B is -- I'm
16 sure that's just, you know, her remark. But we're
17 talking about this is the time when we were already --
18 when things were already in the works to migrate the
19 Andover calls to the Roseville call center, and so this
20 plan was -- was in play at the time their call volumes
21 were ramping up, and we had already made a commitment to
22 provide them some relief and transition some volume of
23 those calls over to our -- over to the Roseville call
24 center.
25 Q. Okay.

**Page 19**

1  A. So that was -- this stuff was all scheduled to
2  happen within a matter of days or weeks to when this --
3  this other change happened.
4  Q. Okay. Then if you look at the next e-mail,
5  which starts in the middle to bottom of MITG 84 and ends
6  on 85 --
7  A. Uh-huh.
8  Q. Before I get to that, let me ask, that last
9  sentence in the e-mail on MITG 85, it says, "This is not
10 fair to the people here."
11    Did you ever discuss with Diane Pound what she
12 was referring to by that statement?
13 A. I don't recall discussing that with her. I -- I
14 don't.
15 Q. Okay.
16 A. I -- you know, I don't -- I'm not sure what
17 she's referring to.
18 Q. Okay. And then apparently that same day,
19 Ms. Meyerfeld then responded to Ms. Pound's e-mail;
20 correct?
21 A. Uh-huh.
22 Q. Is that a yes?
23 A. Yes. Yes.
24 Q. And you are also cc'd on that e-mail; is that
25 correct?

**Page 20**

1  A. Yes.
2  Q. Okay. The first sentence indicates, "We are
3  taking this in two steps. Transitioning the non
4  Presario calls will happen on 11/18."
5     What are the non Presario calls?
6  A. The -- the business that we had planned to
7  migrate was the spares business that had already been
8  taking place at Andover. That's what she's referring to
9  as non Presario calls.
10 Q. The spares --
11 A. Spares. Non Presario calls refers to the
12 pre-merger Compaq spare parts business.
13 Q. Okay. And that apparently was going to happen
14 on 11/18?
15 A. That was their plan.
16 Q. Okay. Which was approximately 18 days from the
17 date of this e-mail?
18 A. Yes.
19 Q. Okay. And the next paragraph begins with
20 discussion on the Presario calls. So I take it they
21 were divided into those two categories?
22 A. I -- the calls weren't divided. They -- they
23 had just identified that this is where this influx of
24 calls had come from. The things that they were -- that
25 was referred to as the Presario calls, I believe, is

```
1  just when this extra call volume began to arrive, and it
2  was unexpected.  People said, "Where are these calls
3  coming from?  What is -- what is this?"
4       Q.   Okay.  Well, do you recall what it was?
5       A.   My understanding was -- is that they had closed
6  one area of the technical support centers that was
7  delivering support for these Presario products, and
8  somebody at that call center location or somebody within
9  that -- that management chain made the decision to
10 redirect those calls to Andover.
11      Q.   Okay.  What -- what are Presario calls?
12           You told me non Presario was the Compaq spares.
13 What is Presario?
14      A.   Presario is a -- is a Compaq product line.
15      Q.   Okay.  Different than the spares business?
16      A.   Well, I -- I don't know exactly what those calls
17 were, but I believe that this was a technical support
18 center, not a -- not a sales business.
19      Q.   Okay.  So it's your understanding that this
20 influx occurs to Andover --
21      A.   Uh-huh.
22      Q.   -- and at some point in time, an understanding
23 comes about that the reason for that influx is this
24 technical support center providing technical support
25 obviously had closed, and someone redirected those
                                                    21
```

```
1  calls, and whatnot, to Andover?
2       A.   Yeah.
3       Q.   And that led to the influx of call volume that
4  was unexpected by Andover?
5       A.   Yes.  That's what I believe.
6       Q.   And that increase in call volume due to this
7  technical support closing, just so happened to take
8  place at the time you were migrating Andover Compaq
9  spares business to Roseville?
10      A.   Yes.
11      Q.   Okay.  And according to Ms. Meyerfeld, she
12 indicates that the decision has not been finalized yet
13 as to where the Presario business should fall.
14           Do you see where I'm reading there, the second
15 paragraph on MITG 84, second paragraph of
16 Ms. Meyerfeld's e-mail?
17      A.   Oh, I got it.  Okay.  So --
18      Q.   Do you see --
19      A.   "The decision has not been finalized yet as to
20 where the Presario business should fall."
21      Q.   Yes.  Do you see where I read that?
22      A.   Yes.
23      Q.   Okay.  Did that ultimately fall to you and your
24 group to decide where that Presario business was going
25 to be sent?
                                                    22
```

```
1       A.   Louise was the project manager, and so at the
2  time, we were trying to determine what these -- what
3  these calls were -- were about.  And this was --
4  noticing that the first message comes from Diane on
5  Wednesday, October 30, this -- this next message is also
6  on Wednesday, October 30, and at that point, nobody
7  within our business knew what the trigger was for these
8  extra calls and where they were coming from.
9       Q.   Okay.  Well, regardless of what was going to
10 happen to them, she goes on to say, "There has been one
11 decision made, and that is all of it is going to be
12 moved out of Andover."
13      A.   Yes.
14      Q.   Okay.  And it says, "Since that has still not
15 occurred," she then apparently asking Roland and Janet
16 to work with the appropriate folks.
17           And Roland, I take it, is Mr. Soriano who is
18 listed on the e-mail above?
19      A.   Yes.
20      Q.   Okay.  Is he -- what -- what is his title, or
21 what is his --
22      A.   Roland's responsibility included the -- the
23 HP parts business operations.  So all of that activity
24 associated with HP parts, order management and delivery,
25 the call centers and the web deliverables, and -- it's
                                                    23
```

```
1  all under Roland's direction.
2       Q.   And Janet Peterson, was she in the same group?
3       A.   No.  Janet is not within that group.
4       Q.   Was she involved in this migration?  Or -- or do
5  you have an understanding as to why she was on this
6  e-mail?
7       A.   I think that Janet Peterson was in the
8  management chain on the pre-merger Compaq side
9  associated with HP Direct -- or pre-merger Compaq
10 Direct.
11      Q.   Okay.  When you say HP Direct, do you understand
12 that to be MITG?
13      A.   No.  MITG is not -- HP Direct is a larger
14 business organization.
15      Q.   Okay.  Fair enough.  I just want to be on --
16 when we're referring to some of these terms, I just want
17 to be on the same page.
18           So why don't we do this.  When I refer to MITG,
19 I will just call them MITG.
20      A.   Okay.
21      Q.   In her second sentence there to Roland and
22 Jeanette at the bottom of MITG 84 --
23      A.   Uh-huh.
24      Q.   -- she indicates, "If we are going to refer them
25 to the outside vendors, then let's put a message on the
                                                    24
```

1 VRU referring the customers there."
2   A.   Okay.
3   Q.   What is a VRU?
4   A.   VRU stands for Voice Recognition Unit, and it's
5 kind of a misnomer for referring to the telecom -- the
6 phone system.  VRU is a telecom feature.  In this case,
7 what -- what she's saying is to put it on the phone
8 system.
9   Q.   Meaning when someone dials 1-800-225-5385, would
10 that be -- I'll call it a tree option or a --
11  A.   Yes.  You could potentially route calls wherever
12 you wanted to.
13  Q.   Okay.  Did you, at this point in time, know who
14 the outside vendors were who were being considered for
15 referral of the Andover calls?
16  A.   I am not sure I knew at this time, but I think
17 pretty shortly after this, people were floating the
18 options that included referring them to MITG.
19  Q.   Okay.  And then it goes on to --
20       Well, was it your understanding that based on
21 what you just said, MITG was an entity that could handle
22 the orders and the referral of these calls?
23  A.   Might not have been at this time, but, as I
24 said, sometime right around this, I learned that they --
25 that they said they had some capacity --

25

1   Q.   Okay.
2   A.   -- and could potentially handle some calls.
3   Q.   And I won't -- I am not here to trick you.
4 There's an e-mail that you get November 1, and we'll get
5 to that, so -- regarding that.
6       It then goes on to say -- well, we just talked
7 about it -- "put an option, if you are calling about
8 Presario parts, you can then press and provide the web
9 info."  Do you see that down there?
10  A.   Yes.  Yes.
11  Q.   Okay.  And just so I'm clear, that 800-225-5385
12 was the Andover number?
13  A.   Yes.
14  Q.   At the bottom of MITG 84, did you -- had there
15 been -- excuse me -- any discussions at this point in
16 time, when she says, "provide the web info" as to what
17 website she was referring to?
18       It's the bottom of MITG 84, second-to-the-last
19 sentence.
20  A.   Oh, provide the web info?
21  Q.   Yeah.
22  A.   I believe that -- that she's referring to the
23 spares store website.
24  Q.   Okay.  Do you know what that site's specific www
25 was?

26

1   A.   No, I -- but it's just a spares store in the
2 URL.
3   Q.   Okay.  Then on MITG 84, up at the top,
4 Ms. Peterson then responds to a person by the name of
5 Nikhil, N-i-k-h-i-l, Behl, B-e-h-l.  Can you tell me who
6 that is?
7   A.   No.
8   Q.   Okay.
9   A.   Only that I believe Nikhil Behl was associated
10 with -- with the previous business that -- where the
11 excess calls were coming from.
12  Q.   The Andover site or the site that closed?
13  A.   The site that closed.  The stuff that -- that's
14 being referred to as the Presario calls.
15  Q.   And apparently, you were also cc'd on that
16 e-mail?
17  A.   Yes.
18  Q.   Maybe not.
19  A.   It maybe comes up later.
20  Q.   Okay.  No.  Actually --
21  A.   I didn't -- I didn't see that one originally,
22 but I --
23  Q.   Okay.
24  A.   -- I'm sure I'm included in this chain later on.
25  Q.   Yeah, you are.  Yeah.  In fact, you're at the

27

1 very final chain.
2       But anyway, that e-mail indicates that
3 "Diane's" -- referring to Diane Pound --
4   A.   Uh-huh.
5   Q.   -- "group cannot place an order as they do not
6 carry the parts," and that customers were screaming at
7 Diane since they were on hold for almost an hour.
8       Do you know what parts is being referred to
9 there that Ms. Pound's group cannot place the order for?
10  A.   I don't know what -- what parts they are, but I
11 am aware that those calls included many types of
12 requests.  There were -- you know, so, then, it's not
13 parts as much as it is items, and among those items,
14 there may be some parts as well.
15       I understood that these -- there were software
16 requests, there were supplies and accessories,
17 consumables, something that was referred to as
18 options -- optional accessories that were ordered
19 from -- from that other -- other business arm.
20  Q.   Did you, at some point, come to an understanding
21 or did someone inform you that MITG was an entity that
22 could meet and fill those orders for those types of
23 parts?
24  A.   No.  I never knew if they could fill the orders.
25 I -- I believe that we were considering whether they had

28

Q. Okay. Well, then, let's look at MITG 83, which is an e-mail from Mr. Soriano the same date, Wednesday, October 30, 2002.

A. Uh-huh.

Q. And you are on that cc.

A. Okay.

Q. And it indicates -- Mr. Soriano directly responded to Ms. Behl, and he indicates he has been talking with Troy Bloomquist of the HP Direct call center in Hannibal, Missouri, about helping us out.

Had you talked to Troy Bloomquist at all regarding this situation?

A. I don't believe I ever talked to Troy about the -- about the situation.

Q. Okay.

A. I -- I think the only conversations I had with Troy was during the initial merger, and it was just an introduction.

Q. Okay. Mr. Soriano then goes on to say, "The call center," which is the one in Hannibal, Missouri, "has the capacity and can take care of these customers. I strongly suggest we take this option and make it happen." It then indicates, "Please let me know immediately when we will see the decrease in calls. I will take action to redirect calls to HP Direct."

A. Uh-huh.

Q. And then do you see, he then sends a specific note to you, Diane and Troy --

Do you see that there?

A. Yes.

Q. -- asking that you three work together and be prepared to redirect the calls to HP Direct from Andover.

Did you, in fact, meet with Ms. Pound, Mr. Bloomquist, whether in person or by phone, to work together and make that happen?

A. I don't recall that we had any -- any discussions or meetings like that.

Q. Okay. Did you take action to redirect the calls to HP Direct from Andover, as requested by Mr. Soriano?

A. No, we did not.

Q. Okay. Why did that not take place?

A. I believe because we continued to pursue the plan of record that we had at the time, which was to migrate those calls to Roseville.

Q. Okay. Who made that ultimate decision? Were you involved in that?

A. No, I don't believe that I was involved in the decision. Well, the -- I was involved in the decisions on -- on how -- on where the business was going to land and where it was going to route. When the decision was made to route calls to Roseville, I was in the position of making sure our resources were prepared and our -- our -- you know, we had the capacity and the business plans in place. So I'm not -- at the time that these messages took place, the plan of record was already to move the Andover call volumes to Roseville.

Q. Okay. After getting this e-mail from Mr. Soriano on October 30th of 2002, did Ms. Pound or Mr. Bloomquist ever follow up with you to attempt to redirect the calls to HP Direct?

A. I did speak to Diane several times around this time about the calls and about how we were going to manage the situation.

Q. Okay. Did that -- did those discussions involve any conversations on sending them to HP Direct in Hannibal, Missouri?

A. Well, Diane had proposed that. That's -- that was one of her solutions, one of her suggestions.

Q. And did she tell you that MITG carried the parts to fill these orders and could -- and had the capacity to take the calls?

A. I don't -- I don't know that we had any discussions about whether they had the parts or they had the access, but it was that -- that they did have some capacity and could potentially take those calls.

Q. Okay. You said you weren't involved in the decision as to where to send the calls, but that a decision was made to continue on the plan that was in place to migrate Andover to Roseville.

A. Yes.

Q. Who ultimately informed you, "We're not going the HP Direct route. We're going to stick to the original plan"?

A. I can't remember who -- who told me. But Louise Meyerfeld was the project manager, and we were engaged in trying to develop a plan to address the call volumes that we had. And so at some point, I offered them a proposal that says, "We can handle this capacity here if we do this and we do that."

Q. And what was the "this and that"?

A. We add some staff and we -- you know, we -- we step up the plan to migrate those calls and do it faster. We move up the time line.

Q. Faster migration of Andover to Roseville --

A. Yes.

Q. -- was one. And two, you said, was add more staff?

A. Yes.

**Page 33**

1 Q. Okay. If it was already set to take place, the
2 migration, on November 18, and this e-mail is being sent
3 October 30, what was the faster time line you proposed?
4 A. Which time -- which would be -- which would be
5 the faster solution?
6 Q. No. My question is, You told me the
7 transitioning -- the plan for the transitioning of
8 Andover was set to take place, based on these e-mails,
9 for the non Presario calls on November 18, and you just
10 told me that you further offered up the proposition that
11 you could handle the capacity here in Roseville, which
12 would require two things: Faster implementation of the
13 plan and adding more staff.
14  My question is, If the plan was already to
15 migrate these calls on November 18, how much faster
16 could you get that time line moved up?
17 A. I don't recall. I don't know what the -- what
18 date we actually offered or what -- or when we actually
19 moved those calls. November is about right. That's
20 when it -- that's when we began moving it and
21 transitioning calls, but --
22 Q. Did somebody -- well, did Ms. Meyerfeld come to
23 you after you made -- strike that. Let me back up.
24  Did you make that proposal to Ms. Meyerfeld as
25 the project manager for the migration?

**Page 34**

1 A. You know, I don't really have any specific
2 recollection, but I -- that's -- that seems to be the
3 reasonable course. That's what we -- you know, as we
4 are looking for solutions, "What can we do?" That's a
5 typical practice here. If we've got, you know, call
6 volumes or business changes, "What can we do?"
7 Q. Okay. Well, my question was, Do you
8 specifically recall telling Ms. Meyerfeld, who was the
9 project manager, of your proposal to add staff, migrate
10 them faster, and we can do it here at Roseville?
11 A. I don't have any -- any independent recollection
12 of that.
13 Q. Did Ms. Meyerfeld report to Mr. Soriano?
14 A. No. I believe that Louise Meyerfeld reported to
15 Lynn Farlin.
16 Q. Who was on the channel side?
17 A. Yes.
18 Q. Going, then, to MITG 82 --
19 A. Yes.
20 Q. -- you are cc'd on the e-mail from Mr. Soriano
21 dated Friday November 1, 2002. Do you see that?
22 A. Yes.
23 Q. Okay. And it is to Janet Peterson and
24 Nikhil Behl regarding the capacity and readiness of
25 HP Direct to start handling the calls from Andover. Do

**Page 35**

1 you see that in the first sentence?
2 A. Yes.
3 Q. And then apparently, it says, "We have a telecom
4 issue that we need to solve first. We are experiencing
5 a busy out at Diane's call center, therefore, the caller
6 is not even getting into our IVR."
7  Can you tell me, what is a busy out?
8 A. A busy out is what happens when the phone lines
9 don't have enough trunking capacity to take the call
10 volume that they're being offered. So telephone systems
11 have X amount of capacity. They call it trunk capacity.
12 And what happens when there's not enough capacity and
13 the callers can't get through, they get a busy out
14 signal. It's -- it's like a busy tone.
15 Q. No different than, I guess, when I call the
16 airline and want to change my reservation, and there's
17 so many people on the line, it just goes beep, beep,
18 beep?
19 A. So the volumes that were planned for Andover and
20 the amount of trunking capacity, this extra volume, was
21 just overwhelming it.
22 Q. Okay. And it says, "The caller is not even
23 getting into our IVR." What is the IVR?
24 A. It's another -- it's another acronym for the
25 telephone system. In this case, the IVR stands for

**Page 36**

1 Internal Voice Recognition, and, again, it's a misnomer,
2 referring to the -- to the telecom system. Internal
3 Voice Recognition is just a feature of the phone. It's
4 not the phone system itself.
5 Q. Would it be, when I called that 800 number, an
6 IVR would say, "For X parts, press 1"?
7 A. Things like that, yeah.
8 Q. Okay.
9 A. It would be the phone system and the menus that
10 are -- that are in that system.
11 Q. Okay. Then Mr. Soriano indicates that his
12 proposal was to use that IVR on the Andover 800 line --
13 A. Uh-huh.
14 Q. -- to redirect the calls to HP Direct. Do you
15 see that?
16 A. Yes.
17 Q. And to resolve the busy out issue, they had
18 ordered an additional T1 to be installed at the end of
19 next week.
20 A. Yes.
21 Q. T1 being another trunking line capacity?
22 A. A T1 is a -- is a telecom interface piece of
23 hardware that allows more volume to flow through.
24 Q. And according to his e-mail, that had been
25 ordered and was going to be installed at the end of next

**Page 37**

1 week, which the following Friday would have been
2 November 8th, 2002.
3    A. Well, that's what -- that's what that e-mail
4 says.
5    Q. Right. My question is, Do you recall speaking
6 with him about that installation?
7    A. No.
8    Q. Okay.
9    A. No.
10    Q. And then it says, "Until we get this in" -- I
11 guess it should be "place" -- "we need to know where the
12 calls are coming from so we can provide them HP Direct's
13 number to refer the customer to."
14    A. Yes, I see that.
15    Q. HP Direct, do you understand that to be the MITG
16 number?
17    A. In this case, yeah, that's what they're
18 referring to.
19    Q. Okay. And then apparently, this does not take
20 place. The calls are not -- strike that.
21      Do you -- do you have an understanding that --
22 that that solution was not implemented?
23    A. Yeah, that's correct. I -- I'm not aware that
24 we redirected any calls to MITG.
25    Q. Okay. Can you tell me where they were

**Page 38**

1 redirected to?
2    A. All those calls were either offered to the
3 Andover call center or -- or were redirected towards the
4 Roseville call center.
5    Q. Do you know what ultimately happened with the
6 Andover situation as far as the influx of call volume?
7    A. Yeah. We ramped up our capacity and redirected
8 all of that call volume over to Roseville.
9    Q. When you say ramped up capacity, added manpower?
10    A. Yeah. Added desktops or manpower or whatever we
11 needed at the time.
12    Q. And do you know who ultimately put that decision
13 into place?
14    A. The business team, in general, would have -- you
15 know, would have at some point, and we would have
16 probably had a quick meeting and said, "What's our
17 situation and what's our best course of action?" I
18 don't remember who said what. But Louise and I were
19 already engaged in that migration project, and Roland
20 was the overall business manager and sponsor, so the
21 decision would have been his.
22    Q. Okay. Was Mr. Bill Crowley involved in that
23 decision?
24    A. I believe Bill was involved in decision-making.
25 I don't know if he was -- if he was involved in this

**Page 39**

1 decision, but Bill was, at the time, working on the
2 planning and the -- and -- you know, for the business
3 projects and the merger.
4    Q. I guess my question with regard to your answer
5 there is, Mr. Soriano, as of November 1, 2002, sends you
6 an e-mail that says he's proposing to use the IVR to
7 redirect the calls to HP Direct.
8    A. Yes.
9    Q. He's ordered an additional T1 line to be
10 installed at the end of next week.
11    A. Yes.
12    Q. He's going to -- he says, "HP Direct has the
13 capacity and is ready to take on these calls."
14      When did, all of a sudden, that change and he
15 decides that that was not going to go forward?
16      MS. CARROLL: Objection; calls for speculation.
17      THE WITNESS: Yeah. I don't know. I
18 couldn't -- you would have to ask Roland.
19    Q. BY MR. HANSEN: And I will, but I just want to
20 know what knowledge you have.
21      Did you discuss that with him?
22    A. I don't recall the discussions or what -- or
23 what took place, but this -- this chain of e-mail
24 messages that starts on October 30th and runs through
25 November 1, is just an example of how quickly our

**Page 40**

1 business tries to move and adapt to changing conditions.
2 And so this is -- based on the information that he had
3 at that point, this is -- this is typical of -- of
4 "Here's the quick solutions."
5      MR. HANSEN: Okay. I will move to strike that
6 as nonresponsive to any question that was asked.
7    Q. Let's look, then, at --
8      Well, before I get into that, did the migration
9 eventually take place where Andover, the entire call
10 volume they experienced, was migrated to Roseville?
11    A. Yes.
12    Q. Did Andover close?
13    A. Yes, it did. Well, at some point, the call
14 center activity that was there was -- was ended. We --
15 they still continued to have some -- some staff in place
16 for some operational stuff, but, yes, at -- pretty soon
17 after that, the call center ramped down and closed.
18    Q. You say pretty soon. Was it by the end of '02?
19    A. We started taking those calls in November, and
20 we finished the migration, I believe, in January.
21    Q. Of '03?
22    A. Yes.
23    Q. I am going to hand to you --
24      MR. HANSEN: You know what? This will be a good
25 time -- why don't we take a break, and I'll call my

**Page 41**

1 office right now, get that call out of the way before we
2 get started on another exhibit. It's just a good place
3 to take a break.
4           MS. CARROLL: All right.
5           (Recess taken.)
6    Q.   BY MR. HANSEN: I'm going to hand you -- and
7 we'll discuss -- these were produced by counsel, and I
8 got it Monday, January 10, 2005. The subject is MITG
9 No. 4, which simply, I believe -- and counsel can state
10 otherwise -- it was the fourth e-mail that was sent to
11 me in a progression of a total of six that had various
12 documents enclosed, and I want to talk with you about a
13 set of e-mails that predated the exhibit we just went
14 over.
15   A.   Okay.
16           MR. HANSEN: And I will mark these -- this one I
17 will mark Exhibit LL.
18           (Exhibit LL was marked for
19           identification.)
20   Q.   And the bottom is an e-mail from Troy Bloomquist
21 to you dated October 22nd; is that correct?
22   A.   Yes.
23   Q.   And in that e-mail, he's informing you he is
24 with what entity?
25   A.   He indicates he is with the HP Direct

**Page 42**

1 organization.
2    Q.   Okay. And --
3           MR. HANSEN: Off the record.
4           (Discussion held off the record.)
5    Q.   Why don't I just stand up, and I can look at it
6 this way.
7           He indicates that he's forwarding to you a note
8 from the call center; correct?
9    A.   Uh-huh.
10   Q.   Is that a yes?
11   A.   Yes. Yes.
12   Q.   And he informs you that there's an agreement in
13 place with a vendor to provide call center support and
14 third party spares procurement. Do you see that?
15   A.   Uh-huh. Yes.
16   Q.   And he wanted you to give him a call to discuss
17 if there was any way he could assist with the additional
18 calls, and that they were below the daily contracted
19 minimum with the vendor. Do you see that?
20   A.   Yes.
21   Q.   And you responded to his e-mail, did you not, on
22 Wednesday, October 23rd?
23   A.   Yes.
24   Q.   And you indicated to him that the Andover call
25 volumes were higher than anticipated. "The good news

**Page 43**

1 is" -- and I'm reading from your e-mail -- "that the
2 increase is related to the launch of the Spare Store
3 website which is www.compaq.com/sparestore," one word,
4 "and parts order volumes logged on-line have also
5 increased."
6           Is that the second event you were talking about
7 earlier?
8    A.   No. No. That's not -- that's not the -- the
9 other event. This is the business at Andover.
10   Q.   Okay. Well, you told me earlier that the
11 Andover call volumes were increased in a capacity that
12 was unexpected due to the technical support center
13 referring that number out. Do you remember that?
14   A.   Yes.
15   Q.   Okay. You also testified here earlier today
16 that there was a second event that also caused an
17 increase in call volume at Andover.
18   A.   Yes.
19   Q.   Okay. This is not that second event?
20   A.   No, that's not it. That's not --
21   Q.   Who launched the Spare Store website that's
22 referenced in your e-mail?
23   A.   The Andover parts business team.
24   Q.   Okay. Was this a website, then, that an end
25 user or customer could go to and make a parts order

**Page 44**

1 volume on-line?
2    A.   Yes.
3    Q.   Okay. And that would be for Compaq spares?
4    A.   Yes.
5    Q.   Would that also be for multi vendor spare parts
6 procurement?
7    A.   Not as I understood.
8    Q.   Okay. Just Compaq spares?
9    A.   Yes.
10   Q.   Okay. It says, "Our integration team is working
11 with us to determine the appropriate course of action."
12 Is that for the handling of the Andover volume?
13   A.   That's for all the integration activity.
14   Q.   For Andover?
15   A.   Yeah.
16   Q.   Okay. And, "Lynn Farlin is managing integration
17 efforts from the parts business perspective."
18   A.   Yes.
19   Q.   Okay. I thought Louise Meyerfeld was managing
20 that.
21   A.   Louise is the project manager. Lynn Farlin was
22 responsible for the -- the overall integration projects.
23   Q.   Okay. "She would be the right person to talk to
24 about our plans." So were you referring him to follow
25 up with Lynn Farlin then?

**Page 45**

1  A.  Yes.
2  Q.  I want to go back to this bottom e-mail that
3  Troy Bloomquist sent to you on October 22nd on
4  Exhibit LL. It is a note from the call center that he
5  was forwarding to you, and it indicates that somebody
6  had called technical support, which is 1-800-OK-COMPAQ?
7  A.  Yes.
8  Q.  Okay. Was that the general technical support
9  number?
10  A.  Yes.
11  Q.  Okay. As opposed to the specific technical
12  center that you said started referring them to Andover,
13  or would it have been off of this line?
14  A.  I understood it was off of that tree there. It
15  was off that phone system.
16  Q.  And this Michelle informed the CSR that they
17  called the technical support 800-OK-COMPAQ. It says,
18  "Out of seven calls to tech support, we were referred to
19  the following in this exact order."
20      Can you identify these numbers for me,
21  1-800-888-0220?
22  A.  I don't know that one.
23  Q.  Well, the second one, I think, is Andover?
24  A.  That's Andover spares.
25  Q.  What is the third one?

**Page 46**

1  A.  I don't -- I don't know that number.
2  Q.  Okay. The fourth one, I'll tell you, is MITG
3  HP Direct.
4  A.  Okay.
5  Q.  Did you know that before I just told you that?
6  A.  I wouldn't have recognized that number.
7  Q.  Okay. The next one was Andover again.
8  A.  Yes.
9  Q.  The next one was the first one again, but we
10  don't know -- you don't know what number that is as you
11  sit here?
12  A.  I'm not familiar with that number.
13  Q.  Okay. And how about the 1-888-999-4747?
14  A.  No, I don't recognize that number.
15  Q.  Okay. Now, I am going to hand you what is
16  marked as Exhibit MM, which is an e-mail dated
17  November 5, 2002, on the second page, from you to
18  Troy Bloomquist in response to the e-mail at the bottom
19  that he sent to you.
20  A.  Okay.
21      (Exhibit MM was marked for
22      identification.)
23  Q.  Do you see the one at the bottom sent to you on
24  that same day where he asks you -- or he informs you
25  that the call volume has not increased. "Is there an

**Page 47**

1  ETA, Troy?" Do you see that?
2  A.  Yes.
3  Q.  Now, I want to clarify. And I'm assuming -- and
4  tell me differently -- was Mr. Bloomquist under the
5  assumption that based on the direction from Mr. Soriano,
6  that the T1 was going to be installed, and those calls
7  were going to be directed to HP Direct?
8      MS. CARROLL: Objection.
9      THE WITNESS: I don't know what he was
10  suggesting.
11  Q.  BY MR. HANSEN: Okay. Regardless, you followed
12  up to him, did you not?
13  A.  Yes.
14  Q.  Okay. And you informed him that the road block
15  to setting up the phone menu to route the excess call
16  volume to MITG was that the call volume at Andover is
17  beyond phone line capacity. Do you see that?
18  A.  Yes.
19  Q.  Okay. Then it says, "The last update we got on
20  installing added T1 for more capacity is 11/19." Do you
21  see that?
22  A.  Yes.
23  Q.  Okay. You then say, "Not soon enough for our
24  plans, so we have escalated and are trying to move it
25  up."

**Page 48**

1      As of November 5, 2002, when you sent this
2  e-mail to Troy Bloomquist, was the plan still to forward
3  that call volume to MITG once the T1 got installed,
4  which you indicated was not soon enough and was trying
5  to be escalated?
6  A.  I -- I can't say if that -- if that was the plan
7  at that time.
8  Q.  Well, you did indicate to him, did you not, that
9  you were escalating the installation of the T1 from the
10  11/19 date?
11  A.  That's what the e-mail says.
12  Q.  In the meantime, next paragraph goes on to say,
13  "I," being you, "will recommend the routing changes go
14  in and continue to work on identifying the sources
15  steering calls to Andover. Then we can work on getting
16  those 'Compaq at home' type calls referred to you,
17  and/or the recently added web deliverable for memory."
18      Do you see that?
19  A.  Yes.
20  Q.  Okay. So as of November 5, 2002, you were going
21  to recommend that those routing changes go in routing
22  the calls to MITG with the new T1's that were installed?
23  A.  It looks like that was our understanding at the
24  time.
25  Q.  Okay. And that the Compaq at Home calls were

**Page 49**

1  going to be referred to MITG. What is Compaq at Home?
2  A. That is the tech support center, I believe. The
3  arm of that business Compaq at Home is for consumer
4  support. I wasn't involved in that business, and so I
5  can't really say exactly what they do.
6  Q. Okay. Then the first page of this Exhibit MM is
7  an e-mail from Louise Meyerfeld to you dated November 5,
8  2002; correct?
9  A. Yeah.
10 Q. Okay. And she instructed you then at this point
11 in time that, "We do not want to make any changes
12 regarding the Presario calls until Roland, Lynn and I,"
13 being Louise --
14 A. Uh-huh.
15 Q. -- "have discussed the direction we want to go
16 with HP Direct," which do you understand in this
17 instance to mean MITG?
18 A. Yes.
19 Q. So as of November 5, 2002, Ms. Meyerfeld
20 informed you that she, Roland and Lynn were going to
21 have discussions on what they wanted to have happen with
22 HP Direct, and that they had a conference call with
23 Troy Bloomquist set for tomorrow?
24 A. I see that.
25 Q. Okay. Is that a yes?

**Page 50**

1  A. Yes.
2  Q. Okay. Now, it then says -- okay. In the next
3  portion, it says, "Roland and Lynn."
4  A. Uh-huh.
5  Q. The second paragraph, "From the integration
6  side, we are looking at Diane's team keeping the
7  Presario calls." Diane being Diane Pound?
8  A. Yes.
9  Q. Being Andover?
10 A. Yes.
11 Q. Presario being Compaq spares?
12    MS. CARROLL: Okay.
13    THE WITNESS: No.
14 Q. BY MR. HANSEN: I'm sorry. You're right.
15 Presario being the non Compaq spares. Non Presario was
16 the Compaq spares; correct?
17    MS. CARROLL: I am going to object. That
18 assumes facts not in evidence.
19 Q. BY MR. HANSEN: Let me go on your testimony,
20 Mr. Chizek. You told me earlier that the -- Presario
21 was the CPQ product line, non Presario calls were the
22 spares business, the Compaq spares business; is that
23 correct?
24 A. No -- yeah. Non Presario calls were the spares
25 business.

**Page 51**

1  Q. Okay.
2  A. The Presario calls are referring to something
3  else.
4  Q. Got ya.
5     And apparently, those were going to be
6  integrated, the Presario calls, into Roseville?
7  A. No. They're saying they're looking at Diane's
8  team to keep the Presario calls there in Andover, and
9  the other calls, which was the integration project,
10 moving those calls to Roseville. So those -- the spares
11 parts business --
12 Q. -- was going to be integrated to Roseville?
13 A. This is -- this -- yeah. It's just saying
14 that -- that they are keeping the Presario calls there
15 for the time being.
16 Q. It says, "Along with this, we are looking at
17 pointing references to HP Compaq parts on the HP Direct
18 website to eSpares and ePDO, and have an option added to
19 the HP Direct phone line for HP Compaq customers rounded
20 to Andover and the website for parts purchases."
21    In this instance, is HP Direct MITG or some
22 other entity, if you know?
23 A. I don't know.
24 Q. Okay.
25 A. I -- it looks like Louise wrote that message.

**Page 52**

1  Q. Okay. Next I am going to hand you Exhibit NN,
2  which are --
3     MR. HANSEN: You probably have these already in
4  your computer there, Elizann.
5  Q. -- HP 6132, 6133 and 6134. And I will tell you
6  that I included all of them because they're a chain, but
7  I am going to be focusing solely on your e-mail on 6132.
8  A. Okay.
9     (Exhibit NN was marked for
10    identification.)
11 Q. Do you see that e-mail there that you sent?
12 A. Yes.
13 Q. Okay. And what is the date on that e-mail?
14 A. The date on the e-mail that I sent? Are you
15 saying on the page 6132, just this one here?
16 Q. Correct.
17 A. The date is Friday, January 16th, 2004.
18 Q. Okay. If you look at the last bullet point,
19 I'll call it, in your e-mail of that date, which was
20 originally addressed to Lauri Vagadori, V-a-g-a-d-o-r-i,
21 who is Lauri?
22 A. Lauri was the Sykes account manager for our
23 business
24 Q. And the subject is the HP Direct migration
25 plans?

```
 1    A.   Yes.
 2    Q.   And this reference to HP Direct, is that MITG
 3  migration plans?
 4    A.   Yes.
 5    Q.   Okay.  Your last bullet point indicates that,
 6  "PBCO" --
 7         Is that Parts Business Center Operations?
 8    A.   Parts Business Center Operations, yes.
 9    Q.   -- "agents should be directed to STOP," in all
10  caps, "referring any parts inquiries to the HP Direct
11  number immediately."
12    A.   Yes.
13    Q.   Okay.  So you were instructing the agents --
14         Are those Parts Business Center Operations here
15  at Roseville or throughout the country?
16    A.   They are here in Roseville.
17    Q.   You were ordering them to stop referring any
18  inquiries for parts to MITG; correct?
19    A.   Yes.
20    Q.   And removing that number -- referral number --
21         Does that mean the MITG number?
22    A.   Yes.
23    Q.   -- from the phone lists.
24    A.   Yes.
25    Q.   Okay.  So as of January 16, 2004, you wanted
                                                         53
 1  MITG's phone number removed from all lists?
 2    A.   Yes.
 3    Q.   Okay.  And that any -- now we're on 6133.  Did
 4  you instruct them that all parts inquiries and order
 5  submissions for any available pmCompaq or HP parts
 6  should be directed to Roseville?
 7    A.   Yes.
 8    Q.   And that was to be effective immediately?
 9    A.   On the date of the transition that was
10  January 9.
11    Q.   Okay.  Well, you did refer them, though, to stop
12  referring any parts inquiries to MITG immediately;
13  correct?
14    A.   Yes.  Yes.
15    Q.   And you instructed them to immediately remove
16  that MITG number from all phone lists?
17    A.   Yes.
18    Q.   What is pmCompaq?
19    A.   Pre-merger Compaq.
20    Q.   And as of January 16, 2004, did you want the
21  PBCO agents to use the hp.com referral tools and
22  internal support sites to research support options for
23  products and parts not available via the parts business
24  center operation?
25    A.   Yes.
                                                         54
 1    Q.   Okay.  And that would be to -- strike that.
 2         Was that to refer and find support sites other
 3  than MITG for those types of products?
 4         MS. CARROLL:  Objection; vague.
 5         THE WITNESS:  Other than MITG?
 6    Q.   BY MR. HANSEN:  Correct.
 7    A.   I'm sorry.  Can you -- could you restate the
 8  question?
 9    Q.   You told them to use hp.com referral tools and
10  internal support sites to research support options for
11  products and parts not available via PBCO?
12    A.   Yes.
13    Q.   Okay.  If they are instructed to use these tools
14  and internal support sites, is that something that would
15  exclude MITG?
16    A.   Yes.
17    Q.   And the last bullet point of your e-mail dated
18  January 16, 2004, you instructed your agents to refer
19  inquiries for unavailable parts or non Hewlett-Packard
20  parts to where?
21    A.   HP authorized parts resellers.
22    Q.   Okay.  Which would exclude MITG?
23    A.   Yes.
24    Q.   Okay.  Why were you instructing your agents to
25  remove HP Direct's phone number from all phone lists as
                                                         55
 1  of January 16, 2004?
 2    A.   Because of the change in the support structure,
 3  all parts -- HP and pre-merger parts issues were landing
 4  at the Roseville call center.
 5    Q.   So as of January 16, 2004, when your e-mail goes
 6  out and you are instructing your agents to stop
 7  referring parts inquiries to MITG, did Roseville have
 8  the capacity to fill and place those orders?
 9    A.   We had the capacity to place orders for the
10  parts and material that was in stock that was in the
11  catalog.
12    Q.   Okay.  And you could do that through HP and send
13  the revenue here, as opposed to sending it to MITG;
14  correct?
15    A.   Yes.
16    Q.   Are you aware of the Standard Support Agreement
17  that was in place between Hewlett-Packard and MITG on
18  the date you sent your e-mail, January 16, 2004?
19    A.   Aware of the -- I was aware that -- that there
20  was an agreement that existed.
21    Q.   Had you ever reviewed it prior to sending your
22  e-mail of January 16, 2004?
23    A.   I reviewed it at some point.  I don't know -- I
24  don't know when I -- I first saw a copy of this
25  agreement.
                                                         56
```

```
 1   Q.  Do you recall reviewing an exclusivity clause
 2   contained within that agreement?
 3   A.  No, I don't recall seeing anything like an
 4   exclusivity clause.
 5   Q.  Well, I will show you what has been marked as
 6   Deposition Exhibit Crowley A, which is the agreement
 7   that was in place between Hewlett-Packard and MITG on
 8   the date you sent that e-mail of January 16, 2004.
 9   A.  Are you saying that this is the agreement that
10   was in place?
11   Q.  It is.
12   A.  Okay.
13   Q.  And is that the agreement that you are
14   referencing that you saw?
15   A.  I would say yes.
16   Q.  Okay.  If you would -- you have got a copy?
17   Great.  Look to page 7 of that agreement --
18   A.  Okay.
19   Q.  -- the very bottom.
20   A.  Uh-huh.
21   Q.  The second sentence in paragraph 22, "Everything
22   herein contained shall be deemed to provide MITG with an
23   exclusive right to provide parts and services to the
24   customers."
25       Do you see what I just read?
                                                    57
```

```
 1   A.  Yes.
 2   Q.  Would you agree referring calls and telling your
 3   agents to stop referring -- strike that.
 4       Would you agree that telling your agents to stop
 5   referring calls to MITG and directing them to HP is in
 6   direct violation of that agreement?
 7       MS. CARROLL:  I am going to object that it calls
 8   for a legal conclusion; that it misrepresents -- or
 9   misstates the scope of the provision that's in
10   paragraph 22, and is misleading.
11       Other than that, you can answer.
12       THE WITNESS:  I don't know whether -- whether it
13   violates that or not.
14   Q.  BY MR. HANSEN:  Okay.  Let me show you what
15   we'll mark as Exhibit OO, documents 5084 to 5087, which
16   is an e-mail from you to numerous people dated Friday,
17   January 16, 2004.  Subject is minutes of account setup
18   meeting.  Go ahead and take a look at that.
19   A.  Okay.
20       (Exhibit OO was marked for
21        identification.)
22   Q.  This references at the end of your e-mail on
23   HP 85 underneath your name, "MITG customer letter.doc,"
24   do you see that?
25   A.  Yes.
                                                    58
```

```
 1   Q.  And then behind that is an 86 and an 87, which
 2   is an attachment.  Is that the document that's
 3   referenced there?
 4   A.  Yes.
 5   Q.  Okay.  That's the MITG customer letter --
 6   A.  Yes.
 7   Q.  -- that you attached?
 8       My questions to you regarding this exhibit are
 9   in your bullet points of the e-mail Friday, January 16,
10   2004, to Yvonne --
11       Right here.
12   A.  Yes.
13   Q.  -- Yvonne -- what is her last name?
14   A.  Yvonne Cowan.
15   Q.  -- that she was to release the announcement
16   ASAP.  Recommends HP Direct migration letter includes
17   that account numbers will follow.
18       Is that HP account numbers?
19   A.  Yes.
20   Q.  And is the announcement that you're telling her
21   to release ASAP the letter that you have attached to
22   this e-mail?
23   A.  Yes.
24   Q.  Okay.  And that was going to go to approximately
25   110 pre -- well, wait a minute.
                                                    59
```

```
 1       Who was that going to go to?
 2   A.  That was going to go to the -- the customer
 3   accounts, that we were going to provide their -- either
 4   their existing account number or their new account
 5   number.
 6   Q.  Okay.  And you then indicate that you will
 7   calibrate Shari Ellis and MITG that new accounts setup
 8   requests and/or parts inquiries should be directed to
 9   the PBCO number.
10   A.  Yes.
11   Q.  That's the number here at Roseville?
12   A.  Yes.
13   Q.  And as of the date of this e-mail, was it your
14   understanding that any new account setups, MITG was
15   going to be directed to send them directly to Roseville?
16   A.  That's what I understood, yes.
17   Q.  Okay.
18       MR. HANSEN:  Let's go off for a second.
19       (Discussion held off the record.)
20   Q.  Okay.  I am handing you Exhibit PP, which is a
21   document HP 5071, which is an e-mail from Yvonne Cowan,
22   who we just talked about, to Louise Meyerfeld of which
23   you are cc'd on stating, "Louise, as you requested,
24   attached you will find the list of accounts in the
25   HP Direct trade business that ordered over $500 in the
                                                    60
```