UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

    vs.                    Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.

_____/

Deposition of

ROLAND SORIANO

Friday, January 14, 2005

Job No. 1764RD
Reported by:  Ruth E. Diederich, RPR, CSR
             CSR No. 4952

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
    Phone: (916) 722-7814    Fax: (916) 726-0784

1

---

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    JUNEAU, BOLL & WARD
    BY:  ELIZANN CARROLL, Esq.
    15301 Spectrum Drive, Suite 300
    Addison, Texas   75001
    (972) 866-8333

FOR THE DEFENDANTS:

    SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
    BY:  JAMES A. HANSEN, Esq.
    525 Jersey
    Quincy, Illinois   62306
    (217) 223-3030

---o0o---

2

---

ROLAND SORIANO                           Friday, January 14, 2005

E-FILED
Wednesday, 01 February, 2006  04:12:18 PM
Clerk, U.S. District Court, ILCD

I N D E X

                                                    Page

Examination by Mr. Hansen                             4

---o0o---

E X H I B I T S

(None marked)

---o0o---

3

---

BE IT REMEMBERED that under the applicable
sections of the Code of Civil Procedure of the State of
California, on Friday, January 14, 2005, commencing
at the hour of 9:11 a.m. thereof, at Hewlett-Packard,
8000 Foothills Boulevard, Building R10, Roseville,
California, before me, Ruth E. Diederich, a Certified
Shorthand Reporter in the State of California, there
personally appeared

            ROLAND SORIANO,

called as a witness by the defendants in the
above-entitled action, who, having been duly sworn by me
to tell the truth, the whole truth, and nothing but the
truth, was examined and testified as follows:

            ---o0o---

        EXAMINATION BY MR. HANSEN

    Q.   Good morning.  Could you please state your name
for the record.

    A.   My name is Roland Soriano.

    Q.   Okay.  And that is spelled S-o-r-i-a-n-o?

    A.   That is correct.

    Q.   Okay.  Who is your -- are you currently employed
with HP?

    A.   Yes.

    Q.   Okay.  How long have you been employed with

4

**Page 5**

2   A.   Over 25 years.

3   Q.   Okay.  What is your current position?

4   A.   I'm the channel and parts business center

5 operations manager.

6   Q.   That's a mouthful.

7   A.   Yes.

8   Q.   How long have you been in that position?

9   A.   I would say over six years.

10   Q.   So from 2004, if I use that as a time reference,

11 you have been in this position since then?

12   A.   That is correct.

13   Q.   Okay.  Can you give me a thumbnail sketch of

14 kind of your history of jobs you have had at HP?

15   A.   Let's see.  I started back in the seventies, '75

16 time frame.  I worked in manufacturing most of the time,

17 working in the call center the rest of the time.  Mostly

18 in the operations end.

19   Q.   Okay.  So you started out in manufacturing with

20 HP, and then you said you went over to call centers?

21   A.   Yes.

22   Q.   Roughly what time frame did you make that

23 switch?

24   A.   Let's see.  Nineties.

25   Q.   1990?

**Page 6**

1   A.   Yes.

2   Q.   Okay.  And when you started out with the call

3 center, was that for Hewlett-Packard here in Roseville?

4   A.   That is correct.

5   Q.   I guess, What did you start out doing at the

6 call center in Roseville?

7   A.   I was supervisor.

8   Q.   Over agents that accepted calls?

9   A.   That is correct.

10   Q.   Okay.  And then when you were promoted, I guess,

11 from supervisor, where did you go to?

12   A.   Then I went to Santa Rosa back in manufacturing.

13   Q.   And how long were you back in Santa Rosa?

14   A.   Eighteen months.

15   Q.   Okay.  When did you return back to Roseville?

16       Did you return back to Roseville next?

17   A.   That is correct.

18   Q.   Okay.  Roughly when?

19   A.   Let's see.  I would say right around '92, '93.

20   Q.   And have you been here since?

21   A.   Yes.

22   Q.   When you came back to Roseville in '92, '93,

23 what position did you have?

24   A.   I was responsible for the channel business,

25 supporting the channel business.

**Page 7**

1   Q.   Before we go any further, let's get on the same

2 page as to what we're talking about here.

3       When you say "channel business," what do you

4 mean?

5   A.   These are our -- what we call the authorized

6 service providers that repair our equipment or our

7 products in warranty.

8   Q.   Okay.  Hold on a second.  Authorized service

9 providers that repair product in warranty?

10   A.   Right.  On HP's behalf.

11   Q.   Is that the same moniker as APR?

12   A.   No.

13   Q.   Okay.  Those are authorized parts resellers?

14   A.   That is correct.

15   Q.   Are they part of the channel business?

16   A.   We call them the channel parts reseller.

17   Q.   Where does the repair -- let's start there -- of

18 product out of warranty come from?

19   A.   Well, our authorized service provider can do

20 repair for HP for out of warranty as well.

21   Q.   Okay.  So it's not limited?

22   A.   It's not limited.

23   Q.   Do the authorized parts reseller -- resellers --

24 sorry -- also sell third-party parts?

25   A.   Yes.

**Page 8**

1   Q.   Is that the same as multi-vendor parts?

2   A.   That is correct.

3   Q.   Are authorized parts resellers under contract

4 with Hewlett-Packard?

5   A.   Yes.

6   Q.   To become an APR -- I'm just going to refer to

7 it as that -- is there a process to receive that

8 authorization?

9   A.   Uh-huh.  Yes.

10   Q.   Okay.  What is that process?

11   A.   They have to meet -- they file an application.

12   Q.   Okay.  And then go through some sort of

13 application review process?

14   A.   Yes.

15   Q.   Do you or a number of individuals in your group

16 have the authority to approve that authorization?

17   A.   No.

18   Q.   Okay.  If I refer to the entity known as MITG --

19   A.   Uh-huh.

20   Q.   -- are you familiar with that --

21   A.   Yes.

22   Q.   -- name?

23       Okay.  Were they an APR, authorized parts

24 reseller?

25   A.   I don't know.

```
 2   right language here -- was categorized, I'll say, as a
 3   channel business, or were they a parts business, or is
 4   there a difference?
 5      A.   So can you ask me the question again?
 6      Q.   Sure.  MITG, I think we can agree, they were not
 7   repairing product; correct?
 8      A.   That's what I know, yes.
 9      Q.   That's all I'm here to find out, what you know,
10   so --
11           Were they an authorized parts reseller?
12      A.   I don't believe so.
13      Q.   Okay.  If you are not an authorized parts
14   reseller or an authorized service provider, what
15   business group do you -- well, strike that.
16           If you are not an authorized parts reseller or
17   an authorized service provider, can you be categorized
18   under the channel business?
19      A.   No.
20      Q.   Okay.  So if I'm an entity that is taking calls
21   and filling orders under an agreement I have with HP for
22   parts, is that what's called the parts business center
23   operations?
24      A.   It depends on -- on what the responsibility --
25      Q.   Was the -- as the manager of the channel and
                                                          9
```

```
 1      A.   Yes.
 2      Q.   Okay.  Give me a brief background how.
 3      A.   Some of the programs that I used to manage has
 4   been moved to other group -- or other managers.  The
 5   responsibility is more focused than being broad.
 6      Q.   Okay.  Your focus has narrowed?
 7      A.   Yes.
 8      Q.   Was that -- strike that.
 9           Okay.  And then you said you have been here
10   since '92, '93, here in Roseville; is that correct?
11      A.   That's correct.
12      Q.   Who do you report to?
13      A.   Today?
14      Q.   Yes.
15      A.   I report to Jim Dupree.
16      Q.   Okay.  How about -- let's go back to 2000.  Is
17   it still Jim Dupree?
18      A.   No.
19      Q.   Okay.  Who did you report to from, let's say,
20   2002 up to 2004?
21      A.   Randy Wagner.
22      Q.   Okay.  When did the change take place that you
23   reported to Jim Dupree?
24      A.   I believe it was last year.
25      Q.   Last year?
                                                         11
```

```
 1   parts business center operations, did MITG fall under
 2   your umbrella?
 3      A.   My understanding is that they may have the same
 4   business model as my operation.
 5      Q.   Okay.  What do you mean by "the same business
 6   model"?
 7      A.   My understanding is that they have a call
 8   center, and they also have a website.  Their parts are
 9   multi-vendor and ours are strictly HP.
10      Q.   When you say the same business model, Roseville
11   has a call center and HP has a website?  Is that what
12   you are talking about?
13      A.   HP has a call center and HP has a website for
14   parts sales.
15      Q.   Okay.  Going back, we were talking about you
16   came back to Roseville in '92, '93.  You were
17   responsible for supporting the channel business.  Was it
18   solely the channel business at that time?
19      A.   The scope of my job is specific to that customer
20   assignment, yeah, channel.
21      Q.   And is that the same as it is now?
22      A.   It's a combination of both now.
23      Q.   Okay.  When you came back in '92 or '93, has
24   your -- maybe your titles changed, but have your duties
25   and responsibilities changed in general?
                                                         10
```

```
 1           We're going to go over some exhibits that I've
 2   marked previously from other depositions.
 3      A.   Excuse me.  It was this -- no.  Last year.
 4   Today is 2005, so it's last year.
 5      Q.   Okay.  I'm not trying to trick you.
 6           Okay.  I am going to hand you an exhibit that
 7   was marked yesterday at Mr. Chizek's deposition as
 8   Exhibit LL.  And why don't you go ahead and take a look
 9   at that document, and I'll ask you some questions about
10   it.
11      A.   Okay.
12      Q.   Okay.  This is a document -- my name is on here
13   only because this was sent to me by your counsel in an
14   e-mail form, and I printed it out.  It's part of a group
15   of e-mails that was sent regarding a document
16   production.  So what I want to focus on, though, is the
17   upper e-mail is from Mr. Chizek to Troy Bloomquist dated
18   October 23, 2002, and you are cc'd on that; correct?
19      A.   Uh-huh.
20      Q.   Is that a yes?
21      A.   Yes.  Yes.  I'm sorry.
22      Q.   That's okay.
23           Have you ever had your deposition taken before?
24      A.   No.
25      Q.   Okay.  I'm sure you have been told some basic
                                                         12
```

**Page 13**

1 background information. You have to answer out loud.

2    A.   Yes, I was told.

3    Q.   Okay. And if you don't understand my question,

4 ask me to rephrase it. Also, it's important that you

5 try and allow me to finish my question before you

6 answer, and I'll do the same, because it's very hard for

7 Ruth to get down two people talking at the same time.

8    A.   Will do.

9    Q.   Okay. And do you recall receiving this e-mail?

10    A.   Yes.

11    Q.   Okay. And apparently, it was in response to an

12 e-mail Mr. Bloomquist sent to Mr. Chizek the day before

13 regarding the HP Direct organization and the

14 multi-vendor spare parts procurement program. And was

15 it your understanding Mr. Chizek was responding to

16 Mr. Bloomquist's request to assist with calls as the

17 multi-vendor HP Direct was below the daily contracted

18 minimum?

19    A.   Yes.

20    Q.   Okay. And was this in relation to the Andover

21 call center?

22    A.   I believe so.

23    Q.   Okay. And did you have any input into this

24 response, or were you just carbon copied on it?

25    A.   I was just cc'd on it.

**Page 14**

1    Q.   Was it because you were the channel and parts

2 business center operations manager?

3    A.   That is correct.

4    Q.   It says -- Mr. Chizek's e-mail back to

5 Mr. Bloomquist says, "Yes, Andover call volumes are

6 higher than anticipated."

7       By way of background, can you tell me what type

8 of call center was Andover?

9    A.   It's a call center that answers through customer

10 calls who are inquiring about parts.

11    Q.   Okay. Were they a multi-vendor spare parts

12 provider?

13    A.   That, I am not aware. I'm not sure.

14    Q.   Okay. You don't know one way or another?

15    A.   I don't know one way or another.

16    Q.   Do you know if they were providing both Compaq

17 and HP parts, or were they just pre-merger Compaq parts?

18    A.   I believe what I know is they're just Compaq,

19 and I also understand they also do other parts.

20    Q.   Such as what?

21    A.   Dec.

22    Q.   D-e-c?

23    A.   Yeah.

24    Q.   Okay. If they're doing that, would that be

25 considered a multi-vendor spare parts?

**Page 15**

1    A.   I don't think so, because Compaq -- Compaq and

2 Dec were together.

3    Q.   Okay. Well, do you know if they were ever

4 providing HP parts?

5    A.   That, I don't know.

6    Q.   Okay. It says, "The good news is that the

7 increase is related to the launch of the Spare Store

8 website at compaq.com, and parts order volume logged

9 on-line have also increased."

10       Do you know who launched that website?

11    A.   It's Compaq.

12    Q.   Okay. And it was for ordering of spare parts?

13    A.   That's correct.

14    Q.   Was it for, obviously, Compaq spare parts?

15    A.   Uh-huh.

16    Q.   Is that a yes?

17    A.   Yes.

18    Q.   Okay. Was it also for -- do you know if it was

19 for multi-vendor spare parts?

20    A.   No, I don't know that.

21    Q.   Okay. Mr. Chizek then goes on to say, "Our

22 integration team is working with us to determine the

23 appropriate course of action."

24       Were you on the integration team?

25    A.   I was not on the integration team.

**Page 16**

1    Q.   Okay. Were you involved in communications,

2 though, on how to possibly redirect some of the call

3 volume that Andover was experiencing?

4    A.   My concern is customer experience, and the

5 team -- the integration team were commissioned to make

6 sure they do the right thing for the customer.

7    Q.   Okay. Did that involve your input, since you

8 were concerned with customer experience?

9    A.   Sometimes.

10    Q.   Okay. How about specific to Andover?

11    A.   Specific to Andover in what way?

12    Q.   Well, we'll get to it in a second.

13       I'm not trying to trip you up here, sir, but you

14 were involved in various communications in Chizek KK,

15 were you not? For instance, on the first page, MITG 82,

16 that's your name on an e-mail dated Friday, November 1,

17 2002, which is about a week after Chizek LL, in regards

18 to redirecting Andover call volume to HP Direct in

19 Hannibal, Missouri.

20       Do you see that? Take the time to read it if

21 you need to.

22    A.   Okay. Now I recall.

23    Q.   I will ask my question again.

24    A.   Okay.

25    Q.   So were you part -- you told me you weren't part

1  of the integration team with regards to Andover.

2     A.   I was part of providing the resources on the

3  integration team.

4     Q.   Okay.  So you had input as far as -- well,

5  strike that.

6          Did you have input as far as where the excess

7  call volume being experienced at Andover was going to be

8  redirected?

9     A.   Yes.  I provided options.

10    Q.   And one of those options was HP Direct?

11    A.   That is correct.

12    Q.   And was it your understanding back in October of

13 2002, that the Andover call center, which was providing

14 pre-merger Compaq parts, was going to be integrated to

15 Roseville?

16    A.   Was I part of the decision-making?

17    Q.   No.

18    A.   Can you repeat the question, please?

19    Q.   Was it your understanding that Andover -- the

20 Andover call center was going to be integrated to

21 Roseville?

22    A.   Yes.

23    Q.   Okay.  And you told me you weren't part of the

24 team that was involved in the actual integration, but

25 you provided resource options for them?

                                                    17

1     A.   Right.

2     Q.   Okay.  Now, going, then, to Chizek KK -- and I

3  will tell you, this string reads from back to front, so

4  I'm going to start with MITG 85 and work my way forward.

5  So feel free to go ahead and review those e-mails.

6          Have you had a chance to look that over?

7     A.   Yes.

8     Q.   Okay.  Let's start at MITG 85.  That's an e-mail

9  dated Wednesday, October 30, 2002, from Diane Pound, on

10 which you were carbon copied; is that correct?

11    A.   Uh-huh.  Yes.

12    Q.   And under the subject line, is that the 800 call

13 number for Andover?

14    A.   I -- I'm not sure.

15    Q.   Okay.  Do you know Diane Pound?

16    A.   Yes, I do.

17    Q.   Okay.  Who is she?

18    A.   She is the manager for the call center in

19 Andover.

20    Q.   Okay.  It says, "Louise, I was hoping we could

21 do something" -- and "NOW" is in all caps.  "Based on

22 the increase in volume, we are losing almost 500 calls

23 per day, and customers are not happy with the long wait

24 time."

25          Do you know if that was 500 calls for spare

                                                    18

1  parts orders per day?

2     A.   I don't know.

3     Q.   Okay.  She then asks in the second paragraph if

4  Roseville could handle a thousand calls per day starting

5  on November 18th.  Do you see that in the second

6  paragraph?

7     A.   Yes.

8     Q.   Do you know whether Roseville was going to start

9  handling calls that were previously sent to Andover?

10    A.   Say that again, please.

11    Q.   Do you know when Roseville was going to begin

12 handling calls that had previously been sent to Andover?

13    A.   No.

14    Q.   Okay.  Mr. Chizek testified yesterday that he

15 believed the integration of that was going to be

16 sometime around this November 18th date referenced in

17 this e-mail.  Do you know if that is about the same time

18 frame?

19    A.   It's about the same time frame.

20    Q.   Okay.  And did Roseville, in November of 2002,

21 have the capacity then to take the pre-merger Compaq

22 calls that were previously being sent to Andover?

23    A.   I can't remember if there was enough capacity.

24 My recollection is that we may not have the capacity.

25    Q.   Okay.  In the last paragraph -- second-to-the-

                                                    19

1  last paragraph, she mentions that she left Richard a

2  voice message regarding a Plan B.  Were you involved in

3  whatever Plan A was?

4     A.   I can't remember what Plan A was.  I can't

5  remember what the Plan A -- there were so many options

6  that we were looking at.

7     Q.   Okay.  Was MITG one of those options?

8     A.   One of the options was MITG.

9     Q.   Okay.  And if you go to the e-mail -- well,

10 before I get to the next e-mail, and based on some of

11 your e-mails here, MITG was one of those options,

12 because they did have the capacity; is that correct?

13    A.   Troy Bloomquist called me and said that, "If you

14 do have any capacity issue, we can help."

15    Q.   Okay.  And was it your understand that MITG

16 could also fill the -- the parts orders that were being

17 sent to Andover?

18    A.   All I know is they can help answer the customer

19 calls.

20    Q.   Okay.  Which may include filling parts orders?

21    A.   It may.

22    Q.   Okay.

23    A.   And I am talking to Troy.  I am not talking to

24 MITG.

25    Q.   I understand that.

                                                    20

2      Q.   Have you ever talked to anyone at MITG?
3      A.   No.
4      Q.   All your conversations were with
5  Troy Bloomquist?
6      A.   That is correct.
7      Q.   Was it your understanding at the time in which
8  your conversations with him were taking place, he was
9  the manager of the MITG --
10     A.   Yes.
11     Q.   -- group?
12     A.   Yes.
13     Q.   Okay.  Troy Bloomquist --
14     A.   Well, let -- I didn't know about MITG.  All I
15  know is Troy was managing the call center.
16     Q.   Okay.  Which you knew as HP Direct?
17     A.   Yes.
18     Q.   At some point in time, you were made aware
19  HP Direct was MITG?
20          MS. CARROLL:  Objection; vague, assumes facts
21  not in evidence.
22     Q.   BY MR. HANSEN:  You can answer.
23     A.   No.
24     Q.   Okay.  Well, are you aware of any other call
25  center that was referenced as HP Direct in Hannibal,

                                                        21

1  Missouri?
2      A.   My understanding was they were Compaq Direct.
3      Q.   Okay.
4      A.   Then after the merger, they were HP Direct.
5      Q.   Okay.
6      A.   We were called HP Direct, as well, so that's --
7  so I don't -- it was more of a naming.
8      Q.   How about if we just refer to Troy Bloomquist in
9  that group.
10     A.   Okay.
11     Q.   Okay.  Go in the e-mail, then, above
12  Ms. Pound's, where Janet -- or, excuse me --
13  Louise Meyerfeld responds to her on that same date where
14  she informs Diane on MITG 84 that, "We are taking this
15  in two steps.  Transitioning the non Presario calls
16  will happen on 11/18.  Mr. Chizek told me yesterday
17  non Presario calls are the spare parts calls."  Is that
18  correct, do you know?
19     A.   Non Presario calls are not spare parts calls?
20     Q.   Okay.  What are they?
21     A.   No.  Is that the question?
22     Q.   Oh, no.  I was informed yesterday that
23  non Presario calls were Compaq spares business, the
24  spare parts calls.
25     A.   Uh-huh.

                                                        22

1      Q.   Is that correct, as opposed to --
2      A.   Presario is Compaq.
3      Q.   Okay.  What is non Presario calls?  Multi-vendor
4  spare part calls?
5      A.   Could be.
6      Q.   Okay.  Do you know as you sit here?
7      A.   Non Presario calls, I don't know if those are
8  parts calls.  They're not -- I don't know if they're
9  spare parts calls.
10     Q.   Okay.  Well, I guess as of 11/18, this e-mail
11  references that the non Presario calls were going to be
12  transitioned to Roseville beginning on 11/18.  What was
13  your understanding as to what types of calls those --
14  this was referencing?
15     A.   It could be order status calls, it could be
16  technical support calls.
17     Q.   Okay.  Whatever they were, it was --
18     A.   It would be parts identification calls.
19     Q.   Okay.  How is that different, then as far
20  as -- the next paragraph says, "As far as the Presario
21  calls, the call center is not staffed appropriately to
22  take on any more than the 400 to 500 discussed.  We need
23  to understand that piece of the business to determine
24  what is needed to transition it, if that is decided what
25  we want to do.  The decision has not been finalized yet

                                                        23

1  as to where the Presario business should fall."
2          What is your understanding of what the Presario
3  business was?
4      A.   So Presario is a product name.  Presario is a --
5  a PC name, so there's a lot of parts associated with
6  Presario, a lot of software as well.  So Presario
7  business is -- can be a lot of things.  It could be
8  technical support for Presario, it could be spare parts
9  for Presario, it could be software application for
10  Presario.
11     Q.   And all calls not relating to Presario, that
12  product line, were going to be transitioned to Roseville
13  on 11/18?
14     A.   Okay.
15     Q.   No.  I'm asking you, based on this e-mail, is
16  that what you --
17     A.   Yes.
18     Q.   -- were under the understanding of?
19     A.   Yes.
20     Q.   Okay.  And the decision had not been made as to
21  what was going to be done with the Presario product line
22  in and of itself?
23     A.   That is correct.
24     Q.   Okay.  But as she references, apparently the
25  only decision that had been made is that it was going to

                                                        24

**Page 25**

```
2      A.   Yes.
3      Q.   Okay.  And then apparently, Roland -- she asked
4  you to do some specific things.  Do you see that?
5      A.   Uh-huh.
6      Q.   Is that a yes?
7      A.   Yes.  Yes.
8      Q.   Okay.  It says, "Can you please work with the
9  appropriate folks to understand the delay in turning
10  these calls away from the Andover call center?"  And
11  then she references referring them to outside vendors
12  and putting an option to take some of the pressure off
13  Andover.
14           What -- did you do anything to follow up on this
15  e-mail that she sent you?
16      A.   My recollection is that I did talk to
17  Richard Chizek, my vendor relationship manager.
18      Q.   Okay.  And what did you talk to Richard about?
19      A.   "Fix this problem."
20      Q.   Okay.  And what were the options that you came
21  up with after that conversation?
22      A.   Well, one of the -- one of the conversations was
23  to -- you know, to talk to Troy, because they're
24  offering help.
25      Q.   Okay.
```

**Page 26**

```
1      A.   That's one option.
2      Q.   Tell me what the other -- what other options
3  there were that you recall?
4      A.   Is for us to take it into Roseville.
5      Q.   So besides Roseville and sending them to Troy's
6  group, were there any other options discussed?
7      A.   No.
8      Q.   Okay.  And then the e-mail above this on 84 is
9  from Janet Peterson to Nikhil Behl.  Do you know
10  Nikhil Behl, or who that is?
11      A.   No.
12      Q.   Okay.  But you are cc'd on the e-mail; right?
13      A.   Yes.
14      Q.   And apparently, Janet was a little upset as to
15  situations still being completely out of control.
16  Customers were screaming at Ms. Pound's people.  So
17  you -- you then, I guess, respond to Ms. Behl in the
18  e-mail right above that on MITG 83.  Do you see that?
19      A.   This one here?  Yes.
20      Q.   Right below -- right here.  That's an e-mail
21  from you to Ms. Behl dated October 30, 2002?
22      A.   Yes.
23      Q.   Okay.  And you indicate you have been talking to
24  Troy Bloomquist of the HP Direct call center in
25  Hannibal, Missouri, about helping you out?
```

**Page 27**

```
1      A.   Uh-huh.  Yes.
2      Q.   Okay.  And you indicate the call center --
3           And I take it you mean the HP Direct call
4  center?
5      A.   Yes.
6      Q.   Okay.
7           -- has the capacity and can take care of these
8  customers.  At this point, you strongly suggest "we take
9  this option and make it happen," and that you were --
10  you were going to take action to redirect those calls to
11  the HP Direct site.  Do you see that?
12      A.   Yes.
13      Q.   So at this point in time, on October 30, 2002,
14  had you and Richard come to a decision to send those --
15  or redirect those calls to HP Direct from Andover?
16      A.   I mentioned to them in this letter that -- or
17  the e-mail to work together to prepare to redirect the
18  calls to Andover -- to HP Direct.
19      Q.   Okay.  So that was the option you were going to
20  go with?
21      A.   That was the option that -- if we can't solve it
22  in Roseville.
23      Q.   Well, I -- okay.  But my -- my question to you
24  is this:  You specifically state, "I will take action to
25  redirect calls to HP Direct."  You then charge Richard,
```

**Page 28**

```
1  Diane and Troy to work together to be prepared to
2  redirect those calls.
3      A.   Yes.
4      Q.   So as of October 30, 2002, was the option you
5  were selecting, then, to redirect the calls from Andover
6  to HP Direct?
7      A.   At that time, yes.
8      Q.   Okay.  And then Ms. Peterson, up at the top of
9  MITG 83, indicates to you, "Thanks," she hopes it works;
10  correct?
11      A.   Uh-huh.  Yes.
12      Q.   Okay.  And then you get to MITG 82.  In the
13  middle of the page there, you see your e-mail
14  November 1, 2002, to Janet and Nikhil?
15      A.   Yes.
16      Q.   Okay.  Apparently, there were some telecom
17  issues that needed to be resolved at Andover; is that
18  correct?
19      A.   Yes.
20      Q.   Okay.  And it appears to resolve the telecom
21  issues.  You had ordered an additional T1 phone line,
22  I'll call it, to be installed at the end of the next
23  week to -- to resolve the telecom problem at Andover; is
24  that correct?
25      A.   That is correct.
```

**Page 29**

2  installed?

3  A.  I did not order that personally.  I made --

4  Q.  Okay.

5  A.  -- direction to order it.

6  Q.  Okay.  All right.  Do you know if it was

7  installed?

8  A.  I can't remember.  I think so.

9  Q.  Okay.  Do you know if any of these calls from

10  Andover were, in fact, redirected to HP Direct in

11  Hannibal, Missouri?

12  A.  That was my assumption.

13  Q.  Okay.  At some point in time, did the

14  integration of Andover take place to Roseville?

15  A.  Yes.

16  Q.  Okay.  And do you know, was that in November of

17  2002?

18  A.  I believe that was about that time.

19  Q.  Okay.  Do you recall if, in fact -- well,

20  yesterday, Mr. Chizek testified that those calls

21  referenced in Chizek KK were not redirected to MITG, and

22  that they were redirected to Roseville after Roseville

23  added more staff and put their migration on a faster

24  track.  Do you recall that taking place?

25  A.  What I recall was the customer issue was

**Page 30**

1  resolved.  Roseville was -- like I mentioned, was the

2  other option.  I was not informed that they were

3  staffing Roseville at that time, so the recommendation I

4  made was from the help of Troy.

5  Q.  Okay.  Can you tell me one way or the other

6  whether calls were actually ever sent to the MITG

7  HP Direct call center in Hannibal, Missouri?

8  A.  That, I cannot recall.

9  Q.  Okay.  Was Andover eventually closed down, or is

10  it still ongoing?

11  A.  They are closed down.

12  Q.  Okay.  Do you know when that happened?

13  A.  Shortly after the transition.

14  Q.  Migrating them to Roseville?

15  A.  That's correct.

16  Q.  Did anyone ever tell you that MITG could not

17  handle the capacity of the Andover volume?

18  A.  No.

19  Q.  Did anyone ever tell you that MITG could not

20  fill the order requests such as those that were being

21  placed at Andover?

22  A.  No.

23  Q.  Okay.  I'm going to -- well, before I get to

24  that, were you ever involved in the decision-making

25  process after you made your option recommendation on why

**Page 31**

1  the calls were not forwarded to the HP Direct call

2  center in Hannibal?

3  A.  I was consulted.

4  Q.  Okay.  Why was the decision made to redirect the

5  Andover calls to Roseville, as opposed to the option you

6  recommended, which was the call center in Hannibal,

7  Missouri?

8  A.  My concern is to resolve the customer issue,

9  making sure that the customers who are calling are being

10  answered.

11  Q.  Okay.  My question is, Why specifically were the

12  Andover calls sent to Roseville when you had recommended

13  the option of sending them to the call center in

14  Hannibal, Missouri?

15  A.  Because that was the one -- the first option.

16  Q.  Okay.  But did somebody specifically tell you

17  why it was decided to send them to Roseville, as opposed

18  to the call center in Hannibal, Missouri?

19  A.  As I recall, yes, that we do have the staffing

20  available.

21  Q.  And did anyone tell you that they wanted to keep

22  the calls here at Roseville so that all revenue from any

23  of those parts or sales calls would go to HP as opposed

24  to the call center in Hannibal, Missouri?

25  MS. CARROLL:  Object to that as vague.

**Page 32**

1  THE WITNESS:  My primary concern is the

2  customer --

3  Q.  BY MR. HANSEN:  Okay.

4  A.  -- experience.

5  Q.  Are you involved in decisions that affect the

6  bottom line profit?

7  A.  From a cost perspective.

8  Q.  Okay.  Were you involved in any decisions

9  regarding the revenue that HP could generate from the

10  Andover calls, as opposed to referring that elsewhere?

11  A.  State that again, please.

12  Q.  Were you involved in any of the decision or

13  discussion as to routing the Andover calls to Roseville,

14  as opposed to forwarding that revenue to another entity

15  such as the call center in Hannibal, Missouri?

16  A.  Yes.

17  Q.  Okay.  And what were those discussions on how

18  that would affect revenues and profits at HP, as opposed

19  to sending that out to the call center in Hannibal?

20  A.  Well, the discussion was involving making sure

21  that we have enough capacity to handle the customer

22  calls.

23  Q.  Okay.  And I take it that it was determined you

24  had the capacity?

25  A.  Yes.

1   Q.   Okay.  And the discussions then focused on you
2   had the capacity to handle the calls, and, therefore,
3   could keep all that revenue in-house, as opposed to
4   sending it to Hannibal, Missouri?
5        A.   It's more of cost leveraging.
6        Q.   How so?
7        A.   We have the call center agents that can take the
8   same calls in Roseville without additional head count to
9   be added.
10       Q.   Okay.  Well, from your e-mail in MITG 82, which
11  is KK, HP Direct at Hannibal, Missouri, had the head
12  count too.  So how was the decision made if they also
13  had the capacity to handle those calls to ultimately
14  keep them here at Roseville and not send them to
15  Hannibal?
16       MS. CARROLL:  Object to that as vague and
17  misleading.
18       THE WITNESS:  I don't know.
19       Q.   BY MR. HANSEN:  Let me ask it a different way.
20  If MITG has the -- sorry.  If HP Direct in Hannibal,
21  Missouri, has the call center capacity, the head count
22  and the ability as referenced in your e-mail there at
23  Chizek KK to handle the volumes from Andover, and
24  Roseville has the same capacity, staffing and head count
25  to do the same thing, what was the factor that led to

                                                    33

1   the decision, if you know, or multiple factors, to send
2   them to Roseville, as opposed to giving them to the call
3   center in Hannibal, Missouri?
4        MS. CARROLL:  I am still going to object to that
5   as misleading.
6        Go ahead.
7        THE WITNESS:  It's -- we wanted to have the
8   parts sales center in Roseville to consolidate the call
9   centers.
10       Q.   BY MR. HANSEN:  Okay.  So to consolidate them
11  all into one primary location?
12       A.   That's correct.
13       Q.   Okay.  And that would then mean, I take it, that
14  at the time of that e-mail on October 2002, HP, were
15  they taking and filling pre-merger Compaq parts orders?
16       A.   Prior -- state that again, please.
17       Q.   In October 2002, if you were going to
18  consolidate call centers into one primary location, and
19  Andover was only selling pre merger Compaq parts, I take
20  it HP had the capacity and was filling pre-merger Compaq
21  parts orders?
22       A.   Yes.
23       Q.   Okay.  Do you know what types of parts orders
24  the call center in Hannibal, Missouri, was filling?
25       A.   No.

                                                    34

1        Q.   Okay.  Do you know if they were also taking and
2   filling pre-merger Compaq parts orders?
3        A.   Don't know that.
4        Q.   Okay.  Have you ever reviewed the agreement
5   between HP Direct and the entity which is MITG?
6        A.   No.
7        Q.   Okay.  I am going to hand you what is Chizek NN
8   from yesterday, and, actually, I'm probably going to ask
9   you some questions about that e-mail dated January 16 of
10  2004 from Mr. Chizek to --
11       Are you a recipient on that?  Yes, you are.
12       A.   Yes.
13       Q.   Okay.  And that is regarding the HP Direct
14  migration plan?
15       A.   Yes.
16       Q.   Okay.  And go to the -- go to the very last
17  paragraph there, and go ahead and read that for a second
18  before I ask you some questions about it.
19       A.   Okay.
20       Q.   Okay.  As of January 16, 2004, did that e-mail
21  from Mr. Chizek instruct that all parts business center
22  operation agents should be directed to stop referring
23  any parts inquiries to the HP Direct number immediately?
24       A.   That's correct.
25       Q.   Okay.  Were the PBCO agents individuals that

                                                    35

1   fell under your command, I'll call it?  Are they in your
2   group?
3        A.   Indirectly.
4        Q.   Okay.  Did you issue an e-mail bulletin,
5   memorandum, to the PBCO agents instructing them to stop
6   referring any parts inquiries to the HP Direct number
7   immediately pursuant to Mr. Chizek's e-mail?
8        A.   No, not that I recall.
9        Q.   Okay.  Do you know if he did?
10       A.   I don't know that.
11       Q.   Okay.  Do you know if that was communicated to
12  the PBCO agents?
13       A.   That, I don't know either.
14       Q.   Okay.  It then says, "Remove the referral number
15  from phone lists."
16       Do you see the sentence I read there?
17       A.   Yes.
18       Q.   Okay.  And did you understand that to be the
19  HP Direct phone number?
20       A.   That is correct.
21       Q.   Okay.  And when I say "the HP Direct," in this
22  occasion, do you understand I mean the one at Hannibal,
23  Missouri?
24       A.   Yes.
25       Q.   Okay.  And did you see to it that all phone

                                                    36

2    A.    No.

3    Q.    Okay.  Who would have done that?

4    A.    That would be Richard.

5    Q.    Okay.  It then says, "Note that PBCO is also

6    driving traffic to HP Direct."

7          Is that sentence referencing, if you know --

8    well, strike that.  I am not going to --

9          It then says, "Address all parts inquiries and

10   submit orders for any available pmCompaq -- pre-merger

11   Compaq or HP parts here."

12         "Here," does that mean Roseville?

13   A.    Yes.

14   Q.    Okay.  So as of January 16th, 2004, were all

15   parts inquiries and orders then submitted to Roseville?

16   A.    That, I'm not sure.

17   Q.    Okay.  Well, this is what Mr. Chizek is

18   instructing the PBCO agents to do, is it not?

19   A.    Yes.

20   Q.    Okay.  And the PBCO agents, are those all the

21   people that are answering the calls at the Roseville

22   call center?

23   A.    Yes.

24   Q.    Okay.  It then says, "Use the www.hp.com

25   referral tools and internal support sites to research

                                                    37

1    support options for products and parts not available via

2    PBCO."  Is that the HP website?

3    A.    Yes.

4    Q.    Okay.  And when he references parts not

5    available via PBCO, is that multi-vendor third-party

6    parts?

7    A.    No.

8    Q.    Okay.  What is that?

9    A.    HP parts, HP Compaq parts.

10   Q.    Okay.  It then says, "Also refer inquiries for

11   unavailable parts or non HP parts issues to HP

12   authorized parts resellers."

13         Are those the channel individuals you discussed

14   earlier?

15   A.    Yes.

16   Q.    Okay.  Would you agree that Mr. Chizek here is

17   instructing the PBCO agents to no longer refer any calls

18   or parts orders or inquiries to the HP Direct folks in

19   Hannibal, Missouri?

20   A.    Based on what I read in here, yes.

21   Q.    Do you know if the agreement between HP and MITG

22   was still in place and effective as of January 16, 2004?

23   A.    That, I am not aware of.

24   Q.    Okay.  Did you take any action after receiving

25   this e-mail from Mr. Check to instruct the individuals

                                                    38

1    that fall within your group to follow those instructions

2    from Mr. Chizek?

3    A.    No.

4    Q.    You were one of the recipients; correct?

5    A.    Yes.

6    Q.    Is that because you're the PBCO manager?

7    A.    Yes.

8    Q.    How would this have been distributed or passed

9    on to the PBCO agents?

10   A.    It was sent to an individual named

11   Lauri Vagadori, who is the PBCO agent manager.

12   Q.    Okay.  So she's kind of -- for simplicity's

13   sake, if I have the PBCO agents here, Ms. Vagadori would

14   be directly over them, and then you're on top of her?

15   That sounds terrible.  But you're above her in the

16   chain?  Sorry.

17   A.    Lauri interfaced with our vendor and

18   relationship manager, which is Richard Chizek.  I work

19   directly with Richard and --

20   Q.    Ms. Vagadori directly relates and communicates

21   to the PBCO agents which she manages?

22   A.    That is correct.

23   Q.    Are you familiar with the Vista system?

24   A.    I have heard about it.  No, I'm not familiar

25   with it.

                                                    39

1    Q.    Okay.  Do you know if it's in place and being

2    used here in Roseville?

3    A.    For some customers, yes.

4    Q.    Okay.  What customers?

5    A.    I -- I don't know who the customers are, but --

6    Q.    Okay.  Do you know what group they're in?

7    A.    We have customers that place the orders on

8    Vista --

9    Q.    Okay.

10   A.    -- but we access it.

11   Q.    And is that a situation where the customers

12   directly place their orders in Vista via -- are you

13   familiar with an XML interface?

14   A.    I do.

15   Q.    Is that the situation with these customers?

16   A.    I don't know the details.  It could be.

17   Q.    Okay.  Who would know the details?

18         MS. CARROLL:  Objection; calls for speculation.

19         THE WITNESS:  I.T.

20   Q.    BY MR. HANSEN:  I.T.?

21         Okay.  Well, Mr. Chizek yesterday referenced a

22   group called HP inside sales.  Is that here in

23   Roseville?

24   A.    I don't know.  I mean, there's -- they're all

25   over the place.

                                                    40

1    Q.    Okay.  But you have heard of customers placing
2    orders on the Vista system?
3    A.    Yes.
4    Q.    Okay.  And are those orders placed here to
5    Roseville?
6    A.    No.
7    Q.    Okay.  Where are they placed to?
8         MS. CARROLL:  Objection; calls for speculation.
9         THE WITNESS:  I've heard of Vista.  We don't use
10   Vista as an ordering tool.
11   Q.    BY MR. HANSEN:  Okay.  But some customers are
12   using Vista as an ordering tool?
13   A.    That's correct.
14   Q.    Okay.  And as you sit here, can you tell me any
15   of those customers?
16   A.    I can't remember.  It's very few.  I don't know
17   who they are.
18   Q.    Do you know if it's for the -- for their parts
19   ordering?
20   A.    Yes.
21   Q.    I am going to say spare parts ordering.
22   A.    Yes.
23   Q.    Are you involved at all in retrieving those
24   orders or --
25   A.    No.

                                                    41

1    Q.    You have got to let me finish.
2         -- or account information to fill those orders
3    when they come in from these customers using Vista?
4    A.    Not me personally, no.
5    Q.    Okay.  Is your parts and channels business
6    center involved in doing that?
7    A.    Can you rephrase the terminology?
8    Q.    Yeah.  You said you weren't personally involved
9    in pulling and filling those orders.  Who is?  Is your
10   group involved in that?
11   A.    Some -- some of my people do.
12   Q.    Okay.  And are those "some of your people" here
13   in Roseville?
14   A.    Yes.
15   Q.    Okay.  And how is that done?
16   A.    They somehow log into a system, and they pull
17   those orders.
18   Q.    Okay.  And those are orders that are directly
19   placed from the customer into the system?
20        MS. CARROLL:  Okay.  Object to the extent that
21   it calls for speculation.
22        THE WITNESS:  I don't know the details.
23   Q.    BY MR. HANSEN:  Well, you just -- you do know,
24   at least, I guess your people have to log in and pull
25   the parts order; correct?

                                                    42

1    A.    Right.  Uh-huh.
2    Q.    Is that a yes?
3    A.    Yes.
4    Q.    And somehow, that order has to get in that
5    system from the customer; correct?
6    A.    Yes.
7    Q.    Okay.  What I'm getting at is, You don't know
8    what customers do that, or how it's done, but --
9    A.    Yes.
10   Q.    -- but you do know that your people go in and
11   pull those orders, they log into a system and pull those
12   orders?
13   A.    Yes.
14   Q.    Okay.  Which is different than placing an order
15   by way of telephone?
16   A.    Yes.
17   Q.    Okay.  And do the people in your group go in and
18   pull these orders on a daily basis?
19   A.    Yes.
20   Q.    Okay.  And is that information that is
21   documented and kept?
22   A.    As far as I know.
23   Q.    Okay.  So if -- if it is --
24        Is it kept, do you know, on a monthly basis?
25   Yearly basis?  How is it done, if you know?

                                                    43

1    A.    I'm not sure what the -- you know, how the
2    document is kept.
3    Q.    Are you familiar with PBCO metrics?
4    A.    Yes.
5    Q.    Okay.  Is it done in that type of fashion on a
6    spreadsheet?
7    A.    Not that I'm aware of.
8    Q.    Okay.  Do you know the individuals in your group
9    by name who are involved in pulling the Vista orders?
10   A.    I don't know the names, but it's in the call
11   center.
12   Q.    Okay.  Do you know who their manager is?
13   A.    Lauri.
14   Q.    Vagadori?
15   A.    Well, that was before, but the call center
16   manager.
17   Q.    It was Lauri, but she's no longer --
18   A.    She's no longer here.
19   Q.    Okay.  Who is that person now?
20   A.    Shelly Borca.
21   Q.    How do you spell the last name?
22   A.    B-o-r-c-a.
23   Q.    Do you know if the Vista account system was used
24   here in Roseville prior to the integration of the
25   HP Direct call center in February of '04?

                                                    44

1    A.    that -- I'm aware of --

2    Q.    Was it used after February of '04?

3    A.    For some small customers.

4    Q.    Okay.  You said it's still being used today, the

5 Vista system?

6    A.    Per the customer's request, yes.

7    Q.    Do you know when --

8          I mean, you have been here in Roseville since

9 '92 or '93 in a management position.  Prior to 2004, was

10 Roseville using Vista?

11    A.    Not in my group.

12    Q.    Okay.  Do you know if it was used at all at HP

13 prior to February 2004?

14    A.    I know HP's inside sales maybe is using it.

15    Q.    Okay.  Do you know when Vista first went into

16 place here?

17    A.    No.

18    Q.    Do you -- prior to the merger with Compaq, did

19 HP use Vista?

20    A.    That, I don't know.

21    Q.    Okay.  Do you know when your people started on a

22 daily basis logging into Vista to pull these various

23 orders to fill?

24    A.    Yes.

25    Q.    Okay.  When was that?

45

1    A.    Right after the integration.

2    Q.    Of?

3    A.    Of the call center.

4    Q.    Which one?

5    A.    Andover, Troy Bloomquist's call center.

6    Q.    The HP Direct call center?

7    A.    That is correct.

8    Q.    The HP Direct call center in Hannibal, Missouri?

9    A.    Yes.

10    Q.    Okay.  So it was after -- just so I'm clear, it

11 was after the integration of the HP Direct call center

12 from Hannibal, Missouri, that your folks started logging

13 into Vista on a daily basis to fill and place spare

14 parts orders?

15    A.    Yes.

16    Q.    Were you involved in setting up that log-in and

17 using that system, Vista?

18    A.    No.

19    Q.    Okay.  Have you ever done it?

20    A.    No.

21    Q.    Have you ever seen it done?

22    A.    No.

23    Q.    Have you ever seen any reports on how it's done?

24    A.    No.

25    Q.    And, again, just so I'm clear, the individuals

46

1 that log into Vista to pull and fill these spare parts

2 orders are individuals in the call center here in

3 Roseville?

4    A.    Yes.

5    Q.    Okay.  And you may not know their names, but

6 they're the PBCO agents here?

7    A.    Yes.

8    Q.    And the person who would, to the best of your

9 knowledge, know that information as to who that is and

10 how they do it is the manager Shelly Borca, or she would

11 be a good place to start, at least?

12    A.    Yes.

13    Q.    Okay.

14          MS. CARROLL:  Objection; calls for speculation.

15    Q.    BY MR. HANSEN:  I'm going to hand you what's

16 been marked as Chizek Exhibit RR, which is --

17          Before I do that, let me back up.  Were you

18 involved in any of the conversations regarding

19 implementation and use of the Vista system after the

20 integration of the HP Direct call center from Hannibal?

21    A.    No.

22    Q.    Okay.  Chizek RR is an e-mail dated -- what? --

23 January 27, 2004; correct?

24    A.    Yes.

25    Q.    Okay.  And it was from Shari Ellis to numerous

47

1 recipients, of which you were one?

2    A.    Uh-huh.  Yes.

3    Q.    Okay.  And it references a conference call she

4 had with Agilent yesterday, which would have been the

5 day before, January 26, 2004.  Do you see that?

6    A.    Yes.

7    Q.    Okay.  Were you involved in any conference calls

8 or presentations to accounts prior to the integration of

9 HP Direct with Roseville?

10    A.    No.

11    Q.    Okay.  So when she references this conference

12 call with Agilent, you were not part of that?

13    A.    That is correct.

14    Q.    Okay.  I'm going to show you the next --

15          Well, no.  I'm going to ask you about this.

16 This further references that in speaking with Agilent,

17 she asked them to indicate what customized solutions

18 they were receiving from HP Direct.  Do you see that?

19    A.    Uh-huh.  Yes.

20    Q.    Okay.  And do you understand that to be MITG

21 when she references HP Direct?

22    A.    Yes.

23    Q.    Okay.  And was it part of the discussion here,

24 of which you were a part of, addressing those customized

25 solutions from various customers so that the Roseville

48

1  ·A·  Yes.··It's·all·the·same·thing.

2  A.  Yes.

3  Q.  Okay.  Were you involved in determining what

4  were the top HP Direct MITG accounts prior to the

5  integration so those accounts could be targeted and

6  addressed by Roseville?

7  A.  Somewhat.

8  Q.  Okay.  "Somewhat," meaning how?

9  A.  I've seen e-mail messages and the criterias that

10  the team and -- the business team is making the decision

11  on.

12  Q.  Okay.  Let me show you what has been marked as

13  Exhibit PP from yesterday, which is an e-mail on which

14  you were cc'd, dated January 20, 2004, from Louise -- or

15  from Yvonne Cowan to Louise Meyerfeld, whereby it was

16  requested that a list of accounts in the HP Direct trade

17  business that have ordered over $500 in the previous six

18  months be identified.

19  Do you recall receiving that?

20  A.  Yes.

21  Q.  Okay.  And does that attachment there identify

22  the MITG accounts as of January 15, 2004, that had

23  ordered over $500 in the last six months?

24  A.  Yes.

25  Q.  Okay.  Were you, then, part of the group that

49

1  identified the accounts from that list that were going

2  to be approached by HP to address such things as

3  customized solutions?

4  A.  Was -- can you rephrase the question?

5  Q.  Were you part of the group, then, that discussed

6  identifying the top accounts from that aging list to

7  then approach to determine customized solutions and the

8  like?

9  A.  No.

10  Q.  Well, you did have a concern on at least taking

11  care of the top accounts; correct?

12  A.  That's correct.

13  Q.  Okay.  Did you assign an individual to take care

14  of any of the, for instance, top ten accounts from the

15  MITG aging list?

16  A.  Yes.

17  Q.  Who?

18  A.  We have a team of people that are what we call

19  the escalation team responsible for making sure that the

20  top accounts are taken care of.

21  Q.  Okay.  And who was -- who were those individuals

22  in this case?

23  A.  Yolanda Toplinski.

24  Q.  T-o-p-l-i-n-s-k-i?

25  A.  That's correct.

50

1  Q.  Well, it appears that Shari Ellis, at least, was

2  charged with communicating with Agilent; is that

3  correct?  Based on her e-mail.

4  MS. CARROLL:  Objection; misleading, assumes

5  facts not in evidence.

6  Q.  BY MR. HANSEN:  Let me rephrase.  Was Ms. Ellis

7  charged with contacting Agilent?

8  MS. CARROLL:  Same objection.

9  Q.  BY MR. HANSEN:  You can answer.

10  A.  I'm not sure.  I'm --

11  Q.  Okay.  How about DHL, do you remember them being

12  an entity that was discussed and contacted?

13  A.  I cannot recall.

14  Q.  Okay.  Well, let me show you Chizek SS, which is

15  an e-mail regarding -- from Mr. Chizek, Monday,

16  January 12, 2004.  You are carbon copied on it --

17  regarding DHL contacts and order placement; is that

18  correct?

19  A.  Yes.

20  Q.  Okay.  And those various requirements of DHL

21  were attached by Mr. Chizek; is that correct?

22  A.  Yes.

23  Q.  Okay.  And were you involved in the drafting of

24  the HP Direct migration letter that went out to the MITG

25  accounts prior to the integration?

51

1  A.  No.

2  Q.  Okay.  And I'll just ask, In Chizek --

3  Is that OO?

4  A.  Yes.

5  Q.  Okay.

6  -- this reference to the e-mail from Mr. Chizek

7  -- or, excuse me -- e-mail from Chizek to these various

8  folks where he says, "Yvonne" -- and he said yesterday

9  that's, I think, Yvonne Cowan -- to release the

10  announcement ASAP regarding the HP Direct letter.

11  Just so we're clear, you weren't involved in the

12  drafting of that letter?

13  A.  No, I was not.

14  Q.  Okay.  And you weren't involved in comments,

15  edits or revisions to that letter?

16  A.  No.

17  MR. HANSEN:  Okay.  Let's take a break for a

18  second.

19  MS. CARROLL:  Okay.

20  (Recess taken.)

21  MR. HANSEN:  We can go back on.

22  Q.  I am going to quickly go through some of these,

23  and I am standing up not to, believe me, try and be

24  intimidating, but we only have one copy, so I am going

25  to lean over.

52

**Page 53**

```
 1        Okay.
 2        Q.   This is Exhibit Chizek XX from yesterday, which
 3   are documents referenced on here HP produced, and this
 4   is HP S01 and S02 top ten -- I believe it references
 5   accounts.
 6             Do you know what S01 and S02 accounts are?
 7        A.   No.
 8        Q.   Okay.  Are they accounts used here at Roseville,
 9   account numbers?
10        A.   Not that I know of.
11        Q.   Okay.  Do you know if those were the MITG
12   account numbers used in the system?
13        A.   No, I don't know.
14        Q.   Okay.  Do you know or were you involved in
15   preparing or gathering the top ten S01 and S02 accounts?
16        A.   No.
17        Q.   Okay.  So I take it you have no idea what this
18   was prepared for?
19        A.   I don't know.
20        Q.   Okay.  I'm going to show you Chizek YY, which
21   says, "HP billing requirements HPD," and it has some
22   various customers listed there and OS account numbers.
23   Do you see that?
24        A.   Yes.
25        Q.   Okay.  Are those -- just so we're clear again,
```

**Page 54**

```
 1   those are not account numbers used in the system for
 2   Roseville or HP?
 3        A.   Not that I know of.
 4        Q.   Okay.  And then "Customer" has a list of
 5   customer names?
 6        A.   Yes.
 7        Q.   Okay.  And it says, "Post shipment
 8   requirements."  Do you see that?
 9        A.   Yes.
10        Q.   Were those post shipment requirements for those
11   customers for sales of -- fulfillment of parts orders
12   with HP Direct MITG, or is that HP billing requirements?
13             MS. CARROLL:  Objection; calls for speculation.
14             THE WITNESS:  I don't know.
15        Q.   BY MR. HANSEN:  As you look at that customer
16   list, do any of those customers ring a bell as ones that
17   are using the Vista system to place orders?
18        A.   I believe Kaiser is the one I think I know.
19        Q.   Okay.  That you know is using the Vista system
20   that you talked about where your agents log in and pull
21   the orders on a daily basis?
22        A.   Kaiser rings a bell.  I am not sure if it's
23   Vista, but it's a special ordering process.
24        Q.   Any other customers on there?
25        A.   No.
```

**Page 55**

```
 1        Q.   Okay.  At the bottom, it says, "Key points."
 2             Do you know what that is in reference to?
 3        A.   No.
 4        Q.   Okay.  I'm going to hand you Chizek UU, which is
 5   a document, the page name says, "Common Accounts for
 6   HPD" -- I assume it stands for direct parts -- Accounts
 7   List Combined as of 1/5/04.  Would you take a minute to
 8   look at that sheet there.
 9             Have you had a chance to look that over?
10        A.   Yes.
11        Q.   Okay.  And the first left-hand column that says
12   "Osprey CBN" --
13        A.   Uh-huh.  Yes.
14        Q.   -- do you know what that is?
15        A.   It's our customer base number.
16        Q.   In the HP system?
17        A.   Yes.
18        Q.   Okay.  And then if you look at the S or SAP,
19   S-A-P, account number?
20        A.   Yes.
21        Q.   Do you see we have some of those OS accounts on
22   there?
23        A.   Yes.
24        Q.   Okay.  Do you know what that is?
25             Excuse me.  Do you know what those are under
```

**Page 56**

```
 1   that column, the S accounts?
 2        A.   SAP account numbers.
 3        Q.   Okay.  Do you know what this references?  Is
 4   that an HP identifier?
 5        A.   Not that I know of.
 6        Q.   Okay.  Do you know what this means under Osprey
 7   CBN that says "Multiple"?  Does that mean they have
 8   multiple HP accounts?
 9        A.   I believe so.
10        Q.   And under the S or SAP account numbers, you told
11   me already you don't know what the OS stands for.  But
12   how about like this first one here.  I am looking at
13   ADP Dealer Services.  Do you see they have a 13 number
14   there, which is different than the Osprey CBN number?
15   Can you tell me what that account number is for?
16        A.   I don't know what that account number is for.
17        Q.   Okay.  Do you know if it's an HP number?
18        A.   No, I don't know.
19        Q.   Okay.  I'm going to show you now what has been
20   marked Chizek VV, which is HPD --
21             MR. HANSEN:  Does that stand for direct?
22             MS. CARROLL:  HP.
23        Q.   BY MR. HANSEN:  -- HP Direct parts accounts list
24   combined 1/5/04.  It says, "Table S account."
25             Now, I'm going to have you look at this document
```

**Page 57**

```
 1   when was, much Chizek, okay? Do you see the column that
 2   says "Account No."?
 3        A.   Yes.
 4        Q.   Okay.  And we have some on there that have the
 5   13 identifiers and others that have 0S.  Do you see
 6   that?
 7        A.   Yes.
 8        Q.   Okay.  Do you know what this list is?
 9        A.   I've never seen this list before.
10        Q.   Okay.  Do you know if, in fact, this is a list
11   of those accounts that were with HP Direct MITG, which
12   is 0S, and the other ones which are HP, or do you have
13   no knowledge one way or the other?
14        A.   I don't have any knowledge.
15        Q.   Okay.  I'm going to hand you Chizek WW, which is
16   an e-mail to you from Mr. Chizek dated February 9th,
17   '04.  Do you see that?
18        A.   Yes.
19        Q.   Okay.  Do you recall receiving that e-mail
20   regarding these web -- this website reference from
21   Mr. Chizek?
22        A.   Yes.
23        Q.   Did you do anything to follow up on that e-mail?
24        A.   I clicked on the website.
25        Q.   Okay.  Did you see what he was referencing where
57
```

**Page 58**

```
 1   it was referring hp.com, rather than hp.com/buy/parts?
 2        A.   Yes.
 3        Q.   Okay.  Did you have any follow-up with anyone
 4   after you clicked on that website?
 5        A.   Not that I recall.
 6        Q.   Okay.  Did you have any conversations with
 7   Mr. Chizek to figure out what he was referencing when he
 8   says, "Check out that site to see how MITG is
 9   positioning themselves to continue handling Compaq and
10   HP parts orders"?
11        A.   Yes.
12        Q.   You did speak to him?
13        A.   Yes.
14        Q.   Okay.  What was the nature of that conversation?
15        A.   Make sure we do the right thing.
16        Q.   Make sure who does the right thing?
17        A.   You do the right thing.
18        Q.   Me?
19        A.   No.  I mean, Richard.  I was talking to Richard.
20        Q.   Okay.  And make sure -- what did you want to
21   make sure Richard did?  I mean, call MITG?  What?
22        A.   Well, I said, "We should get this changed" --
23        Q.   Okay.
24        A.   -- "so make the right change."
25        Q.   Okay.  Get what changed?  The reference to HP,
58
```

**Page 59**

```
 1   and get it changed to the reference to the buy/parts?
 2        A.   Well, whatever he was referring to here --
 3        Q.   Okay.
 4        A.   -- as I recall.
 5        Q.   Okay.  So you get this e-mail.  You speak to
 6   Mr. Chizek, and you tell him, "Well, we should make sure
 7   we get that changed."  Is that the nature --
 8        A.   So I said, you know, "You make the right
 9   change."
10        Q.   To Richard?
11        A.   To Richard.
12        Q.   Okay.  And --
13        A.   "You do the right thing."
14        Q.   -- and was that the total conversation you had
15   with him about this?
16        A.   As I recall, yes.
17        Q.   Okay.  Did you ever call anyone at MITG?
18        A.   No.
19        Q.   Did you ever follow up with anyone at MITG?
20        A.   No.
21        Q.   Did you forward that e-mail that Mr. Chizek sent
22   you on to anyone else?
23        A.   Not that I recall.
24        Q.   Were you involved with the website issue he
25   references there at any time after February 9, '04, when
59
```

**Page 60**

```
 1   he sent you that e-mail?
 2        A.   Not that I know of.
 3        Q.   Okay.  Did you have any further follow-up with
 4   him to find out if he got it changed?
 5        A.   No.
 6        Q.   Okay.  Do you recall clicking on the website
 7   compaqdirectonline.com?
 8        A.   This website's reference here?
 9        Q.   Yes.  The one he told you to check.  Did you
10   click on and check it?
11        A.   Yes.  I clicked on this -- this -- this site
12   right here.
13        Q.   Okay.  And do you recall the message that
14   referenced hp.com?
15        A.   I can't recall.
16        Q.   Okay.  I'm going to make this real quick, and
17   I'm not going to mark these documents.
18             I'm going to hand you these multi-vendor profit
19   and loss.  Were you involved in any of these
20   calculations?
21        A.   No.
22        Q.   Were you involved in pulling any of these
23   spreadsheets?
24        A.   No.
25        Q.   And this is a document HP 6145-6156 referencing
60
```

2    Have you seen that prior to me showing this to
3  you today?
4    A.  No.
5    Q.  Okay.
6    MS. CARROLL:  I will represent to you, those
7  came to me from Chuck Schmaderer in Omaha, that
8  spreadsheet.
9    MR. HANSEN:  Okay.  Let's get this cleared up,
10  then.  How about the multi-vendor P & L?
11    MS. CARROLL:  Yes, it's from Chuck Schmaderer.
12    MR. HANSEN:  It's part of the same list of
13  documents.
14    MS. CARROLL:  Correct.  That -- yes.  That
15  spreadsheet had multiple parts.
16    MR. HANSEN:  See how quick that was?
17    (Discussion held off the record.)
18    Q.  BY MR. HANSEN:  I want to hand you this e-mail
19  from Louise Meyerfeld to Mr. Chizek, of which you are
20  cc'd -- it's Exhibit MM -- regarding responding to the
21  Andover issues.
22    Go ahead and take a look at that.  Have you
23  looked it over?
24    A.  Okay.  Yes.
25    Q.  And is that a response to the Andover issues we

61

1  were talking about earlier from Ms. Meyerfeld?
2    A.  Yes.
3    Q.  And apparently, she -- she references your
4  pushing -- in the middle of this document -- of the
5  Presario calls to Troy and asking his team to also place
6  orders on their behalf regarding the HP or Compaq
7  customers into the call center.  Do you see that?
8    A.  Yes.
9    Q.  Okay.  And that is what was referenced earlier
10  in those e-mails we looked at where you had talked to
11  Troy and determined that HP Direct was one of the
12  options --
13    A.  That's correct.
14    Q.  -- for Andover?
15    A.  That is correct.
16    Q.  And apparently, Ms. Meyerfeld, though, indicates
17  to you that as the project manager for the call center
18  integration, she had a different idea; is that correct?
19    A.  As I recall, yes.
20    Q.  Okay.  And what she indicated was that the
21  commercial parts business from Andover was going to be
22  transferred to Roseville, and the Presario parts were
23  going to be leaved -- excuse me -- were going to be left
24  at Andover; is that correct?
25    A.  That is correct.

62

1    Q.  Okay.  And apparently, a meeting was going to be
2  set up, of which you were going to be included, to talk
3  about where you go from there; correct?
4    A.  That is correct.
5    Q.  Okay.  And were you a part of that meeting?
6    A.  I can't recall.
7    Q.  Okay.  Do you recall if, after that meeting, it
8  was ultimately decided, then, to follow Ms. Meyerfeld's
9  option of bringing the non Presario calls from Andover
10  to Roseville, and leaving the Presario calls at Andover
11  for a relative time period?
12    A.  All I know is that as -- I would validate the
13  customer situation that it's being resolved.
14    Q.  Okay.  Well, I guess I am going to ask my
15  question again.
16    Do you recall the ultimate decision, though, was
17  that Andover would keep the Presario calls for a while,
18  the non Presario calls were going to be sent to
19  Roseville, and then ultimately, both of them would be
20  handled at Roseville at a later date?
21    A.  I believe so.  That was the plan.
22    Q.  Okay.  And, in fact, did that happen?
23    A.  I think so.
24    Q.  Okay.  Do you recall in any discussions you had
25  with Ms. Meyerfeld any statements she made as to why she

63

1  did not want to go the route of the HP Direct call
2  center in Hannibal that you were pushing pursuant to
3  that exhibit?
4    MS. CARROLL:  Object to the extent that
5  misstates the testimony of the form -- of the witness or
6  of the documents.
7    THE WITNESS:  I cannot remember.
8    Q.  BY MR. HANSEN:  Okay.  Well, do you recall in
9  any of these meetings, you know, you're advocating,
10  "Let's re-route them to HP Direct in Hannibal."  She's
11  saying, "No.  We're going to send them to Roseville,"
12  and the substance of any of those conversations?
13    A.  No.
14    Q.  Okay.  Who, I guess, ultimately made the
15  decision to not use the MITG center and bring them --
16  bring the calls to Roseville?  Was that Ms. Meyerfeld?
17    A.  It's the team -- the integration team.
18    Q.  Was Ms. Meyerfeld the integration team leader?
19    A.  That is correct.
20    Q.  Okay.  Who else was on that team; do you know?
21    A.  Richard Chizek, and they -- they are the two
22  that we assigned to manage this project.
23    Q.  Okay.  And when you say "manage this project,"
24  is that not only the Andover integration, but all call
25  center integration?

64

2  Q.  Okay.  I only have a few more questions for you,
3  and they center around the PBCO metrics.  I'll just use
4  Meyerfeld M.
5       You got those on a daily basis -- or, excuse me.
6  You were a recipient on those when they were sent out;
7  correct?
8  A.  That is correct.
9  Q.  Okay.  I take it you weren't involved in pulling
10 any of the data that went into making those?
11 A.  No.
12 Q.  Okay.  Do you know on that Meyerfeld M if
13 Roseville eSpares call center, as of March 12, 2003, was
14 that Andover, or had Andover already been integrated
15 over to Roseville by that point in time?
16 A.  Okay.  Can you rephrase?
17 Q.  Sure.  I'll ask it a different way.
18      We've looked at the e-mails regarding the
19 Andover issues and migrating the non Presario calls from
20 Andover to Roseville; correct?
21 A.  Yes.
22 Q.  And that was in the time frame of
23 November 2002 --
24 A.  Okay.
25 Q.  -- correct?

                                                    65

1  A.  Yes.
2  Q.  Okay.  Now, that spreadsheet I have in front of
3  you is dated March 12 of 2003; correct?
4  A.  That is correct.
5  Q.  Okay.  The Roseville eSpares, I have been
6  informed, is the Compaq red parts.
7  A.  Yes.
8  Q.  Okay.  Were those the calls that were previously
9  handled at -- for parts at Andover, now being reported
10 as the Roseville line item?
11 A.  Yes.
12 Q.  Okay.  So after the Andover integration to
13 Roseville -- well, strike that.
14      Prior to Andover being integrated to Roseville,
15 was Roseville filling or placing any pre-merger Compaq
16 part orders?
17 A.  No.
18 Q.  Okay.  Was Andover the first -- the integration
19 of Andover the first time that began to take place?
20 A.  Yes.
21 Q.  Okay.  And after that took place, is that
22 when -- we have this Roseville eSpares.  Those are the
23 pre-merger Compaq orders that previously, to your
24 knowledge, were handled at Andover?
25 A.  To my knowledge, yes.

                                                    66

1  Q.  Okay.  Now, Roseville PDO, I have been told,
2  those are blue HP parts.
3  A.  Yes.
4  Q.  Okay.  And that would have been calls and orders
5  HP was handling prior to merging with Compaq?
6  A.  That is correct.
7  Q.  Okay.  And then Roseville SOM, in that instance,
8  there are channel issues with authorized
9  representatives; is that --
10 A.  That is correct.
11 Q.  Okay.  Not -- okay.  I will leave it at that.
12      Now we go down here to orders, where it says
13 Roseville PL 91.
14 A.  Yes.
15 Q.  I understand that to be a product line.
16 A.  Yes.
17 Q.  Product line 91.
18 A.  That is correct.
19 Q.  Okay.  Is that all blue, or is that blue and red
20 parts?
21 A.  Let's see.  I believe it's all blue.
22 Q.  Okay.  And then we have Roseville/Andover.  Do
23 you see that?
24 A.  Yes.
25 Q.  Okay.  Would that be the eSpares red from the

                                                    67

1  call center line item above?
2  A.  That is correct.
3  Q.  Okay.  Now, I'll hand you Crowley H.  We
4  fast-forward to February 5 of '04 on the first page
5  there.
6       Do you see that?
7  A.  Yes.
8  Q.  Okay.  And you're still a recipient on that
9  e-mail?
10 A.  That is correct.
11 Q.  Do you see how we are -- do you see how the
12 document is reporting that now in a different fashion?
13 A.  Yes.
14 Q.  Okay.  We now have US Houston, Texas, as a call
15 center.  Do you see that?
16 A.  Yes.
17 Q.  Okay.  Do you know when US Houston, Texas, began
18 being reported as a call center?
19 A.  I can't recall when we -- we reported it.
20 Q.  Do you know what types of calls they were
21 handling at Houston?
22 A.  Yes.
23 Q.  Okay.  What are they?
24 A.  They're the channel.
25 Q.  The parts -- authorized parts resellers?

                                                    68

2  Q.  Okay.  What?

3  A.  It's the service providers.

4  Q.  People who are going out and repairing product

5  for people?

6  A.  Yep.  Yes.

7  Q.  Okay.  Maybe Joe's Computer Company, who is

8  going out and fixing an HP product, they need to order a

9  part, they'll call Houston?

10  A.  It's the partner that's repairing or authorized

11  service provider that's calling.

12  Q.  Okay.  And now we have US Roseville, which is

13  just one line item; is that correct?

14  A.  Yes.

15  Q.  So we've consolidated all the PDO, eSpares and

16  SOM into one line item?

17  A.  It's PDO and eSpares.

18  Q.  Okay.  And is the SOM now being reflected as

19  Houston?

20  A.  That, I can't remember.

21  Q.  Okay.  And then US Hannibal, Missouri, and then

22  we go to trade orders.  Do you see that?

23  A.  Yes.

24  Q.  Okay.  Before, we had it broken down by

25  Roseville PL 91, and then Roseville/Andover.  Do you see

69

1  that?

2  A.  Yes.

3  Q.  And we also had Missouri on there?

4  A.  Yes.

5  Q.  Okay.  As of this date, though, it just says

6  US; correct?

7  A.  Yes.

8  Q.  So everything is being reported as one line

9  item?

10  A.  That's correct.

11  Q.  Okay.  Have you reviewed any documents in

12  preparation of your deposition today?

13  A.  No.

14  Q.  I think that's all I have, but just for my sake,

15  let me go through my notes.

16  I don't know that I will mark it.  I'll just ask

17  you about it.  It's a document HP 5189, which is an

18  e-mail from Yvonne Cowan dated March -- or January 12,

19  2004, to Mr. Chizek and yourself.  And it reads,

20  "Attached is the spreadsheet that identifies the S and

21  HP blue parts account numbers."

22  Do you know what she's referencing there?

23  A.  I can't recall.

24  Q.  Okay.  Do you know if it is, you know, that big

25  sheet we looked at earlier, Exhibit VV, that says

70

1  Table S account?

2  I know you told me you've never seen that

3  before.  Do you know if that's the spreadsheet she was

4  referencing?

5  A.  It could be.  It looks like it has the S and the

6  HP account on there.

7  Q.  Okay.  Do you know why she was sending that to

8  you?  Did you ever ask her that?  Let me strike that.

9  Let me reask it.

10  Do you recall the circumstances as to why she

11  was sending that to you?

12  A.  I can't recall.

13  Q.  Okay.  That's all I have.  Thanks.

14  MS. CARROLL:  All right.

15  (Whereupon, the deposition

16  adjourned at 11:11 a.m.)

17

18  ---0o0---

71

1  DEPONENT'S SIGNATURE AND CORRECTIONS PAGE

2  Deponent:  ROLAND SORIANO
3  Case Title:  Hewlett-Packard Development
       Company, L.P. vs. Midwest Technology
       Information Group, Inc.
4  Date of Deposition:  Friday, January 14, 2005

5  I, ROLAND SORIANO, have read my deposition and
6  state that there are:

7  (Check One) _____ no corrections
       _____ corrections as noted below

8  Signed under penalty of perjury:

10  (Date)                    (Signature)

11  Page    Line          Change/Add/Delete

(If you need more space, please use reverse side.)
72