3:04-cv-03055-JES-CHE    # 1-6    Page 1 of 17
HP and Compaq v. MITG
CondenseIt™
Wednesday, 01 February 2006 04:13:35 PM
Clerk, U.S. District Court, ILCD
COPY
RE-FILED
Ronald Haught

## Page 1

```
                          UNITED STATES DISTRICT COURT
                          CENTRAL DISTRICT OF ILLINOIS
                              SPRINGFIELD DIVISION


  HEWLETT-PACKARD DEVELOPMENT    )
  COMPANY, L.P., HEWLETT-PACKARD )
  COMPANY, and COMPAQ TRADEMARK B.V.,)
                                 )
              Plaintiffs,        )
                                 )
       - vs -                    )  No. 04-3055
                                 )
  MIDWEST INFORMATION TECHNOLOGY )
  GROUP, INC., and MICHAEL LAUBER, )
                                 )
              Defendants.        )
```

DEPOSITION of RONALD HAUGHT, taken in the above-entitled case before Gina Nottingham, a Notary Public and Certified Shorthand Reporter of Adams County, Illinois, at 9:00 o'clock A.M., on February 18, 2005, at 525 Jersey Street, Quincy, Adams County, Illinois.

## Page 2

APPEARANCES:

MS. ELIZANN CARROLL
Attorney at Law
15301 Spectrum Drive, Suite 300
Addison, Texas 75001

   appeared for the Plaintiffs.

MR. JAMES HANSEN
Attorney at Law
525 Jersey Street
Quincy, Illinois 62301

   appeared for the Defendants.

ALSO PRESENT:

Ms. Gaynelle Jones
Litigation Counsel for Hewlett-Packard

MRS. GINA L. NOTTINGHAM, CSR
License No. 084-002584
924 Rim Road
Quincy, Illinois 62301
(217) 224-7009

## Page 3

I N D E X

| DEPONENT | PAGE NUMBER |
|---|---|
| RONALD HAUGHT | |
| Examination by Ms. Carroll | 4 |

E X H I B I T S

| NUMBER | MARKED | IDENTIFIED |
|---|---|---|
| Deposition Exhibit Number 20 | * | 7 |
| Deposition Exhibit Number 5 | * | 17 |
| Deposition Exhibit Number 4 | * | 37 |
| Deposition Exhibit Number 2 | * | 42 |
| Deposition Exhibit Number 1 | * | 43 |
| Deposition Exhibit Number 6 | * | 64 |
| Deposition Exhibit Number 22 | 72 | 72 |
| Deposition Exhibit Number 19 | * | 76 |
| Deposition Exhibit GG | * | 96 |
| Deposition Exhibit Number 23 | 147 | 147 |
| Deposition Exhibit M | * | 154 |
| Deposition Exhibit KK | * | 169 |
| Deposition Exhibit Number 24 | 169 | 172 |
| Deposition Exhibit Number 25 | 169 | 171 |
| Deposition Exhibit B | * | 184 |
| Deposition Exhibit C | * | 194 |
| Deposition Exhibit Number 21 | * | 206 |
| Deposition Exhibit Number 26 | 209 | 209 |
| Deposition Exhibit Number 27 | 222 | 222 |
| Deposition Exhibit Number 28 | 263 | 263 |

## Page 4

(Whereupon the Deponent was sworn by the Notary Public.)

R O N A L D   H A U G H T

having been first duly sworn by the Notary Public, deposeth and saith as follows:

EXAMINATION BY

MS. CARROLL:

Q. Can you state your name for the record, please, sir?

A. Ronald Dean Haught, Jr.

Q. And what is your address, Mr. Haught?

A. 4304 Deer Ridge Road, Quincy, Illinois, 62305.

Q. Thank you. Have you had your deposition taken before?

A. Yes.

Q. How many times?

A. Several over the years. I was former law enforcement, so I have been through this process a few times over the years.

Q. Okay. Any of the depositions relating to MITG?

A. One.

Q. Okay. And what kind of case was that?

Page 5
1  A. Over a construction case.
2  Q. All right. And was MITG a party to the
3 lawsuit, I take it?
4  A. Yes.
5  Q. Plaintiff or defendant?
6  A. Plaintiff.
7  Q. And what was the issue?
8  A. Improper assembly of some beams. I had a
9 bent beam in a construction process.
10  Q. Was it for the construction of the new
11 facility here in Quincy?
12  A. That's correct.
13  Q. All right. And is that case completed now?
14  A. No, it is not.
15  Q. All right. And is that pending here in
16 Quincy?
17  A. I don't know the answer to that actually.
18 I don't know where it was filed.
19  Q. Okay. But MITG is the plaintiff against
20 the construction company in a current lawsuit, is
21 that correct?
22      MR. HANSEN: No. No. MITG is not the
23 plaintiff. It relates to MITG's building. MITG is
24 not the plaintiff.
25      THE WITNESS: That's correct.

Page 6
1      MS. CARROLL: MITG is a party to the
2 lawsuit?
3      MR. HANSEN: No. He can answer. If you
4 know. Go ahead. If you want, I can tell you. MITG
5 is not a party to the lawsuit.
6      MS. CARROLL: Q. There is a dispute
7 involving the construction of MITG's facility here in
8 Quincy, and you had your deposition taken in that
9 context?
10  A. That's correct.
11  Q. All right. Have you had to testify in
12 court for any matters relating to MITG?
13  A. No.
14  Q. All right. You understand that you are
15 here today for your deposition both individually and
16 as the corporate representative of MITG?
17  A. I understand I'm here as a corporate
18 representative, that's correct.
19  Q. Well, you are also here just to the extent
20 that there are matters that aren't included in this
21 deposition notice that you know from your capacity as
22 an employee and the owner of MITG, those questions
23 will be asked today also?
24  A. That's correct.
25  Q. Okay. Let me show you the deposition

Page 7
1 notice. Have you seen that document before? It's
2 Exhibit 20.
3      MR. HANSEN: I can tell you he may not have
4 seen the notice. He has seen the exhibit.
5      MS. CARROLL: Q. That's fine. And I
6 understand from your lawyer, if you can confirm with
7 me, that it's also your understanding that you are
8 the representative on all of the, all 22 topics
9 except 8 and 9 on which your CFO, Miss Koch, was
10 designated. Is that your understanding?
11      MR. HANSEN: And, just so the record is
12 clear, 12.
13      MS. CARROLL: Q. 12 you all were jointly
14 designated on that topic?
15  A. That's correct.
16  Q. What did you do, if anything, to prepare
17 for your deposition today?
18  A. Read over a few -- well, I read over the
19 original contract. That's really about it.
20  Q. The Standard Support Agreement?
21  A. That's correct, yes, and the Middleware
22 document, yes.
23  Q. And have you or has MITG calculated the
24 actual damages that you claim it suffered due to the
25 plaintiff's alleged breach of contract of the

Page 8
1 Standard Support Agreement?
2  A. No. I have been unable to totally
3 calculate those damages.
4  Q. Why is that?
5  A. Well, for one you, I believe, just recently
6 turned over the documents necessary for us to be able
7 to fully evaluate that on one case. Secondly, the
8 damages will more than likely be calculated by an
9 expert, because I don't feel that's my level of
10 expertise.
11  Q. And what documents are you referring to in
12 terms of the documents necessary to fully evaluate
13 the claim?
14  A. Well, if I'm not incorrect, part of our
15 claim for damages is based on misdirected or
16 redirected calls away from my facility, and those
17 records I would not have any, you know, any per se
18 knowledge of. So we have asked that those records be
19 produced by your client.
20  Q. And I'll get into the diversion issue in a
21 little while. Have you calculated the damages that
22 you claim that MITG has suffered due to
23 Hewlett-Packard's alleged misuse of the Middleware,
24 or breach of the Middleware Agreement?
25      MR. HANSEN: Has he or the company?

Page 9

1  MS. CARROLL: Q. Has he or the company,
2 uh-huh.
3  A. We have not calculated as well based on a
4 previous answer, which is, I think that would be
5 determined by an expert.
6  Q. Do you believe that you have all of the
7 documents that would be necessary for an expert to
8 make that calculation?
9  MR. HANSEN: Object to form. Go ahead.
10  THE WITNESS: Can you rephrase that for
11 me?
12  MS. CARROLL: Q. Yeah. You indicated
13 before that there were some documents that you just
14 got that would assist you in calculating the damages
15 relating to the Standard Support Agreement. Do you
16 believe that there are any outstanding documents that
17 you need from HP that would help you calculate? Are
18 you waiting for something from HP to calculate those
19 damages?
20  A. I have yet to see those documents.
21 Actually I know that they were received. I don't
22 know what the content of those documents are. So I
23 don't feel I can answer that question today.
24  Q. Well, tell me who -- do I understand your
25 breach of the Middleware Agreement claim to be that

Page 10

1 HP has used the Middleware for the benefit of a third
2 party?
3  MR. HANSEN: Object to form. I think the
4 pleading speaks for itself. But subject to that, he
5 can answer it.
6  THE WITNESS: Yes.
7  MS. CARROLL: Q. All right. And do you
8 know what third party or parties have been given the
9 use of the Middleware?
10  A. Can you put that in more specific terms?
11  Q. Yeah. Tell me who is using the Middleware
12 improperly?
13  A. I don't have specific knowledge of the
14 customers using that tool as I do not have access to
15 those records from within HP.
16  Q. Okay. Have you calculated the damages that
17 you claim MITG has suffered due to the alleged
18 tortious interference by HP?
19  A. The tortious interference claim, if I'm not
20 incorrect, was just recently filed, and we are still
21 trying to develop all of the information and get the
22 information so that those determinations can be
23 made. So today, no.
24  Q. Okay. And just so the record is clear, I'm
25 reserving my right to retake his deposition on those

Page 11

1 issues since they are the subject of this notice, and
2 if a later date you are going to have an MITG
3 corporate representative discuss the amount of the
4 damages that's not an expert, a retained expert, then
5 I'm reserving my right.
6  All right. When was your first contact
7 with Custom Edge?
8  A. In regards to timeframe, incident?
9  Q. Do you have a general timeframe as to when
10 you first heard from Custom Edge about doing work for
11 their customers or a customer of theirs?
12  A. I'm going to say in the year 2000, but I
13 could be off on the timeframe. I mean, I recall the
14 specific incidence.
15  Q. Okay. Tell me about that, please.
16  A. The specific incident is we were contacted
17 by then CEI or Custom Edge, Incorporated. I don't
18 know which of the parties, either Mr. Bloomquist,
19 Mrs. Ellis. There were some other folks in that
20 department at the time, but we were contacted and
21 asked to provide service and/or parts for a customer
22 in Hannibal, Missouri, by the name of Swiss Colony.
23  Q. And what kind of business was Swiss Colony?
24  A. They are a call center that sells cheese
25 and sausage and all that around the holidays.

Page 12

1  Q. And were they -- do I understand you
2 correctly that CEI was looking for you to do on-site
3 repairs and service calls for them?
4  A. I believe so, yes.
5  Q. And did you have any kind of written
6 agreement that you entered into with CEI to handle
7 that Swiss Colony business?
8  A. No.
9  Q. Okay. How long did that relationship last
10 where you were providing, you being MITG was
11 providing, the service to Swiss Colony?
12  A. The actual service calls went on for
13 several years off and on. It wasn't a repetitive
14 day-to-day scenario. It was hit and miss type of
15 deal.
16  Q. I mean, as-needed bases?
17  A. Correct.
18  Q. So instead of calling a CEI or Compaq
19 Direct service person, they called MITG?
20  A. That's correct.
21  Q. All right. And did then MITG bill CEI?
22  A. I would assume so. I wouldn't have
23 specific knowledge of that.
24  Q. Okay. You don't recall how your company
25 handled that billing?

Page 13
1  A. No, I don't. That's been too far back.
2  Q. Do you have an idea of how much revenue was
3 generated from that relationship?
4    MR. HANSEN: I'll object to relevance. You
5 can answer if you know.
6    THE WITNESS: Well, what relationship?
7    MS. CARROLL: Q. MITG servicing Swiss
8 Colony on behalf of CEI?
9  A. I have no clue.
10  Q. Do you have any recollection as to how MITG
11 was compensated by CEI for the provision of services
12 and spare parts for Swiss Colony?
13  A. How we were compensated?
14  Q. Correct.
15  A. In the form of a check, I would assume.
16  Q. Okay. Let me -- that's not what I mean.
17 What I mean is, did you have an agreed upon mark-up
18 for how much you could charge for profit on spare
19 parts? Did you have a set rate that you had agreed
20 upon with the people from CEI as to how much you
21 could charge for your service people?
22  A. At that time I don't know.
23  Q. And at that time what other kind of
24 business was MITG doing?
25  A. We were in the on-site service business.

Page 14
1 We had retail stores, and we as well did business for
2 various insurance companies from a depot repair
3 perspective.
4  Q. And depot repair being that they sent the
5 equipment in?
6  A. That's correct.
7  Q. To get it fixed and send it back?
8  A. That's correct. For business and
9 consumers.
10  Q. And you said you had retail stores?
11  A. That's correct.
12  Q. How many?
13  A. Three.
14  Q. Where were those stores located?
15  A. Hannibal, Missouri; Quincy, Illinois;
16 Kirksville, Missouri.
17  Q. Does MITG continue to have any retail
18 stores?
19  A. No.
20  Q. When did the relationship between MITG and
21 CEI change or expand into something beyond the
22 provision of service and parts for Swiss Colony?
23  A. In regards to a timeframe?
24  Q. Yes. Any idea?
25  A. No, not specifically, no.

Page 15
1  Q. Well --
2  A. It was an ongoing relationship, I'll say
3 that. It developed into an ongoing relationship.
4  Q. All right. What was the next aspect of the
5 business after the Swiss Colony? What was the next
6 phase of the relationship between MITG and CEI?
7  A. Well, the conversation led to we were able
8 to address a need that they specifically had not had
9 addressed previously, which was the procurement of
10 parts, which was something that we had already had in
11 place. They were able to engage servicers to go on
12 site, but due to fixed costs or in some cases small
13 town servicers who would not have access to the type
14 of equipment necessary to fix a problem, that was a
15 problem there in itself. So, you know, they were
16 managing SLA's, service level agreements; and if they
17 were unable to hit their SLA, I'm sure they were
18 penalized in some form or fashion. So we were able
19 to help through the procurement of that product make
20 sure that they were able to have a greater chance of
21 hitting their SLA's with that customer.
22  Q. Okay. So you're procuring products for
23 who?
24  A. For CEI.
25  Q. Okay. And shipping them where?

Page 16
1  A. To the specific -- in some cases we might
2 send it to the repair facility or to that
3 technician. In some cases it was drop boxes. In
4 some cases it was an office. In other cases we would
5 ship it straight to the customer, and then they would
6 notify the individual to come and repair it after the
7 part was received.
8  Q. And what kind of parts -- I take it these
9 were all spare parts?
10  A. Yes.
11  Q. Multivendor?
12  A. Yes.
13  Q. Were you at that time providing CEI with
14 any Compaq parts, or were they all non-Compaq parts?
15  A. They could very well have been Compaq parts
16 as well.
17  Q. Did you have any kind of a relationship or
18 arrangements with CEI to acquire Compaq parts through
19 a Compaq channel?
20  A. In the beginning?
21  Q. Correct.
22  A. No, not that I recall.
23  Q. Okay. When do you recall that you first
24 entered into an arrangement that enabled MITG to
25 acquire parts from a Compaq channel?

Page 17

1    A. Mid to late '01 maybe. Early '01. Yeah.
2 I don't know. That's a hard question to answer.
3    Q. Let me show you what was previously marked
4 as Deposition Exhibit 5, and it is a document --
5 Exhibit 5 at the top it is denoted Exhibit Roman
6 Numeral II, Scope of Work. It's dated January 12 of
7 2001.
8    A. That's correct.
9    Q. Is this document familiar to you?
10    A. Yes.
11    Q. Okay. And what is this? Just generally
12 what is this Scope of Work covering?
13    A. It is a document covering a transaction
14 fee, which I'm not sure we ever actually used.
15 Basically it establishes the pipelines that we were
16 to receive business from is basically what it
17 establishes, a small process flow in regard to the
18 call management and the compliance issues with
19 financial breakouts as well, and as well penalty
20 terms, I believe.
21    Q. And in talking about these pipelines, is it
22 true that MITG is providing spare parts as requested
23 from these various pipelines as they are referred to
24 in this document? So if technical support for CEI
25 needed a part and you MITG was going to provide it,

Page 18

1 these are the terms under which it would be provided?
2    A. During the period of this timeframe.
3    Q. That this was in place?
4    A. I would say, yes, correct, yes.
5    Q. All right. And so this is the -- is this
6 the first written agreement that you recall? This is
7 only a portion of it because it's Exhibit II.
8    A. Right.
9    Q. Is this January of '01 agreement the first
10 written agreement you, and you being MITG, entered
11 into with CEI?
12    A. To the best of my recollection, yes.
13    Q. How long was this, the January of '01
14 contract in place or agreement in place?
15    A. I'm sorry. What?
16    Q. Well, was it replaced by something? Was a
17 Standard Support Agreement the next written
18 agreement? Did this terminate on its own terms? Did
19 one of you all terminate it?
20    A. It was in place until the Standard Support
21 Agreement was put in place as well as the Middleware
22 document, and that was the driving force behind that.
23    Q. The replacement of this was driven by the
24 desire to have the Middleware Agreement?
25    A. Correct.

Page 19

1    Q. At this time there is a discussion here
2 about call management. Does this indicate that MITG
3 was providing call center services for CEI?
4    A. I'm sorry. What?
5    Q. With the start of this agreement did MITG
6 begin providing call center services for CEI?
7    A. Yes.
8    Q. Were you answering -- how were your people
9 answering the phone? Was it still MITG, or were they
10 answering it CEI?
11    A. It depended actually.
12    Q. On what?
13    A. There were three different groups that
14 would call in. You could have consumer, you could
15 have B to B, and then as well you had the service
16 technicians, and each one of the phones were answered
17 differently based on those.
18    Q. Three different 800 numbers?
19    A. Yeah. I don't recall to be quite frank.
20 It could have been two numbers and an auto
21 attendant. I don't know.
22    Q. And at this point during the time that the
23 January of 2001 agreement was in place, what
24 percentage of your business was business for
25 consumers, business to business, or service calls

Page 20

1 under this agreement versus other work that MITG did?
2    A. At the time this was put in place this was
3 probably 10 percent maybe.
4    Q. All right. By the end of 2001, so before
5 the Standard Support Agreement, which was in February
6 of '02, how much of MITG's business was represented
7 by the relationship handling these pipelines for CEI?
8    A. Most of it.
9    Q. Okay. What happened to all the rest of the
10 other pieces of business MITG was doing?
11    A. Quite frankly almost all my resources went
12 towards building this relationship and trying to keep
13 up with the needs and the process changes that were
14 necessary to address the customers.
15    Q. Was its business more profitable than the
16 other business that you were doing?
17       MR. HANSEN: Object to form as to the word
18 its, but go ahead.
19       MS. CARROLL: Q. Let me try to see if I
20 can clear that up. Was the business that you
21 ultimately were doing by year end of 2001 with CEI,
22 was that business more profitable than the other
23 portion of the business that used to at the beginning
24 of the year made up 90 percent of MITG's business?
25    A. Was it more profitable? Possibly. Was the

Page 21

1 prospect of longevity, was it a better business
2 decision? Yes.
3    Q. Okay. How many call center agents did you
4 have that were answering the different lines that
5 came in from consumer, B to B, and service?
6        MR. HANSEN: At what time?
7        MS. CARROLL: Q. By the end of January of
8 '01. Yeah, in January of '01 when this agreement
9 went in place, how many people did you have in call
10 center to handle this business?
11    A. Just call center agents?
12    Q. Correct.
13    A. 24 maybe.
14    Q. Were there also people -- well, was there
15 website contact, too, where people could call in or
16 people could contact you through e-mail?
17    A. Through e-mail, yes. The actual web inter-
18 face, I don't recall when that was all -- you know,
19 we had various levels of experimentation trying to
20 address those issues.
21    Q. You said you had 24 call center people?
22    A. That's correct.
23    Q. Were any of those people responsible for
24 answering e-mail, or did you have a different group
25 to respond to e-mails that came in?

Page 22

1    A. Well, depending upon which pipeline so to
2 speak that it came in on. It could be a myriad of
3 people. I mean, there were groups assigned to answer
4 those e-mails from customers.
5    Q. By the end of the year 2000 how many call
6 center people did you have to handle these consumer,
7 B to B, and service business for CEI?
8        MR. HANSEN: I believe you misstated your
9 year.
10        MS. CARROLL: Q. 2001. Sorry.
11    A. That's all right. Can you ask the question
12 again, please?
13    Q. Sure. By the end of the year 2001 how many
14 call center people did you have to handle calls from
15 consumers, B to B, and service for CEI?
16    A. Just answer the phones?
17    Q. Correct.
18    A. Again, probably 24. Is that the question
19 you just asked? Correct.
20    Q. Yeah.
21    A. Okay.
22    Q. And did you have changes in the number of
23 people that were handling responses to e-mail or if a
24 web interface was in place to handle web orders?
25    A. Okay. We are going to dive into technical

Page 23

1 areas here. You want to rephrase that for me?
2    Q. Well, you were making a distinction just
3 answering phones. I want to know did you have other
4 people who were taking orders in other ways other
5 than answering the phone?
6    A. At the end of 2001, yes, I did.
7    Q. Okay. How many other people were taking
8 orders that didn't come over the phone?
9    A. It could have been any of those same number
10 of people. They had multiple tasks that they
11 performed.
12    Q. Okay. Is there anybody who didn't answer
13 the phone who got orders from any of these pipelines?
14    A. On a consistent basis?
15    Q. Correct.
16    A. Not that I would recall. But you might
17 have a supervisor who, for instance, didn't take
18 calls who might take escalation issues or possibly
19 fill in if somebody was sick.
20    Q. For example, you didn't have outside sales-
21 people, or did you? You didn't have somebody who's
22 only job was to answer e-mails and didn't answer the
23 phone? That's what I'm trying to figure out.
24    A. Not that I recall, no.
25    Q. All right. Prior to the Standard Support

Page 24

1 Agreement being entered into in early February of
2 '02, did you have any meetings in Omaha to discuss
3 with the folks from what became known as Compaq
4 Direct instead of CEI the financial terms of the
5 relationship between Compaq Direct and MITG?
6    A. Yes.
7    Q. Okay. When do you recall having meetings
8 in Omaha?
9    A. Timeframe I don't recall.
10    Q. Do you recall going to Omaha in the summer
11 of 2001 to discuss the financial issues and telling
12 Compaq Direct that MITG was going to stop servicing
13 the customers if you couldn't enter into a better
14 financial arrangement?
15    A. I will agree with the context of the
16 meeting. I can't agree to the timeframe, because I
17 don't recall that specific date.
18    Q. All right. Fair enough. Tell me what you
19 recall about the meeting?
20    A. Actually there were -- it was a multiple
21 scenario meeting.
22    Q. Okay.
23    A. One was based on, as you have just stated,
24 coming to a better financial arrangement in regards
25 to the amount of business, the type of business,

Page 25

1 etc.. The second aspect, and this is strictly from
2 memory, but I believe as well what facilitated that
3 is the fact that they were either extremely slow in
4 paying invoices or during that timeframe there was a
5 situation, and I do not recall the dollar amount,
6 where we were actually just told that we would not be
7 paid for services rendered for whatever reason. I
8 don't recall what that was. Nonetheless, that's what
9 part of the facilitation of that meeting was about,
10 and, quite frankly, I stated the facts and stood my
11 ground.
12    Q. And did MITG present a proposal to Compaq
13 Direct about how you wanted to be compensated for
14 providing parts and services to the customers?
15    A. I don't recall a specific proposal. It was
16 more of a general discussion and an airing on
17 communication issues between Compaq Direct or CEI or
18 whoever it was at that time and their management
19 staff and basically myself.
20    Q. Who attended the meeting or meetings that
21 you had in Omaha on these subjects for Compaq Direct?
22    A. Mr. Bloomquist, I'm thinking Chuck Smotter
23 (phonetic), if I recall correctly, Bill Pogge
24 (phonetic), and I don't recall anything else really
25 people wise. There were several people in and out,

Page 26

1 but I don't recall who they were.
2    Q. Anybody other than you there for MITG?
3    A. Teresa Koch.
4    Q. Was this -- I take it from your prior
5 answer that this was not just a single meeting?
6 There were these series of meetings until you reached
7 an arrangement?
8    A. Physical meetings or discussions?
9    Q. Well, let's go with discussions.
10    A. I believe that prior to our arrival there
11 had been several discussions on the phone about the
12 specific issues at hand, and that was the culmination
13 of those conversations was just trying to sit down
14 face to face and get it discussed out.
15    Q. At the end of that meeting had you worked
16 out an arrangement for Compaq Direct to begin monthly
17 payment of some amount to MITG?
18    A. At the end of that meeting?
19    Q. Correct.
20    A. I don't believe it was that clear-cut. I
21 believe that we had agreed to further discussion to
22 be able to come to some type of arrangement and that
23 I wouldn't cut it off instantly as long as they were
24 willing to acknowledge the fact that there had been
25 issues and that they would try to or attempt to

Page 27

1 address those issues on their side as well.
2    Q. Had MITG begun to have discussions with
3 Compaq Direct about the development of the Middleware
4 before you had these discussions that culminated in
5 this meeting, or was that afterward, do you know?
6    A. I don't know. I'd have to look at the
7 documents to answer that properly.
8    Q. After this meeting was there a point where
9 MITG and Compaq Direct agreed on a monthly payment to
10 be paid by Compaq Direct to MITG prior to entering
11 into the Standard Support Agreement?
12    A. I believe so.
13    Q. Okay. Who came up with a dollar amount?
14 Was it an amount that you proposed or negotiations
15 over that?
16    A. I believe it was negotiations. I actually
17 believe it was Chuck Smotter that came up with that
18 number, if I remember correctly.
19    Q. Do you recall proposing a number for a
20 monthly fee?
21    A. No, not specifically. I believe that was
22 part of their solution.
23    Q. Other than the monthly fee, was there any
24 other compensation that or amounts that Compaq Direct
25 agreed to pay MITG, for example, to reimburse them

Page 28

1 for any expenses that had been incurred or anything
2 like that?
3    A. Well, sure, there were discussions in
4 regards to the profit split on the products sold.
5    Q. Okay.
6    A. And I believe that during the discussions
7 around this that there were also payments to be made
8 for telephony expenses, if I recall correctly.
9 Forgive me. It's been a long time back so --
10    Q. That's fine. Do you have -- so they were
11 going to reimburse you for some expenses, and there
12 were also discussions about the profit split on the
13 sale of multivendor parts?
14    A. Multivendor as well as Compaq parts, that's
15 correct.
16    Q. All right. Well, were you at that time --
17 so at the time of this meeting prior to the Standard
18 Support Agreement did MITG have access to a Compaq
19 channel to acquire Compaq spare parts?
20    A. Yes.
21    Q. What channel?
22    A. CSN, the Compaq Service Network, I believe
23 is the --
24    Q. All right. So at this point you're selling
25 multivendor parts, you could access CSN to sell to

Page 29

1 customers parts directly from Compaq, and you were
2 also, I take it, selling out of stock or legacy
3 Compaq parts?
4    A. Correct. It was a little bit more
5 detailed. In that day Compaq had -- as my
6 understanding of it was, you had warranty products
7 sitting in Bin A, you would have new products sitting
8 in Bin B, you would have spare parts sitting in Bin
9 C, all of which are the same exact part but allocated
10 for various product lines. And what would happen is
11 they were not allowed, in that timeframe allowed to
12 crossover. So you might have a quantity of a
13 thousand in one bin and absolutely none in the spare
14 parts or consumer bin, and therefore if we were
15 unable to pull those product, which we couldn't, and
16 at the time the policy of Compaq was not to allow
17 that intermingling of product, then we would as well
18 go out and outsource that product for them on the
19 customer's behalf.
20    Q. So in terms of out of stock, it's out of
21 stock as to the bin you had, that this customer had
22 access to?
23    A. I'm sorry?
24    Q. So it may not have been out of stock as a
25 warrantied part, but it would have been out of stock

Page 30

1 as a spare part?
2    A. That specific customer?
3    Q. Okay.
4    A. Correct.
5    Q. All right. Fair enough. By the time of
6 the meeting that we've been discussing what
7 percentage of your business was dedicated to doing
8 the Compaq Direct work?
9    A. Specifically Compaq Direct work?
10    Q. Correct.
11    A. I don't recall what the breakout of that
12 would be. I mean, there were multiple parts to that
13 piece at that time.
14    Q. Well, explain that to me. What are the
15 multiple parts?
16    A. There were more than -- I mean, it was more
17 than just the CEI portion of the business. That was
18 the larger portion of the call center business
19 because previously Compaq really had no, or at least
20 my understanding is, I should say, CEI had not
21 adopted a direct model, and therefore we were
22 somewhat on the cutting edge rogue scenario within
23 the organization of just trying to get this thing
24 going. So we were --- it was a large portion of my
25 business, but there were other pieces as well,

Page 31

1 whether it was still service work or parts
2 procurement for other service providers besides
3 Compaq or CEI at that date, etc. I don't recall the
4 specific percentages. I can just tell you it was a
5 significant percent.
6    Q. Okay. So you had CEI work, you still could
7 have been doing work for Swiss Colony or similar to
8 the Swiss Colony piece of business?
9    A. Sure.
10    Q. All right. And how much of the business --
11    A. Can I go back on that?
12    Q. Sure.
13    A. When you refer to Swiss Colony, that was
14 referred as an incident with Compaq. I would have
15 had other service organizations not associated with
16 CEI that we would have been doing both parts and
17 service business with, okay. Just to clarify the
18 record there.
19    Q. Thank you.
20    A. Uh-huh.
21    Q. Prior to entering into the Standard Support
22 Agreement how many employees did MITG have
23 approximately?
24    A. So the end of '01? When you are referring
25 to the Standard Support Agreement, are you referring

Page 32

1 to the document which accompanies this or the --
2    Q. Not Standard Support Agreement. That was
3 ultimately entered into February 7th of '02.
4    A. And again the question was?
5    Q. The end of '01 how many employees were
6 there of MITG?
7    A. To the best of my recollection, maybe 35.
8    Q. Did you ever have more than 35 employees?
9    A. For MITG?
10    Q. Correct.
11    A. Yes.
12    Q. Okay. When was that?
13    A. It would have been after the move to the
14 new location.
15    Q. And when did you move to the new location
16 in Quincy?
17    A. We moved in April something of '02, I
18 believe.
19       MR. HANSEN: '03.
20       MS. CARROLL: Q. '02 or '03?
21    A. '03, sorry.
22    Q. And what was the maximum number of
23 employees MITG had?
24    A. Probably 45 possibly, 40 to 45.
25    Q. And I take it from your prior answer that

## Page 33

1  you have some other business interests that you might
2  employ people?
3     A. That is correct.
4     Q. Okay. And are any of the other business
5  interests related to parts or services for spare
6  parts for computers?
7     A. Can you rephrase that question?
8     Q. Sure. Well, let me just ask it in a maybe
9  more simple way. Are there any other businesses that
10 do work similar to what MITG does?
11    A. Similar to, no.
12    Q. What is Globalonlineparts.com?
13    A. Global Online Parts is a company that was
14 set up to do service type business with two specific
15 vendors.
16    Q. What do you mean by service type business?
17    A. It was a coordination company for services,
18 logistics, and parts, but really in a different
19 genre, totally different type product line or subset,
20 at this time anyway, as to what Compaq was. Or CEI,
21 sorry.
22    Q. Still computer related but different
23 aspect?
24    A. Right.
25    Q. When did you begin looking for a new

## Page 34

1  location? You were growing out of the location you
2  had in Hannibal?
3     A. From a timeframe perspective?
4     Q. Correct.
5     A. It would have been mid, early to mid '02.
6     Q. And were your other business -- you had
7  MITG in a facility. Were any of your other business
8  interests also in the same facility?
9     A. From an administrative perspective, yes.
10    Q. Well, what I'm looking for is if you're
11 growing out -- you ultimately grew out of your
12 Hannibal location. Hence, the move to Quincy into
13 the new building, correct?
14    A. Uh-huh.
15    Q. I'm sorry. You need to say yes or no.
16    A. I'm sorry. Yes. I apologize.
17    Q. That's all right. And what I'm trying to
18 find out was that growth of the need for more space
19 due solely to MITG or was it MITG plus some other
20 business interests you have that necessitated
21 increased space?
22    A. It was solely because of MITG. May I
23 expound on that?
24    Q. Sure.
25    A. The reason being -- and we had at the time

## Page 35

1  taken three different locations. We were basically
2  located in a strip mall. We had taken three
3  different buildings and had various employees in each
4  building. Based on the call center and what we ran
5  out of room for were seats, physical call center
6  seats. They weren't going to allow me to have
7  anymore space, and, quite frankly, we were not
8  interested in discussing me taking over anymore
9  space.
10    Q. All right.
11       MR. HANSEN: We couldn't move the Subway
12 out of the corner spot. I'm just kidding.
13       THE WITNESS: Actually it was a tuxedo
14 shop.
15       MS. CARROLL: Q. How many -- in terms of
16 the decision on the new facility that you were going
17 to have built in Quincy, what kind of projections
18 were you making to determine what size building you
19 were going to need?
20    A. Well, from an historical perspective we had
21 looked at the escalating numbers of calls. We had
22 looked at the escalating number of customer service
23 calls, and one of the things that as well played into
24 this is the constant frustration that we had in
25 dealing with CEI slash Compaq with Compaq's constant

## Page 36

1  cost cutting measures and their sudden ability to
2  say, we are going to let go of these three or four
3  people. And so that as well partially facilitated
4  trying to have more room, more seats, because we felt
5  that we were going to -- and it was being
6  demonstrated -- we had to actually and we did take
7  over some of those responsibilities. It kind of
8  genred back and forth. We would have them for
9  awhile, and they would figure out a way to pay for
10 somebody or pay for a few bodies, and then quite
11 frankly would get caught. No, you can do it from a
12 temp perspective or you can't do it from this
13 perspective, and those people would be gone, and
14 suddenly we would have that responsibility back on us
15 again, and we just couldn't handle the load without
16 growing.
17    Q. So essentially you were taking advantage of
18 the business cycle of Compaq where they tended to be
19 outsourcing certain resources and you were trying to
20 position yourself to be able to provide those
21 resources for them?
22    A. I don't think I was taking advantage of
23 them. I think they were taking advantage of me.
24    Q. And let me ask the question again because I
25 wasn't meaning to imply that.

Page 37

1  A. Okay.
2  Q. You were trying to take advantage of the
3 opportunity that might be presented by them wanting
4 to send out resources and you wanted to be able to
5 take advantage of that opportunity to grow your
6 business. Is that fair?
7  A. What is that question in reference to, the
8 actual facility itself?
9  Q. The -- well, I asked what kind of
10 projections you were making, and you talked about
11 increasing call volumes and then Compaq letting
12 people go and sending work to you.
13  A. Correct.
14  Q. And what I'm asking is was part of the
15 reason for having more space the ability to take on
16 that additional work?
17  A. Yes, that's correct. Thank you.
18  Q. Okay. Sometimes it takes me awhile.
19  A. We all have that problem.
20  Q. Since you have been deposed so many times,
21 I didn't give you the warning at the beginning that
22 my questions sometimes take a half-hour.
23      Let me ask you to take a look at Exhibit 4,
24 which is a document bates MITG 0527 through 31. It's
25 dated December 5 of 2001. Do you recognize this

Page 38

1 document?
2  A. First let me ask is there a cover page
3 missing possibly?
4  Q. Well, this is the way the document came to
5 me. So if there is a cover page missing, I don't
6 know where it went because I didn't get it. . It
7 indicates it is Page 1, and unless there was a
8 transmittal letter from you to him --
9  A. No. What I was getting at is I was
10 assuming, and this looks to me to be the quote/
11 unquote bible of the process, but I was looking for
12 something quite --
13  Q. Okay. And this document has been
14 identified in response to request for production that
15 this is the bible.
16  A. Right.
17  Q. Tell me how this document came about?
18  A. It came about, quite frankly, from issues
19 that were consistently arising through various
20 processes, etc. Sherry Ellis is a lovely lady and
21 did a fine job for your client being a pain to us,
22 and that was part of the reason this document was put
23 in place is it seemed that the rules would
24 consistently change depending on her mood, whether it
25 was customer complaint, who was to handle the

Page 39

1 customer complaint, what the escalation process was.
2 I believe there is, you know, issues in here in
3 regards to the wrong order of and things of that
4 nature, our main procedures and things of that
5 nature. So those things were put in place to try to
6 alleviate some of those issues on a consistent basis,
7 and as well the communication was a big issue.
8  Q. All right. And RMA stands for?
9  A. Return Material Authorization.
10  Q. All right. Prior to creation of the bible
11 here, did MITG handle RMA?
12  A. Yes.
13  Q. And so this is simply putting, this is what
14 we are going to do, this is what our responsibilities
15 are, we agree that we are going to handle it this
16 way, and you CEI are going to do X, Y, and Z?
17  A. I wouldn't phrase it that way, no.
18  Q. Okay.
19  A. It was more of a general meeting of the
20 minds in regards to, these are our problems, these
21 are the processes, and this was the generally agreed
22 to solution, so that there wasn't it's her word, his
23 word, etc., etc.
24  Q. So this is just the process -- we all agree
25 this is the process. We are going to put it in

Page 40

1 writing so everybody knows?
2  A. Basically, yeah. So it's easily referred
3 back to, correct.
4  Q. Prior to the Standard Support Agreement,
5 did MITG have a website that MITG customers could
6 use? For example, is there an MITG.com?
7  A. Yes.
8  Q. Was that an interactive website for
9 customers to order parts?
10  A. Define interactive.
11  Q. Well, for example, if you go to any kind of
12 regular shopping, retail, you put it in a shopping
13 cart and you put your credit card number in and you
14 can buy that part. Could you do that prior to the
15 Standard Support Agreement on an MITG website? I
16 want to order a spare part. I order it, I give you
17 my credit card number, and I wait for it to show up
18 UPS?
19  A. Yes, but it's not that simple. It's -- it
20 was more based off of e-mail and quote type of
21 scenario. The technology you are talking about
22 really didn't evolve and become mainstream until a
23 little bit later.
24  Q. It is true after the Standard Support
25 Agreement that when people went on the website, for

Page 41

1 example, Compaqonlineparts.com that when they were
2 trying to acquire a part they just got information
3 and then they had to issue a purchase order of some
4 kind? There was not -- they couldn't type it in,
5 yes, this part is available, it can be shipped in two
6 days? Did it always work that way where you had give
7 a quote and then the people issue the purchase order?
8    A. Not always. There were credit card
9 customers. There were two different types of
10 business through this specific model you are
11 referring to.
12    Q. All right.
13    A. It was consumer and as well B to B. The
14 consumer did have the ability to request a quote and/
15 or request product through a website, either through
16 my sites or through the sites that we developed for
17 CEI slash Compaq, whatever you want to call it. And
18 then as well we did have the B to B customers as well
19 that did do PO business as well.
20    Q. All right. What websites -- prior to the
21 Standard Support Agreement what websites did MITG
22 develop for use with the Compaq business, the Compaq
23 Direct business?
24    A. Well, there were several.
25    Q. Okay. Do you recall what any of the names

Page 42

1 are?
2    A. Not off the top of my head. If you've got
3 something to show me, I could say yeah or nay.
4    Q. Let me show you what was previously marked
5 as Deposition Exhibit 2, which are pages from
6 Whois.net that have domain names with the Compaq name
7 in them that are noted as being registered by MITG.
8    A. Okay. And your question was then?
9    Q. Are those -- which websites are those,
10 because they are all registered November of 2001, is
11 that correct?
12    A. I'm sorry. That's correct.
13    Q. All right. And you have Compaqonlineparts,
14 Compaqdirectonline?
15    A. One was consumer. One was B to B. I don't
16 recall which.
17    Q. All right. And were those websites
18 operational prior to the start of the Standard
19 Support Agreement?
20    A. Prior to the Standard Support Agreement?
21 Yes.
22    Q. What was the difference between the two
23 websites? You said one was consumer, one was B to B?
24    A. That's correct. One was more catered
25 toward a credit card type customer, and the other one

Page 43

1 created more towards a business. There were various
2 offshoots from the B to B site as well. For example,
3 we had customized pages for BP Amoco, for -- I don't
4 remember the other ones now. They were the exact
5 same page and used the exact same Vista system, etc.,
6 but were specifically inlaid so that Compaq could
7 address their direct customer need.
8    Q. Did MITG develop those custom pages?
9    A. Yes. At the direction of Compaq Direct.
10    Q. And who were you dealing with at Compaq
11 Direct on that, the issues relating to the
12 development of these websites?
13    A. Well, we were specifically advised to
14 develop those by Troy Bloomquist, who was our general
15 contact.
16    Q. There were -- well, let me ask you this.
17 Mike Lauber is listed as the administrative contact
18 on these domain names. Why is that?
19    A. I instructed him to go get the domain
20 names. So he did.
21    Q. Then let me hand you what was previously
22 marked as Exhibit, Deposition Exhibit 1, which are
23 pages from Whois.net, and these are domain names that
24 include the HP in them. Did you instruct Mr. Lauber
25 to register the HP, the domain names with HP in them?

Page 44

1    A. I directed -- as I was directed, correct.
2    Q. Directed. As directed by who?
3    A. By Mr. Bloomquist and, if I recall
4 correctly, I believe Chip Love was actually involved
5 in facilitating the domain names being registered.
6    Q. And they were employees of who?
7    A. Of Compaq HP, whoever you want to call it.
8    Q. Well, tell me when those, the HP domain
9 names were registered, sir?
10    A. January of '02.
11    Q. All right. Do you know when the merger of
12 HP and Compaq was?
13    A. No, I don't.
14    Q. Are you sure your recollection is correct?
15 If I tell you that the merger of HP and Compaq was
16 not until May of 2002 --
17    A. I'm sorry?
18       MR. HANSEN: I think he -- I don't think he
19 testified when the merger was.
20       MS. CARROLL: Q. It's your testimony --
21 are your sure your testimony as to be instructed to
22 register those by people with Compaq slash HP, are
23 you sure that's correct in light of the fact that the
24 merger was in May of '02, over four months after the
25 registration of those websites?

Page 45

1  A. In regard to the dates?
2  Q. (Nodded her head up and down.)
3  A. No. I mean, I'm not going to sit here and
4  say I'm a hundred percent sure. We had heard
5  rumblings through the grapevine for quite sometime.
6  Q. Do you have any communications in writing
7  whatsoever that show that in January of 2001 Troy
8  Bloomquist, Chip Love, or anyone else working for
9  Compaq directed MITG to register websites that
10 include the HP in the domain name?
11     MR. HANSEN: And, for the record, I'm going
12 to object. Your question as asked references January
13 of 2001. I assume you meant January of 2002.
14     MS. CARROLL: Q. I'm sorry. Thank you.
15 I'll clarify the question. Do you have any written
16 document, communication, e-mail, letter, anything,
17 that shows that MITG was instructed in January of
18 2002 to register domain names with HP included in
19 them by Chip Love or by Troy Bloomquist?
20  A. For that specific timeframe I don't have
21 any recollection. If it exists, you have it.
22  Q. Okay. So anything that you have relating
23 to the registration of the domain names you've turned
24 over?
25  A. That's correct.

Page 46

1  Q. Okay. And so if there were no e-mails, no
2  letters, no written documents showing any
3  communication from Troy or from Chip or from anyone
4  else at Compaq or HP directing you to register the
5  domain names, then no such documentation exists?
6     MR. HANSEN: Specific to HP I would agree
7  with that statement or that question.
8     MS. CARROLL: Yeah. I'm not asking for you
9  to agree. I'm asking for the witness to agree.
10    MR. HANSEN: Then I ask you to rephrase the
11 question, because in its form you said there exists
12 no communication between Troy Bloomquist and MITG to
13 register domain names. You didn't have that
14 qualifier on there.
15    MS. CARROLL: Q. I disagree with that.
16 The record will show it, but I'll ask the question
17 again. If there is no -- you've produced all the
18 documents that you have. If there is no document in
19 any of the MITG documents that have been produced to
20 date showing that Troy Bloomquist or Chip Love or
21 anyone else from Compaq directed you, MITG, in
22 January of 2002 to register the HP domain names, does
23 that mean that no such documentation exists?
24  A. For January 2002? For that timeframe I
25 would say that's correct.

Page 47

1  Q. All right. Do you recall anyone from HP in
2  January of 2002 or earlier communicating with you
3  telling you that it was, that MITG should register
4  domain names that include HP in those domain names?
5  A. If as you have explained to me that the
6  merger date is later than what I recall, then the
7  answer to that question would be no.
8  Q. Thank you.
9  A. Uh-huh.
10 Q. There are some additional domain names, let
11 me show you Exhibit 3, that are registered that
12 include Compaq in the domain names that list the
13 registrant as CEI but list MITG's address. Do you
14 know why?
15 A. I can't answer that, no, I don't know why.
16 Q. Okay.
17 A. It looks like Mike Lauber is the
18 administrative contact.
19 Q. Right. But was it intended that CEI or
20 Custom Edge be the owner of those websites?
21 A. No.
22 Q. Who do you contend is the owner of those
23 websites?
24 A. I would be the owners of those websites
25 because he was my employee.

Page 48

1  Q. Were you -- was your customer ever CEI?
2  A. No.
3  Q. Why are the HP domain names registered in
4  Mike Lauber's name personally?
5  A. I instructed him to do it. I can't answer
6  that.
7  Q. Well, would you agree with me that since
8  they are registered to him personally that your
9  company doesn't own them?
10 A. No, I would not agree with that.
11 Q. Why not?
12 A. Because he was an employee of mine and
13 instructed to follow an order based on his
14 employment.
15 Q. Well, he apparently didn't follow your
16 order if he registered them in his own name, right?
17 A. Correct.
18 Q. Have you ever had a discussion with him
19 about transferring or assigning them from his name
20 personally to MITG?
21 A. Yes.
22 Q. Can you tell me why that hasn't been done?
23 If it involves communications with counsel, please
24 don't tell me.
25 A. I don't have a problem answering. Do you?

Page 49

1   MR. HANSEN: No.
2   THE WITNESS: The communication was --
3   MR. HANSEN: As long as the communication
4 was between you and Lauber.
5   THE WITNESS: That's correct, right. The
6 discussion with Mr. Lauber of transferring those
7 domains to me was actually after you folks filed your
8 lawsuit against me and actually brought it to light.
9 I hadn't actually had no recollection of it prior to
10 that, that they weren't registered in the proper
11 format.
12   MS. CARROLL: Q. So was there something
13 about the filing of the lawsuit that led you and Mr.
14 Lauber to decide that he was going to continue to own
15 those domain names?
16   A. I'm not -- I am maintaining that he doesn't
17 own those domain names. I'm maintaining that I own
18 those domain names. Is it all right if we take a
19 break.
20   Q. I'm almost done with this topic.
21   A. Sure.
22   Q. When did you, you being MITG, begin to use
23 the HP domain names to identify websites?
24   A. The timeframe?
25   Q. Correct.

Page 50

1   A. I don't recall, quite honestly. I know
2 that we were instructed. We had either prior to,
3 during, or a bit after, I don't specifically recall
4 the timeframe, continued to use the Compaq site as
5 they were being redeveloped for the HP name. So, you
6 know, I don't recall that specifically.
7   Q. Well, at the time the Standard Support
8 Agreement was signed February 7th of 2002 --
9   A. Correct.
10   Q. -- at that point you being MITG already had
11 certain Compaq domain named websites operational?
12   A. Correct.
13   Q. Do you know at that point did you have any
14 of the domain names, any of the websites being
15 identified by domain names that included HP in them?
16   A. I can't recall. I mean, there was a period
17 of time where the myriad of names were used because
18 you were trying to make sure you didn't lose Compaq
19 customers during the transition to the new sites,
20 etc. There were also some issues in regards to SSL
21 certificates, which is Security certificates based on
22 the internet, and things of that nature that made it
23 cumbersome to just shut off one and take off another
24 in regard to redirection of a browser and things of
25 that nature. So there was a small or brief period of

Page 51

1 time where it's possible, and I don't recall, but it
2 is possible that both sites would have been up
3 simultaneously because we were unable to forward one
4 to the other because of the security content based on
5 the credit cards, etc.
6   Q. Do you believe there is any documentation
7 that would show when MITG first began using the
8 domain, the HP domain names to connect to live
9 websites?
10   A. To connect to live?
11   Q. An active website.
12   A. No, not a specific timeframe, no.
13   Q. Okay. Well, is there any way to tell, for
14 example, from your web hosting company if you went
15 back to access records from them they could say this
16 is the first day you began having this domain name
17 link to an active website?
18   A. No.
19   Q. Do you know if that's available?
20   A. I don't know that it's available. I
21 understand that you all have requested similar
22 information.
23   MR. HANSEN: You are talking about the
24 hits?
25   THE WITNESS: I'm talking about the hits.

Page 52

1   MS. CARROLL: Q. I'll get to that.
2   A. And we are our own host.
3   Q. Well, who is Adams.net?
4   A. Adams is just my provider for the actual
5 band width. We are the actual web hosting facility
6 and things of that nature, and so those things we
7 don't typically -- I wouldn't keep a record of when
8 one was shut off and one was turned on.
9   Q. And you don't know one way or the other
10 whether on February 7th of '02 the HP domain names
11 were linked to an active website?
12   A. I can't testify to that, no.
13   Q. And you don't know whether it waited all
14 the way until the official announcement of the merger
15 of HP and Compaq?
16   A. Yeah, I can't answer that. You know, these
17 things don't just turn on overnight. It's a process
18 to develop it, etc. So I can't testify to a specific
19 timeframe.
20   Q. Was there anything different about -- once
21 you started having a website identified by an HP
22 domain name, was there anything different about that
23 website, other than the domain name, the content of
24 the website the same?
25   A. No. The content would have been

Page 53

1 different. It would have replicated HP's needs so
2 that it was -- I mean, the process of this was so
3 that it was a seamless transition to the customer.
4 Whether they went to an HP website, HP.com, for
5 instance, and they were linked back to us or if they
6 came to us and they linked into HP, they were to be
7 similar in content and as well visual esthetics.
8    Q. Did HP.com over have a direct link to the
9 HP Direct websites that were being run by MITG?
10    A. That never actually went to fruition, no.
11 It was discussed and killed.
12    Q. So the difference in content from when it
13 was a Compaq Direct website to when it was an HP
14 Direct website the change was going from Compaq to
15 HP, but the offerings of this is how you order a
16 product or this is how you get a price quote remained
17 the same, is that fair?
18    A. To the best of my knowledge, that's
19 correct.
20    Q. Okay. Let me take a break.
21    A. I'm sure there were process changes.
22    Q. I was trying to give you a break.
23         (Whereupon a short recess
24          was taken.)
25    Q. Mr. Haught, do you realize or did you

Page 54

1 realize at the time you had the domain names
2 registered that Compaq was a federally registered
3 trademark?
4    A. No.
5    Q. How about did you realize that HP was a
6 federally registered trademark at the time you had
7 the domain names registered?
8    A. No.
9    Q. Do you make any claim in your defense of
10 this lawsuit that MITG owns any rights to the trade-
11 marks Compaq or HP?
12    A. To those?
13    Q. Yeah.
14    A. No, I do not.
15    Q. What is the basis for your belief that you
16 don't need to transfer the websites -- or strike
17 that. What was the basis for your belief that it is
18 appropriate for MITG after the termination of the
19 Standard Support Agreement to continue to own domain
20 names with the Compaq and HP trademarks in them?
21        MR. HANSEN: I'll object to form, but you
22 can answer.
23        THE WITNESS: Firstly, the Middleware
24 Agreement is still in effect, and I believe, if I'm
25 correct, it just terminated recently. That would be

Page 55

1 point one. The second point would be that I had no
2 intention of doing anything with those websites, but
3 you did sue me, quite frankly, and the method for
4 which your client went about trying to obtain the
5 websites was consistent with all of the other
6 previous communications that we had had with anyone
7 within the HP organization in the past prior to that
8 date eight to ten months, and therefore I didn't feel
9 I had a need to turn those over because the
10 Middleware Agreement was still in place.
11        MS. CARROLL: Q. How is the Middleware
12 Agreement relevant to the domain names?
13    A. The Middleware Agreement is relevant to the
14 domain names in the effect that those domain names
15 and the sites associated thereto were used to
16 facilitate part of the XML portal process from an
17 order processing perspective.
18    Q. But those websites were not actively taking
19 any orders?
20    A. That's correct.
21    Q. So why -- and you -- it's your contention
22 that the Middleware couldn't be used with anyone else
23 other than between HP and MITG?
24        MR. HANSEN: Object to form, and that
25 totally mischaracterizes his testimony. Go ahead.

Page 56

1 You can answer.
2        THE WITNESS: Actually the -- I'm sorry.
3 Can you rephrase that for me?
4        MS. CARROLL: Q. Well, the Middleware --
5 the Middleware is between HP and -- well, between
6 Compaq Direct and MITG, correct?
7    A. Correct.
8    Q. Was there any use of that -- in your mind
9 was it okay to use that for Compaq Direct or
10 subsequently HP Direct to use that Middleware with
11 relationship with any other company other than MITG?
12    A. No, they could not.
13    Q. If Compaq Direct, at this point HP Direct,
14 was no longer doing business with MITG and had shut
15 off the Middleware, why was it necessary in your
16 mind, if it was, to keep the domain names?
17    A. Well, to that portion of your question I
18 believe I have already answered that. The further
19 part of your question in regard to HP is no longer
20 doing business with MITG that is not a factual
21 statement either.
22    Q. MITG -- okay. Well, tell me this. Type in
23 HPonlineparts.com. What do I get?
24    A. You should get either a not displayed or a
25 404 error, if I'm not incorrect. It's shut down, I

Page 57

1  know that.
2    Q. And that's true with every single domain
3  name that are registered that have the HP or Compaq
4  name in them that we have looked at on Exhibits 1
5  through 3? If you type those in, you don't get
6  anything? You don't link to anything?
7    A. I would assume. I personally have not done
8  that.
9    Q. All right. So my question is, if those are
10 not active websites, what is the relationship? Why
11 do you need to keep ownership of the domain names of
12 nonactive websites because the Middleware Agreement
13 was in place, though the Middleware was not being
14 used during that time period?
15   A. Because I can.
16   Q. And when you say the communications --
17 well, you understand that there was a request from HP
18 prior to the termination of the Standard Support
19 Agreement that went to MarkMonitor requesting a
20 transfer of the domain names and that MarkMonitor
21 contacted Mr. Lauber with that request to transfer
22 the domain names?
23   A. Is MarkMonitor the same as All Domains, or
24 do you have that document to review? I'm not
25 familiar with the MarkMonitor. I'm familiar with the

Page 58

1  situation, but not the specifics of the document.
2       MR. HANSEN: Here, I have got mine sitting
3  right here. You got it?
4       THE WITNESS: Thanks.
5       MS. CARROLL: Q. I'm asking you to look at
6  what was previously marked as Deposition Exhibit 1.
7  You see, we have Sarah from MarkMonitor. That's the
8  company that makes the contact with Mr. Lauber
9  requesting, communicating the request from HP to
10 transfer the domain names?
11   A. I'm sorry. I don't see MarkMonitor on this
12 page.
13   Q. Look at her e-mail address Sarah Furrer at
14 MarkMonitor.com?
15   A. Okay. Thank you.
16   Q. Okay.
17   A. Again, I'm sorry. Your question was?
18   Q. You're aware that this company contacted,
19 on behalf of HP contacted Mr. Lauber and asked for
20 the transfer of the domain names?
21   A. That is my understanding, correct.
22   Q. And Mr. Lauber came to you and communicated
23 that to you, is that correct?
24   A. That's correct.
25   Q. And what was your reason -- what was your

Page 59

1  basis, then, when requested by HP prior to the
2  litigation, prior to the end of the Standard Support
3  Agreement to refuse to transfer those domain names?
4    A. I believe that's covered under privilege.
5    Q. Well, were you consulting with a lawyer at
6  the time, January of -- what's the date of this
7  e-mail?
8    A. 2-9, '04.
9    Q. January 29 of '04 were you communicating
10 with counsel regarding the request from HP to
11 transfer those domain names?
12   A. No.
13   Q. So what was your basis at this time period
14 for refusing or declining to transfer the domain
15 names?
16   A. The first point the contract was still in
17 effect until, I believe, February 7th, if I'm not
18 mistaken.
19   Q. Okay.
20   A. First point. Second point, there was --
21 may I flip through here?
22   Q. Through that exhibit?
23   A. Yes.
24   Q. Feel free.
25   A. Okay. I'm sorry. I'm concentrating. Your

Page 60

1  question one more time?
2    Q. Why in January of -- on or around January
3  29 when Mr. Lauber responded to this e-mail that he
4  won't transfer the domain names, what was your
5  reasoning for refusing to transfer the domain names,
6  other than the fact that there was approximately
7  eight days left in the Standard Support Agreement?
8    A. There were several reasons around it. One,
9  the fact that the communication received from Mr.
10 Crowley, Bill Crowley, from Roseville was at best
11 confusing and as well misleading in regard to the
12 actual termination versus moving forward for one.
13 For two, as I have learned from previous experiences
14 in dealing with both Compaq and HP, you might very
15 well receive a request from one portion of the
16 organization who has not communicated with another
17 portion of the organization and therefore if you do
18 everything you are asked to do, there tends to be a
19 problem and you are the guy that gets blamed for it.
20   Q. Any other reasons?
21   A. Sure. Again, I felt the Middleware
22 Agreement was in place, and I wasn't going to release
23 until such time.
24   Q. The Middleware agreement is no longer in
25 place. Would you agree to transfer the domain names

Page 61

1 now?
2  A. No.
3  Q. Did you communicate with anyone from HP
4 that you had had contact with, whether it be Troy
5 Bloomquist, Sherry Ellis, Bill Crowley, or
6 communicate back to any of the people on the e-mail
7 string involved in the request for the transfer and
8 ask them follow-up and say, are you sure that this is
9 what HP wants, any kind of follow-up to see if the
10 communication that asks for the transfer of those
11 domain names was clear?
12  A. I don't recall any such communication per
13 se. Is it possible? Yes. But do I recall it? No.
14  Q. And if you haven't produced any documents
15 reflecting such a communication, would you agree with
16 me that you didn't prepare any written correspondence
17 or communication on that point?
18  A. That's correct.
19  Q. The communication from Bill Crowley that
20 was confusing and misleading, what communication are
21 you talking about?
22  A. Well, Mr. Crowley had -- I don't know if he
23 contacted me or I contacted him in regard to the
24 quote/unquote transition, and we had various
25 conversations, three or four. I don't recall exactly

Page 62

1 how many or the timeframe associated with, but the
2 earlier conversations Mr. Crowley had pointed out
3 there were four or five points of interest that they
4 felt that we had value add toward their company, that
5 he understood that the agreement as such would change
6 or could change, but believed that there were other
7 opportunities or different opportunities that could
8 be played into this and things of that nature, even
9 to the extent he had us go through a proposal
10 process. I offered on a couple of occasions to fly
11 out and meet with him, which he declined. I as well
12 offered him to come visit us. He declined. We sent
13 a proposal and never had a positive response after
14 that. He did acknowledge that there were some things
15 that we were very capable of doing and had a track
16 record of being successful at doing for them, but
17 they had made a strategic business decision and would
18 be changing the method for which those customers were
19 dealt.
20  Q. So you were mad that you were losing this
21 business and you decided to try to hold the domain
22 names hostage, is that fair?
23   MR. HANSEN: Object to the form, and it's
24 completely argumentative.
25   MS. CARROLL: You can go ahead and answer.

Page 63

1   MR. HANSEN: If you want, go ahead.
2   THE WITNESS: I think it's an unfair
3 representation.
4   MS. CARROLL: Q. In what way? Were you
5 mad that you were losing the business?
6  A. I don't know if mad is a proper word. I
7 was more shocked, quite frankly disappointed in the
8 entire process, frustrated with the level of total
9 mismatched communication that you would receive, and
10 as well there were extended periods of time where
11 there was no communication, which even made it worse,
12 but I don't know that mad would be the proper word I
13 would use to address that.
14  Q. Okay. Well, were the emotions and the
15 issues that you were dealing with, being frustrated
16 and disappointed, did that lead you to just make a
17 decision that you were just going to hold onto those
18 domain names because you knew HP wanted them back?
19   MR. HANSEN: Object to the form. Go
20 ahead.
21   THE WITNESS: I can't testify to my exact
22 thoughts at the time. Yeah, I can't do that.
23   MS. CARROLL: Q. That's fine. You
24 recognize that following the termination of the
25 Standard Support Agreement that the plaintiffs, HP

Page 64

1 and Compaq, did not consent to continued use by MITG
2 of the domain names that include Compaq and HP in
3 them, is that fair to say?
4  A. I'm sorry. One more time.
5  Q. Okay. After the termination of the
6 Standard Support Agreement do you agree that it was
7 clear that HP and Compaq did not consent to MITG
8 using the domain names that had Compaq and HP in
9 them?
10  A. Was it clear?
11  Q. Yes.
12  A. No. And, again, the Middleware Agreement
13 was still in effect.
14  Q. Did this letter that's Exhibit 6 from Molly
15 Richard to your counsel requesting the transfer of
16 the domain names and indicating that continued use of
17 the domain names would constitute trademark
18 infringement, did that not make it clear to you that
19 HP and Compaq did not consent to use of the domain
20 names after the termination of the Standard Support
21 Agreement?
22   MR. HANSEN: Well, I guess for the record I
23 will object that the letter speaks for itself, and
24 certainly it was a request for that, and also in
25 light of the fact you sued us in an arbitration cases

Page 65
1  it is what it is. But if you want to answer the
2  question, go ahead.
3      MS. CARROLL: Q. All right. You can
4  answer the question, please. Did that letter that
5  went to your lawyer not make it clear to you that HP
6  and Compaq did not consent to continued use of the
7  domain names that contain Compaq and HP?
8      MR. HANSEN: Object to form, but go ahead
9  and answer.
10     THE WITNESS: Did it make it clear to me?
11     MS. CARROLL: Q. Correct.
12    A. Okay. Rephrase your question one more
13 time. If you could be a little bit more specific.
14    Q. Do you agree -- does this letter make it
15 clear to you that Compaq and HP did not consent to
16 the continued use by MITG of the domain names with
17 Compaq and HP in them after the termination of the
18 Standard Support Agreement?
19    A. It would appear that the letter does
20 express their opinion about the situation. Again, I
21 maintain that the Middleware Agreement was still in
22 effect, and, therefore, I believe there were more
23 facts discovered upon the issuance of this letter.
24    Q. HP and Compaq subsequently filed an
25 arbitration against MITG seeking a transfer of the

Page 66
1  domain names. Did that make it clear to you that
2  they did not consent to MITG's use of the domain
3  names with HP and Compaq in them?
4     A. It demonstrated their unhappiness with the
5  situation, but we also won the arbitration case.
6     Q. And you won the arbitration case because
7  the arbitrator said this could be handled in court,
8  not because the arbitrator said MITG is right, is
9  that correct?
10     MR. HANSEN: Well, first of all, I'm going
11 to instruct him not to answer or comment on an
12 arbitration decision. Object to form. It seeks a
13 legal conclusion, and that decision says what it
14 says. So if you want him to comment on it, put it in
15 front of him and we can read what the decision says.
16     MS. CARROLL: Q. What do you understand --
17 is it your understanding that the arbitrator said
18 MITG had the right to use those domain names?
19     MR. HANSEN: Object to the form. If you
20 want him to comment on what the arbitrator said, put
21 that decision in front of him.
22     MS. CARROLL: I'm not required to give him
23 a document.
24     Q. What is your understanding as you sit
25 here today what the arbitrator ruled? Did the

Page 67
1  arbitrator rule that MITG had the right to use the HP
2  and Compaq domain names?
3     MR. HANSEN: Well, and for the record I'm
4  going to object to the form. Again, the arbitration
5  decision speaks for itself. You filed it seeking
6  domain name transfer. You lost, we won, period so --
7     MS. CARROLL: I want to know -- Jim, object
8  if you want to object. I want to know his basis, how
9  he comes to an understanding that he won or what
10 winning means to him, and I want to know --
11    Q. Sir, you said you won. How did you
12 win? Is it because the arbitrator said? Do you
13 understand the decision? I'm not looking for your
14 interpretation of the law. Is it your understanding
15 of the decision that the arbitrator said it was all
16 right for MITG to use the domain names that are at
17 issue?
18     MR. HANSEN: I'll object to form, but you
19 can answer if you can. Go ahead.
20     THE WITNESS: I don't believe I have an
21 opinion about the verdict in the arbitration case
22 except that I depend on my legal counsel's advice.
23     MR. HANSEN: I mean --
24     MS. CARROLL: Q. Do you under -- I don't
25 need anymore intervention from you on this point. Do

Page 68
1  you understand when you -- let me back up. Do you
2  understand, while you may not agree with HP's
3  position, that HP made it clear to you that they did
4  not consent, whether their lack of consent was right
5  or wrong, do you agree with me that they made it
6  clear that they do not consent to your ongoing use,
7  you being MITG, your use of ongoing domain names?
8     A. Define use.
9     Q. The website was up February 8th. You typed
10 in HPonlineparts.com website. It as active, is that
11 right?
12    A. That's correct.
13    Q. Was it clear to you from everything that
14 was sent via e-mail, via letter, arbitration
15 proceeding, a lawsuit being filed that HP did not
16 consent to the use of the domain names with HP in
17 them and Compaq did not consent to the use of the
18 domain names with Compaq in them?
19    A. I don't have an understanding of that.
20    Q. Do you believe after February 7th of 2004
21 that HP consented to MITG's use of the websites?
22    A. I don't have an opinion either way.
23    Q. Do you believe after February 7th of 2004
24 that Compaq consented to MITG's use of the websites
25 that contained the Compaq names in them?