HP and Compaq v. MITG
E-FILED
Wednesday, 01 February, 2006 04:14:49 PM
Clerk, U.S. District Court, ILCD
Ronald Haught
CondenseIt™

Page 69

1   A. I don't have an opinion.
2   Q. Do you have any documentation at all that
3 would show express consent, expressed consent by
4 either of those companies to the use or ownership of
5 the domain names that incorporate Compaq or HP in
6 them by MITG after February 7th?
7   A. The Standard Support Agreement would
8 reference it, as well the accompanying document,
9 which is the Middleware Agreement, which was still in
10 effect would lead me to believe that, yes.
11  Q. And, again, do you believe -- is it your
12 recollection that the Middleware Agreement makes
13 reference to the domain names?
14  A. I can't answer that.
15  Q. And is it true that you can't say one way
16 or the other whether the HP websites were active as
17 of February 7th of 2002? You can't say as you sit
18 here today whether any of the HP domain names were
19 linked to active websites as of February 7th of 2002?
20  A. Well, I think you need to clarify your
21 question personally firstly. Were they actively
22 linked to a website?
23  Q. Correct.
24  A. Yes. Were they actively linked to the
25 previous HP website? No.

Page 70

1   Q. What website -- what was the content of the
2 website? If I typed in any of the HP domain names,
3 what website came up on February 7th of 2002?
4       MR. HANSEN: So we are back to beginning of
5 the Standard Support, not the end?
6   Q. That's correct. And that's what my prior
7 question was.
8   A. Okay. I'm sorry. I misunderstood that.
9   Q. Well, you said the Standard Support
10 Agreement references it. The Standard Support
11 Agreement doesn't reference websites or domain names,
12 correct?
13  A. I couldn't answer that without viewing it.
14 Okay. I'm sorry. Your question one more time.
15  Q. The Standard Support Agreement doesn't list
16 specific websites in it, does it?
17  A. No, it does not.
18  Q. And just so I'm clear, before we move on,
19 in response to whether or not you believe that you
20 have consent to use the domain names, you're saying
21 you don't know, you don't have an opinion one way or
22 the other?
23  A. That's correct, I don't have an opinion.
24  Q. And you didn't understand any of the
25 communication or correspondence to indicate or the

Page 71

1 arbitration being filed or the lawsuit being filed to
2 be an indication of a lack of consent?
3   A. Again, I will refer to my counsel.
4       MR. HANSEN: You can answer the question.
5 She is asking for your opinion on it.
6       THE WITNESS: You want me to answer it?
7       MS. CARROLL: Q. Did you understand that?
8 I'll repeat the question. Do you understand -- not
9 asking for you, for conversations with your counsel.
10 Do you understand that the e-mail, the letter from
11 HP's counsel, the timing of an arbitration
12 proceeding, the filing of a lawsuit indicate a lack
13 of consent by HP and Compaq to MITG's use of the
14 domain names?
15  A. I don't know that I would answer that from
16 the standpoint of lack of consent. I disagree with
17 that word.
18  Q. Do you believe that any of them indicate
19 that they do consent?
20  A. Again, I really have no opinion either
21 way. You asked me specifically about those
22 documents.
23  Q. Is there anything, other than those
24 documents, which has indicated to you after February
25 7th of 2004 that you received from Compaq or HP that

Page 72

1 indicates a consent or lack of consent to MITG's use
2 of the domain names at issue?
3   A. In document format?
4   Q. Correct.
5   A. Not that I've seen, no.
6   Q. Have you had conversations on the phone
7 with anybody from Compaq or HP that you contend
8 constitutes consent to use the websites or to have
9 the use of the domain names after February 7th of
10 '04, an oral communication?
11  A. No.
12          (Whereupon a document was
13          marked Deposition Exhibit
14          Number 22.)
15  Q. Let me hand you what's been marked as
16 Deposition Exhibit Number 22. It's dated at the
17 bottom February 24th of 2004. Is it accurate that
18 the first page of Exhibit 22 is the message that was
19 posted when entering the websites that were
20 identified by the domain names?
21  A. Okay. I'm sorry. Your question again.
22  Q. That's the message that was posted on the
23 domain names after the termination of the Standard
24 Support Agreement, is that correct?
25  A. That's correct.

Page 73

1  Q. All right. And the big MITG slash parts
2  direct in the middle, that worked as a link to MITG's
3  website?
4  A. I mean, from the document I can't tell if
5  it is a hyperlink or not.
6  Q. You don't remember?
7  A. I don't recall, no. May I clarify this for
8  you actually?
9  Q. Uh-huh.
10 A. I need to see that back, please.
11 Q. Hang on. I'm just trying to take a quick
12 look at this.
13 A. If I'm not incorrect, and I could be, from
14 recollection I believe that the HP.com was a
15 hyperlink and as well the MITG.com was a hyperlink.
16 This strikes me as a graphic, and I do not recall it
17 actually being a hyperlink. It could or might not
18 have been. I can't tell you.
19 Q. You don't know one way or another?
20 A. No. I can't tell from that.
21 Q. The second page of Exhibit 22 the
22 MITGpartsdirect.com, do you recognize this as being
23 the page if you went to the -- in this time period if
24 you went to this hyperlink here, whether it be
25 parts.MITG.com or MITG.com, that this is the page

Page 74

1  that would come up?
2  A. It could be. The MITG.com is a separate
3  page from the parts. There would have been a link.
4  Q. So this may have been a hyperlink right
5  here?
6  A. It may or may not. I don't know. I can't
7  answer that. This would have been -- again, to the
8  best of my knowledge, that would have been the parts
9  direct page, yes.
10     MR. HANSEN: When you say this, so the
11 record is clear, you are talking about the second
12 page?
13     THE WITNESS: Second page of Exhibit 22.
14     MS. CARROLL: Q. Correct, and it is noted
15 it's dated the same 2-24-04?
16 A. Correct.
17 Q. And do I understand from your prior
18 testimony and some testimony of Miss Koch yesterday
19 that MITG does not and did not at the time do any
20 tracking of hits on their websites?
21 A. No, that's correct, yeah.
22 Q. Did you have the capability of monitoring
23 traffic and just didn't have an interest in it or
24 just never got to that feature?
25 A. I can't really say that we had the

Page 75

1  capability. I would assume that we probably did. It
2  was really irrelevant to our business because we
3  equated actual sales. Hits really didn't mean
4  anything to us. It was all the sales that actually
5  equated to anything.
6  Q. When did MITG take -- well, strike that.
7  MITG employees had e-mail addresses with HPdirect, I
8  think, online.com. Do you recall that?
9  A. I would assume, but I don't recall the
10 specific domains, no.
11 Q. Well, do you recall that your employees
12 when acting before Compaq Direct or HP Direct had
13 e-mail addresses that would indicate to the recipient
14 that it was coming from? And I'll just show you as
15 an example Exhibit 8.
16 A. Yeah.
17 Q. Which is Rich@HPdirectonline.com?
18 A. That's that e-mail, that's correct.
19 Q. When -- after the termination of the
20 Standard Support Agreement when did MITG cease using
21 the HP, MITG employees cease using the e-mail
22 addresses with the HP in the e-mail address?
23 A. I can't answer that. It would have been
24 shortly thereafter.
25 Q. Okay. Do you recall having any -- well, do

Page 76

1  you know if you have any documentation that would
2  show when the last day was that they were using the
3  e-mail addresses with HP in them?
4  A. No.
5  Q. Okay. Do you know if it continued after
6  February 7th of 2004?
7  A. Well, obviously it did based on the e-mail
8  you just showed me, correct.
9  Q. Well, that's January 12th of 2004, but I am
10 going to follow up with --
11 A. I'm not saying that it's impossible.
12 Q. This is the page of Exhibit 19 which shows
13 an e-mail address on February 12th where Robin
14 Lowery@BakerNet.com sent an e-mail to
15 Tony@HPdirectonline.com. So at least until February
16 12th --
17 A. I don't know that I agree with that.
18 That's an e-mail to Tony's e-mail address.
19 Q. Correct. But you don't have the rest of
20 the e-mail saying whether it was rejected or etc. and
21 his reply?
22 A. Yes, I do. I just want to cover the
23 technical bases here.
24 Q. Well, let's flip through the exhibit, and
25 he does respond at this point under the MITG.com.

Page 77

1  How long were people from the outside able to contact
2  MITG by using e-mail addresses that had the HP name
3  in them?
4      A. I don't know.
5      Q. Okay. Do you have -- well, the message
6  that is Exhibit 22, how long was that message
7  displayed before the domain names would just go to a
8  not found or an error message, do you know?
9      A. 20 some days. Is that right? 15 days.
10     Q. I think it's been identified as early
11 March?
12         MR. HANSEN: I think March 1.
13         THE WITNESS: I know there was a date. I
14 don't recall the date.
15         MS. CARROLL: Q. It was taken down after
16 that. Without revealing communications with counsel,
17 and you may not be able to answer this question, why
18 was the message taken off of the domain name so it
19 just says not --
20     A. I can't answer that.
21     Q. Okay.
22     A. Privileged.
23     Q. Okay. I want to go back to the Middle-
24 ware.
25     A. Okay.

Page 78

1      Q. And if you will tell me what evidence you
2  have that HP used the Middleware after February 7th
3  of 2004?
4      A. Documented physical evidence, I have none
5  in my possession today.
6      Q. What is the basis for your belief that HP
7  used the Middleware after February 7th of 2001?
8      A. My contention is that during the
9  development process and the subsequent signing of the
10 Middleware Agreement associated around the
11 development of the software that the software resided
12 on two separate locations, one within my organization
13 and as well within the Vista tool, which is a Compaq
14 Direct, Compaq/HP, whatever, owned system. My
15 contention is that from my experience and my
16 knowledge of, A, the process taken to develop that
17 and, B, my understanding of computer programming, not
18 contending to be an expert by any means, but my
19 understanding of the programming and the work that
20 went into that process that it would be extremely
21 difficult, if not impossible, to remove what I would
22 contend would be a portion of the Middleware software
23 out of the Vista system.
24     Q. Let's start back with some basics on what
25 Middleware is.

Page 79

1      A. Uh-huh.
2      Q. Tell me what your understanding is
3  generically of what Middleware is?
4      A. Middleware in a generic overview is a piece
5  of software or various pieces of software utilized
6  by, in this specific instance, both of our companies,
7  respective companies, to communicate via XML for the
8  transmittal of orders, order processing, I believe in
9  some cases inventory level, etc. It was a new
10 developed tool to replace the portal driven, which
11 was the old term, or the -- I can't believe I just
12 lost that word. It will come to me in a minute. The
13 original form of order processing, etc., took place
14 from basically hard line, hard coded relationships.
15 So Vista would have to have a specific tool for you
16 that went just to you and only you, and you as the
17 customer had to as well customize that response
18 back. So it was an extremely time consuming and a
19 relatively expensive process to develop EDI, the EDI
20 link between the two companies.
21         What XML allows you to do is adopt a
22 standard and communicate in very basic overviews,
23 because I don't have a tremendously in-depth
24 knowledge based on the technical aspect of this. In
25 essence, you're communicating with secure e-mail, in

Page 80

1  essence, or documents, XML documents that would have
2  specific line one contains 25 characters, which would
3  be this field. The next 30 characters might be this
4  field, etc., etc.
5      Q. The Middleware is acting as a translator
6  from MITG's system to?
7      A. Vista.
8      Q. Vista?
9      A. Correct. It's -- actually it's operating
10 on both sides as a translator.
11     Q. What is your basis to believe that there is
12 MITG developed software loaded on HP or in this case
13 Compaq Direct's Vista system?
14     A. What's my basis?
15     Q. To believe that software developed by MITG
16 is loaded directly onto the Vista system?
17     A. I was present at the time of development.
18     Q. Was that at the time that there were test
19 runs done to see whether the system would work?
20     A. That was part of it. It was an ongoing
21 process, but, sure.
22     Q. Do you realize that that software after the
23 test process was done was taken off, was deleted off
24 of the system?
25     A. I also know that it was put into production

Page 81

1  because without it it couldn't run.
2      Q. Do you have any basis to contradict the
3  testimony of the people on the Compaq Direct side who
4  were in the IT Department to their testimony that the
5  Middleware software was never loaded on systems in an
6  operations mode to work inside of the Compaq Direct
7  fire wall, directly onto Compaq Direct systems?
8          MR. HANSEN: I'll just object. Their
9  testimony will speak for itself.
10         THE WITNESS: Can I answer that, though?
11 First off, without being able to see who you have
12 talked to within your IT Department, that's an
13 impossible question for me to answer. Two, I again
14 maintain that it's an easy out for them to say that
15 it was taken off of the development systems actually
16 when they were doing the test runs and not put into
17 production, but if it was run on the development
18 systems and put in production so that it would run
19 and there was no other solution prior to for any XML
20 communications within the Vista system but yet they
21 continued to offer and grow those offerings to
22 extended client base, then it would be my belief that
23 it is still in effect today.
24     Q. What is your -- what is the basis for your
25 belief that HP Direct offered and the XML interface

Page 82

1  developed by MITG to customers?
2      A. There is two specific instances where I was
3  a party to orders which came across the, it's been so
4  long now, the OS1 system or OA1, whatever it was,
5  within Vista, the green screen system of Vista, where
6  orders were sent across into our specific bucket for
7  simplicity's sake in which case those orders were for
8  finished goods.
9      Q. Finished goods meaning what?
10     A. For instance, an entire server or a monitor
11 or an entire care pack, whatever it might have been,
12 those were all such items that we would not offer or
13 would not, were not in our list of offerings and as
14 well the customers that came across that were not
15 customers that we would have done that type of
16 business with.
17     Q. Who are the customers?
18     A. I do recall specifically Microsoft, and I
19 vaguely recall Arthur Anderson. It could be Anderson
20 Consulting at the time. I don't recall
21 specifically. There were more instances, but I don't
22 recall specifics of these.
23     Q. Did you print off any of these orders that
24 allegedly came across the system?
25     A. No.

Page 83

1      Q. Did you communicate in writing to anyone at
2  Compaq Direct or subsequently to HP Direct about
3  those orders?
4      A. No. I leaned over the cube and said, hey,
5  we got things in the wrong bucket.
6      Q. Leaned over what cube?
7      A. I was actually in Omaha. This was in one
8  of their cost cutting phases where the ability to
9  continue to process orders was stagnant because they
10 did not have the staff to authorize, etc., the
11 orders, and therefore I was actually in Omaha taking
12 a data entry position for a two- or three-week period
13 to try to get the orders caught up.
14     Q. When was this?
15     A. I don't recall the exact time.
16     Q. So it's your testimony that you went as the
17 owner of MITG and did data entry on behalf of Compaq
18 Direct to process orders. What kind of data entry
19 were you doing?
20     A. On several occasions actually.
21     Q. Okay. Tell me what those several occasions
22 are?
23     A. I mean, they were all related to the same
24 issue, which was a processing of orders.
25     Q. For who?

Page 84

1      A. For it could be CEI. It could have been
2  Compaq. I don't recall the timeframe.
3      Q. What orders are you processing, orders from
4  MITG?
5      A. Orders from -- correct, yeah. Orders
6  through the XML system would come into Omaha, would
7  go into whatever their respective green screen bucket
8  so to speak would be, and they would have to be
9  authorized. You would have to make sure they were
10 the right account number, the right --
11     Q. Is this before the Middleware worked?
12     A. No. This was actually before and after. I
13 mean, it was a process that went on for quite
14 sometime.
15     Q. Is this to try to determine how to
16 determine to make sure the Middleware worked and
17 worked properly?
18     A. I would say that's a somewhat fair
19 statement, yes.
20     Q. Okay. Because the Middleware, the purpose
21 of the Middleware was to get rid of the data entry of
22 orders. So if it was working correctly you wouldn't
23 need to do data entry?
24     A. That's correct.
25     Q. So any of these things where you're there

Page 85

1 and you see an order come across that doesn't belong
2 is before all whatever kinks there may have been in
3 the implementation of the Middleware were ironed out?
4     MR. HANSEN: I object to form. Go ahead.
5     THE WITNESS: I don't know if that's a fair
6 statement, and the reason I say that's not a fair
7 statement is it is conceivably possible, and I
8 contend that it is probable, that the errors for
9 which I saw, and, again, I don't have specific
10 documentation to nail down a date, that there are or
11 were companies utilizing the software that we
12 developed on HP's systems to benefit HP, Compaq, CEI,
13 whoever.
14     MS. CARROLL: Q. What is the last day that
15 you were at Compaq Direct doing data order entry
16 where you saw one of these allegedly wrong orders
17 show up?
18     A. I can't recall a specific date.
19     Q. Okay. When was the Middleware that was
20 developed by MITG fully operational, all kinks ironed
21 out, everything else?
22     A. Again, I can't answer that either.
23     Q. So you don't know whether all of these
24 things that happened with these allegedly wrong
25 orders came across prior to all the kinks working

Page 86

1 out, being worked out, after everyone agreed all the
2 kinks had been worked out, is that fair?
3     A. I would say that's an answer I can't give
4 in that fashion.
5     Q. You cannot say one way or the other?
6     A. I can't say one way or another. But the
7 larger expanse upon that is if they were not
8 utilizing the software in inappropriate fashion, ie.,
9 with other customers, then those orders would have
10 never come to me in the first place.
11     Q. How much technical experience or training
12 do you have in the development of or the operation of
13 Middleware in general?
14     A. No technical training. Just experience.
15     Q. Have you ever developed Middleware? Were
16 you the person that developed this Middleware that we
17 are talking about?
18     A. I was a party to a group, yes.
19     Q. Who was the lead person in terms of the
20 technical aspects of the development of the
21 Middleware programming the interface?
22     A. There were a group of people we employed to
23 do that.
24     Q. John Brewer of Data Enterprises?
25     A. That's one person, yes.

Page 87

1     Q. Who else?
2     A. Jeff Sarkowski, I believe is how you
3 pronounce it.
4     Q. For whom do he work?
5     A. He would be Data Enterprises as well.
6 There were various other people in that timeframe. I
7 don't specifically recall who was involved a hundred
8 percent in that aspect of the development.
9     Q. In this case you, MITG, needed to develop
10 Middleware or this XML interface because Vista did
11 not read XML, is that correct?
12     A. That would be my understanding. I don't
13 know that Vista would be the correct terminology to
14 use. I mean, you guys have thousands of systems, but
15 in essence, yes.
16     Q. So what you had to do was take the XML,
17 this interface was going to take what MITG, the way
18 they entered it, convert it through the interface to
19 a flat file that Vista would understand?
20     A. Well, I think again that's an improper
21 characterization. MITG would -- our system would use
22 a portion of the Middleware to put it into a
23 compatible format to buzz across to another piece of
24 Middleware, which would decipher the XML, and then
25 that would put it into a flat file which would go

Page 88

1 into Vista.
2     Q. So what you needed the Middleware to do was
3 be a translator because you put in 1, 2, 3 and they
4 each had ten characters and the Vista system when it
5 came needed to read it 3, 2, 1 with nine characters.
6 So that Middleware was essentially doing the
7 translation for you saying, okay, I understand when
8 you said 1, 2, 3 that you mean 3, 2, 1. For purpose
9 of my file it means 3, 2, 1?
10     A. If you want to characterize it that way,
11 yes, that's correct.
12     Q. Just trying to keep it simple.
13     A. Sure.
14     Q. Now, is it fair, then, that anybody who was
15 trying to use that Middleware would have to send it
16 in the exact same format that MITG does so the
17 Middleware converts 1, 2, 3 to 3, 2, 1 and 3, 2, 1
18 back to 1, 2, 3? They would need the same language
19 going back and forth?
20     A. Not necessarily, but as well --
21     Q. Why not?
22     A. Because the standard one, the standard that
23 we use is a commonly adopted standard, so anybody
24 trying to do the same thing -- I mean, I guess your
25 question, if I can expand it into an argument

### Page 89

1 standpoint just for a moment, that would be -- what
2 you are saying would equate to if I send -- I'm
3 sorry. I don't recall what your name is.
4     MS. JONES: Gaynelle.
5     MR. HANSEN: Gaynelle.
6     THE WITNESS: If I send Gaynelle an e-mail
7 and she receives my e-mail and Mr. Hansen sends her
8 an e-mail, then what your statement is is that she
9 would receive my e-mail but could not receive his
10 e-mail. In the same fashion that's what I'm getting
11 at. And what your question was -- let's just start
12 over.
13     MS. CARROLL: Yeah, because --
14     THE WITNESS: Maybe I'm reading too much
15 into this.
16     MS. CARROLL: Q. Is it true that
17 Middleware in general is specific to the two formats
18 or the two setups that are being used, the input and
19 the output. Your input has to be in one way and your
20 output is going to be in another way, so you have --
21 you're transmitting data across the Middleware to be
22 translated into a flat file that Vista can read for
23 anybody to use that Middleware that was developed by
24 MITG? The input what they are sending has to be in
25 the same format?

### Page 90

1   A. Not necessarily.
2   Q. Why not?
3   A. Let's say I adopt the first 25 characters
4 and the next 25 and the third set of 25. The next
5 guy adopts 20, 20, 20. It's still possible, and this
6 is what I believe happened in regard to the Microsoft
7 scenario, their order came across in a file of 20.
8 Vista read it as a field of 25. I mean, you know,
9 you would have information in fields that maybe
10 doesn't necessarily apply, but the system doesn't
11 understand that. The system says, okay, are all my
12 fields that I have to have checked, do they all have
13 data in it? Yes, they do.
14   Q. So they at least have to be sending the
15 same data to try to communicate to the exact same
16 data crossing into the Vista order entry system?
17   A. I don't recall the specifics of do we check
18 for name, do we check for account number, do we check
19 for this or that. There were checks in place to make
20 sure that specific things were done. That was an
21 ongoing process once we started to use the tool. It
22 is not fair to say that someone sending -- I mean,
23 for instance, you could have put a hundred A's across
24 the top line, and if you send that via XML into the
25 system without the checks being in place, it is

### Page 91

1 conceivable that that system would go ahead and put
2 that order up onto the screen and show the data.
3     The computer has no capacity to decipher
4 what it's getting is what I'm saying. It would take
5 the data and it could very easily put it into an
6 order and pop it up on a screen, and that would be up
7 to the human person overseeing that scenario to say,
8 oh, this is a junk order or we've got a problem. And
9 then that's when they would, you know, initiate the
10 proper response, whether it's calling Mrs. Irwin or
11 whoever the person or people were associated or
12 responsible for fixing those issues.
13   Q. So you believe that you don't need the
14 exact same format to communicate through the
15 Middleware?
16   A. No.
17   Q. If the person sending it, if it's Microsoft
18 as you allege, that Microsoft can do whatever format
19 they have and make use of the XML interface?
20   A. Without the checks and balances in place,
21 yes. It's literally a flat file. It doesn't matter
22 what's in that flat file.
23   Q. Without the checks and balances in place.
24 What checks and balances are you talking about?
25   A. Well, again, I can't necessarily answer

### Page 92

1 that. That's a question for your folks to answer.
2   Q. And so my question is, other than this
3 allegation that you've made that you saw a Microsoft
4 order and maybe an Anderson order come across while
5 you were doing data entry for Compaq, that's the only
6 basis for the contentions that you've made in the
7 counterclaim that HP has misused or breached the
8 Middleware Agreement? In any other facts?
9   A. Well, there are conversations during the
10 development portion of this. The name that comes to
11 mind is Chris Fortune. I don't specifically recall
12 if that's who the conversation was with. I don't
13 remember who her bosses were, etc., but as we were
14 developing this, there were a lot of people that were
15 excited about the fact that they were going to have
16 an XML offering that they currently did not have and
17 had been working on to develop and had been
18 unsuccessful to such time.
19   Q. So is the fact that they thought that this
20 was a neat solution that was being developed, do you
21 have any facts, other than the Microsoft thing that
22 you allegedly saw and the Anderson stuff that you
23 have a vague recollection that you might have seen,
24 that it was actually used by HP for another customer?
25   A. Do I have that evidence today?

Page 93

1 Q. Yes.
2 A. No, but I believe an expert will be able to
3 uncover that.
4 Q. And if -- do you have any basis to
5 contradict the testimony of Sandy Irwin and Deb Brody
6 who have already testified that HP has not used the
7 XML interface since February 7th of 2004?
8     THE WITNESS: I'm sorry?
9     MR. HANSEN: I'm going to object to form
10 because --
11    THE WITNESS: That's what I was going to
12 say.
13    MS. CARROLL: Q. Do you know who Sandy
14 Irwin is?
15 A. Yes.
16 Q. Do you know who Deb Brody is?
17 A. Yes.
18 Q. Okay. Do you have any basis to contradict
19 their testimony that the Middleware portal or
20 communication line was shut down at the end of the
21 Standard Support Agreement and has not been used by
22 HP for any customers? Do you have any basis to
23 contradict that?
24    MR. HANSEN: Object to form.
25    THE WITNESS: Can I answer?

Page 94

1     MR. HANSEN: Yeah.
2     THE WITNESS: I think the statement shut
3 down is extremely broad, not to mention vague. There
4 are multiple pieces to the tool that create a
5 problem. For instance or example, Mrs. Brody might
6 say, I have shut down the XML interface because she
7 shut off, for lack of a redundant term, portal 1, 2,
8 3, which was assigned to MITG. Whether that's
9 through Samsung -- I don't mean to be disrespectful
10 to the gentlemen there at IT that took care of the
11 fire wall, that had to pop a hole for us to get
12 through. Whether they shut off the fire wall,
13 whether they shut off the XML portal that Deb was in
14 control of, or whether they shut down the processes
15 within Vista or any of the other associated tools
16 that help process that, I can't answer that.
17    When I hear the response it's shut off,
18 that doesn't mean anything to me. Which portion of
19 the, I would say, probably five pieces of the tool
20 are shut off and removed?
21    MS. CARROLL: Q. Okay. Well, let me ask
22 you this. If Sandy Irwin has testified that she shut
23 off her portion -- so she is dealing with web
24 interface and that Vista processing -- that was taken
25 out of a possible processing, so if something got

Page 95

1 through, then Vista no longer would recognize that.
2 If both of those things are disabled or shut off, do
3 you have any basis to contradict that testimony.
4     MR. HANSEN: I'm going to object to form.
5     MS. CARROLL: Q. Okay. Go ahead. Please
6 answer.
7 A. I'm going to say that I don't have -- I
8 guess I don't know how to explain this properly.
9 Sandy --
10 Q. It's very easy. I have just told you. Do
11 you have a basis to disagree with the statement that
12 Sandy Irwin shut off the Middleware Agreement at the
13 web access and that Vista was shut off in terms of
14 the processing of those orders in the batches,
15 however they are processed? If those things -- if
16 the testimony has been that those things have been
17 shut down, do you have any basis to contradict that
18 testimony?
19    MR. HANSEN: Object to form. You can
20 answer.
21    THE WITNESS: I would say that just because
22 Sandy has shut down the portion that she was aware of
23 does not lead me to believe that other portions of
24 that software which were incorporated through other
25 people besides Sandy Irwin within Vista have shut off

Page 96

1 their portions.
2     MS. CARROLL: Q. All right. Do you -- let
3 me show you Exhibit GG and ask you to take a look at
4 that and tell me if you have any basis to deny the
5 facts, the statements that are made in Exhibit GG.
6     MR. HANSEN: Well, first of all, I'm going
7 to object, and you're asking this witness to comment
8 on an HP document that has not one scintilla of
9 evidence that he ever received this.
10    MS. CARROLL: I'm --
11    MR. HANSEN: Hold on. I'm going to get my
12 objection on the record. In asking him to contradict
13 an HP document that he has never seen and has no idea
14 what it is. So I think it's shear speculation and an
15 improper question, but if he wants to answer it, he
16 can answer it.
17    MS. CARROLL: Q. Well, it's not he gets to
18 vote whether he gets to answer it. The question is,
19 those statements that are made in there, do you have
20 any basis to say, no, this didn't happen or, no,
21 somebody, so and so said she typed this up but she
22 didn't really do it, or it got turned off and it got
23 turned back on? That's what I'm looking for. Do you
24 have any basis to contradict those statements?
25 A. I have never seen these documents.

Page 97

1  Q. And now the content that's in those
2 documents, do you have any basis to contradict those
3 statements?
4       MR. HANSEN: I object. It's an improper
5 question. You are asking him to comment to a
6 document, on a document he has never seen.
7       MS. CARROLL: I didn't ask him to comment
8 on the document or anything else.
9       MR. HANSEN: You asked him to give you any
10 evidence he has contradicting the statements that
11 Miss Irwin put in this exhibit.
12      MS. CARROLL: Q. Duane foster removed
13 OE1900SP from the auto startup. Do you have any
14 basis to say one way or the other whether that
15 statement is true.
16      MR. HANSEN: Object to form. It's an
17 improper question, but go ahead and answer.
18      THE WITNESS: No. But as well I don't know
19 what OE1900SP is either.
20      MS. CARROLL: Q. So you don't actually
21 even know what the batches are called with it that
22 are in the Vista order entry system?
23  A. I don't, no.
24  Q. Okay. Now, do you have -- you said that
25 you think an expert could figure out whether the

Page 98

1 Middleware was being used for other customers, was
2 that correct?
3  A. That's correct.
4  Q. Okay. Do you have -- understanding that
5 you're not necessarily an expert, do you have an
6 understanding of what kind of information that expert
7 would need or what they would need access to to
8 determine whether or not the Middleware has been used
9 for another entity other than MITG?
10  A. I believe that I can explain it my better
11 than basic, less than expert fashion.
12  Q. Okay. Great. Please do.
13  A. That would enable a person with the
14 technical experience, education, and knowledge to
15 seek out and find what I allege in my counterclaim.
16  Q. What -- where are they going to seek out
17 and find it?
18  A. Well, there are multiple locations.
19  Q. Okay. Tell me.
20  A. The very first place to start would be
21 Vista. The second place to start would be within the
22 XML processing piece. If I'm not incorrect, and God
23 knows what systems have changed since we have been
24 done with this, there are, to my best knowledge at
25 least, four different processing pieces used for XML

Page 99

1 with Deb Brody. Whether they are servers or how they
2 work, I don't understand that portion of it
3 necessarily, but I believe that the portions of our
4 code could be discovered.
5  Q. Portions of your code could be discovered
6 residing on?
7  A. On any and all of those systems.
8  Q. And is it more than just residing or are
9 they doing something or are they sitting there? Are
10 you contending that something is being done with
11 them?
12  A. Yes, that's correct.
13  Q. And so you believe that somebody could look
14 at that and determine, and you believe, in fact, they
15 would determine, that not only is there MITG created
16 code on the systems but those have been actively used
17 over the last year for other people?
18  A. That's correct.
19  Q. I sent -- do you recall getting request for
20 production where HP, this was awhile back, the first
21 set, where HP requested sent a request for documents
22 through your counsel to MITG?
23  A. I would assume so. I mean, I haven't
24 specifically seen it, no.
25  Q. Well, I want to show you something here,

Page 100

1 and then I want to show you the documents that are
2 referenced. Request for production Number 40, and
3 this is my copy, so I would prefer that you leave it
4 somewhere in my vicinity.
5       MR. HANSEN: Well, hold on. If you are
6 going to put -- I want to make sure this is it. I
7 mean --
8       MS. CARROLL: I'm giving him the pages that
9 he needs to see. I have written on other parts of
10 it, which is why I don't want you --
11      MR. HANSEN: Why don't we do this. Why
12 don't you take your copy. I have ours sitting out
13 here.
14      MS. CARROLL: Q. You have yours?
15  A. Yes.
16  Q. I can give him this that is a request
17 for production Number 40, and this is the request
18 that was asked any and all documents referring and
19 reflect, blah, blah, blah, HP's alleged use of the
20 Middleware created pursuant to the Middleware
21 Agreement from February 7th of '02 to February 7th of
22 '04?
23  A. Uh-huh.
24  Q. And these are the documents that were
25 identified, these ranges right or bates ranges right

Page 101

1  here, and you say that there are other documents that
2  are in HP's possession?
3      A. Okay.
4      Q. Let me hand you -- I'm going to need to get
5  the court reporter to mark these documents. Well,
6  why don't we just do this. Let me hand you -- this
7  is the original one and, Jim, you can confirm this.
8  I don't have MITG 9, but it's the termination
9  letter. MITG9 is this termination letter, and what
10 we are looking for is the use of the Middleware
11 Agreement, this document being one of the ones that
12 was identified. This MITG starting with 497, this
13 document range right here, and my things got cut off
14 there, and then you have this document it starts with
15 471.
16     I want to know if there are any others.
17 These have been identified as relating to the use of
18 the Middleware, these three documents. Are you aware
19 of anything else, other than the documents that you
20 identified here, as relating to the use of the
21 Middleware?
22     A. That I have possession of?
23     Q. Correct.
24     A. No.
25     Q. Okay.

Page 102

1      MR. HANSEN: Off the record.
2          (Discussion off the record.)
3      MS. CARROLL: Q. Do you -- at this point I
4  understand that you allege not only that there has
5  been a misuse of the Middleware, but that you have
6  been, that you're entitled to some sort of monetary
7  damages for that misuse?
8      A. Specifically Middleware?
9      Q. Yes.
10     A. That's correct.
11     Q. All right. And tell me what is the factual
12 basis, not looking for what you think the misuse is,
13 but do you have some methodology on which you are
14 looking at to how those damages would be calculated?
15     A. No. I think that would be turned over to
16 the hands of an expert. I don't have the training to
17 make those recommendations.
18     Q. Well, is there some part of the Middleware
19 Agreement, which is Exhibit Y, that would tell you
20 how to calculate those damages methodology wise? Was
21 there a provision in that agreement that says if you
22 use this for somebody else this is what you pay? Do
23 you recall that?
24     A. I don't recall. If you want to give me a
25 few minutes, I'll read through it for you.

Page 103

1      Q. If you'll just read through that briefly.
2  I don't think there is, and that's what I'm trying to
3  determine, is that how -- and let's just make this
4  assumption. Post-termination February 7th MITG
5  access to Vista is shut off. HP turns it on for
6  another third party and that third party is now, if
7  your allegations are true, that third party is taking
8  advantage of the use of that Middleware, or at least
9  the portion that resides on the HP side. How do you
10 calculate those damages?
11     A. Based off of your sales associated with any
12 customer order placed through that tool. But if I
13 may expand a little more. The issue that I contend
14 is not that they shut me off February 7th and they
15 started somebody else February 8th. My contention is
16 that once the tool was in effect in 2002 that they
17 actively or inactive, however you want to look upon
18 it, solicited and/or offered that solution to other
19 customers because it would alleviate, A, manpower
20 which is a bottom line reduction which I'm sure
21 everyone was happy to have and was to facilitate that
22 greater speed of ordering, and it was something all
23 customers were needing. That's why we developed it
24 in the first place.
25     Q. Is it true that the customer using the

Page 104

1  Middleware would need -- there is a piece of it, as
2  you contend a piece of it is in Vista?
3      A. Uh-huh.
4      Q. And then there is a piece of it on MITG
5  system?
6      A. Uh-huh.
7      Q. In order for a customer, then, to make use
8  of that, a customer other than MITG, they would
9  actually all have to load that piece, the piece that
10 would reside on MITG system onto their system, right?
11     A. They could use the standardized format and
12 use whichever front tool they would like to use to
13 send over, that's correct. It's not specific to my
14 piece. The front end is not 100 percent specific in
15 that issue. If they use the format and they use the
16 back end which HP has to process, then they can make
17 the translation at HP and send it back to the
18 customer.
19     Q. Could I -- I would need some kind of
20 software, right, in order, on my side if I'm sending
21 it, I'm trying to make use of your Middleware by
22 doing an order entry? These are web based order
23 entries, right?
24     A. In some form or fashion. They don't have
25 to be web based, no.

Page 105

1  Q. All right. I'm trying to make a web based
2  order entry into Vista and I want to do it in XML, so
3  I need to use that Middleware. I have to have
4  something loaded onto my system on my end in order to
5  make use of that. I can't just shoot any old thing
6  across. I can't just, you know, put a little form
7  and stick it out there and send it out there. I need
8  some kind of software program to enable my piece to
9  go through?
10     A. As long as HP has the translation piece
11  within the Vista system, it can do translations both
12  ways. So, no, it's not specifically necessary for
13  the end user to have that piece as long as they use
14  the format as given. Then HP can do translations on
15  both sides.
16     Q. What did your piece do on your side?
17     A. My people were able to do multiple things
18  that you wouldn't necessarily offer to a customer and
19  that are -- it was relevant when it came to inventory
20  levels. There were things that were done besides
21  just order processing.
22     Q. What?
23     A. Again, inventory levels, the checking of
24  the tracking information, the response back and
25  forth. I mean, the reason that there were two pieces

Page 106

1  that were so integrally involved is that there were
2  certain information that we gathered and certain
3  information that HP maintained. We would have to
4  translate that information to them. They would
5  decipher the information into theirs, ie., Vista, and
6  then they would shoot back the appropriate responses
7  to us, okay.
8        From a customer perspective it doesn't
9  necessarily work exactly the same. The customer is
10  interested on a PO basis, being able to place an
11  order in their system, however it is, have it shoot
12  an XML message over to HP who deciphers that message,
13  puts it into Vista, and then ships it back. They
14  don't need the multiple level of back and forth
15  communication that we needed to make the thing
16  function that way. So they would not necessarily
17  have to have both pieces of software to offer that to
18  other customers.
19     Q. The order entry -- are you telling me that
20  the software that resides on your system, your
21  portion of the Middleware Agreement, does not have
22  anything that is necessary for your communication of
23  order entry information into Vista?
24     A. You're talking apples and oranges here. If
25  you are looking at -- hold on. Let's say I send 50

Page 107

1  fields, I send 50 fields of data over. My back
2  office systems have to gather that information from
3  their appropriate spots, okay. They process it into
4  a format that is acceptable. They ship it over. HP
5  takes it, looks at it, flips it and molds it however
6  they need to mold it to make it work into Vista.
7  Based off of that same software they put it into
8  Vista. They are in constant communications back and
9  forth, yes. No, the credit card is bad. How do we
10  fix the credit card? There is all these transactions
11  back and forth, whether it is credit cards or PO from
12  a consumer standpoint or another business.
13     Q. And that's -- I'm not trying to distinguish
14  at this point. My question is really focused on the
15  software that you have that MITG had loaded on their
16  system that was the Middleware. You're telling me
17  there are two pieces of this Middleware?
18     A. That's correct.
19     Q. One on their system; one on your system?
20     A. That's correct.
21     Q. My question is, does your part of the
22  system have any information that is necessary for the
23  order entry, direct order entry into Vista, not this
24  inventory checking and tracking, or are you telling
25  me that your piece doesn't have the order entry piece

Page 108

1  that resides over here at HP?
2     A. No. My piece does have the order entry
3  piece. What I'm saying is as well because of the
4  subsequent supporting nature of the software, that's
5  why it is in place. But from an outside company,
6  company ABC, they would not necessarily need the same
7  piece of software on my side as long as HP is
8  utilizing the piece on their side to do the
9  translation.
10     Q. Wouldn't they need the order entry piece on
11  your side? Cut out the inventory tracking, the
12  inventory checking, cut out tracking. Don't they
13  need some kind of software on their side?
14     A. It's a standardized format.
15     Q. Where do I get that standardized format?
16     A. I can't answer that. I mean, it's more and
17  more prevalently available now than it was three
18  years ago now that we did this.
19     Q. Okay. Well, aren't you claiming that three
20  years ago that somebody was making use of your
21  system? Was it standard three years ago?
22     A. No. No.
23     Q. So somebody for you -- say it was
24  Microsoft. Somebody from Microsoft would have had to
25  develop some kind of software to make their system

Page 109

1 interactive with the XML interface that MITG created
2 that you contend is loaded on Vista?
3     A. They could have very easily have just sent
4 a flat file XML format to our tool within HP and had
5 the same response.
6     Q. Do you have any knowledge of how Microsoft
7 or any other customers, specifically knowledge of how
8 any customer of Compaq or HP orders from the order
9 entry system, the Vista order entry system?
10     A. Today?
11     Q. Correct.
12     A. No.
13     Q. At any time?
14     A. I had --
15     Q. Other than your contention that Microsoft
16 was using your -- I'm trying to set that aside. Do
17 you have any knowledge of how Microsoft interacts
18 with Compaq or HP for ordering parts?
19     A. I have a rudimentary understanding of that
20 quite frankly hobbled together method of how those
21 things work, but I don't have specifics, no. I would
22 have to refer to your documentations of flows to go
23 see that.
24          (Whereupon a short recess
25          was taken.)

Page 110

1     Q. Mr. Haught, two or three follow-up
2 questions. You indicated that you were in Omaha when
3 orders came across that you thought were incorrect
4 and/or shouldn't have been going through the
5 Middleware and that you stuck your head up over the
6 cubicle and commented about it. Who did you comment
7 to?
8     A. Sherry Ellis.
9     Q. And what was Miss Ellis's response?
10     A. It's kind of her usual response. I'll get
11 to it. I'll look at it. Whatever. She was never
12 real proactive.
13     Q. Do you know if that order that you
14 allegedly saw was ever processed?
15     A. Through another channel. I mean, did I
16 process it? I was unable to process it.
17     Q. Why?
18     A. I didn't offer those finished goods.
19     Q. Okay. Well, I don't mean process.
20 Processed through so that it became a final order
21 that came in across that screen, it got billed, all
22 of these things got shipped, it got sent to the right
23 place?
24     A. I would assume so, yes. It was redirected,
25 if that's your correct question.

Page 111

1     Q. You assume so, but you don't really know
2 what happened to it?
3     A. No. I don't really have the specifics to
4 it, no.
5     Q. And you have indicated that you have been
6 to Omaha on more than one occasion for this data
7 entry process. Do you have travel records that would
8 show when you made those trips to Omaha?
9     A. Oh, I'm sure I could probably find credit
10 card receipts or hotel receipts, but otherwise I
11 wouldn't have any specific information, no. I mean,
12 I'm sure I can find that from the hotels.
13     Q. Okay. And, Jim, I would ask that you
14 consider the request that we get information that
15 shows when he made those trips to Omaha that he has
16 testified about.
17       MR. HANSEN: Are you making a formal
18 request for that, because your formal request before
19 was for travel expenses of MITG's employees that was
20 reimbursed by HP.
21       MS. CARROLL: Yes, I'm making a formal
22 request for these, yeah. I'm making a formal request
23 for this. If you'll consider that, I would
24 appreciate it.
25       MR. HANSEN: Okay.

Page 112

1       MS. CARROLL: Q. You -- during the time of
2 the Standard Support Agreement, and just making sure
3 that we are clear, February 7th of 2004, the Standard
4 Support Agreement is now in place?
5     A. 2002?
6     Q. 2002. I'm sorry.
7     A. That's okay. Long day.
8     Q. I know. It's early still, too. They have
9 -- from that time going forward I want to talk
10 initially, and I want to break this down a little bit
11 into your initial business when it was still Compaq
12 Direct premerger, and for the purpose of these
13 questions I would ask that you assume that my
14 statement that the merger happened in May of '02 is
15 correct. Before you -- before the merger, how much
16 business, so from February to May, how much of MITG's
17 business was addressing the needs of Compaq Direct's
18 customers pursuant to the Standard Support Agreement?
19     A. How do you want that answered? From a
20 dollar perspective I have no way of knowing it.
21     Q. How about a percentage of business,
22 resources dedicated to the work? Try to start with
23 that. How much of MITG's personnel were going to be
24 dedicated to servicing Compaq Direct customers under
25 the Standard Support Agreement?

Page 113

1  A. 75 to 80 percent maybe.
2  Q. And can you give me a rough estimate of the
3 percentage of revenue during this Compaq Direct only
4 time period, how much of MITG's revenue was generated
5 from sales or parts or service under the Standard
6 Support Agreement?
7  A. I have no way of doing that. I have no
8 recollection of that offhand.
9  Q. Okay. Is it fair to say it would be more
10 than 50 percent of your revenue was being derived
11 from business under the Standard Support Agreement?
12  A. At the time this is in effect?
13  Q. Yeah, from February to May, so the spring
14 of '02.
15  A. I would say that it's fair that it's more
16 than 50 percent, yes. Quite a bit more actually.
17  Q. Would it be along the lines of 75 to 85
18 percent, you think?
19  A. Probably. Yeah. And actually I would say
20 75 to 85 percent.
21  Q. Was there other business that you were
22 doing in the spring of '02 for Compaq Direct that was
23 not governed by the Standard Support Agreement?
24  A. Yes.
25  Q. Okay. Tell me what kind of business that

Page 114

1 was?
2  A. That was a specific piece of -- well, there
3 are multiple pieces actually, but I'm assuming the
4 specific piece you are referring to is in regards to
5 the third party parts which were procured
6 specifically for the service organization of Compaq
7 slash HP slash CEI slash whatever.
8  Q. And trying to focus just again in the
9 spring of '02, were you -- was MITG providing service
10 parts, so which means Compaq Direct service personnel
11 in need of multivendor parts would call and request
12 parts be shipped.
13  A. Well, now we are talking about two
14 different things now.
15  Q. Okay. I apologize.
16  A. That's all right.
17  Q. The service parts that you are talking
18 about, what are we talking about here?
19  A. They are specifically related to customers
20 such as Wiltel, Intel.
21  Q. Savvis maybe?
22  A. Yeah, Savvis, thank you. Savvis. I
23 believe we were even involved in some Sprint stuff.
24 I mean, there were various customers. I don't recall
25 all of them.

Page 115

1  Q. Okay. Half a dozen, give or take,
2 customers that MITG was providing service parts to?
3  A. Well, it could be more than a half a
4 dozen. It was an expansive number. It depended on
5 which ones we previously primarily serviced and which
6 ones were secondary or third on the tier, but, yes,
7 that's true.
8  Q. Just using Intel as an example, how did
9 that -- if Intel needed service parts and MITG was
10 going to provide them, how did that relationship or
11 how that did that scenario go?
12  A. Well, we were providing third party parts
13 anyway along with Compaq HP parts for the out of
14 stock, etc., scenario. There was a tool developed by
15 IP Revolution, which was a service dispatch tool.
16 That service dispatch tool -- and I'm speaking
17 strictly from hearsay, because I have not seen nor do
18 I have specific knowledge of their contract. I know
19 that IP Revolution was put in place to do specific
20 Sun related and Intel related technical support. I
21 don't want to say service calls, even though they did
22 dispatch service teams. I believe they had on-site
23 -- the term escapes me now, but basically engineers
24 like site engineers that were on site to do technical
25 assistance and things of that nature. IPR developed

Page 116

1 that piece of business, and through that then there
2 was a need to have properly diagnosed and properly
3 acquired parts to send out to these service
4 suppliers.
5  Q. So that service supplier needs -- and we
6 are talking about third party parts as well as non-
7 stocked or legacy Compaq and HP parts?
8  A. Most of the parts through that channel were
9 Sun, Intel. You might deal with Motorola in regard
10 to the processors. I mean, there were specific --
11 EMC Storage Works. I mean, there was a whole myriad
12 of, I would say, non-traditional enterprise plus type
13 equipment that those people specifically targeted.
14  Q. Now, when these folks were contacting MITG
15 for the service parts, were they contacting a number
16 that was answered, hi, this is MITG, or, hi, this is
17 Compaq Direct?
18  A. Who are these folks?
19  Q. The Intel. When you are talking about
20 shipping these service parts, who was contacting --
21 well, let me ask first. Who was contacting your
22 organization, regardless of which part of your
23 organization was being contacted? Who was contacting
24 you? Was it Wiltel and Savvis?
25  A. Well, it could have been customers direct.

Page 117
1  It could have been -- for instance, one name that
2  will inevitably always be in my brain because he was
3  a pain was Bill Makai. This was an Intel
4  representative. So we could be contacted by the
5  service rep, which would be like Makai. You could be
6  contacted by the customer. In some cases the
7  customer would call direct. You might have a field
8  service technician from a third party servicing
9  company that would call to follow up. You might have
10 IPR call and be the liaison. There was a myriad of
11 people that would call.
12       How the calls were answered, I mean, there
13 wasn't really a specific format. The tool as used --
14 if, for instance, if Intel were to, Paul Makai were
15 to contact Mike Lauber because Mike was a primary
16 focus of contact on these things, they would call his
17 MITG office. He would answer it MITG, and all his
18 e-mails would be MITG.
19    Q. So it just depended on which access point
20 they hit, how they accessed them? In your example
21 they might ask for Mike Lauber, call an 800 number.
22 It depended on which 800 number they were given as
23 to --
24    A. No. In those cases we were doing 24-hour
25 support for these things, so they would have Mike's

Page 118
1  cell phone number. It was broadcast all over the
2  world throughout Intel's company. So he might get a
3  phone call from somebody in Malaysia at 4:00 in the
4  morning speaking awful English saying, we broke down,
5  help us. It didn't really matter. There wasn't a
6  real big service organization. It was almost as if
7  this was created to go against the service
8  organization that existed because of-- I don't want
9  to say the inadequacies. Because of the minutiae and
10 the size of it. We were a zero turn kind of quickly
11 responsive solution provided portion of that business
12 versus the established day-to-day business.
13    Q. Okay. So you were providing service parts
14 and people contacted you through multiple access
15 points?
16    A. Uh-huh.
17    Q. And when you provided those service parts,
18 who did you bill?
19    A. In most cases we billed HP.
20    Q. Okay.
21    A. In latter transitions we were billing the
22 service providers themselves.
23    Q. Okay. So what part of your business, if
24 you can say, in the spring of '02 was this service
25 parts business?

Page 119
1  A. I have no way of breaking that out.
2  Q. Okay. Was there any other business? You
3  have Standard Support Agreement business. You have
4  the service parts business. Was there any other
5  business that MITG was doing for Compaq Direct in the
6  spring of 2002?
7  A. From a non-compensated basis.
8  Q. I'm only looking for revenue.
9  A. Okay. No. I mean, we did a lot of things
10 that we were not compensated for.
11    Q. After the merger, so we get to the summer,
12 just taking it in broad terms the summer of 2002,
13 after the merger of Compaq and HP, was there any
14 difference in terms of the mechanism for how the
15 Standard Support Agreement worked of you get anything
16 from HP saying we are changing the way we are going
17 to do this from an administrative standpoint?
18    A. Were we notified?
19    Q. Correct.
20    A. No. No. Not to the best of my knowledge,
21 no. Did we see the changes? Yeah. They were
22 apparent very quickly.
23    Q. Do you have any documentation from the
24 spring of '02, or do you have -- are you aware of any
25 way to determine in the spring of '02 the revenue on

Page 120
1  a monthly basis that was being derived by MITG for
2  work under the Standard Support Agreement?
3  A. Independent from my other business?
4  Q. Correct.
5  A. No. There is no way to discern that, I
6  don't believe.
7  Q. All right. Now, is that true for the
8  entire time the Standard Support Agreement was in
9  place? Your revenue numbers that were provided and
10 discussed with Miss Koch yesterday, there is no way
11 to break that out to say this is Standard Support
12 Agreement work, this is other work --
13    A. Huh-uh.
14    Q. -- you know, related to Compaq or HP and
15 this is other Compaq HP work?
16    A. No. I believe that it was never put that
17 way.
18    Q. Okay. And so on all of these -- just so we
19 are clear on what all of these means, all of these
20 being for these categories that are on this revenue
21 spread sheet that Miss Koch prepared for us, sales
22 and revenue, cost of goods sold, gross margin
23 operating expenses, etc., these can't be, none of
24 these can be broken out by Standard Support Agreement
25 work versus other work versus anything else?

Page 121

1   A. No.
2       MR. HANSEN: Well, hold on. I just want --
3   so the record is clear, I think Miss Koch testified
4   we have these invoice registers, okay, and that is a
5   breakout of something.
6       MS. CARROLL: Q. And in terms of this
7   breakout, we have what was actually billed on this,
8   but other than that, other than what actually got
9   billed for third party spare parts, the only thing
10  that can being broken out of this number -- and tell
11  me if you agree or disagree with this statement. The
12  only thing that can be broken out of this sales and
13  revenue number is the amount that was actually billed
14  to HP for third party parts? Do you know one way or
15  the other?
16      A. I don't really know. I mean, I would have
17  to refer back to Mrs. Koch's testimony, I guess.
18      Q. Is it fair to say that you defer to her in
19  terms of what are included in these categories?
20      A. Yeah. Oh, yes. I don't profess to know
21  all.
22      Q. Okay. After the merger of HP and Compaq,
23  you moved to being an HP Direct, just the phone
24  started getting answering HP Direct?
25      A. HP Direct On Line.

Page 122

1       Q. I mean there was the consumer and B to B
2   and --
3       A. Yeah, correct.
4       Q. Now, explain to me in terms of how one
5   phone number you thought went to or one access point
6   was B to B, one access point was consumer, and one
7   access point was support?
8       A. Service support business.
9       Q. And so was the service support business,
10  generally that's the business that we are talking
11  about, the non-standard support agreement business?
12      A. No. The service business I'm referring to,
13  which would be, say, question 3 or answer 3, would be
14  more along the lines of the Mike Lauber, that service
15  business. Or am I confusing what we are getting at
16  here?
17      Q. Well, I have -- you're aware of MITG during
18  the term of the Standard Support Agreement had two
19  800 numbers?
20      A. That we ourselves owned?
21      Q. One of which was controlled by MITG and one
22  which was an HP?
23      A. There was a lot more than two, though.
24      Q. With two options off of it?
25      A. There was more than just two numbers.

Page 123

1       Q. Okay. How many 800 numbers -- this is an
2   e-mail string, and the reason I'm showing this is a
3   discussion about the phone tree. We have
4   800-848-4598 and 9771, and this one, the 9771, has
5   options two and three that route off of and to HP
6   Direct.
7       A. Okay.
8       Q. Are you aware of any additional numbers for
9   MITG to be contacted as HP Direct?
10      A. Well, in regards to channels getting to
11  these numbers?
12      Q. Uh-huh.
13      A. I know there were other numbers, yes.
14  There were numbers at the Welcome Center. There were
15  numbers -- at one time it was a huge mess to try to
16  keep under control. You would ask people, how did
17  you get here? And you might get 50 different phone
18  numbers where one of these people came from. So do I
19  know the internal structure of the HP phone tree?
20  No, I don't have a clue.
21      Q. I'm not looking for that. What I'm looking
22  for is if you can tell me these are -- do you
23  acknowledge that these are two phone numbers that
24  were access points to MITG as HP Direct? Do you
25  recognize those numbers?

Page 124

1       A. Yes, I do uh-huh.
2       Q. Are there any other phone numbers as you
3   sit here today that you can tell me were MITG as HP
4   Direct phone numbers that were either, that you
5   provided on the HP Direct website or that you put on
6   advertising of any kind or information that you gave
7   to CSR's? Were these the phone numbers that you were
8   giving out regardless of people's circuitous route
9   and ended up with you?
10      A. No, I don't have any specific knowledge. I
11  mean, I'm trying to answer your question, I guess,
12  but I have absolutely no way of knowing what numbers
13  got to HP. I know that there were more than just
14  that 800 number that dumped into us.
15      Q. Well, and my point is or my question is,
16  can you tell me as you sit here today what the 800
17  numbers were that were accessed?
18      A. No. I mean, I have no specific knowledge
19  per se as to what those are, no.
20      Q. When -- do you recall when you first heard
21  about the merger actually taking place between Compaq
22  and HP?
23      A. No.
24      Q. Prior to the merger of the companies when
25  people were calling in for sales under the Standard

3:04-cv-03055-CJES-CHE MITG #71-7 Page 15 of 18
HP and Compaq v. MITG
Condenselt™
Ronald Haught

Page 125

1 Support Agreement, describe for me the customer base
2 or what the customer said that you were servicing?
3   A. Well, again, it was B to B and consumer, so
4 it could be, again, Arthur Anderson. It could have
5 been Boeing. It could have been the government. It
6 could have been whoever on the B to B side. On the
7 consumer side it could be you, your mom, your dad,
8 anybody. I mean, whoever went to a myriad of
9 websites and/or a myriad of phone numbers could have
10 eventually come into us.
11   Q. And in terms of -- I want to focus on the
12 B to B side. And so the record is clear, when we are
13 talking about this, it's business to business?
14   A. That's correct.
15   Q. The B to B side, was it an actual customer
16 contacting you, or was it a Compaq Direct sales
17 representative contacting you saying, my customer
18 needs this?
19   A. Oh, it could have been both.
20   Q. Okay. Can you -- do you have any way to
21 tell me what percentage of your B to B business was
22 Compaq Direct, ISR's or CSR's and other sales type of
23 people versus the actual customers of Compaq Direct?
24   A. No, I have no way of knowing that.
25   Q. Do you know if one was greater than the

Page 126

1 other?
2   A. Not really. No. I don't know how you
3 would even equate that quite frankly.
4   Q. Okay. When someone called in, a consumer,
5 the end user sitting at home on their personal
6 computer, if they called in, it was an option which
7 is, if you're calling from your living room or
8 whatever the message was, press this number?
9   A. Well, not necessarily. I mean, for
10 instance, the average call that came to the consumer
11 base either went to the Welcome Center, went to --
12   Q. Let me stop you. What's the Welcome
13 Center?
14   A. Shit, I don't know. Excuse me. You all
15 own it. I don't know.
16   Q. Is it a Compaq corporate Welcome Center
17 1-800 Compaq, is that what I'm trying --
18   A. Yeah, that's one of the numbers, but my
19 understanding of the Welcome Center itself was that
20 it was multiple centers. I don't know if you all
21 were routed geographically, but it seemed like
22 anytime that there was a communication put out from
23 within Compaq to the centers you might still get
24 somebody saying, we just heard of you from so and so,
25 or, we have never heard of this before. It was a

Page 127

1 large octopus, so to speak, I guess.
2   Q. All right. So the Welcome Center -- a
3 consumer sitting at home is trying to get a new
4 printer cable to plug it into their Presario. They
5 are trying to find that part. They could call the
6 Welcome Center and potentially get routed?
7   A. Potentially, yes.
8   Q. Did they -- was material sent out by MITG
9 or by Compaq Direct, for example, a mail order or an
10 e-mail, to people saying, if you want consumer
11 products, spare parts, you can call Compaq Direct,
12 and gave your phone number? Was there any kind of
13 advertising?
14   A. I mean, there were various things. Those
15 types of things were more like the informer, I
16 guess. That's an HP. I don't recall what it was
17 called with Compaq.
18   Q. It was a Compaq document?
19   A. They had a newsletter or whatever you want
20 to call it which everybody tended to ignore, but
21 nevertheless it went out. There would be those types
22 of scenarios. Have I been or were we involved with
23 specific or direct marketing? I can't say yeah or
24 nay. I mean, we were involved in some aspects in
25 regards to like the partnership with IPR and trying

Page 128

1 to build the service order or service piece business
2 for HP or Compaq, whichever you want to call it. You
3 know, we could very well have been a party to that.
4 As to what numbers were associated with that, I don't
5 have a clue.
6   Q. Well, somebody gets one of your 800
7 numbers, an 800 number that's coming to HP Direct
8 slash MITG?
9   A. Uh-huh.
10   Q. When they called in, I take it from some
11 prior testimony of Mr. Rice that what they did was
12 say, okay, hi, welcome to HP Direct. If you are a
13 consumer -- is this how it worked? If you are a
14 consumer, push 1. If you're a business, push 2. If
15 you're a this, push 3. Was there a phone tree?
16   A. There is an auto attendant, yes, because
17 it's also possible that they could have dialed direct
18 to the extension to bypass the tree.
19   Q. Okay.
20   A. They could have as well not even hit that
21 specific tree. Let's say you could end up with
22 consumers on the B to B side and you could end up
23 with B to B on the consumer side.
24   Q. Okay.
25   A. One thing that was interesting in that

Page 129

1  process is once you were able to get a customer and
2  maintain a relationship they typically would find
3  whatever method was the easiest to get their problem
4  resolved. And so in a lot of cases calls would have
5  bypassed that tree altogether, and they would have
6  said, I have always worked with Jim. I want to
7  continue to work with Jim. So therefore they called
8  Jim.
9      Q. So what you have are consumers and B to B
10 ended up through either calling a number that's
11 specifically assigned to HP Direct slash MITG or they
12 could end up someplace else in the Compaq and HP
13 world and eventually get routed to MITG as the direct
14 organization?
15     A. Correct. Or they could have dialed the
16 extensions of that person directly.
17     Q. All right. And then -- but the consumer as
18 far as --
19     A. We are going back to them. If they called
20 and ended up at the Welcome Center, they could end up
21 in multiple places and may, in fact, be able to
22 acquire what they want to acquire from one of these
23 other Compaq sources or from MITG. So say they
24 needed a new keyboard for their Presario, a Compaq
25 keyboard. They could have ended up at MITG. They

Page 130

1  could have ended up at the Compaq spare parts store.
2  They could have gone to an authorized retailer of
3  Compaq parts.
4      Q. Well, is it out of warranty parts?
5      A. Non-warranty parts.
6      Q. So it's an out of warranty part and as well
7  it's --
8      A. I would like for you to discern what
9  timeframe you are talking about, because we were
10 prior to the parts store ever existing.
11     Q. Okay. In the spring of '02 consumer wants
12 to buy a stocked, an in stock Compaq spare part?
13     A. Uh-huh.
14     Q. Where could they get that? They could get
15 it obviously from MITG acting as Compaq Direct?
16     A. Uh-huh.
17     Q. Where else could the consumer go?
18     A. Depending on which method they were
19 shuffled through. On the Compaq side they could get
20 it from -- you know, I don't know where the Welcome
21 Center directed their calls quite frankly, but, you
22 know, they could go to the spare store. They might
23 very well be sent to Ambry or PC Mall or, I mean,
24 there were a myriad of places that we find in
25 retrospect that they were sending those customers to

Page 131

1  versus funneling those customers to us.
2      Q. You were aware at the time of the Standard
3  Support Agreement that Compaq had authorized
4  resellers of spare parts?
5      A. That's correct.
6      Q. Okay. Is there -- do you contend that upon
7  the signing of the Standard Support Agreement that
8  MITG was acting as Compaq Direct was to replace all
9  of those sources as product, as suppliers of spare
10 parts?
11     A. My understanding of the contract as such is
12 that if a call came into the Compaq organization
13 requiring a spare part which was out of stock within
14 Compaq's own warehouse that, yes, that call would be
15 directed to us for us to be able to supply that
16 product.
17     Q. Compaq Direct organization or all of
18 Compaq?
19     A. My understanding is that that would be
20 organizational wide.
21     Q. Compaq worldwide? Compaq U.S.?
22     A. I can't answer that.
23     Q. Well, what was -- at the time what was your
24 belief as to what your customer set was? Is it all
25 people who called in to Compaq in the United States

Page 132

1  who needed non-stocked spare parts?
2      A. Well, it's not that easily defined. You
3  could say -- if you want to be bold about the
4  statement, you could say it's a worldwide effort
5  based on the fact that we did a lot of international
6  shipments to various customers. That wasn't
7  necessarily my belief and/or my intention, but
8  because of the level of service that is what grew out
9  of it.
10     Q. Were you shipping parts under the Standard
11 Support Agreement worldwide?
12     A. We could, yes.
13     Q. Did you?
14     A. Yes, Canada and various other places.
15     Q. Okay. There are some references in e-mails
16 that I discussed with Mr. Rice yesterday about
17 stocking parts in various locations around Europe,
18 and I understood that is to be service parts?
19     A. That could be correct, yeah.
20     Q. All right. Is it fair to say that the
21 majority of your international business would have
22 been the stocking of service parts as opposed to the
23 shipment of product under the Standard Support
24 Agreement, or do you know?
25     A. I don't know. I mean, that's a hard number

Page 133

1 to equate out. It could have been both quite
2 frankly. I mean, I'm not saying that the largest
3 percent is the consumer piece, but we did receive a
4 lot of orders from whether it was military people
5 stationed offshores, whether it was Canadian
6 companies. We did a lot of business with Ireland.
7 We did some business with Israel, a lot of business
8 with Taiwan. Those people weren't necessarily
9 associated with the service piece, but would come in
10 either directly or indirectly to us to take those
11 orders.
12    Q. And were those orders covered under the
13 Standard Support Agreement?
14    A. Some might be; some might not.
15    Q. Now, the Standard Support Agreement, did
16 you draft this document? Do you know who prepared
17 it? Was that you gave that to Compaq Direct to
18 review and sign or they gave it to you?
19    A. I would say, if I recall correctly, this
20 document was a badgering back and forth, and I
21 believe that we had our legal counsel draft this,
22 that's correct.
23    Q. Okay. And that is a contract between
24 Compaq Direct, Inc., a subsidiary of Compaq Computer
25 Corp., and MITG, correct? Is that who the companies

Page 134

1 are?
2    A. Yes.
3    Q. And that agreement gives MITG various
4 rights and responsibilities and gives Compaq Direct
5 various rights and responsibilities as defined in the
6 contract?
7    A. I would assume so, yes.
8    Q. And one of the provisions that has been
9 pointed to by MITG in this lawsuit is, I believe it
10 was, Paragraph 22, which is entitled exclusive
11 agreement?
12    A. Uh-huh.
13    Q. And this indicates that the agreement is
14 exclusive and that this gives MITG the exclusive
15 right to provide parts and services to the capital C
16 Customers. How do you define -- that is a defined
17 term earlier in the agreement. Feel free to look
18 back. How do you define or what did you understand
19 the word capital C Customers to mean in the Standard
20 Support Agreement in the spring of 2002?
21    MR. HANSEN: Again, I'm just going to
22 object to form. It speaks -- the document speaks for
23 itself. You can answer.
24    THE WITNESS: Well, the exclusive agreement
25 -- my understanding of Portion 22 is when these

Page 135

1 folks came to me they would become and/or were
2 previously my customer.
3    MS. CARROLL: Q. Okay. What do you mean
4 by that? Sorry. They were your previous customers,
5 so they were people that -- customers, just so we are
6 clear here that you and I are talking about the same
7 thing since I told you it was a defined term, capital
8 C Customer is defined up here and is referred to in
9 the exclusivity provision that's 22. And when you
10 say that people were your customers, what did you
11 mean by that, because I take that to mean people who
12 MITG was servicing before the start of the Standard
13 Support Agreement?
14    A. Both.
15    Q. Okay. So whoever you were, you being MITG,
16 were servicing on behalf of the Compaq Direct before
17 the agreement their capital C Customers, is that your
18 understanding?
19    A. As well as individuals, whether company or
20 consumer associated, through the process of the
21 contract, that's correct.
22    Q. Okay. So you had this bucket of people --
23 I hate to put people in a bucket, but I will. This
24 bucket of people who you were doing work for as
25 Compaq for Compaq Direct beforehand under prior

Page 136

1 agreements, and we looked at some of those, you then
2 had growth potential? You had this bucket where you
3 were going to try to fill this with more customers
4 over time through the Compaq Direct organization?
5    A. As well as non -- yes, that's correct.
6    Q. All right. And now the people who -- the
7 empty bucket you were going to fill, where were those
8 customers coming from or how -- what did you
9 understand the source of those customers to be?
10    A. Well, there were multiple sources. They
11 could be customers that we recruited through our
12 process, they could be customers that we did together
13 from a recruiting standpoint, but those customers
14 always resided as ours.
15    Q. Recruited together. Tell me what you mean
16 by that?
17    A. I sponsored holes at the Boomer Esiason
18 charity golf tournament. So, therefore, that was a
19 dog and pony show for customers that were flown in
20 from around the company, or flew in, I should say,
21 from around the country. That's what I would
22 consider a co-sponsor there.
23    Q. So you are working with Troy Bloomquist or
24 somebody or a CSR or somebody within the direct
25 organization to develop a relationship with a

Page 137

1 customer that was going to be serviced by MITG acting
2 as Compaq Direct and then later HP Direct?
3      A. But not always was it under that auspice
4 and as well I think it's unfair to characterize it
5 strictly Compaq Direct because we did a lot of
6 business with Houston, which is not Compaq Direct, if
7 I'm not mistaken.
8      Q. And my question here, and that's what I'm
9 trying to determine who you are saying your customers
10 are. So you say you were doing business with
11 Houston. Who are you referring to? Were they in the
12 bucket of existing customers, or were they in the
13 bucket of customers to come?
14     A. They were both.
15     Q. Okay. What customers were to come from
16 Houston that were going to fill the bucket?
17     A. I mean, I don't have specific knowledge of
18 which customers, so to speak, if that's your
19 question.
20     Q. Well, what was -- what customers that were
21 in the bucket of existing customers how did Houston
22 -- how did you end up getting those or servicing
23 those customers for Houston?
24     A. Well, a myriad of ways. One, the customer
25 through various levels of frustration, whether it was

Page 138

1 a solutions architect, whether it was the customer
2 themselves seeking out information and contacting us,
3 etc., etc. I mean, we could be contacted from a
4 myriad of directions over that.
5     Q. Okay. After the merger -- well, at the
6 time of the merger, did someone -- do you recall
7 having a discussion with anyone from what became HP
8 Direct or the HP organization about what MITG's role
9 was going to be post-merger, if it was going to
10 change, if it was going to stay the same?
11     A. We were basically told it was to stay the
12 same.
13    Q. Okay. And so once you have the merger, you
14 continued to have your call center people and you
15 have your customers that you're servicing and you
16 have your customers that you're still working to
17 recruit, etc., is that correct?
18    A. That's a fair statement, yes.
19    Q. Okay. And, now, were you aware or did you
20 become aware shortly after the time of the merger
21 that HP had access points for their customers that
22 existed prior to the merger for customers to buy
23 spare parts?
24    A. Was that ever communicated to us.
25    Q. Were you aware of it, however you became

Page 139

1 aware of it?
2     A. Not specifically, but it was obvious with
3 the decrease in volumes, etc., we went from a peak to
4 a slope.
5     Q. How -- you were aware of -- well, let me
6 ask you this. You were aware that HP had call
7 centers, for example, in various locations?
8     A. That's correct.
9     Q. Okay. And you were aware that HP had web
10 access points for people to buy spare parts?
11    A. That is correct, but I need to expand. May
12 I?
13       MR. HANSEN: Answer the question. Were you
14 aware, yes or no?
15       THE WITNESS: Yes.
16       MS. CARROLL: Q. Were those -- did you
17 know at the time that those, that they were also
18 business partners or authorized resellers of HP spare
19 parts that existed prior to the merger?
20    A. Yes.
21    Q. And did you believe -- well, strike that.
22 Did anyone tell you that MITG was going to become the
23 sole source of spare parts for the entire HP
24 organization and replace those other contact points
25 or access points that customers had to buy spare

Page 140

1 parts?
2     A. Specifically, no.
3     Q. Okay. Did you come to that understanding
4 in some way or based on some communication from HP or
5 Compaq that MITG was going to be acting as, HP Direct
6 was going to become the sole access point for spare
7 parts?
8     A. Sole access point, no.
9     Q. Okay. Was there a limitation -- was there
10 something that MITG acting as HP Direct was going to
11 assume the role or take over the role of pre-existing
12 HP organizations that were providing spare parts to
13 customers?
14    A. Yes, I believe so.
15    Q. Okay. What was MITG as HP Direct going to
16 take over?
17    A. It specifically relates to the ability to
18 have a customer, whomever, to continue the ability
19 which under Compaq existed and under HP post-merger
20 did not exist and as today I believe still doesn't
21 exist. Our understanding is that we would be able to
22 migrate and as well expand upon the customer base, so
23 to speak, based on a one PO scenario. So a customer
24 could order a product, whether it was finished good,
25 whether it was spare parts, whether it was warranty