1 parts, etc., through the Vista system, either credit
2 card or purchase order, and that would be our area
3 of, I guess part of our area of our value add.
4    Q. Did you have any understanding of how HP's
5 order entry system worked at the time of the merger?
6    A. If I recall specifically, they had either
7 just transitioned to SAP or were in process of
8 transitioning to SAP. So it is not very good.
9    Q. And SAP was a different ordering system
10 than Vista?
11    A. That's correct.
12    Q. So in terms of what you were providing on a
13 single purchase order, is that only for orders that
14 were going to be processed by the Vista system?
15    A. As we understood it at the time of the
16 merger, that's correct.
17    Q. And how did you gain this understanding?
18 Who were you dealing with from on the Compaq HP side
19 that gave you this understanding?
20    A. Well, one, Mr. Bloomquist.
21    Q. Okay.
22    A. Yeah, I think that's it.
23    Q. And tell me what it is, as specifically as
24 you can recall what it is, that Mr. Bloomquist told
25 you was going to? Was it expanded role for MITG

1 after the merger?
2    A. I don't know that it was an expanded role
3 as much as it was a consistent role with an expanded
4 opportunity, because this would allow HP the ability
5 to offer a solution that they had not previously been
6 able to offer.
7    Q. Okay. And was it -- was it your
8 understanding, then, that in order for this expanded
9 opportunity was going to go to the reach of anyone
10 who was ordering through the Vista system?
11    A. I don't understand your question.
12    Q. Okay. Well, you said that you could
13 provide the single purchase order for warranty parts,
14 etc., for the Vista system, and you understood that
15 there was the HP organization that wasn't using
16 Vista. That was a Compaq Direct order entry system.
17 And so what I'm trying to find out is the expanded
18 opportunity, was it supposed to go outside of people
19 ordering through Vista, or was this an opportunity
20 that was going to stay within customers ordering
21 through the Vista product system?
22    A. I don't specifically recall one way or the
23 other. I do not know that post-merger there were HP
24 CSR's or whatever you want to call them. Both
25 organizations were in the comingling phase that would

1 utilize our services, because they had opportunities,
2 had issues that they were unable to address on their
3 side. So it wasn't -- was it an electronic
4 communication or was it a phone or was it a FAX? I
5 don't know. I just know that there was some --
6 whether it was organizations, locations, or people, I
7 can't answer that, within HP that utilized the
8 mechanism on the Direct, Compaq Direct side.
9    Q. Okay. And, now, at the time, and we look
10 at the summer of '02, MITG was operating as HP Direct
11 to provide spare parts for customers of theirs,
12 regardless of the definition, and then there were
13 other entities within the entire HP organization that
14 were also providing spare parts to customers. So you
15 had one piece of the pie, and there were other people
16 with pieces of the pie?
17    A. When you say other pieces, you are
18 referring internally or externally?
19    Q. Internally.
20    A. I would assume so, yes.
21    Q. And then you were aware if we are going to
22 put business partners or authorized resellers
23 external, is that your -- I take it that that's the
24 distinction, internal and external? You have
25 internal HP and you have external business partners?

1    A. There is actually three levels.
2    Q. Okay.
3    A. You have internal HP, you have external
4 business partners, and then you would have -- when
5 you say external business partners, you are referring
6 to?
7    Q. Authorized resellers.
8    A. Authorized resellers, correct. Then you
9 would have what I would classify as that third tier
10 which would have been people that were in
11 competition, so to speak, with us.
12    Q. All right. And they were non-authorized
13 resellers?
14    A. I have no specific knowledge one way or
15 another to answer that question.
16    Q. Okay. Well, you distinguished them between
17 authorized resellers, and these are others. Are they
18 selling great market goods or --
19    A. Let me elaborate. My understanding of an
20 authorized reseller would possibly be Insight, for
21 example. Insight is a large reseller who sells a
22 large quantity of HP products every year. My
23 understanding of someone like Parts Now, PC Nation,
24 those types of places, my understanding of those is
25 their primary business is not finished goods. When

Page 145

1  you say an authorized reseller, I think of finished
2  goods and sales and support thereof. When you look
3  at someone like Ambry and etc., they are not, to the
4  best of my knowledge, an authorized reseller because
5  that is not their business model. Their business
6  model is spare parts.
7      Q. And do you have any knowledge as to how
8  Ambry or PC Nation or any of this third group where
9  they acquire parts?
10     A. Where they acquire?
11     Q. Where they are acquiring spare parts.
12     A. I would assume some of the same places that
13 we were.
14     Q. Okay. Well, and if they are in stock
15 Compaq or HP parts, would they go through CSN just
16 like MITG did, or do you know?
17     A. I don't know, but I would not suspect so,
18 no.
19     Q. Is it your belief that sales
20 representatives -- well, strike that. Is it your
21 belief that call center representatives, for example,
22 in Roseville, if they were referring somebody out to
23 Ambry that they were referring people out who were
24 not authorized business partners of HP or Compaq?
25     A. That would be my understanding, correct.

Page 146

1      Q. Okay.
2              (Whereupon a recess was
3               taken for lunch at 12:30.)
4      Q. Mr. Haught, I want to go back to some
5  discussions we were having in the spring of 2002 in
6  terms of the spare part business that you were
7  handling. You were aware at that point that there
8  were some other access points within Compaq where
9  people could get spare parts other than Compaq Direct
10 slash MITG? Was that accurate?
11     A. In the spring of '02?
12     Q. Correct. Before the merger of the
13 companies, but after the Standard Support Agreement.
14     A. Were there other --
15     Q. Let me ask it differently. Were there
16 other access points within Compaq that you're aware
17 of where people, whether they be consumers or
18 businesses, could buy spare parts?
19     A. Compaq spare parts?
20     Q. Correct.
21     A. Yes. Multivendor, no.
22     Q. And was there -- there were also not
23 directly within Compaq but authorized representatives
24 that consumers or business people could acquire
25 Compaq spare parts from?

Page 147

1      A. Yes.
2      Q. And post-merger of the companies you are
3  aware that within or what became HP that there were
4  multiple access points within HP for people to buy
5  in-stock Compaq or HP parts, spare parts?
6      A. In stock spare parts, yes.
7      Q. Right. And were there other access points,
8  other than HP Direct slash MITG, within HP where
9  people could buy what are sometimes referred to as
10 legacy Compaq spare parts or out of stock Compaq
11 spare parts?
12     A. With the exception of Houston at that time,
13 I would say I was unaware of anyone else.
14     Q. And what is Houston when you refer to that?
15     A. I guess the Compaq spare store, if that's
16 the correct terminology for it.
17     Q. Let me --
18              (Whereupon a document was
19               marked Deposition Exhibit
20               Number 23.)
21     Q. Let me hand you what's been marked as
22 Deposition Exhibit 23, which is a document, just for
23 the record, Bates MITG 0479 through 81. And the
24 first e-mail, just so it's clear, is kind of at the
25 bottom of the first page from you to April -- how do

Page 148

1  you pronounce that?
2      A. Muehring.
3      Q. Muehring. For a proposed script for the
4  phone greeting, and if you will take a look at that
5  e-mail stream, I have a question for you.
6      A. Okay. I'm sorry. What's your question?
7         MR. HANSEN: I don't think there was one.
8         MS. CARROLL: Q. No. I let you get
9  through the exhibit first. On the third page there
10 is a reference at the end to Compaq parts. You can
11 visit www.Compaq.com\sparestore. Is that what you
12 were referring to when you referenced Houston a
13 minute ago?
14     A. Yes.
15     Q. And now let me just ask you about the
16 proposed script for a phone greeting. Under your
17 name it's bracket, Bloomquist, comma, Troy, closed
18 bracket?
19     A. Uh-huh.
20     Q. Does that mean -- why is his name there?
21 Is he proposing this, or why is his name there?
22     A. I'm sorry. Where are you?
23     Q. On Page 2 at the bottom right down here
24 there is your name, and then it has Troy Bloomquist's
25 name in brackets. I was wondering what the meaning

Page 149

1 of that was?
2    A. If I'm correct, they were using Lotus notes
3 for their e-mail at that time, and I believe he
4 replied that would bracket his comments, if I'm not
5 incorrect. I'm not all that familiar with Lotus
6 notes so --
7    Q. And is that -- so does that mean that Troy
8 Bloomquist is proposing this phone greeting?
9    A. I can't answer that.
10    Q. Can you tell that?
11    A. No, I can't tell.
12    Q. And this is the phone greeting for people
13 calling in to MITG slash Compaq Direct?
14    A. I would say this is the proposed greeting
15 or discussed, yes.
16    Q. Do you know if this was ever implemented?
17    A. No, I don't have a clue.
18    Q. And this is obviously post-merger? We are
19 looking at an August of 2002, because it says, thank
20 you for calling Compaq Online Parts, now part of the
21 new HP.
22    A. Yes.
23    Q. This gives a couple of different options
24 that you're pressing I take it -- when you call in, I
25 take it that you don't know what the phone number is

Page 150

1 that this phone tree is off of where it says,
2 technical support, please press 2?
3    A. No, I don't know where that's from.
4    Q. Okay. And why the reference at the end,
5 for additional Compaq parts you can visit us at the
6 spare store? Why was this a part of the automated
7 greeting?
8    A. I can speculate. I mean, I have no --
9    Q. Do you know if when the phone message, your
10 automated phone message to MITG slash HP Direct or
11 Compaq Direct, did it ever include that reference to
12 go into the spare store or any other HP, subsequently
13 an HP website?
14    A. I believe that it possibly did, yes.
15    Q. And on your e-mail that's on the first
16 page, it says, new phone scripts for the CPQ, meaning
17 Compaq, side of the house. What did you mean by the
18 Compaq side of that house?
19    A. CPQ would have referred to the B to B.
20 Well, maybe not. Hold on.
21    Q. Okay.
22    A. I would have said that that references the
23 consumer piece.
24    Q. All right.
25    A. We had acronyms for all that stuff. I

Page 151

1 don't remember what they all are now.
2    Q. All right. And your message here
3 indicates, please get with April on this and make it
4 happen on Monday. So it was presumably by the
5 contents of this e-mail string a phone greeting
6 identical to or very similar to what you've got at
7 the bottom of the e-mail was put on the phone system
8 at MITG?
9    A. I would presume, yes.
10    Q. Okay. Now, after the merger -- we talked
11 about the Compaq spare store. After the merger, was
12 there -- I think there is within HP. Was there
13 anyplace for people to buy, customers to buy
14 multivendor parts other than contacting HP Direct?
15    A. To my knowledge, for multivendor parts, no.
16    Q. All right. If people were calling in to
17 buy multivendor parts, they would either get sent to
18 HP Direct slash MITG or possibly get sent to an
19 outside business partner regardless of I'm not
20 getting into what that relationship is?
21    A. Right.
22    Q. Okay. Did you ever during the course of
23 the Standard Support Agreement complain to anyone in
24 writing at HP saying you should not be sending any
25 business from anywhere in the HP organization for

Page 152

1 multivendor parts to anyone other than HP Direct?
2    A. Was I that specific in my correspondence?
3    Q. Correct.
4    A. No. There were multiple e-mails expressing
5 concern, yes.
6    Q. And what were the general content of these
7 e-mails expressing that you say were expressing
8 concern?
9    A. Where are our calls?
10    Q. So it's a call volume as opposed to that
11 your call volume was down?
12    A. The call volume was down. Sales were
13 down. Yes, both.
14    Q. And could you or did you at the time do any
15 analysis to see if you were maintaining one set of
16 customers or servicing one set of customers or types
17 of customers versus another kind? For example, you
18 were losing B to B business and staying the same on
19 consumer or the other way around. Any kind of
20 analysis that would indicate to you who seemed to be
21 not coming to your call center anymore?
22    A. Well, I think the consumer side was pretty
23 apparent that it was decreasing or definitely not
24 increasing at all, and the B to B side would be a
25 little bit more difficult to be able to monitor.

Page 153

1  Q. And how was -- how was it obvious? I'm not
2  meaning to put words in your mouth, but how could you
3  tell that it was, that the consumer side was not only
4  not getting any but losing?
5     A. Well, for instance, we would receive on a
6  relatively frequent basis the call metrics log which
7  showed the numbers of calls, the percentage of
8  abandons, the answer rate, handle time, what
9  percentage of calls were actually handled within a
10 specific time, things of that nature, as a comparison
11 against the other centers, and you could easily see
12 that there were calls that were going into centers
13 over the historical portion of that document. On the
14 basis that we received it, you could see that calls
15 were going from a lower number to a higher number
16 while my numbers were decreasing, and you could as
17 well very clearly see that the handle rates and the
18 customer satisfaction levels were decreasing
19 drastically on the increased call centers and ours
20 always stayed between 98 and a hundred percent.
21    Q. Do you -- did you get these reports that
22 you just referenced on a daily basis?
23    A. No, huh-uh.
24    Q. You have -- or is it fair to say that these
25 are the PBCO metrics?

Page 154

1     A. The PBCO metrics, correct.
2     Q. Did you -- some of them have been produced
3  in this case from MITG. Did you produce in this case
4  all of the PBCO reports that you received during the
5  time of the Standard Support Agreement that those
6  were being created?
7     A. All that I had, yes.
8     Q. Well, do you recall -- let me hand you
9  what's previously marked as Exhibit M, which are a
10 series of the PBCO metrics, and that first one is
11 March 12th of?
12    A. 19th.
13    Q. March 19th. Well, that's when it got sent
14 to you. This is -- the day it's covering is March
15 12th of 2003?
16    A. Yes, that's correct.
17    Q. All right. Are you aware of receiving -- I
18 think your counsel put this exhibit together. It's
19 in chronological order?
20    MR. HANSEN: Yeah. I'm pretty sure it was.
21    MS. CARROLL: Q. Okay. Are you aware of
22 receiving any PBCO metrics that you may have not have
23 kept prior to March 12 of 2003?
24    A. I can't say.
25    Q. Okay. When you received that for the first

Page 155

1  time, assuming that this is the first one you have
2  since this is the oldest one of the copies I think
3  you have, is that -- did you have an understanding as
4  to what all of these other call centers are that are
5  listed?
6     A. I had some understanding, yes.
7     Q. Okay. And from whom did you gain that
8  understanding?
9     A. Well, from various people. I mean, part of
10 the understanding was from Troy, Sherry Ellis. Some
11 of the other understanding would be from my reps who
12 would have had interactions with these various
13 centers.
14    Q. Okay. And do you know, for example,
15 Roseville PDO, eSpares, what kind of customers they
16 were servicing as compared to what is listed you as
17 Missouri HP Direct?
18    A. Typically our -- initially, I should say,
19 initially my understanding of Roseville PDO was
20 mostly printers, if I'm not incorrect. Through the
21 transition or post-merger phase of that it's my
22 understanding that they took on a much larger role
23 than just the printer business.
24    Q. How did you get to an understanding that
25 Roseville PDO was printers?

Page 156

1     A. I spoke to somebody in Roseville. I don't
2  remember who the specific conversation was with, that
3  it very well could have been Bill Crowley. I don't
4  recall. Somebody had made reference to the fact that
5  they did about 10,000 printer processed orders a day,
6  if I'm not incorrect. A lot of them were not
7  necessarily phone orders, but were B to B type orders
8  and things they did for printer product.
9     Q. All right. So on March 12th of 2003 was it
10 your understanding that this was printers plus
11 something else or that this was still printer
12 business?
13    A. No. This would be a conglomeration of
14 printers as well as spare parts, could be monitors,
15 etc.
16    MR. HANSEN: Just for the record, you say
17 this. You mean PDO only or everything?
18    MS. CARROLL: Q. Roseville PDO, because
19 I'm understanding that you thought it was your
20 understanding that Roseville PDO was originally the
21 printer related call center and expanded to
22 additional spare parts?
23    A. That's correct. I believe it was a
24 printer, strictly printer prior to the merger. Post-
25 merger my understanding is that it expanded upon its

Page 157

1  responsibilities and roles.
2     Q. All right. Roseville eSpares, what was
3  your understanding of that?
4     A. My understanding of Roseville eSpares was
5  that that was Houston's eSpares redirected from the
6  management group.
7     Q. So that was Compaq spare parts. When you
8  were referring to Houston before, is this that group
9  now having been handled out of Roseville instead of
10 Houston?
11    A. I don't know that it was necessarily
12 handled out of Roseville. For instance, if I may
13 skip down?
14    Q. Uh-huh.
15    A. CSN, the Compaq Service Network, my
16 understanding is it is or was managed from Houston,
17 even though I believe the parts were held in or
18 FedEx'd from a warehouse in Kentucky and one
19 somewhere else. Both Tennessee and Louisiana type
20 stuff.
21    Q. Okay.
22    A. My understanding is that those could be
23 both. They could be Houston, ie., eSpares and/or
24 Roseville. I don't understand the distinction.
25 Initially why it was Roseville because I believe

Page 158

1  previously in earlier metrics or at least in e-mails
2  that I recall seeing it was not necessarily named
3  Roseville eSpares. I believe it was, that it was
4  actually Houston.
5     Q. Okay. And then Roseville SOM, did you have
6  any understanding as to what that call center was?
7     A. No.
8     Q. And then below this they have the websites,
9  and the website that you all, the HP Direct website
10 is now accounted for under this metrics, correct?
11    A. That's correct.
12    Q. Did you -- you didn't have to report that
13 information?
14    A. No. We never have been requested to nor
15 have we ever recorded that information.
16    Q. All right. And then at the bottom has
17 Roseville p191 orders Roseville, Andover, Missouri,
18 which is you all, right?
19    A. I would assume so, yes.
20    Q. Because at the top it's Missouri HP Direct,
21 and at the bottom it just says Missouri. I'm
22 assuming those are the same. Did you understand
23 those to be the same?
24    A. Yes, I understand those to be the same.
25    Q. All right. And did you know who -- well,

Page 159

1  if you look at this Roseville ePDO and CC, call
2  center, did you have any understanding as to what
3  that means when it says CC and ePDO?
4     A. No.
5     Q. All right. And then Roseville slash
6  Andover CC and eSpares, did you know what the print
7  CC in eSpares meant?
8     A. No.
9     Q. Did you ever have any discussions with Mr.
10 Bloomquist or anyone else about having this explained
11 in more detail to you?
12    A. No.
13    Q. And just so the record is clear, there is
14 one additional at least earlier PBCO metrics. That
15 was the metrics for 3-11-03 that I have a copy of
16 that somehow didn't make it in that, but I think that
17 was the first one. 3-11 is the first one of the ones
18 produced.
19    A. Okay.
20    Q. Did you -- how often did you -- well,
21 strike that. You went through -- looking at this
22 thing you went through kind of periods of time where
23 you got several, you know, March 11th, March 12th,
24 March 13th, the 18th, the 24th. It looks like you
25 got a lot of them in March of '03. Any particular

Page 160

1  reason why these were coming to you at that time
2  period? Do you recall anything going on?
3     A. No, not specifically.
4     Q. Okay. And which one of these -- you said
5  you were looking at the PBCO metrics that you were
6  receiving and you could see some going up in terms of
7  call volume and yours going down. Do you have --
8  looking at the various PBCO metrics that make up part
9  of Exhibit --
10    A. M.
11    Q. M. Can you tell me which, where you are
12 seeing that trend, which call center you think is
13 gaining the calls that you are losing?
14    A. I can't say right here, no.
15    Q. There are several of them behind that tab,
16 and if you just look at all of them and see if that
17 gives you any indication as to what you believe you
18 were seeing at the time?
19       MR. HANSEN: And just so the record is
20 clear, this is an exhibit that I used in a depo of an
21 HP person, and I don't know that I necessarily put in
22 this exhibit every single PBCO we have turned over,
23 but you certainly can look at whatever is in this
24 exhibit.
25       MS. CARROLL: What's the date of the last

Page 161

1  PBCO?
2      MR. HANSEN: The last PBCO in this exhibit
3  is January 15th of 2004.
4      MS. CARROLL: Let me give you -- that's
5  January 16th.
6      MR. HANSEN: 15. I believe there is some
7  from February even that I may not included in that
8  exhibit.
9      MS. CARROLL: That's the latest. That's
10 January 31 is I think the --
11     MR. HANSEN: Maybe they are ones that you
12 turned over. I'm not sure.
13     MS. CARROLL: I'm only trying to get the
14 ones that he knows he had, rather than showing him
15 ones that I had.
16     THE WITNESS: It's very possible. I'm
17 sorry.
18     MR. HANSEN: And just so we are clear,
19 these are the ones we turned over that we still had.
20 These aren't all the ones that he ever got.
21     MS. CARROLL: Q. Well, I asked you -- let
22 me back up. I asked you previously did you think you
23 -- when you said you turned over all of the ones you
24 got, did that mean all of the ones you had?
25     A. That's all of the ones I had, yes.

Page 162

1  Received, I can't answer that question. I'm sure I
2  didn't keep every single one of these things.
3      Q. How often would you, do you recall
4  receiving them?
5      A. It was on a relatively sporadic basis. It
6  could depend on a lot of things, whether Troy was
7  traveling or if Sherry would just send them or
8  whatever.
9      Q. The ones that we see that have, that make
10 up Exhibit M, and I've handed you a couple more and
11 here, the ones for the 11th, all of these came from
12 Mr. Bloomquist. Do you specifically recall anyone
13 other than Mr. Bloomquist sending PBCO metrics to
14 you?
15     A. Yes.
16     Q. Okay. And would that be Miss Ellis?
17     A. Miss Ellis, or it could have been possibly
18 Lisa Stork.
19     Q. And who is Lisa Stork?
20     A. She was an employee who helped Sherry
21 Ellis.
22     Q. And if, in fact, they sent them to you, it
23 just happens that the ones that you were able to find
24 to produce all came from Troy and didn't come from
25 somebody else?

Page 163

1      A. Yeah. I mean, I didn't specifically keep
2  all of these things.
3      Q. Were these on a computer system in your
4  e-mail when you located these particular documents?
5  Were they in a hard file, or were they in a computer?
6      A. These, if I'm not mistaken, were in my
7  e-mail, that's correct.
8      Q. So those are at least all of the e-mails
9  that you had maintained versus that you had
10 maintained in your e-mail system?
11     A. That's correct.
12     Q. Do you recall when you received them ever
13 printing them out and putting them in a file folder
14 in your office?
15     A. Not specifically. Quite frankly, I'm sure
16 I had more, but if you deal with Outlook, you are
17 only allowed so much space on your PSDA files. A lot
18 of stuff got scratched over the years because of
19 that.
20     Q. So at least for the range you were able to
21 locate we go from March 11th of, metrics starting
22 March 11th of 2003, which is MITG 34?
23     A. Correct.
24     Q. To January 31?
25     A. 440.

Page 164

1      Q. January 31 of 2004?
2      A. That's correct.
3      Q. Looking at the exhibits that make up, the
4  documents that make up Exhibit M and the additional
5  ones that I have handed you, can you tell me looking
6  at that which call center you thought was gaining
7  calls at the expense of MITG slash HP Direct? Do
8  those documents give you any indication?
9      A. No. I can't determine that based on the
10 limited information here.
11     Q. Well, do you -- you know in looking at
12 these, looking at March 11th or looking at March
13 12th, the first day of Exhibit M, that there was a
14 change in how the report was presented in terms of a
15 consolidation? You see fewer line items listed by
16 January 31 of '04, correct?
17     A. That appears that way, correct.
18     Q. Do you have any understanding or that you
19 gained from someone at HP as to what the new
20 designations meant?
21     A. No.
22     Q. Did you have any understanding as to the
23 consolidation that HP underwent with call centers,
24 the various call centers they have into Roseville?
25     A. Again, only from the conversations with Mr.

| Page 165 | Page 167 |
|---|---|
| 1  Crowley or -- I can't remember that guy's name. | 1  of the e-mail string that you are referring to? |
| 2  There was somebody before Mr. Crowley that we spoke | 2      A. Well, as usual, we would have inquiries as |
| 3  to in Roseville, but I for my life can't remember who | 3  to, can you handle more volume, can you handle this, |
| 4  that was. We had several phone conversations about | 4  can you handle that? And we would say, yes. We |
| 5  things. More or less trying to address customer | 5  would get in a position to handle those types of |
| 6  issues is how it all started. | 6  volumes to not see those things materialize. |
| 7      Q. Okay. Well, what kind of job description | 7      Q. Tell me what kind of calls or what business |
| 8  did he have and see if we can figure out who you | 8  you are referring to in terms of your communications |
| 9  might have been talking to? | 9  with Roland Soriano and/or Richard Chizek? |
| 10     A. I don't know. It was -- the first initial | 10     A. I don't understand what you're getting at. |
| 11 conversation would have been a supervisor no doubt | 11     Q. Well, you said they contacted you about |
| 12 through the customer service piece, and it would have | 12 whether you could handle more calls? |
| 13 escalated up, but I can't tell you who or how high. | 13     A. They as a general reference. |
| 14     Q. So it was an escalation through the call | 14     Q. They as HP? |
| 15 center? | 15     A. As HP. |
| 16     A. Within Roseville, correct. | 16     Q. HP somebody? |
| 17     Q. Okay. Do you recall when those | 17     A. Somebody. |
| 18 communications were going on? | 18     Q. Whoever. Contacted you about more calls. |
| 19     A. No. | 19 Where were those calls coming from? |
| 20     Q. Have you ever spoken with Richard Chizek? | 20     A. Well, that I can't necessarily answer. I |
| 21     A. Richard Chizek, isn't it? | 21 just know that I seen e-mails requesting, hey, can |
| 22     Q. C-H-I-Z-E-K? | 22 you take these calls? We have high abandon rates. |
| 23     A. I want to say yes, but I'm not 100 percent | 23 We are getting killed. Can you take these calls? |
| 24 sure. | 24     Q. Do you know -- do you have any knowledge as |
| 25     Q. So you don't know? | 25 to what that customer base was or what kind of |
| Page 166 | Page 168 |
| 1      A. I don't know. | 1  products people were attempting to get from that you |
| 2      Q. And you don't know -- do you know one way | 2  needed somebody else to answer the calls? |
| 3  or the other whether he was the person that you | 3      A. Only that would have been Compaq, HP, or |
| 4  ultimately got to and you were talking about on the | 4  multivendor parts. I'm assuming it would be in the |
| 5  escalation? | 5  spare parts world. |
| 6      A. Could have been. I mean, there were | 6      Q. Okay. And you can't be more specific to |
| 7  multiple people. I spoke with some folks in Omaha | 7  what type of parts those were in terms of whether |
| 8  that were involved with the call routing and things | 8  they were multivendor parts or in-stock Compaq parts |
| 9  of that nature, too, and I don't specifically recall | 9  or in-stock HP parts? |
| 10 their names. | 10     A. Yeah, I can't answer that. |
| 11     Q. Okay. Other than receiving the PBCO | 11     Q. Do you recall getting copied on e-mail |
| 12 metrics -- strike that. Would you characterize the | 12 strings, or at least forwarded information on e-mail |
| 13 receipt of these PBCO metrics as sporadic? | 13 strings, about the Andover call center? |
| 14     A. Yes. | 14     A. Specifically Andover? |
| 15     Q. Besides the receipt of these, sporadic | 15     Q. Yes. |
| 16 receipt of these PBCO metrics, did you have, receive | 16     A. Not -- no. I don't have specific |
| 17 any other documentation from HP which indicated to | 17 recollection of that, no. It's not that it's not |
| 18 you that calls that you believe were supposed to come | 18 possible. I don't recall it. |
| 19 to you under the Standard Support Agreement were | 19     Q. Well, let me -- well, and when you said |
| 20 being sent to another call center? | 20 that you were getting e-mails about whether you could |
| 21     A. Well, I believe there was some e-mail | 21 handle call volumes, who -- do you recall who was |
| 22 correspondence with Roland Soriano, and I believe | 22 sending you these e-mails, who within HP? |
| 23 possibly Richard Chizek was involved in that e-mail | 23     A. Well, I believe that we had some direct |
| 24 string. | 24 correspondence with Roland Soriano, and as well I |
| 25     Q. And tell me what the general content was | 25 believe we had direct contact with Mr. Bloomquist, |

Page 169

1 and I am not exactly sure of the lady, but it was
2 another lady involved on that specific instance that
3 you're referring to from Boston possibly.
4   Q. Have you produced -- has MITG produced all
5 of the documents that they were able to locate that
6 indicated or requested information about whether MITG
7 slash HP Direct could handle additional call volumes?
8       MR. HANSEN: We have turned it over. I'm
9 not sitting on anything. I'm not holding anything
10 back.
11      MS. CARROLL: Q. Let me show you what was
12 previously marked as Exhibit KK, which is an MITG
13 document. First page is MITG 082. If you'll take a
14 look at that e-mail string.
15      MR. HANSEN: If that's the one with Roland
16 Soriano, is it not?
17      THE WITNESS: Yeah.
18      MR. HANSEN: It starts at the back.
19      MS. CARROLL: Yeah.
20           (Whereupon documents were
21            marked Deposition Exhibit
22            Numbers 24 and 25.)
23      MS. CARROLL: Q. Now, this e-mail string
24 it starts back at the beginning with discussions
25 about Diane Pound to various people about the need

Page 170

1 for additional resources on calls because they
2 obviously had too much?
3   A. Correct, uh-huh.
4   Q. And going through reading this there is a
5 discussion here about transitioning non-Presario
6 calls, and then as far as Presario calls this is how
7 we are going to do it. Are these calls that you
8 understood in October of 2002, or at least are these
9 the calls that you were referring to on calls where
10 you were being at some point asked if you could
11 handle them where Presario and/or non-Presario calls
12 the types of calls you were expecting at MITG to be
13 receiving?
14  A. One of several, yeah, discussions.
15  Q. And you said you had discussions with
16 people at HP, but it appears that the only place in
17 this exhibit that goes from 82 to 85 that your name
18 or anyone at MITG's name appears is when Troy
19 Bloomquist forwards the e-mail string to you on
20 November 1st with an FYI, should see a decent influx
21 on Monday?
22  A. Uh-huh.
23  Q. Did you have any -- do you recall having
24 any direct communications with any of the people in
25 the e-mail string about these issues, or were you

Page 171

1 getting -- or was Troy Bloomquist being your contact
2 as to this, these calls?
3   A. No. I believe -- one, I believe there is
4 more e-mails than just this. And then, secondly,
5 again, I'm sure that we spoke with either Roland
6 Soriano or Richard Chizek, I don't recall who, and a
7 lady from the Boston area. Diane Pound sticks out,
8 but I can't testify to that because I don't recall
9 specifically.
10  Q. Let me hand you Exhibit 25, and this is
11 again another e-mail string, and it's part of --
12 there is an overlap between Exhibit M, an e-mail
13 string, if you'll start at the back, with some
14 different responses.
15  A. Okay. The only difference, I think, is the
16 forwarding of the e-mail right here at the top.
17  Q. And I'm sorry. I thought there were more
18 differences than that. At the very top on October
19 31st, Exhibit M or Exhibit K, I mean, is?
20      MR. HANSEN: KK.
21      MS. CARROLL: Q. KK, okay. Thank you.
22 Exhibit KK is a November 1st e-mail, kind of end of
23 that e-mail string saying, you should see a decent
24 influx on Monday. The day before that Mr. Bloomquist
25 sent you an e-mail forwarding the e-mail string and

Page 172

1 says, please call me ASAP. Do you recall having any
2 conversations with Mr. Bloomquist after this e-mail
3 was received that is Exhibit 25 to discuss this
4 issue?
5   A. Not explicitly, no. I mean, obviously we
6 probably called, but I don't recall the conversation
7 specifically.
8   Q. Okay. And so do you know if you spoke to
9 him, then, before he sent the next e-mail on Friday
10 that's Exhibit KK?
11  A. I don't know.
12  Q. Okay. And let me hand you --
13      MR. HANSEN: Did we skip an exhibit
14 number?
15      MS. CARROLL: Q. Yeah. Let me hand you
16 Exhibit 24, and, again, this is from you to Mr.
17 Bloomquist on call volume dated October 21 of 2002.
18 It's document MITG 076 and then Mr. Bloomquist's
19 response.
20  A. Okay. And your question?
21  Q. Okay. And do you -- again, this is
22 indicating that Mr. Bloomquist was a contact saying
23 that he was going to check into calls and that Mr.
24 Bloomquist then responded saying, I've made the
25 request. Do you recall, you personally, ever

Page 173

1 contacting anyone to make the request that for these
2 calls to come to you? On or before October 21 did
3 you ever make this contact to anyone, other than
4 Troy, that you think you have e-mails that would
5 reflect that?
6   A. No, because Troy was our contact.
7   Q. Okay. Well, when you were talking about
8 saying that you might have talked to Diane Pound or
9 Richard Chizek or Roland Soriano, when would that
10 have been?
11   A. It would have been in the same timeframe.
12 I mean, they had us -- they had an express problem,
13 and they were looking for a solution. I believe that
14 part of the conversation was on technical abilities.
15 Part of this jars back. Whether it's correct or
16 incorrect, I don't know. But I seem to recall that
17 part of the conversation with somebody over this led
18 to the discovery that they were actually having busy
19 outs on their system. They didn't realize that it
20 was a system limitation initially, if I recall now.
21 And that conversation broke into, can you take the
22 calls, blah, blah, blah, but they had no way to get
23 them to us.
24   Q. Do you have any knowledge of what kind of
25 parts the Andover call center was handling before

Page 174

1 they got this large influx of phone calls that are
2 the subject of these e-mails?
3   A. Andover as we knew it then was the
4 Presario. There were three consumer lines, if I'm
5 not mistaken, that they more or less took care of.
6   Q. Do you know -- where did you come to your
7 understanding of what the Andover call center was
8 before they got this large influx of calls that these
9 e-mails are discussing trying to move to someplace
10 else?
11   A. Where would I receive that understanding?
12   Q. Yeah. From whom did you get an under-
13 standing?
14   A. I would assume or I believe that it would
15 just be from the day-to-day operations of how we all
16 somehow would cross each other's paths on a
17 relatively frequent basis.
18   Q. Well, if I told you that Andover, before
19 all of these calls being sent to them in the fall of
20 2002 that Andover was a digital equipment corp. call
21 center, is that familiar to you?
22   A. I wouldn't necessarily have said just
23 Andover, but I know that there is a group of digital
24 equipment stuff, yes.
25   Q. And you don't know whether that was the

Page 175

1 Andover call center or not?
2   A. No. I mean, you got -- they were shuffling
3 names around. So different people do different
4 things, and I never really did keep a hundred percent
5 track of it.
6   Q. Okay. And let me back up because I asked
7 you if there was an e-mail, and there, in fact, is an
8 e-mail that Mr. Soriano that indicates that he spoke
9 to you, and it is on the second page of Exhibit KK.
10 Well, I shouldn't say that. He said he spoke with
11 Troy Bloomquist about the HP Direct call center. Let
12 me ask you this. Do you recall being on a conference
13 call with Mr. Soriano and Troy Bloomquist about this,
14 or do you think that this was a conversation that you
15 were having with Troy and Troy was speaking to them
16 on your behalf on your ability to handle these calls?
17   A. It could have very well been a
18 conversation, a conference call. I don't remember
19 specific.
20   Q. All right. And what is your understanding
21 as to why these calls that were flooding into Andover
22 were not sent to MITG?
23   A. I believe it was a misrouting within your
24 alls system.
25   Q. Well, were you aware that by the fall of

Page 176

1 2002 HP had begun a consolidation of call centers
2 into, of their call centers all to Roseville?
3   A. No.
4   Q. And that the decision was being made that
5 rather than taking it from Andover to Missouri to
6 Roseville to make the leap directly to Roseville?
7 Did you have any understanding of that at the time?
8   A. No. I had no communication.
9   Q. Okay. And do you criticize the business
10 decision of HP in terms of continuing their
11 consolidation plan in Roseville?
12     MR. HANSEN: I object to the form. You can
13 answer.
14     THE WITNESS: I don't criticize the
15 business decision. I criticize the method for which
16 the decision was derived. I believe there were
17 improper indicators utilized to make that decision.
18     MS. CARROLL: Q. Improper indicators
19 utilized to make that decision. Explain that?
20   A. For instance, for example, I believe that
21 for the one thing that was preached to us from day
22 one is it's all about the customer experience,
23 period. We have numerous examples and I've got
24 numerous battle scars, so to speak, of every time
25 there was a negative experience, whether we were

**Page 177**

1 responsible directly or indirectly, for a customer
2 experience scenario. When these transitions took
3 place, not in the planning phase, I wasn't a part of
4 the planning of the migration, but I believe that
5 there was very little emphasis put on those what I
6 would determine key indicators, things that you need
7 to consider when you are doing business. Not only
8 did it affect me, it affected a lot of people, and I
9 think it was a poor decision quite frankly.
10   Q. Does a poor, what you consider a poor
11 decision by HP in consolidating their call centers
12 into Roseville somehow act as a breach of the
13 Standard Support Agreement?
14      MR. HANSEN: I will just object. I think
15 that document speaks for itself to the extent it
16 violates the conditions and terms of the contract. I
17 object to form, but go ahead.
18      THE WITNESS: Okay. You want to rephrase
19 it for me?
20      MS. CARROLL: Q. Let me try to see if I
21 can remember it.
22   A. That's my problem.
23   Q. What is your -- is it your -- you've
24 indicated that you think that HP made a poor business
25 decision in terms of their customer service

**Page 178**

1 obligations, as it were, to consolidate these call
2 centers into Roseville, and my question to you is the
3 fact that HP made what you believe to be a bad
4 business decision in terms of how the customers were
5 being serviced a basis for a finding of a breach of
6 the Standard Support Agreement based on your
7 understanding of the agreement? I'm not looking for
8 a legal conclusion.
9   A. No.
10   Q. Okay. The fact that -- do you have any --
11 well, do you contend that HP did not have the right
12 to terminate the Standard Support Agreement as they
13 did?
14   A. Do I contend? No.
15   Q. Okay. You just believe that their
16 terminating of the Standard Support Agreement was a
17 bad idea from the customer's side, from the
18 customer's standpoint?
19      MR. HANSEN: I'll object to form.
20      MS. CARROLL: Q. Okay. Can you answer
21 that?
22   A. I don't have an opinion.
23   Q. Well, you said before that you thought they
24 were, it was a bad business decision the way they
25 were handling the transition?

**Page 179**

1   A. That's correct.
2   Q. Was it -- was it a bad business decision in
3 terms of how it affected MITG? Or at least it was
4 bad for MITG's business that they did this, right?
5   A. That's correct.
6   Q. Okay. And the fact that they terminated
7 the Standard Support Agreement, which was bad
8 business for MITG, doesn't act as a breach of the
9 Standard Support Agreement, correct?
10      MR. HANSEN: And I want to object. I don't
11 think that's ever been pled, okay. The breach of the
12 Support Agreement is based --
13      MS. CARROLL: I'm outlining exactly what
14 his beliefs are, and I'll work my way through it, if
15 you don't mind.
16      MR. HANSEN: I'm going to object to the
17 form. It calls for a legal conclusion. Go ahead and
18 answer.
19      MS. CARROLL: Q. I just want to make
20 sure exactly what your claim is, and I'm trying to
21 narrow it. Did you know, and make sure I understand
22 what your claim is, the fact that the Standard
23 Support Agreement was terminated?
24   A. Uh-huh.
25   Q. As it was by HP does not give rise to a

**Page 180**

1 basis for any of the claims you're pursuing in this
2 lawsuit?
3   A. That is correct.
4   Q. Okay. And the issue that you have is that
5 business that you believe was supposed to go to MITG
6 acting as HP Direct went someplace else?
7   A. That is correct.
8   Q. And do you have any basis for -- well,
9 strike that. When we are looking at these exhibits
10 on the Andover call center, do you have -- what facts
11 do you have that support your belief, as I understand
12 your belief to be, that those calls should have come
13 to MITG as HP Direct under the Standard Support
14 Agreement?
15   A. The documents previously produced.
16   Q. What documents?
17   A. The PBCO metrics, for example.
18   Q. What is it in the PBCO metrics that
19 identifies for you that the people who were calling
20 into the Andover call center that are the subjects of
21 Exhibits 24, 25, and KK are capital C Customers under
22 the Standard Support Agreement?
23   A. Okay. I'm sorry. Your question again was,
24 then?
25   Q. What I'm trying to find out is it's your

3:04-cv-03055-JES-CHE  #71-8  Page 11 of 15
HP and Compaq v. MITG
CondenseIt™
Ronald Haught

Page 181

1 contention -- is it your contention that the Andover
2 calls that are the subject of Exhibits 24, 25, and KK
3 were calls from capital C Customers, as that term is
4 defined in the Standard Support Agreement?
5    A. Not all.
6        MR. HANSEN: I want to object, calls for a
7 legal conclusion. Go ahead and answer.
8        THE WITNESS: Not all calls, no.
9        MS. CARROLL: Q. Okay. How can you
10 distinguish, or can you, from any of the information
11 you have between what you consider Customers, capital
12 C Customers, that should have come to MITG under the
13 Standard Support Agreement versus others that were
14 not covered by the Standard Support Agreement?
15    A. I would need your documents to produce
16 that, and I believe we requested those.
17    Q. Well, let me ask you this. What are you
18 looking for in terms of -- what are you looking for
19 the documents to show you about the Andover call
20 center calls that are the subject of these exhibits?
21    A. I'm looking to see from a historical
22 perspective an increase in one and a decrease in the
23 other.
24    Q. Do you have an increase in one and a
25 decrease in the other one of what?

Page 182

1    A. An increase from Andover and a decrease in
2 myself.
3    Q. Okay. Do you know -- do you have any
4 understanding as to how it came to be that this
5 Andover call center got inundated with calls in the
6 fall of '02?
7    A. No.
8    Q. All right. Do you have any knowledge as to
9 what -- do you have any knowledge of what the content
10 or things that people were calling in about on
11 those? This is Presario and non-Presario calls?
12    A. I mean, only from -- I don't have specific
13 knowledge that I recall where the source was, but I
14 do know that the calls were presuming not only
15 Presario but were two other, I believe, models or
16 type of consumer PC's.
17    Q. Well --
18    A. Whether it was the Armada or whathave you,
19 I don't recall.
20    Q. Well, do you have any understanding,
21 though, as to whether those were people trying to buy
22 spare parts versus looking for technical assistance
23 versus return parts versus getting warranty
24 replacements? Any understanding as to what the
25 nature of those calls were?

Page 183

1    A. Sure. My understanding is those were non-
2 warranty parts calls.
3    Q. Sales?
4    A. Sales, whatever.
5    Q. And from whom did you gain that under-
6 standing?
7    A. I don't recall.
8    Q. Do you recall ever getting, seeing any
9 documentation that set out what types of calls in
10 terms of spare parts, returns, technical assistance,
11 any of those, do you recall seeing any documents that
12 laid that out?
13    A. No.
14    Q. And to the extent that the Andover calls
15 before the influx of these calls that are the subject
16 of the e-mails, if those were all DEC, Digital
17 Equipment Corp., calls, you don't contend that those
18 are calls that should have been coming to MITG, is
19 that correct?
20    A. That's correct, even though we did have
21 calls and do business with those folks.
22    Q. All right.
23    A. You want to keep all of this in order?
24    Q. Yeah. You can just toss it over there.
25 Thank you. You were -- is it true that MITG was

Page 184

1 providing -- well, strike that. I don't want to go
2 down that path. I want to try to finish where I
3 was.
4        I understand from your prior testimony, and
5 correct me if I'm wrong, that you took issue with
6 business that was referred to kind of this third
7 group of people, Ambry, etc., that you don't know
8 what their relationship might have been with HP or
9 Compaq, is that correct?
10    A. Do I take issue with that?
11    Q. Yes.
12    A. Yes.
13    Q. Okay. Let's start with Exhibit B.
14    A. Okay.
15    Q. If you will take a look at that e-mail
16 string, it goes as they all do, and the last page
17 going forward. And just so the record is clear, it's
18 MITG's 101 through 102.
19    A. Okay.
20    Q. All right. That document familiar to you?
21    A. Not necessarily, no.
22    Q. Okay. Well, let's just go through starting
23 with April's e-mail at the bottom.
24    A. Okay.
25    Q. And it appears that she is the one that

Page 185

1 starts the string, and her subject, interesting
2 information we wanted to pass on, and she is sending
3 it to Troy with copy to you and Miss Koch and Miss
4 Briscoe.
5    A. Okay.
6    Q. And somebody told her this information that
7 she then passed on about Lyle from warranty group
8 refers a customer to an authorized service provider
9 in her area or the Spare Store or HP Online Parts.
10 She said (that's us) or she could go to Ambry. What
11 is -- do you take issue with Lyle from warranty group
12 giving a customer that information, or those possible
13 access points for getting the part that the person is
14 looking for?
15    A. Yes.
16    Q. Okay. All of it -- well, other than
17 sending it to HP Online Parts, I take it you don't
18 have a problem with that? The other places that are
19 mentioned, an authorized service provider, the Spare
20 Store, or Ambry, do you take issue with all of those
21 other possible sources that are referred to by Lyle
22 in warranty?
23    A. Well, not necessarily. Only because, A, I
24 don't know what that part is.
25    Q. Okay. All right.

Page 186

1    A. B, I'm unfamiliar if it is truly a warranty
2 issue or not, and, C, I would as well take -- I would
3 also be concerned as to her last or second to last
4 sentence, why would technical support refer someone
5 to Ambry when this a part that is available from CSN.
6    Q. So you have somebody apparently from this
7 -- I would read this as that the part, the person
8 ended up in warranty group or technical support and
9 didn't have an item that was under warranty?
10    A. Correct.
11    Q. Hence, the recommendations to go elsewhere?
12    A. That's what I would assume, yes.
13    Q. Okay. And so it's all right if -- in your
14 mind in terms of where customers can go, you don't
15 take issue with going to the Spare Store or coming to
16 HP Online Parts or the authorized service provider?
17    A. That is correct.
18    Q. Okay. The issue is with the referral to
19 Ambry who's outside, is this third group that we
20 talked about earlier?
21    A. In that specific instance, yes.
22    Q. Okay. And do you have -- and all the
23 information you have on this customer, I mean, that's
24 everything you know, that you know about this matter
25 is what we see here?

Page 187

1    A. That's correct, yes.
2    Q. All right. Then the second one that's
3 below that from April, Tuesday, May 20th of '03, a
4 customer called the Welcome Center?
5    A. That's correct.
6       MR. HANSEN: Where is that at?
7       MS. CARROLL: Q. The second page, the
8 second description of the issue.
9    A. Yes.
10    Q. Now, do you have an issue on how this was
11 handled, just assuming everything in here is, this is
12 all we know about this situation. Tell me what you
13 take issue with, if anything, on the May 20, '03,
14 call?
15    A. I'm sorry. What is my issue with this?
16    Q. Yeah. I mean, is there anything that this
17 person did wrong or that you take issue with that you
18 think is the improper handling of or referral of
19 business that's described in the second one?
20    A. Yes. I mean, my issue is why are internal
21 people taking revenue from both your company and mine
22 by referring these to outside vendors?
23    Q. Okay. Other than -- and that's from a
24 business standpoint? In your mind that doesn't make
25 any sense, is that fair?

Page 188

1    A. That's fair, yeah.
2    Q. Okay. Well -- and you don't know one way
3 or the other what relationship HP may have or may
4 have had at the time with Super Warehouse?
5    A. No, I don't.
6    Q. And so you don't know whether Super
7 Warehouse bought the parts that they have available
8 directly from HP at whatever price HP was willing to
9 sell it to?
10    A. That is correct. But my contract stated,
11 and it was explicitly in the nature of or the spirit
12 of the agreement, these types of situations would be
13 stopped.
14    Q. Well, when this -- the Welcome Center, you
15 don't know where this person when they called the
16 Welcome Center, this unknown phone number that we
17 talked about earlier, you don't know how that person
18 got there to the Welcome Center?
19    A. No.
20    Q. Who gave them that number?
21    A. (Shook his head from side to side.)
22    Q. And you don't know who that customer was, I
23 mean, in terms of were they around, for example, and
24 had done business with Compaq Direct before the
25 Standard Support Agreement? You don't know enough

Page 189

1 information about this customer to be able to
2 identify them?
3    A. That's correct.
4    Q. And so at the time you entered into the
5 Standard Support Agreement, if this was the practice
6 of Hewlett-Packard when somebody, a consumer got to
7 their Welcome Center and they got to a call center
8 who said, here is some resources that, we don't sell
9 that, won't sell that to you directly when we don't
10 have it, these are some resources you can use, is
11 there something in your belief the Standard Support
12 Agreement says that post-merger HP could not continue
13 that business practice?
14      MR. HANSEN: Object to form.
15      MS. CARROLL: Q. Do you have an
16 understanding -- again without getting into a legal
17 conclusion. He may have some additionally. I'm not
18 looking for a legal conclusion. It's just your
19 understanding of how the relationship worked is what
20 I'm looking for.
21    A. My understanding would be that this
22 specific situation would not have existed, that's
23 correct.
24    Q. Okay. And so if that's the way HP did it
25 before the merger, then at the time of the merger

Page 190

1 because the Standard Support Agreement was in place
2 they were to change their business practice to stop
3 sending that to places like Super Warehouse or Ambry?
4    A. They were changing everything else.
5    Q. Is that a yes?
6    A. Yes.
7    Q. All right. There was -- it appears that
8 there is no response in that April sent her e-mail
9 again and attached her old e-mail and had some
10 additional follow-up information in her e-mail and
11 she sent a May 27th e-mail to Troy with all the same
12 people, some other information we found out later
13 last week. So she sends that along, and then this is
14 from Troy that he is sending to Jeff Hatfield. Do
15 you know who Jeff Hatfield is within the HP
16 organization? I'm assuming that's within HP. Do you
17 know?
18    A. Yes.
19    Q. Okay. Who is Jeff Hatfield?
20    A. Jeff was in charge of -- I don't remember
21 his exact title. Jeff was involved with third party
22 procurement of finished goods, I believe is my
23 understanding.
24    Q. Third party computer. So if HP wanted to
25 acquire a --

Page 191

1    A. Lexmark printer or whathave you.
2    Q. He was the person?
3    A. I believe he was one of those people, yes.
4    Q. Okay. All right. Did you ever have any
5 conversations with Mr. Hatfield about the issues of
6 referral to places like Super Warehouse and Ambry?
7    A. Yes.
8    Q. Okay. What do you recall of conversations
9 that you may have had with Mr. Hatfield on that
10 subject?
11    A. Well, we had various conversations on that
12 subject actually. Several of the conversations were
13 revolving around our ability to link with the HP
14 product website and being able to offer additional
15 product, whether it be multivendor or out of stock
16 inventory, to the HP customers based off of that
17 link.
18    Q. So were you having discussions with him
19 about a link on HP --
20    A. Correct.
21    Q. -- .com or a page on HP.com which would be
22 the additional services or parts you provided?
23    A. That's correct.
24    Q. Whatever became of those discussions?
25    A. Actually walked quite a ways down that

Page 192

1 road, developed a pilot site, and then another
2 reorganize which seemed to be perfectly timed with
3 issues, another reorganize came into play. I believe
4 Jeff's role was changed, and the people above him,
5 Patrick Voigt (phonetic) and a few of those folks,
6 were gone, and that ended that whole discussion.
7    Q. Okay. Did you have any -- it sounds like
8 those discussions were ways to increase exposure for
9 the in-house solution that was being provided by HP
10 Direct in terms of multivendor parts?
11    A. It was also -- yes, and it was also a way
12 to address an ever growing problem of offering that
13 solution to customers who had not previously had that
14 option.
15    Q. Okay. Explain that to me.
16    A. For example, previously with HP they would
17 say, go to your local reseller. You go to your local
18 reseller, contact back to HP, HP says it is out of
19 stock, go back to the reseller, it is out of stock,
20 reseller tells the customer it is out of stock, upset
21 customer. So discussions with Hatfield and Patrick
22 Voigt and all those people was to solve that issues.
23 Again, those customers go through -- well, whether
24 it's through a web portal, whether it's through phone
25 calls, whatever, if the product was not available for

Page 193

1 the HP channel, instead of referring them back to the
2 reseller and go through that song and dance, they
3 would bring that order to us and we would fill that
4 order and it would go through the same process as
5 everything else.
6   Q. It would appear that HP is sending, that
7 certain people within HP are sending people to, for
8 example, Super Warehouse or Ambry. Is that -- are
9 those the kind of people that they -- how do they fit
10 in what you have just described as the issue of going
11 out to an authorized reseller saying, we don't have a
12 part, and sending them back?
13  A. Well, this again is part of when I was
14 referring in my earlier testimony about language of
15 communication or the left hand not knowing what the
16 right's doing. This is a prime example where you
17 might have one group of people at the Welcome Center,
18 if it was one location, I can't attest to, or if it
19 was, you know, 50 people here and a hundred people
20 here, I don't know, but nonetheless where one group
21 of people would have a message passed out or
22 disseminated amongst the troops, but that message
23 would not filter across the entire organization. So
24 we would receive sporadic issues just like this, and
25 we would report those issues back and say, hey, you

Page 194

1 know, what's going on? As a group we are all losing
2 revenue. And in turn some of these customers might
3 very well come back because they couldn't get the
4 part from Ambry. But, I mean, I again have no way of
5 tracking that, etc.
6   Q. Let me ask you to take a look at Exhibit C,
7 which is Bates MITG 430 through 435.
8   A. Uh-huh.
9   Q. Again, as always, it goes from back to
10 front. If you would?
11     MR. HANSEN: While you are taking a look at
12 that I will get a soda.
13     MS. CARROLL: Q. And tell me when you're
14 done, and if Mr. Hansen has returned, we'll ask
15 questions.
16  A. Okay. What's your question?
17  Q. The first e-mail on the first page is from
18 you to various of your employees?
19  A. Okay.
20  Q. And subject re: Feedback from
21 Globalonlineparts.com customer. What does that mean,
22 Globalonlineparts.com customer? Who is that?
23  A. Globalonlineparts.com is me.
24  Q. And now what happened in this e-mail
25 string? If you'll just explain generally what was

Page 195

1 going on with the customer and where they were trying
2 to get, because going back -- and let me just say the
3 original message starts on Page 434.
4   A. Uh-huh.
5   Q. Okay. Message from Toby L. Morris at
6 Saint-gobain.com to webmaster to Globalonline-
7 parts.com?
8   A. Correct.
9   Q. And there is what appears to be a question
10 that he wants the CDRW drive for his Compaq Armada
11 E500?
12  A. That's correct.
13  Q. And then info at Globalonlineparts.com
14 response?
15  A. Correct.
16  Q. All right. Is there anything wrong with
17 the answer from the Globalonlineparts.com, Toby on
18 the Armada E500 I do not show that except a CDRW
19 drive can use DVD. If you have any further
20 questions, you can contact me on Compaq technical
21 support?
22  A. Correct.
23  Q. That Compaq technical support is a
24 different number than your number?
25  A. Yeah. I don't know that number.

Page 196

1   Q. Okay. And Kimberly, did she work for
2 Globalonlineparts.com or did she work for that part
3 of your business or did she work for the HP Direct
4 portion of your business?
5   A. No. She worked for GOP.
6   Q. And so Toby -- then what's happening next
7 -- this is where it gets a little -- I'm a little
8 confused. Does it appear, then, that Toby sends
9 contacts?
10  A. I can't answer your question.
11  Q. Okay.
12  A. And I'll have to refrain to a later
13 scenario with the CCTR website that somebody
14 contacted us about and said, hey, are we using the
15 Compaq Direct domain? This happened about a month
16 ago.
17  Q. I did -- I'm not worried. I understand
18 from your counsel how that came up, and I'm not
19 worried about that.
20  A. That is going to be the same scenario
21 here. It was an IP situation on the internal routing
22 where the Compaq websites were shut down.
23  Q. Okay.
24  A. But these e-mails are referred from
25 Compaq. They referred, or HP I should say, referred

Page 197
1 the customer to that name Compaqonlineparts.com.
2 Q. Correct.
3 A. In your system or in their system when they
4 refer it it would have been to an IP address, not
5 necessarily a web name.
6 Q. I'm not following you.
7 A. Well, the same thing with the CCTR. You
8 guys went to Compaq Direct Online and popped up that
9 and you wanted to know what it was.
10 Q. Yes.
11 A. The same deal. When you buy a Class A
12 license of IP addresses, you are only given so many
13 numbers. So you typically reuse those numbers, and
14 in this case those IP addresses had basically been
15 reused. What we didn't know, or what I'll speculate
16 we didn't know because of the appearance of this, is
17 that they were referring to that IP address.
18 Q. Okay. Well --
19 MR. HANSEN: I'm lost.
20 MS. CARROLL: Q. I'm lost. And so let me
21 see if I can walk you through this. There is the
22 response from Kimberly?
23 MR. HANSEN: You're in the wrong spot.
24 THE WITNESS: I am?
25 MR. HANSEN: We are right here (indicating)

Page 198
1 right now.
2 MS. CARROLL: This Toby goes to Global
3 Online Parts. Kimberly responds.
4 MR. HANSEN: Toby goes to here
5 (indicating).
6 MS. CARROLL: Q. And then Kimberly at
7 Global Online Parts responds?
8 A. Okay.
9 Q. And then gives, contact me or technical
10 support?
11 A. Correct.
12 Q. And then you go back and the next time
13 there is an e-mail, a normal kind of original looking
14 message, is on 432 where Toby sends to info at Global
15 Online Parts. Below is the letter I received from a
16 previous inquiry with HP slash Compaq, and it's then
17 there is an e-mail, dear HP customer?
18 MR. HANSEN: Do you see that?
19 THE WITNESS: Right.
20 MS. CARROLL: Q. All right. And there
21 they say, in fact, that for the Armada E500 notebook
22 you can purchase a c.d. or with drive, they give the
23 part number, and then they give the link --
24 A. Correct.
25 Q. -- HP Online Parts, and then they give a

Page 199
1 phone number and they give a web address and then for
2 more options we recommend searching the internet.
3 Here are some examples.
4 A. Yes.
5 Q. Now, the original inquiry by Toby was to
6 another one of your companies?
7 A. Correct.
8 Q. Okay. And is there a problem with the fact
9 that -- are you now offering competing services from
10 one of your companies to another?
11 MR. HANSEN: I'm not following you.
12 THE WITNESS: I'm not following your
13 question.
14 MS. CARROLL: Q. Well, you have a person
15 who's looking for a Compaq part who went to
16 Globalonlineparts.com, which is a company of yours.
17 That's not the HP Direct company?
18 A. Okay.
19 Q. All right. So, now, do you have a separate
20 company that is competing with you? Do you have two
21 companies competing with each other? If your company
22 -- then how did he get there? If he was trying to
23 acquire something or get information from
24 Globalonlineparts.com, one of your companies, and
25 then is referred by HP to another one of your

Page 200
1 companies, do you know how that happened?
2 MR. HANSEN: I think that's incorrect. I
3 think Toby is referred by HP services, which is not
4 our company.
5 MS. CARROLL: And I'm going to the original
6 message.
7 MR. HANSEN: Where?
8 MS. CARROLL: At the very bottom on 434,
9 and I want the witness to testify about this. The
10 original message from Toby to Webmaster at
11 Globalonlineparts.com is January 12th.
12 MR. HANSEN: Okay.
13 MS. CARROLL: Q. And what I'm wondering is
14 when you get to this January 12th, are you telling me
15 he is still, Toby is still going to info@-
16 Globalonlineparts.com? He is contacting one of your
17 companies, Global Online Parts, and I'm wondering why
18 this customer is going to Global Online Parts as
19 opposed to HP Direct Online or whatever?
20 A. I can't answer that.
21 Q. Okay. Was Global Online Parts offering for
22 sale CDRW's for Armada E500 notebooks?
23 A. Not as a practice, no.
24 Q. All right. So after this -- the customer
25 was at Globalonlineparts.com. HP says, you can go to