E-FILED
Wednesday, 01 February, 2006 04:17:03 PM
Clerk, U.S. District Court, ILCD
Ronald Hanmgt

Page 201

1 Compaq Direct Online or you can go to Ambry and all
2 these others, and so then what is happening here your
3 Terry Welch at MITG is forwarding e-mails about
4 referring business to PC Nation and to Ambry that was
5 a solicitation or an attempt for somebody to buy
6 parts from your other company?
7     A. I disagree with that characterization.
8     Q. And I'm not trying to characterize it.
9 What I'm trying to do is figure out this guy was
10 trying to buy parts from Globalonlineparts.com, and
11 then he gets referred -- at some point HP refers him
12 to your company, HPdireconline or Compaqdirect-
13 online.com?
14         MR. HANSEN: As evidenced in this e-mail?
15         MS. CARROLL: Correct.
16         MR. HANSEN: I'm following you.
17         MS. CARROLL: Q. With some other issues.
18 Ms. Welch then takes the e-mail correspondence that
19 was between Toby and Globalonlineparts.com and then
20 gets that into MITG stream, is that correct, because
21 there is no e-mail that ever forwards -- what I'm
22 confused about we go from Toby to info@-
23 globalonlineparts, but there doesn't appear ever to
24 be a forwarding of these e-mails. All of a sudden
25 Miss Welch says she is forwarding it, but how did she

Page 202

1 pick that up?
2     A. I can't answer that. I don't know.
3     Q. And then in the front page e-mail you say,
4 very interesting. I think we might include a portion
5 of this into our letter. What letter are you
6 referring to, do you remember?
7     A. That's a good question. No, I don't.
8     Q. Do you remember using any of this portion
9 of the other part of the e-mail in a letter to any of
10 the HP executives to whom you sent correspondence?
11     A. I don't recall.
12     Q. Okay. Just to try to wrap this subject up,
13 we have at least two examples, and there may be --
14 there are two e-mail strings that give examples of
15 what you think is inappropriate or improper referral
16 of business to sources outside HP, being Ambry or
17 Super Warehouse or whoever else?
18         We talked earlier that you believe that
19 some of the calls that were going to the Andover call
20 center that were the subject of the exhibits that we
21 went through before this most recent discussion, that
22 some of those calls were also supposed to go to MITG
23 under the Standard Support Agreement. Are you aware
24 of any other sources of calls that you have specific
25 knowledge of, I don't want to pay attention to call

Page 203

1 volume's down, but specific examples such of these
2 documents that you have been able to produce that
3 show calls that in your mind should have come to you
4 instead of going to another call center or to a third
5 party outside the company?
6     A. No. That's why we requested your records.
7     Q. Okay. Let's take a break.
8         (Whereupon a short recess
9         was taken.)
10     Q. I have a follow-up with a couple of
11 questions on the subject that I was belaboring
12 before. In terms of the types of parts that people,
13 that the calls going in to Andover that you thought
14 should be coming to MITG, if those were parts that
15 were, that you could acquire through CSN, is it true
16 that those parts would not have been subject to the
17 75/25 profit split if you acquired those through CSN?
18     A. That is a correct statement.
19     Q. Okay. And for these parts that we talked
20 about in Exhibits B and C where they were referring,
21 they being internal HP people, to Super Warehouse or
22 to Ambry or something else, if those parts were
23 available, if they contacted you and they were
24 available via CSN, that would not have been subject
25 to the 75/25 percent split, correct?

Page 204

1     A. That is correct.
2     Q. The parts that were subject to the 75/25
3 split were a sourced product, whether they be
4 multivendor or whether they be out of stock or legacy
5 parts, is that correct?
6     A. That's correct.
7     Q. And the compensation that MITG is, Compaq
8 Direct and HP Direct got in part for selling those
9 CSN parts was the $41,000 a month, is that correct?
10     A. That is correct.
11     Q. All right. Did you ever do an analysis to
12 determine whether or not that $41,000 a month payment
13 for the sale of the CSN parts was a good deal, a bad
14 deal, a break even deal?
15     A. Not specifically, no.
16     Q. Did you have a sense during the time of the
17 Standard Support Agreement whether 41,000 was working
18 out to be a number that was break even or better for
19 MITG?
20     A. It all depended. Certain months had
21 different answers to that. On the average I would
22 say it was probably a break even or a little bit less
23 deal depending on what services we had to do.
24     Q. The parts that you were selling to people
25 or offering to sell to people under that were

Page 205

1 covered under the Standard Support Agreement?
2   A. Hold on. Let me go back. Can you rephrase
3 that question? I think I just answered that
4 incorrectly. Your previous question, I'm sorry. My
5 brain just caught up with the situation.
6       MR. HANSEN: I think it was the 41,000.
7       MS. CARROLL: Q. Was the 41,000 -- even if
8 you didn't do a formal analysis, did you ever come to
9 a conclusion based on your experience in your
10 business whether the 41,000 was a break even or
11 better for selling the CSN parts?
12  A. Okay. I'm sorry. Yeah, for selling the
13 CSN parts, I'll say yes, yes. Sorry.
14  Q. That's all right. I know it's been a long
15 day for you. The -- how much of the Standard Support
16 Agreement business that you were doing was sourced
17 parts as opposed to CSN parts on average?
18  A. CSN was probably 60 percent, there about,
19 40 for the other.
20  Q. Was that consistent throughout the two-year
21 term of the Standard Support Agreement? Maybe it
22 fluctuated from month to month, but in terms of if
23 you're looking at the first year of the Standard
24 Support Agreement versus the second year, is it
25 pretty consistent that CSN is 60 percent and sourced

Page 206

1 parts are 40 percent?
2   A. No. I wouldn't have an overall consistent
3 number like that, no. I'd have to review the records
4 for that.
5   Q. Okay. Do you recall being asked by Troy or
6 by Sherry Ellis about I got questions on percentages
7 of your business and what percentage of your business
8 was HP and what percentage was sourced and etc.?
9   A. Not specifically, no.
10  Q. Okay. Let me show you what was marked
11 yesterday as Deposition Exhibit 21, which is an
12 exchange of e-mails between you and Mr. Bloomquist,
13 and if you can just let me know when you finished
14 reading that.
15  A. Okay.
16  Q. Do you recall that e-mail exchange with Mr.
17 Bloomquist?
18  A. It seems somewhat vague based on the e-mail
19 you have given to me.
20  Q. Vague or vaguely familiar?
21  A. I mean vaguely familiar. Thank you.
22  Q. Do you recall when he was asking for these
23 percentages going back and looking at any records to
24 give you that breakout?
25  A. No.

Page 207

1   Q. All right. Do you know why he was asking
2 for that information? Did he ever tell you why he
3 wanted to know that?
4   A. No.
5   Q. Did you respond to him when he said that 76
6 percent seems kind of high?
7   A. Not that I recall, no.
8   Q. And on that it says sourced product is 52
9 percent?
10  A. That's correct.
11  Q. All right. Now, are you -- when you're
12 answering that sourced part question, is that only
13 Standard Support Agreement business, or is that all
14 the business including the service parts that we
15 discussed earlier?
16  A. I can't answer that.
17  Q. Okay. And do you know if that was, what
18 the basis was for that 52 percent number that you
19 came up with there? I mean, were the documents that
20 you looked at or that was just for the month before
21 that and so you happen to know what that number was?
22  A. I have no clue.
23  Q. Okay.
24  A. Sorry. Wish I could be more help for you.
25  Q. Well, and let me ask you this. Why the

Page 208

1 difference in terms of you told me -- and maybe I
2 misunderstood your testimony. You told me that CSN
3 was 60 percent versus 40 percent for sourced parts.
4 This indicates that back in September of '03 you were
5 thinking 52 percent sourced parts, which would make
6 48 percent for the other parts. Any reason for that
7 change? I mean, is it kind of looking back at
8 records?
9   A. 18 months, 18 months worth of time.
10  Q. All right. And do you think the 18 months
11 has made it more accurate, your number today more
12 accurate or less accurate than that number?
13  A. I can't answer that.
14  Q. And, I'm sorry. You said you don't recall
15 responding to --
16  A. To this, no, I don't recall.
17  Q. To that e-mail?
18  A. I vaguely remember the e-mail actually.
19  Q. Let's go off the record for a minute.
20          (Discussion off the record.)
21  Q. Let me just go back on the record. Mr.
22 Hansen and I both know what e-mail we are talking
23 about, but I can't lay my hands on it right now.
24 This 76 percent number that's in this e-mail that's
25 Exhibit 21, do you know one way or the other as you

Page 209

1 sit here whether that's Standard Support Agreement
2 business or all business that you had done?
3   A. I don't know.
4   Q. Let's talk a little bit awhile here about
5 the call volume issue, the straight volume without
6 getting into who is who in terms of customers. Is
7 it --
8           (Whereupon a document was
9           marked Deposition Exhibit
10          Number 26.)
11  Q. I want to hand you Exhibit, 26 and I just
12 want to use this as an example of types of
13 communications that may have gone on between your
14 company and HP Direct in terms of these call volumes,
15 and the e-mail that is Exhibit 26 is HP 1854 to
16 1870. And in here Mr. Michael Brummet sends the
17 e-mail with an attachment called cpqdirect dash
18 callstats to Troy Bloomquist with a copy to you, and
19 it says, numbers for Thursday, May 22nd. Is this
20 e-mail cover and attached report the standard method
21 that you had of communicating your call volume
22 information to Mr. Bloomquist?
23  A. Yes.
24  Q. What was your understanding of what Mr.
25 Bloomquist did with the information after you sent it

Page 210

1 to him?
2   A. This information was forwarded onto
3 whomever and was put into the PBCO metrics.
4   Q. Okay. Who came up with what, the content
5 of this report that you were sending on to Mr.
6 Bloomquist?
7   A. Somebody within HP.
8   Q. Did you prepare these reports and send them
9 out to Troy Bloomquist when it was Compaq before the
10 merger of Compaq Direct? For example, 2001, before
11 the Standard Support Agreement, did you prepare call
12 logs?
13  A. I don't recall if they were that detailed.
14  Q. And let me just show you HP 160 has some
15 information, and I do not believe that that's the
16 entire chart all the way across, but starting at HP
17 160 you see that this is labeled year 2001 call
18 activity and the dates beginning in?
19  A. 3-12.
20  Q. 3-12.
21  A. Uh-huh.
22  Q. Okay. These categories on here, is it --
23 do I understand you, then, correctly to say that
24 someone within CEI or Compaq Direct, whatever it was,
25 called at this stage of the game, told you what

Page 211

1 categories to give them information on?
2   A. I would assume so, yes.
3   Q. Okay. And you would assume so. Is there
4 any -- was there any reason to believe that MITG came
5 up with this kind of tracking information and went to
6 them and said, hey, look where we, what we can show
7 you with our tracking information?
8   A. Well, there is a possibility of that, yes.
9 I mean, I don't know, but, yeah, that's a
10 possibility.
11  Q. Did you keep call activity stats for any of
12 your other call center business that you had? For
13 example, people calling in to MITG?
14  A. No.
15  Q. What other roles did Mr. Brummet have at
16 MITG, other than doing these call stats? What was
17 his general job description?
18  A. Basically PC maintainer and the backup guy.
19  Q. Okay. IT guru?
20  A. Yes, more or less IT guru, if you want to
21 put it that way.
22      MR. HANSEN: Off the record.
23          (Discussion off the record.)
24      MS. CARROLL: Q. Just looking at this
25 stack, and I want to just go with the top stack, do

Page 212

1 you recall that on your system you have a spread
2 sheet that has multiple tabs below it that you can go
3 through various categories; for example, call
4 specifics, daily totals, per employee, etc.?
5   A. I believe so, yes.
6   Q. Okay. Are you familiar with what all of
7 these categories across the top of these reports
8 mean?
9   A. Specifically familiar, no; but common sense
10 I can answer the questions, I guess, if that's what
11 you're shooting at.
12  Q. Let's start with common sense.
13  A. For the most part anyway.
14      MR. HANSEN: I would probably say there is
15 probably no one else that would know more than Ron
16 about it.
17      MS. CARROLL: Q. All right. Looking at
18 the 2002 call specifics, okay, what is number of
19 calls answered? I take it that's --
20      MR. HANSEN: Just so the record is clear,
21 we are starting on MITG pages bate stamped 615, which
22 is stapled, through 618?
23      MS. CARROLL: All right.
24      THE WITNESS: In the upper left-hand corner
25 it says Call Specifics 2002. Go ahead.

Page 213

1   MS. CARROLL: Q. The number of calls
2 answered, I take it that -- well, that's pretty
3 obvious, however many people called. Orders placed
4 CSN?
5   A. Yes.
6   Q. All right. Just the orders that your folks
7 in 2002 were CSN orders that they got?
8   A. That's correct.
9   Q. Orders placed outsource. So anything that
10 wasn't available through CSN, is that what goes in
11 that category?
12   A. I would believe so.
13   Q. Okay. Now, web sales. What are we --
14   A. I don't know. Good question.
15   Q. Okay. Sales calls?
16   A. That's empty, so --
17   MR. HANSEN: And, just for the record, I
18 don't know that -- that's one thing I believe the
19 1532 goes under sales calls as opposed to web sales.
20   MS. CARROLL: And that's what I wondered,
21 because mine ended up in the middle between the two
22 of them so maybe --
23   THE WITNESS: I think that web sales was
24 something they, somebody had requested, but we had --
25 again, we had no way of tracking that. That's why

Page 214

1 I'm kind of surprised by that.
2   MR. HANSEN: I think when it printed this
3 way, that's why it came out on yours and mine kind of
4 like that.
5   MS. CARROLL: Q. Okay. And the actual
6 total sales going on this first one, I'm going with
7 186, belongs under that category. What does actual
8 total sales mean?
9   A. That would be the actual sales total for
10 the day.
11   Q. Okay. So a total of 186 orders were
12 placed, and however many parts were on there could be
13 additional parts?
14   A. Right. We didn't track by actual part.
15   Q. And then orders placed, this is a
16 percentage total of sales versus the number of calls
17 answered?
18   A. I believe so, yes.
19   Q. Referrals back to tech support. What kind
20 of calls were you receiving as Compaq Direct at this
21 point that you were sending to tech support?
22   A. Well, calls where people wouldn't have a
23 clue what product they needed. At this time -- when
24 is this? February. If I'm correct in my
25 recollection, we did not have the ability to do a

Page 215

1 serial number search or what have you. So if the
2 customer called and they were just totally clueless,
3 which happens a lot, then we would not have the tools
4 available to us to be able to answer that question
5 and we would send them back to tech support.
6   Q. All right. And then you have some various
7 other categories here of not enough info, no part
8 couldn't be found, part in warranty, etc., as you go
9 across the top, and I take it those are pretty
10 self-explanatory?
11   A. I would agree.
12   Q. When you get to the other side there is the
13 column that's order info, and then you go to part
14 pricing information?
15   A. Uh-huh.
16   Q. These are just, again, people just with
17 inquiries that don't place an order, and you kind of
18 characterize what it is they are trying to do?
19   A. That's correct. Because we have no way of
20 actually knowing, say, for instance, out of that 253
21 how many actually came back and placed an order. So
22 we were merely trying to characterize the calls in an
23 effort to -- for instance, the high number of
24 referrals back to tech support it was in our benefit
25 and yours, quite frankly, to try to manage that to a

Page 216

1 much lower rate, because one of the issues
2 surrounding this is someone who would be referred
3 back to tech support this is a timeframe when we had
4 people come to us that could have been on hold for
5 three hours. So in an effort to try to resolve that
6 and help find and pinpoint where that problem was
7 arising from is where, I think, a lot of these
8 numbers really kind of got into play.
9   Now, whether they asked to us do it or
10 whether we did it, I don't know. I just know there
11 was a reason we did it, and that was the reason.
12   Q. When we get toward the end and transfer to
13 logistics, what is that?
14   A. Transfer to logistics could be and probably
15 is calls that were shipped over to the B to B side
16 that would be incorrectly placed.
17   Q. Okay. They went to the B to B side?
18   A. They would be from the consumer side coming
19 in that would have been transferred. We commonly
20 referred to the B to B side as the logistics side
21 because that was the side that tracked and all that.
22   Q. All right. And RMA requests, these are
23 people who want to return product?
24   A. Correct.
25   Q. Okay. And then if you look at this next

Page 217

1 report, the daily totals report is another kind of
2 report you kept. There are differences. You might
3 need to leave that out, because I just want you to
4 confirm. There are differences between the
5 categories in the report called Daily Totals versus
6 the report called Call Specifics?
7      A. Okay.
8      Q. Do you see that?
9      A. Yes.
10     Q. Okay. What in general is the difference
11 between those, these two reports? There is some
12 overlapping information, I believe, but why the two
13 different reports?
14     A. One -- without seeing the tabs and all
15 that, the one could be consumer out and the other
16 could be both.
17     Q. Well, let's see, if you were looking at --
18     A. What's that number, 562 and 654, and we
19 said we had how many in logistics?
20        MR. HANSEN: 60, which would be 622.
21        THE WITNESS: And then others associate
22 calls, so that could be that.
23        MS. CARROLL: Q. But if you are looking at
24 the daily totals, if you look under all calls, you
25 get 562. If you look at the call specifics under

Page 218

1 number of calls answered, you get 562. On this
2 report the call specifics, the first report we were
3 looking at, which is the, so the record is clear --
4      A. Call specifics.
5      Q. 0615. And then we look at the daily totals
6 for 2002, which starts 619?
7      A. Uh-huh.
8      Q. The daily totals report has all calls as
9 562, and the call specifics has calls answered 562.
10 Do you know why? I mean, is all calls the same as
11 number of calls answered, do you know?
12     A. I don't know. Anybody got a calculator?
13        MR. HANSEN: What do you want to know?
14        THE WITNESS: Well, if we look at sales
15 calls of 654, subtract it by the number of abandons
16 of 92, what does that get us to?
17        MR. HANSEN: Number of calls and calls
18 abandoned if you add those up, that would be 654.
19        THE WITNESS: So that would be the deal.
20        MS. CARROLL: Q. What's the deal? Sorry.
21     A. The sales calls where you had 654. We had
22 there was 654 calls that came in. We had a number of
23 abandons, which would be 92.
24     Q. Okay.
25     A. And then that number would equal the 562,

Page 219

1 which is the call specifics calls.
2      Q. All right. And then in your report if you
3 slide down to April 1st?
4      A. Okay.
5      Q. April 1st you start recording incoming
6 calls on the daily total report. Do you see that?
7      A. Well, unfortunately this third page doesn't
8 have a header up at the top.
9      Q. Yeah, you may need to --
10        MR. HANSEN: Let me go get a staple
11 remover.
12        THE WITNESS: Okay. What's your question?
13        MS. CARROLL: You are going to have to flip
14 through this. Well, I'll wait until Mr. Hansen gets
15 back.
16        MR. HANSEN: Okay. Daily totals is that
17 what you're talking about?
18        MS. CARROLL: Yeah.
19        THE WITNESS: Okay. Pull it down a little
20 bit because I want to see the first column to make
21 sure it's the same numbers. Okay.
22        MS. CARROLL: Q. So on April 1st of 2000
23 you began, you added another statistic that you were
24 reporting to Compaq Direct, and that was all incoming
25 calls at 883?

Page 220

1      A. That appears that's correct.
2      Q. All right. And, now, does the second
3 column sales calls still have the same meaning, which
4 is the number of calls, all calls plus the number of
5 calls abandoned?
6        MR. HANSEN: That's broken out a heck of a
7 lot different now.
8        MS. CARROLL: Well, that's the thing. I'm
9 trying to get at things, because I think there are a
10 couple of instances where definitions change, and
11 that's why they seem self-explanatory, but I'm trying
12 to figure out how this worked its way through.
13        THE WITNESS: That's a good question.
14        MS. CARROLL: Okay. Well, and -- you know,
15 let's see if we can figure this out. The all calls
16 is no longer a category, but you have the number of
17 incoming calls at 567, the number of --
18        MR. HANSEN: I'm sorry. Where are you at?
19 Where are you at?
20        MS. CARROLL: Q. That April 1st.
21     A. All incoming 883.
22     Q. All incoming. And I'm looking at number of
23 calls answered.
24     A. Oh, I'm sorry.
25     Q. 567.

Page 221

1  MR. HANSEN: Yeah.
2  THE WITNESS: Number of calls.
3  MS. CARROLL: Q. And then the calls
4  abandoned were 27?
5  A. Number of calls, yes.
6  Q. Okay. Now, and then you have a number of
7  sales calls at 594. So it appears that number of
8  calls answered plus calls abandoned equals the number
9  of sales calls, but it doesn't equal the number of
10 all incoming calls. So how do you get to 883, do you
11 know?
12 A. No.
13 Q. Okay. Do you -- looking at this, can you
14 tell if this is -- you also began on April 1st on
15 this daily totals report of tracking to tech
16 support. Could the next two lines -- is it that you
17 have sales calls plus two tech support plus tracking
18 slash RMA?
19 A. Oh, okay. That's correct.
20 Q. Does that get you to your 883?
21 MR. HANSEN: Yes.
22 MS. CARROLL: Q. I think it does.
23 A. Yes.
24 Q. So you are breaking down your, where you
25 did on the call specifics. Now on this daily totals

Page 222

1  report you are breaking down a little bit more on
2  where people went away, and these aren't sales
3  opportunities that tech support or they want to
4  return material. So now we have sales opportunities
5  of some --
6  A. Nature.
7  Q. Of some nature?
8  A. Correct.
9  Q. And these are other things that need to go
10 to somebody else that, or where you are servicing a
11 return product?
12 A. It would appear that way, yes.
13 Q. All right. Which one of these reports are
14 you providing to HP, or is it a combination thereof,
15 do you recall?
16 A. I don't recall, no.
17 Q. Well, let me mark this. This is not --
18 this does not have a bates label on it, because I did
19 -- this is the bates label for the 2002 reports that
20 HP produced, but I'll give it to him in this form,
21 because it's easier to read all the way across, and
22 I'm going to have her mark this before we do this.
23         (Whereupon a document was
24         marked Deposition Exhibit
25         Number 27.)

Page 223

1  Q. Let me hand you what's been marked as
2  Exhibit 27, and just so the record is clear, this is
3  the 2002 call activity report that was produced by
4  HP, HP 192 through 223, and this is in a landscape
5  format so it doesn't have the bates numbers on it,
6  but it's the same report, and I have put a tag where
7  the second half of the report picks up so you get the
8  whole top since I couldn't do the job that you did.
9  A. All right. Thank you.
10 Q. You're welcome. Now, on here let's go
11 through and why don't we start with April. We had
12 April 1st.
13 A. On the new document?
14 Q. Yeah. We want to do April 1st since we
15 just went through those numbers in some detail.
16 A. Okay. This is a document you produced.
17 Q. This is a document from, that came from HP,
18 and I think you'll need to keep the little thing
19 across the top so you can look at it.
20 A. Okay.
21 Q. So for April 1st, what is being reported as
22 the -- well, the first column on the HP one, the one
23 that went to HP, is sales calls?
24 A. Correct.
25 Q. And what number are you showing on the HP

Page 224

1  report for sales calls?
2  A. 594.
3  Q. Okay. And where did that come from in the
4  reports from MITG? What does that match up to?
5  A. Sales calls.
6  Q. Okay. On the daily totals report?
7  A. Daily totals report, correct.
8  Q. All right. And then the next number you
9  have is orders placed?
10 A. Okay.
11 Q. Is that on the daily totals or on the call
12 specifics?
13 A. That would have been on --
14 Q. Wait. You are on the wrong date.
15 A. That would have been on the call specifics.
16 Q. And does the number match in terms of
17 orders placed on what HP got and what is shown on
18 your call specifics report?
19 A. Yes.
20 Q. Okay. And then the number of calls
21 answered on the HP report, I think it's going to be
22 on the second page. It might end up on the second
23 page of there if you go to the tab.
24 MR. HANSEN: Okay.
25 MS. CARROLL: Q. And you're going to have

Page 225

1 to -- well, I guess that would be -- okay. I believe
2 April is going to be this line.
3    MR. HANSEN: April 1 is going to that line
4 right there, Ron.
5    MS. CARROLL: Q. April 1st being a Monday,
6 what do you show on the report as the number that HP,
7 the number of calls answered?
8    A. 567.
9    MR. HANSEN: I have got it lined up as best
10 I could.
11    MS. CARROLL: And that's the number I have
12 also.
13    MR. HANSEN: Okay.
14    MS. CARROLL: Q. Where does that come off
15 in terms of your -- the two reports that we are
16 looking at, where does that number match up?
17    A. It matches numbers of calls answered on the
18 call specifics report and matches up with the --
19 whatever the hell that is. Sorry. Yeah, the numbers
20 of call answered on the daily totals.
21    Q. All right. So all of those when we are
22 looking at this and the sales calls on the report to
23 HP is the number of calls answered plus the number of
24 calls abandoned as we saw from looking at the daily
25 totals report, correct?

Page 226

1    MR. HANSEN: I lost that.
2    THE WITNESS: You lost me.
3    MS. CARROLL: Q. Okay. On the daily
4 totals, on the daily totals report sales call number
5 equals the number of calls answered plus the number
6 of calls abandoned, and that equals sales calls?
7    A. Yes.
8    Q. Okay. So that's what's being shown. Does
9 this -- do you know if that ever changes or whether
10 that was consistent throughout the entire time MITG
11 was reporting its numbers to HP?
12    A. I believe it changed.
13    Q. Okay. And why did it change, or in what
14 way did it change?
15    A. Well, there were several reasons. And,
16 again, I'm testifying not to the specifics, because I
17 don't know if anybody would even recall the
18 specifics. I do know that we could, it was possible
19 it did happen that you could have sales that might
20 possibly show as recorded today on one of these
21 reports that would not actually be a through put
22 sale.
23    Let's say, for instance, we put the order
24 through, it accepted the credit card. We would show
25 it as a sale. We would send that information to HP.

Page 227

1 The JD Edwards system or whatever they used at the
2 time could send it back and say, you know, the credit
3 card is declined because the address doesn't match.
4 It's possible that we would have that recorded as a
5 sale today, even though it physically wasn't a sale
6 until -- in some cases it could take days or weeks to
7 get some of those issues ironed out.
8    As well because we had FAXed credit card
9 authorization forms that we would receive, if it was
10 a PO situation, you would have to have the purchase
11 order FAXed along with tax certificates if they were
12 doing, if it was a reseller scenario for sales tax,
13 etc. And so those things could be multiple weeks in
14 some cases before people, before you're able to get
15 the big company to kick over a piece of paper and
16 process an order.
17    Q. Okay.
18    A. If that's what you're asking me.
19    Q. And let me ask you this. In terms of -- so
20 what that was doing -- your concern then or why there
21 might have been change is was to modify the way the
22 orders placed number worked?
23    A. Well, we made modifications in the
24 software, in the reporting tool trying to get a more
25 accurate understanding of what sales went through on

Page 228

1 what day. For instance, you could as well have a
2 customer put in orders today, but not or put in a
3 quote today, not actually authorize the quote for
4 five days. In some cases the reporting -- and this
5 was something that we found going through the process
6 over the term of about 12 months, quite frankly. You
7 might have a situation where an order was placed one
8 day, was authorized a week or two later, and then it
9 was shipped, the part. In some cases that sale might
10 have been recorded twice in the reporting.
11    In some cases you might have people who had
12 placed a request, placed an order, stopped the order
13 for whatever reason, credit card was bad, they just
14 declined the order, they cancelled the order,
15 whathave you. It would already be recorded as a
16 sale, but yet there would be no sale associated with
17 it.
18    So there are changes throughout this thing,
19 and I can't point to the dates that they happen,
20 where we were trying to get an accurate snapshot of
21 what they were, but I'm sure there is going to be
22 some level of discrepancy because there was no
23 foolproof way of tracking all of those sales, because
24 it's such a dynamic process.
25    Q. Are you -- we just talked that sales and

Page 229

1 what was reported to HP under this first sales call
2 column was the number of calls answered plus the
3 number of calls abandoned. When or why was the
4 decision made to change that from being recorded as a
5 sales call to being recorded as all incoming calls?
6    A. Well, I'm sure that somebody, and I don't
7 know who -- if I had to take a guess Sherry Ellis or
8 Lisa Stork -- would look at the billing spread sheets
9 and say, hey, these numbers don't jive between the
10 two reports, and I believe that's what started or
11 facilitated that process of change.
12    Q. Well, if you can look at the HP spread
13 sheet that is Exhibit 27, if you will look at the
14 date September 18th?
15    A. Okay.
16    Q. The beginning half of the exhibit. You're
17 going to need to look at -- well, I don't know how
18 far across the exhibit goes on what you're looking
19 at, so I don't know.
20       MR. HANSEN: What date?
21       MS. CARROLL: September 18th.
22       MR. HANSEN: It is the last line right
23 there (indicating).
24       THE WITNESS: The last one, okay.
25       MS. CARROLL: Q. So it is -- September

Page 230

1 18th is a Wednesday. How many sales calls -- in that
2 first column of the report to HP how many sales calls
3 is that indicating MITG got?
4    A. 395.
5    Q. Okay. And that's a drop of over a hundred
6 from the day before?
7    A. That's correct.
8    Q. Okay. Now, if you will look across that
9 report on September 18th, it also shows on there a
10 change in the way that -- if you look at that, the
11 old sales call number is now no longer the all calls
12 answered plus all calls abandoned, the incoming calls
13 number?
14    A. Okay. I'm sorry. Say it again.
15    Q. The number -- if you are looking at that,
16 the number of calls answered plus the number of calls
17 abandoned on September 18th equals what?
18       MR. HANSEN: I don't show a number. I got
19 to get these lined up right.
20       MS. CARROLL: I have looking at this the
21 number of calls answered 497.
22       MR. HANSEN: Where are you getting that
23 number of calls answered? On ours is 470 unless I'm
24 the wrong page.
25       MS. CARROLL: Well, that's why I'm trying

Page 231

1 to --
2       MR. HANSEN: All right. We have still have
3 a different number.
4       MS. CARROLL: What is your --
5       MR. HANSEN: Number of calls answered?
6       MS. CARROLL: Q. Correct. What number do
7 you have under number of calls answered?
8    A. 534.
9    Q. All right. I have that for the Thursday,
10 the next day?
11       MR. HANSEN: Well, our page, Thursday page
12 up on the top --
13       MS. CARROLL: Because Wednesday -- the 19th
14 is Wednesday.
15       MR. HANSEN: I have Wednesday the 18th.
16       MS. CARROLL: Wednesday the 18th. That's
17 what we are looking at, is the date we should be
18 looking at.
19       THE WITNESS: Okay.
20       MS. CARROLL: You are right there is three
21 columns. There is four columns here.
22       MR. HANSEN: I mean, you can come across
23 and look at it. All right. Looking at this on the
24 19th, looking at this across from that page goes with
25 this page right here, and I know these line up

Page 232

1 because the bates number document lines up correct.
2 This is the second to last page of the second section
3 of this, and this is the second to last page of the
4 section.
5       MS. CARROLL: Q. So what we are looking at
6 here -- let me put this underneath. In terms of the
7 calls we are looking at 568 calls were answered, and
8 then we have five calls were abandoned. So that on
9 the, earlier in the report that number would be the
10 number of sales calls, which would take us to 573,
11 correct?
12    A. Correct.
13    Q. Okay. And if we look at the, on the 19th
14 we are all the way at 395. How come that what used
15 to be the number of sales calls used to be the number
16 of calls answered plus the number of calls
17 abandoned? Because when you now look at this 573 is
18 now the all incoming calls.
19    A. What's this you have? What's the 138?
20    Q. Look at the top of --
21       MR. HANSEN: Orders placed.
22       THE WITNESS: Order placed.
23       MS. CARROLL: Q. What you have here,
24 though, is what used to be sales calls?
25    A. Uh-huh.

Page 233

1 Q. Calls answered plus calls abandoned equals
2 sales calls. That all now equals all incoming calls,
3 and sales calls has changed to a different formula.
4 Do you know what that different formula was?
5   A. No.
6   Q. Okay. Do you know why that formula changed
7 in September of 2001?
8       MR. HANSEN: 2.
9       MS. CARROLL: Q. 2, sorry. I can't get my
10 years straight. So you don't know why sales calls,
11 the definition of sales calls changed in September,
12 and you don't know from looking at the documents that
13 we have here how that new number of sales calls was
14 calculated?
15   A. No.
16   Q. All right. Was there some benefit to MITG
17 slash HP Direct at that point of lowering the number
18 of sales calls that they had that appeared on the
19 report that they were providing?
20   A. No.
21   Q. All right. Well, other than the fact that
22 it made your attach rate look a lot better. Fewer
23 sales calls, same number of orders and then your
24 attach rate at any rate looked better?
25       MR. HANSEN: Object to the form. Go ahead.

Page 234

1       THE WITNESS: I can't answer that. I don't
2 know.
3       MS. CARROLL: Q. Well, if on the day
4 before sales calls were all calls answered plus all
5 calls abandoned?
6   A. Uh-huh.
7   Q. Which we see is a higher number now than
8 what the sales calls became, and you still got 122
9 sales; and if you lowered the sales from the number
10 lower than all calls answered plus all calls
11 abandoned to a lower number, then your percentage of
12 sales, it would look like you are selling a higher
13 percentage per sales call, right?
14       MR. HANSEN: I'll object to form, but if
15 you can answer it, go ahead.
16       THE WITNESS: I guess.
17       MS. CARROLL: Q. And I'm not trying to be
18 obtuse here, but you are looking at this, and what we
19 saw on September 19th was that this number of sales
20 calls got to a lower number and the new way that this
21 was calculated became all incoming calls and this
22 sales call number was lower. Well, here, for
23 example, you have 840 calls led to 221 orders
24 placed. Well, if you lower this number, as we saw
25 happen starting on September 18th, this makes it look

Page 235

1 better. Your percentage of sales calls that led to
2 the placement of orders gets better looking from a
3 statistical, from a percentage reporting standpoint.
4 Do you agree with that?
5   A. I guess, yeah.
6   Q. Okay. This number is -- you get 700 sales
7 calls, and you sold 221. It looks like you are a lot
8 better off than if you got 840 sales calls and sold
9 221. Do you agree?
10   A. I guess, yes.
11   Q. Okay. Was there any reporting that you
12 needed to do to HP that led MITG to want to make
13 their sales call percentage of success look better?
14       MR. HANSEN: Object to form, but go ahead.
15       THE WITNESS: Not really.
16       MS. CARROLL: Q. Okay. Was there -- do
17 you recall having any discussions with anyone --
18 well, strike that. Do you understand that the attach
19 rate to be the percentage of sales calls versus the
20 percentage of sales made, orders placed, calls
21 received, and orders? The percentage of orders
22 placed to calls received became the attach rate?
23   A. Well, it could have been calculated
24 multiple ways.
25   Q. Well, how was it calculated? I don't

Page 236

1 know. I need to know how it could have been.
2   A. Well, I can't tell you that.
3   Q. Well, let's look at 2003 of the spread
4 sheets. We have to get all the way through 2002.
5       MR. HANSEN: Are you done with this one?
6       MS. CARROLL: Yes. Can you just clip that
7 back together for me? Thanks. And if you can pull
8 up the same two reports for '03. Call specifics and
9 daily totals are the two.
10       MR. HANSEN: There is call specifics.
11       MS. CARROLL: Hopefully this will make it a
12 little easier, because the first page looks -- I
13 think we can stay on the first page, and it will line
14 up a little better. Again, you have two different
15 reports that are providing some overlapping
16 information and some different information based on
17 the general content of these reports. Now, in the
18 call specifics report do you know what sales calls
19 you have? 263?
20   A. Correct.
21   Q. Okay. Do you know what, where the 263 on
22 that sales calls number comes from?
23       MR. HANSEN: Just so we are clear, January
24 2, 2003?
25       MS. CARROLL: Yes.

Page 237

1  THE WITNESS: No.
2  MS. CARROLL: Q. All right. Because we
3  have a total number of calls answered at 458 and 263
4  of those were classified as sales calls?
5  A. Okay.
6  Q. And so do you know how you get to 458, from
7  458 to 263? Can you tell from looking at the report?
8  A. Well, if my math is not incorrect, the
9  referrals to tech support and parts couldn't be found
10  --
11  MR. HANSEN: Slow down.
12  THE WITNESS: Sorry. The serial number on
13  CSN, parts in warranty and other should add up.
14  Q. Okay. So the referral back to tech
15  support, 71; not enough info, 15; part couldn't be
16  found, 20; number of parts in warranty, oh, no serial
17  number on CSN, 2; parts in warranty, 6; other is 28?
18  A. That's correct.
19  Q. Okay. So let's see what we get.
20  MR. HANSEN: And then that gives me 142.
21  MS. CARROLL: Uh-huh.
22  MR. HANSEN: And then if you add in 32,
23  that gives you 174.
24  MS. CARROLL: And it still doesn't get you
25  where you need to be.

Page 238

1  MR. HANSEN: No.
2  MS. CARROLL: Q. That gets you pretty
3  close. That gets you pretty close to where you need
4  to be?
5  A. Yeah.
6  Q. So if you deduct all of these other
7  categories on the call specifics from the number of
8  calls answered you get sales calls?
9  A. (Nodded his head up and down.)
10  Q. All right. And, now, let's look at the
11  daily total report and, again, we have --
12  MR. HANSEN: Same day?
13  MS. CARROLL: Q. The same date of January
14  2nd of '03. We now have sales calls, but sales calls
15  that mean something different on this daily totals
16  report obviously because now you have 469 sales
17  calls, right?
18  A. Yes.
19  Q. Which would appear to be from what?
20  MR. HANSEN: And I don't know if this will
21  help, but you see here that number matches that
22  number there.
23  MS. CARROLL: Q. Well, that's the thing.
24  If you look at the call specifics, the number of
25  calls answered is 458?

Page 239

1  A. Correct.
2  Q. Which matches the 771 request number. What
3  is the 771 request number mean?
4  A. That would have been, I believe, the
5  consumer piece.
6  Q. All right. So if you take that number,
7  which also equals the number of calls answered on the
8  other report, you add 11 to it, now we get to our
9  number of sales calls. So for the daily total
10  purpose you have calls answered plus --
11  MR. HANSEN: Calls abandoned.
12  MS. CARROLL: Q. And you have 771 request
13  plus calls, abandoned calls, sales calls on this
14  report?
15  A. Correct. I think I can answer this, but I
16  would like to go off record and have a discussion
17  before I spit this out.
18  Q. I'm sorry. We can't.
19  MR. HANSEN: Just 771 request plus calls
20  abandoned equal sales calls?
21  THE WITNESS: That's correct.
22  MS. CARROLL: Because the number of calls
23  answered on this daily totals report says there were
24  419 of them answered, and that's different from
25  what's on the call specifics report.

Page 240

1  MR. HANSEN: Where are you at?
2  MS. CARROLL: Q. Look toward the middle
3  right under the word like about 2003. There is a
4  calls answered 419 with an 11 abandoned, and that's
5  why I'm confused?
6  A. I think I can answer this. I'll just say
7  it, I guess.
8  Q. Okay.
9  A. I believe that these reports -- part of the
10  reason you're having problems with numbers is that
11  all incoming calls would be based on a clock, 24-
12  hour clock schedule. We had no way of breaking out
13  or shutting down the system so that any calls
14  received after hours to be broken out. So those
15  calls would have probably been tossed into the all
16  incoming if that's what, if that's what you're trying
17  to equate back to, because that's the only thing that
18  makes sense.
19  Q. So all incoming calls is not -- in your
20  mind, all incoming calls is not relevant because they
21  may have come in at times that there was not an
22  opportunity to answer them because it wasn't staffed
23  hours?
24  A. That's correct. After hours, or there were
25  quite a few calls in the evenings that we did not

Page 241

1 take.
2    Q. Okay. So in this, the more accurate number
3 of calls that you were available to take because the
4 call center was being staffed is the number of calls
5 answered plus the number of calls abandoned with
6 abandoned being somebody was there but didn't get to
7 the phone before somebody hung up?
8    A. That's right, because somebody would be in
9 the cubicle, that's correct.
10    Q. Now, if we look at -- I'll give you this
11 first page. This is the first page, and I'll look at
12 it, is HP --
13    A. 000224.
14    Q. There we go. Okay. And now the number of
15 sales calls you have is 268. It's listed on the
16 report that went to HP?
17    A. This went to HP, or this is what you
18 produced?
19    Q. This is what I produced based on whatever
20 the information that was forwarded by Mr. Brummet
21 that we saw. This is in the same order that we are
22 looking at from Mr. Brummet's report from 2003 is the
23 information that we are looking at.
24    A. Okay.
25      MR. HANSEN: And the only objection I have

Page 242

1 is, first of all, I understand HP produced this
2 statement, but Mr. Brummet's name simply says,
3 numbers for Thursday, May 22nd.
4      MS. CARROLL: Q. If you look the last
5 entry on there is that date, and when I went through
6 all of them, it looks like every day he just added
7 the new information to the end of the thing and
8 resent the entire sheet.
9    A. Okay.
10    Q. So looking at this you got sales calls, and
11 the sales calls number that you were reporting to HP
12 was the sales call number from call specifics?
13    A. From Thursday, January 2nd?
14    Q. Yeah. From Thursday, January 2nd it was
15 268?
16    A. Versus 263, correct.
17    Q. Right. And so where did the other -- do
18 you know why there is a discrepancy between the 263
19 and 265, because that doesn't match the number of
20 calls abandoned, does it?
21    A. I don't have a clue.
22    Q. Okay. And if you look down that list just
23 on sales calls there appears, and if you just go for
24 the next few of them, there is also a small
25 discrepancy between what was on the HP bates number

Page 243

1 document and what's on the call specifics document.
2 So HP says -- the document says 268. The MTG call
3 specifics says 263, 211 versus 206, 290 versus 282.
4 Do you see that?
5    A. Yes.
6    Q. Okay. And you don't know why there is that
7 discrepancy?
8    A. No, I don't. Are the percentages the
9 same?
10    Q. Well, can you look and tell me --
11      MR. HANSEN: Actually look at the calls
12 abandoned number on the HP report and the calls
13 abandoned on the MTG daily totals report, and you'll
14 see that that's the discrepancy.
15      MS. CARROLL: If you look at your reporting
16 to HP that you had and abandoned that you had five
17 calls abandoned where your internal reports show 11
18 calls abandoned.
19    A. Okay.
20    Q. Five versus ten and so on, and the
21 discrepancy between your sales calls number is the
22 exact amount of the discrepancy between your number
23 of calls abandoned.
24    A. Okay.
25    Q. What's the basis for reporting fewer

Page 244

1 abandoned calls in the HP report versus this internal
2 daily totals report, do you know?
3    A. No, I don't.
4    Q. Okay. It certainly makes it look better if
5 you have fewer abandoned calls when you are reporting
6 that, would you agree with that?
7      MR. HANSEN: Object to the form. Go ahead.
8      THE WITNESS: Sure.
9      MS. CARROLL: Q. All right. Do you know
10 when the PBCO metrics started to be created by HP?
11    A. No.
12    Q. Do you recall ever getting asked to modify
13 the way you were providing information so it would
14 fit into exactly the way the PBCO reports were as
15 opposed to providing this more expansive information?
16    A. Well, I mean, we were asked to make
17 multiple changes throughout the term of the
18 agreements. I don't specifically recall why, no.
19    Q. Okay. Well, we saw when we looked at the
20 PBCO metrics that a lot less information was being
21 reflected on here. You just had calls offered,
22 handle rates, service level, and month to date
23 service level. Were you ever asked or did MTG ever
24 just provide a separate report that just had these
25 categories to somebody?

Page 245

1   A. No. Not that I recall, no.
2   Q. Okay. Why was the information that went to
3 HP not identical to the internal information MITG had
4 on the reports that we're seeing that were produced
5 by you folks?
6   A. I have no explanation.
7   Q. Okay. Do you know if there is somebody
8 else in the company who might know Mr. Brummet, for
9 example?
10   A. Probably not. Hold on a second. This
11 is --
12   Q. The call volumes are one of the basis for
13 your, as evidenced to you that business was going
14 someplace else, is that right? Looking I got fewer
15 sales calls, so somebody is sending --
16   A. Yes.
17   Q. I know you sent e-mails, because we have
18 seen those e-mails, to Mr. Bloomquist saying, am I
19 going to get more calls, hey, I'm dying, I'm going to
20 have to let people go home. Do you recall ever
21 sending e-mails to anyone in Roseville similar to
22 those, hey, I need more?
23   A. Cheryl Williams.
24   Q. Okay. And what kind of e-mails? Were they
25 similar in content to what you--

Page 246

1   A. Probably a little bit more professional
2 stated, but, yes.
3   Q. Okay. And what kind of response, if any,
4 did you get from Ms. Williams?
5   A. None.
6   Q. Why Ms. Williams?
7   A. At the time that those requests were made I
8 was directed by Troy that she was the new contact.
9   Q. And you understand that he had a bit of a
10 job change and was no longer the person overseeing,
11 directly overseeing the relationship between MITG and
12 Direct?
13   A. That's correct. We had no contact.
14   Q. You had no contact?
15   A. Nobody. We were never informed of a new
16 contact after Troy was removed.
17   Q. Okay. Well, I thought you just said Cheryl
18 Williams was your new contact?
19   A. Cheryl was Troy's boss, and so we sent an
20 e-mail to Cheryl requesting, and I believe I actually
21 called her from the airport in Phoenix on my cell
22 phone requesting, requesting some information from
23 her and never received correspondence back by e-mail
24 or phone.
25   Q. Okay. So after -- you continued to

Page 247

1 correspond with Mr. Bloomquist after his job
2 transfer, and there wasn't -- and you communicated on
3 a daily and everyday basis with Sherry Ellis, is that
4 right?
5   A. That's correct. I have also had
6 conversation with Charlie Boyle and Tony Barnett, and
7 there was somebody else. I don't remember.
8   Q. And what were -- were all of those
9 communications relating to the Standard Support
10 Agreement or --
11   A. Yes.
12   Q. Okay. What did you understand Mr.
13 Boyle's -- how did he get in the loop, do you know?
14   A. No, I don't remember how he got in there.
15   Q. You were also dealing with Mr. Boyle or he
16 was in the loop when there were issues regarding slow
17 payments on the service parts?
18   A. I do recall that, that's correct.
19   Q. And let me switch topics on you here.
20   A. Can we swing a break real quick?
21   Q. Sure.
22           (Whereupon a short recess
23             was taken.)
24   Q. Let me just turn abruptly so I make sure I
25 get questions about the tortious interference claim.

Page 248

1   A. Sure.
2   Q. Tell me what the factual basis is for your
3 claim that HP tortiously interfered with business
4 relationships of MITG and MITG clients or customers
5 in your counterclaim, and if you need to look at your
6 counterclaim --
7   A. No, that's all right. For example, the
8 supplier.
9   Q. Well, let me try to break that out because
10 we have discussions about customers and then a
11 separate paragraph about suppliers.
12   A. Well, then let me see it. Let me see that,
13 then.
14   Q. There you go. And if they are one and the
15 same, that's fine, you can just tell me that, but I
16 want to make sure that we're distinguishing.
17   A. Okay. I'm sorry. Go ahead.
18   Q. So in the paragraphs, in 33, for example,
19 MITG developed valid business relationships with
20 customers, and there is discussion about that through
21 Paragraph 40, and then Paragraph 41 says, HP also
22 specifically intentionally instructed various
23 suppliers and distributors of MITG not to do further
24 business with MITG. And so I want to break those --
25 if that's appropriate, I want to break those into who

Page 249

1 are the customers and let's talk about that
2 interference and then who were the suppliers and
3 distributors and talk about that interference
4 separately.
5    A. That's fine.
6    Q. So starting with the customers, who -- what
7 customers did HP tortiously interfere with of
8 MITG's? Are there particular ones that you can
9 name? Are there a particular subset of customers?
10    A. I can name a few. Avnet would be one, for
11 example.
12    Q. Okay.
13    A. Baxter Healthcare. The rest of them are
14 it's just kind of a big jumble quite frankly.
15    Q. Okay. Tell me about Avnet, what kind of
16 customer -- well, when did they first become a
17 customer of MITG's, whether as Compaq Direct or HP
18 Direct or whatever?
19    A. I can't answer that. I mean, they have
20 been a customer for a long time.
21    Q. Do you know if they were a customer before
22 the Standard Support Agreement went in place?
23    A. I believe so.
24    Q. Okay. Were they a customer based on the
25 relationship when MITG was servicing customers of CEI

Page 250

1 or Compaq Direct prior to the Standard Support
2 Agreement?
3    A. I can't answer that. I don't know.
4    Q. Okay. And tell me -- do you know how much
5 business on an annual basis Avnet was doing with MITG
6 and in whatever aspect?
7    A. What capacity? No.
8    Q. All right. Do you know if there is any way
9 that there is a report that could be run that would
10 show what Avnet did in terms of business, for
11 example, in 2002, 2003?
12    A. That is possible, I believe.
13    Q. All right. Tell me what you know about the
14 alleged tortious interference by HP of the
15 relationship between MITG and Avnet?
16    A. My understanding is they were visited as
17 well as several other customers were visited by an HP
18 representative and were informed that MITG was to,
19 they were to no longer do business with MITG and that
20 any subsequent business after this visit would
21 constitute a breach of any agreement that they had
22 with HP. Now, I'm not privy to what that agreement
23 is so to speak, but --
24    Q. So do you -- well, did somebody at Avnet
25 tell you that directly?

Page 251

1    A. We actually had some higher level sales
2 managers contact us, and then we contacted their
3 legal counsel.
4    Q. Okay. Who were the -- can you give me the
5 names of the Avnet sales personnel that contacted
6 you?
7    A. No, I can't.
8    Q. All right. Who did they contact at MITG,
9 you or somebody else?
10    A. I believe they actually contacted Mr. Rice,
11 if I'm not mistaken.
12    Q. Okay. And you don't know who those people
13 were? You don't know their names as you sit here?
14    A. No. Again, as I testified earlier this
15 morning, we just really started this tortious
16 interference thing. It was only a month and a half
17 old, so we are still developing all that information.
18    Q. Well, when did you learn about this Avnet
19 issue? When did Mr. Rice report to you that Avnet
20 reported this contact from HP?
21    A. End of February, first of March, possibly
22 April.
23    Q. Of last year?
24    A. Of last year.
25    Q. All right. And did you -- you said that

Page 252

1 after hearing this from the sales rep you contacted
2 or somebody for MITG contacted their legal counsel?
3    A. I believe that's who we were referred to.
4 I can't honestly say.
5    Q. Okay. Did you personally, Ron Haught, talk
6 to this legal counsel or other representatives that
7 the sales people referred you to?
8    A. No.
9    Q. Okay. Did anyone from MITG do that?
10    A. I believe Mr. Rice did.
11    Q. And do you know is there any documentation
12 that you might have that would indicate who Mr. Rice
13 heard from on the sales part or who he talked to from
14 the legal department, do you know?
15    A. No, not that I know of.
16       MR. HANSEN: If we have it. I think he has
17 served, you have served me a request for production,
18 didn't you?
19    Q. Yeah. And you don't know who the HP, no
20 report as to the HP person was?
21    A. No.
22    Q. And there was, I believe, some testimony
23 yesterday, and correct me if I'm wrong in terms of
24 whether you have heard this, that one of the things
25 that was communicated to Avnet was that MITG was no

3:04-cv-03063-JPG-CJP #117-9 Page 14 of 19
HP and Compaq v. MTG
CondenseIt™
Ronald Haught

Page 253
1 longer an authorized part reseller of Compaq or HP
2 parts. Did you hear something along those lines that
3 had been reported to Avnet?
4  A. Yes.
5  Q. Okay. And that statement is true after the
6 end of the Standard Support Agreement, correct?
7  A. That is correct, but that's not the form
8 for which the statement I heard.
9  Q. Well, what was the -- when you say that,
10 what do you mean?
11  A. It was an expanded statement. I mean,
12 that's the short of it.
13  Q. Go ahead and tell me.
14  A. My understanding of the statement is that
15 we were no longer an authorized reseller because we
16 did not sell approved HP Compaq product.
17  Q. Okay. Well, that is a true statement if
18 you were not getting, since you were no longer
19 getting Compaq or HP parts directly from HP?
20  A. I wasn't getting most of those parts from
21 HP directly anyway.
22  Q. Well, what kind of parts was Avnet
23 purchasing from MITG during the time of the Standard
24 Support Agreement, or at least prior to this contact
25 from HP?

Page 254
1  A. Typically they were parts that were not
2 available on CSN or through their channels. They
3 were more to your unavailable product.
4  Q. Do you have any -- do you believe you have
5 any records that would show what percentage, if any,
6 of Avnet's purchases from MITG were CSN parts versus
7 service parts?
8  A. I don't know. I don't think so.
9  Q. Okay. Well, when they were purchasing
10 things, I understand that during this time of the
11 Standard Support Agreement a spread sheet would have
12 been created to get sent in for the sourced parts.
13 Did you get any records so we could go through the,
14 all the spread sheets and look for Avnet and see what
15 they bought, any records of what people were ordering
16 from CSN?
17  A. Well, let me rephrase my earlier statement
18 so it clears it up for you. The product that they
19 would have ordered that would have come through CSN
20 or whathave you, whatever channels, we would have
21 never received those orders. We only received orders
22 that were not available through their typical HP
23 channel. So, for instance, if they wanted a part and
24 it was available through HP, they would have procured
25 it through HP. If it was not available through HP,

Page 255
1 then they would have come to us. This visit happened
2 after that.
3  Q. All right. So you are saying that you
4 heard from Mr. Rice who heard from sales people and/
5 or legal counsel for Avnet that HP told them not to
6 do business with MITG and that business that was
7 being referred to was the acquisition of multivendor
8 parts?
9  A. Multivendor or -- correct. It could have
10 been HP Compaq product if it was not available.
11  Q. Legacy?
12  A. Legacy Compaq, correct.
13  Q. All right. Did you -- have you ever --
14 have you personally ever followed up with anyone from
15 Avnet to try to get back in the door, as it were, for
16 that business?
17  A. Have I personally?
18  Q. Yes.
19  A. No.
20  Q. Do you know if Mr. Rice has, for example,
21 gone to them and said, hey, HP still orders third
22 party parts from us on occasion. Why don't you ask
23 HP, because I'm sure that will be all right. Do you
24 know if he has ever tried to make that --
25  A. Huh-uh.

Page 256
1  Q. -- contact with them?
2  A. No. I mean, after we were told that, then
3 all communication with Avnet's been shut off.
4  Q. And is it true that MITG at times purchased
5 product from Avnet?
6  A. I don't have a clue.
7  Q. Okay.
8  A. Baxter Healthcare, what do you know about
9 the alleged tortious interference with Baxter
10 Healthcare?
11  A. Very similar situation. They received a
12 visit, and subsequent to that visit all communication
13 was cut off.
14  Q. All right. Do you know who at Baxter
15 Healthcare -- well, I take it that somebody at MITG
16 told you about the conversation with Baxter
17 Healthcare?
18  A. That's correct.
19  Q. Who?
20  A. I believe that conversation would have come
21 from -- I can see her face even. Stephanie.
22  Q. Hays?
23   MR. HANSEN: Boden.
24   THE WITNESS: Boden, thank you. Stephanie
25 Boden, I believe.

Page 257

1  MS. CARROLL: Q. All right. And did
2 Stephanie Boden tell you who she spoke with at Baxter
3 Healthcare?
4  A. I don't recall specifics about that, no.
5  Q. Okay. Do you -- did you ever have any
6 contact with Baxter Healthcare after Miss Boden
7 reported this information to you?
8  A. No.
9  Q. Are you aware of any documentation that
10 would show how much business Baxter Healthcare was
11 doing with MITG under the Standard Support Agreement
12 up to the termination date of the Standard Support
13 Agreement, how much annual business was being done?
14  A. No. I believe that actually could be
15 pulled from your records. I don't know that I would
16 have that necessarily.
17  Q. Do you have records that would show how
18 much business either Avnet or Baxter Healthcare did
19 with MITG from the termination of the Standard
20 Support Agreement until the alleged statements were
21 made by an HP representative?
22  A. That's possible, but I reserve the right to
23 check into that because I can't answer that for
24 certain.
25  Q. You don't know for sure?

Page 258

1  A. I don't know for certain, no.
2  Q. Okay. Are there any other companies that
3 you recall the names of while you sit here today that
4 you have been told by someone got a visit from an HP
5 person or communication from an HP person telling
6 them not to do business with MITG?
7  A. Insight was one, and I don't recall
8 anymore. I mean, those are the three that stick in
9 my head.
10  MR. HANSEN: Are you talking about
11 suppliers or distributors?
12  MS. CARROLL: I'm still sticking to
13 customers.
14  THE WITNESS: Okay.
15  MS. CARROLL: Q. So is Insight -- we are
16 going to wait for Insight on suppliers and
17 distributors, or are they customers?
18  A. No, they are a customer. And I'm thinking
19 Multiple Zones, which would have been Microsoft.
20 It's a subsidiary of Microsoft.
21  Q. Multiple Zones?
22  A. Multiple Zones. Those are the only ones
23 that pop out.
24  Q. Well, who at Insight reported this contact
25 from HP?

Page 259

1  A. I don't know.
2  Q. Who reported the contact to you?
3  A. I'm not exactly certain to be honest with
4 you.
5  Q. Was it somebody from your organization told
6 you, hey, Ronnie, listen to what I heard from
7 Insight?
8  A. Yeah. You know, typically the conversation
9 would go, hey, this is what I just got told, and, oh,
10 by the way we've been shut off or shut down and they
11 have asked for no further communication.
12  Q. How long had Insight been doing business
13 with MITG prior to this communication that you allege
14 occurred?
15  A. Years.
16  Q. Do you have documentation that would show
17 when you first began, when MITG first began to do
18 business with Insight?
19  A. Possibly. I don't know for certain.
20  Q. And you don't know who any contact person
21 would be for Insight? Well, for example, do you
22 have -- would have you in your record contact names
23 of people who were ordering parts on behalf of Avnet,
24 Baxter, Insight, or Multiple Zones from MITG?
25  A. Yes.

Page 260

1  Q. So at least you would have the names of
2 people who at the time of the order worked for these
3 companies who were communicating with MITG?
4  A. Yes.
5  Q. Have you at any time made any attempt to
6 contact those people whose names you do have for
7 these companies to ask them, you know, what's going
8 on or what they, you know, this is what you heard
9 and --
10  A. Attempts have been made, but in every case,
11 at least to the best of my recollection, the calls
12 either aren't returned or correspondence is just
13 replied back as, you know, we have been told we can
14 no longer do business with you, thank you.
15  Q. Do you have correspondence that you believe
16 someone responded to you via e-mail or letter?
17  A. I believe these are all phone calls.
18  Q. And did you personally make phone calls to
19 any of these four companies or any other companies to
20 people, the individuals who had ordered parts
21 previously and you personally asked them, hey, I
22 heard that HP contacted you, I'd like to talk to you
23 about it?
24  A. No.
25  Q. And who for MITG made those contacts, to

Page 261

1 your knowledge?
2   A. Could have been Rich Rice, could have been
3 any of the sales reps directly trying to find out
4 exactly what's going on through their contacts. I
5 can't answer that.
6   Q. Other than the four you've identified --
7 and I take it Multiple Zones was similar information
8 which was one of your sales reps told you that they
9 were told by someone at Multiple Zones that HP said
10 don't do business with MITG?
11   A. Yes.
12   Q. All right. Are there any other companies
13 that you can think of while you sit here that you've
14 heard that information?
15   A. Not that I can specifically recall names of
16 companies, no.
17   Q. Well, do you believe that at some point you
18 heard names of other companies and you simply don't
19 recall what those are as you sit here having your
20 deposition taken?
21   A. That is possible, yes.
22   Q. Okay. All right.
23   A. Oh, that's correct. There is another one.
24   Q. All right.
25      MR. HANSEN: While you're here.

Page 262

1      MS. CARROLL: No. That's fine. I don't
2 want to come back. Tell me?
3   A. The other one would be CDW.
4   Q. And who is the contact person at -- CDW was
5 a customer of MITG's?
6   A. That's correct.
7   Q. Were they doing business with MITG under
8 the Standard Support Agreement?
9   A. I believe prior to.
10   Q. Okay. Were -- did they do it during the
11 time that MITG was being Compaq Direct or HP Direct?
12   A. I can't answer that. You get too far
13 back. It's --
14   Q. Well, so it's clear, before the Standard
15 Support Agreement CDW was doing business with MITG?
16   A. Correct.
17   Q. After the Standard Support Agreement for
18 some period of time did CDW go back to, did they
19 continue to do business with MITG after February 7th
20 of 2004?
21   A. I believe so, yes.
22   Q. Okay. And when did they cut off doing
23 business with MITG?
24   A. I can't answer that.
25   Q. Did you personally have any contacts with

Page 263

1 anybody from CDW?
2   A. No.
3   Q. All right. And do you know if anyone --
4 well, who reported to you about CDW, do you recall
5 which one of your folks?
6   A. I don't recall who specifically, no.
7   Q. Now, in the amended -- in your amended
8 counterclaim there is reference that HP sent a letter
9 to the top MITG accounts as part of the agreement
10 terminating and --
11           (Whereupon a document was
12            marked Deposition Exhibit
13            Number 28.)
14   Q. Exhibit 28, this is a January 30, 2004,
15 dear parts customer letter that went from HP. Do you
16 know if Exhibit 28 is the letter that is being
17 referred to in Paragraph 37 of your amended, 37 and
18 38 of your amended counterclaim?
19   A. Is that the specific letter?
20   Q. Yeah. Do you know when it's referring to a
21 letter in January that a letter was sent out to these
22 customers without their acknowledgment or consent of
23 MITG indicating process changes as to the ordering of
24 parts, account numbers, and other information
25 regarding the placement of parts orders, and what I'm

Page 264

1 wondering is the reference, the description of the
2 letter and the amended counterclaim if the
3 correspondence that has been marked as Exhibit 28,
4 the January 30, 2004, letter, is the same letter
5 that's being referenced?
6      MR. HANSEN: Let me just object to the
7 form, that it is completely prepared by counsel.
8 It's not a verified complaint. And if he knows, go
9 ahead.
10     MS. CARROLL: Q. Yeah.
11   A. I don't.
12   Q. Have you ever seen the letter that is in
13 front of you, the January 30 letter that's Exhibit
14 28?
15   A. Yes.
16   Q. Okay. Looking through that letter, do you
17 take issue with the accuracy of any of the statements
18 made?
19   A. Okay. I'm sorry. Your question was?
20   Q. Is there anything in that letter that to
21 your knowledge or understanding is incorrect?
22   A. Incorrect, no. I believe your question
23 earlier was that I take issue with.
24   Q. Okay. Well, and I didn't mean to ask you a
25 different question. It's a good thing you asked me

Page 265

1 to repeat it. Is anything incorrect? The answer is
2 no. Take issue with?
3   A. I take issue with the word genuine.
4   Q. All right. Why?
5   A. A genuine -- by my reading this letter HP
6 and Compaq are saying that this letter would
7 represent that HP and Compaq parts are only genuine
8 if purchased from HP or Compaq, and I don't believe
9 that's the case.
10  Q. All right. Do you understand that that is
11 how parts by HP and Compaq are defined? If they come
12 directly from them, they are genuine parts, or they
13 go directly from one of their authorized resellers
14 it's referred to as a genuine part, and if it's
15 anybody else, it may not be counterfeit, but it may
16 not be genuine. Have you heard that before this came
17 up? Have you heard that distinction buying directly
18 from them or from their authorized parts seller
19 allows you to sell a genuine part?
20  A. No. And I would question -- I would
21 question the definition of the word genuine.
22  Q. Okay. Well, are you aware that Microsoft,
23 you can only purchase genuine Microsoft product from
24 Microsoft and Microsoft's resellers?
25      MR. HANSEN: Object to relevance, but go

Page 266

1 ahead.
2      MS. CARROLL: Q. Do you know in the
3 software industry whether that use of genuine parts
4 for, in software by Microsoft what that means to
5 them?
6   A. No.
7   Q. Okay. You just -- and it's your
8 understanding of what you understand genuine parts to
9 be that the upcoming changes that you disagree or you
10 take issue with the use of genuine parts in here in
11 this letter, the first sentence of the letter, is
12 that correct?
13  A. That's correct.
14  Q. Is there anything in here that MITG doesn't
15 sell genuine parts?
16  A. In this letter?
17  Q. Correct.
18  A. No.
19  Q. All right. Is there anything else that you
20 take issue with, other than the use of genuine, to
21 modify parts in the first sentence of the letter or
22 anywhere else that appears?
23  A. No.
24  Q. All right. Other than the letter that is
25 referenced in the counterclaim and the specific

Page 267

1 examples that you've given me here of five different
2 customers, as you sit here today, are you aware of
3 any other facts which support the contention of MITG
4 that HP tortiously interfered with customers of
5 MITG's?
6      MR. HANSEN: In addition to the phone calls
7 we have pled?
8      MS. CARROLL: Q. I'm sorry. The phone,
9 follow-up phone calls to this letter as pled. So
10 what is included are the facts that are pled in your
11 amended counterclaim, the five companies you have
12 named for me here in this deposition, are you aware
13 of any other facts which support your claim that HP
14 tortiously interfered with MITG's customers?
15  A. Today, no.
16  Q. All right. Suppliers, let's try to get
17 through this, and I think we'll be about done. What
18 suppliers, if any, or distributors as pled in
19 Paragraph 41 of your amended counterclaim do you
20 contend that HP tortiously interfered with?
21  A. The one that specifically comes to mind
22 that I had personal knowledge with was Parts Now.
23  Q. And Parts Now was a supplier to MITG?
24  A. Correct.
25  Q. Okay. What kind of parts was Parts Now

Page 268

1 supplying?
2   A. They could supply a myriad of parts,
3 multivendor stuff.
4   Q. How long had MITG been doing business with
5 Parts Now?
6   A. Quite sometime.
7   Q. Okay. And you said you had personal
8 knowledge of this. Is that because somebody at Parts
9 Now said they wouldn't do business with MITG?
10  A. Their vice-president actually called me.
11  Q. And what is his name?
12  A. I don't have that in front of me.
13  Q. When did this occur?
14  A. Again, I don't have that right in front of
15 me. It's happened between April and May.
16  Q. Of '04?
17  A. Yeah. I can say it was after the suit was
18 started, I believe.
19  Q. The allegation in -- well, can you tell me
20 anything more specifically about what the VP of Parts
21 Now told you about?
22  A. Sure.
23  Q. The contact with HP?
24  A. He received a call and/or visit, I don't
25 recall specifically that portion of it, from folks

Page 269

1 that he deemed in Roseville, would not elaborate as
2 to who that person or persons was, inquiring as to a
3 historical report as to all product that we had
4 purchased in the previous "X" amount of time, whether
5 it was six months, 12 months, whathave you, and as
6 well wanted to know where the product was shipped,
7 who it was shipped to, and any other orders that we
8 had done with them over the last "X" period. I
9 believe it was probably 12 months. I don't remember
10 exactly what he said.
11    Q. And he told you -- anything else that he
12 reported that was communicated to him by the HP
13 person?
14    A. He was also informed that if he did not
15 cease doing business with us that he would lose his
16 HP reseller certification and he would no longer be
17 able to procure HP product from HP.
18    Q. All right. Did he tell you whether he
19 provided this report that is allegedly requested?
20    A. He was in the air as to whether he was
21 going to do that prior to our phone call. Or prior
22 to his calling me. I'm sorry.
23    Q. And do you know whatever happened to that?
24 Did he send it?
25    A. I don't know.

Page 270

1    Q. All right. Have you had any further
2 communications with him after this phone call you've
3 just told me about?
4    A. Not after I informed him at the end of that
5 phone call that I would have counsel contact him.
6    Q. Okay. Any other suppliers or distributors
7 that you allege stopped doing business with MITG
8 because of actions of HP?
9    A. It's on the tip of my tongue. Just give me
10 a second.
11    Q. Okay.
12    A. I can't recall who it is.
13    Q. In the tortious interference claim I know
14 from my question a long time ago first thing this
15 morning that you have not calculated your damages on
16 that, so I'm not looking for a number, but I'm
17 wondering if you believe that MITG has experienced
18 monetary damages as a result of Parts Now not selling
19 parts to MITG?
20    A. Yes.
21    Q. And how is that? Have you not been able to
22 get a supplier in place of Parts Now?
23    A. In some cases, that's correct.
24    Q. Okay. What parts have you been unable to
25 acquire from third parties that you used to get from

Page 271

1 Parts Now before this alleged tortious interference
2 occurred?
3    A. I mean, I can't speak specifically to a
4 part. It's -- I mean, I don't know.
5    Q. Okay. Well, can you think of an instance
6 since this happened in April/May, timeframe of 2004
7 where a customer called in and requested a part and
8 you were unable to find a supplier for it but you
9 knew that if Parts Now were selling, still selling to
10 you you could have acquired it from Parts Now?
11    A. I'm sorry. One more time.
12    Q. Are you aware -- can you think of a time
13 when you heard, you learned from one of your
14 employees or you got through personal knowledge that
15 a customer called in for a part and your only source
16 of that part would be Parts Now and they weren't
17 selling you parts anymore?
18    A. Do I know of an incident?
19    Q. Yes.
20    A. Yes.
21    Q. Okay. Tell me about that.
22    A. I mean, I just know that it has occurred.
23 They were a very beneficial supplier of some
24 strategic parts, usually along the lines of printer
25 or even the Presario type line of equipment.

Page 272

1    Q. Can you tell me how much business MITG did
2 with Parts Now in 2003?
3    A. Sitting here today, no.
4    Q. All right. So you believe that this, it
5 cost you a sale to a customer because Parts Now is
6 your only source of a part that someone called in
7 for?
8    A. I believe so, yes.
9    Q. And, as you sit here now, you can't give me
10 a specific instance when that happened, you just
11 believe that happened?
12    A. No, that's correct.
13    Q. Let's just take a minute. I might be
14 done. I just want to make sure I at least asked one
15 question on every category.
16            (Whereupon a short recess
17             was taken.)
18    Q. I understand from documents that have been
19 produced at various times over the last, since really
20 the start of the production of documents, that
21 customer service representatives of Hewlett-Packard
22 continue to make inquiries into potential parts
23 orders or sending their customers to MITG for parts
24 and continue to do so today?
25    A. And place orders. We are actually still

Page 273

1 filling orders for HP.
2    Q. So the HP Direct, the HP salesperson would
3 -- you would bill HP?
4    A. Colorado Springs.
5    Q. Okay. And is that for similar types of
6 multivendor parts that you were providing under the
7 Standard Support Agreement, or is that similar to the
8 parts, the service parts aspect of the business?
9 What is it?
10    A. That would be under the Standard Support
11 Agreement.
12    Q. Okay. So in this case what kind of parts?
13 Are they all multivendor parts, or were they all
14 sourced parts, some of each kind?
15    A. I can't answer that. The two I have seen
16 where I have actually looked at a purchase order they
17 were both Compaq parts that were not available, I
18 assume, through Compaq's channel. So they were
19 basically sent to us out of total frustration and
20 fear of termination, but they have the unwilling
21 desire to keep this customer happy, and that's what
22 they have done.
23    Q. I'm going to object to that as
24 non-responsive. To your -- your understanding, then,
25 of when HP people have continued to contact MITG or

Page 274

1 had their customers contact MITG to acquire parts
2 they are requiring what we referred to earlier as
3 sourced parts, which is multivendor parts or legacy
4 Compaq or HP parts?
5    A. Right. Or could possibly even be out of
6 stock parts.
7    Q. Out of stock parts?
8    A. Right, correct.
9    Q. Okay. And you bill either HP's, whoever
10 orders it, HP or HP's customer, you bill them
11 directly?
12    A. That's correct.
13    Q. All right. And you no longer have a profit
14 split? You get 100 percent of the profit that's
15 involved?
16    A. That's correct.
17    Q. How much business in terms of dollar volume
18 would you say that you have sold and billed HP
19 directly on for these types of orders since the
20 termination of the Standard Support Agreement?
21    A. A couple thousand bucks maybe.
22    Q. And what about to HP's customers where HP,
23 it's clear that HP was in the loop on sending the
24 customer to you?
25    A. I have no way of knowing that.

Page 275

1    MS. CARROLL: All right. With that and
2 with the reservation I'm going to reserve the right
3 to continue the deposition in the event that he adds
4 anyone on these tortious interference claims since
5 it's not a fully developed claim. If he comes back
6 and maybe if he adds one person, we'll do a phone
7 deposition, but I'm going to reserve my right to ask
8 questions of a corporate representative if he goes
9 into anymore information than he has provided now
10 about these five customers. And I'm going to reserve
11 my right to the extent that factual basis for damages
12 -- though I assume based on his testimony that that
13 is going to come from a retained expert. If it's not
14 and there is a factual basis on the damage claims, I
15 reserve the right to continue the deposition since he
16 was unable to completely articulate that because he
17 hasn't gotten all of the information that he believes
18 is necessary.
19    MR. HANSEN: So noted. And I think -- I
20 guess my one caveat would be you have received my
21 discovery, so arguably there may be a more detailed
22 answer in the discovery than you got in the
23 deposition today.
24    MS. CARROLL: And if there is, that's
25 fine. I'm not going to -- I don't want to continue

Page 276

1 this for the sake of continuing it, but I just want
2 to reserve the right to let you know I might bring it
3 back up in the future.
4    MR. HANSEN: Sure.
5    MS. CARROLL: But with that we are done for
6 the day.
7    THE WITNESS: Okay. Great. Thank you very
8 much. Nice to meet you.
9    (DEPOSITION CLOSED)