UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT
COMPANY, L.P., HEWLETT-PACKARD
COMPANY, and COMPAQ TRADEMARK B.V.,

    Plaintiffs,

vs.                    Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY
GROUP, INC., and MICHAEL LAUBER,

    Defendants.
_____/

Deposition of
BILL CROWLEY
Tuesday, September 28, 2004

Job No. 1608RD
Reported by:  Ruth E. Diederich, RPR, CSR
             CSR No. 4952

---

APPEARANCES

FOR THE PLAINTIFFS:

    THOMPSON & KNIGHT, LLP
    BY:  ELIZANN CARROLL, Esq.
    1700 Pacific Avenue, Suite 3300
    Dallas, Texas   75201
    (214) 969-1700

FOR THE DEFENDANTS:

    SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
    BY:  JAMES A. HANSEN, Esq.
    525 Jersey
    Quincy, Illinois   62306
    (217) 223-3030

IN-HOUSE COUNSEL FOR HEWLETT-PACKARD:

    SUZANNE RAY MILLER
    Senior Attorney
    3000 Hanover Street, ms 20bq
    Palo Alto, California   94304-1112
    (650) 857-4939

---o0o---

Page 2

---

BILL CROWLEY                          Tuesday, September 28, 2004

I N D E X
                                            Page

Examination by Mr. Hansen                          5

---o0o---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| A | A document entitled "Midwest Information Technology Group Incorporated Standard Support Agreement." | 74 |
| B | E-mails Bates-stamped MITG 0101 and MITG 0102. | 91 |
| C | E-mails Bates-stamped MITG 0430, MITG 0431, MITG 0432, MITG 0433, MITG 0434 and MITG 0435. | 91 |
| D | E-mails Bates-stamped HP 000065, HP 000066, HP 000067, HP 000068, and HP 000069. | 103 |
| E | E-mails Bates-stamped HP 000232, HP 000233, HP 000235, HP 000237, HP 000238, HP 000239, HP 000240, HP 000241 and HP 000242. | 132 |
| F | A document entitled "US Parts Sales in K$." | 166 |
| G | A document entitled "US Parts Call Volumes." | 181 |
| H | Business center operations daily metrics. | 187 |
| I | E-mails Bates-stamped HP 001226 and HP 001227. | 202 |
| J | An e-mail Bates-stamped HP 001228 with attached slides. | 206 |
| K | An invitation to a teleconference. | 216 |
| L | A document entitled "HPS Spares Business Summary." | 225 |

---o0o---

Page 3 / Page 4

**Page 5**

```
 1    BE IT REMEMBERED that under the applicable
 2  sections of the Code of Civil Procedure of the State of
 3  California, on Tuesday, September 28, 2004, commencing
 4  at the hour of 9:07 a.m. thereof, at Hewlett-Packard,
 5  8000 Foothills Boulevard, Building R10, Conference
 6  Room B, Roseville, California, before me,
 7  Ruth E. Diederich, a Certified Shorthand Reporter
 8  in the State of California, there personally appeared
 9
10              BILL CROWLEY,
11  called as a witness by the defendants in the
12  above-entitled action, who, having been duly sworn by me
13  to tell the truth, the whole truth, and nothing but the
14  truth, was examined and testified as follows:
15              ---oOo---
16       EXAMINATION BY MR. HANSEN
17   Q.   Please state your name for the record.
18   A.   William J. Crowley.
19   Q.   Mr. Crowley, have you ever had your deposition
20  taken before?
21   A.   Yes.
22   Q.   Okay.  And I'm sure you got this information
23  from the attorneys that you met with prior to your
24  deposition today, but to go over it again, I am going to
25  be asking you questions here today in relation to a suit
```

**Page 6**

```
 1  that's pending in the Central District Federal Court in
 2  Springfield, Illinois.
 3       If at any time I ask you a question today that
 4  you do not understand, please say so, and I will
 5  rephrase it and hopefully put it in a form that you can
 6  answer.
 7       Will you do that for me?
 8   A.   Yes.
 9   Q.   Also, again, we need verbal responses since your
10  answers are being typed up in a booklet form, as are my
11  questions, to read later.  Somebody's uh-huh means an
12  huh-uh to somebody else, so we need verbal answers.  And
13  I may, from time to time, remind you of that; okay?
14   A.   Okay.
15   Q.   Lastly, I would ask that you allow me to
16  complete my questioning before you jump in with an
17  answer.  It's very common that you may know exactly
18  where my question is going, but it's very difficult for
19  our court reporter to transcribe two people talking at
20  the same time; okay?
21   A.   Okay.
22   Q.   And there is a fan over here, so I may have to
23  ask you to speak up a little bit so we can hear your
24  answers, if that's all right.
25   A.   Okay.
```

**Page 7**

```
 1   Q.   I won't take it that you're yelling at me.
 2   A.   Okay.
 3   Q.   How old are you, sir?
 4   A.   I am 43.
 5   Q.   Your date of birth?
 6   A.   6/29/61.
 7   Q.   Okay.  What is your educational background?
 8   A.   I have a bachelor of science degree from
 9  US Military Academy at West Point in engineering.  I
10  have a master's of business administration from the
11  University of Notre Dame.
12   Q.   Who do you root for when Notre Dame plays Army?
13   A.   It's got to be Army.  The longest losing streak
14  in the country.
15   Q.   And when did you graduate from West Point?
16   A.   1983.
17       MR. HANSEN:  Let's go off the record for a
18  second.
19       (Interruption in the deposition.)
20       MR. HANSEN:  Back on.
21   Q.   After graduating from West Point, did you do
22  military service, some duty?
23   A.   Yes.
24   Q.   Okay.  How many years?
25   A.   About five and a half.
```

**Page 8**

```
 1   Q.   Okay.  Honorably discharged?
 2   A.   Yes.
 3   Q.   And then did you go on to obtain your MBA from
 4  Notre Dame?
 5   A.   No.
 6   Q.   Okay.  Did you work for a period of time first?
 7   A.   Yes.
 8   Q.   Okay.  Where at?
 9   A.   At a company called Gerawan Farming.
10   Q.   Could you spell that first name?
11   A.   G-e-r-a-w-a-n.
12   Q.   And what?  Farming?
13   A.   Yes.  It's a farming company.
14   Q.   Where at?
15   A.   Ridley, California, outside of Fresno.
16   Q.   Okay.  What did you do for them?
17   A.   They're a family-owned business.  They're the
18  largest growers of peaches, plums, nectarines and table
19  grapes, and I was in a variety of post production and
20  logistics positions where after the fruit was harvested,
21  we brought it in, cold storage, packaged, shipped it
22  around the world.
23   Q.   Okay.  How long were you with them?
24   A.   About five and a half years.
25   Q.   Okay.  Did you then go to work for some other
```

```
 1  company or go back to get your MBA?
 2    A.   Then I got my MBA.
 3    Q.   Okay.  What year did you obtain your MBA?
 4    A.   1995.
 5    Q.   Okay.  Any subspecialty within that MBA?
 6    A.   Dual concentration in operations and finance.
 7    Q.   Ever go on to try and obtain a doctorate?
 8    A.   No.
 9    Q.   Do you hold any certifications?
10    A.   No.
11    Q.   Any professional accreditations?
12    A.   No.
13    Q.   Are you a member of any professional societies
14  or organizations?
15    A.   No.
16    Q.   On any professional committees?
17    A.   No.
18    Q.   Have you ever lectured or taught at any
19  universities?
20    A.   No.
21    Q.   Published any research or articles?
22    A.   No.
23    Q.   Okay.  Your present employer, is it
24  Hewlett-Packard?
25    A.   Yes.
                                                          9
```

```
 1    Q.   Okay.  And we are taking your deposition today
 2  here in Roseville, California.
 3    A.   Correct.
 4    Q.   Okay.  At the -- is the address 8000 Foothills
 5  Boulevard?
 6    A.   Correct.
 7    Q.   And what is your current position or title with
 8  Hewlett-Packard?
 9    A.   I am the parts business development manager.
10    Q.   How long have you been working for HP at this
11  location?
12    A.   Since June of 1996.
13    Q.   Okay.  Going back a little bit, you graduated
14  with your MBA in 1995.  I take it that would have been
15  May, June of '95?
16    A.   Correct.
17    Q.   Okay.  So you had a year, roughly, in between
18  there before -- you just indicated to me you started
19  here in June of '96?
20    A.   That's right.
21    Q.   What did you do for that one year?
22    A.   I worked for Procter & Gamble Company.
23    Q.   In Cincinnati?
24    A.   No.  In Sacramento.  I was hired out of
25  Cincinnati, their headquarters in Cincinnati.
                                                         10
```

```
 1    Q.   Right.  What did you do for P & G?
 2    A.   I was a -- I was in their financial analysis
 3  group.
 4    Q.   Any particular reason you left P & G to come to
 5  work for HP?
 6    A.   Better opportunity.
 7    Q.   I mean, were you fired or anything like that?
 8    A.   No.  No.  Not at all.
 9    Q.   Okay.  Better job opportunity, and you took it
10  with HP?
11    A.   Correct.
12    Q.   Okay.  I want to break down a little bit of your
13  employment here with HP.
14         You say you started in June of '96.  Have you
15  always been the parts business development manager?
16    A.   No.
17    Q.   Okay.  That is your current role, you indicated.
18  How long have you held that position?
19    A.   I have held some form of it for probably
20  approximately three years.
21    Q.   Okay.  Let's focus on your current job, then
22  we'll work backwards.
23         Describe for me your duties or responsibilities
24  for HP as a parts business development manager.
25    A.   I -- there's a product line that involves
                                                         11
```

```
 1  selling spare parts and replacement parts to outside
 2  companies, and I am the person who is in charge of that
 3  business for the Americas, that includes Latin America
 4  and Canada.  I'm responsible for the financial
 5  performance of the product line, the profitability of
 6  the product line, the customer satisfaction, setting the
 7  strategic directions, and that's it.
 8    Q.   Going back, you said you're responsible for the
 9  product line, the selling of spare parts or replacement
10  parts to outside companies.  Describe for me what types
11  of outside companies.
12    A.   Well, inside of HP, we move a lot of replacement
13  parts and spare parts around, some of those under
14  contract and under warranty, and those are not sold.
15  Parts that are sold fall under my product line, and so
16  the companies -- the customer sets that we have
17  include -- it's really every type of -- it's parts for
18  every type of HP product.  So our customers include
19  consumers, end users of those products, repair providers
20  who are repairing HP products, partners or resellers who
21  have sold the product and then are providing support to
22  those products, and also parts resellers with companies
23  who specialize in -- in selling parts, support parts for
24  computing and printing equipment.
25         We also have customers who -- who take our parts
                                                         12
```

1 and use them in their -- in the products they make.
2 So we have a wide set of customers.
3 Q. Okay. I am going to throw some terms out here,
4 and let's see if we're on the same page.
5 Those outside companies could be a consumer.
6 For instance, Jim Hansen has an HP computer he is
7 looking for a part for. I'm just an individual
8 consumer. I call the 1-800 HP number -- whatever
9 welcome center number, and I am looking for a part. Is
10 that what you're describing when you say a consumer?
11 A. Yes. I misspoke when I said we sell them to
12 outside companies. The primary sales motion is to
13 companies, but we also sell to end users, like a
14 Jim Hansen or individuals who are not companies.
15 Q. Okay. But you also, I take it, sell to what
16 I've seen referred to as the B to B, business end --
17 businesses outside as well, the business side of the
18 aspect?
19 A. So B to B typically refers to a specific I.T.
20 connection with another company. We do sell to other --
21 we sell to commercial companies.
22 Q. What is Microsoft, Dell, what are they
23 considered?
24 A. Those would be called enterprise customers.
25 Q. Okay. Do you do -- well, strike that.

13

1 Is part of your responsibilities the sale of
2 spare parts and replacement parts to those entities as
3 well?
4 A. Yes.
5 Q. Okay. What if I'm Procter & Gamble, let's say,
6 and I have an individual who is in charge of my
7 computers within my company, and I want to contact HP to
8 procure spare parts, replacement parts.
9 Is that also an area that would fall under your
10 control, the selling of spare parts or replacement parts
11 to a business outside of HP?
12 A. Yes.
13 Q. Okay. Just so I'm clear, we have consumers.
14 You then said enterprise -- what were they called --
15 entities?
16 A. No. Enterprise customers.
17 Q. Customers. I'm sorry.
18 A. I will say that Microsoft and Procter & Gamble
19 would fall into the same category. Procter & Gamble
20 doesn't buy parts. They typically buy a contract --
21 Q. Okay.
22 A. -- and that does not fall under my product line.
23 Same with Microsoft.
24 Q. Okay. How about, to simplify things, if -- then
25 we'll get into this later -- a guy from a company

14

1 located in Springfield, Illinois, called the welcome
2 center and routed to MITG for third-party spare parts,
3 and MITG filled that order and sent the product on to
4 that small mom-and-pop shop in Springfield, Illinois.
5 What is the mom-and-pop shop considered under the
6 umbrella of entities that you sell to in your product
7 line? I take it they're not an individual consumer,
8 they are not an enterprise customer. What would they be
9 classified as?
10 A. Small, medium business. But if they were routed
11 to MITG, they're an HP customer that was routed.
12 And I just want to clarify. Are we talking
13 about an MITG fulfilled on behalf of HP?
14 Q. We will get into that later. I'm just trying to
15 figure out what you call them, the mom-and-pop versus
16 Microsoft.
17 A. I would call them a small -- small to medium
18 business. Typically, we break it down as a service
19 provider, self-maintainer --
20 Q. Okay.
21 A. -- enterprise customers, and then partner
22 resellers who have other relationships with HP, OEMs,
23 like Dell, where they are taking the parts and -- and
24 putting them -- we call them an OEM.
25 Q. They are taking HP parts and putting it into

15

1 their product?
2 A. Correct.
3 Q. Okay. Now, the partners and resellers, is that
4 what MITG would be classified as or --
5 A. No.
6 Q. What is a partner and reseller?
7 A. That's someone who -- who sells product -- sells
8 HP products to typically a smaller business, and then
9 they also might sell the support on that product or
10 provide warranty on that product. And so when they --
11 when they have sold a bunch of, say, systems or
12 printers, and then they also provide the warranty on it,
13 we give them the parts, if it's in warranty. And if
14 it's an out-of-warranty after the product has expired,
15 then they buy the parts from us at a discount. So they
16 have a contract as a product reseller, and that contract
17 also includes the ability to buy parts.
18 Q. Maybe I am totally off base. Is that what's
19 like a Best Buy or Circuit City or somebody who sells HP
20 parts or HP product? Is that what --
21 A. Yes. That's a consumer reseller. So they're
22 focused on selling to consumers, but that would be the
23 type of partner that could provide warranty, as well as
24 out-of-warranty. So when Best Buy wants to buy -- has a
25 customer out of warranty, they would buy parts from us

16

**Page 17**

1  to use in that repair, but they are focused on consumer
2  products, and they're not --
3   Q.   And you said you have been the parts business
4  development manager for three years.  How about -- let's
5  go back.  Well, strike that.
6       I want to ask you something.  Spare parts and
7  replacement parts that you are in charge of as the
8  product line, does that include -- well, let me ask it
9  this way:  Does that exclude any part or product of HP?
10  A.   Yes.  It -- so we don't sell products, so we
11 don't sell whole unit servers.
12  Q.   Okay.
13  A.   Those are products.  We -- we do not sell
14 supplies and accessories or options.  Those fall into
15 products.  And so there is a -- it's specified.  You
16 know, our menu of offerings is not HP's complete
17 offerings.  It is what is considered a spare part or
18 replacement part or -- and in some cases, there's a
19 small overlap.  But for the most part, we only sell
20 spare parts, replacement parts, and things that are set
21 up in that system as such.
22  Q.   Okay.  What did you do for HP -- or what was
23 your position prior to becoming the parts business
24 development manager?
25  A.   I was the -- the outbound logistics manager.

**Page 18**

1   Q.   Okay.  How long did you hold that position?
2   A.   One year.
3   Q.   What were your duties and responsibilities in
4  that role?
5   A.   I go back to -- we said HP moves a lot of parts
6  around, not just to outside companies.  In that role, I
7  was responsibility -- responsible for the fulfillment to
8  all customer sets, both -- we call them trade or the
9  sales customers, like we're dealing with now, but also
10 internal HP, internal folks.  So we have -- HP has our
11 own service group that does service, warranty parts that
12 were done, to international.  So from distribution
13 centers and field offices, all the stocking and
14 logistics and transportation.
15  Q.   Not to oversimplify it, but if HP had a site, I
16 guess, in Chicago, and they needed some parts, as the
17 outbound logistics manager, would you move that
18 internally to get that to them?
19  A.   Right.
20  Q.   Same with -- you said international.  If there's
21 somebody in Pakistan that needed something --
22  A.   The transportation is part of it, but so is the
23 warehousing, the stocking, the customs clearance, the
24 back and forth.  And most of those orders were out, you
25 know, through automated systems.  There's, you know,

**Page 19**

1  thousands of orders a day and --
2   Q.   Did any of that role as the outbound logistics
3  manager involve responsibility for the product line of
4  selling spare parts or replacement parts?
5   A.   It was fulfilling, making sure that people who
6  had purchased the part got that part as -- as
7  promised --
8   Q.   Okay.
9   A.   -- as expected.
10  Q.   Okay.  If we just follow a time line here, you
11 said you have been the parts business development
12 manager for three years.  That would take it back
13 roughly to 2001?
14  A.   Uh-huh.
15  Q.   Is that a yes?
16  A.   Yes.
17  Q.   Okay.  And then a year back from that, outbound
18 logistics manager.  So that puts us about 2000.
19       When was the merger between HP and Compaq?
20  A.   May 2002.
21  Q.   Okay.  So I take it prior to that time, did you
22 have any involvement at all with MITG?
23  A.   No.
24  Q.   Okay.  So as the outbound logistics manager, you
25 did not deal at all with MITG?

**Page 20**

1   A.   No.
2   Q.   Okay.  Just to wrap up your background a little
3  bit here, you were hired on in '96.  We have taken it
4  back to 2000.  What did you do prior to being the
5  outbound logistics manager?
6   A.   I was the logistics manager, which was a little
7  bit different flavor because of a different
8  organization.  But I was logistics manager for -- for
9  the parts -- support parts for HP.  So it was a similar
10 job, different organization, slightly different twist on
11 the outbound logistics job.
12  Q.   How long were you in that role?
13  A.   Approximately one year.
14  Q.   Okay.  Only three more years to go.  So we're
15 back to '99.
16       What did you do before logistics manager for
17 parts?
18  A.   I was the -- the lead finance support for the
19 product support division supply chain, so the parts
20 piece of --
21  Q.   I'm sorry.  Parts what?
22  A.   It was the -- the organization that moved parts
23 around HP.
24  Q.   Okay.
25  A.   So I was the -- I was the lead financial

**Page 21**

1 support.
2 Q. How long were you in that role?
3 A. One year.
4 Q. Okay.
5 A. And prior to that, I was the financial analyst
6 for the test and measurement parts, which was a segment
7 of -- so HP -- it's currently Agilent, but the parts
8 that moved around for warranty, out of warranty,
9 internal and external, I was the finance support for the
10 business unit that managed test and measurements parts.
11 That's how I was hired in to HP.
12 Q. Okay. Did you review any materials in
13 preparation for your deposition today?
14 A. Yes.
15 Q. Okay. Can you tell me what you reviewed?
16 A. I reviewed mainly the correspondence that I had
17 sent out during the time in which we were evaluating the
18 MITG contract.
19 Q. Let me stop you. Correspondence out to internal
20 HP people, to Ron Haught, H-a-u-g-h-t, at MITG or both?
21 A. I would say internal.
22 Q. Okay. What else?
23 A. And then I also reviewed some of the
24 correspondence following the notification of Ron Haught
25 that we would terminate -- or that we would allow his

**Page 22**

1 contract to expire and the escalations that followed.
2 Q. "Escalations" being the letters that Mr. Haught
3 sent to various individuals at HP that you were brought
4 in on to respond to?
5 A. The "escalations" meaning the letters that
6 Mr. Haught sent to -- to different people inside of HP,
7 yes.
8 Q. Okay. Did you review the actual letter that
9 Mr. Haught sent?
10 A. No.
11 Q. Okay. The reason I asked it is you made the
12 statement that you reviewed the various letters that
13 Mr. Haught sent. I've seen and produced -- we've seen
14 one letter that was sent to three separate people. Are
15 you referring to other letters?
16 A. Yes.
17 Q. Okay. Did you bring any of the documents you
18 reviewed with you here today?
19 A. No.
20 Q. Do you have a file that you've created for this
21 case?
22 A. No.
23 Q. When did you review that stuff?
24 A. Over the past two days.
25 Q. Okay. Anything other than the correspondence

**Page 23**

1 that you reviewed in preparation for your deposition?
2 A. No.
3 Q. Did you review the Standard Support Agreement
4 between the parties?
5 A. No.
6 Q. Okay. Did you review any of the pleadings,
7 meaning the documents that have been filed with the
8 Court or exchanged between the lawyers in this case?
9 A. I briefly reviewed that last week.
10 Q. Okay. Did you review the complaint that was
11 filed by HP?
12 A. No.
13 Q. Did you review HP's answers to interrogatories?
14 A. No.
15 Q. Did you review HP's answers to request for
16 production of documents?
17 A. No.
18 Q. Did you review the arbitration decision that
19 took place prior to this case?
20 A. No.
21 Q. Did you review MITG's answers to
22 interrogatories?
23 A. No.
24 Q. MITG's responses to request for production?
25 A. No.

**Page 24**

1 Q. Did you review MITG's responses to request for
2 admissions?
3 A. No.
4 Q. Okay. What pleadings? I think I just named
5 every pleading in this case.
6     MS. CARROLL: You missed a big one.
7     MR. HANSEN: Which one?
8     MS. CARROLL: The answer and counterclaim.
9     MR. HANSEN: Oh.
10    MS. CARROLL: I don't know if that's the one he
11 reviewed, but that's the one you missed.
12 Q. BY MR. HANSEN: Did you review MITG's answer and
13 counterclaim?
14 A. I don't know. I reviewed what I thought to be
15 the -- MITG's claim against HP.
16 Q. Okay. You said you reviewed that over the past
17 few days?
18 A. I reviewed that last week.
19 Q. Okay. And I take it -- were those documents
20 provided to you by counsel?
21 A. Yes.
22 Q. Okay. Did you make any handwritten notes in
23 preparation for your deposition based on what you
24 reviewed?
25 A. No.

Page 25:

Q. Did you speak to anyone -- I don't want to know about your lawyers or your counsel. Did you speak to anyone else within HP about your deposition today?

A. I informed a few people that I was being deposed.

Q. Who would those people have been?

A. Those people would be Louise Meyerfeld.

Q. Who is being deposed tomorrow. Did she tell you that?

A. Correct. We sit right across from each other.

Q. Okay.

A. I told Jim Williams, because I had to -- I work with him. He sits across the aisle, and I had to cancel a meeting with him. I told Lynn Farlin who sits next to me.

Q. Other than telling these individuals you were being deposed, did you discuss the case with them at all?

A. No.

Q. Okay. Did you have any sit-down meetings with anyone besides your lawyers to discuss your deposition today, or, you know, rehash some areas you were questionable on due to time lapse, et cetera?

A. No.

Q. Okay. I take it you have met with your

Page 26:

attorneys in preparation for the deposition today?

A. Yes.

Q. Okay. And at that meeting, were there, besides your attorneys, other HP people present?

A. No.

Q. Okay. Going back to -- just to wrap up, you told me you reviewed some correspondence, MITG's claim against HP. Anything else that you reviewed in preparation for your deposition today?

A. I reviewed the documents around the escalations in addition to the two that you just mentioned, the correspondence, the legal documents, and, you know, Mr. Haught's letters, et cetera, around those escalations.

Q. Okay. And when you say "around those escalations," describe for me what you mean by that.

A. There were two escalations, and one was to M.L. Krakauer.

THE COURT REPORTER: I'm sorry?

MS. CARROLL: M.L. Krakauer.

THE WITNESS: The first name is M.L. That's her first name, and then Krakauer, K-r-a-k-a-u-e-r.

MS. CARROLL: It's just M.L.

THE COURT REPORTER: Thank you.

THE WITNESS: And the second was an escalation

Page 27:

that was sent to Carly Fiorina, Ann Livermore and M.L. Krakauer.

Q. BY MR. HANSEN: Okay. When you say an escalation, I'm -- I understand, being involved in this case, Mr. Haught sent a letter to these people. Is an escalation some sort of internal HP term for it, or are we referring to the same thing when you say escalation; that it's correspondence from MITG to Ms. Krakauer, then a second one to Ms. Fiorina and Ms. Livermore?

A. Yes.

Q. That was poorly worded. Yes, we're on the same page when you --

A. Yes, we're on the same page. That's what we're talking about is those letters.

Q. Now, you used the term "escalation." Is it because they were sent to these --

I mean, Ms. Fiorina is the CEO of Hewlett-Packard; is that fair? Is that correct?

A. Correct.

Q. Is it termed an escalation because it was sent to her as a CEO, as opposed to Joe Smith in accounting? Is it just a term of art that we're using?

A. It's a -- it's a term that we use for a customer -- customer or partner that is dissatisfied with the people that they're dealing with, and they,

Page 28:

therefore, want to get a higher level of attention, and so they -- in the Army we used that term when people would write to their congressman.

Q. Okay.

A. And here we use that term -- I use that term when my wife complains to the manager of, you know, the auto body shop.

Q. Okay.

A. It's a complaint path.

Q. Okay. Going back a little bit, who do you report to here at HP?

A. I report to Larry Trichel.

Q. Could you spell that last name for me?

A. T-r-i-c-h-e-l.

Q. Okay. Randy Wagner, do you know him?

A. Yes.

Q. Okay. Is he still here at HP?

A. Yes.

Q. Is he, I guess on the corporate charts, on the same level as you? Above you? Below you?

A. He's above me.

Q. Okay. Is he within your same product group that you report up the ladder to?

A. No.

Q. Okay. The reason I ask is -- and we'll get to

**Page 29**

1 some of these later -- there's some e-mail
2 correspondence that has been produced where he asked you
3 to get involved as part of the team and head up a
4 response or get some information. Is that because you
5 were within the same division, or how was it decided
6 that he pulled you in?
7  A. At that time, I worked for Randy.
8  Q. Okay. When did you stop reporting -- when you
9 say -- strike that.
10   When you say you worked for Randy, did you
11 report to him directly?
12  A. Yes.
13  Q. Okay. How long did you report to Mr. Wagner?
14  A. Probably two and a half years.
15  Q. When did that end?
16  A. About -- I'm not sure exactly, but about four
17 or -- four months ago.
18  Q. Roughly May of '04?
19  A. Correct. I'm not certain of the date.
20  Q. Yeah, I understand.
21   Did he get promoted?
22  A. He moved to a new role.
23  Q. Different division?
24  A. Yes.
25  Q. Okay. And is that when you began reporting to

**Page 30**

1 Larry Trichel?
2  A. Trichel.
3  Q. Trichel?
4  A. Yes, that's right.
5  Q. Okay. I have noticed in some of the documents
6 that have been produced by HP in this case that various
7 individuals forwarded those communications to you even
8 though you may not have been the original recipient of
9 the e-mail. Did you perform some sort of search for
10 documents on behalf of HP in response to the request for
11 production that was served upon them?
12  A. Yes.
13  Q. Okay. And, for instance, so we're clear -- I
14 mean, I will get into this later. But, for instance --
15 I can't find what I am looking for -- a Victor Manzo
16 sent you some e-mail correspondences dated roughly
17 August 16th, or so, of '04, yet the original e-mail
18 trail was back in early '04, '03, and you weren't a
19 recipient on any of those e-mails. Was that because you
20 had asked Mr. Manzo to do a search to try and retrieve
21 documents for this case?
22  A. Yes.
23  Q. Okay. Can you tell me what you were
24 specifically asked to do as far as retrieving documents
25 in this case?

**Page 31**

1   MS. CARROLL: I am going to object to the extent
2 that involves communications that are protected by the
3 attorney-client privilege and the work product
4 exception. He was -- he can't answer those questions
5 without privileged information.
6   MR. HANSEN: Fair enough.
7  Q. Let's do it this way: Did you -- did you,
8 yourself, go back and perform an electronic search to
9 try and come up with documents responsive to the request
10 for production served upon HP in this case?
11  A. I searched my e-mail --
12  Q. Okay.
13  A. -- electronically.
14  Q. Did you send communications out internally to
15 other individuals here at HP requesting that they do the
16 same?
17  A. No.
18  Q. How is it, then, that Victor Manzo and other
19 individuals forwarded you e-mails and communications
20 that were later produced in this case?
21   MS. CARROLL: I will object to the extent that
22 it assumes facts not in evidence.
23   Go ahead and answer.
24  Q. BY MR. HANSEN: You can answer.
25  A. I asked him for specific items of information.

**Page 32**

1  Q. Okay. Tell me the individuals that you asked
2 for specific items of information from.
3  A. I asked Victor Manzo to tell me when they --
4 they made a switch -- and a switch in the phone system
5 to switch over the numbers from -- that were from Compaq
6 Direct that went to MITG, and then when their contract
7 terminated, when it switched over to the HP --
8  Q. Okay.
9  A. -- HP phone center.
10  Q. Did you ask Mr. Manzo for anything else?
11  A. No.
12  Q. Okay. Who else did you ask to give you specific
13 information relative to this case?
14  A. On the -- on that specific item, I talked with
15 the manager of the call center.
16  Q. Who was that?
17  A. Richard Chizek.
18  Q. Okay. C-h-i-z-e-k?
19  A. Correct.
20  Q. Okay. What did you ask Mr. Chizek to provide
21 you?
22  A. I asked him the same question, and he referred
23 me to Victor Manzo who does those types of switches.
24  Q. Okay. And, I'm sorry, you said Mr. Chizek was
25 the manager of the what?

**Page 33**

1  A. He manages the Sykes call center parts.
2  Q. S-i-k-e-s?
3  A. S-y-k-e-s. S-y-k-e-s. Sykes is a company, an
4  outside provider of call center services, much like
5  MITG.
6  Q. Did Sykes perform the same type of third-party
7  spare parts procurement and services that MITG did?
8  A. No.
9  MS. CARROLL: Object as vague.
10  Q. BY MR. HANSEN: Okay. Well, you said they're
11  similar to the -- well, are they simply a router of
12  calls? Or what is their -- strike that.
13  You said they're similar to MITG. What did you
14  mean by that?
15  A. No. I said they provide call center services.
16  Q. You said similar to MITG. What did you mean by
17  that?
18  A. I think my understanding of MITG is that they
19  also provide call center services.
20  Q. Okay. Do you have specific knowledge whether or
21  not Sykes was also an entity that was under contract
22  with HP to provide third-party spare parts services for
23  outside customers?
24  A. Sykes has a contract with HP, and has had a
25  contract with HP, to provide call center services for

**Page 34**

1  customers calling in to purchase spare parts.
2  Q. Okay. Do they fill those orders?
3  A. They provide call center services.
4  Q. Okay. But my question is, Do they fill the
5  orders?
6  A. I don't understand.
7  Q. If I call in to the Sykes call center as
8  Joe Smith and want to buy some memory upgrade, can Sykes
9  fill my order?
10  A. They take the call, and they -- they help place
11  that order.
12  Q. Okay. Do they place that order by creating a
13  purchase order, invoice, to HP, then HP sends the part
14  to them to forward on to the client?
15  A. No.
16  Q. Okay. What is your understanding of how Sykes
17  fills that order?
18  A. They place -- they -- they take the credit card
19  or the payment, and they enter an order into the HP
20  system, and then they are finished with that customer.
21  Q. Okay. Does Sykes ship the part to the customer?
22  A. No.
23  Q. So other than taking the call, taking the credit
24  card information, if applicable, routing the purchase
25  order through HP, is it your understanding, then, that

**Page 35**

1  fulfills the end of Sykes' role with that -- with that
2  call?
3  A. Yes.
4  Q. Okay. What is your understanding of how that
5  differs to what services MITG performed on behalf of HP?
6  A. MITG provided services to Compaq Direct, which
7  is a different entity of HP. That's a major difference.
8  So MITG serviced customers who came in -- and I'm really
9  not clear on -- on all the details in which they may
10  have obtained their customers, but customers were
11  referred to MITG from the Compaq Direct organization,
12  and they provided call center services and web hosting
13  and fulfillment services for Compaq Direct.
14  Sykes is a call center provider for HP Services,
15  and they take phone calls for people -- from people who
16  want to buy parts.
17  Q. Okay. I guess, Why would you be contacting
18  Mr. Chizek at Sykes for documents in this case?
19  MS. CARROLL: Objection; ambiguous, assumes
20  facts not in evidence.
21  Q. BY MR. HANSEN: Go ahead. You can answer.
22  A. Mr. Chizek, his call center runs the 800 number
23  and the phone response where after the MITG contract
24  terminated, the calls were routed to the call center
25  that Mr. -- that Mr. Chizek manages.

**Page 36**

1  Q. Okay. So that's after February --
2  Well, when you say "after the contract was
3  terminated," after the notice --
4  A. After the contract expired.
5  Q. In February of '04?
6  A. Yes. On the -- I believe it was the day after
7  the contract expired, we switched the 800 number or the
8  calls that were going in from the HP 800 number into the
9  MITG call center over to the -- the HP parts call
10  center.
11  Q. Okay. Now, previously, you said it was your
12  understanding that MITG serviced customers that came in
13  from Compaq Direct. Upon the merger, when HP merged
14  with Compaq, is it your understanding that that became
15  HP Direct as well?
16  A. No.
17  Q. Okay. So it's your understanding that MITG did
18  no services for HP Direct customers?
19  A. On the merger, Compaq Direct remained as Compaq
20  Direct. After the merger, several months later, they
21  changed names to HP Direct.
22  Q. Okay. But that change occurred during the time
23  in which the contract with MITG was still in effect; is
24  that fair?
25  A. Yes.

1  Q. Okay.
2  A. They became HP Direct.
3  Q. Okay. And that was during the time in which
4  MITG was still providing services pursuant to the
5  Standard Support Agreement between the parties?
6  A. Correct.
7  Q. Okay. So would MITG have then been providing
8  services for not only Compaq Direct, but then after the
9  merger, HP Direct?
10  A. After the merger, HP Direct included Compaq, HP,
11  everything. So HP -- it was a name change to HP Direct.
12  Q. Okay. But is it your testimony that MITG did
13  not provide any services for any other entity under the
14  HP Direct umbrella besides the Compaq Direct parts?
15  A. No --
16  Q. Okay.
17  A. -- that's not my testimony.
18  Q. Okay. Then my previous question was, Is it your
19  understanding and knowledge that MITG provided parts,
20  services, pursuant to the Standard Support Agreement for
21  HP Direct after the merger took place?
22  A. Yes. They provided parts to HP Direct.
23  Q. Okay.
24  A. And that's not the same as all of HP, or it's
25  not the -- the same as -- as our organization.
                                                    37

1  Q. And that's not my question. My question simply
2  was, You would agree with me that they provided parts
3  and services on behalf of HP Direct after the merger
4  took place?
5  A. Yes.
6  Q. Okay. Now, Compaq Direct didn't necessarily go
7  away after the merger; correct?
8  A. Correct.
9  Q. Okay. So MITG was providing services on behalf
10  of not only the HP Direct, but the Compaq Direct under
11  the Standard Support Agreement?
12  A. Compaq Direct became HP Direct.
13  Q. But if I'm a customer on the outside that didn't
14  know that, and I called my old Compaq Direct number or
15  go to that website, I can still procure and buy Compaq
16  parts; correct?
17  A. Yes. The -- the -- you could -- yeah. The
18  numbers didn't change. The interaction didn't change.
19  Q. Right.
20  A. That's right.
21  Q. Okay. Now, while we're here -- and we will get
22  into this in more detail later, but what is your
23  understanding of -- during the terms of the Standard
24  Support Agreement?
25      You've testified that after the termination --
                                                    38

1  well, let me word this -- after the contract ended in
2  February of '04, that the calls that came into this
3  800 number were then sent to Sykes and Mr. Chizek's
4  group. What is your understanding, during the
5  time of the Standard Support Agreement with MITG, what
6  800 numbers, if you know, were being used in which MITG
7  could receive routed calls?
8  A. There was an 800 number that went to Compaq
9  Direct --
10  Q. And I don't mean to interrupt, but if I use the
11  term "the welcome center," do you understand that Compaq
12  800 number to be termed "the welcome center"?
13  A. I don't understand that.
14  Q. Okay.
15  A. So Compaq Direct is a -- it's one sales -- and
16  then later, HP Direct -- that's one customer entry point
17  of HP.
18  Q. And that's that the 800 number?
19  A. And that 800 number had an option off of it in
20  which it would -- if you're interested in parts, that
21  option would route over to MITG -- the call center
22  operated by MITG, and those agents would answer the
23  phone as HP Direct parts or Compaq Direct parts. They
24  would answer on behalf of HP or Compaq.
25  Q. Okay. Do you know offhand that -- the exact
                                                    39

1  800 number they're referring to there?
2  A. No.
3  Q. Okay. Do you know -- was it more than one
4  800 number?
5  A. No. I don't know.
6  Q. Okay. You don't know one way or the other?
7  A. I don't know.
8  Q. Okay. Whether it's one or multiple 800 numbers,
9  let's just focus on -- I come into that number as a
10  potential customer, and you said there're various
11  options. I take it it's kind of like when you call,
12  "Press 1 if you want to speak to warranty; Press 2 if
13  you want spare parts; Press 3 if it's something we need
14  to order from Mars," or whatever, something like that.
15  You are given various options, and from those options, a
16  call could be routed to MITG?
17  A. That's my understanding.
18  Q. Okay. Do you know on those options how many
19  options there were?
20  A. No.
21  Q. Do you know how many of those options sent the
22  caller to MITG?
23  A. No.
24  Q. Okay. Do you know what the other routing call
25  centers, if any, were on those options?
                                                    40

    A.  No.
    Q.  Okay.  You said that was one entry point for the potential customer to get to MITG.  What -- is there another, more?
    A.  My understanding is that sales -- inside -- Compaq Direct and HP Direct sales folks and inside sales folks would also refer or transfer customers to the MITG call center --
    Q.  If I --
    A.  -- as a representative of HP.
    Q.  I'm sorry.  I didn't mean to cut you off.
        If I use the term CSRs, is that customer service representatives?
    A.  Yes.
    Q.  Okay.  So internal folks at HP Direct or Compaq Direct could, by phone, e-mail, what have you, contact MITG and say, "Hey, I'm looking for a quote on this part.  Can you give it to me?"  Is that what you're referring to?
    A.  Yeah.  They would contact the Compaq Direct spares organization, which -- of which MITG provided the call center and support, and so in -- inside of HP Direct and Compaq Direct, when they had a customer who wanted spare parts, they would refer them over to the Compaq Direct spares or HP Direct spares, which was

41

operated by MITG.
    Q.  Have you seen the communications that have been produced in this case where that is still ongoing?
    A.  No.
    Q.  Okay.  Would it surprise you to know that internal folks at HP are still using MITG to get quotes and have orders filled?
    A.  No, it wouldn't.
    Q.  Okay.  That was -- the second contact was the internal folks.  Is there a third contact, being the websites?
    A.  MITG did have a website that they hosted on behalf of Compaq Direct.
    Q.  Okay.  And just so I'm clear and you're clear on this line of questioning, I'm still limiting myself in the time frame of the Standard Support Agreement before it expired; okay?
    A.  In that term, MITG presented a website that -- that said HP Direct parts or Compaq Direct parts, on-line parts, something like that, and they would take orders.  They wouldn't transact, but they did have a website in which customers could enter a request for a quote.
    Q.  Is there any other entry point that you're aware of during the terms of the Standard Support Agreement

42

besides the three we just discussed, the 800 numbers, the internal folks, and then the websites?
    A.  I am not certain, because I -- I am not certain, but I think there may have been direct lines into the MITG call center in addition to the ones that routed through the main number.  So a direct line into the HP parts -- or HP -- I'm sorry -- HP Direct parts.
    Q.  So a direct 800 number to MITG's call center, as opposed to one where you're routed off?
    A.  Yes.  I believe that is correct.  And I'm -- but I've got to say that I'm not certain.
    Q.  Okay.  Going back to where we got off on this line of questioning, we talked about how you asked Victor Manzo, after speaking to Mr. Chizek, for the documents.  Who else at HP did you ask for specific documents relative to this case?
    A.  I asked Roland Soriano and Vickie Ngo, N-g-o, for back history of the PBCO report.  I asked Darlene Lowe for back copies of the PBCO report.  And I -- there may have been others that I asked for specific items of information.  I don't recall now.
    Q.  Well, I was produced some documents yesterday by HP where this individual, Barbara Sain, S-a-i-n, appears to have produced some documents.  Did you ask her for anything in particular?

43

    A.  No.
    Q.  Okay.  Did you, yourself, go back -- you said you went back and reviewed your e-mails?
    A.  Correct.
    Q.  Okay.  How long is -- how long are e-mails kept on an individual's e-mail system here at HP?
    A.  Individuals manage their own e-mail.  I don't know how long the company is able to retrieve e-mail.
    Q.  Okay.  Do you know how long, for instance, on your e-mail -- let's say you get an e-mail, you read it, you hit delete.  It goes into your delete box.  Is there some sort of time frame where it automatically is deleted from that box?
    A.  I delete every day.  I empty my delete, because I don't have enough storage to manage otherwise.
    Q.  Okay.  And when you delete those e-mails, do you know how you can retrieve them back?
    A.  For a little while, you can retrieve them through Microsoft Outlook.  There's a tool that says, you know, "Look in deleted items."  But after a while, I don't know any other way.
    Q.  Did you go back and look through your -- look in to see if you had any e-mails?
    A.  No.
    Q.  Okay.  You didn't do that relative to any

44

**Page 45**

1 documents that you may have in this case?
2  A. No.
3  Q. Okay. Why not?
4  A. I didn't think there was anything in there of
5 relevance or I didn't delete anything.
6  Q. Your attorneys didn't -- well, strike that.
7   Did you go back and check your hard drive or
8 your servers to see if there was anything documentwise
9 relative to this case?
10  A. No.
11  Q. Do you know who would be most knowledgeable here
12 about the electronic documents and how they're created
13 and stored?
14  A. No.
15  Q. And just so I'm clear, you don't know or have
16 any personal knowledge as to how long e-mails or other
17 data is maintained on your computer here at HP?
18  A. No.
19  Q. Is there a centralized storage location for
20 company documents?
21  A. Not that I'm aware of.
22  Q. Okay. Do you segregate out your documents for
23 your division by sales center?
24  A. I don't understand.
25  Q. Well, I've seen these PBCO, parts business

**Page 46**

1 center operations, metrics where there're various sales
2 centers listed, for instance, Houston, Roseville and my
3 client, Missouri. Do you segregate out their documents
4 by sales center?
5  A. No.
6  Q. Okay. Do you understand that for those PBCOs,
7 that my client was providing information to Ms. Ngo,
8 Ms. Lowe and Mr. Soriano to create those on a daily
9 basis?
10  A. Yes.
11  Q. Okay. Where is that information stored, if you
12 know, that my client sent to HP to create those metrics?
13  A. I think it was just stored locally on
14 someone's -- on that admin's system.
15  Q. So if my client sent it to Vickie Ngo, it would
16 be on Ms. Ngo's system?
17   MS. CARROLL: Objection; calls for speculation.
18  Q. BY MR. HANSEN: If you know.
19  A. It wouldn't be -- I don't know that it would be
20 anywhere else.
21  Q. Okay. What is your understanding as to how
22 those BPCOs were created? Well, strike. Let me go
23 back.
24   Were those BPCOs created on a daily basis?
25  A. Yes.

**Page 47**

1  Q. Okay. And what is your understanding of how
2 they were created?
3  A. There was a person, an admin, so it was Vicki
4 and her predecessor, would pull the different activity
5 from the different call centers and websites so that the
6 operations manager and other folks that were involved
7 with the business could get a feel for the daily
8 activity issues. And so it was a management report
9 created from a variety of sources.
10  Q. Okay. And it's your understanding that, for
11 instance, if my client, MITG, sends information daily
12 into Ms. Ngo to input into those PBCOs, that it would be
13 stored on her computer as the admin, as you called it?
14 Is that fair?
15   MS. CARROLL: Objection; calls for speculation,
16 assumes facts not in evidence.
17  Q. BY MR. HANSEN: Let me ask you this, sir. This
18 is your division that you're responsible for; is that
19 correct?
20   MS. CARROLL: Objection; ambiguous.
21   THE WITNESS: No, it's not.
22  Q. BY MR. HANSEN: Okay. You received the PBCOs,
23 did you not?
24  A. Yes.
25  Q. Okay. And you are in charge of the product line

**Page 48**

1 for spare parts, and as you called them, replacement
2 parts?
3  A. Yes.
4  Q. Okay. And the PBCOs, would that document your
5 selling of spare parts and replacement parts and call
6 volume on a daily basis?
7  A. Yes.
8  Q. Okay. Are those PBCOs important to you as the
9 manager of that division to see what's going on on a
10 daily basis?
11  A. I read them every day.
12  Q. Okay. Do you do that so you get a handle on
13 what type of call volume and service levels your
14 divisions are maintaining?
15  A. They are not my divisions.
16  Q. Who -- well, then, who is in charge of the call
17 centers that handle the spare parts and replacement
18 parts orders?
19  A. Richard Chizek.
20  Q. During the terms of the Standard Support
21 Agreement with MITG, Mr. Chizek was in charge of that?
22  A. He was not in charge of the HP Direct/Compaq
23 Direct call center.
24  Q. That's what -- who was in charge of that during
25 the terms -- during the time of the Standard Support

```
 1  Agreement?
 2    A.  I believe it was Troy Bloomquist.
 3    Q.  Okay.  Well, do you understand that
 4  Troy Bloomquist was removed from that division at some
 5  point in time during the Standard Support Agreement?
 6    A.  Yes.
 7        MS. CARROLL:  Objection; vague and ambiguous.
 8    Q.  BY MR. HANSEN:  Okay.  Who then took over
 9  that -- that responsibility for the call center, MITG?
10    A.  I don't know.
11    Q.  Okay.  Were you responsible for MITG's
12  performance in reporting these daily metrics on behalf
13  of HP?
14    A.  No.
15    Q.  Okay.  Did you -- well, let me go back.
16        These PBCOs, you said, are created on a daily
17  basis?
18    A.  Correct.
19    Q.  And they track, do they not, the number of calls
20  received by the call centers on a daily basis?
21    A.  Yes.
22    Q.  Do they track the sales of spare parts per call
23  center on a daily basis?
24    A.  Yes.
25    Q.  Okay.  And the spare parts is the product line
                                                    49
```

```
 1  you're in charge of?
 2    A.  Yes.
 3    Q.  Okay.  So would those PBCOs be important to you
 4  to see how the product is being sold that you're in
 5  charge of?
 6    A.  Yes.
 7    Q.  Okay.  Now, the PBCOs, you said you asked
 8  Ms. Ngo, Ms. Lowe --
 9        Is that her predecessor, Darlene Lowe?
10    A.  She's not her predecessor.
11    Q.  Okay.  Who was?
12    A.  Carita Carney, C-a-r-n-e-y.
13    Q.  Okay.  So you went back and asked those
14  individuals to come up and provide -- strike that.
15        You asked those individuals to provide to you,
16  for this case, the PBCOs during the time frame of the
17  Standard Support Agreement with MITG?
18    A.  Yes.
19    Q.  Okay.  Have you reviewed the PBCOs that have
20  been produced in this case?
21    A.  I reviewed some of them.
22    Q.  Okay.  Would you agree with me that it was
23  certainly not a production of each day for the two years
24  of the Standard Support Agreement with MITG?
25    A.  Yes.
                                                    50
```

```
 1    Q.  Okay.  Can you tell me why HP is not able to
 2  produce for each day a PBCO for the term -- time frame
 3  of the Standard Support Agreement?
 4        MS. CARROLL:  Objection; assumes facts not in
 5  evidence, calls for speculation.
 6        Go ahead and answer if you can.
 7    Q.  BY MR. HANSEN:  Okay.  Well, I'll ask it this
 8  way --
 9    A.  I can tell why I don't.  I don't keep it because
10  it's a daily snapshot that is -- is not a relevant
11  long-term issue, so I do not keep it.  When I -- I do
12  read it every day, and I immediately delete it, and I do
13  not keep a history of it.  And my understanding is that
14  other people don't keep a history of it for the same
15  reasons.
16    Q.  Well, I guess how do you then trend your sales
17  data and sales information from your call centers?
18    A.  All the data is available but just not on a
19  daily report.  There's no need to put together
20  700 individual reports when the data is available from
21  the underlying systems in a much easier and quicker
22  fashion.
23    Q.  Okay.  Describe for me the much quicker and
24  easier fashion that that data is available.
25    A.  I didn't put together the PBCO reports, so I
                                                    51
```

```
 1  don't know what data sources had to be tapped to put it
 2  together.  It's a daily snapshot that was created from a
 3  wide variety of sources to provide the management team a
 4  daily snapshot so that we would have one sheet to look
 5  at to look at the dailies.
 6    Q.  I understand that.  But based on your testimony
 7  that you just gave, where do you go, as the individual
 8  who is in charge of the spare parts and replacement
 9  parts, if you want to look at it, as you described it,
10  on a much easier fashion?  If you want to pull up the
11  data, where do you go to look at it?
12    A.  I go -- if -- I don't look at that data.  But if
13  I have a question about it, I would go to Richard Chizek
14  and ask what his call volume -- what does his call
15  volume look like over time?  Or if I want to know the
16  financials, I go to the financial person who supports
17  me, and I say, "What is our -- what do our financials
18  look like over time?"  And there are different reports
19  that provide that data and different systems that house
20  that.
21    Q.  Okay.  Let's take Mr. Chizek out of this,
22  because I think we can agree, Mr. Chizek was not
23  responsible or involved, was he -- tell me if I'm
24  wrong -- for the Standard Support Agreement between HP
25  and MITG?
                                                    52
```

**Page 53**

A. You are correct.
Q. Okay. So let's take him out of this. I want to deal totally within the time frame of the two years we're talking about up to February 7th of 2004 between HP and MITG.
So if you wanted MITG's call volume and sales data during that time frame, who did you go to to get it, or where did you go to get it?
A. I didn't want it and I didn't go to get it anywhere. I didn't care at all about their call volume. I only cared about their dollars, and --
Q. Why is that?
A. -- and the dollars were reported in the financial system.
Q. Okay. Why would you not care about their call volumes?
A. Because I'm not responsible for the -- I only care about the -- the dollars; right? The daily call volumes is a tactical operational issue that, frankly, I don't deal with. I don't deal with daily operations.
Q. Are you not -- well, you said you're only concerned about the dollars. Are you concerned about customer satisfaction?
A. Yes, I am.
Q. Would you be concerned about the service level

**Page 54**

in which those customers are being handled?
A. Yes.
Q. Okay. Would you be concerned about the month-to-date sales levels?
A. Yes.
Q. Weren't those all outlined there in the PBCOs on a daily basis for you?
A. Yes.
Q. But you said you didn't -- you looked at it, but that was about it?
A. That's why I read them every -- I read them --
Q. Okay.
A. -- and the information is valuable --
Q. Now --
A. -- but I don't keep it.
Q. I'm sorry. Go ahead an finish your answer.
A. But I don't keep them.
Q. Now, let's say you wanted to look at that in a greater picture for MITG, not on a daily basis. Let's say you wanted to do a trend analysis for some research on MITG's dollar value, the dollar -- dollar line that you talked about.
Where would you go to look at that? Someone in finance or where?
MS. CARROLL: Objection; assumes facts not in

**Page 55**

evidence, calls for speculation.
Go ahead.
Q. BY MR. HANSEN: Sir, you just testified, did you not, you told me you were concerned about the dollar --
A. Yes, I have a report that tells --
Q. Okay.
A. -- what the dollars were each month from that -- from the MITG -- or, excuse me -- the Compaq Direct portion of the parts sales business.
Q. Okay. And who gave you that document?
A. It was produced by Darlene Lowe.
Q. Okay. And I'm not talking about for this case. I am talking about during the time in which the MITG agreement was in place. Was that something you got on a monthly basis from Ms. Lowe?
A. Yes.
Q. Okay.
A. And our financial analysis -- our financial analyst who reported it. So it's reported in the HP systems as revenue, and it was reported in -- in our product line.
Q. Is that from Mr. Schmaderer or "Schmaderer," Chuck Schmaderer?
A. No.
Q. Okay. Do you know Chuck Schmaderer?

**Page 56**

A. I have never spoken with him.
Q. Okay. Did you go back and look for or try and pull up those reports you just talked about from Ms. Lowe?
A. They're on financials that -- no, I didn't -- and, again, I don't keep the monthly reports; right? I only keep the current monthly that has year-to-date and previous years.
Q. What -- is there any retention policy that you're aware of on e-mails within HP here?
A. No.
Q. Okay. Is there any archive systems that you went to to look at for documents?
A. No.
Q. Okay. Did you ask anyone to bring up backup tapes of the networks for the servers here?
A. No.
Q. Do you know who here at HP would most likely be able to testify as to backup documentation, where documents may be on servers, that type of stuff?
A. No.
Q. Okay.
MS. CARROLL: When you get to a breaking point, can we take a quick break?
(Recess taken.)

**Page 57**

MR. HANSEN: Back on the record.
Q. Again, Mr. Crowley, you're under oath still as we continue the deposition.
  Were you involved at all in reviewing the lawsuit filed by HP against MITG? You told me you reviewed MITG's counterclaim back against HP. But my specific question is, Have you reviewed or are you familiar with the suit filed by HP as plaintiff against MITG and Mike Lauber?
A. I haven't reviewed it, and I don't even believe I've read it. I am aware of it, though.
Q. Do you know why HP is suing MITG and Mike Lauber?
A. No.
Q. Okay. Even though you answered that way, I'm going to go through a list of questions here.
  Do you have any personal knowledge that MITG is trading upon HP's valuable goodwill?
A. No.
Q. Do you have any knowledge that MITG or Mike Lauber is intentionally distributing products based upon HP's trademarks and business reputation?
A. No.
Q. Do you have any personal knowledge that MITG or Mike Lauber have acted unfairly by misappropriating HP's

**Page 58**

work product?
A. No.
Q. Do you have any personal knowledge that MITG is seeking to capitalize on HP's success by using domain names confusingly similar to HP?
A. I -- I know that they have captured the domain names. I'm not sure how they're using it at the moment. But, yes, they have domain names that contain the HP brand and the Compaq brand.
Q. When you say HP and Compaq brand, other than the HP, the two letters H and P and the word "Compaq," are you referring to anything else?
A. Those are the brands I'm talking about.
Q. Okay. Now, you said that they've captured them. What do you mean by that?
A. They're the owner of the domain name.
Q. Okay. And do you have any personal knowledge that those websites -- well, strike that.
  Do you have any knowledge of what those websites, the actual www., whatever it is, do you know what they are?
A. I used to.
Q. I want to know what you know right here now.
A. Off the top of my head, I don't -- I think it was -- no, I don't know the exact one, but I believe it

**Page 59**

was HP online parts -- or HP Direct Online Parts, Compaq Direct Online.
Q. Okay. You just threw out quite a few. Is that speculation, or do you actually know that those are the websites that are at issue?
A. I know that there were four websites that they had captured and did not turn over. One of the things that I do is make sure our web presence is not confused, and these particular websites that utilized the HP brand and the Compaq brand in the name of the domain were an issue during the transition.
  After the contract terminated, we asked for -- that was part of the transition, to get those domain names back, as we have done with other companies that have captured those brands.
Q. Okay. Is it your testimony that up until the time in which the agreement ended, that MITG was using them -- "them" being those websites and those names -- with unauthorized permission by HP?
  MS. CARROLL: Objection; vague.
  THE WITNESS: I don't know.
Q. BY MR. HANSEN: Okay. Are you aware of the arbitration that was filed by HP to try and have a determination made that those domain names should be returned to HP?

**Page 60**

A. No.
Q. Were you involved at all in that arbitration in which HP sought to have those domain names transferred back to them?
A. No.
Q. Are you aware that HP lost that arbitration case?
A. No.
Q. Do you have any firsthand knowledge or any facts that show that those websites are active currently?
A. No.
Q. Okay. Do you know when the last time, if at all, that they were active?
A. No.
Q. Okay. Have you attempted to go to those websites to see if they are an active website?
  MS. CARROLL: Objection; vague.
Q. BY MR. HANSEN: Have you typed in www.compaqdirectparts.com to see if you could access that website?
  MS. CARROLL: Same objection.
  THE WITNESS: I did it back when -- I did it quite a while ago. I have not done it recently.
Q. BY MR. HANSEN: Okay. So you don't have any firsthand knowledge as you sit here today whether or

**Page 61**

1 not, A, those websites are active; is that true?
2 A. That is true.
3 Q. Okay. You don't have any specific -- well,
4 strike that. That's good enough.
5    You said you were involved in trying to get
6 those websites turned over during the transition. Did
7 you specifically have conversations with anyone at MITG
8 regarding the domain names?
9 A. No.
10 Q. Okay. I've seen some e-mails that have been
11 produced in this case where a Ms. Linda Gretzinger
12 exchanged some e-mails in that regard with Mr. Lauber.
13 Have you seen those?
14 A. I -- I saw them at the time.
15 Q. Okay. Were you the person that directed
16 Ms. Gretzinger to get in contact with MITG and
17 Mr. Lauber to try and get those domain names?
18 A. Probably. I mean, that was part of the
19 transition --
20 Q. Okay.
21 A. -- and I don't recall, you know, a specific
22 conversation, but as part of the transition, we wanted
23 to transition the websites, the phone numbers and --
24 and Ms. -- Ms. Gretzinger, that's one of her roles.
25 Q. Okay. Does she report to you?

**Page 62**

1 A. Nope.
2 Q. Okay. I guess, how would you know to go to her,
3 I guess? How would you know that that's one of her
4 roles?
5 A. Because I work with her.
6 Q. Okay. What is her title, if you know?
7 A. I don't know.
8 Q. Okay. And did she report back to you that --
9 well, strike that.
10    What did she report back to you after she
11 attempted to get those domain names, if anything?
12 A. She -- I believe she forwarded the e-mail that
13 said that they were not open to turning over the domain
14 names at the time.
15 Q. At that point in time, did you turn it over to
16 your legal department?
17 A. No.
18 Q. Did you have any further follow-up with MITG?
19 A. No.
20 Q. What did you do after Ms. Gretzinger forwarded
21 the chain of e-mails to you?
22 A. I noted it and went on. I'm the -- that's it.
23 Q. Well, was it your responsibility to try and get
24 those domain names back?
25 A. Indirectly. We don't want any confusion or

**Page 63**

1 issues. We want people who are looking for HP websites
2 to find them, and so web presence is one of my measures.
3 Q. Well, if that's one of your measures -- after
4 Ms. Gretzinger forwarded that back to you, you said you
5 didn't follow up on it. Why not?
6 A. Because it's not -- it wasn't my place.
7 Q. Okay. Did you refer it to somebody who's place
8 it was to follow up on that?
9 A. I didn't refer it.
10 Q. Okay. So you just stopped -- it just stopped
11 with you?
12 A. It didn't stop with me.
13 Q. Okay. Are you aware if Ms. Gretzinger forwarded
14 it on to somebody else?
15 A. I'm not aware.
16 Q. Okay. Regardless, was that the end of your
17 involvement in the issue?
18 A. Yes.
19 Q. Okay. Now, do you have any firsthand knowledge
20 that those websites were used by MITG after February 7th
21 of '04?
22 A. No.
23 Q. Okay. So whatever confusion you spoke about
24 that you don't want in the websites, you wouldn't have
25 any firsthand knowledge as you sit here today that there

**Page 64**

1 was any confusion or that the websites were actually
2 used by MITG?
3 A. I have no knowledge.
4 Q. Okay. Do you have any knowledge whether or not
5 after February 7th of '04, any products were even being
6 sold from those websites that you dis -- that we
7 discussed here just a second ago?
8 A. No.
9 Q. Okay. Are you aware if there was any pop-up on
10 those screens where the consumer was given a choice of
11 where to go from those websites?
12 A. No.
13 Q. Okay. Based on your answers, do you have any
14 knowledge as to how MITG, as alleged by HP, is causing
15 any confusion, mistake or discretion as to MITG's goods
16 and services?
17 A. I had a customer ask me about MITG, because they
18 used HP as a reference of a satisfied customer.
19 Q. Is it your testimony here today that HP was not
20 a satisfied customer of MITG?
21 A. No.
22 Q. Okay. Do you have any firsthand knowledge as to
23 any allegations of confusion, mistake or deception as to
24 the source of MITG's goods or services specifically from
25 the domain names as alleged by HP?

**Page 65**

1  A.  Can you repeat or rephrase that?
2  Q.  Sure.  You had mentioned -- I want to take that
3  call you said you had from a customer that referenced
4  MITG, said HP was a satisfied customer.  Take that out
5  of this question; okay?
6      Do you have any firsthand knowledge that MITG
7  was causing confusion, mistake or deception in the
8  marketplace as to their goods or services specifically
9  from the domain names as HP as alleged in this case?
10 A.  No.
11 Q.  Okay.  Do you have any knowledge or information
12 that anyone in the public believes that MITG's goods or
13 services are somehow sponsored, approved or licensed by
14 HP?
15 A.  No.
16 Q.  Do you have any knowledge of any irreparable
17 harm as allegedly suffered by HP in their lawsuit from
18 MITG's use of the domain names or selling of MITG's
19 products?
20 A.  I have no knowledge.
21 Q.  You were listed in the interrogatory answers
22 provided by Hewlett-Packard in this case as an
23 individual that provided some input into those answers.
24 Are you aware of that?
25 A.  No.

**Page 66**

1  Q.  Okay.  As you sit here today, can you
2  specifically recall any answers to interrogatories in
3  which you provided information on behalf of HP?
4  A.  I answered requests for information from our
5  legal team.
6  Q.  Okay.  Do you have any knowledge or can you tell
7  me if -- if at all, that MITG was or is using the domain
8  names to somehow inform users that they could go to the
9  MITG website to order HP and Compaq parts after
10 February 7th of '04?
11 A.  Could you repeat that?
12 Q.  As you sit here today, can you tell me any
13 firsthand information or knowledge you have that MITG
14 was using the domain names in question to inform users
15 at the MITG website that they could order HP and Compaq
16 parts after February 7 of 2004?
17 A.  Yes.
18 Q.  Okay.  What -- tell me what personal information
19 you have that MITG was informing individuals that they
20 could order HP and Compaq parts at the MITG domain names
21 in question?  And when I'm referring to "the domain
22 names," I'm talking about Compaq Direct parts, HP Direct
23 parts that you mentioned earlier.
24 A.  I -- I saw a letter, or it was a notification
25 saying that, "You can buy HP parts from MITG," and

**Page 67**

1  Compaq parts as well.
2  Q.  Okay.  Now, I want to be pretty precise and
3  specific here.  Was that a notification that you saw at
4  the domain names that are in question and the basis of
5  HP's lawsuit against MITG, or was that a notification
6  that you simply saw in documents for this case?  Where
7  did you see that notification?
8  A.  I saw that notification on the web when I went
9  to those domain names.
10 Q.  Okay.  The domain names HP Direct, et cetera?
11 A.  Yes.
12 Q.  Okay.  When -- when did you do that?
13 A.  Shortly after the contract ended.
14 Q.  Okay.  Now, maybe I'm just off, but I thought I
15 went through and asked you pretty much if you had ever
16 done that, and you said you couldn't tell me when those
17 websites were up, when they were down, what have you.
18 So let's go back and go over that.
19     Are you telling me now that after February 7th
20 of 2004, you specifically went to compaqonlineparts.com,
21 compaqdirectonline.com, hponlineparts.com,
22 hpdirectonline.com or hpdirectonlineparts.com and saw
23 that notification?
24 A.  Yes.
25 Q.  Which one of those websites was it?

**Page 68**

1  A.  I don't recall.
2  Q.  When did you go there?
3  A.  I don't recall.
4  Q.  Okay.  And the notification, what did it say?
5  A.  I believe it said that -- that the relationship
6  has changed, and you can still buy the parts from MITG.
7  Q.  Okay.  And do you recall, did the -- did it
8  direct you automatically -- strike that.
9      Did the website automatically direct the user
10 over to mitg.com, or did you have to click onto mitg.com
11 to go there?
12 A.  I don't recall.
13 Q.  Okay.  Did the notification also say that if the
14 consumer so desired, they could go to HP to buy the
15 parts?
16 A.  I don't recall.
17 Q.  Okay.  Do you recall if the consumer was given a
18 choice?
19 A.  No.
20 Q.  Okay.  Do you recall, other than that
21 notification, anything else that was on one of those
22 websites?
23 A.  I know --
24     MS. CARROLL:  You mean after termination?
25 Q.  BY MR. HANSEN:  I'm sorry.  Yeah.

Page 69:

1  After February 7, '04, you said you couldn't
2  recall when you went to these websites; correct?
3  A. Correct.
4  Q. Okay. And you said you saw this notification
5  that a consumer could still buy parts from MITG which
6  are HP or Compaq parts.
7  A. That's right.
8  Q. Okay. Now, do you recall anything else that was
9  typed or listed at these websites?
10 A. At those -- following the links, I recall that
11 the HP brand image was incorrectly -- was not according
12 to standard, and that it was -- it was ugly.
13 Q. Okay. Did you ever go to these websites prior
14 to the end of the contract?
15 A. Yes.
16 Q. Okay. Was it the same HP sign that was on there
17 prior to the end of the contract?
18 A. I don't recall.
19 Q. Okay. And other than that it was ugly, you said
20 there were some links at the website. What were the
21 links?
22 A. On the MITG website, it said, "You can buy parts
23 for," and it has a lot -- it had a lot of brands.
24 Q. Okay. Now hold on. Because I think we're -- I
25 want to be exactly clear on what we're talking about.

Page 70:

1  I'm not talking about www.mitg.com; okay? Is
2  that what you're referring to?
3  A. I don't recall the web address.
4  Q. Okay. I'm specifically referring, Mr. Crowley,
5  to the e-mail -- or the websites I just went over, the
6  five that I mentioned. And I want to be exactly clear
7  on your testimony as we sit here today.
8       Are you telling me that you went to mitg.com and
9  saw the HP thing that was ugly, along with other
10 consumers, or are you telling me this -- you
11 specifically recall this at one of these
12 compaqonlineparts.com, compaqdirectonline.com,
13 hponlineparts.com, hpdirectonline.com or
14 hpdirectonlineparts.com?
15 A. My entry point was one of those four --
16 Q. Okay.
17 A. -- or one of those five. My entry point was one
18 of those, in which case I -- I saw the notification, and
19 I don't recall, but it took me to a request for quote
20 and things with the brand image, and that is what I am
21 talking about, with the -- it wasn't the correct brand
22 image, the -- that Compaq and HP were there.
23 Q. Okay. Now, you said it took you to someplace
24 else. My question previously was, Did you have to click
25 onto mitg.com to get there?

Page 71:

1  A. I don't recall.
2  Q. Okay. And you can't say one way or the other
3  whether you were automatically directed once that
4  notification popped up; is that fair?
5  A. That's fair.
6  Q. Okay. So as you sit here today, you don't know
7  if that notification said, "If you would like, you can
8  visit us at mitg.com, or you can go to hp.com"? You
9  don't recall one way or the other?
10 A. No.
11 Q. Okay. Now, you said you did this after
12 February 7th of '04?
13 A. Uh-huh.
14 Q. Is that a yes?
15 A. Yes.
16 Q. Okay. How many times did you go to view one of
17 these five websites I just listed?
18 A. Two or three times.
19 Q. Okay. Do you recall the time frame?
20 A. It was shortly after the termination, I would
21 imagine.
22 Q. Okay. When you say "shortly," I don't -- I've
23 got to be kind of nitpicky here.
24 A. It would be within a month or two, I believe.
25 I'm not certain.

Page 72:

1  Q. Okay. And were -- did you go to all five of
2  those sites, or just pick one out randomly?
3  A. I didn't go to all five of the sites.
4  Q. Okay. So as you sit here today, again, just so
5  we're clear, you can't tell me the exact time frame when
6  you went there, and you also can't tell me if you ever
7  went back there and saw that they were active or
8  inactive; is that correct?
9  A. Correct.
10 Q. Okay. And you're not sure if you had to then
11 subsequently click onto a link or you were automatically
12 directed?
13 A. Correct.
14 Q. Okay. Did you inform anyone here at HP about
15 the removal of HP -- excuse me. Did you inform anyone
16 at MITG about the removal of the HP or Compaq name from
17 the satisfied customers that were on there?
18 A. No.
19 Q. Okay. Have you been to the mitg.com website in
20 the past few months?
21 A. I went there this morning.
22 Q. Okay. And did you see HP and Compaq's name
23 there?
24 A. Yes.
25 Q. You did?

## Page 73

1  A. Yes.
2  Q. Okay. Where was it?
3  A. I don't recall.
4  Q. Okay. Well, all right. Let me -- I want to
5  differentiate the name of the brand under the satisfied
6  customers. Do you know what I am talking about?
7  A. No.
8  Q. Are you aware that legal counsel in this case
9  for HP asked MITG to remove HP and Compaq from their
10 website, and that, in fact, was done? Are you aware of
11 that?
12 A. No.
13 Q. Well, what I want to know is when you went there
14 this morning, where did you see HP or Compaq?
15 A. I saw it with all the other brands of parts that
16 are offered.
17 Q. This morning you saw that?
18 A. Yep.
19 Q. And why did you go to the website this morning?
20 A. In preparation for the deposition.
21 Q. For what?
22 A. Nothing specific.
23 Q. Okay. In the answers to interrogatories on
24 behalf of HP, there's a statement that MITG provided
25 users with an easy link to the MITG website. Do you

## Page 74

1  have any personal knowledge of that statement, what that
2  means?
3  A. No.
4  Q. Hold on one second here.
5     Can you tell me if you have any firsthand
6  knowledge as to how MITG, as alleged by HP, diverted
7  business from the domain names after February 7th of
8  '04, that should have gone to Hewlett-Packard?
9  A. I have no firsthand knowledge.
10 Q. All right.
11    MR. HANSEN: Mark that as our first exhibit.
12    (Defendants' Exhibit A was marked
13     for identification.)
14    MR. HANSEN: Off the record for a second.
15 Q. BY MR. HANSEN: Okay. Handing you what has been
16 marked as -- what is it? -- Defendants' Exhibit A, I
17 believe. Have you reviewed or looked at the Standard
18 Support Agreement prior to just now here at this
19 deposition?
20 A. Yes.
21 Q. Okay. If you flip to the last page, I think we
22 all can agree that that's not your signature that is
23 there on behalf of Compaq Direct, Inc.; true?
24 A. True.
25 Q. Okay. And the signature dates on the document

## Page 75

1  are February 8 of '02, and the first page says the
2  support agreement was actually entered into on the 7th
3  day of February '02. Was that prior to HP merging with
4  Compaq?
5  A. Yes.
6  Q. Okay. Now, upon the merger, did the Stand
7  Support Agreement for the services provided by MITG, did
8  that fall within your -- I'll call it division?
9  A. It's not a division.
10 Q. Okay. Tell me what it is.
11 A. It -- the dollars or the revenue did fall under
12 my product line.
13 Q. Okay. Does the sale of parts or the product not
14 fall within your product line?
15 A. The operations to support those sales was not
16 under my direction.
17 Q. Okay. Whose direction was that under?
18 A. Troy Bloomquist.
19 Q. Up until the time he was later moved off of
20 that, I guess?
21 A. Right.
22 Q. Okay.
23 A. And -- yeah.
24 Q. I'm sorry. Go ahead.
25 A. That's --

## Page 76

1  Q. Well, who took his place?
2  A. I don't know.
3  Q. Okay. When you say "the operations side," do
4  you mean the support services? Would that fall within
5  that?
6  A. I don't know what you mean by "support
7  services."
8  Q. For instance, if MITG had a question regarding
9  the phone line or that there's a problem with the
10 direction of calls, something like that, is that
11 something that Troy Bloomquist would respond to or
12 someone would?
13 A. Yes. That would be part of the Compaq Direct or
14 the HP Direct operations.
15 Q. Okay. But for this agreement, whatever revenue
16 was generated under the agreement to HP, fell within
17 your product line?
18 A. Yes. It was reported up under part sales.
19 Q. At the time in which Hewlett-Packard and Compaq
20 merged, were you given a copy of this document, or did
21 you review this document?
22 A. No.
23 Q. Okay. Had you seen this or reviewed it at all
24 prior to the termination or the decision to terminate
25 the agreement?