```
 2    Q.   Okay.  Were you familiar with the Standard
 3  Support Agreement prior to October 2003?
 4    A.   No.
 5    Q.   Okay.  What is your understanding as to what
 6  services were provided by MITG under the Standard
 7  Support Agreement?
 8    A.   My understanding is that MITG provided call
 9  center services and logistics and fulfillment -- parts
10  fulfillment to Compaq Direct.
11    Q.   Would those services have also been provided to
12  HP Direct after the merger?
13    A.   Right.
14    Q.   Okay.  And it said under paragraph 1 there in
15  Exhibit A, that -- the second sentence, that "These
16  services will be offered to CDI's," which at the time
17  was an abbreviation for Compaq Direct, Inc., as
18  contained in the first paragraph above that, "end users,
19  customers, companies or commercial entities directed or
20  referred by CDI to MITG."
21         Do you see where I'm at there?
22    A.   Yes.
23    Q.   Okay.  Would that also, after the merger, have
24  been the same for HP Direct?
25    A.   Yes.
                                                        77
 1    Q.   Okay.
 2    A.   As far as I know.  I don't know --
 3    Q.   Right.  I understand.  I'm asking for your --
 4    A.   -- the legal form of CDI or the legal form of
 5  the company, or -- I don't know.  But I would assume
 6  that it --
 7    Q.   HP Direct fell under the same thing as Compaq
 8  Direct as far as this agreement?
 9    A.   Yes.
10    Q.   Okay.  Now, in turn, CDI and HP Direct agreed to
11  pay MITG for those services performed in parts supplied;
12  correct?
13    A.   Correct.
14    Q.   Okay.  Now, is it your understanding -- and
15  specifically, it's in paragraph 9 of this agreement on
16  page 4 -- that -- excuse me.  It's paragraph 10 at the
17  top of page 5.  I'm sorry -- part of that payment
18  included a sharing of profit on parts; is that correct?
19    A.   Correct.
20    Q.   Okay.  And that MITG was entitled to 75 percent
21  of the gross profit on the sale of parts to customers,
22  and that CDI and HP Direct then were entitled to
23  25 percent of the gross profit on the sale, all parts to
24  customers.
25         Is that how you understand that?
                                                        78
 1    A.   Yes.
 2    Q.   Okay.  Now, we have -- so we have a profit
 3  sharing arrangement between the two parties.  Next we
 4  also have in paragraph 11, CDI, and then HP Direct,
 5  guaranteed a service level schedule to MITG; is that
 6  correct?
 7    A.   That's what it looks like, yes.
 8    Q.   Okay.  And in paragraph B, it says there that,
 9  "In consideration for MITG maintaining its call service
10  centers with technicians available to customers during
11  regular business hours as outlined in subsection A, CDI
12  shall guarantee a minimum fee payment to MITG each month
13  for basic telephone service calls based upon either
14  400 calls per day or $41,000 per month, whichever is
15  greater," that's termed the minimum fee.
16         Do you see what I just read there, the first
17  sentence of paragraph B in clause 11?
18    A.   Yes.
19    Q.   Okay.  Are you aware if there were ever any
20  payments made to MITG that were based on call volume as
21  opposed to the flat $41,000 per month?
22    A.   I don't -- I'm not aware.
23    Q.   Okay.  Were you involved at all in the financial
24  side as far as the billing and payment of MITG under
25  either the profit sharing contained in No. 10 or the
                                                        79
 1  service level schedule and guarantee in No. 11?
 2    A.   No.
 3    Q.   Okay.  Now, the other -- I'll call it the third
 4  payment form under the agreement, if you flip to page 4,
 5  No. 9, did CDI and then HP Direct also agree to pay MITG
 6  for invoices submitted for parts delivered to customers?
 7    A.   I'm sorry.  I missed the question.
 8    Q.   Did CDI and HP Direct also agree to pay MITG for
 9  invoices MITG submitted for parts delivered to the
10  customers?
11    A.   That's what it looks like --
12    Q.   Okay.
13    A.   -- yes.
14    Q.   Now, do you know how the agreement worked
15  regarding whether or not those parts were CSN parts or
16  outsourced?
17    A.   I don't understand.
18    Q.   Do you have personal knowledge of the agreement
19  as to when MITG had to buy or use a CSN part or they
20  could outsource it?
21    A.   No.
22    Q.   Okay.  Do you know what I'm talking about when I
23  say a CSN part?
24    A.   No.  I -- let me clarify.  I know what CSN is.
25  It's an ordering system.  It's not a type of part.
                                                        80
```

```
 1    Q.  Okay.  Well, let me rephrase my question.
 2        Do you know under the agreement what
 3  specifically governed whether or not MITG had to sell or
 4  use a Compaq CSN part or -- a Compaq part through CSN or
 5  they could outsource it?
 6    A.  No.
 7    Q.  Okay.  Is that better phrased?
 8    A.  I -- yes.
 9    Q.  Okay.  Now, under the Standard Support
10  Agreement, if you turn to page 7, paragraph 22, it says
11  "Exclusive agreement.  This agreement is exclusive,"
12  period.  "Everything" --
13    A.  I'm sorry.  Which paragraph?
14    Q.  I'm sorry.  Paragraph 22 on page 7 at the
15  bottom.  Do you see where I'm at?
16    A.  Yes.
17    Q.  Okay.  It says, "Exclusive agreement.  This
18  agreement is exclusive.  Everything herein contained
19  shall be deemed to provide MITG with an exclusive right
20  to provide parts and services to the customers."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  Okay.  My question is, Based on your
24  understanding of this document, who were the customers
25  that MITG was given the exclusive right to?
                                                      81
```

```
 1    A.  Customers -- Compaq Direct or later HP Direct
 2  customers who -- who wanted to buy parts who came in
 3  through that touch point, channel.
 4    Q.  Okay.  So would you agree with me that that
 5  referred to Compaq Direct or HP Direct customers,
 6  whether they came in through the 1-800 number, the
 7  website, internal customer service representatives or
 8  the direct 800 number that you thought was in existence
 9  to MITG?
10    A.  Could you say that again?
11    Q.  Sure.  You said it's your understanding that the
12  exclusivity of paragraph 22 was to customers of Compaq
13  Direct or HP Direct; correct?
14    A.  Correct.
15    Q.  Okay.  Would you agree with me that those are
16  customers that come in, from regardless of what channel,
17  entry point, if it's a Compaq Direct customer that calls
18  the 1-800 number, they should be forwarded or referred
19  to MITG?
20    A.  Correct.
21    Q.  Okay.
22    A.  That particular -- the 1-800 number for Compaq
23  Direct, those customers would go to -- MITG was the only
24  provider of parts in the Compaq Direct organization.
25    Q.  Okay.  And that would be customers, whether they
                                                      82
```

```
 1  come in through the 800 number, and my question was, The
 2  website, internally referred by HP customer service
 3  reps, or what you thought was a direct line to MITG?
 4    A.  Correct.
 5    Q.  Okay.  Would you agree that if some other party
 6  is referred the parts and services from Compaq Direct or
 7  HP Direct customers, some other party other than MITG,
 8  that would be in violation of that clause?
 9    A.  I don't know.
10        MS. CARROLL:  Objection; calls for a legal
11  conclusion.
12    Q.  BY MR. HANSEN:  You can answer.
13    A.  I don't know.
14    Q.  Okay.  So if, let's say, PC Nation was referred
15  customers from Compaq Direct, you don't know whether
16  that would be a violation of the exclusivity clause as
17  identified in paragraph 22 of Exhibit A?
18        MS. CARROLL:  Objection; calls for legal
19  conclusion.  Also assumes facts not in evidence and is
20  vague and ambiguous.
21    Q.  BY MR. HANSEN:  Go ahead.
22    A.  I don't know.
23    Q.  Okay.  Well, let me mark for you --
24        No.  First before I do that, go to paragraph 24
25  on page 8, if you would.  Are you there?
                                                      83
```

```
 1    A.  Yes.
 2    Q.  Okay.  Paragraph 24 says, "Amount of work.
 3  ALL" --
 4        And that's in all caps, is it not?
 5    A.  Yes.
 6    Q.  Okay.
 7        -- "applicable parts and service orders of the
 8  customers will be referred by CDI to MITG pursuant to
 9  the terms outlined in paragraph 1 of this agreement."
10  Did I read that correctly?
11    A.  Yes.
12    Q.  Okay.  Would you -- would it be a violation of
13  this agreement if Compaq or HP themselves filled these
14  orders, as opposed to referring them to MITG?
15        MS. CARROLL:  Same objections.
16        THE WITNESS:  When you say Compaq or HP, you're
17  incorrect --
18    Q.  BY MR. HANSEN:  Okay.  How --
19    A.  -- so I don't know.
20    Q.  How am I incorrect?
21    A.  Could you rephrase that question?
22    Q.  Sure.  Let me back up.  Compaq and then HP has
23  their own call centers; correct?  Doesn't Roseville have
24  a call center?
25    A.  Yes.
                                                      84
```

1  Q. There re various routing options that a
2  potential customer can go to as opposed to simply MITG
3  on behalf of Compaq or HP Direct; correct?
4  A. No. Could you rephrase that? I --
5  Q. If I am a customer and I call in and I -- I am
6  given various options, other than simply going to Compaq
7  Direct, which was the MITG option; correct?
8  A. No, you're not correct.
9  Q. Okay. Well, if I call in to the 800 number and
10 I'm given six options to choose from, and I mistakenly
11 punch in Option 4, and I go to the Roseville call center
12 as opposed to --
13 A. No, you are not correct.
14 Q. Okay.
15 A. That's not how it works.
16 Q. Okay. Explain to me how it works.
17 A. A customer contacts Compaq Direct, and their
18 only option to buy a part is to go to MITG. Now, there
19 are other places, other 800 numbers, other parts of HP
20 that customers can contact. But when a customer comes
21 into Compaq Direct, they are not able to be routed --
22 they were not -- during the term of this, they were not
23 able to be routed to the Roseville call center.
24 Q. Okay. And we simply just have a
25 misunderstanding here as to the way my question was

85

1  worded.
2      Let's say I call one of these other 800 numbers.
3  That's what I am talking to. If I call one of these
4  other 800 numbers, is that, for instance, the Roseville
5  call center?
6  A. If you --
7      MS. CARROLL: I am going to object as vague and
8  ambiguous.
9  Q. BY MR. HANSEN: If you don't understand the
10 question, sir, you can tell me you don't understand it.
11 A. If you call the Roseville 800 number, you will
12 be connected to the Roseville call center.
13 Q. Correct. Let's say I call that number, and I
14 mistakenly got that number when I wanted to call Compaq
15 Direct; okay? Are you following me?
16 A. I suppose.
17 Q. Well, I mean, I'm Joe Smith out in the public.
18 Someone gives me the wrong 800 number, and I accidently
19 get called into your Roseville center when I am looking
20 for Compaq Direct; okay? That's the assumption I want
21 you to make.
22 A. Misrouted call.
23 Q. Correct.
24     Let's say I am looking for a part from Compaq
25 Direct, and instead I'm connected to Roseville. Are you

86

1  following me so far?
2  A. You are not connected to Roseville.
3  Q. If I call the Roseville number, I am in the
4  Roseville --
5  A. If you call the number, that's right, and you
6  ask for a part.
7  Q. Right. And let's say Roseville doesn't have the
8  capability to fill that order. Well, no. Let me back
9  up.
10     Does Roseville have the capability to fill the
11 orders during the terms of that agreement that Compaq
12 Direct and MITG did?
13 A. There was overlap. Yeah, the parts could be
14 sold through a variety of channels around HP. Compaq
15 Direct was one sales channel.
16 Q. Right. And for this line of questioning, again,
17 assume I'm the individual that calls the Roseville
18 number. I think you said it was a mis --
19 A. So that individual, as an individual, is not a
20 Compaq Direct customer; right? They're just a Joe Schmo
21 calling an 800 number.
22 Q. Well, if I am looking for a Compaq Direct part,
23 wouldn't I be considered a Compaq Direct customer?
24 A. I don't know what you mean by a Compaq Direct
25 part. There's no such thing as a Compaq Direct part.

87

1  Q. Okay. What types of parts did MITG sell?
2  A. They sold parts for Compaq products and HP
3  products --
4  Q. Okay.
5  A. -- as well as Sun products, IBM products and
6  many other brands.
7  Q. Okay. Let's assume for the purposes of this
8  question, I am a business that is looking for Sun parts;
9  okay? And I contact the 800 number that puts me into
10 Roseville.
11     Are you following me so far?
12 A. Yes.
13 Q. Okay. And I'm looking for Sun parts, which are
14 parts which you just described for me that MITG would
15 sell and orders they would fill; is that correct?
16 A. I assume so.
17 Q. Okay. Well, you just told me that, so I take it
18 you know. So --
19 A. Yeah. They sell -- I am not sure that they
20 would have the same part that the guy is looking for.
21 Q. Right. Fair enough. But I'm saying, Sun was a
22 part that MITG sold and provided to people. Now,
23 following my example here, I am in Roseville; okay? And
24 I get a customer service representative from Roseville.
25 If I talk to that Roseville customer service

88

**Page 89**

1 representative, and I'm still during the time of our
2 Standard Support Agreement, and I'm looking for these
3 Sun products, did Roseville at that time have the
4 capability to fill that order?
5    A.    No.
6    Q.    Okay.  Should the individual at Roseville route
7 or direct me, the business person that's calling to
8 Compaq Direct, to the MITG number?
9         MS. CARROLL:  Objection; calls for speculation,
10 it's vague and ambiguous.
11        Go ahead if you can answer it.
12        THE WITNESS:  No.
13   Q.    BY MR. HANSEN:  What was the standard operating
14 procedure for Hewlett-Packard when a call would come
15 into the Roseville center?
16   A.    So that call is not a Compaq Direct customer.
17   Q.    Why not?
18   A.    That customer -- because Compaq Direct is a
19 small portion of H -- of Compaq -- of HP.  It is a
20 specific sales entity.  And there's a whole broader
21 system of HP sales and entry points, and that customer
22 is not identified at the time as a Compaq Direct
23 customer.  He wouldn't say, "I am a Compaq Direct
24 customer."
25   Q.    I never said he would.

**Page 90**

1    A.    Right.  That's right.  So he's not a customer
2 pursuant to this agreement.  The customers that
3 capitalized are customers of Compaq Direct, CDI, as in
4 the first paragraph.
5    Q.    Tell me how that distinction is made.
6    A.    When a customer identifies themselves or they call
7 the 800 number specific, direct into there, or they call
8 the Compaq Direct 800 number, or they come in through
9 the Compaq Direct spares online website.
10   Q.    Okay.  Tell me what the standing operating
11 procedure was or how HP identified the person who got
12 the wrong number.  Let's say I identify myself as a
13 Compaq Direct customer.  "Whoops, I have dialed the
14 wrong number.  I am in Roseville.  I need to get
15 elsewhere."
16   A.    I don't know.
17        MS. CARROLL:  I am going to object to that as
18 speculation.
19        Give me time to --
20   Q.    BY MR. HANSEN:  Okay.  Did Roseville have the
21 capability to fill that person's order, if you know?
22   A.    I don't know.
23   Q.    Okay.  Who would?
24        MS. CARROLL:  Objection; calls for speculation,
25 vague and ambiguous.

**Page 91**

1         THE WITNESS:  I don't know.
2    Q.    BY MR. HANSEN:  You don't know anyone within HP
3 that could identify for us what the standard operating
4 procedure was or how that call was possibly rerouted to
5 get back to Compaq Direct?
6         MS. CARROLL:  Objection; assumes facts not in
7 evidence.
8    Q.    BY MR. HANSEN:  You can answer, sir.
9    A.    No, I don't know, because I don't know that that
10 even happened, that a customer would call and be wanting
11 a different -- they would be wanting a -- they would
12 want Compaq Direct.
13        MR. HANSEN:  Mark those as B and C, please.
14        (Defendants' Exhibits B and C were marked
15        for identification.)
16        MR. HANSEN:  Back on.
17   Q.    We won't be talking about hypotheticals.  Let me
18 show you what's been marked as Defendant's Exhibit B,
19 documents identified as MITG 101 and MITG 102.  Please
20 refer to the bottom e-mail, please, from April M. at
21 MITG to Troy Bloomquist indicating -- and I'll read for
22 you -- "on Monday, May 19, 2003, Lyle from the warranty
23 group referred a customer to do any of the following for
24 purchasing Part No. 306577-001.  (This part is available
25 on CSN for $25 our cost, $29 customer cost):  He told

**Page 92**

1 her she could contact an authorized service provider in
2 her area.  She could contact the spares store at
3 1-800-225-5385, she could contact HP online parts at
4 1-800-848-4589 (that's us), or she could go to Ambry,"
5 A-m-b-r-y, 1-214-357-5710.  I went to the Ambry site,
6 and this part is selling for $55.  But why would
7 technical support refer someone to Ambry when this part
8 is available from CSN?"
9         Do you see what I just read there?
10   A.    Yes.
11   Q.    Okay.  Would you agree or disagree that if that
12 individual was referred to Ambry, that's in violation of
13 the exclusive agreement pursuant to the Exhibit A?
14        MS. CARROLL:  Objection; calls for speculation,
15 calls for a legal conclusion.
16   Q.    BY MR. HANSEN:  Go ahead.
17   A.    I am not a lawyer, but I disagree that it would
18 violate the terms of that agreement.
19   Q.    Why?
20   A.    Because this is not -- this customer didn't call
21 into Compaq Direct.  This customer called into the
22 technical call center, the warranty call center, or some
23 other place of HP, and HP said, "It's not under
24 warranty, but here's where you can get it."  It's not a
25 customer -- it's not a Compaq Direct customer.

**Page 93**

Q. So is it your understanding that the only customers that are covered under this Standard Support Agreement are the ones who call in and say, "Hi. I'm a Compaq Direct customer"?

MS. CARROLL: I am going to object. That is misrepresenting his prior testimony.

Q. BY MR. HANSEN: I'm asking --

MS. CARROLL: Assumes facts not in evidence.

Q. BY MR. HANSEN: I am asking you, sir, Is that your understanding?

A. My understanding of the Standard Support Agreement is that it is with -- is that customers are customers of Compaq Direct.

Q. Okay. And that says --

A. And that's people who enter through the four entry points which we discussed. This customer did not enter through that -- through those entry points, and so they were not a customer of Compaq Direct.

Q. So if I am a customer that enters by mistake through another entry point, other than the four you've identified, is it your testimony that they are not covered by that agreement?

MS. CARROLL: Objection; calls for speculation, calls for a legal conclusion.

Go ahead.

**Page 94**

THE WITNESS: I don't know, because I don't know what you mean by mistake or hypothetical examples like that.

Q. BY MR. HANSEN: Okay. Well, if I am a customer that dials a 1-800 number and gets me to Roseville, when I mistakenly should have dialed the 1-800 number that took me to Compaq Direct, is it your testimony that that customer is not covered under this agreement?

MS. CARROLL: Same objections.

THE WITNESS: Again, I don't know, because it's hypothetical, and I don't know.

Q. BY MR. HANSEN: Well, that's what we're here to find out. So let me give you an example.

If I am a customer of Compaq Direct and I dialed the 1-800 number that puts me into Roseville, Jane Smith at Roseville comes on to say -- says "Hello." And I say, "Hi. I am a Compaq Direct customer. I am looking for this part." She tells me, "Oh, you have mistakenly dialed Roseville. You need to go to Compaq Direct." Is it your testimony that customer then is not covered by that agreement?

MS. CARROLL: Objection; calls for speculation, calls for a legal conclusion, and it's a hypothetical that is not supported by any facts in evidence.

Q. BY MR. HANSEN: You can answer.

**Page 95**

A. I don't know. I don't think it's ever happened.

Q. I don't --

A. Because the customer calls with a problem to the 800 number, and -- and we will try to solve their problem by directing them to whatever HP place that they want to go --

Q. And if --

A. -- including Compaq Direct.

Q. Okay. Then with the standard operating procedure during the terms of this agreement, should the individual out of Roseville, if I identify myself as a Compaq Direct customer that had mistakenly dialed and gotten Roseville, should that customer have been directed back to CDI?

MS. CARROLL: Objection; calls for speculation, assumes facts not in evidence.

THE WITNESS: I don't know.

Q. BY MR. HANSEN: Who would know that?

MS. CARROLL: Objection; calls for speculation.

THE WITNESS: Don't know.

Q. BY MR. HANSEN: You don't know who is in charge of the call centers?

A. I know who is --

MS. CARROLL: Objection.

THE WITNESS: -- in charge of the call centers.

**Page 96**

Q. BY MR. HANSEN: Who?

A. Richard Chizek.

Q. Well, that's post agreement. I am talking about the time of our Standard Support Agreement, who was in charge of the call centers?

MS. CARROLL: Objection. It's vague and misrepresents prior testimony -- misstates prior testimony.

Go ahead.

THE WITNESS: Richard Chizek was in charge of the Roseville call center at the time.

Q. BY MR. HANSEN: During the terms of our Standard Support Agreement?

A. Richard Chizek was in charge of the Roseville call center during the term of the Standard Support Agreement.

Q. So he is the individual who would know what should have been done during the time of Exhibit A if any call was mistakenly placed to Roseville that should have gone to CDI?

MS. CARROLL: Well, calls for speculation.

Go ahead.

Q. BY MR. HANSEN: You know, let's --

A. Richard Chizek, yeah. He's in charge of directing how to handle misrouted calls.

Q. Okay. And that would have been during the time of Exhibit A, as well?

A. Correct.

Q. Okay. And is he an HP employee or is he with Sykes?

A. He is an HP employee.

Q. Now let's go to page 102, the second e-mail, page -- flip the page, please, on Exhibit B, page 102.

Do you see the e-mail that says Tuesday, 5/20/03?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. It says, "A customer called the welcome center" --

What is the welcome center?

A. I don't know.

Q. Okay. Do you know if that was the 800 number that was for Compaq Direct during the time of Exhibit A?

A. I don't know.

Q. Okay.

-- "looking to order Part No." -- and it lists a part number there -- "and routed to an auto attendant after choosing some options for what she was needing. She was transferred to Eric Bowen," B-o-w-e-n, period.

97

"She explained what she needed, and he referred her to call an 800 number for the small and medium business."

Is that small and medium business an HP division?

A. I don't know.

Q. Okay. "She spoke with Sony at the small and medium business department, and he explained that they no longer sell this item, and he referred her to contact Super Warehouse."

Do you know what Super Warehouse is?

A. No.

Q. Okay. The second -- or the last part there -- let me continue reading -- "The customer ended up getting to us and gave us this information, so I called Super Warehouse and got their website. This is a site that does not appear to be an HP site and sells different kinds of products. My question on both of these is why would our internal representative be referring customers to places that are not Compaq/HP?"

My question to you is, If that welcome center was a Compaq Direct number, and this internal individual referred someone to Super Warehouse, would that be in violation of the agreement Exhibit A between the parties?

MS. CARROLL: Objection; calls for a legal

98

conclusion, calls for speculation, and assumes facts not in evidence.

THE WITNESS: Yeah, I -- I think that your question doesn't make sense.

Q. BY MR. HANSEN: Okay.

A. Because if they called Compaq Direct -- I don't know the parties involved -- they would have talked to an MITG person, and so this whole -- the whole scenario wouldn't -- it -- it's not a possible -- your assumption is not a possible scenario.

Q. That's under your assumption that there was only one 1-800 number to -- for CDI; correct?

A. No, that's not correct.

Q. Okay. Is it your testimony that there were no 800 numbers that someone could dial into that did not automatically route them to CDI, which was MITG?

A. CDI did not control all the 800 numbers. That is correct. Compaq Direct was one part of HP's customer motion, and there are other places in HP that people can call --

Q. That's not my question.

A. -- that are not Compaq Direct.

Q. That's not my question, my question is, Is it your testimony that there was only one 1-800 number for Compaq Direct?

99

A. Oh, I don't know.

Q. Okay. That's my question.

My question is, You are making these statements about these assumption under your assumption that there was a 1-800 number that someone would call into, and it would automatically send them to MITG; is that fair?

A. That's my understanding that there was. I am not sure how many numbers, but Compaq Direct numbers.

Q. Okay. But it's also your -- well, do you have any firsthand knowledge that there was any other 1-800 numbers where an individual could call into that did not automatically route them to MITG?

A. I don't understand.

Q. Do you have any knowledge that there were other 800 numbers that individuals or businesses could call into for Compaq Direct that did not automatically route them to MITG?

A. No.

Q. Okay. So you're not aware of a situation where there was an 800 number where someone could call in, and one of the options on that 800 number was Compaq Direct?

A. I don't know.

Q. Okay. It's your understanding or testimony that HP eServices is different than HP Direct?

A. Could you say that again?

100

```
 1    Q.   Is HP eServices different than HP Direct?
 2    A.   I don't know.
 3    Q.   So you would not have information one way or the
 4  other?
 5    A.   I don't know what HP eServices is.
 6    Q.   Okay.  So if someone went to an HP eServices
 7  site and was referred to options such as Netstream,
 8  PC Nation or Ambry, you would not know whether that is
 9  in violation of Exhibit A?
10         MS. CARROLL:  Objection; calls for speculation.
11         THE WITNESS:  I don't know.
12    Q.   BY MR. HANSEN:  Okay.  The reason I ask that is
13  in Exhibit C, which I'm handing you, which are documents
14  marked MITG 430 through 435, if you turn to page 432
15  near the bottom there, it says, Dear HP Customer:
16  Thank you for contacting HP eServices.  This is in
17  response to your e-mail regarding the Armada E500
18  Notebook."
19         Do you see where I'm at there?
20    A.   Yes.
21    Q.   You don't know what HP eServices is?
22    A.   No.
23    Q.   Okay.  So if this individual, if you turn to
24  MITG 433, up at the top where they're given options for
25  searching the net for the part such as Netstream,
                                                        101

 1  PC Nation and Ambry, you don't know firsthand whether
 2  that would be a violation of the Standard Support
 3  Agreement?
 4    A.   No.
 5    Q.   Have you seen documents Exhibit B and C prior to
 6  today?
 7    A.   Yes.
 8    Q.   Okay.  Did you review them in preparation of
 9  your deposition?
10    A.   Yes.
11    Q.   Okay.  Did you ever ask anyone, after reviewing
12  those documents, other than legal counsel, whether or
13  not those --
14    A.   Can I make a correction?  I didn't see
15  Exhibit B.
16    Q.   Okay.  Hold on.  Let me go back.  You didn't see
17  which one?
18    A.   I saw Exhibit C.  I didn't see Exhibit -- I saw
19  Exhibit C.  I did not see Exhibit B.
20    Q.   Okay.  Were you asked to -- well, did you ask
21  anyone or follow up with anyone besides counsel to
22  discuss Exhibit C?
23    A.   No.
24    Q.   Okay.  And you didn't ask anyone what
25  HP eServices was?
                                                        102

 1    A.   No.
 2    Q.   Exhibit C, which you said you've seen prior to
 3  today, I guess was that just in regards to some
 4  documents you were provided to review prior to your
 5  deposition?
 6    A.   Correct.
 7    Q.   Okay.
 8         MR. HANSEN:  D, please.
 9         (Defendants' Exhibit D was marked
10          for identification.)
11    Q.   Before I get to D, Exhibit A, which is the
12  Standard Support Agreement, which is signed on behalf of
13  Compaq Direct by Troy Bloomquist, is that who signed it
14  for Compaq Direct?
15    A.   I don't -- I don't know, but it looks like
16  Troy's signature.
17    Q.   Okay.  I'm sorry.  I thought his name was
18  actually typed up down there.
19         I think you've already testified, though, that
20  Troy Bloomquist was the individual that oversaw the
21  support and operations of that agreement, whereas the
22  dollars just fell into your product line.  Is that -- is
23  that what you testified to earlier?
24    A.   Correct.
25    Q.   Okay.  So if I wanted to know more about the
                                                        103

 1  support and operations and the terms or understanding of
 2  that agreement relative to that, would he be the
 3  individual that could testify to that?
 4    A.   He would be a good person to testify about that.
 5    Q.   Okay.  Well, let me ask it another way.  Do you
 6  know of anyone, within your opinion, that would have
 7  greater knowledge of that than he?
 8    A.   No.
 9    Q.   Okay.  I am going to hand you what has been
10  marked as Defendants' Exhibit D, which are documents
11  produced by HP in this case, 65 through 69.  I will hand
12  you that and let you and your attorney look that over.
13         Have you had a chance to look that over?  I'm
14  sorry.
15    A.   I'm still not done.
16    Q.   Have you had a chance to look that over?
17    A.   Yes.
18    Q.   Okay.  If you would, flip to the last page of
19  that, which is HP 69, because I believe the order goes
20  reverse to forward.  You had testified earlier to the
21  escalation, which was the letter from Mr. Haught to
22  Ms. Krakauer.  Do you recall being cc'd on the e-mail
23  from Ms. Krakauer on the top of page HP 69 dated
24  October 3, 2003, whereby she indicates to you that she
25  had received the letter from Ron Haught and wanted some
                                                        104
```

**Page 105**

1 of the individuals that it was sent to to respond to it?
2   A.   Correct.
3   Q.   Okay.  Is that the escalation you were talking
4 about earlier?
5   A.   Yes.
6   Q.   Okay.  Now, after having received the e-mail
7 from Ms. Krakauer, she apparently asked Troy and Randy
8 to take the lead.  Do you see that there in the e-mail?
9   A.   Yes.
10  Q.   Okay.  Is that Troy Bloomquist that we have been
11 talking about earlier?
12  A.   Yes.
13  Q.   And Randy, is that Randy Wagner?
14  A.   Yes.
15  Q.   At the time, were you reporting to him?
16  A.   Yes.
17  Q.   Okay.  Would those have been the two individuals
18 that were responsible for the MITG account as far as
19 the dollar part and the support part that we have broken
20 out -- you broke out earlier in your testimony?
21       MS. CARROLL:  Objection; calls for speculation.
22       THE WITNESS:  I would say no, because Troy comes
23 back and says, "I'm not engaged anymore."
24  Q.   BY MR. HANSEN:  Okay.  Fair enough.
25  A.   So I think it's a misunderstanding by M.L.

**Page 106**

1   Q.   Okay.  Regardless, she asked Troy and Randy to
2 formulate an -- or look into the situation; is that
3 fair?
4   A.   Correct.  Because -- yes.
5   Q.   And come back with an action plan --
6   A.   Uh-huh.
7   Q.   -- for the company response; is that correct?
8   A.   Correct.
9   Q.   Okay.  Now, flip to HP 68.
10       Well, before we get to HP 68, let me ask, After
11 getting the e-mail from Ms. Krakauer, did you read the
12 letter from Mr. Haught?
13  A.   Yes.
14  Q.   Okay.  And at this point in time, did you take
15 any action or did you allow Mr. Wagner and Mr.
16 Bloomquist to do that?
17  A.   No.  I -- I knew it would be probably something
18 that I would handle.
19  Q.   Okay.  Anyway, you were then cc'd on HP 68 in
20 the e-mail from Troy dated October 3, 2003, indicating
21 that he is no longer part of the current program, but he
22 could provide some input.  Do you see that?
23  A.   Yes.
24  Q.   And then Mr. Wagner responds to him above on
25 that same date, and you're cc'd on that e-mail.  Do you

**Page 107**

1 see that?
2   A.   Yes.
3   Q.   And Mr. Wagner is asking, "Can you remind me
4 whom within PSG" --
5        Is that parts service group?
6   A.   No.  That's personal systems group.
7   Q.   Okay.  Personal -- I'm sorry -- systems group?
8   A.   Yes.
9   Q.   Okay.  What is that group?
10  A.   That is a major group -- a major part of HP that
11 handles -- and, actually, I -- I am not sure if -- we
12 have reorganized since then, but it was answering the
13 personal systems, the sales of computers and stuff, and
14 Compaq Direct fell under PSG.
15  Q.   So did MITG fall under PSG within HP?
16  A.   So, yeah, Compaq Direct was part of PSG, and,
17 therefore, the relationship and the contract with MITG,
18 I assume, would fall under that as well.
19  Q.   Are you aware of any other contracts like
20 Exhibit A that CDI or HP Direct had with entities
21 similar to MITG and the services they provided?
22  A.   I am not sure what you mean by "services."
23  Q.   Did HP Direct or CDI have contracts with other
24 entities besides MITG for those same types of services?
25  A.   I don't know.

**Page 108**

1   Q.   Have you reviewed any?
2   A.   No.
3   Q.   Okay.  And apparently, Mr. Wagner is asking for
4 someone within PSG to help with AR.  Is that accounts
5 receivable issues?
6   A.   Correct.
7   Q.   And from reviewing that letter, apparently
8 Mr. Haught -- there was some concern about some accounts
9 receivable.  Do you recall that?
10  A.   Yes.
11  Q.   Okay.  And then above that, Troy responds to
12 Mr. Wagner asking what the accounts receivable issues
13 are.  Mr. Wagner above that says, "I don't know
14 specifically."
15       And then Troy responds in HP 67 that no action
16 was needed because those issues were taken care of; is
17 that correct?
18  A.   That's correct.
19  Q.   Now, going to the HP 65, I don't see anywhere in
20 here where you actually respond in this group exhibit by
21 any e-mail; is that fair?
22  A.   Fair.
23  Q.   Okay.  But at the top of page HP 65, apparently
24 Mr. Wagner -- or somehow it had been decided that you
25 were going to be the overall lead.  Do you see that in

**Page 109**

1 the first paragraph on the top of HP 65?
2 A. No.
3 Q. Okay. Look at the e-mail from Randy Wagner to
4 Sheryl Williams, yourself. Do you see that?
5 A. Yes, I do.
6 Q. Dated October 7, 2003?
7 A. Yes, I see it.
8 Q. Okay. Do you see in the second sentence when he
9 says, "As I mentioned, please point Kristen Triolo to
10 Bill who is the overall lead." Is that you?
11 A. Yes.
12 Q. So at this point in time, had you been named the
13 overall lead in responding to Mr. Haught's letter?
14 A. By Randy, yes, I had.
15 Q. Okay. When -- what department is Kristen --
16 well, strike that.
17    What department was Kristen Triolo with at this
18 time?
19 A. She worked for Bob Floyd, which is the HP
20 customer support. I think it's service delivery. And
21 she didn't work directly for him, but that was HP
22 customer support service delivery.
23 Q. Okay. Why was she involved in this?
24    MS. CARROLL: Objection; calls for speculation.
25    THE WITNESS: Certain -- my understanding was

**Page 110**

1 that service delivery was supporting certain contracts
2 and was using MITG as a supplier of multi vendor parts
3 for those contracts that had been inherited. And so
4 when I say HP customer support, this is the integrated
5 HP and Compaq customer support, and they were -- they
6 were using MITG as a supplier of parts.
7 Q. For contracts that HP either inherited through
8 Compaq at the merger or had themselves? Let me rephrase
9 that.
10    Meaning HP was using MITG as a source for
11 supplier of multi vendor parts for contracts HP had with
12 other entities?
13 A. Right. So they were -- they were buying parts
14 from MITG, not -- this was -- it was as if they were
15 buying parts from any -- from a different company. So
16 they were using HP -- they were using MITG as a
17 supplier, and that's where those AR issues, from my
18 understanding, came from.
19 Q. Were they using MITG as a supplier under a
20 separate contract, or that covered by Exhibit A?
21 A. I don't know, but -- I don't know.
22 Q. Now, you said HP was using MITG as a supplier of
23 multi vendor parts. That was not HP Direct; correct?
24 A. Correct. I mean, this entity of HP was not
25 using another entity of HP. They were using MITG.

**Page 111**

1 Q. Right. But that entity of HP was not HP Direct?
2 A. Oh, correct. Bob Floyd, Sheryl Williams,
3 Randy Wagner, none -- none of those people are part of
4 HP Direct or Compaq Direct or even PSG. They're in
5 services.
6 Q. Okay. And what was their -- you said -- is it
7 CSD? CSR?
8 A. PSG.
9 Q. PSG. I'm sorry.
10 A. So PSG, remember the personal services group,
11 that's a major part of HP. It's a group. It's bigger
12 than a division.
13 Q. Right. And just tell me -- let's do a little
14 background here so we're on the same page.
15    Personal services group under --
16 A. Personal systems group.
17 Q. I'm sorry. Personal systems group -- okay --
18 you said that's a larger group within HP?
19 A. Correct.
20 Q. Okay. If I use the term "umbrella," under that
21 umbrella, is that where Ms. Triolo and Mr. Wagner's
22 group fell in?
23 A. No.
24 Q. Okay. Tell me -- explain to me where
25 Mr. Wagner -- was he in charge of the personal systems

**Page 112**

1 group in totality?
2 A. No.
3 Q. Okay. Was he a separate group altogether?
4 A. Everybody -- so Sheryl Williams, Bob Floyd,
5 everybody on this e-mail worked for M.L. Krakauer.
6 M.L. Krakauer is not part of -- of PSG either. She is
7 under a different umbrella called HP Services.
8 Q. That's what I want you to tell me. I want you
9 to tell me where these people are within this. We have
10 Ms. Krakauer who is HP Services. Is that what you just
11 said?
12 A. Right.
13 Q. Okay. And --
14 A. That's her group.
15 Q. Okay. And under her is Mr. Floyd?
16 A. Correct.
17 Q. Okay. Hold on. Let's go slow here.
18    We have Ms. Krakauer who is in charge of
19 HP Services?
20 A. Correct.
21 Q. That's not HP Direct?
22 A. Well, I'm sorry. She's not in charge of
23 HP Services. She was in charge of HP Customer Support
24 Americas.
25 Q. Customer Support Americas?

1  A.  That is part of HP Services.
2  Q.  Okay. HP Direct/Compaq Direct, not within that?
3  A.  No. That's part of PSG, personal --
4  Q.  Okay. We'll get there in a second.
5  A.  Okay.
6  Q.  We have HP Services, which HP Customer Support
7  Americas fell under?
8  A.  Correct.
9  Q.  Ms. Krakauer is in charge of -- or was in charge
10 of HP Customer Support Americas?
11 A.  Correct.
12 Q.  Who was in charge of HP Services?
13 A.  Ann Livermore.
14 Q.  So Ms. Krakauer reported to Ms. Livermore?
15 A.  No.
16 Q.  Okay. Well, she fell under her umbrella;
17 correct?
18 A.  Correct.
19 Q.  Under HP Customer Support Americas fell
20 Bob Floyd; is that correct?
21 A.  Correct.
22 Q.  Sheryl Williams?
23 A.  Well, Sheryl Williams was in Bob Floyd's
24 organization.
25 Q.  Okay. What organization was Bob Floyd in?
                                                  113

1  A.  He was in HP Customer Support Americas, and his
2  job was service delivery.
3  Q.  Service delivery. Okay.
4      And Ms. Williams reported to Mr. Floyd?
5  A.  No.
6  Q.  She was in his service delivery group?
7  A.  Correct.
8  Q.  Same level?
9  A.  No.
10 Q.  Okay. She just reported to somebody else?
11 A.  Who reported to Mr. Floyd.
12 Q.  Okay. So she was once removed from Mr. Floyd?
13 A.  Correct.
14 Q.  Who was the individual in between them?
15 A.  I believe it's Jim Dupree who is also on this.
16 Q.  Okay. We're getting somewhere.
17     We have Bob Floyd of service delivery, which
18 fell under Ms. Krakauer's division, which also included
19 Jim Dupree and Sheryl Williams.
20 A.  Correct.
21 Q.  Okay. Now, Ms. Triolo, if I am saying that
22 correctly, what group is she in?
23 A.  I believe she reported to Sheryl Williams.
24 Q.  Okay. In service delivery?
25 A.  Correct.
                                                  114

1  Q.  Who is PSG?
2  A.  PSG is another group of the company --
3  Q.  Right.
4  A.  -- personal systems group, and their primary
5  role is to sell products like the computers and other
6  stuff.
7  Q.  Okay. Now, did PSG fall under HP Customer
8  Support Americas?
9  A.  No.
10 Q.  What did PSG fall under?
11 A.  Carly Fiorina.
12 Q.  Which is?
13 A.  Under the HP corporate structure -- she's the
14 HP CEO, Carly Fiorina.
15 Q.  Right.
16 A.  Under her, PSG was one of the --
17 Q.  Who was in charge of PSG?
18 A.  I don't remember.
19 Q.  Okay. Where was Randy Wagner?
20 A.  Randy Wagner reported to M.L. Krakauer.
21 Q.  Okay. What was -- what was his division? Was
22 he in charge of a division?
23 A.  No. Division is the wrong term.
24 Q.  Group, team, whatever you want to use.
25 A.  Randy Wagner was in charge of the channel and
                                                  115

1  parts business under M.L. Krakauer, which was
2  HP Customer Support Americas. And so you have got
3  Randy Wagner, Bob Floyd on the same staff reporting to
4  M.L.
5  Q.  Okay. Well, let's go to CSR. You said they are
6  customer -- wait a minute. Did I get it right? Is
7  there a CSR? CS -- customer support delivery, I think
8  you said.
9  A.  CSR is an acronym for -- I think it's a customer
10 service rep that we talked about earlier.
11 Q.  Okay. Let me back up, then, so we're on --
12     You said that the service delivery group was
13 using MITG as a supplier of multi vendor parts.
14 A.  Correct.
15 Q.  What is the service delivery group? Is that
16 PSG? Is that HP?
17 A.  No. That's Bob Floyd's group.
18 Q.  Got ya. Okay. I'm following you now. I think
19 we've got it.
20     So Bob Floyd's group, which was service delivery
21 under HP Customer Support Americas, was using MITG as a
22 supplier of multi vendor parts; is that correct?
23 A.  That's my understanding.
24 Q.  Okay. Now, is it your understanding that they
25 were using MITG to supply multi vendor parts for
                                                  116

**Page 117**

1 contracts the service delivery group had with other
2 entities?
3 A. That was my understanding, yeah.
4 Q. So let's say Bob Floyd and his service delivery
5 group have a contract with Corporation XYZ. They need
6 some multi vendor parts. Was it your understanding
7 that they could contact and would use MITG to procure
8 those multi vendor parts to then forward on to
9 Corporation XYZ?
10 A. Not to sell, but to use in a contract. To use,
11 not to sell.
12 Q. Right. And I'm not -- I never said the word
13 "sell."
14 A. Yeah.
15 Q. So the service delivery group, Bob Floyd's
16 group, has a contract with Corporation XYZ. Is it your
17 understanding they would use MITG to get multi vendor
18 parts to provide to the service delivery group to then
19 turn and sell to Corporation XYZ pursuant to the
20 contract?
21 A. No. They wouldn't sell them to the corporation.
22 They would probably consume them. So the service
23 delivery organization had service delivery engineers who
24 would fix stuff, and they would -- the HP guy would --
25 Q. Got ya.

**Page 118**

1 A. -- use that part. And that company would
2 just -- you know, they would see it as an HP support
3 contract, and so -- that's my understanding. I --
4 Q. That's all I'm here for.
5 A. I will have to say that that's my understanding
6 of that part of this discussion is -- is when HP was
7 also using MITG as a multi vendor parts supplier.
8 Q. Okay. And I understand that. And I just --
9     So in the context of Exhibit D there, it's your
10 understanding that Mr. Floyd, Ms. Williams, Jim Dupree
11 are on this e-mail besides yourself because they were
12 the service delivery group that was using MITG as a
13 multi vendor parts solution under HP Customer Support
14 Americas?
15 A. That's -- that's -- yes, that's part of the
16 reason.
17 Q. My question is -- well, let me back up just a
18 little bit so I have just a little firmer understanding
19 on this. And I'll certainly ask Mr. Floyd or
20 Mr. Dupree, if need be.
21     Was it your understanding, then, that the
22 service delivery would have a contract with, let's say,
23 Corporation XYZ to do service work, what have you. If I
24 am Corporation XYZ, and let's say I have a computer that
25 breaks down. Under that contract, I would give it to

**Page 119**

1 Mr. Floyd's group. They would, in turn, use the parts
2 supplied by MITG to fix that computer and send it back
3 to me?
4 A. Yeah. Or they would go out on site.
5 Q. Right. Okay.
6 A. Whatever the contract was.
7 Q. That's my next question. Are you aware of
8 whether there was a separate contract between the
9 service delivery group and MITG?
10 A. No.
11 Q. Do you know if the multi vendor parts provided
12 by MITG to the service delivery group was encompassed in
13 Exhibit A, the Standard Support Agreement?
14 A. No.
15 Q. Okay.
16     MS. MILLER: Can we break for lunch pretty soon?
17     MS. CARROLL: Yeah. Do you want to -- we need
18 to stop at some point and take a lunch break.
19     MR. HANSEN: When I get through with these
20 e-mails, I will.
21     MS. CARROLL: Okay.
22     MR. HANSEN: Off the record.
23     (Discussion held off the record.)
24 Q. BY MR. HANSEN: Going to that e-mail, then, from
25 Mr. Wagner to you, up at the top on page HP 65 again,

**Page 120**

1 the third sentence, it says, "I'll ask that he make sure
2 we stay connected with you to make sure our I.S. account
3 logistic efforts are not put at risk."
4     Was Mr. Wagner, to your understanding, asking
5 that you stay connected with Ms. Williams regarding
6 these I.S. account logistics?
7 A. Yes.
8 Q. Okay. What were the I.S. account logistics
9 efforts? What does that refer to?
10 A. To be honest, I don't know what it means.
11 Q. Okay. And then as of October 7, 2003,
12 Mr. Wagner expressed to you, in the last sentence that
13 apparently, he and somebody else was on the same page;
14 that the agreement was not in HP's best interest.
15     Do you see that sentence there?
16 A. No.
17 Q. On the top of HP 65, the first page, the last
18 sentence in the e-mail from Mr. Wagner to Ms. Williams
19 and yourself.
20 A. Oh, yes, I see it.
21 Q. Okay. And it says, "We certainly are on the
22 same page that the present agreement is not in HP's best
23 interest."
24     Had Mr. Wagner talked to you, as of October 7,
25 2003, regarding what was in HP's best interest regarding

**Page 121**

1  that agreement?
2  A. Mr. Wagner and I had talked about the agreement
3  and the situation, yes.
4  Q. Okay. Well, when he says the "we," do you know
5  whether he was referring to you and he, or who he was
6  referring to?
7      MS. CARROLL: Objection; calls for speculation.
8      THE WITNESS: I don't know.
9  Q. BY MR. HANSEN: Had you come to a decision as of
10 October 7, 2003, to terminate MITG?
11 A. I will have to look at the specific dates, but I
12 believe no, we had not.
13 Q. Okay. But you at least believe that as of
14 October 7, 2003, it was your opinion that the agreement
15 with MITG was not in HP's best interest?
16 A. Could you say that one again?
17 Q. As of October 7, 2003, you said you and
18 Mr. Wagner had talked and come to the understanding that
19 the present agreement was not in HP's best interest; is
20 that true?
21 A. That is true.
22 Q. Okay. What investigation or determination -- or
23 what investigation did you make to come to the
24 conclusion that the agreement as of October 7, 2003, in
25 your opinion, was not in HP's best interest?

**Page 122**

1  A. I read the contract.
2  Q. Exhibit A?
3  A. Yes. I spoke with Mr. Haught prior to reading
4  the contract, and I talked with several folks about, you
5  know, that aspect of -- of part sales inside of HP.
6  Q. Okay. Who did you talk to? You said you talked
7  with several folks.
8  A. I talked with Troy. I talked with
9  Louise Meyerfeld, who was doing integration work, and I
10 spoke with -- with Randy.
11 Q. Did you look at all into the effect it would
12 have on the customers if this agreement was terminated
13 prior to reaching that decision?
14 A. Yes. I thought a lot about it.
15 Q. Well, not what you thought. What did you do?
16 Did you look at any sales data?
17 A. Yes.
18 Q. Okay. What?
19 A. I looked at the sales data, at the financials,
20 at the amount of sales that were being closed through
21 that portion of HP.
22 Q. Through MITG?
23 A. Through Compaq Direct, and MITG as the provider.
24 Q. And did you make a determination that MITG --
25 that HP could do that internally?

**Page 123**

1  A. HP was doing it internally.
2  Q. Okay. Prior to terminating MITG?
3  A. HP was doing it internally with MITG. MITG was
4  part of the group. These were all HP business and --
5  Q. But did you make a determination, prior to
6  terminating MITG, that HP could handle what MITG was
7  doing solely by themselves internally?
8  A. No.
9  Q. Did you do any investigation to determine if HP
10 had the infrastructure in October of 2003, to take on
11 the work MITG had previously been doing?
12 A. I -- I knew that we had duplicate
13 infrastructure, and we had call center capacity. But in
14 this case, it wasn't so much an evaluation of -- of
15 wanting to move it from one subcontractor to another
16 subcontractor. In -- in this case, the issue was
17 whether PSG should continue to sell parts as a separate
18 entity and a separate touch point, and whether or not
19 there should be separate entry points.
20 Q. Okay. And wasn't the determination made that
21 not subcontractor to subcontractor, but removing from
22 the subcontractor and bringing it all into HP?
23 A. It was all in HP.
24 Q. I'm talking about eliminating the subcontractor
25 altogether from the equation.

**Page 124**

1  A. No, that's not right.
2      MS. CARROLL: All right. We seem to be going
3  down a path that's going to take a while.
4      MR. HANSEN: Yeah. I have got a few -- two more
5  questions.
6  Q. Did HP have a policy in place at the time,
7  written or verbally, not to harm small business
8  partners?
9  A. I'm not aware of one. I don't know of a policy.
10 Q. Okay. So you never -- had you ever heard that
11 in October of 2003?
12 A. As a business philosophy and as, you know,
13 personal and other folks, that -- that's a concern that
14 we have with partners, that we want to make sure that we
15 treat everybody correctly.
16 Q. Okay. Is that a written policy? Is there an
17 actual document, or is it just indicated verbally?
18 A. I don't know. I don't know.
19     MR. HANSEN: We can break right here for lunch.
20        (Lunch recess taken.)
21     MR. HANSEN: Go back on the record.
22 Q. I had a chance to go through some of my notes.
23 I want to follow up with a couple of items.
24     One, in response to a question I asked you,
25 Mr. Crowley, about the allegations that MITG was using

**Page 125**

1  the domain names to inform users that they could go to
2  the MITG website or elsewhere to order HP and Compaq
3  parts, and you indicated you had gone there and saw a
4  notification. Do you recall that testimony?
5   A. Yes.
6   Q. And you said you couldn't recall if it
7  automatically directed you, or you had to click on a
8  link.
9     I am going to show you what is attached to
10 Hewlett-Packard's Complaint as Exhibit F, and ask you,
11 does that refresh your recollection? Is that the
12 notification you are talking about?
13  A. Yes.
14  Q. Okay. And that notification, at the
15 second-to-the-last paragraph -- well, excuse me -- in
16 the third paragraph, informs individuals or whoever
17 comes to the website if they wish to purchase parts
18 through HP, that they would need to go to the --
19 following hp.com website. Do you see that?
20  A. I see that.
21  Q. And if they wanted to order parts through MITG
22 in the second-to-the-last paragraph, they could go to
23 MITG's website?
24  A. I did see this, yes.
25  Q. And then did you have to click on the link

**Page 126**

1  mitg.com to get to MITG's website?
2   A. I believe so.
3   Q. Okay. So having seen that, does that now
4  refresh your recollection that you were not
5  automatically directed over to MITG? Is that fair?
6   A. It wasn't my testimony that I was automatically
7  directed, yeah. And I -- this looks like I would have
8  followed the path right through.
9   Q. Okay. And if you wanted to go to HP's site to
10 order parts through them or view their offerings, you
11 could click on their link as well?
12     MS. CARROLL: Objection. Assumes facts not in
13 evidence.
14  Q. BY MR. HANSEN: Well, sir, does that indicate
15 right there in the middle of that document that you
16 click on hp.com's website?
17     MS. CARROLL: I am going to object that it
18 assumes facts not in evidence.
19  Q. BY MR. HANSEN: You can answer.
20  A. It looks like a link to hp.com.
21  Q. Did you follow that link?
22  A. No.
23  Q. Okay. Was there any other notification other
24 than that which is attached to the Plaintiffs' complaint
25 that you recall seeing?

**Page 127**

1   A. No.
2   Q. Okay. I want to go back and follow up on the
3  testimony when you were explaining to me about the
4  various HP customer support business, PSG, which was the
5  personal systems group; do you recall that?
6   A. Yes.
7   Q. Okay. You indicated that CDI fell under the PSG
8  portion, which I don't recall whether or not you said
9  Randy Wagner and the channel parts business was also in
10 that umbrella.
11  A. Well, that's -- no, that's not correct.
12 Randy Wagner and the channel parts business was under
13 M.L. Krakauer --
14  Q. Okay.
15  A. -- was not under PSG.
16  Q. Who was in charge of PSG back at the time of the
17 agreement between the parties?
18  A. I don't know.
19  Q. Okay. Just another area to follow up on. Under
20 Exhibit A that you have in front of you there --
21  A. Uh-huh.
22  Q. -- paragraph 24 that we discussed, the last
23 page, when we were discussing the section regarding,
24 "ALL applicable parts and service orders of the
25 customers will be referred by CDI to MITG pursuant to

**Page 128**

1  the terms outlined in paragraph 1," do you see that?
2   A. Yes.
3   Q. Okay. I just want to be clear on it. We went
4  over some examples that, you know, you agreed or you
5  disagreed with me on whether or not those were CDI
6  customers that were referred elsewhere.
7     What is your understanding as to the reference
8  there to "ALL applicable parts and service orders of the
9  customers will be referred by CDI to MITG"? Is that
10 only --
11  A. Don't know.
12  Q. I'm sorry. Go ahead.
13  A. I was just saying, I don't know.
14  Q. Okay. Well, let me -- let me follow up with,
15 your testimony earlier was -- and correct me if I'm
16 wrong. I thought you referenced the customers to be
17 those individuals that either identified themselves as
18 Compaq Direct customers or those that entered
19 specifically through the four channels that you
20 mentioned earlier, which were the 800 number that routed
21 calls directly to MITG; is that correct?
22  A. Yes.
23  Q. Whether they were internally referred to MITG by
24 an internal HP Direct or Compaq Direct representative;
25 is that correct?

1  A. Correct.
2  Q. Whether or not that customer or end user went to the website, which we've talked about as compaqparts.com or the other ones that you referenced; is that correct?
5  A. Correct.
6  Q. And fourth was whether they called MITG direct; is that correct?
8  A. Correct.
9  Q. Okay. Now, it was -- I just want to be clear. Are you aware of any 800 numbers where a customer would call in for Compaq Direct parts that did not automatically route the caller to MITG?
13 A. I'm not aware of any Compaq Direct 800 numbers that did not route parts customers to MITG.
15 Q. Are you aware of any 800 numbers where there was an option for Compaq Direct parts?
17 A. Yes. I believe there was a Compaq Direct 800 number that had an option, "If you are interested in buying spare parts, press option number such and such."
20 Q. Okay.
21 A. I am aware that that was --
22 Q. Let me ask, Are you aware of any HP 800 numbers where there was an option for HP Direct parts?
24 A. So HP Direct parts is the nomenclature that we used prior to the merger. It is not -- we did not have

129

1 an HP Direct prior to the merger. But HP Direct Parts and HP -- or Parts Direct Online, those were nomenclatures that were used prior to the merger by HP. There was not -- so when Compaq Direct became HP Direct, there were no 800 numbers that I'm aware of that came in or where a customer calling those numbers would -- would be able to be routed anywhere but MITG
8  Q. And that was my question.
9  So my next question was going to be, So when you were telling me it was your opinion that -- I was giving you hypotheticals that could not take place, it was because it's your understanding there was no numbers -- or, excuse me -- there were no numbers in existence where a Compaq Direct person could call in and not be routed to MITG?
16 A. If they were calling in through -- to Compaq Direct, yes, my understanding is the only place for parts was MITG. That is correct.
19 Q. Okay. What if -- and I know we went round and round on this, but what if I am a Compaq Direct customer that called the 800 number to Roseville, is that what you termed being I misdialed or misrouted myself?
23 A. That's -- that's not what I would consider a misroute. I would consider a misrouted call, if you wanted to talk to your friend or your sales rep at MITG,

130

1 or, you know, at Compaq Direct parts, as provided by MITG, and you wanted to talk to that sales rep or you wanted to use that account, if you called the 800 number into the Roseville parts center, they would not recognize who you were talking about. They -- that would be a misdirected call.
7  Q. And do you know what the procedure was if that took place on behalf of the individual or entities there at Roseville, what they would do about a call like that?
10 MS. CARROLL: Objection; assumes facts not in evidence and calls for speculation.
12 THE WITNESS: No.
13 Q. BY MR. HANSEN: And is that what you said Mr. Chizek would know?
15 MS. CARROLL: Objection; calls for --
16 Never mind. Go ahead.
17 THE WITNESS: I don't think it happened enough that there would be a procedure. Just like there isn't a procedure if somebody calls our call center wanting Dell, that they thought they were dialing for a Dell computer, but they called us. So we don't have a procedure on how to handle those misdirected calls. We have procedures on different misdirections. And if anybody would know, it would -- of what was given to the agents on how to handle somebody clearly looking for

131

1 something else, then that would be Mr. Chizek.
2  Q. BY MR. HANSEN: Okay. And would you --
3  I am going to hand you what has been marked as -- well, let me -- before I hand you this, so it's your testimony that -- well, is it your testimony that that scenario never took place?
7  A. No.
8  Q. Okay. You just don't know one way or the other?
9  A. I don't know.
10 Q. And you don't know what the procedure would be to handle a call like that?
12 A. Correct.
13 Q. Okay. Let me show you what has been marked as Defendants' Exhibit E, documents HP 232 to 242.
15 (Defendants' Exhibit E was marked
16 for identification.)
17 Q. I will speed this along for you. You probably need to go back to forward, because 242 starts with the earliest date and works its way back.
20 Why don't you take a look at the e-mail on 241 and 242 which was sent from you dated October 13, 2003. And after you have had a chance to look that over, let me know.
24 A. Okay.
25 Q. Is that an e-mail that you sent out to the

132

1  recipients there dated October 13, 2003, on HP 241?
2  A.  Yes, it is.
3  Q.  Okay.  And it was an update on the MITG
4  situation?
5  A.  Correct.
6  Q.  And it appears that you were sending to those
7  recipients notes from the meeting which took place on
8  October 8th, 2003, regarding the MITG contract; is that
9  correct?
10  A.  Correct.
11  Q.  Okay.  And you list the attendees there;
12  correct?
13  A.  Correct.
14  Q.  Okay.  And you see the section there in bold
15  labeled "Issues"?
16  A.  Uh-huh.
17  Q.  Is that a yes?
18  A.  Correct.  Yes.
19  Q.  And under A, the question is, "Renew the
20  contract with MITG."  Do you see that?
21  A.  Yes.
22  Q.  And apparently, as of October 13 of 2003, a
23  decision had been reached by HP not to renew the
24  contract; is that correct?
25  A.  Correct.

133

1  Q.  And then it says under B on "Issues," "As soon
2  as possible, in writing notify MITG," and it said
3  "Owner" equals Kristen."
4      Is that referring to Ms. Triolo?
5  A.  Correct.
6  Q.  Okay.  Why is she referred to as the owner?
7  A.  She was the -- she was managing the contract
8  after Troy was moved away, or at least I think at this
9  point, she inherited contract management, and that was
10  what she said.
11  Q.  Okay.  And under C, it says, "Shari" --
12      Is that Ms. Ellis?
13  A.  Correct.
14  Q.  -- "Will be the lead for customer transitions."
15  Do you see that?
16  A.  Yes.
17  Q.  "Such as Intel, Insight, UDF links, et cetera."
18  A.  Yes.
19  Q.  Had there been a discussion that you wanted to
20  notify your customers -- well, excuse me.  Excuse me.
21      Had there been a discussion about notifying
22  customers as soon as possible about the termination of
23  MITG?
24  A.  No.  These are HP customers, and our
25  intention was to make it invisible, just allowing the

134

1  subcontractor's contract to expire.
2  Q.  Okay.  How do you make the statement that they
3  were HP customers?  Were they under a separate contract
4  with HP?
5  A.  The customers who come in through -- through HP
6  Direct are HP customers, not MITG customers.
7  Q.  Well, MITG is the entity that's providing the
8  product; is that correct?  Filling the order?
9  A.  They were filling orders for people that came
10  into HP through the HP Direct channel who wanted parts.
11  Q.  Okay.  Then under the bottom there, you provided
12  everyone some notes of a conversation you had with
13  Mr. Haught.  It appears your conversation was on
14  October 10th of '03.
15  A.  Correct.
16  Q.  Was that the first conversation you had with
17  Mr. Haught after it was determined internally at HP that
18  MITG's contract was not going to be renewed?
19  A.  Yes.
20  Q.  Okay.  The second sentence there indicates that
21  you told Mr. Haught HP was evaluating the current
22  contract and needed a few weeks to determine whether or
23  not it would be renewed; is that correct?
24  A.  Correct.
25  Q.  But it appears, does it not, that the decision

135

1  had already been made as of October 8th not to renew the
2  contract with MITG?
3  A.  The decision hadn't been validated by our legal
4  group and by the -- that's right.  It really hadn't been
5  validated by legal, which was what Kristen was going to
6  try to accomplish, and make sure that her notification
7  was -- was correct.
8  Q.  So even though the decision had been made
9  amongst the recipients on your e-mail of October 13
10  under Issue A, it was protocol that it had to be
11  validated by legal before it was finalized?
12  A.  The contract -- so we said that we wanted to
13  notify them as soon as possible, rather than give them
14  the minimum notification.  But we also wanted to follow
15  the proper channels when we notified them, and that was
16  in writing and with legal -- with our legal group's
17  involvement.  So my conversation with Mr. Haught was --
18  was not that notify -- the notification.  I did not call
19  him to notify him that his contract was ended --
20  Q.  I understand that.
21  A.  -- and it would not be renewed.
22  Q.  I'm sorry.
23      And -- but it had already been determined, had
24  it not, under Issue A above by your group of individuals
25  on that e-mail, that it was your decision not to renew

136

1  MITG's contract, whether it had been validated by legal
2  or not?
3     A.  Right.  We knew the contract, as it stands --
4  the support agreement, we did not want to renew that and
5  exercise the renewal clause at that time.  We didn't --
6  that --
7     Q.  Okay.  And you didn't communicate to Ron Haught
8  at that point in time, "It looks like we're not going to
9  renew it"?
10    A.  No.
11    Q.  Okay.  Turn to HP 240, please, in that group
12 there.  You have got to flip back, actually.
13        Do you see the e-mail you sent dated November 5
14 of '03?
15    A.  Correct.
16    Q.  Apparently, providing everyone on that list an
17 update on your call with Ron Haught that took place the
18 same date of November 5?
19    A.  Correct.
20    Q.  Okay.  Under the second dash or bullet point
21 there, it says, "We talked about four specific items
22 included in the termination."  And prior -- the bullet
23 point above that --
24        Obviously, MITG at this point in time had
25 received the termination notification?

137

1     A.  That's right.  That's right.  And I wanted to
2  validate that, so I did.
3     Q.  What do you mean validate it?
4     A.  I asked him if he received the termination
5  letter, and he said he did.
6     Q.  Is that what HP considers validating the
7  termination?
8     A.  That's what I consider.
9     Q.  Just simply finding out if the contractor or the
10 entity received the termination notice?
11    A.  Right.
12    Q.  Under the bullet point 2 there, it says, "Vista
13 connection will be shut down."  Can you tell me how the
14 Vista connection is shut off?
15    A.  No, I can't.
16    Q.  Are you familiar with the XML piece?
17    A.  No, I'm not.
18    Q.  Do you know what an XML is?
19    A.  Yes.
20    Q.  Okay.  Do you know its applicability between
21 MITG and HP?
22    A.  I'm aware of -- of an I.T. connection that
23 allowed MITG to place orders and have those orders
24 invoiced, and the customer would receive an invoice not
25 from MITG, since they were not MITG customers, but from

138

1  Compaq Direct or HP Direct.  So that XML interface
2  allowed the -- the order placement to -- to go through
3  and the invoices to -- to go onto those accounts.
4     Q.  Are you aware if that XML interface has been
5  used between HP and other third party vendors and
6  customers?
7     A.  I am not aware.  I have been told that it has
8  not.
9     Q.  You don't have knowledge of that one way or the
10 other?
11    A.  I don't.
12    Q.  Even though you have been told it has not been
13 used, do you know how you disconnect or interface that
14 I.T. connection?
15    A.  I don't know the I.T. specifics of how MITG
16 connected to Compaq Direct.
17    Q.  Okay.  Apparently, in this conversation on
18 November 5th with Mr. Haught, you told him HP was no
19 longer interested in MITG's call center web hosting or
20 invoicing services?
21    A.  That's right.
22    Q.  You apparently talked about two possible future
23 businesses, but kind of agreed just to talk about that
24 in the future, I guess?
25    A.  That's a follow-on from -- where I identified

139

1  the value-adds that MITG provided.  So although the
2  decision was made to -- to not renew the contract, these
3  were the -- just kind of ideas that we talked about
4  about how MITG might still partner with -- with HP.
5     Q.  Was there ever any, in your mind, realistic
6  chance that that was going to happen?
7     A.  Yes, I think there was, and I hoped that it
8  would.
9     Q.  Is that why you had him prepare the proposal
10 that he submitted to you?
11    A.  Yes.
12    Q.  Okay.  Who eventually made the decision not to
13 go forward with anything with MITG?
14    A.  We had a team that -- where we made the decision
15 in a meeting.
16    Q.  Were you for the proposal or against it?
17    A.  I didn't think that it was a proposal that we
18 could act on, and I recommended that we not move forward
19 with MITG
20    Q.  Okay.  As far as HP 239, an e-mail you sent out
21 December 19 of 2003, do you see that there?
22        MS. CARROLL:  We have got a problem with this
23 exhibit.
24        THE WITNESS:  I have got 240.
25        MR. HANSEN:  I'm sorry.  That's -- the

140

```
 1  termination letter somehow got stuck in there.
 2   Q.  Do you see 239, the e-mail dated December 19 of
 3  '03?
 4   A.  Yes.
 5   Q.  This is where you talked about those value-add
 6  items there on the bottom and up into the top of 240?
 7   A.  Yes.
 8   Q.  In the second paragraph -- or on the first full
 9  paragraph on the top of 240, the last sentence, you
10  indicate, "Any future agreement would be more of an
11  'arm's length' relationship with HP."
12       What did you mean by that?
13   A.  I meant that they wouldn't answer the phone as
14  HP; that if they were acting on behalf -- or if they
15  were a -- what I wanted Ron to get to was a -- he needed
16  to change -- I wanted him to see if he could change his
17  business so that he could add value to HP, because the
18  values or the existing relationship was not what I felt
19  to be the strategic direction we wanted to go in, but
20  there was a possibility that we would take the parts
21  business in a different strategic direction, where MITG
22  could provide things like outbound sales service or
23  procurement of other things, or even multi vendor parts
24  as -- as a -- as an addition to the lineup or the
25  portfolio of what the HP customer support parts business
                                                         141
```

```
 1  was selling.
 2       And under that, I had in my mind a model which
 3  we use now with other partners called a parts reseller,
 4  where they represent themselves as themselves, and
 5  they -- they source from HP, but they use their
 6  capabilities, like outbound calling and one-stop
 7  shopping, and, you know, good customer service in order
 8  to service customers that would otherwise -- that would
 9  choose them.
10       So that's the model -- that's an arm's length
11  model where they buy parts from us, and they turn around
12  and resell them, and we support them and we help to make
13  them successful, but it's arm's length versus they're
14  acting as a subcontractor.
15   Q.  So you wanted Ron Haught to change MITG to that
16  model?
17   A.  I -- I suggested it, and I was -- you know, of
18  the different things that I was thinking that, "You
19  have got all the makings of this."  That was one of the
20  two -- that was one of the options that if -- if he had
21  been -- if he had said, "Yeah, I am going to do that,"
22  that would probably -- we could have gone on together
23  and made an agreement.
24   Q.  Well, you could have, but you don't know whether
25  you would have or not; correct?
                                                         142
```

```
 1   A.  Correct.
 2   Q.  Okay.  Now, what -- did you have any idea on
 3  what the impact would have been to MITG as a company to
 4  make that change?
 5   A.  Well, I knew that their contract with HP was
 6  ending, and they needed to make a change in order to
 7  minimize the impact to their business.  And I was
 8  hoping to help him minimize that impact by giving him
 9  different -- different ways.  Since his current model
10  was not going to continue, this would have helped.
11   Q.  Did his proposal that he submitted to you
12  address that model you've just identified?
13   A.  No.  No.  He -- his proposal was not adequate.
14   Q.  Okay.  Well -- and the model that you're
15  suggesting, you would be asking a small business to take
16  on a complete change in hopes of possibly getting a
17  future agreement with HP.
18   A.  Is that a question?
19       MS. CARROLL:  Objection; calls for speculation,
20  assumes facts not in evidence.
21       THE WITNESS:  I didn't get the question that I
22  thought was --
23   Q.  BY MR. HANSEN:  I said, based on your model,
24  then, you were asking Mr. Haught and MITG to make a
25  change in their company structure in hopes of possibly
                                                         143
```

```
 1  getting a future deal with HP; is that fair?
 2       MS. CARROLL:  Same objections.
 3       THE WITNESS:  No.  I -- I -- I wasn't trying to
 4  lead him on to give him false hopes.  Our other parts
 5  resellers are small companies, and I thought at the
 6  time, that his company had -- it wouldn't be a stretch
 7  to switch to that model.
 8   Q.  BY MR. HANSEN:  Do you know what the economic
 9  impact was going to be with your new model to MITG?
10   A.  No.
11   Q.  Okay.  Go to page HP 237, please.  Okay.  At
12  the very bottom, there is an e-mail from you dated
13  January 6, '04, to Chip Love and Roland Soriano.  Do you
14  see that?
15   A.  Yes.
16   Q.  Okay.  Who is Chip Love?
17   A.  Chip Love is the parts program -- or, I'm
18  sorry -- he was the parts program manager under
19  Randy Wagner, and --
20   Q.  I'm sorry.
21   A.  -- Roland Soriano was the parts business center
22  operations manager under Randy Wagner.
23   Q.  Chip Love is Compaq; correct?
24   A.  No.  He's HP.
25   Q.  Well, let me take that back.  He was Compaq in
                                                         144
```

**Page 145**

```
 1  Houston prior to the merger with HP; is that correct?
 2     A.  That's correct.
 3     Q.  Okay.  So he was a gentleman that --
 4         If I refer to Compaq as red and HP as blue, do
 5  you understand that terminology?
 6     A.  Yes.
 7     Q.  Okay.  That's kind of a differentiation used
 8  after the merger; is that fair?  HP is considered blue,
 9  Compaq is considered red?
10     A.  That was the way that we referred to, yeah,
11  people.
12     Q.  So Chip Love was Houston, which was red, which
13  was Compaq pre and post merger?
14     A.  No.  He was -- post merger, he was purple, and
15  that's the terminology we use because his group includes
16  people here in Roseville, as well as people in -- his
17  group included people all over the country, and the
18  parts business that he was the program manager for
19  included pre merger Compaq parts, pre merger DEC parts,
20  pre merger HP parts.  So he was purple.  We integrated
21  the parts business very quickly to be purple, not red or
22  blue.
23     Q.  Was Houston also Compaq Direct, Chip Love?
24     A.  I don't know.
25     Q.  Were they also -- do you know if Houston was
```

**Page 146**

```
 1  also selling Compaq Direct parts?
 2     A.  Compaq Direct was a part of Compaq pre merger,
 3  and then there were probably employees of Compaq Direct
 4  in a variety -- in a wide range of places, and there may
 5  have been people in Houston.
 6     Q.  Do you know whether or not there was any routing
 7  of calls into any Compaq Direct 800 numbers to Houston,
 8  as opposed to alt MITG?
 9     A.  I don't know, but Houston -- no, I don't know.
10     Q.  Anyway, you asked Mr. Love and Mr. Soriano to
11  review the proposal MITG and Ron Haught had sent to you;
12  correct?
13     A.  Correct.
14     Q.  And then let's go over Mr. Loves's response back
15  to you, which is dated Thursday, January 8th at the top
16  of HP 237.  Do you see where I'm at?
17     A.  Uh-huh.
18     Q.  Okay.  Apparently, Mr. Love, in the first
19  sentence says that he doesn't like the proposal; is that
20  correct?
21     A.  That's correct.
22     Q.  Okay.  And it says, "These guys are talking like
23  they want to be our partner, but in reality, they're
24  just another competitor.  They're (sic) directly
25  services a couple of our largest accounts and want to
```

**Page 147**

```
 1  maintain that relationship."
 2         Did you ever follow up with him to find out what
 3  he was referring to there?
 4     A.  Yeah, I know what he's referring to.
 5     Q.  Okay.  What?
 6     A.  That when the contract ended, they would -- they
 7  would be a -- they would be a parts reseller that could
 8  sell non-genuine parts for Compaq and HP, so parts that
 9  were not -- so in the parts world, there are aftermarket
10  or parts that come from a variety of sources and not
11  genuine parts.  They are not what we offer, and I
12  think his -- what he is saying here is that if they --
13  after the contract ended, and they became a partner, a
14  parts -- in the parts reseller model, there would be a
15  problem, because their business model of selling other
16  things would conflict with our interest of protecting
17  the HP brand and using genuine parts.
18     Q.  Okay.  Well, then he says in the next sentence,
19  "They should be considered as just another broker, parts
20  reseller, and our relationship should be along those
21  lines."
22         Isn't that a problem you would face with any
23  parts reseller, I guess?  Why is he specifically
24  signaling out MITG?
25     A.  Well, I think what he is saying is that -- that
```

**Page 148**

```
 1  we have a -- we have what we call an RFQ, request for
 2  quote, and we have a process for bringing parts
 3  resellers into the authorized parts reseller program,
 4  and he's -- and this proposal, and given the time,
 5  this -- MITG, if they were to become a partner and
 6  then -- and we were to create an agreement by which they
 7  were doing things for HP, would bypass that program.
 8         And he's saying, "Hey, if we want to get into a
 9  relationship like that, to be fair to everybody, we
10  should, you know, put it through the program and go out
11  for bid or talk to other people about providing the same
12  services, so that when we make this contract or procure
13  this service from MITG, we are not violating any laws."
14     Q.  What -- in the next sentence -- the next
15  paragraph says, "Hell, we have numerous APR's, PPA's
16  that would love to get into a relationship like MITG
17  describes."
18         What is APR's and PPA's?
19     A.  Authorized parts reseller is a type of contract
20  that we offer --
21     Q.  Okay.
22     A.  -- to parts resellers.  That then gives them
23  certain privileges in return for them supporting or
24  providing genuine HP parts.  PPA is a parts purchase
25  agreement, and it's another type of contract which
```

## Page 149

1  allows companies to buy parts from HP.
2  Q. Okay. Going to HP 235, apparently Ms. Meyerfeld
3  forwarded on to you someone's request as to what
4  percentages business makeup MITG has. Do you see that?
5  A. Yes.
6  Q. Okay. Apparently, HP was 65 percent of MITG's
7  business?
8  A. Uh-huh.
9  Q. Is that a yes?
10 A. Yes.
11 Q. Okay. "And of that, 52 percent of this is
12 source product."
13    Do you know what that refers to?
14 A. No.
15 Q. Do you know what "6 percent is backorder CSN
16 product" refers to?
17 A. Let me take that back. I think I can make a --
18 I can guess at what they're talking about.
19 Q. I don't want you to guess.
20 A. Okay. Then I don't know.
21 Q. Okay. After having received that, HP was
22 65 percent of MITG's business, what was that -- why was
23 that request made?
24 A. I'm not sure.
25 Q. Okay. Let's go to HP 232 and 233, the top two

## Page 150

1  pages of that exhibit.
2  A. Can I ask, Is this one continuous e-mail, or is
3  this just a --
4  Q. These are the documents that were produced to me
5  by HP, so --
6     MS. CARROLL: Well, I am going to object to the
7  extent that there's a representation that they all came
8  together. I mean, since they were separate pages -- I
9  mean, I will look at it.
10    MR. HANSEN: I mean, they're numbered in
11 consecutive --
12    MS. CARROLL: The fact that they're numbered
13 consecutively, that's how they were in the file.
14    THE WITNESS: Well, I'm missing 236 and 234.
15 Q. BY MR. HANSEN: I am not here telling you
16 they're one continuous e-mail. They are e-mails that I
17 put together that I wanted to discuss with you, so --
18 A. That's fine.
19 Q. HP 232 and 233 --
20    MS. CARROLL: Wait a minute. Before you do
21 that, then, let's get a correction on the record as to
22 exactly which pages are included, because at the
23 beginning, you said Exhibit E was HP 232 to 242, and
24 he's saying he's missing some pages in the middle.
25    THE WITNESS: I don't have 234. I don't have

## Page 151

1  236. I don't have -- yes, I'm sorry. That's it, 234
2  and 246.
3     MR. HANSEN: That's fine. Make the note for the
4  record. I mean --
5     MS. CARROLL: I didn't know if you meant to do
6  it on purpose, or whether it just came out as a mistake.
7  You are missing pages. I just want to make sure the
8  record is clear as to what the exhibit is.
9     MR. HANSEN: Exhibit E contains documents HP 232
10 to 242 without pages 234 and 236.
11    MS. CARROLL: Thank you.
12 Q. BY MR. HANSEN: HP 232, sir, is an e-mail from a
13 group of recipients from Charlie Boyle dated Wednesday,
14 January 14, '04. Do you see that?
15 A. Yes.
16 Q. Okay. You are one of those recipients?
17 A. Yes.
18 Q. It's apparently some notes from a meeting
19 regarding the transition of MITG.
20 A. Yes.
21 Q. And "the MITG transition," does that mean
22 transitioning what MITG had done to internal areas here
23 at HP?
24 A. No. It's transitioning the work that MITG was
25 doing to other -- to make sure that we met our

## Page 152

1  obligations.
2  Q. Okay. Well, I don't see any other contract or
3  other entity identified in 232 or 233. Do you know
4  whether it was transitioned anywhere other than to HP?
5  A. It always -- so the work that MITG did was
6  inside of HP before, and the work that HP -- that -- the
7  work that was transitioned stayed inside of HP.
8  Q. Thank you.
9     Going to page 232, I just want to ask you some
10 questions. It says -- do you see in the middle, kind of
11 under Ebanks, the gentleman's name, it says, "Provide
12 PL91 with business oriented web links to send customers
13 to." Do you see that?
14 A. Yes.
15 Q. Okay. What does PL91 stand for?
16 A. That's the company's designation of the part --
17 of the replacement parts sales product line.
18 Q. Okay. And the next -- underneath that, it says,
19 "Shari/Louise, continue migration of S-Account customers
20 to PL91."
21    Does that mean referring to S-Account -- or,
22 excuse me -- migrating the S-Account customers to the HP
23 company designation for the replacement parts sales
24 line?
25 A. No.