E-FILED
Wednesday, 01 February, 2006 04:40:49 PM
Clerk, U.S. District Court, ILCD

**Page 153**

```
 1   Q.  Okay.  What does that mean?
 2   A.  I believe it meant making sure -- so there
 3   was -- there was overlap.  Companies that -- that had
 4   been Compaq Direct customers also had accounts or
 5   business with other parts of HP.  So a big company like,
 6   you know, State Farm, or something like that, they might
 7   have somebody that purchased parts from Compaq Direct or
 8   HP Direct, as well as, you know, they touched other and
 9   had other accounts.
10        And in this -- in this case, we wanted to make
11   sure that those enterprise customers' named accounts
12   that HP did business with, that were doing business
13   with Compaq Direct, they were buying parts through the
14   Compaq Direct organization, would still be able to buy
15   parts, and the move from one subcontractor to another
16   or -- or -- you know, that would be a transparent item
17   to any customers since, you know, it was just from one
18   place in HP to another.
19   Q.  These enterprise customers that you called
20   them -- let's use that State Farm example -- that bought
21   from Compaq Direct, HP Direct and other areas within
22   HP --
23   A.  No.  Compaq Direct and HP Direct are the same.
24   Q.  Okay.  Fair enough.
25   A.  So they bought from Compaq Direct, as well as
                                                       153
```

**Page 154**

```
 1   they bought from HP product division, they bought from a
 2   variety of resellers.  They bought through several sales
 3   motions that HP has.
 4   Q.  Would they have one contact here at HP to do
 5   that?
 6   A.  In some cases, an enterprise account would have
 7   an account manager, but, say, the account manager who
 8   met with State Farm, he probably was meeting with the
 9   CIO of State Farm, and there are offices all around the
10   country who, if they need things, they buy from -- they
11   can buy.  And so there probably was not a coordination
12   of all accounts of -- that any one company has.
13   Q.  Okay.  But if that company was to buy from
14   Compaq Direct or HP Direct, that order should have been
15   referred to MITG; correct?
16   A.  Correct.  And that continued to happen.  We did
17   not transition these customers prior to the end of the
18   termination.  If they came in and used that account and
19   wanted a part, and they came in through Compaq Direct,
20   they continued to fulfill that.  We just wanted to be
21   ready, that on February 8th when -- when the flip --
22   whether the switch flipped -- when the switch flipped,
23   that we would be able to talk to those big customers and
24   say, "Oh, hello Mr. State Farm.  We recognize you as a
25   long-time customer, and you're able to do business just
                                                       154
```

**Page 155**

```
 1   as you were able to do business with HP prior to --
 2   A.  It was always handled by HP.  The customer
 3   Q.  But all of that was not going to be handled by
 4   HP?  It was not going to be --
 5   A.  It was always handled by HP.  The customer
 6   interaction -- the customer was owned by HP.
 7   Q.  It was not referred out to MITG after
 8   February 8th of '04, or at least it wasn't supposed to;
 9   correct?
10   A.  Correct.  That -- their services were no longer
11   required by HP, so we allowed the contract to expire.
12   Q.  Well, would you agree that their services are
13   needed by HP, because your internal reps are still
14   referring all those accounts and quotes to MITG?
15        MS. CARROLL:  Objection; calls for speculation.
16        THE WITNESS:  I would say no.
17   Q.  BY MR. HANSEN:  Okay.  Then why are your people
18   still referring business to MITG?
19        MS. CARROLL:  Objection; calls for speculation.
20        THE WITNESS:  I don't know.
21   Q.  BY MR. HANSEN:  Is that something you think you
22   ought to look into?
23   A.  It is not something which I am going to look
24   into.
25   Q.  Okay.  So the transition was supposed to be
                                                       155
```

**Page 156**

```
 1   seamless where these Mr. State Farms would still do
 2   business with HP Direct, Compaq Direct, but that would
 3   all be handled internally through the HP infrastructure,
 4   as opposed to being referred to MITG?
 5   A.  It -- it's all HP infrastructure, and there's a
 6   variety of subcontractors that do work on behalf of HP
 7   for call center services, for web services, for
 8   warehousing, for fulfillment, for transportation of
 9   parts and all that.  We wanted it to be a seamless move
10   from the customer's perspective.
11        And even now, if a customer wants a part to
12   support their HP product, and they're able to get it
13   from MITG and they choose to do business with them
14   rather than -- rather than HP directly, or if they
15   choose to do business with one of our parts resellers,
16   I -- I'm not going to step in and try to prevent a
17   customer from making that choice.
18   Q.  Are you aware of calls that have been made to
19   customers telling them not to do business with MITG from
20   HP?
21   A.  No, I'm not.
22   Q.  Okay.  Are you aware that letters were sent out
23   to customers regarding the transition that has been
24   identified in these e-mails?
25   A.  Yes.
                                                       156
```

1    Q.   Okay.  And are you aware that those letters were
2    sent out prior to the agreement coming to a conclusion?
3    A.   Yes.  We were -- we wanted -- yes, I am.
4    Q.   Okay.  And I guess, then, why -- do you have an
5    explanation as to why HP CSRs are still having parts
6    quoted and orders filled by MITG?
7    A.   I think it's that there is -- it's a big
8    organization and perhaps people don't understand.
9    Q.   Did you orchestrate or did this team orchestrate
10   an internal memorandum or document that was sent
11   company-wide informing HP customer service reps that the
12   agreement with MITG had been terminated?
13   A.   There was no memo sent company-wide.
14   Q.   Okay.  So these people at your Indianapolis call
15   center may not have any idea that you terminated the
16   agreement with MITG?
17   A.   That's not correct.
18   Q.   Okay.  How were they informed?
19   A.   So people in the Compaq Direct organization were
20   informed of the change, because Compaq Direct, their
21   vice president, chose to not replace the services that
22   MITG performed inside of Compaq Direct.
23   Q.   Who is that person?
24   A.   Pete Graziano.
25   Q.   Is he the guy that ultimately terminated this

157

1    deal?
2    A.   No.  But he did not replace MITG inside of
3    Compaq Direct, and, therefore, his -- his agents and his
4    customer service reps needed to know what to do in the
5    case that a customer called them asking for parts.  And
6    so the new policy -- the new procedure would be that
7    instead of calling or routing it to -- to MITG, and/or
8    to Compaq Direct Online parts group, the Compaq Direct
9    parts group, they would now route these customers to a
10   different place.  And depending on what it was, it
11   would be -- there was a procedure so that the customers
12   could -- it would be transparent to the customer, and
13   the customer service reps could still do their jobs.
14   Q.   Where were the customer service reps told to
15   route those people?
16   A.   To -- I believe the letter had them send it to
17   the Roseville call center or to the website.
18   Q.   The hp.com website?
19   A.   The hp.com buy parts, yes.  And --
20   Q.   And that was -- was that a written document that
21   was sent out by Mr. Graziano?  Did you ever see that?
22   A.   I saw a letter.  I don't think -- I don't know
23   that it was sent out by Mr. Graziano, but it was a
24   letter sent to all the different folks insides of Compaq
25   Direct explaining to them the change and how they could

158

1    help their customers get the parts that they needed.
2    Q.   Okay.  Did Roseville have the capacity and were
3    they handling call routing for HP Direct prior to
4    February 8 of 2004?
5        MS. CARROLL:  Objection; compound question.
6        THE WITNESS:  No.  We did not handle any of the
7    caller routing as far as I know.  And after the call --
8    after the contract was terminated, the calls that came
9    into Compaq Direct, the option for spare parts was then
10   routed over to the Roseville call center.
11   Q.   BY MR. HANSEN:  Okay.  Do you know if, prior to
12   the agreement ending, if there was any 800 number that
13   did that during the terms of the Standard Support
14   Agreement that routed Compaq Direct calls to Roseville?
15   A.   No.  And we consciously made an effort to ensure
16   that we fulfilled all our terms and agreements, and we
17   did not change any routings prior to the end of the
18   agreement.
19   Q.   Well, that's for the number you know of;
20   correct?  I mean, you already told me there would be
21   other numbers out there that you just don't know of.
22   A.   That's the policy directive, or that's the --
23   that is what we discussed, and that is the way we
24   managed that transition.  I still don't know the
25   800 number for here in Roseville.  I don't know the

159

1    800 number to Compaq Direct, and I barely know my wife's
2    phone number.
3    Q.   Okay.  Going to HP 232, under "Results from
4    prior action items," do you see under Crowley, your name
5    there?
6    A.   Correct.
7    Q.   Okay.  Do you see under "Result," the second
8    sentence says, "The bulk of MITG business is standard
9    HP.  HP believes even the custom deliverables are
10   probably very close to standard and will be easier to
11   implement than MITG portrays."
12       Do you see that?
13   A.   Yes.
14   Q.   Okay.  What is meant by the sentence "The bulk
15   of MITG business is standard HP"?
16   A.   So this was written by Charlie Boyle, and I
17   assumed that what he means is the billing of Compaq
18   Direct parts business as performed by MITG is for HP
19   parts, and that's purple.  At this time it's a purple
20   thing, where he's saying, "These customers are asking
21   for genuine HP parts, whether those be Compaq branded or
22   HP branded or DEC branded," that it's really not --
23   there are not a lot of customers who are asking for
24   multi vendor parts or asking for anything that's really
25   out of the ordinary, which prior to my call with Ron,

160

1   had been, something that -- that we were uncertain of.
2   We didn't know how much customization there was in the
3   sales of parts through this small channel.
4       Q.   Okay.  Then under the next one, it says,
5   "Mr. Ebanks," under "Result," do you see there, "There
6   is not enough business for HP Direct to be interested
7   in"?
8       A.   Yes.
9       Q.   Was there any discussion as to how much business
10  that was dollarwise?
11      A.   Yes.
12      Q.   Okay.  What was it?
13      A.   So Mr. Ebanks is a vice president in HP Direct
14  that is concerned with selling third-party options, so
15  options for Cisco or Sun, things like that, and that
16  amount was -- I don't recall the exact number, but it
17  was certainly less than half a million a year.
18      Q.   Did you differentiate that -- did you
19  differentiate that number from the actual specific just
20  spare parts business that MITG was doing?
21      A.   Yes.
22      Q.   Okay.  Do you know what that number was?
23      A.   The amount of spare parts business that MITG did
24  on behalf of HP or HP Direct was around four and a half
25  million per year.

161

1       Q.   Was that also not enough to be interested in
2   underneath this scenario?
3       A.   That's not the -- that is not what this comment
4   is about.
5       Q.   Okay.
6       A.   That comment is about third-party options.
7       Q.   Okay.  Going, then, to the bottom of 232 up to
8   the top of 233, it says, "As a result, the plan moving
9   forward is to do this on an account-by-account basis as
10  the account calls in.  Customers have to tell us what
11  services they received from MITG."
12           Do you see that?
13      A.   Yes.
14      Q.   Was HP not aware of what services customers were
15  receiving from MITG?
16      A.   Not at a very tactical account level since MITG
17  handled all the operations on behalf of HP, then each
18  account was done differently, and Mr. Haught did not
19  want to provide us with the details of what
20  customizations he was doing.  I mean, he portrayed
21  continually that, "Oh, we do all this special
22  customization, and that's why we're different.  That's
23  why you need us," but he never came across with any
24  details or accounts.
25      Q.   Did you ask?

162

1       A.   Yes, I did.
2       Q.   What did you ask him for?
3       A.   Because I wanted to know -- I wanted to make
4   sure that, No. 1, the customer did not feel any impact
5   of a transition from a subcontractor.  Since this is an
6   HP customer, we were just transitioning it within HP, I
7   wanted to make it transparent to the customer.  And,
8   second, at the time -- I had asked him in earlier
9   conversations so that I could evaluate whether or not
10  MITG was truly providing a value-add that was not able
11  to be replicated in other capabilities or
12  infrastructures that HP currently had.
13      Q.   Well, if you terminated the agreement with the
14  gentleman four months prior, what made you think he was
15  just going to turn over all his accounting info and his
16  customization info to you so HP could use it?
17      A.   That's typically how these go, where a
18  subcontractor would -- would act in good faith.  But in
19  this particular contract, there wasn't any transitional
20  language that would require him to do that.  So when he
21  said he didn't want to do that, I respected that, and I
22  didn't ask him.  We didn't withhold payment or do
23  anything else, because I realized that this contract
24  didn't have transition language that would have him do
25  that.

163

1       Q.   And he was not obligated to do that based on the
2   agreement; correct?
3       A.   That would be a legal --
4       Q.   Well, you just told me there was no transition
5   language in the agreement.
6       A.   That's right.  There's no transition language in
7   the agreement.
8       Q.   So then would you agree that he wasn't obligated
9   to provide you with any of that customization or account
10  info after you terminated him?
11      A.   That's right.  And so once he said he didn't
12  want to provide it, I didn't push it.  And we decided
13  the way to handle it was that when a customer called in,
14  we would deal with it -- deal -- we would solve the
15  problem at the time.
16      Q.   By specifically saying, "Hey, customer, what
17  type of services were you getting from MITG?"
18      A.   No.  We would say -- they would call up HP and
19  say, "Hey, HP, we used to buy parts from you," and they
20  always put our PO number in the corner of our invoice,
21  "and, HP, I am going to buy parts from you again.  Can
22  you make sure my invoice number -- or my PO number is in
23  the corner of the invoice?"  And so at the time we would
24  take the order, we would identify if there were any
25  custom requirements.

164

**[Page 165]**

1    Q.    Okay.  Going down there into the couple

2    sentences down from where we just looked at on the top

3    of the paragraph on 233, do you see the sentence that

4    says, "Customers call into three potential 800 numbers.

5    One is owned by MITG"?

6    A.    Yes.

7    Q.    Okay.  Do you know if those were the three

8    800 numbers for Compaq Direct/HP Direct?

9    A.    I don't know.

10    Q.    Okay.  It says, "As the contract and technology

11    permits, these numbers will be transferred to PL91,"

12    which was the company designation for the replacement

13    parts sales line; is that correct?  That's what you told

14    me earlier.

15    A.    Yeah.  That's the -- he's using the term PL91

16    for the HP customer support parts business.

17    Q.    So these -- were these -- if you know, were

18    these 800 numbers that were for Compaq or HP Direct that

19    were now going to be, as technology and the contract

20    permits, transferred over to PL91 as part of this

21    transition?

22    A.    I am sorry.  What was the question?

23    Q.    Do you know whether or not these three

24    800 numbers, one of which was owned by MITG, were going

25    to be transferred over to PL91 as part of the transition

**[Page 166]**

1    for Compaq Direct or HP Direct customers?

2    A.    Yes.  That's what he's saying, that we want

3    customers who are -- who are calling HP and want to buy

4    parts, that they get to a place where they can buy parts

5    from HP.

6    Q.    Okay.  But -- and what I'm trying to get at,

7    though, is, Do you know if those were three 800 numbers

8    for Compaq Direct and HP Direct customers?

9    A.    I don't know.

10    Q.    Okay.  Let me hand you what's been marked as

11    Defendants' Exhibit F, HP documents 1129, 1130, and

12    1131, ask you to take a look at those.

13          (Defendants' Exhibit F was marked

14          for identification.)

15    Q.    Have you ever seen that document before?

16    A.    Yes.

17    Q.    Okay.  What is it?

18    A.    It's a report of the sales of parts for the

19    United States headquarters parts business PL91.

20    Q.    Okay.  Is that the financial document you

21    referred to earlier that you review as the product line

22    person in charge?

23    A.    No.

24    Q.    Okay.

25    A.    This is a summary.

**[Page 167]**

1    Q.    Okay.  And there appear to be -- well, let me

2    ask -- let me back up.

3          Did you pull these documents for production on

4    this case?

5    A.    I think I put together the spreadsheet.

6    Q.    Okay.  Was it something that was put together

7    specifically for this lawsuit?

8    A.    No.

9    Q.    Is it something that's generated by HP on a

10    monthly basis?

11    A.    I'm sorry.  This spreadsheet was generated for

12    this lawsuit.

13    Q.    Okay.

14    A.    But, yes, these reports are generated monthly.

15    Q.    Okay.  Were the monthly reports produced where

16    this information was retrieved from?

17    A.    I don't know.

18    Q.    Did you construct this spreadsheet for this

19    lawsuit?

20    A.    Yes.

21    Q.    Okay.  Where did you get the information?

22    A.    From the financial reports.

23    Q.    Who provided you those?

24    A.    Darlene Lowe.

25    Q.    Okay.  And you don't know whether those

**[Page 168]**

1    financial documents have been produced that these

2    numbers were taken from?

3    A.    No, I don't know.

4    Q.    Okay.  Let's go over -- well, did you ask --

5          When did you produce -- excuse me.  When did you

6    construct this spreadsheet?

7    A.    I don't remember.  I think it was --

8    Q.    Was it within the last month?

9    A.    August.  Yeah, month of August or so.

10    Q.    Okay.  Now, do you know whether these financials

11    were taken off the daily metrics?

12    A.    I know that they were not.

13    Q.    They were what?

14    A.    They were not.

15    Q.    Okay.  Let's go under quarterly sales data to --

16    you see where I'm at on page 1129?

17    A.    Yes.

18    Q.    Okay.  And there're five parts sales?

19    A.    Correct.

20    Q.    Okay.  Now, I want you to tell me, are those

21    divisions call centers?  What are those that are in the

22    brackets?

23    A.    Those are invoicing systems.

24    Q.    Okay.  So we have Compaq and HP Direct under

25    No. 1; is that correct?

2    Q.    No. 2, we have Compaq and CSN.  Do you see that?

3    A.    I don't see the "and," but I see that.

4    Q.    Okay.  We have Compaq, comma, CSN?

5    A.    Yes.

6    Q.    What does CSN stand for?

7    A.    I believe it's customer support network.

8    Q.    Okay.  Now, we then have -- the third one is

9  Compaq, and then there's a PEPS.  What does that acronym

10 stand for?

11    A.    I don't know.

12    Q.    Okay.  Fourth, we have CPQ, which, again, is

13 Compaq, and it said "US Field."  What does that mean?

14    A.    Those are parts sold through the US Field.

15    Q.    Okay.  And then on the bottom, we have HP,

16 CC/ePDO.  I take it the HP means Hewlett-Packard?

17    A.    Yes.

18    Q.    CC means credit card?

19    A.    No.

20    Q.    What does it mean?

21    A.    Call center.

22    Q.    And then what does back slash ePDO mean?

23    A.    Electronic parts direct ordering, so it's a

24 website.

25    Q.    And what did you say the CC was?  Call center?

                                                            169

1    A.    Uh-huh.

2    Q.    Is that a yes?

3    A.    Yes.

4    Q.    Tell me, under which one of these five does MITG

5  fall?

6    A.    It falls under No. 1, Compaq, HP Direct.

7    Q.    Okay.  Do you know if MITG is also considered

8  under the second, Compaq CSN?

9    A.    They are not considered there.

10    Q.    Okay.  Is there some sort of document that says

11 that?  Or, I mean, how can you definitively state that?

12 I mean, is it --

13    A.    Invoices go out from CSN, and they go to

14 customers who buy parts.  Invoices that MITG was

15 involved with went out through Vista.

16    Q.    Okay.

17    A.    And the ordering systems were very different.

18 The invoicing systems were very different, and,

19 therefore, the financial roll-up rolled up differently.

20    Q.    Okay.  So MITG would be under the first line

21 item for quarterly sales data?

22    A.    Correct.

23    Q.    Okay.  Now, under monthly sales data, would they

24 also only be limited to the first line item there?

25    A.    Correct.

                                                            170

1    Q.    Okay.  And what has happened here, it looks like

2  you pulled the -- and put together the financials for

3  quarters for the year '02, '03 and Quarter 1 of '04; is

4  that correct?

5    A.    That's right.  At the top section is quarterly

6  data, at the bottom section it's monthly data.

7    Q.    And the monthly data was for beginning February

8  of '02, the first month of the Standard Support

9  Agreement?

10    A.    Correct.

11    Q.    Up until February '04, which was the last month

12 of the Standard Support Agreement?

13    A.    Correct.

14    Q.    Okay.  If MITG sold parts through CSN, if

15 they -- if they sold --

16        Well, how do you want to refer to it?  If they

17 sold CSN parts?

18        Okay.  Are you aware that under the agreement,

19 there was a level in which MITG had to procure parts

20 through CSN before they could outsource them?

21    A.    MITG did not sell parts through CSN.  CSN is an

22 ordering system that is used by a variety of customers,

23 and some people order parts from HP -- partners order

24 parts from HP through CSN, and they get their parts, and

25 the invoice goes out through CSN.

                                                            171

1        MITG got parts from CSN -- they ordered -- they

2  ordered parts from CSN.  They billed customers through

3  Vista.  They did not sell any parts through CSN.

4    Q.    Okay.

5    A.    They bought parts.

6    Q.    When they bought parts through CSN, does that

7  referred to this sales information here?

8    A.    I'm sorry.  They did not buy parts from HP.

9  They were part of HP.  They ordered parts to be

10 delivered, and so orders were transmitted through CSN.

11 It was not a financial transaction.

12    Q.    Okay.

13    A.    And so, no.  The -- the sales of parts to

14 customers is not duplicative.  What MITG facilitated on

15 behalf of Compaq Direct is in the first line.  Sales of

16 parts to customers who ordered on the CSN system is on

17 the second line.

18    Q.    Okay.  So even though MITG may have gotten parts

19 through the CSN ordering system, it was not a financial

20 transaction --

21    A.    That's my understanding.

22    Q.    -- between --

23    A.    Yes.

24    Q.    Okay.  Under the parts sales of February '02 for

25 monthly sales data, is the 673,000 number reflected

                                                            172

1    there), is that an entire payment that was made to MITG?
2    Or, excuse me.  Is that an entire monthly sales data of
3    sales generated by MITG?
4        A.    No.
5        Q.    Okay.  Explain to me what it is, what that
6    number reflects.
7        A.    That is the amount of parts sales invoiced
8    through the Compaq Direct system by Compaq Direct parts
9    sales.  I assume that MITG transacted all of those, but
10   MITG may have done other things as well.
11       Q.    Okay.  Do you know if that number reflects parts
12   sales that does not represent all of MITG as far as
13   other vendors, or what have you, from Compaq Direct?
14       A.    Could you repeat that, please?
15       Q.    Let me rephrase it.
16             For instance, if we go back and look at some
17   other data that's been produced in this case, and it
18   doesn't show that MITG generated $673,000 worth of
19   monthly parts sales in February of '02, do you know
20   where the remainder of that difference would have come
21   from?
22       A.    No.
23       Q.    Okay.  So it's your understanding that all of
24   the numbers reflected in the first line under monthly
25   sales data for Compaq and HP Direct would have been

173

1    generated by MITG?
2        A.    No.  That's not my understanding either.
3        Q.    Okay.  Then clarify for me who else could have
4    generated dollars that have been included in that
5    number?
6        A.    So this is a reflection of the invoicing system
7    Vista, and an order -- and this is also revenue, so --
8        Q.    You put together that spreadsheet; right?
9        A.    That's right.
10       Q.    Okay.  Where did you get the 673 that you put
11   under February of '02 for monthly sales data for Compaq
12   and HP Direct?
13       A.    I copied it and pasted it right off of
14   Darlene Lowe's reporting from -- so that's -- this is
15   what the company reported as sales of parts through
16   Vista.
17       Q.    Okay.  Do you know if all those invoices for the
18   Vista system are generated by MITG?
19       A.    No, I don't.  This was pre merger February '02.
20       Q.    Okay.  Let's go post merger.  Skip on over to --
21   in fact, pick a number, December of '02.  Was that post
22   merger?
23       A.    Yes.
24       Q.    Okay.  The 361 there, do you see the number I'm
25   referring to?

174

1        A.    Yes.
2        Q.    Okay.  Was that all invoiced from MITG?
3        A.    I would assume so.
4        Q.    Okay.  I don't want you to assume.  I want to
5    know what you know.
6        A.    I don't know.  I -- I'm not that close to the
7    details of invoicing or even -- yeah.
8        Q.    So did Ms. Lowe just simply provide you that
9    number, and you cut and pasted onto this document?
10       A.    This is the number that was reported as parts
11   sales through Compaq Direct.
12       Q.    Through the Vista invoicing system as of --
13       A.    My understanding is the Vista invoicing system,
14   that's right.  So this is the official number according
15   to HP's financials.
16       Q.    But what I mean to --
17       A.    And I cut and pasted it out of Darlene's
18   spreadsheet to this one.
19       Q.    Okay.  So to construct what's under December '02
20   on HP 1130, you didn't go back and review all the
21   invoices on the Vista system?
22       A.    No.
23       Q.    Okay.  Now, why for November, December, January
24   and February on HP 1131 are there no numbers generated
25   for HP or Compaq Direct?

175

1        A.    November begins HP's fiscal year, and
2    beginning in fiscal year '03, parts sales through
3    PSG were not reported financially under Product Line 91.
4    They were reported up through PSG as PSG revenue.
5        Q.    Is that because the agreement with MITG had been
6    terminated?
7        A.    I think it was -- actually, I don't know.  But
8    there was a financial reporting change at the beginning
9    of the fiscal year.
10       Q.    Okay.  Were the numbers previously contained
11   under Compaq and HP Direct on line one merged into one
12   of these other entities here, the remaining four, or
13   were they reported separately?
14       A.    They were not merged into any of the other
15   lines, and I believe they were reported separately in
16   PSG under Compaq Direct.
17       Q.    Well, did you go and get the PSG numbers to try
18   and find out what they were for the remainder four
19   months?
20       A.    No, I didn't.
21       Q.    Who would have that?  Did somebody get that?
22       A.    I don't know.
23       Q.    Did you ask Ms. Lowe for that?
24       A.    No.
25       Q.    Did she provide that to you?

176

1    A.    -- she is not part of PSG. I wouldn't ask
2    her to do that.
3    Q.    Well, she provided you all the other info;
4    right?
5    A.    She -- I didn't ask her specifically to provide
6    me this. I get this; right?
7    Q.    Okay. So this was something that you had --
8    well, had you saved it somewhere? How did you construct
9    this?
10    A.    Yeah. There's a monthly report of
11    US headquarters financial that looks pretty much --
12        THE COURT REPORTER:    I am sorry. There's a
13    monthly report -- what?
14        THE WITNESS:    Of US headquarters parts sales.
15    Q.    BY MR. HANSEN:    Okay. So this was stuff that
16    was sent to you by Ms. Lowe on a monthly basis dating
17    back to February of '02 that you were able to go back
18    and --
19    A.    No. I did -- I did not go back and take it from
20    20 different reports.
21    Q.    I am not saying you did. I want to know, Did
22    you specifically call up Ms. Lowe in August and say,
23    "Hey, I need all the financials so I can prepare a
24    spreadsheet for this case," or were you able to go back
25    to documents you already had that Ms. Lowe had

                                                                        177

1    previously sent to construct this?
2    A.    The latter.
3    Q.    Okay. And it just so happens that after MITG
4    was terminated in October of '03, the numbers for --
5    what would have been posted on their line were moved
6    over and reported as PSG revenue?
7    A.    That's --
8        MS. CARROLL:    Objection. It's vague and
9    ambiguous, assumes facts not in evidence.
10        Go ahead.
11        THE WITNESS:    We stopped reporting those sales
12    on November 1st.
13    Q.    BY MR. HANSEN:    Okay. Are they still reported
14    as PSG revenue?
15        MS. CARROLL:    Objection; vague.
16        THE WITNESS:    I don't think your question makes
17    sense.
18    Q.    BY MR. HANSEN:    You said those numbers were
19    moved over and started reporting as PSG revenue.
20    A.    PSG did not replace MITG. PSG does not sale
21    parts anymore.
22    Q.    I am not saying they did. Listen to my
23    question.
24        I said you said revenues that was previously
25    reported as Compaq and HP Direct as of fiscal year

                                                                        178

1    November 1 of '03 --
2        Do you see that?
3    A.    Uh-huh.
4    Q.    -- you said that was moved off of the first line
5    and reported as PSG revenue. Do you recall testifying
6    to that?
7    A.    It -- it wasn't -- if I said that, I didn't mean
8    that it was moved anywhere. It's not reported in the
9    Product Line 91 financials. It's reported in the PSG
10    financials, and, therefore, it would not show up under
11    the -- this is the PL91 US headquarters financials. And
12    as of November 1st, the revenue for parts sales through
13    Vista, as facilitated by MITG through Compaq Direct,
14    that revenue was not reported as Product Line 91, and so
15    I -- we didn't move it anywhere. We just didn't report
16    it as a part of the parts sales.
17    Q.    Where did it get reported?
18    A.    I'm not sure, but I believe it's under PSG
19    Compaq Direct.
20    Q.    Is it still there today, to the best of your
21    knowledge?
22        MS. CARROLL:    Objection; vague.
23        THE WITNESS:    It doesn't exist because MITG
24    doesn't sell parts.
25    Q.    BY MR. HANSEN:    Well, does Compaq --

                                                                        179

1    A.    And Compaq Direct doesn't sell parts anymore.
2    So there is no revenue to report for parts sales under
3    Compaq Direct.
4    Q.    Okay. Is it now reported -- well, if somebody
5    calls in for Compaq Direct or HP Direct parts, that's
6    been transitioned over to someplace internally at HP?
7    A.    There's no such thing as a part that's a Compaq
8    Direct part; right? So if a Compaq Direct customer
9    calls into Compaq Direct and wants a part, those sales
10    reps -- because parts is not a commissionable product
11    line. They wrapped them over, and HP, as a company,
12    is able to fulfill that customer's request now, and that
13    is -- that is now reported under some other invoicing
14    system. It would not be invoiced through Vista using
15    the same system that MITG used when it was working on
16    behalf of Compaq Direct.
17    Q.    Is it reported in one of these other four lines
18    here?
19    A.    If a sale is made that would have otherwise gone
20    there, it would be in one of the other lines.
21        MS. CARROLL:    Can we take a break when you get a
22    chance?
23    Q.    BY MR. HANSEN:    Finishing up with -- what is
24    it? -- Exhibit F -- I have got it here -- how, then,
25    were you able to determine quarterly sales data for

                                                                        180

1  Quarter 1 of 2003?

2      A.   Q4, 2003, ended in October, fiscal quarter.

3      Q.   Okay.

4      A.   Q4 is August, September and October.

5      Q.   And that's why you then don't have anything

6  corresponding to Quarter 1, '04, because you stopped

7  reporting it?

8      A.   The company stopped reporting those sales.

9           MR. HANSEN:  Go ahead and take a break.

10          MS. CARROLL:  All right.  Thanks.

11          (Recess taken.)

12     Q.   Let me hand you what has been marked as

13 Exhibit G, and ask you to look over those three pages.

14 Excuse me.  You should have four pages there, HP 1132,

15 1133, 1134 and 1135.

16          Do you have those?

17     A.   Yes, I do.

18          (Defendants' Exhibit G was marked

19          for identification.)

20     Q.   Okay.  Is that a document at the top that's

21 labeled "US Parts Call Volumes"?

22     A.   Yes.

23     Q.   Okay.  I think it's a four-page spreadsheet,

24 that, unfortunately, when you are printing out a

25 document, you can't print it like a spreadsheet.  You

181

1  have got to print it in one page.  Is that fair?

2      A.   Yes.

3      Q.   Okay.  Is that a document you created?

4      A.   Yes.

5      Q.   Okay.  Did you create this around the same time

6  you created Exhibit F?

7      A.   Yes.

8      Q.   Was that sometime in August of '04, as best as

9  you recall?

10     A.   Yes.

11     Q.   Okay.  Just going through the document, we have

12 four -- I don't know.  I will let you describe them.

13 Are those four call centers?  What are those four items

14 on the left-hand side?

15     A.   I would probably call them call queues.

16     Q.   Call queues?

17     A.   With a "Q."  You know, the word queues starting

18 with a Q.

19     Q.   Q-u-e?

20          THE COURT REPORTER:  It's q-u-e-u-e.

21          THE WITNESS:  I know it has a couple of U's in

22 there.

23     Q.   BY MR. HANSEN:  What does that mean, a call

24 queue?

25     A.   It means line -- or, you know, that's a channel

182

1  for calls.  So in some cases, it would be a distinct

2  number or a district call center, and other cases --

3  there's not -- calls don't need to physically route all

4  to the same spot.  The call in a queue can be answered

5  by, you know, an agent.

6      Q.   Okay.  The first line is HP Parts Roseville; is

7  that correct?

8      A.   Correct.

9      Q.   Okay.  Does that encompass all HP parts that are

10 serviced at Roseville?

11     A.   That's people who call the 800 number for HP

12 parts and they want to buy parts.

13     Q.   And that HP -- or that 800 number, is it

14 Roseville, or do you not distinguish that?

15     A.   That 800 number has options at the front, and

16 then we try to stream off calls that are misdirected in

17 the front.  And if they want to -- if you are interested

18 in buying a part, you press option such and such, and it

19 comes into the agents who sit in Roseville for the most

20 part.

21     Q.   Okay.  So in Roseville here, there's a call

22 center that can take those calls for parts?

23     A.   There are agents to take those calls as well,

24 there are other places where they can take the calls as

25 well.

183

1      Q.   What is digital classic Roseville, the next

2  line?

3      A.   So Digital Equipment Corporation, DEC, was a

4  company that was purchased by Compaq, and it refers to

5  parts that go into digital DEC equipment, and that's a

6  distinct phone number and it's a distinct product line

7  that used to be in Andover, and now it's in Roseville.

8      Q.   Andover Massachusetts?

9      A.   Correct.

10     Q.   And it was moved here to Roseville, you said?

11     A.   Yes.

12     Q.   Okay.  Next is SOM/STORM Houston and -- Houston

13 plus Roseville.  What does that mean?  What is -- does

14 that SOM stand for Service Order Management?

15     A.   Yes.  And it changed, so it's the -- they

16 just changed their name.  It's a team of folks who

17 mainly handle partner inquiries on their parts orders

18 whether -- so a partner who utilizes CSN, typically it's

19 an authorized product reseller or a warranty delivery

20 partner, they're able to order parts.  And if it -- if

21 the equipment that they're working on is in warranty,

22 that part ships out and the partner is not charged.

23          If the partner is working on a -- if they are

24 doing a repair on a piece of equipment that's out of

25 warranty, they purchase the part.  So this is -- this is

184

2 the line, where, if a partner has issues about their
3 claim, their warranty claim, their parts order, any of
4 the partner issues, it goes into this queue and it's --
5     Q.   Is it for Compaq and HP?
6     A.   It's all HP, and -- regardless of the type of
7 product, it all -- some of it comes here.  There's folks
8 in Houston.  It can route back and forth, you know,
9 depending on capacity, and it bounces back and forth.
10         THE COURT REPORTER:  It bounces forth?
11         THE WITNESS:  The calls can be routed to either
12 Houston or Roseville, so the calls can bounce back and
13 forth.
14     Q.   BY MR. HANSEN:  Then the last line says, "HP
15 Direct Missouri."  Is that MITG?
16     A.   Correct.
17     Q.   So is this a document that's tracking the call
18 volumes for parts at these various locations?
19     A.   In these various queues, yes.
20     Q.   Okay.  You created the document.  Where did you
21 pull these numbers from?
22     A.   I got it from a summary -- or I got it from a
23 document.  I believe I got it from Richard Chizek or
24 Vickie Ngo, N-g-o.
25     Q.   Okay.  Was this something you had to
26 specifically -- specifically request in August of '04,

185

1 when it was created?  As opposed to the Exhibit F you
2 had talked about, that was information that Darlene Lowe
3 had sent to you?
4     A.   Yes.  I specifically requested this.
5     Q.   Okay.  And they were able to generate --
6 what? -- summaries of the calls, or was it a specific --
7     A.   Well, they have this.  It's just something that
8 I don't typically -- I am not typically too interested
9 in, and they have -- they had this and just sent it over
10 to me.
11     Q.   Okay.  How was -- specific to MITG, the last
12 line, why would -- their parts call volumes, why was
13 there no information from February of '02 up to November
14 of '02?
15         MS. CARROLL:  Objection; calls for speculation.
16         Go ahead.
17         THE WITNESS:  I don't know.  We didn't -- I
18 imagine that she didn't have the data on file.
19     Q.   BY MR. HANSEN:  Okay.  The first data that you
20 were able to pull to create this was from November of
21 '02, the first data you were given?
22     A.   Correct.
23     Q.   Okay.  How -- did you ask or do you know,
24 either/or, how MITG, HP Direct Missouri, the last line,
25 how the parts call volumes were tracked?

186

1     A.   I don't know.
2     Q.   Do you know if they were tracked by adding up
3 the information contained on the daily PBCO metricies?
4     A.   I don't know.
5     Q.   Okay.  Where is Vickie Ngo based out of?
6     A.   Roseville.
7     Q.   Okay.  Same with Mr. Chizek?
8     A.   Yes.
9     Q.   Are the HP Direct -- strike that.
10         Were the HP Direct parts call volumes still
11 tracked as HP Direct up to February '04, even though the
12 revenue wasn't reported as such in Exhibit F?
13     A.   Yes.
14     Q.   Do you know why?
15     A.   No.
16     Q.   Okay.  Let me show you what has been marked as
17 Exhibit H.  These are documents HP 1139 inclusive to
18 HP 1159, and I am going to hand these to you and ask you
19 to take a look at those.
20         (Defendants' Exhibit H was marked
21         for identification.)
22     Q.   These are -- as you are looking through them,
23 I'll tell you, these are business center operations and
24 daily metrics produced by HP in this case.
25         Do you see that?

187

1     A.   Yes.
2     Q.   Okay.  Now, I will represent to you in this
3 production, there is not a continuation of every day.
4 What we have is starting on the front page, HP 1139 and
5 HP 1140.  Those are dated February 5 of '04.  Do you see
6 that?
7     A.   Yes.
8     Q.   Okay.  Now, up at the top, why did
9 Angela Hogate, H-o-g-a-t-e, send this to you on
10 Wednesday, September 1 of 2004?
11     A.   Because I asked people -- when it became clear
12 that PBCO reports themselves, rather than the underlying
13 data, that we wanted to do our best to produce them, and
14 given that there was -- there's no -- nobody keeps
15 those, I was asked by --
16         MS. CARROLL:  Just say what you did.
17         THE WITNESS:  I then asked the folks on the
18 distribution list -- or I asked several folks if they
19 had any old ones on their hard drive to try to just fill
20 in the pieces.  So Angela had -- Angela is the admin for
21 Antonio Lopez, who is on that, and she sent me this one
22 because she just happened to have that date.
23     Q.   BY MR. HANSEN:  Who is -- okay.  Antonio Lopez
24 is what?
25     A.   He's the worldwide parts business manager.  I

188

1 Certified Fast report to ham.

2    Q. Who at the top is Barbara Sain?

3    A. I don't know.

4    Q. Okay.

5      MS. CARROLL: Well, I'll just clarify, when

6 they -- that's an admin in legal who printed these out

7 for me when they were acquired. So all those things

8 with Barbara's name on it, she's the person who was

9 stuck printing this out.

10      MR. HANSEN: Okay.

11    Q. Now, you said these are not kept under any sort

12 of written policy; is that fair?

13    A. Yes.

14    Q. Okay. How, then, do you, "you" being HP and the

15 HP Americas customer support channel and parts business,

16 track or trend handle rate service level and

17 month-to-date sales level?

18    A. They all have underlying -- the information that

19 comes from this is -- comes from underlying data. This

20 provides a management snapshot, and it's meant to be

21 just a daily snapshot of what happened yesterday. And

22 for longer term or more data, we would typically go to

23 the owner of that piece and say, "What's going on?" If

24 we were interested, if that was a relevant question,

25 so --

                          189

1    Q. Okay. Let's go over these a little bit.

2      You're an individual that is sent these. Are

3 you sent these on a daily basis?

4    A. Yes.

5    Q. Okay. So you have seen them before and you're

6 familiar with them?

7    A. Yes.

8    Q. Okay. Let's use HP 1139 and 1140 as an example

9 here. I see under February 5, 2004, we have "Call

10 Center." Do you see that?

11    A. Yes.

12    Q. Okay. So that identifies apparently four call

13 centers under that section; is that true?

14    A. Yes.

15    Q. Okay. US Houston, Texas, is No. 1; is that

16 fair?

17    A. Yes.

18    Q. Okay. What call -- is that a specific call

19 center for Compaq parts, or do you know?

20    A. Service order management.

21    Q. The SOM/STORM we saw before?

22    A. Yes. Partner issues team.

23    Q. Okay. Would you say it's a lot of warranty and

24 CSN stuff?

25    A. Yes. It's -- it's a variety of calls, but it's

                          190

1 partner issues, and it's not necessarily a call center

2 as much as a team.

3    Q. Okay. Then next we have -- well, let's go

4 across Texas there.

5      Next is "Calls Offered." Is that the daily

6 calls that were directed or routed or came through

7 US Houston?

8    A. Yes.

9    Q. Okay. How was that -- is that number sent back

10 to whoever prepares these by the specific call center?

11    A. I don't know.

12    Q. Okay. Next we have "Handle Rate." Do you see

13 that column?

14    A. Yes.

15    Q. It says 75 percent. What -- can you define for

16 me what handle rate is?

17    A. No, not well.

18    Q. Okay. Do you know if that's the percentage of

19 the calls offered that were actually taken?

20    A. That -- that could be correct. I --

21    Q. Okay. You're not sure one way or the other?

22    A. I am not a call center person. So the

23 difference between handle rate and service level, I

24 know that, you know, there're different service levels

25 on how -- whether a call is answered within a specified

                          191

1 time period, and these are specific call center metrics.

2 I am not certain of definitions.

3    Q. Well, service level is actually defined. If you

4 flip over to 1140, call center service level goals,

5 90 percent of the call volume is answered in 180

6 seconds. Do you see that?

7    A. Yes.

8    Q. Okay. So is the goal under service level for

9 each call center to have the call volume, 90 percent or

10 more, answered within three minutes?

11    A. I don't know.

12    Q. Okay.

13    A. I doubt it.

14    Q. Okay. Well, it says under service level for

15 Houston, they are operating at a service level of

16 68 percent on February 5, '04. Do you see that?

17    A. Yes.

18    Q. Do you know what that percentage reflects?

19    A. No, I don't.

20    Q. Okay. How about the next column, MTDS/L, do you

21 know what that refers to?

22    A. That's month-to-date service level.

23    Q. Okay. So as of February 5, '04, does that mean

24 that Houston was operating at a service level of

25 45 percent for the month as of that date?

                          192

**Page 193**

```
 1      A.   Yes.  That's my understanding.
 2      Q.   As the person who is in charge -- or, excuse me.
 3   As the person who oversees the bottom line dollar for
 4   the product there, are you concerned that Houston is
 5   only operating at a 45 percent service level?
 6      A.   No.
 7      Q.   Do you think that affects your customer
 8   satisfaction?
 9      A.   So those calls are -- are partners, and a lot of
10   those issues are not related to parts sales.
11      Q.   Okay.
12      A.   And that call -- that -- the amount of calls
13   there is -- no, that's not what I consider to be a
14   critical measure of the business.  And I also know that
15   there are people taking care of it.  So me, I am not --
16   I don't look at this and decide --
17           I am going to scratch that last comment.  I
18   don't --
19      Q.   You can't just kind of scratch it.
20           MS. CARROLL:  You don't really get to do that.
21           THE WITNESS:  Okay.  I just mumbled on.  But I
22   said, I don't really look at these numbers and decide
23   what I want to get involved with.
24      Q.   BY MR. HANSEN:  Okay.  Next we have US Roseville
25   Call Center.  Do you see that?
                                                         193
```

**Page 194**

```
 1      A.   Yes.
 2      Q.   Apparently, they had 5,045 calls on that day.
 3   Do you see that?
 4      A.   Yes.
 5      Q.   Okay.  Obviously, that's the largest call center
 6   on this metrics?
 7      A.   Correct.
 8      Q.   Okay.  And we have handle rate, which you
 9   already talked about.  Service level you talked about.
10   Now month-to-date service level at 77 percent.
11      A.   Yes.
12      Q.   Would that be something you would deem critical
13   enough to get involved in?
14      A.   No.
15      Q.   Okay.  Is that something that Randy Wagner would
16   comment on?
17      A.   Maybe.  But service level for this customer set,
18   it's -- there's a high goal and a low goal.  The goal is
19   not 100 percent.
20      Q.   That would be perfection, wouldn't it?
21      A.   No.  It means that -- it means that you have a
22   lot of people sitting around waiting to answer every
23   call, and that would be wasteful and a bad use of
24   resources.  So service level for -- depending on what
25   you want to invest in, you know, you pay for a service
                                                         194
```

**Page 195**

```
 1   level for what you can afford and what you want.  Our
 2   target is 90 percent service level answered in three
 3   minutes.  And if it goes too high or too low, then, yes,
 4   Randy or Roland Soriano would get involved.
 5      Q.   But wouldn't you want all of your calls answered
 6   within three minutes?  You said your goal is 90 percent.
 7   But 100 percent would be nice, wouldn't it?
 8      A.   I would think that we would be spending too much
 9   on call center people, and so I would say no.  And I
10   actually set it -- I have set it lower, because that
11   is -- our goal is not 100 percent.
12      Q.   So you would rather have -- so it's your
13   testimony that it's HP's business goal and standard not
14   to have the calls offered taken and a level of
15   100 percent for a service level of 100 percent for these
16   call center operations?
17      A.   Yes.  That's clear.
18      Q.   Because it's your testimony that you would have
19   too many people sitting around waiting for nothing other
20   than to answer phone calls?
21      A.   You make investments on what it costs per sales
22   order dollar.  And for these sales order dollars, we --
23   we set a goal, and these customers, who can call in from
24   anywhere, we choose to not answer them on the second
25   ring.  We choose to have them maybe answer it on the
                                                         195
```

**Page 196**

```
 1   second ring.  But in order to smooth a queue out and go
 2   through the peaks and valleys of the day, and an unknown
 3   amount of call volume, we set service level targets with
 4   the people that we -- we set service level targets and
 5   that helps us control the amount of costs we spend on
 6   taking orders.
 7      Q.   Wouldn't you rather have satisfied customers
 8   than just simply worry about what you're paying people
 9   to sit around and take calls?
10           MS. CARROLL:  I am going to object.  This has
11   nothing to do with this lawsuit.  Customer service
12   levels are not relevant to this lawsuit.  I will give
13   you a little bit more leeway here, but if you continue
14   down this path, I am going to instruct him not to
15   answer.
16      Q.   BY MR. HANSEN:  You can answer the question.
17      A.   Customer service level is only one factor in any
18   business.  Profitable -- profit dollars is another
19   factor in any business.  And revenue is another factor.
20   And those three can work against each other.  To get
21   very high customer satisfaction, if you have to invest
22   too much and pay too much to make that customer
23   satisfied, that you become unprofitable, your business
24   fails.  And so you have a triangle, and in many cases,
25   they pull against each other.  In order to maximize --
                                                         196
```

1  get maximum profit dollars, then you might -- to sell the
2  really expensive stuff, you might choose to not sell the
3  small stuff.  So revenue and profit pull against each
4  other.  Customer service level and profit pull against
5  each other.  Revenue and customer service level can pull
6  against each other.  And that's a fundamental of most
7  businesses.
8      Q.   Would you agree that if you don't have satisfied
9  customers and they go elsewhere, you're going to not
10 have revenue?
11      MS. CARROLL:  Objection; assumes facts not in
12 evidence, calls for speculation, and is irrelevant to
13 matters at issue in this lawsuit.
14      THE WITNESS:  You have got -- you have got to
15 have satisfied customers.
16      Q.   BY MR. HANSEN:  Or otherwise, you may lose
17 revenue and may lose profits which affect the company's
18 bottom line; is that correct?
19      MS. CARROLL:  Calls for speculation.
20      THE WITNESS:  In some cases, yeah.
21      Q.   BY MR. HANSEN:  Okay.  So then let's go to -- so
22 you take issue with -- well, no.  Let me phrase it this
23 way:  Look under Line 3, US Hannibal, Missouri, Call
24 Center.  Calls offered, do you see handle rate service
25 level and month-to-date service level?

197

1      A.   Uh-huh.
2      MS. CARROLL:  Is that yes?
3      Q.   BY MR. HANSEN:  That they are 99, 99 and
4  100 percent?
5      A.   Yes.
6      Q.   So is that a negative, in your mind, that they
7  are operating at 100 percent month-to-date service
8  level, and they have been able to answer 99 percent of
9  the calls within three minutes?
10     A.   I would say they are answering their calls too
11 quickly, yes.
12     Q.   "Too quickly," meaning they are answering it on
13 the first ring instead of the second ring?
14     A.   If -- if the business has the capacity to answer
15 it on the first ring, the business should answer it on
16 the first ring.  But if you've got so much capacity that
17 you're able to answer every -- every call on the first
18 ring, you have got too much capacity, and you have got
19 people sitting around when the calls start to slow down.
20     Q.   Wouldn't that also be derivative of the number
21 of calls you're offered throughout the day?
22     A.   It's derivative of the amount of spikes you have
23 during the day.  So it's not -- if you have an even
24 call -- call flow, then it's easy to plan and it's easy
25 to get to whatever service level you want.  If you have

198

1  a spiky, and it's -- then it's -- then that's what's
2  difficult.  And if you are not able to forecast
3  correctly what your call volume is, that also makes it
4  more difficult to forecast your capacity.
5      Q.   How do you track the spike forecasting agent
6  that you just referred to?
7      A.   I don't track it.
8      Q.   Okay.  Next under "Website," are those websites
9  for part ordering?
10     A.   Correct.
11     Q.   Okay.  Now, it appears the websites are
12 operating at 100 percent availability, except US CSN and
13 all at a month-to-date 100 percent availability;
14 correct?
15     A.   Correct.
16     Q.   Okay.  And then the next line is -- actually,
17 strike that.  I want to move over to --
18      First, I want to clear something up here.  Let
19 me see your exhibit.  I think something got stuck in
20 there inadvertently.  Nope.  It's just mine.  Thanks.
21 Okay.
22      Skip on over to 1142.
23      MS. CARROLL:  What's the date on that?
24      MR. HANSEN:  February 4 of '04.  The date --
25 it's the day prior.

199

1      MS. CARROLL:  Okay.  That's fine.  I just don't
2  have a page number.
3      MR. HANSEN:  Okay.
4      Q.   Can you explain for me why, under the call
5  center, "US Hannibal M" is listed at NS all the way
6  across the board?
7      A.   Not supplied.
8      Q.   Is that your assumption, or do you know?
9      A.   That is my assumption.
10     Q.   Okay.  And then that coordinates to, on the
11 second page, 1143, it says US Hannibal MO not sent by
12 metrics provider.  Do you see that?
13     A.   Yes.
14     Q.   Okay.  If that information had not been sent in,
15 would that be requested or followed up on by someone
16 here that created the metrics, Ms. Darlene Lowe,
17 Vickie Ngo, or whoever, or would it just go unreported
18 for the day?
19     MS. CARROLL:  Objection; calls for speculation.
20     THE WITNESS:  I don't know.
21     Q.   BY MR. HANSEN:  Okay.  Flipping over to 1148,
22 these are the metrics from February -- daily metrics of
23 2/2/04.  Mr. Wagner apparently had a comment in there
24 that, "The call center service levels need improvement."
25 Do you see that?

200

2   Q.   Okay.  I want to ask you, in the middle there,
3   it says, "Please be sure that we're getting the needed
4   traction to return to a green status."
5        What is a green status?
6   A.   These reports are produced in color, and when --
7   when a metric moves -- when a metrics is acceptable,
8   it's green.  When a metrics is less than acceptable,
9   it's -- it can be yellow, and then when it's
10  unacceptable, it's red.
11  Q.   Okay.  And that's what he comments on in the
12  next line; right?  The business cannot sustain a
13  long-term red status?
14  A.   Correct.
15  Q.   Okay.  Do you know what call center he's
16  referring to, if it's one or all of them?
17  A.   I -- yes.  He's commenting on the Houston and
18  Roseville call centers.
19  Q.   Okay.  What is the acceptable levels for a green
20  report; do you know?
21  A.   No.
22  Q.   Do you know how it's determined whether it falls
23  within the red status?
24  A.   I'm not sure what you mean by -- when you say
25  "it."

201

1   Q.   Well, the daily metrics, he says, "The business
2   cannot sustain a long-term red status."
3   A.   I don't know what number is the cutoff for red.
4   Q.   Okay.  Do you know what the cutoff is for green?
5   A.   No.
6   Q.   Okay.  What is that exhibit on that?  Thanks.
7        I am going to hand you what's been marked as
8   Exhibit I.
9        (Defendants' Exhibit I was marked
10       for identification.)
11  Q.   Have you had a chance to look that over?
12  A.   Yes.
13  Q.   Okay.  This is an e-mail on page -- well, let me
14  just -- these are documents HP 1226 and 1227 that were
15  produced yesterday.  Do you see on 1226, the e-mail from
16  M.L. Krakauer to you dated January 23rd of 2004?
17  A.   Yes.
18  Q.   Okay.  Apparently, this was the draft of the
19  letter that Ms. Krakauer had prepared to send to
20  Ron Haught in response to his original escalation that
21  we talked about earlier; is that correct?
22  A.   Yes.
23  Q.   Okay.  And she was asking for your -- you were
24  one individual that she was asking to check the letter
25  for inaccuracies or any suggested additions or changes;

202

1   is that true?
2   A.   Yes.
3   Q.   Okay.  And your response to her is contained in
4   an e-mail above at the top of page 1226; correct?
5   A.   Correct.
6   Q.   Okay.  Now, the letter she sends -- the draft
7   letter she prepared to send to Mr. Haught, in the second
8   paragraph reads, "Please know that MITG's ability to
9   serve our customers has never been in question," period.
10  "Since the merger of HP and Compaq, we have continued to
11  consolidate vendors where we had duplicate
12  infrastructure and capabilities."
13       Is that what that says there in the second
14  sentence in paragraph 2?
15  A.   Yes.
16  Q.   Okay.  It then says, the third sentence there in
17  the area of parts sales, "HP decided not to renew our
18  contract with MITG for exactly these reasons."
19       Do you see that there?
20  A.   Yes.
21  Q.   Okay.  And are those reasons, as you understand
22  them as described in the previous sentence, because HP
23  had the duplicate infrastructure and capabilities for
24  parts sales that MITG was providing?
25  A.   That was one -- that was -- yeah.  That is one

203

1   of the reasons why we didn't renew the contract.
2   Q.   Was it, in your mind, the main reason?
3   A.   It was one of the main reasons.
4   Q.   Were there others?
5   A.   Yes.
6   Q.   What?
7   A.   The contract was unfavorable to HP.  The --
8   Q.   Dollarwise?
9   A.   Profitwise.
10  Q.   Profitwise.  Would you agree with that?
11  A.   Profitwise, it was unfavorable to HP, and
12  liabilitywise it was unfavorable to HP, and the terms
13  and -- there's a lot of things in there that were
14  unfavorable to HP.  That -- and so the -- that was one
15  reason why we didn't renew it was that it was not
16  something that we wanted to move forward with as a
17  contract.  We wanted it to expire.
18       The second reason was that we -- we didn't need
19  the call center provider.  We didn't need more call
20  center capability or website hosting, exactly as M.L.
21  says.
22  Q.   Because that was duplicate of what HP already
23  had in their infrastructure and their capabilities?
24  A.   When HP contracted with MITG, MITG -- their
25  capacity became part of all of HP's capacity.  And so

204

**Page 205**

1 when I say it was duplicate inside of HP, I count MITG
2 as inside HP.  HP as a subcontractor to the customer,
3 they are acting as HP, and MITG is not separate.
4        And the other capabilities and capacities that
5 HP -- and infrastructure that HP has, it also is not
6 necessarily by people who are employees of HP.  It's
7 capacity by which we handle our business when customers
8 want to do business with HP.  And as they were doing
9 with MITG, they were not doing business with MITG.  They
10 were doing business with Compaq Direct or HP Direct.
11        MR. HANSEN:  Well, I will move to strike that as
12 nonresponsive to my question.
13     Q.  My question is, MITG -- the contract was
14 terminated because, A, it was unfavorable to HP
15 profitwise; correct?
16     A.  And liabilitywise and terms, and there was --
17 that was -- that was one of the reasons why it was
18 unfavorable to HP.
19     Q.  And another reason was because HP internally,
20 through their infrastructure and capabilities, could do
21 what MITG was doing without MITG?
22     A.  That is correct.
23     Q.  Okay.  Ms. Krakauer continues on 1226 to say,
24 "We have other capabilities that can handle this work,
25 and the customers you supported will be migrated to

**Page 206**

1 these other supply streams."
2        Do you see that?
3     A.  Yes.
4     Q.  In fact, had HP been transitioning those
5 customers and migrating them to the other supply streams
6 prior to the termination of the MITG agreement?
7     A.  No, not to my knowledge.
8     Q.  Okay.  And then your response to Ms. Krakauer
9 was it's accurate, and you had no suggested changes; is
10 that correct?
11     A.  That's correct.
12     Q.  Okay.  Now, let me hand you Exhibit J, which
13 are, again, documents that were produced to me
14 yesterday, HP 1228, 1229, 1230 and 1231.  Take a moment
15 to look those over.
16        (Defendants' Exhibit J was marked
17         for identification.)
18     Q.  Have you looked them over?
19     A.  Yes, I have.
20     Q.  Okay.  Sorry.
21     Q.  Okay.  This was an e-mail -- let's -- I'm sorry.
22 Page 1228, and, if you would, probably for reference
23 sake, pull back Exhibit I.  Prior to Ms. Krakauer
24 drafting the letter to Mr. Haught contained in
25 Exhibit I, you sent her this e-mail dated January 21 of

**Page 207**

1 '04 enclosing two slides summarizing the issues and
2 recommendations for the escalation letters from
3 Ron Haught, and you also attached the reply that was
4 sent to Mr. Haught from Randy Wagner which is identified
5 as HP 1231.
6        Do you see that?
7     A.  Yes.
8     Q.  Okay.  Is that fair that you sent Ms. Krakauer
9 this e-mail and slides prior to her drafting her
10 response letter -- or draft letter contained in
11 Exhibit I?
12     A.  This e-mail is not to M.L. Krakauer, but I did
13 send her the same things.
14     Q.  Well, if you look at Exhibit J on page 1228,
15 it's from you to M.L. Krakauer.
16     A.  This is -- this is a forward.  It's to
17 Troy Bloomquist and Charlie Boyle.
18     Q.  Look under "Original message."  From
19 Bill Crowley, HP Roseville.  Date --
20     A.  That's right.  And that's what I am saying.  I
21 did send her the same things, yes.
22     Q.  Okay.  And it looks like --
23     A.  I sent her those two attachments.
24     Q.  Right.  And you sent her those two attachments
25 on January 21, 2004?

**Page 208**

1     A.  Correct.
2     Q.  If you look at Exhibit I, her draft letter
3 e-mail was sent to you on January 23 of '04; correct?
4     A.  Correct.
5     Q.  So this information in these slides were sent to
6 her prior to you reviewing the draft in Exhibit I?
7     A.  That's right.
8     Q.  Okay.  Now, the two slides that you sent her,
9 let's go over those.
10        Starting with page 1229, apparently that is
11 titled "Escalation:  MITG, HP Direct Online"; is that
12 correct?
13     A.  Correct.
14     Q.  Okay.  And it says "Issue," then it describes
15 the letters sent by Mr. Haught to Ms. Krakauer,
16 Livermore and Fiorina after being notified of MITG's
17 contract not being renewed.
18     A.  Yes.
19     Q.  Okay.  Then you provided a background and time
20 line as to the issues.  Is that a fair statement?
21     A.  Yes.
22     Q.  Okay.  Why on the bottom of that page does it
23 say September 23, 2004, page 1?
24     A.  I imagine that the template is something I used
25 from another slide set, and I didn't update the date.

1  Q.   Okay.  Was this slide -- this HP 1229, was that
2  the same document that was actually sent to
3  Ms. Krakauer --
4  A.   Yes.
5  Q.   -- from --
6       Okay.  When you pull up that template, does it
7  pull up the current date when you are pulling it up?  Is
8  that what you're telling me?
9  A.   No.  When I -- when I make slides, a lot of
10 times I'll just use a previous slide set that I had
11 made, and typically when you're viewing it on your
12 computer, you don't see the header and footer, and I
13 imagine this date --
14      MS. CARROLL:  This is recent.  This isn't --
15 it's 2004.
16      THE WITNESS:  Right.
17      MS. CARROLL:  Okay.
18      THE WITNESS:  And I -- so I imagine that this
19 footer, the insert was -- as I said, you know, pull up
20 current date rather than it wasn't a hard date that I
21 typed in.
22 Q.   BY MR. HANSEN:  Okay.
23 A.   Just like I didn't type in page 1.  You know,
24 that's part of the footer.
25 Q.   Okay.  Under background and time line on the
                                                      209

1  first bullet point, the last part where it says, through
2  HP Direct open (PSD).  Do you see that?
3  A.   Yes.
4  Q.   What does "PSD" stand for?
5  A.   I meant to indicate PSG.  So PSD is an old
6  organization that was -- that's a mistake.  But it means
7  Personal Systems Division or -- and I should have put
8  Personal Systems Group.
9  Q.   Is that the same PSG we talked about earlier?
10 A.   Yes.  So I'm telling M.L. Krakauer that this --
11 that HP Direct is not part of the services.  It's part
12 of PSG.
13 Q.   Okay.  Page 2, then, 1230, you provided
14 Ms. Krakauer the reasons for termination.  Do you see
15 that?
16 A.   Yes.
17 Q.   Okay.  No. 1, is this ranked in the order of the
18 reasons for termination, or was it nonspecific as to
19 that?
20 A.   Nonspecific.
21 Q.   Okay.  "One, Increase HP profit."  Is that what
22 that says?
23 A.   Yes.
24 Q.   Okay.  Is this part of the information you
25 testified to earlier where you testified that the
                                                      210

1  decision was made that the contract was unfavorable to
2  HP?
3  A.   Yes.  It's similar.  I mean, that was -- my
4  conclusion is that it was unfavorably -- it was
5  unfavorable to HP.
6  Q.   Because why?
7  A.   Because HP, for each dollar of revenue that was
8  sold by MITG, our costs to support that revenue was too
9  high.
10 Q.   Okay.  Was there also a discussion about the
11 fact that MITG was getting 75 percent of the remaining
12 profit as to HP's 25 percent, as indicated in sentence
13 one there?
14 A.   That's part of the costs of supporting that
15 revenue --
16 Q.   Okay.
17 A.   -- correct.
18 Q.   "No. 2, Merger value capture," that MITG parts
19 procurement, parts logistics, call center, and websites
20 are redundant infrastructure.
21      Is that what we talked about earlier, the
22 redundancy as to what HP had the capability of doing
23 internally within its other groups?
24 A.   HP was paying MITG for this capability.  HP was
25 paying others -- or was paying others.  And with the
                                                      211

1  merger, you know, we want to make sure we eliminate
2  duplicate infrastructure similar -- where we have got
3  duplicate infrastructure, yes.
4  Q.   Okay.  And I just want to be clear.  It wasn't
5  duplicity as far as HP was using MITG and another
6  company similar to MITG.  It was HP could do what MITG
7  was doing?
8  A.   No.  That's not right.  So HP -- MITG was --
9  was -- was not an arm's length.  MITG was acting as a
10 subcontractor on behalf of HP, and so HP had hired MITG
11 for these services.  HP had also hired other people for
12 the same services and was paying for other services.
13      It's not that MITG was outside the wall.  They
14 were inside the wall.  HP was paying them and HP was
15 paying two or three people for capacity and
16 infrastructure, when we only needed, you know, a little
17 bit.  We didn't need all of that.  It was duplicative.
18 We were paying too much.
19 Q.   How many people like MITG is HP under contract
20 now to do that type of work?
21 A.   I don't know.
22 Q.   Are you aware of any?
23 A.   Yes.
24 Q.   Okay.  You just don't know how many?
25 A.   I don't know.  I know we have a lot of call
                                                      212

3:04-cv-03055-JES-CHE # 73-6 Page 16 of 19

**Page 213**

```
2    Q.   That are providing spare parts and replacement
3  parts like MITG did?
4    A.   We have call center providers that provide some
5  of the same services.
6    Q.   And then why is -- No. 3, it says "Redacted,
7  attorney-client privilege."
8         MS. CARROLL:  I am going to instruct him not to
9  answer any questions on the content of that.
10        MR. HANSEN:  Well, I am going to go into it,
11  because I may have to certify the question.
12    Q.   Okay.  This document was sent on January 21 of
13  2004 by you to Ms. Krakauer; is that correct?
14    A.   Correct.
15    Q.   Okay.  And who is cc'd on there?  It says
16  Dennis Cain.  Who is that individual?
17    A.   He's -- he reports to M.L. Krakauer as the head
18  of supply chain.
19    Q.   Okay.  And then Randy Wagner, we already talked
20  about who he is; correct?
21    A.   Yes.
22    Q.   Now, did you create the slides that were sent on
23  to Ms. Krakauer?
24    A.   Yes.
25    Q.   Okay.  Did you create them by yourself?
                                              213
```

**Page 214**

```
1    A.   Yes.
2    Q.   Okay.  And at this point in time, were you even
3  aware that there was a lawsuit ongoing between HP and
4  MITG, if, in fact, it had been filed as of that date?
5    A.   No.
6    Q.   Okay.  And, in fact, the lawsuit wasn't filed
7  until February 27 of 2004.  Are you aware of that?
8    A.   Yes.
9    Q.   Okay.  So that's after -- well, at least a month
10  after your e-mail to Ms. Krakauer; correct?
11    A.   Yes.
12    Q.   Okay.  And you didn't forward this to any
13  attorney on January 21st of '04 within HP; correct?
14    A.   Correct.
15    Q.   And you didn't forward it to any outside
16  attorney with Thompson & Knight, who Ms. Carroll is
17  with; correct?
18    A.   Correct.
19    Q.   Okay.  And you didn't use them or incorporate
20  any of their input as to the slides you prepared for
21  Ms. Krakauer?
22        MS. CARROLL:  Objection; assumes facts not in
23  evidence.
24    Q.   BY MR. HANSEN:  Correct?  You can answer.
25    A.   No, that's not correct.
                                              214
```

**Page 215**

```
1    Q.   You just told me you prepared the sheets that
2  went to Ms. Krakauer.
3    A.   I understood the question to be input from legal
4  to prepare the slides.
5    Q.   Okay.  Who from -- well, are you telling me that
6  someone from legal helped you prepare HP 1229 and 1230?
7    A.   Nobody sat by my side as I put the words onto
8  the text.
9    Q.   Okay.  And did you redact No. 3 prior to
10  producing this document, you, yourself?
11        MS. CARROLL:  I am going to object.
12        Let me just clarify this.  What has been
13  redacted is redacted by me on an attorney-client
14  privilege basis.  It was not done in conjunction with
15  Mr. Crowley, but I will tell you just -- and you can ask
16  him whatever you want.  It says, "I talked to legal and
17  legal said:" and then there's advice directly from HP
18  legal that was contained in No. 3.  If you want to see
19  the beginning of the thing that says "I talked to legal
20  and legal said:" I will produce that much to you.  But
21  what is contained in there is a statement by legal in
22  response to questions about -- that Mr. Crowley asked.
23    Q.   BY MR. HANSEN:  Mr. Crowley, I am going to ask
24  you, as far as No. 3, is what Ms. Carroll just indicated
25  a fair statement as to what is contained within the
                                              215
```

**Page 216**

```
1  redacted portion of No. 3 -- partly within the redacted
2  portion of No. 3?
3    A.   Yes.  I quoted some --
4    Q.   Did you quote advise you received -- I don't
5  know want to know what the advice is.  My question is,
6  Did you quote advice you had received or your team had
7  received from the HP legal department in the information
8  that was listed in No. 3 as for a reason for
9  termination?
10    A.   I didn't follow the question.
11    Q.   Did you quote advice you had received from HP
12  legal under No. 3, "Reasons for Termination" in this
13  slide?
14    A.   Yes.
15    Q.   Okay.  Now, the recommendations, then, were
16  pretty much to simply allow Mr. Wagner's response to
17  stand, and do not communicate with Mr. Haught or MITG
18  outside of daily business transactions.  Is that what it
19  says there?
20    A.   Yes.
21    Q.   Okay.  I am going to hand you what will be
22  marked as Exhibit K.
23        (Defendants' Exhibit K was marked
24         for identification.)
25    Q.   Again, this is a document produced yesterday by
                                              216
```

**Page 217**

1    the page, stamped HP 1261. I am going to ask that you
2    take a look at that.
3    A.   Okay.
4    Q.   What -- is this a summary of a teleconference,
5    or what is this document describing?
6    A.   No.  It looks like an invitation to a
7    teleconference, and it has some comments below.  It's
8    information on the subject of the teleconference.
9    Q.   Okay.  Subject is listed as HP Direct 800 number
10   disposition at the top.  Do you see that?
11   A.   Yes.
12   Q.   Okay.  And then under "Start and End," is that
13   the proposed date for the tentative teleconference?
14   A.   Yes.
15   Q.   And the time?
16   A.   Yes.
17   Q.   And then there's a couple -- three required
18   attendees and a few optional attendees.  Do you see
19   that?
20   A.   Yes.
21   Q.   Okay.  And it discusses what -- under
22   "Background," it says, "The one recently discovered item
23   remaining on the HP Direct to HP transition is the
24   800 number used by IPR, MITG, et cetera."
25        Can you tell me, if you know, what does IPR

**Page 218**

1    stand for?
2    A.   No.
3    Q.   Do you know if the 800 number that is listed
4    there under "Background," it says 1-800-848-9771.  Do
5    you know if that was the 800 number that was in use by
6    Compaq Direct/HP Direct to route callers to MITG?
7    A.   I don't know what it is.
8    Q.   Okay.  It then says -- there're apparently six
9    options that a caller will receive upon dialing that
10   number.  Do you see that there?
11   A.   Yes.
12   Q.   Okay.  Option 1 says, "Routes to IPR."  You
13   don't know what IPR is?
14   A.   No.
15   Q.   Okay.  "2, routes to Roseville consumer line."
16   Do you see that?
17   A.   Yes.
18   Q.   "3, routes to Roseville established accounts."
19   Do you see that?
20   A.   Yes.
21   Q.   "4, routes to IPR," which is a different number
22   than the Option 1 routing to IPR.  Do you see that?
23   A.   Yes.
24   Q.   Okay.  "Option 5, routes to Roseville," and
25   Option 6 apparently is being removed March 8 of '04.

**Page 219**

1    Q.   My question is, What -- under that 800 number
2    line, it says it was used by MITG.  What option, if you
3    know, routed callers to MITG?
4    A.   I don't know.
5    Q.   Okay.  Do you know if those options that are
6    listed for that 800 number were the same as they are
7    typed here for this proposed teleconference as they were
8    during the terms of the Standard Support Agreement?
9    A.   I don't know.
10   Q.   Okay.  And I see the proposed start and end date
11   for the teleconference, but do you have any idea or can
12   you tell me the date in which this was sent out inviting
13   you to attend?
14   A.   I don't know.
15   Q.   Okay.  Is that normally listed on the document,
16   or do you not know one way or the other?
17   A.   Usually you would see who it's from.  I don't
18   even see who it's from.
19   Q.   Okay.  That was my next question.  Who sent this
20   to you?
21   A.   I don't know.
22   Q.   Of the individuals listed on the potential
23   attendees required in "Optional," is there one of them
24   that comes to mind besides yourself who could provide
25   details as far as that 800 number and whether that was

**Page 220**

1    the one in place for MITG, and what the options were and
2    the routes?
3         MS. CARROLL:  Objection; calls for speculation.
4         THE WITNESS:  No, I don't know.
5         MR. HANSEN:  Let's go off.
6         (Recess taken.)
7         MR. HANSEN:  Okay.  Back on.
8    Q.   A little left, and they we can wrap this up.
9         I want to go back to some testimony you gave
10   prior to the lunch break where you said, prior to making
11   the decision to terminate MITG, you were involved with
12   various individuals on some conversations as far as the
13   aspect of parts sales that included Troy Bloomquist,
14   Louise Meyerfeld and Randy Wagner.  Do you recall that
15   testimony?
16   A.   (No audible response.)
17   Q.   That a yes?
18   A.   Yes.
19   Q.   Okay.
20   A.   Sorry.
21   Q.   Now, do you recall -- let me ask it in a broad
22   sense, and then we will narrow it down.
23        Was this a conference call with everybody, or
24   was it individual conversations?
25   A.   On the subject of MITG, I had a variety of

3:04-cv-03055-JES-CHE   # 73-6     Page 18 of 19

1  conversations with different people, and I -- I don't
2  think -- I'm not sure that I recall the context of the
3  conversation -- or the context of the question about
4  when I had these conversations, but I don't imagine
5  there was a specific MITG conference call prior to these
6  different escalations.
7     Q.  Well, how about after the escalations, do you
8  recall participating in any conference calls with
9  Troy Bloomquist, Louise Meyerfeld, Randy Wagner, other
10 individuals identified in that team responding, to
11 discuss specifically MITG?
12    A.  Well, yes.  There were meetings after the
13 escalation, including with M.L. Krakauer.  The slides
14 were a preparation for a teleconference that included
15 Randy Wagner, Troy Bloomquist, Dennis Cain and myself.
16    Q.  Well, what I'm referring to is take a look at
17 Exhibit E.  Hold on a second.  Let me make sure I get
18 this right.  Yes, Exhibit E.
19      And if you go back to 241 and 242, the last two
20 documents, your e-mail dated October 13 of '03, to
21 various individuals there.  Do you see that?
22    A.  Yes.  Yes.
23    Q.  Okay.  Around that time frame, do you recall
24 participating in conference calls regarding specifically
25 MITG and the decision, as you reference in 241, not to

1  renew their contract?
2     A.  Yes.  This was the notes from a meeting about
3  MITG.
4     Q.  Okay.  Do you recall discussing or anyone making
5  any comments that they think it was a good idea to keep
6  the MITG program going and not to terminate it?
7     A.  Yes.  We had different folks who -- including
8  myself.  I mean, I understood that, you know, there
9  were -- there were advantages where the customers were
10 happy who -- and Shari Ellis talked about the advantages
11 that they provided.  I believe, you know, Kristen
12 talked about the -- the role as a supplier that they
13 fulfilled.  So we -- we weighed -- and, you know, so
14 everybody was really weighing the positives and
15 negatives of, well, MITG as a partner, as well as the
16 contract itself.
17    Q.  Okay.  And I didn't see on those e-mails that
18 Mr. Bloomquist was part of that.  But did anyone ask for
19 his opinion, since he was the guy who signed the
20 agreement on behalf of Compaq Direct?
21    A.  At this time, he was in a different role, and
22 so, no.  I think I continued to talk with him every now
23 and then, but he wasn't part of the decision about
24 whether to renew the contract or whether to try to
25 continue on with MITG, because he was doing a completely

1  different job.
2     Q.  Okay.  Was it ever decided that -- I mean, was
3  there ever a change of opinion that it was decided, yes,
4  this should go forward, and then later it was decided
5  no, we should not?  The MITG deal is what I am talking
6  about.
7     A.  So there was the decision about the contract
8  and -- but all the recommendations were that the
9  contract should -- should expire.
10    Q.  Due to the reasons you --
11    A.  Yeah.  And that's what this meeting was about
12 also.  At least one aspect.
13      If you see there're four aspects, so there's --
14 there's the contract, and that decision to have the
15 contract expire, no, I don't think that was ever
16 reversed or was -- we never really went back.  And then
17 Issue D, which is, Do we move forward with MITG?  That
18 was back and forth quite a bit.  And that's when -- even
19 after the -- you know, after we decided that the
20 contract would expire, I agreed with Mr. Haught we
21 should talk weekly, try to figure it out, and see if we
22 could make a new agreement.
23      So the issue of whether MITG was a good partner,
24 there was never a decision on that --
25    Q.  Okay.

1     A.  -- that we wanted to terminate all things with
2  MITG.
3     Q.  Regardless, whatever went forward with MITG
4  after February 7 of '04, was going to be done in a
5  different manner than the agreement we've seen as
6  Exhibit A?
7     A.  It wouldn't -- we were not going to renew the
8  contract in Exhibit A.
9     Q.  Let me show you what has been marked as
10 Exhibit L, and it's a document HP produced, 1102, and I
11 will tell you, this is the way it was produced, and this
12 is the way I had to print it out, and it's -- dang near
13 you need a magnifying glass to read it.
14      MS. CARROLL:  Can you see this one a little
15 better?  Because I printed it out, and I looked at it
16 the other day, and I was, like, "You've got to be
17 kidding me," because that's what it looks like.
18      MR. HANSEN:  I will hold onto Exhibit L, and
19 we'll attach it.
20    Q.  But what you have here in front of you is a
21 better copy that you can read.
22    A.  Okay.
23    Q.  All right.
24      MR. HANSEN:  And we'll just make a note of that,
25 but Exhibit L will be attached.

**Page 225**

```
 1           (Defendants' Exhibit L was marked
 2           for identification.)
 3    Q.   Have you ever seen this document before?
 4    A.   I -- I have not seen this document.
 5    Q.   Okay.  You may have just answered my question.
 6  I guess, then, can you tell me at all any information
 7  you have as far as --
 8         Do you see up at the top, it says, "HPS Spares
 9  Business Summary"?  Is that what that says?
10    A.   That's what it says.
11    Q.   Okay.  And then underneath it, it looks like
12  it's divided into two groups.  There's "CEI support
13  services/multi vendor parts."
14         Do you see that?
15    A.   Yes, I do.
16    Q.   And then underneath that, the next underlined
17  group, it says, "Compaq spare parts."  Do you see that?
18    A.   Yes, I do.
19    Q.   Okay.  Then there's apparently net revenue costs
20  of goods sold.
21         Do you have any information as to how these
22  numbers were put together or where they came from?
23    A.   No.
24    Q.   Okay.
25         MR. HANSEN:  That's all I have.
```

**Page 226**

```
 1         MS. CARROLL:  We'll reserve questions until time
 2  of trial.
 3         MR. HANSEN:  Hold on a second.
 4         THE COURT REPORTER:  I'm sorry.  What did you
 5  say?
 6         MS. CARROLL:  Oh, sorry.  In Texas, you have to
 7  reserve your questions until the time of trial.
 8         MR. HANSEN:  No.
 9         MS. CARROLL:  Well, it doesn't matter.  In Texas
10  state in federal court, you have to reserve your
11  questions until the time of trial, which means I am not
12  asking any questions.
13         MR. HANSEN:  That --
14         MS. CARROLL:  It's unnecessary in your
15  jurisdiction.
16         MR. HANSEN:  Yeah.  You don't have to do that in
17  our jurisdiction.  But what you need to do is you need
18  to indicate if you are reserving signature or if he's
19  waiving.
20         MS. CARROLL:  We're reserving signature.
21         MR. HANSEN:  Okay.  Then you send the
22  original --
23         MS. CARROLL:  She's sending it to me, and I will
24  get it back -- and I will get it to him to get it back
25  or -- she and I talked about that a while ago.
```

**Page 227**

```
 1         MR. HANSEN:  Okay.  Now, as far as the
 2  deposition exhibits go --
 3         We're off the record now.  Let's go off.
 4         (Whereupon, the deposition
 5          adjourned at 4:00 p.m.)
 6
 7         ---oOo---
```

**Page 228**

```
DEPONENT'S SIGNATURE AND CORRECTIONS PAGE
Deponent:  WILLIAM CROWLEY
Case Title:  Hewlett-Packard Development Company,
             L.P., et al., v. Midwest Information
             Technology Group, Inc.
Date of Deposition:  Tuesday, September 28, 2004
    I, WILLIAM CROWLEY, have read my deposition and
state that there are:
  (Check One) _____  no corrections
              _____  corrections as noted below
Signed under penalty of perjury:
 _____      _____
 (Date)               (Signature)
Page    Line          Change/Add/Delete
(If you need more space, please use reverse side.)
```