Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
 2                  SPRINGFIELD DIVISION

 3   HEWLETT-PACKARD              ) CIVIL ACTION NO.
     DEVELOPMENT COMPANY, L.P.,   )    04-3055
 4   HEWLETT-PACKARD COMPANY,     )
     AND COMPAQ TRADEMARK B.V.,   )
 5                                )
              PLAINTIFFS,         )
 6                                )
     VS.                          )
 7                                )
     MIDWEST INFORMATION          )
 8   TECHNOLOGY GROUP, INC.,      )
     AND MICHAEL LAUBER,          )
 9                                )
              DEFENDANTS.         )
10   -----------------------------

11         VIDEOTAPED AND VIDEOCONFERENCED
                    DEPOSITION OF
12                  JOHN K. BREWER

13            TAKEN ON BEHALF OF
                    PLAINTIFFS
14

15       VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION

16   OF JOHN K. BREWER, taken before Cynthia Craig,

17   General Notary Public within and for the State of

18   Nebraska, beginning at 11:00 a.m., on May 13, 2005,

19   at the Offices of FedEx Kinko's, 7110 Dodge Street,

20   Omaha, Nebraska.

21

22

23

24

25
```

Page 2

```
 1       A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
    MS. ELIZANN CARROLL
 3  THOMPSON & KNIGHT, LLP
    1700 Pacific Avenue, Suite 3300
 4  Dallas, Texas 75201
    (214) 969-1700 FAX 969-1751
 5
    FOR THE DEFENDANTS:
 6  MR. JAMES A. HANSEN
    SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
 7  525 Jersey
    P.O. Box 1069
 8  Quincy, Illinois 62306
    (217) 223-3030 FAX 223-1005
 9
    ALSO PRESENT:
10  Mr. Chris DeVaughn, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2  CASE CAPTION ..................... Page  1
    APPEARANCES ...................... Page  2
 3  INDEX ............................ Page  3
    TESTIMONY ........................ Page  4
 4  REPORTER CERTIFICATE ............. Page 29
    COST CERTIFICATE ................. Page 30
 5  READ & SIGN LETTER ............... Page 31
    ERRATA SHEET ..................... Page 32
 6
    DIRECT EXAMINATION:
 7     By Ms. Carroll................. Page  4
 8  CROSS-EXAMINATION:
       By Mr. Hansen.................. Page 20
 9
    REDIRECT EXAMINATION:
10     By Ms. Carroll................. Page 22
11  RECROSS-EXAMINATION:
       By Mr. Hansen.................. Page 26
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         (Whereupon, the following proceedings were had,
 2  to-wit:)
 3         COURT REPORTER: Are there any
 4  stipulations?
 5         MS. CARROLL: No.
 6         VIDEOGRAPHER: Counsel, we are on the
 7  record.
 8             JOHN K. BREWER,
 9       having been first duly sworn,
10     was examined and testified as follows:
11         DIRECT EXAMINATION
12  BY MR. HANSEN:
13     Q. Can you please state your name.
14     A. John Brewer.
15     Q. Can you please state your name -- oops.
16         Mr. Brewer, have you had your deposition
17  taken before?
18     A. No, I haven't.
19     Q. Okay. Let me go over just a couple of
20  things for you to try to make this process as easy
21  as possible.
22         First, it's a little different because the
23  two lawyers and yourself are all in different
24  cities; you are there in Omaha with the court
25  reporter and videographer. Everything that you or I
```

Page 5

```
 1  or Mr. Hansen says while we're on the record is
 2  going to be taken down by the court reporter, and
 3  we'll be able to use that testimony and the video
 4  that's being taken of your testimony in a court,
 5  just so -- so this proceeding is just as though you
 6  were in front of a judge and jury, okay?
 7     A. Yep.
 8     Q. All right. If you can do what you just
 9  did, which is be sure to answer out loud, even
10  though it's on the video, we need to get a written
11  answer down on the transcript that the court
12  reporter is taking, so if you can be sure to answer
13  out loud so Cindy can get your testimony down that
14  would be helpful, okay?
15     A. Okay, understood.
16     Q. Finally if you can -- we got a little bit
17  of time lag I think in between when we're talking,
18  if you can try to be sure to let me finish my
19  question before you begin your answer and I'll try
20  to make sure that you finish your answer before I
21  start talking, that way only one of us is talking at
22  a time. It'll make the court reporter's job easier
23  and make our record clearer, okay?
24     A. Okay.
25     Q. And finally, if you don't understand one
```

THOMAS & THOMAS COURT REPORTERS & CERTIFIED LEGAL VIDEO, LLC
(402) 556-5000   (402) 556-2037

J. BREWER - Direct (By MS. CARROLL)

Page 6

1  of my questions please just ask me to rephrase it or
2  restate it or tell me you don't understanding it and
3  I'll try again, okay?
4     A.  Yes.
5     Q.  What is the name of the company for which
6  you now work?
7     A.  I work for eData Enterprises.
8     Q.  And what does eData Enterprises do?
9     A.  We do consulting, various types of
10 consulting from programming, things like that, of
11 that nature, hosting of web sites and things like
12 that.
13    Q.  All right.  And how long have you been at
14 eData Enterprises?
15    A.  The company's name has changed, but since
16 1999 I've been an employee or owner of either
17 EZ Solutions or eData Enterprises, which is what it
18 is called now, so --
19    Q.  Okay.  Are you currently one of the owners
20 or the owner of eData Enterprises?
21    A.  Yes, I am.
22    Q.  What did you do -- and I want to try to
23 focus on computer programming jobs that you may have
24 had before you started at eData in 1999?
25    A.  Various things.  I mostly was an employee

Page 7

1  at American Business Information, which is now
2  called InfoUSA; I did several things from
3  DOS application development for libraries, CD-ROM
4  type products, window applications, data delivery,
5  data compression, those types of projects for them.
6        After I left InfoUSA I went into
7  consulting and I did various jobs, application
8  development, web development, database development
9  for various clients.  We've --
10    Q.  Does that include or have you ever worked
11 for a company called Inacom?
12    A.  Yes -- well, I didn't work for Inacom.  I
13 was employed by Beacon Information Technologies as a
14 consultant, and I was subcontracted through
15 Alan Durr & Associates as a consultant in about
16 March or April of '99 through the end of '99.
17    Q.  Okay.  And what did you -- what kind of
18 work were you doing as -- when you were doing this
19 contract work for Inacom?
20    A.  Web application development.
21    Q.  And did you become familiar with a system
22 called VISTA when you were doing work at Inacom?
23    A.  Yes, I did.
24    Q.  Okay.  Just tell me -- tell us briefly
25 what is VISTA?

Page 8

1     A.  I'll tell you the best that I can remember
2  it, but VISTA to me was an ordering and billing
3  system which handled all the order and processing
4  for the orders of the projects that I was working on
5  and several projects for Inacom.
6     Q.  And did the work that you were doing as
7  contract programmer for Inacom involve applications
8  in VISTA?
9     A.  No, it was web only, Microsoft ASP and a
10 little bit of Sequel Server, but not VISTA.
11    Q.  At some point eData Enterprises was hired
12 by MITG to do a project; is that correct?
13    A.  Can you repeat that?
14    Q.  Sure, certainly.
15        Was eData Enterprises hired by a company
16 called MITG to do a programming project for it?
17    A.  Yes.
18    Q.  Okay.  Do you recall when that was?
19    A.  That would have been around that same time
20 frame we did -- that we did this work in question, I
21 think around the middle of 2001, late spring, summer
22 2001.
23    Q.  And what -- okay.
24        And what was it that eData Enterprises was
25 hired to do?

Page 9

1     A.  We did some web application development in
2  their current projects, as well as implemented
3  communications via XML with Inacom to place orders
4  into the VISTA system.
5     Q.  And how did you come to know the people at
6  MITG?
7     A.  Originally we met them through a company
8  called IP Revolution.
9     Q.  Okay.  And what kind -- you said you did
10 some web application development; what -- can you
11 tell me a little bit about what that project or --
12    A.  Well, it was -- it was actually -- it was
13 their ordering system, their -- we went in and we
14 fixed their whole things and we made some
15 enhancements to the processes that were there for --
16 for their operations and for their operators to
17 handle the ordering processing of the parts.
18    Q.  And these are spare parts for computers,
19 correct?
20    A.  Yes.
21    Q.  When you said parts -- okay.
22        And you also helped them implement a data
23 transmission -- can you -- what was the other
24 description of the other piece of work you did for
25 them?

J. BREWER - Direct (By MS. CARROLL)

Page 10

1    A.  We communicated via XML documents with
2  Inacom to place orders into the VISTA system.
3    Q.  Were you aware by that time that Inacom
4  had been acquired by Compaq?
5    A.  Yes.
6    Q.  And who participate -- I want to focus on
7  this second part where you're communicating with the
8  VISTA system throughout XML for the rest of the
9  deposition, if you don't mind?
10   A.  Okay.
11   Q.  Who participated in that development from
12 eData Enterprises in addition to yourself, anyone?
13   A.  No, it was me by myself.
14   Q.  Okay.  And how about who were you working
15 with from MITG?
16   A.  I worked with -- oh, man, well, Mike
17 Lauber primarily and Ron Haught.
18   Q.  And what about from Inacom or Compaq, who
19 were you dealing with on their side?
20   A.  I'm having a hard time remembering one of
21 the gal's name, but Deb Broady was the one I worked
22 with for the most part in implementing this.  She
23 was the one that I was in the most contact with, and
24 then the project manager, I can't remember her name,
25 she was the other person.

Page 11

1    Q.  Sandy Urwin?
2    A.  No, she wasn't the project manager, but I
3  did deal with her a little bit on some conference
4  calls.
5    Q.  All right.  And before we get too far into
6  the deposition we're going to be using some
7  terminology and I want to make sure we're all on the
8  same page.
9        Tell me briefly and in laymen's terms if
10 you can what is XML?
11   A.  It's a way to formalize or format a
12 document to prepare for transmission to another
13 party, and so it's a common -- stands for extensible
14 markup language.
15       It's basically a common defined language
16 of how to format documents, data documents, so that
17 you can send it to somebody and they can understand
18 how to interpret and how to receive it and how to
19 process it.
20   Q.  All right.  Okay.  So that wasn't
21 something that you developed; it's something that
22 existed that you were working with?
23   A.  Right, that's correct.
24   Q.  Or an application you used?
25   A.  Right, right.

Page 12

1    Q.  Now, there's also been the term Middleware
2  used quite a bit, describe for me in layman's terms
3  what does Middleware mean?
4    A.  Middleware in general terms means it's
5  either -- it's usually a middle tier in an
6  application between a user interface and a final
7  database or a low-level tier, so the Middleware
8  would be the piece --
9    Q.  Does it have a particular --
10   A.  The Middleware -- the Middleware would be
11 the piece of -- the piece that both the -- they --
12 usually the user interface or other applications
13 would talk to, and it would handle all the business
14 rules and communications with the database and other
15 systems, internal systems of the business.
16   Q.  Okay.  Is it -- does it work as a
17 translator, is that what it's doing?
18   A.  Not really a translator, but it kind of
19 works as an encapsulation or it hides business logic
20 things that the user application really doesn't need
21 to know to get its job done.
22   Q.  Okay.  All right.  And what would you --
23 is what you created for MITG here, was that
24 Middleware that you were creating for them?
25   A.  I would not consider it Middleware, no.

Page 13

1    Q.  Okay.  What would you consider it?
2    A.  It was just basic XML communications,
3  document communications.
4    Q.  Okay.  And so I'll try to stick to that
5  terminology just so you and I are on the page.  Why
6  was this XML document communication needed between
7  MITG and Compaq?
8    A.  In order to get -- in order to get an
9  order into the VISTA system we created an
10 XML document with all the information pertaining to
11 an order--customer information, part information,
12 and other types of information--which we would then
13 send to Compaq, and they would process that document
14 and ultimately it'd end up as an order in the
15 VISTA system.
16   Q.  And let me just try to read a statement to
17 you and see if this properly is describing the
18 various parts of this system as MITG is
19 communicating with VISTA and then VISTA is
20 communicating back to MITG.
21       There is -- when MITG placed a customer
22 order on their web tool, the program that you
23 created for MITG took that order, translated it into
24 XML format so that it could be transmitted to
25 Compaq's VISTA system --

4 (Pages 10 to 13)

Page 14
1    A.   That is correct.
2    Q.   -- is that accurate so far?
3    A.   That's correct, yes.
4    Q.   Okay.  And then there was software on the
5  Compaq side that received the XML document,
6  converted it to the language that VISTA could
7  understand, VISTA would do its processing of it and
8  then send an approval or rejection back that would
9  be transmitted from Compaq's system to MITG's system
10 in an XML format --
11   A.   Yeah, that's correct.
12   Q.   -- is that accurate?
13   A.   Yeah, basically they would send back in
14 the same format, XML, whether it successful or act,
15 and we would act upon that data.
16   Q.   All right.  So then the program you
17 created that was -- would then convert that XML once
18 it got it back in the XML format into whatever
19 language the MITG system understood?
20   A.   In a -- yes, basically.  We would take --
21 if it was successful we would then mark the order on
22 MITG's side as a successful order or if it was
23 declined we'd mark it otherwise -- or likewise.
24   Q.   All right.  And what system or systems
25 is -- did the software that you developed for MITG,

Page 15
1  what systems was that loaded on?
2    A.   It was also a Microsoft development
3  environment, it was ASP and Sequel Server and IIS.
4    Q.   Okay.  And did all of those things reside
5  on MITG's systems?
6    A.   Yes.
7    Q.   Computer or server?
8    A.   Yes.
9    Q.   Okay.  What about the program that
10 converted the XML into a readable format for VISTA,
11 did you create that?
12   A.   That converted it into a readable format
13 for VISTA?  Yes, the application --
14   Q.   Correct.
15   A.   On MITG's application that I was working
16 on, I would take all the information and format it
17 within the code into an acceptable XML document,
18 which Compaq would understand on their side.
19   Q.   Okay.  And then when that got to -- when
20 that document got to Compaq was there some software
21 that had to then take that XML format and convert it
22 into something -- the language that VISTA
23 understood?
24   A.   Yes, basically whatever software -- I
25 would imagine whatever software they were using

Page 16
1  would take that document, decode it, and then, you
2  know, work on that data as needed.
3    Q.   Okay.  And that -- you didn't develop the
4  software that was decoding it on their side --
5    A.   No.
6    Q.   -- on Compaq's side?
7    A.   No.
8    Q.   All right.  Okay.  And did -- do you know
9  who created that software that decoded it in a
10 Compaq system, do you know who created that?
11   A.   From what I can remember, Deb Broady
12 worked on the application which would accept the
13 XML and stick it into a queue, and I believe
14 Sandy Urwin's team on VISTA's side actually took
15 that and pushed it into a VISTA order from what I
16 can remember.
17   Q.   Okay.  All right.  And was any of the code
18 or the program that you created for MITG, was that
19 loaded onto Compaq's systems?
20   A.   No.
21   Q.   In the -- when you were working with
22 MITG to get MITG's systems to be readable by
23 VISTA, were there any adjustments or changes that
24 you know of that had to be made or were made to
25 VISTA to accommodate the MITG information --

Page 17
1    A.   Yes.
2    Q.   -- or were you making accommodations --
3         Okay.  What was it?
4    A.   There was accommodations made, there was
5  some -- several long conference calls I can remember
6  that we sat through while they were tweaking
7  VISTA to get the order where it needed to go.  So I
8  mean I feel that there was changes on their side to
9  get what was sent into an acceptable VISTA order.
10   Q.   Okay.  There's been some conversations
11 about something referred to as UDS, or user defined
12 fields; do you know what those are?
13   A.   The user defines fields were fields
14 that -- again, it's hard -- a little bit hard to
15 remember but I'll try my best.
16        Within a VISTA order there was regular
17 fields that were there and then there was user
18 define fields, and user define fields is what were
19 some of the fields that we were pushing information
20 into with the orders.  That's the best I can
21 remember.
22   Q.   Okay.  So then you on behalf of MITG and
23 the folks at Compaq were trying to work together to
24 be able to make sure that what was coming from MITG
25 went into these user defined fields and essentially

J. BREWER - Direct (By MS. CARROLL)

Page 18

1  having to agree on the size of the -- of the fields
2  and the tag or identification?
3      A.  Yes, exactly.
4      Q.  Okay.  Are you -- was there ever -- do you
5  recall anyone from Compaq ever asking you or
6  receiving a copy of your development codes or what
7  you have created with MITG?
8      A.  No.
9      Q.  Are you -- did you ever hear anything
10 about -- or do you have any understanding that
11 Compaq was using that -- the software that you
12 created for other customers?
13     A.  No.
14     Q.  People other than MITG?
15     A.  No.
16     Q.  If --
17     A.  The software that I created is what you're
18 asking about, right?
19     Q.  How would you go --
20     A.  The software that I created?
21     Q.  Right.
22     MR. HANSEN:  I didn't hear that -- I
23 didn't hear that, hold on.  I didn't hear that
24 answer.
25     THE WITNESS:  I was asking her the

Page 19

1  software that -- I was clarifying the question, I
2  was asking of the software that I created, no, that
3  was not used on their side or asked for from them --
4  from -- by me.
5  BY MS. CARROLL:
6      Q.  Okay.  If -- in order to use the software
7  that you created they would need to -- for another
8  customer so you could -- for somebody other than
9  MITG, they would need a copy of what -- of the
10 development code that you created in order to use --
11 to make use of that application; is that correct?
12     A.  Right, yes.
13     Q.  Okay.  And let me ask you this:  When
14 information is coming through in this XML format,
15 does the -- do the input and output have to match,
16 so you're sending something in and that has to match
17 what's going to be the output on the other end?  I
18 don't know if that's a clear question.
19     A.  Yeah, I don't know.  I guess -- I mean,
20 what comes through has to be what -- exactly what
21 you sent otherwise it would be corrupted, but I
22 don't know if that's the question that you're
23 asking.
24     Q.  Okay.  Let me ask you this:  You have a
25 field and you decided that -- for example, that the

Page 20

1  field is going to be called -- is a customer name
2  and it's going to be C-U-S-C N-O or C-U-S-C N-A-M-E,
3  and that can have 25 characters; does somebody who
4  is using your program, would they also have to be
5  sending that says, okay, this has this field and
6  this is -- 25 characters can fit this --
7      A.  Right, we --
8      Q.  -- and that always has to match?
9      A.  Yes, correct, we actually -- we came up
10 with an agreed upon format that we were going to use
11 for these XML documents.
12     Q.  Okay.  Were you aware of from the --
13 either the time you were doing the work as a
14 contract programmer for Inacom or during this time
15 that you were doing the work for MITG, that Compaq
16 or the VISTA system received other orders in an
17 XML format?
18     A.  I couldn't be sure of that, no.
19     MS. CARROLL:  Okay.  That's all the
20 questions I have, Jim.
21         CROSS-EXAMINATION
22 BY MR. HANSEN:
23     Q.  Mr. Brewer, my name is Jim Hansen, and I
24 represent MITG.  I only have a few questions for
25 you.

Page 21

1      Do you believe the Middleware was
2  developed to accept orders for companies more than
3  just MITG?
4      A.  I would -- in my opinion, I would say that
5  it was, because what was there to accept an order,
6  including user defined fields, was not there when we
7  began this project, but was there -- again, I would
8  believe that could easily be used again for other
9  clients, but I have no -- I can't be sure of that.
10     Q.  Do you believe -- sure.
11         Do you believe the Middleware was
12 developed by Compaq to use into the future?
13     MS. CARROLL:  Object:  That calls for
14 speculation.
15 BY MR. HANSEN:
16     Q.  Meaning after you had developed this
17 program, in your opinion it wasn't simply developed
18 by Compaq to use with MITG, correct?
19     MS. CARROLL:  Objection:  Calls for
20 speculation.
21 BY MR. HANSEN:
22     Q.  You can answer, sir.
23     A.  Okay.  It's kind of the same question as
24 the first one.  The functionality wasn't there when
25 we began, then it was afterwards, and it was

J. BREWER - Cross (By MR. HANSEN)

Page 22

1 something in my opinion that could easily be reused.
2    Q.  That functionality could be reused by
3 Compaq to allow other customers besides just MITG to
4 place their orders into the VISTA system, correct?
5    A.  In my opinion, yes.
6        MS. CARROLL: Objection: Calls for
7 speculation and assumes facts not in evidence.
8        MR. HANSEN: Okay. Well, I'm going to
9 have him answer the question, you cut him off so you
10 can answer the question, Mr. Brewer.
11        THE WITNESS: In my opinion, yes.
12        MR. HANSEN: Thank you, that's all I have.
13        MS. CARROLL: I have a couple more
14 questions.
15        REDIRECT EXAMINATION
16 BY MS. CARROLL:
17    Q.  What is the functionality that you're
18 talking about, Mr. Brewer?
19    A.  Being able to accept XML from an external
20 client like MITG, and then basically getting it into
21 the VISTA system as an official order.
22    Q.  So it is your belief that the program or
23 the adjustments that were made within the
24 VISTA system to accept the MITG orders in the
25 XML format was something that was new to Compaq when

Page 23

1 it was developed at this time?
2    A.  That's correct, yes.
3    Q.  Okay. And the -- this functionality that
4 you're talking about in terms of being able to
5 accept the XML from an external client, are those --
6 is that your software or are those adjustments made
7 or software applications done in the Compaq side?
8    A.  Those were -- all those adjustments were
9 done by Compaq employees or consultants, I don't
10 know.
11        COURT REPORTER: I'm sorry, what?
12        THE WITNESS: All those changes were done
13 by Compaq.
14 BY MS. CARROLL:
15    Q.  Okay. And so you came up and you said,
16 you all -- you, working with Compaq, said this is
17 the way -- made some suggestions about this is the
18 way we're going to do it on this side, we need --
19 working with them to have -- this is the way we're
20 going to communicate, they did their side, but you
21 developed -- you developed the software on the
22 MITG side, and the Compaq people developed -- that
23 worked with you developed that functionality
24 internally; is that correct?
25    A.  Yes, yes, that is correct.

Page 24

1    Q.  All right. And let me ask you this: In
2 order to have somebody do another external client,
3 somebody not -- that's not MITG to be able to do
4 what MITG did, they -- that external client would
5 still need your piece of the puzzle, correct?
6    A.  No, they wouldn't. All they would need to
7 know is the format of the document of how to accept
8 the XML. They wouldn't need anything from MITG at
9 all.
10    Q.  What would they -- what would -- well,
11 wouldn't they need something to convert their own
12 data into an XML format?
13    A.  Once -- not really. I mean, I guess all
14 they need to be able to do -- any programmer would
15 be able to get data into an XML document, which is
16 just a text document.
17        So if I -- in my opinion, if Compaq were
18 to give them the accepted format of how to get an
19 order into the system, they wouldn't -- it's
20 something that could be come up with fairly easily.
21    Q.  Okay. So there's something -- that
22 portion that has to reside on their system is fairly
23 easy because Compaq, working with you, said, okay,
24 we're going to agree that for an XML document that
25 you want to send us to come in, we'll receive it and

Page 25

1 this field will have X number of characters and this
2 field will be defined this way, et cetera?
3    A.  Yes, exactly.
4    Q.  Okay. And you don't have any knowledge of
5 Compaq using that functionality with anyone else; is
6 that correct?
7    A.  No, I do not.
8    Q.  Okay. And you never -- no one from
9 Compaq's ever told you that they were using that for
10 Microsoft or for Anderson Consulting or anything
11 else; is that correct?
12    A.  That's correct, no, they haven't.
13    Q.  Okay. And so when you said, yes, it could
14 be easily used, you have no knowledge that it has,
15 in fact, been used by Compaq for any other
16 XML clients?
17    A.  That's correct, it was just my opinion
18 that it could be used, yeah.
19    Q.  Okay. Let me ask you this: In order to
20 stop an external client from making use of this
21 application what -- do you have any knowledge as to
22 how essentially the flow would be shut off on the
23 Compaq side?
24    A.  How to stop it from happening? They could
25 just easily -- the way the XML came in was over a

J. BREWER - Redirect (By MS. CARROLL)

Page 26

1 web server, and they could just shut down that web
2 server or change the configuration.
3    Q. Okay. Then any -- if you tried to shoot
4 it across any XML format it would just not accept it
5 into Compaq's system; is that right?
6    A. There would -- yeah, there would
7 essentially be nothing there to accept it.
8        MS. CARROLL: All right. That's all the
9 questions I have. Jim, do you have thing else?
10       MR. HANSEN: I have one more.
11         RECROSS-EXAMINATION
12 BY MR. HANSEN:
13    Q. Although you answered you don't have any
14 personal knowledge of other customers using this
15 system, once Compaq had the functionality that you
16 helped create on behalf of MITG, that could be
17 communicated to other customers simply by giving
18 them an accepted format to get their order into the
19 VISTA system, correct?
20    A. Yes.
21       MS. CARROLL: Objection: Calls for
22 speculation.
23 BY MR. HANSEN:
24    Q. Okay. What was your answer, sir?
25    A. Yes.

Page 27

1    Q. I didn't hear the answer.
2    A. Yes.
3       MR. HANSEN: Okay. That's all I have.
4       MS. CARROLL: Mr. Brewer, we appreciate
5 your time today.
6       The court reporter will send you a copy of
7 your transcript. If you want to review it and sign
8 it to say that, yes, this is accurately taken down,
9 your testimony, you can feel free to do that.
10      Cindy, I would ask that you send the
11 transcript directly to Mr. Brewer, and, Jim, do you
12 agree that if we -- if Mr. Brewer does not return it
13 signed that we can use the unsigned copy of the
14 deposition?
15      MR. HANSEN: Yes. Did you explain to
16 Mr. Brewer what he has to do?
17      MS. CARROLL: If what I just said isn't a
18 sufficient explanation then no.
19      Mr. Brewer, when you get the transcript
20 there will be a page in the back for you to read it
21 and sign it in front of a notary saying that it does
22 accurately reflect the testimony that you gave in
23 your testimony to today, and then you would return
24 that to the court reporter.
25      So if you have any questions, you know how

Page 28

1 to get -- I know you know how to get in touch with
2 me, you have my contact information, and, of course,
3 you can always ask the court reporter any questions
4 you may have, okay?
5       THE WITNESS: Okay.
6       VIDEOGRAPHER: Counsel, we are off the
7 record, the time is 11:33 a.m. End of tape, end of
8 deposition.
9         (11:33 a.m. - Adjournment.)
10            ** ** ** **

Page 29

1          C E R T I F I C A T E
2 STATE OF NEBRASKA    )
                       ) ss.
3 COUNTY OF DOUGLAS    )
4     I, Cynthia Craig, General Notary Public
5 within and for the State of Nebraska, do hereby
6 certify that the foregoing testimony of JOHN K.
7 BREWER was taken by me in shorthand and thereafter
8 reduced to typewriting by use of Computer-Aided
9 Transcription, and the foregoing twenty-eight (28)
10 pages contain a full, true and correct transcription
11 of all the testimony of said witness, to the best of
12 my ability;
13    That I am not a kin or in any way
14 associated with any of the parties to said cause of
15 action, or their counsel, and that I am not
16 interested in the event thereof.
17    IN WITNESS WHEREOF, I hereunto affix my
18 signature and seal the 31st day of May, 2005.
19
20   _____
21   CYNTHIA A. CRAIG
     GENERAL NOTARY PUBLIC
22
23 My Commission Expires: