**1**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

HEWLETT-PACKARD DEVELOPMENT )
COMPANY, L.P., HEWLETT-PACKARD )
COMPANY, and COMPAQ TRADEMARK B.V., )
)
PLAINTIFFS, )
) Civil Action
vs. ) No. 04-3055
)
MIDWEST INFORMATION TECHNOLOGY )
GROUP, INC. and MICHAEL LAUBER, )
)
DEFENDANTS. )

DISCOVERY DEPOSITION of TERESA KOCH, taken in the above-entitled case before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter of Adams County, Illinois, at 3:30 p.m., on February 17, 2005, at 525 Jersey, Adams County, Quincy, Illinois, pursuant to stipulation hereto annexed.

Tracy L. Grott, CSR
2901 Sonata Drive
Quincy, IL  62301
217-223-3624

**2**

APPEARANCES

MS. ELIZANN CARROLL
Attorney at Law
Juneau, Boll & Ward
15301 Spectrum Drive, Suite 300
Addison, Texas  75001
    appeared for the Plaintiffs.

MR. JAMES HANSEN
Attorney at Law
Schmiedeskamp, Robertson, Neu & Mitchell
525 Jersey
Quincy, IL  62306
    appeared for the Defendants.

COPY

**3**

INDEX

| DEPONENT | PAGE NUMBER |
|---|---|
| TERESA KOCH | |
| Examination by Ms. Carroll | 5 |

EXHIBITS

| NUMBER | MARKED FOR IDENTIFICATION |
|---|---|
| TK No. 20 | 6 |
| Exhibit A | 14 |
| Exhibit 4 & 5 | 38 |
| TK No. 21 | 50 |

**4**

S T I P U L A T I O N

It is stipulated and agreed by and between the parties hereto, through their attorneys that the deposition of TERESA KOCH may be taken for discovery purposes before Tracy L. Grott, a Notary Public and Certified Shorthand Reporter, upon oral interrogatories, on the 17th day of February A.D., 2005, at the instance of the Plaintiffs, at the hour of 3:30 p.m. at 525 Jersey, in the City of Quincy, County of Adams, State of Illinois;

That all requirements of the Code of Civil Procedure and the Rules of the Supreme Court and the reading over and signing of the deposition by the Deponent are expressly waived;

That any objections as to competency, materiality or relevancy are herby reserved, but any objection as to the form of question and answer is waived unless specifically noted;

That the deposition, or any parts thereof, may be used for any purpose for which discovery depositions are competent, by any of the parties hereto, without foundation proof;

That any party hereto may be furnished copies of the transcript at his or her own expense.

(Whereupon the Deponent
was sworn by the Notary Public.)

## Page 5

1    TERESA KOCH,
2 having been first duly sworn, testified as follows:
3    EXAMINATION BY:
4    MS. CARROLL
5    Q    Can you state your name for the record,
6 please.
7    A    Teresa Koch.
8    Q    And Ms. Koch, what is your address?
9    A    3420 South 46th Street, Quincy, Illinois.
10   Q    All right. You currently work for MITG,
11 is that correct?
12   A    Correct.
13   Q    And what do you do for MITG?
14   A    I'm the chief financial officer.
15   Q    How long have you been the CFO for MITG?
16   A    Since July of 2000.
17   Q    And what did you do before you went to
18 MITG?
19   A    I worked for a local ISP data stream
20 network.
21   Q    And how did you end up at MITG?
22   A    The owners of those two corporations had
23 business acquaintances and I met them through that.
24   Q    All right. And you understand that your
25 deposition today is in both your individual capacity

## Page 6

1 and as a corporate representative of MITG on certain
2 subject matters?
3    A    I guess.
4         MR. HANSEN: Yes.
5         *(Exhibit No. 20 was marked for*
6         *identification.)*
7    Q    Let me hand you what's been marked as
8 Deposition Exhibit 20, which is a document, Amended
9 Notice of Deposition of the Corporate Midwest
10 Information Technology Group, Inc, and I understand
11 from Mr. Hansen that you have been designated to
12 provide responses on behalf of MITG on 8 and 9?
13   A    That's my understanding too.
14   Q    Okay. All right. And what, if anything,
15 did you do to prepare for your deposition today?
16   A    I met with Mr. Hansen.
17   Q    Okay.
18   A    Here and reviewed documents as presented.
19   Q    What documents did you review?
20   A    Financial statement documents that were
21 prepared for you.
22        MR. HANSEN: Just let me know which ones
23        you're pulling. I have them here and we can
24        just do it that way. That will probably be
25        easier.

## Page 7

1 BY MS. CARROLL:
2    Q    Okay. If you -- well, let me just show
3 you -- was it revenue and expense reports?
4    A    Correct.
5    Q    For '02, '03 and '04?
6    A    Yes, that's correct.
7    Q    And what did you do to prepare, what
8 documents or information did you use to prepare the
9 revenue and expense reports that you have prepared
10 for me?
11   A    Sales and revenue records of the company.
12   Q    All right. And do these numbers -- well,
13 let me strike that. Sales and revenue, is that one
14 in the same or something different from sales?
15   A    Well, revenue you could look at as maybe
16 more could possibly be defined as services versus
17 sale of product, so it's just a standard accounting
18 term.
19   Q    All right. That's what I'm wondering, is
20 there something other than sales that was generating
21 revenue that's reflected in these charts?
22   A    There may be some service or fees included
23 in there.
24   Q    All right. Fair enough. And is this the
25 revenue and expenses of MITG as a total company as

## Page 8

1 opposed to any particular portion of MITG?
2    A    I guess I don't fully understand that
3 question.
4    Q    All right. You are aware that MITG for a
5 period of time was doing business under a contract
6 with HP Direct?
7    A    Oh, yes. I understand, I guess the answer
8 to that is that all of those revenues are included
9 in these numbers.
10   Q    All right. And for any other business
11 that MITG was doing, that's also included in these
12 numbers?
13   A    That's right.
14   Q    Do you have any documents that break out
15 the revenue and expenses of just the Compaq
16 Direct/HP Direct portion of the business?
17   A    Not in a concise form.
18   Q    Okay. Do you have any capabilities to
19 create such a report or is the information not
20 stored in that?
21   A    I presented an invoice register that would
22 have had all the billings to HP and Compaq, and
23 those numbers would be included in the numbers
24 presented.
25   Q    Okay.

9

```
 1            MS. CARROLL:  And Jim, if I could just
 2       take a quick look.
 3       A    Those would be the same numbers that were
 4  given to HP and Compaq in invoicing, which they
 5  already have.
 6       Q    All right.
 7            MR. HANSEN:  So the record's clear, what
 8       this is is orders that were placed?
 9            THE WITNESS:  Those are just recent.
10            MR. HANSEN:  On 2/7/05 and 2/8/05 from
11       Hewlett-Packard regarding a shipment to Emerson
12       Shaeffer Valve, and they wanted HP cable, which
13       is reflected in two invoices.
14            THE WITNESS:  Those are two HP POs.
15            MS. CARROLL:  Okay.
16            MR. HANSEN:  HP POs, but those numbers
17       aren't reflected on any other documents.
18            THE WITNESS:  Correct.
19            MS. CARROLL:  All right. Let me just go
20       through and make sure that I understand what
21       these documents are showing without getting
22       into too much nitty-gritty.
23            THE WITNESS:  Okay.
24  BY MS. CARROLL:
25       Q    On this, just tell me, this is the current
```

10

```
 1  history file and this bookends the first part of '04
 2  to the end of the relationship, correct?
 3       A    Yeah, it was the first two months of '04.
 4       Q    Okay. And now this first column, what is
 5  the cumulative bill, what does that mean?
 6       A    That's just an item description from the
 7  accounting software that -- how it was billed, how
 8  it was decided to be billed with Omaha at the
 9  beginning of the contract, so these numbers wouldn't
10  be reflected in any invoices presented to HP and
11  Compaq for payment.
12       Q    And what does incentives mean?
13       A    A 25% split which is reduced off the
14  billing amount, then they paid the net amount.
15       Q    This would be the total sales that were
16  shown on the invoices that were ultimately generated
17  by HP and sent to the customers?
18       A    I did not have any part of what HP did
19  once they got that information. You would have to
20  ask them.
21       Q    All right. Let me -- I'm trying to just
22  get your knowledge. This would be, this example,
23  this $4,186 would be what MITG would show as what
24  the invoice should be?
25       A    To the customer for non-CSN product.
```

11

```
 1       Q    Okay. Then this is the 25% profit
 2  sharing?
 3       A    That's correct.
 4       Q    So this amount, the 3,804.84 is how much
 5  HP should have remitted to MITG?
 6       A    That's correct.
 7       Q    Okay. And this entire thing, that's --
 8       A    It's by date, right. And so this is -- I
 9  had rubber bands around it, but you can look at the
10  current history file.
11       Q    That's really just an accounting system.
12       A    Correct.
13       Q    Then everything in those dates would be
14  reflected.
15       A    This would be all of '03. Then I have '02
16  --
17       Q    In rubber bands over there?
18       A    Right. To my knowledge, to the customer
19  for that business.
20       Q    And invoice number is referring to what?
21       A    The invoice number as it was presented,
22  that would be reflected in HP's records.
23       Q    Okay. This is an MITG invoice?
24       A    Right.
25       Q    MITG's invoice number to them, and this is
```

12

```
 1  how much you're being -- MITG said, you owe this
 2  much minus your 25%, so you need to remit this
 3  amount?
 4       A    Correct.
 5       Q    Okay. And included on this MITG invoice
 6  could be -- could that be multiple? This is for one
 7  single client.
 8       A    No, that's just for one -- excuse me.
 9       Q    Okay. Go ahead.
10       A    That invoice would be for one single day.
11       Q    So this is all the business that MITG did
12  for the day. It all went on a single invoice to
13  MITG -- to HP Direct?
14       A    Correct.
15       Q    And were you the person responsible for
16  getting these invoices sent to or did you oversee
17  the process of getting the invoices sent to HP?
18       A    It was under my oversight, yes.
19       Q    Okay. And you made a distinction earlier
20  about non-CSN parts. Explain.
21       A    We didn't bill HP directly for CSN
22  product.
23       Q    So when someone called in to the call
24  center and they ordered three parts, they wanted
25  three parts and one of the parts you could get from
```

13

1  CSN which was Compaq/HP's internal system, that was
2  the stocked part, correct?
3      A   That's my understanding. If it was
4  available.
5      Q   All right. So if one of the three parts
6  that they wanted was available, that went off to
7  Compaq and subsequently HP and that was the end of
8  the handling of that by MITG, do you know?
9      A   The only additional handling would be to
10 probably track that order to its end user.
11     Q   To make sure that the customer you were
12 servicing received their part?
13     A   That's correct.
14     Q   Now do you know what -- I take it you
15 don't know what the invoice looked like from
16 Compaq -- I mean from, yeah, Compaq or from HP
17 Direct when it went to their customer or was the CSN
18 part included on there as well as the sourced parts
19 that MITG was providing? Do you know if it was a
20 single invoice?
21     A   I do not know that.
22     Q   Okay. And so the 25% that was being
23 listed here as the incentive, how did the 75/25
24 split work? What amounts was it on?
25     A   It was on the sourced product that did not

14

1  go through CSN.
2      Q   Say MITG finds the product for the
3  customer and charges the customer $100?
4      A   Uh-huh.
5      Q   But it only costs them $90 to buy it, so
6  that's a 10% profit, then MITG and HP split that 10
7  bucks?
8      A   Correct.
9      Q   75/25?
10     A   Correct.
11     Q   Okay. Who paid for the shipping and all
12 those things?
13     A   MITG paid for the shipping, I believe.
14     Q   Okay. Were they reimbursed for those
15 amounts by HP or do you know?
16     A   No, I do not believe so.
17     Q   Okay. Were you involved -- just in case
18 you need to look at it, Exhibit A is the Standard
19 Support Agreement, were you involved in the
20 negotiation and terms of that agreement?
21     A   No. Mr. Haught handled that.
22     Q   Did you have any discussions with
23 Mr. Haught in advance of the agreement being signed?
24     A   I'm sure we did regarding the financial
25 arrangement on the split.

15

1      Q   All right. And how did you -- well, did
2  you have input into how that split was calculated,
3  how it ended up being 75/25?
4      A   No, I didn't.
5      Q   Okay. Do you know how, if at all, MITG
6  was compensated for the CSN parts?
7      A   We billed that at $41,000 a month to
8  support that. It was my understanding of what -- I
9  just billed it, I don't know how he arrived at that
10 necessarily.
11     Q   All right. So $41,000 a month was paid by
12 Compaq Direct and HP Direct, and that covered the
13 CSN parts, the call center, making sure the call
14 center is staffed, etcetera. And then the only
15 compensation you recall MITG getting for sourced
16 parts was the 75% profit split?
17     A   That's my understanding.
18     Q   Okay. And do you have -- strike that.
19 What accounting program did you use to create the
20 documents that are the current and history files for
21 invoices and credit memos?
22     A   It's called SBT.
23     Q   And do you know who makes SBT?
24     A   It's just basically canned accounting
25 software we bought.

16

1      Q   Okay. All right. And what software was
2  used to create the revenue and expense spreadsheets
3  that you created for us?
4      A   Excel.
5      Q   Okay. And did you use information from
6  this SBT accounting software to come up with the
7  numbers that are on this Excel spreadsheet?
8      A   Yes.
9      Q   Okay. And is there any way to take, to
10 your knowledge, in the SBT, to take all of these
11 numbers and be able to do a thing where you add up
12 all of the cumulative bill amounts for each year and
13 the total incentives, essentially HP's 25%? Can
14 that be run on the SBT, do you know?
15     A   Can I look at these?
16     Q   Sure. Absolutely.
17         MR. HANSEN: Are you talking about running
18     it to separate them out and get a total at the
19     end of each year?
20         MS. CARROLL: Correct.
21         THE WITNESS: This has the invoice totals.
22     I'm honestly not sure about that.
23         MR. HANSEN: I think at the end of each
24     year there is a total.
25         THE WITNESS: A total for the end of this

17

```
 1            period, right.
 2  BY MS. CARROLL:
 3       Q    Okay. So you have the total invoices and
 4  this represents all of -- the total invoice amount
 5  represents all of the revenue generated or I guess
 6  obtained by MITG from the sale of sourced products
 7  for HP Direct?
 8            MR. HANSEN:  Just so I'm clear, it's my
 9       understanding, she can testify to it, but that
10       is the total amount not deducting anything, so
11       we would have to deduct from that number, you
12       have to take off 25% or multiply by 75.
13            THE WITNESS:  No, that's not correct.
14  BY MS. CARROLL:
15       Q    Okay. When you do this it's -- when you
16  have here the incentive amount, so that last number
17  there --
18       A    That's the invoice amount.
19       Q    The invoice amount that was paid to MITG?
20       A    That's correct.
21       Q    Okay.
22       A    For those products, yes.
23       Q    So when we get to the end of the year for
24  2003, then what is our total? This is the total
25  amount paid by HP to MITG not including the 41,000 a
```

18

```
 1  month?
 2       A    I believe the 41,000 a month is included
 3  in here.
 4       Q    Okay.
 5       A    But it's not necessarily paid, it's what
 6  was billed.
 7       Q    Okay.
 8       A    So there could be timing differences there
 9  with receivables.
10       Q    All right. So that amount is what,
11  please?
12       A    For the year.
13            MR. HANSEN:  What year?
14            THE WITNESS:  2003.
15       A    4,402,574.04.
16       Q    Let's do the other two years too so we
17  have it on the record. For '04 for the first two
18  months.
19       A    329,783.53.
20       Q    Okay. Then finally, if you can tell us
21  the number for the year, is that all of 2002?
22       A    This is 2/1/02 to 12/31/02, so it's for
23  the 11-month period ending 12/31/02.
24       Q    All right.
25       A    4,850,217.39.
```

19

```
 1       Q    Thank you.
 2       A    Here's the back page.
 3       Q    Thank you. Is it fair, can we take that
 4  number, those three numbers that we've just gone
 5  through and looking at these spreadsheets, if we
 6  deduct the total amount paid, these total invoices
 7  from here out of the total sales and revenue, would
 8  the remaining portion of that amount, for example,
 9  in '03 you have total sales and revenue of around
10  8.7 million and we saw that the total invoices were
11  at 4.4 million, does that -- is there any
12  relationship between those two numbers?
13       A    There's a relationship, but it would
14  better be reflected in the gross margin number
15  because of the way we did -- booked CSN sales and
16  then booked the cost of those sales to a net of
17  41,000, so we tried to book the full amount of our
18  sales.
19       Q    Okay. And now -- all right. You think
20  that in the stack of these documents here that we're
21  talking about, the current and history files,
22  include a monthly 41,000?
23       A    Right.
24       Q    Okay.
25       A    But there may have been, you know, several
```

20

```
 1  hundred thousand dollars a month in CSN sales that
 2  we didn't get any profit on besides the 41.
 3       Q    Right.
 4       A    And my entry on a monthly basis, so we
 5  could trend sales, was to book the -- because from
 6  our tool we could tell how much sales we did in CSN,
 7  so it's reflected in those numbers also.
 8       Q    So what this number includes, the
 9  8.7 million that we're looking at, almost
10  8.8 million in 2003, is all of the sourced product,
11  MITG's profit on the sourced product, the $41,000 a
12  month plus the costs of the stocked part on CSN's
13  website?
14       A    Correct.
15       Q    Okay. Is there any -- so when you're
16  looking at this, at your net income -- well, let's
17  back up. Let's start with going through, I was
18  going to use 2003 because it's so large it's easier
19  to see.
20            MS. CARROLL:  What is the baits number on
21       that, please.
22            MR. HANSEN:  MITG0613.
23            MS. CARROLL:  I'm sorry, I forgot what the
24       baits number was.
25
```

**Page 21**

BY MS. CARROLL:
Q   Just looking in 2003 as your example, it's the only full year that the contract was in place.
THE WITNESS:  Okay.
BY MS. CARROLL:
Q   Looking at this, the sales and revenue, you've told me that this is the four parts that we just discussed; the CSN price, the source price, 75% profit and $41,000 a month. What else might go into the 8,784,09.78?
A   There could be a small amount of sales to customers other than HP or Compaq.
Q   Do you have any idea as you sit here today how much revenue MITG generated in 2003 from nonHP Direct related business?
A   A ball park guess, in the 10 to 30,000 a month range.
Q   Okay. Were all of these -- well, strike that. All of the business that was governed by the Standard Support Agreement had this same, and it was sourced product, had a 75/25 split. Was there any business that MITG did for HP or for HP customers that was not sourced product, that was not subject to the 75/25% split?
A   Yes. I believe that there were some

**Page 22**

service parts.
Q   Okay.
A   But I'm not familiar with that specifically. There may have been some service parts that were agreed to be purchased that didn't have that split on them.
Q   Okay. And there was some testimony earlier today from Mr. Lauber who was specifically involved with an Intel account where they were providing that.
A   Correct.
Q   Do you know how much revenue was generated from that provision of service parts that was not subject to the 75/25 split?
A   No. I can't even make an estimated guess to that. I would say it was fairly immaterial numbers compared to the rest of the numbers.
Q   Would those amounts be included in the current and history files, this register that we've been looking at or do you know?
A   Well, as we've been talking, I remember that we did have another customer number set up for HP/Compaq for those parts later in the contract, so there may be another report I can run that would have that for you, but there may be some parts

**Page 23**

included under that agreement in these documents that didn't have that split. I'm not sure.
Q   Okay. All right.
MS. CARROLL:  If I get a request, if you can run a report.
MR. HANSEN:  If we can run it, boy you'll get it.
MS. CARROLL:  Thank you.
THE WITNESS:  I can easily do that when I get to the office.
MS. CARROLL:  That would be great if you can get that to Jim.
MR. HANSEN:  Off the record.
            (Off the record discussion.)
BY MS. CARROLL:
Q   Now the next -- well, let me ask you one or two more questions about that. Did you send the invoices through the same channels for these parts procurement, service parts procurement? Did you send it through the same channels as you sent to the parts that were subject to the Standard Support Agreement, meaning the invoice from MITG would go to the same person regardless?
A   For the service parts that we talked about?

**Page 24**

Q   Uh-huh.
A   Later in the contract the service parts invoices were directed to Colorado Springs rather than Omaha is my understanding.
Q   And did you have a contact person at Colorado Springs?
A   The only contact person I dealt with at one time was Kristin Trilloe.
Q   Okay. Did you deal with anyone else that you recall on the service parts other than Kristin?
A   I specifically did not.
Q   Okay. Well, did you have, in terms of the people that were working for you, did you have one person who did all of this reporting for you?
A   It's been various employees, but one person usually had direct responsibility for it.
Q   Okay. And did that same person also handle the other portions of the business, at the same time the service parts?
A   I believe so.
Q   Okay. And is it simply that over the course of time that employee may have changed?
A   Correct.
Q   Going back to your revenue and expense spreadsheet from 2003, the cost of goods sold, tell

1  me what is represented in the cost of goods sold.
2      A   Any cost directly attributable to the
3  product. Usually the cost of securing the product
4  and freight costs, commissions paid for it. That's
5  all I can think of right now.
6      Q   So the actual part, the cost of procuring
7  the part in terms of shipping, commissions and --
8  commissions to whom?
9      A   Commissions to any sales people or the
10 only one I can think of was the split, the 25% split
11 to HP/Compaq, was included in the cost of sales.
12     Q   The cost of goods sold has that 25% in it?
13     A   That's correct.
14     Q   Okay. Let me back up. I may be
15 misunderstanding something. I understood the sales
16 and revenue number was not the full price of the
17 part but the part plus 75% profits.
18     A   Those numbers don't add up accounting
19 wise.
20     Q   Well, I know, that's why I'm confused.
21     A   Can I go back to this?
22     Q   Yes.
23     A   The sales and revenue numbers would
24 have -- the first line that says cumulative bill on
25 here, the cost of goods sold would include the

1  incentive 25% split.
2      Q   All right, I did misunderstand you before.
3  So you're not taking the deduction instead of -- the
4  sales and revenue amount was the total amount that
5  you were invoicing HP Direct plus the CSN cost of
6  the CSN part and you took the incentive as we see on
7  this detail register out from the cost of goods
8  sold?
9      A   That's correct.
10     Q   All right. And in terms of commission,
11 was that commission that was paid to MITG reps or to
12 somebody else?
13     A   What I call commission was the incentive
14 25%.
15     Q   All right. Gross margin, what's gross
16 margin for?
17     A   That would be the sales and revenue less
18 the cost of goods sold.
19     Q   Operating expenses, how did you calculate
20 those operating expenses?
21     A   Well, can I first explain other income and
22 expenses?
23     Q   Sure.
24     A   Operating expenses would be everything
25 else basically.

1      Q   Okay.
2      A   Other income and expenses are mostly
3  income from interest or interest expenses, and there
4  are also some Illinois Replacement Taxes included in
5  that number; therefore, operating expenses are all
6  other expenses from the business such as salaries,
7  building cost, depreciation, travel expenses,
8  utilities, payroll taxes.
9      Q   Okay. All right. The other income and
10 expenses is Illinois Replacement Tax?
11     A   That's what the larger number was I
12 believe on one month, why it was a little bit
13 larger. There's a tax that's levied for an
14 S Corporation in Illinois called Illinois
15 Replacement Tax.
16     Q   Okay. Well, under the other income
17 expenses, all but one of these are in parentheses.
18 Is this telling me --
19     A   Right, that would be an expense.
20     Q   All right. So operating expenses is just
21 whatever you pay to run the company for each month,
22 so that's not -- you didn't average an amount at the
23 end of every month, that is cash base money, that is
24 how much money came in and that is how much went
25 out?

1      A   That's somewhat incorrect. There is an
2  accrual basis. On an accrual basis there would be
3  expenses either paid or accrued for that month.
4      Q   Okay. And the sales on the sales number,
5  is that a cash only money that came in or the same
6  thing?
7      A   Same thing as accrual basis.
8      Q   Okay. Do you have any documentation that
9  would show out of, starting with the 4.4 million or
10 so, in 2003 that was generated by MITG's sale of
11 sourced parts for HP Direct, how much profit was
12 earned off of the 4.4 million in sales?
13     A   Define profit.
14     Q   Okay. Well you're the accounting person.
15     A   Are you just taking operating expenses?
16     Q   Let's go with gross and net profit, do you
17 know either of those numbers?
18     A   I don't know them off the top of my head,
19 no.
20     Q   Do you have a report that you could run
21 that would tell you your gross and net profit
22 strictly from the sale of sourced product?
23     A   I'm trying to think through the various
24 reports.
25     Q   Take your time, it's not 5:00 yet.

29

 A   I cannot think of a specific report that would give you that number.
 Q   Do you recall during the time of the Standard Support Agreement ever doing any kind of profit and loss statement or anything that would indicate the overall profit or loss of the company not including tax -- company tax things, but did you keep a regular PNL statement or anything like?
 A   The accounting system keeps that, yes.
 Q   You don't have the ability to allocate or determine where that profit comes from, which aspect of the business it's coming from?
 A   We can run reports such as this, that determine how much is billed to a specific customer. The way the accounting system is set up are that a lot of those sales are -- most of the sales by category, which are for part sales are all dumped into the same GL account, so some of those transactions are intermingled together, so that's not a -- I can't think of a specific report to give you that number.
 Q   Okay. And do you have -- MITG was the one that calculated what this split was between the 75 and 25%, is that correct?
 A   Yes, but it was detailed by sale in a

30

spreadsheet and provided with the billing to HP/Compaq on a daily basis.
 Q   So there was a spreadsheet that would say, this is the cost of the product, this is how much you should bill the client, this is the profit, this is our part?
 A   That's correct.
 Q   So when HP Direct was sending you a check, you were telling them ultimately, send me this amount? That's what they got?
 A   That's correct.
 Q   Do you recall there being issues with nonpayment of invoices or slow payment of invoices by HP Direct related to the Standard Support Agreement payments?
 A   From time to time, yes, they would get behind on them.
 Q   When you say "get behind," what kind of -- how far behind are we talking? Were you expecting a one-week turnaround, a 30-day net? How are we doing that?
 A   They were set up on accounting system on a net 10 basis.
 Q   So when they got behind, if they weren't paying net 10, they were late, under the way you

31

were tracking it?
 A   Technically, that's correct.
 Q   And did they generally pay in the 10-day cycle?
 A   I would have to review those records for Compaq payment dates. Generally they were pretty good about most of them except for the service parts.
 Q   That's what I wanted to ask you about because I've seen some emails that are discussions with Charlie Boil and you appear on the emails, and Ron Haught, about nonpayment of invoices and indications that MITG was going to stop providing parts due to nonpayment of invoices. Is it your recollection that those are the service parts aspect of the business as opposed to the Standard Support Agreement part of the business?
 A   Yes, that's correct.
 Q   And ultimately, those issues that Mr. Boil -- dealing with Mr. Boil were resolved, is that correct?
 A   I believe, yes.
 Q   Okay. Did you ever, during the time of the Standard Support Agreement, do you recall ever doing an analysis to determine whether MITG was

32

making money or losing money on a $41,000 piece of the business?
 A   No, I did not.
 Q   Okay. Do you recall any discussions with anyone as to whether or not that was a good deal, bad deal or break even?
 A   Define anyone.
 Q   Well, anyone at MITG; Mr. Haught, a conversation in which you might change -- try to change the way you were doing business as opposed to just chitchat over coffee.
 A   I don't specifically recall specific conversations about it.
 Q   You don't recall Mr. Haught ever coming to you saying, hey Teresa Koch, you're the CFO, figure out whether I've struck a good deal for myself?
 A   On the specific 41,000?
 Q   Yeah.
 A   No, I do not.
 Q   What about for the overall business, do you recall doing an analysis, even if you don't know what the ultimate profit was, but doing an analysis to determine whether MITG's business with HP Direct under the Standard Support Agreement was a profitable business for MITG?

**Page 33**

1  A    Due to the fact that that was the material
2  amount of our busy, that was easy to see, but yes,
3  it was.
4  Q    Now in the revenue and expense for 2003,
5  since that's the one we've been looking at, is net
6  income net profit?
7  A    Yes.
8  Q    Okay. $484,021.13 then was the net income
9  for MITG for all of their business for the year, is
10 that --
11 A    To my best recollection, yes.
12 Q    Okay. That's at least in terms of the
13 documents that you reviewed to prepare this chart,
14 that's what your records show?
15 A    That's right.
16 Q    Okay. And going back a year to the
17 revenue and expenses for the 11 months of '02, which
18 is on MITG0614, is it correct that the descriptions
19 of what make up each of these rows; the sales and
20 revenue, cost of goods sold, etcetera, the
21 descriptions you gave me before, are what make up
22 those numbers? Is it the same in 2002 as it was in
23 2003?
24 A    I believe so.
25 Q    You used the same sources of information

**Page 34**

1  in terms of trying to get the numbers that you used
2  in 2003?
3  A    Correct.
4  Q    All right. And do you know for 2002 how
5  much of the sales and revenue numbers which total
6  9.6 million for the year was business governed by
7  the Standard Support Agreement?
8  A    I believe all but the numbers I gave you
9  before, the 10 to $30,000 a month was. Now that
10 would include revenue from the service parts also,
11 which wasn't, I don't believe, under that agreement.
12 I'm not sure.
13 Q    Okay. Do you have any idea what the
14 revenue -- strike that. It appears from looking at
15 these two documents that you're operating expenses
16 were greater --
17       MR. HANSEN: What year, '02 and '03?
18       MS. CARROLL: '02 and '03.
19 BY MS. CARROLL:
20 Q    Your operating expenses for '03 were
21 higher percentage wise, the percentage of your sales
22 and revenue, than they were in '02. Why the
23 difference? Do you know, was there one event or
24 something to change that?
25 A    Two events that I would estimate caused

**Page 35**

1  that.
2  Q    Okay.
3  A    One would be that the total sales and
4  revenue, I believe, were down and therefore, the
5  gross margin was down in 2003 versus 2002, possibly
6  due to more product being attributable to CSN where
7  the 41,000 remained the same, so less of the sales
8  we received profit on, therefore, resulting in
9  possibly a lower margin. The other difference was
10 an increase in building expenses in 2003 versus
11 2002.
12 Q    Let me ask you this, because I'm not sure
13 I understand the second part, which is building,
14 constructing the building here in Quincy added to
15 your operating expenses. I'm not sure that I
16 understand how the sale of more or less CSN parts
17 affected the operating expenses.
18 A    I'm sorry, it would not have.
19 Q    That would affect your gross margin?
20 A    Yes, it would.
21 Q    All right. So the primary issue affecting
22 the operating expenses, you would generally
23 attribute to the building, is that correct?
24 A    Without detail in front of me, I would say
25 yes.

**Page 36**

1  Q    When did MITG buy the property? Did they
2  buy the property here in Quincy or is that property
3  leased?
4  A    It's purchased.
5  Q    Do you know when that property was
6  purchased?
7  A    It was constructed.
8  Q    Let me go backwards. When did you move
9  in?
10 A    We moved, I believe, April of 2003.
11 Q    Okay. Did you pretty much move in as soon
12 as the building was ready?
13 A    Correct.
14 Q    Okay. So somewhere in the months before
15 that?
16 A    Yeah, it was in the fall prior to that, I
17 believe.
18 Q    Okay. And so sometime in the fall of '02
19 construction had started. Had the property been
20 purchased right around the time construction
21 started?
22 A    Yes, I believe so.
23 Q    I take it that's being paid for on a note
24 that's covered in the monthly operating expenses?
25 A    It is in the monthly operating expenses.

```
 1      Q   Okay. When, to your knowledge, did MITG
 2  begin doing business of any kind with Compaq Direct
 3  or at that time it may have been known as Custom
 4  Edge.
 5      A   I believe that was prior to my employment
 6  with MITG.
 7      Q   Okay. When was your first involvement in
 8  business involving Custom Edge or Compaq Direct?
 9      A   From a number standpoint, it would have
10  been when I first started working with them in July
11  of 2000.
12      Q   Okay. And do you have any understanding
13  as to what kind of business, what the business
14  relationship was, what MITG was doing for Compaq
15  Direct or CEI?
16      A   My understanding has always been the same.
17      Q   Okay. Do you know how it became
18  memorialized in the Standard Support Agreement?
19      A   No.
20      Q   Or do you know why they entered into an
21  agreement in 2002?
22      A   Mr. Haught can answer that for you.
23      Q   Okay, I'm sure he will be asked. I'm just
24  trying to see if you have an understanding about it.
25  Have you been to Omaha to Compaq Direct's
```

```
 1  facilities?
 2      A   One time I was there, yeah.
 3      Q   Why did you go to Compaq Direct?
 4      A   I was with Mr. Haught for some meetings
 5  there.
 6      Q   Do you recall what the general subject
 7  matter of the meetings were?
 8      A   I believe it was regarding the general
 9  flow of business as has been arrived at in the
10  contract. I'm not sure when it was in relation to
11  that.
12      Q   Okay. You don't know if you went there
13  before the agreement was signed or after the
14  agreement was signed?
15      A   Which agreement?
16      Q   The Standard Support Agreement.
17      A   I believe it was before that.
18      Q   Okay.
19      A   It was during another agreement.
20      Q   All right. Let me show you what was
21  previously marked as Deposition Exhibit 5 and ask
22  you if you're familiar with that? I can hand you
23  deposition Exhibit 4 and see if you can recognize
24  that.
25      A   Let's see.
```

39

```
 1      Q   I'm just wondering if either of those
 2  might be a prior agreement that you understood the
 3  companies to be operating under. If you don't know,
 4  that's fine.
 5      A   I don't specifically have any information
 6  about these two documents.
 7      Q   Okay. All right. Did you understand the
 8  Standard Support Agreement was changing the way
 9  business was done or was memorializing the way
10  business was done? Any knowledge of that?
11      A   No, I don't.
12      Q   Okay. And in the meeting that you
13  attended, were there requests by MITG to get paid
14  more money or to get paid differently than they were
15  being paid by Compaq Direct?
16      A   It was a long time ago. I don't really
17  recall a lot about that meeting.
18      Q   Do you recall who was there from Compaq
19  Direct?
20      A   I recall that Craig Smotter was there and
21  I believe Troy Bloomquist was there for a portion of
22  it anyway, and there was a Bill somebody, and I
23  don't remember what his last name was.
24      Q   And at that point, was the $41,000 a month
25  in place, do you recall?
```

40

```
 1      A   I don't believe so.
 2      Q   So subsequent to that meeting, that
 3  41,000 -- well, let me ask you this, do you know if
 4  the $41,000 was started to be paid before the
 5  Standard Support Agreement was signed?
 6      A   I do not recall that.
 7      Q   Okay. Do you have any knowledge of the
 8  development of the Middleware that enabled MITG to
 9  send information in a format that HP or Compaq
10  Direct's computers could understand?
11      A   I'm only aware that there is an agreement.
12      Q   Okay. You don't have any knowledge of how
13  that works or?
14      A   No, I don't.
15      Q   Okay. When you started, you started in
16  July of 2000 as the CFO in the second half of the
17  year 2000, can you tell me what percentage of MITG's
18  business was driven by their relationship with
19  Compaq Direct?
20      A   I don't recall.
21      Q   In 2001, can you give me a rough estimate
22  percentage wise as to how much business of MITG was
23  derived from the relationship with Compaq Direct?
24      A   I believe the majority of it was.
25      Q   Okay.
```

**Page 41**

1   A   I can't give you a specific percentage.
2   Q   Okay. What -- I'm looking at 2002, the
3   first month on the contract is February, and sales
4   and revenue of a little over $742,000. Were those
5   early 2002 numbers consistent with the numbers that,
6   the sales numbers, that MITG had had for say the
7   last six months of '01?
8   A   I haven't reviewed those documents, so I
9   can't adequately answer that question.
10  Q   Do you have any recollection as to whether
11  with the start of the Standard Support Agreement all
12  the sudden sales and revenues just skyrocketed?
13  A   No, I don't.
14  Q   You don't recall there being, one way or
15  the other, whether there was a dramatic change in
16  sales and revenue after the Standard Support
17  Agreement?
18  A   No, not off the top of my head.
19  Q   Okay. And now in 2004, which is the
20  MITG0612.
21  A   Uh-huh.
22  Q   The only full month that was still part of
23  the Standard Support Agreement was January of '04,
24  correct?
25  A   Correct.

**Page 42**

1   Q   All right. So the first little bit of
2   February. On the first week of February -- are you
3   aware that agreement terminated February 7th?
4   A   Yes, but I think we continued to do a few
5   orders after that. You would have to refer to the
6   other documentation for the dates on those.
7   Q   Okay. So there could be some additional
8   numbers in here that was covered? I know invoices,
9   for example, were received and paid after
10  February 7th.
11  A   Correct.
12  Q   So any of that, tying up then the end of
13  that business, whatever those numbers might be,
14  would also be included in February, March?
15  A   Should be, correct.
16  Q   Whenever you got paid?
17  A   No, whenever they were billed.
18  Q   Whenever they were billed, okay. Do you
19  recall during say the latter half of 2003, any
20  discussions with Mr. Haught about declining call
21  volumes for HP Direct business volumes?
22  A   I remember that there were discussions
23  about the call, concerns about the call volume, but
24  I don't recall any specific conversations.
25  Q   Did you have any role in reporting the

**Page 43**

1   call volume numbers to HP Direct in 2003?
2   A   No, I did not.
3   Q   Okay. Did you have any input into the
4   format of the reports, what information was going to
5   be provided on call volumes or anything else to HP?
6   A   No, I did not.
7   Q   Do you recall any discussions with
8   Mr. Haught about declining sales or revenues for HP
9   Direct, the HP Direct business in the latter half of
10  2003?
11  A   I remember telling him, yes, that revenues
12  were declining.
13  Q   Do you recall any discussions that --
14  participating in any discussions with anyone from HP
15  about why the revenues were declining?
16  A   No, I did not.
17  Q   Okay. What was your understanding at the
18  time Compaq and HP merged? What is your
19  understanding of the affect that the merger was
20  going to have, if any, on MITG's business under the
21  Standard Support Agreement?
22  A   I'm not knowledgeable of any notices or
23  anything we received regarding that.
24  Q   Okay. Do you recall having any
25  conversations or hearing Mr. Haught discuss how the

**Page 44**

1   merger might affect MITG's revenues or the call
2   volume?
3   A   I believe we discussed the merger when it
4   came out in the media. I mean there was obviously
5   concern when that happened as to how that would
6   affect us, but I don't remember any specific -- ever
7   being told specifically how it would affect the
8   business.
9   Q   Concerned potentially HP would come in and
10  say, we're going to cancel the contract and off we
11  go?
12  A   Or concern that business could increase as
13  a result of the that merger.
14  Q   You never participated in any
15  conversations with anyone from the HP Direct about
16  how that might affect -- or from Compaq Direct at
17  the time of the merger how that might specifically
18  affect MITG or anything MITG needed to do to deal
19  with the merger and the possible change of the
20  business?
21  A   I didn't directly have any conversations.
22  Rarely did I have conversations with anyone.
23  Q   All right. After the merger, did you
24  have -- gain an understanding from Mr. Haught or
25  anyone else as to what part of HP's spare parts

business MITG was going to be handling?
 A   No, I did not.
 Q   Okay. Do you recall, at any time -- just to give you some parameters, the merger of HP and Compaq was in May of 2002, just to put a bookend on that so I can stop saying the merger of the two companies, it is May 2002 until the end of the Standard Support Agreement, do you recall Mr. Haught ever commenting to you that HP was violating an exclusivity provision of the Standard Support Agreement by using other HP entities to sell spare parts?
 A   No, I did not.
 Q   Do you recall anyone else that you were dealing with at MITG saying that they heard Mr. Haught complaining that HP was violating the exclusivity provision of the Standard Support Agreement?
 A   The only conversations I remember in relation to that were in the same relation to decreased call volume, and we didn't understand why.
 Q   Did you ever get an explanation from -- did you ever hear from anyone, whether it be from HP or from MITG, why the revenue sales and revenues were declining in the latter half of 2003?

 A   No.
 Q   Okay. When did you become aware of HP's decision to terminate the Standard Support Agreement?
 A   I believe it was in October of 2003 that I received word of that.
 Q   And how did you receive word of that?
 A   I saw the letter that they sent.
 Q   And what discussions did you have, if any, with Mr. Haught about that termination notice?
 A   Mr. Haught was out of the office when the termination notice arrived, so I contacted him and told him that we had received it.
 Q   Okay. And do you recall any discussions, whether it's at that initial contact or in the days or weeks following that, any discussions with Mr. Haught about the reasons for that HP was not going to go forward with the contract after February 7 of 2004?
 A   There was no reason given by HP for that termination.
 Q   Okay. Did you participate in any conversations or were you on any email exchanges where the reasons were discussed?
 A   No. Not to my recollection.

 Q   Okay. And were you involved in any way -- well, strike that. You were aware that Mr. Haught and Mr. Crowely, who's from HP, had some discussions about some other ways that MITG might be able to continue to do business with HP?
 A   I was told that, yes.
 Q   Okay. Did you have any role in assisting Mr. Haught in trying to develop a new business model that MITG might be able to propose for doing business with HP?
 A   I'm aware that there was a proposal put together for Mr. Crowely. I believe I even looked at that proposal prior to it being sent, but I didn't develop it myself.
 Q   Did you have to do any analysis of the finances or the impact, the financial impact, of the proposed change in the way of doing business, how would that impact MITG?
 A   I don't recall that proposal having specific financial numbers in it.
 Q   Okay. And well, let me ask you this, did -- before it went out, did you, at any time, do any financial modeling to see, if they accept this, are we going to make money, lose money, break even?
 A   There weren't enough numbers to do any

financial modeling.
 Q   Okay. We talked before about trying to get a calculation of what the total profits were that MITG generated from the sales under the Standard Support Agreement and you said you don't have -- you're not aware of a report that you can run that can cut off profit at just the amount from the Standard Support Agreement, is that correct?
 A   Correct.
 Q   Do you have any numbers that would tell you or any reports that you could run that would tell you how much MITG's 75% was other than multiplying all these, going through this entire report and multiplying the incentive to get to the other 75%, multiply the 25% by 3?
 A   Could you repeat that, please?
 Q   Sure. I know if I look at these detail invoice registers that you have provided and I went through every single one of those and multiplied the 25% incentive, which is 25% of the profit, if I multiplied all these by 3, I would get 75, the other portion, and I could add all those numbers up and figure out on a monthly basis and on a total basis how much profit, what their 75% share was. Is there any other way, any report that you can run so that

could be done?
A  I can't think of a specific report that could do that.
Q  Okay.
  MR. HANSEN:  Get a calculator.
BY MS. CARROLL:
Q  Is there any -- is the SBT accounting software that you use sophisticated enough to do a query that it could do that automatically?
A  No, it's very limited in those capabilities. That's why we tend to use Excel.
Q  Okay. Do you recall having any discussions with -- let me show you this. Let me just show you a document, it starts MITG0109 and it is an email that you sent to Troy Bloomquist on October 31, subject to please call me or Ronnie ASAP. Received a termination letter from Kristin Triolo. Just want to see what you think. Thanks. And that's from you. Do you recall -- Troy actually responds to you in the email. What does it say? I know they wanted to move to a HP agreement versus a MITG agreement. Do you recall -- then you respond --
  MR. HANSEN:  It's at the top.

BY MS. CARROLL:
Q  The very top of the page in your email address. It's on Page 108 that you respond giving some brief information about the termination notice. Do you recall any other communication with Mr. Bloomquist other than this short email string about receiving -- where you were talking about receiving -- do you recall any other discussions with him?
A  No. I believe the reason I did this is because Mr. Haught was traveling.
Q  All right.
A  I did this on his behalf.
Q  So other than this one response from Troy where he's asking you, when it says -- you don't recall any further communications that you personally had with Troy?
A  I don't recall any, no.
Q  Okay.
  (Exhibit No. 21 was marked for identification. marked)
BY MS. CARROLL:
Q  Let me hand you Exhibit 21, and it's an email string, and I'll tell you you're not on the email string anywhere, but I have a question about

the information that's in there. The Troy Bloomquist in the middle of the first page of the exhibit, which is HP002506 says, Hey, what are the numbers again? I wrote them down, but I cannot find them. And Mr. Haught responds by email September 19, what percentage of your business is HP equals 76%? What percentage is sourced equals 52%? Of out sourced, how much is backorder equals 6%? Do you recall any discussions with Mr. Haught about these numbers?
  THE WITNESS:  This is from 2003?
  MS. CARROLL:  Correct.
A  I don't recall this at all.
Q  Okay. You don't recall any discussions with him about how much of MITG's business was made up of HP business? At this time frame you don't recall giving input for these numbers?
A  Gosh, I don't know. Does it say what this was even in relation to?
  MR. HANSEN:  I'm just --
A  No, I don't recall this at all.
BY MS. CARROLL:
Q  All right. Mr. Bloomquist responds, 76 seems high. Is that really correct? Do you recall any discussions in the early fall of 2003 with

Mr. Haught about what numbers, at that time period, what percentage of MITG's business was HP business?
A  I don't recall discussing it with him, no.
Q  All right, fair enough. Have you heard from anyone at -- well, have you heard from any customer of MITG after the termination of the -- well, strike that. Have you heard from anyone outside of MITG after the termination of the Standard Support Agreement of February of '02 that HP was telling customers not to do business with MITG?
A  I've heard of that. I have not had direct conversations with anyone.
Q  And when you say you've heard of that, you heard somebody else say that that was happening, is that correct?
A  That's correct.
Q  Okay. Who did you hear say that?
A  I believe a customer that Mr. Rice contacted -- had said that they stopped doing business with us because of HP.
Q  Mr. Rice told you that's what his customer said?
A  I'm not sure which of the managers told me of that specifically. I know that he had been,

```
 1  probably been, in contact with them, but I don't
 2  remember for sure.
 3      Q   Okay. Do you recall as you sit here today
 4  what the name was of this customer?
 5      A   Yes, I do.
 6      Q   Who was the customer?
 7      A   It was Avnet.
 8      Q   All right. Do you have any more -- did
 9  you understand why Avnet was declining to do -- said
10  they weren't going to do business with MITG or that
11  HP said not to do business with MITG, do you know
12  the details of that communication?
13      A   My understanding was it was lawyers
14  telling the operations people not to, so they
15  refused to because there were lawyers involved.
16      Q   Lawyers for Avnet?
17      A   Avnet's legal people had talked to HP's
18  legal people was my understanding, but I don't have
19  direct -- I didn't have any direct conversations
20  with any of those individuals.
21      Q   It's your understanding that's what you
22  hear through the grapevine.
23      A   That's correct.
24      Q   Do you know how much business in terms of
25  revenue Avnet did with MITG in the calendar year
```

```
 1  2003?
 2      A   The calendar year 2003?
 3      Q   Correct.
 4      A   I wouldn't have any idea.
 5      Q   Do you have the ability in your accounting
 6  software to do an analysis by customer to see say
 7  how much revenue and how much profit was generated
 8  or on a per customer basis?
 9      A   Well, you have to understand in 2003 those
10  numbers were billed directly through HP, so we
11  didn't bill customers directly, so we wouldn't have
12  that in our SBT system.
13      Q   During the time of the Standard Support
14  Agreement when you were invoicing HP, did MITG keep
15  any kind of record of, the names of the customers
16  the part was being shipped to, what parts were being
17  shipped, how much it costs, how much profit was made
18  off of that customer's order?
19      A   There is -- there would be a data base of
20  the actual claims, yes, what the functions are. As
21  far as to accumulate that information, I don't know.
22      Q   Let me ask you this, Avnet, if they
23  ordered, called in, somebody answered HP Direct, can
24  I help you, and they want to order parts and those
25  parts, were sourced parts covered by the Standard
```

```
 1  Support Agreement, that becomes part of this invoice
 2  at the end of the day. Was there a separate record
 3  that MITG kept that would have divided this total
 4  invoice number and said Avnet was $500 of that and
 5  this customer was $500 of that, etcetera?
 6      A   It would have been on the Excel
 7  spreadsheet that went with the billing to HP so they
 8  could then bill Avnet.
 9      Q   So during that time, if you wanted to go
10  back to that time period and you wanted to determine
11  how much revenue was generated from the sale of
12  products to Avent, could you do that kind of search
13  of those spreadsheets? Do you have that capability?
14      A   I guess if you want to accumulate
15  spreadsheets on a daily basis for that many days of
16  every day of the year, business day of the year, you
17  could.
18      Q   Well, do you have -- are all of these
19  spreadsheets sent on a daily basis to HP or stored?
20      A   I do not know where they're stored. I'm
21  sure they're stored somewhere, but I'm not sure
22  where that is.
23      Q   Well, just -- they're archived. If you
24  wanted to, does Excel have the capability just to
25  load an entire year's worth of spreadsheets and do a
```

```
 1  search and identify every time Avnet shows up on the
 2  spreadsheets?
 3      A   My understanding of Excel, you would have
 4  to do it on a per spreadsheet basis.
 5      Q   Okay. Did Avnet continue to do any
 6  business for any period of time after the
 7  termination of the Standard Support Agreement, do
 8  you know?
 9      A   I believe so, yes.
10      Q   Okay. And do you know approximately when
11  this Avnet ceased doing business with MITG?
12      A   I don't have an exact date on that.
13      Q   Do you have a ball park as to -- when are
14  we talking? A month ago? Six months ago?
15      A   No, it was probably mid 2004 possibly, but
16  that is by no means and exact date.
17      Q   Okay. So you can't say as you sit here
18  today how much revenue or how much profit MITG lost
19  from Avnet not doing business with them?
20      A   I don't have access to numbers like that
21  right now, no.
22      Q   Okay. And if you went back to your
23  office, would you have access, other than adding,
24  how would you calculate that, if you could, how
25  would you find that out?
```

```
 1      A   I could easily arrive at any invoices that
 2  were done directly to Avnet in 2004. That would be
 3  after your Standard Support Agreement ended. Prior
 4  to that, I'm not sure how I would arrive at that
 5  number. I would have to consult with other people.
 6      Q   All right. Have you heard of any other
 7  customers of MITG that reported that HP told them
 8  not to do business with MITG?
 9      A   I specifically have not.
10      Q   Have you heard of any other customer other
11  than Avnet?
12      A   I know there have been blanket
13  descriptions or discussions of that, but what
14  specific customers those are, I do not know.
15      Q   Are you aware of any supplier or
16  distributor of MITG's not doing business with MITG
17  because HP told them not to do business with them?
18      A   I do not have any direct conversations.
19  Mr. Haught could answer that question for you.
20      Q   Have you ever heard anything about a
21  supplier?
22      A   I heard there was a supplier or
23  distributor that was told not to. I'm not sure who
24  it was.
25      Q   Okay. All right. Have you heard from
```

```
 1  anyone that HP or HP personnel were making
 2  derogatory statements about MITG to customers,
 3  suppliers, distributors, anyone?
 4      A   I haven't directly, no.
 5      Q   Have you heard from anybody else that they
 6  have heard it's happening, hear it through the
 7  grapevine?
 8      A   Just through Mr. Haught.
 9      Q   Do you have any knowledge as to what kind
10  of statements HP was allegedly making?
11      A   No.
12      Q   Or to whom they were made?
13      A   Other than to Avnet legal staff was all I
14  knew of.
15      Q   Okay. I'm going to change gears on you
16  very quickly and then I'll take a quick break and
17  see what else I need to do. You have also been
18  codesignated with Mr. Haught on item No. 12?
19          MR. HANSEN:  Really?
20          MS. CARROLL:  That's what your letter
21      says. We also believe 12 would be a
22      combination of Ron and Teresa.
23          MR. HANSEN:  All right.
24  BY MS. CARROLL:
25      Q   There are a couple of, four of those; use
```

59

```
 1  of domain names after February 7; including tracking
 2  of hits; 3, the message shown; and 4, the business
 3  generated from the websites containing the domain
 4  names after February 7. Of those four pieces of 12,
 5  you have knowledge of which pieces?
 6      A   Let's see, hits to website no, knowledge
 7  of message as shown on Exhibit G. What's Exhibit G?
 8      Q   It was the message after the end of the
 9  Standard Support Agreement.
10      A   I believe I saw that at one time as it was
11  directed that we put that up.
12      Q   Let me ask you this, did you have any
13  input into the content of that?
14      A   No, I did not. That was legal staff. Any
15  business generated from the websites, we have no way
16  to track if there was business generated directly
17  from that specific website.
18      Q   Do you -- were the websites, when somebody
19  went on the website after February 7th and got this
20  message that said something on the lines of, for the
21  last approximately three years MITG has been
22  providing this service.
23      A   Right.
24      Q   If you want to go to HP, you can go to HP.
25  If you want to continue to go through us, here, you
```

60

```
 1  can click here, and there MITG was. Did the web
 2  hosting company that you had have the capability of
 3  telling you how many people went to the domain name,
 4  for example, hponline.com before or after the
 5  termination of the Standard Support Agreement, did
 6  you get that functionality?
 7      A   I don't know of that functionality
 8  anywhere in our systems.
 9      Q   Okay. And MITG uses a third-party web
10  hosting system, Adams.net, for their websites?
11      A   That's -- yes, we use Adams.net. As far
12  as who hosts what and how that works, that's a
13  technical question I cannot answer.
14      Q   You don't have any knowledge one way or
15  another as to the tracking capabilities of the
16  website to say 100 people ended up on our site
17  today?
18      A   No, I do not.
19      Q   Okay. Likewise, you have -- you're
20  telling me that MITG doesn't have the ability if
21  somebody went on to HP.com on February 15th of 2004
22  and got the message that popped up and clicked on to
23  the link for MITG, you have, to your knowledge, MITG
24  doesn't have the ability to say how many people went
25  from hponline.com and picked that link to go to
```

```
 1  MITG?
 2      A    I have no knowledge of that.
 3      Q    Okay.  Have you had any discussions with
 4  anyone at MITG about that capability, whether that
 5  capability exists?
 6      A    I believe that question arose through
 7  legal staff with this, but that's all I know.  I did
 8  not have any direct conversations regarding any
 9  discussions or how that's arrived at, no.
10      Q    All right.  During the term of the
11  Standard Support Agreement, do you recall ever when
12  people were going on to say hponline.com to order a
13  part, were they actually able to order, put it in a
14  shopping cart and they would give you a credit card
15  like that or did you always need -- did it involve
16  interaction from MITG to approve, for example, the
17  purchase?
18      A    I believe there was a interaction that
19  gave them a quote.  They didn't have direct pricing.
20      Q    Okay.  Let's go off.
21                  (Off the record discussion.)
22                  (A recess was taken.)
23  BY MS. CARROLL:
24      Q    There are -- I saw in going through all
25  the many documents that have been produced in this
```

```
 1  case that you are on numerous documents as a cc.
 2  that deal with sales or specific customer issues.  I
 3  never actually saw you respond to any of them, but
 4  you seem to be on all of those things that, many of
 5  which involved customer relationships or trying to
 6  land business.  Did you have any role during the
 7  term of the Standard Support Agreement for sales?
 8      A    No, I did not.
 9      Q    Okay.  For trying to get new business?
10      A    No, I'm not a sales person.
11      Q    All right.  Let me show you something.  I
12  wanted to try and eliminate having to ask you any of
13  these questions.  There are -- what, if any, contact
14  did you personally have with any customers of MITG
15  or being serviced by MITG?  Any?
16      A    I had no direct contact with customers.
17      Q    Okay.  And in terms of the people who were
18  the -- reporting of information, I think I may have
19  asked you this, the reporting of information on call
20  volumes, etcetera, you didn't have any involvement
21  in that, is that correct?
22      A    No.
23      Q    No, you didn't?
24      A    No, I did not have to accumulate that.
25      Q    There are -- you're aware that after the
```

```
 1  or prior to the end of the Standard Support
 2  Agreement that HP requested that the domain names
 3  that incorporate Compaq and HP be transferred to HP,
 4  were you aware of that?
 5      A    Yes.
 6      Q    Were you involved in any discussions about
 7  whether those domain names should be transferred?
 8      A    I had no input on whether they were
 9  transferred or not.  There were discussions, yes,
10  with Mr. Haught.
11      Q    Well, did you express an opinion at any
12  time, one way or the other, as to prior to the
13  termination of the Standard Support Agreement what
14  should be done with those domain names?
15      A    I wasn't asked for an opinion.
16      Q    Well, did you express them?
17      A    No, I did not.
18      Q    Are you aware of any plans that MITG has
19  for the use of any of the domain names that
20  incorporate Compaq and HP in them?
21      A    No plans to my knowledge.
22      Q    All right.  Do you know why Mr. Lauber
23  testified this morning that Mr. Haught told him not
24  to agree to transfer or sign off on the transfer
25  documents that were forwarded to him?  Do you know
```

```
 1  why Mr. Haught in early February of '04 was not
 2  going to transfer the domain names to HP?  Did he
 3  ever articulate his reasons to you?
 4      A    There was no reason to was my
 5  understanding.
 6      Q    Do you have -- were you involved in any
 7  conversations in which Mr. Haught indicated that he
 8  thought he had rights to use the Compaq, any of the
 9  trademarks of Compaq?
10      A    I don't recall using trademarks of Compaq,
11  no.
12      Q    Are you aware that the word Compaq is a
13  federally registered trademark of Compaq Computer
14  Corporation?
15      A    Not specifically, no.
16      Q    Are you aware that HP is a federally
17  registered trademark of Hewlett-Packard?
18      A    Not till today I guess.
19      Q    Okay.  Well, do you recall any discussions
20  of Mr. Haught or any comments by Mr. Haught stating
21  that he believed that he had the right to use Compaq
22  and HP in the domain names despite their objections
23  to it at the end of the Standard Support Agreement?
24      A    Just the fact that he did.  I'm not sure
25  how to answer that question.  Could you rephrase it
```

 again for me?
 Q Sure. Do you recall any comments or statements made by Mr. Haught that -- now I forgot what my question was. Let me think about this in a simpler fashion. Do you recall Mr. Haught ever saying that he had the right to use the domain names that had incorporated Compaq in the domain names at the end of the Standard Support Agreement after being requested by Compaq to transfer those domain names?
 A I don't believe he ever said that he had the right to use them. I don't recall those terms.
 Q Okay. And when he said -- is it your understanding that his reason for not transferring the domain names was because he didn't think it was necessary?
 A That his company owned them. That's all I --
 Q You didn't have any discussion -- did you have any discussion with him about the allegations in the lawsuit by the Plaintiffs, that the use of those domain names infringed the trademark right?
 A I knew that was alleged from HP.
 Q Not including any conversations that you may have had with lawyers, that you heard Mr. Haught

 having with lawyers, have you had any discussions with him about the possible trademark infringement that would derive out of the use of the domain names that incorporate Compaq and HP?
 A Only that -- that was what his company was being sued for.
 Q Did you ever hear Mr. Haught talk about or say that HP was making use of the Middleware for a third party?
 A I've heard him say that, yes.
 Q Do you know what -- anymore than just him saying that, do you know any factual basis for that?
 A No, just what he told me would be the only thing I would know.
 Q Have you ever seen any documents that would show this alleged misuse of the Middleware by HP?
 A I don't recall seeing anything specific.
 Q Okay. Did he ever identify for you who those customers were that HP was using the Middleware with?
 A No.
 Q And you don't have any technical knowledge of whether the Middleware could be used or could not be used by HP?

                                                                67                                                                 68

 A My technical abilities are limited in that area, no.
 Q So you really don't have an understanding of how it works or?
 A No, I do not.
 Q Okay. And do you know where the Middleware resides? Is it on MITG's system? Is it on HP's system? Do you have any knowledge of that one way or another?
 A You mean where the actual software resides?
 Q Correct.
 A Mr. Haught would have to answer that for you.
 Q You don't have any knowledge of that then?
 A No.
 Q Have you done any analysis to say to try to determine how much money, if any, that this alleged misuse has negatively affected MITG's revenue stream?
 A I have no numbers to do any analysis from that.
 Q Okay. Have you had any discussions with him as to how you might calculate, with "him" being Mr. Haught, how you might calculate damages that

 might arise from HP using the Middleware for somebody else?
 A How I would arrive at that?
 Q Yeah.
 A No, I have none.
 Q So you haven't had any discussions on how that would work in terms of a damage model, for example?
 A A damage model, no. I mean I just have no -- there's no way I could calculate any of that. I don't have any numbers to do that.
 Q Did you have any discussions with Mr. Haught about HP's alleged diversion of business that was intended during this Standard Support Agreement to go to MITG that went to someplace else?
 A I've heard that customers were referred to other businesses other than MITG.
 Q Do you have any knowledge as to where those customers, under the Standard Support Agreement, were designated or were supposed to go to be serviced by MITG?
 A No, I don't.
 Q All right. And the reason I ask you do you have any knowledge as to how they were -- the Standard Support Agreement refers to Compaq Direct

customers, do you know how that group can be defined versus anybody else who was buying spare parts from Compaq or HP?

A   No, I do not.

Q   Okay. And so is it fair to say that you can't say one way or the other whether those companies that were sent to companies other than MITG to buy spare parts, whether or not they should have gone to MITG?

A   No. Mr. Haught would have to answer that.

Q   All right. And have you tried, in discussions with him, have you all discussed any way that you might calculate lost business from these referrals that Mr. Haught believes or indicated to you he thought --

A   No, there's not adequate information to do that.

Q   Have you had any discussions with Mr. Haught about what kind of information would be needed in order to do that calculation?

A   No.

Q   Okay. All right. I have no further questions.

MR. HANSEN:   Thank you. We'll read.

(Whereupon, the deposition was concluded at 5:10 p.m.

---

STATE OF ILLINOIS  )
                   ) SS.
COUNTY OF ADAMS    )

CERTIFICATE

I, Tracy L. Grott, CSR, a Notary Public in and for the County of Adams, State of Illinois, do hereby certify that heretofore, to-wit, on the 17th day of February, A.D., 2005 at the hour of 3:30 p.m., personally appeared before me at 525 Jersey, in the City of Quincy, County of Adams, State of Illinois, the Deponent herein, TERESA KOCH.

I further certify that the said witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid, that the testimony then given by the said witness was reported stenographically by me in the presence of the said witness and afterwards reduced to typewritten form, and the foregoing is a true and correct transcript of the testimony so given by the said witness as aforesaid.

I further certify that the signature of the witness to the deposition was not waived by agreement of counsel.

I further certify that I am not counsel for nor in any way related to any of the parties to this action, nor am I in any way interested in the outcome thereof.

In testimony thereof, I have hereunto set my hand and affixed my notarial seal the 3rd day of March, A.D., 2005.

Notary Public
Certified Shorthand Reporter

Official Seal
Tracy L Grott
Notary Public State of Illinois
My Commission Expires 06/26/08