IN THE MATTER OF:

# Hewlett Packard Development Co., et al
## vs.
# Midwest Information Technology, et al.

*Cause No. 04-3055*

## Deposition of Scott Stringer
## 11/2/2005

*Gore Perry Gateway & Lipa Reporting*
*515 Olive Street*
*Suite 700*
*St. Louis, MO 63101*

*Full GLOSSARY included with this DepoScript*

DepoScript2

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

3:04-cv-03055-JES-CHE   #74-4   Page 2 of 17

Page 1

[1] In Re: the matter between:
[2] HEWLETT PACKARD DEVELOPMENT CO., et al.
[3] and
[4] MIDWEST INFORMATION TECHNOLOGY GROUP, et al.

[14] Deposition of Scott A. STRINGER
[15] November 2, 2005

Page 2

[1] UNITED STATES DISTRICT COURT
[2] CENTRAL DISTRICT OF ILLINOIS
[3] SPRINGFIELD DIVISION

[5] HEWLETT PACKARD DEVELOPMENT CO., et al.,
[7] Plaintiffs,
[9] vs.                Cause No. 04-3055
[11] MIDWEST INFORMATION TECHNOLOGY GROUP, et al.,
[13] Defendants.

[16]      Deposition of SCOTT A. STRINGER, taken on
[17] behalf of the Plaintiffs, at the offices of UHY
[18] Advisors, 3117 S. Big Bend Blvd., Suite 100, St.
[19] Louis, Missouri, on the 2nd of November, 2005,
[20] before Nicki J. Madison, a Certified Court Reporter
[21] #959(G), a Registered Professional Reporter and
[22] Certified Shorthand Reporter and Notary Public.

Page 3

[1] APPEARANCES OF COUNSEL:
[3] FOR THE PLAINTIFFS:
[4]      Ms. Elizann Carroll
[5]      Juneau, Boll & Ward
[6]      15301 Spectrum Drive, Suite 300
[7]      Addison, Texas  75001
[8]      (972) 866-8333

[10] FOR THE DEFENDANTS:
[11]      Mr. James A. Hansen
[12]      Schmiedeskamp, Robertson, Neu & Mitchell
[13]      525 Jersey
[14]      Quincy, Illinois  62306
[15]      (217) 223-3030

[17] ALSO PRESENT:

Page 4

[1]           INDEX OF EXAMINATIONS
[2] QUESTIONS BY:                         PAGE
[3] By Ms. Elizann Carroll                  5

[5]            INDEX OF EXHIBITS
[6] EXHIBIT NO.                      PAGE MARKED
[7] Exhibit No. 65 was marked and identified     5
[8] Exhibit No. 66 was marked and identified    13
[9] Exhibit No. 67 was marked and identified   166
[10] Exhibit No. 68 was marked and identified  175

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE    # 47-4    Page 3 of 17
Deposition of Scott Stringer
11/2/2005

Page 5

[1] SCOTT A. STRINGER,
[2] of lawful age, having been first duly sworn to
[3] testify the truth, the whole truth, and nothing but
[4] the truth in the case aforesaid, deposes and says
[5] in reply to oral interrogatories propounded as
[6] follows, to-wit:
[7] DIRECT EXAMINATION
[8] QUESTIONS BY MS. CARROLL:
[9] Q: Can you, please, state your name for the
[10] record?
[11] A: Scott A. Stringer.
[12] Q: And Mr. Stringer, we are here for a second
[13] time now for the deposition of you and your second
[14] report, a supplement to your expert report dated
[15] August 17, 2005; is that correct?
[16] A: Yes, ma'am.
[17] (Exhibit No. 65 was marked, dated, NJM.)
[18] Q: (By Ms. Carroll) And let me just hand you
[19] what has been marked as Exhibit 65, and ask you if
[20] that is a full copy of your supplement to your
[21] expert report?
[22] A: Yes, ma'am, it is.
[23] Q: And you indicated -- you can keep that, or
[24] do you have a copy that you want to work off of?
[25] A: I have a copy in front of me.

Page 6

[1] Q: You indicated in the first paragraph of
[2] your report, the second paragraph of your report
[3] that -- well, first paragraph of your report that
[4] you're supplementing your original report because
[5] of incorrect information contained therein. Tell
[6] me what incorrect information you determined was in
[7] your first report?
[8] A: Yes, ma'am. Two pieces of information
[9] primarily. The first one was that the Andover
[10] Roseville calls weren't shifted until November of
[11] 2002, and my original report I had utilized the
[12] date of, I believe, May 4 or so. The second error
[13] in my report was the misunderstanding on the way
[14] CSN parts were compensated to MITG, and this
[15] particular report then changes to the correct
[16] methodology.
[17] Q: Anything else?
[18] A: Those are -- oh, and then finally -- well,
[19] I guess you didn't ask me this question, but I
[20] received additional information as well.
[21] Q: And that was going to be my next question
[22] in terms of what additional information did you --
[23] you said important information became available
[24] which required me to modify my methodology and data
[25] amount. What is the important information that

Page 7

[1] became available after your July 27 deposition?
[2] A: I received a disk which contained actual
[3] sales data that MITG had from 2002 through 2004
[4] relating to this contract.
[5] MR. HANSEN: I want to go back up and so
[6] the record's clear, there is additional information
[7] that was corrected which is reflected in the report
[8] under the tortious interference part on the
[9] assumption he made in his first deposition that
[10] people who bought -- everyone stopped buying from
[11] MITG, so I just want to make sure that that gets in
[12] there.
[13] Q: (By Ms. Carroll) And let me follow up. I
[14] know that in the report, and you and I had a
[15] discussion in your first deposition about the
[16] assumption that was made in that report that
[17] essentially there were no more sales to anybody
[18] from --
[19] A: Correct.
[20] Q: -- from MITG who they used to sell to; is
[21] that correct?
[22] A: Correct.
[23] Q: And now you have used information that you
[24] had that shows that there were at least some sales
[25] continued to people that had been selling to

Page 8

[1] previously?
[2] A: That's correct, yes, ma'am.
[3] Q: Okay.
[4] THE WITNESS: Thanks, Jim.
[5] Q: (By Ms. Carroll) And now why was the
[6] actual sales data for MITG from when we say from
[7] '02 to '04, is that just being shorthand for the
[8] term of the contract February 7 of '02, to February
[9] 7 of '04?
[10] A: Actually from November -- yes, I believe it
[11] is from February of '02.
[12] Q: It's the two years for the term of the
[13] contract?
[14] A: Yes.
[15] Q: Which don't quite overlap the two year
[16] calendar year?
[17] A: Yes, ma'am, that's correct.
[18] Q: Now, why did that information require you
[19] to change your methodology?
[20] A: Because that was the information that I
[21] would have liked to have had in my first report
[22] because it's specific, and now that it was
[23] available, that was the best information I could
[24] utilize.
[25] Q: And it was specific in what way?

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE  # 74-4  Page 4 of 17
Deposition of Scott Stringer
11/2/2005

Page 9

[1] A: Because it showed the breakdown of CSN
[2] versus non-CSN. It also gave me information about
[3] the profit margin on products as well. It helped
[4] me in the tortious interference calculation that
[5] refer to which customers had regularly bought
[6] versus which ones they had not regularly bought, so
[7] he contained a lot of information through the
[8] process.
[9] Q: Did you ask for that information before you
[10] did your first report?
[11] A: Yes.
[12] Q: Who did you ask?
[13] A: I asked Mr. Hansen for specific sales
[14] information.
[15] Q: And what were you told when you asked for
[16] it?
[17] A: It was being compiled and/or they were
[18] trying to -- there was going to be subsequent
[19] information supplied, but at this point, that that
[20] information was not available.
[21] Q: Have you ever seen the spreadsheets whether
[22] it be on a disk or printed out that has the same
[23] information that is on the CD provided to you by
[24] MITG that was provided by HP in a different format?
[25] A: I don't believe I ever saw any specific

Page 10

[1] customer information, sales by customer information
[2] at all, no, ma'am.
[3] Q: So until -- so before you got the CD that
[4] was provided to you, that was the first time that
[5] you saw specific information from MITG about their
[6] customer sales during the time of the standard
[7] support agreement; is that correct?
[8] A: I believe it is, yes, ma'am.
[9] Q: Just before we go, because we are going to
[10] be taking much of your deposition about CSN parts
[11] versus non-CSN parts, and I just want to talk about
[12] some technology and make sure you and I are on the
[13] same page. When we say CSN parts, do you
[14] understand those as being in-stock Compaq parts?
[15] A: Yes, ma'am.
[16] Q: And non-CSN parts, what are we -- I think
[17] in your report you refer to them as outsourced
[18] parts?
[19] A: Correct.
[20] Q: What is your understanding as to what those
[21] parts are?
[22] A: Those would be parts that are not in stock
[23] or parts that could be outsourced at a lower price
[24] than what's in stock.
[25] Q: And is it your understanding, are these

Page 11

[1] Compaq spare parts, or are they spare parts of
[2] other vendors?
[3] A: They can be -- are you talking about the,
[4] just the outsourced or both outsourced what they
[5] could --
[6] Q: I mean in terms of the parts that are the
[7] non-CSN parts as you refer to them, and we will
[8] refer to them in the deposition as outsourced parts
[9] or sourced parts.
[10] A: Okay.
[11] Q: Those sourced parts, is it your
[12] understanding they could be Compaq parts that are
[13] no longer carried by Compaq or HP?
[14] A: Yes, I believe so.
[15] Q: Do they also include Compaq parts that are
[16] in stock but meet a certain criteria in terms of a
[17] price savings so could be obtained from another
[18] vendor?
[19] A: Yes, ma'am.
[20] Q: And what is the criteria by which it cuts
[21] it off that they could get the parts from a vendor
[22] through Compaq or HP?
[23] A: It's spelled out in the standard agreement,
[24] and I don't have it memorized, but I believe I'm
[25] going to do it from my best recollection, it seems

Page 12

[1] like $200, if it was a $200 difference. I don't --
[2] I just don't remember the exact terminology and
[3] what that number was.
[4] Q: And when you say it was in the standard
[5] support agreement, there is an indication in your
[6] report, and I don't want to -- your supplemental
[7] report here, that references the MITG quote
[8] "Bible."
[9] A: Yes, ma'am.
[10] Q: Closed quote. And that is also referenced
[11] in the standard support agreement?
[12] A: Yes, ma'am.
[13] Q: So when it's in the standard support
[14] agreement, that's a reference over to this MITG
[15] Bible that sets out --
[16] A: Yes, ma'am, correct.
[17] Q: So do you also understand that sourced
[18] product can be multi-vendor parts?
[19] A: Yes.
[20] Q: And by multi-vendor parts, that somebody
[21] other than Compaq or HP?
[22] A: Correct.
[23] Q: How did the spreadsheet that was provided
[24] by MITG give you information on profit margin on
[25] products?

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

3:04-cv-03055-JES-CHE    # 4-74-4    Page 5 of 17

Deposition of Scott Stringer
11/2/2005

Page 13

A: I'm sorry, I beg your pardon, it was not profit margin. It gave me the information on the CSN outsourced split. I misspoke earlier. I apologize.

Q: Okay. So the information gave you the split between CSN parts and outsourced parts, it helped you in the tortious interference calculation who regularly bought from MITG during the course of the standard support agreement?

A: Yes, ma'am.

Q: Anything else that the spreadsheet gave you?

A: Yes, ma'am.

Q: What is it?

A: What I meant to say earlier was it gave me the average sales price per outsourced order.

Q: And the document you have in front of you, is that a printout of the spreadsheet that was provided by MITG?

A: This is a printout of part of that spreadsheet. This is the 2003 portion.

Q: Okay. Can I take a quick look at that?

A: Yes, ma'am, you may.

(Exhibit No. 66 was marked, dated, NJM.)

Q: (By Ms. Carroll) Exhibit 66 is the 2003

Page 14

portion of the spreadsheet, and I've got it up on my computer here. Let's see if you can recognize this as being the actual information off of the disk provided to you. Can you see the screen?

A: Yes, ma'am, I can.

Q: Does that look to be the right spreadsheet that we've been referring today?

A: That's the tab, the specific spreadsheet.

Q: Is which one, the INV-1046 or this 2003 by customer?

MR. HANSEN: When you say that one for the record, you are pointing to --

Q: (By Ms. Carroll) 2003 by customer?

A: Yeah.

Q: So what we have now on the screen matches 66 other than the formatting, which because of the way the screen is set up, it looks a little different?

A: I believe, ma'am, if you can just tab over a little bit so I can see the second part of the screen. There we go. I did some additional calculation and brought them through up on here to get my numbers.

Q: And in the top corner of the first page of Exhibit 66, you have done some additional

Page 15

calculations to get the percentage of revenue based on the CSN parts versus the outsourced parts; is that correct?

A: I've done that as well as pulled data from one of the other tabs on outsourced dollars, outsourced calls, and then an average revenue per call.

Q: Okay. Let me take a quick look at that. And the outsourced calls, how did you determine that number as being 9086?

A: Well, I went to tab INV-1046 2003, and I tabbed down to the 11,000th salesperson number.

Q: Okay. And so if you just scroll all the way down there, you get to -- you went down to the tab number on the side 18650?

A: Actually 649.

Q: Sorry. To the bottom that will give you the 9000?

A: Yes, ma'am.

Q: So when we look all the way up, and I will go back to the top, so from 18648, which is the last number, that's 150?

A: Yes, ma'am.

Q: Back up to number 11, that would be the number of calls that went to -- that were for CSN

Page 16

parts, right?

A: That appears to be correct, yes, ma'am.

Q: After your first deposition, you and I talked about some of the issues that were identified as being incorrect information, the Andover calls, the misunderstanding of the CSN parts, and the not providing credit for any sales that were in fact made by MITG to prior customers in 2004. Do you recall talking about those in your first deposition?

A: Yes, ma'am, I do.

Q: And even without getting the additional information that we've talked about, and we will talk more about on the spreadsheet, your first report would have required corrections; is that right?

A: Yes, ma'am.

Q: After your first deposition, what discussions do you recall having with Mr. Hansen about your report and changes that would need to be made to your report?

A: We talked about the deposition and what changes needed to be made, and Mr. Hansen informed me that this disk would be coming with the information, and we -- I think we kind of waited

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

Page 17

[1] for that disk really before we started anymore
[2] work. Since the disk was received, by telephone,
[3] Mr. Hansen and I talked about, he explained to me
[4] how the disk was put together and what the
[5] information contained, etc., and then we talked
[6] about, you know, approaches to taking this data and
[7] modifying the report.
[8] Q: Did you have any discussions with Ron
[9] Haught about any of the information, whether it be
[10] on this spreadsheet or the information that you
[11] relied upon for your first report?
[12] A: The only time I spoke with Mr. Haught,
[13] which was discussed in the previous deposition, was
[14] about the information regarding additional costs
[15] per additional volume. Other than that, I've had
[16] no conversations with Mr. Haught, and specifically
[17] none since the last deposition.
[18] Q: Have you had any conversations with
[19] Ms. Koch since your last deposition?
[20] A: No, ma'am.
[21] Q: Have you had conversations with any
[22] representative of MITG other than Mr. Hansen since
[23] your last report?
[24] A: No, ma'am.
[25] Q: There were -- well, in your new report, you

Page 18

[1] have, "Information Reviewed," that's Exhibit 2.
[2] Let's turn to that. The bottom three, the last
[3] three items on the information reviewed list are
[4] new from your first report, but the only new
[5] information that you are relying on for your new
[6] report is the very last item, correct?
[7] A: Yes, ma'am, that is correct.
[8] Q: Those other two items were items that you
[9] hadn't relied upon in your first report, you just
[10] accidentally didn't include them on the list; is
[11] that right?
[12] A: Yes, ma'am, that's correct.
[13] Q: For the purpose of the new report, have you
[14] changed the methodology by which you calculated the
[15] damages for both claims; is that correct?
[16] A: Yes, ma'am.
[17] Q: Has that changed -- what I want to do is go
[18] through this list of information reviewed because I
[19] know from your prior deposition that some of the
[20] information you reviewed but you didn't rely upon
[21] for various reasons, either it wasn't relevant or
[22] it didn't match up, or you didn't have a good
[23] understanding of the documents.
[24] A: Yes, ma'am.
[25] Q: So what I'd like to do is go through each

Page 19

[1] of these things and find out not so much what you
[2] reviewed, but what you relied upon to do your
[3] second report.
[4] A: Yes, ma'am. And I think this will be
[5] helpful because I've taken all the documents, the
[6] vast majority of those documents that I did into my
[7] report here, so this will be helpful. The first
[8] item, MITG prepared revenues and expenses for 2002
[9] through 2004, Bates No. 612 through 614, I relied
[10] upon.
[11] MS. CARROLL: And that was, for the record,
[12] that was marked as Exhibit 46 in the first
[13] deposition.
[14] A: Okay. Let me just skip down to MITG
[15] prepared documents for sales for 2004, Bates No.
[16] MITG 1023 to 1026.
[17] Q: (By Ms. Carroll) Which are deposition
[18] Exhibits 49, 50?
[19] A: HP documents regarding E-spares handled at
[20] Roseville, Bates No. HP 11007 through 11009, and
[21] Ms. Carroll, I believe 11048 through 11050 is a
[22] repeat of this, but I really for purposes of this
[23] report, just relied on that particular document.
[24] Q: Yeah, I believe 11048 to 11050 is simply a
[25] repeat of 11007 and 11009.

Page 20

[1] MR. HANSEN: What are you looking for, the
[2] deposition exhibit?
[3] MS. CARROLL: It's Exhibit 51 is 11007 to
[4] 11009, okay.
[5] A: MITG prepared documents on call volume,
[6] Bates No. MITG 615 to 724.
[7] Q: (By Ms. Carroll) Which is Exhibit 53?
[8] A: The deposition transcripts and exhibits
[9] were reviewed again.
[10] Q: All of them?
[11] A: Yes, ma'am.
[12] Q: And I know you specifically referenced
[13] Exhibit PP?
[14] A: Yes.
[15] Q: Three Ps or two Ps?
[16] A: Two Ps.
[17] Q: And obviously the last one which is the
[18] spreadsheet that we've already discussed part of
[19] which we've marked as Exhibit 56?
[20] A: Yes, ma'am.
[21] Q: Is there anything else, any additional
[22] information you've gotten since you prepared your
[23] new report that you have reviewed?
[24] A: No, ma'am.
[25] Q: So that's everything you relied upon for

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE  # 4.74-4  Page 7 of 17
Deposition of Scott Stringer
11/2/2005

Page 21

[1] the -- that's contained in the supplemental report?
[2]   A: I believe so, yes, ma'am.
[3]   Q: Let's start with the breach of contract
[4] claim. Just summarize for me the way you did the
[5] breach of contract claim in your first report,
[6] because I want to discuss what the different
[7] approaches were.
[8]   A: Certainly. At the risk of getting myself
[9] confused with two methodologies, I will attempt to
[10] relook at this old way.
[11]   Q: And what I'm looking for is an overview,
[12] I'm not look for the details, we have plenty of
[13] details the last time.
[14]   A: All right, okay. Let me refresh my memory
[15] here, I guess. We received information from May
[16] through, I believe, the end or through November of
[17] '04, showing actual call level and sales dollar
[18] volumes for the Andover business. This information
[19] again was inaccurate because the Roseville business
[20] didn't come over until November of that year. When
[21] I look -- these are shown in my previous Exhibit 3.
[22] From the information, I calculated diverted sales
[23] from the information I had previously received,
[24] which included both CSN and outsourced parts, and I
[25] made some, I believe I made some, took some

Page 22

[1] averages, etc., for months that I did not have.
[2] And I took those into '04, as well as into November
[3] and December of '03. I then through inquiry and
[4] review of documents determined that the average
[5] gross profit was 40 percent on that information,
[6] and determined what the lost revenue was for that,
[7] for each month. Then I inadvertently took a 75/25
[8] split. I took a 25 percent of that, I basically
[9] said is payable to HP, again, because I didn't
[10] understand the CSN was a different program
[11] completely. I then took away the costs associated
[12] with additional volume which was per discussion
[13] with Mr. Haught, and arrived at a monthly net
[14] profit that was lost.
[15]   Q: So what you did was take the sales, what
[16] you understood to be sales from that were generated
[17] from calls to the Andover call center after those
[18] calls were being answered by Roseville, subjected
[19] them to 75/25 split. That's for sourced product?
[20]   A: Correct.
[21]   Q: And then did the calculations based on
[22] that, and the errors are the start date being in
[23] May instead of November and subjecting all of the
[24] sales as though they were 75/25 profit split on 100
[25] percent of the sales?

Page 23

[1]   A: That's correct.
[2]   Q: So after the deposition, you came to the
[3] conclusion that there are two errors that you
[4] needed to correct. Could you -- did you have the
[5] act to use the same methodology that you used
[6] before and fixed those numbers based on correcting
[7] your -- with the correct assumptions?
[8]   A: I had -- when I received the disk with the
[9] specific sales information, that gave me a better
[10] -- that is what I had asked for and would have
[11] preferred to have had, and that is much more
[12] accurate information. So the methodology that I
[13] utilized before in addition to containing errors
[14] because of my misunderstanding of the contract and
[15] the revenues, etc., now that I have the specific
[16] sales data, I was able to calculate a much more
[17] accurate calculation. So it required, in my
[18] opinion, it required a change in the methodology.
[19]   Q: Explain to me again from an overview or
[20] broad view the way you did it for your supplemental
[21] report.
[22]   A: Yes, ma'am. For the supplemental report, I
[23] started with Exhibit PP from Chizek's deposition,
[24] and I pulled total calls Andover to Roseville, and
[25] then I determined based upon the MITG historial

Page 24

[1] split out on the HP disk that was given to me
[2] subsequent to the prior deposition that 44 percent
[3] of those were CSN calls and 56 percent were
[4] outsourced calls. And then I took the actual calls
[5] from that Exhibit PP for the month and split them
[6] out between the two, 44 CSN and 56 outsourced. My
[7] first -- after I did that then, I took the CSN
[8] calls, and I compared that to the actual call
[9] volume that MITG had experienced for those months.
[10] When I added those to the actual call volume, I
[11] then compared the total call volume to the minimum
[12] number of calls per the standard agreement of 7810
[13] to the extent that those calls were greater than
[14] 7810. I then took that number times $5.25 per call
[15] to come up with additional call revenue on CSN for
[16] each month. That was the first piece. The second
[17] piece then was to take the outsourced calls that I
[18] had previously calculated, multiplied those calls
[19] times the average revenue per call as calculated on
[20] Exhibit GG as we discussed earlier.
[21]   MR. HANSEN: 66.
[22]   A: Oh, I'm sorry, 66, and then took that
[23] number and calculated total sales of CSN. I then
[24] took total sales, and utilizing MITG's historical
[25] gross profit after payment of the 75/25 split,

3:04-cv-03055-JES-CHE    # 74-4    Page 8 of 17

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

Page 25

[1] which calculated to be 24 percent to determine the
[2] total loss profit for that month. After the loss
[3] profit of each month was calculated, I then
[4] subtracted from each of those months the
[5] incremental operating expense that have in the same
[6] manner that I had done in the first report. Each
[7] month was then summarized and brought up to Exhibit
[8] 3-1, where it says cumulative totals, and the very
[9] bottom box, loss net profits, is the summation of
[10] all of that methodology for each month.
[11]   Q: Let me just make sure I'm clear. When you
[12] referred to Chizek Exhibit PP, that is also HP
[13] 11007 to 009?
[14]   A: Yes, ma'am, it is.
[15]   Q: Let me ask you this, you said that getting
[16] the disk provided you with actual sales information
[17] that made the second methodology more accurate than
[18] the first methodology?
[19]   A: Yes, ma'am.
[20]   Q: Well, the disk that was provided is
[21] providing information on MITG's actual sales during
[22] that time period, correct?
[23]   A: That's correct, yeah.
[24]   Q: It does not provide any information as to
[25] the actual sales by Andover, does it?

Page 26

[1]   A: That's correct.
[2]   Q: You have information that tells you the
[3] actual sales numbers generated from the Andover
[4] calls; isn't that correct?
[5]   A: The information I have on the Andover calls
[6] were incomplete and insufficient for me to be able
[7] to take that information. In other words, I
[8] couldn't understand it, and as a result -- and nor
[9] could it be explained to me, and as a result, I
[10] felt that the historical MITG split, because of the
[11] number of calls, you saw how many orders they had,
[12] was my best, the best information I had about the
[13] split between CSN and outsourced products.
[14]   Q: For the purpose of -- well, let me ask you
[15] two things. What was it that you said you didn't
[16] understand or the information was incomplete that
[17] you had on Andover? Tell me what information you
[18] thought was missing that you would have needed to
[19] use actual sales information generated from the
[20] Andover calls rather than using the MITG?
[21]   MR. HANSEN: I'm going to pose an objection
[22] only as to form. Are we talking pre-November 9,
[23] 2002, Andover, or post November 9, 2002?
[24]   Q: (By Ms. Carroll) Well, let me try to
[25] clarify the question. You have -- you agree that

Page 27

[1] you have information on Andover calls that are
[2] noted in, for example, HP 11007 through 11009, and
[3] some other Chizek PP and other documents; is that
[4] correct?
[5]   A: Yes, ma'am.
[6]   Q: And you said you had information on Andover
[7] that you didn't understand or that was incomplete.
[8] Were you referring to not understanding all of the
[9] information that's on what was previously marked in
[10] your first deposition as Exhibit 51, which is HP
[11] 11007 through 11009?
[12]   A: HP 11007 gives me good information about
[13] the actual call volume, but it does not give me
[14] information at all about the CSN versus outsourced
[15] split.
[16]   Q: So that when you are talking about
[17] incomplete information, that was the incomplete --
[18] that was the part that was incomplete what split
[19] that was?
[20]   A: Yes, ma'am.
[21]   Q: Is there anything else about the reports
[22] that was incomplete, something else that you needed
[23] to have used, information on actual Andover calls?
[24]   A: Could you restate that question? I'm
[25] sorry.

Page 28

[1]   Q: Sure. You've identified one big area that
[2] said this is incomplete. It doesn't tell me what
[3] the sales mix was of Andover. Was there something
[4] else that you also would have needed to know about
[5] Andover calls to use actual Andover calls versus
[6] assuming that Andover calls matched MITG calls?
[7]   A: Well, I think a couple of things. You
[8] know, having the actual CSN versus outsourced calls
[9] in a format like I received on this disk would have
[10] been helpful, but even then, even then, that would
[11] have been not necessarily as good of data I
[12] received because that information I don't believe
[13] was part -- the Andover Roseville, the way
[14] Roseville operated wasn't necessarily the way MITG
[15] would operate under the standard support agreement,
[16] i.e., the 75/25 split for in-stock parts that they
[17] could outsource and receive the 75/25 split on sell
[18] without better information about how Roseville's,
[19] what their standard procedures and operating
[20] procedures were in those situations. Even getting
[21] that data would have required more information for
[22] me to understand the split between CSN and
[23] outsourced orders.
[24]   Q: All right. Now, I'm not sure I'm following
[25] you. In terms of Roseville's standard operating

Hewlett Packard Development Co., et al vs Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

3:04-cv-03055-JES-CHE    # 74-4    Page 9 of 17

Page 29

procedure on handling CSN parts and sourced parts, let me ask you this, if you got the spreadsheet we looked at was marked at 66.

A: Yes, ma'am.

Q: If you got this information in this same set up where you also had, you had information broken down between CSN and outsourced revenue.

A: Yes, ma'am.

Q: And instead of this being MITG's sales mix, this was the actual order information from Andover.

A: Yes, ma'am.

Q: Would you have been more accurate to use that information than to assume that Andover matched --

A: It would have been.

Q: MITG --

A: With one exception, and that would be understanding how the Roseville personnel handled in-stock parts because I don't know whether they have had the incentive like MITG to find the outsourced part, the $200, whatever we referred to earlier, so that's just a question mark. I mean, it would be if they operated in the same manner, then that would be better information for me to utilize, but without that information, utilizing

Page 30

historical information I received was the best estimation.

Q: Okay. So you would need to know both the information in a format similar to what's presented on the spreadsheet for MITG plus know whether they had criteria such as that stated in the MITG Bible about when they could go to an outside source for an in-stock product?

A: Correct.

Q: Do you know out of the outsourced sales by MITG how many, what percentage of those were products that were in stock that were, that MITG was able to acquire from someone else at the required price cut?

A: I don't, do not know that.

Q: Did you ask anybody?

A: I believe -- I don't know if I specifically asked Mr. Hansen, but I think it was implied that, you know, they were either CSN or outsourced, and that this particular document didn't show a trail on what would have otherwise been a CSN part but which is now being outsourced. So I, again, the understanding, I don't remember if he told me that or whether I asked him that.

Q: So is it your understanding then that the

Page 31

majority of outsourced parts are actually in stock, parts that could have been acquired through CSN that were acquired someplace else?

A: I have no idea about the outsourced parts, whether they are, you know, only outsourced parts or whether they are in stock that could be outsourced because of the agreement. I don't know the split on that at all, ma'am.

Q: So it could be that 100 percent of the outsourced sales are actually parts that were available through CSN that were cheaper, or it could be that zero percent were that way?

A: Based on my conversations with Mr. Hansen, I know that some of it, it's probably not zero, it's probably not 100, somewhere in between, but I have no idea where that number is, ma'am.

Q: And to your knowledge, MITG can't provide you with that information?

A: That's my understanding, yes, ma'am.

MR. HANSEN: Can I have a break.

(At this time, there was a break in the deposition.)

Q: (By Ms. Carroll) Let's just try to get into the details of your report and your calculations, and I want to break it into a couple

Page 32

of different segments. And let's start with how you calculated the call volume.

A: Okay. I took --

MR. HANSEN: I'm sorry?

Q: (By Ms. Carroll) How you calculated the call volume for Andover, start with that.

A: All right. I utilized HP 11007 through 11009.

Q: Okay.

A: And I pulled for each month starting November 9, I pulled the data for each month and summarized them from the TTL orders column. I did that throughout the document, and that gave me the total Andover costs.

Q: And when you -- in the first report you assumed, well, that's for the -- is that the same way you calculated the calls to Andover in your first report?

A: I want to be sure I'm correct here.

MR. HANSEN: What exhibit was that, his first depo?

MS. CARROLL: 51.

MR. HANSEN: I got his depo here. I think that's what he testified here, that was the same way he did it. I'm trying to find it.

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al
3:04-cv-03055-JES-CHE    #74-4    Page 10 of 17
Deposition of Scott Stringer
11/2/2005

Page 33

[1] A: Yes, ma'am, that's the same methodology I
[2] utilized.
[3] Q: And then in terms of calculating the number
[4] of MITG calls, how did you do that?
[5] A: In calculating the MITG calls, I utilized
[6] Exhibit 66 to split out the -- we are talking about
[7] the new report, right, ma'am?
[8] Q: Correct.
[9] A: I took those calls and split those 44/56
[10] based upon --
[11] Q: Wait a minute. You misunderstood my
[12] question. How did you calculate you had a number
[13] of Andover calls and I think a number of
[14] historically handled MITG calls?
[15] A: Oh, okay. I'm sorry. MITG calls came from
[16] MITG 0615 through 0724.
[17] MS. CARROLL: And so the record's clear,
[18] that was Exhibit 53 in his original deposition.
[19] Q: (By Ms. Carroll) All right. Let's look
[20] then for 2002. Well, let me see, on your report, I
[21] want to be able to tie back to the pages on your
[22] report. On your report, Exhibit 3-6 breaks it into
[23] the two months of '02, that we are talking about,
[24] right?
[25] A: Yes, ma'am.

Page 34

[1] Q: And so out of Exhibit 53, the Bates range
[2] you just read for us for, let's just go with
[3] November, which pages of that exhibit did you use
[4] to get a November total of 7039?
[5] A: I utilized pages 0617 and 0618.
[6] Q: And which column in 0617, 0618?
[7] A: I believe it was the first column, number
[8] of calls answered.
[9] Q: And this report -- well, let me just ask
[10] you this, just so that we are kind of clear, the
[11] Exhibit 53, this Bates range of documents is a
[12] series of reports, a number of reports per month
[13] that deal with call volumes for MITG; is that
[14] correct?
[15] A: Yes, ma'am.
[16] Q: And this particular report that you use the
[17] pages in the one is with handwriting on the top,
[18] call specifics 2002; is that right?
[19] A: Yes, ma'am.
[20] Q: And now for 2003, on your report that you
[21] did, that's Exhibit 3-5, that has been each month?
[22] A: Yes, ma'am.
[23] Q: And then which report within Exhibit 53 did
[24] you use to get the calls there?
[25] A: I utilized MIT 0673 through 0678.

Page 35

[1] Q: And which took pages -- is that -- that
[2] covers all of 2003; is that right?
[3] A: Yes, ma'am, it does.
[4] Q: And what column did you use on this report?
[5] A: I used sales calls.
[6] Q: And the report is entitled at the top in
[7] handwriting what?
[8] A: Daily Totals 2003.
[9] Q: And then in 2004, the calls reflected on
[10] exhibit 3-4 of your report?
[11] A: Yes, ma'am.
[12] Q: What document did you use?
[13] A: Just one document ma'am, 0718.
[14] Q: And which column?
[15] A: All incoming calls.
[16] Q: And the name of that report?
[17] A: Daily totals 2004.
[18] Q: Why did you use it for 2002, you used
[19] number of calls answered, for '03, sales calls, for
[20] '04, all incoming calls, why did you use different
[21] categories in each year?
[22] A: Well, I think we may have had a
[23] misunderstanding as we were going through this.
[24] The first, in 2002, the format was slightly
[25] different, and I used number of calls answered

Page 36

[1] because the -- I believe the documents I had from
[2] HP said it was total number of calls answered.
[3] Q: I'm sorry, hang on a second. The documents
[4] you had from HP, these are MIT documents?
[5] A: I'm sorry, standard support agreement. In
[6] 2003, I utilized sales calls, but in hindsight, as
[7] I read through the standard support agreement, all
[8] incoming calls were probably subject to that
[9] number. So my numbers in '03 may be smaller than
[10] they should be, and then in 2004, I used the
[11] incoming calls, again, I think that's the right
[12] number, so I may have understated my numbers for
[13] '03.
[14] Q: Let me ask you this though, if there is --
[15] just looking at 2002, all calls answered, that
[16] means sales agent. You understand that to mean
[17] sales agents, hello, whatever the script was, all
[18] right, and when they answered that under the
[19] standard support agreement, that's a tic mark we
[20] get $5.25 for ten minutes or less of a call?
[21] A: Yes, ma'am.
[22] Q: And now, when you go to 2003, you are
[23] counting all incoming calls. You said you counted
[24] sales calls, but you should have counted all
[25] incoming calls?

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE #74-4 Page 11 of 17
Deposition of Scott Stringer
11/2/2005

Page 37

[1] A: It was unclear to me when I did that, and
[2] as we went through, I didn't reconcile between the
[3] three, but as I sit here today, I probably would
[4] have used all incoming calls which would be a
[5] bigger number.
[6] Q: Well, but look, if you look about almost
[7] halfway over, right under the word year under 2003,
[8] call activity, there is a category number of calls
[9] answered. Do you see that?
[10] A: Yes, ma'am.
[11] Q: Why didn't you use that number?
[12] MR. HANSEN: Where are you at? I'm sorry.
[13] MS. CARROLL: Under the word year.
[14] MR. HANSEN: I'm sorry. I just couldn't
[15] see it.
[16] MS. CARROLL: Yeah, it's kind of small.
[17] A: Those numbers would be certainly close to
[18] the sales calls that I had, that's for sure. I
[19] can't answer that, ma'am, I just missed it.
[20] Q: (By Ms. Carroll) Did you have a discussion
[21] with anyone from MITG about the meaning of the
[22] categories at the top?
[23] A: I don't believe I did.
[24] Q: And then same thing for 2004, the two
[25] months of 2004 on 0718, there is also a category

Page 38

[1] called number of calls answered, and --
[2] A: Yes, I see it.
[3] Q: Do you see that?
[4] A: Yes, ma'am, I do.
[5] Q: And you didn't have any discussion with
[6] anyone about which one of those columns to use or
[7] whether it would have been appropriate to calculate
[8] the calls answered for this report?
[9] A: I didn't have any conversations with them
[10] in that regard.
[11] Q: Now, going back to the Andover calls on
[12] Exhibit 51, it's the HP 11007 through 009?
[13] A: Yes, ma'am.
[14] Q: You used the column TTLORDS or total
[15] orders, right?
[16] A: Yes, ma'am.
[17] Q: Did you -- what do you understand that
[18] column to represent?
[19] A: I believe it's the total of the agent
[20] orders and the web orders.
[21] Q: Why did you not -- did you make any
[22] attempts to find information on actual call volumes
[23] for Andover?
[24] A: My understanding was this was the best
[25] information I had, and it represented the call

Page 39

[1] volume.
[2] Q: Did you under the standard support agree,
[3] is it your belief that if somebody ordered a part
[4] on the web, MITG got paid 5.25 -- strike that. Let
[5] me ask you, is it your understanding that if
[6] somebody made contact with MITG over the internet,
[7] that MITG got $5.25 over the standard support
[8] agreement?
[9] A: That is my understanding.
[10] Q: That is your understanding?
[11] A: I believe so.
[12] Q: How did you gain that understanding?
[13] A: I don't recall, but I believe that any
[14] orders that MITG handled for HP, I thought were
[15] covered under the standard support agreement.
[16] Q: Did you review the standard support
[17] agreement when you did that, made that
[18] determination?
[19] A: I did review the standard support agreement
[20] before my original report, yes, ma'am.
[21] Q: Do you have it with you?
[22] A: I do.
[23] MR. HANSEN: Have what?
[24] MS. CARROLL: The standard support
[25] agreement.

Page 40

[1] Q: (By Ms. Carroll) Can you pull that out
[2] again, please?
[3] MR. HANSEN: It's right here.
[4] MS. CARROLL: Thank you.
[5] Q: (By Ms. Carroll) This is a copy of the
[6] standard support agreement I want you to take a
[7] look at it. Once you get a handle on those
[8] documents, take a look at the standard support
[9] agreement and tell me where it is on that agreement
[10] you gained an understanding that web orders would
[11] also result in payment of $5.25 to MITG?
[12] A: Unless I'm missing it, I don't see any
[13] reference to web orders on here.
[14] Q: Did you discuss whether there should have
[15] been compensation or whether there was in fact
[16] compensation to MITG for web orders during the term
[17] of the standard support agreement with anyone?
[18] A: I don't remember if I did, ma'am.
[19] Q: So you didn't recall any -- well, let me
[20] ask you this. I believe you said, and correct me
[21] if I'm wrong, that you understood that the column
[22] total orders on Exhibit 51, most accurately
[23] represented the call volume to Andover.
[24] A: That was my understanding, yes, ma'am.
[25] Q: And did you gain that understanding from

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al
3:04-cv-03055-JES-CHE  #74-4  Page 12 of 17
Deposition of Scott Stringer
11/2/2005

Page 41

[1] any conversations you had with Mr. Hansen or any
[2] representatives of MITG?
[3] A: I would have gained that information prior
[4] to my first deposition because I utilized this
[5] document then, and I believe we had a conversation
[6] about that column, and that that was the -- that
[7] would be the column to be used. And I don't recall
[8] exactly who I talked to with that, but that
[9] understanding was gained prior to the second
[10] report.
[11] Q: And let me just ask you before we move on.
[12] In November of '02, these reflected on Exhibit 3-6
[13] of your report, it appears that you have inflated
[14] the number of total calls for November by including
[15] the number that is listed on Exhibit 51 as 09
[16] November totals. Did you -- do you recall in
[17] calculating that 5734 which numbers you used on
[18] Exhibit 51 to get that number?
[19] A: Is this Exhibit 51, ma'am?
[20] Q: Yes, it is. I'm sorry. Just so it's
[21] clear, 11007 through 009 was marked at Exhibit 51
[22] in your prior deposition, I'm going to refer to it
[23] by that reference.
[24] MR. HANSEN: I'm going to object to the
[25] form. I don't know that he inflated anything. But

Page 42

[1] go ahead, you can answer.
[2] A: Well, I utilized, I added each of the
[3] columns for each of the months and for under total
[4] orders and put that information in there.
[5] Q: (By Ms. Carroll) So you used for starting
[6] with 09, and then 16 and then the row for 23 and
[7] the row for 30, right, for November?
[8] A: Yes, ma'am.
[9] Q: You said you used?
[10] A: Yes, ma'am.
[11] Q: If you look up at the top, this indicates
[12] it's week ending, right?
[13] A: Yes, ma'am.
[14] Q: And you said that the transfer under your
[15] report began on November the 9th, so you shouldn't
[16] have included the week ending November 9, right?
[17] A: I will agree with that.
[18] Q: So you would just reduce your 5734 by 1413?
[19] A: Well, technically, my understanding is the
[20] agreement started November 9, so one day out of
[21] that week, which is not indicated on here, would
[22] have to be pulled in.
[23] Q: November 9 of 2003 was a Saturday.
[24] A: Oh, was it?
[25] MR. HANSEN: Well, it's 2002, first of all.

Page 43

[1] Q: (By Ms. Carroll) Would you know on this
[2] report what the week ending date is, whether it's a
[3] weekend?
[4] A: I don't, I wouldn't know, ma'am, not
[5] without looking.
[6] MR. HANSEN: I'm sure you will tell us.
[7] MS. CARROLL: No, I can't get to it from
[8] there. I won't worry about it.
[9] Q: (By Ms. Carroll) It would appear that this
[10] is a week ending date of November 9. Is it your --
[11] well, back up. Is it your belief that on November
[12] 9, the calls that used to be handled by Andover all
[13] the sudden were transferred then to Roseville, that
[14] 100 percent of the calls that were going to Andover
[15] started going to Roseville on November 9?
[16] A: Yes, ma'am, that's my understanding.
[17] Q: Regardless of what day of the week it was.
[18] So it might be depending on what day of the week,
[19] that might change that number, but it would appear
[20] that at least some additional days were included in
[21] your total call volume?
[22] A: Correct.
[23] Q: Now, also as I understand your calculation
[24] of your call volume from a notation on your report,
[25] that data on calls not provided for November and

Page 44

[1] December of 2003, that is noted on Exhibit 3-5 of
[2] your report, correct?
[3] A: Yes, ma'am.
[4] Q: And that's as we see from Exhibit 51, and
[5] it ends in October?
[6] A: Correct.
[7] Q: For the purpose of calculating the average
[8] per month, why didn't you instead of using only the
[9] ten months of '03, why didn't you include the calls
[10] from November and December so you would have a more
[11] complete view of what the call volume was?
[12] A: Well, November was not a full month, and I
[13] just decided to use 2003 rather than December,
[14] so --
[15] Q: You could have prorated November of 2002,
[16] since you had three-quarters of the month, right?
[17] A: Yes, ma'am.
[18] Q: Did you do that calculation to figure out
[19] how the average number of calls would change if you
[20] included a prorated November and December?
[21] A: I have not done that calculation.
[22] Q: Well, if you look at 2002, just on the
[23] numbers, even accepting the numbers that you have,
[24] November or December of 5896, which would, if you
[25] included that, it would certainly start bringing

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE    # 74-14    Page 13 of 17
Deposition of Scott Stringer
11/2/2005

Page 45

down your average number of calls, right?

A: It would not bring it down substantially, but it would bring it down slightly, yes, ma'am.

Q: And is it your -- how do you determine when you are going to decide when you are going to use an average because you don't have sufficient information, what criteria do you have in general, not just for this case, but do you have a general criteria as to how much information you have to have to do an average to carry on over months that you don't have information for?

A: Well, each set of situations is different.

Q: Okay.

A: You know, when doing any kind of an average for financial reasons, you like to have full periods. You like to have full months, full quarters, full years. To the extent that you don't have full months, we sometimes prorate it. We sometimes have not prorated, it's. Just depends on the specific case.

Q: Well, in this case, you have at least one full month that you have left out of that analysis, and tell me why you decided not to include the additional full month of December of '02, that you had in coming up with your average so you would

Page 46

have an 11 month average instead?

A: I don't recall, ma'am.

Q: And is it your testimony that it wasn't a conscious decision to disregard December because it would lower the average?

A: No, ma'am, that is correct, I did not disregard because it would lower the average.

Q: All right. Well, let's focus on how you got to November 9. How did you get to that date as the date of the transition of the calls?

A: I believe that was stipulated in the depositions --

MR. HANSEN: Well, use the word stipulated, let's maybe use the word testified to.

A: Sorry, testified.

Q: (By Ms. Carroll) Whose deposition did you get that information from?

A: I can't remember off the top of my head, because I may have wrote it in my report.

Q: If you can look at your report and tell me what deposition testimony you used TO come up with a November 9 start date for the transition.

A: It seems like I looked at -- well, I looked at Chizek and Pound and Soriano, and if I recall, -- I can't recall which exact page.

Page 47

Q: Well, you have the transcripts that Mr. Hansen is pulling out for you. If you could cite me to where in those depositions the November 9 date comes from.

MR. HANSEN: Hold on a second. I only grabbed Volume 2 of one of those.

MS. CARROLL: Well, I'd like him to find it.

MR. HANSEN: Yeah, I'm making sure I got the people you are talking about.

MS. CARROLL: Fair enough.

MR. HANSEN: There is Chizek's.

A: Okay. Unfortunately, I don't have a flag here.

Q: (By Ms. Carroll) Does the transcript you have have a index in the back that may make it easier for you to find it?

A: Thank you.

MR. HANSEN: Look under the index under N for November.

A: Oh, there you go. That's better. I'm going to try to answer this question. The depositions of Chizek, he basically states November 18 was the planned date to send it over.

Q: (By Ms. Carroll) Where do you see that?

Page 48

Can you refer me to the page and line that you see that?

A: Sure.

Q: And which deposition, he had two volumes?

A: Let me see here.

MR. HANSEN: He is on Volume 2 because I got Volume 1 in my hand.

MS. CARROLL: Okay.

A: I pulled the date out of Volume 1, page -- and there is numerous references here, but page 16, Mr. Hansen is line 17. Mr. Hansen is asking about Roseville, can Roseville handle 1000 calls per day starting 11-18. Page 20, line 13, question, okay. And that apparently was going to happen on 11-18. Answer, that was their plan. Exhibit GGG for Mr. Chizek's deposition, which I can't remember what exhibit we got that as. It's the HP 11007 through 009. I'm sorry, just call it HP 007 through 009, it appears the totals start the week ending November 9.

Q: Well, it totals all the way from the beginning. It's just that the week ending November 9 is the first time they break it out between agent and web; is that right?

A: Yes, ma'am.

3:04-cv-03055-JES-CHE    # 74-4    Page 14 of 17

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

Deposition of Scott Stringer
11/2/2005

Page 49

[1] Q: All right. You also reference
[2] Mr. Soriano's deposition and Ms. Pound's deposition
[3] for the 9th. Do one of those other than your
[4] report, do you say, per the deposition testimony in
[5] exhibit of Richard Chizek, Diane Pound, and Richard
[6] Soriano, Roseville will not be accepting calls from
[7] Andover until November 9, 2002? Did one of those
[8] other two depositions give you the November 9 date
[9] as opposed to this reference of November 18 in
[10] Mr. Chizek's deposition?
[11] A: I don't recall, ma'am.
[12] Q: And what you cited for me in Mr. Chizek's
[13] deposition, it says the transition and the
[14] non-Presario calls will happen on 11-18, and
[15] Mr. Hansen asked, what are non-Presario calls, and
[16] he answers, that was apparently going to happen on
[17] 11-19, answer, that was their plan. Do you have
[18] anywhere in Mr. Chizek's deposition that he says
[19] all of the Andover calls were transitioned to
[20] Roseville on November 9 and November 18?
[21] A: I don't recall, ma'am.
[22] Q: Do you have Ms. Pound's deposition? I want
[23] to refer you to something in there. Before you
[24] turn to a page, do you understand from reading
[25] Ms. Pound's deposition what her role was at HP at

Page 50

[1] the time of the transition?
[2] A: She worked at Andover.
[3] Q: As the call center manager?
[4] A: I believe so.
[5] Q: Turn to page 19 of her deposition. Do you
[6] see testimony starting at the top of the page,
[7] Mr. Hansen asking, and then when HP bought Compaq,
[8] it was transferred to Roseville. And looking at
[9] page 8, they are talking about -- well, let me back
[10] up. They are talking on page 8 about transferring
[11] transition calls from Andover call center to
[12] Roseville to be one call center. They are talking
[13] about that on page 8. Do you see that?
[14] A: For some reason, page 8 is not in there.
[15] MR. HANSEN: Yeah, here. I don't know.
[16] It's not in here. Why don't you show him yours.
[17] Q: (By Ms. Carroll) On page 8 -- she's
[18] talking about bottom of page 7, that she managed
[19] the call center at Andover, and then talks about
[20] the act that this was Digital and became Compaq,
[21] and she says when HP acquired us, that's when we
[22] transitioned the Andover call center to Roseville
[23] and it became one call center. And feel free to
[24] look over that so you have the context of
[25] Mr. Hansen's questions I want to ask you about.

Page 51

[1] A: Yes, ma'am.
[2] Q: And then when you get to 9, Mr. Hansen
[3] says, okay, and then when HP bought Compaq, it was
[4] transferred to Roseville. And you understand it
[5] here to be the Andover call center based on the
[6] context of prior testimony?
[7] A: Yes, ma'am.
[8] Q: Answer yes. And Mr. Hansen says, okay.
[9] And then she says, not immediately. But
[10] Mr. Hansen's question, right, right, eventually
[11] when it was shutdown. And what is Ms. Pound's
[12] answer?
[13] A: We started the transition in early 2003.
[14] It was finished April of 2003, and the group was
[15] laid off in July of 2003?
[16] Q: Did you in determining for the purpose of
[17] your report, do you use the November 9 transition
[18] date, did you chose to ignore Ms. Pound's testimony
[19] in her deposition that the transition was not
[20] finished until April of 2003?
[21] A: There were conflict dates, and I utilized
[22] the November 9 date.
[23] Q: And so far as we sit here, you can't locate
[24] anything in your notes that would -- or looking
[25] quickly through the deposition transcripts that

Page 52

[1] would get you to November 9?
[2] A: Other than the HP 11007, where there is a
[3] change in the reporting for that particular week.
[4] MR. HANSEN: So the record's clear, I don't
[5] think we went through Mr. Soriano's deposition.
[6] It's sitting right here, and it's highlighted, and
[7] it's right --
[8] MS. CARROLL: Well, then, the answer is I
[9] didn't get to go through Mr. Soriano's.
[10] Q: (By Ms. Carroll) Tell me where you found
[11] November 9 as the date where all the calls from
[12] Andover were transferred to Roseville, and if you
[13] will share the page with me and get to it.
[14] MR. HANSEN: To speed this along, it's
[15] tabbed right here and highlighted.
[16] MS. CARROLL: What page are you on?
[17] MR. HANSEN: I think it's 29.
[18] A: 29, ma'am.
[19] MS. CARROLL: Jim, I'm sure he's perfectly
[20] capable of answering the questions.
[21] MR. HANSEN: Well, it's not a memory test.
[22] If he wants to refer to it, go ahead.
[23] MS. CARROLL: I'm asking him to refer to it
[24] and try to make the transcript a little more clear
[25] without interruptions.

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.

3:04-cv-03055-JES-CHE  #74-4  Page 15 of 17

Deposition of Scott Stringer
11/2/2005

Page 53

[1] A: On page 29, Mr. Soriano testifies, it says,
[2] starting on line 13, Mr. Hansen asked, okay, at
[3] some point in time, did the integration of Andover
[4] take place to Roseville? Answer was, yes, line 16.
[5] Question, okay. And do you know, was that in
[6] November 2002? And the answer, I believe that was
[7] about that time.
[8] Q: Do you have any other testimony, because I
[9] see from just glancing there that you had a number
[10] of things highlighted, is there anything in your
[11] other testimony that's highlighted on those pages
[12] or anyplace else that says November 9?
[13] A: I'm going to look through here real
[14] quickly.
[15] Q: Feel free.
[16] A: Thank you. No, ma'am.
[17] Q: Do you know or do you have an understanding
[18] from reading the depositions about an issue that
[19] arose in Andover with calls unexpectedly being
[20] directed to Andover with the shutdown of a
[21] technical support center in the fall of '02?
[22] A: I don't recall that as I sit here today,
[23] no, ma'am.
[24] Q: So in the discussions that you saw in --
[25] that we've talked about in Chizek's deposition in

Page 54

[1] particular with the November 18 date, do you -- is
[2] it your belief that that references to the regular
[3] call volume Andover as opposed to overflow call
[4] volume?
[5] A: Could you repeat that question, ma'am? I'm
[6] sorry.
[7] Q: Sure. There was -- is it your
[8] understanding from the deposition testimony that
[9] you read of Mr. Chizek's in particular that the
[10] November 18 date when they are talking about
[11] transitioning of non-Presario calls, that that is
[12] talking about just regular everyday call volume
[13] that was handled by the Andover call center as
[14] opposed to an unexpected excess number of calls
[15] that were being received due to a change in phone
[16] routing?
[17] A: My understanding was it was regular calls.
[18] Q: So now what we have here is testimony from
[19] Mr. Chizek that the plan was to move things on
[20] November 19, you have Mr. Soriano's testimony where
[21] he says that he believes that November of '02 was
[22] about the time that the integration of Andover took
[23] place, and you have -- and based on those two
[24] things and your assumption that Exhibit 51, HP
[25] 11007 through 009, that the change in the format of

Page 55

[1] that report, that those three things pieced
[2] together just served as the basis for your November
[3] 9 date in your report?
[4] A: That gave me an indication of that. That
[5] was the best date to utilize, yes, ma'am.
[6] Q: And in reading Mr. Chizek's deposition, did
[7] you see any questions from Mr. Hansen or any --
[8] that elicited information from Mr. Chizek as to why
[9] there was this change in the format?
[10] A: I don't remember if it's in there or not,
[11] ma'am.
[12] Q: Do you make -- are you making an assumption
[13] then that the change in the format is because of
[14] the transition of the calls as opposed to reading
[15] that testimony in a deposition?
[16] A: We had two different dates discussed in the
[17] depositions. I had a document that showed data for
[18] the week ending November 9, and so because we had
[19] different information, I had to make a decision on
[20] what that date was. And based upon the information
[21] I had, I felt that November 9 was the best date to
[22] utilize.
[23] Q: Even though looking back at the transcripts
[24] that you have looked at, November 9 is not listed
[25] anywhere?

Page 56

[1] A: That's correct.
[2] Q: And when you say that you have two
[3] different dates, are you talking about the
[4] testimony regarding November in the Soriano and
[5] Chizek depositions versus the April date given in
[6] the Diane Pound deposition?
[7] A: Yes, ma'am.
[8] Q: Would you agree with me that the Diane
[9] Pound deposition testimony that you and I went
[10] through on page 9, where she says we started the
[11] transition in early 2003, it was finished in April
[12] of 2003, is more definitive than Mr. Chizek's
[13] statement that November 18 was the plan for moving
[14] the calls and Mr. Soriano's testimony that November
[15] was about the right time?
[16] MR. HANSEN: Object to the form, asking him
[17] to comment on the credibility of the witnesses.
[18] Subject to that, you can answer.
[19] A: The -- although it was more definitive in
[20] deposition testimony, as an accountant, when I
[21] receive a document, it's my understanding that the
[22] agent orders and the web orders suddenly appearing
[23] at the same time that the Roseville Andover
[24] transfer was going on, it made me to believe that
[25] those, that that November time frame was more

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al
3:04-cv-00059-JEG-CFB 7-14 Page 16 of 17
Deposition of Scott Stringer
11/2/2005

Page 57

[1] credible. Now, I had conflict information, and I
[2] made a decision that it was November based upon
[3] Soriano and Chizek in this document versus
[4] Ms. Pound's testimony. That was a decision I made.
[5] Whether it was right or wrong, the evidence to me
[6] indicated that that November date was more
[7] accurate.
[8] Q: And your understanding that the change in
[9] the format in HP 11007 through 009, that that
[10] coincided with the transition of calls from Andover
[11] to Roseville comes from what?
[12] A: It would seem to be a coincidence that that
[13] format would change the very same time that two
[14] people testified that there was a transition from
[15] Andover Roseville, so that was the best information
[16] I had at the time.
[17] Q: All right. Well, Mr. Chizek said it was
[18] the plan. He didn't say that's when the transition
[19] occurred, did he, in the testimony that you cited
[20] for me?
[21] A: I don't remember if he said it actually
[22] happened then or not.
[23] Q: Do you -- and is it your belief that 100
[24] percent of the calls that were being handled by
[25] Andover on November 8, that boom, on November 9,

Page 58

[1] all of those calls were then handled by Roseville?
[2] MR. HANSEN: Read it back.
[3] (Whereupon the reporter read the question
[4] as follows: Q: "Do you -- and is it your belief
[5] that 100 percent of the calls that were being
[6] handled by Andover on November 8, that boom, on
[7] November 9, all of those calls were then handled by
[8] Roseville?")
[9] Q: (By Ms. Carroll) Let me reask the question
[10] without the John Madden book reference. Is it your
[11] belief that all the calls that had been going to
[12] Andover, that all through the month of November,
[13] the first week in November the calls are going, and
[14] then on November 9, the calls were shutdown so no
[15] more calls went to Andover and all of the calls
[16] that had previously through that November that went
[17] to Andover went to Roseville?
[18] A: My understanding is that this Exhibit GGG,
[19] Chizek, HP 11007, I pulled the information from the
[20] total order column that that was the calls that
[21] went to Roseville. So I guess to try to answer
[22] your question about what percentage, I would say
[23] yes, all of the calls.
[24] Q: And so in making the decision to use
[25] November, the decision was made to discount the

Page 59

[1] testimony by Ms. Pound that the transition finished
[2] in April and the staff was laid off in July of '03?
[3] A: Yes, ma'am.
[4] Q: And in choosing the November date instead
[5] of an April date, you then increased the damages
[6] that MITG would be able to claim?
[7] MR. HANSEN: Object to the form.
[8] A: Obviously if it shakes out that April is
[9] the correct date, then yes, ma'am, you are correct.
[10] Q: (By Ms. Carroll) Okay. Let's go on to the
[11] next step that I want to talk about in your
[12] calculation of breach of contract, and that is once
[13] you got the Andover, we are going to focus on the
[14] Andover calls for a while here, once you got to the
[15] number of Andover calls from HP 11007 through 009,
[16] you then had to determine which percentage would be
[17] considered CSN calls and which percentage would be
[18] considered outsourced calls; is that right?
[19] A: Yes, ma'am.
[20] Q: And what document did you rely on to come
[21] up with those percentages?
[22] A: Exhibit 66 is what I utilized to determine
[23] that percentage.
[24] Q: And that would at least be for 2003?
[25] A: Yes, ma'am.

Page 60

[1] Q: Did you go ahead and use those same
[2] percentages for the -- for 2002 and 2004 that were
[3] determined in 2003?
[4] A: Yes, ma'am.
[5] Q: And tell me Exhibit 66 is the portion of
[6] the spreadsheet that we discussed as 2003 by
[7] customer, correct?
[8] A: Yes, ma'am.
[9] Q: Now, tell me what it is that you utilized
[10] on Exhibit 66 that led you to the 56 percent
[11] outsourced, 44 percent CSN calls?
[12] A: I divided the number outsourced,
[13] 4,380,622.27 into the grand total 7,746,033.65 to
[14] come up with 56.55 percent, and similarly made that
[15] same calculation for CSN.
[16] Q: And by using this spreadsheet, and more
[17] particularly, the information that's on Exhibit 66,
[18] it represents 2003 information, you assumed that
[19] the Andover mix was identical to the MITG mix?
[20] A: Yes, ma'am, I did.
[21] Q: And what was your basis for doing that?
[22] Well, let me ask you a different way. Was there
[23] something in the evidence that you've seen, the
[24] depositions or deposition exhibits or any of the
[25] documents that you've relied upon that led you to

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al.
3:04-cv-03055-JES-CHE    #74-1    Page 17 of 17

Deposition of Scott Stringer
11/2/2005

Page 61

[1] assume that the Andover mix was identical to the
[2] MITG mix in terms of part sales?
[3] A: The -- this was the best information that I
[4] had, and it was historical on what MITG experience
[5] with CSN versus outsourced, and I did not receive
[6] information, better information about that split.
[7] So in absence of specific information that I
[8] considered to be reliable, I felt that this
[9] historical number, this historical calculation for
[10] MITG in '03, was my best estimate of those
[11] percentages.
[12] Q: All right. Well, I will agree that's the
[13] best estimate of what the mix is for MITG, but is
[14] there something that told you that the best
[15] estimate of MITG's mix was also the best estimate
[16] of Andover's mix?
[17] A: I did not have information that would have
[18] -- that contradicted this. I did not have specific
[19] information to go to, and I made a decision that
[20] MITG's experience, because it was historical,
[21] because it was in the amount of volume that you
[22] know the number of invoices, etc., that we had
[23] here, that that would be the best for determining
[24] the split.
[25] Q: Do you have any understandings from the

Page 62

[1] information that you reviewed what kind of business
[2] Andover did?
[3] A: I believe it did deck parts and it did
[4] legacy.
[5] Q: And what do you understand legacy to mean?
[6] A: Older parts, older versions.
[7] Q: In addition to CSN parts, or that's all
[8] they did?
[9] A: I believe -- yes, in addition to CSN.
[10] Q: Let me ask you then, so when someone called
[11] -- it's your understanding that when a caller
[12] called in to buy -- called in to Andover, they
[13] could buy in-stock Compaq parts, in-stock deck
[14] parts, and legacy parts?
[15] A: I believe so.
[16] Q: And do you recall whose deposition you read
[17] to get that information?
[18] A: Not off the top of my head, ma'am, I don't.
[19] Q: Can you pull out Diane Pound's deposition
[20] again, please?
[21] MR. HANSEN: It appears we are missing from
[22] Ms. Pound's depo the backside of the pages, so tell
[23] me the page we are looking at.
[24] MS. CARROLL: Well, I can share mine.
[25] MR. HANSEN: It could be here.

Page 63

[1] MS. CARROLL: It's ten going into 11 and
[2] page 14.
[3] MR. HANSEN: We have ten, 11, and you may
[4] have to show him 14.
[5] Q: (By Ms. Carroll) If you will look at ten,
[6] starting at line 20 -- well, let me back up.
[7] Beginning of ten, just so you have the context,
[8] look starting at line 3, Mr. Hansen's asking about
[9] the call center in April '01, was a Digital call
[10] center and sold Digital spare parts, and he asked
[11] multi-vendor, no, Digital only. And then when he
[12] goes down to line 20, okay, when Compaq bought
[13] Digital, we talked about the time frame in the
[14] summer of 2000, what type of parts was the Andover
[15] call center selling then. Answer, Digital spare
[16] parts and Compaq spare parts. Question, answer
[17] being were those multi-vendor spare parts. And she
[18] says, no, Compaq part numbers only. All right, do
[19] you see that testimony?
[20] A: Yes, I do.
[21] Q: And when you go to 14, and I will share my
[22] copy of 14, I've got it marked in red starting at
[23] 108, the Compaq call center, I'm going to refer to
[24] that at Andover. Did it sell parts for Presario
[25] and non-Presario products? Yes. And you know

Page 64

[1] what, you know what Presario and what non-Presario
[2] refers to? Answer, Yes. Question, What does it
[3] refer to? Answer, Presario was a type of Compaq
[4] product. Question, I think it's on -- you said
[5] earlier you did not sell multi-third party parts;
[6] is that correct? Answer, Correct. Question,
[7] Outsource any percentage of the sales? Answer, no.
[8] It was at 100 percent Compaq spare parts. Her
[9] answer, Compaq and Digital.
[10] Do you see in response to this question in
[11] line 17, did it outsource any percentage of the
[12] sales. Answer, no. With that testimony in mind,
[13] why is it -- how is the information about MITG
[14] sales mix which include outsourced parts an
[15] accurate depiction of what Andover was when the
[16] testimony of the call center manager is they didn't
[17] outsource any percentage of their sales?
[18] A: I can't explain that.
[19] Q: Okay. Is a possible explanation the fact
[20] that you were missing page 14 of Ms. Pound's
[21] deposition, so you didn't have the information that
[22] says that they didn't outsource any percentage of
[23] the sales?
[24] A: That's possible.
[25] Q: Can you think of any other reason why you