Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

3:04-cv-... Document ... Page 1 of 16

Deposition of Scott Stringer

FILED
1/7/2005

Wednesday, 01 February, 2006 04:55:34 PM
Clerk, U.S. District Court, ILCD

## Page 125

[1] A: Right. It clarified by customer who was
[2] still there and who was not still there.
[3] Q: And now, let's walk-through how you did it
[4] and how you came up starting with how you got to
[5] the customer list. And you say in the first step
[6] in your process, according to your report, is
[7] customers contacted by HP as noted on Exhibit PP of
[8] Richard Chizek's 01/03, and it's a typo, it should
[9] say '05 deposition?
[10] A: Right. May I go to the restroom?
[11] (At this time, there was a break in the
[12] deposition.)
[13] Q: We were just starting to go through this
[14] methodology, and the first thing you said you did
[15] was look at Chizek Exhibit PP, which is Bates
[16] labeled -- well, the first page of it is HP 005071.
[17] A: Yes, ma'am.
[18] Q: And the rest of the pages, but I have a
[19] copy of it also. Tell me what you did looking at
[20] the spreadsheet behind the first two pages, what
[21] did you do with this spreadsheet?
[22] A: Okay. Well, I took the spreadsheet, and I
[23] looked at the customers that were on the
[24] spreadsheet, and I went to MITG 10 -- it's
[25] handwritten Bates stamped MITG 1025.

## Page 126

[1] Q: Right. I think it was marked as Exhibit 50
[2] in your last deposition.
[3] MR. HANSEN: Yeah, I think that's the same
[4] one.
[5] Q: (By Ms. Carroll) Starting with a -- about
[6] computer, and it has February through December and
[7] then totals on sales and margin?
[8] A: Correct.
[9] Q: That was marked as Exhibit 50, just so the
[10] record's clear in the first deposition. So what
[11] did you do with these two documents?
[12] A: The first thing I did was I looked at these
[13] customers.
[14] Q: These customers being the one on Exhibit
[15] PP?
[16] A: On Exhibit PP, and I checked those against
[17] Exhibit MITG 1025.
[18] Q: All right. So if the customer was on this
[19] list --
[20] MR. HANSEN: PP.
[21] A: On PP, sorry, and also on MITG 1025, then I
[22] assumed that they continued buying, and I put a
[23] little checkmark on my work paper here. So that
[24] meant that they were no longer -- because they were
[25] continuing to buy subsequent to January of '04,

## Page 127

[1] that they were not, there was no lost customer per
[2] se.
[3] Q: (By Ms. Carroll) Okay. So you now have a
[4] list of your customers not lost. And what next?
[5] A: Now I have a list of customers who were
[6] doing business apparently per PP, and the ones that
[7] didn't have a checkmark on them, I needed to
[8] investigate further. So I said, okay, let's go
[9] back. Now that I have the specific sales data on
[10] the spreadsheet, I went back, and I checked against
[11] the sales data for both '02 and '03.
[12] Q: Okay. And which part, I've got spreadsheet
[13] up on my computer, just doing, let's start with
[14] '03, there are two different '03 spreadsheets. The
[15] first one is under tab INV-1046 2003, and the one
[16] that's 2003 by customer.
[17] A: It would be the tabs by customer.
[18] Q: All right and that was actually the one
[19] that we marked as Exhibit 66 before, correct?
[20] A: Correct.
[21] Q: So you looked at -- you came up and just
[22] give me an example of one that doesn't have a
[23] checkmark by it, so we'll use it.
[24] A: So, for example, Inside Direct USA, I went
[25] to 2003 by customer on the spreadsheet to see if

## Page 128

[1] they had bought in 2003.
[2] Q: Okay. Can we just do a find here?
[3] A: Um-hum.
[4] Q: So we just do the find function, find next,
[5] and there they are.
[6] A: Correct. And so that's the first prong on
[7] my test. And the second prong is did they buy also
[8] in '02.
[9] Q: And so we went to 2002 by customer?
[10] A: And did the same thing, yes, ma'am.
[11] Q: And again, just doing the find function,
[12] find next, and that wraps us back around and we see
[13] they show up at line 430 as having to purchase?
[14] A: Correct. So that told me -- what that
[15] means is that they bought in '02, they bought in
[16] '03, they stopped buying after January of '04.
[17] Q: And then on your, in your supplemental
[18] report here, then they made the list that is
[19] Exhibit 4-1 through 4-2, correct?
[20] A: Yes, ma'am.
[21] Q: And about two-thirds of the way down they
[22] show up?
[23] A: Correct.
[24] Q: Now, once they made it on this list, you've
[25] done something else also. You are looking just at

Page 129

[1] -- you are looking now when you put them on this
[2] list, they may, at least customer name shows up on
[3] your exhibit because they bought in 2002, they
[4] bought in 2003, and they didn't buy after February
[5] 7 of 2004, which is what's shown on MITG 1025
[6] through 1026?
[7]     A: Yes, ma'am, that's correct.
[8]     Q: So once all of those -- and do all of these
[9] people, these customers that are on the Exhibit 4-1
[10] through 4-2 of your report fit that criteria that
[11] I've just identified?
[12]     A: Yes, ma'am.
[13]     Q: Now, once they make the list, what was the
[14] next step?
[15]     A: Once they made the list, then it was to
[16] determine what was an expected sales volume for
[17] 2004, and the first step was to basically
[18] determine, you know, what would be the best base
[19] for that. And we determined that 2003, because it
[20] was closer to 2004, would probably serve as a
[21] batter proxy of an estimation of 2004. So we took
[22] the 2004 sales -- I'm sorry, beg your pardon. We
[23] took the 2003 sales, both CSN and outsourced and
[24] added those for 2003 to come up with a total. We
[25] then prorated that because the period of '04, we

Page 130

[1] are looking at is not a full year, it's only ten
[2] months and three weeks, so we prorated that number
[3] of '03 to ten and three-quarters.
[4]     Q: Which one of the tabs on the spreadsheet
[5] that is up on the screen did you use to determine
[6] the CSN sales versus outsource sales?
[7]     MR. HANSEN: So we are talking about the
[8] same thing?
[9]     Q: (By Ms. Carroll) You want 2003 by
[10] customer?
[11]     A: Yes.
[12]     Q: And again, just so the record's clear,
[13] that's Exhibit 66?
[14]     A: Right.
[15]     Q: So how did you determine that information
[16] from this report?
[17]     A: It was determined -- well, it's basically
[18] laid out by customer here in the Column C, D, E and
[19] F.
[20]     Q: All right. So what we have, this
[21] spreadsheet has two different parts of it, the
[22] Columns A and B are dealing with per order basis,
[23] and C through F are then combining all of the
[24] information for any particular customer, so just
[25] looking at the first one. Let's look at

Page 131

[1] Kimberly-Clark, and you have Kimberly-Clark
[2] outsource sales CSN sales and a total sales by MITG
[3] to Kimberly-Clark for the year 2000.
[4]     A: 3.
[5]     Q: 2003 for Kinberly Clark?
[6]     A: Yes, ma'am.
[7]     Q: So everybody who made your list, you went
[8] down the right side of the spreadsheet as Exhibit
[9] 66 and up on the computer screen and took the
[10] information that's contained here for those sales
[11] and added it to your list?
[12]     A: Correct.
[13]     Q: And you added all of those up to get total
[14] sales for 2003?
[15]     A: Correct.
[16]     Q: Prorated it, and then how did you use that
[17] for 2004?
[18]     A: Well, I prorated it to reflect the ten and
[19] three-fourths months of 2004.
[20]     Q: So you assumed then that the business they
[21] did for the calendar year 2003 was going to be the
[22] same volume of business on a prorated basis for
[23] 2004?
[24]     A: Exactly.
[25]     Q: Do you have any information that you have

Page 132

[1] been given as to any reasons why the companies that
[2] are listed on your Exhibit 4-1 through 2 stopped
[3] doing business with MITG?
[4]     A: Specific reasons?
[5]     Q: Correct.
[6]     A: Why each -- well, I know that the list that
[7] was prepared which was Exhibit PP represents
[8] customers who are contacted by HP. And without
[9] calling each customer individually and saying why
[10] did you stop buying from MITG, I did not do that
[11] analysis, no.
[12]     Q: And have you seen anything, did MITG
[13] representatives provide you with anything about any
[14] of these people saying, testimony or an affidavit
[15] saying we quit doing business with MITG because HP
[16] called us?
[17]     A: I have not seen anything like that.
[18]     Q: So what you did was for the purpose of your
[19] analysis assumed that if they were contacted by HP,
[20] that they ceased doing business because of that
[21] contact?
[22]     A: Based upon my methodology for looking at,
[23] you know, the fact that they bought for two years
[24] and then stopped buying, yes, ma'am, that was my
[25] only way of determining who would have stopped

Page 133

[1] buying.

[2]     Q: And just so it's clear, you don't have any

[3] information about actual comments made by HP or

[4] anything else to account for the fact that back up

[5] the tortious interference claim?

[6]     A: Unless they are in deposition and I've

[7] forgotten them since and I don't recall.

[8]     Q: Now, I just want to make sure before we go

[9] any further, I think in your report, you referred

[10] to these in the third paragraph of your tortious

[11] interference, it says you included these people

[12] because they demonstrated a regular pattern of

[13] purchasing.

[14]     A: Yes, ma'am.

[15]     Q: Do you see that phrase?

[16]     A: Yes, ma'am.

[17]     Q: Is that regular pattern of purchasing

[18] simply on the fact that they purchased some revenue

[19] from them as opposed to the number of orders that

[20] they may have placed?

[21]     A: Yes. My only attribute was my attribute

[22] test was did they purchase in '03, and did they

[23] purchase in '02, irregardless of what the volume

[24] was.

[25]     Q: You are aware, are you not, that once the

Page 134

[1] standard support agreement terminated on February 7

[2] of '04, that MITG would not have access to in-stock

[3] Compaq parts?

[4]     A: You are asking defining in-stock Compaq

[5] parts as they won't be able to order through HP

[6] anymore.

[7]     Q: Let me back up and make sure we are on the

[8] same page. You understand CSN parts to be those

[9] parts that were ordered because they were in stock

[10] from HP?

[11]     A: Correct.

[12]     Q: All right. Were you aware that after the

[13] end, the standard support agreement, MITG won't be

[14] able to order CSN parts from HP?

[15]     A: Well, I guess my understanding is just so I

[16] understand, that if I had a customer, if MITG had a

[17] customer and they need Hewlett Packard parts, that

[18] MITG was going to be able to get those parts either

[19] through a third party or some supplier. So the

[20] fact that they were not under the standard support

[21] agreement in my assumption was that that would not

[22] prohibit them from finding supply for these

[23] customers.

[24]     Q: But you did understand they weren't going

[25] to be able to buy those directly from Hewlett

Page 135

[1] Packard?

[2]     A: I definitely understood the standard

[3] support agreement changed, and that you know, that

[4] they would have other suppliers to buy that from,

[5] whether Hewlett Packard would sell to them, I made

[6] no assumption.

[7]     Q: You simply assumed that regardless of where

[8] they could get them, that MITG was going to have

[9] access to the same identical CSN parts that they

[10] had access to in 2003?

[11]     A: Yeah, pretty much that's my assumption,

[12] yes, ma'am.

[13]     Q: And the basis for that assumption is what?

[14]     A: Is that they can buy parts from other

[15] vendors, that typically as a buyer, I mean, they

[16] have access to supply, and that I just assumed that

[17] there would be no problem with supply to these

[18] customers.

[19]     Q: Do you have any knowledge as to how the HP

[20] authorized parts resell program parts?

[21]     A: Unless it's in documents, I can't quote it.

[22]     Q: As you sit here, you have no knowledge as

[23] to whether or not -- well, do you know one way or

[24] the other whether HP has a program that restricts

[25] the sale of authorized parts at least by HP to

Page 136

[1] certain people, certain customers they have under

[2] contract?

[3]     A: I'm not aware of that.

[4]     Q: Did you make the assumption also that even

[5] if they couldn't get the parts from HP, the CSN

[6] parts through HP, and they got them through another

[7] vendor, that the cost of the part would be the

[8] same?

[9]     A: I simply assumed that the cost of the part

[10] would be the same.

[11]     Q: What's the basis for that assumption?

[12]     A: Not having data to contradict it.

[13]     Q: Well, is it -- if they are obtaining CSN

[14] parts from a source other than HP, wouldn't the

[15] fair assumption to be is that that source had some

[16] kind of markup so they made profit off of the sale

[17] of that part?

[18]     MR. HANSEN: Object to form. It assumes

[19] facts not in evidence. Go ahead.

[20]     A: What I know about the CSN parts though is

[21] that there are opportunities to go out the CSN or

[22] had been opportunities and achieve a price that was

[23] lower and achieve the non-stock price. So there

[24] would be situations I think where they would pay

[25] more for a part and situation where they would pay

Page 137

[1] less for a part.

[2] Q: But we saw that on call volume that 67

[3] percent of the time based on the orders that were

[4] actually placed, a part was gotten from CSN which

[5] means it wasn't cheaper to get it from another

[6] source.

[7] MR. HANSEN: Object to the form. Is there

[8] a question?

[9] MS. CARROLL: Um-hum.

[10] MR. HANSEN: That's a statement, but if he

[11] wants to answer it, go ahead.

[12] A: Could you ask the question again?

[13] Q: (By Ms. Carroll) We know from the

[14] information we went through before that's provided

[15] on the spreadsheet that 67 percent of the orders

[16] were CSN orders which means that there wasn't a

[17] cheaper place to get them based on?

[18] A: That would make sense.

[19] Q: Based on the terms of the MITG

[20] availability.

[21] A: At least significantly cheaper, the $200

[22] threshold. Perhaps they could have had under that

[23] threshold and outsourced it because they wouldn't

[24] have been bound if it was $50 cheaper or $100

[25] cheaper, they would have done it outside the

Page 138

[1] agreement.

[2] Q: But you have no knowledge one way or the

[3] other, you just assume that they were going to be

[4] able to obtain the price for the same amount?

[5] A: Because I was dealing with hypothetical,

[6] yes, ma'am, I had to assume that.

[7] Q: And you made no -- well, did you talk with

[8] Mr. Haught or any other representative of MITG to

[9] ask them whether or not they could have gotten the

[10] same parts, the CSN parts at the same price in '04,

[11] as they were getting them in '03?

[12] A: I don't know whether I made that, had that

[13] conversation with Mr. Haught. I may have had that

[14] conversation when I did my original work, and we

[15] talked about the reduction, and you know, what

[16] would be the reduction in his volume, etc., before

[17] I had the specific sales information. And I don't

[18] recall as I sit here, ma'am, whether I asked him

[19] that or not, but my general understanding was that

[20] supply was not an issue.

[21] Q: Would the profit margin be the same then in

[22] 2004, after the end of the standard support

[23] agreement? I mean, what kind of profit margin do

[24] you assume on the sale of CSN parts in '04?

[25] A: It could go up -- well, on CSN parts, it

Page 139

[1] would all go to MITG because they would get all the

[2] gross profit on it.

[3] Q: And MITG for the purpose of the numbers

[4] that are in your report as the CSN sales, those are

[5] actually the actual cost of the part, not the cost

[6] of the part with markup, correct?

[7] A: Yes, I believe that's correct.

[8] Q: So, for example, and I will just pick one

[9] of the smaller ones at the bottom here, the H & R

[10] Block, bottom of the first page, H & R Block, the

[11] only thing they have for 2003 is $479 purchase of

[12] CSN parts, correct?

[13] A: Correct.

[14] Q: And we don't -- can we find out using the

[15] spreadsheet how many orders there were that made up

[16] the 479, do you know how to do that?

[17] A: We would have to go to INV-1046, I think.

[18] Q: And then we do a find function for that?

[19] A: Um-hum.

[20] Q: So these are the three, they have different

[21] dates, February, June, and October, there are three

[22] sales here that make up our -- that make up this

[23] amount, okay?

[24] A: Yes, ma'am.

[25] Q: And so then your assumption for each of

Page 140

[1] those orders was that that would be, it would be

[2] that amount, the same amount that's shown on here

[3] if they sold these identical things in '04?

[4] A: Yes, ma'am.

[5] Q: Did you assume also for the purpose of your

[6] analysis in your report that the sales, if they

[7] were not interfered with, that their volume would

[8] stay the same, that their sales volume would stay

[9] the same so Kimberly-Clark is on here because they

[10] are interfered with, but for a company that was not

[11] interfered with, is it your belief that they would

[12] have their same pattern of purchases?

[13] A: Well, for customers that were not

[14] interfered with.

[15] Q: Correct. Let's use an example off Exhibit

[16] PP. Tell me somebody who you found was on both

[17] lists so was not interfered with under your

[18] analysis.

[19] A: Okay. Software House International.

[20] Q: Okay. So is it your assumption then that

[21] Software House International had a volume business

[22] in 2003, and was going to do the same amount of

[23] business in 2004?

[24] A: No, my assumption was strictly from an

[25] attribute standpoint without respect to quantity,

Page 141

[1] and it was MITG, did it do business with Software
[2] House International in subsequent to January of
[3] '04, answer, yes, exclude.
[4] Q: So did you do any analysis to see whether
[5] or not the volume of business with a non-interfered
[6] with customer changed at all, so if their buying
[7] patterns changed between 2003 and post-termination
[8] of the standard support agreement in February of
[9] '04?
[10] A: That wouldn't — I don't think that was
[11] relevant to my calculation.
[12] Q: Well, wouldn't it be relevant if you found
[13] that the people who were not interfered with
[14] started doing a lot less business with MITG?
[15] A: You know, I would probably have to look on
[16] an individual basis for that.
[17] Q: Well, because there is -- we've talked
[18] about the assumption that you made that the CSN
[19] parts were going to be sufficiently available, so
[20] those sales were counted in your calculation.
[21] Well, if your assumption is wrong and so they
[22] weren't readily available, if you continued to buy
[23] from MITG, you might be able to get only the
[24] outsourced products and not all of the CSN parts
[25] that you needed, and hence, you would continue

Page 142

[1] doing business with them, but do less business from
[2] them?
[3] A: As I stated earlier, I made no assumption
[4] that there was a supply chain problem.
[5] Q: Okay. If you did the analysis of the 2003
[6] customers that continued to do business with MITG
[7] in 2004, and found that they did less business in
[8] terms of dollars or in terms of the number of
[9] orders, would that call into question your
[10] assumption there was no supply problem?
[11] A: I would need to have more information, yes.
[12] Q: What kind of information would you need?
[13] A: Well, I haven't done the analysis, it's
[14] hypothetical, but if I was asked to compare those
[15] and render an opinion about whether the customers
[16] who are not interfered with had less sales, I would
[17] do like, I guess, I would ask questions of the
[18] management, and I would look on an individual basis
[19] and analyze who went up and who went down and why.
[20] Q: Okay. This is customer number 1472, which
[21] is identified as ACO Computers and Software on the
[22] 2000 INV-1046 2003 tab of the spreadsheet, and if
[23] we slide over, it shows the purchases that they
[24] made during 2003, right?
[25] A: Yes, ma'am.

Page 143

[1] Q: And that works out to be almost --
[2] A: About 805.
[3] Q: About 800 bucks roughly?
[4] A: Yeah.
[5] Q: And on here all of these parts are CSN
[6] parts, correct?
[7] A: Yes, ma'am.
[8] Q: And now looking on the MITG 025 – 1025 for
[9] ACO Computers, and they did business in June once
[10] and they kept — they did 326 versus the 800.
[11] A: Correct.
[12] Q: And you know, you don't know one way or the
[13] other what those parts were or why in 2003 they did
[14] 800, and 2004 they did 325, right?
[15] A: That's correct.
[16] Q: Before you go too far down that path, let
[17] me go back where I was. In this report, in your
[18] first report actually, you had an attrition of
[19] customers by one percent per month?
[20] A: Yes, ma'am.
[21] Q: Well, an attrition of revenue that you say
[22] was decrease in revenue that was an attrition of
[23] customers, that's a naturally occurring process,
[24] right?
[25] A: Correct.

Page 144

[1] Q: Why didn't you account for the natural
[2] attrition of customers in your calculations for
[3] this report?
[4] A: Because I had specific information to
[5] utilize.
[6] Q: Specific information being that they showed
[7] up on MITG 1025 through 1026?
[8] A: That I had the software of sales by
[9] customer that I went through an attribute test
[10] under the assumption that you had to buy two years
[11] to be considered a regular customer and have an
[12] expectancy that you would buy, and if you didn't
[13] buy in the period subsequent to that, then that
[14] went on my list. If you were on the list and
[15] actually did buy, it's conceivable that that should
[16] be on the lift too, but I did not include that. I
[17] made the attribute more stringent, and that is '02
[18] and '03, and no sales if they had gone from, you
[19] know, $50,000 in sales in '03, and they sold $2 in
[20] '04, I didn't include that.
[21] Q: Well, let's look on your list here, going
[22] back to your report. But two-thirds of the way
[23] down, you've got a company SSN, Inc., d/b/a Entre
[24] Computer Center. Do you see that?
[25] A: Yes, ma'am.

Hewlett Packard Development Co., et al. vs.
Midwest Information Technology, et al.

3:04-cv- Page 6 of 16

Deposition of Scott Stringer
11/2/2005

## Page 145

[1] Q: And that shows up, and it's easier to find
[2] it on PP because it has the customer number of
[3] 1691. I guess it's not in alphabetical order.
[4] This company obviously should appear.
[5] MR. HANSEN: They are on -- they are
[6] customer number -- well, it's 192.
[7] MS. CARROLL: Going down the side.
[8] MR. HANSEN: Going down the far left
[9] column, 192.
[10] MS. CARROLL: Thank you. I meant to have
[11] that marked.
[12] Q: (By Ms. Carroll) So there is the SSN,
[13] Inc., D/b/a Entre Computer Center?
[14] A: Correct.
[15] Q: 1691. So that shows up on your list
[16] because it's not supposed to be on MITG 1025, but
[17] if you look 1025 and 1026 are alphabetically. In
[18] fact, you have an error in your exhibit because if
[19] you look in alphabetical order, you go down to
[20] 1026, you see SSN d/b/a Entre Computer Center.
[21] A: Right, you are correct.
[22] Q: So you've got, in fact, they purchase
[23] $3311.50 worth of parts from MITG according to
[24] MITG's exhibit?
[25] A: That's correct.

## Page 146

[1] Q: So that's an error in your report, correct?
[2] A: Yes, that one is overlooked.
[3] Q: So that $5349 number on the total sales
[4] that's on your list, on your calculation, needs to
[5] be deducted, right?
[6] A: Yes, ma'am.
[7] Q: Now let's test a couple other things. I
[8] want to look at this in 2003, you have -- well,
[9] you've listed on your report right here, Wells
[10] Fargo Insurance, Inc.
[11] MR. HANSEN: I'm sorry, could you --
[12] Q: (By Ms. Carroll) 17, and it's customer
[13] number 1798?
[14] A: Yes, ma'am.
[15] Q: So you see that on your report?
[16] A: Yes, ma'am.
[17] Q: All right. And now, so that should show up
[18] on this report if we do a find, and this is 2003,
[19] we should find 1798, okay. So we found them. Here
[20] is 1798, so they have a purchase, at least one
[21] purchase in 2003. This was the sheet you were
[22] using, or were you using the other one to try to
[23] determine this, or do you recall?
[24] MR. HANSEN: To determine what?
[25] MS. CARROLL: To determine whether or not

## Page 147

[1] they were doing business.
[2] A: I was probably using the summary sheet
[3] because you summarize it by customer.
[4] Q: (By Ms. Carroll) The 2003 by customer?
[5] A: Yeah, because it's probably easier.
[6] Q: And if we do, I guess we can do it this
[7] way, okay, here we go. That's right. So now you
[8] have 1798, and you have the Wells Fargo Insurance,
[9] and then you have that they got sourced product in
[10] this amount for the 2003?
[11] A: Correct.
[12] Q: So we should be able to make it on your
[13] lost, do the same thing, this is for 2002 by
[14] customer, 1798, I'm going to get this all the way
[15] to the top.
[16] MR. HANSEN: It's alphabetical, so you
[17] might go to W.
[18] Q: (By Ms. Carroll) There is Wells Fargo,
[19] Wells Fargo Bank, Wells Fargo WIN/REG, Wells Fargo
[20] Denver, Wells Fargo Business Corporation, Wells
[21] Fargo Home Mortgage. I don't see Wells Fargo
[22] Insurance anywhere.
[23] MR. HANSEN: What are those down there?
[24] MS. CARROLL: XXGB International.
[25] Q: (By Ms. Carroll) If you just do that the

## Page 148

[1] same way on the other sheet which is doing it by
[2] customer number, and these are numerical by
[3] customer number, we've got 1798, which is our
[4] number we are supposed to be dealing with, 1712,
[5] 1735. So we do it on this half, 1783, 1801. So
[6] Wells Fargo Insurance, which makes your list,
[7] doesn't show up here as a company that acquired
[8] product from MITG in 2002, hence they shouldn't be
[9] considered a regular customer, should they?
[10] A: Not specifically. It's not specifically by
[11] that customer number. I grant you it appears that
[12] way. It is possible it's included in a different
[13] customer number in '02, and you know, we saw the
[14] Wells Fargo show up without a customer number. And
[15] I agree with you it could be that way and also
[16] could be that the customer number changed. So I do
[17] agree with you that the customer number doesn't
[18] show up in '02, but does show up in '03.
[19] Q: And when you look at your report, we have a
[20] number of Wells Fargos on your report, we have
[21] about ten down, Wells Fargo Bank, which shows up on
[22] your report, see down it says Wells Fargo Bank?
[23] A: Correct.
[24] Q: And a little farther down, and you've got
[25] Wells Fargo Insurance about three-quarters of the

Page 149

[1] way down, 1798?

[2]     A: Correct.

[3]     Q: And that's actually the one we are dealing

[4] with, the Wells Fargo Insurance.  And we also have

[5] Wells Fargo Bank Denver that's on your analysis

[6] also as 1592.  So you can't explain as you sit here

[7] why the Wells Fargo insurance, whether that's

[8] accurate on this list because at least based on

[9] what we are looking at on the spreadsheet, Wells

[10] Fargo Insurance customer number 1798 doesn't show

[11] up in 2002, correct?

[12]     A: Wells Fargo customer number 1798 does not

[13] show up in 2002, that's correct.

[14]     Q: Let's go through some more of these.  And

[15] on your list we have next is 2939 GMAC Motor, so we

[16] get to the end starting with 2939, and let's try to

[17] see again if we -- here is 2939, and it doesn't

[18] show up.  And if we go even to the end of this

[19] customer list and try to look for it because we are

[20] since the right side in column CSN customer number

[21] order, we are on the 2000s, this list actually cuts

[22] off with customer for 2002, ends with customer

[23] number OS 2804.

[24]     A: OS 2804, yes.

[25]     Q: If we look at your list here, you have a

Page 150

[1] bunch of customer numbers that exceed that customer

[2] number?

[3]     A: Correct.

[4]     Q: So if those folks were supposed to be

[5] regularly buying from MITG, if they are regular

[6] customers of MITG, how can they be regular

[7] customers if they don't show up in '02?

[8]     MR. HANSEN: Can I see something?  I want

[9] to go to the bottom of a --

[10]     MS. CARROLL: You want to go to where the

[11] bottom of the sales were?

[12]     MR. HANSEN: I want to go over here.

[13] That's fine.  Thank you.

[14]     A: I just saw Sears, which is OSW.

[15]     Q: (By Ms. Carroll)  Well, let's do that,

[16] there is Sears customer number 3291, which is what

[17] you have listed on here.  Let's do this, and let's

[18] see if that's the right customer number.  It

[19] doesn't show up, does it?  And I will get rid of it

[20] just so it's clear that it's not doing a search on

[21] any of these things.

[22]     A: Go down to the bottom of Column B.

[23]     Q: I want to go to the end of it.

[24]     A: Yeah.  Now, that number reconciles to this

[25] number here, so those sales are somewhere in here.

Page 151

[1] But they are not categorized with the same number

[2] for some reason.

[3]     Q: But what you are doing here is you are

[4] looking at a customer number and we've seen in the

[5] case of Wells Fargo, that you could have the same

[6] company have multiple customer numbers, and by

[7] looking at this, there are -- and we were looking

[8] at GMAC Motor Insurance Corp, and these other

[9] numbers, where those customer numbers don't exist,

[10] do you have anything that tells you that you can

[11] hand me that says this customer number that is now

[12] on my report is 3291 for Sears and Roebuck, used to

[13] be whatever, Sears and Roebuck customer number here

[14] versus there being two customer numbers?

[15]     A: I'm going to have to go back through the

[16] data to do that.  I got lost with the question.

[17] What was that comparing if it says Sears and

[18] Roebuck?

[19]     Q: Whether or not he has something that says

[20] that the Sears Roebuck that he found in the

[21] left-hand Column A is clearly it's not Sears

[22] Roebuck customer number 3291.  My question is, does

[23] he have something that says what I've listed as

[24] 3291 in 2002, was this customer number.  And the

[25] answer is no, right?  Let's see if we can find

Page 152

[1] Sears here.  All right, that's Sears Roebuck 2005,

[2] right, so that's not the same customer number, so

[3] the analysis that you've done is for a different

[4] Sears Roebuck under a different customer number.

[5] And so I'm looking at your report that's

[6] identifying who you are saying was interfered with,

[7] and they don't match up.

[8]     A: Well --

[9]     MR. HANSEN: Well, for the record, he's

[10] saying they don't match up as far as customer

[11] number, but as far as Sears Roebuck company as in

[12] customer name appears on both.

[13]     Q: (By Ms. Carroll)  But you know that when

[14] you look at MITG's customer information that they

[15] have the same company may have multiple customer

[16] numbers?

[17]     A: Correct.

[18]     Q: And we saw it, for example, in Wells Fargo,

[19] Wells Fargo Bank, Wells Fargo Bank Denver, etc.,

[20] and they each have different customer numbers?

[21]     A: Correct.

[22]     Q: And the customer number that you are using

[23] for the purpose of your report and the customer

[24] numbers that were on Chizek Exhibit PP, right?

[25]     A: Correct.

## Page 153

[1] Q: And those are the -- so that is the
[2] particular person for Sears and Roebuck or the
[3] particular purchasing office of Sears and Roebuck
[4] within that customer number that was contacted by
[5] HP, right?
[6] A: Without going into customer address and
[7] such, I don't know whether these are related
[8] accounts, whether the accounts were changed. I did
[9] not do that analysis. I simply did what I said I
[10] did, which was to look to see by name if Sears
[11] Roebuck had been doing business and whether there
[12] were different customer numbers for those items. I
[13] do not reconcile that.
[14] Q: But what we have here is you have now
[15] created a report that says that you looked at
[16] Exhibit PP, which identifies specifically this is
[17] the company, this is the customer number, we sent
[18] them a letter, we followed up and called them, and
[19] would you agree with me that there is an address
[20] and a phone number associated with each customer by
[21] customer number?
[22] A: Yes, ma'am.
[23] Q: So that's actually who was contacted?
[24] A: Correct.
[25] Q: And then you looked at the list that MITG

## Page 154

[1] has prepared and said, okay, these people continued
[2] to do business, so it's going to eliminate them,
[3] and everybody else was interfered with. Well, if
[4] there is Sears and Roebuck in Missouri that is
[5] purchasing from MITG, and Sears and Roebuck in
[6] Texas that's purchasing from MITG, and they each
[7] have separate customer numbers, if I only contacted
[8] the one in Missouri, and I didn't contact the one,
[9] I being HP contact one in Texas, aren't we talking
[10] about two separate issues?
[11] A: I think in that scenario, yes, ma'am, you
[12] are correct.
[13] Q: So rather than going through every single
[14] one of these, needless to say, there are a number
[15] of these that didn't match up and we've gone
[16] through Wells Fargo, we looked at the Sears Roebuck
[17] example, because you saw that. Do you agree with
[18] me that if they don't show up on '02, they show up
[19] on '03, I will stipulate that all of these folks
[20] showed up with purchasers in '03, if they don't
[21] show up in '02 anywhere, that there is an error in
[22] your report by including them as a customer who is
[23] regularly buying from MITG?
[24] A: Under the assumption that I set out which
[25] was the attribute test was '02 and '03 if in fact

## Page 155

[1] the specific customer did not buy in one of those
[2] two years and I put him on the list, then you are
[3] correct.
[4] Q: There is another company I want to ask you
[5] about on the list, and they did buy in '02 and '03,
[6] and that's Costco, which is the customer number
[7] 2082.
[8] A: Okay.
[9] Q: Do you see them on your list there?
[10] A: Yes, ma'am.
[11] Q: And what you have here for Costco is total
[12] purchase they got CSN sales of $83.
[13] A: Yes, ma'am.
[14] Q: In '03. All right. Let's look at what
[15] they did in '02. Here is Costco. They actually
[16] did quite a bit of business primarily on sourced
[17] parts, correct?
[18] A: Yes, ma'am.
[19] Q: Almost $29,000 worth of business in '02?
[20] A: Correct.
[21] Q: And your analysis of 2003 by customer shows
[22] that Costco only did $83 worth of business in '03?
[23] A: Correct.
[24] Q: Why do you consider them a regularly buying
[25] customer when they reduced while MITG was servicing

## Page 156

[1] their account, they reduced their, what they
[2] purchased from MITG by over $26,000.
[3] A: To try and be consistent in my application,
[4] I was only looking at attribute. As I stated
[5] earlier in my testimony, if somebody bought $50,000
[6] in one year and a dollar in the next, my attribute
[7] test was simply to look at the two years.
[8] Q: Well, let me ask you this, wouldn't it
[9] appear looking at this information, and I would
[10] have done now on 2003 is go down to Costco's
[11] purchase for on the left-hand side, Costco
[12] wholesale, $82.55, which is the $83 rounded up that
[13] we have there, so they have a one time purchase in
[14] 2003, as shown on this report. Is that what that
[15] shows is this is a one time purchase or just a
[16] summary of all the purchases?
[17] A: All the purchases for that year.
[18] Q: So we have to go to INV 1046, and then we
[19] can see our regularly Costco because it should show
[20] everything, right, so Costco on two occasions in
[21] 2003, they bought something in April, April 24, and
[22] they bought something May 1 for that total amount?
[23] A: Yes, ma'am.
[24] Q: And now, did you consider when you were
[25] looking at companies if there were other companies

Page 157

[1] like Costco in here that there is a reason other
[2] then the contact from HP by letter and by follow up
[3] phone call that led them to stop doing business
[4] with MITG?
[5] A: I felt like the approach was reasonable
[6] because example for Costco, for all I know, they
[7] may go back to the 2002 levels because they are not
[8] buying capital equipment or servicing computers or
[9] don't have that need, or they stockpiled, but
[10] without going to each specific customer and asking
[11] them specifically to tell me why they stopped doing
[12] business with MITG, I really don't know other than
[13] what documents I've been given. And I have to use
[14] some sort of a quantitative methodology to
[15] determine that. It could have been more, yes,
[16] could it have been less, absolutely, but this is
[17] the approach I took because it was the most
[18] reasonable in the circumstances I had.
[19] Q: Is it your testimony then that you came up
[20] with a perimeter to design regularly buying
[21] customers as you've described it purchasing in at
[22] least one order in 2002 and one order in 2003, and
[23] accepted that regardless of the number of order or
[24] the amount of money in the two years; is that
[25] accurate?

Page 158

[1] A: That's correct.
[2] Q: And you didn't go back and question whether
[3] or not that was appropriate — you don't go back
[4] and look at these and say, wait a minute, there may
[5] be this definition that I have come up with doesn't
[6] work because of variables such as Costco where they
[7] were $26,000 in spare parts one year and 83,000 in
[8] spare parts the next?
[9] A: I did not analyze by customer, no, ma'am, I
[10] did not.
[11] Q: So just to try to wrap this up, it doesn't
[12] matter if there are a dozen or more customers that
[13] only bought one thing in 2003, if they bought it in
[14] 2003 and they bought one thing in 2004, they make
[15] the list just being interfered with because they
[16] fit your definition of a regularly buying customer
[17] who no longer bought in '04.
[18] MR. HANSEN: I don't know if it's an
[19] objection, but you gave wrong dates.
[20] MS. CARROLL: Let me do it again. Thank
[21] you.
[22] Q: (By Ms. Carroll) Is it fair to say that on
[23] your analysis, you didn't take into account or you
[24] didn't go back and look and see if there are dozens
[25] of companies that have at least one purchase in '02

Page 159

[1] and one purchase in '03, you considered them a
[2] regularly buying customer because they didn't buy
[3] in '04?
[4] A: That was the criteria I considered the most
[5] dependable.
[6] Q: And my question is, I've raised an issue of
[7] Costco. Did you go back at any time and do an
[8] analysis to try to determine whether or not the
[9] parameters that you came up with to define a
[10] regularly buying customer made sense under with the
[11] specific customers that you are looking at on
[12] exhibits 4-1 and 4-2 of your report?
[13] A: I do remember thinking that for customers
[14] who bought a lot in 2002, I think Costco was an
[15] example of that, and then had a small amount in
[16] '03, that I may be understating what that effect
[17] would be in '04 because of the natural purchasing
[18] or business cycle of that company. By the same
[19] token, that would be offset by perhaps customers
[20] that bought a lot in '03, but that because of their
[21] business cycles may not have bought a lot in '04.
[22] MR. HANSEN: You mean in '02?
[23] A: No, in '04. They bought a lot in '03,
[24] maybe they would have bought less in '04, maybe
[25] they would have bought more in '04. Maybe the

Page 160

[1] company like Costco that bought 83 in '03, would
[2] have bought more in '04. Without understanding in
[3] great detail and basically interviewing these
[4] companies in detail as to what their buying habits
[5] are and why they stopped buying, it seemed to me
[6] that my methodology eliminated those offsets, that
[7] I might be understated purchases on one company and
[8] might be overstating them on another. But I had no
[9] data, no ability other than to take it through this
[10] process to come up with that number.
[11] Q: Well, when you just looked at your, at the
[12] lift that you ended up creating, when you got
[13] companies that had very low dollar figures in 2003,
[14] did you go back and look and see when was the last
[15] time they purchased in 2003, to see if they had a
[16] low order volume or low revenue numbers because
[17] they hadn't ordered from MITG in the second half of
[18] the year?
[19] A: I did not look to see when the specific
[20] orders were.
[21] Q: Because in this case, what we have is the
[22] last order Costco ever had was May 1 of '03, and so
[23] they didn't, the contract was still in place,
[24] standard support agreement from May 2 to February 7
[25] of 2004, and they didn't buy a single thing?

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

3:04-cv-00065-IRH Document 33 Filed 06/02/2006 Page 10 of 16

Deposition of Scott Stringer
11/2/2005

Page 161

[1] A: And if I'm wrong, ma'am, then that effects

[2] the total calculation by about $20.

[3] Q: On this particular customer?

[4] A: If I'm wrong, correct. And I'm answering a

[5] question still, if I'm wrong, then including that

[6] $80, by the time I put gross profit and prorate it,

[7] it does not distort my calculation in a material

[8] way.

[9] Q: But if you are also in your report wrong

[10] when you listed all of these people with regularly

[11] purchasing from MITG that made your report that

[12] don't show up in 2002, then all of those numbers

[13] would go, would need to come off also, right?

[14] A: Would you repeat that? I'm sorry.

[15] Q: If you are also wrong when you included

[16] companies that we looked at Wells Fargo Insurance,

[17] Inc., and GMAC Motor Insurance Corp, and Sears

[18] Roebuck, if you included all of those folks on here

[19] as regularly buying customers that don't show up as

[20] having a purchase in 2002, then all of those would

[21] have to come off from your total sales too,

[22] correct?

[23] A: If I determined that those customers were

[24] indeed different customers and that I needed to go

[25] through the methodology and take them off, then I

Page 162

[1] would take them off.

[2] Q: And SSN, Inc., d/b/a Entre Computer Center

[3] would also come off because they continued to

[4] purchase from MITG?

[5] A: Correct.

[6] Q: If you took all of those that could

[7] materially alter your conclusions, right?

[8] A: I don't know what you mean by material.

[9] Q: Well, let me back up. You said before that

[10] if I was right, if you took Costco out, it wouldn't

[11] materially alter your conclusion. What do you mean

[12] by materially alter?

[13] A: $83 times the gross profit percentage times

[14] ten and three-fourths, I mean, these are

[15] estimations, ma'am, and you know, the actual,

[16] because the actual sells are hypothetical because

[17] we don't know about what their patterns were in

[18] '04, this is my best estimate, so, you know, if my

[19] number's off by $83, then I hit a home run.

[20] Q: Well, then let's go through it. It's not

[21] off just $83. That's saying excepting me, you are

[22] off $5349 for SSN. If you are also off for Wells

[23] Fargo Insurance, that's 2459. If you are off for

[24] GMAC Motor Insurance Corporation and all of those

[25] numbers that don't show up, remember we cut off at

Page 163

[1] 28, 29,000 something, that cuts off the entire

[2] bottom of your analysis. All of the things in the

[3] 3000s, all didn't show up on '02, because those

[4] customers numbers don't show up. So all of those

[5] numbers would have to come off. Is that going to

[6] be assuming that's true that everything from the

[7] GMAC Insurance Corp, 2939 down at the end comes

[8] off, would that materially alter your conclusions?

[9] A: It would alter it by ten to $15,000.

[10] Q: And that indicates that with the list that

[11] you've made that there are over a dozen companies

[12] that don't belong on the list, right?

[13] A: I would have to do further analysis, ma'am.

[14] Q: Let's change topics a little bit. We are

[15] still talking about tortious interference, but I

[16] wanted to get to the end of your calculation here,

[17] and you came up with lost gross profits at 34

[18] percent. Why 34 percent?

[19] A: Because I was projecting 2004, I went to

[20] MITG 0612, and I calculated gross profit from that

[21] page of 34 percent.

[22] Q: He's in the sales and revenue numbers, the

[23] same thing I talked about on 0613?

[24] A: Correct, except I used the last ten months.

[25] Q: So you used the numbers for March through

Page 164

[1] December and for the sales and revenue, your gross

[2] margin, the operating expenses, etc., and you came

[3] up with 34 percent there?

[4] A: Just the revenue and the gross profit, yes,

[5] ma'am.

[6] Q: All right. I'm sorry. I'm not sure I

[7] follow where you got to -- you took a total sales

[8] and revenue of the 1,834,877, you reduced -- you

[9] deducted 314,830 and the 187,612 from February?

[10] A: Correct ma'am.

[11] Q: And do you have a total what that total

[12] came out to be?

[13] A: 1,332,435.

[14] Q: And then using that number for your sales

[15] and revenue, what did you use to then determine the

[16] profit margin of 34 percent?

[17] A: Same methodology, took the gross profit, or

[18] I'm sorry, gross margin 693,869.12 minus January 1,

[19] 44,883.40 minus February 8, 7930.27, to come up

[20] with 450,055, and then I divided that into the

[21] previous number.

[22] Q: So again, for the purpose of this

[23] calculation you assumed that the -- well, for this,

[24] you assumed that the profit margin they would get

[25] on part sales was the same profit margin they were

## Page 165

[1] getting from all of their sales of whatever else
[2] they were selling from March to December of '04?
[3]     A: Yes, ma'am, that's correct.
[4]     Q: And now you have less associated operating
[5] expenses. What are we talking about there?
[6]     A: Oh, basically the same theory that we had,
[7] and that is that if we were going to do 2.1 million
[8] more in volume, that there would be an incremental
[9] overhead associated with that.
[10]     Q: So their actual operating expenses, are you
[11] then looking at the actual operating expenses that
[12] are reported on MITG 0612?
[13]     A: No, ma'am, I have a separate work paper in
[14] my work papers that shows the calculation.
[15]     Q: Okay.
[16]     A: What I'm doing here is I took the gross
[17] profit that was calculated on this page here.
[18]     Q: This page being the first page of the
[19] exhibit?
[20]     A: Second page of the exhibit.
[21]     Q: Okay.
[22]     MR. HANSEN: Exhibit 42.
[23]     A: And I was basically, I was comparing that
[24] to the incremental or to the diverted gross profit
[25] of the previous calculation. So if you will, I've

## Page 166

[1] got incremental profit in this analysis. I had
[2] incremental profit in another analysis. What was
[3] the incremental increase or what's the relationship
[4] to that, and the relationship of that 723 to the
[5] 5.4 million in the previous analysis was 13
[6] percent. So then I said, okay, well what was my
[7] incremental overhead in my breach of contract
[8] analysis, it was 391, 13 percent times 3 91 is
[9] 52,000 and I rounded to 50.
[10]     (Exhibit No. 67 was marked, dated, NJM.)
[11]     Q: (By Ms. Carroll) I've marked the work
[12] paper that we've just been discussing as Exhibit
[13] 67, okay?
[14]     A: Yes, ma'am.
[15]     Q: Now, if we had some discussions during the
[16] breach of contract of the numbers that -- well,
[17] let's go back to your report. And the numbers that
[18] we are looking at are reflected on Exhibit 3-1, in
[19] terms of the 5.4 million in lost gross profits that
[20] have showed up on your worksheet, on your work
[21] paper. Do you have that 5.4 so for 28,300, that's
[22] the number, that's where that number ties back to.
[23] I think on that first page on 3-1, I think matches,
[24] it's at 5.4 million there?
[25]     A: Yeah, it's 3-2 actually.

## Page 167

[1]     Q: That's fine. We can -- either one. So on
[2] 3-2 for the year end total, the 5.4 million on lost
[3] gross profits?
[4]     A: Yes, ma'am.
[5]     Q: Ties back to the second line item on your
[6] work paper here, correct?
[7]     A: Correct.
[8]     Q: And then the 391 is a total incremental
[9] operating expenses on that same Exhibit 3-2?
[10]     A: For 2003.
[11]     Q: And then we discussed earlier in your
[12] testimony that the lost gross profits on outsourced
[13] orders, if you used the percentage that I presented
[14] of 33 percent versus based on the number of calls
[15] as opposed to the 56 percent that you used based on
[16] volume, that that would in effect reduce the $5.4
[17] million number?
[18]     A: Correct.
[19]     Q: Because it would reduce the lost gross
[20] profits on outsourced orders?
[21]     A: Yes, ma'am.
[22]     Q: And if that number was reduced, would that
[23] number being reduced on 3-2 affect your total
[24] incremental operating expenses?
[25]     A: It would increase it on this schedule.

## Page 168

[1]     Q: It would not change it on schedule 3-2, it
[2] would still be the 391,000?
[3]     A: That's correct.
[4]     Q: But that number would go up?
[5]     A: And the 13 percent would become something
[6] higher.
[7]     Q: And then that would in fact, if that, if
[8] the $50,000 number went up, then that would have
[9] the effect of reducing the net profit lost due to
[10] tortious interference?
[11]     A: Correct, ma'am.
[12]     MS. CARROLL: Why don't we take a break.
[13]     (At this time, there was a break in the
[14] deposition.)
[15]     Q: (By Ms. Carroll) This is related, is
[16] similar to the subject we were talking about before
[17] was did you do any kind of analysis to determine
[18] whether the estimated $50,000 in operating expenses
[19] would be appropriate or would be enough for MITG to
[20] do an additional $2.1 million in sales?
[21]     A: No, I simply relied upon the previous
[22] analysis, and then in essence, compared that number
[23] to the amount of gross profit and made that
[24] correlation.
[25]     Q: And you have not done any analysis of

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

3:04-cv-                               Page 12 of 16

Deposition of Scott Stringer
11/2/2005

Page 169

[1] whether the customers that continued to do business
[2] with MITG had continued to do the same volume of
[3] business in 2004 that they had been doing at 2003?
[4]     A: I had no way of knowing. Are you talking
[5] about the customers that I included on the list?
[6]     Q: No, the customers that continued to do
[7] business with MITG in 2004, so the non-interfered
[8] with customers. Can I call them that?
[9]     A: Yes, ma'am.
[10]     Q: So you have not done any analysis to say
[11] the people on MITG 1025 through 1026 did in 2004,
[12] for the rest of the year, they did $833,773.70
[13] worth of business, worth of purchases from MITG
[14] according to that report, right?
[15]     A: Right.
[16]     Q: You didn't go back and do an analysis to
[17] see whether in 2003, they did approximately
[18] $500,000 in business or whether they did $28
[19] million in business?
[20]     A: That's correct.
[21]     Q: And if there is -- I'm just going to do a
[22] hypothetical. If they did $2 million in business
[23] in 2003, and did half a million dollars in business
[24] after the end of the standard support agreement in
[25] 2004, you also haven't done any analysis to

Page 170

[1] determine why they did less business in '04 than
[2] they did in '03?
[3]     A: That's correct.
[4]     Q: And with that, you also didn't do any
[5] analysis -- well, you assumed that the sales were
[6] going to be the same in '04, with the interfered
[7] with customers as they had been for '04?
[8]     A: That's correct.
[9]     Q: So for the sales that show up on Exhibit
[10] 4-1 through 4-2 of your report, the $2.1 million in
[11] sales that are there is based on the assumption
[12] that if they had done business with MITG in 2004,
[13] after the standard support agreement, they would
[14] have done that same volume of business, correct?
[15]     A: As overall. Obviously, some would be --
[16] would do more and some would do less.
[17]     Q: And I just want to go through and see what
[18] other documents -- you appear to have some
[19] additional work papers with you. I've marked two
[20] of them. What else do you have with you today that
[21] relates to information in terms of work papers on
[22] your new report?
[23]     A: Okay. Before we go into that, can I
[24] clarify something I said earlier?
[25]     A: Yes.

Page 171

[1]     A: We were talking about different dates in
[2] November for the, I think it was for the breach of
[3] contract.
[4]     Q: Correct.
[5]     A: And it seems to me that in Mr. Chizek's
[6] deposition, there is a date, there is a date stated
[7] of November 9, or thereabouts, and I couldn't
[8] recall that earlier, but I recall that now.
[9]     Q: All right. So if we go through
[10] Mr. Chizek's two depositions, you believe that
[11] somewhere within those two deposition transcripts
[12] he specifically notes November 9?
[13]     A: I believe so. It's like maybe early parts,
[14] like 38, 39 or 40 or something.
[15]     MR. HANSEN: I don't know if he says the
[16] 9th. I know he says November.
[17]     Q: (By Ms. Carroll) Well, if you look for the
[18] number 9 --
[19]     A: Oh, here we go, yeah, so that's what I
[20] recall. I hadn't had a chance to look at this. It
[21] was basically that Chizek also said they started
[22] taking calls in November.
[23]     Q: What page are you on?
[24]     A: I'm on page 40, line 19. And I just wasn't
[25] sure if I said that in my previous testimony.

Page 172

[1]     Q: So this is another part where he
[2] specifically says here, we started taking those
[3] calls in November and finished the migration, I
[4] believe, in January?
[5]     A: Correct.
[6]     Q: Doesn't that testimony indicate to you that
[7] not 100 percent of the calls started going to
[8] Roseville on November 9, that there was a migration
[9] that took, at least according to Mr. Chizek's
[10] belief, until January?
[11]     A: Yes, that's the way it's stated, but again,
[12] I just took the numbers that I had believing that
[13] those were the items that went to Roseville.
[14]     Q: So for the purpose of your report again,
[15] you just assumed that on November 9, Andover
[16] doesn't get anymore calls, Roseville gets them all,
[17] and don't try to account for what appears from this
[18] testimony to be transition?
[19]     A: Well, again, I was utilizing the
[20] spreadsheet that was given to me, and the only
[21] reason I bring this up again, Ms. Carroll, is
[22] because it, again, the issue we were talking about
[23] was November versus April, and why did I pick
[24] November. That was one of the reasons.
[25]     Q: But looking at that, though, that you just

Hewlett Packard Development Co., et al vs.
3:04-cv-Midwest Information Technology, et al. Page 13 of 16

Deposition of Scott Stringer
11/2/2005

Page 173

[1] cited, it indicates that there was a migration that
[2] took at least a couple of months. For the purpose
[3] of your analysis, you just assumed 100 percent of
[4] the calls transitioned at one time as opposed to a
[5] migration of calls over a couple months?
[6]     A: I assumed that the document I used to pull
[7] those calls were the calls that should have gone to
[8] MITG, yes, ma'am.
[9]     Q: Now, in terms of the work papers, let's
[10] just go through them real quickly and see what
[11] we've got.
[12]     A: Sure. I've got them put together by part
[13] of my report, so this is the tortious interference
[14] work papers. You've identified 67 as my work
[15] paper. The only thing that's not in the report is
[16] really page 3 of that exhibit. I shouldn't say
[17] that. I've got some chicken scratch on page 2.
[18] MITG 1025 and 1026 and MITG 612 through 614.
[19]     MR. HANSEN: And just so we are clear, when
[20] you say work papers, these are the papers that's
[21] got some writing on it.
[22]     MS. CARROLL: Yeah, absolutely.
[23]     A: I printed out things, you know, so that
[24] when I've got the document in front of me, I've got
[25] everything I need in front of me.

Page 174

[1]     Q: And you have there part of the spreadsheet
[2] that's the 2002 customers that was identical to
[3] what we've been looking at using the computer
[4] screen that we have, right?
[5]     A: Exactly.
[6]     MR. HANSEN: Just so we are clear, there is
[7] a pile back here and printed the same thing as
[8] 2003.
[9]     MS. CARROLL: Right, that's the one we
[10] marked.
[11]     A: I copied that exhibit again just because it
[12] also dealt with my tortious interference claim, so
[13] this is just a repeat of that.
[14]     Q: (By Ms. Carroll) Okay. All right.
[15]     A: So I've got '02, I've got '03, and that was
[16] identified in the previous deposition.
[17]     Q: The per seat?
[18]     A: Yes, ma'am.
[19]     Q: Two seconds. Let me just look before we go
[20] on. There is a notation on your copy of MITG 1025
[21] and 26. It's part of your work papers. Is this
[22] your handwriting at the time?
[23]     A: That is actually Linda Liberman's
[24] handwriting. That is made in the process of
[25] receiving the work papers.

Page 175

[1]     Q: And this says, is this only third party or
[2] third party and CSN?
[3]     A: Correct.
[4]     Q: Do you recall having a discussion with her
[5] about that?
[6]     A: Well, I think it's a mute point because
[7] they were not on the standard agreement then, so I
[8] don't remember what I told her at that point.
[9]     Q: All right. So those are all your work
[10] papers for your tortious interference claim?
[11]     A: I'm sorry, this one is out what's marked as
[12] Exhibit PP from Chizek's exhibits which I have
[13] documentation of my test work to pick the
[14] customers.
[15]     Q: Let me take a look at this real quick. I'm
[16] sorry. What is the paper right here? What does
[17] that say on it, the yellow tag paper?
[18]     A: Exhibit 4 tort customers contacted compared
[19] to MITG 1025.
[20]     MR. HANSEN: Are you leaving the Post-Its
[21] on there? My concern would be them falling off or
[22] do you want -- off the record.
[23]     (Off-the-record discussion.)
[24]     (Exhibit No. 68 was marked, dated, NJM.)
[25]     Q: (By Ms. Carroll) So we marked that as

Page 176

[1] Exhibit 68, which is your marked-up copy of Chizek
[2] PP?
[3]     A: Correct, ma'am.
[4]     Q: So that's it for your tortious
[5] interference. What do you have for your breach of
[6] contract?
[7]     MR. HANSEN: Well, we've already gone over
[8] this, I think.
[9]     Q: (By Ms. Carroll) So we have HP 11007
[10] through 008, and you just got some markings on
[11] that, correct?
[12]     A: Correct.
[13]     Q: What else have you got?
[14]     MR. HANSEN: This is a copy of his report,
[15] it has no markings on it. I think he just pulled
[16] it out for the depo today.
[17]     Q: (By Ms. Carroll) And the notations on the
[18] side?
[19]     A: Tells me where to go back to find the
[20] information.
[21]     Q: Okay?
[22]     MR. HANSEN: And then as I was concerned,
[23] apparently this Post-it fell off.
[24]     Q: (By Ms. Carroll) Does that go -- and the
[25] other part of that you have is simply your call

Page 177

[1] volume documents that we talked about during your
[2] deposition?
[3]     A: Yes, ma'am.
[4]     MR. HANSEN: And the Post-it, for the
[5] record, says, detail call activity year '04, '02.
[6]     Q: (By Ms. Carroll) Do you have anything
[7] else, draft of your reports, anything else that you
[8] created in comparing your supplemental report that
[9] we have not looked at today?
[10]     MR. HANSEN: Yeah, here is -- the only
[11] other thing we have is emails to and from me and
[12] him on setting up his depo, and an email on a
[13] draft.
[14]     Q: (By Ms. Carroll) After you sent the draft
[15] report to Mr. Hansen, did he suggest any changes?
[16]     A: I think we talked about a couple of
[17] customers in the tortious interference claim. I
[18] can't remember. There weren't significant changes.
[19]     Q: Do you have any recollection of anything
[20] specific that you and Mr. Hansen talked about after
[21] you sent him the draft report?
[22]     A: No, I sure don't.
[23]     Q: Do you recall any specific change that you
[24] made to your draft report before you put it in
[25] file?

Page 178

[1]     A: No, ma'am, I don't.
[2]     MS. CARROLL: With that, I'm done. That's
[3] all I have.
[4]     MR. HANSEN: We'll read and sign.
[5]         ----------
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 179

[1]     STATE OF MISSOURI
[2]                             SS
[3]     COUNTY OF ST. LOUIS
[4]         I, Nicki J. Madison, a Notary Public in
[5]     and for the State of Missouri, duly commissioned,
[6]     qualified and authorized to administer oaths and to
[7]     certify to depositions, do hereby certify that
[8]     pursuant to Notice in the civil cause now pending
[9]     and undetermined in the U.S. District Court, Central
[10]     District of Illinois, Springfield Division, to be
[11]     used in the trial of said cause in said court, I
[12]     was attended at the offices of UHY Advisors, 3117 S.
[13]     Big Bend Blvd., Suite 100, St. Louis, Missouri, by
[14]     the aforesaid witness; and by the aforesaid
[15]     attorneys; on this 2nd day of November, 2005.
[16]         The said witness, being of sound mind and
[17]     being by me first carefully examined and duly
[18]     cautioned and sworn to testify the truth, the whole
[19]     truth, and nothing but the truth in the case
[20]     aforesaid, thereupon testified as is shown in the
[21]     foregoing transcript, said testimony being by me
[22]     reported in shorthand and caused to be transcribed
[23]     into typewriting, and that the foregoing pages
[24]     correctly set forth the testimony of the
[25]     aforementioned witness, together with the questions

Page 180

[1]     propounded by counsel and remarks and objections of
[2]     counsel thereto, and is in all respects a full,
[3]     true, correct and complete transcript of the
[4]     questions propounded to and the answers given by
[5]     said witness; that signature of the deponent
[6]     was not waived by agreement of counsel.
[7]         I further certify that I am not of counsel
[8]     or attorney for either of the parties to said suit,
[9]     not related to nor interested in any of the parties
[10]     or their attorneys.
[11]         Witness my hand and notarial seal at St.
[12]     Louis, Missouri, this 19th day of November, 2005.
[13]         My Commission expires April 26, 2009.
[14]
[15]
[16]     Notary Public in and for the State
[17]         of Missouri
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

3:04-cv-01202-DRH   Page 15 of 16

Deposition of Scott Stringer
11/2/2005

Page 181

[1] Gore Perry Gateway & Lipa Reporting

[2]

[3]

[4] Mr. Scott Stringer

[5] UHY Advisors

[6] 3117 S. Big Bend Blvd., Suite 100

[7] St. Louis, MO 63143

[8]

[9] Enclosed please find the Original Signature pages

[10] and errata sheets for the deposition of:

[11] Scott Stringer taken 11/2/2005 in the case of:

[12] Hewlett Packard Development Co., et al vs. Midwest Information Technology, et al.

[13] Please read your copy of the transcript, noting

[14] any corrections on the enclosed errata sheets,

[15] and return all pages for filing in court to:

[16] Ms. Elizann Carroll

[17] Juneau, Boll & Ward

[18] 15301 Spectrum Drive, Suite 300

[19] Addison, TX 75001

[20]

[21] Your prompt cooperation will be appreciated.

[22] Sincerely,

[23]

[24] Gore Perry Gateway & Lipa Reporting

[25]

Page 182

[1] Page   Line   Should Read:

[2] Reason for change:

[3]

[4] Page   Line   Should Read:

[5] Reason for change:

[6]

[7] Page   Line   Should Read:

[8] Reason for change:

[9]

[10] Page   Line   Should Read:

[11] Reason for change:

[12]

[13] Page   Line   Should Read:

[14] Reason for change:

[15]

[16] Page   Line   Should Read:

[17] Reason for change:

[18]

[19] Page   Line   Should Read:

[20] Reason for change:

[21]

[22] Page   Line   Should Read:

[23] Reason for change:

[24]

[25]

Page 183

[1] Page   Line   Should Read:

[2] Reason for change:

[3]

[4] Page   Line   Should Read:

[5] Reason for change:

[6]

[7] Page   Line   Should Read:

[8] Reason for change:

[9]

[10] Page   Line   Should Read:

[11] Reason for change:

[12]

[13] Page   Line   Should Read:

[14] Reason for change:

[15]

[16] Page   Line   Should Read:

[17] Reason for change:

[18]

[19] Page   Line   Should Read:

[20] Reason for change:

[21]

[22] Page   Line   Should Read:

[23] Reason for change:

[24]

[25]

Page 184

[1] Comes now the witness, Scott Stringer,

[2] and having read the the foregoing transcript

[3] of the deposition taken on the 11/2/2005,

[4] acknowledges by signature hereto that it is a

[5] true and accurate transcript of the testimony given

[6] on the date hereinabove mentioned.

[7]

[8]

[9] _____

[10] Scott Stringer

[11]

[12] Subscribed and sworn to me before this

[13] _____ day of _____,2005.

[14] My Commission expires

[15]

[16]

[17] _____

[18] Notary Public

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Hewlett Packard Development Co., et al vs.
Midwest Information Technology, et al

3:04-cv-03055-JES-BGC  #10-16   Page 16 of 16

Deposition of Scott Stringer
11/2/2005

Page 185

[1] COURT MEMO

[2] .

[3] 4

[5] Hewlett Packard Development Co., et al vs. Midwest Information Technology, et al.

[6] 04-3055

[7]

[8] CERTIFICATE OF OFFICER AND

[9] STATEMENT OF DEPOSITION CHARGES

[10]

[11] DEPOSITION OF SCOTT STRINGER

[12] TAKEN ON BEHALF OF THE PLAINTIFF

[13] 11/2/2005

[14] Name and address of person or firm having custody of

[15] the original transcript:

[16] Ms. Elizann Carroll

[17] Unknown

[18] UnKnown, UnKnown

[19] UnKnown,

[20]

[21]

[22]

[23]

[24]

[25]

Page 186

[1] ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

[2] Ms. Elizann Carroll

[3] Unknown

[4] UnKnown, UnKnown

[5] UnKnown,

[6] Total:

[7] 1 ONE COPY - TAXED IN FAVOR OF:

[8] Mr. James Hansen

[9] Schmiedeskamp Robertson Neu & Mitch

[10] 525 Jersey Street,

[11] Quincy, IL 62306

[12] Total:

[13]

[14] Upon delivery of transcripts, the above

[15] charges had not been paid.  It is anticipated

[16] that all charges will be paid in the normal course

[17] of business.

[18] GORE PERRY GATEWAY & LIPA REPORTING COMPANY

[19] 515 Olive Street, Suite 700

[20] St. Louis, Missouri 63101

[21] IN WITNESS WHEREOF, I have hereunto set

[22] my hand and seal on this _____ day of _____

[23] Commission expires

[24] _____

[25] Notary Public