1

2                    U.S. DISTRICT COURT

3              CENTRAL DISTRICT OF ILLINOIS

4                  SPRINGFIELD DIVISION

5

6    HEWLETT-PACKARD DEVELOPMENT        )
     COMPANY, L.P., HEWLETT-PACKARD     )
7    COMPANY, AND COMPAQ TRADEMARK,)
     B.V.,                              )
8                                       )
              PLAINTIFFS,               )
9                                       )
              vs.                       )   No. 04-3055
10                                      )
     MIDWEST INFORMATION                )
11   TECHNOLOGY GROUP, INC., AND        )
     MICHAEL LAUBER,                    )
12                                      )
              DEFENDANTS.               )

13

14         DISCOVERY DEPOSITION of RONALD HAUGHT, taken in

15   the above-entitled case before Tracy L. Grott, a Notary

16   Public and Certified Shorthand Reporter of Adams County,

17   Illinois, at 2:30 p.m., on July 25, 2005, at 525 Jersey, in

18   the City of Quincy, County of Adams, State of Illinois,

19   pursuant to stipulation hereto annexed.

20

21

22                Tracy L. Grott, CSR
                  2901 Sonata Drive
23                Quincy, IL  62301
                   217-223-3624

24

25

```
 1   APPEARANCES

 2   MS. ELIZANN CARROLL
     Attorney at Law
 3   Juneau, Boll & Ward
     15301 Spectrum Drive, Suite 300
 4   Addison, TX  75001
                 appeared for the Plaintiffs.
 5

 6   MR. JAMES HANSEN
     Attorney at Law
 7   Schmiedeskamp, Robertson, Neu & Mitchell
     525 Jersey
 8   P.O. Box 1069
     Quincy, IL  62306
 9               appeared for the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22   Tracy L. Grott, CSR
     License No. 084-004435
23   2901 Sonata Drive
     Quincy, IL  62301
24   217-223-3624

25
```

```
 1                          INDEX

 2   DEPONENT                        PAGE NUMBER

 3   RONALD HAUGHT

 4   Examination by MS. CARROLL           5

 5

 6

 7

 8                   E X H I B I T S

 9   NUMBER                    MARKED FOR IDENTIFICATION

10   Plaintiffs No. 44                 47

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    S T I P U L A T I O N

1          It is stipulated and agreed by and between the
2  parties hereto, through their attorneys that the deposition
3  of RONALD HAUGHT may be taken for discovery purposes before
4  Tracy L. Grott, a Notary Public and Certified Shorthand
5  Reporter, upon notice, on the 25th day of July A.D., 2005,
6  at the instance of the Plaintiffs, at the hour of 2:30 p.m.,
7  at 525 Jersey, in the City of Quincy, County of Adams, State
8  of Illinois;

9          That all requirements of the Code of Civil
10 Procedure and the Rules of the Supreme Court and the reading
11 over and signing of the deposition by the Deponent are
12 expressly waived;

13         That any objections as to competency, materiality
14 or relevancy are herby reserved, but any objection as to the
15 form of question and answer is waived unless specifically
16 noted;

17         That the deposition, or any parts thereof, may be
18 used for any purpose for which discovery depositions are
19 competent, by any of the parties hereto, without foundation
20 proof;

21         That any party hereto may be furnished copies of
22 the transcript at his or her own expense.

23                      (Whereupon the Deponent
24                       was sworn by the Notary Public.)

RONALD HAUGHT,

having been first duly sworn by the Notary Public, deposeth

and saith as follows:

EXAMINATION BY:

MS. CARROLL

Q.    State your name for the record, please.

A.    Ronald Dean Haught, H-A-U-G-H-T, Junior.

Q.    Thank you, Mr. Haught.  We did your

deposition in February and the same process applies.

Obviously, I'll be a lot quicker this time than I

was last time.  I don't think I have it in me to go

that long again.  I want to follow up on some areas

based on some documents that you all produced to

me --

A.    Okay.

Q.    -- since that last deposition, but let me

start with a place where we started last time, which

is during your last deposition I asked you about

dollar amounts of damages of each of the three

claims you have against HP and you deferred to an

expert at that time.

A.    Correct.

Q.    And Mr. Stringer of UHY Advisors has now

provided a report on damages for the breech of the

Standard Support Agreement and the tortious

1    interference claim, you're familiar with that

2    report?

3        A.    No, I haven't seen it yet.

4        Q.    Okay.  Let me ask you this, are you aware

5    of the numbers that he came up with in terms of

6    round numbers for what the damage claim is for the

7    breech of the Standard Support Agreement and the

8    tortious interference claim?

9        A.    No.

10        Q.    Mr. Stringer's report, I'll just ask you

11    if you've heard of any of these numbers as to Count

12    1 on the breech of the Standard Support Agreement,

13    they have a rounded damage number of $6,422,000, do

14    you have -- are you going to rely on Mr. Stringer to

15    testify as to the dollar amount of the Standard

16    Support Agreement claim or do you have a number

17    different from what's been provided in your expert's

18    report?

19            MR. HANSEN:  I'll object to the form only

20        that we don't have a different number.  Mr.

21        Haught may testify to something in support of

22        that.

23        Q    (By Ms. Carroll) Fair enough.  What I'm

24    looking for is, I understood before that you were

25    deferring to an expert, that expert indicates in his

1    report that he got documents from MITG and had some

2    discussions with people at MITG and based on that he

3    has come up with an actual figure, do you have a

4    figure, I know that your information is going to be

5    necessary for information about the business, but do

6    you have a dollar number different from your expert?

7        A.    Well, one, I don't know what the expert's

8    number was, I haven't seen the report and that's

9    been based on the fact that I've been traveling for

10   the last four weeks, so I don't have any assemblance

11   of what this should be yet because I haven't had a

12   chance to review any of those documents.

13       Q.    Do you have a number in your mind as to

14   what your damages are for the breech of the Standard

15   Support Agreement?

16           MR. HANSEN:  I mean if you're asking --

17       Mr. Haught is not going to come in and testify

18       to another number I guess, if that's what

19       you're asking.

20       Q.    That's all I want to know.  I understood

21   you before that the expert's going to come up with

22   the actual dollar amount.  I just want to confirm

23   you're going to rely on Mr. Stringer and his

24   expertise for that number.

25       A.    I believe so.

1    Q.    All right.   And then would that be true

2    also for the tortious interference claim that you

3    have given him information about your business for

4    him to come up with the actual dollar amount?

5    A.    Once again, I need to review it, but I

6    would say I believe so.

7    Q.    Okay.   What about --

8         MR. HANSEN:   Just so the record's clear,

9         based on the Court's order, that report may be

10        supplemented based on some stuff that's been

11        produced and once Mr. Haught talks to

12        Mr. Stringer -- the experts were given leave to

13        amend reports if needed.

14        MS. CARROLL:   All right.

15        MR. HANSEN:   I'm saying if the number

16        changes you're going to get a supplement

17        report.

18        MS. CARROLL:   I'm not saying -- if we try

19        this case a year from now -- just whenever you

20        get around to it.

21        MR. HANSEN:   Thank you.

22    Q    (By Ms. Carroll) Fair enough. What I

23    haven't seen is any number since you're last

24    deposition for a dollar figure for the breech of the

25    Middleware Agreement which you also deferred that to

1    an expert, do you have a dollar figure for what you

2    claim MITG suffered in damages due to the alleged

3    breech of the Middleware Agreement?

4            MR. HANSEN:  You can answer.

5            THE DEPONENT:  No, not at this time I

6        don't.

7        Q    (By Ms. Carroll) Is there something that

8    you, again in your prior deposition, you indicated

9    you had just gotten some documents that you thought

10   were going to give you an answer, are you waiting

11   for something, is there some piece of information

12   that you're waiting for from somebody to be able to

13   calculate that number or have you just been to this

14   point unable to come up with the dollar amount?

15       A.    I have just been lazy and haven't got it

16   done yet.

17       Q.    And do you believe that you have documents

18   that will show a dollar figure, will enable you to

19   calculate an amount?

20       A.    I believe so, but I haven't reviewed all

21   of them so I can't testify one way or the other yet.

22       Q.    Did you talk to Mr. Stringer at all about

23   trying to calculate the damages for the alleged

24   breech of the Middleware Agreement?

25       A.    Of the Middleware Agreement, I mean I

1    don't specifically know what agreement we were

2    talking about.  We had discussed -- he asked a few

3    questions, basically more clarification.  That was

4    about it.

5        Q.   Okay.  Tell me what you recall of

6    conversations that you had with -- do you remember

7    specifically talking with Mr. Stringer or with

8    people from his office?

9        A.   I guess that's what it was.

10            MR. HANSEN:  Mr. Haught I can tell you was

11       on one conversation I know for sure where

12       Mr. Stringer and myself and Mr. Haught were

13       speaking.

14            THE DEPONENT:  Yeah.

15            MR. HANSEN:  Subject to that, I don't

16       know, and Ron, you can testify if you had

17       additional conversations with him.

18            THE DEPONENT:  You know, I did have one

19       phone call after that and it was in regards to

20       an explanation of the -- I don't remember

21       exactly what it was.  He was looking for a

22       clarification to something, I don't recall what

23       it was now.  He had one specific question, but

24       I don't recall what it was exactly about.  My

25       contact with him was very brief.

BY MS. CARROLL:

Q.   You mean a question about something on a document that got sent to him?

A.   No, I think it was more along the lines of a clarification of terminology, I think is what it was.

Q.   Okay.  Did you have discussions with Mr. Stringer about how the Standard Support Agreement operated in terms of invoicing of customers, invoicing of Compaq Direct, HP Direct?

A.   I don't believe so.

Q.   All right.  Do you know how he got the information, if he did at all, in the way that agreement worked?

A.   Do I have knowledge of how he got the information?

Q.   Correct.

A.   I would assume only from the documents provided.

Q.   All right.  When you were participating in conversations with Mr. Stringer, did he ask you to send him any particular documents?

A.   No.

Q.   All right.  To your knowledge, he had already been supplied documents by your counsel?

1    A.    That's my understanding, yes.

2    Q.    All right.  What I want to focus on today

3  is information on the tortious interference claim

4  that was provided to me after your last deposition

5  and there was, in response to supplemental

6  interrogatories that we had served, you provided an

7  answer and this indicates that you are the person

8  who signed off on it, Interrogatory No. 2 was --

9    A.    Uh-huh.

10    Q.    -- an answer that was provided in terms of

11  the specific actions in relation to specific

12  companies that you all allege that HP took and that

13  was including Parts Now, CP&S, Avnet and Software

14  House International, and there are descriptions in

15  the paragraphs 2, 3 and 4 of that answer that have

16  information about Avnet, Parts Now and Software

17  House.  The first one being Parts Now involves a

18  conversation that you personally had with Tom Walter

19  of Parts Now.

20    A.    That's correct.

21    Q.    Does that accurately describe your

22  conversations with him?

23    A.    I believe that's fairly accurate, correct.

24    Q.    Is there anything in there that you think

25  is important that is missing or does that summarize

1   it, the important information, accurately?

2      A.   I would say that that's a fair

3   representation, I believe.

4      Q.   Nothing you need to add to that?

5      A.   Not at this time, no.

6      Q.   All right.  Paragraphs 3 and 4 deal with

7   conversations that employees of MITG had.  First,

8   Teri Welch with Avnet and Richard Rice with Software

9   House International, would you -- do you have

10   anything to -- any additional information since the

11   time you provided this interrogatory that needs to

12   be added as to either of the calls your employees

13   had with Avnet or with Software House?

14      A.   Not at this time, no.

15      Q.   On Software House, Richard Rice talked to

16   Vince Kasow or Kaselle?  Let me just show you a

17   letter I got from your counsel while I'm asking,

18   which is, it comes back and he identifies -- I'm not

19   sure the interrogatory has Mr. Kasow's name, but on

20   this one he indicates that Vince Kasow, Software

21   House International, so do you know if Richard Rice

22   talked to Mr. Kasow?

23      A.   I don't know.  I can't testify to that.

24      Q.   All right.  Would you defer to Mr. Rice

25   and Mr. Kasow as to the contents of their

1    conversation?  I mean, if one of them were to

2    testify about it, they would have more personal

3    knowledge than you would?

4        A.    Correct.

5        Q.    Same with Teri Welch and the conversations

6    she had with people at Avnet, correct?

7        A.    Yes.

8        Q.    All right.  CP&S is also identified in the

9    answer, but there's not a paragraph in there

10   describing any conversations with them, are you --

11   who, to your knowledge if anyone at MITG, had any

12   conversations with CP&S that led CP&S to be

13   identified in that interrogatory answer?

14       A.    At this time, I don't recall.

15             MR. HANSEN:  Off the record.

16                    (Off the record discussion.)

17   BY MS. CARROLL:

18       Q.    Is there anybody else -- I know that there

19   is an answer that says everybody who got the letter,

20   the January 30th letter, so I kind of want to

21   exclude people that fall in that category unless

22   there's something other than the letter because for

23   each of these paragraphs here about Parts Now, Avnet

24   and Software House, in addition to any letter they

25   may have gotten, this is talking about additional

1    contacts, do you have any knowledge of any of these

2    types of contacts taking place in this interrogatory

3    that are not described in there?

4         A.    No.  Offhand, no.

5         Q.    All right.  I'm going to start asking you

6    some questions about Exhibit 41.

7         A.    Okay.

8         Q.    Which is MITG 1023 through 24.  We talked

9    with Ms. Koch about those and got a description as

10   to what that was, but do you have any knowledge on

11   any of the customers that are listed on Exhibit 41

12   whether those customers also were buying parts from

13   other access points of Hewlett-Packard or buying

14   Hewlett-Packard parts directly from HP?

15        A.    During what time frame?

16        Q.    During that same time period.

17             MR. HANSEN:  Objection, calls for

18        speculation.  Subject to that, go ahead.

19             THE DEPONENT:  I don't know.

20        Q    (By Ms. Carroll) All right.

21        A.    Well, let me rephrase that; rephrase your

22   question, what type of parts?

23        Q.    Whether they were buying -- well, have you

24   seen -- let me ask you in a different way.  There

25   was a document that was created by HP, and I don't

1  know if you've seen it, it's called Table S Accounts

2  that had all of the account numbers that had this

3  S-01.

4      A.  No.

5      Q.  Have you seen it?

6      A.  No, I have not.

7      Q.  Likewise, there was a list that took

8  customers -- it was called a Common Accounts List

9  where a customer might have an S-01 account number

10  and then a separate HP number because they were

11  ordering from a separate access point, have you ever

12  seen that?

13      A.  Not that I recall.

14      Q.  Okay.  You don't have any knowledge one

15  way or the other whether these people were buying,

16  for example, Compaq and multivendor parts from MITG

17  and HP parts by calling Roseville?

18      A.  No, I have no way of knowing that.

19      Q.  Okay.

20      A.  I mean there might be some supporting

21  emails in stuff we produced that would show possibly

22  these folks were purchasing product from both

23  channels, I don't know, I don't have any personal

24  knowledge, no.

25      Q.  All right.  The customers that are on the

1    Exhibit 41, those are all customers that MITG was

2    doing business with that were -- the sales were

3    subject to the Standard Support Agreement, is that

4    accurate?

5         A.   January 2004, that would be correct.

6         Q.   All right.  Now as I understand Exhibit

7    40, which is right here below you, which is February

8    of '04 to December of '04, those are customers who

9    were buying when the Standard Support Agreement was

10   in place that continued to buy during the months in

11   '04, is that your understanding of that document?

12        A.   I have no clue, it's not titled.

13        Q.   Do you recall seeing that document before?

14        A.   No.

15        Q.   All right.  Ms. Koch has testified about

16   the creation of that document.  Would you defer to

17   her in terms of describing what was being shown on

18   there?

19        A.   Yes, I would.

20        Q.   All right.  Once the -- focussing back on

21   Exhibit 41, which is January of '04, were there

22   any -- what, if any, efforts were made by MITG as

23   the Standard Support Agreement was coming to an end

24   to contact any of these customers who had been

25   buying in January to inform them of how they were

1    going to be able -- how they could get to MITG after

2    the termination of the Standard Support Agreement?

3        A.    I'm sorry, rephrase that again.

4        Q.    Sure.  What efforts, if any -- let me just

5    ask a broader question.  What efforts, if any, were

6    made by MITG as this Standard Support Agreement was

7    coming to an end to contact customers that they were

8    selling to under the Standard Support Agreement and

9    tell them hey, starting on this date you can get to

10   us, MITG, by these access points?

11       A.    Prior to the termination of the agreement?

12       Q.    Correct.

13       A.    None.

14       Q.    Okay.  After the end of the Standard

15   Support Agreement terminated on February 7th.  So

16   there was no communication to those customers prior

17   to that date telling them how to get to MITG post

18   Standard Support Agreement?

19       A.    Not that I'm specifically aware of, no.

20       Q.    After the February 7th termination date,

21   what efforts, if any, were made by MITG to contact

22   those customers and tell them how to get to MITG?

23       A.    One of the websites, which you've been

24   shown or you have access to that information, I

25   believe, that some of the larger customers were

1    contacted by a phone call, I believe.

2        Q.   Do you have -- well, who qualifies, to

3    your knowledge, as a larger customer?  I mean do you

4    recall there being more than $500?  More than

5    $1,000?

6        A.   No.  I mean I don't recall that list, how

7    that list was broken off, no.

8        Q.   Who made the phone calls for MITG?

9        A.   I can't answer that either.  I don't know.

10       Q.   Did you participate in making any contacts

11   with any of those customers?

12       A.   No.  No.  In most cases, if I recall

13   correctly, the customers actually contacted us.

14       Q.   They had your phone number or your website

15   address to get -- to contact you to continue

16   ordering parts from MITG?

17       A.   That's correct.  The phone number from us,

18   yes.

19       Q.   And I have seen some emails that you all

20   produced previously that showed that customer

21   service representatives of HP were still contacting

22   MITG to acquire third party parts.

23       A.   We get stuff every week.  Still do.

24       Q.   All right.  How much of your business is

25   made up of those referrals from HP customer service

1    reps?

2            MR. HANSEN:   Today?

3            MS. CARROLL:   Yeah.

4            THE DEPONENT:   I think I previously

5        answered that.   I don't know, but I don't

6        recall what I testified to.

7        Q    (By Ms. Carroll) Okay.   Let me ask you

8    this, that was back in February, if you were able to

9    give a percentage, it might still be kind of a

10   steady flow of whatever that amount was?   It would

11   be about the same number?

12       A    Yeah, there's other businesses involved,

13   so, you know, it's very difficult to put an answer

14   to that question specifically.

15       Q.   Let me show you what was previously marked

16   as Deposition Exhibit PP in the deposition of

17   Richard Chezick of HP and what this is, there's a

18   report attached here that was run by HP that says --

19   it's called MITG Aging and they're looking for

20   companies that ordered over $500 in spare parts

21   through MITG in the six months prior to the

22   termination of the agreement and then there's a list

23   here, have you ever seen that document before?

24       A.   No.

25       Q.   Okay.   The customers that MITG was doing

business with whose sales were subject to the

Standard Support Agreement, how did MITG develop

those customers?  Were they --

    A.    Well, rephrase that question and put a

time frame on it.

    Q.    Well, during the years of the Standard

Support Agreement, February 7th of '02 to

February 7th of '04, MITG had a set of customers

that were Standard Support Agreement customers and

as I understand it, there were service parts

business with HP and then there was independent of

HP business, right?

    A.    Correct.

    Q.    All right.  Focussing on the first group,

which is the sales that were subject to the Standard

Support Agreement, how did MITG get those customers

or find those customers to sell those parts to?

    A.    Traditional marketing.  I don't know,

there's referrals, there's mailings, just contacts

in the industry, however they were sent.  A lot of

them were just inquiries from the customer's

standpoint.

    Q.    When you're talking about referrals, were

some of those referrals from HP sales people looking

for spare parts for their customers?

1        A.    From HP sales people from '02 to '04?

2        Q.    Well, it would have been Compaq sales

3    people until premerger and HP sales people

4    postmerger.

5        A.    Can you rephrase that?

6        Q.    Sure.  For the purpose of this question,

7    HP is the whole time, okay, to make it easier, what

8    I'm trying to find out is when you got business when

9    you, being MITG, got business for sales that were

10    subject to the Standard Support Agreement, were

11    those customers referred to MITG by HP sales

12    representatives?

13        A.    Not always, no.

14        Q.    All right.  What percentage of the

15    customers that were being serviced from February of

16    '02 to January of '04 -- I mean to February of '04

17    were referred by Compaq Direct or HP Direct sales

18    people?

19        A.    I can't answer that.

20        Q.    Okay.  Are there documentation that would

21    show what percentage of the business was from

22    referrals from Compaq Direct or HP Direct versus

23    customers that MITG developed?

24        A.    No.

25        Q.    Okay.  Can you identify for me the five

1    largest customers that MITG would have developed on

2    their own without it being a referral from HP or

3    Compaq?

4        A.    Right now today, no.

5        Q.    Okay.  Let me ask you this about Exhibit

6    40 before I move on, this list of customers here on

7    Exhibit 40 that shows sales through the end of the

8    year '04, do you know if MITG has done any tracking

9    of sales to customers that they used to sell under

10   the Standard Support Agreement during the years

11   2005?

12       A.    Is there a breakout?

13       Q.    Correct.

14       A.    No, there's not.

15            MR. HANSEN:  You're talking about -- just

16       so I'm clear.

17            MS. CARROLL:  If they did something

18       similar to that for '05.

19            MR. HANSEN:  I haven't.  I don't know --

20       if they could produce it for '04, I don't know

21       why they couldn't produce it for '05.

22            MS. CARROLL:  I'm not making a request,

23       I'm just wondering if it had been done.

24            MR. HANSEN:  No, I haven't.

25       Q    (By Ms. Carroll) Since the termination of

1    the Standard Support Agreement, and let's just focus

2    on today, how much of your business is -- well, can

3    you say how much of your business is selling parts

4    to companies that you used to sell under the

5    Standard Support Agreement?

6          A.    I don't know.

7          Q.    Let me give you Exhibits 42 and 43 and,

8    Exhibit 42 is entitled B2B Sales Report and 43 is

9    B2B Customer Sales Report Net Income, are those

10   documents familiar to you at all?

11         A.    No.

12         Q.    Okay.   There's a second supplemental set

13   of Answers to Interrogatories, and let me give you

14   that and ask you to take a look at Interrogatory No.

15   4 at the top.

16         A.    Okay.

17         Q.    All right.   This interrogatory indicates

18   that the documents that make up Exhibit 42 and 43

19   are responsive to the request that asks for

20   information on suppliers and distributors that MITG

21   alleges terminated a business relationship with MITG

22   due to interference by HP, are you -- you said you

23   didn't have any involvement in creating these

24   reports, they weren't familiar to you, but is it

25   correct then that you, and you being MITG, are

1   claiming that Hewlett-Packard interfered with MITG's

2   business relationship with each of the companies

3   that are listed on these exhibits?

4        A.   Okay, rephrase that.  There's something at

5   the beginning of that I disagree with, but go ahead.

6        Q.   Are you alleging that every company that's

7   identified on Exhibits 42 and 43 were companies that

8   MITG was doing business with previously and those

9   companies are no longer doing business with MITG due

10  to the alleged interference by HP?

11       A.   And "previously" refers to what time

12  frame, of the Standard Support Agreement?

13       Q.   Well, looking at -- what I asked for in

14  this interrogatory is for net and gross profit

15  information up until the time these companies ceased

16  doing business with MITG due to the alleged

17  interference by HP.

18       A.   Okay.

19       Q.   What I'm trying to do -- you provided

20  several different lists for different time periods.

21  What I'm trying to do is determine whether or not

22  the companies inclusion on Exhibits 42 and 43 mean

23  that you had a business relationship with them, that

24  you no longer have because of interference by HP?

25            MR. HANSEN:  I'll just object based on the

1    prior testimony of Ms. Koch.  I think the

2    documents as she's testified to MITG 1025 and

3    1026 reflect entities that continued to order

4    with us, so for the entities that appear

5    obviously on 42 and 43, if they also appear on

6    40, I don't believe then that the relationship

7    is terminated because they have obviously

8    continued to order with us.  I think the spirit

9    of these things was to get you the

10   documentation we could for the time period

11   along with what we've supplementally produced.

12   Subject to that --

13       MS. CARROLL:  And I guess the issue I'm

14   having is, I don't have a comprehensive list of

15   who we allegedly interfered with.  And my take

16   is, the people, if they're on Exhibit 40, they

17   continued to buy during the year 2004, so we've

18   eliminated these people from the list, and let

19   me ask you this, here's a list of all S

20   accounts that were ever created, did we

21   interfere with everybody on this list that's

22   not on this list, and that's what I'm trying to

23   narrow down.

24       MR. HANSEN:  I agree.  I agree that it is

25   incumbent upon us to narrow that down, and I

```
 1        have not sat down with Mr. Haught as he
 2        testified to, he hasn't seen that document, to
 3        actually go through the entire thing to compare
 4        to find out who may be on that S account list
 5        that is not -- that also appears on Exhibit 40,
 6        so I would agree, you should get something in
 7        writing and we will do that for you.
 8   BY MS. CARROLL:
 9        Q.   Okay.  So at least at this point, as you
10   sit here today, you are not in a position, based on
11   what your counsel has just said to indicate, to tell
12   me specifically, these are people we had a business
13   relationship with and this is who terminated that
14   had business relationship because of HP other than
15   the specific companies you listed in the
16   interrogatory as being definite terminated business;
17   Avnet, Parts Now --
18        MR. HANSEN:  Well, no, I think one thing
19        we have alleged that I won't say a hundred
20        percent, I thought in one of the interrogatory
21        answers you can also compare, take a look at
22        who ordered on Exhibit 41.
23        MS. CARROLL:  And didn't order on here?
24        MR. HANSEN:  And who didn't on 40, those
25        individuals.  And I've done that.  I think the
```

1   other thing that we would need to do as the

2   interrogatory requests, the interrogatory

3   actually states that those groups that ordered

4   from February 7, 2000, having these invoices, I

5   think what's going to have to happen is maybe

6   go through every invoice and see what company

7   appears on that, what companies appear on the S

8   account, what companies don't appear on Exhibit

9   40.  Part of the reason I don't have that is

10  the time necessary to do that based on the fact

11  that I just got you this disk five days ago.  I

12  certainly will produce Mr. Haught or Ms. Koch

13  for a supplemental telephone deposition once

14  that has been pinpointed down or however you

15  want to do it.

16      MS. CARROLL:  If you will agree now that

17  if you come up with a list that I can have a

18  telephone deposition to get an explanation on

19  how the list was done --

20      MR. HANSEN:  You betcha.  That's fine.

21      MS. CARROLL:  Okay.  Fair enough.  That

22  doesn't mean you're done yet.

23      THE DEPONENT:  You're blowing my mind with

24  all the questions.

25  Q    (By Ms. Carroll) I understand that you all

1    made some efforts to go through an old data base to

2    try to find some information responsive to these

3    questions.  Can you tell me a little bit about what

4    that data base was and what efforts you made to try

5    to obtain the information?

6        A.   Well, was is probably a good word to use

7    for that.  Part of the issue, Jim had contacted us

8    in regards to the information you requested, we

9    immediately went back and tried to look for the old

10   tool.  Now this is three revisions or almost four

11   revisions of software ago and that's through two

12   different types of languages.  Part of the issue

13   that we have is we are unable to locate a

14   substantial portion of that information.  It -- you

15   know, five years, God knows where it went.  It's

16   gone.  We had tried to parse the existing

17   information, it just doesn't exist.  It's not in a

18   format -- what's left is not in a format.  It's all

19   relational.  Basically, we have the legend, but we

20   have no data to substantiate the legend.

21       Q.   All right.  What do you mean by the

22   legend?

23       A.   Well, like, I might know what the road map

24   is.  You take a right here, a left here, but we

25   don't have the data for those points to connect to

1    put the puzzle together.  The data itself is not

2    existent.

3        Q.   Is it a matter of you don't have -- you

4    don't know how to write the code or you don't know

5    how to reopen that data or do you think the data's

6    been overwritten?

7        A.   It just doesn't exist.  It was in a spot

8    that is no longer valid.  It's either -- I don't

9    think it's even overwritten, I think it was on an

10   older system.  We've had hardware changes, software

11   changes throughout this time and the data just isn't

12   there.  When the original conversation with Jim

13   transpired, I was under the belief that that data

14   would all be in one specific location.  I had no

15   idea that either the IT guys or just through

16   attrition of going to new machines, that that data

17   wasn't kept.

18       Q.   Okay.  Is that data -- is it your belief

19   that that data resided on a server at MITG?

20       A.   Yeah, but like I said, this was two or

21   three pieces of hardware ago, so we even went to the

22   extent of trying to pull through old drives that

23   might be there and look for the data, and it's just

24   not around, so the information that you have

25   received in reference to your question was based off