UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEWLETT-PACKARD | § | |
| DEVELOPMENT COMPANY, L.P., | § | |
| HEWLETT-PACKARD COMPANY, | § | |
| AND COMPAQ TRADEMARK B.V. | § | |
| | § | Civil Action No. 04-3055 |
| Plaintiffs/Counter-Defendants | § | |
| | § | |
| VS. | § | |
| | § | |
| MIDWEST INFORMATION | § | |
| TECHNOLOGY GROUP, INC. | § | |
| | § | |
| | § | |
| Defendants/ Counter-Plaintiff | § | |
| | § | |

**COUNTER-DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO THE COUNTERCLAIMS ASSERTED BY MIDWEST INFORMATION TECHNOLOGY GROUP, INC.**

Plaintiffs/Counter-Defendants Hewlett-Packard Development Company, L.P., Hewlett-Packard Company and Compaq Trademark, B.V. (collectively "Counter-Defendants" or "HP") file this Reply in Support of Their Motion for Summary Judgment as to the Counterclaims Asserted by Counter-Plaintiff Midwest Information Technology Group, Inc. ("MITG") pursuant to Local Rule 7.1 (D)(3) and for good cause shows the Court as follows:

**REPLY TO COUNTER-PLAINTIFFS' ADDITIONAL FACTS**

A. Breach of Standard Support Agreement

1.    Material and undisputed.

2.    Material and undisputed.

3.    Material and disputed to the extent it states or implies that the SSA gave MITG rights to provide parts and services to all of customers of Compaq Computer

Corp., rather than just to Compaq Direct customers, as defined by the SSA. Paragraph 22 of the SSA provided MITG only with the exclusive right to provide parts and services to "Customers," who are defined in paragraph 1 as "CDI's end users, customers,… directed or referred by CDI to MITG." In the testimony cited by MITG, Mr. Bloomquist simply confirmed what the SSA says.

4.      Material and undisputed, though noting that "applicable parts" does not expand the Agreement to include all spare parts offered by and sold to all customers of Compaq and/or HP.

5.      Material and disputed to the extent it states or implies that the SSA gave MITG rights in relation to any corporate entity other than Compaq Direct and, after the merger, HP Direct. The SSA is a contract between MITG and Compaq Direct, not its parent company Compaq Computer Corp., or the post-merger parent, HP, and Mr. Bloomquist testifies as such in acknowledging the wording of the SSA. The profit sharing is between MITG and Compaq/HP Direct, not the parent company Compaq, which later merged with HP.    [SSA ¶ 1, Bloomquist Depo (Tab 1) 88:11-15, Crowley Depo (Tab 2) 77:5-25, 78:14-79:1, Crowley Decl (Tab 3) ¶¶ 2, 10].

6.      Material and disputed to the extent it states or implies that the SSA gave MITG rights in relation to any corporate entity other than Compaq Direct and, after the merger, HP Direct. The SSA is a contract between MITG and Compaq Direct, not its parent company Compaq Computer Corp., or the post-merger parent, HP, and Mr. Bloomquist testifies as such. The monthly payment was made by

Compaq/HP Direct, not the parent company, to MITG.    [SSA ¶ 1, Bloomquist Depo 88:11-15, Crowley Depo 77:5-25, 78:14-79:1; Crowley Dec ¶¶ 2, 10].

7.    Material and disputed, as worded.  The SSA did provide that MITG could receive amounts over the $41,000 guarantee from Compaq/HP Direct if there were additional calls handled, as provided for in the SSA.  As Mr. Bloomquist testified on the deposition pages cited by MITG, MITG was never paid more than the $41,000 [Bloomquist Depo 88:20-89:7] and there is no evidence that any amounts were ever invoiced by MITG.  In fact, Teresa Koch, MITG's chief financial officer, who oversaw preparation of the invoices to Compaq/HP Direct, testified that MITG did not bill directly for CSN parts.  [Koch Depo (Tab 4) 12:11-22]. Koch never mentioned the "bible" exception that MITG first came to reply upon in its second expert report.    As stated above, the relationship and obligations existed between MITG and Compaq/HP Direct.

8.    Material and undisputed.

9.    Material and undisputed. Although as stated above,  Teresa Koch, MITG's chief financial officer, who oversaw preparation of the invoices to Compaq/HP Direct, testified that MITG did not bill directly for CSN parts.  [Koch Depo 12:11-22]. Koch never mentioned the "bible" exception that MITG first came to reply upon in its second expert report.

10.    Material and undisputed.

11.    Immaterial because the testimony relates to HP, not to HP Direct. As explained in the Crowley Declaration, there are multiple group within post-merger HP, with

HP Direct being just on the contact points for customers. [Crowley Decl. ¶¶6-9] MITG again attempts to blur the distinction between the Direct organization (and Compaq/HP Direct) and Compaq and HP, to expand the SSA without factual support. The SSA was between MITG and Compaq Direct, a subsidiary of Compaq. Post-merger, Compaq Direct became known as HP Direct and assumed the obligations of Compaq Direct in relation to the SSA. The merger did not expand the rights or obligations of either MITG or HP Direct. The parent companies, Compaq and HP were not bound by the exclusivity provision of the SSA, so were free to refer customers to sources other than MITG. Moreover, the testimony cited does not establish that the customers referenced in the e-mails were HP Direct customers. In fact, Mr. Bloomquist testifies on page 95 (not cited by MITG) that HP e-Services, the entity contacted by a customer and was responding, was not "connected at all to third-party parts or HP Direct." [Bloomquist Depo 95:4-6] Further, a review of the deposition exhibit combined with Mr. Bloomquist's testimony shows that HP e-Services recommended several options to the person inquiring about a drive, and one of those options was MITG, under the name HP Direct. [Bloomquist Depo 94:6-96:8 and Depo Ex. C]. The fact that a non-HP Direct arm of HP gave MITG as an option does not establish that there was a contractual obligation to send that business only to MITG. Further, the cited testimony of Mr. Crowley clearly establishes that the responding entity in Deposition Exhibit C was not a Compaq/HP Direct call center, but rather was another customer center within HP. [Crowley Depo 91:14-92:25].

12.     This paragraph is vague, but Counter-Defendants do not dispute that under the SSA, if a "Customer" called for a part that was not in stock (either because it was a third party part, or was obsolete or a legacy part), MITG would seek to fulfill that order through its vendors. [Crowley Dec. ¶ 11]

13.     Immaterial because Haught's self-serving comments that calls "seemed" to be slowing down is not evidence of improper acts by HP.  Also, MITG's damages are not based on a general perceived slow down in calls in 2002 [See Stringer Reports on damages].  Also, this paragraph is disputed to the extent it states that Mr. Bloomquist was in charge of the third party parts business for all of Compaq and HP.  Mr. Bloomquist was the program manager for Compaq/HP Direct for support services. [Bloomquist Depo 103:1-5].

14.     Immaterial because it addresses sources for calls outside of Compaq/HP Direct. Mr. Bloomquist's testimony is that in response to one of Mr. Haught's e-mails he contacted Chip Love, of Compaq Services, a different arm of HP[1], to see if calls going to Andover, which was a Compaq/HP call center (not a Compaq/HP Direct call center) could be directed to MITG.  Mr. Bloomquist testified that he believed some of those calls could "potentially" be sent to MITG.  [Bloomquist Depo 103:11–104:11, 105:15-18; Love Depo (Tab 5)6:6-13, 8:9-24].

15.     Immaterial because as Mr. Bloomquist acknowledges, Andover was a Compaq/HP call center that took some spare parts calls, not a Compaq/HP Direct call center [Bloomquist Depo 104:1-11, 104:20-105:3].

---

[1]   *See* Crowley Decl. ¶¶8-9, and Bloomquist Depo 27:2-18, 103:1-8 and 107:3-108:2 relating to the difference between/separation of Compaq Direct and Compaq Services.

16.     Material, but disputed.  The testimony is clear that MITG could provide in-stock Compaq spare parts (also referred to as CSN parts), which were offered by Andover.  Andover only stocked Compaq and Digital Equipment Corp. ("DEC") parts, while MITG could also provide third party parts and legacy or obsolete Compaq and DEC parts [Pound Depo (Tab 6) 13:8-19, 14:10-20, 29:25-30:11, Pound Decl. (Tab 7) ¶ 3; Crowley Decl. ¶11-12; Bloomquist Depo 104:24-105:3 (Andover was focused on DEC parts); Love Depo 78:17-22 (Compaq Direct offering same Compaq parts as Andover)].  Ms. Ellis' testimony on page 53 (cited by MITG) that Andover was an HP Direct call center selling computer systems, not handling spare parts orders, is in fact contrary to the statement in this paragraph.

17.     Immaterial and disputed because Mr. Soriano never testifies that MITG and Andover had the same business model.  In fact, Andover is not mentioned on page 10 (the page cited by MITG in its Response) so it is unknown what testimony on that page provides support for the statement.  Mr. Soriano was discussing the business models of MITG and HP Roseville. [Soriano Depo (Tab 8) 9:25-10:14]

18.     Immaterial, and disputed to the extent it is misleading as written. Mr. Chizek is the vendor manager and operations manager for the parts business call center in Roseville, not Andover.  He further testified that Andover sold only Compaq parts, not HP Parts and did not sell third party parts, which is clearly not consistent with MITG's scope of product offerings.  [Chizek Depo (Tab 9) 6:21:7:2, 14:19-22, 15:12-14].

19.    Immaterial, and disputed to the extent it is misleading, as written.  Ms. Pound's testimony is that Andover call center agents had the phone number for Compaq/HP Direct so if a customer called for a part not in stock,  the call center agent could provide the MITG/HP Direct telephone number to the caller, but did not forward telephone calls through the phone system. [Pound Depo 37:17-38:5].

20.    Immaterial and disputed.  Mr. Bloomquist testified he contacted Mr. Love to look for a potential source of calls.  He further testified that Andover was a Compaq and then HP call center, not a Compaq/HP Direct call center.  [*see* ¶ 14, above]. The fact that HP Services was referring calls to another HP support center, and not HP Direct is not evidence of a breach because MITG only had the exclusive right to "Customers" referred by  Compaq/HP Direct. [SSA ¶1].

21.    Immaterial and disputed.  The pages cited do not support the statement made. Mr. Hansen, counsel for MITG, asked Mr. Bloomquist if Mr. Bloomquist told Mr. Love that there was an agreement in place regarding calls that should be referred to MITG, and Mr. Bloomquist replied that he told Mr. Love there was an agreement in place.  There is not discussion of a requirement. [Bloomquist Depo 110:19-111:3].  Chip Love was the HP Services, which was not part of HP Direct (see footnote 1), so there was no requirement for calls from customers serviced by his group to be sent to MITG. [Love Depo 8:9-18; Crowley Decl. ¶¶ 8, 9].

22.    Immaterial and disputed for the same reason as set forth above in paragraph 20. Mr. Bloomquist never says Mr. Love said that statement attributed to him in ¶22.

23.    Immaterial and disputed.  There is no claim that HP wrongfully terminated the SSA [*see* Amended Counterclaim], so discussions relating to ending the

relationship between HP Direct and MITG in accordance with the terms of the SSA are irrelevant.  Further, the cited page from Mr. Bloomquist's deposition simply states that discussions occurred after the merger – there is no reference to when after the merger these discussions occurred.

24.     Immaterial.   There is no claim that HP wrongfully terminated the SSA, so discussions relating to ending the relationship between HP Direct and MITG in accordance with the terms of the SSA are irrelevant.

25.     Immaterial and disputed.  There is no claim that HP wrongfully terminated the SSA, so decisions relating to ending the relationship between HP Direct and MITG in accordance with the terms of the SSA are irrelevant.  Further, the cited page from Ms. Meyerfeld's deposition simply states that discussions occurred after the merger, which happened in May 2002 – there is no reference to "early" 2002.

26.     Material and disputed to the extent it is misleading as written.  The integration of the Andover call center, an HP call center, is irrelevant to MITG's claims relating to HP Direct's alleged diversion of HP Direct Customer calls.   Also, this transition was discussed in the fall of 2002, but did not occur until early 2003. [Pound Decl ¶2; Pound Depo 7:3-8:9, 8:15-25].

27.     Material and disputed.  The testimony cited does not establish the date of the transition.  The testimony cited is not definitive, as Mr. Soriano simply testifies that he understands an e-mail, that he did not write, to mean that on November 18 non-Presario calls were to be transitioned [Soriano Depo 22:11-24:19].  When asked if the transition occurred  in November he responded:  "I believe it was

about that time." [Soriano Depo 29:13-18].  Ms. Pound, the Andover call center manager, provided definitive testimony as to what actually happened, not what the plan was.  The transition actually was completed in April 2003 [Pound Decl. ¶2], not on November 18, 2002, as claimed by MITG in its Response.

28.    Immaterial.  There is no claim that HP wrongfully terminated the SSA, so decisions relating to ending the relationship between HP Direct and MITG in accordance with the terms of the SSA are irrelevant.

29.    Immaterial.  The integration of various nationwide call centers into a single call center based in Roseville is irrelevant to MITG's claims that HP diverted calls from "Customers" as defined in the SSA.  Re-directing calls from customers contacting Compaq/HP customer service or sales points is not covered by the SSA, which controls HP Direct  customer calls only.

30.    Immaterial and undisputed.  Again, Compaq Services' launch of eSpares (also referred to a the Spares Store) is not relevant to MITG's claims in this case.  MITG's owner Ron Haught admitted that eSpares was not objectionable under the SSA [*see* Motion, ¶A(12), p. 6, *see also* Haught Depo #1 (Tab 10) 129:9-131:16].  The Spares Store was the site developed by Compaq Services in Houston. [Bloomquist Depo 92:15-24]

31.    Immaterial, and undisputed.  Again, Compaq Services launch of eSpares is not relevant to MITG's claims in this case.  MITG's owner Ron Haught admitted that eSpares was not objectionable under the SSA [*see* Motion, ¶A(12), p. 6, *see also* Haught Depo #1 129:9-131:16].  The Spares Store was the site developed by Compaq Services in Houston.  [Bloomquist Depo 92:15-24]

32.    Immaterial, and disputed.  Mr. Love testified that Compaq created a relationship with Compaq Direct to give end users another avenue to obtain spare parts, and that the relationship was not the only way end users could obtain such parts [Love Depo 75:10-24].  This does not establish that MITG was entitled, under the SSA, to receive all calls for parts.  In fact, Mr. Haught admitted this. [Motion ¶ A(12), p.6, *see also* Haught Depo #1 129:9-131:16].   The Spares Store was the site developed by Compaq Services in Houston.  [Bloomquist Depo 92:15-24]

33.    Material but undisputed.  Again, eSpares and the Andover call center actions are not relevant to MITG's claims. See ¶¶30-32, above.

34.    Immaterial but undisputed.  As the witnesses testified, another HP 800 number shut down, which inundated Andover with calls. [Pound Depo 17:6-21; Love Depo 82:3-14].  This has nothing to do with MITG because the call center that was shut down was not servicing HP Direct "Customers," as that term is defined in the SSA.

35.    Immaterial and disputed.  See ¶34, above.  Further, page 79 of Mr. Love's testimony does not address this issue, so it is unsupported by proper summary judgment evidence.

36.    Immaterial and disputed.  See ¶34, above.  Further, the statement in MITG's ¶36 is part of a question by MITG's counsel, not by the witness and not agreed to by the witness. The unsupported statement of counsel is not proper summary judgment evidence.

37.     Immaterial, but undisputed.  MITG's claim that it could have supported the calls is not established and, in fact, Mr. Love details why it could not [Love Depo 82:23-83:10].  Further, the fact that it could have has no bearing on its claim against Counter-Defendants.

38.     Immaterial, but undisputed.  See ¶34, above.

39.     Immaterial, but undisputed.  See ¶34, above.

40.     Immaterial, but undisputed.  See ¶34, above.

41.     Immaterial, but undisputed.  See ¶34, above.

42.     Immaterial, but undisputed.  See ¶34, above.

43.     Immaterial, but undisputed.  See ¶34, above.

44.     Immaterial, but undisputed.  See ¶34, above.  Further, HP objects to the sentence to the extent that MITG's insertion of the word "merely" alters the meaning of Mr. Soriano's testimony explaining the ultimate decision to continuing transitioning call center support services to Roseville.

45.     Material and undisputed.

46.     Immaterial because HP's revenue, which is separate and apart from revenue driven by its HP Direct subsidiary, is irrelevant to MITG's claim.  MITG does not calculate its damages based on HP's revenue and the fact that such revenue was earned on the sale of stocked Compaq parts (which Haught acknowledges was acceptable under the SSA) does not establish a diversion of calls from HP Direct customers.

47.    Immaterial because there is no evidence that MITG routed calls for new accounts to HP, or forfeited any revenue/profit on such calls to HP prior to the termination of the SSA.

48.    Immaterial and disputed.  First, there is no evidence that MITG routed calls for new accounts to HP, or forfeited any revenue/profit on such calls to HP prior to the termination of the SSA.   Further, Ms. Ellis, who's testimony is cited, also testified that  HP was setting up accounts as part of the transition, but not sending orders. [Ellis Depo (Tab 11) 40:17-41:1].  Further, the document Ms. Ellis is being questioned on (Meyerfeld P, bates no. HP 00011) states "ordering for pmCompaq parts has been consolidated at Roseville … focused parts order [management] is migrating to Roseville on Feb. 9."   Thus, MITG's citation, which suggests that HP took over business before the end of the SSA, is misleading.  Finally, MITG's statement in ¶48 relates to "post-merger Compaq." In HP lingo, "pmCompaq" means "pre-merger Compaq."  Post-merger, the parts business integrated so the companies worked toward removing any distinction between parts – all parts were HP (also referred to in testimony as "purple"). [Chizek Depo 54:18-19; Crowley Depo 145:4-22]

49.    Immaterial and disputed.  Ms. Ellis simply testified that MITG was instructed to tell customers to contact HP, but MITG provides no evidence that this occurred. [Ellis Depo 78:12-17].

50.    Material and undisputed.

B. Breach of Middleware Agreement

51.    Material and disputed.  MITG and Compaq Direct[2], a subsidiary of Compaq
       Computer Corp., entered into the Middleware Agreement. [Middleware
       Agreement ¶1]

52.    Material and disputed.   HP Direct, as successor to Compaq Direct, assumed
       Compaq Direct's obligations under the Middleware Agreement. [Crowley Decl.
       ¶10]

53.    Material and disputed.  The Middleware Agreement gave Compaq Direct the
       rights listed in MITG's ¶53, which are set out in the Agreement.

54.    Material and disputed.  VISTA is an order entry system of Compaq/HP Direct.
       [Ellis Depo 28:5-7], not the parent companies.[3]

55.    Material and undisputed.

56.    Material and disputed.  MITG did not create software that resided on Compaq
       Direct's system.  Deb Broady and Sandy Urwin, Compaq Direct employees,
       created the necessary software that resided on the Compaq Direct system, not Mr.
       Brewer, the person hired by MITG to assist it with the Middleware. None of the
       software created by Brewer for MITG resided on Compaq Direct's computer
       system. [Brewer Depo (Tab 12) 14:24-16:20].

---

[2]  The Middleware Agreement uses "Compaq" as meaning "Compaq Direct, a subsidiary of Compaq Computer."
*See* ¶1].
[3]  Interestingly, MITG cited testimony of a non-employee who testified that "the best I can remember it, …VISTA
was an order entry system … for Inacom" which was a company acquired by Compaq and became Compaq Direct.
[Brewer 7:24-8:5' Ellis Depo 6:18-7:2, 7:22-8:1]

57.   Material and undisputed, EXCEPT to the extent it states or infers that the VISTA system is a Compaq, rather than a Compaq Direct, system and/or that the Middleware Agreement is applicable to the parent company, Compaq, rather than just Compaq Direct, as per the terms of the Agreement.

58.   Material and undisputed, except as stated in ¶57.

59.   Material and undisputed, except as stated in ¶57.

60.   Material and undisputed, except as stated in ¶57.

61.   Material and undisputed, except as stated in ¶57.

62.   Material and disputed.  Mr. Bloomquist testified that he had no knowledge of Compaq or HP using the technology with other customers.  He heard about a Microsoft order, but believed it was a test order only.  [Bloomquist Depo 71:6-15].  MITG ignores the testimony of the programmers involved and who were deposed, who stated unequivocally that the Middleware was not used for other customers, including Microsoft [Urwin Depo (Tab 13) 82:20-83:8, 90:9-12; Broady Depo (Tab 14) 11:21-13:4, 30:5-12, 31:6-12].  Further, Ms. Ellis, the Compaq/HP Direct employee who processed orders received through the Middleware, testified she did not recall ever seeing orders from anyone other than MITG  [Ellis Depo 98:7-99:11]. MITG has no admissible evidence of misuse of the middleware program.

63.   Material and disputed.  Mr. Bloomquist testified, subject to objections lodged, that he was "not sure," "not exactly sure" and "I guess."  [Bloomquist Depo 76:3-

77:20]. This is not evidence of improper use of the software. *See also* the testimony cited in ¶62, above.

64.    Material and disputed. Ms. Ellis testified that a customer service representative told her that some companies could feed their orders into VISTA but she did not believe it was a direct link to VISTA, but rather to a screen with the information needed to place an order. She had no such personal knowledge as to whether this was true or, if true, how it worked. [Ellis Depo 99:12-101:5]. The programmers explained how other customer interfaces were different from, and in some cases, prior to the MITG Middleware. [Urwin Depo 64:2-65:10, 82:20-84:7; Broady Depo 10:11-23, 11:21-13:4].

65.    Material and undisputed, except as stated in ¶57.

66.    Immaterial because the continuing use of the VISTA system is irrelevant to whether the Middleware was used without authorization. Further, VISTA is the system used for HP Direct. [*See* ¶ 57, above].

67.    Immaterial. See ¶66, above.

68.    Immaterial. See ¶66, above. Further, MITG cites Soriano deposition page 41. On that page, Mr. Soriano specifically says he had heard of orders placed into VISTA, but that the orders were not placed in Roseville. [Soriano Depo 41:1-6] Thus, the testimony on the cited page is contrary to the "fact" in the paragraph.

69.    Immaterial and disputed as misleading. "UDF" stands for "user defined fields." As explained by HP Direct's programmers involved in the development of the Middleware from HP Direct's side, "UDFs was a terminology that was developed

in the Inacom days" and the UDF concept was developed by Inacom.  MITG wanted to be able to use the previously created functionality of UDF.  MITG's program would have to send the data in a way to be put in these previously created fields.  Mr. Brewer, programming for MITG, had to develop a way to send Compaq/HP Direct the data to fit on those fields. [Urwin Depo 38:16-44:22; Brewer Depo 17:10-18:3].   Ms. Ellis' testimony regarding the transfer of information on UDFs to HP does not establish the HP wrongfully used the software created by MITG and is irrelevant to MITG's claims in this case.

70.    Immaterial and disputed.  See testimony cited in ¶69, above.

71.    Immaterial.  VISTA was an order entry system for HP Direct, and, thus the parent companies use of same is no evidence of wrongdoing.

72.    Material and disputed.  There is no MITG created software that resides on HP Direct's system, or any other HP systems. The software created by MITG was loaded on MITG's system [Brewer Depo 14:16-15:8].  Ms Urwin testified she shut off MITG's access to VISTA [Urwin Depo 92:1-93:24, 94:4-13] and Ms. Broady testified access was also shut off from the ASP group [Broady Depo 48:14-49:5].

73.    Immaterial and disputed.  The existence or non-existence of such an interface is irrelevant, as the question is whether Counter-Defendants made improper use of the software created by MITG.  The fact that Ms. Broady testified that there was "no XML interface to the external Compaq world" is therefore irrelevant.

74.     Immaterial and disputed as speculative and lacking in foundational facts.  Mr. Brewer's belief is irrelevant.  The only relevant  testimony from Mr. Brewer on this issue is that he has no personal knowledge that HP used or was using the software or the functionality of the software with anyone other than MITG. [Brewer Depo 25:4-18].

75.     Immaterial and disputed, for the reasons set forth in ¶74, above.  The fact that Mr. Brewer, who was hired by MITG thought it could be done is no evidence is was done.

76.     Immaterial and disputed, for the reasons set forth in ¶74, above.  The fact that Mr. Haught, who owns MITG thought it could be done is no evidence is was done.

77.     Immaterial  and disputed, for the reasons set forth in ¶74, above.  The fact that Mr. Brewer, who was hired by MITG thought it could be done is no evidence is was done.

C.  Tortious Interference

78.     Material and undisputed.

79.     Material because there is no evidence that MITG routed calls for new accounts to HP, or forfeited any revenue/profit on such calls to HP prior to the termination of the SSA.

80.     Material because there is no evidence that MITG routed calls for new accounts to HP, or forfeited any revenue/profit on such calls to HP prior to the termination of the SSA.

81.     Material and disputed.  There is not evidence that MITG routed calls for new accounts to HP, or forfeited any revenue/profit on such calls to HP prior to the termination of the SSA.  Further, Ms. Ellis, who's testimony is cited, also testified that  HP was setting up accounts as part of the transition, but not sending orders. [Ellis Depo 40:17-41:1].  Further, the document Ms. Ellis is being questioned on (Meyerfeld P, bates no. HP 00011) states "ordering for pmCompaq parts has been consolidated at Roseville … focused parts order [management] is migrating to Roseville <u>on Feb. 9</u>."  Thus, MITG's citation, which suggests that HP took over business before the end of the SSA, is misleading.

82.     Immaterial but undisputed.  Mr. Chizek was the vendor manager and operations manager for the parts business call center in Roseville, which was an HP call center.  The Roseville call center and its agents were not bound by the SSA [Chizek Depo 6:21:7:2, 9:15-10:9, 10:23-25]. Thus, without some evidence that any "Customers" as that term is defined in the SSA were impacted, or interfered with, the evidence of HP's actions in relation to a non-HP Direct call center is irrelevant.  HP objects to MITG's reliance on documents not properly before this court, namely Exhibit NN, because same has not been proven up so is not admissible summary judgment evidence.

83.     Material and disputed as to the final phrase of the paragraph ("in other words, not to contact MITG anymore").  The letter, which MITG does not provide to the Court, is dated January 30, 2004 and informs parts customers that "effective February 7, 2004" changes will be made in the spare parts ordering process. [Meyerfeld Depo #2 (Tab 15)124:22-25, 125:7-10, 127:2-6, Depo Ex. DDDD].

84.    Immaterial but undisputed because HP's determination of the top accounts in terms of revenue generated under the SSA by MITG, who was one of its vendors, is not evidence of tortious interference.

85.    Material and undisputed.  However, HP would note that the letter is dated January 30, 2004 and simply informs parts customers that "effective February 7, 2004" changes will be made in the spare parts ordering process.  Mr. Haught conceded in his deposition that the statements made in the letter correct [Haught Depo # 1 264:20-22].

86.    See ¶85, above.

87.    Material and disputed.  Louise Meyerfeld, who's testimony is cited, testified that follow up calls were made to the top 89 accounts around February 1, 2004 to "ensure they got the letters," provide the URL and phone number, to ensure they understood the letter and the process that would be in place [Meyerfeld Depo 88:23-89:3, 92:24-93:13].  HP did not inform the customers not to use MITG, nor did HP attempt to discourage customers from using MITG. [Meyerfeld Depo #1, 91:11-16].

88.    Material and disputed.  The Agilent meeting was to explain what was going to take place or explain the "flow."  [Meyerfeld Depo 97:7-17, Depo Ex. Q]. MITG does not present any evidence what happened at the meeting, that this meeting constituted tortious interference, or that MITG was damaged in any way.

89.    Material and disputed based on the characterization of the contents of the letter to customers.  The letter [Depo Ex. DDDD] speaks for itself.  It has no reference to MITG, and simply informs the recipient of changes effective February 7, 2004.

90.    Material and disputed.  There is no evidence of "personal visits" as claimed in MITG's "facts."  Further, HP does not dispute that the persons contacted by letter and telephone calls were accounts serviced by MITG pursuant to the terms of the SSA (a/k/a "Customers").  However, HP does dispute this paragraph to the extent it states or is intended to imply that the customers at issue were separate and distinct from "Customers" under the SSA.  In fact, the account list from which the letter recipient names and addresses were obtained identifies these accounts by the account number (beginning with S0___) from VISTA.  [Meyerfeld Depo #2 127:25-135:4, 136:9-12, Depo Ex. UU and VV].

91.    Immaterial for the reasons set forth in ¶90, above.  The shorthand reference for sake of clarity should be expected, as shown by the fact that at times there were references to HP Direct that led to follow up questions as to whether the reference was to HP Direct in Omaha or MITG acting as HP Direct.  [*see e.g.* Meyerfeld Depo 128:20 -129:16].

92.    See ¶91 above.  Also, in the testimony cited by MITG, Ms. Meyerfeld is discussing customers with accounts to order from both MITG and HP/Compaq.

93.    Immaterial and disputed, as misleading for the reasons explained in ¶91, above.  Also, Mr. Chizek's testimony was in response to a question that asked if problems arose because "some of these customers had been ordering from MITG for years."

This fails to establish that the years inquired about were more than the two years the SSA was in place.  [Chizek Depo 71:20-72:1].

94.    See ¶93 above.  None of the testimony cited establishes that the recipients of the letters and/or telephone calls were not "Customers" under the SSA, and thus referred to MITG by HP Direct.

95.    Immaterial.   There are different formats for customer numbers between the various entities within HP (see Depo Ex. UU, showing the Osprey CBN, S and SAP account numbers which differ based on the ordering system, and Ms. Meyerfeld's explanation of same at Meyerfeld #2 131:1-132:16).  The fact that account numbers were established for customers who did not already have an account number in the HP order entry system is not evidence of tortious interference.  In fact, the testimony is that the numbers were set up but orders were not sent [Ellis Depo 40:17-41:1].

96.    Immaterial.  HP was under no obligation to tell its customers that they could order from a third party.

D.  Damages

97.    Immaterial and disputed.  MITG's billings are irrelevant because none of MITG's damages are calculated based on its prior billings under the SSA, and a change in the amount invoiced from year to year is not evidence of wrongful acts by HP. Further, this paragraph is misleading because the amount stated is the amount invoiced to Compaq/HP Direct for sales of sourced product under the SSA, plus the monthly $41,000 guarantee, not all business with HP. [Koch Depo 8:14-25,

11:25-12:18, 17:3-18:25, *see* also selected pages from the MITG Detail Invoice Register from which the number was selected and was discussed in the above cited testimony].  MITG provided "service parts" to HP and was paid for those separately from the SSA. [Lauber Depo (Tab 16) 69:4-16, 69:25-70:8].  Further, despite being listed as "material" by MITG, these facts are cited in MITG's Response only as "additional evidence that MITG suffered damages due to the breach" of the SSA [Response, p. 36].  There is no explanation as to how this constitutes evidence of damages.

98.    Immaterial.  See ¶97, above.

99.    Immaterial.  See ¶97, above.

100.    Immaterial.  HP's revenue is irrelevant because MITG's damages are not calculated based on amounts earned by HP (and should not be, as MITG's relationship was with a subsidiary, HP Direct).  Also, despite being listed as "material" by MITG, this fact is not cited again in MITG's Response.

101.    Immaterial.  MITG's business  unrelated to the SSA is not the subject of this lawsuit.  Further, despite being listed as "material" by MITG, this fact are not cited again in MITG's Response.

102.    Immaterial.  There is no allegation of wrongdoing by Counter-Defendants in terminating the SSA and the fact that MITG apparently focused its business on fulfilling its obligations under the SSA is irrelevant to the claims asserted herein.  Further, despite being listed as "material" by MITG, this fact is not cited again in MITG's Response.

103.   Immaterial. There are multiple explanations for why revenue could have been declining, and the simple fact that it did is not evidence of wrongdoing by HP. Further, despite being listed as "material" by MITG, these facts are not cited again in MITG's Response.

104.   Material but disputed, as set forth in detail in Counter-Defendants' Motion.

105.   Material but disputed, as set forth in detail in Counter-Defendants' Motion

## ARGUMENT

HP provides the following brief response to issues raised by MITG in its Response, mindful of the admonition in the Local Rule not to simply re-state previously stated arguments:

I.     NO EVIDENCE OF A BREACH OF THE STANDARD SUPPORT AGREEMENT BY HP

A.   There is ZERO support MITG's claim that the SSA "obligated [HP] to forward all calls to MITG which MITG had the capacity to serve" (page 30, emphasis added) and/or that it gave MITG the "*exclusive* right to provide parts and services to all HP/Compaq customers which it had the capacity to serve" (p. 31, emphasis added).  HP would refer the Court to the plain language of the SSA.  MITG's citation to the testimony of Troy Bloomquist is simply a restatement of the actual language of the SSA.

B.   Andover did not carry "legacy parts" and the fact that legacy parts are not mentioned in the testimony cited by MITG does not change that fact.  Legacy parts are also referred to as "obsolete" parts  These are parts not carried in Compaq's or HP's inventory, thus have to be acquired from third party vendors. [Pound Decl. ¶3; Crowley Decl. ¶11] .

II.     MITG HAS NO ADMISSIBLE EVIDENCE OF DAMAGES ON THE BREACH CLAIM

A. MITG essentially argues that Stringer provides expert testimony and thus it is entitled to get to a jury, as the finder of fact. It ignores court's gatekeeping functions and the language of the case it cited in support, *Smith v. Ford Motor Company*, 215 F3d 713, 719 (7th Cir. 2000). *Smith* says:

> "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact or, <u>where appropriate, on summary judgment</u>. (emphasis added).

The *Smith* court also notes that the admission of expert testimony is governed by Federal Rule of Evidence Rule 702. A basic element of Rule 702 is that the testimony be "based upon sufficient facts or data." Stringer's opinion does not clear this hurdle. Stringer relies on information by MITG on its sales and then pleads ignorance on (1) what percentage of those MITG sales fit in the $175 exception in the MITG "bible," which is information controlled by his own client and (2) sales by Andover/Roseville because he was apparently not given what he wanted/needed to do his job. An expert should not be permitted to make assumptions solely because he is not given information by his client. MITG certainly could have established if it EVER in the two years of the SSA sold a single part under the $175 exception in the MITG "bible." Its citation to the split of business between stocked (CSN) parts and not in stock (sourced) parts is not evidence of the element challenged by Counter-Defendants.

B. Counter-Defendants take exception to the accusation that they were "attempting to mislead the court" about the missing pages in Stringer's copy of the Pound

deposition. In the testimony cited by HP, MITG's own counsel says on the record that the pages were missing, and Stringer acknowledges as much. There is nothing about the pages "not located at the moment."

C. Diane Pound did not report to Chip Love, as claimed on page 35. [Love Depo 38:23–24:15; Pound Depo16:5-24]. Ms. Pound was the Compaq Andover call center manager. Mr. Love was her contact at Compaq in Houston.

III. MITG PLED FOR DAMAGES IN EXCESS OF ONE HUNDRED THOUSAND DOLLARS, NOT NOMINAL DAMAGES, FOR HP'S ALLEGED BREACH OF THE MIDDLEWARE AGREEMENT

MITG's Amended Counterclaim states that it has been damaged in an amount in excess of $100,000 due to Counter-Defendants' alleged misappropriation of the Middleware. It now seeks nominal damages, a concept raised for the first time in its Response. The cases cited by MITG, including *Software, Ltd. v. Willie Washer Mfg. Co.*, 630 N.E.2d 1088 (Ill. App. 1994), state the law of nominal damages, but do not hold that summary judgment should be denied when a party fails to provide <u>any</u> basis for damages. Moreover, the court of appeals reversed the court's award of damages to Willie Washer as "necessarily speculative" because its proof was materially deficient under the available theories. *Id.* at 1105. There was no award of nominal damages by the court.

IV. MITG FAILS TO PRESENT A GENUINE ISSUE OF MATERIAL FACT TO DEFEAT COUNTER-DEFENDANT'S MOTION ON THE TORTIOUS INTERFERENCE CLAIM

A. MITG's assertion in footnote 4 that it is not required to show an absence of justification because the cases cited by HP do not deal with "business relationships" is nonsensical because the law of tortious interference, under both Illinois and Missouri law, includes the elements cited by HP, regardless of

whether a contract, relationship or expectancy exists. MITG ignores the plain language of the cases both MITG and HP cite in making this argument. For example, *O'Brien* (the 1980 case cited by MITG) and *Stoufer* (the 1991 case cited by HP) define tortious interference claims as arising from intentional interference with a valid business expectancy, relationship, or contract. The fundamental elements of the cause of action is the same, whether there is an expectancy, non-contractual relationship, or contract. *Stoufer*, 571 N.E.2d 157, 166 (Ill. App.1991). The fact that the cases cited by HP apply the law of tortious interference to fact patterns that do not address a business relationship is irrelevant. MITG makes no effort to meet its burden, as set forth in HP's Motion, apparently conceding it cannot do so. Thus, summary judgment is proper.

B. MITG fails to explain the gigantic, unsupported leap Stringer made to calculate damages and seemingly fails to understand HP's issue with Stringer's analysis. Stringer admits he saw no evidence (and MITG presents none in its Response) that explained why even one customer stopped doing business with MITG, so he simply assumed they doing stopped doing business with MITG because of HP. As discussed above, in section II (A), an expert opinion must be based on "sufficient facts" under Federal Rule of Evidence 702. Assuming 100% of the people who bought from MITG, acting as HP Direct, during the term of the Standard Support Agreement stopped buying from MITG, when it was not acting as HP Direct, because of wrongful actions by HP is unsupportable because MITG cannot provide any evidence that even one account stopped purchasing due to improper conduct by HP.

In conclusion, MITG failed to present genuine issues of material fact necessary to defeat summary judgment. Its claims are based on pure speculation, assumptions, and beliefs, rather than admissible evidence. The simple fact is that HP terminated the SSA in accordance with the terms of the agreement, so stopped referring its customers to MITG, and consolidated the business that MITG was doing for it, as a vendor, in existing HP facilities. The fact that the decision led to a dramatic decrease in MITG's sales is not an indication of wrongful conduct. Further, MITG never complained about Andover and the Spares Store during the SSA, and Haught's deposition testimony explains why – he was aware of that call center and had no issue with it because it sold only stocked parts. The complaint about that call center now is a figment of the litigation.

Similarly, after two years MITG cannot show any facts to support its claims that HP wrongfully used the Middleware with or for a single customer or that a single account that did not buy from MITG in 2004 stopped using MITB because of wrongful acts of HP. MITG throws a lot of "facts," most of which HP disputes because they are not supported by the evidence, or asserts are immaterial. In fact, one might believe that MITG's 10 pages of "disputed" facts and 105 "additional material facts" are simply an attempt to make it appear as though there is a fact issue for a jury. There is not. Accordingly, Counter-Defendants respectfully request that this Court grant it Motion.

For the reasons set forth above, Plaintiffs/Counter-Defendants respectfully request that this Court grant summary judgment on all three of the counterclaims asserted by MITG, and grant the relief requested by Counter-Defendants in their Motion.

Respectfully submitted,

/s Elizann Carroll
ELIZANN CARROLL
Texas State Bar No. 00787209
JUNEAU, BOLL & WARD, P.L.L.C.
15301 Spectrum Dr., Suite 300
Addison Texas 75001
(972) 866-8333
(972) 866-8378 *fax*

MOLLY BUCK RICHARD
Texas State Bar No. 16842800
THE RICHARD LAW GROUP
8411 Preston Road, Suite 890
Dallas, TX  75225
(214) 206-4300
(214) 206-4330 (fax)

SCOTT D. SPOONER
Heyl, Royster, Voelker & Allen
Suite 575 National City Center
1 North Old State Capital Plaza
P. O. Box 1687
Springfield, IL 62705
(217) 522-8822
(217) 523-3902 *fax*

ATTORNEYS FOR PLAINTIFFS/
COUNTER- DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of February, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to James Hansen, counsel for Defendants, and Molly Buck Richard and Scott Spooner, counsel for Plaintiffs.

/s Elizann Carroll
ELIZANN CARROLL
State Bar No. 00787209
JUNEAU, BOLL & WARD
15301 Spectrum Dr., Suite 300
Addison Texas 75001
(972) 866-8333
(972) 866-8378 *fax*
ecarroll@juneauboll.com