Page 6

1      TROY BLOOMQUIST,
2      having been first duly sworn,
3      was examined and testified as follows:
4           DIRECT EXAMINATION
5   BY MR. HANSEN:
6      Q.   Please, state your name for the record.
7      A.   Troy Bloomquist.
8      Q.   Troy, how old are you?
9      A.   Thirty-five.
10     Q.   Date of birth?
11     A.   2/5/69.
12     Q.   You reside here in Omaha?
13     A.   Yes.
14     Q.   Okay. Married?
15     A.   Yes.
16     Q.   Kids?
17     A.   Three.
18     Q.   Okay. All still living in the home?
19     A.   Yes.
20     Q.   Can you tell me your educational
21  background?
22     A.   I've got a bachelor's degree in computer
23  science from University of Nebraska, Omaha, with a
24  minor in communications.
25     Q.   When did you receive your bachelor's?

Page 7

1      A.   1991.
2      Q.   Have any postgraduate schooling work
3   towards a master's or anything?
4      A.   No.
5      Q.   Any specialized postgraduate training?
6      A.   I've been through a lot of sales
7   management training and executive briefing training,
8   and spent a lot of time in front of customers.
9      Q.   You hold any professional certifications
10  or accreditations?
11     A.   No.
12     Q.   Are you a member of any professional
13  business associates?
14     A.   (Witness nods head.)
15     Q.   You have to answer out loud.
16     A.   No.
17     Q.   That's a good point. I'll stop right
18  here, I forgot to do it.
19          I'm sure you met with the attorneys here
20  sometime prior to your deposition and went over the
21  ground rules. If at any time I ask you a question
22  today that you don't understand, ask me to rephrase
23  it and hopefully I'll put it in a form you can
24  answer.
25     A.   Okay.

Page 8

1      Q.   As you were just reminded, we need
2   verbal --
3      A.   Verbal yeah, sorry.
4           MS. CARROLL: Don't interrupt, that'll be
5   the next one.
6   BY MR. HANSEN:
7      Q.   Say yes or no because Cindy here is taking
8   down everything we say and it'll be typed up in a
9   booklet form for us to read later, but one person's
10  uh-huh is another person's huh-uh, so it's very
11  difficult. We'll remind you, don't worry.
12          And also it's very hard for Cindy to take
13  down two of us talking at the same time, so I would
14  ask you to allow me to complete my question before
15  you answer, and I in turn will allow you to answer
16  before I ask my next question, okay?
17     A.   Yes.
18     Q.   If at any time you need to take a break
19  today let us know, and we'll do so. I'm sure we'll
20  take breaks throughout the course of the deposition
21  but if for any reason you need to use the rest room,
22  make a call or something, just let us know, okay?
23     A.   Yes.
24     Q.   Tell me your present employer.
25     A.   Hewlett-Packard.

Page 9

1      Q.   What is your position or title?
2      A.   Business development manager for the
3   Great Lakes for integrated support.
4      Q.   That was a mouthful. Business developer
5   manager for Great Lakes?
6      A.   Uh-huh.
7      Q.   What was the last?
8      A.   Integrated support.
9      Q.   How long have you been in that position?
10     A.   Well, kind of hard -- well, in this
11  specific Great Lakes position about a year.
12     Q.   Okay.
13     A.   I held a regional position before that and
14  then we collapsed the region into areas so I moved
15  to an area.
16     Q.   How long were you in the regional
17  position?
18     A.   About a year, year and a half.
19     Q.   Okay. Tell me what your current duties
20  and responsibilities are in your current position.
21     A.   My job is to -- is to help drive and
22  develop business, new business in HP clients around
23  what we call integrated support, which is
24  multivendor support, so supporting other products
25  like Sun and Dell, IBM and others.

3 (Pages 6 to 9)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 70

1  BY MR. HANSEN:
2  Q. You don't have a final -- you don't have a
3  copy of the final agreement, the final business
4  requirements?
5  A. I don't at this time.
6  Q. Okay. Anyway, under that agreement if you
7  turn to Paragraph 3 on Page 2, do you see the
8  paragraph, grant of license, Paragraph 3?
9  A. Yes.
10 Q. Up at the top, pursuant to the agreement
11 which you signed on behalf of Compaq, MITG granted
12 Compaq a personal nontransferable and nonexclusive
13 right and license to use the Middleware and all
14 portions thereof solely for the purpose of doing
15 business with MITG and for no other use; is that
16 correct?
17 A. Yes, that is the way it's --
18 Q. Is that what it says in the document?
19 A. Yes.
20 Q. In the last sentence under that
21 Paragraph 3 pursuant to the Middleware agreement,
22 states that Compaq shall not modify, revise or
23 sublicense the Middleware to others, nor use the
24 Middleware for the benefit of parties other than
25 MITG without MITG's prior written consent except

Page 71

1  that the Middleware may be sublicensed by Compaq for
2  use by its affiliates and subsidiaries.
3        Is that what that says in the last
4  sentence of Paragraph 3 on Page 2 of Exhibit Y?
5  A. Yes.
6  Q. To your knowledge, has Compaq or
7  Hewlett-Packard used this technology for use with
8  other customers?
9  A. Not to my knowledge.
10 Q. Okay. Have you been told that they've
11 used this Middleware for use with other customers?
12 A. I only know of one instance, which was
13 with an accidental order that flowed through to MITG
14 for Microsoft, but it was a -- I think it was a test
15 order only.
16 Q. To your knowledge, is Compaq or HP using
17 this technology for use with currently Microsoft?
18 A. I have no knowledge of that.
19 Q. Do you know who would?
20 A. I don't know.
21       MS. CARROLL: Objection: Calls for
22 speculation.
23 BY MR. HANSEN:
24 Q. Are they using technology for use with
25 UPS, Xerox or Arthur Andersen?

Page 72

1  A. I have no knowledge of that.
2  Q. Have you heard that?
3  A. No.
4  Q. To your knowledge, is Compaq and
5  Hewlett-Packard still using the Middleware for any
6  other use since MITG has been terminated?
7  A. Not to my knowledge.
8  Q. Under Paragraph 5, ownership rights in the
9  Middleware, Compaq acknowledges that the Middleware
10 is the sole and exclusive property of MITG, and that
11 it has no right to the ownership therein, the
12 Middleware license authorizes Compaq to use the
13 Middleware to link its VISTA order entry system to
14 MITG web tools and for other purposes set forth
15 herein; however, except as stated herein, the
16 Middleware license gives Compaq no other rights or
17 entitlements to the Middleware, nor shall Compaq
18 have any rights to use the Middleware in any other
19 way. Compaq acknowledges that MITG owns the
20 Middleware.
21       To your knowledge, is Compaq or
22 Hewlett-Packard using the Middleware to link it's
23 VISTA order entry system to any other third-party
24 parts suppliers' web tools?
25 A. Not to my knowledge.

Page 73

1  Q. Have you heard that?
2  A. No, I have not.
3  Q. Okay. Do you have knowledge that HP or
4  Compaq is using the Middleware in any fashion, way,
5  shape or form other than to do business with MITG?
6  A. Not to my knowledge.
7  Q. Okay. What do you have knowledge of as
8  far as what the Middleware is currently being used
9  for?
10 A. My knowledge was is once HP did not renew
11 the contract that both agreements were once -- once
12 we cancelled -- not -- excuse me.
13       Once we didn't renew the contract, that
14 they were tied together.
15 Q. Okay. But would you agree with me that
16 the Middleware is not something you can simply flip
17 a switch and turn it off?
18       MS. CARROLL: Objection: Calls for
19 speculation, assumes facts not in evidence.
20 BY MR. HANSEN:
21 Q. Tell me what you know.
22 A. I have no knowledge of a switch.
23 Q. Okay. This is a program that is
24 implemented and placed onto Compaq's systems,
25 correct?

19 (Pages 70 to 73)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 74

1  MS. CARROLL: Objection: Assumes facts
2 not in evidence.
3 BY MR. HANSEN:
4  Q. You can answer.
5  A. Well, yes, it is used by -- I mean, it's
6 part of -- it was part of the VISTA system.
7  Q. Okay.
8  A. But without the other -- you know, without
9 the -- without the MITG side, nothing -- it probably
10 didn't -- they could probably shut that off.
11  Q. Well, could they or not, do you know?
12  A. I'm not a technical -- I'm not a technical
13 person, so I couldn't tell you if they could
14 actually flip it to turn it on and shut it off.
15  Q. Have they removed -- they being
16 Compaq/Hewlett-Packard, removed the Middleware from
17 the VISTA system?
18  MS. CARROLL: Objection: Calls for
19 speculation.
20  THE WITNESS: I don't know the answer to
21 that exact question.
22 BY MR. HANSEN:
23  Q. Okay. Tell me about the one order you are
24 aware of from Microsoft that you were talking about.
25  MS. CARROLL: Objection: Assumes facts

Page 75

1 not in evidence.
2 BY MR. HANSEN:
3  Q. You brought it up, go ahead and tell me
4 about it.
5  MS. CARROLL: Same objection: It's vague,
6 ambiguous, misstates the witness's prior testimony.
7 Go ahead.
8 BY MR. HANSEN:
9  Q. That's fine, you can answer.
10  A. The only -- the only thing I was aware of
11 was an e-mail that came across from our IT team that
12 stated, you know, please, excuse this -- you know,
13 these orders, they were tested orders for Microsoft.
14  Q. Okay. Test orders implementing the
15 Middleware system from Microsoft?
16  A. Don't know the exact answer to that. Just
17 know it was an e-mail communicating that an error
18 had occurred.
19  Q. That Microsoft was -- well, that some sort
20 of test orders had been placed with Microsoft using
21 the Middleware agreement?
22  MS. CARROLL: Objection: Assumes facts
23 not in evidence.
24  THE WITNESS: I think it stated that
25 something had flowed through VISTA and then for

Page 76

1 whatever reason went to MITG versus Microsoft.
2 BY MR. HANSEN:
3  Q. Okay. Well, for that to occur, Microsoft
4 would have had to have the interface on their system
5 to accept the VISTA XML, correct?
6  MS. CARROLL: Objection: Calls for
7 speculation, assumes facts not in evidence.
8  THE WITNESS: Not sure. Not sure what
9 Microsoft would have on their side.
10 BY MR. HANSEN:
11  Q. Well, for them to accept or place a test
12 order that you just described inadvertently went to
13 MITG, Microsoft would have had to have the capacity
14 to accept that same interface on their end; is that
15 correct?
16  MS. CARROLL: Same objections.
17  THE WITNESS: Not exactly sure on that --
18 that -- that answer, but --
19 BY MR. HANSEN:
20  Q. What's your -- I want -- not sure what,
21 yes or no?
22  MS. CARROLL: Same objection.
23 BY MR. HANSEN:
24  Q. You can answer.
25  A. I guess my answer would be since test

Page 77

1 orders went through something -- you know, there
2 must have been something in the works or in place
3 for them to do that. That's all I know.
4  Q. But weren't involved in it, but it's your
5 testimony that you're -- based on your experience
6 with the creation of the Middleware, for that to
7 occur they would have had to have something on their
8 end to either accept or reject that test order?
9  MS. CARROLL: Objection: Vague and
10 ambiguous, misstates the witness's prior testimony
11 and assumes facts not in evidence.
12 BY MR. HANSEN:
13  Q. You can answer.
14  A. As I stated before, I guess, yes, the --
15 they would -- something would have to be in place
16 for them to do that, so, you know, what -- when that
17 communication came through I think we were just
18 trying to make sure that MITG knew that it was an
19 error, you know, on our part, on the VISTA system's
20 part.
21  Q. Did anyone at any point in time from
22 Compaq or MITG -- or from Compaq or HP have
23 Ron Haught or MITG's written permission to use that
24 Middleware with anyone other than MITG?
25  A. I have knowledge of that --

20 (Pages 74 to 77)

Page 86

1  Q. Okay. Is the VISTA system still being
2  used?
3  A. Yes.
4  Q. Okay. Are you aware of any other
5  XML interface that's been created to replace the
6  Middleware that was developed with MITG?
7  A. Not to my knowledge.
8  Q. If there is an XML interface currently
9  being used with VISTA, to your knowledge, is it
10 still the Middleware that was created with MITG?
11 A. I don't know.
12 Q. If the VISTA system is still being used
13 and the Middleware is not, are you back to the
14 double-entry system?
15      MS. CARROLL: Objection: Calls for
16 speculation, assumes facts not in evidence.
17      THE WITNESS: It's hard to answer because,
18 you know, I'm not sure what other groups are using
19 VISTA today.
20 BY MR. HANSEN:
21 Q. You said you're not aware of any other
22 interface that's been created to replace the
23 Middleware we've been talking?
24 A. No, I'm not. I'm not. I'm not saying
25 there's not.

Page 87

1  Q. Okay. Other than using the Middleware
2  infrastructure that was built with MITG, how else
3  did CEI or Compaq Direct -- strike that, let me
4  rephrase it.
5      Other than creating the interphase,
6  explain how CEI used the infrastructure that was
7  built with MITG.
8      MS. CARROLL: Objection: Vague.
9      THE WITNESS: I would agree, I really
10 don't understand what you're asking there.
11 BY MR. HANSEN:
12 Q. That's all right, I'll move on.
13     Let me show you what's been marked as
14 Crowley Exhibit A. Is that the standard support
15 agreement entered into with the MITG and at the time
16 I believe it was Compaq Direct?
17 A. Yes.
18 Q. Okay. Is your signature on the last page
19 of that document?
20 A. Yes.
21 Q. Tell me what you understand MITG was hired
22 to provide pursuant to this standard support
23 agreement?
24 A. Well, they were hired to provide spare
25 parts services for the end user group that they're

Page 88

1  already providing support for, as well as the
2  consumer business for Compaq around procurement of
3  Compaq spare parts and third-party parts.
4  Q. And in return, that agreement outlines the
5  way in which they were going to be paid; is that
6  correct?
7  A. Yes.
8  Q. Okay. And they were to receive sharing of
9  profits on parts pursuant to Paragraph 10?
10 A. Yes.
11 Q. Okay. And they also were -- well, that
12 breakdown of profits was 75 percent to MITG,
13 25 percent to CDI for all parts sold to the
14 customers; is that correct?
15 A. Yes.
16 Q. Okay. And were they also given a specific
17 service level and schedule guarantee pursuant to
18 Paragraph 11?
19 A. Yes.
20 Q. Okay. And in Paragraph B it says that
21 guarantee was approximately -- well, that guarantee
22 was 400 calls a day or $41,000 a month, do you see
23 that?
24 A. Yes.
25 Q. Okay. Do you know if MITG was ever paid

Page 89

1  any amount over $41,000 a month based on call level
2  volume?
3      MS. CARROLL: Objection: Vague.
4  BY MR. HANSEN:
5  Q. You can answer.
6  A. No, they weren't -- they weren't paid -- I
7  mean we paid them the flat 41,000.
8  Q. Okay. Now, also pursuant to that
9  agreement under Paragraph 22 -- flip to
10 Paragraph 22.
11 A. (Witness complies.)
12 Q. Okay. That indicates that MITG was given
13 the exclusive right to provide parts and services to
14 the customers, correct?
15 A. Yes.
16 Q. Okay. And lastly Paragraph 24 of that
17 agreement provided that all applicable parts and
18 service orders of the customers will be referred to
19 MITG from CDI, correct?
20 A. Yes.
21 Q. Okay. Now, I'm going to show you what's
22 been marked as Crowley Exhibit B.
23 A. (Witness reviewing document.)
24 Q. Actually probably ought to start at the
25 bottom down there, which is Wednesday, May 21, and

23 (Pages 86 to 89)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 90

1 continues over on the second page. Go ahead and
2 take whatever time you need to read that.
3    A.   (Witness reviewing document.)
4    Q.   Okay. Is that an e-mail to you from April
5 at MITG dated May 21, 2003?
6    A.   Yes.
7    Q.   Okay. Apparently she's talking about
8 someone named -- in the first portion there,
9 actually Monday, May 19, '03, it says Lyle from
10 Warranty Group refer customer to any of the
11 following for purchase part number, and she -- the
12 customer was told to contact the spare store, HP
13 online parts, where she could go to Ambry, and that
14 she indicated to you that she had a concern why
15 technical support was referring someone to Ambry
16 when this part was available from CSN, do you see
17 that in the e-mail?
18   A.   Yes.
19   Q.   Okay. And then the top -- well, the
20 other -- the bottom portion is an e-mail string she
21 also copied you on if you flip it over, dated
22 May 20, 2003, do you see that?
23       A customer called the welcome center
24 looking to order part number, was routed to auto
25 attendant and then was eventually referred to

Page 91

1 Super Warehouse.
2    A.   Yes.
3    Q.   Okay. And she had a question to you that
4 said on both of these, why is the internal rep
5 referring customers to places that are not
6 Compaq/HP-related for parts that they could procure,
7 do you see that?
8    A.   Yes.
9    Q.   Okay. And if you then go to the top of
10 the second page, you said in a response --
11   A.   Second page or first page?
12   Q.   First page. Thank you.
13       Dated May 27, 2003, you responded back to
14 Jeff Hatfield. Who is he?
15   A.   He was part of -- he headed up -- he was
16 part of the -- the third-party in the small business
17 group for -- for Compaq Direct.
18   Q.   Okay. And you indicated, do you have any
19 idea who heads up the small and medium business
20 department, why would we send customers outside the
21 company, this is lost revenue, is that what your
22 e-mail says?
23   A.   Yes.
24   Q.   Would you agree that if those customers
25 were referred by Compaq/HP representatives to Ambry

Page 92

1 or Super Warehouse that was in violation of the
2 standard support with MITG?
3       MS. CARROLL: Objection: Calls for a
4 legal conclusion.
5 BY MR. HANSEN:
6    Q.   You can answer.
7    A.   I would say that to my recollection of the
8 agreement, you know, the way it's written, it was
9 for Compaq Direct, so the -- you know, the issue is,
10 you know, the small/medium business group wasn't
11 underneath the Compaq Direct organization.
12   Q.   Okay. Well, you certainly had concerns
13 over it, did you not?
14   A.   Well, certainly.
15   Q.   Okay. And that is the -- you said the
16 small and medium business centers were not
17 Compaq Direct; however, it said, we had a customer
18 that was speaking with the spares store.
19       The spares store, would that be part of
20 the third-party parts and spares that MITG was
21 servicing for Compaq?
22   A.   Spares store was the group out of Houston,
23 that Compaq Services group out of Houston led by
24 Chip Love.
25   Q.   What about the -- another customer started

Page 93

1 at the welcome center, what was the welcome center?
2    A.   The welcome center is a -- is a group of
3 people that are there to kind of take all
4 Compaq-type calls, so if you want to -- the welcome
5 center is the number that was the -- that answered
6 the 1-800 okay Compaq, that's what the welcome
7 center was.
8    Q.   Okay. And off the 1-800 okay Compaq, if
9 they were all taking all Compaq calls, would
10 Compaq Direct have been on one of those options?
11   A.   It was an option, yes.
12   Q.   So if a call came into the welcome center
13 for Compaq Direct and had a customer that needed to
14 order the part, it should have been referred to
15 MITG pursuant to the standard support agreement?
16       MS. CARROLL: Objection: Calls for
17 speculation.
18       THE WITNESS: Yes.
19 BY MR. HANSEN:
20   Q.   Okay. And on the e-mail from the warranty
21 group, this Lyle, Monday, 5/19/03, apparently the
22 part was available on CSN, for $25 our cost and
23 $29 to the customer cost, but the individual was
24 referred to Ambry where the part was $55, did that
25 also lead to your concern that that was money that

24 (Pages 90 to 93)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 94
1  was being sent outside of HP Compaq?
2      A.  Yes.
3      Q.  Okay.  What is -- do you know what PC and
4  Netstream are?
5      A.  No.
6      Q.  Okay.  And then -- did I hand you Crowley
7  Exhibit C on the back of that?  Let me find it.
8  (Counsel hands document to witness.)
9      A.  (Witness reviewing document.)
10     Q.  Actually I'm going to ask you, to speed
11 things along, flip to the page marked MITG 432.
12     A.  Okay.
13     Q.  Do you see in the middle there it should
14 say original message from a Toby Morris?
15     A.  Uh-huh, yes.
16     Q.  Okay.  And this individual was sending an
17 e-mail to info@globalonlineparts.com, is that HP --
18 is that an HP e-mail site, do you know?
19     A.  I have no idea.
20     Q.  Anyway, this person indicates that --
21 something about a notebook, he was looking for
22 RW drive, but my questions relate to this, it says,
23 dear HP customer, do you see where I'm at there?
24     A.  Okay.
25     Q.  Thank you for contacting HPE Services,

Page 95
1  okay, what was HPE Services?
2      A.  HPE Services was the services
3  organizations' web-based tool.
4      Q.  Was it connected at all to third-party
5  parts or the HP Direct?
6      A.  No.
7      Q.  Okay.  Now, if you flip over to the --
8  well, continuing on, apparently this guy was looking
9  for some Armada E500 notebook, do you see that?
10     A.  Uh-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  Okay.  He wanted to purchase the CD-RW
14 drive, and they gave him a spare part number, do you
15 see that?
16     A.  Yes.
17     Q.  Okay.  It says for spare parts and prices
18 you can visit the following link, and flip over,
19 okay, and it says the web site for
20 sparestore.compaq.com, do you see that, flip over?
21     A.  (Witness complies.)
22     Q.  Compaq online parts, do you see that?
23     A.  Uh-huh, yes.
24     Q.  Okay.  And the Compaq online parts web
25 site, is that the MITG web-based tool?

Page 96
1      A.  Yes.
2      Q.  Okay.  So that was one of the options
3  given for this individual who wanted to get some
4  CD-RW drive?
5      A.  Yes.
6      Q.  So eservices was referring this person as
7  a potential part order to the MITG site, correct?
8      A.  Yes.
9      Q.  Okay.  They list the 800 number there next
10 to that?
11     A.  Yes.
12     Q.  Now, they also give this individual other
13 options as far as searching the internet, and they
14 give them Netstream, PC Nation and Ambry, do you see
15 that there, one, two and three?
16     A.  Yes.
17     Q.  Okay.  Do you know -- Ambry you said you
18 had knowledge of?
19     A.  Yes.
20     Q.  Okay.  And are these other places that the
21 consumer could go to to buy that part, do you know?
22     A.  It appears, yes.
23     Q.  Okay.  My question is if that was a part
24 that could have been filled in the order provided by
25 MITG through Compaq online parts pursuant to this

Page 97
1  the standard support agreement, should it have been
2  referred to them?
3          MS. CARROLL:  Objection:  Assumes facts
4  not in evidence and is an improper hypothetical.
5          THE WITNESS:  No knowledge on how they
6  were told to route calls from this e-mail.
7  BY MR. HANSEN:
8      Q.  Okay.  But you do agree that the
9  Middleware agreement says that all --
10 Paragraph 24 --
11         MS. CARROLL:  Standard support agreement.
12         MR. HANSEN:  I'm sorry, in the standard
13 support agreement, thank you.
14         MS. CARROLL:  Behind you, on the table
15 behind you.
16         MR. HANSEN:  Thank you.
17 BY MR. HANSEN:
18     Q.  Paragraph 24 states that all, in caps,
19 applicable parts and service orders of the customers
20 will be referred by CDI to MITG.
21         Pursuant to that, should that call have
22 been referred to MITG only?
23         MS. CARROLL:  Objection:  Assumes facts
24 not in evidence, improper hypothetical and calls for
25 a legal conclusion.

25 (Pages 94 to 97)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 102

1  consumer -- the consumer calls.
2  Q. When you say engaged your program, is that
3  the relationship with MITG you're referring to?
4  A. No, what I mean is the Compaq Services
5  organization from a spare parts perspective in
6  engaged our program, the Compaq Direct program, to
7  be able to -- they had a need to be able to have an
8  800 number for consumers to take their spare parts
9  orders rather than send them off to authorized
10 resellers.
11 Q. Okay. So to create 800 numbers so Compaq
12 didn't sell money elsewhere, the orders were placed
13 here with the authorized resellers?
14 A. Yes.
15 Q. Okay. And were those the 800 numbers that
16 were tied directly into MITG?
17 A. Restate the question.
18 Q. Were those the 800 numbers that were tied
19 directly into MITG, meaning I call 1-800 whatever
20 the number is and I'm -- somebody says Compaq Direct
21 and it's somebody at MITG's facility?
22 A. For that initiative, yes.
23 Q. Okay. You said it was Compaq Services who
24 engaged your group?
25 A. Correct.

Page 103

1  Q. Okay. And your group was Compaq parts?
2  A. Compaq --
3  Q. Direct?
4  A. My group was -- I was the program manager
5  for Compaq Direct for support services.
6  Q. Okay. And Chip Love, was he the Compaq
7  Services?
8  A. Person.
9  Q. Person, okay.
10 A. Uh-huh.
11 Q. Okay. And then flipping to MITG 76, which
12 is in that exhibit, there is apparently an e-mail to
13 you from Ron Haught, dated Monday, October, 21,
14 2002, subject says call volume, do you see that?
15 A. Yes.
16 Q. He was asking you to check into the calls
17 today to find out why they were getting lesser and
18 lesser, do you see that?
19 A. Yes.
20 Q. Okay. At the top we actually have your
21 response on this e-mail, you responded back to him
22 shortly thereafter; is that correct?
23 A. Yes.
24 Q. Okay. You said I've made the request,
25 what request were you talking about?

Page 104

1  A. I made the request to Chip Love regarding
2  call volumes and why -- you know, if he knew where
3  the calls were going and if they're going to
4  Andover, which was a HP call center, you know, my
5  question was why or, you know, is there -- what's
6  the change.
7  Q. Okay. My next question was going to be
8  what was Andover? It says their Andover only
9  540 calls on Friday versus 436 for us, what is
10 Andover?
11 A. It was a Compaq call center.
12 Q. Were they a call center providing the same
13 service that MITG was?
14     MS. CARROLL: Objection: Calls for
15 speculation.
16 BY MR. HANSEN:
17 Q. You can answer.
18 A. I'm not sure exactly what all of their --
19 their actual charter was from that perspective.
20 Q. Okay. Well, you said you'd call Chip Love
21 to find out why calls were going to Andover that
22 could have been going to MITG, why would you do
23 that?
24 A. Because I -- because that was an area that
25 I knew that we were taking -- as Compaq, they were

Page 105

1  taking some spare part calls, but Andover typically
2  was focused on digital parts, which wasn't part of
3  our program.
4  Q. But they were taking some spare parts
5  calls that also could have been serviced by MITG?
6     MS. CARROLL: Objection: Calls for
7  speculation.
8  BY MR. HANSEN:
9  Q. You can answer.
10 A. I have no direct knowledge of that taking
11 place.
12 Q. But you said you contacted Chip Love to
13 find out why calls were going to Andover?
14 A. Yes.
15 Q. Did you do that because those were calls
16 that you felt could have been directed to --
17 A. Potentially, yes, I was trying to look
18 into it.
19 Q. Because Andover and MITG was offering
20 similar type services for spare parts?
21 A. Yes.
22 Q. Okay. Now, Andover was taking these
23 calls, you indicate 540 calls on Friday, which would
24 have been sometime in October 2002, correct?
25 A. Yes.

27 (Pages 102 to 105)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

Page 110

1  Q. Meaning cancelling the contract with MITG?
2  A. No.
3  Q. Okay.
4  A. Meaning that, you know, they had an
5  agreement with HP Direct where they would send the
6  calls, they were moving a different direction.
7  Q. Okay. They would send the calls to
8  Andover?
9  A. Not sure exactly where they were sending
10 them, but they were going somewhere else.
11 Q. Other than to MITG?
12 A. Right.
13 Q. Would you then in turn communicate that
14 back I guess to Mr. Haught at MITG?
15 A. I communicated back to him every time I
16 got communication back of what I was hearing, and I
17 would tell him I'd continue to try to work it and
18 see, you know, what we could -- what we could do.
19 Q. Did you ever have any communications or
20 conversations with Mr. Love specifically discussing
21 the standard support agreement that was in place
22 regarding calls that should be referred to MITG and
23 that that wasn't taking place based on the call
24 volume?
25 A. My messaging was, yes, that we had an

Page 111

1  agreement in place that -- where a vendor was
2  suspecting calls and that we weren't hitting the
3  same numbers we were hitting in the past.
4  Q. You inquired as to where those calls were,
5  what happened to them, where they were going, and
6  that's when you said Mr. Love told you whatever he
7  responded, that he had an agreement with HP, that
8  the calls going to someplace else?
9       MS. CARROLL: Objection: Misstates the
10 witness's prior testimony.
11 BY MR. HANSEN:
12 Q. Go ahead and tell me.
13 A. He said that the -- he said he referred to
14 the calls -- that they were being routed to Andover.
15 Q. Okay. I'm going to show you a previous
16 deposition exhibit, which is actually Meyerfeld M,
17 and it was -- let me get this out of your way.
18      Do you recognize those as parts business
19 center operations matrix?
20 A. Yes.
21 Q. Okay. And the one sitting in front of you
22 is dated March 12 of 2003?
23 A. Yes.
24 Q. Okay. And if you flip to the second page
25 do you see there it says matrix provided by --

Page 112

1  A. Uh-huh, yes.
2  Q. -- Darlene Low -- hold on a second, let me
3  finish, Vicki Ngo, N-G-O; Michelle Sarty, S-A-R-T-Y,
4  and then your name?
5  A. Yes.
6  Q. Were you the individual that prepared
7  these and sent them on to whoever?
8  A. I only prepared -- I only prepared the
9  Missouri HP Direct numbers. I received a daily -- a
10 daily call stat sheet from MITG that I in turn put
11 in a format and forwarded on for daily -- daily
12 updates.
13 Q. Okay. You said you put it in a
14 spreadsheet format and then e-mailed it on to
15 somebody?
16 A. Yes.
17 Q. Who would you send your reports to?
18 A. Either Vicki Ngo -- I think she -- that
19 was the only one to my recollection.
20 Q. Okay. Was she at Roseville or do you
21 know?
22 A. I don't know.
23 Q. Okay. And then to the best of your
24 knowledge and recollection, would she then compile
25 the full matrix that we have there or would somebody

Page 113

1  else do that, do you know?
2  A. I'm not sure who compiled it.
3  Q. But the information you provided
4  specifically related to the line we see there,
5  Missouri HP Direct?
6  A. Yes.
7  Q. Okay. Now, after you sent those on
8  apparently would then be put in this form and resent
9  back to you in a final form?
10 A. Uh-huh, yes.
11 Q. Because you're one of the individuals
12 listed there amongst others that received the
13 complete matrix?
14 A. Yes.
15 Q. Okay. Would you receive these on a daily
16 basis?
17 A. Yes.
18 Q. Okay. Now, you said you compiled this
19 information based on numbers that were sent to you
20 from -- or tied to you from Missouri HP Direct?
21 A. Yes.
22 Q. Okay. Would the folks from MITG send
23 those to you on a daily basis?
24 A. Yes.
25 Q. Okay. For instance, I just want to go

29 (Pages 110 to 113)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.



From: ron [mailto:rdhj@mitg.com]
Sent: Monday, January 12, 2004 11:07 AM
To: 'Terri Welch'; 'Teresa M Koch'; 'Richard Rice'
Subject: RE: Feedback from GlobalOnlineParts.com Customer
Importance: High


Very interesting.. I think that we might include a portion of this into our letter. TERESA.. and explain or better yet.. ask WHY are you referring business to the outside.. when we give you profit to allow us to fill these orders...

MITG 0430



217-214-7299 ext 7111

Direct Dial 214-214-7111

Fax-217-214-7211

http://www.mitg.com <http://www.mitg.com/>

rdhj@mitg.com

The information contained in this e-mail message is PRIVILEGED AND CONFIDENTIAL, and is intended for the use of the addressee and no one else. If you are not the intended recipient, please do not read, distribute, reproduce or use this e-mail message (or the attachments) and notify the sender of the mistaken transmission. Thank you.

---

From: Terri Welch [mailto:twelch@mitg.com]
Sent: Monday, January 12, 2004 10:50 AM
To: Ronald Haught Jr.; Teresa M Koch; Richard Rice
Subject: FW: Feedback from GlobalOnlineParts.com Customer

I thought the info from HP below was interesting. Especially the fact that they refer him to Netstream, PC Nation and Ambry.

Also, I don't know who is incorrect (HP or Kim) in regard to the information...would be interesting to know.

Terri A. Welch

Director of Administrative Services

MITG, Inc.

4220 Kochs Ln

Quincy IL 62305

Direct line: 217-214-7118

Fax: 217-214-7204

Email: twelch@mitg.com

MITG 0431

The information contained in this e-mail message is PRIVILEGED AND CONFIDENTIAL, and is intended for the use of the addressee and no one else. If you are not the intended recipient, please do not read, distribute, reproduce or use this e-mail message (or the attachments) and notify the sender of the mistaken transmission. Thank you.

-----Original Message-----
From: Morris, Toby L. [mailto:toby.l.morris@saint-gobain.com]
Sent: Monday, January 12, 2004 10:44 AM
To: 'info@globalonlineparts.com'
Subject: RE: Feedback from GlobalOnlineParts.com Customer

Below is a letter that I received from a previous inquiry with HP/Compaq.

The letter gave me the part # showing the RW drive available, I currently have the DVD installed; The Notebook is just not much use to me without the CD-RD.

-----------------------------------------------------------------
----

Please retain this line in all replies: <ID:215504-370502845>

-----------------------------------------------------------------
----

Dear HP Customer,

Thank you for contacting HP eServices.

This is in response to your e-mail regarding the Armada E500 Notebook.

From your e-mail, we understand that you wish to purchase the CD-RW drive.

To purchase the CD-RW drive please refer to the information below:

CD-RW Drive the spare part number is 153992-001.

For spare parts and prices, you can visit the following link:

MITG 0432

or HP Online Parts at:

http://www.compaqonlineparts.com/cust/index.asp (Phone: 800-848-4589 )

For more options, we recommend searching the Internet. Here are some examples:

1) Netstream at http://www.cpqparts.com

2) PC Nation at http://www.pcnation.com

3) Ambry at http://www.ambry.com

You can also contact a service center to have the part ordered for you. You can find the closest service center here:

http://compaq.infonow.net/bin/findNow?CLIENT_ID=COMPAQ_BUS_USA&MARKET=SERVICE

Please e-mail us in case of any further questions and we will be glad to assist you.

Thank you,

HP eServices


==== Created - toby.l.morris@saint-gobain.com - 1/7/04 11:11:37 AM ====

webform_submit_time : Wed Jan 07 2004 12:09:35

remote_host : atwnt947.external.hp.com

language : English [en]

template : CPQ_NOTEBOOKS

product_name : Armada E500

first_name : Toby

last_name : Morris

email_address : toby.l.morris@saint-gobain.com

MITG 0433

phone_number : 254-918-6462

Toby Morris
Senior Control Technician

2770 West Washington Street
Stephenville, TX. 76401
Tel.: (254) 918-6462 . Fax: (254)968-6993
e-mail: toby.l.morris@saint-gobain.com

-----Original Message-----
From: info@globalonlineparts.com [mailto:info@globalonlineparts.com]
Sent: Monday, January 12, 2004 9:16 AM
To: toby.l.morris@saint-gobain.com
Subject: Re: Feedback from GlobalOnlineParts.com Customer

Toby,


   On the Armada E500, i do not show that it can accept a cdrw drive. It can use a DVD rom but not a cdrw. If you have any further question, you may contact me or Compaq's technical support at 1-800-474-6836.



Kimberly

----- Original Message -----

From: toby.l.morris@saint-gobain.com


To: webmaster@globalonlineparts.com

Sent: Monday, January 12, 2004 8:43 AM

Subject: Feedback from GlobalOnlineParts.com Customer


Name   :Toby Morris
Email   :toby.l.morris@saint-gobain.com
About   : Question
Proiority: Normal


Comment: Compaq Armada E500
CD-RW Drive Part # 153992-001
Is this a good part No. for replacement of standard cd-r for one that will read/write and what is the price?

MITG 0434

The information contained in this e-mail message is PRIVILEGED AND CONFIDENTIAL, and is intended for the use of the addressee and no one else. If you are not the intended recipient, please do not read, distribute, reproduce or use this e-mail message (or the attachments) and notify the sender of the mistaken transmission. Thank you.

MITG 0435