**Page 5**

1  BE IT REMEMBERED that under the applicable
2  sections of the Code of Civil Procedure of the State of
3  California, on Tuesday, September 28, 2004, commencing
4  at the hour of 9:07 a.m. thereof, at Hewlett-Packard,
5  8000 Foothills Boulevard, Building R10, Conference
6  Room B, Roseville, California, before me,
7  Ruth E. Diederich, a Certified Shorthand Reporter
8  in the State of California, there personally appeared
9
10              BILL CROWLEY,
11  called as a witness by the defendants in the
12  above-entitled action, who, having been duly sworn by me
13  to tell the truth, the whole truth, and nothing but the
14  truth, was examined and testified as follows:
15              ---oOo---
16       EXAMINATION BY MR. HANSEN
17  Q.  Please state your name for the record.
18  A.  William J. Crowley.
19  Q.  Mr. Crowley, have you ever had your deposition
20  taken before?
21  A.  Yes.
22  Q.  Okay. And I'm sure you got this information
23  from the attorneys that you met with prior to your
24  deposition today, but to go over it again, I am going to
25  be asking you questions here today in relation to a suit

**Page 6**

1  that's pending in the Central District Federal Court in
2  Springfield, Illinois.
3       If at any time I ask you a question today that
4  you do not understand, please say so, and I will
5  rephrase it and hopefully put it in a form that you can
6  answer.
7       Will you do that for me?
8  A.  Yes.
9  Q.  Also, again, we need verbal responses since your
10 answers are being typed up in a booklet form, as are my
11 questions, to read later. Somebody's uh-huh means an
12 huh-uh to somebody else, so we need verbal answers. And
13 I may, from time to time, remind you of that; okay?
14 A.  Okay.
15 Q.  Lastly, I would ask that you allow me to
16 complete my questioning before you jump in with an
17 answer. It's very common that you may know exactly
18 where my question is going, but it's very difficult for
19 our court reporter to transcribe two people talking at
20 the same time; okay?
21 A.  Okay.
22 Q.  And there is a fan over here, so I may have to
23 ask you to speak up a little bit so we can hear your
24 answers, if that's all right.
25 A.  Okay.

**Page 7**

1  Q.  I won't take it that you're yelling at me.
2  A.  Okay.
3  Q.  How old are you, sir?
4  A.  I am 43.
5  Q.  Your date of birth?
6  A.  6/29/61.
7  Q.  Okay. What is your educational background?
8  A.  I have a bachelor of science degree from
9  US Military Academy at West Point in engineering. I
10 have a master's of business administration from the
11 University of Notre Dame.
12 Q.  Who do you root for when Notre Dame plays Army?
13 A.  It's got to be Army. The longest losing streak
14 in the country.
15 Q.  And when did you graduate from West Point?
16 A.  1983.
17     MR. HANSEN:  Let's go off the record for a
18 second.
19     (Interruption in the deposition.)
20     MR. HANSEN:  Back on.
21 Q.  After graduating from West Point, did you do
22 military service, some duty?
23 A.  Yes.
24 Q.  Okay. How many years?
25 A.  About five and a half.

**Page 8**

1  Q.  Okay. Honorably discharged?
2  A.  Yes.
3  Q.  And then did you go on to obtain your MBA from
4  Notre Dame?
5  A.  No.
6  Q.  Okay. Did you work for a period of time first?
7  A.  Yes.
8  Q.  Okay. Where at?
9  A.  At a company called Gerawan Farming.
10 Q.  Could you spell that first name?
11 A.  G-e-r-a-w-a-n.
12 Q.  And what? Farming?
13 A.  Yes. It's a farming company.
14 Q.  Where at?
15 A.  Ridley, California, outside of Fresno.
16 Q.  Okay. What did you do for them?
17 A.  They're a family-owned business. They're the
18 largest growers of peaches, plums, nectarines and table
19 grapes, and I was in a variety of post production and
20 logistics positions where after the fruit was harvested,
21 we brought it in, cold storage, packaged, shipped it
22 around the world.
23 Q.  Okay. How long were you with them?
24 A.  About five and a half years.
25 Q.  Okay. Did you then go to work for some other

**Page 77**

1  A. Yes.
2  Q. Okay. Were you familiar with the Standard
3  Support Agreement prior to October 2003?
4  A. No.
5  Q. Okay. What is your understanding as to what
6  services were provided by MITG under the Standard
7  Support Agreement?
8  A. My understanding is that MITG provided call
9  center services and logistics and fulfillment -- parts
10 fulfillment to Compaq Direct.
11 Q. Would those services have also been provided to
12 HP Direct after the merger?
13 A. Right.
14 Q. Okay. And it said under paragraph 1 there in
15 Exhibit A, that -- the second sentence, that "These
16 services will be offered to CDI's," which at the time
17 was an abbreviation for Compaq Direct, Inc., as
18 contained in the first paragraph above that, "end users,
19 customers, companies or commercial entities directed or
20 referred by CDI to MITG."
21      Do you see where I'm at there?
22 A. Yes.
23 Q. Okay. Would that also, after the merger, have
24 been the same for HP Direct?
25 A. Yes.

**Page 78**

1  Q. Okay.
2  A. As far as I know. I don't know --
3  Q. Right. I understand. I'm asking for your --
4  A. -- the legal form of CDI or the legal form of
5  the company, or -- I don't know. But I would assume
6  that it --
7  Q. HP Direct fell under the same thing as Compaq
8  Direct as far as this agreement?
9  A. Yes.
10 Q. Okay. Now, in turn, CDI and HP Direct agreed to
11 pay MITG for those services performed in parts supplied;
12 correct?
13 A. Correct.
14 Q. Okay. Now, is it your understanding -- and
15 specifically, it's in paragraph 9 of this agreement on
16 page 4 -- that -- excuse me. It's paragraph 10 at the
17 top of page 5. I'm sorry -- part of that payment
18 included a sharing of profit on parts; is that correct?
19 A. Correct.
20 Q. Okay. And that MITG was entitled to 75 percent
21 of the gross profit on the sale of parts to customers,
22 and that CDI and HP Direct then were entitled to
23 25 percent of the gross profit on the sale, all parts to
24 customers.
25      Is that how you understand that?

**Page 79**

1  A. Yes.
2  Q. Okay. Now, we have -- so we have a profit
3  sharing arrangement between the two parties. Next we
4  also have in paragraph 11, CDI, and then HP Direct,
5  guaranteed a service level schedule to MITG; is that
6  correct?
7  A. That's what it looks like, yes.
8  Q. Okay. And in paragraph B, it says there that,
9  "In consideration for MITG maintaining its call service
10 centers with technicians available to customers during
11 regular business hours as outlined in subsection A, CDI
12 shall guarantee a minimum fee payment to MITG each month
13 for basic telephone service calls based upon either
14 400 calls per day or $41,000 per month, whichever is
15 greater," that's termed the minimum fee.
16      Do you see what I just read there, the first
17 sentence of paragraph B in clause 11?
18 A. Yes.
19 Q. Okay. Are you aware if there were ever any
20 payments made to MITG that were based on call volume as
21 opposed to the flat $41,000 per month?
22 A. I don't -- I'm not aware.
23 Q. Okay. Were you involved at all in the financial
24 side as far as the billing and payment of MITG under
25 either the profit sharing contained in No. 10 or the

**Page 80**

1  service level schedule and guarantee in No. 11?
2  A. No.
3  Q. Okay. Now, the other -- I'll call it the third
4  payment form under the agreement, if you flip to page 4,
5  No. 9, did CDI and then HP Direct also agree to pay MITG
6  for invoices submitted for parts delivered to customers?
7  A. I'm sorry. I missed the question.
8  Q. Did CDI and HP Direct also agree to pay MITG for
9  invoices MITG submitted for parts delivered to the
10 customers?
11 A. That's what it looks like --
12 Q. Okay.
13 A. -- yes.
14 Q. Now, do you know how the agreement worked
15 regarding whether or not those parts were CSN parts or
16 outsourced?
17 A. I don't understand.
18 Q. Do you have personal knowledge of the agreement
19 as to when MITG had to buy or use a CSN part or they
20 could outsource it?
21 A. No.
22 Q. Okay. Do you know what I'm talking about when I
23 say a CSN part?
24 A. No. I -- let me clarify. I know what CSN is.
25 It's an ordering system. It's not a type of part.

**Page 145**

1  Houston, pre -- the merger with HP; is that correct?
2  A. That's correct.
3  Q. Okay. So he was a gentleman that --
4  If I refer to Compaq as red and HP as blue, do
5  you understand that terminology?
6  A. Yes.
7  Q. Okay. That's kind of a differentiation used
8  after the merger; is that fair? HP is considered blue,
9  Compaq is considered red?
10 A. That was the way that we referred to, yeah,
11 people.
12 Q. So Chip Love was Houston, which was red, which
13 was Compaq pre and post merger?
14 A. No. He was -- post merger, he was purple, and
15 that's the terminology we use because his group includes
16 people here in Roseville, as well as people in -- his
17 group included people all over the country, and the
18 parts business that he was the program manager for
19 included pre merger Compaq parts, pre merger DEC parts,
20 pre merger HP parts. So he was purple. We integrated
21 the parts business very quickly to be purple, not red or
22 blue.
23 Q. Was Houston also Compaq Direct, Chip Love?
24 A. I don't know.
25 Q. Were they also -- do you know if Houston was

**Page 146**

1  also selling Compaq Direct parts?
2  A. Compaq Direct was a part of Compaq pre merger,
3  and then there were probably employees of Compaq Direct
4  in a variety -- in a wide range of places, and there may
5  have been people in Houston.
6  Q. Do you know whether or not there was any routing
7  of calls into any Compaq Direct 800 numbers to Houston,
8  as opposed to alt MITG?
9  A. I don't know, but Houston -- no, I don't know.
10 Q. Anyway, you asked Mr. Love and Mr. Soriano to
11 review the proposal MITG and Ron Haught had sent to you;
12 correct?
13 A. Correct.
14 Q. And then let's go over Mr. Loves's response back
15 to you, which is dated Thursday, January 8th at the top
16 of HP 237. Do you see where I'm at?
17 A. Uh-huh.
18 Q. Okay. Apparently, Mr. Love, in the first
19 sentence says that he doesn't like the proposal; is that
20 correct?
21 A. That's correct.
22 Q. Okay. And it says, "These guys are talking like
23 they want to be our partner, but in reality, they're
24 just another competitor. They're (sic) directly
25 services a couple of our largest accounts and want to

**Page 147**

1  maintain that relationship."
2  Did you ever follow up with him to find out what
3  he was referring to there?
4  A. Yeah, I know what he's referring to.
5  Q. Okay. What?
6  A. That when the contract ended, they would -- they
7  would be a -- they would be a parts reseller that could
8  sell non-genuine parts for Compaq and HP, so parts that
9  were not -- so in the parts world, there are aftermarket
10 or parts that come from a variety of sources and not
11 genuine parts. They are not what we offer, and I
12 think his -- what he is saying here is that if they --
13 after the contract ended, and they became a partner, a
14 parts -- in the parts reseller model, there would be a
15 problem, because their business model of selling other
16 things would conflict with our interest of protecting
17 the HP brand and using genuine parts.
18 Q. Okay. Well, then he says in the next sentence,
19 "They should be considered as just another broker, parts
20 reseller, and our relationship should be along those
21 lines."
22 Isn't that a problem you would face with any
23 parts reseller, I guess? Why is he specifically
24 signaling out MITG?
25 A. Well, I think what he is saying is that -- that

**Page 148**

1  we have a -- we have what we call an RFQ, request for
2  quote, and we have a process for bringing parts
3  resellers into the authorized parts reseller program,
4  and he's -- and this proposal, and given the time,
5  this -- MITG, if they were to become a partner and
6  then -- and we were to create an agreement by which they
7  were doing things for HP, would bypass that program.
8  And he's saying, "Hey, if we want to get into a
9  relationship like that, to be fair to everybody, we
10 should, you know, put it through the program and go out
11 for bid or talk to other people about providing the same
12 services, so that when we make this contract or procure
13 this service from MITG, we are not violating any laws."
14 Q. What -- in the next sentence -- the next
15 paragraph says, "Hell, we have numerous APR's, PPA's
16 that would love to get into a relationship like MITG
17 describes."
18 What is APR's and PPA's?
19 A. Authorized parts reseller is a type of contract
20 that we offer --
21 Q. Okay.
22 A. -- to parts resellers. That then gives them
23 certain privileges in return for them supporting or
24 providing genuine HP parts. PPA is a parts purchase
25 agreement, and it's another type of contract which