E-FILED
Monday, 20 February, 2006   04:09:08 PM
Clerk, U.S. District Court, ILCD

## Page 5

2    YY   A document entitled, "Document Name:       107
          (HP005681-5682-Confidential)
3         HP Billing Requirements HPD.xls."

4    ZZ   A document entitled, "Document Name:       107
          (HP005683-Confidential) HP Compaq
5         Phone Numbers.xls."

---oOo---

## Page 6

BE IT REMEMBERED that under the applicable sections of the Code of Civil Procedure of the State of California, on Thursday, January 13, 2005, commencing at the hour of 9:09 a.m. thereof, at Hewlett-Packard, 8000 Foothills Boulevard, Building R10, Roseville, California, before me, Ruth E. Diederich, a Certified Shorthand Reporter in the State of California, there personally appeared

RICHARD CHIZEK,

called as a witness by the defendants in the above-entitled action, who, having been duly sworn by me to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

---oOo---

EXAMINATION BY MR. HANSEN

Q.   Please state your name for the record.
A.   Eugene Richard Chizek.
Q.   And what is your position of employment -- well, let me strike that.
     Who are you employed with?
A.   Hewlett-Packard.
Q.   Okay. And what is your position there?
A.   I'm the vendor manager and operations manager for the parts business call center.

## Page 7

Q.   Is that the call center here in Roseville?
A.   Yes.
Q.   And how long have you been employed in that position?
A.   Since June of 2000, so just --
Q.   Going on four years, five years?
A.   Going on five years, yeah.
Q.   Have you held that title for the entire time you have been employed here?
A.   Titles are kind of subjective. It's been -- my responsibilities have been pretty much those of vendor management and making sure the call center is functioning.
Q.   That was my next question. Since June of 2000, have your responsibilities or duties here at Hewlett-Packard changed?
A.   Yeah. My responsibilities have changed. The scope of my responsibility has changed.
Q.   How so?
A.   Through the parts business consolidation and the merger, it grew from the local parts business to the -- all the pre-merger Compaq and HP business for North America.
Q.   What did you do prior to June of 2000?
A.   I was a business process analyst for the parts

## Page 8

business and trainer.
Q.   Were you on the Compaq side or the Hewlett-Packard side prior to the merger?
A.   Hewlett-Packard side.
Q.   How long have you been with Hewlett-Packard?
A.   Almost 15 years. Since May of 1990.
Q.   What is your educational background?
A.   High school graduate, and I have got a couple of years of college courses and -- and some other training.
Q.   Do you hold any post high school degrees?
A.   No.
Q.   You said a couple years of college courses. Was that at a four-year institution? Two-year institution?
A.   No. Mostly local community colleges.
Q.   Is that in the Sacramento area?
A.   Yes.
Q.   Okay. Technical school?
A.   No.
Q.   Were you working towards a degree?
A.   That was my intent.
Q.   What field of study?
A.   Just general education at liberal arts.
Q.   Okay. You said you had some additional training?
A.   Just as far as the business goes as a process

```
 1  analyst and a trainer. I took training delivery, course
 2  design, training management courses, technical writing.
 3     Q.  Is that through HP or an outside entity?
 4     A.  Most of the training was actually delivered
 5  through third-party, you know, providers.
 6     Q.  Okay. Was that on-site here, or was it a class
 7  you attended, or what was the scope of the training?
 8     A.  Most of the training was off-site. We would go
 9  to a -- to a vendor site or a designated site, and, you
10  know, a couple, three days of focused training.
11     Q.  Okay. Any training since you have been in the
12  position as the vendor manager of the parts business
13  call center since June of 2000?
14     A.  No. No -- no specific dedicated training.
15     Q.  Okay. Prior to the merger between
16  Hewlett-Packard and Compaq, what responsibilities did
17  you have for what call center?
18     A.  It was -- the vendor relationship is managing
19  the relationship with our partner who provides the
20  support services for what we refer to as the channel and
21  the parts business. And the channel is -- is our
22  authorized delivery partners, and the parts business is
23  all the rest of the trade activity, and that was for the
24  United States. So that -- that -- my responsibilities
25  covered the -- that area, the channel and parts business
                                                         9
```

```
 1  for the US and the vendor relationship.
 2     Q.  Prior to the merger?
 3     A.  Prior to the merger.
 4     Q.  Okay. Post merger, the same thing?
 5     A.  After the merger, it expanded into Canada as
 6  well.
 7     Q.  Okay. Let's focus pre-merger. Did your
 8  management include that of the Roseville call center?
 9     A.  Yes.
10     Q.  Andover?
11     A.  Yeah, for -- I didn't manage any of the activity
12  at Andover, but once the merger took place, I was
13  responsible for helping with the operations and
14  delivery. And when there were questions about what's
15  happening, and, you know, what kinds of volumes and
16  service levels are happening in Andover, I would answer
17  those questions as well.
18     Q.  And Andover is where?
19     A.  Andover, Massachusetts.
20     Q.  Okay. And when did the merger take place?
21     A.  Let's see. I think it's somewhere, like, mid
22  2002.
23     Q.  Okay. Did your responsibility also include the
24  HP Direct, or as I will call them, MITG call center?
25     A.  No. I never had any responsibility.
                                                        10
```

```
 1     Q.  Was that out of Omaha?
 2     A.  Well, I -- yeah, I understand it was out of
 3  Omaha.
 4     Q.  Okay. How was it that you did not have any
 5  responsibility for the MITG center, but in your duties
 6  you did for Andover?
 7     A.  I don't know.
 8     Q.  Well, would you agree with me that MITG was a
 9  parts business partner with Compaq pre-merger?
10     A.  Yeah, I understand that was their relationship.
11     Q.  Okay. And then you said post merger -- I'm
12  sorry -- you had that responsibility for call centers,
13  as well as into Canada?
14     A.  Yes.
15     Q.  Okay. Tell me the call centers that you did not
16  have direct responsibility for.
17     A.  Well, there's a very large support environment
18  out, and there's many, many, you know, different call
19  centers. And so if -- if our -- if we're talking about
20  the things that are related to the parts business --
21       The areas that I did not have responsibility
22  for?
23     Q.  Correct.
24     A.  Well, the parts business was -- there was a
25  piece of it in Andover. There was a piece of it in
                                                        11
```

```
 1  Houston. I wasn't responsible for the Houston
 2  operations.
 3     Q.  Was that Chip Love?
 4     A.  Yeah, part of his organization was there in
 5  Houston.
 6     Q.  Okay.
 7     A.  I wasn't responsible for the channel
 8  deliverables in that area where there wasn't a vendor
 9  relationship.
10     Q.  Is that Lynn Farlin?
11     A.  Yeah. That would be the group that was under
12  her -- her management.
13     Q.  But you did have direct input as to the
14  operations and recommendations for handling call
15  volumes, et cetera, for Andover?
16     A.  Well, only so far as when the merger took place,
17  and we were aware that we were going to be migrating,
18  consolidating some activity, the -- when we first got
19  involved with Andover, we were already managing that
20  project.
21     Q.  Okay. And you said the migrating -- was it the
22  migrating of Andover to Roseville?
23     A.  Yes.
24     Q.  Okay. And is it your understanding, immigration
25  such as that at Andover also took place for MITG?
                                                        12
```

**Page 13**

A. Well, we were taking those projects one at a time, but I was aware that there were other parts business segments that were going to be ultimately migrated to Roseville.

Q. And you were involved -- correct? -- in the migration of the MITG to Roseville?

A. Yeah.

Q. Okay. I am going to hand you a document I'm going to mark as Exhibit KK. This didn't come off very well, but it still has the date, reporter and the deponent on there, so that's all we need. I will have you take a look at this MITG 82 to 85, and I will tell you, for ease of reference, it flows from back to front. So 85 would be the first e-mail in the chain.

A. Okay.

(Exhibit KK was marked for identification.)

Q. Okay. You have had a chance to look that over?

A. Yeah.

Q. Okay. Starting with MITG 85, which is the last page in that exhibit --

A. Yes.

Q. -- it is an e-mail dated Wednesday, October 30, 2002, from Diane Pound to Louise Meyerfeld and Janine Lindstrom of which you are copied on the e-mail;

**Page 14**

is that correct?

A. Yes.

Q. Okay. And it says, "Re: 1-800-225-5385 changes"; is that correct?

A. Yes.

Q. What is that phone number?

A. That was the pre-merger Compaq spares phone number. They referred to the parts business as spares.

Q. Okay. Is that a number that was for Andover?

A. Yes.

Q. Okay. Was that -- let me back up. What is your understanding as to what the business was that MITG was providing? Were they in the spares parts business as well?

A. I understood that they were the point of contact for customers who wanted to order spare parts, options, and what we refer to as multi vendor parts, parts that we don't typically carry in stock.

Q. Is that the same type of line of offerings that were being offered by Andover?

A. Andover did the same thing, except they didn't source multi vendor parts.

Q. Okay. They had spare parts similar --

A. They had spare parts. They -- as I understood it, they were using the same back -- back end order

**Page 15**

management tools to place these parts orders.

Q. That MITG was?

A. Yeah.

Q. Okay. And then the difference was MITG would have multi vendor offerings, whereas Andover did not?

A. That's correct.

Q. Okay. This e-mail --
Well, before I get into it, who is Diane Pound?

A. Diane Pound was the -- the call center manager in the Andover spares call center, so she managed that team of call center agents and support staff.

Q. Okay. Did Andover offer Compaq and Hewlett-Packard parts?

A. No. They only offered Compaq parts.

Q. Okay. And I think you said Diane was at the Andover call center; correct?

A. Yeah. She was -- she was the manager there.

Q. Okay. It indicates in this e-mail that Diane sent to Louise Meyerfeld --
And, again, I apologize. Before I get into it, Louise Meyerfeld, I have already deposed her in this case. She is here in Roseville; correct?

A. Yes.

Q. And she was one of the people who was also involved in the migration and transition of Andover as

**Page 16**

well as MITG to Roseville?

A. Yes.

Q. Okay. This e-mail from Ms. Pound to Ms. Meyerfeld indicates in the second sentence, "We are losing almost 500 calls per day, and customers are not happy about the long wait time."
Did you ever have any conversations with Ms. Pound or Ms. Meyerfeld to determine what types of calls those were?

A. Well, I don't think that we ever talked about what types of calls that they were. It was that -- that they were getting these calls that -- that were flooding their call center. I -- today, I still don't know what anybody determined what the -- what the issues were, what types of calls, or what -- what types of customer inquiries were associated with these calls.

Q. Okay. Well, it then says in the second paragraph, "Can Roseville handle a thousand calls per day starting 11/18? I thought we talked about approximately 400 calls initially, and then taking four to six weeks to get additional resources."
Were you involved in those discussions about Roseville handling the flow of these calls beginning on November 18th?

A. Yeah. I -- I had some discussions about that,

**Page 53**

Q. And this reference to HP Direct, is that MITG migration plans?
A. Yes.
Q. Okay. Your last bullet point indicates that, "PBCO" --
Is that Parts Business Center Operations?
A. Parts Business Center Operations, yes.
Q. -- "agents should be directed to STOP," in all caps, "referring any parts inquiries to the HP Direct number immediately."
A. Yes.
Q. Okay. So you were instructing the agents --
Are those Parts Business Center Operations here at Roseville or throughout the country?
A. They are here in Roseville.
Q. You were ordering them to stop referring any inquiries for parts to MITG; correct?
A. Yes.
Q. And removing that number -- referral number --
Does that mean the MITG number?
A. Yes.
Q. -- from the phone lists.
A. Yes.
Q. Okay. So as of January 16, 2004, you wanted

**Page 54**

MITG's phone number removed from all lists?
A. Yes.
Q. Okay. And that any -- now we're on 6133. Did you instruct them that all parts inquiries and order submissions for any available pmCompaq or HP parts should be directed to Roseville?
A. Yes.
Q. And that was to be effective immediately?
A. On the date of the transition that was January 9.
Q. Okay. Well, you did refer them, though, to stop referring any parts inquiries to MITG immediately; correct?
A. Yes. Yes.
Q. And you instructed them to immediately remove that MITG number from all phone lists?
A. Yes.
Q. What is pmCompaq?
A. Pre-merger Compaq.
Q. And as of January 16, 2004, did you want the PBCO agents to use the hp.com referral tools and internal support sites to research support options for products and parts not available via the parts business center operation?
A. Yes.

**Page 55**

Q. Okay. And that would be to -- strike that.
Was that to refer and find support sites other than MITG for those types of products?
MS. CARROLL: Objection; vague.
THE WITNESS: Other than MITG?
Q. BY MR. HANSEN: Correct.
A. I'm sorry. Can you -- could you restate the question?
Q. You told them to use hp.com referral tools and internal support sites to research support options for products and parts not available via PBCO?
A. Yes.
Q. Okay. If they are instructed to use these tools and internal support sites, is that something that would exclude MITG?
A. Yes.
Q. And the last bullet point of your e-mail dated January 16, 2004, you instructed your agents to refer inquiries for unavailable parts or non Hewlett-Packard parts to where?
A. HP authorized parts resellers.
Q. Okay. Which would exclude MITG?
A. Yes.
Q. Okay. Why were you instructing your agents to remove HP Direct's phone number from all phone lists as

**Page 56**

of January 16, 2004?
A. Because of the change in the support structure, all parts -- HP and pre-merger parts issues were landing at the Roseville call center.
Q. So as of January 16, 2004, when your e-mail goes out and you are instructing your agents to stop referring parts inquiries to MITG, did Roseville have the capacity to fill and place those orders?
A. We had the capacity to place orders for the parts and material that was in stock that was in the catalog.
Q. Okay. And you could do that through HP and send the revenue here, as opposed to sending it to MITG; correct?
A. Yes.
Q. Are you aware of the Standard Support Agreement that was in place between Hewlett-Packard and MITG on the date you sent your e-mail, January 16, 2004?
A. Aware of the -- I was aware that -- that there was an agreement that existed.
Q. Had you ever reviewed it prior to sending your e-mail of January 16, 2004?
A. I reviewed it at some point. I don't know -- I don't know when I -- I first saw a copy of this agreement.

**Page 69**

1  A.  I believe Agilent is making calls to HP
2  today.
3  Q.  Okay.  But you don't know how or who is handling
4  their customized solutions?
5      MS. CARROLL:  Objection; assumes facts not in
6  evidence.
7      THE WITNESS:  Yeah, I -- I don't know which --
8  which arm of the business this is, which -- what that
9  refers to.
10 Q.  BY MR. HANSEN:  Do you know why you were cc'd on
11 that e-mail, then?
12 A.  I believe just to keep everybody in the loop.
13 Q.  Okay.  Well, I am going to hand you Exhibit SS,
14 then, because this is an e-mail directly from you dated
15 January 12, 2004, to Ms. Ellis, documents 5179 to 5182.
16 Go ahead and read that e-mail.  Actually, give me my red
17 tab back.  Sorry.
18 A.  Okay.
19      (Exhibit SS was marked for
20       identification.)
21 Q.  Is that the DHL account we had referenced just a
22 little back there?
23 A.  Yes.
24 Q.  Yes.  And you were forwarding to Ms. Ellis an
25 attachment that include -- that includes -- sorry -- HP

**Page 70**

1  parts sales center contacts and numbers for DHL to order
2  HP and pre-merger Compaq spares service and replacement
3  parts through your call center?
4  A.  Yes.
5  Q.  Okay.  And is that what's referenced on HP 5180?
6  A.  Yes.
7  Q.  Okay.  And this e-mail was sent on January 12,
8  2004, to Ms. Ellis?
9  A.  Yes.
10 Q.  Okay.  You then indicate, "DHL must have an HP
11 parts account for any net 30 orders placed against a
12 purchase order."
13 A.  Yes.
14 Q.  "There are several listings for DHL in the
15 customer account database.  Please provide me with DHL
16 location contact names and numbers," and that you would
17 have someone contact them to determine if any of their
18 current HP accounts apply or submit an account request.
19 A.  Yes.
20 Q.  My questions regarding that paragraph is the
21 last portion that says you are going to have someone
22 contact DHL to determine if any of their current HP
23 accounts apply, what is that in reference to?
24 A.  That DHL is an ongoing customer of the parts
25 business, and they might have -- might have an existing

**Page 71**

1  account to leverage for this activity.
2  Q.  Okay.  Do you know if, in fact, they did or did
3  not?
4  A.  I don't -- I didn't -- I don't recall finding
5  out, but they have accounts.
6  Q.  Okay.  Do you know if the account they had with
7  MITG/HP Direct was for a different type of parts and
8  ordering system than that which they had at HP?
9  A.  I don't know what the -- what type of account
10 they had at MITG.
11 Q.  And you don't know how that relates to any
12 account they had at HP?
13 A.  Yeah.  I just -- I don't know what the -- what
14 the specifics were of the account relationships.
15 Q.  And if none of the HP accounts applied, DHL was
16 going to have to submit an account request?
17 A.  Yes.
18 Q.  Does that include a credit application?
19 A.  Could be, yes.
20 Q.  Okay.  And isn't that one of the problems that
21 was experienced with the migration, that some of these
22 customers had been ordering through MITG for years, and
23 got a little out of sorts, if you will, that they had to
24 respond with a new credit application to HP?
25 A.  Yeah.  I understand that there were those

**Page 72**

1  situations, yes.
2  Q.  Okay.  And the people that had to submit a
3  credit application through HP, would those be entities
4  that did not have an account at HP?
5  A.  Yes.  There would be -- there would be
6  situations where they didn't have an existing account.
7  Q.  Okay.  Meaning they had an account at MITG, but
8  they didn't have one at HP?
9  A.  I -- I don't know what their situation was at
10 MITG, but we had cases where people, you know, called in
11 to place orders, wanted net 30 terms, and didn't have an
12 account.  And if they didn't have an account, then they
13 would get channeled into the account qualification
14 process.
15 Q.  Okay.  And if they didn't have an account at
16 HP -- well, strike that.
17     If anyone had placed an order with HP, would
18 they have had an account here?
19     MS. CARROLL:  Objection; calls for speculation.
20     THE WITNESS:  Well --
21 Q.  BY MR. HANSEN:  You can still answer.
22 A.  Not necessarily.  They -- they wouldn't
23 necessarily have an account.  Net 30 terms, some are
24 qualified for them, some are not.
25 Q.  But if you are making someone submit a credit

**Page 89**

1  packs. This would help me find your Vista contact."
2       You responded to her by saying you're not
3  familiar with the Vista environment --
4    A.  That's correct.
5    Q.  Let me finish.
6       -- but you believe those accounts are for
7  product purchase. When you reference product purchase,
8  what do you mean?
9    A.  I'm meaning whole unit product, computers,
10 printers.
11   Q.  Do you understand that also to mean spare parts?
12   A.  No, not in this case.
13   Q.  Apparently, then, Ms. Miller knew three people
14 to get in touch -- three people you could -- excuse
15 me -- try to get in touch with to figure that out in
16 this e-mail here?
17   A.  Yes.
18   Q.  Okay. And "Cindi Whittington,"
19 W-h-i-t-t-i-n-g-t-o-n, "is our Vista contact as it
20 relates to CarePack orders through Vista."
21   A.  Yes.
22   Q.  What are CarePack orders?
23   A.  I believe that those are on-site service
24 agreements or -- or support agreements for servicing
25 products, but I'm not -- I'm not in that business line.

**Page 90**

1    Q.  Okay. Well, on-site, do you mean, for instance,
2  someone who is actually on-site at the customer?
3    A.  Yes.
4    Q.  I am just going to pick a company, Proctor &
5  Gamble; okay? I am not saying there's an agreement
6  there. Somebody would actually be on-site to service
7  them?
8    A.  This is getting outside of my area of process
9  and knowledge and expertise --
10   Q.  Okay.
11   A.  -- but --
12   Q.  Do you know where Cindi Whittington is?
13   A.  No.
14   Q.  Do you know if that means an on-site person at a
15 customer can then order from that site through Vista
16 with HP inside sales?
17   A.  I don't know.
18   Q.  Okay. Do you know any of these three
19 individuals on here?
20   A.  No, I -- I don't know those -- those people, and
21 I don't -- I didn't have any contact with them.
22   Q.  That was going to be my next question. She
23 says, "You can try those three." Did you?
24   A.  I don't believe that I -- I talked to any of
25 those.

**Page 91**

1    Q.  Where is Tracy Miller located?
2    A.  Tracy Miller is on the Roseville site.
3    Q.  Okay. Here where we're at today?
4    A.  She's not in this building, but she works
5  somewhere on-site.
6    Q.  In one of the ten buildings here where we're at?
7    A.  Yes.
8    Q.  Okay. You then get an e-mail from
9  Melissa Allen. Can you tell me who she is?
10   A.  I believe Melissa is a manager in the accounts
11 finance accounts business.
12   Q.  Do you know if she's here at Roseville?
13   A.  I don't think she's on-site, but I -- I'm not
14 sure. I don't know.
15   Q.  Okay. Who then indicates to you, "Rather than
16 trying to find a contact that has access to Vista,
17 wouldn't it make more sense to leverage off the list of
18 S01/S02 accounts that Richard's team already has
19 available to them?"
20      That's your team; correct?
21   A.  Yes. That's what she's referring to.
22   Q.  "That way, they will know up front if this
23 particular customer had a spares account with us in the
24 past before the request was even sent to Sonia, and we
25 wouldn't even have to mention the possibility of filling

**Page 92**

1  out a credit app to the customer."
2       My question for you is, Is this that S list?
3    A.  I don't know -- there were other lists. That --
4  that may be the list, but I don't know if that's the
5  list that she's referring to.
6    Q.  Well, let me show you another list that's much
7  more voluminous.
8    A.  Okay.
9    Q.  Not that one.
10      MR. HANSEN: Let's go off for a second while I
11 find it.
12      (Recess taken.)
13   Q.  Okay. I am handing you Exhibit VV. That is a
14 document that is a little more expansive than UU.
15   A.  Okay.
16      (Exhibit VV was marked for
17      identification.)
18   Q.  This is -- okay -- part of HP 4665-5063. Now,
19 Exhibit UU was the same documents -- okay? -- but not
20 inclusive, which listed HPD parts accounts list combined
21 1/5 of '04.
22   A.  Okay.
23   Q.  They both are listed by that document name;
24 however, the page name, one says, "Common accounts," one
25 says, "Table S accounts." Do you see that?