3:04-cv-03055-JES-CHE    # 76-12    Page 1 of 3

HP and Compaq v. MITG    CondenseIt™

E-FILED
Monday, 20 February, 2006 02:19:23 PM
Ronald Haught
Clerk, U.S. District Court, ILCD

**Page 1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

HEWLETT-PACKARD DEVELOPMENT          )
COMPANY, L.P., HEWLETT-PACKARD       )
COMPANY, and COMPAQ TRADEMARK B.V.,  )
                                     )
            Plaintiffs,              )
                                     )
        - vs -                       ) No. 04-3055
                                     )
MIDWEST INFORMATION TECHNOLOGY       )
GROUP, INC., and MICHAEL LAUBER,     )
                                     )
            Defendants.              )

        DEPOSITION of RONALD HAUGHT, taken in the

above-entitled case before Gina Nottingham, a Notary

Public and Certified Shorthand Reporter of Adams

County, Illinois, at 9:00 o'clock A.M., on February

18, 2005, at 525 Jersey Street, Quincy, Adams County,

Illinois.

---

**Page 3**

I N D E X

| DEPONENT | PAGE NUMBER |
|---|---|
| RONALD HAUGHT | |
| Examination by Ms. Carroll | 4 |

E X H I B I T S

| NUMBER | MARKED | IDENTIFIED |
|---|---|---|
| Deposition Exhibit Number 20 | * | 7 |
| Deposition Exhibit Number 5 | * | 17 |
| Deposition Exhibit Number 4 | * | 37 |
| Deposition Exhibit Number 2 | * | 42 |
| Deposition Exhibit Number 1 | * | 43 |
| Deposition Exhibit Number 6 | * | 64 |
| Deposition Exhibit Number 22 | 72 | 72 |
| Deposition Exhibit Number 19 | * | 76 |
| Deposition Exhibit GG | * | 96 |
| Deposition Exhibit Number 23 | 147 | 147 |
| Deposition Exhibit M | * | 154 |
| Deposition Exhibit KK | * | 169 |
| Deposition Exhibit Number 24 | 169 | 172 |
| Deposition Exhibit Number 25 | 169 | 171 |
| Deposition Exhibit B | * | 184 |
| Deposition Exhibit C | * | 194 |
| Deposition Exhibit Number 21 | * | 206 |
| Deposition Exhibit Number 26 | 209 | 209 |
| Deposition Exhibit Number 27 | 222 | 222 |
| Deposition Exhibit Number 28 | 263 | 263 |

---

**Page 2**

APPEARANCES:

    MS. ELIZANN CARROLL
    Attorney at Law
    15301 Spectrum Drive, Suite 300
    Addison, Texas  75001

        appeared for the Plaintiffs.

    MR. JAMES HANSEN
    Attorney at Law
    525 Jersey Street
    Quincy, Illinois  62301

        appeared for the Defendants.

ALSO PRESENT:

    Ms. Gaynelle Jones
    Litigation Counsel for Hewlett-Packard

MRS. GINA L. NOTTINGHAM, CSR
License No. 084-002584
924 Rim Road
Quincy, Illinois  62301
(217)  224-7009

---

**Page 4**

            (Whereupon the Deponent was

            sworn by the Notary Public.)

        R O N A L D   H A U G H T

having been first duly sworn by the Notary Public,

deposeth and saith as follows:

            EXAMINATION BY

            MS. CARROLL:

    Q.   Can you state your name for the record,

please, sir?

    A.   Ronald Dean Haught, Jr.

    Q.   And what is your address, Mr. Haught?

    A.   4304 Deer Ridge Road, Quincy, Illinois,

62305.

    Q.   Thank you.  Have you had your deposition

taken before?

    A.   Yes.

    Q.   How many times?

    A.   Several over the years.  I was former law

enforcement, so I have been through this process a

few times over the years.

    Q.   Okay.  Any of the depositions relating to

MITG?

    A.   One.

    Q.   Okay.  And what kind of case was that?

Page 129

1 process is once you were able to get a customer and
2 maintain a relationship they typically would find
3 whatever method was the easiest to get their problem
4 resolved. And so in a lot of cases calls would have
5 bypassed that tree altogether, and they would have
6 said, I have always worked with Jim. I want to
7 continue to work with Jim. So therefore they called
8 Jim.
9    Q. So what you have are consumers and B to B
10 ended up through either calling a number that's
11 specifically assigned to HP Direct slash MITG or they
12 could end up someplace else in the Compaq and HP
13 world and eventually get routed to MITG as the direct
14 organization?
15    A. Correct. Or they could have dialed the
16 extensions of that person directly.
17    Q. All right. And then -- but the consumer as
18 far as --
19    A. We are going back to them. If they called
20 and ended up at the Welcome Center, they could end up
21 in multiple places and may, in fact, be able to
22 acquire what they want to acquire from one of these
23 other Compaq sources or from MITG. So say they
24 needed a new keyboard for their Presario, a Compaq
25 keyboard. They could have ended up at MITG. They

Page 130

1 could have ended up at the Compaq spare parts store.
2 They could have gone to an authorized retailer of
3 Compaq parts.
4    Q. Well, is it out of warranty parts?
5    A. Non-warranty parts.
6    Q. So it's an out of warranty part and as well
7 it's --
8    A. I would like for you to discern what
9 timeframe you are talking about, because we were
10 prior to the parts store ever existing.
11    Q. Okay. In the spring of '02 consumer wants
12 to buy a stocked, an in stock Compaq spare part?
13    A. Uh-huh.
14    Q. Where could they get that? They could get
15 it obviously from MITG acting as Compaq Direct?
16    A. Uh-huh.
17    Q. Where else could the consumer go?
18    A. Depending on which method they were
19 shuffled through. On the Compaq side they could get
20 it from -- you know, I don't know where the Welcome
21 Center directed their calls quite frankly, but, you
22 know, they could go to the spare store. They might
23 very well be sent to Ambry or PC Mall or, I mean,
24 there were a myriad of places that we find in
25 retrospect that they were sending those customers to

Page 131

1 versus funneling those customers to us.
2    Q. You were aware at the time of the Standard
3 Support Agreement that Compaq had authorized
4 resellers of spare parts?
5    A. That's correct.
6    Q. Okay. Is there -- do you contend that upon
7 the signing of the Standard Support Agreement that
8 MITG was acting as Compaq Direct was to replace all
9 of those sources as product, as suppliers of spare
10 parts?
11    A. My understanding of the contract as such is
12 that if a call came into the Compaq organization
13 requiring a spare part which was out of stock within
14 Compaq's own warehouse that, yes, that call would be
15 directed to us for us to be able to supply that
16 product.
17    Q. Compaq Direct organization or all of
18 Compaq?
19    A. My understanding is that that would be
20 organizational wide.
21    Q. Compaq worldwide? Compaq U.S.?
22    A. I can't answer that.
23    Q. Well, what was -- at the time what was your
24 belief as to what your customer set was? Is it all
25 people who called in to Compaq in the United States

Page 132

1 who needed non-stocked spare parts?
2    A. Well, it's not that easily defined. You
3 could say -- if you want to be bold about the
4 statement, you could say it's a worldwide effort
5 based on the fact that we did a lot of international
6 shipments to various customers. That wasn't
7 necessarily my belief and/or my intention, but
8 because of the level of service that is what grew out
9 of it.
10    Q. Were you shipping parts under the Standard
11 Support Agreement worldwide?
12    A. We could, yes.
13    Q. Did you?
14    A. Yes, Canada and various other places.
15    Q. Okay. There are some references in e-mails
16 that I discussed with Mr. Rice yesterday about
17 stocking parts in various locations around Europe,
18 and I understood that is to be service parts?
19    A. That could be correct, yeah.
20    Q. All right. Is it fair to say that the
21 majority of your international business would have
22 been the stocking of service parts as opposed to the
23 shipment of product under the Standard Support
24 Agreement, or do you know?
25    A. I don't know. I mean, that's a hard number

| Page 261 | Page 263 |
|---|---|

**Page 261**

1  your knowledge?

2  A. Could have been Rich Rice, could have been

3  any of the sales reps directly trying to find out

4  exactly what's going on through their contacts. I

5  can't answer that.

6  Q. Other than the four you've identified --

7  and I take it Multiple Zones was similar information

8  which was one of your sales reps told you that they

9  were told by someone at Multiple Zones that HP said

10  don't do business with MITG?

11  A. Yes.

12  Q. All right. Are there any other companies

13  that you can think of while you sit here that you've

14  heard that information?

15  A. Not that I can specifically recall names of

16  companies, no.

17  Q. Well, do you believe that at some point you

18  heard names of other companies and you simply don't

19  recall what those are as you sit here having your

20  deposition taken?

21  A. That is possible, yes.

22  Q. Okay. All right.

23  A. Oh, that's correct. There is another one.

24  Q. All right.

25  MR. HANSEN: While you're here.

**Page 262**

1  MS. CARROLL: No. That's fine. I don't

2  want to come back. Tell me?

3  A. The other one would be CDW.

4  Q. And who is the contact person at -- CDW was

5  a customer of MITG's?

6  A. That's correct.

7  Q. Were they doing business with MITG under

8  the Standard Support Agreement?

9  A. I believe prior to.

10  Q. Okay. Were -- did they do it during the

11  time that MITG was being Compaq Direct or HP Direct?

12  A. I can't answer that. You get too far

13  back. It's --

14  Q. Well, so it's clear, before the Standard

15  Support Agreement CDW was doing business with MITG?

16  A. Correct.

17  Q. After the Standard Support Agreement for

18  some period of time did CDW go back to, did they

19  continue to do business with MITG after February 7th

20  of 2004?

21  A. I believe so, yes.

22  Q. Okay. And when did they cut off doing

23  business with MITG?

24  A. I can't answer that.

25  Q. Did you personally have any contacts with

**Page 263**

1  anybody from CDW?

2  A. No.

3  Q. All right. And do you know if anyone --

4  well, who reported to you about CDW, do you recall

5  which one of your folks?

6  A. I don't recall who specifically, no.

7  Q. Now, in the amended -- in your amended

8  counterclaim there is reference that HP sent a letter

9  to the top MITG accounts as part of the agreement

10  terminating and --

11  (Whereupon a document was

12  marked Deposition Exhibit

13  Number 28.)

14  Q. Exhibit 28, this is a January 30, 2004,

15  dear parts customer letter that went from HP. Do you

16  know if Exhibit 28 is the letter that is being

17  referred to in Paragraph 37 of your amended, 37 and

18  38 of your amended counterclaim?

19  A. Is that the specific letter?

20  Q. Yeah. Do you know when it's referring to a

21  letter in January that a letter was sent out to these

22  customers without their acknowledgment or consent of

23  MITG indicating process changes as to the ordering of

24  parts, account numbers, and other information

25  regarding the placement of parts orders, and what I'm

**Page 264**

1  wondering is the reference, the description of the

2  letter and the amended counterclaim if the

3  correspondence that has been marked as Exhibit 28,

4  the January 30, 2004, letter, is the same letter

5  that's being referenced?

6  MR. HANSEN: Let me just object to the

7  form, that it is completely prepared by counsel.

8  It's not a verified complaint. And if he knows, go

9  ahead.

10  MS. CARROLL: Q. Yeah.

11  A. I don't.

12  Q. Have you ever seen the letter that is in

13  front of you, the January 30 letter that's Exhibit

14  28?

15  A. Yes.

16  Q. Okay. Looking through that letter, do you

17  take issue with the accuracy of any of the statements

18  made?

19  A. Okay. I'm sorry. Your question was?

20  Q. Is there anything in that letter that to

21  your knowledge or understanding is incorrect?

22  A. Incorrect, no. I believe your question

23  earlier was that I take issue with.

24  Q. Okay. Well, and I didn't mean to ask you a

25  different question. It's a good thing you asked me