Page 2

1  **APPEARANCES**
2  FOR THE PLAINTIFFS:
   MS. ELIZANN CARROLL
3  THOMPSON & KNIGHT, LLP
   1700 Pacific Avenue, Suite 3300
4  Dallas, Texas 75201
   (214) 969-1700  FAX 969-1751
5
   FOR THE DEFENDANTS:
6  MR. JAMES A. HANSEN
   SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
7  525 Jersey
   P.O. Box 1069
8  Quincy, Illinois 62306
   (217) 223-3030  FAX 223-1005
9
   ALSO PRESENT:
10 Mr. Chris DeVaughn, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  **I N D E X**
2  CASE CAPTION ......................... Page 1
   APPEARANCES .......................... Page 2
3  INDEX ................................ Page 3
   TESTIMONY ............................ Page 4
4  REPORTER CERTIFICATE ................. Page 29
   COST CERTIFICATE ..................... Page 30
5  READ & SIGN LETTER ................... Page 31
   ERRATA SHEET ......................... Page 32
6
   DIRECT EXAMINATION:
7     By Ms. Carroll..................... Page 4
8  CROSS-EXAMINATION:
      By Mr. Hansen...................... Page 20
9
   REDIRECT EXAMINATION:
10    By Ms. Carroll..................... Page 22
11 RECROSS-EXAMINATION:
      By Mr. Hansen...................... Page 26
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       (Whereupon, the following proceedings were had,
2  to-wit:)
3       COURT REPORTER:  Are there any
4  stipulations?
5       MS. CARROLL:  No.
6       VIDEOGRAPHER:  Counsel, we are on the
7  record.
8            JOHN K. BREWER,
9       having been first duly sworn,
10      was examined and testified as follows:
11           DIRECT EXAMINATION
12 BY MR. HANSEN:
13 Q.  Can you please state your name.
14 A.  John Brewer.
15 Q.  Can you please state your name -- oops.
16      Mr. Brewer, have you had your deposition
17 taken before?
18 A.  No, I haven't.
19 Q.  Okay.  Let me go over just a couple of
20 things for you to try to make this process as easy
21 as possible.
22      First, it's a little different because the
23 two lawyers and yourself are all in different
24 cities; you are there in Omaha with the court
25 reporter and videographer.  Everything that you or I

Page 5

1  or Mr. Hansen says while we're on the record is
2  going to be taken down by the court reporter, and
3  we'll be able to use that testimony and the video
4  that's being taken of your testimony in a court,
5  just so -- so this proceeding is just as though you
6  were in front of a judge and jury, okay?
7  A.  Yep.
8  Q.  All right.  If you can do what you just
9  did, which is be sure to answer out loud, even
10 though it's on the video, we need to get a written
11 answer down on the transcript that the court
12 reporter is taking, so if you can be sure to answer
13 out loud so Cindy can get your testimony down that
14 would be helpful, okay?
15 A.  Okay, understood.
16 Q.  Finally if you can -- we got a little bit
17 of time lag I think in between when we're talking,
18 if you can try to be sure to let me finish my
19 question before you begin your answer and I'll try
20 to make sure that you finish your answer before I
21 start talking, that way only one of us is talking at
22 a time.  It'll make the court reporter's job easier
23 and make our record clearer, okay?
24 A.  Okay.
25 Q.  And finally, if you don't understand one

THOMAS & THOMAS COURT REPORTERS & CERTIFIED LEGAL VIDEO, LLC
(402) 556-5000  (402) 556-2037

J. BREWER - Direct (By MS. CARROLL)

Page 14

1  A. That is correct.
2  Q. -- is that accurate so far?
3  A. That's correct, yes.
4  Q. Okay. And then there was software on the
5  Compaq side that received the XML document,
6  converted it to the language that VISTA could
7  understand, VISTA would do its processing of it and
8  then send an approval or rejection back that would
9  be transmitted from Compaq's system to MITG's system
10 in an XML format --
11 A. Yeah, that's correct.
12 Q. -- is that accurate?
13 A. Yeah, basically they would send back in
14 the same format, XML, whether it successful or act,
15 and we would act upon that data.
16 Q. All right. So then the program you
17 created that was -- would then convert that XML once
18 it got it back in the XML format into whatever
19 language the MITG system understood?
20 A. In a -- yes, basically. We would take --
21 if it was successful we would then mark the order on
22 MITG's side as a successful order or if it was
23 declined we'd mark it otherwise -- or likewise.
24 Q. All right. And what system or systems
25 is -- did the software that you developed for MITG,

Page 15

1  what systems was that loaded on?
2  A. It was also a Microsoft development
3  environment, it was ASP and Sequel Server and IIS.
4  Q. Okay. And did all of those things reside
5  on MITG's systems?
6  A. Yes.
7  Q. Computer or server?
8  A. Yes.
9  Q. Okay. What about the program that
10 converted the XML into a readable format for VISTA,
11 did you create that?
12 A. That converted it into a readable format
13 for VISTA? Yes, the application --
14 Q. Correct.
15 A. On MITG's application that I was working
16 on, I would take all the information and format it
17 within the code into an acceptable XML document,
18 which Compaq would understand on their side.
19 Q. Okay. And then when that got to -- when
20 that document got to Compaq was there some software
21 that had to then take that XML format and convert it
22 into something -- the language that VISTA
23 understood?
24 A. Yes, basically whatever software -- I
25 would imagine whatever software they were using

Page 16

1  would take that document, decode it, and then, you
2  know, work on that data as needed.
3  Q. Okay. And that -- you didn't develop the
4  software that was decoding it on their side --
5  A. No.
6  Q. -- on Compaq's side?
7  A. No.
8  Q. All right. Okay. And did -- do you know
9  who created that software that decoded it in a
10 Compaq system, do you know who created that?
11 A. From what I can remember, Deb Broady
12 worked on the application which would accept the
13 XML and stick it into a queue, and I believe
14 Sandy Urwin's team on VISTA's side actually took
15 that and pushed it into a VISTA order from what I
16 can remember.
17 Q. Okay. All right. And was any of the code
18 or the program that you created for MITG, was that
19 loaded onto Compaq's systems?
20 A. No.
21 Q. In the -- when you were working with
22 MITG to get MITG's systems to be readable by
23 VISTA, were there any adjustments or changes that
24 you know of that had to be made or were made to
25 VISTA to accommodate the MITG information --

Page 17

1  A. Yes.
2  Q. -- or were you making accommodations --
3     Okay. What was it?
4  A. There was accommodations made, there was
5  some -- several long conference calls I can remember
6  that we sat through while they were tweaking
7  VISTA to get the order where it needed to go. So I
8  mean I feel that there was changes on their side to
9  get what was sent into an acceptable VISTA order.
10 Q. Okay. There's been some conversations
11 about something referred to as UDS, or user defined
12 fields; do you know what those are?
13 A. The user defines fields were fields
14 that -- again, it's hard -- a little bit hard to
15 remember but I'll try my best.
16       Within a VISTA order there was regular
17 fields that were there and then there was user
18 define fields, and user define fields is what were
19 some of the fields that we were pushing information
20 into with the orders. That's the best I can
21 remember.
22 Q. Okay. So then you on behalf of MITG and
23 the folks at Compaq were trying to work together to
24 be able to make sure that what was coming from MITG
25 went into these user defined fields and essentially

Page 18

1  having to agree on the size of the -- of the fields
2  and the tag or identification?
3      A.  Yes, exactly.
4      Q.  Okay.  Are you -- was there ever -- do you
5  recall anyone from Compaq ever asking you or
6  receiving a copy of your development codes or what
7  you have created with MITG?
8      A.  No.
9      Q.  Are you -- did you ever hear anything
10 about -- or do you have any understanding that
11 Compaq was using that -- the software that you
12 created for other customers?
13     A.  No.
14     Q.  People other than MITG?
15     A.  No.
16     Q.  If --
17     A.  The software that I created is what you're
18 asking about, right?
19     Q.  How would you go --
20     A.  The software that I created?
21     Q.  Right.
22         MR. HANSEN:  I didn't hear that -- I
23 didn't hear that, hold on.  I didn't hear that
24 answer.
25         THE WITNESS:  I was asking her the

Page 19

1  software that -- I was clarifying the question, I
2  was asking of the software that I created, no, that
3  was not used on their side or asked for from them --
4  from -- by me.
5  BY MS. CARROLL:
6      Q.  Okay.  If -- in order to use the software
7  that you created they would need to -- for another
8  customer so you could -- for somebody other than
9  MITG, they would need a copy of what -- of the
10 development code that you created in order to use --
11 to make use of that application; is that correct?
12     A.  Right, yes.
13     Q.  Okay.  And let me ask you this:  When
14 information is coming through in this XML format,
15 does the -- do the input and output have to match,
16 so you're sending something in and that has to match
17 what's going to be the output on the other end?  I
18 don't know if that's a clear question.
19     A.  Yeah, I don't know.  I guess -- I mean,
20 what comes through has to be what -- exactly what
21 you sent otherwise it would be corrupted, but I
22 don't know if that's the question that you're
23 asking.
24     Q.  Okay.  Let me ask you this:  You have a
25 field and you decided that -- for example, that the

Page 20

1  field is going to be called -- is a customer name
2  and it's going to be C-U-S-C N-O or C-U-S-C N-A-M-E,
3  and that can have 25 characters; does somebody who
4  is using your program, would they also have to be
5  sending that says, okay, this has this field and
6  this is -- 25 characters can fit this --
7      A.  Right, we --
8      Q.  -- and that always has to match?
9      A.  Yes, correct, we actually -- we came up
10 with an agreed upon format that we were going to use
11 for these XML documents.
12     Q.  Okay.  Were you aware of from the --
13 either the time you were doing the work as a
14 contract programmer for Inacom or during this time
15 that you were doing the work for MITG, that Compaq
16 or the VISTA system received other orders in an
17 XML format?
18     A.  I couldn't be sure of that, no.
19         MS. CARROLL:  Okay.  That's all the
20 questions I have, Jim.
21            CROSS-EXAMINATION
22 BY MR. HANSEN:
23     Q.  Mr. Brewer, my name is Jim Hansen, and I
24 represent MITG.  I only have a few questions for
25 you.

Page 21

1         Do you believe the Middleware was
2  developed to accept orders for companies more than
3  just MITG?
4      A.  I would -- in my opinion, I would say that
5  it was, because what was there to accept an order,
6  including user defined fields, was not there when we
7  began this project, but was there -- again, I would
8  believe that could easily be used again for other
9  clients, but I have no -- I can't be sure of that.
10     Q.  Do you believe -- sure.
11        Do you believe the Middleware was
12 developed by Compaq to use into the future?
13         MS. CARROLL:  Object:  That calls for
14 speculation.
15 BY MR. HANSEN:
16     Q.  Meaning after you had developed this
17 program, in your opinion it wasn't simply developed
18 by Compaq to use with MITG, correct?
19         MS. CARROLL:  Objection:  Calls for
20 speculation.
21 BY MR. HANSEN:
22     Q.  You can answer, sir.
23     A.  Okay.  It's kind of the same question as
24 the first one.  The functionality wasn't there when
25 we began, then it was afterwards, and it was

J. BREWER - Cross (By MR. HANSEN)

Page 22

1 something in my opinion that could easily be reused.
2    Q.  That functionality could be reused by
3 Compaq to allow other customers besides just MITG to
4 place their orders into the VISTA system, correct?
5    A.  In my opinion, yes.
6        MS. CARROLL: Objection: Calls for
7 speculation and assumes facts not in evidence.
8        MR. HANSEN: Okay. Well, I'm going to
9 have him answer the question, you cut him off so you
10 can answer the question, Mr. Brewer.
11       THE WITNESS: In my opinion, yes.
12       MR. HANSEN: Thank you, that's all I have.
13       MS. CARROLL: I have a couple more
14 questions.
15             REDIRECT EXAMINATION
16 BY MS. CARROLL:
17   Q.  What is the functionality that you're
18 talking about, Mr. Brewer?
19   A.  Being able to accept XML from an external
20 client like MITG, and then basically getting it into
21 the VISTA system as an official order.
22   Q.  So it is your belief that the program or
23 the adjustments that were made within the
24 VISTA system to accept the MITG orders in the
25 XML format was something that was new to Compaq when

Page 23

1 it was developed at this time?
2    A.  That's correct, yes.
3    Q.  Okay. And the -- this functionality that
4 you're talking about in terms of being able to
5 accept the XML from an external client, are those --
6 is that your software or are those adjustments made
7 or software applications done in the Compaq side?
8    A.  Those were -- all those adjustments were
9 done by Compaq employees or consultants, I don't
10 know.
11       COURT REPORTER: I'm sorry, what?
12       THE WITNESS: All those changes were done
13 by Compaq.
14 BY MS. CARROLL:
15   Q.  Okay. And so you came up and you said,
16 you all -- you, working with Compaq, said this is
17 the way -- made some suggestions about this is the
18 way we're going to do it on this side, we need --
19 working with them to have -- this is the way we're
20 going to communicate, they did their side, but you
21 developed -- you developed the software on the
22 MITG side, and the Compaq people developed -- that
23 worked with you developed that functionality
24 internally; is that correct?
25   A.  Yes, yes, that is correct.

Page-24

1    Q.  All right. And let me ask you this: In
2 order to have somebody do another external client,
3 somebody not -- that's not MITG to be able to do
4 what MITG did, they -- that external client would
5 still need your piece of the puzzle, correct?
6    A.  No, they wouldn't. All they would need to
7 know is the format of the document of how to accept
8 the XML. They wouldn't need anything from MITG at
9 all.
10   Q.  What would they -- what would -- well,
11 wouldn't they need something to convert their own
12 data into an XML format?
13   A.  Once -- not really. I mean, I guess all
14 they need to be able to do -- any programmer would
15 be able to get data into an XML document, which is
16 just a text document.
17       So if I -- in my opinion, if Compaq were
18 to give them the accepted format of how to get an
19 order into the system, they wouldn't -- it's
20 something that could be come up with fairly easily.
21   Q.  Okay. So there's something -- that
22 portion that has to reside on their system is fairly
23 easy because Compaq, working with you, said, okay,
24 we're going to agree that for an XML document that
25 you want to send us to come in, we'll receive it and

Page 25

1 this field will have X number of characters and this
2 field will be defined this way, et cetera?
3    A.  Yes, exactly.
4    Q.  Okay. And you don't have any knowledge of
5 Compaq using that functionality with anyone else; is
6 that correct?
7    A.  No, I do not.
8    Q.  Okay. And you never -- no one from
9 Compaq's ever told you that they were using that for
10 Microsoft or for Anderson Consulting or anything
11 else; is that correct?
12   A.  That's correct, no, they haven't.
13   Q.  Okay. And so when you said, yes, it could
14 be easily used, you have no knowledge that it has,
15 in fact, been used by Compaq for any other
16 XML clients?
17   A.  That's correct, it was just my opinion
18 that it could be used, yeah.
19   Q.  Okay. Let me ask you this: In order to
20 stop an external client from making use of this
21 application what -- do you have any knowledge as to
22 how essentially the flow would be shut off on the
23 Compaq side?
24   A.  How to stop it from happening? They could
25 just easily -- the way the XML came in was over a

7 (Pages 22 to 25)

THOMAS & THOMAS COURT REPORTERS & CERTIFIED LEGAL VIDEO, LLC
(402) 556-5000  (402) 556-2037