E-FILED
Monday, 20 February, 2006 04:11:44 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V.,

Plaintiffs,

vs. Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY GROUP, INC., and MICHAEL LAUBER,

Defendants.
______________________________/

Deposition of
LOUISE MEYERFELD
Wednesday, September 29, 2004

Job No. 1610RD
Reported by: Ruth E. Diederich, RPR, CSR
CSR No. 4952

APPEARANCES

FOR THE PLAINTIFFS:

THOMPSON & KNIGHT, LLP
BY: ELIZANN CARROLL, Esq.
1700 Pacific Avenue, Suite 3300
Dallas, Texas 75201
(214) 969-1700

FOR THE DEFENDANTS:

SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
BY: JAMES A. HANSEN, Esq.
525 Jersey
Quincy, Illinois 62306
(217) 223-3030

---o0o---

I N D E X

| | Page |
|---|---|
| Examination by Mr. Hansen | 4 |

---o0o---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| M | E-mails Bates-stamped MITG 36 to MITG 66, regarding metrics. | 21 |
| N | E-mails with no Bates-stamps dated May 6, 2003; May 12, 2003; and May 16, 2003. | 42 |
| O | E-mails with no Bates-stamps dated September 25, 2003; September 26, 2003; and September 29, 2003. | 59 |
| P | E-mails Bates-stamped HP 9, HP 10, HP 11 and HP 12. | 84 |
| Q | E-mails Bates-stamped HP 13 and HP 14. | 91 |
| R | E-mails Bates-stamped MITG 0179, MITG 0180, MITG 0181, MITG 0182 and MITG 0183. | 100 |

---o0o---

BE IT REMEMBERED that under the applicable sections of the Code of Civil Procedure of the State of California, on Wednesday, September 29, 2004, commencing at the hour of 9:00 a.m. thereof, at Hewlett-Packard, 8000 Foothills Boulevard, Building R10, Conference Room B, Roseville, California, before me, Ruth E. Diederich, a Certified Shorthand Reporter in the State of California, there personally appeared

LOUISE MEYERFELD,

called as a witness by the defendants in the above-entitled action, who, having been duly sworn by me to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

---o0o---

EXAMINATION BY MR. HANSEN

Q. Could you please state your name for the record.
A. Louise Meyerfeld.
Q. And how old are you?
A. Fifty-three.
Q. Date of birth?
A. 3/10/51.
Q. Okay. What is your educational background?
A. I have got an A.A., and I did four years of college.

A. Correct.
Q. Okay. And it discusses minutes of an account setup meeting?
A. Yes.
Q. Okay. Do you recall when that meeting took place?
A. No.
Q. Okay. Yvonne Cowan, C-o-w-a-n?
A. Yes.
Q. What is her title, if you know?
A. She's over -- she's over in credit and collections that handled the accounts.
Q. Accounts receivable issues?
A. Yeah. Yes.
Q. Okay. On the bottom there, it says under her name, to release the announcement ASAP. Recommends HP Direct migration letter includes that "account numbers will follow." Approximately 110 pre MITG accounts identified as recurrent parts customers. Many of the MITG clients have existing HP accounts.
And then if you flip to page HP 12, the last paragraph says, "A draft of the announcement letter to MITG clients is attached outlining process changes and parts options. Do not forward outside of project team."
My question is, Did you draft the announcement

letter that was sent to MITG clients?
A. No.
Q. Who did?
A. There was a collaboration of Bill, myself, Shari Ellis and then our -- our communications person Jodi Parmeley.
Q. Okay. What did the letter state?
A. I don't recall.
Q. Was it sent to MITG clients before February 7 of '04?
A. Yes.
Q. Was it sent to -- well, do you understand -- do you have an understanding of what it means when it says, "Approximately 110 pre MITG accounts identified as recurrent parts customers" on the bottom of HP 11?
A. I know that we found a lot of the MITG customers had account setups with HP and Compaq, as well as MITG.
Q. So would you have to then still create a migration account for them into PL 91?
A. No.
Q. Okay. So there were some that had been ordering from both that you didn't need to do that for?
A. Correct.
Q. But I take it, then, there were also clients that had just simply ordered from MITG that you had to

change over into the HP account system?
A. Yes.
Q. Okay. Flipping forward on the 9 and 10 of that exhibit, page 9 at the top -- disregard the forwarding to Mr. Crowley, but the original message is from you by e-mail dated Thursday, January 22nd of '04, to a host of recipients.
Do you see that?
A. Yes.
Q. Okay. And are you sending out an e-mail there regarding various issues for the integration of the MITG business?
A. Basically updates.
Q. Okay. Now, it says, in the second paragraph there under account setups, "The letters will be mailed out to the top 89 accounts by January 29th, with the follow-up calls starting February 1 that will provide account numbers and information about the parts store and other information required about placing parts orders." Do you see that?
A. Yes.
Q. Okay. What is -- is the letter the same letter that was referred to as the draft announcement letter on HP 12, or was it different?
A. I believe it was the same.

Q. Okay. That's not the letter you drafted -- you drafted; right? It was a collaboration?
A. Right. Yes.
Q. Okay. Was there someone's signature on the bottom of it?
A. I believe -- I'm not sure.
Q. Okay. Who determined what the top 89 accounts were?
A. It was based on their amount of business done.
Q. With MITG?
A. Yes.
Q. And HP was going to send those top 89 accounts these letters by January 29th?
A. Yes.
Q. And then they were going to -- "they" being HP -- were going to call these customers beginning February 1?
A. Correct.
Q. Okay. Who was going to make the follow-up calls?
A. We had some folks in Sykes identified to make them.
Q. What were they calling these customers and telling them?
A. To provide them -- to, one, make sure that they

received their letter, and if not, explain -- Richard did some scripting for them, and then to let them know what the new account number would be.

Q. What if they wanted to stay with MITG, were they given that option?

MS. CARROLL: Objection; calls for speculation, assumes facts not in evidence.

THE WITNESS: I don't -- we never told them that they couldn't.

Q. BY MR. HANSEN: Did you ever tell them that they could?

A. No.

Q. Okay. Were you involved in any of the follow-up calls, or were they all by these Sykes people?

A. No, I was not involved.

Q. Okay. It then says, continuing that paragraph, "The remainder of the letters, 2000-plus, will go out the first week in February." Do you see that?

A. Yes.

Q. Okay. Is that the same letter that has been referred to here?

A. Yes.

Q. Okay. Why were these letters being sent out to these MITG customers?

A. Because they were customers at MITG, and we

wanted to make them aware of the change so it would have been a seamless transition.

Q. Okay. And that was -- those letters were sent out prior to the agreement ending; correct? The contract.

A. Prior.

Q. Prior to the contract ending?

A. Yes.

Q. Okay. It then says, "The letters will contain the parts store URL as well as any needed phone numbers."

A. Correct.

Q. What is the parts store URL?

A. That's where they can go on-line and place the trade orders on-line rather than calling in.

Q. So that's a website?

A. Yes.

Q. Do you know what that website was?

A. I believe it was www.partstore.com.

Q. Okay. Was there -- it then says, "The letters will also contain any needed phone numbers."

Was there a change in phone numbers?

A. Well, there was a change in the number they would call to place the order, and there were also numbers as far as escalation if they needed information.

Q. Okay. Were they informed that the prior 800 numbers that they were using to call to get direct to MITG would no longer be in service?

A. I don't know about that. They were informed as of the 8th, that they should be start -- they should start calling here.

Q. Were they informed in this letter as of the 8th, if they wanted to, they could also call MITG?

A. No.

Q. Okay. Let me show you --

Were there any calls made to these customers informing them not to use MITG anymore?

A. No.

Q. Were they discouraged from using MITG after February 8th of '04, to your knowledge?

A. Not to my knowledge.

Q. Okay. Let me show you what I will mark as exhibit -- I think we're on Q, a two-page document, HP 13 and HP 14.

(Defendants' Exhibit Q was marked for identification.)

Q. Actually, before we get to that, let me ask you a question real quick back on the previous exhibit.

The top 89 accounts that were identified, you said were based on -- were identified by HP based on the

amount of call volume and dollars of orders placed with MITG.

A. Correct.

Q. Okay. Was there a decision that you were involved in that HP wanted to make sure that these top 89 accounts continued on and did business with HP after February 8 of '04?

A. Can you repeat that?

Q. Sure. Were there any discussions, meetings, conferences that you were involved in that once these top 89 accounts were established based on call volume and call dollars -- or excuse me -- call volume and parts dollars to MITG, that HP wanted to make absolutely sure that these top 89 accounts kept doing business with HP and did not go with MITG?

A. No. We didn't proactively go after them, no.

Q. Well, you sent them letters and called them, didn't you?

A. We sent them letters. We did that with everyone.

Q. Right. But the top 89 accounts were sent letters before January 29th?

A. Correct.

Q. And then there were follow-up calls made prior or right around February 1?

A. Correct. To ensure they got the letters.

Q. Okay. And then -- and also to explain to them various ways in which they could continue to transition their business over to HP now that HP had integrated the MITG business to Roseville?

A. Basically, what was given to them are -- was the URL and the phone numbers to call to make sure they understood what the letter -- the intent of the letter.

Q. And also account numbers and information --

A. Yes.

Q. -- about the part stores and other information required about placing parts orders?

A. Correct.

Q. Okay. And then the other 2000 or so letters, I guess that represents the remaining accounts that weren't the top 89, were then also sent out the first week in February?

A. Correct.

Q. Okay. Was there ever any follow-up that you were involved in after February 8th of 2004, to determine if, in fact, these 2089 accounts, in fact, had all set up an account with HP?

A. We proactively set the accounts up.

Q. Okay. Prior to February 8 of '04?

A. Yes.

Q. Okay. Back -- I'm sorry. Back to Exhibit -- what is it? -- Q?

MS. CARROLL: Yes.

THE WITNESS: Yes.

Q. BY MR. HANSEN: Okay. The original message is February 3 of '04 from Ms. Cowan, of which you are a recipient. Do you see that?

A. Yes.

Q. Okay. And this is a synopsis of the HP Direct integration status?

A. Correct.

Q. Okay. It gives you some updates?

A. Yes.

Q. Okay. And that first paragraph is in regards to the redirection of telephone calls and the two known entry points, which are the 800 numbers, will be directed from Omaha to Roseville. Do you see that?

A. Correct. Yes.

Q. Okay. Now, my question to you is, Under "Action," it says, "To include RMA option for HP Direct parts." What is RMA option?

A. Return material authorization.

Q. What is that?

A. If the customer has -- receives a defective part, then they can return that to HP and receive a

replacement.

Q. Okay.

A. So it's just like a return label type of thing.

Q. Okay. So there was going to be on option, then, placed on the phone -- 800 line for that return?

A. Correct.

Q. Okay. It says, "Victor and Victoria will handle the move details, along with Jeff and Maureen."

Now, I see Victoria appears to be the person in Omaha. Victor appears to be here in Roseville.

A. Correct.

Q. Who are Jeff and Maureen?

A. They're in the customer solutions center. Maureen is the manager and Jeff is her BPA.

Q. What is BPA?

A. Business process analyst.

Q. Is that here in Roseville?

A. Yes.

Q. Okay. It says -- skip the next paragraph. "Letters to top 100 mailed 1/30." It says, "Shari - letters went to a key target and disbursed to other internal HP players. Most letters went to HP sales reps. Questions that arrived were met with confidence that customers will not notice flow in actions," and then Shari had a concern about two key customers.

Is that simply referencing the letters we've already talked about in the earlier e-mail there dated -- or in Exhibit P, or is there an additional letter?

A. There was an internal letter that went out as well.

Q. Okay. To -- well, it says, "Letters to top 100 mailed 1/30."

A. That's what we were talking about.

Q. Okay. The top 100 accounts?

A. Yes.

Q. And then letters also went to internal HP players and HP sales reps?

A. Correct.

Q. I guess -- was that describing for them -- what? What to tell their accounts or --

A. Actually, more detail of what we were doing, so they understood if they had accounts calling them.

Q. Okay. So questions -- how they could better understand questions that may come from customers?

A. Correct.

Q. Customers that previously had been ordering from MITG that now were going to be directed to Roseville?

A. Correct.

Q. Do you know why Shari Ellis was concerned, or

    Q. Did she ever tell you why she was concerned about two key customers Agilent and DHL?
A. DHL, I don't know. I know Agilent had special arrangements.
Q. With MITG?
A. Yes.
Q. And apparently, Yolanda Topolonski, T-o-p-o-l-o-n-s-k-i, was going to give a presentation to Agilent management to explain the flow on February 4 of '04.
Do you see that?
A. Yes.
Q. Okay. So Ms. Topolonski was going to Agilent, who had a high customized account with MITG, as of February 4, '04, to explain to them what was going to take place?
A. Yes.
Q. Do you know if she made the presentation?
A. Yes, she did.
Q. Were you there?
A. No.
Q. It then says, "Remainder of letters to be mailed February 4," the next paragraph. Do you see that?
A. Yes.
Q. Okay. Were those what we talked about earlier,

the 2000 or so letters?
A. Yes.
Q. Okay. Then it says, "Internal letter to HP Direct mailed 1/27." Was that a letter to MITG, or is that to HP Direct?
A. No. That was HP Direct.
Q. The customer service reps?
A. Yes.
Q. Do you know what that letter -- did you see that letter?
A. I can't recall what it was about.
Q. Okay. Then it says, "MITG's access to CSN to be cut off Friday, February 6th, at 5 p.m. Pacific standard time." What do you understand MITG's access to CSN to be?
A. That's -- they were able to access CSN to place Compaq parts.
Q. So they were no longer going to have those ordering access measures?
A. Correct.
Q. Were you involved in cutting that off?
A. No.
Q. Okay. Flip to page HP 14. That very long paragraph there, do you see that?
A. Yes.

Q. Okay. Talking about the account setups, the TAT with five silos touching the account setups in various systems.
Were you involved in any of that?
A. I was.
Q. Your name doesn't appear there.
A. I was in discussions with it.
Q. Okay.
A. But not --
Q. Did you provide input into that, or was that outside of your realm of duties and responsibilities?
A. That was outside of my realm.
Q. Okay. The last sentence there in that big paragraph says, "Richard C will discuss that call center agents should not refer customers direct to Sonia for new account setups, but refer to" -- then there's this hyperlink. Do you see that?
A. Yes.
Q. Okay. Were the MITG customers that had to set up accounts with HP being referred, then, to this hyperlink to do that? Is that how new accounts were supposed to be set up?
A. Yes. We had a process in place for setting up new accounts.
Q. Okay. As opposed to referring everyone to this

Sonia?
A. Correct. Yes.
Q. Okay. The next paragraph regarding the MITG website, "Domain in limbo." Then it says, "Louise will share information with Bill C and Chip Love."
What information were you to share with them?
A. Just what I learned from Linda --
Q. What --
A. -- as far -- as.
Q. Oh, Gretzinger?
A. Gretzinger, yes.
Q. Okay.
MS. CARROLL: Can we take a short break.
MR. HANSEN: Yes. I only have, I believe, one more document to go over, and we'll finish up right around lunchtime.
(Recess taken.)
MR. HANSEN: Last one here.
(Defendants' Exhibit R was marked for identification.)
Q. This is Exhibit R. This is a document, it's MITG 179, 80 -- 180, 181, 182 and 183.
Have you had a chance to look that over?
A. Yes.
Q. Okay. Let's start on the back page. Page 182

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

---o0o---

HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V.,

Plaintiffs,

vs. Civil Action No. 04-3055

MIDWEST INFORMATION TECHNOLOGY GROUP, INC., and MICHAEL LAUBER,

Defendants.
______________________________/

Deposition of

LOUISE MEYERFELD

(Volume II)

Wednesday, May 4, 2005

Job No. 1937RD
Reported by: Ruth E. Diederich, RPR, CSR
CSR No. 4952

I N D E X

| | Page |
|---|---|
| Examination by Mr. Hansen | 123 |

---o0o---

E X H I B I T S

| Exhibits | Description | Page |
|---|---|---|
| DDDD | A string of e-mails Bates-stamped HP004662, HP004663, HP00466, with attachments HP005064, HP005065, and HP005190. | 124 |
| EEEE | An e-mail Bates-stamped HP010150. | 138 |

---o0o---

A P P E A R A N C E S

FOR THE PLAINTIFFS:

JUNEAU, BOLL & WARD
BY: ELIZANN CARROLL, Esq.
15301 Spectrum Drive, Suite 300
Addison, Texas 75001
(972) 866-8333

FOR THE DEFENDANTS:

SCHMIEDESKAMP, ROBERTSON, NEU & MITCHELL
BY: JAMES A. HANSEN, Esq.
525 Jersey
Quincy, Illinois 62306
(217) 223-3030

BE IT REMEMBERED that under the applicable sections of the Code of Civil Procedure of the State of California, on Wednesday, May 4, 2005, commencing at the hour of 8:32 a.m. thereof, at Hewlett-Packard, 8000 Foothills Boulevard, Building R10, Roseville, California, before me, Ruth E. Diederich, a Certified Shorthand Reporter in the State of California, there personally appeared

LOUISE MEYERFELD,

called as a witness by the defendants in the above-entitled action, who, having been duly sworn by me to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

---o0o---

EXAMINATION BY MR. HANSEN

Q. Please state your name again for the record.
A. Louise Meyerfeld.
Q. Ms. Meyerfeld, we took your deposition earlier in this case sometime last year, and you're being produced today to hopefully identify some documents that were marked at the deposition of Mr. Chizek.
Is that your understanding?
A. Yes.

3:04-cv-03055-JES-CHE # 76-17 Page 7 of 20

LOUISE MEYERFELD

(Defendants' Exhibit DDDD was marked
for identification.)

Q. Okay. I have placed in front of you some documents that are labeled Deposition Exhibit DDDD. Do you have those there?

A. Yes, I do.

Q. Actually, before I get into that, since we took your last deposition, has your job changed at all? Are you still in the same position?

A. No. My job as changed. I am a warranty program manager now.

Q. Okay. When did that change take place?

A. I would say about seven months ago.

Q. Okay. But you're still located here in Roseville?

A. No. Actually, I work out of the home now.

Q. Oh, okay. Your home?

A. Yes.

Q. Okay. But you are still employed by Hewlett-Packard?

A. Correct.

Q. Take a look at that group exhibit I gave you there, and I have them -- the cover page is 4663; is that correct?

A. Correct.

124

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

Q. And the reason I put that first is that's actually the first dated and timed e-mail in this group. It just got kind of numbered out of sync, I guess. But that's an e-mail from Jody Parmley to yourself dated Wednesday, January 21, 2004; is that correct?

A. Correct.

Q. She says to you -- the subject is Re: Letter. Do you understand or have a recollection that that was the MITG customer letter?

A. Yes.

Q. And then she's asking you a question there. "Who the heck is on the HP Direct list and who are the customers for the external exactly?"

Who is Jody Parmley?

A. She was our communication person, so any letters, any communication that went out went through her for wordsmithing to make sure everything was okay.

Q. Okay. So -- and if you look to HP 4664, in fact, she -- you had sent her the MITG customer letter that says V 5 -- I take it that's Version 5 -- if you look under the attachments there.

A. Yes.

Q. Okay. And that is dated, actually, approximately two hours after the e-mail of 4663.

A. Correct.

125

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

Q. Okay. And in the chain, you then sent her 4664 responding to her prior e-mail on who the heck was HP Direct and who are the customers; is that correct?

A. Yes.

Q. Okay. In your e-mail on 4664, it says, "Attached is the letter we want you to wordsmith. We want one internal letter to be sent to HP Direct and one external letter to the customers."

Do you see where I just read?

A. Yes, I do.

Q. Okay. And prior to the e-mail Ms. Parmley sent you, which is 4663, I guess she had -- did you have any discussion with her as to her questioning who HP Direct was?

A. I'm sorry. At -- at this time, she really wasn't in the picture. She didn't come into the picture until after we had gone through everything else and gotten to the point of doing the letter.

Q. Okay. Going back to 4664, the second -- the first paragraph there where it says, "We want one internal letter to be sent to HP Direct," was that HP Direct within the HP organization?

A. Yes.

Q. And that was a letter that was going to be sent to the HP internal customer service representatives?

126

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

A. Yeah. The sales team.

Q. Okay. And then the external letter to the customers is the one that, if you look on what I've attached, which is HP 5064 and 5065, is that the external letter?

A. It appears to be, yes.

Q. Okay. Now, your e-mail is dated Wednesday, January 21, but for some reason, the 5064 and 5065 has a date of January 30; okay?

Do you know why that is?

A. I believe the 30th may have been the date that we asked Jody to mail them.

Q. Okay. The second paragraph just kind of says, "Shari Ellis wants some input on the internal letter. Once you have this one ready, let me know," and you'll set up a call with her.

Is that kind of what the second paragraph is referencing there?

A. Correct.

Q. And then the third paragraph there, you indicate the letter is generic, so we don't have to worry about who gets it as far as addressing each account, each customer.

A. Yes.

Q. Okay. Now, what I want to get into is the other

127

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

05/18/2005 07:20:44 AM Page 124 to 127 of 146 2 of 11 sheets

attachment here. You are attaching to Jody Parmley a document labeled "hpDparts accounts list combined, January 5, '04." Do you see that?

A. Yes, I do.

Q. Okay. Now, for -- in terms of my questioning, I'll represent to you and will show you here that there has been marked at Mr. Chizek's deposition, of which the originals I brought here, Exhibit UU and Exhibit VV, which are the documents in this Bates range that come right after that letter --

A. Okay.

Q. -- or right after that e-mail -- I'm sorry -- and prior to the letter that's attached there.

A. Okay.

Q. And, in fact, Chizek UU is HP 4665 through 4683, and Chizek VV is 4684 through 5063.

So I am going to hand you UU, which is labeled "Common accounts" --

A. Okay.

Q. -- and ask you first to tell me what common accounts is referencing and what this list is.

A. When we were in the midst of this and having to set up, we had to determine if these customers already had HP accounts set up or not, or if it was just HP Direct accounts, so --

Q. I don't mean to interrupt you, but when you say "HP Direct," you mean MITG?

MS. CARROLL: I am going to object to that as vague.

Q. BY MR. HANSEN: Well, you understand -- let me ask it. Do you understand there's HP Direct within HP, and there's an entity known as MITG, which was also operating as Compaq Direct and HP Direct? Do you understand that?

A. Yes.

Q. Okay. So when you say you needed to determine if these -- these entities listed here had customer HP accounts or HP Direct accounts, when you say "HP Direct," are you referring to accounts --

A. The accounts that the customers would have used to order parts through MITG.

Q. Okay. All right. So go ahead.

A. Okay. So what we first asked the collections department to do is to go in with all of these and see if they already had accounts set up. And if they had accounts already set up, we wouldn't have to worry about setting additional accounts up.

Q. You say "set up," within HP?

A. Yes.

Q. Okay. Because if they only had an MITG account,

you were going to have to set up a new account with HP?

A. Well, some of them -- most of them had accounts with HP already --

Q. Right. But my question is --

A. -- besides HP Direct.

Q. But my question is, If they did not have an HP account, you were going to have to determine who that was so they eventually would have one set up?

A. Correct.

Q. So there could have been entities that had solely an MITG account --

A. Uh-huh.

Q. -- or --

Is that a yes?

A. I'm sorry. Yes.

Q. -- or they had an account with both HP and MITG?

A. Correct.

Q. Okay. Continue. I'm sorry.

A. Okay. And so what we did is we looked at them -- like on some of these, you can see where they've got two or three of the same account number within -- within the --

To separate the two, I'll refer to it as pre-merger blue -- okay? -- for -- for the HP parts accounts, versus the -- versus the MITG parts accounts.

Q. On that document where the column says "Osprey CBN" --

A. Correct.

Q. -- what does that reference?

A. That's the HP parts account.

Q. So that's blue?

A. Blue.

Q. Is that pre-merger blue?

A. Yes.

Q. Okay. So that would have been entities that were ordering through HP prior to HP merging with Compaq?

A. Correct.

Q. Okay. And what is the next column?

A. The next column is called S, or SAP account numbers, and those are the accounts that were used by customers ordering parts through the MITG process.

Q. Okay. How can you determine from that list if somebody had only -- well, strike that.

Does -- does this document Chizek UU show entities that solely had an MITG account?

A. No.

Q. Okay. Is this an exhibit that shows entities, as referred on the cover page, that had common accounts with both HP and MITG?

3:04-cv-03055-JES-CHE # 76-17 Page 9 of 20

LOUISE MEYERFELD

A. Yes.
Q. Okay. Are all of the accounts listed here accounts that had pre-merger HP account setups?
A. Yes, I believe so.
Q. What does Osprey CBN stand for?
A. Osprey is an ordering system --
Q. Is it --
A. -- and CBN is a computer-based number -- or customer-based number.
Q. Okay. Is that an HP ordering system?
A. Yes.
Q. If they had a pre-merger HP number from Osprey CBN, I think you told me that means they had an account set up with HP prior to its merging with Compaq; correct?
A. Correct.
Q. That does not mean that those -- well, strike that.
HP did not sell Compaq parts prior to the merger; correct?
A. Correct.
Q. Okay. So the ordering that would have been done by these entities prior to the merger through Osprey CBN was for Hewlett-Packard offerings?
A. Correct.

132

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

Q. After this account was run, was there a system then created for entities that only had an MITG account number? Strike that.
Was there a document run -- excuse me -- for entities that only had an MITG number --
MS. CARROLL: Object to --
Q. BY MR. HANSEN: -- to --
MS. CARROLL: Go ahead. Sorry.
Q. BY MR. HANSEN: -- to determine --
A. This -- you mean like in this same fashion?
Q. Yeah.
A. Yes.
Q. Okay. What was that document? Is that what I'm -- the Table S account?
A. Yeah. Table S would be MITG account numbers.
Q. Okay. All right. Let's clear -- let's just end with UU, then.
So Chizek UU was attached in this e-mail sent Ms. Parmley on HP 4664, and it represented those entities that had a common pre-merger Hewlett-Packard account and an MITG account number?
A. Correct.
Q. Okay. Did Ms. Parmley have anything to do with this?
A. You mean creating it?

133

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

Q. Yeah.
A. No.
Q. All right. If you take a look at HP 4662 -- it should be there -- this is an e-mail the following day that you sent to Ms. Parmley. Do you see that?
A. Yes.
Q. And it says in the second portion there, "Jody, I will forward on two lists, one of all 2,500 accounts who are going to receive this generic letter. The second list, those accounts in red, are the accounts we are actually going to be proactive with and follow up with phone calls. They are the ones who meet the qualification of having activity in the past six months with at least $500 in purchases."
The accounts in red, I'll represent to you, are not here. That's a different exhibit that's already been identified by Mr. Chizek. But were those lists being forwarded to her so she would know who was going to receive the letter you were creating?
A. Correct.
Q. Okay. Now, handing you Chizek VV, which was also, as I indicated to you earlier, part of the attachment on -- you sent Ms. Parmley on 4664, this document is much lengthier, and the cover page identifies it as Table S accounts.

134

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

A. Yes.
Q. Do you see that? Okay.
Are those the accounts for MITG?
A. Yes.
Q. Okay. And if we look under the column that says "Account Number" --
A. Yes.
Q. -- I guess can we compare it with Common S accounts to determine those that were solely -- strike that.
Let me ask it this way. Is there a way to determine from the Table S account which of these various companies had only MITG accounts?
A. Looking at this list?
Q. Yeah.
A. I don't know if that's how this was polled.
Q. Okay. Was that poll based on a determination of any entity that had previously placed an order with MITG?
A. That would be my assumption, yes.
Q. Okay. Let me ask it this way: If they aren't on the Common S account list, would it be fair to say that they did not have a pre-merger HP and an MITG account?
MS. CARROLL: Objection to the extent that calls

135

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

05/18/2005 07:20:44 AM Page 132 to 135 of 146 4 of 11 sheets

3:04-cv-03055-JES-CHE # 76-17 Page 10 of 20

LOUISE MEYERFELD

for speculation.

THE WITNESS: I can't -- I can't say for sure. I know we originally took the list of all the S accounts and those companies, and did the cross-check to see if those companies had HP accounts.

Q. BY MR. HANSEN: And those are the entities that came up in Deposition Exhibit Chizek UU?

A. Yes.

Q. Okay. So if I'm the -- when you say you took the S accounts, S account is how MITG's accounts were identified?

A. Correct.

Q. So if you cross-referenced it by taking those S accounts to determine which entities also had an HP account, and they are printed in Chizek UU, I take it if -- if they didn't qualify, they wouldn't be on that list right there; is that correct?

A. No. The reason for this common -- the common list is what we were trying to do is identify which of the MITG customers had Hewlett-Packard account numbers.

Q. Right. And my question was, If they didn't come up on that common account list, I take it, then, they didn't have an MITG and a Hewlett-Packard account number?

A. Correct.

136

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

Q. Okay. And my next question in that regard is, If the cross-referencing was to determine who had both accounts, if they didn't have -- well, strike that. Let me back up. Strike that.

This was MITG S accounts, Chizek VV.

A. Correct.

Q. Okay. You then cross-referenced them to determine Chizek UU, which is the common accounts.

A. Correct.

Q. If you did that cross-reference using the MITG -- did you do that cross-reference using the MITG account number or simply the company name?

A. Company -- company name, address, phone number.

Q. And if you ran that, and that company did not come up in the HP system, then that company would not have had an HP account, and it would not have shown up on Deposition Exhibit Chizek UU; correct?

A. Correct. It wouldn't have shown up on here.

Q. And tying that up, then, if I go through Chizek VV and look at all these accounts and compare them to Chizek UU, the common accounts, the companies that don't appear under the common list would be the companies that only had an MITG account number?

A. Correct.

Q. And if they had not ordered a part through -- or

137

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

if they had only an MITG account, would that indicate that they had not ordered anything through HP?

MS. CARROLL: I am going to object to that as misleading.

Q. BY MR. HANSEN: Go ahead.

A. I can't say yes or no.

Q. Well, could somebody have ordered something through HP without having an account?

A. Yes.

Q. Okay. Was there any determination to find out what entities off this Table S account list fit under that description?

A. No.

MR. HANSEN: Okay. I'm just going to -- this will be the last. Mark that EEEE.

(Defendants' Exhibit EEEE was marked for identification.)

Q. Okay. I'm going to hand you Deposition Exhibit EEEE, which is HP 10150, which is an e-mail from Shari Ellis to you on Friday, January 9, 2004.

Do you see that?

A. Yes.

Q. Okay. And attached there is a whole bunch of documents from her to you.

Do you see that?

138

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

LOUISE MEYERFELD

A. Yes, I do.

Q. Okay. I just want to go over those.

The S account list she sent you, which we've already identified as Chizek VV.

A. Correct.

Q. Okay. The hpD parts accounts list combined underneath that we've identified as Chizek UU.

MS. CARROLL: I am going to object. Both of these documents are the same thing. HpD parts direct list combined under the document name, these are two different tabs. The common accounts is one tab under a spreadsheet, and the Table S account is another tab under the spreadsheet. So to the extent that you are identifying these, those are both a part of what makes up HP parts direct --

MR. HANSEN: Okay.

MS. CARROLL: -- just so it's clear. Because I can show you the document on-line, but that's how it appears. It's two different -- you printed them separately, but they're two different tabs on one spreadsheet.

MR. HANSEN: Right. No, I --

MS. CARROLL: All right.

Q. BY MR. HANSEN: And then she also has, again, the MITG customer letter V 5 that we talked about

139

RUTH E. DIEDERICH CERTIFIED SHORTHAND REPORTERS
Phone: (916) 722-7814 Fax: (916) 726-0784

5 of 11 sheets Page 136 to 139 of 146 05/18/2005 07:20:44 AM



**From:** Manzo, Victor
**Sent:** Monday, August 16, 2004 5:40 PM
**To:** Crowley, Bill
**Subject:** FW: Minutes*HPD migration team meeting 2/3

-----Original Message-----
**From:** Cowan, Yvonne C [mailto:yvonne.cowan@hp.com]
**Sent:** Tuesday, February 03, 2004 4:59 PM
**To:** Ellis, Shari; Chizek, Richard; Manzo, Victor; Heath, Maureen C; Soriano, Roland L; Perez, Sonia; Allen, Melissa A; Farlin, Lynn; Meyerfeld, Louise A; Karas, John P
**Cc:** Parmley, Jody; Crowley, Bill; Miller, Tracy
**Subject:** Minutes*HPD migration team meeting 2/3

Greetings all,

Below is a synopsis of the HP Direct integration status: updates highlighted in purple

*Telephony is in place and ready to move--5AM pst 3/9 **Victor and Victoria working on the issues: Calls will be redirected to Roseville- options 2 & 3. Scripting for existing orders channeled to "split skill team" and "digital classic team". There are only 2 known entry points #800-848-4589/848-9771 both redirected from Omaha / Victoria to Roseville / Victor . The current phone lines provide options: #2 pmCPQ-Deq, #3 HP branded, #4 post ship option. Option 4 channel's to Maureen Heath's team regardless of whether is a red or blue part. **ACTION***to include RMA option for HP Direct Parts. That will move option 5 to option 6. The new request for RMA will be on option 5. Victor & Victoria will handle the move details along with Jeff & Maureen.

*Drawer statement in place and being distributed to agents 3/4 (attached document)**Richard- All items in place-if anything additional it will not change the direction of the letter

*Letters to top 100 mailed 1/30 **Shari- letters went to a key target and dispersed to other internal HP players. Most letters went to HP sales reps. Questions that arrived were met with confidence that customers will not notice flow in actions. Shari concerned about 2 key customers- Agilent and DHL. Yolanda Topolonski will give presentation tomorrow to Agilent management to explain flow. ****Action**-Yvonne-requested that collections is forwarded copies of letters and brought up to speed with Agilent resolution.

*Remainder of letters to be mailed 2/4****Action**-Yvonne-requested that collections is forwarded copies of letters

*Internal letter to HP Direct mailed 1/27****Action**-Yvonne-requested that collections is forwarded copies of letters

*MITG's access to CSN to be cut off Friday 2/6 5PM pst **no further discussion -action unknown.

*Call center readiness (Richard update) **Richard had a meeting with the call center and went through the drawer statement. Included how the call center will respond to question's and concerns of HPD trade customers. Only outstanding issue revolves around the inability to enter the orders as the accounts are not yet linked.

*Post shipment process hand off team working on project to make happen (Maureen/Shari update) *included in meetings also Jeff M & Yvonne. Shari will remain on team to ensure that all

issues are resoled- possible March 8 transition. Meetings are ongoing with next call taking place Friday 2/6.

*Account numbers in place, but not linked yet (still some questions) **Shari is concerned with two major customers: DHL & Agilent. Agilent is being handled by Yolanda Toloplinski with inclusion of Richard C, Lynn Farlin & Shari Ellis for discussion. DHL is having issue as they are not yet linked- Richard C will contact DHL. It was discovered that customers must be linked to Power (CRT team) and CPR (Sonia)- in addition- the information must be sent to Claudia to send to David for HPPS portion of the link. Update on the account set-ups:Blue CBN's and Red ID#'s have been created. Red #'s are loaded into CPR. Power is in action (no eta) from CRT team primarily Mary P. Until today it was unknown that the extra step needed to be taken by Claudia to ensure that the customers are fully activated in account setup. Claudia's TAT is 24 hours from list that was acquired this morning. issue is that red accounts are in place but not yet linked. Concern is that we currently have 5 customers that are trying to place orders but remain in the holding pattern until we can link the accounts. Discussion was had concerning the issue of Turnaround Time for new account set up. At this present time the TAT is 48 hours, however we have 5 silos that must touch the account and set up in various systems. The feeling is that the process should be streamlined due to the fact that the actions can take place concurrently after credit is approved. Sonia is concerned because she is receiving calls from customers inquiring why they can not order; the calls are arriving direct from agents. *** **ACTION** - Richard C to provide escalation path for customers that want accounts but issues arise. Richard will add feature in call box to handle issues on HP migration and channel to himself and the migration team. If Tracy/Sonia have current escalations ok to email/forward to Richard C and he will respond. Lynn Farlin will take action to follow up with Claudia to ensure that credit & account creations are owned by those teams. Richard C will discuss that call center agents should not refer customers direct to Sonia for new account set-ups but refer to { HYPERLINK "mailto:cbn.offsite@hp.com" }

*Current MITG website with HP/CPQ domain in limbo--no idea as to when this will be completed **out of our hands- into legal department's hands. Louise will share information with Bill C and Chip Love.

*Process to be handed off, front end business, are sketchy as we cannot get adequate information from MITG **out of our hands- into legal department's hands. Louise will share information with Bill C and Chip Love.

Regards,
Yvonne Cowan
#916-785-3684



-----Original Message-----

From: Parmley, Jody [mailto:jody.parmley@hp.com]

Sent: Wednesday, January 21, 2004 4:46 PM

To: Meyerfeld, Louise A

Subject: RE: Letter

Hello lady,

Question: who the heck is on the HP Direct list? and the who are the customers for the external exactly?

Jody Parmley

HP Channel Support & Parts Business

Business Planning, Review and Communications

EXHIBIT 0000
Deponent Meyerfeld
Date 5/4/05 Rptr. RD
DEPOBOOK

-----Original Message-----

From: Meyerfeld, Louise A

Sent: Thursday, January 22, 2004 10:41 AM

To: Parmley, Jody

Cc: Ellis, Shari

Subject: RE: Letter

Importance: High

Shari,

Would you be able to let Jody know who the key players are,

within HP Direct that should receive this letter?

Jody,

I will forward on two lists. One of all 2500 accounts, who are going to receive this generic letter.

The second list (those accounts in RED) are the accounts we are

actually going to be proactive with and follow up with phone calls.

They are the one's who meet the qualification of having activity in

the past 6 months, with at least $500 in parts purchases.

I'll be on the road later this morning, so if you have questions, leave me a VM and I'll pick it up later and call you back.

Hope this helps,

Louise

-----Original Message-----

From: Meyerfeld, Louise A

Sent: Wednesday, January 21, 2004 6:24 PM

To: Parmley, Jody

Subject: Letter

Importance: High

Hey Girl,

Attached is the letter we want you to wordsmith. We want one internal letter to be sent to HP Direct, and one external letter to the customers.

Shari Ellis would like some input on the internal letter prior to it going out. So, once you have this ready, let me know and I will set up a call for Shari, you and me to discuss the internal letter.

The letter is generic so we do not have to worry about who get what letter.

I will be out of the office Thurs and Friday on a business trip to the bay area to visit with Les. If you have any questions,

please leave me a VM and I will pick it up and get back to you.

If you have any questions regarding the letter, feel free to contact Bill Crowley while I am gone.

Take care,

Louise


Thanks,

Louise

hpDpartsAccountsListcombined-2004-01-05.xls    MITG_customer letterV5.doc



January 30, 2004

Dear Parts Customer,

This letter is to inform you of some upcoming changes to the ordering process for HP and Compaq genuine parts. HP would to thank you for your service and replacement parts business over recent months, and in an effort to better serve your business needs, HP is consolidating certain ordering processes and support services. We recognize these changes may impact your business and kindly ask for your patience and cooperation. This letter outlines the HP Parts Business support services information you will need during this time, including your primary points of contact and online options to order HP and Compaq branded parts.

## Business consolidation

In order to help our customers locate parts more effectively, the HP Parts Business is consolidating spare parts ordering into one location. Effective February 7, 2004, parts ordering through the organization known as "HP Direct" will no longer be available. In addition, the following website and phone numbers will be out of service.

- HP Direct Online Site { HYPERLINK "http://www.compaqdirectonline.com/" } will no longer be used for parts orders. Please go to { HYPERLINK "http://www.hp.com/buy/parts" }
- Phone numbers: 800-848-9771 and 800-848-4589 will no longer be used for parts orders. Please call 800-227-8164.

## HP Parts Business ordering

Effective February 7, 2004, please use the following ordering and returns processes for HP and Compaq replacement parts.

- HP Parts Store online

  The HP Parts Store on the web is available 7 days a week, 24 hours a day for ordering both HP and Compaq branded parts.

  - Go to the website at { HYPERLINK "https://partsdirect.hp.com/" }
  - Click 'Register' and follow the necessary steps
  - The main page lists reference numbers for assistance.

- HP Parts Business Sales Center

  To reach an HP Parts Sales Center Representative for ordering for both HP and Compaq branded parts, please dial 800-227-8164. Our hours of operation are Monday through Friday, 5AM - 5PM PST. HP Parts Sales agents at each of these options can address parts inquiries, parts identification, pricing and availability, order placement, order status, and backorder inquiries. Order Reference Numbers are provided for completed orders.

  - Select Option #2 on the phone menu for Compaq branded parts issues, parts identification, and ordering options, select Option #2.
  - Select Option #3 on the phone menu for HP branded parts issues, parts identification, and ordering options, select Option #3.

## Support program modification

Although HP and Compaq parts can still be ordered online from the HP Parts Store and by calling the HP Parts Business Sales Center, some previously offered services at 'HP Direct,' will no longer be available through the HP Parts Business Center. The dissolved services include:

1. Dedicated Account Management and assigned Sales Representatives.
2. Per incident parts sourcing and delivery options for HP and Compaq branded parts that are not in the current catalog of inventory.
3. Per incident parts sourcing and delivery options for other 'Multi-Vendor,' i.e. non-HP and Compaq parts.

## Net 30 Parts accounts

HP Parts Business is moving any existing 'HP Direct' Net 30 Accounts to the HP Parts Business Center Accounts programs. (Due to current business infrastructure, separate accounts are established for purchase of HP and Compaq parts.)

## Payment terms

- HP Parts accepts Visa, MasterCard, Discover, and American Express credit cards.
- An HP or Compaq Parts Account is required for any Net 30 orders.
- Please be prepared to provide the following information: an account number, purchase order number, part number, quantity, and Ship-To information.

## Returns

- Please call 800-227-8164, and select Option #4.
- Please be prepared to provide the following information: Original order number, PO from the original order, Part Number, Quantity to return, Reason for the return
- For eligible part returns issues, an RMA (Return Material Authorization) will be provided.
- Return as instructed, referencing your RMA number

HP appreciates your business and will continue to provide the replacement parts that you need. If you have any questions about this process change, please don't hesitate to contact us. And again, we thank you for your patience and cooperation.

Sincerely,

Bill Crowley
HP Parts Business Manager

-----Original Message-----
**From:** COWAN,YVONNE (HP-USA,ex1)
**Sent:** Sunday, January 11, 2004 3:10 PM
**To:** ELLIS,SHARI (HP-Omaha); CROWLEY,BILL (HP-Roseville,ex1); MEYERFELD,LOUISE (HP-Roseville,ex1); ALLEN,MELISSA A (HP-Colorado Springs); PEREZ,SONIA (HP-Roseville,ex1)
**Subject:** S / HPD and blue Parts account spreadsheet
**Importance:** High

Hello,

The first tab of the attached spreadsheet indicates the common accounts (by name and address) and the Osprey CBN account number that is currently open. The second tab indicates all active accounts for the two business types. I have spoken with the Jeri Tellechea, the collector for the S accounts and she has indicated which she feels are major accounts for her business. These are also indicated on the second spreadsheet.

Please be advised that although it would appear that there are many more commonalities, there was no way I could assure that the CBN would be one in the same. Due to address variances this detail should be confirmed by the customer.

Kind Regards,
Yvonne Cowan
Collections Resolution Analyst
Hewlett Packard
phone #916-785-3684
fax # 916-748-7340



yvonne.cowan@hp.com  hpDpartsAccountsListcombined-2004-01-05.xls