E-FILED
Monday, 27 March, 2006  03:40:36 PM
Clerk, U.S. District Court, ILCD

H

» CO

**COMPAQ**



| >> PRESARIO DESKTOPS | >> PRESARIO NOTEBOOKS | PRESARIO SUPPORT: |

**PRESARIO SUPPORT:**

» Product Support Information
» Software & Drivers
» Customer Communities
» Chat with a Support Specia
» Email a Support Specialist

**BUSINESS PC SUPPORT:**

» Support & Drivers for Other
  Products

**ONLINE SHOPPING:**

**Buy Compaq at hpshopping**

» Compaq Presario Desktops
» Compaq Presario Notebook
» Compaq Monitors
» Compaq Accessories



**Compaq Presario R3000T**

Stay connected – customize a notebook with built in
5-in-1 memory card reader and integrated wireless LAN.

Save $100 with mail in rebate plus get free shipping!

» customize now

**SPECIALS & PROMOTIONS:**

**OTHER PRODUCTS from HP:**

» Business & IT Services
» Desktops for Business
» Digital Photography
» Fax, Copiers & Scanners
» Handheld Devices
» Media Center PCs
» Monitors for Business
» Monitors for Home
» Networking
» Notebooks for Business
» Point of Sale (POS)
» Printing & Multifunction
» Projectors
» Servers
» Storage
» Software Products
» Supplies & Accessories
» Tablet PCs
» Thin Clients
» Workstations

» Free shipping with purchase of customized Compaq Presario desktops and
  notebooks

» Get $100 off Compaq Presario notebooks  (with mail-in rebate)

» Free Microsoft wireless base station when you add a 54g LAN option to your
  customized Compaq Presario notebook  (offer requires two mail-in rebates, and may be subject
  to tax and shipping)

» Free memory, 8X DVD writer and RAID upgrades with purchase of select
  customized Compaq Presario desktops

» Get $50 off customized Compaq Presario desktops  (with mail-in rebate)

» Get $100 off a select Compaq flat panel display or monitor with purchase of a
  customized Compaq Presario desktop  (with mail-in rebate)

» Pay no interest for 12 months with hpshopping.com e-financing

» My Presario Club, choices and offers

Privacy statement   |   Using this site means you accept its terms

© 2004 Hewlett-Packard Development Co

2/24/2004





Hewlett-Packard Company
8000 Foothills Blvd
Mail Stop 5719
Roseville, CA 95747
www.hp.com

916.748.8141 Tel
916.785.9590 Fax

**To**
Molly Richard

**Company**
Midwest Information
Technology Group
Incorporated

**Telephone**

**Fax**
214-999-9277

**From**
Bill Crowley

**Subject**
Standard Support Agreement

**Number of Pages**
8

**Date**
January 30, 2004

**Confidential**

Information intended only for a limited audience. Includes most information relating to HP projects, technical data, HP research and development, prices paid by HP, and most product or plan data. HP Confidential information should be distributed using good business judgments and may be limited to people or entities having a need to know the information.

# MIDWEST INFORMATION TECHNOLOGY GROUP INCORPORATED
## STANDARD SUPPORT AGREEMENT

THIS SUPPORT AGREEMENT (the "Agreement") is made and entered into as of the 7th day of February, 2002 between Midwest Information Technology Group, Incorporated, ("MITG") a Missouri corporation, located at #17 Northport Plaza, Hannibal, Missouri 63401 and Compaq Direct, Inc. ("CDI"), a corporate subsidiary of Compaq Computer Company, located at 10810 Farnam Drive, Omaha, Nebraska 68154 and is effective as of the date and time of execution by the last party to sign this Agreement as shown on the signature page below (the "Effective Date").

1. **Agreement.** Upon the terms and conditions herein provided, MITG agrees to provide CDI with computer related support services which shall include, but not be limited to, computer hardware maintenance and repair. These services will be offered to CDI's end users, customers, companies or commercial entities (collectively, "Customers") directed or referred by CDI to MITG. CDI agrees to pay MITG for services performed and parts supplied (including taxes, shipping and handling charges) by MITG to Customers pursuant to the terms and conditions of this Agreement.

2. **Warranty.** Parts provided to Customers by MITG under this Agreement will be warranted by MITG to be free of defects for a period of ninety (90) days from the date of shipment from MITG to Customer (the "Warranty Period"). If, within the Warranty Period, CDI or any Customer discovers or finds that a part is defective, CDI or Customer, as the case may be, shall notify MITG and the defective part shall be replaced by MITG without charge. The foregoing states MITG's sole warranty with respect to parts furnished hereunder and all other warranties, expressed or implied, are expressly disclaimed by MITG. The sole liability of MITG and the sole remedy of CDI or Customer with respect to any parts supplied by MITG hereunder shall be limited to the replacement thereof if the same proves defective or is found to be defective within the Warranty Period. In no case shall MITG be responsible for any incidental, special or consequential damages or any other relief not expressly provided herein nor shall CDI assert any other claims against MITG relating to any defective parts, whether in contract or tort, including, without limitation, any other claims relating to breach of warranty or other breach of contract or any claim that any parts were otherwise defective.

3. **Obligations of MITG.** MITG agrees to:
    A.    Provide maintenance and repair services as needed to keep and maintain Customer's computer hardware in operating condition as determined by the manufacturer's specifications for such computer hardware.
    B.    Retain records as they relate to the parts procurement services performed by MITG on behalf of the Customers for a period of one (1) year following the date such services are performed.
    C.    Maintain suitable call center facilities in accordance with professional business practices, and in compliance with all applicable federal, state and local laws.
    D.    Subscribe to pertinent factory service literature in order for MITG to perform required maintenance and repair services hereunder in an efficient and professional manner.

758-725

E.   Comply with all state and local license, or registration laws, and all other laws applicable to MITG's performance of its duties and obligations hereunder.

F.   Maintain properly trained employees who are competent to perform the services offered herein.

G.   Submit invoices to CDI only for repair and maintenance services rendered and parts furnished or supplied to Customers pursuant to the terms of this Agreement.

H.   Provide reports to CDI via MITG's electronic interface which will include the CDI reference number, the corresponding MITG tracking number, current status of the order and any relevant comments.

I.   Provide CDI with an escalation path through MITG for resolution of customer satisfaction issues.

4.   **Obligations of CDI.** CDI agrees to:

A.   Pay MITG in accordance with Section 9 for the cost of all parts (including taxes, shipping and handling charges) provided to Customers and for all repair and maintenance services rendered to the Customers.

B.   Maintain an adequate customer service staff in order to process incoming calls from MITG and the Customers.

C.   Provide toll-free "800" lines in order that MITG may contact CDI during normal business hours both Central Standard Time or Central Daylight Savings Time.

D.   Insure MITG's access to Customers' computer hardware which is in need of maintenance or repair, during normal business hours, for the purpose of performing maintenance and repair services thereon.

5.   **Indemnity.** CDI will indemnify MITG, and its assigns from any and all claims, costs, including court costs and attorneys fees, actions, losses, damages or other liabilities whatsoever (collectively "Losses") arising out of any acts or warranties of MITG or its employees, agents, or independent contractors, except for such Losses which arise out of the gross negligence, intentional torts, or defective workmanship of MITG, its employees, agents or independent contractors, in connection with MITG performance under this Agreement.

6.   **Liability/Limitation.**

A.   IN NO EVENT SHALL MITG BE LIABLE TO CDI OR ITS CUSTOMERS FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES OR FOR LOST PROFITS INCURRED BY CDI OR ANY OF ITS CUSTOMERS, INCLUDING, WITHOUT LIMITATION, ANY LOSS OF BUSINESS EQUIPMENT, LOSS OF DATA, OR ANY OTHER LOSS RESULTING FROM DOWN TIME ARISING OUT OF, RESULTING FROM OR RELATED TO, THIS AGREEMENT OR THE PARTS OR SERVICES PROVIDED BY MITG HEREUNDER. CDI AGREES TO INDEMNIFY AND HOLD HARMLESS MITG FROM AND AGAINST ANY LOSS, CLAIM, COST, EXPENSE OR LIABILITY ARISING IN CONNECTION WITH THIS AGREEMENT.

B.   IN NO EVENT SHALL MITG BE LIABLE TO CDI OR ITS CUSTOMERS FOR ANY DAMAGES RESULTING FROM OR RELATED TO ANY

2

FAILURE OR DELAY OF MITG IN FURNISHING PARTS OR PERFORMING MAINTENANCE OR REPAIR SERVICES UNDER THIS AGREEMENT.

7.    **Term; Termination Fee.**

A.    The term of this Agreement shall commence on the Effective Date and shall remain in effect for a period of twenty-four (24) months, unless terminated earlier by MITG or CDI (the "Initial Term"). Either party shall have the right to terminate this Agreement: (i) at any time upon providing 120 days prior written notice of termination to the other party or (ii) immediately upon the occurrence of an Event of Default. After the expiration of the Initial Term, this Agreement shall automatically renew for an additional twenty-four month period (the "Renewal Term") unless terminated by either party by written notice delivered at least sixty (60) days prior to the termination date for the Initial Term. As used herein "term" shall include both the Initial Term and any Renewal Term.

B.    Notwithstanding the foregoing subsection A, should CDI terminate this Agreement, other than as the result of MITG committing an Event of Default, then CDI shall pay to MITG, as a termination fee, within seven (7) days of such termination, a sum (the "Termination Fee") equal to ten percent (10%) of all gross receipts paid by CDI to MITG during the preceding twelve (12) months for each one year period or part thereon remaining on the term hereof had CDI not terminated this Agreement (the "Unexpired Term"). The Termination Fee due and owing from CDI to MITG shall be prorated to take into account the length of the Unexpired Term if the same is either more or less than twelve (12) months. If the Termination Fee is not paid when due, the same shall accrue interest at the rate of eight percent (8%) per annum from the due date until paid in full.

8.    **Default.**

A.    Default by CDI. The occurrence of any of the following will constitute an event of default ("Event of Default") by CDI:

i.Failure by CDI to pay MITG any Fees for parts and/or services provided hereunder within forty-five (45) days of the invoice date; or

ii.Any breach or failure by CDI to observe or perform any of CDI's non-monetary obligations which breach or failure is not cured within thirty (30) days after notice of such breach or failure is given by MITG to CDI; or

iii.Any representation or warranty made by CDI herein or in any certificate furnished by CDI is untrue in any material respect as of the date of the making thereof; or

iv.Proceedings are instituted by CDI under the Federal Bankruptcy Code or any similar federal or state law for the relief of debtors, or are instituted against CDI or CDI becomes insolvent or is generally unable to pay its debts as such debts become due; or

v.Any order, judgment or decree is entered in any proceeding by any court of competent jurisdiction appointing, without the consent of CDI, a receiver, trustee or liquidator of CDI or of all or any substantial part of any of its property, or sequestering any substantial part of the property of CDI.

3

B.    Default by MITG  The occurrence of any of the following will constitute an event of default ("Event of Default") by MITG:

i.Any breach or failure by MITG to observe or perform any of MITG's material obligations under this Agreement which breach or failure is not cured within thirty (30) days after written notice of such breach or failure is given to MITG; provided, however, that such failure is not the result of CDI's breach of a representation, warranty, or covenant hereunder; or

ii.Any representation or warranty made by MITG herein or if any certificate furnished by MITG is untrue in any material respect as of the date of making thereof; or

iii.Proceedings are instituted by MITG under the United States Bankruptcy Code or any similar federal or state law for the relief of debtors, or are instituted against MITG or MITG becomes insolvent or is generally unable to pay its debts as such debts become due; or

(iv)  Any order, judgment or decree is entered in any proceeding by any court of competent jurisdiction appointing, without the consent of MITG, a receiver, trustee or liquidator of MITG or of all or any substantial part of any of its property, or sequestering any substantial part of the property of MITG.

Upon an event of default hereunder, the non-defaulting party shall be entitled to all rights and remedies available at law and if the violation relates to a breach of the covenants set out in paragraph 14 or 15 herein, to equitable relief, i.e. a remedy at law is inadequate.  In any such equitable proceeding, the defaulting party agrees that an order may be entered in such suit enjoining the defaulting party from violating said covenants.  The defaulting party further agrees that an order to that effect may be made while the litigation is pending as well as upon a final determination thereof without the requirement that the non-defaulting party post a bond.  In addition, any such application for an injunction shall be without prejudice to any of the other rights or actions which may accrue to the non-defaulting party by reason of the breach of the aforesaid covenants.  Moreover, in the event either party breaches this Agreement, the non-breaching party shall have the right to recover from the breaching party its reasonable attorney fees and costs incurred in pursuing the remedies for such breach.

9.    Parts Invoice Procedure and Payment Terms.  MITG shall submit invoices daily to CDI for all applicable charges for all parts delivered hereunder to Customers during that day (the "Parts Fees").  The Parts Fees charged shall be based upon and calculated as follows: all parts will be furnished to Customer by MITG at the market cost thereof and shall be paid for by CDI together with all taxes, shipping and handling costs associated therewith.  All maintenance and repair services or labor will be billed to CDI as specified in paragraph 11 for Basic Telephone Service Calls or otherwise at the rate the parties mutually agree upon prior to MITG performing such labor or services in each case.  Payment of the Parts Fees due on any parts invoice shall be made by CDI to MITG no later than ten (10) days following the stated date on the invoice (the "Due Date").  Any Parts Fees due from CDI to MITG which are not received by MITG within thirty (30) days of the invoice date, being twenty (20) days after the Due Date, shall accrue interest from such Due Date at the rate of one and one half (1-1/2%) percent per month on the unpaid Fees including therein any previously accrued interest.

4

10.    **Sharing of Profit on Parts.** As part of, and in consideration of the parties agreements herein, CDI and MITG agree to share gross profits on the sale of parts to Customers as follows:

    A.    MITG shall be entitled to seventy-five percent (75%) of the gross profit on the sale of all parts to Customers and CDI shall be entitled to twenty-five percent (25%) of the gross profit on the sale of all parts to Customers. For purpose of this provision, "gross profit" shall equal the difference between the invoice price for the part as billed to CDI and MITG's cost in procuring or obtaining the part. CDI's share of the profits shall be accounted for, and deducted by MITG daily, from the balance due MITG by CDI as established by the daily invoices sent to CDI as provided in paragraph 9.

11.    **Service Level Schedule and Guarantee.**

    A.    As part of the services provided hereunder by MITG, MITG shall provide technical advice, assistance and support to Customers via telephone through its technicians at its call center facilities with such service being available to Customers during regular business hours, being 8:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). Such service calls placed to MITG's technicians through its call centers, for technical support and assistance shall be billed and charged to CDI for each call of ten (10) minutes or less ("Basic Telephone Service Call"), as follows:

| | | |
|---|---|---|
| (i) | 0 - 40000 calls per month | $5.25 per call; |
| (ii) | 40,001 calls to 80,000 calls per month | $5.00 per call; and |
| (iii) | over 80,000 calls | $4.75 per call. |

The aforesaid charges ("Basic Telephonic Service Charge") shall apply for any Basic Telephone Service Call and shall be billed monthly by MITG to CDI as set out in subsection B.

    B.    In consideration of MITG maintaining its call service centers with technicians available to Customers during regular business hours as outlined in subsection A, CDI shall guarantee a minimum fee payment to MITG each month for Basic Telephone Service Calls based upon either 400 calls per day or $41,000 per month whichever is greater (the "Minimum Fee"). Billing for Basic Telephone Service Charges is as follows: $41,000 shall be invoiced by MITG to CDI each month (the "Billing Month") on the 1st day of the Billing Month and shall be due on the 15th day of the Billing Month. At the end of the Billing Month, MITG shall calculate the Basic Telephone Service Charges due for the entire Billing Month based upon the Minimum Fee and number of Basic Telephone Service Calls received (and the charges therefore) as set out herein. If more than $41,000 is due therefore from CDI to MITG for the Billing Month, MITG shall invoice CDI for the additional sum due on the first day of the following month and such additional sum shall be due from CDI to MITG on the 15th day of that month.

12.    **Other Terms and Conditions Governing Transactions.** In addition to the specific terms and conditions set forth in this Agreement, CDI understands and agrees that the

5

parts transactions and services rendered to Customers hereunder shall be governed and controlled, as well, by certain written policies and procedures of MITG including, but not limited to, those relating to returns, credit acceptability, its outsourcing rules ("MITG's Bible"), manufacturing authorization, etc. MITG shall provide copies of these policies to CDI as well as any amendments or revisions thereto from time to time as those policies and procedures may be modified or changed.

13.     **Notices.** All notices, approvals, requests, consents, and other communications given pursuant to this Agreement shall be in writing and shall be effective when received, or, if earlier, five (5) days after it is sent, and either shall be hand-delivered, set by telex, sent by Federal Express service or sent by United States certified or registered mail, return receipt requested, addressed to the recipient at the address listed in the first paragraph of this Agreement or at such other location to which the recipient has directed notice in accordance with this section.

14.     **Proprietary Rights.** Each party acknowledges that the other party exclusively owns certain proprietary software, web sites, trademarks, logos, copyrights, domain names and other proprietary and intellectual property rights (collectively, "Intellectual Property Rights"). In this regard, CDI specifically acknowledges that MITG has developed web sites, logos, etc. for not only CDI, but also, for its Customers and that all rights thereto belong to MITG as part of its Intellectual Property Rights. Each party agrees that it shall not use the other party's Intellectual Property Rights without the prior written permission of the other party unless such use is reasonably necessary for its efficient performance under this Agreement and then only to the extent so necessary, but without acquiring any rights therein or thereto as a result of such permitted or necessary use. Neither this Agreement nor such use shall not give either party any rights or entitlements to the Intellectual Property Rights of the other party. Moreover, neither party shall ever dispute the ownership or validity of the other party's Intellectual Property Rights or take or cause to be taken any action that would invalidate such party's Intellectual Property Rights or otherwise demise such parties Intellectual Property Rights. It is understood that neither party shall acquire nor claim any rights to the Intellectual Property Rights of the other party or adverse to the other party's Intellectual Property Rights by virtue of this Agreement. As between the parties, all Intellectual Property Rights shall inure solely to and for the benefit of the rightful owner thereof.

15.     **Confidentiality.**
        A.      Each party acknowledges that their relationship with the other party will bring them each into close contact with certain proprietary information of the other party. In recognition of the foregoing, the parties agree that during the term of this Agreement, and for a period of two (2) years after the term hereof, each party will keep secret and will not disclose to any other person or entity any confidential matters of the other party, except as specifically consented to in the writing by the other party. For purposes of this Agreement, the term "confidential matters" shall mean all technical, financial and business information of the parties, their respective suppliers, principals, and customers lists, the contents of any MITG Service Agreement, suppliers' lists, marketing plans, and pricing information.

B:    In connection herewith, the parties acknowledge that all documents pertaining to, or relating to the confidential matters of the other party, are the sole and exclusive property of that party and are considered part of such party's intellectual property. To the extent that any such documents are in the possession of the other party upon the termination of this Agreement, then in that event, the party in possession of such documents shall return all such documents and copies thereof to the owner.

16.    **Reputation.** During the term of this Agreement and following the termination hereof, neither MITG nor CDI shall intentionally or willfully engage in any act, the result of which damages the business reputation or image of the other party. It is agreed that termination of this Agreement, as the result of the occurrence of an Event of Default shall not constitute an act that damages the reputation of the other party.

17.    **Force Majeure.** MITG shall not be liable to CDI or any of its Customers for any failure by it to perform its obligations under this Agreement by reason of war, civil commotion, strike, labor disturbances or disputes, abnormal weather conditions, an act of God, or any other causes outside the reasonable control of MITG.

18.    **No Assignment.**   Neither this Agreement nor any terms hereunder shall be assignable by either party without the other party's prior written consent.

19.    **Governing Law and Consent to Jurisdiction.**   This Agreement shall be governed by, and construed under the laws of the State of Missouri, and the parties hereto consent to the jurisdiction of the courts of the State of Missouri in connection with any matter relating to or arising out of this Agreement.

20.    **Arbitration.**   Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration pursuant to the then current rules of the American Arbitration Association or as otherwise provided by a decision of a majority of the arbitrators, and both parties hereby submit to such arbitration in Missouri. In the event either party institutes litigation or arbitration involving this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorney fees and costs incurred.

21.    **Severability.**  In the event any provision of this Agreement is found to be unenforceable, void, invalid, or to be unreasonable in scope, such provision shall be modified to the extent necessary to make it enforceable, and as so modified, this Agreement shall remain in full force and effect. Failure to exercise any rights contained in this Agreement shall not be construed as a waiver of such rights or of any default hereunder.  The payment terms of this Agreement shall be independent and unconditional so that such timely payment shall not be subject to any setoff or counterclaim.

22.    **Exclusive Agreement.**   This Agreement is exclusive.   Everything herein contained shall be deemed to provide MITG with an exclusive right to provide parts and services to the Customers.

J

# Customer Notice

For the past three (3) years, HP Direct Online services have been provided to you by a company called MITG, Inc.

As of Sunday, February 8th, 2004 at 6:00pm CST, HP will no longer offer HP Direct Online through MITG, Inc. as a multi-vendor parts solution to its customers.

Thereafter, if you wish to purchase your parts through HP you need to go to the following site www.hp.com. However, even though we will no longer be associated with HP Direct Online, MITG, Inc. can continue to provide you with the exact same service and processes to which you have become accustomed.

If you are in need of parts today we do accept Visa, MasterCard, Discover and American Express with a 24 – 48 hr delivery of your parts.

We as well will offer Net Accounts. However, this will require a credit application available at parts.mitg.com. It will take less than 48 hours on average to set up your Net Account. Be sure to fill out the credit application form entirely to ensure the fastest processing possible.

### You can reach us at parts.mitg.com



So, with that in mind, we are proud to have served you for the past 3 years, and we hope you will consider doing future business with MITG, Inc.

To learn more about MITG, visit our corporate site at www.mitg.com.

**We welcome Visa, MasterCard, Discover, and American Express.**

**K**




# MITG | Parts Direct

**MITG delivers the very best multi-vendor spare parts to customers worldwide for computer systems which are out of warranty.**

## PARTS
Search Inventory
Create an Account
View Payment Options

## ORDERS
Create a New Order
View Shopping Cart
View Your Orders
Track Your Order
See our Return Policy
Return an Item

## SUPPORT
Call 1-877-909-4609 or Email
See our Privacy Policy
Suggestion Box

# Welcome to MITG Parts Direct

There are three ways to place a request for parts. By entering part information, by choosing from a selectable list, or adding manually.

◉ by Part Number ○ by Model Number [_____] 

Or click here to add item to Quote manually 

Or select the Manufacturer: [_____] 








© Copyright 2004, All Rights Reserved, Midwest Information Technology Group, Inc.
All vendor logos are trademark by their respective corporations

L

3:04-cv-03055-JES-CHE    # 78-7    Page 17 of 24

Yahoo! Search Results for wv    hpdirectonlineparts.com                Page 1 of 1

Yahoo!  My Yahoo!  Mail    Welcome, **guest** [ Sign in ]                Search Home   Help

# YAHOO!search  www.hpdirectonlineparts.com

| Web | Images | Directory | Yellow Pages | News | Products |

**WEB RESULTS**

Did you mean: www.hpdirectonline.com or
www.onlineparts.com? We didn't find any Web pages
containing **www.hpdirectonlineparts.com**.

Suggestions:

- Check your spelling.
- Try going directly to
www.hpdirectonlineparts.com.
- Find web pages that contain
"www.hpdirectonlineparts.com".

Also, you can visit the Yahoo! Search Help Center for more
suggestions.

Have feedback on your search results?  Let us know.

Copyright © 2004 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Ad Feedback



M



# Uniform Domain Name Dispute Resolution Policy

Policy Adopted: August 26, 1999
Implementation Documents Approved: October 24, 1999

---

**Notes:**

**1. This policy is now in effect. See www.icann.org/udrp/udrp-schedule.htm for the implementation schedule.**

**2. This policy has been adopted by all accredited domain-name registrars for domain names ending in .com, .net, and .org. It has also been adopted by certain managers of country-code top-level domains (e.g., .nu, .tv, .ws).**

**3. The policy is between the registrar (or other registration authority in the case of a country-code top-level domain) and its customer (the domain-name holder or registrant). Thus, the policy uses "we" and "our" to refer to the registrar and it uses "you" and "your" to refer to the domain-name holder.**

---

## Uniform Domain Name Dispute Resolution Policy

(As Approved by ICANN on October 24, 1999)

**1. Purpose.** This Uniform Domain Name Dispute Resolution Policy (the "Policy") has been adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN"), is incorporated by reference into your Registration Agreement, and sets forth the terms and conditions in connection with a dispute between you and any party other than us (the registrar) over the registration and use of an Internet domain name registered by you. Proceedings under Paragraph 4 of this Policy will be conducted according to the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules of Procedure"), which are available at www.icann.org/udrp/udrp-rules-24oct99.htm, and the selected administrative-dispute-resolution service provider's supplemental rules.

**2. Your Representations.** By applying to register a domain name, or by asking us to maintain or renew a domain name registration, you hereby represent and warrant to us that (a) the statements that you made in your Registration Agreement are complete and accurate; (b) to your knowledge, the registration of the domain name will not infringe upon or otherwise violate the rights of any third party; (c) you are not registering the domain name for an unlawful purpose; and (d) you will not knowingly use the domain

name in violation of any applicable laws or regulations. It is your responsibility to determine whether your domain name registration infringes or violates someone else's rights.

**3. Cancellations, Transfers, and Changes.** We will cancel, transfer or otherwise make changes to domain name registrations under the following circumstances:

a. subject to the provisions of Paragraph 8, our receipt of written or appropriate electronic instructions from you or your authorized agent to take such action;

b. our receipt of an order from a court or arbitral tribunal, in each case of competent jurisdiction, requiring such action; and/or

c. our receipt of a decision of an Administrative Panel requiring such action in any administrative proceeding to which you were a party and which was conducted under this Policy or a later version of this Policy adopted by ICANN. (See Paragraph 4(i) and (k) below.)

We may also cancel, transfer or otherwise make changes to a domain name registration in accordance with the terms of your Registration Agreement or other legal requirements.

**4. Mandatory Administrative Proceeding.**

This Paragraph sets forth the type of disputes for which you are required to submit to a mandatory administrative proceeding. These proceedings will be conducted before one of the administrative-dispute-resolution service providers listed at www.icann.org/udrp/approved-providers.htm (each, a "Provider").

**a. Applicable Disputes.** You are required to submit to a mandatory administrative proceeding in the event that a third party (a "complainant") asserts to the applicable Provider, in compliance with the Rules of Procedure, that

(i) your domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and

(ii) you have no rights or legitimate interests in respect of the domain name; and

(iii) your domain name has been registered and is being used in bad faith.

In the administrative proceeding, the complainant must prove that each of these three elements are present.

**b. Evidence of Registration and Use in Bad Faith.** For the purposes of Paragraph 4(a)(iii), the following circumstances, in particular but without

limitation, if found by the Panel to be present, shall be evidence of the registration and use of a domain name in bad faith:

> (i) circumstances indicating that you have registered or you have acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of your documented out-of-pocket costs directly related to the domain name; or

> (ii) you have registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that you have engaged in a pattern of such conduct; or

> (iii) you have registered the domain name primarily for the purpose of disrupting the business of a competitor; or

> (iv) by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location.

**c. How to Demonstrate Your Rights to and Legitimate Interests in the Domain Name in Responding to a Complaint.** When you receive a complaint, you should refer to Paragraph 5 of the Rules of Procedure in determining how your response should be prepared. Any of the following circumstances, in particular but without limitation, if found by the Panel to be proved based on its evaluation of all evidence presented, shall demonstrate your rights or legitimate interests to the domain name for purposes of Paragraph 4(a)(ii):

> (i) before any notice to you of the dispute, your use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services; or

> (ii) you (as an individual, business, or other organization) have been commonly known by the domain name, even if you have acquired no trademark or service mark rights; or

> (iii) you are making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

**d. Selection of Provider.** The complainant shall select the Provider from

among those approved by ICANN by submitting the complaint to that Provider. The selected Provider will administer the proceeding, except in cases of consolidation as described in Paragraph 4(f).

**e. Initiation of Proceeding and Process and Appointment of Administrative Panel.** The Rules of Procedure state the process for initiating and conducting a proceeding and for appointing the panel that will decide the dispute (the "Administrative Panel").

**f. Consolidation.** In the event of multiple disputes between you and a complainant, either you or the complainant may petition to consolidate the disputes before a single Administrative Panel. This petition shall be made to the first Administrative Panel appointed to hear a pending dispute between the parties. This Administrative Panel may consolidate before it any or all such disputes in its sole discretion, provided that the disputes being consolidated are governed by this Policy or a later version of this Policy adopted by ICANN.

**g. Fees.** All fees charged by a Provider in connection with any dispute before an Administrative Panel pursuant to this Policy shall be paid by the complainant, except in cases where you elect to expand the Administrative Panel from one to three panelists as provided in Paragraph 5(b)(iv) of the Rules of Procedure, in which case all fees will be split evenly by you and the complainant.

**h. Our Involvement in Administrative Proceedings.** We do not, and will not, participate in the administration or conduct of any proceeding before an Administrative Panel. In addition, we will not be liable as a result of any decisions rendered by the Administrative Panel.

**i. Remedies.** The remedies available to a complainant pursuant to any proceeding before an Administrative Panel shall be limited to requiring the cancellation of your domain name or the transfer of your domain name registration to the complainant.

**j. Notification and Publication.** The Provider shall notify us of any decision made by an Administrative Panel with respect to a domain name you have registered with us. All decisions under this Policy will be published in full over the Internet, except when an Administrative Panel determines in an exceptional case to redact portions of its decision.

**k. Availability of Court Proceedings.** The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded. If an Administrative Panel decides that your domain name registration should be canceled or transferred, we will wait ten (10) business days (as observed in the location of our principal office) after we are informed by the applicable Provider of the Administrative Panel's decision before implementing that decision. We will then implement the decision unless we have received from

you during that ten (10) business day period official documentation (such as a copy of a complaint, file-stamped by the clerk of the court) that you have commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) of the Rules of Procedure. (In general, that jurisdiction is either the location of our principal office or of your address as shown in our Whois database. See Paragraphs 1 and 3(b)(xiii) of the Rules of Procedure for details.) If we receive such documentation within the ten (10) business day period, we will not implement the Administrative Panel's decision, and we will take no further action, until we receive (i) evidence satisfactory to us of a resolution between the parties; (ii) evidence satisfactory to us that your lawsuit has been dismissed or withdrawn; or (iii) a copy of an order from such court dismissing your lawsuit or ordering that you do not have the right to continue to use your domain name.

**5. All Other Disputes and Litigation.** All other disputes between you and any party other than us regarding your domain name registration that are not brought pursuant to the mandatory administrative proceeding provisions of Paragraph 4 shall be resolved between you and such other party through any court, arbitration or other proceeding that may be available.

**6. Our Involvement in Disputes.** We will not participate in any way in any dispute between you and any party other than us regarding the registration and use of your domain name. You shall not name us as a party or otherwise include us in any such proceeding. In the event that we are named as a party in any such proceeding, we reserve the right to raise any and all defenses deemed appropriate, and to take any other action necessary to defend ourselves.

**7. Maintaining the Status Quo.** We will not cancel, transfer, activate, deactivate, or otherwise change the status of any domain name registration under this Policy except as provided in Paragraph 3 above.

**8. Transfers During a Dispute.**

    **a. Transfers of a Domain Name to a New Holder.** You may not transfer your domain name registration to another holder (i) during a pending administrative proceeding brought pursuant to Paragraph 4 or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded; or (ii) during a pending court proceeding or arbitration commenced regarding your domain name unless the party to whom the domain name registration is being transferred agrees, in writing, to be bound by the decision of the court or arbitrator. We reserve the right to cancel any transfer of a domain name registration to another holder that is made in violation of this subparagraph.

    **b. Changing Registrars.** You may not transfer your domain name registration to another registrar during a pending administrative proceeding brought pursuant to Paragraph 4 or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded. You may transfer administration of your domain name registration to another registrar during a pending court action or

arbitration, provided that the domain name you have registered with us shall continue to be subject to the proceedings commenced against you in accordance with the terms of this Policy. In the event that you transfer a domain name registration to us during the pendency of a court action or arbitration, such dispute shall remain subject to the domain name dispute policy of the registrar from which the domain name registration was transferred.

**9. Policy Modifications.** We reserve the right to modify this Policy at any time with the permission of ICANN. We will post our revised Policy at least thirty (30) calendar days before it becomes effective. Unless this Policy has already been invoked by the submission of a complaint to a Provider, in which event the version of the Policy in effect at the time it was invoked will apply to you until the dispute is over, all such changes will be binding upon you with respect to any domain name registration dispute, whether the dispute arose before, on or after the effective date of our change. In the event that you object to a change in this Policy, your sole remedy is to cancel your domain name registration with us, provided that you will not be entitled to a refund of any fees you paid to us. The revised Policy will apply to you until you cancel your domain name registration.

---

Comments concerning the layout, construction and functionality of this site should be sent to webmaster@icann.org.

Page Updated 05-Feb-2002

©2000, 2002 The Internet Corporation for Assigned Names and Numbers. All rights reserved.