# MIDWEST INFORMATION TECHNOLOGY GROUP INCORPORATED
## STANDARD SUPPORT AGREEMENT

THIS SUPPORT AGREEMENT (the "Agreement") is made and entered into as of the __7th__ day of __February__, 200__2__ between Midwest Information Technology Group, Incorporated, ("MITG") a Missouri corporation, located at #17 Northport Plaza, Hannibal, Missouri 63401 and Compaq Direct, Inc. ("CDI"), a corporate subsidiary of Compaq Computer Company, located at 10810 Farnam Drive, Omaha, Nebraska 68154 and is effective as of the date and time of execution by the last party to sign this Agreement as shown on the signature page below (the "Effective Date").

1. **Agreement.** Upon the terms and conditions herein provided, MITG agrees to provide CDI with computer related support services which shall include, but not be limited to, computer hardware maintenance and repair. These services will be offered to CDI's end users, customers, companies or commercial entities (collectively, "Customers") directed or referred by CDI to MITG. CDI agrees to pay MITG for services performed and parts supplied (including taxes, shipping and handling charges) by MITG to Customers pursuant to the terms and conditions of this Agreement.

2. **Warranty.** Parts provided to Customers by MITG under this Agreement will be warranted by MITG to be free of defects for a period of ninety (90) days from the date of shipment from MITG to Customer (the "Warranty Period"). If, within the Warranty Period, CDI or any Customer discovers or finds that a part is defective, CDI or Customer, as the case may be, shall notify MITG and the defective part shall be replaced by MITG without charge. The foregoing states MITG's sole warranty with respect to parts furnished hereunder and all other warranties, expressed or implied, are expressly disclaimed by MITG. The sole liability of MITG and the sole remedy of CDI or Customer with respect to any parts supplied by MITG hereunder shall be limited to the replacement thereof if the same proves defective or is found to be defective within the Warranty Period. In no case shall MITG be responsible for any incidental, special or consequential damages or any other relief not expressly provided herein nor shall CDI assert any other claims against MITG relating to any defective parts, whether in contract or tort, including, without limitation, any other claims relating to breach of warranty or other breach of contract or any claim that any parts were otherwise defective.

3. **Obligations of MITG.** MITG agrees to:
   A. Provide maintenance and repair services as needed to keep and maintain Customer's computer hardware in operating condition as determined by the manufacturer's specifications for such computer hardware.
   B. Retain records as they relate to the parts procurement services performed by MITG on behalf of the Customers for a period of one (1) year following the date such services are performed.
   C. Maintain suitable call center facilities in accordance with professional business practices, and in compliance with all applicable federal, state and local laws.
   D. Subscribe to pertinent factory service literature in order for MITG to perform required maintenance and repair services hereunder in an efficient and professional manner.

1

**EXHIBIT 7**

  E. Comply with all state and local license, or registration laws, and all other laws applicable to MITG's performance of its duties and obligations hereunder.

  F. Maintain properly trained employees who are competent to perform the services offered herein.

  G. Submit invoices to CDI only for repair and maintenance services rendered and parts furnished or supplied to Customers pursuant to the terms of this Agreement.

  H. Provide reports to CDI via MITG's electronic interface which will include the CDI reference number, the corresponding MITG tracking number, current status of the order and any relevant comments.

  I. Provide CDI with an escalation path through MITG for resolution of customer satisfaction issues.

4. **Obligations of CDI.** CDI agrees to:

  A. Pay MITG in accordance with Section 9 for the cost of all parts (including taxes, shipping and handling charges) provided to Customers and for all repair and maintenance services rendered to the Customers.

  B. Maintain an adequate customer service staff in order to process incoming calls from MITG and the Customers.

  C. Provide toll-free "800" lines in order that MITG may contact CDI during normal business hours both Central Standard Time or Central Daylight Savings Time.

  D. Insure MITG's access to Customers' computer hardware which is in need of maintenance or repair, during normal business hours, for the purpose of performing maintenance and repair services thereon.

5. **Indemnity.** CDI will indemnify MITG, and its assigns from any and all claims, costs, including court costs and attorneys fees, actions, losses, damages or other liabilities whatsoever (collectively "Losses") arising out of any acts or warranties of MITG or its employees, agents, or independent contractors, except for such Losses which arise out of the gross negligence, intentional torts, or defective workmanship of MITG, its employees, agents or independent contractors, in connection with MITG performance under this Agreement.

6. **Liability/Limitation.**

  A. IN NO EVENT SHALL MITG BE LIABLE TO CDI OR ITS CUSTOMERS FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES OR FOR LOST PROFITS INCURRED BY CDI OR ANY OF ITS CUSTOMERS, INCLUDING, WITHOUT LIMITATION, ANY LOSS OF BUSINESS EQUIPMENT, LOSS OF DATA, OR ANY OTHER LOSS RESULTING FROM DOWN TIME ARISING OUT OF, RESULTING FROM OR RELATED TO, THIS AGREEMENT OR THE PARTS OR SERVICES PROVIDED BY MITG HEREUNDER. CDI AGREES TO INDEMNIFY AND HOLD HARMLESS MITG FROM AND AGAINST ANY LOSS, CLAIM, COST, EXPENSE OR LIABILITY ARISING IN CONNECTION WITH THIS AGREEMENT.

  B. IN NO EVENT SHALL MITG BE LIABLE TO CDI OR ITS CUSTOMERS FOR ANY DAMAGES RESULTING FROM OR RELATED TO ANY

FAILURE OR DELAY OF MITG IN FURNISHING PARTS OR PERFORMING MAINTENANCE OR REPAIR SERVICES UNDER THIS AGREEMENT.

7. Term; Termination Fee.

A. The term of this Agreement shall commence on the Effective Date and shall remain in effect for a period of twenty-four (24) months, unless terminated earlier by MITG or CDI (the "Initial Term"). Either party shall have the right to terminate this Agreement: (i) at any time upon providing 120 days prior written notice of termination to the other party or (ii) immediately upon the occurrence of an Event of Default. After the expiration of the Initial Term, this Agreement shall automatically renew for an additional twenty-four month period (the "Renewal Term") unless terminated by either party by written notice delivered at least sixty (60) days prior to the termination date for the Initial Term. As used herein "term" shall include both the Initial Term and any Renewal Term.

B. Notwithstanding the foregoing subsection A, should CDI terminate this Agreement, other than as the result of MITG committing an Event of Default, then CDI shall pay to MITG, as a termination fee, within seven (7) days of such termination, a sum (the "Termination Fee") equal to ten percent (10%) of all gross receipts paid by CDI to MITG during the preceding twelve (12) months for each one year period or part thereon remaining on the term hereof had CDI not terminated this Agreement (the "Unexpired Term"). The Termination Fee due and owing from CDI to MITG shall be prorated to take into account the length of the Unexpired Term if the same is either more or less than twelve (12) months. If the Termination Fee is not paid when due, the same shall accrue interest at the rate of eight percent (8%) per annum from the due date until paid in full.

8. Default.

A. Default by CDI. The occurrence of any of the following will constitute an event of default ("Event of Default") by CDI:

i. Failure by CDI to pay MITG any Fees for parts and/or services provided hereunder within forty-five (45) days of the invoice date; or

ii. Any breach or failure by CDI to observe or perform any of CDI's non-monetary obligations which breach or failure is not cured within thirty (30) days after notice of such breach or failure is given by MITG to CDI; or

iii. Any representation or warranty made by CDI herein or in any certificate furnished by CDI is untrue in any material respect as of the date of the making thereof; or

iv. Proceedings are instituted by CDI under the Federal Bankruptcy Code or any similar federal or state law for the relief of debtors, or are instituted against CDI or CDI becomes insolvent or is generally unable to pay its debts as such debts become due; or

v. Any order, judgment or decree is entered in any proceeding by any court of competent jurisdiction appointing, without the consent of CDI, a receiver, trustee or liquidator of CDI or of all or any substantial part of any of its property, or sequestering any substantial part of the property of CDI.

B. Default by MITG  The occurrence of any of the following will constitute an event of default ("Event of Default") by MITG:

i. Any breach or failure by MITG to observe or perform any of MITG's material obligations under this Agreement which breach or failure is not cured within thirty (30) days after written notice of such breach or failure is given to MITG; provided, however, that such failure is not the result of CDI's breach of a representation, warranty, or covenant hereunder; or

ii. Any representation or warranty made by MITG herein or if any certificate furnished by MITG is untrue in any material respect as of the date of making thereof; or

iii. Proceedings are instituted by MITG under the United States Bankruptcy Code or any similar federal or state law for the relief of debtors, or are instituted against MITG or MITG becomes insolvent or is generally unable to pay its debts as such debts become due; or

(iv) Any order, judgment or decree is entered in any proceeding by any court of competent jurisdiction appointing, without the consent of MITG, a receiver, trustee or liquidator of MITG or of all or any substantial part of any of its property, or sequestering any substantial part of the property of MITG.

Upon an event of default hereunder, the non-defaulting party shall be entitled to all rights and remedies available at law and if the violation relates to a breach of the covenants set out in paragraph 14 or 15 herein, to equitable relief, i.e. a remedy at law is inadequate. In any such equitable proceeding, the defaulting party agrees that an order may be entered in such suit enjoining the defaulting party from violating said covenants. The defaulting party further agrees that an order to that effect may be made while the litigation is pending as well as upon a final determination thereof without the requirement that the non-defaulting party post a bond. In addition, any such application for an injunction shall be without prejudice to any of the other rights or actions which may accrue to the non-defaulting party by reason of the breach of the aforesaid covenants. Moreover, in the event either party breaches this Agreement, the non-breaching party shall have the right to recover from the breaching party its reasonable attorney fees and costs incurred in pursuing the remedies for such breach.

9. **Parts Invoice Procedure and Payment Terms.** MITG shall submit invoices daily to CDI for all applicable charges for all parts delivered hereunder to Customers during that day (the "Parts Fees"). The Parts Fees charged shall be based upon and calculated as follows: all parts will be furnished to Customer by MITG at the market cost thereof and shall be paid for by CDI together with all taxes, shipping and handling costs associated therewith. All maintenance and repair services or labor will be billed to CDI as specified in paragraph 11 for Basic Telephone Service Calls or otherwise at the rate the parties mutually agree upon prior to MITG performing such labor or services in each case. Payment of the Parts Fees due on any parts invoice shall be made by CDI to MITG no later than ten (10) days following the stated date on the invoice (the "Due Date"). Any Parts Fees due from CDI to MITG which are not received by MITG within thirty (30) days of the invoice date, being twenty (20) days after the Due Date, shall accrue interest from such Due Date at the rate of one and one half (1-1/2%) percent per month on the unpaid Fees including therein any previously accrued interest.

4

10. **Sharing of Profit on Parts.** As part of, and in consideration of the parties agreements herein, CDI and MITG agree to share gross profits on the sale of parts to Customers as follows:

    A. MITG shall be entitled to seventy-five percent (75%) of the gross profit on the sale of all parts to Customers and CDI shall be entitled to twenty-five percent (25%) of the gross profit on the sale of all parts to Customers. For purpose of this provision, "gross profit" shall equal the difference between the invoice price for the part as billed to CDI and MITG's cost in procuring or obtaining the part. CDI's share of the profits shall be accounted for, and deducted by MITG daily, from the balance due MITG by CDI as established by the daily invoices sent to CDI as provided in paragraph 9.

11. **Service Level Schedule and Guarantee.**

    A. As part of the services provided hereunder by MITG, MITG shall provide technical advice, assistance and support to Customers via telephone through its technicians at its call center facilities with such service being available to Customers during regular business hours, being 8:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). Such service calls placed to MITG's technicians through its call centers, for technical support and assistance shall be billed and charged to CDI for each call of ten (10) minutes or less ("Basic Telephone Service Call"), as follows:

    | | | |
    |---|---|---|
    | (i) | 0 - 40000 calls per month | $5.25 per call; |
    | (ii) | 40,001 calls to 80,000 calls per month | $5.00 per call; and |
    | (iii) | over 80,000 calls | $4.75 per call. |

    The aforesaid charges ("Basic Telephonic Service Charge") shall apply for any Basic Telephone Service Call and shall be billed monthly by MITG to CDI as set out in subsection B.

    B. In consideration of MITG maintaining its call service centers with technicians available to Customers during regular business hours as outlined in subsection A, CDI shall guarantee a minimum fee payment to MITG each month for Basic Telephone Service Calls based upon either 400 calls per day or $41,000 per month whichever is greater (the "Minimum Fee"). Billing for Basic Telephone Service Charges is as follows: $41,000 shall be invoiced by MITG to CDI each month (the "Billing Month") on the 1st day of the Billing Month and shall be due on the 15th day of the Billing Month. At the end of the Billing Month, MITG shall calculate the Basic Telephone Service Charges due for the entire Billing Month based upon the Minimum Fee and number of Basic Telephone Service Calls received (and the charges therefore) as set out herein. If more than $41,000 is due therefore from CDI to MITG for the Billing Month, MITG shall invoice CDI for the additional sum due on the first day of the following month and such additional sum shall be due from CDI to MITG on the 15th day of that month.

12. **Other Terms and Conditions Governing Transactions.** In addition to the specific terms and conditions set forth in this Agreement, CDI understands and agrees that the

5

parts transactions and services rendered to Customers hereunder shall be governed and controlled, as well, by certain written policies and procedures of MITG including, but not limited to, those relating to returns, credit acceptability, its outsourcing rules ("MITG's Bible"), manufacturing authorization, etc. MITG shall provide copies of these policies to CDI as well as any amendments or revisions thereto from time to time as those policies and procedures may be modified or changed.

13. **Notices.** All notices, approvals, requests, consents, and other communications given pursuant to this Agreement shall be in writing and shall be effective when received, or, if earlier, five (5) days after it is sent, and either shall be hand-delivered, set by telex, sent by Federal Express service or sent by United States certified or registered mail, return receipt requested, addressed to the recipient at the address listed in the first paragraph of this Agreement or at such other location to which the recipient has directed notice in accordance with this section.

14. **Proprietary Rights.** Each party acknowledges that the other party exclusively owns certain proprietary software, web sites, trademarks, logos, copyrights, domain names and other proprietary and intellectual property rights (collectively, "Intellectual Property Rights"). In this regard, CDI specifically acknowledges that MITG has developed web sites, logos, etc. for not only CDI, but also, for its Customers and that all rights thereto belong to MITG as part of its Intellectual Property Rights. Each party agrees that it shall not use the other party's Intellectual Property Rights without the prior written permission of the other party unless such use is reasonably necessary for its efficient performance under this Agreement and then only to the extent so necessary, but without acquiring any rights therein or thereto as a result of such permitted or necessary use. Neither this Agreement nor such use shall not give either party any rights or entitlements to the Intellectual Property Rights of the other party. Moreover, neither party shall ever dispute the ownership or validity of the other party's Intellectual Property Rights or take or cause to be taken any action that would invalidate such party's Intellectual Property Rights or otherwise demise such parties Intellectual Property Rights. It is understood that neither party shall acquire nor claim any rights to the Intellectual Property Rights of the other party or adverse to the other party's Intellectual Property Rights by virtue of this Agreement. As between the parties, all Intellectual Property Rights shall inure solely to and for the benefit of the rightful owner thereof.

15. **Confidentiality.**

A. Each party acknowledges that their relationship with the other party will bring them each into close contact with certain proprietary information of the other party. In recognition of the foregoing, the parties agree that during the term of this Agreement, and for a period of two (2) years after the term hereof, each party will keep secret and will not disclose to any other person or entity any confidential matters of the other party, except as specifically consented to in the writing by the other party. For purposes of this Agreement, the term "confidential matters" shall mean all technical, financial and business information of the parties, their respective suppliers, principals, and customers lists, the contents of any MITG Service Agreement, suppliers' lists, marketing plans, and pricing information.

6

B. In connection herewith, the parties acknowledge that all documents pertaining to, or relating to the confidential matters of the other party, are the sole and exclusive property of that party and are considered part of such party's intellectual property. To the extent that any such documents are in the possession of the other party upon the termination of this Agreement, then in that event, the party in possession of such documents shall return all such documents and copies thereof to the owner.

16. Reputation. During the term of this Agreement and following the termination hereof, neither MITG nor CDI shall intentionally or willfully engage in any act, the result of which damages the business reputation or image of the other party. It is agreed that termination of this Agreement, as the result of the occurrence of an Event of Default shall not constitute an act that damages the reputation of the other party.

17. Force Majeure. MITG shall not be liable to CDI or any of its Customers for any failure by it to perform its obligations under this Agreement by reason of war, civil commotion, strike, labor disturbances or disputes, abnormal weather conditions, an act of God, or any other causes outside the reasonable control of MITG.

18. No Assignment. Neither this Agreement nor any terms hereunder shall be assignable by either party without the other party's prior written consent.

19. Governing Law and Consent to Jurisdiction. This Agreement shall be governed by, and construed under the laws of the State of Missouri, and the parties hereto consent to the jurisdiction of the courts of the State of Missouri in connection with any matter relating to or arising out of this Agreement.

20. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration pursuant to the then current rules of the American Arbitration Association or as otherwise provided by a decision of a majority of the arbitrators, and both parties hereby submit to such arbitration in Missouri. In the event either party institutes litigation or arbitration involving this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorney fees and costs incurred.

21. Severability. In the event any provision of this Agreement is found to be unenforceable, void, invalid, or to be unreasonable in scope, such provision shall be modified to the extent necessary to make it enforceable, and as so modified, this Agreement shall remain in full force and effect. Failure to exercise any rights contained in this Agreement shall not be construed as a waiver of such rights or of any default hereunder. The payment terms of this Agreement shall be independent and unconditional so that such timely payment shall not be subject to any setoff or counterclaim.

22. Exclusive Agreement. This Agreement is exclusive. Everything herein contained shall be deemed to provide MITG with an exclusive right to provide parts and services to the Customers.

23. **Amendment.** This Agreement may be amended only in a writing agreed upon by and shall be effective upon being signed by both parties.

24. **Amount of Work.** ALL applicable parts and service orders of the Customers will be referred by CDI to MITG pursuant to the terms outlined in Paragraph 1 of this Agreement.

25. **Entire Agreement.** This Agreement and the exhibits annexed hereto constitute the entire Agreement between the parties, and there are no understandings or terms relative to this Agreement other than those which are expressed herein.

26. **Survival of Obligations.** The covenants, obligations, rights and remedies of the parties hereunder which contemplate or require action by any of them after the termination of this Agreement shall survive any such termination.

IN WITNESS WHEREOF, both parties have executed this Agreement as of the date and year first above written.

Accepted by:

MIDWEST INFORMATION
TECHNOLOGY GROUP, INC.

BY: _____
        (Authorized Signature)

_____
(Print or Type Name)

TITLE: President / CEO
DATE: 2/8/2002

Accepted by:

COMPAQ DIRECT, INC.

BY: _____
        (Authorized Signature)

_____
(Print or Type Name)

TITLE: Service Programs Manager
DATE: 2/8/2002