## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., et al., | ) ) ) ) | |
| Plaintiffs/ Counter-Defendants, | ) ) ) | |
| v. | ) ) | No.  04-3055 |
| MIDWEST INFORMATION TECHNOLOGY GROUP, INC., | ) ) ) ) | |
| Defendant/ Counter-Plaintiff. | ) ) | |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on the Plaintiff/Counter-Defendants Hewlett-Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V.'s (collectively HP) Motion for Summary Judgment as to the Counterclaims Asserted by Midwest Information Technology Group, Inc. (d/e 68) (Summary Judgment Motion). On February 7 and 8, 2002, Midwest Information Technology Group, Inc. (Midwest) entered into two contracts with Compaq Direct, Inc. (Direct),

1

then a subsidiary of Compaq Computer Company (Compaq). The contracts were called the Standard Service Agreement (SSA) and the Middleware Agreement (MA) (collectively the Agreements). The two-year terms of the Agreements ended on February 6 and 7, 2004, respectively. In 2003, Compaq merged into HP. Direct did not renew the Agreements after the original terms expired on February 6 and 7, 2004.

HP subsequently brought this action against Midwest for trademark infringement and unfair trade practices. Midwest has counterclaimed alleging that HP breached the Agreements and tortiously interfered with Midwest's business relationships. Amended Counterclaim (d/e 42). Midwest seeks actual and punitive damages for all of its claims. HP asks for summary judgment on the counterclaims. For the reasons set forth below, HP's Motion is allowed in part and denied in part. Issues of fact exist regarding whether Direct breached the SSA. Summary judgment is denied with respect to this claim. Midwest, however, has failed to establish that issues of fact exist with respect to any other claim, including its claim for punitive damages for breach of the SSA. HP is entitled to summary judgment on the rest of the Amended Counterclaim.

2

<u>STATEMENT OF FACTS</u>

In 2001, Compaq merged with Digital Equipment Corporation (Digital).  At that time Digital operated a call center in Andover, Massachusetts.  <u>Summary Judgment Motion</u>, Exhibit 10, <u>Diane Pound Deposition (Pound Deposition)</u> at 7-8.  This call center handled telephone orders for Digital parts.  The Andover center maintained toll-free 800 telephone numbers for receiving calls.  After the merger, the Andover call center became part of Compaq and started selling Compaq and Digital parts.  <u>Id.</u>  At the time of the Digital merger, Compaq also had its subsidiary, Direct.  Direct was located in Omaha, Nebraska.  Direct sold Compaq parts through separate toll-free 800 telephone numbers.

On February 7, 2002, Direct and Midwest executed the SSA. <u>Summary Judgment Motion</u>, Exhibit 1, <u>SSA</u>.  Under the terms of the SSA, Direct agreed to refer to Midwest all of its customers seeking computer parts and service.[1]  Midwest agreed to provide maintenance and repair services

---

[1]Midwest argues that the SSA bound the parent Compaq, and later HP, to refer all parts customers to it.  Midwest cites no authority for this proposition, only the belief of its president, Ronald Haught.  Haught's subjective impressions are not relevant in the face of an unambiguous contract.  <u>See</u> <u>Jake C. Byers, Inc. v. J.B.C. Investments</u>, 834 S.W.2d 806, 814 (Mo.App. 1992).  The SSA recites that Direct is the contracting party, not Compaq, and that Direct is a corporate subsidiary of Compaq.  Thus, only Direct was bound by the SSA.

and to operate a call center to handle parts sales and calls seeking technical advice. Direct agreed to maintain the 800 telephone numbers for the call center. Midwest also operated a web site on behalf of Direct through which customers could order parts.

The SSA stated that Midwest would receive 75 percent of the gross profits from the sale of parts and Direct would receive the remaining 25 percent. SSA, ¶ 10. In practice, this split of profits only applied to parts that: (1) were not stocked in the current inventory of Compaq, or (2) were in the current inventory of Compaq, but were available elsewhere for a price that was at least $175.00 below the price charged by Compaq ($100.00 for memory). Summary Judgment Motion, Exhibit 5, Declaration of Troy Bloomquist, ¶¶ 3-5, and Exhibit 6, Deposition of Ronald Haught at 204. Parts not in Compaq's current inventory consisted of parts manufactured by other companies ("multi-vendor parts") or obsolete parts ("legacy parts"). Id.

Direct also agreed to pay Midwest for providing "technical advice, assistance and support to Customers via telephone through its technicians. . . ." SSA, ¶ 11.A. For these technical support services, Direct agreed to pay Midwest the greater of: (1) a monthly minimum charge of $41,000.00, and

(2) (a) $5.25 per call for the first 40,000 calls per month, (b) $5.00 per call for the next 40,000 calls per month, and (c) $4.75 per call for all calls in excess of 80,000 calls per month. Id. During the two-year term of the SSA, Direct only paid Midwest the $41,000.00 monthly minimum charge for these technical support services. Response in Opposition to Counter-Defendants' Motion for Summary Judgment (d/e 69)(Response), Exhibit 3, Deposition of Troy Bloomquist at 88-89.

The SSA stated, in part:

22. **Exclusive Agreement.** This Agreement is exclusive. Everything herein contained shall be deemed to provide [Midwest] with an exclusive right to provide parts and services to the Customers.
. . . .
24. **Amount of Work.** ALL applicable parts and service orders of the Customers will be referred by [Direct] to [Midwest] pursuant to the terms outlined in Paragraph 1 of this Agreement.

SSA, ¶¶ 22, 24. The SSA defined "Customers" as Direct's, "end users, customers, companies or commercial entities (collectively, "Customers") directed or referred by [Direct] to [Midwest]." SSA, ¶ 1. The SSA stated that it was governed by Missouri law.

On February 8, 2002, Direct and Midwest entered into the MA. Summary Judgement Motion, Exhibit 14, MA. Under the MA, Midwest

5

agreed to develop software called middleware. The middleware was an interface between Midwest's computers and Direct's computerized order entry system, called VISTA. Without this middleware, Midwest had to send orders to Direct, and Direct employees had to input the orders manually into the VISTA system. After the middleware was developed and implemented, the orders were automatically placed into the VISTA system through the middleware interface.

Under the terms of the MA, Midwest owned the middleware and Direct could not use the middleware for any purpose other than its dealings with Midwest. Upon termination of the MA, Direct was obligated to cease using the middleware immediately. The MA stated that it was governed by Illinois law.

In May 2002, Compaq merged into HP. Direct's name was changed from Compaq Direct to HP Direct.[2] Before this merger, HP had its own call center in Roseville, California. After the merger, HP had several call centers,

---

[2]It is unclear from the record whether Direct currently exists as a separate corporate entity. For purposes of this Motion, the Court assumes Direct either was dissolved or was merged into HP at some point in time prior to the filing of this action. If Direct still exists as a separate corporate entity, HP may be entitled to summary judgment on all of the breach of contract counts since Direct would be the liable entity, not HP. Effectively, Midwest would have sued the wrong party. HP has not raised this issue, and the Court will not address this matter further.

including Roseville, Andover, and Direct's call center operated by Midwest. Each operated separate toll-free 800 numbers, and Midwest and Andover, at least, also received orders from web sites over the Internet.

During this period, Sheri Ellis worked for Direct. Initially, she was a claim administrator, and later, in October 2003, she became responsible for the day-to-day operations of Direct. Response, Exhibit 4, Deposition of Sheri Ellis at 13, 21. She testified in her deposition that the Andover call center was also an HP Direct call center for customers seeking new products, such as computer systems and monitors. Id. at 53. She also stated that the Andover center, "took spare parts orders if their customers had a need." Id. at 53-54.

HP decided to consolidate all call centers into a single call center in Roseville, California. In early 2003, HP started transferring calls from the Andover call center to the Roseville call center. This transfer was completed in April 2003, and the Andover call center was closed in July 2003. Pound Deposition at 9. HP then decided to have Direct end its call center relationship with Midwest on February 6, 2004, when the two-year term of the SSA expired. Direct's parts customers would be referred to the Roseville, California call center, and Direct's 800 telephone numbers would

be turned off and its web site would be shut down.  HP would also no longer

sell multi-vendor or legacy parts.  Customers would only be able to buy in-

stock HP and Compaq parts from the Roseville center.

Starting in January 2004, HP began contacting Direct customers to

inform them of the consolidation of call centers.  HP sent out a letter dated

January 30, 2004, to the customers.  The letter said, in part:

> Business consolidation
> In order to help our customers locate parts more effectively, the
> HP Parts Business is consolidating spare parts ordering into one
> location.  Effective February 7, 2004, parts ordering through the
> organization known as "HP Direct" will <u>no longer</u> be available.
> In addition, the following website and phone numbers will be
> out of service.
>
> • HP Direct Online Site {HYPERLINK
> "http://www.compaqdirectonline.com/"} will no longer be
> used for parts orders.  Please go to {HYPERLINK
> "http://www.hp.com/buy/parts"}
>
> • Phone numbers: 800-848-9771 and 800-848-4589 will no
> longer be used for parts orders.  Please call 800-227-8164.

<u>Response</u>, Exhibit 14, <u>Haught Deposition</u>, Exhibit No. 28 (emphasis in the

original).  The letter further informed Direct customers that HP would no

longer sell anything but HP and Compaq in-stock parts.  The letter stated:

> Support program modification
> Although HP and Compaq parts can still be ordered online from
> the HP Parts Store and by calling the HP Parts Business Sales

Center, some previously offered services at 'HP Direct,' will <u>no longer</u> be available through the HP Parts Business Center.  The dissolved services include:

1.    Dedicated Account Management and assigned Sales Representatives.
2.    Per incident parts sourcing and delivery options for HP and Compaq branded parts that are not in the current catalog of inventory.
3.    Per incident parts sourcing and delivery options for other 'Multi-Vendor,' i.e. non-HP and Compaq parts.

<u>Id.</u> (emphasis in the original).  HP employees also contacted Direct customers by phone and made an in-person presentation to at least one customer to explain the consolidation.  HP representatives made these contacts in January and February 2004, before the SSA expired.

After the Agreements expired, Direct stopped using the middleware. <u>Response</u>, Exhibit 13, <u>Deposition of Sandra Urwin</u> at 93-94; <u>Bloomquist Deposition</u> at 73, 77.  HP also asked Midwest to give HP its web site domain names that included the terms "HP" or "Compaq" in the names. Midwest refused.  The refusal precipitated this lawsuit and the counterclaims by Midwest.

<u>ANALYSIS</u>

Midwest alleges six counterclaims against HP.  Count I alleges that HP breached the SSA by not referring all of Direct's parts customers to

Midwest.   Count II seeks punitive damages for the breach of the SSA.
Count III claims that HP violated the MA by misappropriating the
middleware for use with third parties.  Count IV seeks punitive damages for
the breach of the MA.  Counts V and VI allege tortious interference with
Midwest's business relations with its customers and suppliers.  HP seeks
summary judgment on all of these counts.

At summary judgment, HP must present evidence that demonstrates
the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,
477 U.S. 317, 323-24 (1986).  The Court must consider the evidence
presented in the light most favorable to Midwest.  Any doubt as to the
existence of a genuine issue for trial is resolved against HP.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once HP has met its
burden, Midwest must present evidence to show that issues of fact remain
with respect to an issue essential to its case, and on which it will bear the
burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Midwest
has only met its burden on Count I of the Amended Counterclaim for
breach of the SSA.

A.    SSA

Midwest has shown that issues of fact exist regarding whether HP violated the SSA by referring Direct customers to the Andover call center for parts sales. Sheri Ellis stated in her deposition that Andover handled Direct customer orders for new products. Selling new products to Direct customers through the Andover call center would not violate the SSA. The SSA only obligated Direct to refer parts and service customers to Midwest, not customers seeking new products. Ellis, however, stated that the call center at Andover sometimes sold parts to Direct customers. These sales would violate the SSA. The SSA states that Midwest had the exclusive right to sell parts to Direct customers. Ellis' testimony creates an issue of fact regarding whether Direct breached the SSA.

HP argues that Midwest has no evidence on damages. The Court agrees that the opinions of Midwest's expert Scott Stringer are inadmissible. Stringer opined that Midwest suffered $6,242,000.00 in damages from the breach of the SSA. Summary Judgment Motion, Exhibit 13, Supplement to Expert Report of Scott A. Stringer (Stringer Report) at 3. This Court must examine an expert's opinion to determine its admissibility. Expert evidence is admissible when, "(1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This Court must examine, as a threshold matter, whether: (1) the expert will testify to valid scientific knowledge, and (2) whether that testimony will assist the trier of fact in understanding or determining a fact in issue. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). "The first prong of this framework evaluates the reliability of the testimony. . . . The second prong evaluates the testimony's relevance." Ammons v. Aramark Uniform Services, Inc., 368 F.3d 809, 816 (7th Cir. 2004). "In determining whether evidence is reliable, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." Id. (internal quotations and citations omitted). "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005).

In this case, Stringer fails to present a good reason to think that his approach will produce an accurate estimate of the damages. First, Stringer

opined that Midwest lost $100,165.00 in gross receipts for the per call charge for technical assistance telephone calls that were diverted from Midwest to the Andover center. <u>Stringer Report</u>, Exhibit III-1. He based this calculation, in part, on the parts orders received by the Andover center, including Internet orders. <u>Summary Judgment Motion</u>, Exhibit 12, <u>Second Deposition of Scott Stringer</u> at 27, 32, 38. Midwest would not be entitled to a per call fee for Internet orders under any reading of the SSA. Stringer makes no effort to differentiate between Internet orders and telephone orders. Since Stringer had no data on call volume at the Andover center, he had no basis for his estimate of the number of calls for which Midwest would have received a per call payment for providing technical advice and assistance.[3]

Stringer also assumed that 56 percent of parts orders at the Andover center were for multi-vendor or legacy parts. He based this assumption on

---

[3]Stringer also assumed that: (1) Midwest should have received every call that Andover received, and (2) should have been paid its per call fee for each call, no matter what the caller's purpose. <u>Stringer Report</u> at 2-3. Ellis, however, testified that Direct customers ordered new products at the Andover call center. Midwest would not be entitled to payments for new product orders. The SSA also does not call for Direct to pay a per call fee for telephone parts orders. Midwest received the per call fee for providing "technical advice, assistance and support to Customers via telephone through its technicians. . . ." <u>SSA</u>, ¶ 11.A. HP does not raise these issues in its Motion, so the Court will not address them further.

his estimate that 56 percent of Midwest's sales were multi-vendor and legacy parts. He just assumed that the Andover center sold the same percentage of multi-vendor and legacy parts. <u>Stringer Report</u> at 2. This assumption greatly affected Stringer's estimate of lost profits. Midwest received 75 percent of the gross profits for multi-vendor and legacy parts, but none of the gross profits for in-stock HP and Compaq parts except in the situation that the same parts were available elsewhere for a price that was $175.00 below the HP price ($100.00 for memory). Based on this assumption, Stringer opined that Midwest should have been paid an additional $6,640,087.00 in gross profits from parts sales. <u>Id.</u> Exhibit III-1.

No evidence supports his assumption that 56 percent of parts sales at the Andover center were for multi-vendor and legacy parts. The evidence shows that Andover sold in-stock HP and Compaq parts, not multi-vendor or legacy parts. <u>Pound Deposition</u> at 14, 29-30; <u>Summary Judgment Motion</u>, Exhibit 11, <u>Declaration of Diane Pound</u>, ¶ 3; <u>Summary Judgment Motion</u>, Exhibit 9, <u>Declaration of William Crowley</u>, ¶¶ 11-12; and <u>Response</u>, Exhibit 9, <u>Deposition of Richard Chizek</u> at 14-15.[4] If the

---

[4]Chizek did not differentiate between multi-vendor parts and legacy parts. He used the term "multi-vendor" parts to include all parts that were not in stock. <u>Chizek Deposition</u> at 14. One other HP employee, Chip Love, stated that Direct offered for sale

Andover center only sold in-stock HP and Compaq parts, then Midwest might not have been entitled to receive any additional gross profits even if it should have made all these additional sales. Stringer does not explain why he ignored the statements of all these witnesses.

Based on the evidence, there is no good reason to believe that Stringer's method of analysis has any reliability. His "opinions" are speculation based on assumptions. An expert's opinions must be more than pure speculation before they are admissible. <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 719 (7th Cir. 2000). The Court, therefore, agrees with HP that Stringer's opinions fail to provide any competent evidence on the issue of damages.

Even so, Midwest has enough evidence of damage to overcome summary judgment on Count I. Ellis indicates that some Direct customers were sold parts by the Andover call center. This testimony shows at least some evidence of damage. At a minimum, Midwest would be able to recover nominal damages. <u>Shirley's Realty, Inc. v. Hunt</u>, 160 S.W.3d 804,

---

the same parts that Andover offered for sale. <u>Response</u>, Exhibit 7, <u>Deposition of Chip Love</u> at 77, 79. This statement is consistent with the statements of the other witnesses since both Direct and Andover sold in-stock HP and Compaq parts. Love did not say that the Andover center offered for sale the same array of parts that Direct sold (i.e., multi-vendor and legacy parts).

808 (Mo.App. 2005) (Missouri law allows an award of nominal damages for breach of contract claims).  Summary judgment for Count I is therefore denied.

Midwest, however, has failed to present any evidence to entitle it to recover punitive damages for the possible breach of the SSA.  Punitive damages generally are not available for a breach of contract, even if the breach is intentional, willful, wanton, and malicious.  <u>Peterson v. Continental Boiler Works, Inc.</u>, 783 S.W.2d 896, 902 (Mo. 1990).  Punitive damages are only available if the breach constitutes a separate, independent tort, or if the defendant breached a fiduciary duty.  <u>Id.</u>  Midwest has failed to present any evidence that Direct's referral of parts customers to the Andover call center constituted a separate tort.  Further, there is no evidence of a fiduciary relationship between Midwest and Direct.  HP is therefore entitled to summary judgment on Count II of the Amended Counterclaim.

B.    <u>MA</u>

Midwest has failed to present any evidence of a breach of the MA.  All of the evidence indicates that once the MA terminated, HP stopped using the middleware.  There is no evidence that HP or anyone else used the

middleware thereafter. Midwest argues that other HP customers used similar computer interfaces to order products. That is true, but no evidence shows that any of these customers used the middleware. The evidence indicates that these customers had their own computer interface software for this purpose. Urwin Deposition at 64-65, 82-85; Summary Judgment Motion, Exhibit 19, Deposition of Debra Broady at 10-13; Ellis Deposition at 99-101. Midwest also cites the fact that Direct took user defined fields (UDFs) when they terminated the MA. This is correct, but UDFs were developed by Direct before it entered into the MA. Ellis Deposition at 44; Urwin Deposition at 38-44. Thus, the UDFs were not part of the middleware, and Direct did not breach the MA by keeping or using this information.

Midwest also relies on the testimony of Troy Bloomquist to attempt to show that Microsoft used the middleware. Bloomquist managed Direct until October 2003. Bloomquist testified that a Microsoft test order inadvertently flowed through to Midwest on the middleware. Response, Exhibit 3, Bloomquist Deposition at 71. This evidence does not show a breach of the MA. The test order was sent to Midwest over the middleware. The statement does not indicate that Direct used the middleware to

17

communicate with Microsoft or that Microsoft used the middleware. Since the middleware was only used to communicate an order between Direct and Midwest, there was no misappropriation.

Finally, Midwest argues that HP could use the middleware in the future. This is irrelevant. The fact that HP might violate an agreement in the future does not prove that it has done so. Midwest has not shown a breach of the MA.

C.    Tortious Interference

Last, Midwest fails to show any tortious interference. To prove tortious interference, Midwest must show, inter alia, that HP's actions were not justified. Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 398-99 (7th Cir. 2003); Toys "R" Us, Inc. v. NBD Trust Co. of Illinois, 904 F.2d 1172, 1178 (7th Cir. 1990); Waldinger Corp. v. CRS Group Engineers, Inc., 775 F.2d 781, 789 (7th Cir. 1985); see HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 157, 545 N.E.2d 672, 677 (Ill. 1989). Midwest argues that lack of justification is an element of tortious interference with contract or prospective business advantage, but not tortious interference with business relations. The Court is convinced by the cases cited above that Illinois law does not draw this distinction. A plaintiff

asserting any of these tortious interference theories must present evidence that the alleged tortfeasor's actions were not justified.

A defendant's actions are justified if the interest it sought to protect is of equal or greater value than plaintiff's interests affected by defendant's actions.  Waldinger Corp., 775 F.2d at 789; see HPI Health Care Services, Inc., 131 Ill.2d at 157, 545 N.E.2d at 677.  In this context, a competitor's actions are justified if done to protect its financial interest and if the actions are not motivated solely by spite or ill will.  See Cromeens, 349 F.3d at 398 (discussing Illinois cases on justification).

Here, the admissible evidence shows that HP contacted Direct's customers to tell them that, effective February 7, 2004, Direct would no longer take orders, and these customers should use HP's call center and web site to order HP parts.  This was clearly justified to protect its financial interest.  Direct was part of HP, and HP had a right to tell Direct's customers about the new arrangement for ordering HP parts.  HP told the customers that the change would be effective February 7, 2004, after the SSA expired.  There is no admissible evidence that HP acted out of spite or ill will.  Midwest complains that some or all of Direct's customers were also Midwest's customers.  If so, then the customers were customers of both

Midwest and Direct, and HP still had the right to contact them to tell them of the change in Direct's operations.

Midwest argues that HP routed orders to Roseville before the expiration of the SSA. The evidence is that HP set up accounts in Roseville for Direct's customers in January and February 2004, before the expiration of the SSA, and Direct instructed Midwest, on February 2, 2002, to refer customers with back orders to contact HP. Ellis Dep. at 68. The fact that HP set up accounts in Roseville before February 7, 2004, does not prove that Direct sent orders to Roseville before that date. HP's preparation of new accounts was justified and did not interfere with Midwest's customers. Further, Direct's instructions to Midwest to refer orders to Roseville did not constitute tortious interference. Direct did not contact customers, only Midwest, so there was no interference. Midwest was also free to ignore Direct's instructions.

Midwest also claims that HP told customers and suppliers not to do business with Midwest. Midwest failed to present any competent evidence that any HP representative made such statements. Midwest only presents inadmissible hearsay. See e.g., Haught Deposition at 249-63, 267-70 (statements by Midwest's president that various named and unnamed third

parties told him that HP representatives made these statements to him), and Exhibit 4, <u>Deposition of Richard Rice</u> at 112-14 (similar hearsay by Midwest's Director of Business Development).   Such hearsay is not competent to oppose a motion for summary judgment.  <u>Fed.R.Civ.P.</u> 56(e). There is no evidence of tortious interference.

THEREFORE,   Plaintiff/Counter-Defendants   Hewlett-Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V.'s Motion for Summary Judgment as to the Counterclaims Asserted by Midwest Information Technology Group, Inc. (d/e 68) is ALLOWED in part, and DENIED in part.  Partial summary judgment is entered in favor of Counter-Defendants Hewlett-Packard Development Company, L.P., Hewlett-Packard Company, and Compaq Trademark B.V. and against Counter-Plaintiff Midwest Information Technology Group, Inc., on Counts II-VI of the Amended Counterclaim.  The Motion for Summary Judgment on Count I of the Amended Counterclaim for breach of the SSA is denied.

IT IS THEREFORE SO ORDERED.

ENTER:  April 11, 2006.

FOR THE COURT:

_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE