UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

HEWLETT-PACKARD )
DEVELOPMENT COMPANY, L.P., )
HEWLETT-PACKARD COMPANY, )
and COMPAQ TRADEMARK B.V., )
)
Plaintiffs, )
)
vs. )  Civil Action No. 04-3055
)
MIDWEST INFORMATION )
TECHNOLOGY GROUP, INC. and )
MICHAEL LAUBER, )
)
Defendants. )

### DEFENDANTS/COUNTERCLAIM PLAINTIFF'S RULE 26 DISCLOSURES

Comes Now the Defendants/Counterclaim Plaintiff, **Midwest Information Technology Group, Inc. ("MITG") and Michael Lauber**, by their attorneys, **Schmiedeskamp, Robertson, Neu & Mitchell**, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure states as follows:

1. Individuals likely to have discoverable information:

    a. Individuals from Hewlett-Packard ("HP"):

    Carleton Fiorina, 3000 Hanover Street, Palo Alto, CA 94304
    Ann Livermore, 3000 Hanover Street, Palo Alto, CA 94304
    M.L. Krakauer, 2 Results Way, Marlboro, MA 01752
    Bill Crowley, 8000 Foothills Boulevard, Roseville, CA 95747
    Randy Wagner, 8000 Foothills Boulevard, Roseville, CA 95747
    Kristin Triolo, 7887 Sitio Abeto, Carlsbad, CA 92009
    Troy Bloomquist, 10810 Farnam Dr., Omaha, NE
    Chuck Schmader, 10810 Farnam Dr., Omaha, NE



1

        Linda Gretzinger, Roseville, CA 95747
        John Kading, Roseville, CA 95747
        Dan Wieland, address unknown
        Patrick Vogt, address unknown
        Jeff Hatfield, address unknown
        Sheryl Williams, address unknown
        Lynn Farlin, address unknown
        Louise Meyerfeld, address unknown
        Charlie Boyle, address unknown
        Roland Soriano, address unknown
        Jim Dupree, address unknown
        Al Karisa, address unknown
        Pete Graziano, 10810 Farnam Dr., Omaha, NE
        Sheri Ellis, address unknown
        Tony Barnett, address unknown
        Deb Brody, 10810 Farnam Dr., Omaha, NE
        Chip Love, address unknown
        Robert Calvert, 10810 Farnam Dr., Omaha, NE

    b.    Individuals from MITG:

        Ronald Haught, Jr., 4220 Kochs Lane, Quincy, IL 62305
        Teresa Koch, 4220 Kochs Lane, Quincy, IL 62305
        Michael Lauber, 4220 Kochs Lane, Quincy, IL 62305
        Richard Rice, 4220 Kochs Lane, Quincy, IL 62305
        Tony Bacott, 4220 Kochs Lane, Quincy, IL 62305
        Dulsey Hays, former employee, address unknown
        Stephanie Boden, 4220 Kochs Lane, Quincy, IL 62305
        Andrea Clarkson, 4220 Kochs Lane, Quincy, IL 62305

2.    Documents currently in the possession of Defendants/Counterclaim Plaintiff:

    a.    Defendants/Counterclaim Plaintiff hereby produce copies of documents bate stamped MITG 01- MITG 0324 which relate to the defense of the claims presented by Plaintiff as well as the claims being brought by Counterclaim Plaintiff.

3.    Damages Calculations:

    a.    Defendants/Counterclaim Plaintiff hereby produce copies of documents bate stamped MITG 01 - MITG 0324 which relate to the claims being brought by Counterclaim Plaintiff.

b.  Counterclaim Plaintiff's damages are based on the Standard Support Agreement executed by the parties, the BCO Matrices of the Parts Business Center Operations (PBCO), the Middleware Agreement executed by the parties, and all documents being produced herein by Counterclaim Plaintiff. Further, Counterclaim Plaintiff affirmatively states that the entire scope of the documents evidencing its damages are in the possession of the Counterclaim Defendants.

At this time, the computation of MITG's damages for HP's breach of the Standard Support Agreement is based on the average sales calls diverted by HP away from MITG for the year 2003. In reviewing the limited PBCO Matrices in possession of Counterclaim Plaintiff to establish the average number of calls diverted, Counterclaim Plaintiff states that this number appears to be 4,000 calls per day. Of the 4,000 average calls per day diverted away from MITG to HP, approximately one-half led to service orders. Based on HP's own records, the daily service orders produced an average daily sales revenue of $500,000. For 2003, these sales total $120,000,000. Based upon the profit sharing arrangements contained within the Standard Support Agreement, MITG's damages are equal to 75% of the gross profits on $120,000,000. Counterclaim Plaintiff reserves the right to amend its alleged damages and computation as discovery progresses and the entire documentation is produced in this case evidencing the diverted calls for the years 2002 and 2004.

MITG is also alleging damages for Counterclaim Defendants' breach of the Middleware Agreement entered into between the parties. MITG is alleging damages for the continued and intentional breach of the Middleware Agreement by Counterclaim Defendants. HP is/was using the Middleware software in contrast to the terms of the agreement to interface orders with its customers. This use is in direct violation of the Middleware Agreement which is the sole and exclusive property of MITG and MITG had and has not consented to such use. Counterclaim Plaintiff will supplement its computation of damages as the case progresses and HP produces documents within its possession relative to the allegations regarding its unauthorized use of the Middleware software.

Lastly, MITG is alleging damages in the sum of $2,000,000 for the expenditures incurred by MITG in building a new facility based upon the representations of Counterclaim Defendants as to the amount of volume that would be experienced by MITG in furtherance of the Standard Support Agreement entered into between the two parties.

4.  Insurance Agreement:

    Defendants/Counterclaim Plaintiff state that there is no insurance agreement from any insurance business which may be liable to satisfy part or all of the judgment which may be entered in this action.

MIDWEST INFORMATION TECHNOLOGY<br>
GROUP, INC., and MICHAEL LAUBER<br>
Defendants/Counterclaim Plaintiff

By: _____
                    One of their Attorneys

Delmer R. Mitchell
James A. Hansen
Schmiedeskamp, Robertson, Neu & Mitchell
Attorneys for Defendant/Counterclaim Plaintiff
525 Jersey
P.O. Box 1069
Quincy, Illinois   62306
Telephone:  217-223-3030
Facsimile:  217-223-1005

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V., <br><br> Plaintiffs, <br><br> vs. <br><br> MIDWEST INFORMATION TECHNOLOGY GROUP, INC. and MICHAEL LAUBER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 04-3055 |

## CERTIFICATE OF SERVICE

I, the undersigned, on the __30__ day of __JUNE__, 2004, deposited a copy of Defendants'/Counterclaim Plaintiff's Rule 26(a)(1) Disclosures, postage prepaid, in the United States Mail, addressed to all counsel of record listed below:

Ms. Elizann Carroll
Thompson & Knight, LLP
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201-4693

Mr. Scott Spooner
Heyl, Royster, Voelker & Allen
Suite 575, National City Center
1 North Old State Capitol Plaza
Springfield, IL 62705-1687

_____
One of the Attorneys for the Defendants

Delmer R. Mitchell
James A. Hansen
Schmiedeskamp, Robertson, Neu & Mitchell
Attorneys for Defendants/Counterclaim Plaintiff
525 Jersey
P.O. Box 1069
Quincy, Illinois  62306
Telephone:  217-223-3030
Facsimile:   217-223-1005

```
Post-It® Fax Note    7671   Date 3/8/04  # of pages ▶ 19
To JIM SIKMIHERS           From ML KRAKAUER
Co./Dept.                  Co.
Phone #                    Phone # 508-467-2150
Fax # 281-518-7188         Fax # 508-467-2153
```

**Schmiedeskamp, Robert**
LAWYE
528 JES
P.O. BOX

RICHARD B. NEU
DELMER R. MITCHELL
DENNIS W. GORMAN
WILLIAM G. KELLER, JR.
WILLIAM M. McCLEERY, JR.
TED M. NIEMANN
GENA J. AWERKAMP*
BRETT K. GORMAN*
HAROLD B. OAKLEY*
MICHAEL A. BICKHAUS*
DAVID G. PENN
JAMES A. HANSEN*
GREGORY A. PRATT
ANDREW K. CASHMAN*
MELINDA S. MADISON**
MAREC E. EDGAR

*ALSO LICENSED IN MISSOURI
**ALSO LICENSED IN NEW YORK

**Quincy, Illinois**
62306

(217) 223-3030

FAX (217) 223-1005

www.smrm.com

F.E.I.N. 37-0870873

March 5, 2004

Ms. Carleton S. Fiorina
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304-1112

Re:   Midwest Information Technology Group ("MITG")

Dear Ms. Fiorina:

We have been retained by Midwest Information Technology Group, Inc. ("MITG") regarding the Standard Support Agreement MITG entered into with Compaq Direct, Inc. ("CDI") on February 7, 2002 and the Middleware Agreement MITG entered into with CDI on February 8, 2002. The Standard Support Agreement was terminated by Hewlett-Packard ("HP") by way of correspondence from Ms. Kristin Triolo dated October 30, 2003. Attached, as Exhibit 1, is a copy of that letter for your convenience.

HP has breached both the Standard Support Agreement and the Middleware Agreement in numerous ways. What follows herein is MITG's demands upon HP as successor to CDI based upon those breaches which are fully explained and set forth herein.

<u>**STANDARD SUPPORT AGREEMENT**</u>

On February 7, 2002 MITG and CDI entered into the Standard Support Agreement (Exhibit 2). Under the terms thereof, MITG agreed to provide CDI with computer related support services, which included, but were not limited to, computer parts sales, computer hardware maintenance and repair. The services were offered to CDI's end users, customers, companies and commercial entities either directed or referred by CDI to MITG. In return for the services performed and parts supplied by MITG, CDI agreed to pay MITG pursuant to the terms and conditions of the Agreement.

On or about May 3, 2002 HP merged with Compaq and assumed the rights and obligations of the Standard Support Agreement. The Support Agreement contains an **exclusivity** clause whereby HP gave MITG the exclusive right to provide parts and services to HP's customers. Consistent with that exclusivity, MITG was given a service level schedule and guarantee. In

*1914 · Celebrating 90 Years of Service to Our Valued Clients · 2004*

EXHIBIT
B

𝕾𝖈𝖍𝖒𝖎𝖊𝖉𝖊𝖘𝖐𝖆𝖒𝖕, 𝕽𝖔𝖇𝖊𝖗𝖙𝖘𝖔𝖓, 𝕹𝖊𝖚 & 𝕸𝖎𝖙𝖈𝖍𝖊𝖑𝖑

Letter to Carleton S. Fiorina
March 5, 2004
Page 2

consideration for MITG maintaining its call service centers, HP guaranteed a minimum fee payment to MITG each month for basic telephone service calls based upon either four hundred (400) calls per day or Forty-one Thousand Dollars ($41,000) per month, whichever was greater. If MITG received more than the minimum four hundred (400) calls per day, creating a balance due above and beyond Forty-one Thousand Dollars ($41,000) in a given month, HP was obligated to pay MITG the additional sum due on the first day of the following month.

Based on the representations conveyed to MITG from Hewlett-Packard ("HP")(formerly CDI) when the contract was entered as to the volume of calls MITG would be called upon to support, MITG moved its operations to a new facility. The construction of the new facility was based on the reliance that MITG would be called upon to support the number of calls that were later discovered intentionally diverted to HP's own service center in Roseville, California. MITG relied upon the representations of HP when MITG invested $2,000,000 in its new facility to allow it to perform under the contract.

HP breached the terms of the Standard Support Agreement throughout the term of the Agreement. Specifically, despite the exclusivity clause and contrary thereto, HP diverted calls away from the MITG Support Center beginning in 2003 or earlier. Calls that should have gone to MITG, per the Standard Support Agreement, were diverted by HP from MITG to HP's own service center in Roseville, California ("Roseville").

The calls per day for the Parts Business Center Operations at Roseville (based on HP's own Parts Business Center Operations Matrices for the year 2003) establish the average number of calls to Roseville at four thousand (4,000) calls per day. Of the four thousand (4,000) average calls per day to Roseville, one half led to service orders. Based on HP's records, the daily service orders, in turn, produced an average daily sales revenue of Five Hundred Thousand Dollars ($500,000) through Roseville. For 2003, these sales total $120,000,000.00 all of which should have been generated through MITG's Support Center, but for the calls having been diverted by HP to Roseville. We suggest you review the BCO Matrix of the Parts Business Center Operations. This report is compiled and distributed by Randy Wagner's group. Upon your review of the documents for the year 2003 you will be able to confirm our numbers.

By contrast, the average daily calls handled by MITG for the year 2003 were approximately Two Hundred Eighty-Seven (287). By diverting calls that were the exclusive right of MITG under the Standard Support Agreement to its own facility in Roseville, HP directly violated the exclusivity clause of the Standard Support Agreement. Further, MITG brought these actions to the attention of Bill Crowley at HP. HP knowingly and intentionally continued to divert sales calls after the intentional acts violating the contract were brought to HP's attention. HP continued its cover up of these actions up to and including the date of termination even after said actions had been brought to HP's attention.

**Schmiedeskamp, Robertson, Neu & Mitchell**

Letter to Carleton S. Fiorina
March 5, 2004
Page 3

By way of this action, HP acted in bad faith and intentionally and fraudulently attempted to cut MITG out of its contract rights. HP's actions unlawfully and substantially harmed, hindered and negated the business opportunity of MITG in fulfilling the orders that were its exclusive right under the Standard Support Agreement. By virtue of HP's intentional wrongful actions in breaching the Standard Support Agreement, HP profited greatly to the detriment of MITG, thus irreparably harming a small business partner. The intentional bad faith actions on behalf of HP subject HP to substantial punitive damages.

As a result of HP's default and breach of the Standard Support Agreement, HP substantially harmed, hindered and negated MITG's business opportunity to fulfill the orders that were its exclusive right under the Standard Support Agreement. By virtue of HP's wrongful actions, HP profited greatly to the detriment of MITG.

MITG has direct and substantial evidence that the calls to HP's Roseville facility increased substantially beginning in January 2003 up to and including the date of termination of the Standard Support Agreement. In addition, calls may have been diverted away from MITG by HP as early as 2002. Therefore, at a minimum for 2003 alone, based on the profit sharing arrangement contained within the Standard Support Agreement MITG's damages are equal to Seventy-Five percent (75%) of the gross profits on One Hundred Twenty Million Dollars ($120,000,000) in gross revenue intentionally diverted away from MITG to Roseville.

## MIDDLEWARE AGREEMENT

On February 8, 2002 MITG and CDI entered into a Middleware Agreement. Under the terms thereof, MITG developed software that linked together the parties' web tools and created an interface that sent orders from MITG's web tool directly into Compaq's VISTA-Order Entry System. (Exhibit 3). By means of this "Middleware", after an order was reviewed, released and credit approval obtained, the system would submit an order acknowledgment to the parties' web tools. The Middleware Agreement was entered into for a period of two (2) years. Thereafter, the Agreement automatically continued for a period of one (1) year and from year to year thereafter unless one (1) of the parties gave notice to the other not less than ninety (90) days prior to the end of the then current year that the party desired to terminate the Middleware Agreement. To date, neither party has given such termination notice. Therefore, the Middleware Agreement continues in effect until at least February 8, 2005. In short, the Middleware Agreement remains in full force and effect between MITG and HP as of this date.

The Middleware Agreement specifically provides that HP shall not modify, revise or sublicense the Middleware to others or use the Middleware for the benefit of any parties other than MITG without MITG's prior written consent. Further, the Middleware and all information and documentation relating thereto is to be held in confidence by HP, its subsidiaries and affiliates and

Schmiedeskamp, Robertson, Neu & Mitchell

Letter to Carleton S. Fiorina
March 5, 2004
Page 4

cannot be disclosed to third-parties without MITG's prior written consent. Under the Agreement, HP acknowledges the Middleware is the sole and exclusive property of MITG and that HP has no rights to its ownership or use except as expressly provided in the Agreement.

Despite the aforesaid prohibitions, HP has directly violated and continues to directly violate the Middleware Agreement by using the Middleware with and for other of its customers, all without MITG's prior approval or consent. MITG has first hand knowledge and evidence that HP is using the Middleware created by MITG for HP's benefit and that HP has appropriated the Middleware for use with third parties which have been and now are conducting business with HP. HP has done so without obtaining any prior written consent of MITG. More specifically, it is MITG's understanding that the Middleware is being used, contrary to the terms of the Middleware Agreement, by HP to interface orders placed by such customers as UPS, Microsoft, etc. Since the Middleware is the sole and exclusive property of MITG and MITG has not consented to such use, HP is in breach of the Middleware Agreement.

**DEMAND**

As set forth above, HP has breached both the Standard Support Agreement and the Middleware Agreement referenced herein. It is clear from HP's own documentation that approximately One Hundred Twenty Million Dollars ($120,000,000) in parts sales revenues were intentionally diverted away from MITG to HP's own facility in Roseville. It is also clear, as outlined above, that HP has and continues to violate the Middleware Agreement which remains in full force and effect by using the Middleware without MITG's consent, to communicate and do business with outside third parties.

To remedy these breaches, MITG is fully prepared to exercise all legal remedies and rights available should it become necessary to do so. However, in an effort to avoid litigation on behalf of both parties, MITG hereby demands in full and final settlement of all causes of action and potential causes of action under the Standard Support Agreement and the Middleware Agreement the sum of Seventy-five Million Dollars ($75,000,000). In return, MITG is prepared to execute separate Releases of All Claims pertaining to the Standard Support Agreement and the Middleware Agreement. As part of such settlement, MITG would also agree to execute documentation effectively terminating the Middleware Agreement as well as authorizing HP to use the Middleware. In addition, MITG would turnover or assign to HP the various domain names as previously demanded by HP.

Based on HP's continued violation of the Middleware Agreement still in full force and effect, time is of the essence in receiving a response from HP. Therefore, the above settlement demand shall remain open up to and including March 15, 2004. If we have not received a response from HP by 5:00 p.m. Central Standard Time on Monday, March 15, 2004 we will proceed with all legal remedies available to MITG. This would include, without limitation, seeking arbitration of

𝕾𝖈𝖍𝖒𝖎𝖊𝖉𝖊𝖘𝖐𝖆𝖒𝖕, 𝕽𝖔𝖇𝖊𝖗𝖙𝖘𝖔𝖓, 𝕹𝖊𝖚 & 𝕸𝖎𝖙𝖈𝖍𝖊𝖑𝖑

Letter to Carleton S. Fiorina
March 5, 2004
Page 5

MITG's damages for HP's breach of the Standard Support Agreement as well as seeking to enjoin HPs continued use of the Middleware in violation of the Middleware Agreement.

By its actions, HP has materially and substantially damaged a small business, MITG, with which HP had two (2) binding and enforceable agreements. MITG's Call Center sits half empty, jobs that should have been created are lost. MITG's losses are significant.

Thank you for your attention to this matter and we look forward to hearing from you. Also, should you have any questions concerning MITG's position or its proposed settlement as outlined above, please feel free to contact me.

Yours truly,

Schmiedeskamp, Robertson, Neu & Mitchell

Delmer R. Mitchell

DRM/emp
Enclosure
CC: Ronald D. Haught, Jr.
    Molly Buck Richard
    M.L. Krakauer
    Anne Livermore
    Randy Wagner
    Bill Crowley