E-FILED
Thursday, 22 June, 2006 04:07:01 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ TRADEMARK B.V., </br></br>Plaintiffs, </br></br>vs. </br></br>MIDWEST INFORMATION TECHNOLOGY GROUP, INC., </br></br>Defendant. | ) ) ) ) ) ) ) ) ) Civil Action No. 04-3055 ) ) ) ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT MOTION IN LIMINE TO BAR EVIDENCE RELATED TO SETTLEMENT NEGOTIATIONS

COMES NOW the Defendant/Counterclaim Plaintiff, **Midwest Information Technology Group, Inc.** ("MITG"), by and through its attorneys, **Schmiedeskamp, Robertson, Neu & Mitchell**, and submits this memorandum of law in support of its motion in limine to bar evidence related to settlement negotiations.

### INTRODUCTION

On March 5, 2004, MITG's counsel forwarded a letter to HP outlining MITG's settlement position and making a settlement demand of HP. A copy of this letter is attached as <u>Exhibit A</u>. HP has identified this letter on its Exhibit List, and it is presumed HP seeks to admit the March 5, 2004 settlement letter into evidence to demonstrate MITG's initial damages claim and compare it to MITG's current position. The Federal Rules of Evidence prohibit the use of evidence relating to settlement negotiations in situations such as this, and HP should not be permitted to rely on such evidence at trial.

1

## ARGUMENT

Rule 408 of the Federal Rules of Evidence states:

"Evidence of accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible."

Fed. R. Evid. 408.

Rule 408 authorizes this court to exclude settlement letters. See Fed. R. Evid. 408; New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1482 (7th Cir. 1990); Reagan v. First UNUM Life Ins. Co., 39 F. Supp. 2d 1121, 1127 (C.D. Ill. 1999).

The letter HP seeks to admit is clearly a settlement letter. In the letter, MITG outlined its position in this matter and agreed to accept payment of a certain monetary amount as consideration in compromising or attempting to compromise its claim against HP. HP cannot use that letter to demonstrate liability (or the lack thereof), the alleged invalidity of MITG's claims against it, or the alleged invalidity of the amount of any damages claimed by MITG. Fed. R. Evid. 408; see also Reagan, 39 F. Supp. 2d at 1126-1127.

WHEREFORE, Defendant/Counterclaim Plaintiff, **Midwest Information Technology Group, Inc.**, requests that this court exclude the March 5, 2004 letter (and any other evidence obtained during settlement negotiations offered to prove liability or the validity or invalidity of claims or damages) pursuant to Fed. R. Evid. 408.

2

                MIDWEST INFORMATION TECHNOLOGY
                GROUP, INC.,
                Defendant/Counterclaim Plaintiff


s/           James A. Hansen
    James A. Hansen IL Bar #6244534
    Attorney for Defendant/Counterclaim Plaintiff,
    Midwest Information Technology Group, Inc.
    Schmiedeskamp, Robertson, Neu & Mitchell
    525 Jersey Street, P. O. Box 1069
    Quincy, IL 62306-1069
    Telephone: (217) 223-3030
    Facsimile: (217) 223-1005
    E-mail: jhansen@srnm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Molly Buck Richard
>The Richard Law Group
>8411 Preston Road, Suite 890
>Dallas, TX 75201-4693
>
>Elizann Carroll
>Juneau, Boll & Ward
>15301 Spectrum Drive, Suite 300
>Addison, TX 75001
>
>Scott Spooner
>Heyl, Royster, Voelker & Allen
>Suite 575, National City Center
>1 North Old State Capitol Plaza
>P.O. Box 1687
>Springfield, IL 62705-1687

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

>s/_____James A. Hansen_____
>James A. Hansen IL Bar #6244534
>Attorney for Defendant/Counterclaim Plaintiff,
>Midwest Information Technology Group, Inc.
>Schmiedeskamp, Robertson, Neu & Mitchell
>525 Jersey Street, P. O. Box 1069
>Quincy, IL 62306-1069
>Telephone: (217) 223-3030
>Facsimile: (217) 223-1005
>E-mail: jhansen@srnm.com

# Schmiedeskamp, Robertson, Neu & Mitchell
### LAWYERS

RICHARD B. NEU
DELMER R. MITCHELL
DENNIS W. GORMAN
WILLIAM G. KELLER, JR.
WILLIAM M. McCLEERY, JR.
TED M. NIEMANN
GENA J. AWERKAMP*
BRETT K. GORMAN*
HAROLD B. OAKLEY*
MICHAEL A. BICKHAUS*
DAVID G. PENN
JAMES A. HANSEN*
GREGORY A. PRATT
ANDREW K. CASHMAN*
MELINDA S. MADISON**
MAREC E. EDGAR

*ALSO LICENSED IN MISSOURI
**ALSO LICENSED IN NEW YORK

525 JERSEY
P.O. BOX 1069
Quincy, Illinois
62306

CARL G. SCHMIEDESKAMP (1898-1987)
JOHN T. ROBERTSON (1916-1995)

(217) 223-3030

FAX (217) 223-1005

www.srnm.com

F.E.I.N. 37-0670873

March 5, 2004

Ms. Carleton S. Fiorina
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304-1112

Re:   Midwest Information Technology Group ("MITG")

Dear Ms. Fiorina:

We have been retained by Midwest Information Technology Group, Inc. ("MITG") regarding the Standard Support Agreement MITG entered into with Compaq Direct, Inc. ("CDI") on February 7, 2002 and the Middleware Agreement MITG entered into with CDI on February 8, 2002. The Standard Support Agreement was terminated by Hewlett-Packard ("HP") by way of correspondence from Ms. Kristin Triolo dated October 30, 2003. Attached, as Exhibit 1, is a copy of that letter for your convenience.

HP has breached both the Standard Support Agreement and the Middleware Agreement in numerous ways. What follows herein is MITG's demands upon HP as successor to CDI based upon those breaches which are fully explained and set forth herein.

### STANDARD SUPPORT AGREEMENT

On February 7, 2002 MITG and CDI entered into the Standard Support Agreement (Exhibit 2). Under the terms thereof, MITG agreed to provide CDI with computer related support services, which included, but were not limited to, computer parts sales, computer hardware maintenance and repair. The services were offered to CDI's end users, customers, companies and commercial entities either directed or referred by CDI to MITG. In return for the services performed and parts supplied by MITG, CDI agreed to pay MITG pursuant to the terms and conditions of the Agreement.

On or about May 3, 2002 HP merged with Compaq and assumed the rights and obligations of the Standard Support Agreement. The Support Agreement contains an **exclusivity** clause whereby HP gave MITG the exclusive right to provide parts and services to HP's customers. Consistent with that exclusivity, MITG was given a service level schedule and guarantee. In

*1914 · Celebrating 90 Years of Service to Our Valued Clients · 2004*

EXHIBIT A

𝔖𝔠𝔥𝔪𝔦𝔢𝔡𝔢𝔰𝔨𝔞𝔪𝔭, 𝔎𝔬𝔟𝔢𝔯𝔱𝔰𝔬𝔫, 𝔑𝔢𝔲 & 𝔐𝔦𝔱𝔠𝔥𝔢𝔩𝔩

Letter to Carleton S. Fiorina
March 5, 2004
Page 2

consideration for MITG maintaining its call service centers, HP guaranteed a minimum fee payment to MITG each month for basic telephone service calls based upon either four hundred (400) calls per day or Forty-one Thousand Dollars ($41,000) per month, whichever was greater. If MITG received more than the minimum four hundred (400) calls per day, creating a balance due above and beyond Forty-one Thousand Dollars ($41,000) in a given month, HP was obligated to pay MITG the additional sum due on the first day of the following month.

Based on the representations conveyed to MITG from Hewlett-Packard ("HP")(formerly CDI) when the contract was entered as to the volume of calls MITG would be called upon to support, MITG moved its operations to a new facility. The construction of the new facility was based on the reliance that MITG would be called upon to support the number of calls that were later discovered intentionally diverted to HP's own service center in Roseville, California. MITG relied upon the representations of HP when MITG invested $2,000,000 in its new facility to allow it to perform under the contract.

HP breached the terms of the Standard Support Agreement throughout the term of the Agreement. Specifically, despite the exclusivity clause and contrary thereto, HP diverted calls away from the MITG Support Center beginning in 2003 or earlier. Calls that should have gone to MITG, per the Standard Support Agreement, were diverted by HP from MITG to HP's own service center in Roseville, California ("Roseville").

The calls per day for the Parts Business Center Operations at Roseville (based on HP's own Parts Business Center Operations Matrices for the year 2003) establish the average number of calls to Roseville at four thousand (4,000) calls per day. Of the four thousand (4,000) average calls per day to Roseville, one half led to service orders. Based on HP's records, the daily service orders, in turn, produced an average daily sales revenue of Five Hundred Thousand Dollars ($500,000) through Roseville. For 2003, these sales total $120,000,000.00 all of which should have been generated through MITG's Support Center, but for the calls having been diverted by HP to Roseville. We suggest you review the BCO Matrix of the Parts Business Center Operations. This report is compiled and distributed by Randy Wagner's group. Upon your review of the documents for the year 2003 you will be able to confirm our numbers.

By contrast, the average daily calls handled by MITG for the year 2003 were approximately Two Hundred Eighty-Seven (287). By diverting calls that were the exclusive right of MITG under the Standard Support Agreement to its own facility in Roseville, HP directly violated the exclusivity clause of the Standard Support Agreement. Further, MITG brought these actions to the attention of Bill Crowley at HP. HP knowingly and intentionally continued to divert sales calls after the intentional acts violating the contract were brought to HP's attention. HP continued its cover up of these actions up to and including the date of termination even after said actions had been brought to HP's attention.

𝔖𝔠𝔥𝔪𝔦𝔢𝔡𝔢𝔰𝔨𝔞𝔪𝔭, 𝔅𝔬𝔟𝔢𝔯𝔱𝔰𝔬𝔫, 𝔑𝔢𝔲 & 𝔐𝔦𝔱𝔠𝔥𝔢𝔩𝔩

Letter to Carleton S. Fiorina
March 5, 2004
Page 3

By way of this action, HP acted in bad faith and intentionally and fraudulently attempted to cut MITG out of its contract rights. HP's actions unlawfully and substantially harmed, hindered and negated the business opportunity of MITG in fulfilling the orders that were its exclusive right under the Standard Support Agreement. By virtue of HP's intentional wrongful actions in breaching the Standard Support Agreement, HP profited greatly to the detriment of MITG, thus irreparably harming a small business partner. The intentional bad faith actions on behalf of HP subject HP to substantial punitive damages.

As a result of HP's default and breach of the Standard Support Agreement, HP substantially harmed, hindered and negated MITG's business opportunity to fulfill the orders that were its exclusive right under the Standard Support Agreement. By virtue of HP's wrongful actions, HP profited greatly to the detriment of MITG.

MITG has direct and substantial evidence that the calls to HP's Roseville facility increased substantially beginning in January 2003 up to and including the date of termination of the Standard Support Agreement. In addition, calls may have been diverted away from MITG by HP as early as 2002. Therefore, at a minimum for 2003 alone, based on the profit sharing arrangement contained within the Standard Support Agreement MITG's damages are equal to Seventy-Five percent (75%) of the gross profits on One Hundred Twenty Million Dollars ($120,000,000) in gross revenue intentionally diverted away from MITG to Roseville.

## MIDDLEWARE AGREEMENT

On February 8, 2002 MITG and CDI entered into a Middleware Agreement. Under the terms thereof, MITG developed software that linked together the parties' web tools and created an interface that sent orders from MITG's web tool directly into Compaq's VISTA-Order Entry System. (Exhibit 3). By means of this "Middleware", after an order was reviewed, released and credit approval obtained, the system would submit an order acknowledgment to the parties' web tools. The Middleware Agreement was entered into for a period of two (2) years. Thereafter, the Agreement automatically continued for a period of one (1) year and from year to year thereafter unless one (1) of the parties gave notice to the other not less than ninety (90) days prior to the end of the then current year that the party desired to terminate the Middleware Agreement. To date, neither party has given such termination notice. Therefore, the Middleware Agreement continues in effect until at least February 8, 2005. In short, the Middleware Agreement remains in full force and effect between MITG and HP as of this date.

The Middleware Agreement specifically provides that HP shall not modify, revise or sublicense the Middleware to others or use the Middleware for the benefit of any parties other than MITG without MITG's prior written consent. Further, the Middleware and all information and documentation relating thereto is to be held in confidence by HP, its subsidiaries and affiliates and

𝔖𝔠𝔥𝔪𝔦𝔢𝔡𝔢𝔰𝔨𝔞𝔪𝔭, 𝔎𝔬𝔟𝔢𝔯𝔱𝔰𝔬𝔫, 𝔑𝔢𝔲 & 𝔐𝔦𝔱𝔠𝔥𝔢𝔩𝔩

Letter to Carleton S. Fiorina
March 5, 2004
Page 4

cannot be disclosed to third-parties without MITG's prior written consent. Under the Agreement, HP acknowledges the Middleware is the sole and exclusive property of MITG and that HP has no rights to its ownership or use except as expressly provided in the Agreement.

Despite the aforesaid prohibitions, HP has directly violated and continues to directly violate the Middleware Agreement by using the Middleware with and for other of its customers, all without MITG's prior approval or consent. MITG has first hand knowledge and evidence that HP is using the Middleware created by MITG for HP's benefit and that HP has appropriated the Middleware for use with third parties which have been and now are conducting business with HP. HP has done so without obtaining any prior written consent of MITG. More specifically, it is MITG's understanding that the Middleware is being used, contrary to the terms of the Middleware Agreement, by HP to interface orders placed by such customers as UPS, Microsoft, etc. Since the Middleware is the sole and exclusive property of MITG and MITG has not consented to such use, HP is in breach of the Middleware Agreement.

## DEMAND

As set forth above, HP has breached both the Standard Support Agreement and the Middleware Agreement referenced herein. It is clear from HP's own documentation that approximately One Hundred Twenty Million Dollars ($120,000,000) in parts sales revenues were intentionally diverted away from MITG to HP's own facility in Roseville. It is also clear, as outlined above, that HP has and continues to violate the Middleware Agreement which remains in full force and effect by using the Middleware without MITG's consent, to communicate and do business with outside third parties.

To remedy these breaches, MITG is fully prepared to exercise all legal remedies and rights available should it become necessary to do so. However, in an effort to avoid litigation on behalf of both parties, MITG hereby demands in full and final settlement of all causes of action and potential causes of action under the Standard Support Agreement and the Middleware Agreement the sum of Seventy-five Million Dollars ($75,000,000). In return, MITG is prepared to execute separate Releases of All Claims pertaining to the Standard Support Agreement and the Middleware Agreement. As part of such settlement, MITG would also agree to execute documentation effectively terminating the Middleware Agreement as well as authorizing HP to use the Middleware. In addition, MITG would turnover or assign to HP the various domain names as previously demanded by HP.

Based on HP's continued violation of the Middleware Agreement still in full force and effect, time is of the essence in receiving a response from HP. Therefore, the above settlement demand shall remain open up to and including March 15, 2004. If we have not received a response from HP by 5:00 p.m. Central Standard Time on Monday, March 15, 2004 we will proceed with all legal remedies available to MITG. This would include, without limitation, seeking arbitration of

𝔖𝔠𝔥𝔪𝔦𝔢𝔡𝔢𝔰𝔨𝔞𝔪𝔭, 𝔕𝔬𝔟𝔢𝔯𝔱𝔰𝔬𝔫, 𝔑𝔢𝔲 & 𝔐𝔦𝔱𝔠𝔥𝔢𝔩𝔩

Letter to Carleton S. Fiorina
March 5, 2004
Page 5

MITG's damages for HP's breach of the Standard Support Agreement as well as seeking to enjoin HPs continued use of the Middleware in violation of the Middleware Agreement.

By its actions, HP has materially and substantially damaged a small business, MITG, with which HP had two (2) binding and enforceable agreements. MITG's Call Center sits half empty, jobs that should have been created are lost. MITG's losses are significant.

Thank you for your attention to this matter and we look forward to hearing from you. Also, should you have any questions concerning MITG's position or its proposed settlement as outlined above, please feel free to contact me.

Yours truly,

Schmiedeskamp, Robertson, Neu & Mitchell

Delmer R. Mitchell

DRM/emp
Enclosure
CC: Ronald D. Haught, Jr.
    Molly Buck Richard
    M.L. Krakauer
    Anne Livermore
    Randy Wagner
    Bill Crowley